**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Key West Division**

**CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN**

**TREAVOR EIMERS**, as Personal Representative of
the Estate of Charles Eimers, Deceased,

        Plaintiff,

vs.

**CITY OF KEY WEST**, a Florida municipality;
**HENRY DEL VALLE**, an Officer with the City of
Key West's Police Department, *et al.,*

        Defendants.

_____/

## PLAINTIFF'S MOTION FOR SANCTIONS AGAINST SPECIFIC DEFENDANTS AND REQUEST FOR HEARING / ORAL ARGUMENT

Pursuant to Local Rule 7.1 for the United States District Court, Southern District of Florida, Rule 37, Fed.R.Civ.P., and this Court's inherent powers, Plaintiff TREAVOR EIMERS, as Personal Representative of the Estate of his father CHARLES EIMERS, requests that sanctions, including the ultimate sanction of default, be entered by this Court against **Defendants, City of Key West, Francisco Zamora, Gary Lovette, Gabriel Garrido, Thaddeus Calvert, Nicholas Galbo, Henry del Valle, Gustavo Medina and Kathy Ann Wanciak** and requests oral argument upon the following grounds:[1]

            \* \* \*

*Mr. Eimers could breathe at all times, did not suffocate and was not hit, punched or tased.  Rather, Charles Eimers actively resisted attempts to arrest him, suddenly collapsed, was given first aid as soon as he suddenly became unconscious, and was rendered unconscious not because of any improper police force, but by his own physical frailty.  Further, because he collapsed, he never was in custody and was free to leave the hospital any time after recovering from his comatose condition.*

            \* \* \*

---

[1]     Contemporaneously with this Motion Plaintiff is filing a separate Motion seeking permission to file / hand deliver certain video and audio recorded evidence that are Exhibits to this Motion.  They include two bystanders' cellphone and digital camera videos of the event; the Taser Cam™ footage, and the COM1 and COM2 recordings.

This is and has been the *official* City of Key West defensive line, collectively and individually, by and among all Defendants, whether delivered in or out of Court and regardless of any oath to tell the truth in these proceedings.  The Defendants have attempted to fortify the above-stated official position and to destroy any meaningful opportunity to challenge it by committing perjury and engaging in an orchestrated, ongoing pattern of spoliation and the destruction of material evidence.  The Defendants' post-incident actions, including those committed during the pendency of these proceedings, defile and disrespect the very purpose and function of our judicial system.  This statement is not lightly made and, unfortunately for all who place their trust in the law and our justice system, its truth is abundantly clear.

<u>**SPOLIATION, THE DESTRUCTION OF EVIDENCE**</u>
<u>**AND PERJURY:  An Introduction**</u>

Gone … "missing" … are key transmissions on the City's CAD computer and audio recorded dispatch system.  The audio recorded statement of and ability to identify the officer who admitted "SUSPECT TASED" *never* have been produced.  Gone are the initial several minutes of Officer Gary Lovette's Taser Cam™ video and audio footage, -- the footage of the actual physical encounter with Charles Eimers; -- the encounter that is at the very heart of this litigation!  The edited version of what Plaintiff received only has Officer Lovette, after the fact, sometime later that day, <u>**admitting**</u> that during the encounter he ***"dropped like a f***ing bomb on his [Eimers'] head";*** that ***"[h]e [Eimers] has blunt force trauma on his head from me"*** and that ***"I tased a mother f***er in custody today."***[2]  Gone are the Dash-Cam recordings from officers who either chose to disobey Sgt. Francisco Zamora's order to activate their Dash-Cams so that evidence would be preserved, or who thought they were recording but apparently were not.  With one very limited exception, also gone, … missing, … are the COBAN / ICOP wireless recordings that would have been captured by the body microphones provided to all of the officers.  According to some

---

[2]    **Exhibit 1,** Officer Lovette's Edited Taser Cam™ Recording.  Several but not all of his admissions thereon are:
   "…easier for us to bury him" – 47 seconds
   "I just tased a mother f***er in custody" – 35:52
   "I dropped like a f***ing bomb on his head" – 1:07:42
   "Blunt force trauma to the head from me" – 1:07:22
   "We killed him so you don't have to worry about it" – 1:09:08

officers at least, they did not use their microphone because their "battery was not charged."[3]  These recordings, all of them, would have been public record.  These devices were paid for with taxpayer dollars and/or confiscated drug money.  They should have been used.  They should have been preserved.  These devices and their recordings are for the protection of the victim, whether they be an officer or a citizen.  Yet in this case, all of them, *conveniently,* are "missing."

      With key video and audio recorded evidence of the Officers' physical encounter with Charles Eimers "missing", and the Officers' pact to tell the same story, Defendants' perceived risk associated with perjury in any potential criminal or civil litigation arising from the Eimers incident was nill.[4]

### A.  <u>Defendants' Perjury.</u>

      Defendants have at all times falsely denied that they utilized unreasonable force, including that they never discharged one or more Tasers onto the body of Charles Eimers, that Officer Lovette never was seen "*dropping like a f\*ing bomb on Eimers' head*", (despite the blood on Eimers right ear and cheek and Lovette's left hand), and that Mr. Eimers' face never was pressed into the sand in a way that could cause him either to stop breathing, stop the functioning of his heart, or both.  As part of their denials, the Defendants attempted to control the flow of information and cover up the actual events by not allowing certain evidence within their sole possession and control to be seen.  Despite the fact that Defendants have had every opportunity to amend the record in this Court, in the public domain and in their conscience, they have refused, all of them, despite the penalty of perjury and notwithstanding their respective roles as officers of the Court, and protectors of all that is just.

      Plaintiff's counsel took the sworn depositions of Officers Gary Lovette, Gabriel Garrido, Thaddeus Calvert, Henry Del Valle, Nicholas Galbo, Gustavo Medina, Matthew Johnson, Derek Wallis, Todd Stevens, Pablo Rodriguez, Francisco Zamora, and Kathy Ann Wanciak, who testified

---

[3]     **Exhibit 2,** Depo. Kathy Ann (KA) Wanciak, p. 36 "If my mic had charged, I would have loved to have had the mic on for the whole thing."

[4]     On Officer Lovette's recorded TaserCam footage is heard another officer, Plaintiff believes, Officer Garrido saying that ***"We're all going to have to do supplements.  Let's get together and work that sh\*t out."***  *See*, **Exhibit 2**, Taser Recording at 37:13.  All of the Supplemental Reports contain an identical paragraph attempting to indicate that they are being forced to write the report under penalty of being terminated.  Nevertheless, the officers who were asked, testified they wrote their reports unassisted and on their own.  There are other striking verbatim similarities in the reports.  *See*, *e.g.*, the reports of Officer Galbo and Officer Lovette attached as **Composite Exhibit 3.**

that no Tasers were <u>discharged</u> onto the body of Charles Eimers.[5]  New audio video evidence obtained on November 17, 2014 after most of these depositions were taken shows two eyewitnesses' excited utterances captured on the footage exclaiming that the officers had "shocked" and "tased" Charles Eimers during the event.  One of them even made the sound effect of what he had heard to be a Taser in action.[6]

The officers testified under oath that Mr. Eimers' face was not forced face down into the sand and none of them can explain the blood coming from Eimers' ear.  This is despite the fact that Officers were there and in close proximity to Eimers.  Some of those officers even testified that Mr. Eimers had no sand on his face, eyes, mouth or nose.[7]  However, the new video evidence shows that Charles Eimers' face had been in the sand, was forced directly down into the sand such that his face has virtually no skin that is not covered in sand, including his nose, mouth and eyes. Clearly, he could not have breathed much or any oxygen in that body position. At bare minimum he certainly had to feel he was going to suffocate.

---

[5]  *See, e.g,* **Exhibit 4,** Depo. Gabriel Garrido at p. 66, line 5-19; **Exhibit 5**, Depo Sgt. Francisco Zamora, p. 19, line 12-17; **Exhibit 2**, Depo. Wanciak, p. 79, line 9-13.

[6]  **Exhibit 6,** Colombian Witness, Giovanni Espitia's Digital Video Recording obtained 11/17/14 at: min/sec, 5:04 – 5:17 (in Spanish discussing why they were giving CPR and whether it due to the electric shock); and at 5:52-6:00 min/sec (witness asking videographer "did you see when they were tasing him? When they had him on the ground?").

[7]  **Exhibit 4**, Depo. Garrido, p. 83, line 17-24; p. 101, line 19-24; **Exhibit 5**, Depo. Zamora, p. 28, Line 19-25; p. 44, line 10-16; p. 95, line 6-13; **Exhibit 7,** Depo. Nick Galbo, p. 31 (face had no sand on it).



Officer Lovette (seen here taking Eimers' pulse), said he merely was "embellishing" or engaging in "shop talk" and "decompressing" when his accidental Taser audio recording later had him stating that Eimers had *"blunt force trauma to the head"* and that he, referring to himself, *"dropped a "f***ing bomb"* on Charles Eimers' head.[8]  The new video evidence shows it was not "embellishment" as it displays the likely result of the "bomb" with blood pouring out of the interior of the right ear of Charles Eimers and *down* his right cheek**.**  The downward movement of Eimers' blood substantiates that he was face down in the sand before being rolled supine and unconscious.

Officers testified that due to the struggle with Mr. Eimers, Officer Garrido locked his finger into the second (right) handcuff and it hurt so badly that he cried out "like a girl".[9]  The new audio/video evidence reveals no such occurrence. There is no howling or screaming of an officer. There is no reaction in pain by an officer.  The new incontrovertible audio and video evidence shows that the only person ever screaming in pain, ("OW!" "You're hurting me!") was Charles

---

[8]     **Exhibit 8,** Depo. Gary Lovette, p. 207, 213-14.

[9]     *See, e.g.,* **Exhibit 2,** Depo. Wanciak, pp. 77-78; p.  ; **Exhibit 9**, Depo. Henry Del Valle, p. 45, 48; **Exhibit 4,** Depo. Garrido, p. 65, 68.

Eimers and that the Officer Garrido event described by the officers never occurred.[10]  This false testimony was clearly fabricated in order to give some unchallenged evidence that Eimers was presenting a danger to the officers and fighting them.

Officers testified that a hobble (a restraining device to bind the legs) was not used or that they never saw it being used despite the fact that they were there and in close proximity to Mr. Eimers.[11]  A few of the officers even testified that Mr. Eimers was being stood up or trying to stand on his own volition which is why he could not have been hobbled![12]  The new video evidence shows the hobble actually was requested verbally by an officer, was obtained by Officer Wanciak who ran for it and that it was brought back by Officer Matthew Johnson.  The video evidence shows the officers' testimony is complete fiction.  It shows that the hobble was completely placed onto Charles Eimers by Officers Johnson and Lovette and that they had disengaged before Officer Garrido rolled Mr. Eimers over, bloodied, blue and unconscious.[13]  Mr. Eimers never was lifted or stood up, and certainly he did not stand or try to stand on his own volition.  The video discloses, contrary to Officers' testimony, that Mr. Eimers was not moving the entire time up until he suddenly lost consciousness, that in reality that he was no longer moving, was certainly not

---

[10]      Plaintiff requested any photos or official injury documentation of Officer Garrido's injured finger.  There was none.  The officers queried about it could not agree on what finger supposedly it was and Officer Garrido could not even recall what finger it was.  **Exhibit 4,** Depo. Garrido p. 69 "I don't remember."; **Exhibit 2**, Depo. Wanciak, p.77-78 (right thumb).  *See also*, **Exhibit 6**, Video Tape, 37-57 seconds.

[11]      **Exhibit 7,** Depo. Galbo, p. 29-30 (his legs were not hobbled, never got hobbled, we were unable to hobble him); **Exhibit 9,** Depo. Del Valle, p. 56-57; 60-61 (cannot recall seeing him hobbled); **Exhibit 10,** Depo. Thaddeus Calvert, p. 73-74 (only retrained used was handcuffs; never saw a hobble);" **Exhibit 11**, Depo. Medina, p. 74, lines 8-15.

[12]      **Exhibit 7,** Depo. Galbo, p. 29-30 ("*we decided to stand Mr. Eimers up and try to wlk him over to the patrol vehicle and secure him inside a vehicle and off the beach.*"; **Exhibit 9,** Depo. Del Valle, p. 56-65 (from his perspective *"two officers assisted Mr. Eimers in standing.  When he came up to his feet, it looked like he was having – he was struggling to get up to his feet, and he never stood completely upright…"*).

[13]      **Exhibit 6,** Video Recording starting at 1:22 min/sec with Officer Wanciak running for her hobble shortly after Officer Thad Calvert requests it.  By this time at least one officer has donned blue hazmat gloves and Sgt. Zamora is still kneeling on Eimers' back, and Officer Garrido is standing next to Eimers head putting on blue hazmat gloves.  At 1:43 (min/sec) Officer Johnson is running back with the hobble.  With Officer Wanciak back on the beach at 2:31 watching, the hobble is fully on and the hobbling officers Lovette and Johnson have backed away by 2:41.  At 2:45 Officers roll Mr. Eimers over and suddenly observe that he is unconscious.  *See* **Exhibit 12,** Attorney Prepared Timeline of events on **Exhibit 6**.

resisting, and likely was on his way to death… with a stopped heart preceded by blunt force trauma to the head, the lifting of his legs (not body) into the air serving to place greater downward pressure on his chest and face while in the prone position, and the potentially asphyxiating forces of the Officers' body weight onto his torso.

Officers testified that Mr. Eimers was conscious after handcuffing as they began to raise him to his feet).[14]   The new video evidence shows that Charles Eimers was not resisting or struggling while Officer Calvert held his legs in the air putting pressure on his chest all while Eimers was lying face down in the sand.  The video shows that despite the fact that Eimers was fully handcuffed, surrounded by multiple police officers and not resisting, the officers still hobbled him and never once tried to lift or stand him to his feet as many officers said they had.[15]  What actually happened as disclosed by the video evidence is that they finally rolled him over and it is then that they "suddenly saw" Eimers was unconscious, his blue face, blood-smeared from within his right ear canal.[16]

Truthful reality is contrary to the sworn testimony of these Key West officers.  Truthful reality was attempted to be hidden, lost, destroyed and caused to be mysteriously missing. Fortunately for Mr. Eimers, the web of deceit and the preservation of truth has occurred because of the courage of two Colombian tourists who escaped the grasp of the officer deceivers when they traveled back to Colombia with the video-taped recordings of what really happened on Thanksgiving Day morning in 2013.  Truthful reality is that in the most recently discovered tourist video of the event, the defendants' sworn testimony regarding the events is shown to be perjury.[17]

Fifty-four (54) seconds of cell phone audio/video of one of the Colombian tourists was actually obtained by a witness at the Southernmost Hotel and produced to the police on the day of

---

[14]     *See*, fn. 12, *supra. See e.g,*  **Exhibit 11**, Depo. Officer Medina, p. 38, lines 11-19; p. 71-72.

[15]     *See* fn. 14*, supra***.**

[16]     While at Lower Keys Medical Center Dr. Zivco Gajic even examined Eimers in the ER for a basilar skull fracture (the area of the skull around the ear).  **(Exhibit 13).**  While he diagnosed no fracture the fact that he looked at that and no other bone is telling.  The video shows the officers starting to don their blue hazmat gloves (for blood) at 1 minute 16 seconds into the video.  The sudden realization that Charles Eimers is unconscious occurs at 2 minutes and 45 seconds into the video.

[17]     *See* **Exhibit 14,** Plaintiff's compilation of Defendant's proven false sworn testimony as determined by review of their testimony and the video content.

the incident.[18]  Within the frames of that cell phone video one can observe another person actually videotaping the events from a closer position with a camcorder device. The police investigators were aware that the Colombian witness who videotaped the scene on her phone had returned to Colombia on Thanksgiving and was no longer in the United States. They thought that the evidence was captured and in their possession. That way, the sole videotape of the events could be controlled … along with the dash cam, and Taser Cam™ footage and importantly, the Taser audio and video of each of multiple officers who likely discharged their Tasers onto the body of Charles Eimers.

When controlling the scene after the event, rather than obtaining statements and the identification of witnesses, the involved officers compelled the witnesses to leave the scene and admonished no one to stay.[19]  Officer Wanciak even engaged one such witness, a man, reportedly a retired police officer from New York, who was visibly upset by what he saw and which he called "murder."  Officer Wanciak did not bother to get his name.[20]

Defendants' corrupt defense is countered by the non-party, eye-witness' digital audio/visual recordings and real time still photographic evidence taken from that November 28, 2013 recording of the Eimers incident.  (See photo, *supra).*  It is contradicted by Defendants' own admissions in Taser Cam™ and dispatch documents, -- public records of the City of Key West itself wherein admissions of tasing clearly are made.[21]  It is obliterated by the admissions of murder, tasing and brutality made by Defendant Officer Gary Lovette while unwittingly being recorded by his own Taser device within hours of essentially rendering Charles Eimers a dead man.[22]  And it is underscored by multiple instances of evidence destruction while such evidence was in Defendants' possession and control, as well as myriad perjurious statements by Defendants during their depositions.

**B.  Spoliation and Evidence Destruction.**

---

[18]        **Exhibit 15,** Cell Phone Video Footage.

[19]        **Exhibit 9**, Depo. Henry Del Valle, pp. 70, line 10-23; p. 74, line 15-23; p. 76, line 10-13.

[20]        **Exhibit 2**, Depo. Wanciak, p. 9-30.

[21]        **Exhibit 16,** Computer Aided Dispatch, aka "CAD" transcript; **Exhibit 17**, COM1 Dispatch Recording (1st part); **Exhibit 18**, COM1 Dispatch Recording (2nd part); and **Exhibit 19**, COM2, Fire & Rescue Channel Recording.

[22]        *See,* fn. 2, *supra*, referring to **Exhibit 1,** Officer Lovette's Taser Cam edited recording.

The possibility that any scintilla of truth could even be cautiously associated with any part of Defendants' mantra is rendered nugatory by Defendants' refusal and inability to produce, material public records in response to its Fed.R.Civ.P. 26(a) obligations and Plaintiff's multiple requests and demands.[23]

Defendants' litigation gamesmanship is exemplified clearly in the parties' exchanges regarding the production of the City's complete and unedited COM1 and COM2 recordings as well as the missing, material, initial minutes of Taser recorded footage from Officer Gary Lovette's X26 Taser device.  Also missing are the *"17 Million"* text messages Officer Lovette admitted receiving and probably responded to as he unwittingly was being recorded by his Taser device.[24]

Regarding Officer Lovette's missing Taser Cam™ footage, Defendants produced only limited footage **starting** *after* the already unconscious and bleeding Charles Eimers had been taken by ambulance to the hospital.  Defendants would have us believe that Lovette's Taser miraculously started recording while it was in its holster and at a time when Officer Lovette was still on the beach and had just commented that "it would have been easier to bury him." [25]

---

[23]     Additionally, Defendants were duty bound to utilize their dash-cams.  In fact, all of them were specifically instructed to use them by Sgt. Francisco Zamora.  *See, e.g*, **Exhibit 3**, Depo. Galbo, p. 20. Many, however, did not for unexplained reasons.  Further, only Officer Gary Celcer, the officer making the initial traffic stop, turned his dash-cam recording in as evidence.  According to the Internal Affairs Report, the other few officers who did use their dash-cams, did not turn them in until asked.  In fact, in the case of Officer Lovette, he testified he turned it on but upon review with his supervisor, was surprised to find that it did not contain the recording at the scene.  More evidence inexplicably missing.

[24]     **Exhibit 1,** Taser Recording, at 56:15 min/sec. Also, Officer Lovette testified at his deposition that the "swoosh" sound heard on the Taser audio of messages being sent and received on his cell phone were in fact e-mails and not texts. But these e-mails magically are missing too.  Of course, the 1.5 hours of Lovette's Taser recording that was produced, the portion containing his varied admissions that "Gabe [Garrido] killed him"; how something "would be funny if we didn't just murder a man"; how Lovette "**came down like a f\*\*\*ing bomb on his head**; and how "it **would be better if we just buried him**" was passed off by Lovette, under oath, merely as pure "shop talk", "embellishment" and "decompression."  *See*, **Exhibit 8,** Depo. Lovette, p. 207, 213-214.  No other officer needed to "decompress" and no officer, including Lovette, sought psychological help following the incident.  Unlike the verbal admissions, the missing initial minutes of the Taser footage, footage that should readily demonstrate the unjust and excessive forces used against Mr. Eimers, could not so simply be explained away.  It is no wonder it is that portion of the footage that we know once existed, is "missing."

[25]     The beginning of the recording provided to Plaintiff has no footage of any hand or thumb movements on or near the holstered taser activating its camera feature.

Officer Lovette clearly testified during his deposition on November 4, 2014 that he un-holstered his Taser on the beach during his encounter with Mr. Eimers and turned it on.  He admitted activating his Taser device as it was his intention to deliver a drive stun to Mr. Eimers.[26]  Officer Lovette also admitted that while his Taser was activated, he knew it would be recording.[27]  That the Taser would start recording when the safety switch was moved to off, is consistent with the operating materials for his X26 Taser Cam™ equipped Taser device.[28]  According to Taser, *"[t]he TASER CAM audio video recorder is activated any time the safety is in the off position "ARMED". This allows officers to capture vital audio and video information prior to, during, and after the potential deployment of an X26 ECD."*[29]  Moreover, it records for between 4 and 10 ½ hours*.[30]*

Officer Lovette's testimony is consistent with that of Officer Wanciak who testified that she saw Officer Lovette's Taser unholstered and that he was holding it to the back of Mr. Eimers' body.[31]  Accordingly, the undisputed testimony is that Officer Lovette's Taser was deployed and activated during Charles Eimers' arrest.  It is footage that clearly is material and apparently destroyed.

Similarly, limited key portions of the City's CAD recordings are missing and/or destroyed. The City's CAD records are written and automatically recorded.  There are two channels police use for the transmission of calls in the field:  COM1 and COM2.  The written CAD Report Defendants provided (**Exhibit 16**) has a combination of COM1 and COM2 communications on it.[32]  At 8:34:15 there are two communications written on the Report, they are first, "SUSPECT TASED" and second, "ROLL RESCUE 10-18 (Expedite)."

---

[26]     **Exhibit 8,** Depo. Lovette at pp. 53-54, 61-62.

[27]     **Exhibit 8**, Depo. Lovette at p. 54.

[28]     **Exhibit 20, www.taser.com/products/on-officer-video/taser-cam**.

[29]     ECD is an Electronic Control Device.

[30]     *Id.; see also*, **Exhibit 21,** Depo. Sgt. Joseph Tripp, at p. 110-111 ("it will record for 4 ½ hours continuously").

[31]     *See, e.g,* **Exhibit 2,** Depo. Officer Wanciak, at p 75-76.
[32]     This was determined by listening to the recordings (**Exhibits 17, 18 and 19**) and from Officer Wanciak's testimony that she had to use COM2 to call in for expedited rescue.  (**Exhibit 2,** Depo Wanciak at p. 84-85; 136

Defendants initially produced two separate recordings from COM1 and one recording from COM2.[33]  To this day, the Defendants **never** have produced the portion of the dispatch recording containing the damning "SUSPECT TASED" call-in by an involved Defendant officer.  Defendant Sgt. Zamora, the supervising officer at the scene admitted that the only way such a record can occur on their CAD Report is by a radio recorded transmittal from the field.[34]  It is missing!

Moreover, the first COM1 recording Defendants produced goes from 8:23 to 8:32 (CAD Report time 8:20 to 8:28), -- a mere 9 minutes of recording time.  It stops before the key transmission.  The second COM1 recording produced starts at 8:33 (still during the pursuit) and goes until after 12:00pm, when Charles Eimers was already at the hospital.[35]  Nowhere on the recording is the subject transmission or any other relating to the suspect being tased.  Plaintiff asks, *why the separation of recorded sections?*  Why is there no mention of "SUSPECT TASED" on the audio when it clearly is on the CAD Report?[36]

It gets more interesting when considering the recording of COM2.  What Defendants initially produced to Plaintiff starts at audio time 8:36, (CAD Report time **8:34:15**).  As previously stated with respect to the written CAD Report, there are two transmissions identified as having been made at 8:34:15; the first one being "SUSPECT TASED" and the second one "ROLL RESCUE 10-18 (Expedite).  Oddly, it is the subsequent transmission, "ROLL RESCUE 10-18 (EXPEDITE)" by Officer Wanciak that begins the COM2 audio-recording.[37]  Why does COM2

---

[33]     Plaintiff subsequently demanded the prior COM2 footage as there clearly is a continuous recording of both channels, however, all that Defendants additionally produced was one additional unrelated entry at 5:03AM from COM2.

[34]     **Exhibit 5**, Depo Zamora at p. 57-66.

[35]     Please note that the times listed on the written CAD Report are not synced with the times on the CAD audio recordings and that as between the CAD audio recordings, there are time differences between them as well.

[36]     In light of the fact that Officer Wanciak is the last identified officer on the CAD Report before "SUSPECT TASED" occurs at 8:34:15, it is presumed (consistent with her testimony) that Officer Wanciak made the "SUSPECT TASED" transmission.

[37]     This fact further bolsters that Officer Wanciak is the officer who made the "SUSPECT TASED" transmission.  He made the ROLL RESCUE transmission and is the last identified officer on the CAD Report (P48) prior to the "SUSPECT TASED" transmission.  However, Officer Wanciak denied that she is the one who made the "SUSPECT TASED" transmission.  *See* **Exhibit 2,** Depo Wanciak, p. 84.

not contain the recording "SUSPECT TASED" if it is on the CAD Report?  The only reasonable conclusion is that the audio was doctored and the material transmissions deleted or destroyed.[38]

Further substantiation of this conclusion is found in the transmission by the female fire rescue dispatcher who at 8:37 on the Fire Rescue Channel states "Medic 2, Fire 2 assist . . . *officer requests* rescue 1405,... reference male **involved in** *pursuit*.  *They tased him*.  *They are advising they are not sure if he is breathing now."*  Unfortunately, no officer has admitted making the damning statement that the police "*tased"* Mr. Eimers.  Perhaps this is because, as one of the Defendant Officers said to Officer Lovette while being recorded by Lovette's Taser Cam™ "we have to get together to get our sh*t straight."[39]  They denied this under oath.  If one thing is certain, the Plaintiff did not concoct this information; this information comes straight from the Defendants' own documents, the defendants' own recordings and the Defendants' public record evidence.  The missing portions are material and unfortunately, Mr. Eimers did not live to tell about it.

Lastly, is the intentional non-use of wireless body microphones with which the officers are equipped to record communications taking place outside their vehicles.  None of the officers used theirs, save for Officer Gustavo Medina, and interestingly, his microphone only recorded very few, select or intermittent communications such as "No", "Stop Resisting" and "OW!"[40]  Officer Medina was at the scene for a good amount of time yet these are the only recordings. None of the many other officers who had such wireless microphones used them (Officers Del Valle, Garrido, Wanciak and Wallis).  Many, like Officer Wanciak, testified that "their battery was dead" and it was only 8:33 am.[41]

Fortunately, with Officer Lovette's admissions of murder and police brutality as well as the bystanders' video we can put into context what really happened on the beach that Thanksgiving

---

[38]     The written CAD Report also contains an entry at 10:38:11of "SUSPECT NOT TASED – TASER DEPLOYED".  The last identified officer to speak according to the CAD is "S14", Sgt. Francisco Zamora. He testified he did not make the transmission, that the only way transmissions are recorded is if they come in by radio that he had left the scene by that point and as of 10:38:11am, no taser download had occurred. As such it is unknown how anyone would know that a Taser was not utilized**.  (Exhibit 5,** Depo Sgt. Zamora, at pp. 57-64).

[39]     **Exhibit 1,** Taser Footage at 37:13 min/sec.

[40]     These transmissions occur between the 37 and 57 second mark on the bystander's digital video and at 8:34:22 to 8:34:46 according to Medina's dash cam timer.  *See*, **Exhibits 6 and 12,** respectively.

[41]     *See, e.g.,* **Exhibit 2**, Depo. Wanciak, p. 36, 72.

morning.  For the first time we have a credible, real-time account of the arrest and of heretofore previously unknown excited utterances of bystanders describing the probable Tasing they witnessed.  We now know which of the officers were on, around and within visual proximity of Charles Eimers.  We can see Mr. Eimers' lack of so-called "resistance," and his complete obedience until he was injured by their harmful forces.  The video identifies how long officers actually took after handcuffing before they started rendering first aid, and otherwise verifies the falsity of the testimony received in this case.  We know Eimers was indeed fully and completely hobbled, we know the time it took to do that.  We now know that after being fully handcuffed and surrounded by multiple big, strong officers Mr. Eimers was not fighting and not resisting.  We know that officers took almost two minutes to retrieve and then hobble this already unresisting man who was no threat to them singularly or collectively.  The video also provides clear visual evidence that again, contrary to the Officers' sworn testimony, that Charles Eimers' head and face was bloodied and covered in sand.[42]

### THE REALITY
### Thanksgiving Morning – 2013 versus The Initial "Official" Story

Per the bystander video, on Thanksgiving morning, November 28, 2013, an older gentleman, now known to be retired 61 year-old Michigan resident Charles Eimers, voluntarily complied with the verbal instructions of two uniformed Key West Police Officers to "get on the ground" and to "do it now!"  He was standing on Southernmost Beach in Key West and only seconds before had calmly exited his car and walked a few steps toward its rear where he waited for the officers to arrest him.  As they surrounded him with service weapons and an AR15 drawn and pointed at him, they ordered him to the ground.  It took Mr. Eimers three (3) seconds to comply.  It was approximately 8:33am.

Per the new bystander video, Mr. Eimers was unarmed and at no point before or after officers ordered him to the ground had Mr. Eimers run at, approached, threatened, spewed profanity, physical assaults or anything of the like at or toward any police officer.  Simply stated, Mr. Eimers had surrendered following a slow speed police pursuit that started at a traffic stop a few minutes before and ended on Southernmost Beach.  It was there that Mr. Eimers, as instructed,

---

[42]        *See* **Exhibit 6 and 12;** *see also* **Exhibit 14**, Deposition designations of Defendants' perjury.

knelt down on one knee and then the other with arms extended, laid down prone on the sand and waited for the officers to arrest him.  These facts are undisputed.

Per both bystanders' videos, Mr. Eimers did not resist arrest after he laid down.  Rather, Defendant Officer Garrido violently and without warning yanked Mr. Eimers' right arm straight back without bending the elbow, ostensibly to facilitate cuffing the wrist of that arm.  That caused Mr. Eimers to scream and move in pain, as it would cause anyone to so do.  The Defendant Officers took Mr. Eimers' natural pain reaction as invitation to visit excess force upon him under the auspices that Mr. Eimers was resisting arrest.[43]

Per the new bystander video, two minutes and forty-five seconds (02:45) after being ordered to the ground, Mr. Eimers was fully handcuffed, fully hobbled, fully engulfed by at least seven (7) police officers, unconscious, blue, actively bleeding from his right ear and with his face completely caked with sand.

Notwithstanding what really happened, Key West Police Officers told paramedics that the man had collapsed while running away from them.  The EMS Report states:

> *"KWPD [Key West Police Department] reported PT [patient] left vehicle and ran then collapsed on the beach."*

(**Exhibit 22**).[44]  The KWPD reiterated the false story to the medical doctors at LKMC.  Dr. Joan Homan was consulted on Mr. Eimers' case.  At 11:10 am the day of the incident she dictated the following (false) information:

> *In speaking with the police <u>directly</u>, apparently he had been pulled over for a traffic violation.  When the officer walked away from his car with his license, he drove off, drove to the end of Duval Street, left his car ___ and <u>attempted to flee</u> the scene.  The police <u>then apprehended</u> him.  He struggled somewhat, <u>but not significantly</u>.  He was handcuffed then found to be apneic."  <u>(Emphasis added)</u>.*

---

[43]     The yanking of Mr. Eimers' right arm is better visualized on the cell phone video given her position relative to Mr. Eimers.  (**Exhibit 15**).

[44]     The EMS report is devoid of any mention or report of the bloody ear and face, potential blunt force head trauma, tasing, potentially blocked airways or broken ribs.  Either the police never told them or the EMTs capitulated in the cover-up.  Regardless, there clearly is seen dried, coagulated blood on the orange back board and blood stain on the gurney sheet below the backboard in the LKMC ER.  (**Exhibit 23,** Police Photograph at Hospital.  It is interesting that no police report or supplemental report (all of them complete by 12/03/13) mentions a bleeding Mr. Eimers while he was under their control.

**(Exhibit 24)**.  In fact, prior to arrival at LKMC, Mr. Eimers, who clearly had been arrested and in police custody on the beach when he lost consciousness, was "un-arrested" by KWPD.[45]  Contrary to established police procedures regarding medical care for persons in custody, Mr. Eimers was taken to the hospital and left unattended by any police officer.  The act of "unarresting" Mr. Eimers made Mr. Eimers appear just like any other citizen "found" by police to be having a possible medical emergency.  The act of "un-arresting" Mr. Eimers when they "knew" was going to die and after they had called KWPD Caption Scott Smith's ex-wife Cathy Smith at the FDLE to investigate their actions in causing it, speaks volumes about their intentions and game plan.

The following day KWPD public relations official Alyson Crean advised the media *(The Blue Paper)* that Eimers suddenly collapsed.  She reported in response to an email inquiry:

> *Yes.  An older man was stopped for driving erratically.  While the officer was out with him, he drove off.  Police followed … Not in pursuit.  The man (sic) pulled up at south beach and officers approached him.  <u>He was again erratic and resisted officers (sic) approach, then apparently collapsed unconscious</u> and was transported to the hospital.  I will attempt to get a report in the morning to verify this sequence of events for you.  I was out of town for the holiday and have just returned.  There was no shooting.  There was no taser.  (<u>Emphasis added</u>).*

No one from the media had mentioned a Taser in the email to Ms. Crean.  **(Exhibit 25)**.

Five (5) days after the incident, Mr. Eimers' next of kin in Michigan was reached.  This is despite the KWPD having Mr. Eimers' Michigan Driver's license, driving history, personal documents, prescription medicine bottles, and contact with Eimers' medical providers in Michigan on the day the incident occurred.  Well after KWPD had the cell phone video, and in line with the first official version of events, Mr. Eimers' son Treavor Eimers was told by KWPD Detective Todd Stevens that his dad had run from police and collapsed.  On December 4, 2013 when medically trained Treavor Eimers arrived in Key West to see his father, he found him bruised and battered about his right ear, head and wrists.  He had not expected to see such injuries given that police said he merely collapsed.  When Treavor Eimers questioned Detective Stevens about his father's obvious injuries the response was "we are still investigating."[46]

---

[45]      *See, e.g.,* **Exhibit 2**, Depo. Wanciak, p.  137-138.  In fact, Sgt. Tripp of the KWPD said in his Internal Affairs Report just published this week that Mr. Eimers was free to leave had he regained consciousness.

[46]      Mr.  Eimers was removed from life support on Dec. 4, 2013 and Treavor Eimers, not knowing otherwise, gave consent for cremation.  Thereafter, Mr. Eimers body immediately was sent to the funeral home and not the medical examiner's office as is statutorily required for "in custody" deaths.  *See, Fla. Stat.* §406.11.

On December 5, 2013 Treavor Eimers had an eight minute phone conversation with Detective Stevens wherein he advised him of his father's death.  Nevertheless, Detective Stevens did nothing to get the body to the ME's office or protect it from inadvertent destruction by cremation.  The only reason Mr. Eimers' un-cremated remains ever made it to the ME's office for autopsy on December 12, 2013 – 8 days after death, - is because the media contacted the ME's office.  The media only knew to contact the ME's office because on that day a media member saw the Colombian tourist's cell phone footage posted on YouTube.  This is footage the Defendants had from day one and is probably why the police officers' individual reports tell a slightly different version than that initially published.  They had to make it consistent at least with what the cell phone video showed and as they had agreed after they got together to "*get their sh\*t straight*."

We, the Eimers family, and this Court now know what really happened on November 28, 2013 solely because of the "other" video evidence that the KWPD and the Defendants did not care to obtain.  It was obtained after most of the officers had committed to their false testimony under oath.  Fortunately, the video does not lie and proves that what we are dealing with here is the destruction of evidence and the continued willful violation of the Rules governing proceedings in this Court.

## MEMORANDUM OF LAW

This Court's authority to sanction parties for bad faith litigation misconduct is long recognized by the United States Supreme Court.  The United States Supreme court has held that in addition to the sanctions provisions in the Federal Rules of Civil Procedure and US Code, federal courts possess the inherent power to sanction parties and attorneys who conduct litigation in bad faith or who perpetrate a fraud on the court.  *Quantum Communications Corp. v. Star Broadcasting, Inc.*, 473 F.Supp.2d 1249, 1268 (S.D. Fla. 2007), citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991).  This inherent power derives from the court's absolute need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases" and to punish and deter abuses of the judicial process, *Chambers*, 501 U.S. at 43.  Hence, the imposition of sanctions pursuant to the Court's inherent power "vindicates judicial authority" and does so without resort to the more drastic sanctions available for contempt of court.  *Quantum Communications Corp.*, 473 F.Supp.2d at 1268, citing *Chambers*, 501 U.S. at 50.  Such inherent power may be appropriate exercised particularly where a party "commits perjury or . . . doctors evidence" that "relates to the pivotal or linchpin issue in the case."  In Re Brican America, 977

F.Supp.2d at 1292, citing *Quantum*, 473 F.Supp.2d at 1269, *citing, Vargas v. Peltz,* 901 F.Supp. 1572, 1581-82 (S.D. Fla. 1995).

The key to unlocking a federal court's inherent power is a finding of bad faith.  *See*, *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998); *Quantum Communications Corp.*, 473 F.Supp.2d at 1268.  Exercising the power requires restraint and discretion, all the time keeping due process considerations in mind when determining whether the requisite bad faith exists.  See, *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980).  The law is clear, however, that the sanctions of dismissal and an award of attorney fees are within the court's inherent power where bad faith is found.  *Quantum Communications Corp.*, 473 F.Supp.2d at 1268, citing *Chambers,* 501 U.S. at 40-46.

In *Quantum Communications* the Defendants were found to have engaged in a calculated scheme to interfere with the judicial system's ability to impartially adjudicate the matter by unfairly hampering the presentation of the opposing party's claim.  Consequently, this Court, in an exercise of its inherent power, entered default as to liability against the defendant on all counts.  *Quantum Communications*, 473 F.Supp.2d at 1277.  Specifically, this very Court found that the defendant deliberately lied under oath regarding when he had communications about the agreement at issue as the plaintiff had pointed out defendant's perjury with a number of documents directly contradicting the defendant's testimony.  This Court also found the defendant failed to produce "smoking gun" email documents during discovery about key issues in the case notwithstanding defendant's excuse that purging emails was his regular practice and that the failure to produce them did not cause the plaintiff any prejudice.  This Court found plaintiff had to expend significant time and money proving defendant's breach of the agreement because of the defendant's deliberate failure to produce them.  This Court astutely identified the crux of the matter when considering sanctions:

> Those who lie, evade and fail to tell the whole truth obviously enjoy an advantage over honest litigants.  The victimized opponent winds up, as in this case, consuming substantial resources to respond to and undo the victimizer's lies and distortions. . . . In the meantime, the Court itself is prevented from actually reaching the merits of the case as well as resolving other cases by having to stop and, as it has done here, exhaustively examine what is, at bottom, sanctionable perjury and fraud upon the Court.

*Quantum Communications Corp.*, 473 F.Supp.2d at 1276.  *See also, Vargas v. Peltz,* 901 F.Supp. 1572 (S.D. Fla. 1995)(dismissing complaint for persistent pattern of misconduct including fraud

on the court, fabrication of evidence, "a litany of lies" including at deposition and the obstruction of the discovery process).

In *Flury v. Daimler Chrysler Corp.,* 427 F.3d 989 (11th Cir. 2005) the Eleventh Circuit found that a jury instruction on spoliation was insufficient to cure the resulting prejudice to the defendant and consequently reversed a judgment for the plaintiff. It found that the plaintiff's failure to preserve a vehicle following a wreck resulted in extreme prejudice to the manufacturer and warranted the sanction of dismissal. The vehicle was the best evidence of the impact speed and defective airbag deployment and with that evidence lost, defendant's experts were forced to use much less reliable means of examining the product's condition. No jury instruction could cure the resulting prejudice therefrom. *Id.* at 946. Flury is also important because, although it was a diversity case, the Court held that federal law governs the imposition of spoliation sanctions since spoliation is an evidentiary matter. Notwithstanding the application of Federal law, however, the 11th Circuit found that its opinion could be informed by state law as "the federal law in this [11[th]] circuit does not set forth specific guidelines." As such the court recognized principles from some of the state cases cited. *Id.* at 944.

In *Tramel v. Bass*, 672 So.2d 78 (Fla. 1st DCA 1996) the court struck the County Sheriff's answer and affirmative defenses and entered a default on liability against it because it found the Sheriff's office to have intentionally omitted the first six (6) seconds of dash-cam footage of a police pursuit that ultimately resulted in a collision between the fleeing car and the plaintiff. Following the crash, the deputy in his police report stated that the pursuit of the fleeing vehicle occurred after the fleeing vehicle nearly collided with him. Plaintiff requested the dash cam in discovery and was given the dash cam footage, minus the initial six (6) seconds of it. Fortunately, the plaintiff had gotten the footage through other means via a public records request and that footage contained the missing 6 seconds which disclosed that the pursuit started in a much different manner and that the supposedly "fleeing" vehicle was not driving erratically at all.

In his deposition the deputy reiterated the facts of his police report and the story of the fleeing vehicle's reckless operation giving rise to his pursuit. Thereafter, the Sheriff filed a summary judgment motion and included a copy of the shortened tape. In response the plaintiff moved for sanctions because the shortened tape gave the wrong impression of what actually occurred. The sheriff's attempted to explain away the discrepancy by saying it was merely an operational error. *Id.* at 81. The lower court found:

The actions of the Columbia County Sheriff's Department were an intentional and flagrant attempt to mislead [Bass], the Department's own counsel, and this Court regarding the facts surrounding the reason for initiation of the pursuit, and to prevent highly prejudicial and relevant evidence from falling into the hands of [Bass] with which [Bass] could seriously impeach Dowling's version of events. The misconduct of Defendant Tramel, by and through his employees, was an intentional attempt to perpetrate a fraud upon this Court and was in contumacious disregard of the integrity of the judicial system and the authority of this Court.

This Court recognizes that [Tramel's] conduct was not specifically in violation of any discovery order . . . [h]owever, aware of its inherent power to sanction fraudulent conduct in matters of discovery, this Court will not permit such flagrant and intentional misconduct to go unsanctioned.   Furthermore, the outrageous nature of Defendant Tramel's conduct warrants imposition of the severest sanctions against him.

**Tramel v. Bass**, 672 So.2d at 82.

The Eleventh Circuit has noted that "[**p**]**erjury**, regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system as well as to private individuals."  *United States v. Holland*, 22 F.3d 1040, 1047 (11th Cir. 1994).  Indeed, **perjury** is an "assault on the cornerstone of our judicial system." *Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974).  *See also, United States v. Dunnigan,* 507 U.S. 87, 95 (1993)("A witness testifying under oath or affirmation [commits **perjury**] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake…").

As in the **Quantum, Flury,** and **Trame**l cases discussed, *supra,* Defendants have evidenced a clear pattern of intentional misconduct.  The missing recordings in this case are more voluminous than and just as material as the omitted dash cam footage in **Tramel**.  That we have consistent perjury from multiple officers after getting their "sh*t straight", is perjury just the same.  The scope of this perjury on the material facts of force, excessive force, tasing, hobbling, resistance, struggle, opportunity for suffocation, and blunt force trauma are all belied by the Colombian witness's video and the edited Taser Cam.  The opposite of the perjured testimony was admitted by Officer Lovette many times as he unknown to him, he was being recorded by his Taser, - *"dropped like a f***ing bomb on his head"; "[who murdered him] 'Gabe did'"; "I tased a mother f***er in custody today."*  As a result Charles Eimers is dead.

## CONCLUSION

Defendants' perjury and bad faith destruction of evidence on multiple levels is flagrant.  It rises to and beyond the level of bad faith.  The "missing" evidence is crucial to Plaintiff's ability to prove his prima facie case.  Had the two Colombian tourists not video-recorded the events of that Thanksgiving Day, the official cover-up may have been completely successful. The images captured powerfully contradict the intended subterfuge of the officers and their superiors. No litigant should be able to so attempt to mislead and misrepresent about the evidence in such a concerted way.  Perjury, destruction of evidence, and avoiding eyewitnesses who would likely disappear back to their non-vacation homes is what the Key West Police Department had hoped to accomplish. This Court should show them the reality of this misconduct and these ongoing crimes of deceit.  It was the Defendants' hope that Charles Eimers, along with the knowledge of what really happened to him, would die and disappear.

-- *"it would be easier to just bury him …"*

Charles Eimers may have died, but the legacy of what happened on and after November 28, 2013 lives on in this Courtroom.  "We who labor here seek only truth" is not just a quotable quote.  It is a fact.  Charles Eimers and his family deserve the truth.  What disappeared was material evidence in the hands of our protectors – members of another co-equal branch of government that had everything to gain and nothing to lose, save for their integrity and that of ***our*** justice system.

Plaintiff respectfully requests that this Court enter an Order granting sanctions against the specified Defendants, to wit:  City of Key West, Francisco Zamora, Gary Lovette, Gabriel Garrido, Nicholas Galbo, Gustavo Medina, Henry Del Valle, Thaddeus Calvert, and Kathy Ann Wanciak, including the ultimate sanction of default, attorney fees and costs.  Plaintiff requests any further relief this Court deems just and proper.

## REQUEST FOR HEARING / ORAL ARGUMENT

Pursuant to Local Rule 7.1(b)(2) for the US District Court for the Southern District of Florida, Plaintiff requests oral argument on this evidentiary Motion.  Such a hearing is necessary to highlight and put into perspective the interrelationship and impact of the multiple pieces of evidence among multiple parties.  It also likely will result in a judicial time savings due to the volume of evidence and would allow the parties the opportunity to respond to questions the Court may have.  Plaintiff believes one (1) hour for Plaintiff and one (1) hour for the Defendants is adequate if the Court is able to accommodate.

## <u>GOOD FAITH CERTIFICATION PER LOCAL RULE 7.1(a)</u>

The undersigned co-counsel for Plaintiff conferred with counsel for all parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the Motion and has been unable to do so.

*Respectfully submitted,*

By:  /s/ *Jeannete C. Lewis*
Jeannete C. Lewis, Esq.
Florida Bar No.:  987565
jlewis@lewislegalgroup.com
**LEWIS LEGAL GROUP, P.A.**
17150 Royal Palm Blvd., Suite 1
Weston, FL  33326
Tel:     954-888-9877
Fax:    954-217-0150
*Co-Counsel for Plaintiff, Treavor Eimers*

## <u>CERTIFICATE OF SERVICE</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served this **12TH day of DECEMBER, 2014** upon all persons and counsel listed on the attached Service List via CM/ECF or regular mail for those not authorized to receive service via electronic means.

By:  /s/ *Jeannete C. Lewis*
Jeannete C. Lewis, Esq.
Florida Bar No.:  987565

<u>**SERVICE LIST**</u>

**David Paul Horan, Esq.**                                     CO-COUNSEL FOR PLAINTIFF
Florida Bar No.: 142474
E-mail: dph@horan-wallace.com
**Darren M. Horan, Esq.**
Email:  darren@horan-wallace.com
**HORAN, WALLACE & HIGGINS, LLP**
608 Whitehead Street
Key West, Florida 33040
Telephone:      (305) 294-4585
Facsimile:      (305) 294-7822

**Robert J. McKee, Esq.**                                     CO-COUNSEL FOR PLAINTIFF
Florida Bar No.: 972614
E-mail: rmckee@themckeelawgroup.com
**THE MCKEE LAW GROUP, LLC**
17150 Royal Palm Blvd., Suite 1
Weston, FL 33327
Telephone:      (954) 888-9877
Facsimile:      (954) 217-0150

**Jeannete C. Lewis, Esq.**                                     CO-COUNSEL FOR PLAINTIFF
Florida Bar No.: 987565
E-mail: jlewis@lewislegalgroup.com
Secondary E-mail:  BCesare@lewislegalgroup.com
**LEWIS LEGAL GROUP, P.A.**
17150 Royal Palm Blvd., Suite 1
Weston, FL 33326
Telephone No.: (954) 888-9877
Facsimile No.: (954) 217-0150

**David W. Brill, Esq.**                                     CO-COUNSEL FOR PLAINTIFF
Florida Bar No. 0959560
Primary e-mail: david@brillrinaldi.com
Secondary e-mail: yamile@brillrinaldi.com
**Joseph J. Rinaldi, Jr., Esq.**
Florida Bar No. 0581941
Primary e-mail: joe@brillrinaldi.com
**Anely M. Hernandez, Esq.**
Florida Bar No. 105993
Primary e-mail: anely@brillrinaldi.com
**BRILL & RINALDI, THE LAW FIRM**
17150 Royal Palm Blvd., Suite 2
Weston, FL 33326
Telephone No.: (954) 876-4344
Facsimile No.: (954) 384-6226

**MICHAEL T. BURKE, ESQ.**
**JOHNSON, ANSELMO, MURDOCH, BURKE,**
**PIPER & HOCHMAN, P.A.**
2455 East Sunrise Boulevard, Ste. 1000
Fort Lauderdale, FL 33304
Telephone: 954/463-0100
Facsimile: 954/463-2444
burke@jambg.com
cardona@jambg.com

**COUNSEL FOR DEFENDANT**
**CITY OF KEY WEST**

---

**RHEA PINCUS GROSSMAN, ESQ.**
2650 W. State Road 84, Suite 103
Fort Lauderdale, FL 33312-4882
Telephone:      954-791-2010
Facsimile:      954-791-2141
rheagrossman@comcast.net

**COUNEL FOR DEFENDANTS**
**EXCEPT GARY LEE LOVETTE**

---

**LYMAN H. REYNOLDS, JR., ESQ.**
**ROBERTS, REYNOLDS, BEDARD**
**& TUZZIO, PLLC**
470 Columbia Drive, Bldg. C101
West Palm Beach, FL 33409
Telephone: 561-688-6560
Facsimile: 561-688-2343
Email: lreynolds@rrbpa.com

**COUNSEL FOR DEFENDANT**
**GARY LEE LOVETTE**