**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,

Plaintiff,

vs.

CITY OF KEY WEST, a Florida municipality, et al.,

Defendants.
_____/

VIDEO DEPOSITION OF KATHYANN WANCIAK
Volume I
(Pages 1 - 60)

Tuesday, November 4, 2014
4:02 p.m. - 5:00 p.m.
United States Federal Courthouse
301 Simonton Street
Key West, Florida  33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter
Florida Professional Reporter

**2**

APPEARANCES

On Behalf of the Plaintiff:
BRILL & RINALDI, THE LAW FIRM
17150 Royal Palm Boulevard, Suite 2
Weston, Florida 33326
(954) 876-4344 / Fax (954) 384-6226
david@brillrinaldi.com
BY:  DAVID W. BRILL, ESQUIRE

HORAN WALLACE & HIGGINS, LLP
608 Whitehead Street
Key West, Florida  33040
(305) 294-4585 / Fax (305) 294-7822
darren@horan-wallace.com
BY:  DARREN M. HORAN, ESQUIRE

THE MCKEE LAW GROUP, LLC
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / (954) 217-0150
rmckee@themckeelawgroup.com
BY:  ROBERT J. MCKEE, ESQUIRE

LEWIS LEGAL GROUP, P.A.
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / Fax (954) 217-0150
jlewis@lewislegalgroup.com
BY:  JEANNETE C. LEWIS, ESQUIRE

On Behalf of the Defendants:
JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
2455 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida 33304
(954) 463-0100 / Fax (954) 463-2444
burke@jambg.com
BY:  MICHAEL T. BURKE, ESQUIRE

**3**

APPEARANCES CONTINUED

On Behalf of the Defendant Gary Lee Lovette:
ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
470 Columbia Drive, Building C-101
West Palm Beach, Florida 33409
(561) 688-6560 / Fax (561) 688-2343
lreynolds@rrbpa.com
BY:  LYMAN H. REYNOLDS, JR., ESQUIRE

Also Present:
RODERICK PRATT, LEGAL VIDEOGRAPHER
FRANCISCO ZAMORA
GABRIEL HUMBERTO GARRIDO
GUSTAVO ADOLFO MEDINA
NAJA GIRARD, KEY WEST THE NEWSPAPER
ARNAUD GIRARD, KEY WEST THE NEWSPAPER

--oo0oo--

INDEX OF PROCEEDINGS
Page

Video Deposition of KATHYANN WANCIAK
Direct Examination by Ms. Lewis . . . . . . . . . . 4

Certificate of Oath . . . . . . . . . . . . . . . . . 57
Certificate of Reporter . . . . . . . . . . . . . . . 58
Read Letter . . . . . . . . . . . . . . . . . . . . 59
Errata Sheet . . . . . . . . . . . . . . . . . . . . 60

INDEX OF PLAINTIFF'S EXHIBITS
Page

No. 3   KWPD Code of Ethics . . . . . . . . . . . . 12
No. 4   Wanciak's Answers to First Set of Interrogs . . 23
No. 5   Wanciak's KWPD Incident Report . . . . . . . 56

**4**

1    Deposition taken before Suzanne Ex, Certified Verbatim
2    Reporter, Florida Professional Reporter and Notary Public in
3    and for the State of Florida at Large in the above cause.
4          - - - - - - -
5          THE COURT REPORTER:  Good afternoon.  We are now on
6    the video record.  Today is Tuesday, November 4th, 2014,
7    and we are at the Federal Courthouse on Simonton Street
8    in Key West, Florida, for the purpose of taking the
9    video deposition of Kathyann Wanciak in Case Number 14-
10   10028-CIV, Treavor Eimers vs. City of Key West, et al.,
11   in the U.S. District Court, Southern District of
12   Florida.  The court reporter is Suzanne Ex of U.S. Legal
13   Support.  And, the videographer is Roderick Pratt, also
14   of U.S. Legal Support.
15         Would all counsel please state their appearances
16   for the record and then I will swear in the witness.
17         MS. LEWIS:  Jeannete Lewis on behalf of the
18   Plaintiffs.
19         MR. MCKEE:  David Brill, Robert McKee and Darren
20   Horan on behalf of the Plaintiffs.
21         MR. BURKE:  Michael Burke on behalf of Kathyann
22   Wanciak and the City of Key West and others.
23         MR. REYNOLDS:  Lyman Reynolds on behalf of Officer
24   Lovette.
25         MS. LEWIS:  She's sworn?



5

1    THE COURT REPORTER:  Would you raise your right
2    hand, please.  Do you swear or affirm the testimony you
3    are giving in this cause will be the whole truth and
4    nothing but the truth?
5         THE WITNESS:  I do.
6    THEREUPON,
7              KATHYANN WANCIAK
8    having been first duly sworn, was examined and testified as
9    follows:
10             DIRECT EXAMINATION
11   BY MS. LEWIS:
12   Q.   Good afternoon, Officer Wanciak.
13   A.   Good afternoon.
14   Q.   Could you please state your full name for the
15   record.
16   A.   It's Kathyann Wanciak.
17   Q.   And have you given a deposition before?
18   A.   Yes, ma'am.
19   Q.   How many times?
20   A.   Numerous times.
21   Q.   You're familiar with the rules; is that fair?
22   A.   Yes, ma'am.
23   Q.   All right.  You were born on November 2nd, 1959; is
24   that correct?
25   A.   Yes, ma'am.

6

1    Q.   Your maiden name, McCormick?
2    A.   Yes, ma'am.
3    Q.   Adopted by the Doer (ph) family in '73?
4    A.   Yes, ma'am.
5    Q.   Graduated high school in '78 in Pennsylvania?
6    A.   Yes, ma'am.
7    Q.   Married Mr. Wanciak in 1983?
8    A.   Yes, ma'am.
9    Q.   Divorced in '86?
10   A.   Yes, ma'am.
11   Q.   Social security number ends in 7974?
12   A.   Yes, ma'am.
13   Q.   Driver's license is issued in Florida; is that
14   correct?
15   A.   Yes, ma'am.
16   Q.   You've previously lived in Seminole County from
17   1990 through 1996; is that correct?
18   A.   Yes, ma'am.
19   Q.   You currently live in Key West; is that right?
20   A.   Yes, ma'am.
21   Q.   And who is your current employer?
22   A.   Key West Police Department.
23   Q.   How long have you been in their employ?
24   A.   Start -- getting ready to start the tenth year.
25   Q.   You entered the employ of the Key West Police

7

1    Department in 2006; is that right?
2    A.   Yes, ma'am.
3    Q.   And you've had continuous employment with the Key
4    West Police Department since that time?
5    A.   I'm sorry.  You turned your head.
6    Q.   You have continuous employment with the Key --
7    A.   Yes, ma'am.
8    Q.   And so, and currently, your rank is what?
9    A.   Patrol officer.
10   Q.   And how long have you been a patrol officer; for
11   the entire time?
12   A.   Same amount of time.
13   Q.   All right.
14        MR. BURKE:  Make sure you don't talk over her.
15        THE WITNESS:  Oh.  Yes, sir.
16        MR. BURKE:  Take your time and let her finish her
17        question and then you can answer.  No extra points for
18        quick responses.  It's not like Jeopardy.
19   BY MS. LEWIS:
20   Q.   And I know it's been a long day today and I
21   apologize for my quick tone.  I certainly mean nothing by it.
22   We have about, a little bit less than an hour today to get
23   your deposition underway.
24        I'm not going to mean to ask leading questions.
25   I'm sure your counsel will -- well, I'm allowed to ask

8

1    leading questions, but I'm sure if I ask an objectionable
2    question, he'll let me know.
3        And so, with that said, you know, it's fair to say
4    that becoming a police officer was not your first job choice
5    in life; is that right?
6        MR. BURKE:  Object to form.
7    A.   No, ma'am.  It was my first job choice in life.  I
8    just didn't do it.
9    Q.   All right.  Well, you were born in 1959, and you
10   entered the job force in or around the age of 18, 19; is that
11   right?
12   A.   I tried.
13   Q.   You were 46 when you took the course and
14   examination to become a law-enforcement officer; is that
15   right?
16   A.   Yes, ma'am.
17   Q.   All right.  And is that the first time you took the
18   course to become a law-enforcement officer?
19   A.   Yes, ma'am.
20   Q.   Before that time, you had spent perhaps most of
21   your working life working in the restaurant industry, the
22   lawn maintenance industry, commercial driving industry; is
23   that fair?
24   A.   The majority of my life was orthodontics.
25   Q.   And you did have some work as an orthodontic and a

---

**9**

1  dental assistant; is that right?

2      A.  Sixteen years.  Yes, ma'am.

3      Q.  So you hit your forties and you decide it's time

4  for a career change; is that right?

5      MR. BURKE:  Object to form.

6      A.  Well, it was something I always wanted to do.  So,

7  it wasn't time, it just happened.

8      Q.  And so you entered the academy in 2006; is that

9  right?  2005.

10     A.  Yes.  Two-thousand -- I think it was 2005.

11     Q.  You took your course and you failed it the first

12  time?

13     A.  Yeah.

14     Q.  And then you passed it?

15     A.  Yes.  I don't really remember.  It's been a while.

16     Q.  You made application, because you were -- you made

17  application with other, other police agencies; is that right?

18     A.  Yes, ma'am.

19     Q.  Tavares, is that one?

20     A.  Taveres.  Yes, ma'am.

21     Q.  Mount Dora?

22     A.  Yes, ma'am.

23     Q.  Okay.  And did you get a position with either of

24  those police departments?

25     A.  No, ma'am.

---

**10**

1      Q.  At the time you applied for the Key West position,

2  you were living in Lake County; is that right?

3      A.  Yes, ma'am.

4      Q.  And so why did you apply at Key West?

5      A.  I had always wanted to live down here.  I had been

6  coming down here for 20 -- 20 years.

7      Q.  Did you have a residence down here?

8      A.  No, ma'am.

9      Q.  And so, you applied at Key West and you ultimately,

10  you're sitting here, you obtained a position; is that right?

11     A.  Yes, ma'am.

12     Q.  Fair to say that you take your job very seriously

13  as a law-enforcement officer?

14     A.  Yes, ma'am.

15     Q.  As seriously today as you did in 2006; is that

16  right?

17     A.  Yes, ma'am.

18     Q.  So in 2006, you signed what's known as a Code of

19  Ethics; is that right?

20     A.  Yes, ma'am.

21     Q.  And that's something you took very seriously?

22     A.  Yes, ma'am.

23     Q.  You recognize as a law-enforcement officer, your

24  fundamental duty is to serve humankind and safeguard lives;

25  is that right?

---

**11**

1      A.  Yes, ma'am.

2      Q.  All right.  And that you agreed to maintain

3  courageous calm in the face of danger; is that right?

4      MR. BURKE:  Object to the form, but go ahead.

5      MR. REYNOLDS:  Join.

6      A.  Yes, ma'am.

7      Q.  And to be honest in thought and deed in both your

8  personal and professional life?

9      A.  Yes, ma'am.

10     Q.  These are principles that you guide yourself by; is

11  that right?

12     A.  Yes, ma'am.

13     Q.  You undertook and agreed that you'd be exemplary in

14  obeying the laws of the land and the regulations of the City

15  of Key West Police Department; is that right?

16     A.  Yes, ma'am.

17     Q.  Are some of these ringing, ringing true in your

18  memory, the Code of Ethics that you read and that you signed

19  back in 2006?

20     A.  Yes, ma'am.

21     Q.  All right.  And you also agreed and recognized that

22  the badge of your office as a law-enforcement officer in Key

23  West was to be a symbol of public faith; is that right?

24     A.  Yes, ma'am.

25     Q.  And to accept it as a public trust to be held as

---

**12**

1  long as you are true to the ethics of police service?

2      A.  Yes, ma'am.

3      MR. BURKE:  Object to the form of the question.

4      MR. REYNOLDS:  Join.

5      Q.  And did you agree then, on March 1st, 2006, to

6  constantly strive to achieve these objectives and ideals?

7      A.  Yes, ma'am.

8      Q.  And you continue to do so today?

9      A.  Yes, ma'am.

10     Q.  We'll mark this as Exhibit 3.  It's the Code of

11  Ethics.  I'd like to know and verify, is this your signature?

12     MR. BURKE:  What, what exhibit are we at?  Is this

13  now number 3?

14     MS. LEWIS:  Three, I believe.

15     A.  Yes, ma'am.  That's my signature.

16     MR. BURKE:  Did you want the reporter to mark this,

17  did you say?

18     MS. LEWIS:  I'll have her --

19     (Plaintiff's Exhibit 3 was marked.)

20     THE WITNESS:  Who needs it?  Who wants it back?

21     MR. BURKE:  Do you need it again?

22     MS. LEWIS:  It goes back to her.  The court

23  reporter can have it.

24  BY MS. LEWIS:

25     Q.  Now, is it fair to say, given your age, that you

---

**WWW.USLEGALSUPPORT.COM**
**1-888-311-4240**

**13**

1  have to work harder than most to maintain the requirements of
2  law-enforcement officers for the City of Key West?
3       MR. BURKE:  Object to form.
4       A.  No.
5       Q.  It's as easy for you to maintain physical abilities
6  as it is for Officer Lovette who we met here earlier; is that
7  -- is that what you're saying?
8       MR. BURKE:  Object to form.
9       A.  It can be.  Yes, ma'am.
10      Q.  You failed the agility test, didn't you?
11      A.  Yes, ma'am.
12      Q.  Okay.  And then you've been out on workers comp
13  leave; is that right?
14      A.  Yes, ma'am.
15      Q.  And you've been out on family medical leave for
16  your mom?
17      A.  Yes, ma'am.
18      MR. BURKE:  Object to the form.  Just give me a
19  chance to object.
20      THE WITNESS:  Yes, sir.
21      MR. BURKE:  Object to the form of the question.
22  BY MS. LEWIS:
23      Q.  Are you as physically fit today as you were in your
24  thirties?
25      A.  Probably am right now.

**14**

1       Q.  And you are on duty today?
2       A.  Yes.
3       Q.  Okay.  And you're not in uniform as was Officer
4  Lovette, and why is that?
5       A.  I'm on admin leave at the station under Lieutenant
6  Green.
7       Q.  And why is that?
8       A.  I'm not supposed to talk about it, so I don't know.
9       MR. BURKE:  Off the record for a second.  I'll need
10  to confer with her on that, perhaps.  Did you want to go
11  off the video record so I can confer with her?
12      THE VIDEOGRAPHER:  Off the video record at 4:12
13  p.m.
14      (Brief pause.)
15      THE VIDEOGRAPHER:  Back on the video record at 4:14
16  p.m.
17      MR. BURKE:  Ms. Wanciak is currently the subject of
18  a pending Internal Affairs investigation, and as a
19  consequence of that pending investigation, she's on
20  administrative duty at the station and is not wearing a
21  uniform.  She can't discuss the pending Internal Affairs
22  investigation until it's completed.
23      When it's completed, there will be -- a report will
24  be issued and you can have that report.  It will be a
25  public record.  If you need to then question her about

**15**

1  that investigation, obviously, you'll be able to do so,
2  but she can't speak about that today.
3       MS. LEWIS:  May I ask you then, is it concerning
4  the Eimers incident?
5       MR. BURKE:  No.  Has absolutely nothing whatsoever
6  to do with the Eimers incident.
7       MS. LEWIS:  May I ask you how long she's been on
8  administrative leave?
9       MR. BURKE:  Well, you'd have to ask her that.  I
10  don't know the answer to that.  How long have you been
11  on --
12      MS. LEWIS:  Would I be able to inquire of her?
13      MR. BURKE:  Sure.  You can ask how long that's
14  been, but she can't get into the details of the pending
15  Internal Affairs investigation.  But, as I said, it will
16  be a public record in probably not too long from now.
17  And if you, after reading the report, feel the need that
18  you want to question her about that, obviously, you'll
19  be able to.
20      MS. LEWIS:  Appreciate it.
21  BY MS. LEWIS:
22      Q.  With that said, ma'am, and I won't inquire into the
23  substance of the IA investigation, how long have you been on
24  administrative leave?
25      A.  Two weeks.

**16**

1       Q.  And do you have an understanding as to how much
2  longer you will remain on administrative leave?
3       A.  Hopefully, very soon, I'll be back to full duty.
4       Q.  Has anybody given you any kind of, you know, time
5  frame?
6       A.  Not a time frame, just saying that everything is
7  going well, as planned.
8       Q.  Do you have an understanding -- well, strike that.
9       With regard to the administrative leave, is it with
10  pay or without pay?
11      A.  With pay.
12      Q.  In connection with the Eimers incident, were you
13  the subject of any Internal Affairs investigation?
14      A.  I believe, Sergeant Tripp talked to us about it,
15  but that was it.
16      Q.  All right.  With regard to the Eimers -- let me see
17  if I understand you.
18      With regard to the Eimers incident, Sergeant Tripp
19  spoke with you regarding the incident; is that right?
20      A.  I'm confused -- excuse me a minute, but I'm
21  confused as to which one.  Sergeant Tripp has talked to me.
22  I don't remember if it was him I spoke to about Eimers or
23  not, so I'd have to clarify that with Sergeant Tripp.  He's
24  the Internal Affairs Sergeant for the station.
25      Q.  As you sit here today, are you aware of an Internal

4  (Pages 13 to 16)

17

1  Affairs investigation by the Key West Police Department into

2  the Eimers incident?

3      A.  I heard that there was one.  Yes, ma'am.

4      Q.  Do you know what the current status of that

5  investigation is?

6      A.  No, ma'am.  I don't.

7      Q.  Are you entitled to know the status of that

8  investigation?

9      A.  I have no idea.

10     Q.  Have you been Mirandized at all, by anyone, in

11  connection with your role in the Eimers incident?

12     A.  I'm not sure if we were Mirandized with FDLE or

13  not.

14     Q.  Were you ever put on administrative leave regarding

15  the Eimers incident?

16     A.  No, ma'am.

17     Q.  Were you given any reprimands as a result of the

18  Eimers incident?

19     A.  No, ma'am.

20     Q.  Are you aware of anyone who was reprimanded within

21  the Key West Police Department as a result of the Eimers

22  incident?

23     A.  I am not aware of any.

24     Q.  Other than your involvement on the day of the

25  incident, November 28, 2013, have you engaged in any

18

1  investigation into the Eimers incident?

2      A.  No, ma'am.

3      Q.  In connection with your deposition here today, did

4  you review materials?

5      A.  Did I review mine?  Yes, ma'am.  I did.

6      Q.  What did you review?

7      A.  I listened to the FDLE interview.  I looked at my

8  case report that I made.  I glanced over the training -- what

9  we've done for training.  I didn't study it, I just glanced

10  it over.

11     Q.  Did you look at any training syllabi?

12     A.  I looked at all the -- I looked them up, all the

13  policies and procedures for several subjects like handcuffing

14  and traffic stops and that kind of thing.  I just reviewed

15  them.

16     Q.  When you say policies and procedures, --

17     A.  Yes.

18     Q.  -- were you looking at general orders?

19     A.  Yes, ma'am.

20     Q.  Special orders?

21     A.  Yes, ma'am.

22     Q.  Standard operating procedures?

23     A.  Yes, ma'am.

24     Q.  Those all form part of the Key West Police

25  Department directives; is that correct?

19

1      A.  Yes, ma'am.

2      Q.  Do any of those -- are any of those higher than the

3  other?

4      A.  Yes, ma'am.  Some are.

5      Q.  What's the hierarchy, if you will?

6      A.  The ones that have no discretionary time.

7      Q.  Those are the most high, if you will?

8      A.  Yeah, I believe, the ones that you have, you have

9  yellow around the border.

10     Q.  Correct.

11     A.  That's like where you have no discretionary time.

12  So you have three different levels.

13     Q.  Now, where you have no discretionary time, these

14  are actually general orders that are -- you must commit to

15  memory; is that right?

16     A.  Yes, ma'am.

17     Q.  All right.  Because they're high-risk, low-

18  frequency and, therefore, you need to have these requirements

19  committed to your memory; is that right?

20     A.  Yes, ma'am.

21     Q.  Because you have no time whatsoever to consult the

22  directives when you're in the field and in a situation where

23  you need to employ these procedures; is that right?

24     A.  Yes, ma'am.

25     Q.  As you sit here today, did you comply with each and

20

1  every one of the Key West general orders on November 28,

2  2013?

3      A.  Yes, ma'am.  I did.

4      Q.  As you sit here today, did you comply with all of

5  the special operating procedures -- well, excuse me, standard

6  operating procedures of the Key West Police Department on

7  October [sic] 28, 2013?

8      A.  Yes, ma'am.  I did.

9      Q.  As you sit here today, were there any special

10  orders which were applicable to the situation which unfolded

11  on November 28, 2013?

12     A.  Rephrase your question.

13     Q.  Were there any special orders that were applicable

14  to the events that occurred regarding Mr. Eimers, on the

15  beach and prior thereto, on November 28, 2013?

16     A.  There's nothing special about any of them.  No,

17  ma'am.

18     Q.  As you sit here today, did you observe any

19  deviations from Key West Police Department general orders,

20  standard operating procedures or special orders by any of

21  your fellow officers in blue?

22     A.  No, ma'am.  I did not.

23     Q.  If you had seen officers deviate from the Key West

24  policies and procedures, you would have written that in your

25  report; is that right?

5 (Pages 17 to 20)

21

1    A.  Yes, ma'am.  I would have.
2    Q.  And that's because you take your job extremely
3  seriously; is that right?
4    A.  Yes, ma'am.  I do.
5    Q.  And when you wrote your report, you attempted to be
6  as complete and detailed as possible regarding what happened
7  on that day; is that right?
8    A.  Yes, ma'am.
9    Q.  And you, obviously in compliance with the Code of
10  Ethics for the Key West Police Department, you were
11  endeavoring to tell the truth when you prepared that report;
12  is that right?
13    A.  Yes, ma'am.
14    Q.  And you have, at every moment since that time,
15  whether it be an interview with the Key West Police
16  Department superiors, the FDLE, you're trying to tell the
17  truth; is that right?
18    MR. BURKE:  Object to form, but go ahead.
19    A.  Yes, ma'am.
20    Q.  You're telling the truth?
21    A.  Yes, ma'am.
22    Q.  All right.  Now, are you familiar with what's known
23  as interrogatories?
24    A.  Can't say that I am.
25    Q.  Did you review your report for accuracy before

22

1  turning it in?
2    A.  I did.  Yes, ma'am.
3    Q.  With regard to interrogatories, do you recall being
4  asked the following question or reading the following
5  question:
6    "Which officer remarked to the effect of, 'Get him
7  the fuck away from me, he just killed that man'"?
8    A.  I never heard that question.
9    Q.  Did you read that question and respond in
10  interrogatories?
11    THE WITNESS:  I'm not sure what she's asking.
12    MS. LEWIS:  All right.  Let me clarify, please.
13    MR. BURKE:  Then you need to ask her to clarify.
14    MS. LEWIS:  I'll be happy to clarify.
15  BY MS. LEWIS:
16    Q.  I'm going to show you a document.  It's multi-
17  paged.  The last page is a photocopy, but it appears to have
18  a signature and a notary stamp by Claire Hurd, and appears to
19  be dated October 30, 2014.  And the specific interrogatory
20  I'm going to refer to is Number 14.
21    So, given that I'm asking you to multitask, please
22  take a look at the document, then the last page.  Confirm for
23  me whether or not that's your signature.
24    MR. BURKE:  Do you have a -- can we see that here?
25  I'm sorry, I just --

23

1    A.  Okay.  If you're asking if that was my signature,
2  yes, it is.  And, I answered the same question, I don't know
3  who said that.
4    Q.  So --
5    A.  I never heard it.
6    Q.  Have you seen these questions before?
7    A.  Yes, ma'am.
8    Q.  These interrogatories, which I will mark as Exhibit
9  4.  Is it your testimony that you answered each and every one
10  of these questions?
11    A.  Yes, ma'am.
12    (Plaintiff's Exhibit 4 was marked.)
13    Q.  All right.  And did you have the help of anybody in
14  answering these questions?
15    A.  Not in answering them; no, ma'am.
16    Q.  Where were you when you answered them?
17    A.  I was with Mr. Burke.
18    Q.  Did Mr. Burke assist you in responding?
19    A.  No, he did not.
20    Q.  And with regard to the question, "Which officer
21  remarked to the effect of, quote, get him the fuck away from
22  me, he just killed that man," your answer is, quote,
23  "Unknown, I did not hear the quoted statement," end quote.
24  Is that correct?
25    A.  Yes, ma'am.

24

1    Q.  That is correct?
2    A.  That is correct.
3    Q.  Okay.  Did you ever say words to the effect of, on
4  November 28, 2013, at the beach, following the Eimers
5  incident, "Get him the fuck away from me, he just killed that
6  man"?
7    A.  No, ma'am.  I never said that at all.
8    Q.  You're familiar, a police officer, you're familiar
9  with perjury; is that correct?
10    A.  Very familiar.
11    MR. BURKE:  Well, we are very familiar with all
12  that.
13    MS. LEWIS:  All right.
14    MR. BURKE:  You don't have to be argumentative.
15  Please just answer her questions.
16    Q.  Now, you swore that this was a true answer; is that
17  correct?
18    A.  Yes, ma'am.
19    Q.  All right.  You know Mr. Mark Patterson?
20    A.  No, ma'am.  Not by name, I don't.
21    Q.  Are you familiar with the people at the
22  Southernmost Cafe?
23    A.  Not really.  I know one bartender and I don't know
24  him by name.
25    Q.  You're familiar and you told the FDLE that you were

---

25

1  quite familiar with the Southernmost Cafe; isn't that right?
2      A.  I told them I frequently go there to eat, but I
3  don't know the people there.
4      Q.  All right.  And you frequently go there in uniform?
5      A.  No.
6      Q.  You're familiar with the bartender.  What's his
7  name, is it Bill?
8      A.  I don't know.  That's what I said, I don't know his
9  name, I just know him.
10     Q.  Do you know some of the other people that work
11  there?
12     A.  I think there's a girl that works there now.  I
13  don't really remember her name, but somebody that I do know
14  that she was a waitress over there.
15     Q.  Joell Grassy?
16     A.  I don't know the name.
17     Q.  You don't know the name?
18     A.  I'm very friendly with a lot of people.
19     Q.  Now, if you were to have made the statement, "Get
20  him the fuck away from me, he just killed that man," that
21  would be a violation of Key West Police Department policy,
22  wouldn't that be?
23     MR. BURKE:  To make the statement?
24     MS. LEWIS:  Yes.
25     MR. BURKE:  Is that the question?

---

26

1      MS. LEWIS:  Yes.
2      MR. BURKE:  Object to the form of the question.  Go
3  ahead.
4      A.  Yes.
5      Q.  And why is that?
6      A.  Why is it against policy?
7      Q.  Yes.
8      A.  Because there's policies and procedures written,
9  right?
10     Q.  Well, what's the policy and procedure that would be
11  violated for you to, in uniform, at a scene, make the
12  statement, "Get him the fuck away from me, he just killed
13  that man"?
14     A.  I'd have to look it up, ma'am.  I don't really
15  know.
16     Q.  Did this -- what would it be in?
17     A.  I don't know.  Honestly, I'd have to search, do a
18  search on it.
19     Q.  Is it one of the general orders that you're
20  supposed to commit to memory?
21     MR. BURKE:  She told you she doesn't know.
22     MS. LEWIS:  Okay.  I'm just asking the questions.
23     MR. BURKE:  Well, she can tell you, I don't know.
24     A.  I really don't know.
25     Q.  And you had made inappropriate comments to other

---

27

1  members of the Key West Police Department in previously
2  incidents.  I believe at one point in time you called one of
3  the officers a faggot.  Do you remember that incident?
4      A.  I remember.
5      MR. BURKE:  Object to form of the question.
6      Q.  Now, and that did happen, right?
7      MR. BURKE:  Object to form of the question.
8      A.  I called him a fag, jokingly, as friends.
9      Q.  And you were written up for that; is that right?
10     A.  Yes, I was.
11     Q.  Okay.  And which policy were you charged with
12  violating on that instance?
13     A.  Conduct towards a coworker.
14     Q.  Would it be a similar violation to say, "Get him
15  the fuck away from me, he just killed that man"?
16     MR. BURKE:  Object to form of the question.
17     MR. REYNOLDS:  Join.
18     A.  I don't know about that, ma'am.  But I didn't say
19  it, so I don't know.
20     Q.  Now, if you made the statement -- strike that.
21     Do you deny that you made the following statement:
22  "Someone better get that son-of-a-bitch away from me before I
23  arrest him myself"?
24     And that statement is purportedly made on November
25  28th, 2013, outside the Southernmost Cafe, after the Eimers

---

28

1  incident.
2      MR. BURKE:  So your question is, did she make that
3  statement?
4  BY MS. LEWIS:
5      Q.  Did you make that statement?
6      A.  I did not make that statement.
7      Q.  Do you affirmatively deny, under oath, that you
8  made that statement?
9      A.  I deny it.
10     Q.  Do you affirmatively, do you also affirmatively
11  deny, under oath, that you made the following statement on
12  November 28, 2013, in uniform, following the Eimers incident
13  at the Southernmost Cafe Beachside:  "That son-of-a-bitch
14  just murdered that man."
15     A.  I -- did I say that?
16     Q.  Correct.
17     A.  No, ma'am.  I did not say that.
18     Q.  You affirmatively deny, under oath, making that
19  statement; is that right?
20     A.  I totally deny it.
21     Q.  Can you think of any reason on this earth why a
22  person who was neither affiliated with Mr. Eimers, nor
23  affiliated with any of his attorneys, nor affiliated with the
24  Key West Police Department, would himself make a statement,
25  under oath, that you had said those two things?

**WWW.USLEGALSUPPORT.COM**
**1-888-311-4240**

---

**29**

1    MR. BURKE:  Object, objection to form of the
2  question.
3    MR. REYNOLDS:  Join.
4    MR. BURKE:  Calls for speculation.
5    A.  He may have overheard a man say that to me, because
6  there is a man that said that last statement to me over by
7  the cafe, and I was appalled that he said it.
8    He said, "I just saw what you guys did, you
9  murdered that guy."
10    And it really upset me.  So I said, "Sir," I said,
11  "the only thing I can say to you is perception.  It's all
12  about perception.  Now, please step back."
13    Q.  I want to talk to you about perception.  Now, that
14  man, first of all, that man who said that, he's a former —
15  he's a former police officer in New York; is that your
16  understanding?
17    A.  I didn't know him at all, ma'am.
18    Q.  You didn't know him from a hole in the wall.
19  Didn't he tell you he was a police officer?
20    A.  No, ma'am.  I don't believe he did.
21    Q.  And he was very accusatory and upset with how the
22  Key West Police Department had handled themselves that day;
23  is that right?
24    A.  He was upset, by that statement that he made to me.
25    Q.  And, in fact, would it be fair to say that you and

---

**30**

1  he were having words back and forth with each other?
2    A.  No, ma'am.  Just one, one sentence I said to him.
3    Q.  And what did that man say that you heard?
4    A.  That statement you just read.  "I just saw what you
5  did to that man.  You murdered him."
6    Q.  Did you get his name?
7    A.  No, ma'am.
8    Q.  Now, you, and we're going to get there, but you
9  went and physically spoke to and took statements of two other
10  witnesses that day; is that right?
11    A.  They approached me and my sergeant.
12    Q.  All right.  And this man similarly made statements
13  in your presence; is that correct?
14    A.  This man made statements, accusatory statements,
15  just being very disruptive and yelling.
16    Q.  Did you feel it unnecessary to get this man's
17  statement to figure out what he saw?
18    A.  I would have taken his statement if he had said,
19  hey, I want a state — I want to write a statement.  I had no
20  problem doing that.
21    Q.  Did you tell this man, listen, something just
22  occurred here and I need to get what you saw?
23    A.  No.  No, ma'am.  My job was to do scene security at
24  that time.
25    Q.  And scene security.  How long after Mr. Eimers was

---

**31**

1  removed from the scene, was it that we waited to have yellow
2  police tape at the scene?
3    A.  I don't know.
4    Q.  You didn't place the police tape, did you?
5    A.  Honestly, I can't remember if I did or not.  I just
6  know I didn't let anybody down by the beach area.
7    Q.  So if a video shows people milling about at the
8  scene, walking up close by to it, walking to the pier,
9  walking in the general vicinity and there's no police tape,
10  are you securing the scene at that point?
11    MR. BURKE:  Object to form.  Go ahead.
12    MR. REYNOLDS:  Join.
13    A.  The pier, the pier didn't have anything to do with
14  it.  I was just standing right where the beach started, from
15  the side of the restaurant.  I was not allowing anybody where
16  the sand area where the car was.  There were other officers
17  out there, too, because I couldn't do it all by myself.
18    Q.  Do you deny that you threatened to arrest that man
19  who was not very — who was upset with how the Key West
20  Police Department conducted themselves that day on the beach?
21    A.  I never said that to him.
22    Q.  You never threatened to arrest that man?
23    A.  No, ma'am.
24    Q.  Do you know why witnesses would say that Kathyann
25  Wanciak or Officer Wanciak threatened to arrest that man —

---

**32**

1    MR. BURKE:  Objection.
2  BY MS. LEWIS:
3    Q.  — who had said he had never before seen such an
4  abuse of power?
5    MR. BURKE:  Objection, it calls for —
6    A.  I was standing next to my —
7    MR. BURKE:  Pardon me, ma'am.  Pardon me.
8    THE WITNESS:  Oh, I'm sorry.
9    MR. BURKE:  Objection, it calls for speculation as
10  to why he would say that.
11    THE WITNESS:  So I don't answer now?
12    MR. BURKE:  You may, you may answer it.
13    THE WITNESS:  Okay.
14    MR. BURKE:  If you know what he was thinking, then
15  you tell her.
16    THE WITNESS:  No, I don't know what he was
17  thinking.  I was standing next to my sergant.
18  BY MS. LEWIS:
19    Q.  You've never seen that man's name in anything
20  you've reviewed in —
21    A.  No, ma'am.
22    Q.  — this case; is that right?
23    And you never told anybody about him; is that
24  right?
25    A.  I mentioned about somebody saying that we murdered

WWW.USLEGALSUPPORT.COM
1-888-311-4240

33

1 this man and it upset me.
2 Q.  To the FDLE, you made that statement; is that
3 right?
4 A.  Yes, ma'am.
5 Q.  That's not in your police report, though, is it?
6 A.  No, ma'am.
7 Q.  How come?
8 A.  I put down the facts of what happened when I was
9 out there, not about some guy being a disruptive person out
10 there, trying to make a scene.
11 Q.  But your statement does include the fact of two,
12 two, two people who claim that they were almost run over by
13 Mr. Eimers; is that right?
14 A.  Yes, ma'am.  They came up to us and asked --
15 Q.  Why --
16 A.  -- to do a statement.
17 Q.  Why are they important, but the gentleman who was
18 very upset with how Key West police officers handled
19 themselves, not?
20     MR. BURKE:  Object to form.
21     MR. REYNOLDS:  Join.
22     MR. BURKE:  You may answer.
23 A.  I don't know why he was so upset, but obviously he
24 was.  I had no problem taking a statement, but I couldn't do
25 it right then.

34

1 Q.  Now, if you were running scene security, obviously,
2 and you've been sitting here all day like we all have been,
3 you saw during questioning of Officer Lovette, the portions
4 of the videotape of the cell phone bystander, if you will,
5 that shows another man shooting the scene with what appears
6 to be a handheld camera; is that right?
7 A.  I saw a man there, yes, right.
8 Q.  Did you approach him?
9 A.  No, ma'am.  If you saw the same video, I was over
10 by Mr. Eimers.  I didn't even see him until you just showed
11 it on the video.
12 Q.  Did you ever approach him after the fact?
13 A.  I didn't know who, who he was or that he had a cell
14 phone.
15 Q.  Wouldn't it be -- wouldn't it be important, since
16 the man had a camera, to go talk to him, get his name, his
17 address, so that you could get a copy of his footage?
18     MR. BURKE:  Object to the form of the question.
19     MR. REYNOLDS:  Join.
20 A.  Yeah, it would be very important, but I had no
21 idea.
22 Q.  Well, you were running scene security.  Did you
23 make a point to go try and find him?
24     MR. BURKE:  Object to the form of the question.
25     MR. REYNOLDS:  Join.

35

1 A.  Okay.  I did not know he was there, because I was
2 in the video over there with Mr. Eimers on the ground.  So I
3 had no idea that that man was there, else I would have hunted
4 him down.
5 Q.  Did anybody else attempt to go try and find
6 witnesses?
7 A.  I have no idea what they did.
8 Q.  Isn't one of the things as a certified law-
9 enforcement officer, aren't you supposed to try and obtain
10 all relevant information that you can?
11 A.  Always.
12 Q.  And, nevertheless, you never saw this man?
13 A.  No, ma'am.  I did not.
14 Q.  You never learned about this man?
15 A.  I didn't see it until just today that he had a
16 camera.
17 Q.  Nobody ever told you about this man?
18 A.  No, ma'am.
19 Q.  How many officers were there during the arrest and
20 detention of Mr. Eimers?
21 A.  I heard you say that there were eleven.  I would
22 not know.
23 Q.  Have you looked at any of the dash-cam footage?
24 A.  No, ma'am.
25 Q.  Have you looked at your own dash-cam footage?

36

1 A.  I was showed my own, yes.
2 Q.  Now, you didn't have your wireless mic on that day,
3 did you?
4 A.  No, ma'am.
5 Q.  Why not?
6 A.  It was in the cradle charging.
7 Q.  Now, you knew, because you were following this man,
8 that what was going to unfold when you got out of your car at
9 the beach, would probably be very important; is that fair?
10     MR. BURKE:  Object to the form of the question.
11 A.  Fair.
12 Q.  Why did you not grab your mic?
13 A.  If my mic had charged, I would have loved to have
14 had the mic on for the whole thing.
15 Q.  Now, it was just shortly after eight, about 8:22
16 a.m., Thanksgiving morning.  Why was there no charge to your
17 mic?
18 A.  I wished I knew that.  I had the ICOP system and
19 the ICOP system, I have numerous emails to my supervisors
20 that there's malfunctioning in it.  So, I have no idea if
21 that was part of it or not.
22 Q.  Did anybody confirm for you at any point in time
23 after the Eimers incident that, yes, your ICOM [sic]
24 experienced a malfunction on that day?
25 A.  Not on that day.  No, ma'am.  I know I had to have

---

**37**

1    another hard drive installed and replaced for my ICOP.
2        Q.  How long after the Eimers incident did that occur?
3        A.  I couldn't tell you without looking at
4    documentation.
5        Q.  Was it in 2014 or 2013?
6        A.  I think it was '14.  I'm really not sure unless I
7    look.
8        Q.  And the ICOM is something you use every day?
9            MR. BURKE:  ICOP.
10   BY MS. LEWIS:
11       Q.  ICOP?
12       A.  Yeah.
13       Q.  Excuse me.
14       A.  I use it because I do a lot of traffic.
15       Q.  And that's something you use every day?
16       A.  I take it out of the cradle each time I have a
17   traffic stop.
18       Q.  Do you know of any other officers who were wearing
19   their ICOP wireless mic that day?
20       A.  I have no idea what they would have, no.
21       Q.  I apologize for jumping back, but how many witness
22   statements did you get from people who spoke negatively about
23   the Key West Police Department regarding the Eimers incident?
24       A.  I only got two witness statements, period, that was
25   it.

---

**38**

1        Q.  Did you attempt to go ask any other bystanders,
2    hey, did you observe anything, could I talk to you, could I
3    get your names, the detective's on his way, anything like
4    that?
5        A.  I -- there were people, there were some women down
6    by the beach area, by the dead end of the street.  And I went
7    over there and asked if anybody saw anything and everybody
8    was like, no, no, no, no.  So, I did try to canvass the area
9    a little bit.
10       Q.  When is the first time you became aware of the
11   young lady or at least the fact that there was a cell phone
12   video that captured part of the encounter?
13       A.  I think I heard about it later that afternoon.
14       Q.  Okay.  And who told you?
15       A.  I believe Sergeant Zamora told me.
16       Q.  Had he seen the video?
17       A.  I finally got to see it, yeah.  It was a long --
18           MR. BURKE:  The question was, had he seen the
19   video.
20           THE WITNESS:  Oh, I'm sorry.  There's a fan over
21   here and it's loud.
22       Q.  I'm sorry.  I'll try and talk louder, but I'm not
23   yelling.
24       A.  That's all right.
25       Q.  Did Sergeant Zamora indicate to you that he had

---

**39**

1    seen the video at that time?
2        A.  I don't remember if he said he saw it or not.  I
3    just knew that there was one and I said, good.
4        Q.  Did you mention that video at all in your report
5    that you prepared?
6        A.  I believe it was after I had wrote that report that
7    I even found out.
8        Q.  Did you ever prepare a supplemental report?
9        A.  Yes, ma'am.
10       Q.  And so, you have two reports to the Key West Police
11   Department in connection with this incident; is that correct?
12       A.  No.  I have one supplemental.
13       Q.  Okay.
14       A.  As far as I'm aware.
15       Q.  Did someone steal mine?  Here it is.
16           Have you seen the incident report prepared by
17   Office Celcer and as supplemented by the various officers?
18       A.  I haven't seen all of theirs, no.
19       Q.  With regard to the Key West Police Department
20   report, I will show you a copy of what has been represented
21   to me to be your report connected with the Eimers incident.
22       A.  This is the only one I know that I wrote.
23       Q.  And that's a three-page report; is that right?
24       A.  Yes, ma'am.
25       Q.  All right.  And you called it supplemental?

---

**40**

1        A.  Yes, ma'am.
2        Q.  All right.  Now, at the top -- now, the date of the
3    Eimers incident was Thanksgiving morning; is that right?
4        A.  Yes, ma'am.
5        Q.  That was October 28 -- or, excuse me, November 28,
6    2013?
7        A.  Yes, ma'am.
8        Q.  The top right of the report that you authored,
9    let's first of all establish your signature at the end.  Do
10   we have a signature?  I guess we don't.  Did you
11   electronically sign this document?
12       A.  Yeah, it's all -- it's all done electronically.
13       Q.  All right.  The date at the top right of the report
14   is what?
15       A.  11/28 of '13.
16       Q.  At 16 minutes after midnight; is that right?
17       A.  That's what it says.
18       Q.  At what time did you prepare your report?
19       A.  I did it on December 2nd, 2013.
20       Q.  Do you know why the date the report is prepared, at
21   least as is indicated at the top of the report, is 16 minutes
22   after the hour of midnight on Thanksgiving, November 28,
23   2013?
24       A.  It probably goes -- it goes under our original
25   report and then we just do a supplemental.  So a lot of the

---

                                    10  (Pages 37 to 40)

41

1 original report stuff gets put on this still, and then we
2 just go and do our narrative. So you'll see a lot of what
3 Officer Celcer wrote on the top, and then I do the narrative
4 for the supplement.
5 Q. Well, the reason I'm asking, also, is because under
6 report type, just under that it says, original. And, you
7 know, I know you —
8 A. Where are you looking, ma'am?
9 Q. On the first page of your report.
10 A. Yeah, that's for Officer Celcer.
11 Q. All right. Because when I looked at everybody
12 else's report, theirs says supplemental, and yours is the
13 only one that says original other than Mr. -- or, Officer
14 Celcer.
15 A. Oh.
16 MR. BURKE: The copy I have says supplemental.
17 THE WITNESS: No, right here she's looking, and it
18 says original. If that's supposed to say supplemental,
19 then I missed it. To change it, my sergeant must have
20 not caught it.
21 Q. That's right. The verifying officer is Sergeant
22 Zamora who is sitting right here at your deposition and he's
23 been sitting here all day; is that right?
24 A. Yes, ma'am.
25 Q. And he verified your report for what, accuracy?

42

1 A. Yes, ma'am.
2 Q. Tell me in your words, as opposed to mine, what it
3 means to verify the report?
4 A. He has to make sure I have what happened before,
5 during and after, grammatically proper, you know, spelling,
6 we don't leave words out. And I have read it and I do
7 believe I messed up on a couple of words still. So, we're
8 not perfect. We are human.
9 Q. So this report was prepared by you and verified by
10 Sergeant Zamora. We've already identified at least two
11 errors; is that correct?
12 A. Yeah.
13 Q. Now, let's go into the narrative, which is
14 something that -- did you personally type it?
15 A. Yeah.
16 Q. And did you type it at a computer screen at the
17 office?
18 A. I believe I did it in my car.
19 Q. This is -- do you have like a laptop device in your
20 car?
21 A. Yeah. And you have to do like this (indicating)
22 while you're typing.
23 Q. Is that what you're required to do as soon as you
24 can after an incident, is to write your report?
25 A. Yes, ma'am. Normally.

43

1 Q. And is that what you did in this case?
2 A. No, ma'am. I did not do it immediately.
3 Q. When did you first prepare your report in
4 connection with the Eimers incident?
5 A. Prepare it or write it out?
6 Q. Well, is there a difference?
7 A. Yes.
8 Q. Okay.
9 A. Because I wanted to keep everything in my head, I
10 wrote on a Microsoft and wrote down everything that you're
11 seeing, so that I would have it for when I was told to write
12 it.
13 Q. Understood. Now, okay. So, the Microsoft, is that
14 in your car?
15 A. It's just something that you just, you know,
16 Microsoft Word, just so I could have something and write it
17 up.
18 Q. Is that a thing in your car? I understand it's
19 software, but is that on the car's computer?
20 A. Yeah, right.
21 Q. And when I say it's the car, it's your departmental
22 issued —
23 A. Uh-huh.
24 Q. -- cruiser; is that right?
25 A. Yes, ma'am.

44

1 Q. And it's a Word document; is that right?
2 A. Yes, ma'am.
3 Q. And do you still have it?
4 A. No.
5 Q. Did you erase it?
6 A. I transferred it over when it was time to write the
7 report.
8 Q. Did you save a copy?
9 A. No.
10 Q. You don't ever save your drafts?
11 A. No, ma'am.
12 Q. Did anybody see your draft?
13 A. No, ma'am.
14 Q. And so, when you say you prepared your report, when
15 did you do that? Was it still on scene?
16 A. It was afterwards, after the captain had come and
17 talked to us all.
18 Q. And where did the captain talk to you all?
19 A. Out in the parking lot.
20 Q. At the Southernmost?
21 A. At the station.
22 Q. At the station; is that right?
23 A. Yes, ma'am.
24 Q. After, after you left the beach where the Eimers
25 incident happened, did you go back to the station right

**WWW.USLEGALSUPPORT.COM**
**1-888-311-4240**

45

1  after?
2      A.  No, it was not right after.
3      Q.  How long after the Eimers incident was it that the
4  captain spoke to you in the parking lot of the Key West
5  Police Department?
6      A.  I don't know.  Maybe a couple hours.  I don't
7  really remember.
8      Q.  And what did the — what did he talk to you all
9  about?
10     A.  Well, he just came up to me in my car and asked me
11  if I was okay, if everything was all right and did I feel
12  okay to keep working.  And I said, yeah.
13     Q.  And this is captain who?
14     A.  Smith, Scott Smith.
15     Q.  Married to Kathy Smith of FDLE; is that right?
16     A.  I don't think they're married.
17     Q.  Well, they're no longer married; is that right?
18     A.  I think so.
19     Q.  They are —
20     A.  You'd have to check that out.
21     Q.  They were formerly married; is that right?
22     A.  As far as I know.
23     Q.  They've been now divorced a long time?
24     A.  I have no idea how long they've been divorced.
25     Q.  Had you met Kathy Smith before the FDLE interview?

46

1      A.  Yes, ma'am.
2      Q.  Have you ever worked with her before on anything?
3      A.  No, ma'am.
4      Q.  Did you know her personally?
5      A.  No, ma'am.
6      Q.  So, were you with other officers when Captain Smith
7  came to talk to you in the parking lot at the police
8  department?
9      A.  There were other patrol cars there, but I just saw
10  him come out and he came to the side of my car when my window
11  was down and spoke to me then.  It was very brief.
12     Q.  Did he talk to any of the other, other —
13     A.  I have no idea.
14     Q.  Blah.  I was mumbling.
15         Did he talk to any of the other officers?
16     A.  I have no idea.
17     Q.  Were the other officers in the parking lot also
18  involved in the Eimers incident?
19     A.  I really don't know who was all there, because
20  there was -- all the patrol cars were pretty full in the
21  slots.
22     Q.  Was it your understanding that Captain Smith was
23  referring to perhaps you would have been upset with what had
24  happened that morning and were not feeling well enough to
25  continue your shift?

47

1      A.  He, he seemed concerned about that, and I told him
2  that I was upset, but I could handle it.
3      Q.  Is that the first time an in-custody death had
4  occurred in an arrest that you were involved in?
5      A.  That I was involved in?  Yes, ma'am.
6      Q.  Was that the first time you had also been involved
7  in a prone restraint?
8      A.  No, I've helped DUI officers in years ago, do a
9  prone restraint.
10     Q.  Have you ever done prone restraints on the sand
11  before Mr. Eimers?
12     A.  Not on the sand.  No, ma'am.
13     Q.  Have you ever been the subject of a prone
14  restraint?
15     A.  We did it in training at the school.
16     Q.  And when you say training at the school, is that
17  the school you attended to get your certificate for a law-
18  enforcement officer?
19     A.  Yes, ma'am.
20     Q.  In Lake County --
21     A.  Yes, ma'am.
22     Q.  -- Technical School?
23     A.  Yes, ma'am.
24     Q.  All right.  And how many times have you been the
25  subject of a prone restraint?

48

1      A.  Just, just during the training time.
2      Q.  And, I don't want to go too far afield, but in
3  connection with that training, did you also learn about the
4  physiology of struggle?  Do you know what I mean when I say
5  that term?
6      A.  Yeah, they -- they do go over it, you know, about
7  the A, B, Cs and all that.  Make sure your detainee is okay
8  and all that.
9      Q.  When you say the A, B, Cs?
10     A.  Air, breathing and cardiovascular.
11     Q.  And is that a special concern when conducting a
12  prone restraint, as you've been trained?
13     A.  It's -- it's with any detainee, you always want to
14  make sure they're okay.
15     Q.  Has your training taught you that when undertaking
16  a prone restraint, that the A, B, Cs are even more important
17  in that regard?
18     A.  I really couldn't remember that far back, but I
19  still take it into consideration all the time.
20     Q.  Because you've had training with the Key West
21  Police Department since 2006; is that right?
22     A.  Yes, ma'am.
23     Q.  And some of the training has actually addressed
24  prone restraint; is that right?
25     A.  We talk about so much, it's so hard to pinpoint

49

1   which part we talk about. So, if you say so, then I guess
2   O've had it. I'd have to look at my --
3       MR. BURKE: Well, you don't have to agree with her.
4       THE WITNESS: Oh.
5       MR. BURKE: If you don't know the answer --
6       THE WITNESS: No, I said I'd have to look.
7       MR. BURKE: -- you should tell her you don't know
8   or remember. That's what you should do.
9       THE WITNESS: I don't really remember. I'd have to
10  look at my documentation.
11  BY MS. LEWIS:
12      Q.  And obviously, the documentation, such as a summary
13  of your training, that's just a summary; is that right? It's
14  not a syllabus, is my point.
15      A.  Yeah.
16      Q.  It doesn't have everything on here that you are
17  tuteled (ph) in or instructed in as a part of the individual
18  courses; is that right?
19      A.  Correct.
20      Q.  All right. So the summary document may not
21  indicate that you were taught about prone restraint. But my
22  question is, is have you, as an officer with the Key West
23  Police Department, had the training in prone restraint?
24      A.  I'm not sure if I have or not. I just know that
25  I've had it.

50

1       Q.  Well, let me give you a minute to think about it.
2       A.  I don't think it's going to trigger my brain any.
3   I have had prone restraint direction through, through school.
4   I'm not sure if we've focused on that part with the Key West
5   Police Department part.
6       Q.  Do you know why?
7       A.  No, ma'am.
8       Q.  Are you familiar with the Department of Justice?
9       A.  Yes, ma'am.
10      Q.  And they have certain programs on law-enforcement
11  procedures; is that a fair understanding?
12      A.  Okay.
13      Q.  Well, do you have that understanding?
14      A.  Yes, ma'am.
15      Q.  And, in fact, Department of Justice materials form
16  the basis for some of the general orders at Key West Police
17  Department; isn't that right?
18      MR. BURKE: Object to the form.
19      MR. REYNOLDS: Join.
20      A.  Yes, ma'am.
21      Q.  And there's, there's — and are you familiar with
22  them?
23      A.  Yes, ma'am.
24      Q.  Do you look at the reference materials for some of
25  your general orders?

51

1       A.  Once in a while, I do; yes, ma'am.
2       Q.  Do you recall ever being trained in physiology of
3   struggle?
4       A.  I remember us talking about it; yes, ma'am.
5       Q.  As an officer for the Key West Police Department;
6   is that right?
7       A.  I really don't remember.
8       Q.  Do you recall being instructed that a person lying
9   on his stomach has trouble breathing when pressure is applied
10  to his back?
11      A.  Yes, ma'am.
12      Q.  You recall that as being part of the physiology of
13  struggle?
14      A.  Yes, ma'am.
15      Q.  What did the training dictate or indicate would be
16  the remedy to that problem?
17      A.  I don't remember.
18      Q.  Were you trained that a suspect, when restrained in
19  a face-down position, may have labored breathing?
20      A.  Yes, ma'am.
21      Q.  Were you trained that the more weight, the more
22  severe the degree of compression would be?
23      A.  Yes, ma'am.
24      Q.  Do you recall in your training that the more
25  weight, the more severe the degree of compression and, hence,

52

1   the individual experiences increased difficulty breathing?
2       A.  Yes, ma'am.
3       Q.  And do you recall being trained that the natural
4   reaction to oxygen deficiency occurs, the person struggles
5   more violently?
6       A.  Yes, ma'am. I know that.
7       Q.  You understand that, as you understood that on
8   November 28th, 2013, as being a known risk, if you will, with
9   the prone restraint?
10      A.  Yes, ma'am.
11      MR. BURKE: Object.
12      MR. REYNOLDS: Join.
13      Q.  Do you consider the Department of Justice articles
14  authoritative?
15      MR. BURKE: Object to form.
16      MR. REYNOLDS: Join.
17      A.  Yes.
18      Q.  Did you personally consider the physiology of
19  struggle during the Charles Eimers incident?
20      A.  Yes, I did.
21      Q.  And what did you consider?
22      A.  I made sure that he was still breathing and his
23  face was turned sideways while we were trying to get his
24  handcuffs on.
25      Q.  When you were trying to get his handcuffs on; is

53

1   that right?
2       A.  Yes, ma'am.
3       Q.  Now, his handcuffs were on before you sprinted to
4   your car to get the hobble; is that right?
5       A.  Yes, ma'am.
6       Q.  All right.  How long was it from the time Mr.
7   Eimers got out of his car to the time Officer Garrido,
8   yourself and Lovette successfully secured his right hand into
9   the cuff?
10      A.  I don't know exactly how much time it was.
11      Q.  It was definitely before Officer Garrido exclaimed,
12  "Ow," is that right?
13          MR. BURKE:  Object to the form.
14      A.  Say the question again?
15      Q.  Let me, let me ask you this.
16          Officer Garrido, at one point in time, allegedly
17  got his fingers stuck in the right cuff on Mr. Eimers' wrist;
18  is that right?
19      A.  Yes, he did.
20      Q.  All right.  And, at that time, he made a verbal
21  sound; is that correct?
22      A.  Yes, ma'am.  He did.
23      Q.  Do you recall whether that verbal sound was the
24  word or the exclamation, "Ow"?
25      A.  I don't recall what it was.  I could hear it.  So

54

1   could everyone else.
2       Q.  Do you recall what he specifically said?
3       A.  I heard him say his finger was stuck.
4       Q.  My finger is stuck, is what you heard?
5       A.  I heard him say something about his finger being
6   stuck, yes.
7       Q.  You're sure you didn't hear him say the word "ow"?
8       A.  I said, I don't know.
9       Q.  You don't dispute that he said the word "ow"?
10      A.  No, I don't dispute it.
11      Q.  Okay.  And at the time he said, "ow," Mr. Eimers --
12  both of Mr. Eimers' hands were behind his back; is that
13  correct?
14      A.  Yes, ma'am.  They were.
15      Q.  Secured in handcuffs; is that right?
16      A.  His hands, yes, they were.
17      Q.  All right.  And so you were --
18      A.  With --
19      Q.  -- there making sure --
20      A.  With his --
21      Q.  I'm sorry.  I didn't mean to interrupt.
22      A.  With his finger attached.
23      Q.  And for how long was his finger stuck?
24      A.  Not very long.
25      Q.  And that's when you were looking to make sure Mr.

55

1   Eimers was still breathing; is that right?
2       A.  I -- I checked his, his breathing the whole time
3   with his face, because his face was to the side and I could
4   see that he was still breathing.
5       Q.  And what is it about his face that tells you he's
6   still breathing?
7       A.  He was still making motions and noises and he was
8   making noises the whole time.
9       Q.  Have you ever seen a drowning victim?
10      A.  Not in person.
11      Q.  Have you seen someone in the process of drowning?
12      A.  On video.
13      Q.  What's that person doing?
14      A.  Making noises.
15      Q.  Are they breathing?
16      A.  Yes, ma'am.
17      Q.  Really?  Are you a lifeguard?
18      A.  No, ma'am.
19          MR. REYNOLDS:  Objection, form.  It's five o'clock
20  and I don't want to run into a problem with our --
21          MR. BURKE:  As long as we don't get locked in.
22          MR. REYNOLDS:  Yeah, exactly.
23          MR. MCKEE:  Well, more importantly that we don't
24  get thrown out for the rest of the week, so let's be
25  compliant with the courthouse people.

56

1           MR. REYNOLDS:  Yeah.
2           MS. LEWIS:  Do you want to go off record and
3   discuss logistics?  Because I'm not going to be done in
4   the next 50 seconds.
5           THE VIDEOGRAPHER:  Off the video record at 4:59
6   p.m.
7           (Off-the-record discussion.)
8           (Plaintiff's Exhibit 5 was marked.)
9           (The deposition was adjourned at 5:00 p.m.)

57

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MONROE )

    I, Suzanne F. Ex, Certified Verbatim Reporter,
Florida Professional Reporter, Notary Public, State of
Florida, certify that KATHYANN WANCIAK personally appeared
before me on the 4th day of November, 2014, and was duly
sworn.

    Signed this 10th day of November, 2014.

*Suzanne F. Ex*

Suzanne F. Ex, CVR-M, FPR
Notary Public, State of Florida
Commission No.:  FF015913
Commission Expires:  July 27, 2017

---

58

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF MONROE )

    I, Suzanne Ex, Certified Verbatim Reporter and
Florida Professional Reporter, certify that I was authorized
to and did report the deposition of KATHYANN WANCIAK, pages
through 56; that the review of the transcript was requested;
and that the transcript is a true record.

    I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor am
I a relative or employee of any of the parties' attorneys or
counsel connected with the action, nor am I financially
interested in the action.

    Dated this 10th day of November, 2014.

*Suzanne F. Ex*

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter-Master
Florida Professional Reporter

---

59

WITNESS NOTIFICATION LETTER

November 10, 2014

Kathyann Wanciak
c/o Michael T. Burke, Esquire
Johnson Anselmo Murdoch Burke Piper & Hochman, P.A.
2488 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida  33304

RE:  Treavor Eimers vs. City of Key West, et al.
    Deposition Taken November 4, 2014
    U.S. Legal Support Job No. 1186137

The transcript of the above-referenced proceeding has been
prepared and is being provided to your office for review by
the witness.

We respectfully request that the witness complete their
review within 30 days and return the errata sheet to our
office.

Sincerely,

*Suzanne F. Ex*  CVR-M, FPR
U.S. Legal Support, Inc.
One Southeast Third Avenue, Suite 1250
Miami, Florida  33131
(305) 373-8404

CC via transcript:

David W. Brill, Esquire
Jeannete C. Lewis, Esquire
Robert J. McKee, Esquire
David Paul Horan, Esquire
Darren M. Horan, Esquire
Lyman H. Reynolds, Jr., Esquire

---

60

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT -- ENTER CHANGES ON THIS PAGE

IN RE:  Treavor Eimers vs. City of Key West, et al.
    Kathyann Wanciak
    November 4, 2014

| Page No. | Line No. | Change | Reason |
|----------|----------|--------|--------|
|          |          |        |        |

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

_____
Date       Kathyann Wanciak

WWW.USLEGALSUPPORT.COM
1-888-311-4240

## A

**a.m** 36:16
**abilities** 13:5
**able** 15:1,12,19
**above-referenced**
  59:10
**absolutely** 15:5
**abuse** 32:4
**academy** 9:8
**accept** 11:25
**accuracy** 21:25
  41:25
**accusatory** 29:21
  30:14
**achieve** 12:6
**action** 58:15,16
**address** 34:17
**addressed** 48:23
**adjourned** 56:9
**admin** 14:5
**administrative**
  14:20 15:8,24
  16:2,9 17:14
**ADOLFO** 3:9
**Adopted** 6:3
**Affairs** 14:18,21
  15:15 16:13,24
  17:1
**affiliated** 28:22
  28:23,23
**affirm** 5:2
**affirmatively** 28:7
  28:10,10,18
**afield** 48:2
**afternoon** 4:5 5:12
  5:13 38:13
**age** 8:10 12:25
**agencies** 9:17
**agility** 13:10
**ago** 47:8
**agree** 12:5 49:3
**agreed** 11:2,13,21
**ahead** 11:4 21:18
  26:3 31:11
**Air** 48:10
**al** 1:8 4:10 59:7
  60:4
**allegedly** 53:16
**allowed** 7:25
**allowing** 31:15
**amount** 7:12
**Anselmo** 2:19 59:5
**answer** 7:17 15:10
  23:22 24:15,16
  32:11,12 33:22
  49:5
**answered** 23:2,9,16

**answering** 23:14,15
**Answers** 3:22
**anybody** 16:4 23:13
  31:6,15 32:23
  35:5 36:22 38:7
  44:12
**apologize** 7:21
  37:21
**appalled** 29:7
**appearances** 2:1
  3:1 4:15
**appeared** 57:8
**appears** 22:17,18
  34:5
**applicable** 20:10
  20:13
**application** 9:16
  9:17
**applied** 10:1,9
  51:9
**apply** 10:4
**Appreciate** 15:20
**approach** 34:8,12
**approached** 30:11
**area** 31:6,16 38:6
  38:8
**argumentative**
  24:14
**ARNAUD** 3:10
**arrest** 27:23 31:18
  31:22,25 35:19
  47:4
**articles** 52:13
**asked** 22:4 33:14
  38:7 45:10
**asking** 22:11,21
  23:1 26:22 41:5
**assist** 23:18
**assistant** 9:1
**attached** 54:22
**attempt** 35:5 38:1
**attempted** 21:5
**attended** 47:17
**attorney** 58:13
**attorneys** 28:23
  58:14
**authored** 40:8
**authoritative**
  52:14
**authorized** 58:7
**Avenue** 59:18
**aware** 16:25 17:20
  17:23 38:10
  39:14

## B

**B** 48:7,9,16

**back** 11:19 12:20
  12:22 14:15 16:3
  29:12 30:1 37:21
  44:25 48:18
  51:10 54:12
**badge** 11:22
**bartender** 24:23
  25:6
**basis** 50:16
**beach** 3:4 20:15
  24:4 31:6,14,20
  36:9 38:6 44:24
**Beachside** 28:13
**becoming** 8:4
**BEDARD** 3:3
**behalf** 2:2,19 3:2
  4:17,20,21,23
**believe** 12:14
  16:14 19:8 27:2
  29:20 38:15 39:6
  42:7,18
**better** 27:22
**Bill** 25:7
**bit** 7:22 38:9
**Blah** 46:14
**blue** 20:21
**border** 19:9
**born** 5:23 8:9
**Boulevard** 2:3,11
  2:15,20 59:5
**brain** 50:2
**breathing** 48:10
  51:9,19 52:1,22
  55:1,2,4,6,15
**brief** 14:14 46:11
**Brill** 2:3,5 4:19
  59:22
**Building** 3:3
**Burke** 2:19,22 4:21
  4:21 7:14,16 8:6
  9:5 11:4 12:3,12
  12:16,21 13:3,8
  13:18,21 14:9,17
  15:5,9,13 21:18
  22:13,24 23:17
  23:18 24:11,14
  25:23,25 26:2,21
  26:23 27:5,7,16
  28:2 29:1,4
  31:11 32:1,5,7,9
  32:12,14 33:20
  33:22 34:18,24
  36:10 37:9 38:18
  41:16 49:3,5,7
  50:18 52:11,15
  53:13 55:21 59:4
  59:5

**burke@jambg.com**
  2:21
**bystander** 34:4
**bystanders** 38:1

## C

**C** 2:17 59:23
**C-101** 3:3
**c/o** 59:4
**cafe** 24:22 25:1
  27:25 28:13 29:7
**called** 27:2,8
  39:25
**calls** 29:4 32:5,9
**calm** 11:3
**camera** 34:6,16
  35:16
**canvass** 38:8
**captain** 44:16,18
  45:4,13 46:6,22
**captured** 38:12
**car** 31:16 36:8
  42:18,20 43:14
  43:18,21 45:10
  46:10 53:4,7
**car's** 43:19
**cardiovascular**
  48:10
**career** 9:4
**cars** 46:9,20
**case** 1:3 4:9 18:8
  32:22 43:1
**caught** 41:20
**cause** 4:3 5:3
**CC** 59:21
**Celcer** 39:17 41:3
  41:10,14
**cell** 34:4,13 38:11
**certain** 50:10
**certainly** 7:21
**certificate** 3:16
  3:17 47:17 57:1
  58:1
**certified** 1:24 4:1
  35:8 57:6 58:6
  58:22
**certify** 57:8 58:7
  58:12
**chance** 13:19
**change** 9:4 41:19
  60:7
**CHANGES** 60:2
**charge** 36:16
**charged** 27:11
  36:13
**charging** 36:6
**Charles** 1:5 52:19

**check** 45:20
**checked** 55:2
**choice** 8:4,7
**City** 1:8 4:10,22
  11:14 13:2 59:7
  60:4
**claim** 33:12
**Claire** 22:18
**clarify** 16:23
  22:12,13,14
**close** 31:8
**Code** 3:22 10:18
  11:18 12:10 21:9
**Columbia** 3:3
**come** 33:7 44:16
  46:10
**coming** 10:6
**comments** 26:25
**commercial** 8:22
**Commission** 57:15
  57:16
**commit** 19:14 26:20
**committed** 19:19
**comp** 13:12
**complete** 21:6
  59:12
**completed** 14:22,23
**compliance** 21:9
**compliant** 55:25
**comply** 19:25 20:4
**compression** 51:22
  51:25
**computer** 42:16
  43:19
**concern** 48:11
**concerned** 47:1
**concerning** 15:3
**Conduct** 27:13
**conducted** 31:20
**conducting** 48:11
**confer** 14:10,11
**confirm** 22:22
  36:22
**confused** 16:20,21
**connected** 39:21
  58:15
**connection** 16:12
  17:11 18:3 39:11
  43:4 48:3
**consequence** 14:19
**consider** 52:13,18
  52:21
**consideration**
  48:19
**constantly** 12:6
**consult** 19:21
**continue** 12:8

  46:25
**CONTINUED** 3:1
**continuous** 7:3,6
**copy** 34:17 39:20
  41:16 44:8
**correct** 5:24 6:14
  6:17 18:25 19:10
  23:24 24:1,2,9
  24:17 28:16
  30:13 39:11
  42:11 49:19
  53:21 54:13
**counsel** 4:15 7:25
  58:13,15
**County** 6:16 10:2
  47:20 57:4 58:4
**couple** 42:7 45:6
**courageous** 11:3
**course** 8:13,18
  9:11
**courses** 49:18
**court** 1:1 4:5,11
  4:12 5:1 12:22
**courthouse** 1:17
  4:7 55:25
**coworker** 27:13
**cradle** 36:6 37:16
**cruiser** 43:24
**Cs** 48:7,9,16
**cuff** 53:9,17
**current** 6:21 17:4
**currently** 6:19 7:8
  14:17
**CVR-M** 1:23 57:14
  58:21 59:17

———————

**D**

**danger** 11:3
**Darren** 2:9 4:19
  59:24
**darren@horan-w...**
  2:9
**dash-cam** 35:23,25
**date** 40:2,13,20
  60:25
**dated** 22:19 58:18
**David** 2:5 4:19
  59:22,24
**david@brillrin...**
  2:5
**day** 7:20 17:24
  21:7 29:22 30:10
  31:20 34:2 36:2
  36:24,25 37:8,15
  37:19 41:23 57:9
  57:11 58:18
**days** 59:13

**dead** 38:6
**death** 47:3
**Deceased** 1:5
**December** 40:19
**decide** 9:3
**declare** 60:22
**deed** 11:7
**Defendant** 3:2
**Defendants** 1:9
  2:19
**deficiency** 52:4
**definitely** 53:11
**degree** 51:22,25
**dental** 9:1
**deny** 27:21 28:7,9
  28:11,18,20
  31:18
**department** 6:22
  7:1,4 11:15 17:1
  17:21 18:25 20:6
  20:19 21:10,16
  25:21 27:1 28:24
  29:22 31:20
  37:23 39:11,19
  45:5 46:8 48:21
  49:23 50:5,8,15
  50:17 51:5 52:13
**departmental** 43:21
**departments** 9:24
**deposition** 1:13
  3:14 4:1,9 5:17
  7:23 18:3 41:22
  56:9 58:8 59:8
**detailed** 21:6
**details** 15:14
**detainee** 48:7,13
**detective's** 38:3
**detention** 35:20
**deviate** 20:23
**deviations** 20:19
**device** 42:19
**dictate** 51:15
**difference** 43:6
**different** 19:12
**difficulty** 52:1
**Direct** 3:15 5:10
**direction** 50:3
**directives** 18:25
  19:22
**discretionary** 19:6
  19:11,13
**discuss** 14:21 56:3
**discussion** 56:7
**dispute** 54:9,10
**disruptive** 30:15
  33:9
**District** 1:1,1

  4:11,11
**DIVISION** 1:2
**divorced** 6:9 45:23
  45:24
**document** 22:16,22
  40:11 44:1 49:20
  60:23
**documentation** 37:4
  49:10,12
**Doer** 6:3
**doing** 30:20 55:13
**Dora** 9:21
**draft** 44:12
**drafts** 44:10
**drive** 3:3 37:1
**Driver's** 6:13
**driving** 8:22
**drowning** 55:9,11
**DUI** 47:8
**duly** 5:8 57:9
**duty** 10:24 14:1,20
  16:3

———————

**E**

**earlier** 13:6
**earth** 28:21
**East** 2:20 59:5
**easy** 13:5
**eat** 25:2
**effect** 22:6 23:21
  24:3
**eight** 36:15
**Eimers** 1:5,5 4:10
  15:4,6 16:12,16
  16:18,22 17:2,11
  17:15,18,21 18:1
  20:14 24:4 27:25
  28:12,22 30:25
  33:13 34:10 35:2
  35:20 36:23 37:2
  37:23 39:21 40:3
  43:4 44:24 45:3
  46:18 47:11
  52:19 53:7,17
  54:11,12 55:1
  59:7 60:4
**either** 9:23
**electronically**
  40:11,12
**eleven** 35:21
**else's** 41:12
**emails** 36:19
**employ** 6:23,25
  19:23
**employee** 58:13,14
**employer** 6:21
**employment** 7:3,6

encounter 38:12
endeavoring 21:11
ends 6:11
enforcement 35:9
  47:18
engaged 17:25
ENTER 60:2
entered 6:25 8:10
  9:8
entire 7:11
entitled 17:7
erase 44:5
errata 3:18 59:13
  60:1
errors 42:11
Esquire 2:5,9,13
  2:17,22 3:5 59:4
  59:22,23,23,24
  59:24,25
establish 40:9
Estate 1:5
et 1:8 4:10 59:7
  60:4
ethics 3:22 10:19
  11:18 12:1,11
  21:10
events 20:14
everybody 38:7
  41:11
Ex 1:23 4:1,12
  57:6,14 58:6,21
  59:17
exactly 53:10
  55:22
examination 1:21
  3:15 5:10 8:14
examined 5:8
exclaimed 53:11
exclamation 53:24
excuse 16:20 20:5
  37:13 40:5
exemplary 11:13
exhibit 12:10,12
  12:19 23:8,12
  56:8
EXHIBITS 3:20
experienced 36:24
experiences 52:1
Expires 57:16
extra 7:17
extremely 21:2

            F

F 57:6,14
face 11:3 52:23
  55:3,3,5
face-down 51:19

fact 29:25 33:11
  34:12 38:11
  50:15
facts 33:8 60:23
fag 27:8
faggot 27:3
failed 9:11 13:10
fair 5:21 8:3,23
  10:12 12:25
  29:25 36:9,11
  50:11
faith 11:23
familiar 5:21
  21:22 24:8,8,10
  24:11,21,25 25:1
  25:6 50:8,21
family 6:3 13:15
fan 38:20
far 39:14 45:22
  48:2,18
Fax 2:4,8,16,21
  3:4
FDLE 17:12 18:7
  21:16 24:25 33:2
  45:15,25
Federal 1:17 4:7
feel 15:17 30:16
  45:11
feeling 46:24
fellow 20:21
FF015913 57:15
field 19:22
figure 30:17
finally 38:17
financially 58:15
find 34:23 35:5
finger 54:3,4,5,22
  54:23
fingers 53:17
finish 7:16
FIRM 2:3
first 3:22 5:8 8:4
  8:7,17 9:11
  29:14 38:10 40:9
  41:9 43:3 47:3,6
fit 13:23
five 55:19
Florida 1:1,8,18
  1:25 2:4,8,12,16
  2:20 3:4 4:2,3,8
  4:12 6:13 57:3,7
  57:8,15 58:3,7
  58:22 59:6,19
focused 50:4
following 22:4,4
  24:4 27:21 28:11
  28:12 36:7

follows 5:9
footage 34:17
  35:23,25
force 8:10
foregoing 60:23
form 8:6 9:5 11:4
  12:3 13:3,8,18
  13:21 18:24
  21:18 26:2 27:5
  27:7,16 29:1
  31:11 33:20
  34:18,24 36:10
  50:15,18 52:15
  53:13 55:19
former 29:14,15
formerly 45:21
Fort 2:20 59:6
forth 30:1
forties 9:3
found 39:7
FPR 1:23 57:14
  58:21 59:17
frame 16:5,6
FRANCISCO 3:8
frequency 19:18
frequently 25:2,4
friendly 25:18
friends 27:8
fuck 22:7 23:21
  24:5 25:20 26:12
  27:15
full 5:14 16:3
  46:20
fundamental 10:24
further 58:12

            G

GABRIEL 3:8
Garrido 3:8 53:7
  53:11,16
Gary 3:2
general 18:18
  19:14 20:1,19
  26:19 31:9 50:16
  50:25
gentleman 33:17
getting 6:24
GIRARD 3:9,10
girl 25:12
give 13:18 50:1
given 5:17 12:25
  16:4 17:17 22:21
giving 5:3
glanced 18:8,9
go 11:4 14:10
  21:18 25:2,4
  26:2 31:11 34:16

34:23 35:5 38:1
  41:2 42:13 44:25
  48:2,6 56:2
goes 12:22 40:24
  40:24
going 7:24 16:7
  22:16,20 30:8
  36:8 50:2 56:3
  39:3
good 4:5 5:12,13
  39:3
grab 36:12
Graduated 6:5
grammatically 42:5
Grassy 25:15
Green 14:6
ground 35:2
GROUP 2:11,15
guess 40:10 49:1
guide 11:10
GUSTAVO 3:9
guy 29:9 33:9
guys 29:8

            H

H 3:5 59:25
hand 5:2 53:8
handcuffing 18:13
handcuffs 52:24,25
  53:3 54:15
handheld 34:6
handle 47:2
handled 29:22
  33:18
hands 54:12,16
happen 27:6
happened 9:7 21:6
  33:8 42:4 44:25
  46:24
happy 22:14
hard 37:1 48:25
harder 13:1
he'll 8:2
head 7:5 43:9
hear 23:23 53:25
  54:7
heard 17:3 22:8
  23:5 30:3 35:21
  38:13 54:3,4,5
held 11:25
help 23:13
helped 47:8
hey 30:19 38:2
hierarchy 19:5
HIGGINS 2:7
high 6:5 19:7
high-risk 19:17
higher 19:2

hit 9:3
hobble 53:4
Hochman 2:19 59:5
hole 29:18
honest 11:7
Honestly 26:17
  31:5
Hopefully 16:3
Horan 2:7,9 4:20
  59:24,24
hour 7:22 40:22
hours 45:6
human 42:8
humankind 10:24
HUMBERTO 3:8
hunted 35:3
Hurd 22:18

_____ I _____

IA 15:23
ICOM 36:23 37:8
ICOP 36:18,19 37:1
  37:9,11,19
idea 17:9 34:21
  35:3,7 36:20
  37:20 45:24
  46:13,16
ideals 12:6
identified 42:10
immediately 43:2
important 33:17
  34:15,20 36:9
  48:16
importantly 55:23
in-custody 47:3
inappropriate
  26:25
incident 3:23 15:4
  15:6 16:12,18,19
  17:2,11,15,18,22
  17:25 18:1 24:5
  27:3 28:1,12
  36:23 37:2,23
  39:11,16,21 40:3
  42:24 43:4 44:25
  45:3 46:18 52:19
incidents 27:2
include 33:11
increased 52:1
INDEX 3:13,20
indicate 38:25
  49:21 51:15
indicated 40:21
indicating 42:21
individual 49:17
  52:1
industry 8:21,22

8:22
information 35:10
inquire 15:12,22
installed 37:1
instance 27:12
instructed 49:17
  51:8
interested 58:16
Internal 14:18,21
  15:15 16:13,24
  16:25
interrogatories
  21:23 22:3,10
  23:8
interrogatory
  22:19
Interrogs 3:22
interrupt 54:21
interview 18:7
  21:15 45:25
investigation
  14:18,19,22 15:1
  15:15,23 16:13
  17:1,5,8 18:1
involved 46:18
  47:4,5,6
involvement 17:24
issued 6:13 14:24
  43:22

_____ J _____

J 2:13 59:23
Jeannete 2:17 4:17
  59:23
Jeopardy 7:18
jlewis@lewisle...
  2:17
job 8:4,7,10 10:12
  21:2 30:23 59:8
Joell 25:15
Johnson 2:19 59:5
Join 11:5 12:4
  27:17 29:3 31:12
  33:21 34:19,25
  50:19 52:12,16
jokingly 27:8
Jr 3:5 59:25
July 57:16
jumping 37:21
Justice 50:8,15
  52:13

_____ K _____

Kathy 45:15,25
Kathyann 1:13 3:14
  4:9,21 5:7,16
  31:24 57:8 58:8

59:4 60:4,25
keep 43:9 45:12
Key 1:2,8,18 2:8
  3:9,10 4:8,10,22
  6:19,22,25 7:3,6
  10:1,4,9 11:15
  11:22 13:2 17:1
  17:21 18:24 20:1
  20:6,19,23 21:10
  21:15 25:21 27:1
  28:24 29:22
  31:19 33:18
  37:23 39:10,19
  45:4 48:20 49:22
  50:4,16 51:5
  59:7 60:4
killed 22:7 23:22
  24:5 25:20 26:12
  27:15
kind 16:4 18:14
knew 36:7,18 39:3
know 7:20 8:2,3
  12:11 14:8 15:10
  16:4 17:4,7 23:2
  24:19,23,23 25:3
  25:8,8,9,10,13
  25:16,17 26:15
  26:17,21,23,24
  27:18,19 29:17
  29:18 31:3,6,24
  32:14,16 33:23
  34:13 35:1,22
  36:25 37:18
  39:22 40:20 41:7
  41:7 42:5 43:15
  45:6,22 46:4,19
  48:4,6 49:5,7,24
  50:6 52:6 53:10
  54:8
known 10:18 21:22
  52:8
KWPD 3:22,23

_____ L _____

labored 51:19
lady 38:11
Lake 10:2 47:20
land 11:14
laptop 42:19
Large 4:3
Lauderdale 2:20
  59:6
law 2:3,11 35:8
  47:17
law-enforcement
  8:14,18 10:13,23
  11:22 13:2 50:10

lawn 8:22
laws 11:14
leading 7:24 8:1
learn 48:3
learned 35:14
leave 13:13,15
  14:5 15:8,24
  16:2,9 17:14
  42:6
Lee 3:2
left 44:24
Legal 2:15 3:7
  4:12,14 59:8,18
let's 40:9 42:13
  55:24
Letter 3:17 59:1
levels 19:12
Lewis 2:15,17 3:15
  4:17,17,25 5:11
  7:19 12:14,18,22
  12:24 13:22 15:3
  15:7,12,20,21
  22:12,14,15
  24:13 25:24 26:1
  26:22 28:4 32:2
  32:18 37:10
  49:11 56:2 59:23
license 6:13
Lieutenant 14:5
life 8:5,7,21,24
  11:8
lifeguard 55:17
Line 60:7
listen 30:21
listened 18:7
little 7:22 38:9
live 6:19 10:5
lived 6:16
lives 10:24
living 10:2
LLC 2:11
LLP 2:7
locked 55:21
logistics 56:3
long 6:23 7:10,20
  12:1 15:7,10,13
  15:16,23 30:25
  37:2 38:17 45:3
  45:23,24 53:6
  54:23,24 55:21
longer 16:2 45:17
look 18:11 22:22
  26:14 37:7 49:2
  49:6,10 50:24
looked 18:7,12,12
  35:23,25 41:11
looking 18:18 37:3

41:8,17 54:25
**lot** 25:18 37:14
  40:25 41:2 44:19
  45:4 46:7,17
**loud** 38:21
**louder** 38:22
**loved** 36:13
**Lovette** 3:2 4:24
  13:6 14:4 34:3
  53:8
**low** 19:17
**lreynolds@rrbp...**
  3:5
**lying** 51:8
**Lyman** 3:5 4:23
  59:25

───────────
**M**
**M** 2:9 59:24
**ma'am** 5:18,22,25
  6:2,4,6,8,10,12
  6:15,18,20 7:2,7
  8:7,16,19 9:2,18
  9:20,22,25 10:3
  10:8,11,14,17,20
  10:22 11:1,6,9
  11:12,16,20,24
  12:2,7,9,15 13:9
  13:11,14,17
  15:22 17:3,6,16
  17:19 18:2,5,19
  18:21,23 19:1,4
  19:16,20,24 20:3
  20:8,17,22 21:1
  21:4,8,13,19,21
  22:2 23:7,11,15
  23:25 24:7,18,20
  26:14 27:18
  28:17 29:17,20
  30:2,7,23 31:23
  32:7,21 33:4,6
  33:14 34:9 35:13
  35:18,24 36:4,25
  39:9,24 40:1,4,7
  41:8,24 42:1,25
  43:2,25 44:2,11
  44:13,23 46:1,3
  46:5 47:5,12,19
  47:21,23 48:22
  50:7,9,14,20,23
  51:1,4,11,14,20
  51:23 52:2,6,10
  53:2,5,22 54:14
  55:16,18
**maiden** 6:1
**maintain** 11:2 13:1
  13:5

───────────
**maintenance** 8:22
**majority** 8:24
**making** 28:18 54:19
  55:7,8,14
**malfunction** 36:24
**malfunctioning**
  36:20
**man** 22:7 23:22
  24:6 25:20 26:13
  27:15 28:14 29:5
  29:6,14,14 30:3
  30:5,12,14,21
  31:18,22,25 33:1
  34:5,7,16 35:3
  35:12,14,17 36:7
**man's** 30:16 32:19
**March** 12:5
**mark** 12:10,16 23:8
  24:19
**marked** 12:19 23:12
  56:8
**married** 6:7 45:15
  45:16,17,21
**materials** 18:4
  50:15,24
**McCormick** 6:1
**McKee** 2:11,13 4:19
  4:19 55:23 59:23
**mean** 7:21,24 48:4
  54:21
**means** 42:3
**medical** 13:15
**MEDINA** 3:9
**members** 27:1
**memory** 11:18 19:15
  19:19 26:20
**mention** 39:4
**mentioned** 32:25
**messed** 42:7
**met** 13:6 45:25
**Miami** 59:19
**mic** 36:2,12,13,14
  36:17 37:19
**Michael** 2:22 4:21
  59:4
**Microsoft** 43:10,13
  43:16
**midnight** 40:16,22
**milling** 31:7
**mine** 18:5 39:15
  42:2
**minute** 16:20 50:1
**minutes** 40:16,21
**Mirandized** 17:10
  17:12
**missed** 41:19
**mom** 13:16

───────────
**moment** 21:14
**MONROE** 57:4 58:4
**morning** 36:16 40:3
  46:24
**motions** 55:7
**Mount** 9:21
**multi** 22:16
**multitask** 22:21
**mumbling** 46:14
**municipality** 1:8
**murdered** 28:14
  29:9 30:5 32:25
**Murdoch** 2:19 59:5

───────────
**N**
**NAJA** 3:9
**name** 5:14 6:1
  24:20,24 25:7,9
  25:13,16,17 30:6
  32:19 34:16
**names** 38:3
**narrative** 41:2,3
  42:13
**natural** 52:3
**need** 12:21 14:9,25
  15:17 19:18,23
  22:13 30:22
**needs** 12:20
**negatively** 37:22
**neither** 28:22
**never** 22:8 23:5
  24:7 31:21,22
  32:3,19,23 35:12
  35:14
**nevertheless** 35:12
**New** 29:15
**NEWSPAPER** 3:9,10
**noises** 55:7,8,14
**Normally** 42:25
**notary** 4:2 22:18
  57:7,15
**NOTIFICATION** 55:11
**November** 1:16 4:6
  5:23 17:25 20:1
  20:11,15 24:4
  27:24 28:12 40:5
  40:22 52:8 57:9
  57:11 58:18 59:2
  59:8 60:5
**number** 4:9 6:11
  12:13 22:20
**numerous** 5:20
  36:19

───────────
**O**
**o'clock** 55:19
**O've** 49:2

───────────
**oath** 3:16 28:7,11
  28:18,25 57:1
**obeying** 11:14
**object** 8:6 9:5
  11:4 12:3 13:3,8
  13:18,19,21
  21:18 26:2 27:5
  27:7,16 29:1
  31:11 33:20
  34:18,24 36:10
  50:18 52:11,15
  53:13
**objection** 29:1
  32:1,5,9 55:19
**objectionable** 8:1
**objectives** 12:6
**observe** 20:18 38:2
**obtain** 35:9
**obtained** 10:10
**obviously** 15:1,18
  21:9 33:23 34:1
  49:12
**occur** 37:2
**occurred** 20:14
  30:22 47:4
**occurs** 52:4
**October** 20:7 22:19
  40:5
**Off-the-record**
  56:7
**office** 11:22 39:17
  42:17 59:10,13
**officer** 4:23 5:12
  7:9,10 8:4,14,18
  10:13,23 11:22
  13:6 14:3 22:6
  23:20 24:8 29:15
  29:19 31:25 34:3
  35:9 41:3,10,13
  41:21 47:18
  49:22 51:5 53:7
  53:11,16
**officers** 13:2
  20:21,23 27:3
  31:16 33:18
  35:19 37:18
  39:17 46:6,15,17
  47:8
**Oh** 7:15 32:8 38:20
  41:15 49:4
**okay** 9:23 13:12
  14:3 23:1 24:3
  26:22 27:11
  32:13 35:1 38:14
  39:13 43:8,13
  45:11,12 48:7,14
  50:12 54:11

**Once** 51:1
**ones** 19:6,8
**ooOoo** 3:11
**operating** 18:22
  20:5,6,20
**opposed** 42:2
**orders** 18:18,20
  19:14 20:1,10,13
  20:19,20 26:19
  50:16,25
**original** 40:24
  41:1,6,13,18
**orthodontic** 8:25
**orthodontics** 8:24
**outside** 27:25
**overheard** 29:5
**ow** 53:12,24 54:7,9
  54:11
**oxygen** 52:4

---

**P**

**P.A** 2:15,19 59:5
**p.m** 1:16,16 14:13
  14:16 56:6,9
**page** 3:13,20 22:17
  22:22 41:9 60:2
  60:7
**paged** 22:17
**pages** 1:14 58:8
**Palm** 2:3,11,15 3:4
**Pardon** 32:7,7
**parking** 44:19 45:4
  46:7,17
**part** 18:24 36:21
  38:12 49:1,17
  50:4,5 51:12
**parties** 58:13,14
**passed** 9:14
**patrol** 7:9,10 46:9
  46:20
**Patterson** 24:19
**Paul** 59:24
**pause** 14:14
**pay** 16:10,10,11
**penalties** 60:22
**pending** 14:18,19
  14:21 15:14
**Pennsylvania** 6:5
**people** 24:21 25:3
  25:10,18 31:7
  33:12 37:22 38:5
  55:25
**perception** 29:11
  29:12,13
**perfect** 42:8
**period** 37:24
**perjury** 24:9 60:22

**person** 28:22 33:9
  51:8 52:4 55:10
  55:13
**personal** 1:5 11:8
**personally** 42:14
  46:4 52:18 57:8
**ph** 6:3 49:17
**phone** 34:4,14
  38:11
**photocopy** 22:17
**physical** 13:5
**physically** 13:23
  30:9
**physiology** 48:4
  51:2,12 52:18
**pier** 31:8,13,13
**pinpoint** 48:25
**Piper** 2:19 59:5
**place** 31:4
**Plaintiff** 1:6 2:2
**Plaintiff's** 3:20
  12:19 23:12 56:8
**Plaintiffs** 4:18,20
**planned** 16:7
**please** 4:15 5:2,14
  22:12,21 24:15
  29:12
**PLLC** 3:3
**point** 27:2 31:10
  34:23 36:22
  49:14 53:16
**points** 7:17
**police** 6:22,25 7:4
  8:4 9:17,24
  11:15 12:1 17:1
  17:21 18:24 20:6
  20:19 21:10,15
  24:8 25:21 27:1
  28:24 29:15,19
  29:22 31:2,4,9
  31:20 33:5,18
  37:23 39:10,19
  45:5 46:7 48:21
  49:23 50:5,16
  51:5
**policies** 18:13,16
  20:24 26:8
**policy** 25:21 26:6
  26:10 27:11
**portions** 34:3
**position** 9:23 10:1
  10:10 51:19
**possible** 21:6
**power** 32:4
**Pratt** 3:7 4:13
**prepare** 39:8 40:18
  43:3,5

**prepared** 21:11
  39:5,16 40:20
  42:9 44:14 59:10
**presence** 30:13
**Present** 3:7
**pressure** 51:9
**pretty** 46:20
**previously** 6:16
  27:1
**principles** 11:23
**prior** 20:15
**probably** 13:25
  15:16 36:9 40:24
**problem** 30:20
  33:24 51:16
  55:20
**procedure** 26:10
**procedures** 18:13
  18:16,22 19:23
  20:5,6,20,24
  26:8 50:11
**proceeding** 59:10
**PROCEEDINGS** 3:13
**process** 55:11
**professional** 1:25
  4:2 11:8 57:7
  58:7,22
**programs** 50:10
**prone** 47:7,9,10,13
  47:25 48:12,16
  48:24 49:21,23
  50:3 52:9
**proper** 42:5
**provided** 59:10
**public** 4:2 11:23
  11:25 14:25
  15:16 57:7,15
**purportedly** 27:24
**purpose** 4:8
**put** 17:14 33:8
  41:1

---

**Q**

**question** 7:17 8:2
  12:3 13:21 14:25
  15:18 20:12 22:4
  22:5,8,9 23:2,20
  25:25 26:2 27:5
  27:7,16 28:2
  29:2 34:18,24
  36:10 38:18
  49:22 53:14
**questioning** 34:3
**questions** 7:24 8:1
  23:6,10,14 24:15
  26:22
**quick** 7:18,21

**quite** 25:1
**quote** 23:21,22,23
**quoted** 23:23

---

**R**

**raise** 5:1
**rank** 7:8
**reaction** 52:4
**read** 3:17 11:18
  22:9 30:4 42:6
  60:22
**reading** 15:17 22:4
**ready** 6:24
**really** 9:15 24:23
  25:13 26:14,24
  29:10 37:6 45:7
  46:19 48:18 49:9
  51:7 55:17
**reason** 28:21 41:5
  60:7
**recall** 22:3 51:2,8
  51:12,24 52:3
  53:23,25 54:2
**recognize** 10:23
**recognized** 11:21
**record** 4:6,16 5:15
  14:9,11,12,15,25
  15:16 56:2,5
  58:10
**refer** 22:20
**reference** 50:24
**referring** 46:23
**regard** 16:9,16,18
  22:3 23:20 39:19
  48:17
**regarding** 16:19
  17:14 20:14 21:6
  37:23
**regulations** 11:14
**relative** 58:12,14
**relevant** 35:10
**remain** 16:2
**remarked** 22:6
  23:21
**remedy** 51:16
**remember** 9:15
  16:22 25:13 27:3
  27:4 31:5 39:2
  45:7 48:18 49:8
  49:9 51:4,7,17
**removed** 31:1
**Rephrase** 20:12
**replaced** 37:1
**report** 3:23 14:23
  14:24 15:17 18:8
  20:25 21:5,11,25
  33:5 39:4,6,8,16

39:20,21,23 40:8
40:13,18,20,21
40:25 41:1,6,9
41:12,25 42:3,9
42:24 43:3 44:7
44:14 58:8
**reporter** 1:24,25
3:17 4:2,2,5,12
5:1 12:16,23
57:6,7 58:1,6,7
58:22
**Reporter-Master**
58:22
**reports** 39:10
**Representative** 1:5
**represented** 39:20
**reprimanded** 17:20
**reprimands** 17:17
**request** 59:12
**requested** 58:9
**required** 42:23
**requirements** 13:1
19:18
**residence** 10:7
**respectfully** 59:12
**respond** 22:9
**responding** 23:18
**responses** 7:18
**rest** 55:24
**restaurant** 8:21
31:15
**restrained** 51:18
**restraint** 47:7,9
47:14,25 48:12
48:16,24 49:21
49:23 50:3 52:9
**restraints** 47:10
**result** 17:17,21
**return** 59:13
**review** 18:4,5,6
21:25 58:9 59:10
59:13
**reviewed** 18:14
32:20
**Reynolds** 3:3,5
4:23,23 11:5
12:4 27:17 29:3
31:12 33:21
34:19,25 50:19
52:12,16 55:19
55:22 56:1 59:25
**right** 5:1,23 6:19
7:1,13 8:5,9,11
8:15,17 9:1,4,9
9:17 10:2,10,16
10:19,25 11:2,3
11:11,15,21,23

13:13,25 16:16
16:19 19:15,17
19:19,23 20:25
21:3,7,12,17,22
22:12 23:13
24:13,19 25:1,4
26:9 27:6,9
28:19 29:23
30:10,12 31:14
32:22,24 33:3,13
33:25 34:6,7
38:24 39:23,25
40:2,3,8,13,13
40:16 41:11,17
41:21,22,23
43:20,24 44:1,22
44:25 45:2,11,15
45:17,21 47:24
48:21,24 49:13
49:18,20 50:17
51:6 53:1,4,6,8
53:12,17,18,20
54:15,17 55:1
**RINALDI** 2:3
**ringing** 11:17,17
**risk** 52:8
**rmckee@themcke** ...
2:13
**Robert** 2:13 4:19
59:23
**ROBERTS** 3:3
**Roderick** 3:7 4:13
**role** 17:11
**Royal** 2:3,11,15
**rules** 5:21
**run** 33:12 55:20
**running** 34:1,22

_____
S
**safeguard** 10:24
**sand** 31:16 47:10
47:12
**save** 44:8,10
**saw** 29:8 30:4,17
30:22 34:3,7,9
35:12 38:7 39:2
46:9
**saying** 13:7 16:6
32:25
**says** 40:17 41:6,12
41:13,16,18
**scene** 26:11 30:23
30:25 31:1,2,8
31:10 33:10 34:1
34:5,22 44:15
**school** 6:5 47:15
47:16,17,22 50:3

**Scott** 45:14
**screen** 42:16
**search** 26:17,18
**second** 14:9
**seconds** 56:4
**secured** 53:8 54:15
**securing** 31:10
**security** 6:11
30:23,25 34:1,22
**see** 16:16 22:24
34:10 35:15
38:17 41:2 44:12
55:4
**seeing** 43:11
**seen** 20:23 23:6
32:3,19 38:16,18
39:1,16,18 55:9
55:11
**Seminole** 6:16
**sentence** 30:2
**sergant** 32:17
**sergeant** 16:14,18
16:21,23,24
30:11 38:15,25
41:19,21 42:10
**seriously** 10:12,15
10:21 21:3
**serve** 10:24
**service** 12:1
**Set** 3:22
**severe** 51:22,25
**sheet** 3:18 59:13
60:1
**shift** 46:25
**shooting** 34:5
**shortly** 36:15
**show** 22:16 39:20
**showed** 34:10 36:1
**shows** 31:7 34:5
**sic** 20:7 36:23
**side** 31:15 46:10
55:3
**sideways** 52:23
**sign** 40:11
**signature** 12:11,15
22:18,23 23:1
40:9,10
**signed** 10:18 11:18
57:11
**similar** 27:14
**similarly** 30:12
**Simonton** 1:17 4:7
**Sincerely** 59:15
**sir** 7:15 13:20
29:10
**sit** 16:25 19:25
20:4,9,18

**sitting** 10:10 34:2
41:22,23
**situation** 19:22
20:10
**Sixteen** 9:2
**slots** 46:21
**Smith** 45:14,14,15
45:25 46:6,22
**Social** 6:11
**software** 43:19
**somebody** 25:13
32:25
**son-of-a-bitch**
27:22 28:13
**soon** 16:3 42:23
**sorry** 7:5 22:25
32:8 38:20,22
54:21
**sound** 53:21,23
**Southeast** 59:18
**Southern** 1:1 4:11
**Southernmost** 24:22
25:1 27:25 28:13
44:20
**speak** 15:2
**special** 18:20 20:5
20:9,13,16,20
48:11
**specific** 22:19
**specifically** 54:2
**speculation** 29:4
32:9
**spelling** 42:5
**spent** 8:20
**spoke** 16:19,22
30:9 37:22 45:4
46:11
**sprinted** 53:3
**stamp** 22:18
**standard** 18:22
20:5,20
**standing** 31:14
32:6,17
**start** 6:24,24
**started** 31:14
**state** 4:3,15 5:14
30:19 57:3,7,15
58:3
**stated** 60:23
**statement** 23:23
25:19,23 26:12
27:20,21,24 28:3
28:5,6,8,11,19
28:24 29:6,24
30:4,17,18,19
33:2,11,16,24
**statements** 30:9,12

30:14,14 37:22
37:24
**States** 1:1,17
**station** 14:5,20
16:24 44:21,22
44:25
**status** 17:4,7
**steal** 39:15
**step** 29:12
**stomach** 51:9
**stop** 37:17
**stops** 18:14
**street** 1:17 2:7
4:7 38:6
**strike** 16:8 27:20
**strive** 12:6
**struggle** 48:4 51:3
51:13 52:19
**struggles** 52:4
**stuck** 53:17 54:3,4
54:6,23
**study** 18:9
**stuff** 41:1
**subject** 14:17
16:13 47:13,25
**subjects** 18:13
**substance** 15:23
**successfully** 53:8
**Suite** 2:3,11,15,20
59:5,18
**summary** 49:12,13
49:20
**Sunrise** 2:20 59:5
**superiors** 21:16
**supervisors** 36:19
**supplement** 41:4
**supplemental** 39:8
39:12,25 40:25
41:12,16,18
**supplemented** 39:17
**Support** 4:13,14
59:8,18
**supposed** 14:8
26:20 35:9 41:18
**sure** 7:14,25 8:1
15:13 17:12
22:11 37:6 42:4
48:7,14 49:24
50:4 52:22 54:7
54:19,25
**suspect** 51:18
**Suzanne** 1:23 4:1
4:12 57:6,14
58:6,21 59:17
**swear** 4:16 5:2
**swore** 24:16
**sworn** 4:25 5:8

**T**

**T** 2:22 59:4
**take** 7:16 10:12
21:2 22:22 37:16
48:19
**taken** 1:21 4:1
30:18 59:8
**talk** 7:14 14:8
29:13 34:16 38:2
38:22 44:18 45:8
46:7,12,15 48:25
49:1
**talked** 16:14,21
44:17
**talking** 51:4
**tape** 31:2,4,9
**taught** 48:15 49:21
**Tavares** 9:19
**Taveres** 9:20
**Technical** 47:22
**tell** 21:11,16
26:23 29:19
30:21 32:15 37:3
42:2 49:7
**telling** 21:20
**tells** 55:5
**tenth** 6:24
**term** 48:5
**test** 13:10
**testified** 5:8
**testimony** 5:2 23:9
**Thanksgiving** 36:16
40:3,22
**theirs** 39:18 41:12
**thereto** 20:15
**thing** 18:14 29:11
36:14 43:18
**things** 28:25 35:8
**think** 9:10 25:12
28:21 37:6 38:13
45:16,18 50:1,2
**thinking** 32:14,17
**Third** 59:18
**thirties** 13:24
**thought** 11:7
**threatened** 31:18
31:22,25
**three** 12:14 19:12
**three-page** 39:23
**thrown** 55:24
**time** 7:4,11,12,16

57:10
**syllabi** 18:11
**syllabus** 49:14
**symbol** 11:23
**system** 36:18,19

8:17,20 9:3,7,12
10:1 16:4,6 19:6
19:11,13,21
21:14 27:2 30:24
36:22 37:16
38:10 39:1 40:18
44:6 45:23 47:3
47:6 48:1,19
53:6,7,10,16,20
54:11 55:2,8
**times** 5:19,20
47:24
**today** 4:6 7:20,22
10:15 12:8 13:23
14:1 15:2 16:25
18:3 19:25 20:4
20:9,18 35:15
**told** 24:25 25:2
26:21 32:23
35:17 38:14,15
43:11 47:1
**tone** 7:21
**top** 40:2,8,13,21
41:3
**totally** 28:20
**traffic** 18:14
37:14,17
**trained** 48:12 51:2
51:18,21 52:3
**training** 18:8,9,11
47:15,16 48:1,3
48:15,20,23
49:13,23 51:15
51:24
**transcript** 58:9,10
59:10,21 60:2
**transferred** 44:6
**Treavor** 1:5 4:10
59:7 60:4
**tried** 8:12
**trigger** 50:2
**Tripp** 16:14,18,21
16:23
**trouble** 51:9
**true** 11:17 12:1
24:16 58:10
60:23
**trust** 11:25
**truth** 5:3,4 21:11
21:17,20
**try** 34:23 35:5,9
38:8,22
**trying** 21:16 33:10
52:23,25
**Tuesday** 1:16 4:6
**turned** 7:5 52:23
**turning** 22:1

**tuteled** 49:17
**TUZZIO** 3:3
**two** 15:25 28:25
30:9 33:11,12,12
37:24 39:10
42:10
**Two-thousand** 9:10
**type** 41:6 42:14,16
**typing** 42:22

**U**

**U.S** 4:11,12,14
59:8,18
**Uh-huh** 43:23
**ultimately** 10:9
**understand** 16:17
43:18 52:7
**understanding** 16:1
16:8 29:16 46:22
50:11,13
**understood** 43:13
52:7
**undertaking** 48:15
**undertook** 11:13
**underway** 7:23
**unfold** 36:8
**unfolded** 20:10
**uniform** 14:3,21
25:4 26:11 28:12
**United** 1:1,17
**Unknown** 23:23
**unnecessary** 30:16
**upset** 29:10,21,24
31:19 33:1,18,23
46:23 47:2
**use** 37:8,14,15

**V**

**various** 39:17
**verbal** 53:20,23
**Verbatim** 1:24 4:1
57:6 58:6,22
**verified** 41:25
42:9
**verify** 12:11 42:3
**verifying** 41:21
**vicinity** 31:9
**victim** 55:9
**video** 1:13 3:14
4:6,9 14:11,12
14:15 31:7 34:9
34:11 35:2 38:12
38:16,19 39:1,4
55:12 56:5
**videographer** 3:7
4:13 14:12,15
56:5

**videotape** 34:4
**violated** 26:11
**violating** 27:12
**violation** 25:21
  27:14
**violently** 52:5
**Volume** 1:13
**vs** 1:7 4:10 59:7
  60:4

**W**

**W** 2:5 59:22
**waited** 31:1
**waitress** 25:14
**walking** 31:8,8,9
**wall** 29:18
**WALLACE** 2:7
**Wanciak** 1:13 3:14
  4:9,22 5:7,12,16
  6:7 14:17 31:25
  31:25 57:8 58:8
  59:4 60:4,25
**Wanciak's** 3:22,23
**want** 12:16 14:10
  15:18 29:13
  30:19,19 48:2,13
  55:20 56:2
**wanted** 9:6 10:5
  43:9
**wants** 12:20
**wasn't** 9:7
**way** 38:3
**We'll** 12:10
**we're** 30:8 42:7
**we've** 18:9 42:10
  50:4
**wearing** 14:20
  37:18
**week** 55:24
**weeks** 15:25
**weight** 51:21,25
**went** 30:9 38:6
**West** 1:2,8,18 2:8
  3:4,9,10 4:8,10
  4:22 6:19,22,25
  7:4 10:1,4,9
  11:15,23 13:2
  17:1,21 18:24
  20:1,6,19,23
  21:10,15 25:21
  27:1 28:24 29:22
  31:19 33:18
  37:23 39:10,19
  45:4 48:20 49:22
  50:4,16 51:5
  59:7 60:4
**Weston** 2:4,12,16

**whatsoever** 15:5
  19:21
**Whitehead** 2:7
**window** 46:10
**wireless** 36:2
  37:19
**wished** 36:18
**witness** 1:21 4:16
  5:5 7:15 12:20
  13:20 22:11 32:8
  32:11,13,16
  37:21,24 38:20
  41:17 49:4,6,9
  59:1,11,12
**witnesses** 30:10
  31:24 35:6
**women** 38:5
**word** 43:16 44:1
  53:24 54:7,9
**words** 24:3 30:1
  42:2,6,7
**work** 8:25 13:1
  25:10
**worked** 46:2
**workers** 13:12
**working** 8:21,21
  45:12
**works** 25:12
**wouldn't** 25:22
  34:15,15
**wrist** 53:17
**write** 30:19 42:24
  43:5,11,16 44:6
  60:2
**written** 20:24 26:8
  27:9
**wrote** 21:5 39:6,22
  41:3 43:10,10

**X**

**Y**

**yeah** 9:13 19:8
  34:20 37:12
  38:17 40:12
  41:10 42:12,15
  42:21 43:20
  45:12 48:6 49:15
  55:22 56:1
**year** 6:24
**years** 9:2 10:6
  47:8
**yelling** 30:15
  38:23
**yellow** 19:9 31:1
**York** 29:15
**young** 38:11

**Z**

**Zamora** 3:8 38:15
  38:25 41:22
  42:10

**0**

**1**

**1** 1:14 2:11,15
  58:8
**10** 59:2
**1000** 2:20 59:5
**10028-CIV** 4:10
**10th** 57:11 58:1
**11/28** 40:15
**1186** 1:17 59:8
**12** 3:22
**1250** 59:18
**13** 40:15
**14** 4:9 22:20 37:6
**14-10028-CIV-M...**
  1:3
**16** 40:16,21
**17150** 2:3,11,15
**18** 8:10
**19** 8:10
**1959** 5:23 8:9
**1983** 6:7
**1990** 6:17
**1996** 6:17
**1st** 12:5

**2**

**2** 2:3
**20** 10:6,6
**2005** 9:9,10
**2006** 7:1 9:8 10:15
  10:18 11:19 12:5
  48:21
**2013** 17:25 20:2,7
  20:11,15 24:4
  27:25 28:12 37:5
  40:6,19,23 52:8
**2014** 1:16 4:6
  22:19 37:5 57:9
  57:11 58:18 59:2
  59:8 60:5
**2017** 57:16
**217-0150** 2:12,16
**23** 3:22
**2455** 2:20
**2488** 59:5
**27** 57:16
**28** 17:25 20:1,7,11
  20:15 24:4 28:12
  40:5,5,22
**28th** 27:25 52:8

**294-4585** 2:8
**294-7822** 2:8
**2nd** 5:23 40:19

**3**

**3** 3:22 12:10,13,19
**30** 22:19 59:13
**301** 1:17
**305** 2:8,8 59:19
**33040** 1:18 2:8
**33131** 59:19
**33304** 2:20 59:6
**33326** 2:4
**33327** 2:12,16
**33409** 3:4
**373-8404** 59:19
**384-6226** 2:4

**4**

**4** 1:16 3:15,22
  23:9,12 59:8
  60:5
**4:02** 1:16
**4:12** 14:12
**4:14** 14:15
**4:59** 56:5
**46** 8:13
**463-0100** 2:21
**463-2444** 2:21
**470** 3:3
**4th** 4:6 57:9

**5**

**5** 3:23 56:8
**5:00** 1:16 56:9
**50** 56:4
**56** 3:23 58:9
**561** 3:4,4
**57** 3:16
**58** 3:17
**59** 3:17

**6**

**60** 1:14 3:18
**608** 2:7
**688-2343** 3:4
**688-6560** 3:4

**7**

**73** 6:3
**78** 6:5
**7974** 6:11

**8**

**8:22** 36:15
**86** 6:9
**876-4344** 2:4

**888-9877** 2:12,16

**9**

**954** 2:4,4,12,12,16
   2:16,21,21

## 61

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,

                                    Plaintiff,

vs.

CITY OF KEY WEST, a Florida municipality, et al.,

                                    Defendants.
_____

CONTINUED VIDEO DEPOSITION OF KATHYANN WANCIAK

Volume II

(Pages 61 - 161)

Friday, November 21, 2014
4:24 p.m. - 6:01 p.m.
Horan Wallace & Higgins, LLP
608 Whitehead Street
Key West, Florida  33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter
Florida Professional Reporter

## 62

APPEARANCES

On Behalf of the Plaintiff:
HORAN WALLACE & HIGGINS, LLP
608 Whitehead Street
Key West, Florida 33040
(305) 294-4585 / Fax (305) 294-7822
dphoran@horan-wallace.com / darren@horan-wallace.com
chiggins@horan-wallace.com
BY: DAVID P. HORAN, ESQUIRE
BY: DARREN M. HORAN, ESQUIRE
BY: CARA HIGGINS, ESQUIRE

THE MCKEE LAW GROUP, LLC
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / (954) 217-0150
rmckee@themckeelawgroup.com
mrodriguez@themckeelawgroup.com
BY: ROBERT J. MCKEE, ESQUIRE
BY: MARY LUZ RODRIGUEZ ALVAREZ, ESQUIRE

LEWIS LEGAL GROUP, P.A.
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / Fax (954) 217-0150
jlewis@lewislegalgroup.com
BY: JEANNETE C. LEWIS, ESQUIRE

On Behalf of the Defendants:
JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
2455 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida 33304
(954) 463-0100 / Fax (954) 463-2444
burke@jambg.com
BY: MICHAEL T. BURKE, ESQUIRE

On Behalf of the Defendant Gary Lee Lovette:
ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
470 Columbia Drive, Building C-101
West Palm Beach, Florida 33409
(561) 688-6560 / Fax (561) 688-2343
aamigo@rrbpa.com
BY: ANDREA G. AMIGO, ESQUIRE

## 63

APPEARANCES CONTINUED

Also Present:
    ED SALAZAR, LEGAL VIDEOGRAPHER
    NAJA GIRARD, KEY WEST THE NEWSPAPER
    ARNAUD GIRARD, KEY WEST THE NEWSPAPER
    GWEN FILOSA, THE KEY WEST CITIZEN
    MEGAN TOWEY, CBS NEWS

--oo0oo--

INDEX OF PROCEEDINGS
                                              Page

Video Deposition of KATHYANN WANCIAK
    Direct Examination Resumed by Ms. Lewis . . . . . . 65

Certificate of Oath . . . . . . . . . . . . . . . . . 158
Certificate of Reporter . . . . . . . . . . . . . . . 159
Read Letter . . . . . . . . . . . . . . . . . . . . . 160
Errata Sheet . . . . . . . . . . . . . . . . . . . . . 161

INDEX OF PLAINTIFF'S EXHIBITS
                                              Page

-- None Marked --

## 64

1   Deposition taken before Suzanne Ex, Certified Verbatim
2   Reporter, Florida Professional Reporter and Notary Public in
3   and for the State of Florida at Large in the above cause.
4   - - - - - - -
5       THE VIDEOGRAPHER:  Today is November 21, 2014.
6   This is the case Treavor Eimers as Personal
7   Representative of the Estate of Charles Eimers,
8   Deceased, Plaintiff vs. City of Key West, et al.,
9   Defendants.  This deposition is taking place at Horan,
10  Wallace and Higgins, 608 Whitehead Street in Key West,
11  Florida.  For the record, the attorneys present will
12  introduce themselves and the court reporter will swear
13  in the witness.
14      MS. LEWIS:  Jeannete Lewis -- oh.  Jeannete Lewis,
15  Bob McKee, David Horan, Darren Horan, on behalf of the
16  Plaintiffs.
17      MR. BURKE:  Michael Burke on behalf of the
18  Defendant City of Key West, Kathyann Wanciak, and
19  others.
20      MS. AMIGO:  Andrea Amigo on behalf of Officer
21  Lovette.
22      THE COURT REPORTER:  Would you raise your right
23  hand.  Do you swear or affirm the testimony you are
24  giving in this cause will be the whole truth and nothing
25  but the truth?

65

1    THE WITNESS: I do.
2  THEREUPON,
3        KATHYANN WANCIAK
4  having been first duly sworn, was examined and testified as
5  follows:
6        DIRECT EXAMINATION RESUMED
7  BY MS. LEWIS:
8    Q.  Good afternoon, Officer Wanciak.
9    A.  Good afternoon.
10   Q.  Could you please state your name again for the
11 record.
12   A.  It's Kathyann Wanciak.
13   Q.  And you and I met before on November 4th; is that
14 correct?
15   A.  Yes, ma'am.
16   Q.  And since you -- we started your deposition on
17 November 4th, have you had an opportunity to review any
18 additional evidence or videotape in this case?
19   A.  I did not.
20   Q.  Are you aware that another videotape of the
21 incident has surfaced?
22   A.  Yes, I was.
23   Q.  And is it your testimony under oath that you have
24 not yet seen that videotape?
25   A.  I have not.

66

1    Q.  Have you been told by anybody other than your
2  attorney about what is contained on that videotape?
3    A.  No.  My attorney didn't even tell me.
4    Q.  Have you, since the time of your last deposition,
5  looked at any documents or attempted to refresh your
6  recollection of anything pertaining to the incident of
7  November 28, 2013?
8    A.  All I did was read what we had talked about.
9    Q.  And in terms of what we had talked about, are you
10 saying that you read your deposition transcript?
11   A.  Uh-huh.  Yes, ma'am.
12   Q.  All right.  Do you wish to change anything that you
13 testified to in your deposition transcript?
14   A.  No, ma'am.
15     MR. BURKE:  Object to form.
16   Q.  Did you identify any errors in your testimony or
17 incorrect testimony in your deposition transcript of November
18 4th?
19   A.  No, ma'am.
20   Q.  So, as you sit here today, you stand by the
21 testimony that you gave on page 55, line 2, that you checked
22 Mr. Eimers' breathing the whole time with his face, because
23 his face was to the side, and you could see that he was still
24 breathing?
25     MR. BURKE:  Object to form.

67

1    A.  Yes.
2    Q.  You were with Mr. Eimers the whole time on the
3  beach?
4    A.  No, ma'am.
5    Q.  So, then you couldn't have been checking his face
6  the whole time that he was there on the beach; is that right?
7    A.  I said the whole time I was there.
8    Q.  All right.  So you agree with me that you were not
9  there the whole time, correct?
10   A.  Correct.
11   Q.  There's a period of time that Mr. Eimers was on the
12 beach that you were not; is that right?
13   A.  Correct.
14   Q.  Who was checking Mr. Eimers' breathing then?
15   A.  I have no idea.
16   Q.  Do you know if anyone was?
17   A.  I do not.
18   Q.  Was Mr. Eimers' face ever down in the sand?
19   A.  Yes.
20   Q.  How many times?
21   A.  Just, the only time I remember is when he went down
22 to his knees and he laid flat down into the sand.
23   Q.  When you initially ordered him to get down on the
24 ground?
25   A.  When Officer Del Valle and I did, yes.

68

1    Q.  That's the initial time, the only time that you
2  ever saw his face in the sand; is that correct?
3    A.  Flat in the sand.  I saw him turn, he would turn
4  from side to side, and that's how I saw sand all over his
5  face.
6    Q.  And do you know what happens when you turn your
7  face side to side in the sand?
8    A.  I don't know what you're asking me.  I mean, you
9  get sand on yourself.
10   Q.  What happens to the sand that your face is
11 displacing?
12   A.  You push it to the side.
13   Q.  So it goes to either side of the head if you're
14 turning your head left to right; is that correct?
15   A.  It depends on whether your face is in the sand or
16 whether you're like this turning.  It doesn't mean you're
17 like, pushing all that weight into the sand.  I can't tell
18 how much weight he put in there.
19   Q.  And you were -- is it your testimony that Mr.
20 Eimers did not push the sand to the side when he's turning
21 his head from left to right?
22     MR. BURKE:  Object to form.
23     MS. AMIGO:  Form.
24   A.  Ma'am, I have no idea.
25   Q.  Is it your testimony that Mr. Eimers never had his

2  (Pages 65 to 68)

69

1    face in the sand after initially getting down on the ground?
2        A.  No, I didn't -- I just said he did.
3        Q.  You've seen this photograph, ma'am?
4        A.  No.
5        Q.  Do you recognize the gentleman in this photograph?
6        A.  Mr. Eimers and Officer Lovette.  Uh-huh.
7        Q.  And what's all over Mr. Eimers' face?
8        A.  Sand.
9        Q.  And would you agree with me that sand was all over
10   Mr. Eimers' face, from his forehead, to his eyes, to his
11   nose, to his lips, to his chin?
12       MS. AMIGO:  Form.
13       MR. BURKE:  Object to form.
14       A.  If that's sand, yeah, and I'm assuming that is.
15       Q.  What else could it be?
16       A.  It's just a discoloration to me.  I can't tell it's
17   sand, but I saw sand on his face.
18       Q.  And is this consistent to what you saw?
19       A.  When I came back to the beach, yes.
20       Q.  When you came back to the beach after running for
21   your hobble; is that correct?
22       A.  Yes, ma'am.
23       Q.  And how long after you got back to the beach after
24   running for your hobble, was it that you saw Mr. Eimers in
25   this situation?

70

1        A.  When I came back to the beach, he was already --
2        Q.  Face up?
3        A.  -- face up.  And as soon as I walked behind
Sergeant Zamora, that's when Sergeant Zamora said, he's out.
So it was immediately after I returned to the beach.
6        Q.  Are you sure?
7        A.  Yes, ma'am.
8        Q.  How did Mr. Eimers get that blood on the right side
9    of his face?
10       A.  I have no idea.
11       Q.  Is that the first time you've seen the blood on his
12   face?
13       A.  Yes, ma'am.
14       Q.  You didn't see any blood on his face on November
15   28, 2013?
16       A.  No, ma'am.  I did not.
17       Q.  So just, I want to be clear, you'd never, before
18   today, saw anything that depicted blood on Mr. Eimers face,
19   depicting him in the condition he was in on the beach, on
20   November 28, 2013?
21       MS. AMIGO:  Form.
22       MR. BURKE:  Object to form.
23       A.  I never saw the blood.  No, ma'am.
24       Q.  Did you know that people had talked about there
25   being blood on Mr. Eimers?

71

1        MS. AMIGO:  Form.
2        A.  I had heard that the sarge said something to
3    Lovette about washing the sand.
4        Q.  Did you hear Officer Zamora say that to Lovette?
5        A.  I don't -- I don't remember hearing it.  I think I
6    heard it from somebody else, or I read it in the paper, but I
7    didn't know he even had blood on him.
8        Q.  Do you know what caused this blood on Mr. Eimers?
9        A.  No, ma'am.
10       Q.  Do you know where that blood is coming from?
11       A.  No, I can't tell.
12       Q.  Do you know if Officer Lovette was pressing his
13   Taser so hard into this man's neck that he drew blood?
14       MS. AMIGO:  Form.
15       A.  I never saw him push it into the neck.  I saw it
16   like right in the middle of the back.
17       Q.  Where the vertebrae is?
18       A.  Yeah, I guess, yeah.  It's not -- it wasn't in the
19   neck area, though.  That's the only thing I did see.
20       Q.  And how long did you see him have his Taser there?
21       A.  Just while we were yelling commands to him --
22       Q.  And you were yelling --
23       A.  -- to stop resisting.
24       Q.  And you were yelling commands to him, you
25   personally.  Did you tell him to stop resisting?

72

1        A.  Yeah.  I pleaded with him to stop resisting.
2        Q.  And was your wireless mic on?
3        A.  No.
4        Q.  Why not?
5        A.  Because, I had told you, I had left it in the car
6    because it was charging.
7        Q.  And when you yelled commands to Mr. Eimers to stop
8    resisting, was Officer Garrido there?
9        A.  Yeah, he was.  He was there.
10       Q.  Was his wireless mic on?
11       A.  I have no idea.
12       Q.  When you were there yelling to Mr. Eimers to stop
13   resisting, was Officer Lovette there?
14       A.  Yes, ma'am.
15       Q.  Was his wireless mic on?
16       A.  I have no idea.
17       Q.  When you were there yelling commands to Mr. Eimers
18   to stop resisting, was Officer Medina there?
19       A.  Now, that, I can't tell you.  I don't remember.
20       Q.  You don't know when he arrived?
21       A.  Uh-uh.  Because I, like I said, I only saw feet
22   down.  And I saw Lovette and I heard his voice.  That's how I
23   knew he was there.
24       Q.  How about Officer Del Valle?
25       A.  He was there.

3  (Pages 69 to 72)

73

1   Q.  Was he – did he have his wireless mic on?

2   A.  I have no idea.

3   Q.  Is there any recording of which you are aware that

4   captures you telling Mr. Eimers to stop resisting?

5   A.  I don't know.  I don't have one.

6   Q.  You're able to yell pretty loud, aren't you?

7   A.  Yeah, but I didn't yell at him.  I was pleading

8   with him.  I said, sir, please, please give me your arm,

9   please.

10   Q.  Can you look at the camera and in the voice that

11   you were using that day, tell the jury how you were talking

12   to Mr. Eimers?

13   A.  I was telling Mr. Eimers, as everybody else was

14   trying to yell and tell him what to do, I was getting his arm

15   and I'm like, please, Mr. Eimers, please -- or, I didn't know

16   his name.  I said, please, sir.  Sir, please, we're just

17   trying to get your handcuff on.  Please, just hold still.

18   And that was it.  That's all I could say to him.

19   Q.  Did you ever put that in any report that you filled

20   out for the Key West Police Department?

21   A.  There's not a reason to.

22   Q.  It's not important?

23   A.  It was, it was -- it wasn't that it was going to

24   make or break anybody.

25   Q.  Did you tell the FDLE when they interviewed you?

74

1   A.  I told the FDLE investigator that I pleaded with

2   him to put his hand behind his back.

3   Q.  Mr. Eimers had sand in his nose when you saw him?

4   A.  No, I never saw it in the nose.  I saw it on his

5   face.  You're saying in his nose.

6   Q.  How close did you get to Mr. Eimers when you came

7   back to the beach and he was in the condition or position

8   that is depicted in this photograph?

9   A.  About this close.

10   Q.  And were you on his right side or left side?

11   A.  I was over here.

12   Q.  So, it's hard from your vantage point --

13   A.  That would be his right side.

14   Q.  You were on his right side, so that would be the

15   side that the blood is on?

16   A.  Uh-huh.

17   Q.  Is that a yes?

18   A.  Yes, ma'am.  Sorry.

19   Q.  And you did not see the blood on his ear?

20   A.  I truly did not.

21   Q.  Do you know what would cause blood to come from Mr.

22   Eimers' ear?

23   MS. AMIGO:  Form.

24   A.  I have no idea.

25   Q.  Could it come from Officer Lovette dropping like an

75

1   F-ing bomb on his head?

2   MS. AMIGO:  Form.

3   A.  If -- I never saw it, so I can't say that I saw

4   anything to make bleed -- or, blood come to his face.

5   Q.  Well, you saw -- you saw Lovette's feet and Taser,

6   is that right?

7   A.  Yes.

8   Q.  So you don't know what he was doing with his arms,

9   his fists, his hands?

10   A.  No.  I truly, all I remember is the Taser in the

11   back of his back.  That's all I can remember of Lovette.

12   Q.  Was he in the discharge position with regard to the

13   Taser?  And I'm referring to Mr. Lovette, Officer Lovette.

14   Excuse me, I mean him no disrespect.

15   A.  Discharge?  Well, he had the cartridge off --

16   Q.  Okay.

17   A.  -- of the front, and the Taser was on his back.

18   Q.  And so, the cartridge is what has the prongs in it?

19   A.  Yeah, yeah.

20   Q.  When the cartridge is removed, is there anything

21   sharp on the edge of the Taser that would be pointed?

22   A.  No.  It's just like metal pieces so that it makes a

23   connection with the electricity.

24   Q.  Are they sharp?

25   A.  Uh-uh.

76

1   Q.  Is that a no.

2   A.  Yeah, sorry.  No, ma'am.

3   Q.  And is it true that you're trained, in order to get

4   a good connection for a drive-stun mode -- you're familiar

5   with the drive-stun mode; is that right?

6   A.  Yes, ma'am.

7   Q.  That you need to aggressively push that Taser into

8   the suspect; is that correct?

9   MS. AMIGO:  Objection, form.

10   A.  It doesn't have to be aggressively.  It just has to

11   make contact.

12   Q.  Have you read the operating manual for the X26

13   Taser?

14   A.  I have.  And if it says aggressively, I don't

15   remember that it said it.

16   Q.  But Officer Lovette did make contact with Mr.

17   Eimers' body, is that correct, with his Taser?

18   A.  Yes, ma'am.  With the back of it.

19   Q.  On his skin?

20   A.  No.  He had a shirt on.

21   Q.  So it would have been through his clothes?

22   A.  Uh-huh.

23   Q.  Is that a yes?

24   A.  Yes, ma'am.

25   Q.  Did you see Officer Garrido get his finger stuck in

4  (Pages 73 to 76)

77

1  the handcuffs?
2      A.  Yes, ma'am.
3      Q.  Which finger?
4      A.  I believe it was his -- it was the tip of his
5  thumb, but I think it might have been his right hand.
6      Q.  And do you have an independent recollection of
7  seeing Officer Garrido's finger in the handcuffs?
8      A.  Oh, yes, ma'am.
9      Q.  Did you tell Key West Police Department that in
10  your statement?
11      A.  I'm not sure if I did or not, honestly.
12      Q.  That wasn't --
13      A.  I don't remember.  I'd have to look.
14      Q.  -- wasn't important?
15      A.  That a finger was stuck in a handcuff?  No, not
16  really.
17      Q.  Did you tell that to FDLE?
18      A.  Yes, ma'am.
19      Q.  Did Officer Garrido say anything when he
20  purportedly got his finger stuck in the handcuff?
21      A.  He screamed.
22      Q.  He screamed that his finger was stuck?  Is that
23  yes?
24      A.  Yes, ma'am.
25      Q.  You've got to say yes or no.

78

1      A.  Yes, I forgot.
2      Q.  He didn't say "ow"?
3      A.  I don't know if he said "ow."  He screamed like a
4  little girl, so I just --
5      Q.  You would --
6      A.  -- know he screamed.
7      Q.  You would recognize his voice if you heard it on
8  video?
9      A.  I think so.
10      Q.  Are you aware of anybody who heard Officer
11  Garrido's voice on any videotape or any recording whatsoever?
12      A.  Oh, I think whoever was around Mr. Eimers heard
13  Garrido scream about his thumb.
14      Q.  I'm asking about a recording and you're talking
15  about what you think other people heard?
16      A.  I'm sorry.  Say your sentence again.
17      Q.  Are you aware of any recording that captures
18  Officer Garrido saying anything with regard to his finger?
19      A.  Oh, no, I'm not aware of it.
20      Q.  And who are you supposing heard Officer Garrido
21  make a statement about his finger?
22      A.  Lovette should have heard it, myself, and there was
23  other feet on the other side.  So I don't know if it was
24  Medina, Galbo, I have no idea.  But there were other feet
25  over there, so I know other people heard it.

79

1      Q.  And your testimony back on November 4th on page 54,
2  was that you heard him say something about his finger being
3  stuck, is that right?
4      A.  Yes.
5      Q.  And if Officer Medina was there with his wireless
6  microphone on, it should have captured that, correct?
7      A.  Yes.
8          MR. BURKE:  Object to form.
9      Q.  Was Mr. Eimers Tased?
10      A.  No, ma'am.
11      Q.  Do you deny telling anyone that Mr. Eimers was
12  Tased?
13      A.  I do deny.
14      Q.  Did you talk to dispatch on COM1 or COM2
15  immediately following seeing Mr. Eimers in the face-up
16  condition and a blue, blue coloration with sand on his face?
17      A.  I don't remember Mr. Eimers being blue, but I did
18  go to COM2 to tell them I needed rescue immediately.
19      Q.  And you did that immediately upon seeing Mr. Eimers
20  in that condition; is that right?
21      A.  Yes, ma'am.
22      Q.  And you are P48; is that correct?
23      A.  Paul-48.  Yes, ma'am.  I was.
24      Q.  By the way, I see that you're in your uniform
25  today.  Are you back off of administrative leave?

80

1      A.  Yes, ma'am.
2      Q.  Have you been cleared of all charges in the
3  Internal Affairs investigation?
4      A.  Yes, ma'am.
5      Q.  Are you able to discuss that Internal Affairs
6  investigation now?
7      A.  Yes.
8      Q.  And what was the nature of that Internal Affairs
9  investigation?
10      A.  I had asked a gentleman to move a foot over so an
11  elderly man could see the Eagles kicking butt on a football
12  game.  And they were a little intoxicated and did not like
13  that a woman asked them to move.
14      Q.  And who cleared you of those charges?
15      A.  The IA Sergeant, then it went to the Captain, then
16  it went to the Chief.
17      Q.  So that would have been Officer Tripp?
18      A.  Sergeant Tripp.
19      Q.  Sergeant Tripp, then Chief Doni Lee?
20      A.  I don't know if it was Doni -- I don't know if it
21  was Captain Torres or Captain Brandenburg, and then Chief
22  Lee.
23      Q.  All right.  Are you familiar with the CAD system?
24      A.  Yes, ma'am.
25      Q.  And the CAD system records what is called in; is

81

1  that correct?
2      A.  Yes, ma'am.
3      Q.  And you made contact with the CAD system on COM2
4  immediately after seeing Eimers face up with sand all over
5  his face, is that correct?
6      A.  Not when he had the sand, no.  I called when he
7  wasn't breathing.  And they were trying to get COM1 to tell
8  them about the medical issue and dispatch, I believe, said
9  what is the nature of the call.  And I'm like, this is
10  ridiculous.  And I walked aside to the beach area and turned
11  to 2.  I said, I need rescue now.  The man is not breathing.
12     Q.  So let's back up.
13         When you came back from getting the hobble, Eimers,
14  as I understand your testimony, was already face up; is that
15  correct?
16     A.  Yes, ma'am.
17     Q.  In the condition in which we see him in this
18  photograph here; is that right?
19     A.  With the sand on his face.  Yes, ma'am.
20     Q.  At that point in time, did you not appreciate that
21  he was unconscious?
22     A.  No, I -- I did not -- I had no clue.  I walked
23  around, because I just walked.  I'm walking this way, and I
24  don't know if that's the sarge or -- no, that's not the
25  sarge.  This must be the sarge.  I walked around the sergeant

82

1  and then I looked at Mr. Eimers, and that's the exact same
2  time Sergeant Zamora said, he's out.  So that's as much as I
3  walked around like that.
4      Q.  So you then went to Mr. Eimers' left side as he's
5  situated in this photograph?
6      A.  No.  I was right here.  I was behind this person's
7  feet right here.  I never walked on the other side of Mr.
8  Eimers.
9      Q.  So you were, at all times, after coming back from
10  the hobble, you were at all times on the right side of Mr.
11  Eimers?
12     A.  As far as I can remember.  Yes, ma'am.
13     Q.  You came back to the beach.  Mr. Eimers was in this
14  position; is that right?
15     A.  Yes, ma'am.
16     Q.  And at that point in time, you did not appreciate
17  that he was unconscious; is that correct?
18     A.  No.
19     Q.  Okay.  And how long after you arrived on the beach
20  did Sergeant Zamora say, he's out?
21     A.  Almost immediately.  As soon as I turned and walked
22  to the right of the sarge and I looked and I did like that,
23  and I'm like -- and I heard the sarge go, he's out.  And I'm
24  like, oh, my God, he is.
25     Q.  And Mr. Eimers was in this position when Sergeant

83

1  Zamora said, he's out?
2      A.  Correct.
3      Q.  And are you able to tell me how long you were on
4  the beach before that happened?
5      A.  I told you, I walked up, walked around the sarge,
6  and then I came back, and that's just as immediately, he said
7  it.
8      Q.  Is that a second, two seconds?
9      A.  It was very quickly, as soon as I entered the
10  beach.
11     Q.  You didn't stand there and observe for a number of
12  seconds before Mr. Eimers was turned over, did you?
13     A.  I could have, for a couple of seconds, but I really
14  couldn't tell you exactly.
15     Q.  But you have a firm recollection that when you got
16  back to the beach, Mr. Eimers was face up; is that correct?
17     A.  I believe so.  Yes, ma'am.
18     Q.  That's your firm recollection?
19     A.  That's my firm recollection.
20     Q.  And so, when Mr. Eimers was identified as
21  unconscious, who called dispatch?
22     A.  I heard -- I don't know who got on the radio,
23  because COM1 is where we call for rescue.  Somebody got on
24  and --
25     Q.  How do you know?

84

1      A.  Because you can hear it.  We all have the same
2  channel.
3      Q.  So before you called dispatch, someone else had
4  already called dispatch?
5      A.  Somebody was already on the radio trying to get
6  through to dispatch.  They got dispatch and then the
7  dispatcher was questioning why we needed rescue, what is the
8  age of the -- so, to me, it was wasting time.  I needed to
9  get rescue there now.  So I just switched to -- I walked
10  away, switched to 2, and I said, we need rescue now.  The man
11  is not reading.  Tell them to expedite.
12     Q.  And the microphone into which you speak is on your
13  left shoulder?
14     A.  Yes, ma'am.
15     Q.  And it's on your left shoulder today?
16     A.  Yes, ma'am.
17     Q.  And did you -- do you know who told dispatch that
18  the suspect was Tased?
19     A.  No.  I never heard that.
20     Q.  Do you deny that it was you that called dispatch
21  and advised at 8:34 and 15 seconds that -- excuse me, 8:34
22  and 15 seconds that the suspect was Tased?
23     A.  Yeah.  I don't remember saying Tased at all.
24     Q.  Who would have said that -- who was calling
25  dispatch on COM1 that you heard?

85

A. I don't know. You could pull the tape, because I don't really remember who. There were so many of us there.

Q. It's recorded, isn't that right?

A. Right, right.

Q. And so, whoever said that the subject was Tased at 8:34 and 15 seconds would be recorded and memorialized on a tape; is that right?

A. Yes, ma'am.

Q. Have you heard that tape?

A. No. I didn't know anybody actually said that.

MR. MCKEE: Because that's clearly evidence in this case, we expect it produced as immediately as you can get your hands on it.

MR. BURKE: Yeah, I didn't -- I didn't know that it hadn't been. Be happy to provide it to you.

MR. MCKEE: Thank you.

Q. Now, given that you were not at the beach at all times, you have no idea what happened when you were not there; is that correct?

A. Correct.

Q. So it's entirely possible that the suspect, Mr. Eimers, could have been Tased when you were gone; is that right?

MS. AMIGO: Form.

MR. BURKE: Object to form.

86

A. It could happen. Yes, ma'am.

Q. So as you sit here today, you can't deny that Mr. Eimers was Tased?

MS. AMIGO: Objection, form.

A. I can't deny. While I was gone, it could have happened.

Q. Did you speak to EMS?

A. I don't think -- I spoke to firefighters, I think, when they got there. I don't remember if I talked to EMS or not --

Q. Did you tell --

A. -- because firefighters got there first.

Q. Did you tell firefighters that -- what did you tell the firefighters?

A. I don't even remember except, get over here, let's go, hurry up, hurry up.

Q. Did you tell the firefighters what happened?

A. I don't believe so.

Q. Do you know who did?

A. No, ma'am. I don't.

Q. Do you know who spoke with EMS?

A. No, I don't.

Q. You were on scene until about 10:03 that morning; is that correct?

A. I'd have to look at CAD, but, if you have it.

87

Q. It shows when you were dispatched, when you arrived on scene and when you left; is that right?

A. Correct.

Q. With respect to Paul or Papa-48, it says, Officer Wanciak at scene at 8:30 and 35 seconds; is that correct?

A. Uh-huh. I saw it.

Q. And -- you've got better eyesight than I do.

A. Only from far away.

Q. And then, when does it say that you cleared the scene?

A. It says I was available at 12:14.

Q. All right. And when --

A. I was in station, though, at 10:39.

Q. All right. So when did you radio in that you were at the station or on your way at the station?

A. En route to station at 10:03.

Q. Do you do that as soon as you leave someplace?

A. Yes, ma'am.

Q. All right. So you left the scene at or about 10:03?

A. Yes, ma'am.

Q. That morning?

A. Yes, ma'am.

Q. All right. And you were at the scene continuously from when you initially followed Mr. Eimers' vehicle to the

88

beach, to about 10:03 a.m.

A. Correct.

Q. And, as you sit here today, you don't recall whether or not you spoke with Key West EMS, if you will?

A. I can't remember if I did or not, or the firefighters. If I did anything, it was to tell them to hurry up.

Q. You were one of the three, three officers who were there when Mr. Eimers got out of his car; is that right?

A. Yes, ma'am.

Q. There was no more than you three officers there when Mr. Eimers got out of his car, right?

A. I don't -- I only remember Officer Garrido, myself and Del Valle.

Q. All right. And Del Valle is the one with the AR15?

A. Correct.

Q. And you saw the AR15 trained on Mr. Eimers?

A. No. I actually, I only saw Henry from -- because I was so busy watching Mr. Eimers, I knew he had a long gun, but I didn't know what he had. I just saw him over there with the gun.

Q. Your service weapon was drawn?

A. Yes, ma'am.

Q. And Officer Garrido's service weapon was drawn?

A. Yes, ma'am.

89

Q. And there was no on else on the beach in terms of officers from Key West Police Department at that time, that you can recall; is that right?

A. No. We were the first -- I was -- we were the first three.

Q. So in terms of people with knowledge as to how Mr. Eimers got out of his car, what he did when he got out of his car, and collapsing and things of that nature, if collapsing ever did occur, that would have had to have come, at some point in time, from one of you three officers; agreed?

MR. BURKE: Object to form.

MS. AMIGO: Join.

A. Correct. But remember, I didn't see him get out of the car. Because I told you, I couldn't see around the kiosk.

Q. And you recall seeing him out of the car; is that right?

A. I saw him get out of the car. Yes, ma'am.

Q. And you saw him walk to the end of his car; is that right, on the driver's side?

A. I saw him after he was already behind his car, walking towards the end of the beach area where he was.

Q. He was walking away from you?

A. I don't know if he even saw me, actually, because I came up from behind him.

90

Q. You didn't tell FDLE that he looked at you?

A. Not when I came up behind him at first.

Q. Did he ever look at you?

A. Yeah. He turned around. He was like this.

Q. When you had your gun drawn?

A. I don't know if it was when I had my gun drawn or when I had put it in, but I know he looked.

Q. Mr. Eimers was walking away from his vehicle; is that correct?

A. Yes.

Q. He was not walking toward you?

A. No, ma'am.

Q. He was not walking toward Officer Del Valle?

A. Yeah -- Del Valle was in his direction. Yes, ma'am.

Q. Officer Del Valle was where?

A. He was that way.

Q. And which way did Mr. Eimers --

A. Mr. Eimers, his car was here and he came around this way, right to here, and Del Valle was over there. And I was here and then got on this side of Mr. Eimers.

Q. Del Valle was near the driveway?

A. He was over here. The driveway is right there.

Q. Mr. -- Officer Del Valle was near the driveway near the Southernmost Cafe; is that correct?

91

A. Correct.

Q. And Mr. Eimers was walking parallel to the Southernmost Cafe; isn't that also correct?

A. Yes.

Q. Walking parallel to the Southernmost Cafe is not walking toward Officer Del Valle; would you agree?

A. Well, Del Valle was here, and Mr. Eimers' car is here, and Mr. Eimers walked this way. So, he did walk towards Officer Del Valle, yeah.

Q. Are you indicating or intimating or telling this jury that Mr. Eimers was walking toward Officer Del Valle?

A. He walked in his direction. Yes, ma'am.

Q. Have you seen the video?

A. Not the newest video, no.

Q. Was he charging Officer Del Valle?

A. No, no.

Q. Was he making any threatening comments to Officer Del Valle?

A. Not that I was aware.

Q. Did he make any threatening comments to you?

A. No, no threatening comments.

Q. Was he thrashing about?

A. At which time?

Q. When he's walking toward Officer Del Valle?

A. No, not when he was walking towards him.

92

Q. In fact, he never walked toward Officer Del Valle, did he?

A. He walked in his direction is -- I'm not saying he approached him. I'm just saying he walked in that general area.

Q. You started screaming commands at Mr. Eimers from the sidewalk as you were walking onto the beach; is that correct?

A. Yes, it is.

Q. And by the time you finished your command of, "Get down on the ground, do it now," Mr. Eimers was down, wasn't he?

A. Yes, he was.

Q. How many steps did he walk in that time?

A. I have no idea. I'd have to look at the video.

Q. We will.

Do you know who Alycon Crean is?

A. Alycon is the PIO, Public Information Officer.

Q. When did you first speak with her with regard to this incident?

A. I don't really know.

Q. Did you speak with her that day?

A. I really don't know.

Q. Did you speak with her the following day?

A. She -- I don't, I don't know when I spoke to her.

93

```
 1   I'm sure I did.
 2        Q.  Well, I don't want you to guess.  Nobody wants you
 3   to guess.
 4        A.  I truly don't know.
 5        Q.  Did you speak with Alycon Crean with regard to this
 6   incident the day it happened or the day after?
 7             MR. BURKE:  Objection, it's repetitive.
 8        A.  I just don't know.
 9        Q.  Did you leave her a memo?
10        A.  I don't know.
11        Q.  Do you know who spoke with Alycon Crean about what
12   happened that day?
13        A.  I have no idea.
14        Q.  Do you know where she gets her information from?
15        A.  She has a radio that she monitors, so.
16        Q.  What station?
17        A.  Channel 1.
18        Q.  Do you know anyone who spoke with her before
19   Friday, November 29th, at 8:24 p.m.
20        A.  I wouldn't know.
21        Q.  If she was told and then relayed to members of the
22   media that Mr. Eimers was erratic and resisted officers'
23   approach, that would be false; is that correct?
24             MR. BURKE:  Object to form.
25             MS. AMIGO:  Form.
```

94

```
 1        A.  No, that wouldn't be false, because he did resist
 2   us.
 3        Q.  He resisted your approach?
 4        A.  Not the approach, the handcuffing.
 5        Q.  That's what I just read to you.  He was erratic and
 6   resisted officers' approach.  That's a false statement, isn't
 7   it?
 8             MS. AMIGO:  Form.
 9             MR. BURKE:  Object to form.
10        A.  I didn't see that he resisted.  He went down on the
11   ground when we asked him to.
12        Q.  So it would be an incorrect statement of fact,
13   correct?
14             MS. AMIGO:  Form.
15        A.  Very possibly.
16        Q.  Well, you were there.  Was Mr. Eimers erratic as he
17   was walking away from --
18        A.  Not for the approach.  No, ma'am.
19        Q.  Okay.  And did he resist the approach?
20        A.  Again, I said, no, he did not.
21        Q.  He complied in every respect by getting down on the
22   ground; is that correct?
23        A.  Correct.
24        Q.  And that's what you told him to do?
25        A.  Correct.
```

95

```
 1        Q.  And that's what he did when you told him to do it?
 2        A.  Correct.
 3        Q.  Were you up to date in your Taser training when
 4   this incident happened?
 5        A.  Yes, ma'am.
 6        Q.  When's the last time -- you're supposed to have
 7   Taser training every year; is that correct?
 8        A.  Yes, ma'am.
 9        Q.  When in 2012 did you have Taser training?
10        A.  I have to look at the training dates that you had.
11        Q.  That's marked up, I apologize, but this is the
12   summary.
13             MR. BURKE:  I'm sorry?
14             MS. LEWIS:  Officer Wanciak.
15             MR. BURKE:  Okay.  I have a copy.
16        A.  2012, you said?
17        Q.  Yes.
18        A.  It began 10/4 of 12.
19        Q.  And ended?
20        A.  10/4 of 12.
21        Q.  It was mandatory training?
22        A.  Yes.  It's re-certification.
23        Q.  And you take it every year?
24        A.  Yes, ma'am, or else you can't carry your Taser.
25        Q.  When did you take it in 2013?
```

96

```
 1        A.  Taser was 7/15.
 2        Q.  Let me see that.
 3        A.  Right there.  Taser user re-cert.  You have it
 4   highlighted.
 5        Q.  Damn.
 6        A.  Thanks for highlighting it.
 7        Q.  Curses.
 8             MR. BURKE:  There goes the case.
 9        A.  I thought it was a trick question.
10        Q.  Why did you take your re-certification eight months
11   after taking it in 2012?
12        A.  You'd have to ask training that.  I just do what
13   I'm told.
14        Q.  Wouldn't it make sense for you to take it around
15   the same time every year?
16        A.  Ma'am, if it makes sense -- it would make perfect
17   good sense.
18        Q.  I hate when that happens.
19        You had recently had physiological response
20   dynamics training; is that correct?
21        A.  Yes, ma'am.
22        Q.  And in that training, what did they go over?
23        A.  They go over a lot of different things and I don't
24   think it's the same every year.
25        Q.  They go over the prone restraint?
```

97

1    A.  Well, you had asked me before and I wasn't sure,
2  and I asked a lieutenant that I know, that I was under, at an
3  admin leave.  And she said, yes, that is one thing that we
4  have gone over.  Because I couldn't remember where we'd gone
5  over it.  So, yes, we do.
6    Q.  And that's where you learned about the
7  physiological response to struggle; is that correct?
8    A.  Yes, ma'am.
9    Q.  Okay.  And had you ever had any training with
10  regard to prone restraint on sand?
11    A.  No.  We had talked about this and my answer was no.
12    Q.  And had you ever conducted a prone restraint on the
13  sand before?
14    A.  Not on the sand.  No, ma'am.
15    Q.  Now, given that you were on scene from the time
16  that we saw Mr. Eimers in the condition in which he's
17  depicted in Exhibit 19, and you were on the scene until
18  10:03, how many witness statements did you take in that time
19  frame?
20    A.  We had talked about this.  I had taken two.
21    Q.  And did you approach any others to secure their
22  information for follow up by either other detectives or
23  officers of the Key West Police Department or the FDLE?
24    A.  I asked a bunch of people over in the corner by the
25  black iron gate towards the pier if anybody had seen

98

1  anything, and nobody had said they saw anything.
2    Q.  And can you describe these people?
3    A.  There were two black females that I saw, and I
4  think there was a family that didn't speak English, so that
5  was a little difficult.
6    Q.  You don't speak Spanish?
7    A.  No, ma'am.
8    Q.  And at what point in time did you make this
9  inquiry?
10    A.  It was after -- I don't know if it was after Mr.
11  Eimers had -- it had to be after Mr. Eimers had left the
12  scene.  We were just securing the scene for the detective.
13    Q.  And can you describe the New York police officer
14  who you engaged in conversation, the gentleman who was
15  critical of the Key West Police Department in terms of how
16  they handled Mr. Eimers?
17    A.  First off, I didn't know he was an ex-police
18  officer.  I never seen him before.  He was standing at the
19  beach area when I was going to go secure the scene.  And he
20  said, I saw what you guys did, you murdered that guy.
21    Q.  What did he look like?
22    A.  I couldn't tell you.  White guy, five-foot-nine or
23  ten, short-cut hair.  That's it.
24    Q.  What was he wearing?
25    A.  Not a clue.

99

1    Q.  Did you get -- and you didn't get his name?
2    A.  No.  He was acting a little irrational and he was
3  starting to scream.  And I was like, sir, I need you to calm
4  down, be quiet, and I need you to back away, please.
5    Q.  You didn't threaten to arrest him?
6    A.  No.  The only thing I told you before in the last
7  depo was I told him, I said, sir, the only thing I'm going to
8  say to you is it's all about perception.
9    Q.  So you can appreciate how someone could look at
10  what was goin on between the Key West police officers and
11  Mr. Eimers and come to the conclusion that he was murdered?
12    MS. AMIGO:  Objection, form.
13    MR. BURKE:  Object to the form.
14    A.  I could understand why people would have their
15  perspective of something like that, yes.
16    Q.  Reasonable to you, given what happened that day?
17    MS. AMIGO:  Objection, form.
18    MR. BURKE:  Object to form.
19    A.  Yes.
20    MS. LEWIS:  I think it might be a good time to go
21  through the video.
22    MR. DARREN HORAN:  Your call.  Mike, I don't want
23  to blind you again.
24    Q.  Do you need glasses for the video?
25    A.  No.

100

1    MS. LEWIS:  I sure do.
2    MR. DARREN HORAN:  I need you to move that,
3  Jeannete, that brief little corner there.
4    MS. LEWIS:  Oh, I'm sorry.
5    Q.  Again, just to be clear, you've not seen this video
6  footage before?
7    A.  This one is the original, right?
8    Q.  This is not the cell phone video.
9    A.  Oh.  Well, I've seen one from this angle from some
10  tourist that day.  I don't know if this is the one I've seen
11  or not.
12    MS. LEWIS:  I'm going to take this through until
13  about 24 seconds.  I lied.  Stop.
14    Q.  Was that your voice?
15    A.  Yes, ma'am.
16    Q.  Are you able to see where Mr. Eimers is at the
17  point that you stopped your statement to get on the ground
18  and do it now?
19    A.  I just kept yelling it.  He look -- it's hard to
20  tell if he's kneeling right there or on the ground, because I
21  see something black behind him.
22    Q.  Knowing that I'm going to ask you that question,
23  let's take it back to zero.  Where is Mr. Eimers when you
24  finish your statement, "Down on the ground, do it now"?
25    A.  He's on his knees.  He's on his knees right there.

101

1    Q.  So you heard your full statement, get on the
2  ground, do it now; is that correct?
3    A.  Yes, ma'am.
4    Q.  Took all of about three seconds for you to make
5  that statement?
6    A.  Yes, ma'am.
7    Q.  And in that three seconds of time, Mr. Eimers got
8  down onto his knees; is that right?
9    A.  Yes, ma'am.
10     MS. LEWIS:  Take the video further.
11    Q.  What's he doing now?
12    A.  He's laying down, like, on his elbows, it looks
13  like.
14    Q.  And where are you?  That's you coming up —
15    A.  That's me —
16    Q.  — on the left?
17    A.  — coming up there.  Sorry.
18    Q.  And is your gun drawn?
19    A.  Yes, ma'am.
20    Q.  And where is Officer Del Valle?  Del Valle, if
21  that's you pronounce it.
22    A.  It looks like he's on the — where that, the arrow
23  is.
24    Q.  So he's on the passenger side of Mr. Eimers' car
25  near the chaise lounges?

102

1    A.  Yes.
2     MS. LEWIS:  All right.  Go ahead.  Strike that.
3    Q.  Do you see Officer Garrido at this point?
4    A.  No.
5    Q.  All right.
6     MS. LEWIS:  Go ahead.
7    A.  Now I see Officer Garrido.
8    Q.  Okay.  Now, is Officer Garrido the closest one to
9  Mr. Eimers?
10    A.  I believe it is him.
11    Q.  Is his arm extended with his service weapon?
12    A.  It looks like he's holstering his weapon.
13    Q.  You know at some point in time before approaching
14  Mr. Eimers, he holstered his weapon; is that right?
15    A.  Correct.
16    Q.  And you holster your weapon when there's no longer
17  a threat to you; is that correct?
18    A.  Correct.
19     MS. LEWIS:  Go further.  Can you stop it.
20    Q.  Did you see, at any point in time up to now, where
21  Mr. Eimers approached Officer Del Valle?
22    A.  No.
23    Q.  And you were wearing a windbreaker that day that
24  says Police on the back?
25    A.  Yes, ma'am.

103

1     MS. LEWIS:  All right.  Go ahead.
2    Q.  Now, who has straddled Mr. Eimers?
3    A.  That's Garrido.
4    Q.  All right.  So, 15 seconds into it.
5     So, from zero seconds, you're instructing Mr.
6  Eimers to get down on the ground, do it now.  By his
7  knees.  Fair to say by second five, he's down on the ground?
8    A.  Fair to say.
9     MR. BURKE:  Object to form.
10     MS. AMIGO:  Form.
11    Q.  By 15 seconds, you're to Mr. Eimers' right, Del
12  Valle is to his left, and Officer Garrido has straddled him;
13  is that right?
14    A.  Correct.
15    Q.  All right.  Where is Mr. Eimers going to go at this
16  point?
17     MR. BURKE:  Object to form.
18     MS. AMIGO:  Form.
19    A.  I have no idea.
20    Q.  Was he a threat to anyone at this point?
21    A.  He is.  He is right now.
22    Q.  Why is he a threat?
23    A.  It's the unknown.  We don't know if he has any
24  weapons on him or anything.  He could have a gun on his
25  waistband, for all I know.

104

1    Q.  He's down on the ground?
2    A.  Yes, ma'am.
3    Q.  On his stomach?
4    A.  Yes, ma'am.
5    Q.  With a long gun pointed at him?
6    A.  Yes, ma'am.
7    Q.  Three officers in his close vicinity?
8    A.  Yes, ma'am.
9     MS. LEWIS:  All right.  Go ahead.
10    Q.  Do you see Officer Del Valle approach Mr. Eimers?
11    A.  Yes, ma'am.
12    Q.  And what's going on at this point?
13    A.  It looks — I know Garrido had one, the left hand,
14  in a handcuff.  But from here, it's just — all I can see is
15  Officer Del Valle bending over and Garrido overtop of him.
16    Q.  Let's back up a few seconds and I'd like to see if
17  we can identify at what point in time we have the left hand
18  in cuffs.
19    A.  It's hard to tell exactly.
20    Q.  You see it there?
21    A.  I remember that he had it, but it's really hard
22  to tell that he's got it in cuffs right there.
23    Q.  Tell me when you see him grab for the right arm.
24  Is he grabbing there?
25    A.  Yeah.  It looked like you could — looked like

105

1   something was -- he was --
2       Q.  Did you see him yank his arm behind him?
3           MS. AMIGO:  Form.
4           MR. BURKE:  Object to form.
5       A.  Well, I saw him grab his arm.  I don't know that he
6   yanked it.
7       Q.  How did Officer Garrido grab Mr. Eimers' arm?
8       A.  Took the arm trying to put it behind.
9       Q.  Did he bend him at the elbow?
10      A.  I couldn't tell you if he did or not.
11      Q.  Can I go grab your arm right now, put it behind
12  your back without bending it at the elbow without inflicting
13  any kind of pain on you?
14          MS. AMIGO:  Objection, form.
15      A.  Sure.
16      Q.  Isn't it true that they --
17      A.  I wouldn't let you, but sure.
18      Q.  Isn't it true that they teach you to bend the arm
19  at the elbow to get it behind their back?
20      A.  No.  They don't -- I mean, they -- they -- you get
21  it any way you can get it when you're on a situation like
22  this.
23      Q.  Your job is not to inflict pain, is it?
24      A.  No, I don't ever want to inflict pain, but it does
25  happen sometimes.

106

1       Q.  Did Garrido ever ask him for his arm?
2       A.  I -- I don't know if he did or not, honestly.
3       Q.  You didn't hear it on this tape, did you?
4       A.  No.  I didn't hear anything on this tape.
5       Q.  But we heard you on this tape, get on the ground
6   and do it now; is that right?
7       A.  I have a big mouth, ma'am.
8       Q.  So when you're telling him to stop resisting, I'm
9   going to expect to hear you on the tape; is that right?
10      A.  Oh, yeah.
11      Q.  Okay.  So, at least at 17 seconds, we, more likely
12  than not, we've got his right arm; is that right?
13          MS. AMIGO:  Form.
14          MR. BURKE:  Object to form.
15      A.  We have his left arm, and then his right arm has
16  been pulled to the back, yeah.
17      Q.  All right.  And we have Officer Del Valle now
18  assisting with his long gun slung over his shoulder?
19      A.  I can't even -- I was wondering where he put it.  I
20  had no idea.
21          MS. LEWIS:  All right.  Go ahead.
22      Q.  Do you see Officer Garrido in possession of Mr.
23  Eimers' right arm there?
24      A.  Sure do.
25      Q.  All right.  And that's at 20 seconds.  And you're

107

1   walking toward the pile; is that correct?
2       A.  Correct.
3       Q.  All right.
4           MS. LEWIS:  Go ahead.
5       A.  I actually stopped right there.
6       Q.  Okay.  And why is that?
7       A.  Because I thought they had gotten him under control
8   and got him handcuffed.
9       Q.  Do you see any other officers on the beach?
10      A.  I don't.
11      Q.  You don't see Officer Medina anywhere?
12      A.  Do you?
13      Q.  No.
14      A.  Okay.  I don't, either.
15      Q.  But, do you?
16      A.  I don't.  I don't know if that's a head on the
17  backside of the car or not.
18      Q.  Do you know why Kathy Smith --
19      A.  Right there.  Yeah, is that a person?
20      Q.  Well, we'll find out.
21          Do you know why Kathy Smith would say that Officer
22  Medina was here and heard your commands to get down on the
23  ground and do it now, and how his wireless microphone
24  recorded that?
25      A.  Not unless he's over here on the sidewalk behind

108

1   this guy in the blue shirt.
2       Q.  You don't see him over there, do you?
3       A.  Well, I can't see who's behind this guy.  That's
4   what --
5       Q.  We'll watch.
6       A.  You asked me if there was a way.  I said, if he was
7   over there, sure, he could hear me.
8       Q.  You don't know where Officer Medina is at this
9   point, do you?
10      A.  No, ma'am.
11          MS. LEWIS:  Go ahead.
12          THE WITNESS:  Oh, there.
13          MS. LEWIS:  Stop.
14      Q.  Do you know who this officer is?
15      A.  No, I don't.
16          MS. LEWIS:  Keep going.
17      Q.  Isn't that Officer --
18          MS. LEWIS:  Stop.
19  BY MS. LEWIS:
20      Q.  -- Officer Lovette?
21      A.  I couldn't tell from here, but I believe he was the
22  next person that came on scene.
23          MS. LEWIS:  Go ahead.
24      Q.  And Officer Del Valle walks away; is that right?
25      A.  Correct.

109

1  Q.  And now you see the person who just walked up, the
2  fourth officer on scene, bend down on his knees; is that
3  right?
4  A.  Correct.
5  Q.  He's wearing a short-sleeved shirt; is that right?
6  A.  Correct.
7  Q.  Do you know who that is?
8  A.  I'm assuming that's Officer Lovette.
9  Q.  At this point in time, is his Taser out?  We're at
10  30 seconds.
11  A.  I couldn't tell you right this second.
12      MR. MCKEE:  The jet.  Wait for the jet.  I can't
13  hear you.
14  Q.  So we're at 30 seconds.  There's you on Mr. Eimers'
15  right side; is that correct?
16  A.  Actually, Mr. Eimers' left side -- no, he's laying
17  face down.  Yeah, his right side.
18  Q.  And Garrido is on top of him, straddling?
19  A.  He's straddling him.
20  Q.  Correct?
21  A.  Yeah.  Down by his legs.
22  Q.  And the gentleman who you believe is Officer
23  Lovette is down on his knees next to Mr. Eimers' head?
24  A.  Correct.
25  Q.  And he's got his arm extended.

110

1  A.  I see that.
2  Q.  Do you see that?
3  A.  I sure do.
4  Q.  Is that where he had the Taser?
5  A.  Yeah, because he had -- he's right-handed, so he
6  had the Taser out, but I can't really see the Taser on his
7  back.
8  Q.  So Mr. -- Officer Garrido's leg is in the way?
9  A.  Yes.
10  Q.  And Officer Del Valle has walked away?
11  A.  Yes, it seems that he has.
12  Q.  And you saw Officer Lovette pull the Taser on Mr.
13  Eimers' back; is that right?
14  A.  I, I didn't see him pull it out of his holster.  I
15  just saw it go onto his back.
16  Q.  And this is the vantage point were you were on Mr.
17  Eimers' right side, and given where the gentleman who you
18  believe is Officer Lovette is with his arm extended is the
19  time when you saw him with the Taser on Mr. Eimers' back; is
20  that fair?
21  A.  Fair.
22  Q.  And we're at 30 seconds in; is that right?
23  A.  You're asking me?
24  Q.  Yeah.
25  A.  Yeah, it says 30 seconds.

111

1      MS. LEWIS:  All right.  Go ahead.
2  Q.  And at this point in time, are both hands already
3  secured?
4  A.  I think, when I just bounced back up, that we
5  finally got the handcuff on and Garrido's finger out.
6  Q.  And this is as of 31 seconds?
7  A.  It appears so.
8  Q.  All right.  Now, there's going to be, there's a
9  head that you could see above the PT Cruiser, --
10  A.  Yes.
11  Q.  -- approaching, and I'm going to ask you who that
12  is.
13  A.  Are you asking me now?
14  Q.  Did you hear Officer Garrido make any screams?  Do
15  you need me to back up the videotape?
16  A.  No.  He was like, my finger, my finger.
17  Q.  You don't hear that on the videotape, do you?
18  A.  On this tape here?
19  Q.  Correct.
20  A.  No, I don't hear anything.
21      MS. LEWIS:  All right.  Roll tape.
22  Q.  Who's this?
23  A.  Looks like Calvert, Thaddeus.
24  Q.  I think you're correct.
25  A.  Just his stature.

112

1  Q.  He's a big guy?
2  A.  He walks very straight.
3  Q.  He's about six-two, three, four?
4  A.  I don't think he's that tall.
5      MS. LEWIS:  Go ahead.  Stop.
6  Q.  Who's behind him?
7  A.  That might be Medina.  I see black hair.
8      MS. LEWIS:  Would you back, back up tape?
9      THE WITNESS:  It looks, it resembles Medina, and he
10  usually wears a jacket, too.  So, I couldn't tell you
11  exactly, but I think it's Medina.
12  Q.  All right.  So this would be the first time, at 35
13  seconds, when we see Officer Medina on the beach; is that
14  right?
15  A.  Yes.
16      MS. LEWIS:  Roll tape.
17  Q.  And who's -- who's that walking over to Mr. Eimers?
18  Is that Medina?
19  A.  That's Medina.
20  Q.  And what's going on with Mr. Eimers' now?  What's
21  Lovette doing with his hand?
22  A.  Honestly, I don't know what he's doing with his
23  hand.  Looks like it's on his back still.
24  Q.  We still have the Taser on Mr. Eimers' back?
25  A.  I can't see the Taser out, but I see Lovette's hand

113

1    there.
2        Q.  All right.  And Mr. Eimers is on his -- is facing
3    away from the camera?
4        A.  Correct.
5        Q.  On the left side with Officer Lovette on his back?
6        A.  I see his hand there.
7        Q.  Do you see where his knees are?
8        A.  I can't -- his knee, his knees look like they're in
9    the sand.
10       Q.  And you're bending over?
11       A.  Yeah.
12       Q.  And Garrido is bending over?
13       A.  Yes, it looks that way.
14       Q.  Officer Lovette still have the Taser at this point?
15       A.  I couldn't tell you without a better video.
16       Q.  And who's monitoring his breathing?
17       A.  I was watching, because he kept turning his head
18   while he was flailing his arms.
19       Q.  Flailing his arms.  I thought he was cuffed.
20       A.  Well, he still was trying to get -- do like this,
21   and I couldn't understand why he was doing it.
22       Q.  Well, I want to see that.  Let's back up tape.
23   Tell me where you see that.
24       A.  Okay.
25       Q.  Is Mr. Eimers moving?

114

1        A.  Well, he was.
2        Q.  There he --
3        A.  Right there.
4        Q.  And that's at 45 seconds?  What happened to Mr.
5    Eimers at 45 seconds?
6        A.  I don't now.
7        Q.  We've got Officer Lovette over Mr. Eimers' head and
8    back?
9            MS. AMIGO:  Objection, form.
10       A.  Well, he's leaning over him, yeah.  His knees look
11   like they're in the ground.
12       Q.  You're leaning over him; is that right?
13       A.  Yeah, barely.
14       Q.  Garrido --
15       A.  I was almost standing up.
16       Q.  Garrido is leaning over him; is that right?
17       A.  Garrido.  Yeah, yeah, he's somewhere.  It all looks
18   like black to me.
19       Q.  And Medina is leaning over him?
20       A.  Okay.  I'll go with that.
21       Q.  We've got four officers over Mr. Eimers at 45
22   seconds; is that right?
23       A.  It looks like it.
24           MS. LEWIS:  All right.  Let's back tape up to about
25   43.

115

1        Q.  And his hands are cuffed at this time; is that
2    correct?
3        A.  I'm assuming so, if I got Garrido's finger out.
4            MS. LEWIS:  All right.  Roll tape.  I want to --
5    take it through to about 57 seconds.  Stop.
6        Q.  Did you hear him say, "Ow, you're hurting me"?
7        A.  No.  I just heard somebody say something.  I don't
8    know who it was.
9            MS. LEWIS:  Is there a way to pump up the volume or
10   no?
11           MR. DARREN HORAN:  No.
12           MS. LEWIS:  Take it back to 46.  Stop.
13       Q.  Who said, "Ow"?
14       A.  I have no idea.  It could have been Mr. Eimers, but
15   I don't really know.
16       Q.  And who's grabbing Mr. Eimers' feet now?  Is that
17   Officer Calvert?
18       A.  Could be.
19       Q.  All right.
20           MS. LEWIS:  Pull, go back to 56.
21       A.  Yes, it's Officer Calvert.
22           MS. LEWIS:  Roll tape.
23       Q.  What's Officer Calvert doing with his feet?
24       A.  Trying to contain him so nobody gets hurt.
25           MS. LEWIS:  Stop.

116

1        Q.  What's Officer Calvert doing here?
2        A.  He looks like he's lifting his leg up.
3        Q.  And that's to put greater pressure on the chest; is
4    that correct?
5        A.  Not necessarily.
6        Q.  It's one of the maneuvers you're taught in the
7    prone restraint; isn't that right?
8        A.  Yeah.
9        Q.  To put additional pressure on the chest?
10       A.  It's to gain control.
11       Q.  And you've got, let's see, Officer Calvert at the
12   feet, lifting them up, correct?
13       A.  Yeah.
14       Q.  You've got Officer Lovette at the head and with his
15   knee on the upper back of Mr. Eimers; is that right?
16           MS. AMIGO:  Objection, form.
17       A.  I don't see that.  I never saw his back in -- his
18   knee in his back.
19       Q.  Okay.  Well, if he testified -- and you were there
20   when Officer Lovette testified.
21       A.  Yeah, I know.  That's what I -- I just never saw
22   it.  All I saw was the Taser in his back.
23       Q.  All right.  But you heard Officer Lovette testify
24   that his knee and shin, his right knee and right shin, were
25   on Mr. Eimers' upper back; is that correct?

14  (Pages 113 to 116)

117

1    A. I did hear him.
2        MS. AMIGO: Objection, form.
3    Q. His modified three-point pin. Do you recall that
4    testimony?
5        MS. AMIGO: Objection, form.
6    A. I did. I did hear that testimony.
7    Q. All right. And what's Lovette's arm doing right
8    there, his right arm?
9    A. The only thing I ever saw Lovette do was hold
10   the Taser in the middle of the upper part of his back.
11   Q. And at this point in time, it's still consistent
12   with that, with that motion; is that correct?
13   A. It is consistent with it, yes.
14   Q. And you have Officer -- who is the officer standing
15   up with his back toward us? He's in the short sleeves.
16   A. I don't know. You've got Henry, me, Lee, Calvert.
17   I don't know who that -- I'd have to watch it backwards
18   again.
19   Q. And Garrido is there in the pile, too?
20   A. Yeah, I think he's in front of the guy that we're
21   trying to figure out who it is.
22   Q. All right. That's you with the hat on in the
23   background?
24   A. Oh, yeah. Yes, ma'am.
25   Q. I want you to tell me if Mr. Eimers moves after

118

1    this point.
2    A. Yes, ma'am. He does. He was flailing his legs.
3    Q. Wait, wait, wait. This is Officer Calvert picking
4    up Mr. Eimers' legs; do you agree?
5        MS. AMIGO: Objection, form.
6    A. No, no. Before he picked them up, he was -- he
7    started flailing his legs around. That's why somebody yelled
8    we needed a hobble.
9    Q. I want you to tell me where you see that on the
10   videotape.
11   A. Okay. Back it up a little, please.
12       MS. LEWIS: Take it back to like, 1:13.
13       THE WITNESS: Okay. Did you -- there's a movement
14   in his knee before Calvert picks his legs up. So I'm
15   assuming he picked his legs up because Mr. Eimers was
16   starting to move his legs around, because that was the
17   whole reason that I ran to get the hobble.
18   Q. So your testimony, under oath, looking at the
19   video, that you see Mr. Eimers' knee move?
20   A. I saw him flailing his knees, his legs. And you're
21   asking me when did it start. And I said, when that knee
22   looked like it came out from the sand, it looks like that's
23   when it started gain.
24   Q. Stop the tape when it happens.
25       MS. LEWIS: Let's go back to 13.

119

1    A. Right -- do you see? Right before he lifts it up.
2    You've got to go real slow before he lifts the legs up. If
3    that's, in fact, what he did.
4    Q. All right. Now, why's he lifting the legs up?
5    A. You have to ask him. I have no idea.
6    Q. Appears to be lifting them up from the hip?
7    A. I have no idea --
8    Q. We've got --
9    A. -- what his intentions were.
10   Q. We've got daylight between Mr. Eimers' hip, hips,
11   and the ground?
12   A. I don't even -- I can't even tell if he has both
13   legs or one.
14   Q. You don't see one of Mr. Eimers' legs on the
15   ground, do you?
16   A. No, but it looks like on the right side, it's --
17   the other one doesn't look like it's as high, but it looks
18   like his legs are parallel in his hands.
19   Q. And Officer Lovette is on, in his modified three-
20   point pin, with his shin and knee on Mr. Eimers' upper back,
21   is that right?
22       MS. AMIGO: Objection, form.
23   A. And again, I don't ever remember seeing that three-
24   point pin.
25   Q. But you were there when he testified --

120

1    A. I did.
2    Q. -- that's what he was doing?
3    A. I did.
4    Q. And what you see here in this videotape is
5    consistent with him still remaining in that position; --
6    A. He --
7        MR. BURKE: Object to form.
8    Q. -- is that right?
9    A. He's remaining in the position that I said that I
10   saw him, with both knees in the sand. I don't -- I don't
11   ever remember seeing his knee in the back.
12   Q. And you're still here at this point, is that
13   correct, and you're about to go run for the hobble?
14   A. Correct.
15       MS. LEWIS: Go ahead.
16   Q. That's you running for the hobble?
17   A. Yeah. My car was close.
18   Q. Is Mr. Eimers moving?
19   A. Well, he was when I left. That's why I ran to get
20   the hobble.
21   Q. Okay. Well, we're going to watch the tape after
22   you left. We're going to give you the benefit of the
23   videotape. Is he moving?
24   A. Well, I don't know that he could with people
25   holding his legs down.

15 (Pages 117 to 120)

121

Q. Was he moving? Did you see him --

A. I didn't see him move.

Q. Okay.

A. But, like I said, people are holding his legs down, so there's -- you're not going to move much with that many people.

Q. Now we're back to 1:40, because the videographer panned away. Is Mr. Eimers still in the same position he was at 1:18 when you went to go -- or, 1:20 when you went to go run for the hobble?

MS. AMIGO: Object to form.

A. I can't tell, ma'am, because --

MS. LEWIS: Let's go back to 1:18.

THE WITNESS: -- I see -- is there another -- oh, there's the sergeant. Okay.

Q. So he picks his legs up. You tell me if Mr. Eimers changes position.

A. Well, he's moving right there. They're trying to hold his waist down.

MR. BURKE: Uh-huh.

THE WITNESS: I see one of the officers go and push onto his waist to try to hold his waist down.

Q. The officers movement is not Eimers movement, correct?

MR. BURKE: Object to form.

122

MS. AMIGO: Join.

A. No, it was Eimers' waist, hips moving.

Q. Is he in the same position he was in at 1:18?

MS. AMIGO: Objection, form.

A. Looks like it's close to it, but I see another position of an officer up by the front.

Q. I'm not asking about the officers' movement, most respectfully. I'm asking about Mr. Eimers.

A. With all due respect, though, I'm telling you, it's hard to tell because of the way the officers' position is now, I don't see the exact same position that Mr. Eimers was in.

Q. You would agree with me that he is in a position consistent to the position he was in at 1:18, as he is in at 1:42?

A. Consistent?

MS. AMIGO: Objection, form.

THE WITNESS: Consistent, I would say yes.

MS. LEWIS: Roll tape.

Q. Now, you're running for the hobble and you see Officer Johnson; is that correct?

A. Correct.

Q. Why do you give the hobble to Officer Johnson?

A. Because I was 40 pounds heavier and I was not about to run back. So he was fresh meat and I asked him to run for

123

it.

Q. And did you proceed at this moment in time to walk back to the beach?

A. I think I had. I don't see me. I know I wasn't there very long and I walked back to the beach.

Q. Now, you ran for the hobble at 1:22; is that correct?

A. You'd have to --

MS. LEWIS: Can we go back, please?

THE WITNESS: -- go by that.

MS. LEWIS: I actually want to take it back to 1:13, and I want to stop it at 1:18.

Q. Tell me when you see Officer Garrido stand up. Right there. See that?

A. Yeah.

Q. What's he doing with his right hand?

A. Oh, I have no idea.

Q. Did he have his Taser out?

A. No. Garrido? Never.

Q. How do you know?

A. I never saw him with -- I never saw him with his Taser out, personally.

Q. But you didn't see half the things that Officer Lovette did, most respectfully, either, did you?

MR. BURKE: Object to form.

124

MS. AMIGO: Objection, form.

A. Correct.

Q. So you don't know what Officer Garrido was doing with his right hand, do you?

MR. BURKE: Object to form.

MS. AMIGO: Join.

A. All I can say is I did not ever see him with the Taser in his hand.

Q. Who's monitoring his breathing at this point?

A. Well, I could still see his face.

Q. And you were looking at his face continuously?

A. I looked -- a lot, trust me. I was really worried about anything that could go wrong at this time.

Q. So you were more focused on Mr. Eimers' face than Officer Garrido's hand; is that correct?

A. Well, we are women. We can multitask. So I was able to view both, trust me.

Q. And is it your testimony under oath that you know for a fact that Officer Garrido did not re-holster his Taser at this moment?

A. I don't know for a fact. I just said what I saw. I don't know if he ever pulled it out. I never saw it.

Q. The moment you start to run for the hobble is at 1:22; is that correct?

MS. LEWIS: Let's roll tape.

16 (Pages 121 to 124)

125

BY MS. LEWIS:
    Q.  You see yourself get up?
    A.  I get up.  Right, yes, 1:22.
    Q.  So at 1:22, you run for the hobble.  And you are back on the beach, according to the tape —
    MS. LEWIS:  Keep going.
BY MS. LEWIS:
    Q.  Is that you on the sidewalk?
    A.  Yes, that's --
    Q.  At 1:33.
    A.  I'm the only one that has a jacket.
    MS. LEWIS:  Go ahead.
    Q.  You reach the back of your car at 1:35; is that pretty fair?
    A.  That's fair.
    Q.  And now you see Officer Johnson, he's in jeans?
    A.  It looks that way.
    Q.  He's, at 1:45, running out on the beach?
    A.  It looked that way.
    Q.  And who's this officer?
    A.  I believe that's me still.
    Q.  So at 1:50, you're walking back to the beach; is that right?
    A.  I was a little winded.  Yes, ma'am.
    MS. LEWIS:  Stop.

126

    Q.  Is that you on the beach?
    A.  Yes, ma'am.
    Q.  You're standing on Eimers' — well, you're standing —
    A.  On the west side of the --
    Q.  If Mr. Eimers is face down at this point, you're on Mr. Eimers' left side; is that correct?
    A.  He doesn't look face down, though.
    Q.  Well, we're going to see.
        But, if he's face down, to orient yourself, you'd be on his left side at this point?
    A.  If he's face down, but he looks more like he's on his side.
    Q.  You're closer to the sidewalk than you are to the cafe?
    A.  Correct.  Correct.  The pier.
    Q.  You're closer to the pier.  Thank you.
    A.  You're-welcome.
    Q.  And who is that at Mr. Eimers' feet?  Is that Officer Johnson in the jeans?
    A.  I didn't -- I thought that was Mr. Eimers.  See -- oh, okay.  Now I see it.  I'm looking at it a different way.
    Q.  Is that Officer Johnson?
    A.  I just now saw the belt.  Yeah, it looks like it's Mr. -- or, I mean, Officer Johnson.

127

    Q.  And is that Officer Lovette at the feet?
    A.  I couldn't tell you.
    Q.  Kneeling down?
    A.  I thought -- it's a bald-headed person.  Looks -- and Lovette's the only bald-headed one.  Because I think Calvert's out by the car, so I think it is Lovette.
    Q.  I want to come back to this point, but I do want to take the video back to about 1:22 when you run for the hobble.  There's an officer with sunglasses.
    MS. LEWIS:  Keep going.
    A.  I don't know who just went to the knee.
    MS. LEWIS:  Just keep it, keep it rolling.  Oh, sorry.  Can you put it back to 1:22?  I got distracted.  Actually, take it back to about 1:18.
    Q.  Who is this guy?
    A.  Where?
    Q.  He just took something out of his back belt.
    A.  Okay.  Where am I looking?
    Q.  Let's move it back to about 1:15.
    A.  The short officer?
    Q.  Yeah.  He's got sun --
    A.  That's got to be Galbo.
    Q.  I call him Mr. Sunglasses.  Who is this gentleman?
    A.  That's Officer Galbo.
    Q.  That's Galbo.  And what's he taking out of his back

128

pocket?
    A.  He could have taken his gloves out.  I don't -- yeah, he took gloves out.
    MS. LEWIS:  All right.  Stop.  Stop it.
    Q.  So we first see him at about 1:18; is that correct?  Shortly before you run for the hobble?
    A.  Well, it's 1:25 there, so I didn't check the time.  I was looking to see who it was.  You'd have to back it up so I can verify it 1:18.
    MS. LEWIS:  Let's back it up.
    Q.  Tell me when he reaches in the back for his gloves.
    A.  Right there.
    Q.  Okay.
    A.  As soon as he's coming on scene, he reaches for his gloves.
    Q.  Why do you have gloves?
    A.  Just in case we get bio-hazard.
    Q.  We had blood by this time, didn't we?
    MS. AMIGO:  Objection, form.
    A.  I didn't know that.
    Q.  But you would agree with me that protocol requires that if there's blood involved, the gloves come on, correct?
    A.  We put gloves on a lot, so, yeah.  Not just for blood.
    Q.  He's going to walk around.  And at this point in

129

time, you've already, you're about ready to go leave to run and get the hobble; is that correct?

A. Yes, ma'am.

MS. LEWIS: Run it forward to about 1:39.

Q. Galbo's putting on his gloves at the feet; is that correct?

A. On his side, yeah.

Q. See Officer Garrido standing up with a blue object in his hand?

A. Uh-huh. I see something in his hand.

Q. He's putting on gloves at this point?

A. Okay. Fair.

Q. Is he?

A. I can't really tell, but if they're blue, more than likely they probably are gloves, but --

Q. Why is he now putting on gloves?

A. Who?

Q. Officer Garrido.

A. Why is he not?

Q. Why is he putting on gloves at this point?

A. I have no idea.

Q. Do we have blood at this time?

A. I have no idea.

Q. Officer Galbo and now Officer Garrido have their gloves on; is that correct? Or, they're applying them.

130

A. I couldn't say for sure that that's what Garrido has, but it does resemble his gloves.

MS. LEWIS: Roll tape. Stop. Take it back two seconds.

Q. Who's going to pat Lovette, Officer Lovette on the back? Who's that officer?

A. That's Calvert.

Q. Do you know why he patted Officer Lovette on the back?

MS. AMIGO: Form.

A. Not a clue.

Q. Job well done?

MS. AMIGO: Objection, form.

A. I have no idea.

MS. LEWIS: Roll tape.

Q. Now, by 2:31, you're back on the beach; is that right?

A. Oh, yeah.

MS. LEWIS: Okay. Roll tape. Stop.

Q. 2:38, Officer Lovette is standing up and stepping back; is that correct?

A. Oh, at the feet. Yes.

Q. Officer Johnson is still at the feet?

A. Yes.

MS. LEWIS: Go ahead.

131

Q. Officer Johnson stands up at 2:41?

A. Yes.

Q. Do you see the hobble around Mr. Eimers' legs?

A. Yes.

Q. Just above the knee?

A. Yes.

Q. At that point in time, is Mr. Eimers fully hobbled?

A. Actually, it looks like it's right below the knee. It doesn't look like it's at the bend in the knee.

Q. Mr. Eimers is fully hobbled at 2:41?

A. It appears that he is.

Q. All right. The gentlemen who were hobbling Mr. Eimers have stood up and are backing away; is that right?

A. Well, Lovette is. Johnson hasn't yet.

Q. All right.

MS. LEWIS: Roll tape.

A. Now, he's starting to.

Q. Johnson, Johnson has just stood fully up; is that correct?

A. Almost.

Q. No one's got their hands at Mr. Eimers' feet at this point; is that right?

A. Correct.

Q. You see Mr. Eimers' butt is facing the sky?

A. Yes.

132

Q. And so Mr. Eimers is prone down on the sand; is that correct?

A. It appears that way.

Q. And so, when you came back after going to run for the hobble, Mr. Eimers was not in the position as shown in Exhibit 19, was he?

A. No, he wasn't.

Q. And you were back on the beach, standing there, just looking from the left side of Mr. Eimers', because we see that he is face down in the sand at 2:31; is that right?

MR. BURKE: Object to form.

A. 2:42.

Q. No, no, no. You came back --

A. Oh, you mean before. Yes, yes.

Q. You came back at 2:31; is that right?

A. Yes.

Q. At 2:42, he's fully hobbled; is that right?

A. Yes, ma'am.

Q. At 2:42, he is still face down on the sand?

A. It appears that way. Yes, ma'am.

Q. Now, what's Officer Lovette doing?

A. Standing there.

Q. Is he looking at his left hand?

A. He's looking at something -- well, he's got his hand out. It looks like he's looking at it.

133

1 MS. LEWIS: Let's back it up to 2:40.
2 Q. Tell me what you see Officer Lovette do.
3 MS. LEWIS: Stop.
4 A. Looked like he looked at the back, bottom, whatever
5 way it was.
6 Q. Correct. He looked at the top of his hand and the
7 bottom of his hand; is that correct?
8 A. That's what it appeared to be.
9 Q. His left hand?
10 A. Yes.
11 Q. The one with the sleeve on the left arm?
12 A. Yes.
13 Q. And why was he doing that?
14 MS. AMIGO: Form.
15 A. I have no idea.
16 Q. Did Officer Lovette punch Mr. Eimers with his left
17 hand?
18 MS. AMIGO: Objection, form.
19 A. No, ma'am. Not to my knowledge. I never saw him
20 do that.
21 MS. LEWIS: Roll tape. Stop.
22 Q. Did they just roll Mr. Eimers over at this point?
23 A. I was watching the officers. I wasn't watching
24 that.
25 Q. Let's go back.

134

1 Q. Did they just roll Mr. Eimers over --
2 A. Yeah, yes. They just rolled him.
3 Q. -- at 2:44 or 2:43?
4 A. Yes.
5 Q. And it was Officer Garrido who rolled him over; is
6 that right?
7 A. I don't know, ma'am.
8 Q. And at this point in time — or, you can't see from
9 this particular still. Officer Garrido has his gloves on.
10 A. Okay.
11 MS. LEWIS: Can we go back to 2:42?
12 Q. Look for who rolls him.
13 A. I can't even see Garrido right this second. I see
14 somebody's arms, that's it.
15 Q. Do you see a blue glove on that hand?
16 A. I see something.
17 Q. They rolled Eimers by 44; is that correct? He
18 stands up and now, the gentleman who just rolled Mr. Eimers,
19 is running, correct?
20 A. Okay. Yeah, that's Garrido.
21 Q. That's Garrido. So would you agree with me that
22 Officer Garrido, with blue gloves on, was the one that rolled
23 Mr. Eimers over from face down to face up?
24 A. It appeared that way.
25 Q. And that was at about 2:43; is that correct?

135

1 A. You have to roll it again. Two -- yeah, about
2 2:43, 2:44.
3 Q. All right. Now, at all -- in the time that you
4 were back on the beach from 2:31 to 2:45, we've had
5 continuous video for that time frame, did you see Mr. Eimers
6 move at all?
7 A. I saw him -- he was -- I saw his head moving. I
8 couldn't tell you in relation to the time when he was, but I
9 saw him moving and I heard noises. So, I know Mr. Eimers was
10 talking or saying things, but I couldn't tell you what time
11 frame it was. Because I thought he was in that position when
12 I came back --
13 Q. That's right.
14 A. -- to the beach and --
15 Q. He wasn't.
16 A. -- I was wrong.
17 Q. You didn't hear anything on the tape, did you?
18 A. Uh-uh.
19 Q. No? No?
20 A. No, I did not.
21 Q. You didn't hear anything on Medina's internal mic?
22 A. No, ma'am.
23 Q. And you were standing several feet back from Mr.
24 Eimers'; is that correct?
25 A. Correct.

136

1 Q. And there were officers huddling over Mr. Eimers in
2 front of you; is that right?
3 A. Correct.
4 Q. And, at this point in time, you're walking away; is
5 that right?
6 A. I'm not -- I'm walking away, yeah, and I'm trying
7 to figure out why.
8 MS. LEWIS: Go back to 2:42.
9 Q. Let's go back to 2:42 so you can see the roll of
10 Mr. Eimers, and then I want you to tell me what you see
11 yourself doing immediately upon them rolling him. You're
12 walking away, talking into your left shoulder; is that right?
13 A. Yes.
14 Q. Okay. So you were immediately calling COM2?
15 A. Yes.
16 Q. And you deny that you made any reference or
17 mentioned to dispatch that Mr. Eimers was Tased?
18 A. I never remember saying anything about being Tased.
19 Q. Where is Officer Del Valle at this point? You see
20 the bald head in the background?
21 A. Well, I see two there. I see Lovette with his
22 sleeve and then I see a bald head, so I'm assuming --
23 Q. Let's go back to 2:42.
24 A. -- that's Officer Del Valle.
25 Q. Tell me what you see Officer Del Valle doing. Just

19 (Pages 133 to 136)

137

```
1    standing there?
2         A.  Yeah.  He's on his radio right now.
3         Q.  Okay.  At 2:47?
4         A.  Yeah.
5         Q.  About the same time you are clutching your left
6    shoulder?
7         A.  Uh-huh.
8         Q.  Is that a yes?
9         A.  Yes, ma'am.
10        Q.  Was Mr. Eimers in custody at this point?
11        A.  He was cuffed and hobbled, yes.
12        Q.  Why did they de-arrest Mr. Eimers in bringing him
13   to the hospital?
14        A.  De-arrest?
15        MR. BURKE:  Object to form.
16        Q.  Un-arrest, if that's a word.
17        MS. AMIGO:  Join.
18        A.  I don't -- what do you mean?  I don't understand.
19   He went to the hospital because he wasn't --
20        Q.  Well, --
21        A.  He needed medical attention.
22        Q.  -- Mr. Eimers is under arrest at this point; is
23   that correct?
24        A.  Correct.
25        Q.  All right.  And he became in this condition while
```

138

```
1    under police control; is that correct?
2         MR. BURKE:  Object to form.
3         MS. AMIGO:  Join.
4         A.  Okay.  Yes.
5         Q.  Do you -- I'm not putting words in your mouth.
6         A.  No.  I said, yes.
7         Q.  He's under police control at this point; --
8         A.  Correct.
9         Q.  -- is that correct?
10        A.  Correct.
11        Q.  Why did no officer go and stand and stay with Mr.
12   Eimers at Lower Keys Medical Center?
13        A.  I have no idea.
14        Q.  You're supposed to, aren't you?
15        A.  If he's an arrest, you would.  Somebody would be
16   with him.
17        Q.  Why was nobody there with him?
18        A.  I'm not the supervisor.  You'd have to ask Sergeant
19   Zamora that.
20        Q.  We will.
21        Chief Lee testified that Mr. Eimers was never under
22   arrest.  Why -- do you disagree with Chief Lee?
23        A.  There's -- we have a -- there's a point that we
24   detain somebody until we can figure out our investigation.
25   So, clearly, he's in our custody, detained, and that's as far
```

139

```
1    as I knew about it, so.
2         Q.  And at this point in time, would you agree with me,
3    especially given what evidence we see on the still photo,
4    that Mr. Eimers had an injury?
5         MS. AMIGO:  Form.
6         A.  Well, I see something here, but I don't really know
7    what that is.
8         Q.  You didn't see blood on Mr. Eimers when you first
9    approached him and told him to get down on the ground, did
10   you?
11        A.  No, ma'am.
12        Q.  But he certainly has blood on his ear by the time
13   you officers have him cuffed and hobbled; is that right?
14        A.  He looks like he has blood on him there.
15        Q.  In the two minutes and 47 seconds, between the time
16   that this video starts and the time this video, at least at
17   this point in time, has him face up on the sand, Mr. Eimers
18   has an injury to the right side of his head; is that right?
19        MS. AMIGO:  Objection, form.
20        A.  Right -- oh.
21        Q.  I didn't hear you.
22        A.  I was waiting for her.
23        Q.  Okay.  He had an injury to the --
24        A.  Yes, ma'am.
25        Q.  -- right side of his head?
```

140

```
1         A.  Yes, ma'am.
2         Q.  How did he get that injury?
3         A.  I told you before, I have no -- I didn't -- I have
4    no idea.
5         Q.  He got that injury while under police control; is
6    that correct?
7         MS. AMIGO:  Form.
8         A.  It appears that way.
9         Q.  Yes?
10        A.  Yes, ma'am.
11        MS. LEWIS:  Go ahead.
12        Q.  This point in time, we see Officer Lovette putting
13   gloves on; is that correct?
14        A.  Where's -- oh, okay.  Yeah.  Yes, he is.
15        Q.  And you're standing there.  What's going through
16   your head at that time?
17        A.  I'm still trying to get on the radio.
18        Q.  Were you thinking to yourself, oh, my God, we just
19   killed this man?
20        MS. AMIGO:  Objection, form.
21        A.  I never thought that, ma'am.
22        MS. LEWIS:  Keep going.
23        Q.  Is anybody doing CPR?
24        A.  Now, there's -- it looks like a knife that they're
25   cutting his shirt with.  They had to take the handcuffs off
```

141

and the hobble off to start doing CPR.

Q.  You can do CPR over clothing, can't you?

A.  Yes, ma'am.

Q.  And what's your department protocol with regard to giving breaths?

A.  Well, it's blue -- or, red -- blue cross -- Red Cross, you can do two breaths to the compressions, or you can keep doing compressions, you don't have to do breaths.

Q.  Anybody do breaths by this point?

A.  I don't think so.

Q.  At 3:24?

A.  They have the red back there, though.

Q.  There's a bag valve mask in there; is that right?

A.  Uh-huh.  Yes, ma'am.

Q.  And it's yellow?

A.  Yes, ma'am.

Q.  Do you know how long it took for them to apply that bag valve mask to Mr. Eimers?

A.  No, ma'am.  I don't.

Q.  Do you know what percentage of oxygen that bag valve mask gives to Mr. Eimers?

A.  No, ma'am.

Q.  Do you know how long a person can go without oxygen when they're heart is not beating before they suffer brain damage?

142

MS. AMIGO:  Form.

A.  Not exactly.

Q.  Aren't you trained to get the bag valve mask on as soon as possible?

A.  If the -- we are trained to put the mask on. However, we are also trained that if you can't -- don't have a mask readily available, just to do chest compressions.

Q.  All right.  Is anybody doing chest compressions as of 3:24?

A.  I don't see anybody.

MS. LEWIS:  All right.  Roll tape.  Let me just stop right here.

Q.  Officer Lovette is looking at Mr. Eimers head on, if you will, face to face?

A.  He's doing A, B, Cs.

Q.  Is he looking at Mr. Eimers' face?

A.  It looks like he is.

Q.  Clearly, Mr. Eimers' face is visible to Officer Lovette at this point; is that right?

A.  Yes, ma'am.

Q.  Officer Johnson is in the vicinity of Mr. Eimers; is that correct?

A.  Yes, ma'am.

Q.  Although we can't see his head, he appears, the way his body is standing, to be facing Mr. Eimers' head; is that

143

right?

A.  Yeah.  His shoulders are tilted to the left a little, but yeah, he's facing Mr. Eimers.

Q.  Would you agree with me that this is probably, this is the point in time in this video -- or, excuse me, this still photograph was taken?

MS. AMIGO:  Objection, form.

A.  Almost.  His thumb's up in the air on this one.

Q.  We have all these other officers that are around in clear view of Mr. Eimers' face; is that correct?

A.  Yes, ma'am.

Q.  And the sand on Mr. Eimers' face is clearly visible?

MS. AMIGO:  Form.

A.  Yes, ma'am.

Q.  As is the blood on his ear?

A.  Yeah.  I can see it now.

MS. LEWIS:  Roll tape.

Q.  Has anybody made any movement as of 3:31 to cut Mr. Eimers' shirt?

A.  I thought I saw -- we backed up so many times.  I thought I saw Lovette cutting his shirt with a knife, starting to, but now I don't know where we are with the tape.

Q.  There's no bag valve mask out at this point; is that right?

144

A.  I don't know if anybody's grabbed it or if it's been pulled out or not.

Q.  And no one's doing chest compressions; is that right?

A.  No, he's trying to get a pulse right now.  He's got to feel it.  That's why none of us are touching him.

MS. LEWIS:  Roll tape.

Q.  3:42, they're cutting Mr. Eimers' shirt?

A.  Yes.  Now I see it.

Q.  Why are you guys now telling people to leave the area?

A.  I have no idea.  I didn't let anybody on the area the whole time I was there.

MS. LEWIS:  Roll tape.

Q.  Now, while you're there, the person who's shooting this videotape is there, correct, obviously?

A.  Obviously.

Q.  Did you ever ask him his name?

A.  I never even saw anybody doing it, honestly.

Q.  You never saw a gentleman with a handy-cam videotaping the incident?

A.  No, I sure didn't.

MS. LEWIS:  Go ahead.

Q.  Who's telling everybody to get out of the area?

A.  I can't -- I'm trying to hear who it is.  Sounds

145

like Calvert.

Q. Does it sound like Officer Hartle?

A. It sounded more like Calvert to me, but they both talk like that. Yeah, now that you say that, it could be Officer Hartle.

Q. Do you know if he stopped that woman who was walking by in the video to get her name, ask her if she saw anything?

A. I have no idea.

Q. He's closing the gate?

A. Oh, I have no idea what he did, honestly. I was more worried about getting rescue out there.

Q. Now, by this time, 4:12 in the videotape, talking about moving vehicles, has rescue been called at this time?

A. Yeah, I'd already called them.

Q. And why were the vehicles being moved?

A. Because we have to allow the rescue, the ambulance to come in, and we had the whole street blocked.

MS. LEWIS: Go ahead.

Q. Now, what was this in reference to?

A. I believe the manager yelled to the -- to me about -- to one of us about an AED.

Q. And you said yes?

A. That's a really bad shot. I said, yes, we need it very quickly, please.

146

MS. LEWIS: Go ahead.

Q. And who's that?

A. That's Randall Hartle, Officer.

Q. Did you talk to any of those people, the gentleman in the white apron or --

A. I never even saw those people, ma'am. I was too busy moving vehicles.

Q. How about any of these people on the sidewalk? Did you talk to the gentleman in the red jacket or the green shirt or the black shirt?

A. I don't remember talking to them. I remember, before I left, I was over in that area with the sergeant, but I don't know who approached us.

Q. And where were you when you had this interaction with the New York police officer who was critical of the Key West Police Department?

A. All the way up the driveway, closer to the restaurant.

Q. Okay.

MS. LEWIS: Roll tape.

A. All the way up there by those bushes, but near -- between the tree and the bush, that area.

Q. All right. The bush in that --

A. I just remember him being over that way somewhere when he, when he started yelling about what he yelled about.

147

Q. And when did you have that interaction with him? How long after you moving the vehicle, do you recall?

A. I couldn't remember. I couldn't tell you.

MS. LEWIS: Go ahead.

Q. What was that man yelling, anyway, the police officer, the guy from New York?

A. I don't know that he's a police officer. You keep saying that, but I truly don't know. I just know him as a white male.

Q. What was he yelling?

A. He was yelling that he saw -- I saw what you guys did, you just murdered the guy. And he just was like, yeah, yeah. And I'm like, sir, seriously? I said, could you just back up. I said, it's all about perception, that's all I'm going to say.

Q. Did you tell Detective Stevens about him?

A. I don't think so.

MS. LEWIS: Go ahead. Stop.

Q. We're stopped at 4:55. Is this the first time that you -- this videotape depicts CPR being performed on Mr. Eimers?

MS. AMIGO: Objection, form.

MS. LEWIS: Roll tape.

A. Yeah, that's the first time that we can see that their -- their straight arms are on him, yeah.

148

MS. LEWIS: Roll tape a few seconds.

Q. Are they performing CPR?

A. Yes, ma'am.

Q. So about 4:55 is the first time the videotape reveals any CPR being performed?

A. The videotape. Yes, ma'am.

MS. LEWIS: Keep it going.

Q. Tell me when you see the bag valve mask come out. I'm going to ask you to listen for the videographer. Do you understand what that means? Do you under --

A. No, ma'am.

MR. MCKEE: Shock electrico (ph). Did she hear that? Shock electrico.

Q. Electrico; did you hear that?

A. Shock electrico?

MS. AMIGO: Objection, form.

THE WITNESS: That's what it said?

Q. Shock electric?

A. I don't know what the hell he's saying. I just know he's -- he made some kind of noise.

MS. LEWIS: Keep going.

Q. See the bag valve mask there?

A. I don't see it. I see --

Q. It's not in use, is it?

A. I see something. It's hard to tell.

WWW.USLEGALSUPPORT.COM
1-888-311-4240

149

1      Q. It's still in the bag, isn't it? Now they're
2 talking it out. Do you agree with me? At 5:33?
3      A. Well, it looked like it was sitting there, but it's
4 really hard to --
5      Q. Now you see it?
6      A. I see it in somebody's hand now.
7      Q. All right. At 5:39, now it's in someone's hand.
8 Now it looks like they're applying it at 5:44. Would you
9 agree with me?
10      A. I can agree to part of it, but I really can't --
11 the video part is really poor with trying to see if it was
12 out at all, but I did see somebody actually pick it up.
13      Q. But the bag valve mask that you're familiar with is
14 yellow; is that right?
15      A. Yes, ma'am.
16      MS. LEWIS: Okay. Roll it back to about 5:50. And
17 I want to ask you if you recognize any of the voices
18 here, and then I'm going to ask you some more questions
19 about it. Stop.
20      Q. Do you recognize the gentleman speaking English?
21      A. Do I recognize him? No.
22      Q. The voice.
23      A. No, I don't know that voice.
24      Q. What did you understand him to say?
25      A. I heard him ask the guy, did you videotape it.

150

1 And, did you see him or hear them Tase him. That's what I
2 heard, something like that.
3      Q. Do you know why --
4      MR. MCKEE: One second. Play it one more time.
5      A. Did you see him when they were Tasing, Tasering
6 him? Did you see him when they Tased him, when they had him
7 on the ground? Ch-ch-ch-ch-ch-ch.
8      Q. That's the sound the Taser makes?
9      A. Yeah.
10      Q. And, in drive-stun mode?
11      A. Yeah. Any mode.
12      Q. And you don't recognize the voice of the English-
13 speaking person; is that correct?
14      A. No, I don't.
15      Q. Did you talk to anybody on the scene who indicated
16 to you that they saw the Taser being used?
17      A. No. Nobody said a word to me about it.
18      Q. Did you ask anybody for their name so you could
19 last gather information for either Detective Stevens or
20 whoever was going to take over the investigation of this
21 incident?
22      A. No. Remember, we talked about it the last time and
23 I had only had two people that approached me on it.
24      Q. With this witness report, seeing, at least in the
25 videotape, is consistent with what was called into dispatch

151

1 at 8:34 and 15 seconds about the suspect being Tased; is that
2 correct?
3      MR. BURKE: Object to form.
4      A. I'd have to look at CAD. Because, like I said, I
5 didn't hear it. What time did you have? I'm down here.
6      Q. 8:34. 8:34 and 15 seconds, is that --
7      A. 1018, Suspect Tased. Why is it not saying --
8      Q. The last person recorded -- strike that.
9      Do you see "Suspect Tased" on the CAD report?
10      A. I do. I do.
11      Q. Do you see it called in, "Suspect Tased" at
12 8:34:15?
13      A. I do.
14      Q. And also called in at 8:34:15 is, "Roll Rescue;" is
15 that correct?
16      A. I do.
17      Q. And "CPR in progress"?
18      A. I do.
19      Q. Did you report that CPR was in progress?
20      A. I may have.
21      Q. And did you ask for rescue?
22      A. I did.
23      Q. And what's 1018?
24      A. To expedite.
25      Q. And that was, that was the instruction that you

152

1 gave to them on COM2 to expedite medical care?
2      A. Yes, ma'am. Yes, I did.
3      Q. Do you know how the computer records in terms of
4 what it puts in certain paragraphs or what it puts together?
5      A. It's all, it's all per dispatcher that works out
6 there.
7      Q. Have you talked with the dispatcher at all, Keith
8 Klein?
9      A. Keith? No, I didn't -- I don't talk to him.
10      Q. That a suspect was reported Tased by a -- well,
11 strike that.
12      The only people who can call in the CAD are police
13 officers? At least on this report?
14      A. On that, yeah. That's on our Channel 1.
15      Q. All right. And so a police officer apparently
16 reported to CAD, dispatch, that the suspect was Tased; is
17 that right?
18      A. That's what it's saying.
19      Q. And that's consistent with what the witness is
20 saying in English as captured on the videotape, that the
21 suspect, he observed him being Tased; is that correct?
22      MR. BURKE: Object to form.
23      MS. AMIGO: Form.
24      A. It appears to be that way.
25      Q. Should the CAD report identify who actually called

153

1  in that the suspect was Tased?

2      A.  Yeah, the CAD.  It's showing my Paul number.

3      Q.  Is the one immediately before that?

4      A.  It's saying my Paul number, saying all this, but I

5  never said he was Tased.  I never saw it.

6      Q.  Should the CAD report indicate who called it in?

7      A.  Oh, yeah.

8      Q.  Do you know why it doesn't?

9      A.  Well, it looks like it just continued.

10     Q.  So it looks like it was all a call in from Paul --

11     A.  It looks like it was all in from Paul-48, which

12  would be me.

13     Q.  And you don't have any recollection?

14     A.  I never said he was Tased.

15     Q.  Was the dispatcher lying?

16     A.  I don't want to accuse anyone of lying.  However,

17  I'm going to tell you, in all the years I've been here, do

18  things get put on the CAD that did not happen or that did

19  happen, all the time.  It happens a lot, unfortunately.  So,

20  whether he misunderstood what I said, I have no idea.  But if

21  -- there's a recording, there should be a recording on COM2.

22         MR. MCKEE:  Can't wait to get it.

23     Q.  Do you know why it took the ambulance 22 minutes to

24  get Mr. Eimers 4.9 miles from the beach to Lower Keys Medical

25  Center?

154

1         MS. AMIGO:  Objection, form.

2         MR. BURKE:  Object to form.

3      A.  I have no idea.

4      Q.  Did you give it a police escort or are you aware of

5  any police officer that escorted the ambulance to the

6  hospital?

7      A.  No, that's against policy.

8      Q.  And did the ambulance leave with lights and sirens?

9      A.  I couldn't tell -- I don't remember, honestly.

10     Q.  If they thought Mr. Eimers was a dead man at that

11  point, they would not have lights and sirens on; is

12  that correct?

13         MR. BURKE:  Object to form.

14         MS. AMIGO:  Objection, form.

15     A.  I don't have a clue, ma'am.

16     Q.  In fact, --

17     A.  They run lights and sirens for a lot of things.

18     Q.  -- if Mr. Eimers was dead, they wouldn't have

19  transported him, they would have called the ME right then and

20  there; is that correct?

21         MS. AMIGO:  Objection, form.

22     A.  I don't know their protocol, honestly.

23     Q.  So can you conceive of why it would take 22 minutes

24  to go 4.9 miles?

25         MS. AMIGO:  Objection, form.

155

1         MR. BURKE:  Calls for speculation.

2      A.  I don't know.

3      Q.  Do you know why EMTs were told that Mr. Eimers got

4  out of his car and ran and collapsed on the beach?

5         MS. AMIGO:  Form.

6         MR. BURKE:  Object to form.

7      A.  No, ma'am.

8      Q.  You don't know who told fire rescue that?

9      A.  I don't now.

10     Q.  It would have been false if that's what they were

11  told?

12     A.  It would have been false --

13         MS. AMIGO:  Form.

14         THE WITNESS:  Yeah, he didn't run.

15     Q.  And he didn't collapse on the beach, did he?

16     A.  No.  He went to his knees.

17     Q.  I want to ask you, at the time of the Eimers

18  incident, you were under investigation by Internal Affairs

19  for an incident that happened earlier in November regarding a

20  Glynn Archer proposed facility for the --

21     A.  Uh-huh.

22     Q.  -- City Hall; is that correct?

23     A.  Yes, ma'am.

24     Q.  And at the time of this incident involving Mr.

25  Eimers, that was an open investigation, and a resolution and

156

1  a determination had not yet been made with regard to that

2  investigation; is that right?

3      A.  I don't know dates, so I'd have to look it all up.

4      Q.  Your personnel file would be the best evidence of

5  that?

6      A.  Yes.  Sergeant Tripp's paperwork will have open,

7  closing.

8      Q.  If you were notified on December 10th that you were

9  the subject of an internal investigation -- excuse me,

10  December 10th, 2013, that would indicate to you when the IA

11  investigation was opened; is that right?

12     A.  That it was open?  If he -- whatever he tells me --

13     Q.  Well, at least ongoing.

14     A.  Whenever he tells me it's open, until he says it's

15  closed.

16     Q.  Okay.  And so, Sergeant Tripp presides over those;

17  is that right?

18     A.  Yes, ma'am.

19     Q.  And do you recall when that meeting took place, the

20  meeting at Glynn Archer or about Glynn Archer?

21     A.  I have -- I don't remember dates at all.

22     Q.  Do you recall parking in a no-parking zone?

23     A.  I sure do.

24     Q.  Were you on duty at the time?

25     A.  I sure was.

24  (Pages 153 to 156)

157

1    **Q.  Do you know why the Internal Affairs Department**
2    **would have statementized 13 people in connection with that**
3    **internal investigation, Internal Affairs investigation, when**
4    **they only, in this instance involving the in-custody death of**
5    **Mr. Eimers, got the statements from two people --**
6         MS. AMIGO:  Objection, form.
7    BY MS. LEWIS:
8         **Q.  -- who weren't even there during the arrest?**
9         MS. AMIGO:  Form.
10        MR. BURKE:  Object to form.
11        A.  I have no idea, because I got those forms.
12        MS. LEWIS:  Nothing further.
13        MS. AMIGO:  I don't --
14        MR. MCKEE:  Yes, there's one more.
15        MS. LEWIS:  We're done.
16        MR. BURKE:  I have no questions at this time.  The
17   witness will read and we'll take a copy if it's ordered.
18        THE VIDEOGRAPHER:  Going off the record.
19        (The deposition was concluded at 6:01 p.m.)
20
21
22
23
24
25

---

158

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MONROE )

     I, Suzanne F. Ex, Certified Verbatim Reporter,
Florida Professional Reporter, Notary Public, State of
Florida, certify that KATHYANN WANCIAK personally appeared
before me on the 21st day of November, 2014, and was duly
sworn.

     Signed this 25th day of November, 2014.


     *Suzanne F. Ex*
     Suzanne F. Ex, CVR-M, FPR
     Notary Public, State of Florida
     Commission No.:  FF015913
     Commission Expires:  July 27, 2017

---

159

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF MONROE )

     I, Suzanne Ex, Certified Verbatim Reporter and
Florida Professional Reporter, certify that I was authorized
to and did report the deposition of KATHYANN WANCIAK, pages
61 through 157; that the review of the transcript was
requested; and that the transcript is a true record.

     I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor am
I a relative or employee of any of the parties' attorneys or
counsel connected with the action, nor am I financially
interested in the action.

     Dated this 25th day of November, 2014.


     *Suzanne F. Ex*
     Suzanne Ex, CVR-M, FPR
     Certified Verbatim Reporter-Master
     Florida Professional Reporter

---

160

WITNESS NOTIFICATION LETTER

November 25, 2014

Kathyann Wanciak
c/o Michael T. Burke, Esquire
Johnson Anselmo Murdoch Burke Piper & Hochman, P.A.
2488 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida  33304

RE:  Treavor Eimers vs. City of Key West, et al.
     Deposition Taken November 21, 2014
     U.S. Legal Support Job No. 1215286

The transcript of the above-referenced proceeding has been
prepared and is being provided to your office for review by
the witness.

We respectfully request that the witness complete their
review within 30 days and return the errata sheet to our
office.

Sincerely,

*Suzanne F. Ex, CVR-M, FPR*
U.S. Legal Support, Inc.
One Southeast Third Avenue, Suite 1250
Miami, Florida  33131
(305) 373-8404

CC via transcript:

David W. Brill, Esquire
Jeannete C. Lewis, Esquire
Robert J. McKee, Esquire
David Paul Horan, Esquire
Darren M. Horan, Esquire
Lyman H. Reynolds, Jr., Esquire

---

25 (Pages 157 to 160)

161

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT -- ENTER CHANGES ON THIS PAGE

IN RE:  Treavor Eimers vs. City of Key West, et al.
Kathyann Wanciak
November 21, 2014

| Page No. | Line No. | Change | Reason |
|---|---|---|---|

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

Date _____ Kathyann Wanciak

26 (Page 161)

**A**

**a.m** 88:1
**aamigo@rrbpa.com** 62:24
**able** 73:6 80:5 83:3 100:16 124:17
**above-referenced** 160:10
**accuse** 153:16
**acting** 99:2
**action** 159:15,16
**additional** 65:18 116:9
**admin** 97:3
**administrative** 79:25
**advised** 84:21
**AED** 145:22
**Affairs** 80:3,5,8 155:18 157:1,3
**affirm** 64:23
**afternoon** 65:8,9
**age** 84:8
**aggressively** 76:7 76:10,14
**agree** 67:8 69:9 91:6 118:4 122:13 128:21 134:21 139:2 143:4 149:2,9,10
**agreed** 89:10
**ahead** 102:2,6 103:1 104:9 106:21 107:4 108:11,23 111:1 112:5 120:15 125:12 130:25 140:11 144:23 145:19 146:1 147:4,18
**air** 143:8
**al** 61:8 64:8 160:7 161:4
**allow** 145:17
**ALVAREZ** 62:12
**Alycon** 92:17,18 93:5,11
**ambulance** 145:17 153:23 154:5,8
**Amigo** 62:25 64:20 64:20 68:23 69:12 70:21 71:1 71:14 74:23 75:2 76:9 85:24 86:4 89:12 93:25 94:8 94:14 99:12,17

103:10,18 105:3 105:14 106:13 114:9 116:16 117:2,5 118:5 119:22 121:11 122:1,4,17 124:1 124:6 128:19 130:10,13 133:14 133:18 137:17 138:3 139:5,19 140:7,20 142:1 143:7,14 147:22 148:16 152:23 154:1,14,21,25 155:5,13 157:6,9 157:13
**Andrea** 62:25 64:20
**angle** 100:9
**Anselmo** 62:18 160:5
**answer** 97:11
**anybody** 66:1 73:24 78:10 85:10 97:25 140:23 141:9 142:8,10 143:19 144:12,19 150:15,18
**anybody's** 144:1
**anyway** 147:5
**apologize** 95:11
**apparently** 152:15
**APPEARANCES** 62:1 63:1
**appeared** 133:8 134:24 158:8
**appears** 111:7 119:6 131:11 132:3,20 140:8 142:24 152:24
**apply** 141:17
**applying** 129:25 149:8
**appreciate** 81:20 82:16 99:9
**approach** 93:23 94:3,4,6,18,19 97:21 104:10
**approached** 92:4 102:21 139:9 146:13 150:23
**approaching** 102:13 111:11
**apron** 146:5
**AR15** 88:15,17
**Archer** 155:20 156:20,20
**area** 71:19 81:10

89:22 92:5 98:19 144:11,12,24 146:12,22
**arm** 73:8,14 102:11 104:23 105:2,5,7 105:8,11,18 106:1,12,15,15 106:23 109:25 110:18 117:7,8,9 133:11
**arms** 75:8 113:18 113:19 134:14 147:25
**ARNAUD** 63:4
**arrest** 99:5 137:22 138:15,22 157:8
**arrived** 72:20 82:19 87:1
**arrow** 101:22
**aside** 81:10
**asked** 80:10,13 94:11 97:1,2,24 108:6 122:25
**asking** 68:8 78:14 110:23 111:13 118:21 122:7,8
**assisting** 106:18
**assuming** 69:14 109:8 115:3 118:15 136:22
**attempted** 66:5
**attention** 137:21
**attorney** 66:2,3 159:13
**attorneys** 64:11 159:14
**authorized** 159:7
**available** 87:11 142:7
**Avenue** 160:18
**aware** 65:20 73:3 78:10,17,19 91:19 154:4

**B**

**B** 142:15
**back** 69:19,20,23 70:1 71:16 74:2 74:7 75:11,11,17 76:18 79:1,25 81:12,13 82:9,13 83:6,16 99:4 100:23 102:24 104:16 105:12,19 106:16 110:7,13 110:15,19 111:4 111:15 112:8,8

112:23,24 113:5 113:22 114:8,24 115:12,20 116:15 116:17,18,22,25 117:10,15 118:11 118:12,25 119:20 120:11 121:7,13 122:25 123:3,5,9 123:11 125:5,13 125:22 127:7,8 127:13,14,17,19 127:25 128:8,10 128:11 130:3,6,9 130:16,21 132:4 132:8,13,15 133:1,4,25 134:11 135:4,12 135:23 136:8,9 136:23 141:12 147:14 149:16
**backed** 143:21
**background** 117:23 136:20
**backing** 131:13
**backside** 107:17
**backwards** 117:17
**bad** 145:24
**bag** 141:13,18,20 142:3 143:24 148:8,22 149:1 149:13
**bald** 136:20,22
**bald-headed** 127:4 127:5
**barely** 114:13
**beach** 62:23 67:3,6 67:12 69:19,20 69:23 70:1,5,19 74:7 81:10 82:13 82:19 83:4,10,16 85:17 88:1 89:1 89:22 92:7 98:19 107:9 112:13 123:3,5 125:5,18 125:22 126:1 130:16 132:8 135:4,14 153:24 155:4,15
**beating** 141:24
**BEDARD** 62:22
**began** 95:18
**behalf** 62:2,17,22 64:15,17,20
**believe** 77:4 81:8 83:17 86:18 102:10 108:21 109:22 110:18

125:21 145:21
151:6
**belt** 126:24 127:17
**bend** 105:9,18
109:2 131:9
**bending** 104:15
105:12 113:10,12
**benefit** 120:22
**best** 156:4
**better** 87:7 113:15
**big** 106:7 112:1
**bio-hazard** 128:17
**black** 97:25 98:3
100:21 112:7
114:18 146:10
**bleed** 75:4
**blind** 99:23
**blocked** 145:18
**blood** 70:8,11,14
70:18,23,25 71:7
71:8,10,13 74:15
74:19,21 75:4
128:18,22,24
129:22 139:8,12
139:14 143:16
**blue** 79:16,16,17
108:1 129:8,14
134:15,22 141:6
141:6
**Bob** 64:15
**body** 76:17 142:25
**bomb** 75:1
**bottom** 133:4,7
**Boulevard** 62:9,14
62:18 160:5
**bounced** 111:4
**brain** 141:24
**Brandenburg** 80:21
**break** 73:24
**breathing** 66:22,24
67:14 81:7,11
113:16 124:9
**breaths** 141:5,7,8
141:9
**brief** 100:3
**Brill** 160:22
**bringing** 137:12
**Building** 62:23
**bunch** 97:24
**Burke** 62:18,20
64:17,17 66:15
66:25 68:22
69:13 70:22 79:8
85:14,25 89:11
93:7,24 94:9
95:13,15 96:8
99:13,18 103:9

103:17 105:4
106:14 120:7
121:20,25 123:25
124:5 132:11
137:15 138:2
151:3 152:22
154:2,13 155:1,6
157:10,16 160:4
160:5
burke@jambg.com
62:20
**bush** 146:22,23
**bushes** 146:21
**busy** 88:19 146:7
**butt** 80:11 131:24

---

**C**

**C** 62:16 160:23
**C-101** 62:23
**c/o** 160:4
**CAD** 80:23,25 81:3
86:25 151:4,9
152:12,16,25
153:2,6,18
**cafe** 90:25 91:3,5
126:15
**call** 81:9 83:23
99:22 127:23
152:12 153:10
**called** 80:25 81:6
83:21 84:3,4,20
145:14,15 150:25
151:11,14 152:25
153:6 154:19
**calling** 84:24
136:14
**Calls** 155:1
**calm** 99:3
**Calvert** 111:23
115:17,21,23
116:1,11 117:16
118:3,14 130:7
145:1,3
**Calvert's** 127:6
**camera** 73:10 113:3
**Captain** 80:15,21
80:21
**captured** 79:6
152:20
**captures** 73:4
78:17
**car** 72:5 88:9,12
89:7,8,14,16,18
89:19,21 90:19
91:7 101:24
107:17 120:17
125:13 127:6

155:4
**CARA** 62:7
**care** 152:1
**carry** 95:24
**cartridge** 75:15,18
75:20
**case** 61:3 64:6
65:18 85:12 96:8
128:17
**cause** 64:3,24
74:21
**caused** 71:8
**CBS** 63:5
**CC** 160:21
**cell** 100:8
**center** 89:22
138:12 153:25
**certain** 152:4
**certainly** 139:12
**Certificate** 63:14
63:15 158:1
159:1
**Certified** 61:24
64:1 158:6 159:6
159:22
**certify** 158:8
159:7,12
**Ch-ch-ch-ch-ch**
150:7
**chaise** 101:25
**change** 66:12 161:7
**changes** 121:17
161:2
**channel** 84:2 93:17
152:14
**charges** 80:2,14
**charging** 72:6
91:15
**Charles** 61:5 64:7
**check** 128:7
**checked** 66:21
**checking** 67:5,14
**chest** 116:3,9
142:7,8 144:3
**Chief** 80:16,19,21
138:21,22
chiggins@horan...
62:5
**chin** 69:11
**CITIZEN** 63:4
**City** 61:8 64:8,18
155:22 160:7
161:4
**clear** 70:17 100:5
143:10
**cleared** 80:2,14
87:9

**clearly** 85:11
138:25 142:18
143:12
**close** 74:6,9 104:7
120:17 122:5
**closed** 156:15
**closer** 126:14,17
146:17
**closest** 102:8
**closing** 145:10
156:7
**clothes** 76:21
**clothing** 141:2
**clue** 81:22 98:25
130:11 154:15
**clutching** 137:5
**collapse** 155:15
**collapsed** 155:4
**collapsing** 89:8,8
**coloration** 79:16
**Columbia** 62:23
**COM1** 79:14 81:7
83:23 84:25
**COM2** 79:14,18 81:3
136:14 152:1
153:21
**come** 74:21,25 75:4
89:9 99:11 127:7
128:22 145:18
148:8
**coming** 71:10 82:9
101:14,17 128:14
**command** 92:10
**commands** 71:21,24
72:7,17 92:6
107:22
**comments** 91:17,20
91:21
**Commission** 158:15
158:16
**complete** 160:12
**complied** 94:21
**compressions** 141:7
141:8 142:7,8
144:3
**computer** 152:3
**conceive** 154:23
**concluded** 157:19
**conclusion** 99:11
**condition** 70:19
74:7 79:16,20
81:17 97:16
137:25
**conducted** 97:12
**connected** 159:15
**connection** 75:23
76:4 157:2

consistent 69:18
  117:11,13 120:5
  122:14,16,18
  150:25 152:19
contact 76:11,16
  81:3
contain 115:24
contained 66:2
continued 61:13
  63:1 153:9
continuous 135:5
continuously 87:24
  124:11
control 107:7
  116:10 138:1,7
  140:5
conversation 98:14
copy 95:15 157:17
corner 97:24 100:3
correct 65:14 67:9
  67:10,13 68:2,14
  69:21 76:8,17
  79:6,22 81:1,5
  81:15 82:17 83:2
  83:16 85:19,20
  86:24 87:3,5
  88:2,16 89:13
  90:9,25 91:1,3
  92:8 93:23 94:13
  94:22,23,25 95:2
  95:7 96:20 97:7
  101:2 102:15,17
  102:18 103:14
  107:1,2 108:25
  109:4,6,15,20,24
  111:19,24 113:4
  115:2 116:4,12
  116:25 117:12
  120:13,14 121:24
  122:21,22 123:7
  124:2,15,24
  126:7,16,16
  128:5,22 129:2,6
  129:25 130:21
  131:19,23 132:2
  133:6,7 134:17
  134:19,25 135:24
  135:25 136:3
  137:23,24 138:1
  138:8,9,10 140:6
  140:13 142:22
  143:10 144:16
  150:13 151:2,15
  152:21 154:12,20
  155:22
counsel 159:13,15
COUNTY 158:4 159:4

couple 83:13
court 61:1 64:12
  64:22
CPR 140:23 141:1,2
  147:20 148:2,5
  151:17,19
Crean 92:17 93:5
  93:11
critical 98:15
  146:15
cross 141:6,7
Cruiser 111:9
Cs 142:15
cuffed 113:19
  115:1 137:11
  139:13
cuffs 104:18,22
Curses 96:7
custody 137:10
  138:25
cut 143:19
cutting 140:25
  143:22 144:8
CVR-M 61:23 158:14
  159:21 160:17

                D
damage 141:25
Damn 96:5
Darren 62:6 64:15
  99:22 100:2
  115:11 160:24
darren@horan-w...
  62:5
date 95:3 161:25
Dated 159:18
dates 95:10 156:3
  156:21
David 62:6 64:15
  160:22,24
day 73:11 92:22,24
  93:6,6,12 99:16
  100:10 102:23
  158:9,11 159:18
daylight 119:10
days 160:13
de-arrest 137:12
  137:14
dead 154:10,18
death 157:4
Deceased 61:5 64:8
December 156:8,10
declare 161:22
Defendant 62:22
  64:18
Defendants 61:9
  62:17 64:9

Del 67:25 72:24
  88:14,15 90:13
  90:14,16,20,22
  90:24 91:6,7,9
  91:11,15,18,24
  92:1 101:20,20
  102:21 103:11
  104:10,15 106:17
  108:24 110:10
  136:19,24,25
deny 79:11,13
  84:20 86:2,5
  136:16
department 73:20
  77:9 89:2 97:23
  98:15 141:4
  146:16 157:1
depends 68:15
depicted 70:18
  74:8 97:17
depicting 70:19
depicts 147:20
depo 99:7
deposition 61:13
  63:11 64:1,9
  65:16 66:4,10,13
  66:17 157:19
  159:8 160:8
describe 98:2,13
detain 138:24
detained 138:25
detective 98:12
  147:16 150:19
detectives 97:22
determination
  156:1
different 96:23
  126:22
difficult 98:5
Direct 63:12 65:6
direction 90:14
  91:12 92:3
disagree 138:22
discharge 75:12,15
discoloration
  69:16
discuss 80:5
dispatch 79:14
  81:8 83:21 84:3
  84:4,6,6,17,20
  84:25 136:17
  150:25 152:16
dispatched 87:1
dispatcher 84:7
  152:5,7 153:15
displacing 68:11
disrespect 75:14

distracted 127:13
DISTRICT 61:1,1
DIVISION 61:2
document 161:23
documents 66:5
doing 75:8 101:11
  112:21,22 113:21
  115:23 116:1
  117:7 120:2
  123:16 124:3
  132:21 133:13
  136:11,25 140:23
  141:1,8 142:8,15
  144:3,19
Doni 80:19,20
dphoran@horan-...
  62:5
drawn 88:22,24
  90:5,6 101:18
drew 71:13
Drive 62:23
drive-stun 76:4,5
  150:10
driver's 89:20
driveway 90:22,23
  90:24 146:17
dropping 74:25
due 122:9
duly 65:4 158:9
duty 156:24
dynamics 96:20

                E
Eagles 80:11
ear 74:19,22
  139:12 143:16
earlier 155:19
East 62:18 160:5
ED 63:3
edge 75:21
eight 96:10
Eimers 61:5,5 64:6
  64:7 66:22 67:2
  67:11,14,18
  68:20,25 69:6,7
  69:10,24 70:8,18
  70:25 71:8 72:7
  72:12,17 73:4,12
  73:13,15 74:3,6
  74:22 76:17
  78:12 79:9,11,15
  79:17,19 81:4,13
  82:1,4,8,11,13
  82:25 83:12,16
  83:20 85:22 86:3
  87:25 88:9,12,17
  88:19 89:7 90:8

90:18,19,21 91:2
91:7,8,11 92:6
92:11 93:22
94:16 97:16
98:11,11,16
99:11 100:16,23
101:7,24 102:9
102:14,21 103:2
103:6,11,15
104:10 105:7
106:23 109:14,16
109:23 110:13,17
110:19 112:17,20
112:24 113:2,25
114:5,7,21
115:14,16 116:15
116:25 117:25
118:4,15,19
119:10,14,20
120:18 121:8,16
121:23 122:2,8
122:11 124:14
126:3,6,7,19,21
131:3,7,10,13,21
131:24 132:1,5,9
133:16,22 134:1
134:17,18,23
135:5,9,24 136:1
136:10,17 137:10
137:12,22 138:12
138:21 139:4,8
139:17 141:18,21
142:13,16,18,21
142:25 143:3,10
143:12,20 144:8
147:21 153:24
154:10,18 155:3
155:17,25 157:5
160:7 161:4
**either** 68:13 97:22
107:14 123:24
150:19
**elbow** 105:9,12,19
**elbows** 101:12
**elderly** 80:11
**electric** 148:18
**electricity** 75:23
**electrico** 148:12
148:13,14,15
**employee** 159:13,14
**EMS** 86:7,9,21 88:4
**EMTs** 155:3
**En** 87:16
**ended** 95:19
**engaged** 98:14
**English** 98:4
149:20 150:12

152:20
**ENTER** 161:2
**entered** 83:9
**entirely** 85:21
**errata** 63:16
160:13 161:1
**erratic** 93:22 94:5
94:16
**errors** 66:16
**escort** 154:4
**escorted** 154:5
**especially** 139:3
**Esquire** 62:6,6,7
62:11,12,16,20
62:25 160:4,22
160:23,23,24,24
160:25
**Estate** 61:5 64:7
**et** 61:8 64:8 160:7
161:4
**everybody** 73:13
144:24
**evidence** 65:18
85:11 139:3
156:4
**Ex** 61:23 64:1
158:6,14 159:6
159:21 160:17
**ex-police** 98:17
**exact** 82:1 122:11
**exactly** 83:14
104:19 112:11
142:2
**Examination** 61:21
63:12 65:6
**examined** 65:4
**excuse** 75:14 84:21
143:5 156:9
**Exhibit** 97:17
132:6
**EXHIBITS** 63:19
**expect** 85:12 106:9
**expedite** 84:11
151:24 152:1
**Expires** 158:16
**extended** 102:11
109:25 110:18
**eyes** 69:10
**eyesight** 87:7

---
**F**
---

**F** 158:6,14
**F-ing** 75:1
**face** 66:22,23 67:5
67:18 68:2,5,7
68:10,15 69:1,7
69:10,17 70:2,3

70:9,12,14,18
74:5 75:4 79:16
81:4,5,14,19
83:16 109:17
124:10,11,14
126:6,8,10,12
132:10,19 134:23
134:23 139:17
142:14,14,16,18
143:10,12
**face-up** 79:15
**facility** 155:20
**facing** 113:2
131:24 142:25
143:3
**fact** 92:1 94:12
119:3 124:19,21
154:16
**facts** 161:23
**fair** 103:7,8
110:20,21 125:14
125:15 129:12
**false** 93:23 94:1,6
155:10,12
**familiar** 76:4
80:23 149:13
**family** 98:4
**far** 82:12 87:8
138:25
**Fax** 62:4,15,19,24
**FDLE** 73:25 74:1
77:17 90:1 97:23
**feel** 144:6
**feet** 72:21 75:5
78:23,24 82:7
115:16,23 116:12
126:19 127:1
129:5 130:22,23
131:21 135:23
**females** 98:3
**FF015913** 158:15
**figure** 117:21
136:7 138:24
**file** 156:4
**filled** 73:19
**FILOSA** 63:4
**finally** 111:5
**financially** 159:15
**find** 107:20
**finger** 76:25 77:3
77:7,15,20,22
78:18,21 79:2
111:5,16,16
115:3
**finish** 100:24
**finished** 92:10
**fire** 155:8

**firefighters** 86:8
86:12,13,14,17
88:6
**firm** 83:15,18,19
**first** 65:4 70:11
86:12 89:4,5
90:2 92:19 98:17
112:12 128:5
139:8 147:19,24
148:4
**fists** 75:9
**five** 103:7
**five-foot-nine**
98:22
**flailing** 113:18,19
118:2,7,20
**flat** 67:22 68:3
**Florida** 61:1,8,18
61:25 62:4,9,14
62:19,23 64:2,3
64:11 158:3,7,8
158:15 159:3,7
159:22 160:6,19
**focused** 124:14
**follow** 97:22
**followed** 87:25
**following** 79:15
92:24
**follows** 65:5
**foot** 80:10
**footage** 100:6
**football** 80:11
**foregoing** 161:23
**forehead** 69:10
**forgot** 78:1
**form** 66:15,25
68:22,23 69:12
69:13 70:21,22
71:1,14 74:23
75:2 76:9 79:8
85:24,25 86:4
89:11 93:24,25
94:8,9,14 99:12
99:13,17,18
103:9,10,17,18
105:3,4,14
106:13,14 114:9
116:16 117:2,5
118:5 119:22
120:7 121:11,25
122:4,17 123:25
124:1,5 128:19
130:10,13 132:11
133:14,18 137:15
138:2 139:5,19
140:7,20 142:1
143:7,14 147:22

148:16 151:3
152:22,23 154:1
154:2,13,14,21
154:25 155:5,6
155:13 157:6,9
157:10
forms 157:11
Fort 62:19 160:6
forward 129:4
four 112:3 114:21
fourth 109:2
FPR 61:23 158:14
159:21 160:17
frame 97:19 135:5
135:11
fresh 122:25
Friday 61:16 93:19
front 75:17 117:20
122:6 136:2
full 101:1
fully 131:7,10,18
132:17
further 101:10
102:19 157:12
159:12

**G**

G 62:25
gain 116:10 118:23
Galbo 78:24 127:22
127:24,25 129:24
Galbo's 129:5
game 80:12
Garrido 72:8 76:25
77:19 78:13,18
78:20 88:13
102:3,7,8 103:3
103:12 104:13,15
105:7 106:1,22
109:18 111:14
113:12 114:14,16
114:17 117:19
123:13,19 124:3
124:19 129:8,18
129:24 130:1
134:5,9,13,20,21
134:22
Garrido's 77:7
78:11 88:24
110:8 111:5
115:3 124:15
Gary 62:22
gate 97:25 145:10
gather 150:19
general 92:4
gentleman 69:5
80:10 98:14

109:22 110:17
127:23 134:18
144:20 146:4,9
149:20
gentlemen 131:12
getting 69:1 73:14
81:13 94:21
145:12
GIRARD 63:3,4
girl 78:4
give 73:8 120:22
122:23 154:4
given 85:17 97:15
99:16 110:17
139:3
gives 141:21
giving 64:24 141:5
glasses 99:24
glove 134:15
gloves 128:2,3,11
128:15,16,22,23
129:5,11,15,16
129:20,25 130:2
134:9,22 140:13
Glynn 155:20
156:20,20
go 79:18 82:23
86:16 96:22,23
96:25 98:19
99:20 102:2,6,19
103:1,15 104:9
105:11 106:21
107:4 108:11,23
110:15 111:1
112:5 114:20
115:20 118:25
119:2 120:13,15
121:9,9,13,21
123:9,10 124:13
125:12 129:1
130:25 133:25
134:11 136:8,9
136:23 138:11
140:11 141:23
144:23 145:19
146:1 147:4,18
154:24
God 82:24 140:18
goes 68:13 96:8
going 73:23 98:19
99:7,10 100:12
100:22 103:15
104:12 106:9
108:16 111:8,11
112:20 120:21,22
121:5 125:6
126:9 127:10

128:25 130:5
132:4 140:15,22
147:15 148:7,9
148:21 149:18
150:20 153:17
157:18
good 65:8,9 76:4
96:17 99:20
gotten 107:7
grab 104:23 105:5
105:7,11
grabbed 144:1
grabbing 104:24
115:16
greater 116:3
green 146:9
ground 67:24 69:1
92:11 94:11,22
100:17,20,24
101:2 103:6,7
104:1 106:5
107:23 114:11
119:11,15 139:9
150:7
GROUP 62:8,13
guess 71:18 93:2,3
gun 88:19,21 90:5
90:6 101:18
103:24 104:5
106:18
guy 98:20,22 108:1
108:3 112:1
117:20 127:15
147:6,12 149:25
guys 98:20 144:10
147:11
GWEN 63:4

**H**

H 160:25
hair 98:23 112:7
half 123:23
Hall 155:22
hand 64:23 74:2
77:5 104:13,17
112:21,23,25
113:6 123:16
124:4,8,15 129:9
129:10 132:23,25
133:6,7,9,17
134:15 149:6,7 .
handcuff 73:17
77:15,20 104:14
111:5
handcuffed 107:8
handcuffing 94:4
handcuffs 77:1,7

140:25
handled 98:16
hands 75:9 85:13
111:2 115:1
119:18 131:21
handy-cam 144:20
happen 86:1 105:25
153:18,19
happened 83:4
85:18 86:6,17
93:6,12 95:4
99:16 114:4
155:19
happens 68:6,10
96:18 118:24
153:19
happy 85:15
hard 71:13 74:12
100:19 104:19,21
122:10 148:25
149:4
Hartle 145:2,5
146:3
hat 117:22
hate 96:18
head 68:13,14,21
75:1 107:16
109:23 111:9
113:17 114:7
116:14 135:7
136:20,22 139:18
139:25 140:16
142:13,24,25
hear 71:4 84:1
106:3,4,9 108:7
109:13 111,14,17
111:20 115:6
117:1,6 135:17
135:21 139:21
144:25 148:12,14
150:1 151:5
heard 71:2,6 72:22
78:7,10,12,15,20
78:22,25 79:2
82:23 83:22
84:19,25 85:9
101:1 106:5
107:22 115:7
116:23 135:9
149:25 150:2
hearing 71:5
heart 141:24
heavier 122:24
hell 148:19
Henry 88:18 117:16
Higgins 61:17 62:3
62:7 64:10

**high** 119:17
**highlighted** 96:4
**highlighting** 96:6
**hip** 119:6,10
**hips** 119:10 122:2
**hobble** 69:21,24
  81:13 82:10
  118:8,17 120:13
  120:16,20 121:10
  122:20,23 123:6
  124:23 125:4
  127:9 128:6
  129:2 131:3
  132:5 141:1
**hobbled** 131:7,10
  132:17 137:11
  139:13
**hobbling** 131:12
**Hochman** 62:18
  160:5
**hold** 73:17 117:9
  121:19,22
**holding** 120:25
  121:4
**holster** 102:16
  110:14
**holstered** 102:14
**holstering** 102:12
**honestly** 77:11
  106:2 112:22
  144:19 145:11
  154:9,22
**Horan** 61:17 62:3,6
  62:6 64:9,15,15
  99:22 100:2
  115:11 160:24,24
**hospital** 137:13,19
  154:6
**huddling** 136:1
**hurry** 86:16,16
  88:7
**hurt** 115:24
**hurting** 115:6

**I**

**IA** 80:15 156:10
**idea** 67:15 68:24
  70:10 72:11,16
  73:2 74:24 78:24
  85:18 92:15
  93:13 103:19
  106:20 115:14
  119:5,7 123:17
  129:21,23 130:14
  133:15 138:13
  140:4 144:12
  145:9,11 153:20

  154:3 157:11
**identified** 83:20
**identify** 66:16
  104:17 152:25
**II** 61:13
**immediately** 70:5
  79:15,18,19 81:4
  82:21 83:6 85:12
  136:11,14 153:3
**important** 73:22
  77:14
**in-custody** 157:4
**incident** 65:21
  66:6 92:20 93:6
  95:4 144:21
  150:21 155:18,19
  155:24
**incorrect** 66:17
  94:12
**independent** 77:6
**INDEX** 63:10,19
**indicate** 153:6
  156:10
**indicated** 150:15
**indicating** 91:10
**inflict** 105:23,24
**inflicting** 105:12
**information** 92:18
  93:14 97:22
  150:19
**initial** 68:1
**initially** 67:23
  69:1 87:25
**injury** 139:4,18,23
  140:2,5
**inquiry** 98:9
**instance** 157:4
**instructing** 103:5
**instruction** 151:25
**intentions** 119:9
**interaction** 146:14
  147:1
**interested** 159:16
**internal** 80:3,5,8
  135:21 155:18
  156:9 157:1,3,3
**interviewed** 73:25
**intimating** 91:10
**intoxicated** 80:12
**introduce** 64:12
**investigation** 80:3
  80:6,9 138:24
  150:20 155:18,25
  156:2,9,11 157:3
  157:3
**investigator** 74:1
**involved** 128:22

**involving** 155:24
  157:4
**iron** 97:25
**irrational** 99:2
**issue** 81:8

**J**

**J** 62:11 160:23
**jacket** 112:10
  125:11 146:9
**Jeannete** 62:16
  64:14,14 100:3
  160:23
**jeans** 125:16
  126:20
**jet** 109:12,12
**jlewis@lewisle...**
  62:15
**job** 105:23 130:12
  160:8
**Johnson** 62:18
  122:21,23 125:16
  126:20,23,25
  130:23 131:1,1
  131:18,18 142:21
  160:5
**Join** 89:12 122:1
  124:6 137:17
  138:3
**Jr** 160:25
**July** 158:16
**jury** 73:11 91:11

**K**

**Kathy** 107:18,21
**Kathyann** 61:13
  63:11 64:18 65:3
  65:12 158:8
  159:8 160:4
  161:4,25
**keep** 108:16 125:6
  127:10,12,12
  140:22 141:8
  147:7 148:7,21
**Keith** 152:7,9
**kept** 100:19 113:17
**Key** 61:2,8,18 62:4
  63:3,4,4 64:8,10
  64:18 73:20 77:9
  88:4 89:2 97:23
  98:15 99:10
  146:15 160:7
  161:4
**Keys** 138:12 153:24
**kicking** 80:11
**killed** 140:19
**kind** 105:13 148:20

**kiosk** 89:15
**Klein** 152:8
**knee** 113:8 116:15
  116:18,24,24
  118:14,19,21
  119:20 120:11
  127:11 131:5,8,9
**kneeling** 100:20
  127:3
**knees** 67:22 100:25
  100:25 101:8
  103:7 109:2,23
  113:7,8 114:10
  118:20 120:10
  155:16
**knew** 72:23 88:19
  139:1
**knife** 140:24
  143:22
**know** 67:16 68:6,8
  70:24 71:7,8,10
  71:12 72:20 73:5
  73:15 74:21 75:8
  78:3,6,23,25
  80:20,20 81:24
  83:22,25 84:17
  85:1,10,14 86:19
  86:21 88:20
  89:24 90:6,7
  92:17,21,23,25
  93:4,8,10,11,14
  93:18,20 97:2
  98:10,17 100:10
  102:13 103:23,25
  104:13 105:5
  106:2 107:16,18
  107:21 108:8,14
  109:7 112:22
  115:8,15 116:21
  117:16,17 120:24
  123:4,20 124:3
  124:18,21,22
  127:11 128:20
  130:8 134:7
  135:9 139:6
  141:17,20,23
  143:23 144:1
  145:6 146:13
  147:7,8,8 148:19
  148:20 149:23
  150:3 152:3
  153:8,23 154:22
  155:2,3,8 156:3
  157:1
**Knowing** 100:22
**knowledge** 89:6
  133:19

## L

laid 67:22
Large 64:3
Lauderdale 62:19
  160:6
LAW 62:8
laying 101:12
  109:16
leaning 114:10,12
  114:16,19
learned 97:6
leave 79:25 87:17
  93:9 97:3 129:1
  144:10 154:8
Lee 62:22 80:19,22
  117:16 138:21,22
left 68:14,21 72:5
  74:10 82:4 84:13
  84:15 87:2,19
  98:11 101:16
  103:12 104:13,17
  106:15 109:16
  113:5 120:19,22
  126:7,11 132:9
  132:23 133:9,11
  133:16 136:12
  137:5 143:2
  146:12
leg 110:8 116:2
Legal 62:13 63:3
  160:8,18
legs 109:21 118:2
  118:4,7,14,15,16
  118:20 119:2,4
  119:13,14,18
  120:25 121:4,16
  131:3
let's 81:12 86:15
  100:23 104:16
  113:22 114:24
  116:11 118:25
  121:13 124:25
  127:19 128:10
  133:1,25 136:9
  136:23
Letter 63:15 160:1
Lewis 62:13,16
  63:12 64:14,14
  64:14 65:7 95:14
  99:20 100:1,4,12
  101:10 102:2,6
  102:19 103:1
  104:9 106:21
  107:4 108:11,13
  108:16,18,19,23
  111:1,21 112:5,8
  112:16 114:24

115:4,9,12,20,22
115:25 118:12,25
120:15 121:13
122:19 123:9,11
124:25 125:1,6,7
125:12,25 127:10
127:12 128:4,10
129:4 130:3,15
130:19,25 131:16
133:1,3,21
134:11 136:8
140:11,22 142:11
143:18 144:7,14
144:23 145:19
146:1,20 147:4
147:18,23 148:1
148:7,21 149:16
157:7,12,15
160:23
lied 100:13
lieutenant 97:2
lifting 116:2,12
  119:4,6
lifts 119:1,2
lights 154:8,11,17
line 66:21 161:7
lips 69:11
listen 148:9
little 78:4 80:12
  98:5 99:2 100:3
  118:11 125:24
  143:3
LLC 62:8
LLP 61:17 62:3
long 69:23 71:20
  82:19 83:3 88:19
  104:5 106:18
  123:5 141:17,23
  147:2
longer 102:16
look 73:10 77:13
  86:25 90:3 92:15
  95:10 98:21 99:9
  100:19 113:8
  114:10 119:17
  126:8 131:9
  134:12 151:4
  156:3
looked 66:5 82:1
  82:22 90:1,7
  104:25,25 118:22
  124:12 125:19
  133:4,4,6 149:3
looking 118:18
  124:11 126:22
  127:18 128:8
  132:9,23,24,25

142:13,16
looks 101:12,22
  102:12 104:13
  111:23 112:9,23
  113:13 114:17,23
  116:2 118:22
  119:16,17 122:5
  125:17 126:12,24
  127:4 131:8
  132:25 139:14
  140:24 142:17
  149:8 153:9,10
  153:11
lot 96:23 124:12
  128:23 153:19
  154:17
loud 73:6
lounges 101:25
Lovette 62:22
  64:21 69:6 71:3
  71:4,12 72:13,22
  74:25 75:11,13
  75:13 76:16
  78:22 108:20
  109:8,23 110:12
  110:18 112:21
  113:5,14 114:7
  116:14,20,23
  119:19 123:24
  127:1,6 130:5,5
  130:8,20 131:14
  132:21 133:2,16
  136:21 140:12
  142:13,19 143:22
Lovette's 75:5
  112:25 117:7,9
  127:5
Lower 138:12
  153:24
LUZ 62:12
lying 153:15,16
Lyman 160:25

## M

M 62:6 160:24
ma'am 65:15 66:11
  66:14,19 67:4
  68:24 69:3,22
  70:7,13,16,23
  71:9 72:14 74:18
  76:2,6,18,24
  77:2,8,18,24
  79:10,21,23 80:1
  80:4,24 81:2,16
  81:19 82:12,15
  83:17 84:14,16
  85:8 86:1,20

87:18,21,23
88:10,23,25
89:18 90:12,15
91:12 94:18 95:5
95:8,24 96:16,21
97:8,14 98:7
100:15 101:3,6,9
101:19 102:25
104:2,4,6,8,11
106:7 108:10
117:24 118:2
121:12 125:24
126:2 129:3
132:18,20 133:19
134:7 135:22
137:9 139:11,24
140:1,10,21
141:3,14,16,19
141:22 142:20,23
143:11,15 146:6
148:3,6,11
149:15 152:2
154:15 155:7,23
156:18
making 91:17
male 147:9
man 80:11 81:11
  84:10 140:19
  147:5 154:10
man's 71:13
manager 145:21
mandatory 95:21
maneuvers 116:6
manual 76:12
marked 63:21 95:11
MARY 62:12
mask 141:13,18,21
  142:3,5,7 143:24
  148:8,22 149:13
McKee 62:8,11
  64:15 85:11,16
  109:12 148:12
  150:4 153:22
  157:14 160:23
mean 68:8,16 75:14
  105:20 126:25
  132:14 137:18
means 148:10
meat 122:25
media 93:22
medical 81:8
  137:21 138:12
  152:1 153:24
Medina 72:18 78:24
  79:5 107:11,22
  108:8 112:7,9,11
  112:13,18,19

114:19
Medina's 135:21
meeting 156:19,20
MEGAN 63:5
members 93:21
memo 93:9
memorialized 85:6
mentioned 136:17
met 65:13
metal 75:22
Miami 160:19
mic 72:2,10,15
  73:1 135:21
Michael 62:20
  64:17 160:4
microphone 79:6
  84:12 107:23
middle 71:16
  117:10
Mike 99:22
miles 153:24
  154:24
minutes 139:15
  153:23 154:23
misunderstood
  153:20
mode 76:4,5 150:10
  150:11
modified 117:3
  119:19
moment 123:2
  124:20,23
monitoring 113:16
  124:9
monitors 93:15
MONROE 158:4 159:4
months 96:10
morning 86:23
  87:22
motion 117:12
mouth 106:7 138:5
move 80:10,13
  100:2 118:16,19
  121:2,5 127:19
  135:6
moved 145:16
movement 118:13
  121:23,23 122:7
  143:19
moves 117:25
moving 113:25
  120:18,23 121:1
  121:18 122:2
  135:7,9 145:14
  146:7 147:2
mrodriguez@the...
  62:11

multitask 124:16
municipality 61:8
murdered 98:20
  99:11 147:12
Murdoch 62:18
  160:5

—————————
                N
—————————
NAJA 63:3
name 65:10 73:16
  99:1 144:18
  145:7 150:18
nature 80:8 81:9
  89:8
near 90:22,24,24
  101:25 146:21
necessarily 116:5
neck 71:13,15,19
need 76:7 81:11
  84:10 99:3,4,24
  100:2 111:15
  145:24
needed 79:18 84:7
  84:8 118:8
  137:21
never 68:25 70:17
  70:23 71:15 74:4
  75:3 82:7 84:19
  92:1 98:18
  116:17,21 123:19
  123:21,21 124:22
  133:19 136:18
  138:21 140:21
  144:19,20 146:6
  153:5,5,14
New 98:13 146:15
  147:6
newest 91:14
NEWS 63:5
NEWSPAPER 63:3,4
no-parking 156:22
noise 148:20
noises 135:9
nose 69:11 74:3,4
  74:5
Notary 64:2 158:7
  158:15
NOTIFICATION 160:1
notified 156:8
November 61:16
  64:5 65:13,17
  66:7,17 70:14,20
  79:1 93:19
  155:19 158:9,11
  159:18 160:2,8
  161:5
number 83:11 153:2

153:4

—————————
                O
—————————
oath 63:14 65:23
  118:18 124:18
  158:1
object 66:15,25
  68:22 69:13
  70:22 79:8 85:25
  89:11 93:24 94:9
  99:13,18 103:9
  103:17 105:4
  106:14 120:7
  121:11,25 123:25
  124:5 129:8
  132:11 137:15
  138:2 151:3
  152:22 154:2,13
  155:6 157:10
Objection 76:9
  86:4 93:7 99:12
  99:17 105:14
  114:9 116:16
  117:2,5 118:5
  119:22 122:4,17
  124:1 128:19
  130:13 133:18
  139:19 140:20
  143:7 147:22
  148:16 154:1,14
  154:21,25 157:6
observe 83:11
observed 152:21
obviously 144:16
  144:17
occur 89:9
office 160:10,13
officer 64:20 65:8
  67:25 69:6 71:4
  71:12 72:8,13,18
  72:24 74:25
  75:13 76:16,25
  77:7,19 78:10,18
  78:20 79:5 80:17
  87:4 88:13,24
  90:13,16,24 91:6
  91:9,11,15,17,24
  92:1,18 95:14
  98:13,18 101:20
  102:3,7,8,21
  103:12 104:10,15
  105:7 106:17,22
  107:11,21 108:8
  108:14,17,20,24
  109:2,8,22 110:8
  110:10,12,18
  111:14 112:13

113:5,14 114:7
  115:17,21,23
  116:1,11,14,20
  116:23 117:14,14
  118:3 119:19
  122:6,21,23
  123:13,23 124:3
  124:15,19 125:16
  125:20 126:20,23
  126:25 127:1,9
  127:20,24 129:8
  129:18,24,24
  130:5,6,8,20,23
  131:1 132:21
  133:2,16 134:5,9
  134:22 136:19,24
  136:25 138:11
  140:12 142:13,18
  142:21 145:2,5
  146:3,15 147:6,7
  152:15 154:5
officers 88:8,11
  89:2,10 93:22
  94:6 97:23 99:10
  104:7 107:9
  114:21 121:21,23
  122:7,10 133:23
  136:1 139:13
  143:9 152:13
oh 64:14 77:8
  78:12,19 82:24
  100:4,9 106:10
  108:12 117:24
  121:14 123:17
  126:22 127:12
  130:18,22 132:14
  139:20 140:14,18
  145:11 153:7
okay 75:16 82:19
  94:19 95:15 97:9
  102:8 106:11
  107:6,14 113:24
  114:20 116:19
  118:11,13 120:21
  121:3,15 126:22
  127:18 128:13
  129:12 130:19
  134:10,20 136:14
  137:3 138:4
  139:23 140:14
  146:19 149:16
  156:16
one's 131:21 144:3
ongoing 156:13
oo0oo 63:7
open 155:25 156:6
  156:12,14

opened 156:11
operating 76:12
opportunity 65:17
order 76:3
ordered 67:23
  157:17
orient 126:10
original 100:7
overtop 104:15
ow 78:2,3 115:6,13
oxygen 141:20,23

**P**

P 62:6
P.A 62:13,18 160:5
p.m 61:16,16 93:19
  157:19
P48 79:22
page 63:10,19
  66:21 79:1 161:2
  161:7
pages 61:14 159:8
pain 105:13,23,24
Palm 62:9,14,23
panned 121:8
Papa-48 87:4
paper 71:6
paperwork 156:6
paragraphs 152:4
parallel 91:2,5
  119:18
parking 156:22
part 117:10 149:10
  149:11
particular 134:9
parties 159:13,14
passenger 101:24
pat 130:5
patted 130:8
Paul 87:4 153:2,4
  153:10 160:24
Paul-48 79:23
  153:11
penalties 161:22
people 70:24 78:15
  78:25 89:6 97:24
  98:2 99:14
  120:24 121:4,6
  144:10 146:4,6,8
  150:23 152:12
  157:2,5
percentage 141:20
perception 99:8
  147:14
perfect 96:16
performed 147:20
  148:5

performing 148:2
period 67:11
perjury 161:22
person 107:19
  108:22 109:1
  127:4 141:23
  144:15 150:13
  151:8
person's 82:6
Personal 61:5 64:6
personally 71:25
  123:22 158:8
personnel 156:4
perspective 99:15
pertaining 66:6
ph 148:12
phone 100:8
photo 139:3
photograph 69:3,5
  74:8 81:18 82:5
  143:6
physiological
  96:19 97:7
pick 149:12
picked 118:6,15
picking 118:3
picks 118:14
  121:16
pieces 75:22
pier 97:25 126:16
  126:17
pile 107:1 117:19
pin 117:3 119:20
  119:24
PIO 92:18
Piper 62:18 160:5
place 64:9 156:19
Plaintiff 61:6
  62:2 64:8
PLAINTIFF'S 63:19
Plaintiffs 64:16
Play 150:4
pleaded 72:1 74:1
pleading 73:7
please 65:10 73:8
  73:8,9,15,15,16
  73:16,17 99:4
  118:11 123:9
  145:25
PLLC 62:22
pocket 128:1
point 74:12 81:20
  82:16 89:10 98:8
  100:17 102:3,13
  102:20 103:16,20
  104:12,17 108:9
  109:9 110:16

111:2 113:14
  117:11 118:1
  119:20,24 120:12
  124:9 126:6,11
  127:7 128:25
  129:11,20 131:7
  131:22 133:22
  134:8 136:4,19
  137:10,22 138:7
  138:23 139:2,17
  140:12 141:9
  142:19 143:5,24
  154:11
pointed 75:21
  104:5
police 73:20 77:9
  89:2 97:23 98:13
  98:15 99:10
  102:24 138:1,7
  140:5 146:15,16
  147:5,7 152:12
  152:15 154:4,5
policy 154:7
poor 149:11
position 74:7
  75:12 82:14,25
  120:5,9 121:8,17
  122:3,6,10,11,13
  122:14 132:5
  135:11
possession 106:22
possible 85:21
  142:4
possibly 94:15
pounds 122:24
prepared 160:10
present 63:2 64:11
presides 156:16
pressing 71:12
pressure 116:3,9
pretty 73:6 125:14
probably 129:15
  143:4
proceed 123:2
proceeding 160:10
PROCEEDINGS 63:10
produced 85:12
Professional 61:25
  64:2 158:7 159:7
  159:22
progress 151:17,19
prone 96:25 97:10
  97:12 116:7
  132:1
prongs 75:18
pronounce 101:21
proposed 155:20

protocol 128:21
  141:4 154:22
provide 85:15
provided 160:10
PT 111:9
Public 64:2 92:18
  158:7,15
pull 85:1 110:12
  110:14 115:20
pulled 106:16
  124:22 144:2
pulse 144:5
pump 115:9
punch 133:16
purportedly 77:20
push 68:12,20
  71:15 76:7
  121:21
pushing 68:17
put 68:18 73:19
  74:2 90:7 105:8
  105:11 106:19
  116:3,9 127:13
  128:23 142:5
  153:18
puts 152:4,4
putting 129:5,11
  129:16,20 138:5
  140:12

**Q**

question 96:9
  100:22
questioning 84:7
questions 149:18
  157:16
quickly 83:9
  145:25
quiet 99:4

**R**

radio 83:22 84:5
  87:14 93:15
  137:2 140:17
raise 64:22
ran 118:17 120:19
  123:6 155:4
Randall 146:3
re-cert 96:3
re-certification
  95:22 96:10
re-holster 124:19
reach 125:13
reaches 128:11,14
read 63:15 66:8,10
  71:6 76:12 94:5
  157:17 161:22

readily 142:7
reading 84:11
ready 129:1
real 119:2
really 77:16 83:13
  85:2 92:21,23
  104:21 110:6
  115:15 124:12
  129:14 139:6
  145:24 149:4,10
  149:11
reason 73:21
  118:17 161:7
Reasonable 99:16
recall 88:3 89:3
  89:16 117:3
  147:2 156:19,22
recognize 69:5
  78:7 149:17,20
  149:21 150:12
recollection 66:6
  77:6 83:15,18,19
  153:13
record 64:11 65:11
  157:18 159:10
recorded 85:3,6
  107:24 151:8
recording 73:3
  78:11,14,17
  153:21,21
records 80:25
  152:3
red 141:6,6,12
  146:9
reference 136:16
  145:20
referring 75:13
refresh 66:5
regard 75:12 78:18
  92:19 93:5 97:10
  141:4 156:1
regarding 155:19
relation 135:8
relative 159:12,14
relayed 93:21
remaining 120:5,9
remember 67:21
  71:5 72:19 75:10
  75:11 76:15
  77:13 79:17
  82:12 84:23 85:2
  86:9,15 88:5,13
  89:13 97:4
  104:21 119:23
  120:11 136:18
  146:11,11,24
  147:3 150:22

154:9 156:21
removed 75:20
repetitive 93:7
report 73:19
  150:24 151:9,19
  152:13,25 153:6
  159:8
reported 152:10,16
reporter 61:24,25
  63:15 64:2,2,12
  64:22 158:6,7
  159:1,6,7,22
Reporter-Master
  159:22
Representative
  61:5 64:7
request 160:12
requested 159:10
requires 128:21
rescue 79:18 81:11
  83:23 84:7,9,10
  145:12,14,17
  151:14,21 155:8
resemble 130:2
resembles 112:9
resist 94:1,19
resisted 93:22
  94:3,6,10
resisting 71:23,25
  72:1,8,13,18
  73:4 106:8
resolution 155:25
respect 87:4 94:21
  122:9
respectfully 122:8
  123:24 160:12
response 96:19
  97:7
restaurant 146:18
restraint 96:25
  97:10,12 116:7
Resumed 63:12 65:6
return 160:13
returned 70:5
reveals 148:5
review 65:17 159:9
  160:10,13
Reynolds 62:22
  160:25
ridiculous 81:10
right 64:22 66:12
  67:6,8,12 68:14
  68:21 70:8 71:16
  74:10,13,14 75:6
  76:5 77:5 79:3
  79:20 80:23
  81:18 82:6,7,10

82:14,22 85:3,4
  85:4,7,23 87:2
  87:12,14,19,24
  88:9,15 89:3,17
  89:20 90:20,23
  96:3 100:7,20,25
  101:8 102:2,5,14
  103:1,4,11,13,15
  103:21 104:9,22
  104:23 105:11
  106:6,9,12,12,15
  106:17,21,23,25
  107:3,5,19
  108:24 109:3,5
  109:11,15,17
  110:13,17,22
  111:1,8,21
  112:12,14 113:2
  114:3,12,16,22
  114:24 115:4,19
  116:7,15,23,24
  116:24 117:7,7,8
  117:22 119:1,1,4
  119:16,21 120:8
  121:18 123:14,16
  124:4 125:3,23
  128:4,12 130:17
  131:8,12,13,15
  131:22 132:10,15
  132:17 134:6,13
  135:3,13 136:2,5
  136:12 137:2,25
  139:13,18,18,20
  139:25 141:13
  142:8,11,12,19
  143:1,25 144:4,5
  146:23 149:7,14
  152:15,17 154:19
  156:2,11,17
right-handed 110:5
rmckee@themcke...
  62:10
Robert 62:11
  160:23
ROBERTS 62:22
RODRIGUEZ 62:12
roll 111:21 112:16
  115:4,22 122:19
  124:25 130:3,15
  130:19 131:16
  133:21,22 134:1
  135:1 136:9
  142:11 143:18
  144:7,14 146:20
  147:23 148:1
  149:16 151:14
rolled 134:2,5,17

134:18,22
rolling 127:12
  136:11
rolls 134:12
route 87:16
Royal 62:9,14
run 120:13 121:10
  122:25,25 124:23
  125:4 127:8
  128:6 129:1,4
  132:4 154:17
  155:14
running 69:20,24
  120:16 122:20
  125:18 134:19

_____

S

SALAZAR 63:3
sand 67:18,22 68:2
  68:3,4,7,9,10,15
  68:17,20 69:1,8
  69:9,14,17,17
  71:3 74:3 79:16
  81:4,6,19 97:10
  97:13,14 113:9
  118:22 120:10
  132:1,10,19
  139:17 143:12
sarge 71:2 81:24
  81:25,25 82:22
  82:23 83:5
saw 68:2,3,4 69:17
  69:18,24 70:18
  70:23 71:15,15
  72:21,22 74:3,4
  74:4 75:3,3,5,5
  87:6 88:17,18,20
  89:18,19,21,24
  97:16 98:1,3,20
  105:5 110:12,15
  110:19 116:17,21
  116:22 117:9
  118:20 120:10
  123:21,21 124:21
  124:22 126:24
  133:19 135:7,7,9
  143:21,22 144:19
  144:20 145:7
  146:6 147:11,11
  150:16 153:5
saying 66:10 74:5
  78:18 84:23 92:3
  92:4 135:10
  136:18 147:8
  148:19 151:7
  152:18,20 153:4
  153:4

**says** 76:14 87:4,11
 102:24 110:25
 156:14
**scene** 86:23 87:2,5
 87:10,19,24
 97:15,17 98:12
 98:12,19 108:22
 109:2 128:14
 150:15
**scream** 78:13 99:3
**screamed** 77:21,22
 78:3,6
**screaming** 92:6
**screams** 111:14
**second** 83:8 103:7
 109:11 134:13
 150:4
**seconds** 83:8,12,13
 84:21,22 85:6
 87:5 100:13
 101:4,7 103:4,5
 103:11 104:16
 106:11,25 109:10
 109:14 110:22,25
 111:6 112:13
 114:4,5,22 115:5
 130:4 139:15
 148:1 151:1,6
**secure** 97:21 98:19
**secured** 111:3
**securing** 98:12
**see** 66:23 70:14
 71:19,20 74:19
 76:25 79:24
 80:11 81:17
 89:13,14 94:10
 96:2 100:16,21
 102:3,7,20
 104:10,14,16,20
 104:23 105:2
 106:22 107:9,11
 108:2,3 109:1
 110:1,2,6,14
 111:9 112:7,13
 112:25,25 113:6
 113:7,22,23
 116:11,17 118:9
 118:19 119:1,14
 120:4 121:1,2,14
 121:21 122:5,11
 122:20 123:4,13
 123:14,23 124:7
 124:10 125:2,16
 126:9,21,22
 128:5,8 129:8,10
 131:3,24 132:10
 133:2 134:8,13

134:13,15,16
 135:5 136:9,10
 136:19,21,21,22
 136:25 139:3,6,8
 140:12 142:10,24
 143:17 144:9
 147:24 148:8,22
 148:23,23,25
 149:5,6,11,12
 150:1,5,6 151:9
 151:11
**seeing** 77:7 79:15
 79:19 81:4 89:16
 119:23 120:11
 150:24
**seen** 65:24 69:3
 70:11 91:13
 97:25 98:18
 100:5,9,10
**sense** 96:14,16,17
**sentence** 78:16
**sergeant** 70:4,4
 80:15,18,19
 81:25 82:2,20,25
 121:15 138:18
 146:12 156:6,16
**seriously** 147:13
**service** 88:22,24
 102:11
**sharp** 75:21,24
**sheet** 63:16 160:13
 161:1
**shin** 116:24,24
 119:20
**shirt** 76:20 108:1
 109:5 140:25
 143:20,22 144:8
 146:10,10
**Shock** 148:12,13,15
 148:18
**shooting** 144:15
**short** 117:15
 127:20
**short-cut** 98:23
**short-sleeved**
 109:5
**Shortly** 128:6
**shot** 145:24
**shoulder** 84:13,15
 106:18 136:12
 137:6
**shoulders** 143:2
**showing** 153:2
**shown** 132:5
**shows** 87:1
**side** 66:23 68:4,4
 68:7,7,12,13,20

70:8 74:10,10,13
 74:14,15 78:23
 82:4,7,10 89:20
 90:21 101:24
 109:15,16,17
 110:17 113:5
 119:16 126:5,7
 126:11,13 129:7
 132:9 139:18,25
**sidewalk** 92:7
 107:25 125:8
 126:14 146:8
**Signed** 158:11
**Sincerely** 160:15
**sir** 73:8,16,16
 99:3,7 147:13
**sirens** 154:8,11,17
**sit** 66:20 86:2
 88:3
**sitting** 149:3
**situated** 82:5
**situation** 69:25
 105:21
**six-two** 112:3
**skin** 76:19
**sky** 131:24
**sleeve** 133:11
 136:22
**sleeves** 117:15
**slow** 119:2
**slung** 106:18
**Smith** 107:18,21
**somebody** 71:6
 83:23 84:5 115:7
 118:7 138:15,24
 149:12
**somebody's** 134:14
 149:6
**someone's** 149:7
**someplace** 87:17
**soon** 70:3 82:21
 83:9 87:17
 128:14 142:4
**sorry** 74:18 76:2
 78:16 95:13
 100:4 101:17
 127:13
**sound** 145:2 150:8
**sounded** 145:3
**Sounds** 144:25
**Southeast** 160:18
**SOUTHERN** 61:1
**Southernmost** 90:25
 91:3,5
**Spanish** 98:6
**speak** 84:12 86:7
 92:19,22,24 93:5

98:4,6
**speaking** 149:20
 150:13
**speculation** 155:1
**spoke** 86:8,21 88:4
 92:25 93:11,18
**stand** 66:20 83:11
 123:13 138:11
**standing** 98:18
 114:15 117:14
 126:3,4 129:8
 130:20 132:8,22
 135:23 137:1
 140:15 142:25
**stands** 131:1
 134:18
**start** 118:21
 124:23 141:1
**started** 65:16 92:6
 118:7,23 146:25
**starting** 99:3
 118:16 131:17
 143:23
**starts** 139:16
**state** 64:3 65:10
 158:3,7,15 159:3
**stated** 161:23
**statement** 77:10
 78:21 94:6,12
 100:17,24 101:1
 101:5
**statementized**
 157:2
**statements** 97:18
 157:5
**STATES** 61:1
**station** 87:13,15
 87:15,16 93:16
**stature** 111:25
**stay** 138:11
**stepping** 130:20
**steps** 92:14
**Stevens** 147:16
 150:19
**stomach** 104:3
**stood** 131:13,18
**stop** 71:23,25 72:1
 72:7,12,18 73:4
 100:13 102:19
 106:8 108:13,18
 112:5 115:5,12
 115:25 118:24
 123:12 125:25
 128:4,4 130:3,19
 133:3,21 142:12
 147:18 149:19
**stopped** 100:17

107:5 145:6
 147:19
**straddled** 103:2,12
**straddling** 109:18
 109:19
**straight** 112:2
 147:25
**street** 61:17 62:3
 64:10 145:18
**strike** 102:2 151:8
 152:11
**struggle** 97:7
**stuck** 76:25 77:15
 77:20,22 79:3
**subject** 85:5 156:9
**suffer** 141:24
**Suite** 62:9,14,18
 160:5,18
**summary** 95:12
**sun** 127:21
**sunglasses** 127:9
 127:23
**Sunrise** 62:18
 160:5
**supervisor** 138:18
**Support** 160:8,18
**supposed** 95:6
 138:14
**supposing** 78:20
**sure** 70:6 77:11
 93:1 97:1 100:1
 105:15,17 106:24
 108:7 110:3
 130:1 144:22
 156:23,25
**surfaced** 65:21
**suspect** 76:8 84:18
 84:22 85:21
 151:1,7,9,11
 152:10,16,21
 153:1
**Suzanne** 61:23 64:1
 158:6,14 159:6
 159:21 160:17
**swear** 64:12,23
**switched** 84:9,10
**sworn** 65:4 158:10
**system** 80:23,25
 81:3

**T**
**T** 62:20 160:4
**take** 95:23,25
 96:10,14 97:18
 100:12,23 101:10
 115:5,12 118:12
 123:11 127:8,14

130:3 140:25
 150:20 154:23
 157:17
**taken** 61:21 64:1
 97:20 128:2
 143:6 160:8
**talk** 79:14 145:4
 146:4,9 150:15
 152:9
**talked** 66:8,9
 70:24 86:9 97:11
 97:20 150:22
 152:7
**talking** 73:11
 78:14 135:10
 136:12 145:13
 146:11 149:2
**tall** 112:4
**tape** 85:1,7,9
 106:3,4,5,9
 111:18,21 112:8
 112:16 113:22
 114:24 115:4,22
 118:24 120:21
 122:19 124:25
 125:5 130:3,15
 130:19 131:16
 133:21 135:17
 142:11 143:18,23
 144:7,14 146:20
 147:23 148:1
**Tase** 150:1
**Tased** 79:9,12
 84:18,22,23 85:5
 85:22 86:3
 136:17,18 150:6
 151:1,7,9,11
 152:10,16,21
 153:1,5,14
**Taser** 71:13,20
 75:5,10,13,17,21
 76:7,13,17 95:3
 95:7,9,24 96:1,3
 109:9 110:4,6,6
 110:12,19 112:24
 112:25 113:14
 116:22 117:10
 123:18,22 124:8
 124:19 150:8,16
**Tasering** 150:5
**Tasing** 150:5
**taught** 116:6
**teach** 105:18
**tell** 66:3 68:17
 69:16 71:11,25
 72:19 73:11,14
 73:25 77:9,17

79:18 81:7 83:3
 83:14 84:11
 86:11,13,13,17
 88:6 90:1 98:22
 100:20 104:19,22
 104:23 105:10
 108:21 109:11
 112:10 113:15,23
 117:25 118:9
 119:12 121:12,16
 122:10 123:13
 127:2 128:11
 129:14 133:2
 135:8,10 136:10
 136:25 147:3,16
 148:8,25 153:17
 154:9
**telling** 73:4,13
 79:11 91:10
 106:8 122:9
 144:10,24
**tells** 156:12,14
**ten** 98:23
**terms** 66:9 89:1,6
 98:15 152:3
**testified** 65:4
 66:13 116:19,20
 119:25 138:21
**testify** 116:23
**testimony** 64:23
 65:23 66:16,17
 66:21 68:19,25
 79:1 81:14 117:4
 117:6 118:18
 124:18
**Thaddeus** 111:23
**Thank** 85:16 126:17
**Thanks** 96:6
**thing** 71:19 97:3
 99:6,7 117:9
**things** 89:8 96:23
 123:23 135:10
 153:18 154:17
**think** 71:5 77:5
 78:9,12,15 86:8
 86:8 96:24 98:4
 99:20 111:4,24
 112:4,11 117:20
 123:4 127:5,6
 141:10 147:17
**thinking** 140:18
**Third** 160:18
**thought** 96:9 107:7
 113:19 126:21
 127:4 135:11
 140:21 143:21,22
 154:10

**thrashing** 91:22
**threat** 102:17
 103:20,22
**threaten** 99:5
**threatening** 91:17
 91:20,21
**three** 88:8,8,11
 89:5,10 101:4,7
 104:7 112:3
 119:19,23
**three-point** 117:3
**thumb** 77:5 78:13
**thumb's** 143:8
**tilted** 143:2
**time** 66:4,22 67:2
 67:6,7,9,11,21
 68:1,1 70:11
 81:20 82:2,16
 84:8 89:2,10
 91:23 92:10,14
 95:6 96:15 97:15
 97:18 98:8 99:20
 101:7 102:13,20
 104:17 109:9
 110:19 111:2
 112:12 115:1
 117:11 123:2
 124:13 128:7,18
 129:1,22 131:7
 134:8 135:3,5,8
 135:10 136:4
 137:5 139:2,12
 139:15,16,17
 140:12,16 143:5
 144:13 145:13,14
 147:19,24 148:4
 150:4,22 151:5
 153:19 155:17,24
 156:24 157:16
**times** 67:20 82:9
 82:10 85:18
 143:21
**tip** 77:4
**today** 64:5 66:20
 70:18 79:25
 84:15 86:2 88:3
**told** 66:1 72:5
 74:1 83:5 84:17
 89:14 93:21
 94:24 95:1 96:13
 99:6,7 139:9
 140:3 155:3,8,11
**top** 109:18 133:6
**Torres** 80:21
**touching** 144:6
**tourist** 100:10
**TOWEY** 63:5

trained 76:3 88:17
  142:3,5,6
training 95:3,7,9
  95:10,21 96:12
  96:20,22 97:9
transcript 66:10
  66:13,17 159:9
  159:10 160:10,21
  161:2
transported 154:19
Treavor 61:5 64:6
  160:7 161:4
tree 146:22
trick 96:9
Tripp 80:17,18,19
  156:16
Tripp's 156:6
true 76:3 105:16
  105:18 159:10
  161:23
truly 74:20 75:10
  93:4 147:8
trust 124:12,17
truth 64:24,25
try 121:22
trying 73:14,17
  81:7 84:5 105:8
  113:20 115:24
  117:21 121:18
  136:6 140:17
  144:5,25 149:11
turn 68:3,3,6
turned 81:10 82:21
  83:12 90:4
turning 68:14,16
  68:20 113:17
TUZZIO 62:22
two 83:8 97:20
  98:3 130:3 135:1
  136:21 139:15
  141:7 150:23
  157:5

U

U.S 160:8,18
Uh-huh 66:11 69:6
  74:16 76:22 87:6
  121:20 129:10
  137:7 141:14
  155:21
Uh-uh 72:21 75:25
  135:18
Un-arrest 137:16
unconscious 81:21
  82:17 83:21
understand 81:14
  99:14 113:21

137:18 148:10
  149:24
unfortunately
  153:19
uniform 79:24
UNITED 61:1
unknown 103:23
upper 116:15,25
  117:10 119:20
use 148:24
user 96:3
usually 112:10

V

Valle 67:25 72:24
  88:14,15 90:13
  90:14,16,20,22
  90:24 91:6,7,9
  91:11,15,18,24
  92:1 101:20,20
  102:21 103:12
  104:10,15 106:17
  108:24 110:10
  136:19,24,25
valve 141:13,18,21
  142:3 143:24
  148:8,22 149:13
vantage 74:12
  110:16
vehicle 87:25 90:8
  147:2
vehicles 145:14,16
  146:7
Verbatim 61:24
  64:1 158:6 159:6
  159:22
verify 128:9
vertebrae 71:17
vicinity 104:7
  142:21
video 61:13 63:11
  78:8 91:13,14
  92:15 99:21,24
  100:5,8 101:10
  113:15 118:19
  127:8 135:5
  139:16,16 143:5
  145:7 149:11
videographer 63:3
  64:5 121:7 148:9
  157:18
videotape 65:18,20
  65:24 66:2 78:11
  111:15,17 118:10
  120:4,23 144:16
  145:13 147:20
  148:4,6 149:25

150:25 152:20
videotaping 144:21
view 124:17 143:10
visible 142:18
  143:13
voice 72:22 73:10
  78:7,11 100:14
  149:22,23 150:12
voices 149:17
volume 61:13 115:9
vs 61:7 64:8 160:7
  161:4

W

W 160:22
waist 121:19,22,22
  122:2
waistband 103:25
wait 109:12 118:3
  118:3,3 153:22
waiting 139:22
walk 89:19 91:8
  92:14 123:2
  128:25
walked 70:3 81:10
  81:22,23,25 82:3
  82:7,21 83:5,5
  84:9 91:8,12
  92:1,3,4 109:1
  110:10 123:5
walking 81:23
  89:22,23 90:8,11
  90:13 91:2,5,6
  91:11,24,25 92:7
  94:17 107:1
  112:17 125:22
  136:4,6,12 145:7
walks 108:24 112:2
Wallace 61:17 62:3
  64:10
Wanciak 61:13
  63:11 64:18 65:3
  65:8,12 87:5
  95:14 158:8
  159:8 160:4
  161:4,25
want 70:17 93:2
  99:22 105:24
  113:22 115:4
  117:25 118:9
  123:11,12 127:7
  127:7 136:10
  149:17 153:16
  155:17
wants 93:2
washing 71:3
wasn't 71:18 73:23

77:12,14 81:7
  92:11 97:1 123:4
  132:7 133:23
  135:15 137:19
wasting 84:8
watch 108:5 117:17
  120:21
watching 88:19
  113:17 133:23,23
way 79:24 81:23
  87:15 90:17,18
  90:20 91:8
  105:21 108:6
  110:8 113:13
  115:9 122:10
  125:17,19 126:22
  132:3,20 133:5
  134:24 140:8
  142:14 146:17,21
  146:24 152:24
we'll 107:20 108:5
  157:17
we're 73:16 109:9
  109:14 110:22
  117:20 120:21,22
  121:7 126:9
  147:19 157:15
we've 106:12 114:7
  114:21 119:8,10
  135:4
weapon 88:22,24
  102:11,12,14,16
weapons 103:24
wearing 98:24
  102:23 109:5
wears 112:10
weight 68:17,18
welcome 126:18
went 67:21 80:15
  80:16 82:4 94:10
  121:9,9 127:11
  137:19 155:16
weren't 157:8
west 61:2,8,18
  62:4,23 63:3,4,4
  64:8,10,18 73:20
  77:9 88:4 89:2
  97:23 98:15
  99:10 126:5
  146:16 160:7
  161:4
Weston 62:9,14
whatsoever 78:11
When's 95:6
white 98:22 146:5
  147:9
Whitehead 61:17

62:3 64:10
**why's** 119:4
**windbreaker** 102:23
**winded** 125:24
**wireless** 72:2,10
  72:15 73:1 79:5
  107:23
**wish** 66:12
**witness** 61:21
  64:13 65:1 97:18
  108:12 112:9
  118:13 121:14,21
  122:18 123:10
  148:17 150:24
  152:19 155:14
  157:17 160:1,11
  160:12
**woman** 80:13 145:6
**women** 124:16
**wondering** 106:19
**word** 137:16 150:17
**words** 138:5
**works** 152:5
**worried** 124:12
  145:12
**wouldn't** 93:20
  94:1 96:14
  105:17 154:18
**WRITE** 161:2
**wrong** 124:13
  135:16

---
**X**

**X26** 76:12

---
**Y**

**yank** 105:2
**yanked** 105:6
**yeah** 69:14 71:18
  71:18 72:1,9
  73:7 75:19,19
  76:2 84:23 85:14
  90:4,14 91:9
  104:25 106:10,16
  107:19 109:17,21
  110:5,24,25
  113:11 114:10,13
  114:17,17 116:8
  116:13,21 117:20
  117:24 120:17
  123:15 126:24
  127:21 128:3,23
  129:7 130:18
  134:2,20 135:1
  136:6 137:2,4
  140:14 143:2,3
  143:17 145:4,15

147:12,13,24,25
  150:9,11 152:14
  153:2,7 155:14
**year** 95:7,23 96:15
  96:24
**years** 153:17
**yell** 73:6,7,14
**yelled** 72:7 118:7
  145:21 146:25
**yelling** 71:21,22
  71:24 72:12,17
  100:19 146:25
  147:5,10,11
**yellow** 141:15
  149:14
**York** 98:13 146:15
  147:6

---
**Z**

**Zamora** 70:4,4 71:4
  82:2,20 83:1
  138:19
**zero** 100:23 103:5
**zone** 156:22

---
**0**

---
**1**

**1** 62:9,14 93:17
  152:14
**1:13** 118:12 123:12
**1:15** 127:19
**1:18** 121:9,13
  122:3,14 123:12
  127:14 128:5,9
**1:20** 121:9
**1:22** 123:6 124:24
  125:3,4 127:8,13
**1:25** 128:7
**1:33** 125:10
**1:35** 125:13
**1:39** 129:4
**1:40** 121:7
**1:42** 122:15
**1:45** 125:18
**1:50** 125:22
**10/4** 95:18,20
**10:03** 86:23 87:16
  87:20 88:1 97:18
**10:39** 87:13
**1000** 62:18 160:5
**1018** 151:7,23
**10th** 156:8,10
**12** 95:18,20
**12:14** 87:11
**1215286** 160:8
**1250** 160:18

**13** 118:25 157:2
**14-10028-CIV-M...**
  61:3
**15** 84:21,22 85:6
  103:4,11 151:1,6
**157** 159:9
**158** 63:14
**159** 63:15
**160** 63:15
**161** 61:14 63:16
**17** 106:11
**17150** 62:9,14
**19** 97:17 132:6

---
**2**

**2** 66:21 81:11
  84:10
**2:31** 130:16 132:10
  132:15 135:4
**2:38** 130:20
**2:40** 133:1
**2:41** 131:1,10
**2:42** 132:12,17,19
  134:11 136:8,9
  136:23
**2:43** 134:3,25
  135:2
**2:44** 134:3 135:2
**2:45** 135:4
**2:47** 137:3
**20** 106:25
**2012** 95:9,16 96:11
**2013** 66:7 70:15,20
  95:25 156:10
**2014** 61:16 64:5
  158:9,11 159:18
  160:2,8 161:5
**2017** 158:16
**21** 61:16 64:5
  160:8 161:5
**217-0150** 62:10,15
**21st** 158:9
**22** 153:23 154:23
**24** 100:13
**2455** 62:18
**2488** 160:5
**25** 160:2
**25th** 158:11 159:18
**27** 158:16
**28** 66:7 70:15,20
**294-4585** 62:4
**294-7822** 62:4
**29th** 93:19

---
**3**

**3:24** 141:11 142:9
**3:31** 143:19

**3:42** 144:8
**30** 109:10,14
  110:22,25 160:13
**305** 62:4,4 160:19
**31** 111:6
**33040** 61:18 62:4
**33131** 160:19
**33304** 62:19 160:6
**33327** 62:9,14
**33409** 62:23
**35** 87:5 112:12
**373-8404** 160:19

---
**4**

**4.9** 153:24 154:24
**4:12** 145:13
**4:24** 61:16
**4:55** 147:19 148:4
**40** 122:24
**43** 114:25
**44** 134:17
**45** 114:4,5,21
**46** 115:12
**463-0100** 62:19
**463-2444** 62:19
**47** 139:15
**470** 62:23
**4th** 65:13,17 66:18
  79:1

---
**5**

**5:33** 149:2
**5:39** 149:7
**5:44** 149:8
**5:50** 149:16
**54** 79:1
**55** 66:21
**56** 115:20
**561** 62:24,24
**57** 115:5

---
**6**

**6:01** 61:16 157:19
**608** 61:17 62:3
  64:10
**61** 61:14 159:9
**65** 63:12
**688-2343** 62:24
**688-6560** 62:24

---
**7**

**7/15** 96:1

---
**8**

**8:24** 93:19
**8:30** 87:5
**8:34** 84:21,21 85:6

```
 151:1,6,6
8:34:15 151:12,14
888-9877 62:10,15
```

|   9   |
|-------|

```
954 62:10,10,15,15
  62:19;19
```