**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO.: 14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,

      Plaintiff,

vs.

CITY OF KEY WEST, a Florida municipality, et al.,

      Defendants.

_____/

VIDEO DEPOSITION OF GABRIEL HUMBERTO GARRIDO

Wednesday, November 5, 2014
8:55 a.m. - 12:10 p.m.
United States Federal Courthouse
301 Simonton Street
Key West, Florida 33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter
Florida Professional Reporter

**2**

APPEARANCES

On Behalf of the Plaintiff:
BRILL & RINALDI, THE LAW FIRM
17150 Royal Palm Boulevard, Suite 2
Weston, Florida 33326
(954) 876-4344 / Fax (954) 384-6226
david@brillrinaldi.com
BY: DAVID W. BRILL, ESQUIRE

HORAN WALLACE & HIGGINS, LLP
608 Whitehead Street
Key West, Florida 33040
(305) 294-4585 / Fax (305) 294-7822
dph@horan-wallace.com / darren@horan-wallace.com
BY: DAVID PAUL HORAN, ESQUIRE
BY: DARREN M. HORAN, ESQUIRE

THE MCKEE LAW GROUP, LLC
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / ((954) 217-0150
rmckee@themckeelawgroup.com
BY: ROBERT J. MCKEE, ESQUIRE

LEWIS LEGAL GROUP, P.A.
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / Fax (954) 217-0150
jlewis@lewislegalgroup.com
BY: JEANNETE C. LEWIS, ESQUIRE

On Behalf of the Defendants:
JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
2455 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida 33304
(954) 463-0100 / Fax (954) 463-2444
burke@jambg.com
BY: MICHAEL T. BURKE, ESQUIRE

**3**

APPEARANCES CONTINUED

On Behalf of the Defendant Gary Lee Lovette:
ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
470 Columbia Drive, Building C-101
West Palm Beach, Florida 33409
(561) 688-6560 / Fax (561) 688-2343
lreynolds@rrbpa.com
BY: LYMAN H. REYNOLDS, JR., ESQUIRE

Also Present:
RODERICK PRATT, LEGAL VIDEOGRAPHER
GUSTAVO ADOLFO MEDINA
THADDEUS CALVERT
HENRY DEL VALLE
TODD STEVENS
NAJA GIRARD, KEY WEST THE NEWSPAPER

--oo0oo--

INDEX OF PROCEEDINGS

Page

Video Deposition of GABRIEL HUMBERTO GARRIDO
Direct Examination by Mr. McKee . . . . . . . . . . 5

Certificate of Oath . . . . . . . . . . . . . . . . . . 175
Certificate of Reporter . . . . . . . . . . . . . . . . 176
Read Letter . . . . . . . . . . . . . . . . . . . . . 177
Errata Sheet . . . . . . . . . . . . . . . . . . . . . 178

INDEX OF PLAINTIFF'S EXHIBITS
Page

No. 6    Garrido's KWPD Incident Report . . . . . . . . 91
No. 7    FDLE Investigative Report . . . . . . . . . . 113

**4**

1    Deposition taken before Suzanne Ex, Certified Verbatim

2  Reporter, Florida Professional Reporter and Notary Public in

3  and for the State of Florida at Large in the above cause.

4        - - - - - - -

5    THE COURT REPORTER: Good morning. We are now on

6  the video record. Today is Wednesday, November 5th,

7  2014, at 8:55 a.m. We're here at the Federal Courthouse

8  on Simonton Street in Key West, Florida, for the purpose

9  of taking the video deposition of Gabriel Humberto

10  Garrido in the case -- in Case Number 14-10028-CIV,

11  styled Treavor Eimers vs. City of Key West, et al.,

12  filed in U.S. District Court, Southern District of

13  Florida. The court reporter is Suzanne Ex of U.S. Legal

14  Support. And the videographer is Roderick Pratt, also

15  of U.S. Legal Support.

16    Would counsel please state their appearances, and

17  then I will swear in the witness.

18    MR. MCKEE: Robert McKee, David Horan, Darren

19  Horan, David Brill and Jeannete Lewis on behalf of the

20  Plaintiff Eimers family.

21    MR. BURKE: Michael Burke on behalf of the

22  Defendants City of Key West, Gabriel Garrido and others.

23    MR. REYNOLDS: Lyman Reynolds on behalf of Officer

24  Lovette.

25    THE COURT REPORTER: Would you raise your right

5

1  hand.  Do you swear or affirm the testimony you are
2  giving in this cause will be the whole truth and nothing
3  but the truth?
4       THE WITNESS:  I do.
5  THEREUPON,
6       GABRIEL HUMBERTO GARRIDO
7  having been first duly sworn, was examined and testified as
8  follows:
9            DIRECT EXAMINATION
10 BY MR. MCKEE:
11      Q.  Good morning, sir.  Could you please give us your
12 full name and address.
13      MR. BURKE:  You can give your business address,
14 would be fine.
15      MR. MCKEE:  Yes, in light of who you are.
16      A.  Gabriel Humberto Garrido, 1604 North Roosevelt
17 Boulevard.
18      Q.  Here in Key West?
19      A.  Yes, sir.
20      Q.  By whom are you employed, sir?
21      A.  Key West Police Department.
22      Q.  How long have you worked with them?
23      A.  Five years.
24      Q.  Did you work with any other police entity anywhere
25 else?

6

1       A.  No.
2       Q.  Where did you grow up?
3       A.  Key West, Florida.
4       Q.  Born and raised here?
5       A.  Yes.
6       Q.  Are you, to your knowledge, fully compliant with
7  the requisite mandatory training that is required as a police
8  officer here?
9       A.  To my knowledge?
10      Q.  Yes.
11      A.  Yes.
12      Q.  Have you ever been deposed in a civil matter
13 before?
14      A.  Yes.
15      Q.  How many times?
16      A.  Do not know.
17      Q.  You're aware of the rules of a deposition, what
18 we're trying to accomplish here right?
19      A.  Yes.
20      Q.  Okay.  As a brief reminder, no one wants guessing,
21 I want to communicate with you.  If you don't understand my
22 question, ask me to restate it, rephrase it or give up on it,
23 okay?
24      A.  Yes, sir.
25      Q.  As you're doing, verbal responses are needed.  We

7

1  all use body language at one point or another, but because
2  we're creating a written record, if I point to the court
3  reporter, I'm not trying to be rude, it's I need an answer,
4  not a head shake or something like that.  If that doesn't get
5  through, I'll just ask, was that a yes or was that a no.  I
6  don't want that to be offensive to you, okay?
7       A.  Yes, sir.
8       Q.  If you need a break, say so.  Do you have any
9  condition that would allow -- make you have to leave here
10 quickly if you needed a break?
11      A.  No.
12      Q.  Okay.  Then that being the case, I'd like to finish
13 our thought process, if we can, in a question and answer,
14 before we were to take a break, if you want a break, okay?
15      A.  Yes, sir.
16      Q.  Describe how you were trained to cuff a person.
17      A.  How would you like me to describe it?
18      Q.  In a prone restraint, what was the process for
19 handcuffing someone during an arrest?
20      A.  You come up from behind him, place one hand in the
21 handcuff, bring the other around, place the second hand in
22 the handcuff.
23      Q.  Were you ever trained to ask to give me your hand,
24 sir?
25      A.  Yes.

8

1       Q.  And is that part of the protocol, ask first?
2       A.  Not that recall.  It's not part of the policy.
3       Q.  Okay.  Is part of the policy to aggressively grab
4  it and pull it?
5       A.  No.
6       Q.  Are manners part of your interaction with even
7  somebody that you are believing you need to arrest?
8       A.  Yes.
9       Q.  Would you agree that policy, ethics and manners,
10 all or any of those would say, prior to cuffing someone,
11 especially someone who's being compliant, you ask them for
12 his hand?
13      MR. BURKE:  Object to form.
14      A.  I don't recall the word manners in a policy.
15      Q.  Okay.  Ethics and policy; ask first?
16      A.  Yes.
17      MR. BURKE:  Object to form.
18      MR. REYNOLDS:  Join.
19      Q.  And by ask first, I mean, ask for his hand first
20 before doing anything?
21      A.  Yes.
22      Q.  When you do a process of applying handcuffs, is it
23 supposed to be with hands behind the back?
24      A.  Not necessarily.
25      Q.  Okay.  So you can cuff from the front?

9

1    A.  Yes.
2    Q.  What's the difference as to when you would do one
3 versus the other, under policy, as you were trained?
4    A.  Depends on the circumstances.
5    Q.  Okay.  Give me some circumstances of what makes the
6 difference.
7    A.  A circumstance would be a extremely obese person
8 and you do not have access to larger cuffs, you temporarily
9 handcuff them in the front.
10    Q.  Okay.
11       MR. BURKE:  Can you keep your voice up just a
12    little bit, too, Officer?  I'm having trouble hearing
13    you.
14       THE WITNESS:  Yes.
15       MR. MCKEE:  Yeah, we have a fan in here, the air
16    conditioner or something is kind of intrusive.  Thank
17    you.
18 BY MR. MCKEE:
19    Q.  Are there any other circumstances in which, by
20 policy, you're allowed to cuff from the front, hands in the
21 front?
22    A.  I don't recall any other circumstance.
23    Q.  How obese is obese?  What do you mean by that?
24 What's the policy?
25       MR. REYNOLDS:  Objection, form.

10

1    A.  I don't recall there being a policy on obesity.
2    Q.  Is there any policy on age and cuffing in the
3 front?
4    A.  I believe the policy specifies to age, but not to a
5 specific number.
6    Q.  What do you recall about the policy as it relates
7 to age and front cuffing?
8    A.  I don't recall any age in the front cuffing
9 section.
10    Q.  Were you ever trained that as you get older, your
11 joints hurt?
12    A.  No.
13    Q.  Was there any training that as one ages, cuffing
14 from behind can be very painful to one's shoulder joints?
15    A.  I don't remember specific training in that.
16    Q.  Does that mean it didn't happen or that you just
17 don't remember such training?
18    A.  I don't remember such training.
19    Q.  Do you remember Policy 03.15.02.02, capital D,
20 which states, and I'll quote for you, "When there is no
21 indication that they are capable of successful escape or
22 would pose a threat to the officer or others, the officer may
23 handcuff the prisoner/detainee with his/her hands in front
24 where the individual (1) is in an obvious state of pregnancy,
25 (2) elderly or frail, (3) young juveniles, (4) has a physical

11

1 handicap, or (5) has injuries that could be aggravated by
2 standard handcuffing procedures."  Do you remember that one?
3    A.  Not that specific section, no.
4    Q.  No?
5    Oddly enough, obesity wasn't in that list, was it?
6    A.  No.
7    Q.  But you remember one that dealt with obesity in
8 your training?
9    A.  No.
10    Q.  Did you just testify that you thought obesity would
11 give you a route to being allowed by policy to cuffing in the
12 front?
13    A.  You asked for an example of what would be allowed.
14    Q.  Okay.  And obesity is also one?
15    A.  As an example, yes.
16       MR. BURKE:  Could you tell us the General Order,
17    would you mind?  I know you gave us the whole --
18       MR. MCKEE:  Yeah.
19       MR. BURKE:  Just, there's a number in the front.
20       MR. MCKEE:  I was looking at the General Order --
21       MS. LEWIS:  03.15.
22       MR. BURKE:  Thank you.
23       MR. MCKEE:  Dated 3/21, 2010.
24       MR. BURKE:  Thank you.
25       MR. MCKEE:  As a date of effectiveness.

12

1       MR. BURKE:  Thank you.
2 BY MR. MCKEE:
3    Q.  Were you ever trained prior, to the Eimers
4 incident, about what a prone position can present as risks to
5 the detainee during your arrest process?
6    A.  Yes.
7    Q.  Did that include the physiological aspects of risk
8 to the detainee when being cuffed in a prone position?
9    A.  Yes.
10    Q.  Describe for me what risks you remember in your
11 training.
12    A.  I have training in positional asphyxiation.
13    Q.  Describe what you learned as you recall it today.
14    A.  A prone position, as well as many other positions,
15 can place a slightly higher risk of asphyxiation on a person.
16    Q.  Did you learn that the lack of oxygen may also
17 cause events, harmful events, to occur with the human heart?
18    A.  No.
19    Q.  You never had that training?
20    A.  No.
21    Q.  Are you aware, outside of your own training in the
22 police department, that oxygen deprivation can cause harmful
23 effects to the heart?
24    A.  Yes.
25    Q.  Did you learn that fear of asphyxiation can cause

13

```
 1   adverse heart reactions?
 2        A.  No.
 3        Q.  Never had that training?
 4        A.  No.
 5        Q.  And have never learned it in your otherwise non-
 6   professional life?
 7        A.  No.
 8        Q.  When we talk about the prone restraint -- and my
 9   goal here is not to be malicious.  My goal here is to try to
10   communicate an idea.
11            Have you ever learned about various ways that
12   torture can cause asphyxiation?
13        A.  No.
14        Q.  Did you ever know that crucifixion doesn't cause
15   death by bleeding, it causes it by asphyxiation?
16        A.  No.
17        Q.  Did you know that --
18            MR. BURKE:  Keep your voice up if you would,
19   Officer Garrido.  We cannot hear you.  You've got to
20   speak louder.
21            THE WITNESS:  I'll attempt to speak louder.
22   BY MR. MCKEE:
23        Q.  Did you know that back in the day, or actually,
24   there may still be crucifixions in some part of this world,
25   that being put on a cross, your body weight leaning forward
```

14

```
 1   with your arms held behind you, causes you to eventually die
 2   of asphyxiation?
 3        A.  I did not know that.
 4        Q.  Ever have a snake for a pet?
 5        A.  No.
 6        Q.  Ever learn anything about how constrictors kill
 7   their prey?
 8        A.  Yes.
 9        Q.  What's your understanding of how that works?
10        A.  They squeeze, squeeze the air out of the prey.
11        Q.  Actually, did you know, they don't do that?  That
12   each time the animal breaths, further pressure causes it less
13   able to move its diaphragm, and so it gets less and less able
14   to breath with each exhalation.  Did you know that?
15        A.  No.
16        Q.  Do you know how quickly someone can lose
17   consciousness with a lack of oxygen?
18        A.  No.
19        Q.  Were you ever taught a choke-hold that will cause
20   almost immediate blackout?
21        A.  No.
22        Q.  Have you ever wrestled?
23        A.  No.
24        Q.  Have you ever had wrestling training?
25        A.  No.
```

15

```
 1        Q.  Are you aware that there's a point on your neck
 2   that, with pressure, you can cause someone to black out in
 3   less than ten seconds?
 4        A.  No.
 5        Q.  As you -- as the day of the Eimers event came last
 6   Thanksgiving, did you know that a prone position with the
 7   arms pulled backwards could cause a human being to have
 8   breathing stress?
 9        A.  No.
10        Q.  So, in your training, you didn't learn that
11   asphyxia can happen with the prone position, arms drawn
12   backwards?
13        A.  No.
14        Q.  Did you learn that pressure on the back of the
15   restrained person during a prone restraint can cause loss of
16   oxygenation?
17        A.  That was not a course, no.
18        Q.  When you describe the courses in positional
19   asphyxia, you had that course, right?
20        A.  It was a block in a course, yes.
21        Q.  Okay.  You learned that in that prone position,
22   asphyxia can happen?
23        A.  Yes.
24        Q.  What's your understanding, based on what you were
25   trained, on how that happens in that position?
```

16

```
 1        A.  A person's weight on his chest could make it
 2   slightly more difficult to breath.
 3        Q.  Just his own weight?
 4        A.  From what I understand, yes.
 5        Q.  Okay.  So, if you add more weight, it's even more
 6   difficult to breath, right?
 7        A.  Yes.
 8        Q.  So the officers involved in that type of restraint,
 9   if they're applying additional mass to the back of the
10   detainee, that's additional stress that you learned about
11   that could cause one to either lose an ability to breath or
12   reduce an ability to breath, correct?
13            MR. BURKE:  Object to form.
14   BY MR. MCKEE:
15        Q.  You learned that?
16            MR. REYNOLDS:  Join.
17        A.  That could happen.
18        Q.  Did you get trained on the requirement to monitor
19   the breathing of a prone restraint detainee?
20        A.  I do not recall that specific block of that
21   training.
22        Q.  Do you know whether it happened at all, that you
23   were trained about monitoring the breathing patterns of a
24   prone restraint detainee?
25        A.  I don't recall if, while someone is the prone, how
```

17

```
 1   to monitor their breathing.
 2       Q.  Were you ever trained of a -- on how to do a prone
 3   restraint on a soft surface such as sand?
 4       A.  No.
 5       Q.  Did you ever, through training or otherwise,
 6   participate in being the detainee in a prone restraint?
 7       A.  Yes.
 8       Q.  Was that ever done on sand?
 9       A.  No.
10       Q.  Was it ever done on shallow water?
11       A.  No.
12       Q.  Was it ever done where the surface on which you're
13   being pinned could aid in your lack of ability to breath?
14       A.  Just being on asphalt.
15       Q.  Just a hard, flat surface?
16       A.  Yes.
17       Q.  Would you agree that the more weight that is placed
18   on the back of a prone restraint detainee, the more severe
19   the degree of compression on his capacity to breath?
20       A.  Theoretically, yes.
21       Q.  Would you agree that on a soft surface, which may
22   also contain inhalable particles, that that would also have a
23   potential to decrease his ability to breath?
24       MR. BURKE:  Object to form.  Go ahead.
25       A.  No, I don't know.
```

18

```
 1       Q.  Because you weren't trained in that?
 2       A.  Correct.
 3       Q.  Does it make sense that that would be the case?
 4       MR. BURKE:  Object to form.
 5       A.  To me, sand would be giving and may be less
 6   restrictive than a solid surface.
 7       Q.  But if you're inhaling it, it would not be so
 8   forgiving, would it?
 9       MR. BURKE:  Object to form.
10       A.  I don't know.
11       Q.  Have you ever attempted to breath in a dusty
12   scenario?
13       A.  Yes.
14       Q.  It's more difficult, isn't it?
15       A.  Yes.
16       Q.  Were you ever trained that a prone restraint causes
17   the detainee to actually physically react when he can't
18   breath properly?
19       A.  No.
20       Q.  You never received that sort of training of what
21   you could expect physiologically from an individual when he's
22   fearful of not being able to breath?
23       A.  No.
24       Q.  Were you ever trained on the physiological aspects
25   that when an individual feels he cannot breath, he will
```

19

```
 1   struggle as if he is resisting, because he's fighting for his
 2   life?
 3       A.  I do not recall that part of the training.
 4       Q.  Does that mean you didn't receive that kind of
 5   training or you just don't remember what it was about?
 6       A.  I may not remember the block of training.
 7       Q.  You're supposed to get that training every two
 8   years?
 9       MR. REYNOLDS:  Objection, form.
10   BY MR. MCKEE:
11       Q.  That type of training?
12       A.  I don't know.
13       Q.  Do you know whether you've had that kind of
14   training in the two years before the Eimers event?
15       A.  I don't know.
16       Q.  By the way, have you reviewed anything today or
17   prior to today for today's deposition?
18       A.  Yes.
19       Q.  What have you reviewed?  And I don't want to talk
20   about anything you've discussed with your lawyer.  What
21   you've reviewed, read, watched, listened to that's not a
22   lawyer's voice, that's what I'm talking about.
23       A.  My report and my FDLE interview.
24       Q.  Have you ever reviewed, other than at yesterday's
25   deposition in which you sat and watched, have you ever
```

20

```
 1   reviewed videotapes of the event?
 2       A.  Yes.
 3       Q.  When was the last time you reviewed that, other
 4   than yesterday?
 5       A.  I don't know.
 6       Q.  In the last six months?
 7       A.  I don't recall a time frame.
 8       Q.  When is the first time you saw a video of the
 9   event?
10       A.  After the event.
11       Q.  When?
12       A.  I don't recall a time frame on how long after the
13   event.
14       Q.  Within a month?
15       A.  I don't recall.
16       Q.  Same day as the event?
17       MR. BURKE:  Object to the form.
18       A.  No.
19       Q.  It was not on the same day as the event?
20       A.  No.
21       Q.  Was it on the weekend of the event?
22       A.  I don't know.
23       Q.  Was it before you wrote your report, your
24   supplemental report?
25       A.  I don't know.
```

**21**

1  Q.  When you wrote your supplemental report, had you
2  seen the tourist video?
3  A.  I don't know.
4  Q.  When you wrote your report and learned of the
5  tourist video, did you rewrite your supplemental report?
6  A.  I don't know whether I looked at the video before
7  or after, but I never rewrote my supplemental report.
8  Q.  When you were aware that a tourist video existed
9  before you wrote your supplemental report?
10  A.  I don't remember at what time I saw the video,
11  whether I saw it before or after my supplemental report.
12  Q.  When you wrote your supplemental report and then
13  learned of the video, did you wonder whether your report
14  comported what the video showed?
15  A.  I don't know when I saw the video, so I don't know
16  what I was thinking when I saw the video.
17  Q.  Prior to the Eimers event, were you ever trained
18  that Great Britain had outlawed the prone restraint method of
19  detaining?
20  A.  I was not.
21  Q.  Were you ever made aware that Colorado outlawed it?
22  A.  I was not.
23  Q.  Were you aware of any other governmental entity
24  that has reduced or eliminated prone restraint as a method of
25  restraining a detainee?

**22**

1  A.  No.
2  Q.  That never came up in any of your training?
3  A.  Not that I can recall.
4  Q.  During a prone restraint when a detainee is under
5  the fear of asphyxia, were you trained or aware that it can
6  cause a panic in that person?
7  MR. BURKE:  Object to form.
8  A.  Specifically in the prone, no.
9  Q.  In any other kind of restraint does that arise or
10  were you trained in whether that arises?
11  A.  Not in a restraint, no.
12  Q.  In what capacity are you aware through your
13  training of a panic that might arise in the detainee?
14  A.  When someone's in fear in general, it could happen,
15  panic could result.
16  Q.  Okay.  Would you agree that that kind of panic
17  could arise when one has surrendered, has three guns pointed
18  at him, and is being violently placed into handcuffs?  Would
19  such a panic be one of the events that could arise with that
20  individual?
21  MR. BURKE:  Object to form.
22  MR. REYNOLDS:  Join.
23  A.  I don't know.
24  Q.  Did you have any training in that regard?
25  A.  When a person would feel panic?

**23**

1  Q.  Yes.
2  A.  No.
3  Q.  Were you trained at all about a response of a
4  detainee to panic?
5  A.  Every person panics at different points.
6  Q.  Were you trained that that can have an impact on
7  one's heart, healthy or otherwise?
8  A.  Panic?
9  Q.  Yeah.  That panic can set up chemical reactions
10  that could affect the heart?
11  A.  No.
12  Q.  You never received that kind of training?
13  A.  Not that I can recall.
14  Q.  Can the age of a detainee impact the ability of his
15  heart to endure the stresses of a detainment?  Were you ever
16  trained in that area?
17  MR. BURKE:  Object to form.
18  MR. REYNOLDS:  Join.
19  A.  Not that I can recall in a healthy person.
20  Q.  How about one with -- which may be older, 60 or
21  older; can his age, were you trained that his age is
22  something you have to be aware of when you're dealing with
23  someone in a restraining arrest situation?
24  A.  I recall that it's something you should take into
25  consideration, but not that a specific age may be more or

**24**

1  less likely.
2  Q.  Were you ever trained to ask a detainee whether
3  they have a condition before you start doing some aggressive
4  physical altercation with them?
5  MR. BURKE:  Object to form.
6  A.  No.
7  Q.  I want to take you straight to November 28, 2013,
8  last Thanksgiving.  Okay?
9  A.  Yes, sir.
10  Q.  Do you have a pretty good recollection of that day?
11  A.  I believe I do.
12  Q.  Where were you when you first learned of a PT
13  Cruiser that had left the scene of a traffic stop?
14  A.  I was near the Palm Avenue bridge.
15  Q.  And what were you doing there?
16  A.  I had just gotten fuel.  That's where the fuel
17  pumps are.
18  Q.  And how did you learn of that PT Cruiser?
19  A.  Over the police radio.
20  Q.  And what did you do?
21  A.  I responded toward where the officer who was
22  engaged in the stop, last reported the vehicle was.
23  Q.  And the officer who reported it was whom?
24  A.  Officer Celcer.
25  Q.  What did you next do?

25

1    A.  I responded to where I believed he was.
2    Q.  Did you locate him?
3    A.  Yes.
4    Q.  What next happened?
5    A.  I got behind Officer Celcer and continued westbound
6  on North Roosevelt Boulevard.
7    Q.  And was Officer Celcer immediately behind the PT
8  Cruiser or were there other cars between him and the PT
9  Cruiser?
10    A.  I recall him at that time being immediately behind.
11    Q.  And so that would mean that it was the PT Cruiser
12  of Mr. Eimers, Officer Celcer's vehicle, and immediately
13  followed by your vehicle?
14    A.  From what I recall, yes.
15    Q.  What next happened?
16    A.  I followed the vehicles, but was stopped at a
17  stoplight on Truman Avenue.
18    Q.  As of that time, had the radio order come on to
19  activate your dash cams?
20    A.  I don't recall.
21    Q.  But you're aware that such an order came out?
22    A.  Yes.
23    Q.  Did you comply?
24    A.  As I recall, I did.
25    Q.  Okay.  Do you know of any officer that did not

26

1  comply that day?
2    A.  I do not.
3    Q.  Is policy that when ordered to turn on the dash
4  cams, announced over the radio for those who were involved in
5  that pursuit, that that must be done?
6    A.  Yes.
7    Q.  And you did comply?
8    A.  As far as I remember, yes.
9    Q.  Have you ever seen your dash cam?
10    A.  Not that I can recall.
11    Q.  Was there ever a time that it malfunctioned on that
12  day, to your knowledge?
13    A.  Not that I can recall.
14    Q.  Have you ever asked to see your dash cam?
15    A.  No.
16    Q.  Do you know where the footage is of your dash cam?
17    A.  No.
18    Q.  Do you know whether it's complete?
19    A.  Complete.
20    Q.  Meaning no one has deleted it?
21    A.  I do not know the condition of my video.
22    Q.  Did anyone download the information from your dash
23  cam and preserve it, all of it?
24    A.  It was downloaded.
25    Q.  Who did that?

27

1    A.  I don't remember.
2    Q.  If you wanted to have your dash cam info
3  downloaded, who would you ask to do it?
4    A.  It would be a sergeant.
5    Q.  At that time, which sergeant?
6    A.  At that time, Sergeant Zamora and Sergeant Robert
7  Allen were working -- or, Sergeant Allen was not working.
8  I'm sorry.  But, I do not recall if it was him who downloaded
9  it.
10    Q.  I hate to say it, but I just didn't understand the
11  second sergeant that you identified other than Zamora.  Who,
12  who was that?
13    A.  Sergeant Robert Allen.
14    Q.  The last name again, spell it?
15    MR. BURKE:  Robert Allen.
16    MR. MCKEE:  Allen.
17    A.  Allen.
18    Q.  I'm sorry.  The noise is getting to me, too.  Plus,
19  you speak quickly for me.
20    So Sergeant Allen was not on duty that day?
21    A.  I recall he was not.
22    Q.  Was he on duty the next week?
23    A.  I don't know.
24    MR. BURKE:  Keep your voice up, Officer.  I'm
25  sorry.

28

1    THE WITNESS:  Sorry.  I'm a low speaker normally.
2    MR. BURKE:  I know, you're soft spoken, but --
3    MR. MCKEE:  And I normally am, too, but in this
4  process, I've learned I've got to speak up.
5    Q.  In the week after this event with Eimers, did
6  anyone ask you for any recording devices that you possess?
7    A.  I don't recall if I asked to submit it a week
8  after.
9    Q.  That day, did you have any sort of mechanism on you
10  that recorded audio or video?
11    A.  I don't believe I had my audio recording on me.
12    Q.  Where was it that day?
13    A.  In the vehicle.
14    Q.  Did you ever activate it during the Eimers event?
15    A.  The audio recording on my person was not on me.
16    Q.  Before I get too far afield from the prone
17  restraint, when you pull an arm behind one's back to cuff
18  them, were you trained to bend it at the elbow to aid in its
19  flexibility?
20    A.  I don't recall if we were trained to bend it at the
21  elbow.
22    Q.  Are you aware that there's a point at which there's
23  almost no way that a human can -- to oppose an elbow bent in
24  the correct position, in that position
25    A.  Yes.

29

1  Q. So it facilitates an easier, less painful way of
2  cuffing if you cause it to bend at the elbow, correct?
3  A. Yes.
4  Q. Back to the scene.
5  So you've taken us to the point that you have
6  complied with the order to activate your dash cam and you are
7  in pursuit with Officer Celcer of the PT Cruiser, correct?
8  A. I'm following.
9  Q. During the time that you're following, has Officer
10  Celcer described what he perceived to be the mental state of
11  this driver of this vehicle?
12  A. Not that I recall.
13  Q. Did he indicate that this man may have some mental
14  faculty problem?
15  A. Not that I recall.
16  Q. Did he describe what Mr. Eimers said to him when he
17  did stop him, during this chase period?
18  A. Can you say that again?
19  Q. Yeah.
20  A. I'm sorry.
21  Q. Prior to getting to the point where your exiting
22  your vehicle and Mr. Eimers has stopped and gotten out of his
23  car, prior to that time, has anyone communicated to you,
24  through the radio or in person, that Mr. Eimers didn't sound
25  quite right when Officer Celcer had stopped him?

30

1  MR. BURKE: Object to form.
2  A. Not that I can recall.
3  Q. If that had happened, had you ever received
4  training on how to deal with detaining such a person?
5  MR. BURKE: Object to form.
6  A. Yes.
7  Q. Describe what you were trained.
8  A. We were trained that regardless of a person's
9  mental status, you need to take precautions in detaining
10  them, and that a person who is ill or is mentally ill, could
11  still be as violent or more violent in some cases than
12  another person.
13  Q. Were you ever trained that it could be a sign that
14  they have a physical problem that could be hazardous to them?
15  MR. BURKE: Object to form.
16  A. That what could be a sign?
17  Q. That a -- odd statements being made could indicate
18  a problem with the brain or the functioning of the heart such
19  that a person who would not ordinarily be violent, or
20  dangerous, or with a health risk, becomes one?
21  MR. BURKE: Object to form.
22  A. Yes.
23  Q. Were you ever trained that that could be a sign
24  that he is having a health problem which a physical
25  altercation could cause additional harm to him?

31

1  MR. BURKE: Object to form.
2  A. Yes.
3  Q. And you had that before the Eimers altercation?
4  A. Far as I recall, yes.
5  Q. And that physical harm could include things such as
6  heart attack? That's what you were trained, right?
7  MR. BURKE: Object to form.
8  A. Yes.
9  Q. So, prior to arriving at Southernmost and getting
10  out of your vehicle, had anyone from the police department
11  informed you that this individual might have such a
12  condition?
13  A. Not that I can recall, no.
14  Q. Okay. You took us to an intersection. What
15  happened next?
16  A. I was stopped at the red light. The vehicle
17  continued and I lost sight of the vehicle.
18  Q. Did Celcer continue?
19  A. I don't recall where he was at the time I stopped
20  at the red light.
21  Q. Were other police vehicles in pursuit in the same
22  line with you by then?
23  A. I don't recall at that time if other vehicles had
24  joined in with us.
25  Q. Okay. What did you next do?

32

1  A. I monitored my radio and was hearing where other
2  officers were calling out the vehicle's position.
3  Q. Okay. And with that, did you continue to pursue,
4  as the traffic signals allowed you, into the direction that
5  they were describing?
6  A. I followed using my radio in the direction that I
7  thought the vehicle would be going.
8  Q. Where did you end up going?
9  A. To Thomas Street.
10  Q. By the way, what was the maximum speed you needed
11  to apply to keep up with the PT Cruiser?
12  MR. BURKE: This is before the Truman light?
13  MR. MCKEE: Correct.
14  A. I don't recall the speed at which I was going.
15  Q. Was it ever more than 45?
16  A. I don't, I don't recall.
17  Q. Did you feel like you were flying as you were
18  pursuing this guy or were you kind of at the speed of traffic
19  for the most part?
20  MR. BURKE: Object to form.
21  MR. REYNOLDS: Join.
22  BY MR. MCKEE:
23  Q. If you recall.
24  A. I don't recall.
25  Q. So is there any instrument in the car that actually

**33**

1  logs your speed during a chase?
2      A.  To my knowledge, the ICOP system does have a speed
3  on it.
4      Q.  Do you have to activate it?
5      A.  No.
6      Q.  So would there be an instrument that would actually
7  have retained information about how fast you were going when
8  you were in this pursuit of the PT Cruiser?
9      A.  It is my understanding that if my ICOP was
10  activated, the speed would be recorded.
11      Q.  And is it your understanding that it was activated
12  that day?
13      A.  Yes.
14      Q.  Do you know whether that information has been
15  preserved?
16      A.  I don't know.
17      Q.  Once you got to Truman, what did you do?
18      A.  After being stopped at the light, like I said, I
19  monitored my radio.  Heard he was driving throughout the
20  Village, Bahama Village.  I ended up on Thomas Street and
21  headed toward Amelia Street.  That was when I saw him cross
22  over Ameila -- over Thomas Street, and I was able to get
23  behind him once again.
24      Q.  So you got immediately behind him at that point?
25      A.  There was a vehicle in front of me.

**34**

1      Q.  Was it a police vehicle or someone --
2      A.  There was a patrol vehicle in front of me, yes.
3      Q.  Do you know who that was?
4      A.  To my recollection, it was Officer Henry Del Valle.
5      MR. BURKE:  I didn't hear the answer.
6      THE WITNESS:  Henry Del Valle.  Officer Henry Del
7  Valle.
8      MR. BURKE:  Okay.
9      Q.  A little bit off track.  The dash cam, you say it
10  was downloaded after this event, right?
11      A.  Yes.
12      Q.  Where are the downloads stored, to your knowledge?
13      A.  I don't know where the system is.
14      Q.  Is it with the police station?
15      MR. BURKE:  Object to form.
16      A.  It is downloaded in the sergeant's office.  After
17  that, I don't know where they're stored.
18      Q.  Okay.  Have you ever been involved in an in-custody
19  death before?
20      A.  No.
21      Q.  Since?
22      A.  No.
23      Q.  Ever have training about what to do with videotapes
24  that you may have participated in, in causing to occur, such
25  as a dash cam or any other device such as a Taser, and what

**35**

1  to do with the downloading of it?
2      A.  Provide it to a supervisor so it may be downloaded.
3      Q.  Were you ever interviewed by the FDLE?
4      A.  Yes.
5      Q.  Did you ever see your dash cam when, either in
6  advance of or during, your interview with the FDLE?
7      A.  I don't recall seeing my dash cam video.
8      Q.  Ever?
9      A.  I don't recall seeing my dash cam video.
10      Q.  But my question is ever.
11      A.  Ever.
12      Q.  Okay.  And when you're in a pursuit and the speed
13  limit is exceeded, must you turn on your lights, siren and
14  activate a video cam?
15      MR. BURKE:  Object to form.
16      A.  If we were in a pursuit.  We were not in a pursuit.
17      Q.  You were not in a pursuit that day?
18      A.  No.
19      Q.  So that's why you were ordered to turn on the dash
20  cam?
21      MR. BURKE:  Object to form.
22      MR. REYNOLDS:  Join.
23      A.  You'd have to ask the supervisor who ordered that.
24  That could be a reason.
25      Q.  But you were ordered to turn it on that day?

**36**

1      A.  Yes.
2      Q.  But you were not in pursuit?
3      A.  Correct.
4      Q.  How do you describe that event that day, if not a
5  pursuit of the PT Cruiser?
6      A.  We followed it through the city.
7      Q.  Okay.  So you get to the point where you're right
8  behind Officer Del Valle and the PT Cruiser.  What happened
9  next?
10      A.  The, from what I recall, the three of us turned
11  onto Duval Street headed southbound.  I again was stopped at
12  a light, I don't recall which light, on Duval Street, and the
13  other vehicles continued.
14      Q.  There's only like one or two lights the rest of
15  that track to Southernmost, right?
16      A.  Correct.  There's only -- there's only a couple
17  more lights.
18      Q.  Okay.  But Officer Del Valle and the PT Cruiser
19  proceeded, and you got stopped at the light?
20      A.  Yes.
21      Q.  What did you next do?
22      A.  I heard that the vehicle was turning onto the beach
23  at the Southernmost Cafe.
24      Q.  What did you next do?
25      A.  I responded to the beach, parked my vehicle, and

9 (Pages 33 to 36)

37

saw Officer Del Valle exiting his vehicle with his weapon.

Q. Now, you had the benefit of seeing a tourist video yesterday and you did watch it, correct?

A. Yes.

Q. Did that help refresh your recollection of events and who was there and what was going on?

A. Yes.

Q. To some degree. Okay.

Going to go specifically, but inch by inch, through what happened next, okay? Little by little.

MR. BURKE: Object to form. Go ahead, the best you can.

BY MR. MCKEE:

Q. Just trying to make sure you understand, I want to take this slice by slice, if we can, to the best of your recollection. Okay?

A. Yes.

Q. So you got to the area, got out of your car. What did you see at that moment in time when you got out of your car?

A. I saw the PT Cruiser on the beach. I saw Officer Henry Del Valle exit his vehicle.

Q. Where was he in relation to the PT Cruiser?

A. His vehicle was in front of mine, as I recall.

Q. On the street?

38

A. Yes.

Q. Okay. And so, he got out of his car, and you saw him exit his car?

A. Yes.

Q. What did he do as you saw?

A. I saw him exit his vehicle with his patrol rifle.

Q. Okay. So he had the rifle in a position that he could use it if he needed to?

A. I don't recall which position he had his rifle in.

Q. You saw it in the video yesterday, right?

A. Yes, but I don't recall seeing whether he -- what position he had it.

Q. Was he running or walking, as you recall?

A. I don't recall the -- what speed. I don't recall what speed he was going.

Q. Was he the first officer at the scene, to your recollection?

A. I don't recall if he was first.

Q. It would make sense for him to be first if he was immediately behind the PT Cruiser, right?

MR. BURKE: Object to form.

A. It would, yes.

Q. You're not aware of any officer that actually anticipated that that's where the chase -- that's where the follow would end, at that beach, and beat everyone to it,

39

right?

A. I'm not aware of that.

Q. Okay. So it's likely that Officer Del Valle was the first one at the scene, correct?

MR. BURKE: Object to form.

BY MR. MCKEE:

Q. Based on your recollection?

A. I do not know if he's the first one at the scene.

Q. Are you aware of anyone else being there first?

A. Prior, prior to Officer Del Valle and I?

Q. Yes.

A. Before us, I'm not aware of.

Q. Okay. So about how much time elapsed before you got out of your car in comparison to when Officer Del Valle got out of his?

A. Time frame, I don't know. I got out as quickly as I could.

Q. Had Officer Del Valle made it to the beach before you got out of your car?

A. I don't recall whether he was all the way on the beach.

Q. Was he pointing his rifle at Mr. Eimers?

A. At which time?

Q. At the time that you saw him?

A. When I first saw him, I don't recall if he had his

40

weapon pointed at Mr. Eimers.

Q. Did there come a time that you saw him pointing his weapon at Mr. Eimers?

A. I did see that, yes.

Q. Was he giving any orders to Mr. Eimers?

A. I heard loud verbal commands.

Q. Okay. Do you remember the commands you heard?

A. I don't recall the specific commands.

Q. When -- did you see Mr. Eimers exit his vehicle?

A. I did.

Q. Was he running?

A. No.

Q. Was he moving with apparently no difficulty?

A. It appeared to me, from what I remember.

Q. And was he walking?

A. From what I remember, he was walking.

Q. And was he walking towards the restaurant?

A. I recall him walking toward myself and Officer Del Valle.

Q. Where were you located?

A. At the point I saw him exiting his vehicle, I had begun to walk onto the beach.

Q. Okay. So wouldn't that have been the opposite direction from the restaurant?

A. Opposite from?

41

```
1       Q.  Wouldn't your location be opposite to the other
2   side of where the restaurant was?
3       A.  I was directly west of the restaurant.
4       Q.  Okay.  And didn't Mr. Eimers get out of his car,
5   walk down the side of his car towards the restaurant?
6       A.  I recall him walking north, which would have been
7   toward Officer Del Valle and I.
8       Q.  Okay.  Did you see the videotape yesterday?
9       A.  I did.
10      Q.  And is that what you thought you saw then, too?
11      A.  It is.
12      Q.  Okay.  Was he -- were his hands exposed?
13      A.  I don't recall where his hands were at that time.
14      Q.  At that moment, based on your recollection, was
15  there anything about his person that made you think he was
16  carrying a weapon?
17      A.  He had a lot of clothing on, so it was an unknown.
18      Q.  But in his hands, you know that they were empty of
19  any weapon?
20      A.  I don't recall where his hands were, so I couldn't
21  recall at that time if I had seen a weapon or not.
22      Q.  Is that something you were trained to look for at
23  the beginning of attempting to detain someone?
24      A.  Yes.
25      Q.  Did you do it that day?
```

42

```
1       A.  I don't recall if I saw his hands.
2       Q.  You saw the video yesterday.  His hands were at his
3   sides, open air and nothing in them, right?
4           MR. BURKE:  Object to form.
5           MR. REYNOLDS:  Join.
6       A.  The video was from across the beach.  I don't
7   recall where his hands were when we first saw him.
8       Q.  And you didn't note at the time of the incident
9   whether he had anything in his hands?
10      A.  I don't recall as I was approaching him.
11      Q.  Did you follow your procedure to verify he had
12  nothing in his hands before getting too much closer?
13      A.  When we first saw him and as I was approaching, I
14  don't recall what I was thinking about his hands.
15      Q.  Did you see anything about him that indicated to
16  you he was probably armed?
17      A.  Other than a large amount of clothing, I did not
18  see a weapon as I approached.
19      Q.  You'll agree with me that clothing is not arms,
20  right?
21      A.  Correct.
22      Q.  And you know subsequent to all this, he was not
23  armed?
24      A.  Yes.
25      Q.  But on that day, prior to actually physically
```

43

```
1   confronting him, you didn't see any arms, either?
2       A.  I didn't see a weapon.
3       Q.  Of any type.
4           And so, you're saying that Mr. Eimers was
5   approaching the two of you?
6       A.  From what I remember, yes.
7       Q.  Was he approaching in a way that seemed to be
8   threatening?
9       A.  Not that I can recall.
10      Q.  He wasn't yelling at you?
11      A.  No.
12      Q.  He was actually absolutely silent, right?
13      A.  I could not hear him.
14      Q.  But you could hear Officer Del Valle yelling orders
15  out to him?
16      A.  Yes.
17      Q.  Did he seem to be following Officer Del Valle's
18  orders?
19      A.  Yes.
20      Q.  He seemed compliant to you, correct?
21      A.  Yes.
22      Q.  As a matter of fact, what's the next thing you saw
23  him do after Officer Del Valle told him to get on the ground?
24      A.  He complied.
25      Q.  Did he comply in a physically aggressive way?
```

44

```
1       A.  No.
2       Q.  He carefully place himself down, first on his knees
3   and then, shortly thereafter, right onto his stomach, face
4   down, right?
5       A.  From what I recall, yes.
6       Q.  What next happened?
7       A.  I approached him.
8       Q.  Hold it, before we get there.
9           At that point, Officer Del Valle is pointing his
10  rifle at him, correct?
11      A.  At the point I approached him, Officer Del Valle
12  would have been behind me.  I wasn't watching him.
13      Q.  Okay.  Before Officer Del Valle is behind you and
14  he's ordering, in a loud voice, Mr. Eimers to get on the
15  ground, was he pointing his weapon at him?
16      A.  From what I recall, yes.
17      Q.  Okay.  Then what next happened?
18      A.  I approached Mr. Eimers.
19      Q.  Did you say anything to him?
20      A.  I did not.
21      Q.  Did you -- what were you going to do as you
22  approached him?
23      A.  Place him into handcuffs.
24      Q.  Did you ask him for his left hand?
25      A.  I did not.
```

11  (Pages 41 to 44)

45

1   Q.  Did you say, sir, for your safety and mine, I want
2   to handcuff you; did you say that?
3       A.  No.
4       Q.  Did you ask him, I'd like you to comply, just as
5   you did with Officer Del Valle, that you put your arms behind
6   your back and let me handcuff you for your safety and mine?
7       A.  No.
8       Q.  Were you ever trained to do something like that?
9       A.  Yes.
10      Q.  But you didn't do it that day?
11      A.  No.
12      Q.  Was the chase exciting to you?  Excuse me.
13          Was the follow exciting to you?
14      A.  No.
15      Q.  Were you with any anxiousness in your own body that
16  you perceived?
17      A.  Not greatly, no.
18      Q.  As you approached Mr. Eimers, this relatively older
19  man as compared to you, he was kind of heavy, overweight,
20  right?
21          MR. BURKE:  Object to form.
22          MR. REYNOLDS:  Join.
23  BY MR. MCKEE:
24      Q.  You saw that, right?
25          MR. BURKE:  Object to form.

46

1       A.  I don't recall him being specifically obese.
2       Q.  Did you consider that he was significantly older
3   than you?
4       A.  Yes.
5       Q.  And so, as you approached him, were you expecting
6   to have to do something physically aggressive or harmful to
7   this man?
8       A.  I was taking the circumstances as they came.
9       Q.  Right, but as they came, that was not in your mind,
10  was it?
11          MR. BURKE:  Object to form.
12      A.  What wasn't?
13      Q.  To do something physically aggressive to this man
14  when you approached him?
15      A.  No.
16      Q.  And nothing about what he was doing at that time,
17  on the sand, face down, when you were approaching him,
18  appeared to be suggestive that he wanted to do some harm to
19  you, agreed?
20      A.  At the time he became compliant?
21      Q.  Yes.
22      A.  Agreed, yes.
23      Q.  Okay.  And that's the time frame I'm talking about
24  now.  Once he's on the beach, he's face down, you're
25  approaching him, nothing about his conduct indicated a desire

47

1   to do harm to you as you perceived it, correct?
2       A.  As I approached him, no.
3       Q.  Okay.  And then, not following protocol, you
4   grabbed his left arm, correct?
5           MR. BURKE:  Object to form of the question.
6   BY MR. MCKEE:
7       Q.  And I'm using the word grabbed because you did,
8   right?
9       A.  Yes.
10          MR. REYNOLDS:  Join.
11      Q.  You grabbed his left arm, pulled it back and put a
12  cuff on it, correct?
13      A.  Yes.
14      Q.  You didn't ask him if you could do it, right?
15      A.  Correct.
16      Q.  And he's had a gun pointed at his head, right?
17          MR. BURKE:  Object to form.
18      A.  I don't know where the gun was pointed.
19      Q.  Would you think that event is scary if it was you
20  in his shoes?
21          MR. BURKE:  Object to form.
22          MR. REYNOLDS:  Join.
23      A.  I can't testify for what he was feeling.
24      Q.  Have you ever had a gun pointed at your head with
25  someone who might actually shoot you?

48

1       A.  No.
2       Q.  Have you anticipated what that might feel like for
3   you?
4       A.  No.
5       Q.  Do you think you'd be frightened?
6           MR. BURKE:  Object to form.
7       A.  Yes.
8       Q.  No one wants to die, do they?  Right?
9           MR. BURKE:  We'll stipulate to that.
10          MR. MCKEE:  I'm glad, but I'm talking to the
11      witness.
12  BY MR. MCKEE:
13      Q.  You don't want to die, do you?
14      A.  I don't.
15      Q.  It would be fearful if someone, when you are
16  unarmed, has a high-powered rifle pointed at you, right?
17          MR. BURKE:  Object to form.
18      A.  To me?
19      Q.  Yes.  To you.  To you.
20      A.  To me, yes.
21      Q.  And so, with your own human experience, do you
22  believe it likely was a frightful moment for Mr. Eimers?
23          MR. BURKE:  Object to the form of the question.
24  BY MR. MCKEE:
25      Q.  Based on your training

12  (Pages 45 to 48)

49

1  A.  I still don't want to testify as to how Mr. Eimers
2  was feeling.
3  Q.  No.  I'm asking you how you think a person, based
4  on your training, would feel right at that time.
5  MR. BURKE:  Same objection.
6  MR. REYNOLDS:  Join.
7  A.  I'm not going to testify to how someone else may
8  have been feeling or how I think they were feeling, sir.
9  Q.  See, this is the point of the training, though,
10 sir; do you understand that?  To have the empathy to know
11 what's going on before you, to know how physiologically
12 people will be responding.  You learned that, right?
13 MR. BURKE:  Object to the form of the question.
14 MR. REYNOLDS:  Join.
15 BY MR. MCKEE:
16 Q.  You learned that in training, right?
17 A.  Yes.
18 Q.  Okay.  That's what I'm getting at here, sir.
19 So, as you're approaching Mr. Eimers, you know he's
20 likely, based on your training, feeling fearful, right?
21 MR. BURKE:  Object to form.
22 A.  As I'm approaching Mr. Eimers, I'm not thinking on
23 if he's fearful or not.
24 Q.  So you're avoiding that part of your training, too?
25 MR. BURKE:  Object to the form of the question.

50

1  MR. REYNOLDS:  Join.
2  A.  I am trying to control the scene.
3  Q.  But you're also supposed to, under your training,
4  anticipate the physiological responses that may be
5  encountered by you, right?
6  MR. BURKE:  Object to the form of the question.
7  BY MR. MCKEE:
8  Q.  You're trained that?
9  MR. BURKE:  Object to the form of the question.
10 A.  Can you repeat the question?
11 Q.  Aren't you trained in this sort of circumstance to
12 understand the physiological emotional responses that you
13 might be encountering in this detainement, right?
14 A.  We are trained to --
15 MR. BURKE:  Object to form.  I'm sorry.
16 THE WITNESS:  We are trained to secure the scene.
17 MR. BURKE:  You don't have to wait for Mr. Brill to
18 finish his comments.
19 THE WITNESS:  We are trained to secure the scene.
20 BY MR. MCKEE:
21 Q.  Go ahead.
22 A.  We're trained to secure the scene.  For everybody's
23 safety and ourselves, the first thing we do is secure the
24 scene.
25 Q.  Okay.  So what you did is you made sure all the

51

1  people on the beach got out of the way first, right?
2  MR. BURKE:  Object to the form of the question.
3  A.  The way to secure the scene in this circumstance
4  was to detain Mr. Eimers.
5  Q.  Ah, okay.  So now, you're approaching Mr. Eimers
6  and you're trained how to do things so that you're not put in
7  danger and so that the detainee is not put in danger, right?
8  A.  Correct.
9  Q.  Okay.  What did you do to make sure Mr. Eimers was
10 not put in danger at that moment when you're approaching him?
11 A.  I attempted to detain him as quick as possible.
12 Q.  But you didn't talk to him, as you're trained,
13 right?
14 MR. BURKE:  Object to the form of the question,
15 it's argumentative.
16 BY MR. MCKEE:
17 Q.  Did you talk to him?
18 A.  I did not.
19 Q.  And you're the one that's coming to put handcuffs
20 on him, right?
21 A.  Correct.
22 MR. BURKE:  Object to the form of the question.
23 Q.  And you're trained to talk, to him to ask first,
24 right?
25 MR. BURKE:  Object to the form.  Go ahead, sir.

52

1  A.  Yes, trained to be giving commands.
2  Q.  And did you give him the command even?  Please let
3  me have your left hand and then follow it with your right
4  hand, sir.  Did you do that?
5  MR. BURKE:  Objection, argumentative and redundant.
6  A.  No.
7  Q.  So you didn't follow your training in that regard?
8  A.  We aren't trained to ask for a hand for a handcuff.
9  Q.  Gee, I could have sworn that you testified under
10 oath about a half-hour ago that that was part of your
11 training.
12 A.  I don't recall testifying that we're trained to ask
13 for a hand so it may be placed into a handcuff.  We are
14 trained to speak with a person as we are approaching to
15 handcuff them.
16 Q.  So you're not trained to say, you know, this man
17 may not be violent in any way, but I'm going to protect
18 myself and him, so let me say, sir, could you give me your
19 left hand, please?  You're not trained that?
20 MR. BURKE:  Object to the form of the question.
21 A.  I don't recall being trained specifically to ask
22 for a hand to be placed into a handcuff.
23 Q.  So if you testified to that about a half-hour ago,
24 were you lying then?
25 MR. BURKE:  Object to the form of the question.

13 (Pages 49 to 52)

53

```
1    BY MR. MCKEE:
2        Q.  Now that you know what the question is about, why I
3    asked it?
4        A.  I was not lying, but I don't recall being asked if
5    that is specifically what we were trained to.
6        Q.  Okay.  So you've approached him and you have not
7    said a word to him, right?
8        A.  Correct.
9        Q.  And right before you approached him, Officer Del
10   Valle is pointing a high-powered rifle at him, right?
11       A.  When I -- when he was behind me, I don't know where
12   he was pointing.
13       Q.  When he was in front, when Officer Del Valle was in
14   front of you, he was pointing the rifle at Mr. Eimers, right?
15       A.  From what I saw, yes.
16       Q.  Why do you point a weapon at someone as a police
17   officer?
18       A.  An unknown threat.
19       Q.  And what conduct is it known to elicit?
20       A.  Normally, compliance.
21       Q.  Yeah.  And fear.
22           MR. BURKE:  Object --
23   BY MR. MCKEE:
24       Q.  That's why you comply, right?
25           MR. BURKE:  Object to the form of the question.
```

54

```
1        A.  That could be a reason you comply from.
2        Q.  Okay.  So, using your training, a pointed high-
3    powered rifle at someone is likely to induce enough fear to
4    guarantee compliance, based on your training, right?
5            MR. BURKE:  Object to form.
6        A.  It's likely to cause compliance.
7        Q.  Because no one wants to get shot, usually?
8            MR. BURKE:  Object to the form.
9        A.  I wouldn't say no one wants to get shot.
10       Q.  That's why I said usually.  There are some people
11   that want to get shot.
12       A.  Unfortunately.
13       Q.  But usually, most people don't want to get shot, so
14   they'll comply, right?
15       A.  Correct.
16       Q.  So you know, based on your observations, that he is
17   complying.  He's following the orders, right?
18       A.  Yes.
19       Q.  Was there anything that would prohibit you asking
20   Mr. Eimers to allow you to cuff him?
21       A.  In my training, it's been -- when several people
22   are yelling at someone to do something, the person more than
23   likely gets confused.  So it's my --
24       Q.  So shouldn't --
25           MR. BURKE:  Go ahead and finish your thought.  You
```

55

```
1    can finish your thought.
2    BY MR. MCKEE:
3        Q.  Go ahead, yes.  I didn't mean to cut you off.
4    You're right.
5        A.  It's my experience that one person giving commands
6    is more successful than more than one person yelling commands
7    at one person.
8        Q.  And would that also have been your training?
9        A.  Yes.
10       Q.  So who was in charge on the beach at that point
11   when you and Officer Del Valle were there?
12       A.  I still heard Officer Del Valle yelling commands.
13       Q.  Okay.  So did Officer Del Valle say, sir, please
14   give your left hand to the police officer that's approaching
15   you?
16       A.  I don't recall what Officer Del Valle was saying.
17       Q.  Was any order given while Mr. Eimers was being
18   compliant, to allow his hands to be cuffed, please?
19       A.  I do not recall what Officer Del Valle was saying.
20       Q.  And does that mean you don't have any recollection
21   of such an order being given?
22       A.  After we attempted to cuff him, we -- and he began
23   resisting, we were giving commands to stop resisting.
24       Q.  Oh, well, that -- no, that's not my question.
25   Motion to strike.
```

56

```
1        My question is, if I wasn't clear, at the point you
2    are approaching him to cuff him, was any order given by the
3    officer on the scene who's supposed to be handling the
4    orders, as an individual so no one's getting confused,
5    please, sir, we're going to handcuff you, give us your hands?
6            MR. BURKE:  Object to form.
7        A.  I do not recall the words specifically that were
8    coming out of his mouth, so you'd have to ask Officer Del
9    Valle.
10       Q.  Do you have any recollection that such an order was
11   given prior to your approach of Mr. Eimers?
12       A.  No.
13       Q.  So the next thing you did was grab his left arm
14   when it was at his side, correct?
15       A.  Yes.
16       Q.  Didn't offer to do it from the front, did you?
17       A.  No.
18       Q.  Didn't ask him to roll over and let me cuff you
19   from the front, right?
20       A.  No.
21       Q.  Didn't ask him how his joints were?
22       A.  No.
23       Q.  Didn't ask him how his physical condition was in
24   any way, shape or form?
25       A.  No.
```

14 (Pages 53 to 56)

57

```
1        Q.  Didn't ask if he had a heart problem?
2        A.  No.
3        Q.  Never even tried to ask him these questions?
4        A.  No.
5        Q.  Neither did Officer Del Valle?
6        A.  I don't know what he asked him.
7        Q.  You didn't hear any health questions from Officer
8    Del Valle, did you?
9        A.  I didn't hear it, no.
10        Q.  And all this time, in this time from when you left
11   the car to the point that you're about to grab his left hand,
12   there was no aggressive action by Mr. Eimers, correct?
13        A.  Correct.
14        Q.  Why did you jerk his left hand up and put a cuff on
15   it?
16            MR. BURKE:  Object to the form.
17   BY MR. MCKEE:
18        Q.  We saw it in the film.  Why did you do it that way?
19        A.  I did not jerk his left hand up.
20        Q.  Do you know whether it hurt him?
21        A.  I'm sorry?
22        Q.  Do you know whether it hurt him?
23        A.  No.
24        Q.  I don't know about you, you're far younger than I.
25   All I know is my shoulders hurt like hell when my arms go
```

58

```
1    backwards.  I'm 57.  Are you aware that that can be the case
2    with a man over the age of 50?
3            MR. BURKE:  Object to the form.
4            MR. REYNOLDS:  Join.
5    BY MR. MCKEE:
6        Q.  Pain in his shoulders?
7        A.  I did not know how old the person was.
8        Q.  You couldn't see he had gray hair?
9        A.  I don't recall whether I looked at his hair.
10        Q.  So you didn't even observe his physical traits as
11   you were about to do this maneuver of handcuffing, correct?
12        A.  I didn't take an observation on how old he was, no.
13        Q.  So you didn't see whether he was obese, you didn't
14   see how old he was, you didn't communicate with him in any
15   way, shape or form to ask him if he will accede to this
16   handcuffing; all of that's true, correct?
17            MR. BURKE:  Object to form.
18        A.  Correct.
19        Q.  Okay.  So then, you got to put the other hand in
20   the cuffs to make it a successful handcuffing, right?
21        A.  Yes.
22        Q.  So you ask him for his right hand, correct?
23        A.  No.
24        Q.  No.  You forcibly took it backwards without bending
25   it at the elbow, right?
```

59

```
1        A.  I don't --
2        Q.  We saw it in the video yesterday, right?
3        A.  I don't recall specific --
4            MR. BURKE:  Object to the form of the question.
5            MR. REYNOLDS:  Join.
6            MR. BURKE:  Go ahead and answer.
7            THE WITNESS:  I don't recall specifically not
8    bending it at the elbow.
9    BY MR. MCKEE:
10        Q.  Well, you said you reviewed that tourist video.
11   Did you see how the arm came back, the right arm came back?
12        A.  I did review the tourist video and I can't see that
13   detail.
14        Q.  You jerked it back without ever bending it, didn't
15   you?
16            MR. BURKE:  Object to form of the question.
17            MR. REYNOLDS:  Join.
18        A.  I did put it behind his back.
19        Q.  Without bending it.
20        A.  I didn't grab the center of his elbow and bend it
21   at a 90-degree, I did not.
22        Q.  And you pulled it so hard, you lifted him off the
23   ground.  Did you see that?
24            MR. BURKE:  Object to form.
25        A.  I did not see that.
```

60

```
1        Q.  If that happened, that you pulled it so hard that
2    you lifted him partly off the ground, that would be a lot of
3    force, wouldn't it?
4            MR. BURKE:  Object to form.
5            MR. REYNOLDS:  Join.
6        A.  I did not see or recall pulling him off the ground.
7        Q.  So the man's over 200 pounds.  How strong are you?
8    What can you bench?
9            MR. REYNOLDS:  Objection, form.
10   BY MR. MCKEE:
11        Q.  You work out.  Come on, what can you bench?
12            MR. BURKE:  Object to form.
13        A.  I don't know.
14        Q.  Did you play football?
15        A.  I did not.
16        Q.  You ever do any sport that involved a requirement
17   to lift weights?
18        A.  No.
19        Q.  Do you go to a fitness center?
20        A.  Yes.
21        Q.  Do you ever lift weights?
22        A.  Yes.
23        Q.  What's the most you can clean and jerk?
24        A.  I don't clean and jerk.
25        Q.  Do you ever do bench presses?
```

61

1  A.  Yes.
2  Q.  Do you -- have you ever tested yourself on your
3  maximum press ability?
4  A.  Many years ago, yes.
5  Q.  You're not that old, but what was it then?
6  A.  225, approximately.
7  Q.  So you could literally lift a man of Mr. Eimers'
8  size off your chest at that time?
9  MR. BURKE:  Object to the form of the question.
10  BY MR. MCKEE:
11  Q.  220 pounds, bench press?
12  A.  I don't know how heavy --
13  MR. BURKE:  He's not a barbell.
14  THE WITNESS:  I don't know how heavy Mr. Eimers
15  was.
16  MR. MCKEE:  As long as I can talk like this when
17  you're deposing my clients, we'll just make it even,
18  okay?
19  MR. BURKE:  That's fine.  Absolutely.
20  MR. MCKEE:  Okay.  I don't mind, because it --
21  MR. BURKE:  Oh, I'm not --
22  MR. MCKEE:  -- puts some levity in this.
23  MR. BURKE:  Oh, I'm not --
24  MR. MCKEE:  I like form objections.  Thank you.
25  Q.  If the video taken by the tourist on her phone

62

1  shows that in pulling his right arm back behind him, and it
2  was not being bent, would you agree that the video is the
3  best capture of what happened there --
4  MR. BURKE:  Object to form.
5  MR. MCKEE:  -- as opposed to your description?
6  MR. REYNOLDS:  Join.
7  A.  The video is an angle of what happened.
8  Q.  Right.
9  A.  I don't recall pulling him off the ground.  I don't
10  recall pulling it particularly violently, either.
11  Q.  It wasn't until you did that, that he started
12  fighting you, right?
13  MR. BURKE:  Object to form.
14  A.  Correct.
15  Q.  So it was your action, sir, your action that
16  started him having to fight.  Did it ever dawn on you, you
17  might have hurt him?
18  MR. BURKE:  Object to form.
19  MR. REYNOLDS:  Join.
20  A.  No.
21  Q.  If you were being hurt, would you fight?
22  MR. BURKE:  Object to form.
23  A.  I wouldn't resist.
24  Q.  Oh, no, no.  There's a difference here.  You're
25  face down and now you have a man who's not talking to you

63

1  with another man pointing a rifle at you and he's hurting
2  you.  Do you think you'd fight yourself?
3  MR. BURKE:  Object to form.
4  MR. REYNOLDS:  Join.
5  A.  Sir --
6  Q.  It doesn't matter who it is.  Would you fight?
7  MR. BURKE:  Object to form.
8  MR. REYNOLDS:  Join.
9  A.  Sir, I was attempting to detain him.  I was not
10  hurting him.
11  Q.  He might have thought you were about to kill him.
12  MR. BURKE:  Object to form.
13  BY MR. MCKEE:
14  Q.  Did it ever dawn on you when you were doing that?
15  A.  I was not thinking what was going through his mind.
16  Q.  Okay.  You were thinking of what was going through
17  your mind, right?
18  A.  I was thinking about detaining him as quick as
19  possible.
20  Q.  And you were thinking about getting him cuffed in
21  whatever mechanism was necessary to do it, right?
22  A.  I was thinking about detaining him as quick as
23  possible.
24  Q.  He was already detained, sir, wasn't he?
25  MR. BURKE:  Object to form.

64

1  A.  He was not.
2  Q.  Detained means he has submitted to your control,
3  right?
4  A.  At the time I grabbed --
5  MR. BURKE:  Object to the form.
6  THE WITNESS:  I'm sorry.  At the time I grabbed his
7  right arm is when he began to roll and push and pull.
8  Q.  Under your training, wasn't he detained when he
9  went to his knees?
10  MR. BURKE:  Object to form.
11  BY MR. MCKEE:
12  Q.  In compliance with the orders of Officer Del Valle,
13  sir?
14  A.  No.
15  Q.  No?  Isn't it true, sir, under your own rules, that
16  as soon as the point of subject compliance is reached, you
17  must de-escalate your response level?
18  A.  Yes.
19  Q.  You saw Mr. Eimers completely accede to the demands
20  of Officer Del Valle, right?
21  A.  Yes.
22  Q.  And you escalated your response when you physically
23  jerked his arms back to cuff him without asking him, right?
24  A.  No.
25  MR. BURKE:  Object to form.

16 (Pages 61 to 64)

65

1    MR. REYNOLDS:  Join.

2    Q.  That's when he started fighting you, right?

3    MR. BURKE:  Object to form.

4    A.  When I attempted to place his right hand into a

5    cuff, yes.

6    Q.  When you attempted.  You did it, didn't you?

7    A.  After -- after several seconds of him fighting and

8    resisting.

9    Q.  And you did it so aggressively that you actually

10   caught your own finger in the cuff, between the cuff and his

11   arm, right?

12   MR. BURKE:  Object to form.

13   MR. REYNOLDS:  Objection, form.

14   A.  My finger was caught in the cuff because he was

15   resisting.

16   Q.  No.  It was caught in the cuff because Officer

17   Lovette shocked you; isn't that true, sir?

18   MR. BURKE:  Object to form.

19   MR. REYNOLDS:  Objection, form.

20   A.  No.

21   Q.  When he was applying the Taser repeatedly,

22   according to an eyewitness, --

23   MR. REYNOLDS:  Objection, form.

24   BY MR. MCKEE:

25   Q.  -- he shocked you and you shut it right on your own

66

1    hand, didn't you?

2    A.  No.

3    MR. BURKE:  Object to form.

4    MR. REYNOLDS:  Objection, form.

5    Q.  Is there a way to know if the Taser was fired

6    during an event?

7    A.  Yes.

8    Q.  What's that method?

9    A.  It is very distinct.  The -- it's audible.

10   Q.  Yeah.  So if witnesses heard it, it would have been

11   fired, right, based on those witnesses' perspective?

12   MR. BURKE:  Object to form.

13   MR. REYNOLDS:  Objection, form.

14   A.  I did not hear his Taser activate.

15   Q.  No, you were too busy screaming like a girl,

16   according to Officer Lovette, right?

17   MR. BURKE:  Object to form.

18   MR. REYNOLDS:  Objection, form.

19   A.  I did not hear his Taser activate?

20   Q.  Do you scream like a girl when you capture your

21   finger in your cuffs?

22   MR. BURKE:  Object to form.

23   A.  No.

24   MR. BURKE:  Counsel, now, you know this is --

25   MR. MCKEE:  No, that's -- you're -- that's --

67

1    MR. BURKE:  Well, wait a second.

2    MR. MCKEE:  No, no.  That's not a form --

3    MR. BURKE:  You don't need to embarrass --

4    MR. MCKEE:  This is not an embarrassment.  This is

5    what was testified to yesterday.

6    MR. BURKE:  Well, I understand that.

7    MR. MCKEE:  This is right on point and do not do

8    this.  I want form objections, especially in federal

9    court.

10   MR. BURKE:  Well, I really think that this is just

11   simply trying to embarrass him.

12   MR. MCKEE:  No, no, no.

13   Q.  You can't hear a Taser when you're screaming like a

14   girl, can you?

15   MR. BURKE:  Object to form.

16   MR. REYNOLDS:  Join.

17   A.  I wouldn't say I was screaming like a girl.

18   Q.  So Officer Lovette was not telling the truth

19   yesterday?

20   MR. BURKE:  Object to form.

21   MR. REYNOLDS:  Objection, form.

22   A.  That's what he observed.  I said, I wouldn't say I

23   was screaming like a girl.

24   Q.  Do you know whether you could hear the Taser if you

25   were screaming?

68

1    MR. REYNOLDS:  Objection, form.

2    A.  I've never tried to listen to a Taser while

3    screaming.

4    Q.  I'm still trying to figure out why it's so painful

5    when you're cuff is pressing you against the pliable skin of

6    a wrist, why it couldn't just be pulled out.  How tight were

7    those cuffs?

8    MR. BURKE:  Object to form.

9    MR. REYNOLDS:  Join.

10   A.  He was pulling extremely hard.

11   Q.  In his face down position, being pinned to the

12   ground by Officer Lovette?

13   MR. BURKE:  Object to form.

14   MR. REYNOLDS:  Objection, form.

15   A.  In the prone position.

16   Q.  Was Officer Lovette on his back yet?

17   MR. REYNOLDS:  Objection, form.

18   A.  I don't recall.

19   Q.  Where was Officer Lovette when this happened?

20   A.  I don't know.

21   MR. BURKE:  When what happened?  The cuffing?

22   Q.  When the cuffs were closed on your finger.

23   MR. REYNOLDS:  Objection, form.

24   A.  I was occupied with the cuffs and my finger.  I

25   don't know where Officer Lovette was.

69

1    Q.   Well, before you were occupied with that, the
2    moment before, where was Officer Lovette?
3         MR. BURKE:  Object to the form of the question.
4         MR. REYNOLDS:  Join.
5    BY MR. MCKEE:
6         Q.   If you know.
7         A.   I don't know.
8         Q.   Where was Officer Wanciak in that time right before
9    the cuffing problem?
10        A.   I don't know.
11        Q.   Who was monitoring -- in this prone position, were
12   you ever trained to monitor the breathing of the subject?
13        A.   I don't recall specifically being trained to look
14   for his breathing while trying to handcuff him.
15        Q.   Were you -- by the way, weren't more than one
16   officer ordering things to happen at the same time?
17        A.   I only recall Officer Henry Del Valle.
18        Q.   You didn't hear Officer Wanciak, too?
19        A.   I did not.
20        Q.   So let me make sure I understand this.
21             You've got the cuff on the left hand and you've
22   cuffed him with your finger -- which finger was it?
23        A.   I don't remember.
24        Q.   It didn't cause an injury there, right?
25        A.   I was not bleeding.

70

1    Q.   Did you report an injury as part of this event?
2    A.   I don't recall filling out a report of injury.
3         Q.   So it didn't cut you.  Did it bruise you?
4    A.   I don't recall whether I had bruising.
5         Q.   So you don't even have a recollection of a bruising
6    or a cut, yet, according to Officer Lovette, you were
7    screaming like a girl and somehow, this was so tight you
8    couldn't get it out between the cuff and the wrist?
9         MR. REYNOLDS:  Objection, form.
10        MR. BURKE:  Object to form.
11   A.   I wasn't screaming like a girl, that I recall.
12        Q.   It was so tight you couldn't get the part of your
13   finger out that had been captured by your own action of
14   closing it around Mr. Eimers' wrist?
15        MR. BURKE:  Object to form.
16   A.   He was resisting so hard, I could not pull my
17   finger out of the cuff.
18        Q.   And you don't -- you remember which finger it was?
19   A.   I do not.
20        Q.   How far up the finger was it?
21   A.   I don't remember.
22        Q.   Was it just the tip?
23        MR. BURKE:  Object to form.
24        MR. REYNOLDS:  Join.
25   A.   I don't remember.

71

1    Q.   Was it at the base of the finger?
2         MR. BURKE:  Same objection.
3    A.   I can say it was not at the base.
4         Q.   It was not the base where it joins the palm.
5    A.   Correct.
6         Q.   So it was nearer the digital end?
7         MR. BURKE:  Object to form.
8    BY MR. MCKEE:
9         Q.   Based on your recollection?
10   A.   I recall it was not at the base.  I don't recall
11   how far up the finger it was.
12        Q.   And it was you who locked it with your own finger
13   there, right?
14   A.   I did not place my finger into the cuff.
15        Q.   Well, how did it get there?
16   A.   Due to Mr. Eimers' resistance, my finger ended up
17   in the cuff.  I do not know how it ended up in it.
18        Q.   And he started resisting because you yanked his
19   right arm back, right?
20        MR. BURKE:  Object to form.  Calls for speculation.
21   BY MR. MCKEE:
22        Q.   That's when it happened, right?
23   A.   He started resisting while I was trying to place
24   his right hand into the handcuff.
25        Q.   You call that placing his right hand into the

72

1    handcuff?  You saw the video yesterday, right?
2    A.   Yes.
3         Q.   Let's make sure we're clear here.
4             After you put it around the left hand, I know I've
5    asked about that first action.  The second one, right hand.
6    Did you say, Mr. Eimers, I'd now like you to give me your
7    right hand so that I can put the other cuff on?  Did you say
8    that?
9         MR. BURKE:  Objection, form, redundant.
10   A.   I did not say that.
11        Q.   He was not yet doing any aggressive action, was he,
12   at that point?
13   A.   At which point is that?
14        Q.   Before you've taken his right hand.
15   A.   Before I touched his right hand, no.
16        Q.   Before any officer got on his back, he was not
17   being aggressively moving?
18   A.   I don't recall when the other officers assisted me.
19        Q.   Well, they assisted you when you ripped his arm
20   back; and then, Mr. Eimers started to react to your
21   aggression, right?
22        MR. BURKE:  Object to form.
23        MR. REYNOLDS:  Join.
24   A.   I don't recall when they jumped in.
25        Q.   Did you see the videotape yesterday?

18  (Pages 69 to 72)

73

1  A.  Yes.
2  Q.  It's after you yanked his arm back that he now
3  starts to roll or attempt to roll, right?
4  MR. BURKE:  Object to form.
5  A.  You're telling me that.  I don't -- I don't know
6  when they assisted.
7  Q.  Did you see that on the videotape?
8  A.  I did see the videotape.
9  Q.  And you see that's when he started to yell and to
10  start to try to roll, when you pulled, yanked his arm back to
11  attempt this maneuver?
12  A.  You can't hear --
13  MR. BURKE:  Object to form.
14  MR. REYNOLDS:  Join.
15  THE WITNESS:  You can't hear his audio on the
16  videotape.
17  Q.  Well, you were there.  When did he start yelling?
18  A.  I don't know when he started yelling.  I don't
19  recall when he started yelling.
20  Q.  And then, did you ever see the FDLE report of
21  Officer Lovette?
22  A.  No.
23  Q.  Did you see where he told the investigators he had
24  both shins against the back of Mr. Eimers?  Did you see that
25  at any time?

74

1  MR. BURKE:  Object to form.
2  MR. REYNOLDS:  Objection, form.
3  A.  No.
4  Q.  Did you see Mr. Lovette in his position on Mr.
5  Eimers?
6  A.  No.
7  Q.  You heard him testify yesterday, right?
8  A.  Yes.
9  Q.  Was there any need to put a three-point pin on Mr.
10  Eimers at this time frame?
11  MR. REYNOLDS:  Objection, form.
12  A.  I don't know what Officer Lovette observed to
13  believe he needed to do that.
14  Q.  Is that something you would have done?
15  MR. BURKE:  Objection, calls for speculation.
16  A.  I don't know.  I wasn't where he was.
17  Q.  You didn't attempt to do it, did you?
18  A.  I was trying to put handcuffs on him.
19  Q.  And had you simply asked and, in compliance with
20  the request as he had been doing up to that point, none of
21  this aggressive action happens, right?
22  MR. BURKE:  Object to form.
23  MR. REYNOLDS:  Join.
24  A.  I don't know.
25  Q.  You never gave him a chance to know, right?

75

1  MR. BURKE:  Object to form.
2  MR. REYNOLDS:  Join.
3  A.  I never asked him.
4  Q.  Did you ask for assistance at any point from your
5  fellow officers?
6  A.  I don't recall asking for assistance.
7  Q.  Who next came to the scene of your altercation with
8  Mr. Eimers?
9  MR. BURKE:  Object to form.
10  MR. REYNOLDS:  Join.
11  A.  I don't know who came to the scene when I was
12  attempting to place Mr. Eimers in handcuffs.
13  Q.  Did you have a Taser on you at the time?
14  A.  Yes.
15  Q.  Did you think about using it?
16  A.  No.
17  Q.  Why not?
18  A.  I was trying to place handcuffs on Mr. Eimers.
19  Q.  You heard Officer Lovette speaking yesterday,
20  testifying yesterday.  As you heard him testify about the
21  events, did you have any disagreement with his version of the
22  facts?
23  MR. BURKE:  Object to form.
24  MR. REYNOLDS:  Join.
25  A.  No.

76

1  Q.  Were you ever aware of the statements that he had
2  made on his recording of his Taser?
3  A.  No.
4  Q.  Did you ever see a transcript or listen to his
5  Taser device prior to today?
6  A.  No.
7  Q.  Not even for the FDLE investigation?
8  A.  Not that I can recall, no.
9  Q.  Was it surprising to hear some of the things you
10  heard yesterday as to what was captured on his recording
11  Taser?
12  MR. BURKE:  Object to form.
13  MR. REYNOLDS:  Join.
14  A.  I did not know that there were recordings.
15  Q.  Well, that's not my question.
16  Were you surprised by some of the comments he made
17  on that recording?
18  A.  Yes.
19  MR. REYNOLDS:  Objection, form.
20  Q.  You were at the scene, right, during the whole time
21  of this incident, right?
22  A.  Yes.
23  Q.  At what point did Officer Lovette drop a fucking
24  bomb on Eimers' head?
25  MR. REYNOLDS:  Objection, form.

77

```
 1        A.  I never saw him do that.
 2        Q.  Were you always looking at MR. Eimers' head?
 3        A.  No.
 4        Q.  So it could have happened?
 5            MR. BURKE:  Object to form.
 6            MR. REYNOLDS:  Objection, form.
 7   BY MR. MCKEE:
 8        Q.  It could have happened?
 9            MR. REYNOLDS:  Objection, form.
10        A.  I never saw him.
11        Q.  I'm only asking since there were times that you
12   weren't looking at his head -- actually, you can't even tell
13   me Mr. -- Officer Lovette was at most of this time, can
14   you?
15        A.  Correct.
16        Q.  So you don't know what Officer Lovette did?
17            MR. BURKE:  Object to form.
18            MR. REYNOLDS:  Objection, form.
19        A.  I could not speak for Officer Lovette.
20        Q.  And that's not my question.
21            My question is, you don't know what he did during
22   this event, do you?
23        A.  No.
24            MR. REYNOLDS:  Objection, form.
25        Q.  Yet he was there, fully participating at various
```

78

```
 1   times, right?
 2        A.  Yes.
 3        Q.  Why is he not in your report?
 4        A.  Because I don't know what he did.
 5        Q.  But he was there.  You don't put who was there in
 6   your reports?
 7            MR. BURKE:  Object to form.
 8            MR. REYNOLDS:  Objection, form.
 9        A.  Who was on scene would be in the CAD reports and
10   everybody else wrote a report as well.
11        Q.  And only one of them mentioned Officer Lovette,
12   too.  Do you know why that is?
13            MR. REYNOLDS:  Objection, form.
14            MR. BURKE:  Object to form.
15        A.  No.
16        Q.  Especially since, as you heard yesterday, Officer
17   Lovette was telling somebody, in order to do these
18   supplemental reports, we'll have to get our shit together.
19   That's what you heard him say, right?
20            MR. REYNOLDS:  Objection, form.
21            MR. BURKE:  Object to form.
22        A.  I did not hear that.
23        Q.  You heard it yesterday, didn't you?
24            MR. REYNOLDS:  Objection, form.
25        A.  I couldn't hear the audio from where I was seated
```

79

```
 1   yesterday.
 2        Q.  You heard him, you heard Officer Lovette agree that
 3   that's what he said, right?
 4            MR. REYNOLDS:  Objection, form.
 5            MR. BURKE:  Object to the form of the question.
 6        A.  No.
 7        Q.  Okay.  You were here during the testimony yesterday
 8   of Officer Lovette, right?
 9        A.  Yes.
10        Q.  And so, when we play that to a jury and he agrees
11   that that was said, are you disputing he had that
12   conversation with somebody?
13            MR. BURKE:  Object to the form.
14            MR. REYNOLDS:  Join.
15        A.  You were explaining what you thought you heard on
16   the video.  I don't recall if he agreed to that specific
17   comment, because there were several comments.
18        Q.  Did you ever get together to determine what would
19   be in supplemental reports with your co-officers, any of
20   them?
21        A.  No.
22        Q.  Describe what you remember Officer Lovette doing at
23   the scene.
24        A.  I recall him being one of the officers who
25   assisted, but I don't recall his specific actions.
```

80

```
 1        Q.  Do you remember seeing him pull out his Taser?
 2        A.  I remember seeing the Taser in his hand at one
 3   point, yes.
 4        Q.  And was he on, touching, contacting Mr. Eimers with
 5   any part of his own body at that time?
 6            MR. REYNOLDS:  Objection, form.
 7        A.  I don't recall where -- with the Taser?
 8        Q.  Yes.
 9        A.  No.  I don't --
10            MR. REYNOLDS:  Objection, form.
11            THE WITNESS:  When I saw the Taser in his hand, he
12   was not touching him at that time.
13        Q.  Where was he?
14        A.  I don't know.  As I said, I don't recall his
15   actions with Mr. Eimers.
16        Q.  Who was down on the ground by Mr. Eimers' face
17   verifying in the prone position that he could breath.
18        A.  I don't know.
19        Q.  Was it you?
20        A.  It was not me.
21        Q.  Did you see anyone doing that?
22        A.  I did not see anybody doing that.
23        Q.  Was anyone assigned to do that at the scene?
24        A.  I wasn't assigned to do that.
25        Q.  Did you hear anyone get assigned to do that?
```

81

1    A. I did not hear anybody get assigned to do that.
2    Q. Did you see anyone do that?
3    A. I did not see anybody do that.
4    Q. So, to your personal experience, you're not aware
5  of anyone monitoring Eimers' breathing during the prone
6  restraint, correct?
7    A. I did not do that.
8    Q. That's not my question.
9        Based on your personal known facts, what you
10 perceived, what you saw, what you heard, you're not aware of
11 any evidence to suggest that any officer involved in this
12 monitored Eimers' ability to breath at that time?
13       MR. BURKE: Object.
14 BY MR. MCKEE:
15   Q. Correct?
16       MR. BURKE: Object to form.
17       MR. REYNOLDS: Join.
18   A. Correct.
19   Q. Once the cuffs are on both hands, now Mr. Eimers is
20 apparently upset, right?
21       MR. BURKE: Object to form.
22       MR. REYNOLDS: Objection, form.
23 BY MR. MCKEE:
24   Q. That was your experience, he was upset at that
25 point?

82

1        MR. BURKE: Object to form.
2        MR. REYNOLDS: Join.
3    A. Yes.
4    Q. And so what was next decided to do by the officers?
5    A. I went to his right side and held his shoulder.
6    Q. Pushing it down into the sand?
7    A. I don't recall pushing it down into the sand.
8    Q. Holding his shoulder; you mean, pinning it to the
9  ground?
10   A. No.
11   Q. Holding it gently like a nursemaid?
12       MR. REYNOLDS: Objection, form.
13   A. No.
14   Q. No. Holding it forcibly so that he cannot move,
15 right?
16   A. Holding it with enough force so he could not roll.
17   Q. Okay. And is that with downward pressure on his
18 shoulder?
19   A. I don't recall whether it was downward pressure or
20 I specifically had his shoulder in my hand.
21   Q. Were you above him with your body weight applied to
22 that shoulder?
23   A. My knees were in the sand and I was attached to his
24 shoulder. I don't recall if I was pushing down or how I was
25 holding it.

83

1    Q. Was there anyone on the other shoulder?
2    A. Yes.
3    Q. Who?
4    A. Sergeant Zamora.
5    Q. So Zamora is applying force to his left shoulder?
6    A. He was on his left side. I don't know how he was
7  -- what he was doing while he was on his left side.
8    Q. What next happened?
9    A. We attempted to remove him from the sand and lift
10 him up.
11   Q. Who attempted to clear his nostrils and mouth from
12 sand that he was inhaling during that time?
13   A. I didn't --
14       MR. BURKE: Object to form.
15       MR. REYNOLDS: Join.
16       THE WITNESS: I didn't, and I did not know he was
17 inhaling sand.
18   Q. Well, he's face down, right?
19       MR. BURKE: Object to form.
20       MR. REYNOLDS: Objection, form.
21   A. I never saw his face down into the sand.
22   Q. Never bothered to check?
23   A. I recall his face moving from right to left, never
24 straight down in the sand.
25   Q. Well, in order to go right to left, it would have

84

1  to go into the sand, right?
2        MR. BURKE: Object to form.
3        MR. REYNOLDS: Join.
4        MR. MCKEE: There's no other way.
5        MR. BURKE: Object to form.
6  BY MR. MCKEE:
7    Q. To go from left to right, his face, in a prone
8  position, has to go through the sand, right?
9        MR. BURKE: Object to form.
10       MR. REYNOLDS: Objection, form.
11   A. He could move it above the sand from right to left,
12 is what I saw. I never saw his face, face down into the
13 sand.
14   Q. Did anyone make sure his face was not going into
15 the sand?
16   A. I didn't.
17   Q. Are you aware of anyone else that did?
18   A. I am not.
19   Q. And this is while putting pressure on his
20 shoulders, right?
21       MR. BURKE: Object to form.
22   A. While holding his shoulder, keeping it from
23 turning.
24   Q. Right. His face is going right to left, prone,
25 with shoulder pressure at that time, right?

21 (Pages 81 to 84)

85

1    MR. BURKE:  Object to form.
2       A.  His face is going right to left.  I don't recall
3    whether I was pushing down on his shoulder or simply holding
4    his shoulder from him rolling.
5       Q.  Is he saying anything during this time?
6       A.  I recall him saying something.
7       Q.  What?
8       A.  I don't recall the words that were coming out of --
9       Q.  How about no, no, no?  Did that -- does that sound
10   familiar to you?
11      A.  I don't recall the words that were coming out of
12   his mouth.
13      Q.  It was no, no, no, sir, wasn't it?
14      MR. BURKE:  Object to form.
15      A.  I don't recall the words.
16      Q.  Do you listen to somebody when you're doing this?
17      MR. BURKE:  Object to form.
18      MR. REYNOLDS:  Join.
19      A.  I don't recall the words, sir.
20      Q.  If he was eating five gallons of sand at that time,
21   is that something you should have been noticing?
22      MR. BURKE:  Object to form.
23      MR. REYNOLDS:  Objection, form.
24      A.  I did not see his face face down in the sand.
25      Q.  Did you look?

86

1    MR. BURKE:  Object to form.
2    MR. REYNOLDS:  Join.
3    BY MR. MCKEE:
4       Q.  Did you look?
5       MR. BURKE:  Object to form.
6       A.  His face was going right to left.  I never saw it
7    face down in the sand.
8       Q.  And you were behind him so you could never know,
9    right?
10      MR. BURKE:  Object to form.
11      A.  I was on his -- at that time, I was on his right
12   shoulder.
13      Q.  Who from all these officers now that are all around
14   him, who is trying to make sure he doesn't suffocate?  Who?
15      MR. BURKE:  Object to form.
16      MR. REYNOLDS:  Join.
17      A.  I saw his face going right to left.  I never saw it
18   straight down in the sand.
19      Q.  Not my question.  Motion to strike.
20      Who in this detail of armed officers was trying to
21   make sure he doesn't die when this is happening?  Who?
22      MR. BURKE:  Object to form.
23      MR. REYNOLDS:  Join.
24   BY MR. MCKEE:
25      Q.  No one, right?

87

1    MR. BURKE:  Object to form.
2    MR. REYNOLDS:  Join.
3       A.  I did not see anybody monitoring his head.  I saw
4    his face going right and left.  I can't speak for the actions
5    of the other officers.
6       Q.  No one's making sure that this previously non-
7    violent man isn't being killed by this action.  No one is
8    doing that, right?
9       MR. BURKE:  Object to form.
10      MR. REYNOLDS:  Join.
11      A.  I was -- saw his head, it was going right to left.
12   I never saw it directly in the sand.
13      Q.  Not my question.
14      MR. BURKE:  Bob, there's no jury here.
15      MR. MCKEE:  Not my question.  There may well be.
16   This is a videotape.  This is a deposition.  This man,
17   whether -- it may not be comfortable and I'm sorry, but
18   the reality is, I get these questions and I get to ask
19   them.
20      MR. BURKE:  Well, none of these will ever be asked,
21   you know that.  You know that the judge --
22      MR. MCKEE:  I hope you're right.
23      MR. BURKE:  You know that the judge won't allow
24   this kind of argument.
25      MR. MCKEE:  Oh, no.  I disagree.

88

1    MR. BURKE:  Well, then we'll see.
2    MR. MCKEE:  I disagree.
3    BY MR. MCKEE:
4       Q.  Sir, who from the Police Department of Key West,
5    that day, with all of these officers present on the scene,
6    was there making sure that this detainment was not going to
7    kill this man?  Who?
8       MR. BURKE:  Object to the form of the question.
9       MR. REYNOLDS:  Objection, form.
10      MR. BURKE:  It's redundant.
11      A.  I can only testify to what I did and I saw his face
12   going right and left, not in the sand.
13      Q.  And you weren't attempting to make sure that this
14   process didn't kill him, right?
15      MR. REYNOLDS:  Objection, form.
16      A.  I saw his face going right and left.  I did not see
17   it going in the sand.
18      Q.  Motion to strike.  Who -- strike that.
19      Were you, at the time of these events, making sure
20   that the physiologic response of Mr. Eimers was not such that
21   these events would kill him?
22      MR. BURKE:  Object to the form of the question.
23      MR. REYNOLDS:  Objection, form.
24   BY MR. MCKEE:
25      Q.  Were you doing that?

89

1    A.  I was not.
2        MR. REYNOLDS:  Join.
3    Q.  Did you see anyone else doing it?
4        MR. BURKE:  Object to the form.
5        MR. REYNOLDS:  Join.
6    A.  I know that -- what I saw.  I don't know what
7    everybody else was doing.
8    Q.  With what you saw, did you see anyone else looking
9    out for the well being of Mr. Eimers as this prone restraint
10   was going down?
11       MR. BURKE:  Same objection.
12       MR. REYNOLDS:  Join.
13   A.  I did not see what they were seeing.
14   Q.  I'm not asking what they were seeing.  I'm asking
15   whether you saw anyone using their body in such a way as to
16   verify that this event was not potentially lethal to Mr.
17   Eimers.
18       MR. BURKE:  Same objection.
19       MR. REYNOLDS:  Join.
20   A.  No, I did not see that.
21   Q.  No, you did not.
22       MR. REYNOLDS:  Move to strike comment of Counsel.
23   BY MR. MCKEE:
24   Q.  Correct?  No, you did not see that?
25       MR. BURKE:  Same objection.

90

1        MR. REYNOLDS:  Objection, form.
2    BY MR. MCKEE:
3    Q.  Correct?
4    A.  I did not see other officers moving their bodies.
5    Q.  Did you see anyone monitoring the color of his
6    skin?
7    A.  I did not.
8    Q.  Was anyone monitoring his heart rate?
9    A.  Not that -- I did not.
10   Q.  What next happened?
11   A.  We attempted to remove him from the sand.
12   Q.  How?
13   A.  By lifting him.
14   Q.  Wasn't he already unconscious?
15   A.  Not at that time, we did not --
16   Q.  I have police reports that say before he was
17   lifted, he was out.
18       MR. REYNOLDS:  Objection, form.
19   BY MR. MCKEE:
20   Q.  Were they not telling the truth?
21       MR. BURKE:  Object to form.
22       MR. REYNOLDS:  Objection, form.
23   A.  As I recall, we attempted to lift him out of the
24   sand before noticing he was unconscious.
25   Q.  Didn't you write in your report, quote, "While

91

1    waiting for other officers to secure the suspect's legs,
2    Sergeant Zamore announced that the suspect was unconscious."
3    Didn't you write that?
4    A.  I'm going to have to read it.
5        MR. MCKEE:  I'll be -- I'll be happy to mark it as
6    my first exhibit.
7        MR. BURKE:  What are we going to go, in order?
8        MR. MCKEE:  Yeah, might as well.  What are we up
9    to?
10       MR. BURKE:  I think it would be about Number 6 now?
11       MR. MCKEE:  Six, I think.  I think it's 6.  God
12   forbid we have to keep track of that.
13       (Plaintiff's Exhibit 6 was marked.)
14       MR. MCKEE:  So, Number 6.  I know I stole your pen,
15   David, but I don't know where it went.  Thank you.  And
16   I do have a copy.
17       MR. BURKE:  Thank you, sir.
18       MR. MCKEE:  I think.  Did I give you the right one?
19   Yeah, I think so.
20       MR. DARREN HORAN:  Which one is that one?
21       MR. BURKE:  This is Officer Garrido?
22       MR. MCKEE:  I'm handing the witness Exhibit Number
23   6.
24   BY MR. MCKEE:
25   Q.  Take a look and verify whether that's your report,

92

1    sir.
2    A.  Yes.
3    Q.  Was this done under oath?
4    A.  Yes.
5    Q.  And you know the importance of what it means to be
6    under oath, right?
7    A.  Yes.
8    Q.  True and accurate to the best of your knowledge and
9    ability of time, right?
10   A.  Yes.
11   Q.  Okay.  And this was done, this report was written
12   for the first time, when?
13   A.  December 2nd.
14   Q.  About four days after the event?
15   A.  Approximately.
16   Q.  Why?
17   A.  We were instructed to by our PBA attorney.
18   Q.  A man was close to death and you're writing a
19   report not until four days later?
20       MR. REYNOLDS:  Objection, form.  Asked and
21   answered.
22       MR. BURKE:  Well, he was instructed by his PBA
23   attorney.
24       MR. MCKEE:  That's not an objection to form.
25       MR. BURKE:  We'll have to get into all that.

93

1  MR. MCKEE:  That's not an objection to form.  Just
2  form.  I appreciate it.
3  MR. BURKE:  Well, this is a matter that I guess we
4  will have to intercede on and take before the judge.
5  MR. MCKEE:  Well, you do what you want.
6  MR. BURKE:  They were instructed, as he's told you,
7  by the PBA attorney, not to write a report, and so
8  that's the reason it wasn't written.  Now, you may
9  disagree with it, but that's -- that's what it is.  And
10  any further discussion on that, we're going to claim
11  privilege and have to go forward.
12  MR. MCKEE:  Well, here, let me start asking you the
13  questions then since you want to testify.
14  MR. BURKE:  No.
15  MR. MCKEE:  Okay?
16  MR. BURKE:  Go ahead and ask your questions and
17  we'll assert the privilege.
18  MR. MCKEE:  I'll ask them to you, since you want to
19  testify.
20  THE VIDEOGRAPHER:  Excuse me, Counsel.  We need to
21  go off the record.
22  MR. MCKEE:  Okay.
23  THE VIDEOGRAPHER:  Off the video record at 10:26
24  a.m.
25  MR. MCKEE:  Good time for a quick break.

94

1  (Brief recess.)
2  THE VIDEOGRAPHER:  Back on the video record at
3  10:38 a.m.
4  BY MR. MCKEE:
5  Q.  Sir, I've handed you as Exhibit 6, and you've --
6  you recognize that as your sworn supplemental report?
7  A.  Yes.
8  Q.  For the Eimers incident?
9  A.  Yes.
10  Q.  And I was asking you questions as to when Mr.
11  Eimers, during this process, became unconscious.
12  Is it true that back on or about December 2nd,
13  2013, just a few days after this event, you stated, quote,
14  "While waiting for other officers to secure the suspect's
15  legs, Sergeant Zamora announced that the subject was
16  unconscious."  Correct?
17  A.  Yes, that's correct.
18  Q.  Is that a correct statement, a true statement?
19  A.  Yes.
20  Q.  So it did not occur when he was lifted?
21  A.  You asked what I recalled.
22  Q.  Yes.
23  A.  I recalled beginning to lift him.
24  Q.  But back in December, a year go, your recollection
25  was that he was already pronounced unconscious before the

95

1  lift occurred, correct?
2  A.  That's what I wrote.
3  Q.  Okay.  As you sit here today, do you find that what
4  you wrote to be false or incorrect?
5  A.  No.
6  Q.  And you state, quote, "I also noticed that he
7  suspect was not responsive."  That's before the lift
8  occurred, right?
9  A.  I recall it now being as we lifted him is when we
10  noticed.
11  Q.  But you didn't put that in you report?
12  A.  That's not what's in -- what's written.
13  Q.  When you would be lifting him, that would mean
14  you're lifting him from behind with his arms pulled back
15  behind him in a hobble where the cuffs and the hobble are
16  connected, right?
17  MR. BURKE:  Object to form.
18  MR. REYNOLDS:  Objection, form.
19  A.  The cuffs and hobble are not connected.
20  Q.  Okay.  At the time of the lift, his feet were
21  hobbled and his arms were behind his back, right?
22  A.  Yes.
23  Q.  And the lift occurred by lifting him by his arms,
24  up, right?
25  A.  We did not lift him by his arms.

96

1  Q.  No one was holding his arms?
2  A.  I recall I lifted him by his shoulders.
3  Q.  You by yourself?
4  A.  No.
5  Q.  What, you're lifting him while he's unconscious?
6  A.  When we noticed he was unconscious, that's when we
7  began to lift him.
8  Q.  Well, according to your report a year ago, Zamora
9  already announced he was unconscious before the lift, right?
10  A.  That's there.
11  Q.  Okay.  And that's true, right?
12  A.  That is what's in the report, yes.
13  Q.  But it's true -- the report is true or what you're
14  saying now is true?
15  MR. BURKE:  Object to form.
16  A.  The report is true, and you're asking what I
17  recollect and that is what I recall.
18  Q.  Okay.  And was your recollection better a year ago,
19  a few days after this incident, or is it better today?
20  A.  I can't answer that.  That would be an assumption.
21  Q.  Do you think you had a better recollection of
22  events a few days after it as opposed to a year later?
23  A.  It would be assumption.
24  Q.  What would be an assumption?
25  A.  To assume that it was or was not better.

24  (Pages 93 to 96)

97

1  Q.  Do you think you have sharper recall of details
2  from a year ago at that time, or sharper recall now that a
3  year has passed?
4  A.  Recall of events would be sharper immediately
5  following.
6  Q.  So is it most likely that what you wrote in your
7  report was true and correct as of that time?
8  MR. BURKE:  Object to form.
9  A.  That is what I wrote at that time on this report.
10  Q.  And was it true and correct?
11  A.  Yes.
12  Q.  When was the hobble put on?
13  A.  At some point after he was fully in handcuffs and I
14  was at his right shoulder.
15  Q.  Why was it put on?
16  A.  Because he was kicking.
17  Q.  Was it because he was going to be put into
18  transport?
19  MR. REYNOLDS:  Objection, form.
20  A.  It's because he was kicking and we were attempting
21  to get him off the beach as quickly as possible.
22  Q.  So you'd be transporting him?
23  A.  He would ultimately be transported.
24  Q.  Are you aware that there is -- there are
25  regulations about handcuffing and use of restraining devices

98

1  with the Key West Police Department?
2  A.  Yes.
3  Q.  Are you aware of anything that says a hobble should
4  be used with a handcuffed detainee only in a sitting
5  position?
6  A.  No, I don't recall that section of the --
7  Q.  How about Section 03.15.02.07, Directive Number
8  03.15 that says, "When any person is handcuffed for any
9  reason, other than training or demonstration purposes or a
10  Marchman Act, the circumstances will be documented in
11  writing, in particularly those instances when the subject is
12  eventually released from custody."
13  Do you know whether you documented the handcuffing
14  and hobbling in your report as required by this?
15  A.  My report?
16  Q.  Yes.
17  A.  I don't recall whether I wrote it in there.  If I
18  could review it.
19  MR. BURKE:  Sure, you're always welcome to review
20  that exhibit.
21  Q.  Yeah.  Look at it.
22  A.  I wrote that other officers were attempting to
23  secure his legs, but not by use of a hobble.
24  Q.  Okay.  Why didn't you include the hobble restraint
25  in your report?

99

1  A.  I don't know why.
2  Q.  Do you know, under 03.15.04.12, paragraph (3) --
3  excuse me, paragraph (b)(3), quote, "When the hobble device
4  is used, it shall only be used in accordance with
5  manufacturer's specification and training specific for the
6  device."  Were you aware of that?
7  A.  I do not recall that specific section of these.
8  Q.  Was this hobble used in accordance with the
9  manufacturer's specifications --
10  A.  Given --
11  Q.  -- to your knowledge?
12  A.  Given the totality of circumstances, we used the
13  hobble properly.
14  Q.  What were the manufacturer's specifications for
15  this hobble?
16  A.  I don't recall.
17  Q.  Did you know them on the day of this event?
18  A.  I didn't recall.
19  Q.  Do you know whether they were used in accordance
20  with the manufacturer's specifications on this date?
21  A.  I don't recall manufacturer's specifications.
22  Q.  Do you know who the manufacturer was for this
23  hobble?
24  A.  No.
25  Q.  Have you ever read their specifications?

100

1  A.  No.
2  Q.  So you don't know whether they were used according
3  to the manufacturer's specifications?
4  A.  I don't know.
5  Q.  Nor have you received training on what that
6  manufacturer's specifications were, have you?
7  A.  We have received training on the hobble.
8  Q.  On that hobble?  The one used with Eimers?
9  A.  To my knowledge, they -- we were issued a hobble
10  from the Key West Police Department.  I don't know if they
11  were all the same or from the same manufacturer.
12  Q.  Have you ever read that manufacturer specifications
13  of the hobble used in the Eimers restraint?
14  A.  No, I have not.
15  Q.  And in that same paragraph, subparagraph (a) it
16  says, "Due to the rare possibility of positional asphyxia,
17  the practice of connecting the handcuffs to the leg
18  restraints while the prisoner detainee is in any position
19  other than seat belted in a seated position is prohibited."
20  Are you aware of that?
21  A.  No.
22  Q.  Now, you say the handcuffs and the restraints were
23  not connected during the Eimers restraint?
24  A.  I did not see them connected.
25  Q.  Did anyone's body connect them?

25 (Pages 97 to 100)

101

1   A. I'm sorry?  Did anybody --
2   Q. Was someone holding the hobble and holding the
3   cuffs when the restraint activities were going on?
4   A. Not that I recall.
5   Q. When you were compressing the shoulder of Mr.
6   Eimers, which is where we left off at the scene, where was
7   Officer Lovette?
8   A. I don't recall compressing his shoulders.  I don't
9   recall how I was holding him.  And, I don't know where
10  Officer Lovette was at the time.
11  Q. Well, you already described you were holding his
12  shoulder.
13  A. Correct.
14  Q. So that he couldn't roll.
15  A. Correct.
16  Q. Face down.
17  A. He was in the prone position.
18  MR. REYNOLDS:  Objection, form.
19  Q. Prone meaning face down?
20  A. His face was not face down.  His face was to the
21  side.
22  Q. The front part of his body was pressed down to the
23  sand.
24  A. Chest down, yes.
25  Q. Right.  You were on one shoulder, Officer Del Valle

102

1   was on the other.  We saw in the video, more officers came.
2   What did you see Officer Lovette actually do?
3   A. Officer Del Valle was not --
4   MR. BURKE:  Object to form.
5   MR. REYNOLDS:  Join.
6   MR. BURKE:  Excuse me.  Go ahead, sir.
7   THE WITNESS:  Officer Del Valle was not on the
8   other shoulder, as I recall.
9   Q. Who was on the other shoulder?
10  A. As I recall, it was Sergeant Zamora.
11  Q. Excuse me.  I misstated.
12  So, with Zamora on the left shoulder, you were on
13  the right shoulder, another officer came in; male or female?
14  A. I don't know.
15  Q. What did that officer do?
16  A. I don't know.
17  Q. Did anyone put part of their body on the back area
18  of Mr. Eimers during this restraint process?
19  A. At the time I was at his shoulder?
20  Q. At any time that you saw.
21  A. I believe there was a knee near his back, but I do
22  not know whose it was.
23  Q. Near his back or on his back?
24  A. On his back.
25  Q. Why is that not in your report?

103

1   A. Because it was not.
2   Q. Verify, is anything about Lovette in your report?
3   A. No.
4   Q. Is anything about a knee with pressure on the back
5   of Mr. Eimers in your report?
6   A. No.
7   MR. REYNOLDS:  Objection, form.
8   Q. Why not?
9   A. Because I wrote what I did and what I saw.
10  Q. Well, you just told me you saw a knee on his back.
11  Why is that not in your report?
12  A. I didn't --
13  MR. REYNOLDS:  Objection, form.
14  THE WITNESS:  I didn't do that.  This was my report
15  from what I did.
16  Q. Did you write this report?
17  A. Yes.
18  Q. You just told me that you know that someone's knee
19  was on his back or near his back.  Was it on his back or near
20  his back?
21  A. On his back.
22  Q. Why did you choose not to put that in your report?
23  MR. BURKE:  Object to the form of the question.
24  MR. REYNOLDS:  Join.
25  A. I wrote the report on what I did.  My knee was not

104

1   on his back, so I did not put that.
2   Q. You wrote what Zamora did, right?
3   A. Correct.  He was on his other side.
4   Q. So why didn't you say what Lovette did?
5   MR. REYNOLDS:  Objection, form.
6   MR. BURKE:  Object to the form of the question.
7   A. I can't answer to why I wrote -- how I wrote my
8   report a year ago.
9   Q. Were you told not to include Lovette in this
10  report?
11  A. I was never told that.
12  MR. REYNOLDS:  Objection, form.
13  Q. Is there any reason why you excluded it from your
14  report?
15  MR. BURKE:  Object to the form of the question.
16  MR. REYNOLDS:  Join.  Asked and answered.
17  A. No.
18  Q. You don't mention anything about what Wanciak did,
19  right, in your report?
20  A. I do not.
21  Q. Do you remember interviewing with the FDLE?
22  A. Yes.
23  Q. Do you remember saying to the investigator that you
24  were the third police officer on the scene?
25  A. Not specifically.

26 (Pages 101 to 104)

105

Q.  Do you remember telling the FDLE investigator that you approached the suspect while other officers, plural, continued to give commands?

A.  Not specifically.

Q.  Have you seen the report from the FDLE on your interview?

A.  Yes.

Q.  Was there anything in it that you found to be false?

MR. BURKE:  Object to the form.

A.  No.

Q.  Did other officers place Mr. Eimers' right hand into the cuffs?

A.  I don't recall anybody else actually having control of the cuff.

Q.  Do you know why the FDLE report on your interview said that other officers arrived and eventually were able to place the suspect's right hand into the handcuff?

A.  No.

Q.  That's not what happened, is it?

A.  I recall what I recall and what was in the report.

Q.  And it was you who were putting the right hand into the cuff, right?

A.  I was in physical control of the cuff.

Q.  No other officers?

106

A.  Not that I can recall at this time.

Q.  If Zamora, as you stated in your report, announced that he, that Mr. Eimers, was unconscious after you finished cuffing him, there's no need to put restraint on his feet, is there?

MR. BURKE:  Object to the form of the question.

MR. REYNOLDS:  Join.

A.  He announced that after I had already been to his right shoulder and we began to lift him.  And, as I believe the report states that, and as I believe I stated on the testimony, the leg restraints, as you're referring to, were placed between, from what I remember, between the time the cuff went on and I went to his shoulder.  So it would have been after that we noticed he was unconscious.

Q.  See, that's not what you say in your report, though, is it?

MR. BURKE:  Object to the form of the question.

MR. REYNOLDS:  Join.

BY MR. MCKEE:

Q.  What you're telling us now is something that you've decided to say after you wrote this report, different from your report, right?

MR. BURKE:  Object to the form of the question.

A.  That's what I recall right now.

Q.  Sir, what really happened here, according to your

107

report, is he went unconscious.  And then, his feet were restrained because no one noticed he was unconscious other than Zamora.

MR. BURKE:  Object to the form of the question.

MR. REYNOLDS:  Join.

BY MR. MCKEE:

Q.  And you still put a restraint on his feet, right?

MR. BURKE:  Object to the form of the question.

MR. REYNOLDS:  Join.

A.  I recall the restraint went on his feet before we noticed  him unconscious.

Q.  Well, was he unconscious or not unconscious when the restraint went on his feet?

A.  As far as I know, he was conscious.

Q.  And show me where you said that in your report of December 2nd, 2013.

A.  You're asking --

Q.  Show it to us.

A.  You're asking for my recollection.

Q.  Hold it up, please.  Show where you said that in your report on December 2nd, 2013.

MR. BURKE:  Said what?

BY MR. MCKEE:

Q.  Said that he was still struggling, we put restraints on his feet, and then he went unconscious.  Show

108

me where that says it.

A.  "After securing the suspect into handcuffs, he began to kick his feet and continued to resist Sergeant Zamora.  And I remained in control of his upper body and other officers began attempting to secure his legs.  While waiting for other officers to secure his legs, Sergeant Zamora announced the suspect was unconscious."

Q.  So they haven't secured his legs yet according to your report at that time, right?

A.  What I recall now is that his legs were secure.  He went unconscious and not --

Q.  I asked about your --

MR. BURKE:  Well, let him finish his answer, please.

MR. MCKEE:  Well, he's got to answer my question.

MR. BURKE:  Well, let him -- let him finish his answer and then you can ask your next question.

BY MR. MCKEE:

Q.  Go ahead.  Are you finished with your answer?

A.  I noticed or I believed he was still conscious at that time.

Q.  And that's not what you said in your report back in 2013, right?

MR. BURKE:  Object to the form of the question.

A.  That's what I recollect now was happening.

27 (Pages 105 to 108)

109

```
 1        Q.  You specifically said, "I also noticed that the
 2   suspect was non-responsive."  You said that on December 2nd,
 3   2013, right?
 4        A.  Yes.
 5        Q.  And then they put the hobble on him, right?
 6            MR. REYNOLDS:  Objection, form.
 7            MR. BURKE:  Object to the form of the question.
 8        A.  I don't recall putting the hobble on after.  I
 9   recall him still being conscious when the hobble was placed
10   on.
11        Q.  Is the hobble -- is the hobble a cuff?
12        A.  No, it's --
13        Q.  What's the next thing you said in your report that
14   happened?
15            MR. BURKE:  After what?
16   BY MR. MCKEE:
17        Q.  What's the next thing that -- after you say you
18   noticed he was not responsive, what's the next thing the
19   officers do?
20        A.  We un-cuff the suspect.
21        Q.  When did the hobble come off?
22        A.  I don't know when the hobble come off.
23        Q.  According to your report, it was never put on.
24            MR. BURKE:  Object to the --
25   BY MR. MCKEE:
```

110

```
 1        Q.  Was it?
 2            MR. BURKE:  Object to the form of the question.
 3        A.  I do not know when the hobble came off.
 4        Q.  Was the hobble put on, according to your report?
 5        A.  I did not write the word hobble in my report.
 6        Q.  Was the hobble taken off after it was noticed that
 7   he was not conscious?
 8        A.  I did not write the word hobble in my report.
 9        Q.  Is there anything about this that would indicate
10   that the police officers on the scene were really monitoring
11   this man for his decline until it was too late?
12        A.  The second --
13            MR. BURKE:  Object to the form of the question.
14            MR. REYNOLDS:  Objection, form.
15            MR. BURKE:  Go ahead, sir.
16            THE WITNESS:  The second we noticed he was
17   unconscious, we attempted to render medical aid.
18   BY MR. MCKEE:
19        Q.  How about when he stopped breathing, did anyone
20   notice that?
21        A.  The second --
22            MR. BURKE:  Object to the form of the question.
23            MR. REYNOLDS:  Join.
24            MR. BURKE:  Go ahead.
25            THE WITNESS:  The moment we noticed he was
```

111

```
 1   unconscious, we immediately attempted to render aid.
 2   BY MR. MCKEE:
 3        Q.  When did he stop breathing?
 4        A.  I don't know when he stopped breathing.  I just
 5   know that he was not responsive --
 6        Q.  When did his skin color change?
 7        A.  I don't know.  I never noticed his skin color
 8   change.
 9        Q.  None of the officers were monitoring that, were
10   they?
11            MR. BURKE:  Object to the form of the question.
12            MR. REYNOLDS:  Join.
13        A.  I don't know.  I can't attest to what the other
14   officers were monitoring.
15        Q.  Are you aware of any other officer that monitored
16   skin change or breathing?
17        A.  I'm not aware of any officers and what they did as
18   far as skin color or breathing.
19        Q.  Did you?
20        A.  I noticed he was pushing his face right to left, as
21   I stated before.  I don't know exactly at what point he went
22   unconscious, I just noticed he was unconscious.
23        Q.  And had you been monitoring, you, and noticed that
24   he wasn't breathing before he lost consciousness, could you
25   have stopped what you were doing then?
```

112

```
 1            MR. BURKE:  Object to the form of the question.
 2            MR. REYNOLDS:  Join.
 3        A.  If I would have noticed he would have stopped
 4   breathing, yes.
 5        Q.  It might have saved is life, --
 6            MR. BURKE:  Object to --
 7   BY MR. MCKEE:
 8        Q.  -- right?
 9            MR. REYNOLDS:  Objection, form.
10            MR. BURKE:  Object to the form of the question.
11        A.  The second we noticed he was unconscious, we
12   immediately switched to lifesaving techniques.
13        Q.  Not my question.
14        Had you noticed he had stopped breathing before he
15   lost consciousness, had you been monitoring it, you might
16   have been able to save his life, right?
17            MR. BURKE:  Object.  Object to the form of the
18   question.
19            MR. REYNOLDS:  Objection, form.
20            MR. BURKE:  That's beyond this witness' capability,
21   obviously.
22        A.  The second we noticed he was unconscious, we
23   started to render aid.
24        Q.  Would you agree that he might not have lost
25   consciousness had he been able to breath again?
```

113

1    MR. BURKE:  Object to the form of the question.
2    MR. REYNOLDS:  Join.
3    A.  I don't know whether the breathing had an issue or
4  had an affect on whether he became unconscious.  I know he
5  became unconscious.
6    Q.  But no one was monitoring to see if the actions
7  were causing him to lose consciousness?
8    MR. BURKE:  Object to the form of the question.
9    MR. REYNOLDS:  Join.
10 BY MR. MCKEE:
11   Q.  No one that you saw?
12   A.  No one that I saw.
13   MR. MCKEE:  I want to give as the next Exhibit
14 Number 7, the FDLE Investigative Report relating to your
15 interview.
16   MR. BURKE:  The summary?
17   MR. MCKEE:  Yeah.
18   (Plaintiff's Exhibit 7 was marked.)
19 BY MR. MCKEE:
20   Q.  Exhibit 7.  Have you ever seen that summary?
21   A.  Yes.
22   Q.  Look at the second page.  When you did this
23 interview, were you under oath?
24   A.  Don't recall.
25   Q.  Do you know whether you were given Miranda rights?

114

1    A.  I don't recall.
2    Q.  When you read this report and reviewed it, was
3  anything in it false?
4    MR. BURKE:  Object to form.
5    A.  Not that I noticed.
6    Q.  Did you ever compare it to the report you wrote on
7  December 2nd, 2013?
8    A.  Not specifically.
9    Q.  This interview was in February of 2014, right?  You
10 can look at the front page, bottom.
11   A.  Yes.
12   Q.  You remember this interview?
13   A.  Yes.
14   Q.  You see on the second paragraph of the second page,
15 it states, quote, "Officer Garrido was on the suspect's right
16 side while the suspect was still in the prone position.
17 Sergeant Frank Zamora was on the subject's left side.
18 Officer Garrido noticed that the other officers were having
19 trouble controlling the suspect's feet because the suspect
20 was, quote, 'kicking,' unquote.  Officer placed a hobble on
21 the suspect."
22   Is that what you told the FDLE investigators?
23   A.  I don't remember specifically what I told them.
24   Q.  Did that information come from you; officers placed
25 a hobble on the suspect?

115

1    MR. BURKE:  Object to the form of the question.
2    A.  I don't remember exactly the words I told them.
3    Q.  And then it says, "As the officers began to stand
4  the suspect onto his feet, the officers noticed the suspect
5  was unconscious and the officers immediately placed the
6  suspect down onto the ground."
7    Is that something you told this investigator?
8    A.  I don't remember the exact words I used during the
9  interview.
10   Q.  If that happened, why wasn't it in your report
11 which you wrote a few days after the incident occurred?
12   MR. BURKE:  Object to the form.
13   A.  As I already stated, that is what I recalled at
14 that time, the same comments I made during this interview.
15   Q.  Well, did my client lose consciousness while he was
16 on the ground before the hobble or after he was hobbled?
17   A.  I noticed it after.
18   Q.  You noticed it after.
19   Do you have an explanation why none of that went in
20 your report?
21   MR. BURKE:  Object to the form of the question.  I
22 think you've covered that a lot, Bob.
23   MR. MCKEE:  I might have, but I want to make sure I
24 have a clear answer.
25   MR. REYNOLDS:  Objection, form.

116

1    A.  No.
2    Q.  You've described you and Zamora holding him down
3  and the other officers dealing with his feet, his legs,
4  right?
5    A.  Yes.
6    Q.  Who were those other officers?
7    A.  I don't know specifically.
8    Q.  Did it include Lovette?
9    A.  I don't know if Officer Lovette was at his feet.
10   Q.  Did you ever see Officer Lovette anywhere other
11 than his upper torso?
12   MR. REYNOLDS:  Objection, form.
13   A.  I do not recall where Officer Lovette was.
14   Q.  Have you ever heard of a modified three-point pin?
15   A.  No.
16   Q.  Did you hear it for the first time with Officer
17 Lovette?
18   A.  Yes.
19   Q.  Did you feel you needed to do a three-point pin of
20 Mr. Eimers during this process?
21   MR. REYNOLDS:  Objection, form.
22   A.  I did not do a three-point pin on Mr. Eimers.
23   Q.  And is that because you didn't feel it was
24 necessary?
25   MR. REYNOLDS:  Objection, form.

29 (Pages 113 to 116)

117

1    A.  From where I was and what I was observing, I did
2  not need to do a three-point pin.
3    Q.  Because you didn't think it was necessary?
4    MR. REYNOLDS:  Objection, form.
5    A.  From what I was observing and the positioning I
6  was, no.
7    Q.  As the person trying to get the handcuffs on,
8  wouldn't that have been your call to make?
9    MR. BURKE:  Object to form.
10    MR. REYNOLDS:  Objection, form.
11  BY MR. MCKEE:
12    Q.  To control the suspect in that way?
13    A.  It would not have.
14    Q.  Whose call would it have been?
15    A.  Every officer --
16    MR. REYNOLDS:  Objection, form.
17    THE WITNESS:  Sorry.  Every officer has their own
18  view and their own experiences.  He made his judgment
19  based on what he perceived.
20    Q.  Well, wasn't the goal to cuff him?
21    A.  Yes.
22    Q.  Did you believe that cuffing required a three-point
23  pin during this operation since you were the one doing it?
24    MR. REYNOLDS:  Objection, form.
25    A.  I observed what I observed, did not do a three-

118

1  point pin.  Whatever he observed, he believed he needed it.
2    Q.  You were the one doing the handcuffing, right?
3    A.  Yes, sir.
4    Q.  And you did not believe that that level of activity
5  was necessary for what you were trying to accomplish in
6  handcuffing this man, right?
7    MR. REYNOLDS:  Objection, form.
8    A.  From my side of the body, not for me.
9    Q.  By the way, is the time to use a three-point pin
10  during cuffing?
11    MR. REYNOLDS:  Objection, form.
12    A.  It could be, yes.
13    Q.  Is the reason for a three-point pin to effectuate
14  the handcuffing, right?
15    A.  To help --
16    MR. REYNOLDS:  Objection, form.
17    THE WITNESS:  To help secure a body so it can be
18  cuffed, would be one of the reasons.
19  BY MR. MCKEE:
20    Q.  When you were writing your report in 2012, after
21  this incident -- excuse me, 2013, December 2nd.  Well, let me
22  nail that down first.
23    When did you write your report as opposed to when
24  was it printed with a date on it?
25    A.  I wrote the report on December 2nd on the computer.

119

1    Q.  Did you do it in longhand?
2    A.  I'm sorry.  No.  On the computer.
3    Q.  You typed it into a computer?
4    A.  Yes.
5    Q.  Was it typed into a computer that is the property
6  of the Key West Police Department?
7    A.  Yes.
8    Q.  Were you given a form to utilize for that document?
9    A.  No.  For my supplemental report, no.
10    Q.  Did you at that time know what anyone else was
11  writing?
12    A.  No.
13    Q.  Did you write the first paragraph of your report?
14    A.  Yes.
15    Q.  You did it yourself?
16    A.  Yes.  That was, the first paragraph was given to us
17  to write.
18    Q.  Okay.  That's what I'm getting at.  I want to know
19  what you wrote versus someone else.  Okay?
20    Do you know who wrote the first paragraph?
21    A.  It was after instruction from our PBA attorney.
22    Q.  Did you get any instruction or order from your
23  supervising officer?
24    A.  Our sergeant?  No.
25    Q.  Of anyone in the police hierarchy?

120

1    A.  We were ordered --
2    MR. BURKE:  With regard to putting that statement
3  in, Bob, or something else?
4    MR. MCKEE:  Well, first, with doing a statement.
5    MR. BURKE:  Okay.
6    THE WITNESS:  We were instructed by, I believe,
7  Captain Smith at that time to write a report.
8    Q.  And what day did he instruct you to do that?
9    A.  I don't recall.
10    Q.  And I'm recognizing this is Thanksgiving weekend,
11  so that could explain a four-day delay.
12    My question is, were you instructed on the day of
13  the event to write the report or were you instructed sometime
14  later?
15    A.  It was later.
16    Q.  Was it likely on December 2nd?
17    MR. BURKE:  Object to the form.
18    A.  I can tell you that's the date I wrote it on.
19    Q.  Okay.  Do you know when you were ordered to write
20  it?
21    A.  I don't recall if it was that day or not.
22    Q.  I don't do a lot of police cases, quite frankly.
23  I'm trying, as a private citizen and a lawyer in this case,
24  I'm trying to figure out how, in this event, you wouldn't
25  have had to do a report without an order.

121

```
 1        A.  After consulting my PBA attorney the day of the
 2   event, we were instructed --
 3        MR. BURKE:  You don't have to tell what your PBA
 4   attorney instructed you to do.
 5        THE WITNESS:  The resulting conversation resulted
 6   in us writing the report several days later.
 7        Q.  But the thing that's puzzling to me is the first
 8   paragraph says you were ordered to do it.  That's not from
 9   your lawyer, that's from your boss, right?
10        A.  Yes.
11        Q.  Okay.  So someone's ordering you to write a report.
12   That sounds, at least from that first paragraph, that you
13   didn't want to do it.
14        MR. REYNOLDS:  Objection, form.
15        MR. BURKE:  Object to the form.  You don't have to
16   get into what your lawyer told you.
17   BY MR. MCKEE:
18        Q.  I'm not talking about lawyers, I'm talking about
19   your boss.
20        A.  That's when we were -- that's what the conversation
21   was with my lawyer.
22        MR. BURKE:  You don't have to get into your
23   conversation.
24        Q.  And I'm not trying to go there and I want you to
25   stay away from that.  I'm not trying to get into attorney-
```

122

```
 1   client privilege.  I'm getting at --
 2        A.  I'm going to answer your question --
 3        Q.  Well, let me take the specific language of your
 4   report.
 5        "On 12/2, 2013, I was ordered to write the
 6   following report regarding an incident that took place on
 7   11/28, 2013, in the City of Key West."
 8        Who ordered you to write it?
 9        A.  Captain Smith.
10        Q.  As a matter of police protocol for the Key West
11   Police Department, would you have had to have written a
12   report anyway, without an order?
13        MR. BURKE:  Object to the form of the question.
14        A.  Yes.
15        Q.  Okay.  And if you weren't ordered, would you have
16   written a report?
17        MR. BURKE:  Object to the form.
18   BY MR. MCKEE:
19        Q.  On this incident?
20        A.  Yes.
21        Q.  Okay.  And had you written a report as of prior to
22   being ordered by your chief?
23        A.  It wasn't the chief, sir.  It was the captain.
24        Q.  Okay.  Your captain, excuse me.
25        A.  No.
```

123

```
 1        Q.  Did you write a report different from this one,
 2   which is not the one you were ordered to write?
 3        A.  No, not --
 4        Q.  Was this intended to be your report that you would
 5   have written anyway without being ordered to do so?
 6        A.  I was -- I would have written --
 7        MR. BURKE:  Object to the form of the question.  Go
 8   ahead.
 9        THE WITNESS:  I would have written a report anyway,
10   yes.
11        Q.  And would you have written it in this fashion,
12   other than the first paragraph?
13        A.  Other than the first paragraph, yes.
14        Q.  Okay.  And I'm not talking about words from your
15   lawyer when I ask this question, so if the only way you can
16   write it is to say that's because it's dealing with the
17   lawyer, stop there, okay?  So now I'm going to ask the
18   question.
19        Your next sentence in this report says, "It is my
20   understanding that by refusing to obey the order to write
21   this report, that I can be disciplined for insubordination
22   and that the punishment for insubordination can be up to and
23   including termination of employment."
24        Have you ever written that in any other report
25   you've ever written for the Key West Police Department?
```

124

```
 1        A.  No.
 2        Q.  Before or since, right?
 3        A.  Correct.
 4        Q.  Why is that line in your report?  Your report.
 5        MR. BURKE:  Again, if that's information you --
 6   well, he's going to decline to answer that based on the
 7   fact that he believes that's attorney-client privileged
 8   information.
 9        MR. MCKEE:  Well, hold it.  How can it be?  It's in
10   his report.
11        MR. BURKE:  I understand.  You asked why --
12        MR. MCKEE:  I asked why.
13        MR. BURKE:  You asked why he did it and that calls
14   for --
15        MR. MCKEE:  Well, if he tells me a lawyer told him
16   to do it, that's --
17        MR. BURKE:  Well, then he'd be telling you what the
18   lawyer said, wouldn't he?
19        MR. MCKEE:  That's already there.
20        MR. BURKE:  Well, no, no.  It's not there that my
21   lawyer told me to do it.  It says, it's my
22   understanding.
23   BY MR. MCKEE:
24        Q.  If you're ordered to do something by your captain
25   and you refuse to do it, can you be subject to termination of
```

31 (Pages 121 to 124)

125

1  employment?
2      A.  That could be one of the results, yes/
3      Q.  Okay.
4      A.  In any case.
5      Q.  Since you were going to write this anyway, this
6  report, why did you need -- why did you feel you needed to
7  put this in the report?
8          MR. BURKE:  You don't have to describe what your
9      lawyer said.  We're going to claim privilege on that and
10     you can bring that before the judge.
11 BY MR. MCKEE:
12     Q.  You say, "This report is made only pursuant to such
13 orders."  Was that not true?
14     A.  Sir, that whole paragraph was entered --
15         MR. BURKE:  Well, you don't -- he put this
16     paragraph in and he's not going to discuss how he got
17     this paragraph or where it came from.  But we will
18     represent to you that he's going to claim attorney-
19     client privilege with respect to the inclusion of that
20     paragraph in the report.
21     Q.  Hold it.  This, this is a matter of honesty here.
22 You say in this line that you wrote, under oath, "This report
23 is made only pursuant to such orders."  Right?
24     A.  Yes, sir.
25     Q.  Orders of your captain, right?

126

1      A.  I'm sorry?
2      Q.  You're writing this report, you're making it, only
3  pursuant to your captain's orders, right?
4      A.  The report, yes.
5      Q.  It's not because of your lawyer, it's because your
6  captain ordered you to write it, right?
7      A.  Yes.
8      Q.  But if you were going to write it anyway, what's
9  your understanding of why you put the first paragraph in?
10         MR. BURKE:  We're going to claim privilege and not
11     answer the question.  You can bring it before the judge.
12     I know you're unhappy about it and -- we're going to
13     claim that it's protected by attorney-client privilege,
14     what you're seeking, and we're not going to proceed
15     further.
16         MR. MCKEE:  We'll deal with the judge.  You know,
17     if we've got to go to the judge, I don't have a problem
18     with that.
19 BY MR. MCKEE:
20     Q.  Were you under investigation at the time you wrote
21 this report for some sort of misconduct?
22     A.  Not that I know of.
23     Q.  At the time you wrote this, had your captain given
24 a public description of what happened that was clearly
25 different than the videotape that was taken of this event by

127

1  a tourist?
2      A.  I don't know.
3      Q.  Had you seen the tourist video by the time you
4  wrote this?
5          MR. BURKE:  You've asked that about 20 times
6      already.
7          MR. MCKEE:  I haven't got an answer.  That's my
8      problem.
9          MR. BURKE:  Well, you have.  He said he didn't
10     recall about 20 times.
11     A.  I don't know at what point I saw the tourist video
12 and at what point I wrote this.
13     Q.  See, Officer Wanciak says she saw it the day of the
14 incident.  Do you know when the police got it?
15         MR. BURKE:  Object to form.
16     A.  I don't know when the police got it.
17     Q.  Do you know whether they got it because a newspaper
18 already had it days later?
19     A.  I don't know.
20     Q.  Did anyone, anyone, suggest to you what to put into
21 this report?
22     A.  Other than the first paragraph, no.
23     Q.  Did anyone suggest to you what not to put into this
24 report?
25     A.  No.

128

1      Q.  Prior to being put into a final form, was it
2  reviewed by anyone first?
3      A.  It would have been reviewed by my supervisor.
4      Q.  And were any corrections, changes, edits, deletions
5  or additions made after that review?
6      A.  Not that I can recall.
7      Q.  That tourist phone video, what tourist took it?
8      A.  I don't know.
9      Q.  Why not?
10     A.  I never spoke with them.
11     Q.  Do you know who it was?
12     A.  No.
13     Q.  Why didn't the police get that tourist's name when
14 they interviewed her?
15     A.  I don't know.
16     Q.  Remember yesterday on that videotape of the scene
17 when this was all happening, that man by the telephone pole
18 holding the video camera, which was much closer than the
19 tourist camera, obviously, are you aware that a police
20 officer at the scene made him delete the footage?
21         MR. BURKE:  Object to form.
22         MR. REYNOLDS:  Join.
23     A.  No.
24     Q.  Who was that man?
25     A.  I am not aware that happened.

WWW.USLEGALSUPPORT.COM
1-888-311-4240

129

```
1          Q.  Tell the City of Key West why that man's tape isn't
2     available.
3          MR. REYNOLDS:  Objection, form.
4          A.  I'm not aware that happened.
5          Q.  Well, you saw the video being played, right?
6          A.  Yes.
7          Q.  Being taken on the scene.  Where's that tape?
8          MR. REYNOLDS:  Objection, form.
9          MR. BURKE:  He's answered, he's answered your
10    question three times now.
11         A.  I don't know.
12         Q.  How big is this police force at this time, a year
13    ago?
14         A.  A year ago, I don't know.
15         Q.  More than 20?
16         A.  Yes.
17         Q.  More than 30?
18         A.  I believe there's approximately 90 sworn officers
19    in the police department.
20         Q.  Okay.  And at the time of this event, how many
21    officers were at the scene collecting evidence?
22         MR. BURKE:  Collecting evidence?
23         MR. MCKEE:  Yeah, after the event.
24         A.  I don't know.
25         Q.  Who was in charge of scene control that day?
```

130

```
1          A.  I don't know.
2          Q.  Who was -- who, if anyone, ordered any officers to
3     gather witness statements that day?
4          A.  I don't know.
5          Q.  Were you ordered to do so?
6          A.  No.
7          Q.  Did you participate in that in any way, shape or
8     form?
9          A.  Not that I can recall.
10         Q.  Do you have an explanation why a man with a video
11    camera who is less than 20 feet from this event, we don't
12    know the name, identity or where his video footage is?  Do
13    you have any understanding why that happened?
14         MR. BURKE:  Object to the form.
15         MR. REYNOLDS:  Join.
16         A.  I recall him holding a cell phone up, but not a
17    video camera.
18         Q.  Okay.  Whether it be a cell phone or a video cam
19    held -- a handheld camera, do you have any explanation why
20    the police don't know the identity of that person and where
21    this footage is?
22         A.  No.
23         Q.  You heard yesterday in the testimony that the
24    direct evidence of the Taser footage -- excuse me, of the
25    dash-cam footage of Mr. Lovette somehow doesn't exist.  Do
```

131

```
1     you remember hearing that?
2          A.  I heard that yesterday, yes.
3          MR. BURKE:  Object to the form.
4          Q.  Is that the first time you heard that?
5          MR. REYNOLDS:  Join.
6          A.  Yes.
7          Q.  You heard that he had a tape -- you heard that he
8     had activated his Taser such that it should have video and
9     audio taped the events with Mr. Eimers, right?
10         MR. BURKE:  Object to form.
11         MR. REYNOLDS:  Objection, form.
12         A.  You're speaking of his Taser now?
13         Q.  Yeah.
14         A.  That's what I heard yesterday.
15         Q.  And somehow, that footage is missing too.  You
16    heard that, right?
17         MR. BURKE:  Object to form.
18         MR. REYNOLDS:  Objection, form.
19         A.  That's what I heard yesterday.
20         Q.  Right.  Where did that footage go?
21         MR. REYNOLDS:  Objection, form.
22         MR. BURKE:  Object to form.
23         A.  I don't know.  I don't have access to that.
24         Q.  Do you find it odd that the police evidence of
25    their own taping devices all disappeared?
```

132

```
1          MR. BURKE:  Object to the form.
2          MR. REYNOLDS:  Objection, form.
3     BY MR. MCKEE:
4          Q.  Do you find that odd?
5          A.  I don't know.
6          Q.  Have you ever had your dash cam not tape when it
7     was on, to your knowledge?
8          A.  To my knowledge, no.
9          Q.  Do you have a bunch of problems with that, with
10    that instrument in your car?
11         A.  The -- yes.
12         Q.  It doesn't tape?
13         A.  The ICOP had several malfunctions.
14         Q.  Okay.  Did it have any malfunctions the day of the
15    Eimers event in your car?
16         A.  I don't recall.
17         Q.  When they have malfunctions, do they get fixed?
18         A.  If you take them to the city garage and they're
19    able to be fixed, generally they are.
20         Q.  Are you aware of any evidence that suggests that
21    Lovette's dash cam system was actually broken on the day of
22    this event?
23         MR. REYNOLDS:  Objection, form.
24         A.  I do not know the condition of his vehicle or his
25    recording system.
```

133

```
 1        Q.  And then, when we get to the issue of the folks at
 2   the scene, the tourists, was it the police that obtained the
 3   video from the Columbian lady or was it a news facility that
 4   got it?
 5        A.  I don't know.
 6        Q.  If it was the news entity, can you explain why the
 7   police department didn't get it first?
 8            MR. BURKE:  Object to the form.
 9            MR. REYNOLDS:  Join.
10        A.  I didn't know.
11        Q.  When the scene was being controlled, all those cop
12   cars on the street, right, they were blocking the street,
13   right?
14        A.  In essence, yeah, but that's not what the intent
15   was.  The street's very small.
16        Q.  But nonetheless, you've got all the police cars
17   there, a man's just been taken down, a man may be dying at
18   the scene.  Are police officers now controlling the scene to
19   make sure no one's leaving, coming or going at that point
20   that day?
21            MR. BURKE:  Object -- object to the form of the
22   question.
23            MR. REYNOLDS:  Join.
24        A.  I wasn't.
25        Q.  When involved in an event that may be criminal in
```

134

```
 1   nature, it may just be a very bad day for somebody that the
 2   police are involved, where there might be a death, a severe
 3   injury, police involved, are all of the officers involved
 4   supposed to be collecting evidence thereafter?
 5        A.  Depends on the circumstances.
 6        Q.  In this circumstance, the officers involved, when
 7   they know something bad happened to Mr. Eimers during this
 8   process, were any of them supposed to collect evidence?
 9        A.  I made -- I left shortly after to go to another
10   call, another priority call across the city.
11        Q.  How long did you stay at the scene?
12        A.  I don't know.  That would be on the CAD recordings.
13        Q.  Was it long enough to have heard from a New York
14   retired police officer who was incensed by what he saw?
15        A.  No.
16            MR. BURKE:  Object to form.
17            MR. REYNOLDS:  Join.
18        Q.  Are you aware of that individual as we sit here
19   today?
20        A.  Other than you selling it yesterday.
21        Q.  Selling it or telling it?
22        A.  Telling it.  I'm sorry.
23        Q.  I don't want to try to sell anything.
24            MR. BURKE:  Well, that's a matter of perception.
25            MR. MCKEE:  I object to form.
```

135

```
 1            MR. BURKE:  There you go.
 2            MR. MCKEE:  Sorry to laugh.  It's a serious matter,
 3   actually.
 4   BY MR. MCKEE:
 5        Q.  But, I'm trying to figure out why you as an officer
 6   who you were under investigation from the FDLE, right?
 7        A.  Yes.
 8            MR. BURKE:  Object to form.
 9        Q.  How do you not know of a police officer from
10   another jurisdiction who witnessed this and who was incensed
11   by your conduct, how did you not know that until yesterday?
12            MR. BURKE:  Object to the form of the question.
13            MR. REYNOLDS:  Objection, form.
14            MR. BURKE:  How would anybody answer that question?
15            MR. MCKEE:  I know I could.
16        A.  I must have not been near him.  I don't recall.
17        Q.  You did not have any conversations with your fellow
18   officers, like Officer Wanciak?
19        A.  Not about that, no.
20        Q.  You heard yesterday she was near him, right?
21        A.  That is what I heard.
22        Q.  And that's the first time you've ever heard of him?
23        A.  Yes.
24        Q.  Is there a protocol that requires the names and
25   contact information of all witnesses be taken by the
```

136

```
 1   investigating officers at the scene?
 2        A.  I don't know of protocol, but that is practice.
 3        Q.  You're aware that the police department did get
 4   access to the videotape from the Columbian lady, right?
 5        A.  From what you're saying.  I don't know what the
 6   lady was.
 7        Q.  Well, it's a police department you work for.
 8   You're aware that the police interviewed her, right?
 9            MR. BURKE:  Object to the form of the question.
10            MR. REYNOLDS:  Join.
11        A.  No, I'm not aware of that.
12        Q.  If it's true that they actually interviewed her, do
13   you have an understanding why they wouldn't have gotten her
14   name, address, and maybe contact information other than her
15   phone number?
16            MR. BURKE:  Object to the form.
17            MR. REYNOLDS:  Join.
18        A.  If she was interviewed, I cannot speak to what the
19   officer did during the intaerview.
20        Q.  Should they have gotten her name, address, email,
21   phone numbers --
22            MR. BURKE:  Object to the form of the question.
23   BY MR. MCKEE:
24        Q.  -- under the protocol that you're aware of?
25        A.  I don't know of protocol, but I cannot speak for
```

34  (Pages 133 to 136)

137

1   what another officer did.
2      Q.  You don't know the protocol of what to do at the
3   scene?
4      A.  You asked if I knew any protocol of witness
5   statements and gathering names.
6      Q.  Yeah.
7      A.  That is practice.  I don't recall if there's a
8   protocol for that.
9      Q.  Do you think it's within protocol to know that you
10  have an eyewitness that's recorded the event that lives in
11  another country, and let her leave without getting who she
12  is, where she lives, what her phone number is, what her email
13  is; do you think that's proper protocol?
14     A.  I don't know of the policy that would deal with
15  that.
16     Q.  Well, is it --
17     A.  I don't recall a specific policy.
18     Q.  Is it the same kind of policy that gets rid of
19  Taser footage, dash-cam footage and then, the one known video
20  doesn't get her information as she leaves this country?
21         MR. REYNOLDS:  Objection, form.
22         MR. BURKE:  Object to the form.
23  BY MR. MCKEE:
24     Q.  Is that the same policy?
25         MR. BURKE:  Object to the form of the question.

138

1         MR. REYNOLDS:  Objection, form.
2      A.  As I stated, I don't know the policy that would
3   cover the video.
4      Q.  Does it sound like sound police policy to have the
5   only direct evidence of the police-involved taping of the
6   incident, disappear, and the only known videotape, have that
7   person leave the country and not get who she is?  Does that
8   sound like sound practice to you as a police officer?
9         MR. BURKE:  Object to the form of the question.
10        MR. REYNOLDS:  Join.
11     A.  I can't answer to any of those actions, if they
12  happened or not.
13     Q.  If you're life depended on that information being
14  known, if your freedom or your life depended on it, would you
15  expect your police officers to obtain that information?
16        MR. BURKE:  Object to the form of the question.
17        MR. REYNOLDS:  Join.
18  BY MR. MCKEE:
19     Q.  And not lose it?
20        MR. REYNOLDS:  Join.
21     A.  That would be information to obtain.
22     Q.  Yeah.
23     A.  That is practice.
24     Q.  By the way, how do you keep a man's shoulder from
25  moving if he's stomach-prone in the sand?  Describe that

139

1   process.
2      A.  There's many ways you can keep a shoulder from
3   moving.
4      Q.  How did you do it that day?
5      A.  As I said, I don't recall if I was pushing on it,
6   if I was holding it.  I don't recall the specific manner in
7   which I was doing it.
8      Q.  How many sergeants were in the Key West Police
9   Department back in 2013?
10     A.  In total?  I don't know.
11     Q.  Were there a lot?
12     A.  What's a lot?  It's relative.
13     Q.  Okay.  Who had access, based on your knowledge back
14  in 2013, to the devices that would download materials from
15  dash cams and Tasers; who, to your knowledge?
16     A.  The only person that I know was Sergeant Zamora, he
17  was the sergeant for our shift at that time.
18     Q.  Sergeant Moro (ph)?
19     A.  Zamora.
20     Q.  Zamora.  Okay.  Anyone else?
21     A.  I don't know if any of the other sergeants were in
22  the office that day.
23     Q.  I'm going to ask this question just like I did the
24  prior one.  If you were trying to avoid being prosecuted for
25  a crime, something you did in the police department, and you

140

1   know it got videotaped and you've got to find it, what would
2   you do to find it?
3      A.  I've never had to ask to review a videotape.
4      Q.  Not my question.  I'm giving you a hypothetical.
5   You know it got taped.  It had to have, under the
6   procedures and equipment that you know were involved in the
7   event, and your life depends on you finding it, what would
8   you do to find it in your department?
9         MR. REYNOLDS:  Objection, form.
10     A.  I would not know how to locate a video.
11     Q.  You wouldn't.
12     A.  No.
13     Q.  So you'd just allow yourself to go to prison
14  because you wouldn't take any steps, you'd just go to prison?
15        MR. REYNOLDS:  Objection, form.
16     A.  You're asking if I know how to find a video.  I do
17  not know how to locate videos.
18     Q.  I get the impression you're a smart guy, and I
19  don't mean that in a condescending way.  I want you to use
20  your common sense based on what you've seen around your
21  offices, around your facilities, people you know.  My life --
22  if your life depended on it, where would you go to track down
23  missing video?
24        MR. BURKE:  Objection.
25        MR. REYNOLDS:  Objection, form.

35  (Pages 137 to 140)

141

1    MR. BURKE:  It's been asked and answered.
2    A.  I don't know where the video is stored.  I don't
3  know how to grab a video.
4    Q.  Are you aware that there was a recent Key West
5  Police Department settlement of a lawsuit that involved a
6  higher-level official at a department allegedly destroying
7  evidence?
8    MR. BURKE:  Object to the form of the question.
9    MR. REYNOLDS:  Objection.
10  BY MR. MCKEE:
11    Q.  Are you aware of that?  It's been in the press
12  recently.
13    A.  No.
14    Q.  No?
15    A.  No.
16    Q.  Do you read the news?
17    A.  No.
18    Q.  Okay.
19    MR. BURKE:  I read the news and I haven't seen
20  that, either.
21    MR. MCKEE:  Well, maybe you ought to check with the
22  insurers that pay for those sorts of things.  We're
23  aware of it.
24    MR. BURKE:  Well, you're not paying for the
25  insurance, I don't think.

142

1    MR. MCKEE:  That's for sure.  That's why I don't
2  need to use it.  I got distracted.  Let's take a couple-
3  minute break.  What time is it, by the way, guys?
4    MR. BURKE:  11:30.
5    MR. MCKEE:  Just a couple-minute break.  I want to
6  get myself back on track.
7    THE VIDEOGRAPHER:  Off the video record at 11:30
8  a.m.
9    (Brief recess.)
10    THE VIDEOGRAPHER:  Back on the video record at
11  11:39 a.m.
12  BY MR. MCKEE:
13    Q.  I think I asked you a question that I don't know
14  that I ever got an answer and I'm going to go back briefly to
15  it.
16    Is there a mechanism by which one can ascertain
17  whether the Taser was fired other than the sound it makes
18  after the fact?
19    MR. REYNOLDS:  Objection, form.
20    MR. BURKE:  Join the objection.
21    A.  I don't know.
22    Q.  With your own Taser, for example, were you trained
23  that there's something you can look at, review, whatnot, that
24  would say whether it was actually fired moments or hours
25  before?

143

1    A.  There is video recorded inside the Taser; yes, sir.
2    Q.  Ah.  So if the video of the time that it was in use
3  disappeared, there's also no objective evidence of whether it
4  was actually fired, right?
5    MR. BURKE:  Object to the form.
6    MR. REYNOLDS:  Objection, form.
7    A.  Yes.
8    Q.  Now, going back to the scene, you've got a man that
9  you now notice is unresponsive on the sand, face down, right?
10    A.  Yes.
11    Q.  What did you next do?
12    A.  I immediately ran to my patrol car to retrieve my
13  medical bag.
14    Q.  Do you know what anyone else did when you did that?
15    A.  I believe they were un-cuffing the subject.
16    Q.  Were they also taking off his shackle down at his
17  ankles?
18    A.  I don't know.  It was a hobble, not shackles.
19    Q.  Did they roll him over onto his back?
20    A.  Yes.
21    Q.  When you returned with the medical bag, in what
22  position was he?
23    A.  He was on his back.
24    Q.  Was anyone performing mouth-to-mouth?
25    A.  No.

144

1    Q.  Was anyone doing chest compressions?
2    A.  As I recall, yes.
3    Q.  Who?
4    A.  I believe it was Officer Del Valle.
5    Q.  Do you know for how long he performed that
6  operation?
7    A.  No.
8    Q.  Do you know whether it was continued throughout the
9  time until the paramedics arrived?
10    A.  As far as I recall, yes.
11    Q.  Were you there until the paramedics arrived?
12    A.  Yes.
13    Q.  How many paramedics arrived?
14    A.  I don't recall.
15    Q.  Do you know who made the call for paramedics?
16    A.  No.
17    Q.  Do you know how long it took them to respond?
18    A.  No.
19    Q.  Was it seconds, minutes, tens of minutes?
20    A.  I don't know.  That would be recorded on the CAD
21  system, when medics arrived.
22    Q.  But you were there when they arrived?
23    A.  Yes.
24    Q.  It seemed to be fairly close in time to when the
25  distress of Mr. Eimers had arisen?

145

1    MR. BURKE:  Object to the form of the question.
2    MR. REYNOLDS:  Join.
3    A.  I do not know the time frame.
4    Q.  Do you know from how far away they were coming when
5    they arrived?
6    A.  No.
7    Q.  Do you know how long they were on the scene with
8    Mr. Eimers?
9    A.  No.  I believe I left before they did.
10   Q.  You left before the paramedics left?
11   A.  Yes.
12   Q.  Did you go to the hospital at any point?
13   A.  No.
14   Q.  Have you ever been to the hospital where he was
15   brought?
16   A.  Have I been there?  Yes.
17   Q.  Do you know how long it should take for the
18   paramedics to arrive at that location from the location they
19   were transporting him?
20   A.  I don't know.
21   Q.  Are you aware of any particular traffic congestion
22   that would have caused 4.5 miles to take 22 minutes to
23   arrive?
24   A.  I am not.
25   Q.  Do you know that that's how long it took to get him

146

1    back to the hospital?
2    A.  I didn't.  I did not.
3    Q.  Twenty-two minutes.  Are you aware of anything at
4    that time that would have caused that slow of a transport for
5    this clearly distressed man to get to hospital care?
6    MR. BURKE:  Object to form.
7    MR. REYNOLDS:  Join.
8    A.  I was not in the ambulance.  I did not see it leave
9    and I did not see it drive there.
10   Q.  Was Mr. Eimers ever under arrest?
11   A.  I'm sorry?
12   Q.  Was he placed under arrest?
13   A.  Yes.
14   Q.  Why was he de-arrested at the hospital?
15   MR. REYNOLDS:  Objection, form.
16   A.  I'm sorry.  De-arrested?
17   Q.  Are you aware he was de-arrested at the hospital?
18   A.  No.
19   Q.  No one ever told you that?
20   A.  No.
21   Q.  Do you know what de-arresting has the practical
22   aspect of accomplishing?
23   MR. BURKE:  Object to form.
24   A.  No.
25   Q.  The City doesn't have to pay for his medical care

147

1    if he's not under arrest.  Are you aware of that?
2    A.  No.
3    Q.  Are you aware of whether or not being un-arrested,
4    the body doesn't have to be sent to the medical examiner?
5    MR. BURKE:  Object to form.
6    A.  I am not aware of that.
7    Q.  Are you aware of any attempt for having avoided a
8    medical examiner when Mr. Eimers died by the Key West Police
9    Department?
10   MR. BURKE:  Object to form.
11   MR. REYNOLDS:  Join.
12   A.  No.
13   Q.  Weren't they trying to get him cremated before
14   going to a medical examiner?
15   MR. BURKE:  Object to form.
16   MR. REYNOLDS:  Join.
17   A.  I don't know.
18   Q.  You're not aware of that?
19   A.  No.
20   Q.  Had any discussions with your fellow officers about
21   that?
22   A.  No.
23   Q.  Are you hearing this for the first time from me?
24   A.  Yes.  Like I said, I don't follow the news very
25   much.

148

1    Q.  Do you have friendly relationships with your fellow
2    officers?
3    A.  As you can tell, I'm a soft spoken kind of quiet
4    person.
5    Q.  I can tell that, yes.  But do you have close
6    relationships, friendly relationships with any of your fellow
7    officers?
8    A.  Yes.
9    Q.  You've never had that discussion about the facts
10   that I just described to you?
11   A.  No.  Not about the cremation and the --
12   Q.  Do you know who Officer Stevenson [sic] is?
13   A.  Yes.
14   Q.  Do you know that he went to the hospital?
15   A.  I know he was the detective at that time assigned
16   to it.
17   Q.  Do you know that he took photos of the body?
18   A.  No.
19   Q.  Do you know that during the photographing of his
20   body, in the same time frame --
21   A.  I'm sorry.  Was that a question?
22   Q.  I'm finishing the question.
23       During the photographing of the body, a photograph
24   taken by that officer, the gold earring in Mr. Eimers' ear is
25   removed and has never been seen again.

149

1    MR. BURKE:  Object to form.
2    MR. REYNOLDS:  Join.
3    BY MR. MCKEE:
4        Q.  Do you know whether Mr. Stevenson, Officer
5    Stevenson stole his gold jewelry?
6        MR. BURKE:  Object to form.
7        MR. REYNOLDS:  Join.
8        A.  I did not know of any of those things you're
9    explaining right now.
10       Q.  Lovette said he went to wash his hands from the
11   blood at the scene at some point in time; remember that?
12       MR. REYNOLDS:  Objection, form.
13       A.  Yes.
14       Q.  Did you ever see him bloody?
15       A.  No.
16       Q.  Do you know where -- were you bleeding?
17       A.  I was not.
18       Q.  Did you see any officer bleeding?
19       A.  I did not.
20       Q.  Did you see Mr. Lovette -- or, excuse me, Mr.
21   Eimers bleeding?
22       A.  Yes.
23       Q.  From where?
24       A.  I recall it being from his ears.
25       Q.  Bleeding from his ears.  What have you been trained

150

1    that can cause bleeding from one's ears?
2        MR. REYNOLDS:  Objection, form.
3        A.  I'm not a doctor.  I do not know.
4        Q.  Was that both ears?
5        A.  I don't recall if it was both ears.
6        Q.  Well, you said bleeding from his ears and you
7    pluralized it.  I'm just wanting to make sure I understood
8    you.
9        A.  Okay.  I did pluralize it, but I don't recall if it
10   was from both ears.
11       Q.  Okay.  And you're not saying it wasn't occurring
12   from both ears?
13       A.  Correct.  I just don't recall it.
14       Q.  Are you aware of anything, anybody jamming
15   something in his ear canals?
16       A.  No.
17       Q.  Are you aware of anything, other than dropping a
18   fucking bomb on his head, that could have caused his ears to
19   bleed?
20       MR. BURKE:  Object to the form.
21       MR. REYNOLDS:  Objection, form.
22       A.  I did not see that.
23       Q.  And I'm not using that in a form other than what
24   you heard that Officer Lovette admitted to saying when his
25   Taser was operating, right?

151

1    MR. BURKE:  Object to form.
2    MR. REYNOLDS:  Objection, form.
3        A.  I did not see that.
4        Q.  Okay.  But my point being, you're aware that a
5    heavy blow to the head can cause one's ear or ears to bleed,
6    right?
7        MR. BURKE:  Object to form.
8        MR. REYNOLDS:  Objection, form.
9        A.  I don't know.
10       Q.  Did you observe Mr. Eimers as he was being loaded
11   in the transport to the hospital?
12       A.  I don't recall I did.
13       Q.  Did you observe him when he was on the ground
14   facing upwards?
15       A.  Yes.
16       Q.  Did he have sand in his nose?
17       A.  I don't recall he had sand in his nose.
18       Q.  Did any of the police officers photograph him at
19   the scene?
20       A.  I don't know.
21       Q.  Do you know whether Mr. -- Officer Lovette's Taser
22   visualized him at the scene when he was face up?
23       A.  Whether his Taser videoed?
24       MR. REYNOLDS:  Objection.  Objection, form.
25       THE WITNESS:  I don't know.

152

1        Q.  No one can know because that's the footage that's
2    missing, right?
3        MR. BURKE:  Object to form.
4        MR. REYNOLDS:  Objection, form.
5        A.  You're saying it is.  I don't know.
6        Q.  Well, have you seen his Taser footage anywhere?
7        A.  I have not.
8        Q.  You heard yesterday he activated it, right?
9        MR. REYNOLDS:  Objection, form.
10       A.  Yes.
11       Q.  It should exist, shouldn't it?
12       MR. BURKE:  Object to form.
13       MR. REYNOLDS:  Objection, form.
14       A.  If he activated it.
15       Q.  But you don't know where it is?
16       MR. REYNOLDS:  Objection, form.
17       A.  I don't know where that video is.
18       Q.  Who's Jeff Dean?
19       A.  An officer with the Key West Police Department.
20       Q.  Do you know what his father does?
21       A.  I believe he owns one of the -- I'm sorry, the name
22   of the business escapes me.
23       Q.  Funeral director, right?
24       A.  Yes, yes.
25       Q.  That's where Key West wanted to have him cremated

38  (Pages 149 to 152)

153

```
 1    before getting him to the medical examiner, right?
 2         MR. BURKE:  Object to form.
 3         MR. REYNOLDS:  Join.
 4    A.  I don't know.  I don't know if there are any
 5    others.
 6    Q.  It's the Dean-Lopez Funeral Home, right?
 7    A.  I believe so, yes.
 8    Q.  That's where the body ended up, right?
 9         MR. BURKE:  Object to form.
10    A.  I don't know.
11    Q.  Before getting to the medical examiner, right?
12    A.  I don't know.
13    Q.  Let's talk about objective reasonableness and all
14    the facts and circumstances known to you at the time of your
15    response to resistance here at the Eimers scene.  Okay?
16         MR. BURKE:  Can I interrupt just for a second?
17         MR. MCKEE:  Sure.
18         MR. BURKE:  Just before you -- just for scheduling
19    purposes.  You know, we're --
20         MR. MCKEE:  I'm going to be finished in ten minutes
21    here.
22         MR. BURKE:  Oh, you are.  Okay.
23         MR. MCKEE:  Yeah.
24         MR. BURKE:  I just -- because --
25         MR. MCKEE:  Then we'll go to lunch and then we'll
```

154

```
 1    take him on and his is going to be shorter.
 2         MR. BURKE:  Okay.  Just -- thank you.
 3         MR. MCKEE:  I can guarantee it.
 4         MR. BURKE:  Got-cha.  Go ahead then.
 5    BY MR. MCKEE:
 6    Q.  The crime or alleged crime for which Mr. Eimers was
 7    perpetrating at the time that he was prone in the sand was
 8    what?
 9    A.  Fleeing and alluding, resisting.
10    Q.  No.  I'm talking about when he's already complied
11    and is prone in the sand, before you pulled his arms back,
12    what crime was he participating in then?
13    A.  The reason we were detaining him is because of the
14    crimes he had committed, not for laying in the sand.
15    Q.  But I'm focusing on the place where you're applying
16    force, okay.  So the crime at that scene was what?
17    A.  Like I said, it was crimes he had committed.
18    Q.  Okay.  So he had gone through some red lights and
19    was being followed by police and not stopping.  He is not
20    pulling over.  That's what he's doing, right?
21    A.  He's fleeing, yes.
22    Q.  Well, does fleeing connote to you that the person
23    knows what he's doing?  That means you're trying to escape
24    something.  What if he just doesn't know what in the world
25    you want of him because of his brain function at the time?
```

155

```
 1         MR. BURKE:  Object to the form.
 2         MR. REYNOLDS:  Join.
 3    A.  We cannot attest to his brain function at the time
 4    this was going on.
 5    Q.  And during that chase or that follow, I think the
 6    proper word is, what we know he did, based on some video
 7    cams, he ran some red lights, which is dangerous, right?
 8    A.  Yes.
 9    Q.  He ran some stop signs, which is dangerous, right?
10    A.  Yes.
11    Q.  And those would be crimes, right?
12    A.  Yes.
13    Q.  But they're not crimes where you as an officer feel
14    endangered because you're not the one crossing his path,
15    right?
16         MR. BURKE:  Object to the form.
17         MR. REYNOLDS:  Join.
18    A.  We're to protect ourself or others.
19    Q.  Okay.
20    A.  The others would be the people crossing his path.
21    Q.  And the severity of that crime is -- once he's to
22    the beach, what severity of his crime could arise at the
23    beach --
24         MR. BURKE:  Object to the form.
25    BY MR. MCKEE:
```

156

```
 1    Q.  -- that you were worried about?
 2         MR. REYNOLDS:  Join.
 3    A.  Was unknown.  We didn't know what his condition
 4    was, what he was doing, what he intended on doing.
 5    Q.  So you had no knowledge of the severity of what he
 6    could be like at the beach?
 7    A.  Correct.  It was an unknown threat.
 8    Q.  But it wasn't -- there was no threat since you saw
 9    no arms, right, once he got out of his car?
10         MR. REYNOLDS:  Objection, form.
11    A.  It's still a threat.  We don't know if he could
12    have arms in his pockets.  It's unknown, that's why it's
13    unknown.
14    Q.  Once he has submitted himself by kneeling, laying
15    down and putting his arms to his side, as you've described in
16    your report, he was no longer a threat, was he?
17         MR. BURKE:  Object to form.
18         MR. REYNOLDS:  Join.
19    A.  Until he was in handcuffs, he could still be a
20    threat.
21    Q.  He was not an immediate threat to your harm, as
22    you've described earlier, right?
23         MR. BURKE:  Object to form.
24         MR. REYNOLDS:  Objection, form.
25    A.  I don't know what trainings he could have had.
```

157

1    Hands could be pretty serious weapons on some people.
2        Q.  You -- well, you told me earlier, you did not
3    perceive him as threatening to you.  Do you remember that?
4        A.  I believe I said he wasn't making -- or, I believe
5    you asked if he was making threatening movements and he was
6    not.
7        Q.  Okay.  So he was not making a threat to you at the
8    time when you were about to cuff him, correct?
9        MR. REYNOLDS:  Objection, form.
10       A.  No, he was not making threatening motions to me.
11       Q.  You knew nothing about Eimers' mental or
12   psychiatric history at that time, right?
13       A.  That is correct.
14       Q.  And likewise, no one had conveyed any such
15   information to you, even if they possessed that information?
16       A.  That -- correct.
17       Q.  Mr. Eimers had no violent history that you're aware
18   of, did he?
19       MR. BURKE:  Object to form.
20       A.  At that time?
21       Q.  Right.
22       A.  No.
23       Q.  You had no awareness of his ability to fight,
24   training, strength, you had no knowledge of that?
25       A.  It was unknown at the time.

158

1        Q.  He had no weapons?
2        A.  I don't know for positive he had no weapons at that
3    time.  I knew I didn't see any.
4        Q.  Right.  And nor did you later find any.  There were
5    no weapons.
6        A.  Correct.
7        Q.  On the beach, at that time, there were no
8    bystanders, right?
9        MR. REYNOLDS:  Object to the form.
10       MR. REYNOLDS:  Join.
11       A.  I don't recall any immediate bystanders on the
12   actual beach.
13       Q.  And there were how many police officers versus Mr.
14   Eimers at that time?
15       A.  I don't recall the specific amount of officers.
16   That would be in CAD.
17       Q.  Was it 13?
18       A.  I don't recall the specific amount.
19       Q.  More than five, right?
20       MR. BURKE:  Object to form.
21       A.  I don't recall the amount.
22       Q.  You saw the video yesterday, right?  You don't
23   recall yesterday's video?
24       A.  I didn't count the officers in the video yesterday.
25       Q.  Were there at least five?

159

1        MR. BURKE:  Object to form.
2        MR. REYNOLDS:  Join.
3        A.  If you'd like to show me the video, then I can
4    count them if you'd like.
5        Q.  You don't even remember yesterday?
6        MR. BURKE:  Object to form.
7        MR. REYNOLDS:  Join.
8        A.  I didn't count the officers on the scene.
9        Q.  Can you identify the officers that touched Eimers
10   at the beach?
11       A.  Officer Del Valle would have when conducting CPR.
12   Myself.  Specifically who I saw touch, I couldn't.  Any more,
13   I don't know.
14       Q.  How about Medina?
15       A.  I don't recall whether he was touching him.
16       Q.  How about Del Valle?
17       A.  I already said he was one of the officers.
18       MR. BURKE:  Who?
19       MR. MCKEE:  Del Valle.
20       Q.  How about Wanciak?
21       A.  I don't recall whether she was -- I didn't see her
22   touch him.
23       Q.  Did you watch the video yesterday?
24       A.  Yes.
25       Q.  Didn't you see her touching him?

160

1        MR. REYNOLDS:  Objection, form.
2        A.  I could not see her from the video.
3        Q.  Were you here when she was testifying?
4        A.  Yes.
5        Q.  How she said that she was at his legs?
6        A.  Okay.  I can assume people were touching him
7    because of what, but what I saw is I saw those two officers I
8    named.
9        Q.  Lovette?
10       MR. REYNOLDS:  Objection, form.
11       A.  I did not see him, at that time, touch him.
12       Q.  At any time?
13       A.  No.
14       Q.  How did he get blood on him?
15       MR. REYNOLDS:  Objection, form.
16       A.  I don't know.
17       Q.  You saw him with blood, right?
18       MR. REYNOLDS:  Objection, form.
19       A.  I don't believe I said I saw blood on his hands.
20       Q.  Well, let me get this straight.  You're on my
21   client's right shoulder and you didn't see what he described
22   having done yesterday?  You didn't see him do it?
23       A.  No.
24       MR. REYNOLDS:  Objection, form.
25       Q.  Were your eyes closed?

161

```
1       A.  No.
2       Q.  Did Officer Calvert touch him?
3       A.  I didn't see him.
4       Q.  Was he there?
5       A.  I believe he was there.
6       Q.  Officer Galbo?
7       A.  I don't recall him touching him.
8       Q.  Was he there?
9       A.  I actually don't recall if he was.
10      Q.  Officer Celcer?
11      A.  Yes, he was there.
12      Q.  Did he touch him?
13      A.  Yes, he did.
14      Q.  Are we over five now?
15          MR. REYNOLDS:  Objection, form.
16      A.  I think we're at four touching him.
17      Q.  Sergeant Zamora?
18      A.  Yes.
19      Q.  There and touched him?
20      A.  I'm sorry?
21      Q.  There and touched him?
22      A.  There and touched him.
23      Q.  Yes?
24      A.  Yes.
25      Q.  Officer Wallis?
```

162

```
1       A.  If you're asking, you're recollecting my memory,
2   then --
3       Q.  Yeah, that's what I -- I'm trying to be helpful
4   here.
5       A.  I don't recall if Officer Wallis touched him.
6       Q.  Okay.  So as far as the number of subjects versus
7   the number of officers, it was that many against Eimers,
8   right?
9           MR. BURKE:  Object to form.
10          MR. REYNOLDS:  Join.
11      A.  Yes.
12      Q.  And you saw three with drawn arms, right?
13      A.  Drawn weapons?
14      Q.  Yeah.
15      A.  I saw myself and Officer Del Valle.  I don't recall
16  seeing another one with a weapon.
17      Q.  Who was the third person that you told FDLE that
18  was also there before you?
19      A.  I think, Officer KA, I saw her in the street, but I
20  don't recall seeing her once I ran to the beach.
21      Q.  The duration of the confrontation was about how
22  long?
23      A.  I don't know the time frame.
24      Q.  The duration on the beach, was it more than five
25  minutes?
```

163

```
1       A.  I don't know the time frame.
2       Q.  You've already told us that -- well, when you were
3   there and even to today, you don't remember anything about
4   the size of Mr. Eimers?
5       A.  I don't remember anything spectacular about him.  I
6   don't remember him being specifically obese and he wasn't a
7   hundred-pounds.
8       Q.  You don't remember what his age was?
9       A.  No.
10      Q.  Didn't remember really what his weight was, whether
11  he was obese or not?
12      A.  He was a larger person.  I wouldn't consider him
13  obese.
14      Q.  And you had no -- had no knowledge of his physical
15  condition?
16      A.  I did not, at that time.
17      Q.  And of the officers involved with you, you're how
18  tall?
19      A.  Five-ten, eleven.
20      Q.  You're what age?
21      A.  Twenty-eight.
22      Q.  Your weight is what?
23      A.  195.
24      Q.  Consider yourself in good shape?
25      A.  Sometimes.
```

164

```
1       Q.  You work out?
2       A.  Yes.
3       Q.  You have no -- had no physical impairment to your
4   ability to use your musculature at the time?
5       A.  No.
6       Q.  Same with Lovette?
7       A.  I can't speak for Lovette?
8       Q.  Big guy?  We all met him yesterday.
9       A.  Can't speak for Lovette's condition.
10      Q.  Okay.  How about Del Valle?  Big guy?
11      A.  I can't speak for other officers' conditions.
12      Q.  Okay.  We'll deal with that.
13          Would you agree it's harder to run on sand?
14      A.  Yes.
15      Q.  So the environmental factors such as physical
16  terrain, weather conditions, the terrain was such that you
17  had the advantage?
18          MR. BURKE:  Object to form.
19  BY MR. MCKEE:
20      Q.  Sandy, a man at gunpoint, completely compliant at
21  the time he was laying down in the sand, right?
22      A.  Yes.
23          MR. REYNOLDS:  Objection, form.
24      Q.  Did you ever hear any discussion of turning Eimers
25  over to the Sheriff's Department or Monroe County Detention
```

41 (Pages 161 to 164)

165

1   Facility?
2       A.  No.
3       Q.  Are you aware that the paramedics were called and
4   told that the patient had been Tased?
5       A.  I'm not aware of that.
6       MR. REYNOLDS:  Objection, form.
7       Q.  Have you ever seen the paramedics' report?
8       A.  No.
9       Q.  We know one thing for sure that day, up to the time
10  that they loaded him into the truck, the paramedics never
11  spoke to Eimers, right?
12      MR. BURKE:  Object to form.
13      MR. REYNOLDS:  Join.
14      A.  I don't know.  I wasn't one of the paramedics.
15      Q.  Did you see any conversation ability by Mr. Eimers
16  at the time that he was being dealt with there with the
17  paramedics on the scene?
18      A.  I did not see the paramedics speak to Mr. Eimers,
19  no.
20      Q.  And Mr. Eimers wasn't talking anyway because he was
21  out, right?
22      A.  As far as I know.
23      Q.  Okay.  Did you see the paramedics talk to anyone
24  other than the police officers?
25      A.  I didn't, no.

166

1       Q.  Did you see them talk to police officers?
2       A.  I don't recall specifically them speaking to police
3   officers.
4       Q.  Did you talk to any of the paramedics?
5       A.  I don't recall speaking with them.
6       Q.  Do you know what the source of the paramedics'
7   report that stated that Mr. Eimers had exited his car, run
8   and collapsed, as the story of what was given to them of what
9   happened at the scene?
10      MR. BURKE:  Object to form.
11      MR. REYNOLDS:  Join.
12      A.  I don't know how they got their comment.
13      Q.  Do you know that they're going to testify that it
14  was police officers who said that?
15      MR. BURKE:  Object to form.
16      MR. REYNOLDS:  Objection, form.
17  BY MR. MCKEE:
18      Q.  That wouldn't be true, would it?
19      MR. BURKE:  Object to form.
20      MR. REYNOLDS:  Join.
21      A.  I don't know how they got that information.  You'd
22  have to ask them.
23      Q.  You were here yesterday when Officer Lovette was
24  testifying and it was pulled up on his Taser audio and he
25  said several times, "Gabe killed him."  At the scene, who was

167

1   Gabe?
2       MR. BURKE:  Object to the form.
3       MR. REYNOLDS:  Objection, form.
4       A.  That's what I'm called, Gabe.
5       Q.  I assume you don't agree with Officer Lovette's
6   Taser recording that you killed him?
7       MR. BURKE:  Object to the form.
8       MR. REYNOLDS:  Objection, form.
9       A.  That's incorrect, yes.
10      Q.  Is he the type of personality that when he doesn't
11  know he's being recorded, he tells lies?
12      MR. REYNOLDS:  Objection, form.
13  BY MR. MCKEE:
14      Q.  Based on your appreciation of him?
15      MR. REYNOLDS:  Objection, form.
16      A.  I don't know.  I'm not a profiler.  I don't -- I
17  really don't speak with him very much.
18      Q.  In the scene after this event and in the police
19  department in the days following, did you know he had accused
20  you of killing Eimers?
21      MR. BURKE:  Object to form.
22      MR. REYNOLDS:  Objection, form.
23      A.  That statement was said on the radio, which I heard
24  once.
25      Q.  You heard that on the radio, meaning the news

168

1   radio?
2       A.  Yes.
3       Q.  And when you heard it, what did you think?
4       MR. REYNOLDS:  Objection, form.
5       A.  Something made up.
6       Q.  And now you know it wasn't made up, right?
7       MR. BURKE:  Object to the form.
8       MR. REYNOLDS:  Objection, form.
9       A.  I couldn't hear that on the audio.  You're saying
10  that's what it said on the audio.
11      Q.  You're fellow officer who was at the scene said
12  that on his Taser recording, right?
13      MR. REYNOLDS:  Objection, form.
14      A.  I didn't hear it on the audio yesterday.  I
15  couldn't hear it from where I was.
16      Q.  Did you hear him confirming that he had said that?
17      MR. REYNOLDS:  Objection, form.
18      A.  I don't remember if he confirmed that specific
19  comment, because there were several comments.
20      Q.  In your actions around the community and maybe on
21  down time, do you decompress by telling lies about what
22  happened at the death of somebody?
23      MR. REYNOLDS:  Objection, form.
24      A.  I do not.
25      Q.  It seems odd to you, doesn't it?

169

1      MR. BURKE:  Object to form.
2      MR. REYNOLDS:  Objection, form.
3      A.  Everybody has their own ways of decompression.
4  That's not mine.
5      Q.  Is a way that -- does your policy, your police
6  policy, allowing him to state on a recording that a fellow
7  officer killed somebody, is that allowed?
8      MR. REYNOLDS:  Objection, form.
9      A.  I don't know if there's a policy pertaining to that
10  specifically.  I don't know.
11     Q.  No?  Are you allowed to say false information about
12  an officer?
13     MR. REYNOLDS:  Objection, form.
14     A.  I don't know --
15     Q.  Are you allowed --
16     A.  -- of a policy.
17     Q.  Are you allowed to say true information about an
18  officer?
19     MR. REYNOLDS:  Objection, form.
20     A.  I don't know if there's a policy that specifically
21  says whether you are or are not allowed.
22     Q.  Do you have any reason why you can come to terms
23  with why your fellow Officer Lovette would say that you
24  killed Mr. Eimers?
25     MR. REYNOLDS:  Objection, form.

170

1      A.  I do not.
2      Q.  How does it make you feel that he said that?
3      MR. REYNOLDS:  Objection, form.
4      MR. BURKE:  Object to form.
5      A.  I know it's not true.
6      Q.  How does it make you feel that on the same day that
7  this man is sent, on the verge of death, on the same day,
8  he's saying that to people on his Taser recording?
9      MR. REYNOLDS:  Objection, form.
10     A.  I know what actions I had, so as far as that
11  statement is concerned differed.
12     Q.  Did the FDLE ask you about that statement?
13     A.  I don't recall they did.
14     Q.  Do you know whether they even knew that that
15  statement existed?
16     MR. REYNOLDS:  Objection, form.
17     A.  I can't state for what they knew at that time of
18  the interview.
19     Q.  Did you testify at the grand jury proceedings?
20     A.  Yes.
21     Q.  An eyewitness -- strike that.
22         Did you know who the witnesses were going to be at
23  that proceeding?
24     A.  The grand jury?
25     Q.  Yes.

171

1      A.  No.
2      Q.  Do you have any understanding of how a toy police
3  officer with a pointed gun would be placed facing the front
4  door of one of those witnesses on the day he was going to
5  testify?
6      A.  No.
7      Q.  Do you have an understanding why police vehicles
8  were parked outside one of those witnesses homes for hours
9  the day before they were supposed to testify?
10     A.  No.
11     Q.  Do you know how police officers would know who the
12  witnesses were for the grand jury?
13     A.  I don't know how to find that information.
14     Q.  If you could do that day over, what, if anything,
15  would you have done over?
16     MR. BURKE:  Object to form.
17     MR. REYNOLDS:  Join.
18     A.  I believe we did -- all our actions were accurate.
19  I would not change.
20     Q.  Sir, I want to make sure we understand each other.
21  If you could have simply asked him for his hands and he gave
22  them to you, would you have wished you had done that?
23     MR. BURKE:  Object to form.
24     MR. REYNOLDS:  Join.
25     A.  I believe now, and then, that my actions were

172

1  reasonable and necessary to take him into custody.
2      Q.  Not my question.  Motion to strike.
3          If you could have asked him and he gave you his
4  hands to handcuff him, would you have done it?
5      MR. BURKE:  Object to form.
6      MR. REYNOLDS:  Join.
7      A.  I did not.
8      Q.  I'm asking you, if you could do it over, would you
9  have?
10     MR. REYNOLDS:  Objection, form.
11     A.  No.
12     Q.  You would not have done it?
13     A.  I explained already, one officer was giving
14  commands, that officer was not me.
15     Q.  No, sir.  Two officers were giving commands.  We
16  heard it on the videotape yesterday.  Right?
17     MR. REYNOLDS:  Objection, form.
18     A.  I was not one of the ones giving commands.
19     Q.  There should have only been one, right?
20     MR. BURKE:  Object to form.
21     A.  I heard only one.
22     Q.  And had that officer said, sir, please give your
23  hands to the officer so he can cuff you, do you wish that had
24  happened?
25     MR. REYNOLDS:  Objection, form.

43  (Pages 169 to 172)

173

1    A. I don't know.
2    **Q. You never gave Mr. Eimers a chance, right?**
3    MR. BURKE: Object to form.
4    MR. REYNOLDS: Join.
5    A. I never asked him for his hands.
6    **Q. You're the only one with the second chance, right?**
7    MR. BURKE: Object to the form.
8    MR. REYNOLDS: Objection, form.
9    A. I never asked him for his hands.
10   **Q. Mr. Eimers never gets the opportunity to respond to**
11   **you, does he?**
12   MR. REYNOLDS: Objection, form.
13   MR. BURKE: Don't we know the answer to that, Bob,
14   since he's not here? Is this your question?
15   **Q. You would have done nothing different?**
16   A. I believe that my actions --
17   MR. REYNOLDS: Objection, form.
18   THE WITNESS: -- were reasonable and necessary to
19   take him into custody.
20   **Q. See, not what I asked.**
21   **Would you have done anything different?**
22   MR. BURKE: Object to form.
23   MR. REYNOLDS: Join.
24   A. No.
25   **Q. Nothing different?**

174

1    A. Nothing different.
2    **Q. So you'd have killed him no matter what?**
3    MR. BURKE: Object to form.
4    A. Key West Police Department didn't kill him.
5    **Q. According to your fellow officer, you killed him.**
6    MR. BURKE: Object to form.
7    MR. REYNOLDS: Objection, form.
8    A. That was a question? Was there a question?
9    **Q. Yeah, it was. According to your fellow officer who**
10   **was there at the scene, you killed him, right?**
11   MR. REYNOLDS: Objection, form.
12   BY MR. MCKEE:
13   **Q. That's what was said by him, right?**
14   MR. REYNOLDS: Objection, form.
15   A. That is what he said.
16   MR. REYNOLDS: It's been answered repeatedly. It's
17   harassment now, Counsel.
18   MR. MCKEE: I have no further questions. Thank
19   you. I tender the witness.
20   MR. BURKE: No questions at this time. The witness
21   will read. We'll take a copy of it's ordered.
22   MR. MCKEE: Counsel, any questions?
23   MR. REYNOLDS: No questions.
24   VIDEOGRAPHER: Off the video record at 12:10 p.m.
25   (The deposition was concluded at 12:10 p.m.)

175

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MONROE )

I, Suzanne F. Ex, Certified Verbatim Reporter,
Florida Professional Reporter, Notary Public, State of
Florida, certify that GABRIEL HUMBERTO GARRIDO personally
appeared before me on the 5th day of November, 2014, and was
duly sworn.
Signed this 10th day of November, 2014.

Suzanne F. Ex
Suzanne F. Ex, CVR-M, FPR
Notary Public, State of Florida
Commission No.: FF015913
Commission Expires: July 27, 2017

176

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF MONROE )

I, Suzanne Ex, Certified Verbatim Reporter and
Florida Professional Reporter, certify that I was authorized
to and did report the deposition of GABRIEL HUMBERTO GARRIDO,
pages 1 through 174; that the review of the transcript was
requested; and that the transcript is a true record.

I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor am
I a relative or employee of any of the parties' attorneys or
counsel connected with the action, nor am I financially
interested in the action.

Dated this 10th day of November, 2014.

Suzanne F. Ex
Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter-Master
Florida Professional Reporter

44 (Pages 173 to 176)

177

WITNESS NOTIFICATION LETTER

November 12, 2014

Gabriel Humberto Garrido
c/o Michael T. Burke, Esquire
Johnson Anselmo Murdoch Burke Piper & Hochman, P.A.
2488 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida  33304

RE:  Treavor Eimers vs. City of Key West, et al.
     Deposition Taken November 5, 2014
     U.S. Legal Support Job No. 1186143

The transcript of the above-referenced proceeding has been
prepared and is being provided to your office for review by
the witness.

We respectfully request that the witness complete their
review within 30 days and return the errata sheet to our
office.

Sincerely,

_Suzanne J. Fry_
Suzanne J. Fry
U.S. Legal Support, Inc.
One Southeast Third Avenue, Suite 1250
Miami, Florida  33131
(305) 373-8404

CC via transcript:

David W. Brill, Esquire
Jeannete C. Lewis, Esquire
Robert J. McKee, Esquire
David Paul Horan, Esquire
Darren M. Horan, Esquire
Lyman H. Reynolds, Jr., Esquire          .

178

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT ~ ENTER CHANGES ON THIS PAGE

IN RE:  Treavor Eimers vs. City of Key West, et al.
        Gabriel Humberto Garrido
        November 5, 2014

| Page No. | Line No. | Change | Reason |
|----------|----------|--------|--------|
|          |          |        |        |

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

_____
Date          Gabriel Humberto Garrido

**A**

**a.m** 1:15 4:7 93:24
94:3 142:8,11
**ability** 16:11,12
17:13,23 23:14
61:3 81:12 92:9
157:23 164:4
165:15
**able** 14:13,13
18:22 33:22
105:17 112:16,25
132:19
**above-referenced**
177:10
**absolutely** 43:12
61:19
**accede** 58:15 64:19
**access** 9:8 131:23
136:4 139:13
**accomplish** 6:18
118:5
**accomplishing**
146:22
**accurate** 92:8
171:18
**accused** 167:19
**Act** 98:10
**action** 57:12 62:15
62:15 70:13 72:5
72:11 74:21 87:7
176:15,16
**actions** 79:25
80:15 87:4 113:6
138:11 168:20
170:10 171:18,25
173:16
**activate** 25:19
28:14 29:6 33:4
35:14 66:14,19
**activated** 33:10,11
131:8 152:8,14
**activities** 101:3
**activity** 118:4
**actual** 158:12
**add** 16:5
**additional** 16:9,10
30:25
**additions** 128:5
**address** 5:12,13
136:14,20
**admitted** 150:24
**ADOLFO** 3:8
**advance** 35:6
**advantage** 164:17
**adverse** 13:1
**affect** 23:10 113:4
**affirm** 5:1

**afield** 28:16
**age** 10:2,4,7,8
23:14,21,21,25
58:2 163:8,20
**ages** 10:13
**aggravated** 11:1
**aggression** 72:21
**aggressive** 24:3
43:25 46:6,13
57:12 72:11
74:21
**aggressively** 8:3
65:9 72:17
**ago** 52:10,23 61:4
96:8,18 97:2
104:8 129:13,14
**agree** 8:9 17:17,21
22:16 42:19 62:2
79:2 112:24
164:13 167:5
**agreed** 46:19,22
79:16
**agrees** 79:10
**Ah** 51:5 143:2
**ahead** 17:24 37:11
50:21 51:25
54:25 55:3 59:6
93:16 102:6
108:19 110:15,24
123:8 154:4
**aid** 17:13 28:18
110:17 111:1
112:23
**air** 9:15 14:10
42:3
**al** 1:8 4:11 177:7
178:4
**alleged** 154:6
**allegedly** 141:6
**Allen** 27:7,7,13,15
27:16,17,20
**allow** 7:9 54:20
55:18 87:23
140:13
**allowed** 9:20 11:11
11:13 32:4 169:7
169:11,15,17,21
**allowing** 169:6
**alluding** 154:9
**altercation** 24:4
30:25 31:3 75:7
**ambulance** 146:8
**Ameila** 33:22
**Amelia** 33:21
**amount** 42:17
158:15,18,21
**angle** 62:7

**animal** 14:12
**ankles** 143:17
**announced** 26:4
91:2 94:15 96:9
106:2,8 108:7
**Anselmo** 2:20 177:5
**answer** 7:3,13 34:5
59:6 96:20 104:7
108:13,15,17,19
115:24 122:2
124:6 126:11
127:7 135:14
138:11 142:14
173:13
**answered** 92:21
104:16 129:9,9
141:1 174:16
**anticipate** 50:4
**anticipated** 38:24
48:2
**anxiousness** 45:15
**anybody** 80:22 81:1
81:3 87:3 101:1
105:14 135:14
150:14
**anyone's** 100:25
**anyway** 122:12
123:5,9 125:5
126:8 165:20
**apparently** 40:13
81:20
**appearances** 2:1
3:1 4:16
**appeared** 40:14
46:18 175:9
**applied** 82:21
**apply** 32:11
**applying** 8:22 16:9
65:21 83:5
154:15
**appreciate** 93:2
**appreciation**
167:14
**approach** 56:11
**approached** 42:18
44:7,11,18,22
45:18 46:5,14
47:2 53:6,9
105:2
**approaching** 42:10
42:13 43:5,7
46:17,25 49:19
49:22 51:5,10
52:14 55:14 56:2
**approximately** 61:6
92:15 129:18
**area** 23:16 37:18

102:17
**argument** 87:24
**argumentative**
51:15 52:5
**arisen** 144:25
**arises** 22:10
**arm** 28:17 47:4,11
56:13 59:11,11
62:1 64:7 65:11
71:19 72:19 73:2
73:10
**armed** 42:16,23
86:20
**arms** 14:1 15:7,11
42:19 43:1 45:5
57:25 64:23
95:14,21,23,25
96:1 154:11
156:9,12,15
162:12
**arrest** 7:19 8:7
12:5 23:23
146:10,12 147:1
**arrive** 145:18,23
**arrived** 105:17
144:9,11,13,21
144:22 145:5
**arriving** 31:9
**ascertain** 142:16
**asked** 11:13 26:14
28:7 53:3,4 57:6
72:5 74:19 75:3
87:20 92:20
94:21 104:16
108:12 124:11,12
124:13 127:5
137:4 141:1
142:13 157:5
171:21 172:3
173:5,9,20
**asking** 49:3 54:19
64:23 75:6 77:11
89:14,14 93:12
94:10 96:16
107:17,19 140:16
162:1 172:8
**aspect** 146:22
**aspects** 12:7 18:24
**asphalt** 17:14
**asphyxia** 15:11,19
15:22 22:5
100:16
**asphyxiation** 12:12
12:15,25 13:12
13:15 14:2
**assert** 93:17
**assigned** 80:23,24

80:25 81:1
148:15
**assistance** 75:4,6
**assisted** 72:18,19
73:6 79:25
**assume** 96:25 160:6
167:5
**assumption** 96:20
96:23,24
**attached** 82:23
**attack** 31:6
**attempt** 13:21 73:3
73:11 74:17
147:7
**attempted** 18:11
51:11 55:22 65:4
65:6 83:9,11
90:11,23 110:17
111:1
**attempting** 41:23
63:9 75:12 88:13
97:20 98:22
108:5
**attest** 111:13
155:3
**attorney** 92:17,23
93:7 119:21
121:1,4,25
125:18 176:13
**attorney-client**
124:7 126:13
**attorneys** 176:14
**audible** 66:9
**audio** 28:10,11,15
73:15 78:25
131:9 166:24
168:9,10,14
**authorized** 176:7
**available** 129:2
**Avenue** 24:14 25:17
177:18
**avoid** 139:24
**avoided** 147:7
**avoiding** 49:24
**aware** 6:17 12:21
15:1 21:8,21,23
22:5,12 23:22
25:21 28:22
38:23 39:2,9,12
58:1 76:1 81:4
81:10 84:17
97:24 98:3 99:6
100:20 111:15,17
128:19,25 129:4
132:20 134:18
136:3,8,11,24
141:4,11,23

145:21 146:3,17
147:1,3,6,7,18
150:14,17 151:4
157:17 165:3,5
**awareness** 157:23

---
**B**
**b** 99:3
**back** 8:23 13:23
15:14 16:9 17:18
28:17 29:4 45:6
47:11 59:11,11
59:14,18 62:1
64:23 68:16
71:19 72:16,20
73:2,10,24 94:2
94:12,24 95:14
95:21 102:17,21
102:23,23,24
103:4,10,19,19
103:19,20,21
104:1 108:22
139:9,13 142:6
142:10,14 143:8
143:19,23 146:1
154:11
**backwards** 15:7,12
58:1,24
**bad** 134:1,7
**bag** 143:13,21
**Bahama** 33:20
**barbell** 61:13
**base** 71:1,3,4,10
**based** 15:24 39:7
41:14 48:25 49:3
49:20 54:4,16
66:11 71:9 81:9
117:19 124:6
139:13 140:20
155:6 167:14
**beach** 3:4 36:22,25
37:21 38:25
39:18,21 40:22
42:6 46:24 51:1
55:10 97:21
155:22,23 156:6
158:7,12 159:10
162:20,24
**beat** 38:25
**BEDARD** 3:3
**began** 55:22 64:7
96:7 106:9 108:3
108:5 115:3
**beginning** 41:23
94:23
**begun** 40:22
**behalf** 2:2,19 3:2

4:19,21,23
**believe** 10:4 24:11
28:11 48:22
74:13 102:21
106:9,10 117:22
118:4 120:6
129:18 143:15
144:4 145:9
152:21 153:7
157:4,4 160:19
161:5 171:18,25
173:16
**believed** 25:1
108:20 118:1
**believes** 124:7
**believing** 8:7
**belted** 100:19
**bench** 60:8,11,25
61:11
**bend** 28:18,20 29:2
59:20
**bending** 58:24 59:8
59:14,19
**benefit** 37:2
**bent** 28:23 62:2
**best** 37:11,15 62:3
92:8
**better** 96:18,19,21
96:25
**beyond** 112:20
**big** 129:12 164:8
164:10
**bit** 9:12 34:9
**black** 15:2
**blackout** 14:20
**bleed** 150:19 151:5
**bleeding** 13:15
69:25 149:16,18
149:21,25 150:1
150:6
**block** 15:20 16:20
19:6
**blocking** 133:12
**blood** 149:11
160:14,17,19
**bloody** 149:14
**blow** 151:5
**Bob** 87:14 115:22
120:3 173:13
**bodies** 90:4
**body** 7:1 13:25
45:15 80:5 82:21
89:15 100:25
101:22 102:17
108:4 118:8,17
147:4 148:17,20
148:23 153:8

**bomb** 76:24 150:18
**Born** 6:4
**boss** 121:9,19
**bothered** 83:22
**bottom** 114:10
**Boulevard** 2:3,12
2:16,20 5:17
25:6 177:5
**brain** 30:18 154:25
155:3
**break** 7:8,10,14,14
93:25 142:3,5
**breath** 14:14 16:2
16:6,11,12 17:13
17:19,23 18:11
18:18,22,25
80:17 81:12
112:25
**breathing** 15:8
16:19,23 17:1
69:12,14 81:5
110:19 111:3,4
111:16,18,24
112:4,14 113:3
**breaths** 14:12
**bridge** 24:14
**brief** 6:20 94:1
142:9
**briefly** 142:14
**Brill** 2:3,5 4:19
50:17 177:22
**bring** 7:21 125:10
126:11
**Britain** 21:18
**broken** 132:21
**brought** 145:15
**bruise** 70:3
**bruising** 70:4,5
**Building** 3:3
**bunch** 132:9
**Burke** 2:20,22 4:21
4:21 5:13 8:13
8:17 9:11 11:16
11:19,22,24 12:1
13:18 16:13
17:24 18:4,9
20:17 22:7,21
23:17 24:5 27:15
27:24 28:2 30:1
30:5,15,21 31:1
31:7 32:12,20
34:5,8,15 35:15
35:21 37:11
38:21 39:5 42:4
45:21,25 46:11
47:5,17,21 48:6
48:9,17,23 49:5

49:13,21,25 50:6
50:9,15,17 51:2
51:14,22,25 52:3
52:20,25 53:22
53:25 54:5,8,25
56:6 57:16 58:3
58:17 59:4,6,16
59:24 60:4,12
61:9,13,19,21,23
62:4,13,18,22
63:3,7,12,25
64:5,10,25 65:3
65:12,18 66:3,12
66:17,22,24 67:1
67:3,6,10,15,20
68:8,13,21 69:3
70:10,15,23 71:2
71:7,20 72:9,22
73:4,13 74:1,15
74:22 75:1,9,23
76:12 77:5,17
78:7,14,21 79:5
79:13 81:13,16
81:21 82:1 83:14
83:19 84:2,5,9
84:21 85:1,14,17
85:22 86:1,5,10
86:15,22 87:1,9
87:14,20,23 88:1
88:8,10,22 89:4
89:11,18,25
90:21 91:7,10,17
91:21 92:22,25
93:3,6,14,16
95:17 96:15 97:8
98:19 102:4,6
103:23 104:6,15
105:10 106:6,17
106:23 107:4,8
107:22 108:13,16
108:24 109:7,15
109:24 110:2,13
110:15,22,24
111:11 112:1,6
112:10,17,20
113:1,8,16 114:4
115:1,12,21
117:9 120:2,5,17
121:3,15,22
122:13,17 123:7
124:5,11,13,17
124:20 125:8,15
126:10 127:5,9
127:15 128:21
129:9,22 130:14
131:3,10,17,22
132:1 133:8,21

134:16,24 135:1
135:8,12,14
136:9,16,22
137:22,25 138:9
138:16 140:24
141:1,8,19,24
142:4,20 143:5
145:1 146:6,23
147:5,10,15
149:1,6 150:20
151:1,7 152:3,12
153:2,9,16,18,22
153:24 154:2,4
155:1,16,24
156:17,23 157:19
158:9,20 159:1,6
159:18 162:9
164:18 165:12
166:10,15,19
167:2,7,21 168:7
169:1 170:4
171:16,23 172:5
172:20 173:3,7
173:13,22 174:3
174:6,20 177:4,5
**burke@jambg.com**
  2:22
**business** 5:13
  152:22
**busy** 66:15
**bystanders** 158:8
  158:11

------
**C**
**C** 2:18 177:23
**C-101** 3:3
**c/o** 177:4
**CAD** 78:9 134:12
  144:20 158:16
**Cafe** 36:23
**call** 71:25 117:8
  117:14 134:10,10
  144:15
**called** 165:3 167:4
**calling** 32:2
**calls** 71:20 74:15
  124:13
**Calvert** 3:8 161:2
**cam** 26:9,14,16,23
  27:2 29:6 34:9
  34:25 35:5,7,9
  35:14,20 130:18
  132:6,21
**camera** 128:18,19
  130:11,17,19
**cams** 25:19 26:4
  139:15 155:7

**canals** 150:15
**capability** 112:20
**capable** 10:21
**capacity** 17:19
  22:12
**capital** 10:19
**captain** 120:7
  122:9,23,24
  124:24 125:25
  126:6,23
**captain's** 126:3
**capture** 62:3 66:20
**captured** 70:13
  76:10
**car** 29:23 32:25
  37:18,20 38:2,3
  39:14,19 41:4,5
  57:11 132:10,15
  143:12 156:9
  166:7
**care** 146:5,25
**carefully** 44:2
**carrying** 41:16
**cars** 25:8 133:12
  133:16
**case** 1:3 4:10,10
  7:12 18:3 58:1
  120:23 125:4
**cases** 30:11 120:22
**caught** 65:10,14,16
**cause** 4:3 5:2
  12:17,22,25
  13:12,14 14:19
  15:2,7,15 16:11
  22:6 29:2 30:25
  54:6 69:24 150:1
  151:5
**caused** 145:22
  146:4 150:18
**causes** 13:15 14:1
  14:12 18:16
**causing** 34:24
  113:7
**CC** 177:21
**Celcer** 24:24 25:5
  25:7 29:7,10,25
  31:18 161:10
**Celcer's** 25:12
**cell** 130:16,18
**center** 59:20 60:19
**Certificate** 3:17
  3:17 175:1 176:1
**Certified** 1:24 4:1
  175:6 176:6,22
**certify** 175:8
  176:7,12
**chance** 74:25 173:2

  173:6
**change** 111:6,8,16
  171:19 178:7
**changes** 128:4
  178:2
**charge** 55:10
  129:25
**Charles** 1:5
**chase** 29:17 33:1
  38:24 45:12
  155:5
**check** 83:22 141:21
**chemical** 23:9
**chest** 16:1 61:8
  101:24 144:1
**chief** 122:22,23
**choke-hold** 14:19
**choose** 103:22
**circumstance** 9:7
  9:22 50:11 51:3
  134:6
**circumstances** 9:4
  9:5,19 46:8
  98:10 99:12
  134:5 153:14
**citizen** 120:23
**city** 1:8 4:11,22
  36:6 122:7 129:1
  132:18 134:10
  146:25 177:7
  178:4
**civil** 6:12
**claim** 93:10 125:9
  125:18 126:10,13
**clean** 60:23,24
**clear** 56:1 72:3
  83:11 115:24
**clearly** 126:24
  146:5
**client** 115:15
  122:1 125:19
**client's** 160:21
**clients** 61:17
**close** 92:18 144:24
  148:5
**closed** 68:22
  160:25
**closer** 42:12
  128:18
**closing** 70:14
**clothing** 41:17
  42:17,19
**co-officers** 79:19
**collapsed** 166:8
**collect** 134:8
**collecting** 129:21
  129:22 134:4

**color** 90:5 111:6,7
111:18
**Colorado** 21:21
**Columbia** 3:3
**Columbian** 133:3
136:4
**come** 7:20 25:18
40:2 60:11
109:21,22 114:24
169:22
**comfortable** 87:17
**coming** 51:19 56:8
85:8,11 133:19
145:4
**command** 52:2
**commands** 40:6,7,8
52:1 55:5,6,12
55:23 105:3
172:14,15,18
**comment** 79:17
89:22 166:12
168:19
**comments** 50:18
76:16 79:17
115:14 168:19
**Commission** 175:15
175:16
**committed** 154:14
154:17
**common** 140:20
**communicate** 6:21
13:10 58:14
**communicated** 29:23
**community** 168:20
**compare** 114:6
**compared** 45:19
**comparison** 39:14
**complete** 26:18,19
177:12
**completely** 64:19
164:20
**compliance** 53:20
54:4,6 64:12,16
74:19
**compliant** 6:6 8:11
43:20 46:20
55:18 164:20
**complied** 29:6
43:24 154:10
**comply** 25:23 26:1
26:7 43:25 45:4
53:24 54:1,14
**complying** 54:17
**comported** 21:14
**compressing** 101:5
101:8
**compression** 17:19

**compressions** 144:1
**computer** 118:25
119:2,3,5
**concerned** 170:11
**concluded** 174:25
**condescending**
140:19
**condition** 7:9 24:3
26:21 31:12
56:23 132:24
156:3 163:15
164:9
**conditioner** 9:16
**conditions** 164:11
164:16
**conduct** 46:25
53:19 135:11
**conducting** 159:11
**confirmed** 168:18
**confirming** 168:16
**confrontation**
162:21
**confronting** 43:1
**confused** 54:23
56:4
**congestion** 145:21
**connect** 100:25
**connected** 95:16,19
100:23,24 176:15
**connecting** 100:17
**connote** 154:22
**conscious** 107:14
108:20 109:9
110:7
**consciousness**
14:17 111:24
112:15,25 113:7
115:15
**consider** 46:2
163:12,24
**consideration**
23:25
**constrictors** 14:6
**consulting** 121:1
**contact** 135:25
136:14
**contacting** 80:4
**contain** 17:22
**continue** 31:18
32:3
**continued** 3:1 25:5
31:17 36:13
105:3 108:3
144:8
**control** 50:2 64:2
105:14,24 108:4
117:12 129:25

**controlled** 133:11
**controlling** 114:19
133:18
**conversation** 79:12
121:5,20,23
165:15
**conversations**
135:17
**conveyed** 157:14
**cop** 133:11
**copy** 91:16 174:21
**correct** 16:12 18:2
28:24 29:2,7
32:13 36:3,16
37:13 39:4 42:21
43:20 44:10 47:1
47:4,12,15 51:8
51:21 53:8 54:15
56:14 57:12,13
58:11,16,18,22
62:14 71:5 77:15
81:6,15,18 89:24
90:3 94:16,17,18
95:1 97:7,10
101:13,15 104:3
124:3 150:13
156:7 157:8,13
157:16 158:6
**corrections** 128:4
**counsel** 4:16 66:24
89:22 93:20
174:17,22 176:13
176:15
**count** 158:24 159:4
159:8
**country** 137:11,20
138:7
**County** 164:25
175:4 176:4
**couple** 36:16 142:2
**couple-minute**
142:5
**course** 15:17,19,20
**courses** 15:18
**court** 1:1 4:5,12
4:13,25 7:2 67:9
**Courthouse** 1:16
4:7
**cover** 138:3
**covered** 115:22
**CPR** 159:11
**creating** 7:2
**cremated** 147:13
152:25
**cremation** 148:11
**crime** 139:25 154:6
154:6,12,16

155:21,22
**crimes** 154:14,17
155:11,13
**criminal** 133:25
**cross** 13:25 33:21
**crossing** 155:14,20
**crucifixion** 13:14
**crucifixions** 13:24
**Cruiser** 24:13,18
25:8,9,11 29:7
32:11 33:8 36:5
36:8,18 37:21,23
38:20
**cuff** 7:16 8:25
9:20 28:17 47:12
54:20 55:22 56:2
56:18 57:14
64:23 65:5,10,10
65:14,16 68:5
69:21 70:8,17
71:14,17 72:7
105:15,23,24
106:13 109:11
117:20 157:8
172:23
**cuffed** 12:8 55:18
63:20 69:22
118:18
**cuffing** 8:10 10:2
10:7,8,13 11:11
29:2 68:21 69:9
106:4 117:22
118:10
**cuffs** 9:8 58:20
66:21 68:7,22,24
81:19 95:15,19
101:3 105:13
**custody** 98:12
172:1 173:19
**cut** 55:3 70:3,6
**CVR-M** 1:23 175:14
176:21 177:17

---
**D**

**D** 10:19
**danger** 51:7,7,10
**dangerous** 30:20
155:7,9
**Darren** 2:10 4:18
91:20 177:24
**darren@horan-w...**
2:9
**dash** 25:19 26:3,9
26:14,16,22 27:2
29:6 34:9,25
35:5,7,9,19
132:6,21 139:15

**dash-cam** 130:25 137:19
**date** 11:25 99:20 118:24 120:18 178:25
**Dated** 11:23 176:18
**David** 2:5,9 4:18 4:19 91:15 177:22,24
**david@brillrin...** 2:5
**dawn** 62:16 63:14
**day** 13:23 15:5 20:16,19 24:10 26:1,12 27:20 28:9,12 33:12 35:17,25 36:4 41:25 42:25 45:10 88:5 99:17 120:8,12,21 121:1 127:13 129:25 130:3 132:14,21 133:20 134:1 139:4,22 165:9 170:6,7 171:4,9,14 175:9 175:11 176:18
**days** 92:14,19 94:13 96:19,22 115:11 121:6 127:18 167:19 177:13
**de-arrested** 146:14 146:16,17
**de-arresting** 146:21
**de-escalate** 64:17
**deal** 30:4 126:16 137:14 164:12
**dealing** 23:22 116:3 123:16
**dealt** 11:7 165:16
**Dean** 152:18
**Dean-Lopez** 153:6
**death** 13:15 34:19 92:18 134:2 168:22 170:7
**Deceased** 1:5
**December** 92:13 94:12,24 107:16 107:21 109:2 114:7 118:21,25 120:16
**decided** 82:4 106:21
**declare** 178:22
**decline** 110:11
124:6
**decompress** 168:21
**decompression** 169:3
**decrease** 17:23
**Defendant** 3:2
**Defendants** 1:9 2:19 4:22
**degree** 17:19 37:8
**Del** 3:9 34:4,6,6 36:8,18 37:1,22 39:3,10,14,18 40:18 41:7 43:14 43:17,23 44:9,11 44:13 45:5 53:9 53:13 55:11,12 55:13,16,19 56:8 57:5,8 64:12,20 69:17 101:25 102:3,7 144:4 159:11,16,19 162:15 164:10
**delay** 120:11
**delete** 128:20
**deleted** 26:20
**deletions** 128:4
**demands** 64:19
**demonstration** 98:9
**department** 5:21 12:22 31:10 88:4 98:1 100:10 119:6 122:11 123:25 129:19 133:7 136:3,7 139:9,25 140:8 141:5,6 147:9 152:19 164:25 167:19 174:4
**depended** 138:13,14 140:22
**depends** 9:4 134:5 140:7
**deposed** 6:12
**deposing** 61:17
**deposition** 1:13 3:14 4:1,9 6:17 19:17,25 87:16 174:25 176:8 177:8
**deprivation** 12:22
**describe** 7:16,17 12:10,13 15:18 29:16 30:7 36:4 79:22 125:8 138:25
**described** 29:10 101:11 116:2
148:10 156:15,22 160:21
**describing** 32:5
**description** 62:5 126:24
**desire** 46:25
**destroying** 141:6
**detail** 59:13 86:20
**details** 97:1
**detain** 41:23 51:4 51:11 63:9
**detained** 63:24 64:2,8
**detainee** 12:5,8 16:10,19,24 17:6 17:18 18:17 21:25 22:4,13 23:4,14 24:2 51:7 98:4 100:18
**detainement** 50:13
**detaining** 21:19 30:4,9 63:18,22 154:13
**detainment** 23:15 88:6
**detective** 148:15
**Detention** 164:25
**determine** 79:18
**device** 34:25 76:5 99:3,6
**devices** 28:6 97:25 131:25 139:14
**diaphragm** 14:13
**die** 14:1 48:8,13 86:21
**died** 147:8
**differed** 170:11
**difference** 9:2,6 62:24
**different** 23:5 106:21 123:1 126:25 173:15,21 173:25 174:1
**difficult** 16:2,6 18:14
**difficulty** 40:13
**digital** 71:6
**direct** 3:15 5:9 130:24 138:5
**direction** 32:4,6 40:24
**Directive** 98:7
**directly** 41:3 87:12
**director** 152:23
**disagree** 87:25 88:2 93:9
**disagreement** 75:21
**disappear** 138:6
**disappeared** 131:25 143:3
**disciplined** 123:21
**discuss** 125:16
**discussed** 19:20
**discussion** 93:10 148:9 164:24
**discussions** 147:20
**disputing** 79:11
**distinct** 66:9
**distracted** 142:2
**distress** 144:25
**distressed** 146:5
**District** 1:1,1 4:12,12
**DIVISION** 1:2
**doctor** 150:3
**document** 119:8 178:23
**documented** 98:10 98:13
**doing** 6:25 8:20 24:3,15 46:16 63:14 72:11 74:20 79:22 80:21,22 83:7 85:16 87:8 88:25 89:3,7 111:25 117:23 118:2 120:4 139:7 144:1 154:20,23 156:4,4
**door** 171:4
**download** 26:22 139:14
**downloaded** 26:24 27:3,8 34:10,16 35:2
**downloading** 35:1
**downloads** 34:12
**downward** 82:17,19
**dph@horan-wall...** 2:9
**drawn** 15:11 162:12 162:13
**drive** 3:3 146:9
**driver** 29:11
**driving** 33:19
**drop** 76:23
**dropping** 150:17
**Due** 71:16 100:16
**duly** 5:7 175:10
**duration** 162:21,24
**dusty** 18:11
**duty** 27:20,22

**Duval** 36:11,12
**dying** 133:17

---

**E**

**ear** 148:24 150:15
  151:5
**earlier** 156:22
  157:2
**earring** 148:24
**ears** 149:24,25
  150:1,4,5,6,10
  150:12,18 151:5
**easier** 29:1
**East** 2:20 177:5
**eating** 85:20
**edits** 128:4
**effectiveness**
  11:25
**effects** 12:23
**effectuate** 118:13
**Eimers** 1:5,5 4:11
  4:20 12:3 15:5
  19:14 21:17
  25:12 28:5,14
  29:16,22,24 31:3
  39:22 40:1,3,5,9
  41:4 43:4 44:14
  44:18 45:18
  48:22 49:1,19,22
  51:4,5,9 53:14
  54:20 55:17
  56:11 57:12 61:7
  61:14 64:19
  70:14 71:16 72:6
  72:20 73:24 74:5
  74:10 75:8,12,18
  76:24 77:2 80:4
  80:15,16 81:5,12
  81:19 88:20 89:9
  89:17 94:8,11
  100:8,13,23
  101:6 102:18
  103:5 105:12
  106:3 116:20,22
  131:9 132:15
  134:7 144:25
  145:8 146:10
  147:8 148:24
  149:21 151:10
  153:15 154:6
  157:11,17 158:14
  159:9 162:7
  163:4 164:24
  165:11,15,18,20
  166:7 167:20
  169:24 173:2,10
  177:7 178:4

**either** 16:11 35:5
  43:1 62:10
  141:20
**elapsed** 39:13
**elbow** 28:18,21,23
  29:2 58:25 59:8
  59:20
**elderly** 10:25
**eleven** 163:19
**elicit** 53:19
**eliminated** 21:24
**email** 136:20
  137:12
**embarrass** 67:3,11
**embarrassment** 67:4
**emotional** 50:12
**empathy** 49:10
**employed** 5:20
**employee** 176:13,14
**employment** 123:23
  125:1
**empty** 41:18
**encountered** 50:5
**encountering** 50:13
**endangered** 155:14
**ended** 33:20 71:16
  71:17 153:8
**endure** 23:15
**engaged** 24:22
**ENTER** 178:2
**entered** 125:14
**entity** 5:24 21:23
  133:6
**environmental**
  164:15
**equipment** 140:6
**errata** 3:18 177:13
  178:1
**escalated** 64:22
**escape** 10:21
  154:23
**escapes** 152:22
**especially** 8:11
  67:8 78:16
**Esquire** 2:5,9,10
  2:14,18,22 3:5
  177:4,22,23,23
  177:24,24,25
**essence** 133:14
**Estate** 1:5
**et** 1:8 4:11 177:7
  178:4
**ethics** 8:9,15
**event** 15:5 19:14
  20:1,9,10,13,16
  20:19,21 21:17
  28:5,14 34:10

36:4 47:19 66:6
  70:1 77:22 89:16
  92:14 94:13
  99:17 120:13,24
  121:2 126:25
  129:20,23 130:11
  132:15,22 133:25
  137:10 140:7
  167:18
**events** 12:17,17
  22:19 37:5 75:21
  88:19,21 96:22
  97:4 131:9
**eventually** 14:1
  98:12 105:17
**everybody** 78:10
  89:7 169:3
**everybody's** 50:22
**evidence** 81:11
  129:21,22 130:24
  131:24 132:20
  134:4,8 138:5
  141:7 143:3
**Ex** 1:23 4:1,13
  175:6,14 176:6
  176:21 177:17
**exact** 115:8
**exactly** 111:21
  115:2
**Examination** 1:20
  3:15 5:9
**examined** 5:7
**examiner** 147:4,8
  147:14 153:1,11
**example** 11:13,15
  142:22
**exceeded** 35:13
**exciting** 45:12,13
**excluded** 104:13
**excuse** 45:12 93:20
  99:3 102:6,11
  118:21 122:24
  130:24 149:20
**exhalation** 14:14
**exhibit** 91:6,13,22
  94:5 98:20
  113:13,18,20
**EXHIBITS** 3:20
**exist** 130:25
  152:11
**existed** 21:8
  170:15
**exit** 37:22 38:3,6
  40:9
**exited** 166:7
**exiting** 29:21 37:1
  40:21

**expect** 18:21
  138:15
**expecting** 46:5
**experience** 48:21
  55:5 81:4,24
**experiences** 117:18
**Expires** 175:16
**explain** 120:11
  133:6
**explained** 172:13
**explaining** 79:15
  149:9
**explanation** 115:19
  130:10,19
**exposed** 41:12
**extremely** 9:7
  68:10
**eyes** 160:25
**eyewitness** 65:22
  137:10 170:21

---

**F**

**F** 175:6,14
**face** 44:3 46:17,24
  62:25 68:11
  80:16 83:18,21
  83:23 84:7,12,12
  84:14,24 85:2,24
  85:24 86:6,7,17
  87:4 88:11,16
  101:16,19,20,20
  101:20 111:20
  143:9 151:22
**facilitates** 29:1
**facilities** 140:21
**facility** 133:3
  165:1
**facing** 151:14
  171:3
**fact** 43:22 124:7
  142:18
**factors** 164:15
**facts** 75:22 81:9
  148:9 153:14
  178:23
**faculty** 29:14
**fairly** 144:24
**false** 95:4 105:9
  114:3 169:11
**familiar** 85:10
**family** 4:20
**fan** 9:15
**far** 26:8 28:16
  31:4 57:24 70:20
  71:11 107:14
  111:18 144:10
  145:4 162:6

165:22 170:10
**fashion** 123:11
**fast** 33:7
**father** 152:20
**Fax** 2:4,8,17,21
3:4
**FDLE** 3:23 19:23
35:3,6 73:20
76:7 104:21
105:1,5,16
113:14 114:22
135:6 162:17
170:12
**fear** 12:25 22:5,14
53:21 54:3
**fearful** 18:22
48:15 49:20,23
**February** 114:9
**federal** 1:16 4:7
67:8
**feel** 22:25 32:17
48:2 49:4 116:19
116:23 125:6
155:13 170:2,6
**feeling** 47:23 49:2
49:8,8,20
**feels** 18:25
**feet** 95:20 106:4
107:1,7,10,13,25
108:3 114:19
115:4 116:3,9
130:11
**fellow** 75:5 135:17
147:20 148:1,6
168:11 169:6,23
174:5,9
**female** 102:13
**FF015913** 175:15
**fight** 62:16,21
63:2,6 157:23
**fighting** 19:1
62:12 65:2,7
**figure** 68:4 120:24
135:5
**filed** 4:12
**filling** 70:2
**film** 57:18
**final** 128:1
**financially** 176:15
**find** 95:3 131:24
132:4 140:1,2,8
140:16 158:4
171:13
**finding** 140:7
**fine** 5:14 61:19
**finger** 65:10,14
66:21 68:22,24

69:22,22 70:13
70:17,18,20 71:1
71:11,12,14,16
**finish** 7:12 50:18
54:25 55:1
108:13,16
**finished** 106:3
108:19 153:20
**finishing** 148:22
**fired** 66:5,11
142:17,24 143:4
**FIRM** 2:3
**first** 5:7 8:1,15
8:19,19 20:18
24:12 38:16,18
38:19 39:4,8,9
39:25 42:7,13
44:2 50:23 51:1
51:23 72:5 91:6
92:12 116:16
118:22 119:13,16
119:20 120:4
121:7,12 123:12
123:13 126:9
127:22 128:2
131:4 133:7
135:22 147:23
**fitness** 60:19
**five** 5:23 85:20
158:19,25 161:14
162:24
**Five-ten** 163:19
**fixed** 132:17,19
**flat** 17:15
**fleeing** 154:9,21
154:22
**flexibility** 28:19
**Florida** 1:1,8,17
1:25 2:4,8,12,16
2:21 3:4 4:2,3,8
4:13 6:3 175:3,7
175:8,15 176:3,7
176:22 177:6,19
**flying** 32:17
**focusing** 154:15
**folks** 133:1
**follow** 38:25 42:11
45:13 52:3,7
147:24 155:5
**followed** 25:13,16
32:6 36:6 154:19
**following** 29:8,9
43:17 47:3 54:17
97:5 122:6
167:19
**follows** 5:8
**footage** 26:16

128:20 130:12,21
130:24,25 131:15
131:20 137:19,19
152:1,6
**football** 60:14
**forbid** 91:12
**force** 60:3 82:16
83:5 129:12
154:16
**forcibly** 58:24
82:14
**foregoing** 178:23
**forgiving** 18:8
**form** 8:13,17 9:25
16:13 17:24 18:4
18:9 19:9 20:17
22:7,21 23:17
24:5 30:1,5,15
30:21 31:1,7
32:20 34:15
35:15,21 37:11
38:21 39:5 42:4
45:21,25 46:11
47:5,17,21 48:6
48:17,23 49:13
49:21,25 50:6,9
50:15 51:2,14,22
51:25 52:20,25
53:25 54:5,8
56:6,24 57:16
58:3,15,17 59:4
59:16,24 60:4,9
60:12 61:9,24
62:4,13,18,22
63:3,7,12,25
64:5,10,25 65:3
65:12,13,18,19
65:23 66:3,4,12
66:13,17,18,22
67:2,8,15,20,21
68:1,8,13,14,17
68:23 69:3 70:9
70:10,15,23 71:7
71:20 72:9,22
73:4,13 74:1,2
74:11,22 75:1,9
75:23 76:12,19
76:25 77:5,6,9
77:17,18,24 78:7
78:8,13,14,20,21
78:24 79:4,5,13
80:6,10 81:16,21
81:22 82:1,12
83:14,19,20 84:2
84:5,9,10,21
85:1,14,17,22,23
86:1,5,10,15,22

87:1,9 88:8,9,15
88:22,23 89:4
90:1,18,21,22
92:20,24 93:1,2
95:17,18 96:15
97:8,19 101:18
102:4 103:7,13
103:23 104:5,6
104:12,15 105:10
106:6,17,23
107:4,8 108:24
109:6,7 110:2,13
110:14,22 111:11
112:1,9,10,17,19
113:1,8 114:4
115:1,12,21,25
116:12,21,25
117:4,9,10,16,24
118:7,11,16
119:8 120:17
121:14,15 122:13
122:17 123:7
127:15 128:1,21
129:3,8 130:8,14
131:3,10,11,17
131:18,21,22
132:1,2,23 133:8
133:21 134:16,25
135:8,12,13
136:9,16,22
137:21,22,25
138:1,9,16 140:9
140:15,25 141:8
142:19 143:5,6
145:1 146:6,15
146:23 147:5,10
147:15 149:1,6
149:12 150:2,20
150:21,23 151:1
151:2,7,8,24
152:3,4,9,12,13
152:16 153:2,9
155:1,16,24
156:10,17,23,24
157:9,19 158:9
158:20 159:1,6
160:1,10,15,18
160:24 161:15
162:9 164:18,23
165:6,12 166:10
166:15,16,19
167:2,3,7,8,12
167:15,21,22
168:4,7,8,13,17
168:23 169:1,2,8
169:13,19,25
170:3,4,9,16

171:16,23 172:5
172:10,17,20,25
173:3,7,8,12,17
173:22 174:3,6,7
174:11,14
**Fort** 2:21 177:6
**forward** 13:25
93:11
**found** 105:8
**four** 92:14,19
161:16
**four-day** 120:11
**FPR** 1:23 175:14
176:21 177:17
**frail** 10:25
**frame** 20:7,12
39:16 46:23
74:10 145:3
148:20 162:23
163:1
**Frank** 114:17
**frankly** 120:22
**freedom** 138:14
**friendly** 148:1,6
**frightened** 48:5
**frightful** 48:22
**front** 8:25 9:9,20
9:21 10:3,7,8,23
11:12,19 33:25
34:2 37:24 53:13
53:14 56:16,19
101:22 114:10
171:3
**fucking** 76:23
150:18
**fuel** 24:16,16
**full** 5:12
**fully** 6:6 77:25
97:13
**function** 154:25
155:3
**functioning** 30:18
**Funeral** 152:23
153:6
**further** 14:12
93:10 126:15
174:18 176:12

---

**G**

**Gabe** 166:25 167:1
167:4
**Gabriel** 1:13 3:14
4:9,22 5:6,16
175:8 176:8
177:4 178:4,25
**Galbo** 161:6
**gallons** 85:20

**garage** 132:18
**Garrido** 1:13 3:14
4:10,22 5:6,16
13:19 91:21
114:15,18 175:8
176:8 177:4
178:4,25
**Garrido's** 3:22
**Gary** 3:2
**gather** 130:3
**gathering** 137:5
**Gee** 52:9
**general** 11:16,20
22:14
**generally** 132:19
**gently** 82:11
**getting** 27:18
29:21 31:9 42:12
49:18 56:4 63:20
119:18 122:1
137:11 153:1,11
**GIRARD** 3:10
**girl** 66:15,20
67:14,17,23 70:7
70:11
**give** 5:11,13 6:22
7:23 9:5 11:11
52:2,18 55:14
56:5 72:6 91:18
105:3 113:13
172:22
**given** 55:17,21
56:2,11 99:10,12
113:25 119:8,16
126:23 166:8
**giving** 5:2 18:5
40:5 52:1 55:5
55:23 140:4
172:13,15,18
**glad** 48:10
**go** 17:24 37:9,11
50:21 51:25
54:25 55:3 57:25
59:6 60:19 83:25
84:1,7,8 91:7
93:11,16,21
94:24 102:6
108:19 110:15,24
121:24 123:7
126:17 131:20
134:9 135:1
140:13,14,22
142:14 145:12
153:25 154:4
**goal** 13:9,9 117:20
**God** 91:11
**going** 32:7,8,14

33:7 37:6,9
38:15 44:21 49:7
49:11 52:17 56:5
63:15,16 84:14
84:24 85:2 86:6
86:17 87:4,11
88:6,12,16,17
89:10 91:4,7
93:10 97:17
101:3 122:2
123:17 124:6
125:5,9,16,18
126:8,10,12,14
133:19 139:23
142:14 143:8
147:14 153:20
154:1 155:4
166:13 170:22
171:4
**gold** 148:24 149:5
**good** 4:5 5:11
24:10 93:25
163:24
**Got-cha** 154:4
**gotten** 24:16 29:22
136:13,20
**governmental** 21:23
**grab** 8:3 56:13
57:11 59:20
141:3
**grabbed** 47:4,7,11
64:4,6
**grand** 170:19,24
171:12
**gray** 58:8
**Great** 21:18
**greatly** 45:17
**ground** 43:23 44:15
59:23 60:2,6
62:9 68:12 80:16
82:9 115:6,16
151:13
**GROUP** 2:11,15
**grow** 6:2
**guarantee** 54:4
154:3
**guess** 93:3
**guessing** 6:20
**gun** 47:16,18,24
171:3
**gunpoint** 164:20
**guns** 22:17
**GUSTAVO** 3:8
**guy** 32:18 140:18
164:8,10
**guys** 142:3

---

**H**

**H** 3:5 177:25
**hair** 58:8,9
**half-hour** 52:10,23
**hand** 5:1 7:20,21
7:23 8:12,18
44:24 52:3,4,8
52:13,19,22
55:14 57:11,14
57:19 58:19,22
65:4 66:1 69:21
71:24,25 72:4,5
72:7,14,15 80:2
80:11 82:20
105:12,18,22
**handcuff** 7:21,22
9:9 10:23 45:2,6
52:8,13,15,22
56:5 69:14 71:24
72:1 105:18
172:4
**handcuffed** 98:4,8
**handcuffing** 7:19
11:2 58:11,16,20
97:25 98:13
118:2,6,14
**handcuffs** 8:22
22:18 44:23
51:19 74:18
75:12,18 97:13
100:17,22 108:2
117:7 156:19
**handed** 94:5
**handheld** 130:19
**handicap** 11:1
**handing** 91:22
**handling** 56:3
**hands** 8:23 9:20
10:23 41:12,13
41:18,20 42:1,2
42:7,9,12,14
55:18 56:5 81:19
149:10 157:1
160:19 171:21
172:4,23 173:5,9
**happen** 10:16 15:11
15:22 16:17
22:14 69:16
**happened** 16:22
25:4,15 30:3
31:15 36:8 37:10
44:6,17 60:1
62:3,7 68:19,21
71:22 77:4,8
83:8 90:10
105:20 106:25
109:14 115:10

**happening** 126:24 128:25 129:4 130:13 134:7 138:12 166:9 168:22 172:24

**happening** 86:21 108:25 128:17

**happens** 15:25 74:21

**happy** 91:5

**harassment** 174:17

**hard** 17:15 59:22 60:1 68:10 70:16

**harder** 164:13

**harm** 30:25 31:5 46:18 47:1 156:21

**harmful** 12:17,22 46:6

**hate** 27:10

**hazardous** 30:14

**head** 7:4 47:16,24 76:24 77:2,12 87:3,11 150:18 151:5

**headed** 33:21 36:11

**health** 30:20,24 57:7

**healthy** 23:7,19

**hear** 13:19 34:5 43:13,14 57:7,9 66:14,19 67:13 67:24 69:18 73:12,15 76:9 78:22,25 80:25 81:1 116:16 164:24 168:9,14 168:15,16

**heard** 33:19 36:22 40:6,7 55:12 66:10 74:7 75:19 75:20 76:10 78:16,19,23 79:2 79:2,15 81:10 116:14 130:23 131:2,4,7,7,14 131:16,19 134:13 135:20,21,22 150:24 152:8 167:23,25 168:3 172:16,21

**hearing** 9:12 32:1 131:1 147:23

**heart** 12:17,23 13:1 23:7,10,15 30:18 31:6 57:1 90:8

**heavy** 45:19 61:12 61:14 151:5

**held** 14:1 82:5 130:19

**hell** 57:25

**help** 37:5 118:15 118:17

**helpful** 162:3

**Henry** 3:9 34:4,6,6 37:22 69:17

**hierarchy** 119:25

**HIGGINS** 2:7

**high** 54:2

**high-powered** 48:16 53:10

**higher** 12:15

**higher-level** 141:6

**his/her** 10:23

**history** 157:12,17

**hobble** 95:15,15,19 97:12 98:3,23,24 99:3,8,13,15,23 100:7,8,9,13 101:2 109:5,8,9 109:11,11,21,22 110:3,4,5,6,8 114:20,25 115:16 143:18

**hobbled** 95:21 115:16

**hobbling** 98:14

**Hochman** 2:20 177:5

**hold** 44:8 107:20 124:9 125:21

**holding** 82:8,11,14 82:16,25 84:22 85:3 96:1 101:2 101:2,9,11 116:2 128:18 130:16 139:6

**Home** 153:6

**homes** 171:8

**honesty** 125:21

**hope** 87:22

**Horan** 2:7,9,10 4:18,19 91:20 177:24,24

**hospital** 145:12,14 146:1,5,14,17 148:14 151:11

**hours** 142:24 171:8

**human** 12:17 15:7 28:23 48:21

**Humberto** 1:13 3:14 4:9 5:6,16 175:8 176:8 177:4 178:4,25

**hundred-pounds** 163:7

**hurt** 10:11 57:20 57:22,25 62:17 62:21

**hurting** 63:1,10

**hypothetical** 140:4

**I**

**ICOP** 33:2,9 132:13

**idea** 13:10

**identified** 27:11

**identify** 159:9

**identity** 130:12,20

**ill** 30:10,10

**immediate** 14:20 156:21 158:11

**immediately** 25:7 25:10,12 33:24 38:20 97:4 111:1 112:12 115:5 143:12

**impact** 23:6,14

**impairment** 164:3

**importance** 92:5

**impression** 140:18

**in-custody** 34:18

**incensed** 134:14 135:10

**inch** 37:9,9

**incident** 3:22 12:4 42:8 76:21 94:8 96:19 115:11 118:21 122:6,19 127:14 138:6

**include** 12:7 31:5 98:24 104:9 116:8

**including** 123:23

**inclusion** 125:19

**incorrect** 95:4 167:9

**INDEX** 3:13,20

**indicate** 29:13 30:17 110:9

**indicated** 42:15 46:25

**indication** 10:21

**individual** 10:24 18:21,25 22:20 31:11 56:4 134:18

**induce** 54:3

**info** 27:2

**information** 26:22 33:7,14 114:24 124:5,8 135:25

**136:14 137:20 138:13,15,21 157:15,15 166:21 169:11,17 171:13**

**informed** 31:11

**inhalable** 17:22

**inhaling** 18:7 83:12,17

**injuries** 11:1

**injury** 69:24 70:1 70:2 134:3

**inside** 143:1

**instances** 98:11

**instruct** 120:8

**instructed** 92:17 92:22 93:6 120:6 120:12,13 121:2 121:4

**instruction** 119:21 119:22

**instrument** 32:25 33:6 132:10

**insubordination** 123:21,22

**insurance** 141:25

**insurers** 141:22

**intaerview** 136:19

**intended** 123:4 156:4

**intent** 133:14

**interaction** 8:6

**intercede** 93:4

**interested** 176:16

**interrupt** 153:16

**intersection** 31:14

**interview** 19:23 35:6 105:6,16 113:15,23 114:9 114:12 115:9,14 170:18

**interviewed** 35:3 128:14 136:8,12 136:18

**interviewing** 104:21

**intrusive** 9:16

**investigating** 136:1

**investigation** 76:7 126:20 135:6

**Investigative** 3:23 113:14

**investigator** 104:23 105:1 115:7

**investigators** 73:23 114:22

**involved** 16:8 26:4
34:18 60:16
81:11 133:25
134:2,3,3,6
140:6 141:5
163:17
**issue** 113:3 133:1
**issued** 100:9

---
**J**
**J** 2:14 177:23
**jamming** 150:14
**Jeannete** 2:18 4:19
177:23
**Jeff** 152:18
**jerk** 57:14,19
60:23,24
**jerked** 59:14 64:23
**jewelry** 149:5
**jlewis@lewisle...**
2:17
**Job** 177:8
**Johnson** 2:20 177:5
**Join** 8:18 16:16
22:22 23:18
32:21 35:22 42:5
45:22 47:10,22
49:6,14 50:1
58:4 59:5,17
60:5 62:6,19
63:4,8 65:1
67:16 68:9 69:4
70:24 72:23
73:14 74:23 75:2
75:10,24 76:13
79:14 81:17 82:2
83:15 84:3 85:18
86:2,16,23 87:2
87:10 89:2,5,12
89:19 102:5
103:24 104:16
106:7,18 107:5,9
110:23 111:12
112:2 113:2,9
128:22 130:15
131:5 133:9,23
134:17 136:10,17
138:10,17,20
142:20 145:2
146:7 147:11,16
149:2,7 153:3
155:2,17 156:2
156:18 158:10
159:2,7 162:10
165:13 166:11,20
171:17,24 172:6
173:4,23

**joined** 31:24
**joins** 71:4
**joints** 10:11,14
56:21
**Jr** 3:5 177:25
**judge** 87:21,23
93:4 125:10
126:11,16,17
**judgment** 117:18
**July** 175:16
**jumped** 72:24
**jurisdiction**
135:10
**jury** 79:10 87:14
170:19,24 171:12
**juveniles** 10:25

---
**K**
**KA** 162:19
**keep** 9:11 13:18
27:24 91:12
138:24 139:2
**keeping** 84:22
**Key** 1:2,8,17 2:8
3:10 4:8,11,22
5:18,21 6:3 88:4
98:1 100:10
119:6 122:7,10
123:25 129:1
139:8 141:4
147:8 152:19,25
174:4 177:7
178:4
**kick** 108:3
**kicking** 97:16,20
114:20
**kill** 14:6 63:11
88:7,14,21 174:4
**killed** 87:7 166:25
167:6 169:7,24
174:2,5,10
**killing** 167:20
**kind** 9:16 19:4,13
22:9,16 23:12
32:18 45:19
87:24 137:18
148:3
**knee** 102:21 103:4
103:10,18,25
**kneeling** 156:14
**knees** 44:2 64:9
82:23
**knew** 137:4 157:11
158:3 170:14,17
**know** 6:16 11:17
13:14,17,23 14:3
14:11,14,16 15:6

16:22 17:25
18:10 19:12,13
19:15 20:5,22,25
21:3,6,15,15
22:23 25:25
26:16,18,21
27:23 28:2 33:14
33:16 34:3,13,17
39:8,16 41:18
42:22 47:18
49:10,11,19
52:16 53:2,11
54:16 57:6,20,22
57:24,25 58:7
60:13 61:12,14
66:5,24 67:24
68:20,25 69:6,7
69:10 71:17 72:4
73:5,18 74:12,16
74:24,25 75:11
76:14 77:16,21
78:4,12 80:14,18
83:6,16 86:8
87:21,21,23 89:6
89:6 91:14,15
92:5 98:13 99:1
99:2,17,19,22
100:2,4,10 101:9
102:14,16,22
103:18 105:16
107:14 109:22
110:3 111:4,5,7
111:13,21 113:3
113:4,25 116:7,9
119:10,18,20
120:19 126:12,16
126:22 127:2,11
127:14,16,17,19
128:8,11,15
129:11,14,24
130:1,4,12,20
131:23 132:5,24
133:5,10 134:7
134:12 135:9,11
135:15 136:2,5
136:25 137:2,9
137:14 138:2
139:10,16,21
140:1,5,6,10,16
140:17,21 141:2
141:3 142:13,21
143:14,18 144:5
144:8,15,17,20
145:3,4,7,17,20
145:25 146:21
147:17 148:12,14
148:15,17,19

149:4,8,16 150:3
151:9,20,21,25
152:1,5,15,17,20
153:4,4,10,12,19
154:24 155:6
156:3,11,25
158:2 159:13
160:16 162:23
163:1 165:9,14
165:22 166:6,12
166:13,21 167:11
167:16,19 168:6
169:9,10,14,20
170:5,10,14,22
171:11,11,13
173:1,13
**knowledge** 6:6,9
26:12 33:2 34:12
92:8 99:11 100:9
132:7,8 139:13
139:15 156:5
157:24 163:14
**known** 53:19 81:9
137:19 138:6,14
153:14
**knows** 154:23
**KWPD** 3:22

---
**L**
**lack** 12:16 14:17
17:13
**lady** 133:3 136:4,6
**language** 7:1 122:3
**large** 4:3 42:17
**larger** 9:8 163:12
**late** 110:11
**Lauderdale** 2:21
177:6
**laugh** 135:2
**LAW** 2:3,11
**lawsuit** 141:5
**lawyer** 19:20
120:23 121:9,16
121:21 123:15,17
124:15,18,21
125:9 126:5
**lawyer's** 19:22
**lawyers** 121:18
**laying** 154:14
156:14 164:21
**leaning** 13:25
**learn** 12:16,25
14:6 15:10,14
24:18
**learned** 12:13 13:5
13:11 15:21
16:10,15 21:4,13

24:12 28:4 49:12
49:16
**leave** 7:9 137:11
138:7 146:8
**leaves** 137:20
**leaving** 133:19
**Lee** 3:2
**left** 24:13 44:24
47:4,11 52:3,19
55:14 56:13
57:10,11,14,19
69:21 72:4 83:5
83:6,7,23,25
84:7,11,24 85:2
86:6,17 87:4,11
88:12,16 101:6
102:12 111:20
114:17 134:9
145:9,10,10
**leg** 100:17 106:11
**Legal** 2:15 3:7
4:13,15 177:8,18
**legs** 91:1 94:15
98:23 108:5,6,8
108:10 116:3
16:5
**Let's** 72:3 142:2
153:13
**lethal** 89:16
**Letter** 3:18 177:1
**level** 64:17 118:4
**levity** 61:22
**Lewis** 2:15,18 4:19
11:21 177:23
**lies** 167:11 168:21
**life** 13:6 19:2
112:5,16 138:13
138:14 140:7,21
140:22
**lifesaving** 112:12
**lift** 60:17,21 61:7
83:9 90:23 94:23
95:1,7,20,23,25
96:7,9 106:9
**lifted** 59:22 60:2
90:17 94:20 95:9
96:2
**lifting** 90:13
95:13,14,23 96:5
**light** 5:15 31:16
31:20 32:12
33:18 36:12,12
36:19
**lights** 35:13 36:14
36:17 154:18
155:7
**likewise** 157:14

**limit** 35:13
**line** 31:22 124:4
125:22 178:7
**list** 11:5
**listen** 68:2 76:4
85:16
**listened** 19:21
**literally** 61:7
**little** 9:12 34:9
37:10,10
**lives** 137:10,12
**LLC** 2:11
**LLP** 2:7
**loaded** 151:10
165:10
**locate** 25:2 140:10
140:17
**located** 40:20
**location** 41:1
145:18,18
**locked** 71:12
**logs** 33:1
**long** 5:22 20:12
61:16 134:11,13
144:5,17 145:7
145:17,25 162:22
**longer** 156:16
**longhand** 119:1
**look** 41:22 69:13
85:25 86:4 91:25
98:21 113:22
114:10 142:23
**looked** 21:6 58:9
**looking** 11:20 77:2
77:12 89:8
**lose** 14:16 16:11
113:7 115:15
138:19
**loss** 15:15
**lost** 31:17 111:24
112:15,24
**lot** 41:17 60:2
115:22 120:22
139:11,12
**loud** 40:6 44:14
**louder** 13:20,21
**Lovette** 3:2 4:24
65:17 66:16
67:18 68:12,16
68:19,25 69:2
70:6 73:21 74:4
74:12 75:19
76:23 77:13,16
77:19 78:11,17
79:2,8,22 101:7
101:10 102:2
103:2 104:4,9

116:8,9,10,13,17
130:25 149:10,20
150:24 160:9
164:6,7 166:23
169:23
**Lovette's** 132:21
151:21 164:9
167:5
**low** 28:1
**lreynolds@rrbp...**
3:5
**lunch** 153:25
**lying** 52:24 53:4
**Lyman** 3:5 4:23
177:25

_____

**M**

**M** 2:10 177:24
**making** 87:6 88:6
88:19 126:2
157:4,5,7,10
**male** 102:13
**malfunctioned**
26:11
**malfunctions**
132:13,14,17
**malicious** 13:9
**man** 29:13 45:19
46:7,13 52:16
58:2 61:7 62:25
63:1 87:7,16
88:7 92:18
110:11 118:6
128:17,24 130:10
133:17 143:8
146:5 164:20
170:7
**man's** 60:7 129:1
133:17 138:24
**mandatory** 6:7
**maneuver** 58:11
73:11
**manner** 139:6
**manners** 8:6,9,14
**manufacturer** 99:22
100:11,12
**manufacturer's**
99:5,9,14,20,21
100:3,6
**Marchman** 98:10
**mark** 91:5
**marked** 91:13
113:18
**mass** 16:9
**materials** 139:14
**matter** 6:12 43:22
63:6 93:3 122:10

125:21 134:24
135:2 174:2
**maximum** 32:10 61:3
**McKee** 2:11,14 3:15
4:18,18 5:10,15
9:15,18 11:18,20
11:23,25 12:2
13:22 16:14
19:10 27:16 28:3
32:13,22 37:13
39:6 45:23 47:6
48:10,12,24
49:15 50:7,20
51:16 53:1,23
55:2 57:17 58:5
59:9 60:10 61:10
61:16,20,22,24
62:5 63:13 64:11
65:24 66:25 67:2
67:4,7,12 69:5
71:8,21 77:7
81:14,23 84:4,6
86:3,24 87:15,22
87:25 88:2,3,24
89:23 90:2,19
91:5,8,11,14,18
91:22,24 92:24
93:1,5,12,15,18
93:22,25 94:4
106:19 107:6,23
108:15,18 109:16
109:25 110:18
111:2 112:7
113:10,13,17,19
115:23 117:11
118:19 120:4
121:17 122:18
124:9,12,15,19
124:23 125:11
126:16,19 127:7
129:23 132:3
134:25 135:2,4
135:15 136:23
137:23 138:18
141:10,21 142:1
142:5,12 149:3
153:17,20,23,25
154:3,5 155:25
159:19 164:19
166:17 167:13
174:12,18,22
177:23
**mean** 8:19 9:23
10:16 19:4 25:11
55:3,20 82:8
95:13 140:19
**meaning** 26:20

101:19 167:25
**means** 64:2 92:5
154:23
**mechanism** 28:9
63:21 142:16
**medical** 110:17
143:13,21 146:25
147:4,8,14 153:1
153:11
**medics** 144:21
**Medina** 3:8 159:14
**memory** 162:1
**mental** 29:10,13
30:9 157:11
**mentally** 30:10
**mention** 104:18
**mentioned** 78:11
**met** 164:8
**method** 21:18,24
66:8
**Miami** 177:19
**Michael** 2:22 4:21
177:4
**miles** 145:22
**mind** 11:17 46:9
61:20 63:15,17
**mine** 37:24 45:1,6
169:4
**minute** 142:3
**minutes** 144:19,19
145:22 146:3
153:20 162:25
**Miranda** 113:25
**misconduct** 126:21
**missing** 131:15
140:23 152:2
**misstated** 102:11
**modified** 116:14
**moment** 37:19 41:14
48:22 51:10 69:2
110:25
**moments** 142:24
**monitor** 16:18 17:1
69:12
**monitored** 32:1
33:19 81:12
111:15
**monitoring** 16:23
69:11 81:5 87:3
90:5,8 110:10
111:9,14,23
112:15 113:6
**Monroe** 164:25
175:4 176:4
**month** 20:14
**months** 20:6
**morning** 4:5 5:11

**Moro** 139:18
**Motion** 55:25 86:19
88:18 172:2
**motions** 157:10
**mouth** 56:8 83:11
85:12
**mouth-to-mouth**
143:24
**move** 14:13 82:14
84:11 89:22
**movements** 157:5
**moving** 40:13 72:17
83:23 90:4
138:25 139:3
**municipality** 1:8
**Murdoch** 2:20 177:5
**musculature** 164:4

**N**

**nail** 118:22
**NAJA** 3:10
**name** 5:12 27:14
128:13 130:12
136:14,20 152:21
**named** 160:8
**names** 135:24 137:5
**nature** 134:1
**near** 24:14 102:21
102:23 103:19,19
135:16,20
**nearer** 71:6
**necessarily** 8:24
**necessary** 63:21
116:24 117:3
118:5 172:1
173:18
**neck** 15:1
**need** 7:3,8 8:7
30:9 67:3 74:9
93:20 106:4
117:2 125:6
142:2
**needed** 6:25 7:10
32:10 38:8 74:13
116:19 118:1
125:6
**Neither** 57:5
**never** 12:19 13:3,5
18:20 21:7 22:2
23:12 57:3 68:2
74:25 75:3 77:1
77:10 83:21,22
83:23 84:12 86:6
86:8,17 87:12
104:11 109:23
111:7 128:10
140:3 148:9,25

165:10 173:2,5,9
173:10
**New** 134:13
**news** 133:3,6
141:16,19 147:24
167:25
**newspaper** 3:10
127:17
**noise** 14:21,25
**non** 13:5 87:6
**non-responsive**
109:2
**normally** 28:1,3
53:20
**north** 5:16 25:6
41:6
**nose** 151:16,17
**nostrils** 83:11
**Notary** 4:2 175:7
175:15
**note** 42:8
**notice** 110:20
143:9
**noticed** 95:6,10
96:6 106:14
107:2,11 108:20
109:1,18 110:6
110:16,25 111:7
111:20,22,23
112:3,11,14,22
114:5,18 115:4
115:17,18
**noticing** 85:21
90:24
**NOTIFICATION** 177:1
**November** 1:15 4:6
24:7 175:9,11
176:18 177:2,8
178:5
**number** 4:10 10:5
11:19 91:10,14
91:22 98:7
113:14 136:15
137:12 162:6,7
**numbers** 136:21
**nursemaid** 82:11

**O**

**oath** 3:17 52:10
92:3,6 113:23
125:22 175:1
**obese** 9:7,23,23
46:1 58:13 163:6
163:11,13
**obesity** 10:1 11:5
11:7,10,14
**obey** 123:20

**object** 8:13,17
16:13 17:24 18:4
18:9 20:17 22:7
22:21 23:17 24:5
30:1,5,15,21
31:1,7 32:20
34:15 35:15,21
37:11 38:21 39:5
42:4 45:21,25
46:11 47:5,17,21
48:6,17,23 49:13
49:21,25 50:6,9
50:15 51:2,14,22
51:25 52:20,25
53:22,25 54:5,8
56:6 57:16 58:3
58:17 59:4,16,24
60:4,12 61:9
62:4,13,18,22
63:3,7,12,25
64:5,10,25 65:3
65:12,18 66:3,12
66:17,22 67:15
67:20 68:8,13
69:3 70:10,15,23
71:7,20 72:22
73:4,13 74:1,22
75:1,9,23 76:12
77:5,17 78:7,14
78:21 79:5,13
81:13,16,21 82:1
83:14,19 84:2,5
84:9,21 85:1,14
85:17,22 86:1,5
86:10,15,22 87:1
87:9 88:8,22
89:4 90:21 95:17
96:15 97:8 102:4
103:23 104:6,15
105:10 106:6,17
106:23 107:4,8
108:24 109:7,24
110:2,13,22
111:11 112:1,6
112:10,17,17
113:1,8 114:4
115:1,12,21
117:9 120:17
121:15 122:13,17
123:7 127:15
128:21 130:14
131:3,10,17,22
132:1 133:8,21
133:21 134:16,25
135:8,12 136:9
136:16,22 137:22
137:25 138:9,16

141:8 143:5
145:1 146:6,23
147:5,10,15
149:1,6 150:20
151:1,7 152:3,12
153:2,9 155:1,16
155:24 156:17,23
157:19 158:9,20
159:1,6 162:9
164:18 165:12
166:10,15,19
167:2,7,21 168:7
169:1 170:4
171:16,23 172:5
172:20 173:3,7
173:22 174:3,6
**objection** 9:25
  19:9 49:5 52:5
  60:9 65:13,19,23
  66:4,13,18 67:21
  68:1,14,17,23
  70:9 71:2 72:9
  74:2,11,15 76:19
  76:25 77:6,9,18
  77:24 78:8,13,20
  78:24 79:4 80:6
  80:10 81:22
  82:12 83:20
  84:10 85:23 88:9
  88:15,23 89:11
  89:18,25 90:1,18
  90:22 92:20,24
  93:1 95:18 97:19
  101:18 103:7,13
  104:5,12 109:6
  110:14 112:9,19
  115:25 116:12,21
  116:25 117:4,10
  117:16,24 118:7
  118:11,16 121:14
  129:3,8 131:11
  131:18,21 132:2
  132:23 135:13
  137:21 138:1
  140:9,15,24,25
  141:9 142:19,20
  143:6 146:15
  149:12 150:2,21
  151:2,8,24,24
  152:4,9,13,16
  156:10,24 157:9
  160:1,10,15,18
  160:24 161:15
  164:23 165:6
  166:16 167:3,8
  167:12,15,22
  168:4,8,13,17,23

**objections** 61:24
  67:8
**objective** 143:3
  153:13
**observation** 58:12
**observations** 54:16
**observe** 58:10
  151:10,13
**observed** 67:22
  74:12 117:25,25
  118:1
**observing** 117:1,5
**obtain** 138:15,21
**obtained** 133:2
**obvious** 10:24
**obviously** 112:21
  128:19
**occupied** 68:24
  69:1
**occur** 12:17 34:24
  94:20
**occurred** 95:1,8,23
  115:11
**occurring** 150:11
**odd** 30:17 131:24
  132:4 168:25
**Oddly** 11:5
**offensive** 7:6
**offer** 56:16
**office** 34:16
  139:22 177:10,13
**officer** 4:23 6:8
  9:12 10:22,22
  13:19 24:21,23
  24:24 25:5,7,12
  25:25 27:24 29:7
  29:9,25 34:4,6
  36:8,18 37:1,21
  38:16,23 39:3,10
  39:14,18 40:18
  41:7 43:14,17,23
  44:9,11,13 45:5
  53:9,13,17 55:11
  55:12,13,14,16
  55:19 56:3,8
  57:5,7 64:12,20
  65:16 66:16
  67:18 68:12,16
  68:19,25 69:2,8
  69:16,17,18 70:6
  72:16 73:21
  74:12 75:19

76:23 77:13,16
77:19 78:11,16
79:2,8,22 81:11
91:21 101:7,10
101:25 102:2,3,7
102:13,15 104:24
111:15 114:15,18
114:20 116:9,10
116:13,16 117:15
117:17 119:23
127:13 128:20
134:14 135:5,9
135:18 136:19
137:1 138:8
144:4 148:12,24
149:4,18 150:24
151:21 152:19
155:13 159:11
161:2,6,10,25
162:5,15,19
166:23 167:5
168:11 169:7,12
169:18,23 171:3
172:13,14,22,23
174:5,9
**officers** 16:8 32:2
  72:18 75:5 79:24
  82:4 86:13,20
  87:5 88:5 90:4
  91:1 94:4 98:22
  102:1 105:2,12
  105:17,25 108:5
  108:6 109:19
  110:10 111:9,14
  111:17 114:18,24
  115:3,4,5 116:3
  116:6 129:18,21
  130:2 133:18
  134:3,6 135:18
  136:1 138:15
  147:20 148:2,7
  151:18 158:13,15
  158:24 159:8,9
  159:17 160:7
  162:7 163:17
  164:11 165:24
  166:1,3,14
  171:11 172:15
**offices** 140:21
**official** 141:6
**Oh** 55:24 61:21,23
  62:24 87:25
  153:22
**okay** 6:20,23 7:6
  7:12,14 8:3,15
  8:25 9:5,10
  11:14 15:21 16:5

22:16 24:8 25:25
31:14,25 32:3
34:8,18 35:12
36:7,18 37:8,10
37:16 38:2,7
39:3,13 40:7,23
41:4,8,12 44:13
44:17 46:23 47:3
49:18 50:25 51:5
51:9 53:6 54:2
55:13 58:19
61:18,20 63:16
79:7 82:17 92:11
93:15,22 95:3,20
96:11,18 98:24
119:18,19 120:5
120:19 121:11
122:15,21,24
123:14,17 125:3
129:20 130:18
132:14 139:13,20
141:18 150:9,11
151:4 153:15,22
154:2,16,18
155:19 157:7
160:6 162:6
164:10,12 165:23
**old** 58:7,12,14
  61:5
**older** 10:10 23:20
  23:21 45:18 46:2
**once** 33:17,23
  46:24 81:19
  155:21 156:9,14
  162:20 167:24
**one's** 10:14 23:7
  28:17 56:4 87:6
  133:19 150:1
  151:5
**ones** 172:18
**oo0oo** 3:11
**open** 42:3
**operating** 150:25
**operation** 117:23
  144:6
**opportunity** 173:10
**oppose** 28:23
**opposed** 62:5 96:22
  118:23
**opposite** 40:23,25
  41:1
**order** 11:16,20
  25:18,21 29:6
  55:17,21 56:2,10
  78:17 83:25 91:7
  119:22 120:25
  122:12 123:20

**ordered** 26:3 35:19
35:23,25 120:1
120:19 121:8
122:5,8,15,22
123:2,5 124:24
126:6 130:2,5
174:21
**ordering** 44:14
69:16 121:11
**orders** 40:5 43:14
43:18 54:17 56:4
64:12 125:13,23
125:25 126:3
**ordinarily** 30:19
**ought** 141:21
**ourself** 155:18
**outlawed** 21:18,21
**outside** 12:21
171:8
**overweight** 45:19
**owns** 152:21
**oxygen** 12:16,22
14:17
**oxygenation** 15:16

**P**

**P.A** 2:15,20 177:5
**p.m** 1:15 174:24,25
**page** 3:13,21
113:22 114:10,14
178:2,7
**pages** 176:9
**Pain** 58:6
**painful** 10:14 29:1
68:4
**palm** 2:3,12,16 3:4
24:14 71:4
**panic** 22:6,13,15
22:16,19,25 23:4
23:8,9
**panics** 23:5
**paragraph** 99:2,3
100:15 114:14
119:13,16,20
121:8,12 123:12
123:13 125:14,16
125:17,20 126:9
127:22
**paramedics** 144:9
144:11,13,15
145:10,18 165:3
165:7,10,14,17
165:18,23 166:4
166:6
**parked** 36:25 171:8
**part** 8:1,2,3,6
13:24 19:3 32:19

49:24 52:10 70:1
70:12 80:5
101:22 102:17
**participate** 17:6
130:7
**participated** 34:24
**participating**
77:25 154:12
**particles** 17:22
**particular** 145:21
**particularly** 62:10
98:11
**parties** 176:13,14
**partly** 60:2
**passed** 97:3
**path** 155:14,20
**patient** 165:4
**patrol** 34:2 38:6
143:12
**patterns** 16:23
**Paul** 2:9 177:24
**pay** 141:22 146:25
**paying** 141:24
**PBA** 92:17,22 93:7
119:21 121:1,3
**pen** 91:14
**penalties** 178:22
**people** 49:12 51:1
54:10,13,21
140:21 155:20
157:1 160:6
170:8
**perceive** 157:3
**perceived** 29:10
45:16 47:1 81:10
117:19
**perception** 134:24
**performed** 144:5
**performing** 143:24
**period** 29:17
**perjury** 178:22
**perpetrating** 154:7
**person** 7:16 9:7
12:15 15:15 22:6
22:25 23:5,19
28:15 29:24 30:4
30:10,12,19
41:15 49:3 52:14
54:22 55:5,6,7
58:7 98:8 117:7
130:20 138:7
139:16 148:4
154:22 162:17
163:12
**person's** 16:1 30:8
**personal** 1:5 81:4
81:9

**personality** 167:10
**personally** 175:8
**perspective** 66:11
**pertaining** 169:9
**pet** 14:4
**ph** 139:18
**phone** 61:25 128:7
130:16,18 136:15
136:21 137:12
**photograph** 148:23
151:18
**photographing**
148:19,23
**photos** 148:17
**physical** 10:25
24:4 30:14,24
31:5 56:23 58:10
105:24 163:14
164:3,15
**physically** 18:17
42:25 43:25 46:6
46:13 64:22
**physiologic** 88:20
**physiological** 12:7
18:24 50:4,12
**physiologically**
18:21 49:11
**pin** 74:9 116:14,19
116:22 117:2,23
118:1,9,13
**pinned** 17:13 68:11
**pinning** 82:8
**Piper** 2:20 177:5
**place** 7:20,21
12:15 44:2,23
65:4 71:14,23
75:12,18 105:12
105:18 122:6
154:15
**placed** 17:17 22:18
52:13,22 106:12
109:9 114:20,24
115:5 146:12
171:3
**placing** 71:25
**Plaintiff** 1:6 2:2
4:20
**Plaintiff's** 3:20
91:13 113:18
**play** 60:14 79:10
**played** 129:5
**please** 4:16 5:11
52:2,19 55:13,18
56:5 107:20
108:14 172:22
**pliable** 68:5
**PLLC** 3:3

**plural** 105:2
**pluralize** 150:9
**pluralized** 150:7
**Plus** 27:18
**pockets** 156:12
**point** 7:1,2 15:1
28:22 29:5,21
33:24 36:7 40:21
44:9,11 49:9
53:16 55:10 56:1
57:11 64:16 67:7
72:12,13 74:20
75:4 76:23 80:3
81:25 97:13
111:21 118:1
127:11,12 133:19
145:12 149:11
151:4
**pointed** 22:17 40:1
47:16,18,24
48:16 54:2 171:3
**pointing** 39:22
40:2 44:9,15
53:10,12,14 63:1
**points** 23:5
**pole** 128:17
**police** 5:21,24 6:7
12:22 24:19
31:10,21 34:1,14
53:16 55:14 88:4
90:16 98:1
100:10 104:24
110:10 119:6,25
120:22 122:10,11
123:25 127:14,16
128:13,19 129:12
129:19 130:20
131:24 133:2,7
133:16,18 134:2
134:3,14 135:9
136:3,7,8 138:4
138:8,15 139:8
139:25 141:5
147:8 151:18
152:19 154:19
158:13 165:24
166:1,2,14
167:18 169:5
171:2,7,11 174:4
**police-involved**
138:5
**policy** 8:2,3,9,14
8:15 9:3,20,24
10:1,2,4,6,19
11:11 26:3
137:14,17,18,24
138:2,4 169:5,6

169:9,16,20
**pose** 10:22
**position** 12:4,8,14
  15:6,11,21,25
  28:24,24 32:2
  38:7,9,12 68:11
  68:15 69:11 74:4
  80:17 84:8 98:5
  100:18,19 101:17
  114:16 143:22
**positional** 12:12
  15:18 100:16
**positioning** 117:5
**positions** 12:14
**positive** 158:2
**possess** 28:6
**possessed** 157:15
**possibility** 100:16
**possible** 51:11
  63:19,23 97:21
**potential** 17:23
**potentially** 89:16
**pounds** 60:7 61:11
**powered** 54:3
**practical** 146:21
**practice** 100:17
  136:2 137:7
  138:8,23
**Pratt** 3:7 4:14
**precautions** 30:9
**pregnancy** 10:24
**prepared** 177:10
**present** 3:7 12:4
  88:5
**preserve** 26:23
**preserved** 33:15
**press** 61:3,11
  141:11
**pressed** 101:22
**presses** 60:25
**pressing** 68:5
**pressure** 14:12
  15:2,14 82:17,19
  84:19,25 103:4
**pretty** 24:10 157:1
**previously** 87:6
**prey** 14:7,10
**printed** 118:24
**prior** 8:10 12:3
  19:17 21:17
  29:21,23 31:9
  39:10,10 42:25
  56:11 76:5
  122:21 128:1
  139:24
**priority** 134:10
**prison** 140:13,14

**prisoner** 100:18
**prisoner/detainee**
  10:23
**private** 120:23
**privilege** 93:11,17
  122:1 125:9,19
  126:10,13
**privileged** 124:7
**probably** 42:16
**problem** 29:14
  30:14,18,24 57:1
  69:9 126:17
  127:8
**problems** 132:9
**procedure** 42:11
**procedures** 11:2
  140:6
**proceed** 126:14
**proceeded** 36:19
**proceeding** 170:23
  177:10
**proceedings** 3:13
  170:19
**process** 7:13,18
  8:22 12:5 28:4
  88:14 94:11
  102:18 116:20
  134:8 139:1
**professional** 1:25
  4:2 13:6 175:7
  176:7,22
**profiler** 167:16
**prohibit** 54:19
**prohibited** 100:19
**prone** 7:18 12:4,8
  12:14 13:8 15:6
  15:11,15,21
  16:19,24,25 17:2
  17:6,18 18:16
  21:18,24 22:4,8
  28:16 68:15
  69:11 80:17 81:5
  84:7,24 89:9
  101:17,19 114:16
  154:7,11
**pronounced** 94:25
**proper** 137:13
  155:6
**properly** 18:18
  99:13
**property** 119:5
**prosecuted** 139:24
**protect** 52:17
  155:18
**protected** 126:13
**protocol** 8:1 47:3
  122:10 135:24

136:2,24,25
  137:2,4,8,9,13
**Provide** 35:2
**provided** 177:10
**psychiatric** 157:12
**PT** 24:12,18 25:7,8
  25:11 29:7 32:11
  33:8 36:5,8,18
  37:21,23 38:20
**public** 4:2 126:24
  175:7,15
**pull** 8:4 28:17
  64:7 70:16 80:1
**pulled** 15:7 47:11
  59:22 60:1 68:6
  73:10 95:14
  154:11 166:24
**pulling** 60:6 62:1
  62:9,10 68:10
  154:20
**pumps** 24:17
**punishment** 123:22
**purpose** 4:8
**purposes** 98:9
  153:19
**pursuant** 125:12,23
  126:3
**pursue** 32:3
**pursuing** 32:18
**pursuit** 26:5 29:7
  31:21 33:8 35:12
  35:16,16,17 36:2
  36:5
**push** 64:7
**pushing** 82:6,7,24
  85:3 111:20
  139:5
**put** 13:25 45:5
  47:11 51:6,7,10
  51:19 57:14
  58:19 59:18 72:4
  72:7 74:9,18
  78:5 95:11 97:12
  97:15,17 102:17
  103:22 104:1
  106:4 107:7,24
  109:5,23 110:4
  125:7,15 126:9
  127:20,23 128:1
**puts** 61:22
**putting** 84:19
  105:22 109:8
  120:2 156:15
**puzzling** 121:7

_____
        **Q**
**question** 6:22 7:13

35:10 47:5 48:23
  49:13,25 50:6,9
  50:10 51:2,14,22
  52:20,25 53:2,25
  55:24 56:1 59:4
  59:16 61:9 69:3
  76:15 77:20,21
  79:5 81:8 86:19
  87:13,15 88:8,22
  103:23 104:6,15
  106:6,17,23
  107:4,8 108:15
  108:17,24 109:7
  110:2,13,22
  111:11 112:1,10
  112:13,18 113:1
  113:8 115:1,21
  120:12 122:2,13
  123:7,15,18
  126:11 129:10
  133:22 135:12,14
  136:9,22 137:25
  138:9,16 139:23
  140:4 141:8
  142:13 145:1
  148:21,22 172:2
  173:14 174:8,8
**questions** 57:3,7
  87:18 93:13,16
  94:10 174:18,20
  174:22,23
**quick** 51:11 63:18
  63:22 93:25
**quickly** 7:10 14:16
  27:19 39:16
  97:21
**quiet** 148:3
**quite** 29:25 120:22
**quote** 10:20 90:25
  94:13 95:6 99:3
  114:15,20

_____
        **R**
**radio** 24:19 25:18
  26:4 29:24 32:1
  32:6 33:19
  167:23,25 168:1
**raise** 4:25
**raised** 6:4
**ran** 143:12 155:7,9
  162:20
**rare** 100:16
**rate** 90:8
**reached** 64:16
**react** 18:17 72:20
**reactions** 13:1
  23:9

**read** 3:18 19:21
  91:4 99:25
  100:12 114:2
  141:16,19 174:21
  178:22
**reality** 87:18
**really** 67:10
  106:25 110:10
  163:10 167:17
**reason** 35:24 54:1
  93:8 98:9 104:13
  118:13 154:13
  169:22 178:7
**reasonable** 172:1
  173:18
**reasonableness**
  153:13
**reasons** 118:18
**recall** 8:2,14 9:22
  10:1,6,8 12:13
  16:20,25 19:3
  20:7,12,15 22:3
  23:13,19,24
  25:10,14,20,24
  26:10,13 27:8,21
  28:7,20 29:12,15
  30:2 31:4,13,19
  31:23 32:14,16
  32:23,24 35:7,9
  36:10,12 37:24
  38:9,11,13,14,14
  38:18 39:20,25
  40:8,18 41:6,13
  41:20,21 42:1,7
  42:10,14 43:9
  44:5,16 46:1
  52:12,21 53:4
  55:16,19 56:7
  58:9 59:3,7 60:6
  62:9,10 68:18
  69:13,17 70:2,4
  70:11 71:10,10
  72:18,24 73:19
  75:6 76:8 79:16
  79:24,25 80:7,14
  82:7,19,24 83:23
  85:2,6,8,11,15
  85:19 90:23 95:9
  96:2,17 97:1,2,4
  98:6,17 99:7,16
  99:18,21 101:4,8
  101:9 102:8,10
  105:14,21,21
  106:1,24 107:10
  108:10 109:8,9
  113:24 114:1
  116:13 120:9,21

  127:10 128:6
  130:9,16 132:16
  135:16 137:7,17
  139:5,6 144:2,10
  144:14 149:24
  150:5,9,13
  151:12,17 158:11
  158:15,18,21,23
  159:15,21 161:7
  161:9 162:5,15
  162:20 166:2,5
  170:13
**recalled** 94:21,23
  115:13
**receive** 19:4
**received** 18:20
  23:12 30:3 100:5
  100:7
**recess** 94:1 142:9
**recognize** 94:6
**recognizing** 120:10
**recollect** 96:17
  108:25
**recollecting** 162:1
**recollection** 24:10
  34:4 37:5,16
  38:17 39:7 41:14
  55:20 56:10 70:5
  71:9 94:24 96:18
  96:21 107:19
**record** 4:6 7:2
  93:21,23 94:2
  142:7,10 174:24
  176:10
**recorded** 28:10
  33:10 137:10
  143:1 144:20
  167:11
**recording** 28:6,11
  28:15 76:2,10,17
  132:25 167:6
  168:12 169:6
  170:8
**recordings** 76:14
  134:12
**red** 31:16,20
  154:18 155:7
**reduce** 16:12
**reduced** 21:24
**redundant** 52:5
  72:9 88:10
**referring** 106:11
**refresh** 37:5
**refuse** 124:25
**refusing** 123:20
**regard** 22:24 52:7
  120:2

**regarding** 122:6
**regardless** 30:8
**regulations** 97:25
**relates** 10:6
**relating** 113:14
**relation** 37:23
**relationships**
  148:1,6,6
**relative** 139:12
  176:12,14
**relatively** 45:18
**released** 98:12
**remained** 108:4
**remember** 10:15,17
  10:18,19 11:2,7
  12:10 19:5,6
  21:10 26:8 27:1
  40:7,14,16 43:6
  69:23 70:18,21
  70:25 79:22 80:1
  80:2 104:21,23
  105:1 106:12
  114:12,23 115:2
  115:8 128:16
  131:1 149:11
  157:3 159:5
  163:3,5,6,8,10
  168:18
**reminder** 6:20
**remove** 83:9 90:11
**removed** 148:25
**render** 110:17
  111:1 112:23
**repeat** 50:10
**repeatedly** 65:21
  174:16
**rephrase** 6:22
**report** 3:22,23
  19:23 20:23,24
  21:1,4,5,7,9,11
  21:12,13 70:1,2
  73:20 78:3,10
  90:25 91:25
  92:11,19 93:7
  94:6 95:11 96:8
  96:12,13,16 97:7
  97:9 98:14,15,25
  102:25 103:2,5
  103:11,14,16,22
  103:25 104:8,10
  104:14,19 105:5
  105:16,21 106:2
  106:10,15,21,22
  107:1,15,21
  108:9,22 109:13
  109:23 110:4,5,8
  113:14 114:2,6

  115:10,20 118:20
  118:23,25 119:9
  119:13 120:7,13
  120:25 121:6,11
  122:4,6,12,16,21
  123:1,4,9,19,21
  123:24 124:4,4
  124:10 125:6,7
  125:12,20,22
  126:2,4,21
  127:21,24 156:16
  165:7 166:7
  176:8
**reported** 24:22,23
**reporter** 1:24,25
  3:17 4:2,2,5,13
  4:25 7:3 175:6,7
  176:1,6,7,22
**Reporter-Master**
  176:22
**reports** 78:6,9,18
  79:19 90:16
**represent** 125:18
**Representative** 1:5
**request** 74:20
  177:12
**requested** 176:10
**required** 6:7 98:14
  117:22
**requirement** 16:18
  60:16
**requires** 135:24
**requisite** 6:7
**resist** 62:23 108:3
**resistance** 71:16
  153:15
**resisting** 19:1
  55:23,23 65:8,15
  70:16 71:18,23
  154:9
**respect** 125:19
**respectfully**
  177:12
**respond** 144:17
  173:10
**responded** 24:21
  25:1 36:25
**responding** 49:12
**response** 23:3
  64:17,21 88:20
  153:15
**responses** 6:25
  50:4,12
**responsive** 95:7
  109:18 111:5
**rest** 36:14
**restate** 6:22

restaurant 40:17
  40:24 41:2,3,5
restrained 15:15
  107:2
restraining 21:25
  23:23 97:25
restraint 7:18
  13:8 15:15 16:8
  16:19,24 17:3,6
  17:18 18:16
  21:18,24 22:4,9
  22:11 28:17 81:6
  89:9 98:24
  100:13,23 101:3
  102:18 106:4
  107:7,10,13
restraints 100:18
  100:22 106:11
  107:25
restrictive 18:6
result 22:15
resulted 121:5
resulting 121:5
results 125:2
retained 33:7
retired 134:14
retrieve 143:12
return 177:13
returned 143:21
review 59:12 98:18
  98:19 128:5
  140:3 142:23
  176:9 177:10,13
reviewed 19:16,19
  19:21,24 20:1,3
  59:10 114:2
  128:2,3
rewrite 21:5
rewrote 21:7
Reynolds 3:3,5
  4:23,23 8:18
  9:25 16:16 19:9
  22:22 23:18
  32:21 35:22 42:5
  45:22 47:10,22
  49:6,14 50:1
  58:4 59:5,17
  60:5,9 62:6,19
  63:4,8 65:1,13
  65:19,23 66:4,13
  66:18 67:16,21
  68:1,9,14,17,23
  69:4 70:9,24
  72:23 73:14 74:2
  74:11,23 75:2,10
  75:24 76:13,19
  76:25 77:6,9,18

77:24 78:8,13,20
78:24 79:4,14
80:6,10 81:17,22
82:2,12 83:15,20
84:3,10 85:18,23
86:2,16,23 87:2
87:10 88:9,15,23
89:2,5,12,19,22
90:1,18,22 92:20
95:18 97:19
101:18 102:5
103:7,13,24
104:5,12,16
106:7,18 107:5,9
109:6 110:14,23
111:12 112:2,9
112:19 113:2,9
115:25 116:12,21
116:25 117:4,10
117:16,24 118:7
118:11,16 121:14
128:22 129:3,8
130:15 131:5,11
131:18,21 132:2
132:23 133:9,23
134:17 135:13
136:10,17 137:21
138:1,10,17,20
140:9,15,25
141:9 142:19
143:6 145:2
146:7,15 147:11
147:16 149:2,7
149:12 150:2,21
151:2,8,24 152:4
152:9,13,16
153:3 155:2,17
156:2,10,18,24
157:9 158:10
159:2,7 160:1,10
160:15,18,24
161:15 162:10
164:23 165:6,13
166:11,16,20
167:3,8,12,15,22
168:4,8,13,17,23
169:2,8,13,19,25
170:3,9,16
171:17,24 172:6
172:10,17,25
173:4,8,12,17,23
174:7,11,14,16
174:23 177:25
rid 137:18
rifle 38:6,7,9
  39:22 44:10
  48:16 53:10,14

54:3 63:1
right 4:25 6:18
  15:19 16:6 29:25
  31:6 34:10 36:7
  36:15 38:10,20
  39:1 42:3,20
  43:12 44:3,4
  45:20,24 46:9
  47:8,14,16 48:8
  48:16 49:4,12,16
  49:20 50:5,13
  51:1,7,13,20,24
  52:3 53:7,9,10
  53:14,24 54:4,14
  54:17 55:4 56:19
  58:20,22,25 59:2
  59:11 62:1,8,12
  63:17,21 64:3,7
  64:20,23 65:2,4
  65:11,25 66:11
  66:16 67:7 69:8
  69:24 71:13,19
  71:19,22,24,25
  72:1,5,7,14,15
  72:21 73:3 74:7
  74:21,25 76:20
  76:21 78:1,19
  79:3,8 81:20
  82:5,15 83:18,23
  83:25 84:1,7,8
  84:11,20,24,24
  84:25 85:2 86:6
  86:9,11,17,25
  87:4,8,11,22
  88:12,14,16
  91:18 92:6,9
  95:8,16,21,24
  96:9,11 97:14
  101:25 102:13
  104:2,19 105:12
  105:18,22,23
  106:9,22,24
  107:7 108:9,23
  109:3,5 111:20
  112:8,16 114:9
  114:15 116:4
  118:2,6,14 121:9
  124:2 125:23,25
  126:3,6 129:5
  131:9,16,20
  133:12,13 135:6
  135:20 136:4,8
  143:4,9 149:9
  150:25 151:6
  152:2,8,23 153:1
  153:6,8,11
  154:20 155:7,9

155:11,15 156:9
156:22 157:12,21
158:4,8,19,22
160:17,21 162:8
162:12 164:21
165:11,21 168:6
168:12 172:16,19
173:2,6 174:10
174:13
rights 113:25
RINALDI 2:3
ripped 72:19
risk 12:7,15 30:20
risks 12:4,10
rmckee@themcke...
  2:13
Robert 2:14 4:18
  27:6,13,15
  177:23
ROBERTS 3:3
Roderick 3:7 4:14
roll 56:18 64:7
  73:3,3,10 82:16
  101:14 143:19
rolling 85:4
Roosevelt 5:16
  25:6
route 11:11
Royal 2:3,12,16
rude 7:3
rules 6:17 64:15
run 164:13 166:7
running 38:13
  40:11

_____
         S
safety 45:1,6
  50:23
sand 17:3,8 18:5
  46:17 82:6,7,23
  83:9,12,17,21,24
  84:1,8,11,13,15
  85:20,24 86:7,18
  87:12 88:12,17
  90:11,24 101:23
  138:25 143:9
  151:16,17 154:7
  154:11,14 164:13
  164:21
Sandy 164:20
sat 19:25
save 112:16
saved 112:5
saw 20:8 21:10,11
  21:15,16 33:21
  37:1,21,21 38:2
  38:5,6,10 39:24

39:25 40:2,21
41:10 42:1,2,7
42:13 43:22
45:24 53:15
57:18 59:2 64:19
72:1 77:1,10
80:11 81:10
83:21 84:12,12
86:6,17,17 87:3
87:11,12 88:11
88:16 89:6,8,15
102:1,20 103:9
103:10 113:11,12
127:11,13 129:5
134:14 156:8
158:22 159:12
160:7,7,17,19
162:12,15,19
**saying** 43:4 55:16
55:19 85:5,6
96:14 104:23
136:5 150:11,24
152:5 168:9
170:8
**says** 98:3,8 100:16
108:1 115:3
121:8 123:19
124:21 127:13
169:21
**scary** 47:19
**scenario** 18:12
**scene** 24:13 29:4
38:16 39:4,8
50:2,16,19,22,24
51:3 56:3 75:7
75:11 76:20 78:9
79:23 80:23 88:5
101:6 104:24
110:10 128:16,20
129:7,21,25
133:2,11,18,18
134:11 136:1
137:3 143:8
145:7 149:11
151:19,22 153:15
154:16 159:8
165:17 166:9,25
167:18 168:11
174:10
**scheduling** 153:18
**scream** 66:20
**screaming** 66:15
67:13,17,23,25
68:3 70:7,11
**seat** 100:19
**seated** 78:25
100:19

**second** 7:21 27:11
67:1 72:5 110:12
110:16,21 112:11
112:22 113:22
114:14,14 153:16
173:6
**seconds** 15:3 65:7
144:19
**section** 10:9 11:3
98:6,7 99:7
**secure** 50:16,19,22
50:23 51:3 91:1
94:14 98:23
108:5,6,10
118:17
**secured** 108:8
**securing** 108:2
**see** 26:14 35:5
37:19 40:4,9
41:8 42:15,18
43:1,2 49:9 58:8
58:13,14 59:11
59:12,23,25 60:6
72:5 73:7,8,9
73:20,23,24 74:4
76:4 80:21,22
81:2,3 85:24
87:3 88:1,16
89:3,8,13,20,24
90:4,5 100:24
102:2 106:15
113:6 114:14
116:10 127:13
146:8,9 149:14
149:18,20 150:22
151:3 158:3
159:21,25 160:2
160:11,21,22
161:3 165:15,18
165:23 166:1
173:20
**seeing** 35:7,9 37:2
38:11 80:1,2
89:13,14 162:16
162:20
**seeking** 126:14
**seen** 21:2 26:9
41:21 105:5
113:20 127:3
140:20 141:19
148:25 152:6
165:7
**sell** 134:23
**selling** 134:20,21
**sense** 18:3 38:19
140:20
**sent** 147:4 170:7

**sentence** 123:19
**sergeant** 27:4,5,6
27:6,7,11,13,20
83:4 91:2 94:15
102:10 108:3,6
114:17 119:24
139:16,17,18
161:17
**sergeant's** 34:16
**sergeants** 139:8,21
**serious** 135:2
157:1
**set** 23:9
**settlement** 141:5
**severe** 17:18 134:2
**severity** 155:21,22
156:5
**shackle** 143:16
**shackles** 143:18
**shake** 7:4
**shallow** 17:10
**shape** 56:24 58:15
130:7 163:24
**sharper** 97:1,2,4
**sheet** 3:18 177:13
178:1
**Sheriff's** 164:25
**shift** 139:17
**shins** 73:24
**shit** 78:18
**shocked** 65:17,25
**shoes** 47:20
**shoot** 47:25
**shorter** 154:1
**shortly** 44:3 134:9
**shot** 54:7,9,11,13
**shoulder** 10:14
82:5,8,18,20,22
82:24 83:1,5
84:22,25 85:3,4
86:12 97:14
101:5,12,25
102:8,9,12,13,19
106:9,13 138:24
139:2 160:21
**shoulders** 57:25
58:6 84:20 96:2
101:8
**show** 107:15,18,20
107:25 159:3
**showed** 21:14
**shows** 62:1
**shut** 65:25
**sic** 148:12
**side** 41:2,5 56:14
82:5 83:6,7
101:21 104:3

114:16,17 118:8
156:15
**sides** 42:3
**sight** 31:17
**sign** 30:13,16,23
**signals** 32:4
**Signed** 175:11
**significantly** 46:2
**signs** 155:9
**silent** 43:12
**Simonton** 1:16 4:8
**simply** 67:11 74:19
85:3 171:21
**Sincerely** 177:15
**sir** 5:11,19,20
6:24 7:7,15,24
24:9 45:1 49:8
49:10,18 51:25
52:4,18 55:13
56:5 62:15 63:5
63:9,24 64:13,15
65:17 85:13,19
88:4 91:17 92:1
94:5 102:6
106:25 110:15
118:3 122:23
125:14,24 143:1
171:20 172:15,22
**siren** 35:13
**sit** 95:3 134:18
**sitting** 98:4
**situation** 23:23
**six** 20:6 91:11
**size** 61:8 163:4
**skin** 68:5 90:6
111:6,7,16,18
**slice** 37:15,15
**slightly** 12:15
16:2
**slow** 146:4
**small** 133:15
**smart** 140:18
**Smith** 120:7 122:9
**snake** 14:4
**soft** 17:3,21 28:2
148:3
**solid** 18:6
**somebody** 8:7 78:17
79:12 85:16
134:1 168:22
169:7
**someone's** 22:14
103:18 121:11
**soon** 64:16
**sorry** 27:8,18,25
28:1 29:20 50:15
57:21 64:6 87:17

101:1 117:17
119:2 126:1
134:22 135:2
146:11,16 148:21
152:21 161:20
**sort** 18:20 28:9
50:11 126:21
**sorts** 141:22
**sound** 29:24 85:9
138:4,4,8,8
142:17
**sounds** 121:12
**source** 166:6
**southbound** 36:11
**Southeast** 177:18
**Southern** 1:1 4:12
**Southernmost** 31:9
36:15,23
**speak** 13:20,21
27:19 28:4 52:14
77:19 87:4
136:18,25 164:7
164:9,11 165:18
167:17
**speaker** 28:1
**speaking** 75:19
131:12 166:2,5
**specific** 10:5,15
11:3 16:20 23:25
40:8 59:3 79:16
79:25 99:5,7
122:3 137:17
139:6 158:15,18
168:18
**specifically** 22:8
37:9 46:1 52:21
53:5 56:7 59:7
69:13 82:20
104:25 105:4
109:1 114:8,23
116:7 159:12
163:6 166:2
169:10,20
**specification** 99:5
**specifications**
99:9,14,20,21,25
100:3,6,12
**specifies** 10:4
**spectacular** 163:5
**speculation** 71:20
74:15
**speed** 32:10,14,18
33:1,2,10 35:12
38:14,15
**spell** 27:14
**spoke** 128:10
165:11

**spoken** 28:2 148:3
**sport** 60:16
**squeeze** 14:10,10
**stand** 115:3
**standard** 11:2
**start** 24:3 73:10
73:17 93:12
**started** 62:11,16
65:2 71:18,23
72:20 73:9,18,19
112:23
**starts** 73:3
**state** 4:3,16 10:24
29:10 95:6 169:6
170:17 175:3,7
175:15 176:3
**stated** 94:13 106:2
106:10 111:21
115:13 138:2
166:7 178:23
**statement** 94:18,18
120:2,4 167:23
170:11,12,15
**statements** 30:17
76:1 130:3 137:5
**states** 1:1,16
10:20 106:10
114:15
**station** 34:14
**status** 30:9
**stay** 32:11 121:25
134:11
**steps** 140:14
**STEVENS** 3:9
**Stevenson** 148:12
149:4,5
**stipulate** 48:9
**stole** 91:14 149:5
**stomach** 44:3
**stomach-prone**
138:25
**stop** 24:13,22
29:17 55:23
111:3 123:17
155:9
**stoplight** 25:17
**stopped** 25:16
29:22,25 31:16
31:19 33:18
36:11,19 110:19
111:4,25 112:3
112:14
**stopping** 154:19
**stored** 34:12,17
141:2
**story** 166:8
**straight** 24:7

83:24 86:18
160:20
**street** 1:16 2:7
4:8 32:9 33:20
33:21,22 36:11
36:12 37:25
133:12,12 162:19
**street's** 133:15
**strength** 157:24
**stress** 15:8 16:10
**stresses** 23:15
**strike** 55:25 86:19
88:18,18 89:22
170:21 172:2
**strong** 60:7
**struggle** 19:1
**struggling** 107:24
**styled** 4:11
**subject** 64:16
69:12 94:15
98:11 124:25
143:15
**subject's** 114:17
**subjects** 162:6
**submit** 28:7
**submitted** 64:2
156:14
**subparagraph**
100:15
**subsequent** 42:22
**successful** 10:21
55:6 58:20
**suffocate** 86:14
**suggest** 81:11
127:20,23
**suggestive** 46:18
**suggests** 132:20
**Suite** 2:3,12,16,20
177:5,18
**summary** 113:16,20
**Sunrise** 2:20 177:5
**supervising** 119:23
**supervisor** 35:2,23
128:3
**supplemental** 20:24
21:1,5,7,9,11,12
78:18 79:19 94:6
119:9
**Support** 4:14,15
177:8,18
**supposed** 8:23 19:7
50:3 56:3 134:4
134:8 171:9
**sure** 37:14 50:25
51:9 69:20 72:3
84:14 86:14,21
87:6 88:6,13,19

98:19 115:23
133:19 142:1
150:7 153:17
165:9 171:20
**surface** 17:3,12,15
17:21 18:6
**surprised** 76:16
**surprising** 76:9
**surrendered** 22:17
**suspect** 91:2 95:7
105:2 108:2,7
109:2,20 114:16
114:19,21,25
115:4,4,6 117:12
**suspect's** 91:1
94:14 105:18
114:15,19
**Suzanne** 1:23 4:1
4:13 175:6,14
176:6,21 177:17
**swear** 4:17 5:1
**switched** 112:12
**sworn** 5:7 52:9
94:6 129:18
175:10
**system** 33:2 34:13
132:21,25 144:21

**T**

**T** 2:22 177:4
**take** 7:14 23:24
24:7 30:9 37:15
58:12 91:25 93:4
122:3 132:18
140:14 142:2
145:17,22 154:1
172:1 173:19
174:21
**taken** 1:20 4:1
29:5 61:25 72:14
110:6 126:25
129:7 133:17
135:25 148:24
177:8
**talk** 13:8 19:19
51:12,17,23
61:16 153:13
165:23 166:1,4
**talking** 19:22
46:23 48:10
62:25 121:18,18
123:14 154:10
165:20
**tall** 163:18
**tape** 129:1,7 131:7
132:6,12
**taped** 131:9 140:5

**taping** 131:25
  138:5
**Tased** 165:4
**Taser** 34:25 65:21
  66:5,14,19 67:13
  67:24 68:2 75:13
  76:2,5,11 80:1,2
  80:7,11 130:24
  131:8,12 137:19
  142:17,22 143:1
  150:25 151:21,23
  152:6 166:24
  167:6 168:12
  170:8
**Tasers** 139:15
**taught** 14:19
**techniques** 112:12
**telephone** 128:17
**tell** 11:16 77:12
  120:18 121:3
  129:1 148:3,5
**telling** 67:18 73:5
  78:17 90:20
  105:1 106:20
  124:17 134:21,22
  168:21
**tells** 124:15
  167:11
**temporarily** 9:8
**ten** 15:3 153:20
**tender** 174:19
**tens** 144:19
**termination** 123:23
  124:25
**terms** 169:22
**terrain** 164:16,16
**tested** 61:2
**testified** 5:7 52:9
  52:23 67:5
**testify** 11:10
  47:23 49:1,7
  74:7 75:20 88:11
  93:13,19 166:13
  170:19 171:5,9
**testifying** 52:12
  75:20 160:3
  166:24
**testimony** 5:1 79:7
  106:11 130:23
**THADDEUS** 3:8
**thank** 9:16 11:22
  11:24 12:1 61:24
  91:15,17 154:2
  174:18
**Thanksgiving** 15:6
  24:8 120:10
**Theoretically**

17:20
**thing** 43:22 50:23
  56:13 109:13,17
  109:18 121:7
  165:9
**things** 31:5 51:6
  69:16 76:9
  141:22 149:8
**think** 41:15 47:19
  48:5 49:3,8 63:2
  67:10 75:15
  91:10,11,11,18
  91:19 96:21 97:1
  115:22 117:3
  137:9,13 141:25
  142:13 155:5
  161:16 162:19
  168:3
**thinking** 21:16
  42:14 49:22
  63:15,16,18,20
  63:22
**third** 104:24
  162:17 177:18
**Thomas** 32:9 33:20
  33:22
**thought** 7:13 11:10
  32:7 41:10 54:25
  55:1 63:11 79:15
**threat** 10:22 53:18
  156:7,8,11,16,20
  156:21 157:7
**threatening** 43:8
  157:3,5,10
**three** 22:17 36:10
  117:25 129:10
  162:12
**three-point** 74:9
  116:14,19,22
  117:2,22 118:9
  118:13
**tight** 68:6 70:7,12
**time** 14:12 20:3,7
  20:8,12 21:10
  25:10,18 26:11
  27:5,6 29:9,23
  31:19,23 37:19
  39:13,16,23,24
  40:2 41:13,21
  42:8 46:16,20,23
  49:4 57:10,10
  61:8 64:4,6 69:8
  69:16 73:25
  74:10 75:13
  76:20 77:13 80:5
  80:12 81:12
  83:12 84:25 85:5

85:20 86:11
  88:19 90:15 92:9
  92:12 93:25
  95:20 97:2,7,9
  101:10 102:19,20
  106:1,12 108:9
  108:21 115:14
  116:16 118:9
  119:10 120:7
  126:20,23 127:3
  129:12,20 131:4
  135:22 139:17
  142:3 143:2
  144:9,24 145:3
  146:4 147:23
  148:15,20 149:11
  153:14 154:7,25
  155:3 157:8,12
  157:20,25 158:3
  158:7,14 160:11
  160:12 162:23
  163:1,16 164:4
  164:21 165:9,16
  168:21 170:17
  174:20
**times** 6:15 77:11
  78:1 127:5,10
  129:10 166:25
**tip** 70:22
**today** 4:6 12:13
  19:16,17 76:5
  95:3 96:19
  134:19 163:3
**today's** 19:17
**TODD** 3:9
**told** 43:23 73:23
  93:6 103:10,18
  104:9,11 114:22
  114:23 115:2,7
  121:16 124:15,21
  146:19 157:2
  162:17 163:2
  165:4
**torso** 116:11
**torture** 13:12
**total** 139:10
**totality** 99:12
**touch** 159:12,22
  160:11 161:2,12
**touched** 72:15
  159:9 161:19,21
  161:22 162:5
**touching** 80:4,12
  159:15,25 160:6
  161:7,16
**tourist** 21:2,5,8
  37:2 59:10,12

61:25 127:1,3,11
  128:7,7,19
**tourist's** 128:13
**tourists** 133:2
**toy** 171:2
**track** 34:9 36:15
  91:12 140:22
  142:6
**traffic** 24:13 32:4
  32:18 145:21
**trained** 7:16,23
  9:3 10:10 12:3
  15:25 16:18,23
  17:2 18:1,16,24
  21:17 22:5,10
  23:3,6,16,21
  24:2 28:18,20
  30:7,8,13,23
  31:6 41:22 45:8
  50:8,11,14,16,19
  50:22 51:6,12,23
  52:1,8,12,14,16
  52:19,21 53:5
  69:12,13 142:22
  149:25
**training** 6:7 10:13
  10:15,17,18 11:8
  12:11,12,19,21
  13:3 14:24 15:10
  16:21 17:5 18:20
  19:3,5,6,7,11,14
  22:2,13,24 23:12
  30:4 34:23 48:25
  49:4,9,16,20,24
  50:3 52:7,11
  54:2,4,21 55:8
  64:8 98:9 99:5
  100:5,7 157:24
**trainings** 156:25
**traits** 58:10
**transcript** 76:4
  176:9,10 177:10
  177:21 178:2
**transport** 97:18
  146:4 151:11
**transported** 97:23
**transporting** 97:22
  145:19
**Treavor** 1:5 4:11
  177:7 178:4
**tried** 57:3 68:2
**trouble** 9:12
  114:19
**truck** 165:10
**true** 58:16 64:15
  65:17 92:8 94:12
  94:18 96:11,13

96:13,14,16 97:7
97:10 125:13
136:12 166:18
169:17 170:5
176:10 178:23
**Truman** 25:17 32:12
33:17
**truth** 5:2,3 67:18
90:20
**try** 13:9 73:10
134:23
**trying** 6:18 7:3
37:14 50:2 67:11
68:4 69:14 71:23
74:18 75:18
86:14,20 117:7
118:5 120:23,24
121:24,25 135:5
139:24 147:13
154:23 162:3
**turn** 26:3 35:13,19
35:25
**turned** 36:10
**turning** 36:22
84:23 164:24
**TUZZIO** 3:3
**Twenty-eight**
163:21
**Twenty-two** 146:3
**two** 19:7,14 36:14
43:5 160:7
172:15
**type** 16:8 19:11
43:3 167:10
**typed** 119:3,5

**U**

**U.S** 4:12,13,15
177:8,18
**ultimately** 97:23
**un-arrested** 147:3
**un-cuff** 109:20
**un-cuffing** 143:15
**unarmed** 48:16
**unconscious** 90:14
90:24 91:2 94:11
94:16,25 96:5,6
96:9 106:3,14
107:1,2,11,12,12
107:25 108:7,11
110:17 111:1,22
111:22 112:11,22
113:4,5 115:5
**understand** 6:21
16:4 27:10 37:14
49:10 50:12 67:6
69:20 124:11

171:20
**understanding** 14:9
15:24 33:9,11
123:20 124:22
126:9 130:13
136:13 171:2,7
**understood** 150:7
**Unfortunately**
54:12
**unhappy** 126:12
**United** 1:1,16
**unknown** 41:17
53:18 156:3,7,12
156:13 157:25
**unquote** 114:20
**unresponsive** 143:9
**upper** 108:4 116:11
**upset** 81:20,24
**upwards** 151:14
**use** 7:1 38:8 97:25
98:23 118:9
140:19 142:2
143:2 164:4
**usually** 54:7,10,13
**utilize** 119:8

**V**

**Valle** 3:9 34:4,6,7
36:8,18 37:1,22
39:3,10,14,18
40:19 41:7 43:14
43:23 44:9,11,13
45:5 53:10,13
55:11,12,13,16
55:19 56:9 57:5
57:8 64:12,20
69:17 101:25
102:3,7 144:4
159:11,16,19
162:15 164:10
**Valle's** 43:17
**various** 13:11
77:25
**vehicle** 24:22
25:12,13 28:13
29:11,22 31:10
31:16,17 32:7
33:25 34:1,2
36:22,25 37:1,22
37:24 38:6 40:9
40:21 132:24
**vehicle's** 32:2
**vehicles** 25:16
31:21,23 36:13
171:7
**verbal** 6:25 40:6
**Verbatim** 1:24 4:1

175:6 176:6,22
**verge** 170:7
**verify** 42:11 89:16
91:25 103:2
**verifying** 80:17
**version** 75:21
**versus** 9:3 119:19
158:13 162:6
**video** 1:13 3:14
4:6,9 20:8 21:2
21:5,6,8,10,13
21:14,15,16
26:21 28:10 35:7
35:9,14 37:2
38:10 42:2,6
59:2,10,12 61:25
62:2,7 72:1
79:16 93:23 94:2
102:1 127:3,11
128:7,18 129:5
130:10,12,17,18
131:8 133:3
137:19 138:3
140:10,16,23
141:2,3 142:7,10
143:1,2 152:17
155:6 158:22,23
158:24 159:3,23
160:2 174:24
**videoed** 151:23
**videographer** 3:7
4:14 93:20,23
94:2 142:7,10
174:24
**videos** 140:17
**videotape** 41:8
72:25 73:7,8,16
87:16 126:25
128:16 136:4
138:6 140:3
172:16
**videotaped** 140:1
**videotapes** 20:1
34:23
**view** 117:18
**Village** 33:20,20
**violent** 30:11,11
30:19 52:17 87:7
157:17
**violently** 22:18
62:10
**visualized** 151:22
**voice** 9:11 13:18
19:22 27:24
44:14
**vs** 1:7 4:11 177:7
178:4

**W**

**W** 2:5 177:22
**wait** 50:17 67:1
**waiting** 91:1 94:14
108:6
**walk** 40:22 41:5
**walking** 38:13
40:15,16,17,18
41:6
**WALLACE** 2:7
**Wallis** 161:25
162:5
**Wanciak** 69:8,18
104:18 127:13
135:18 159:20
**want** 6:21 7:6,14
19:19 24:7 37:14
45:1 48:13 49:1
54:11,13 67:8
93:5,13,18
113:13 115:23
119:18 121:13,24
134:23 140:19
142:5 154:25
171:20
**wanted** 27:2 46:18
152:25
**wanting** 150:7
**wants** 6:20 48:8
54:7,9
**wash** 149:10
**wasn't** 11:5 43:10
44:12 46:12 56:1
62:11 63:24 64:8
70:11 74:16
80:24 85:13
90:14 93:8
111:24 115:10
117:20 122:23
133:24 150:11
156:8 157:4
163:6 165:14,20
168:6
**watch** 37:3 159:23
**watched** 19:21,25
**watching** 44:12
**water** 17:10
**way** 19:16 28:23
29:1 32:10 39:20
43:7,25 51:1,3
52:17 56:24
57:18 58:15 66:5
69:15 84:4 89:15
117:12 118:9
123:15 130:7
138:24 140:19
142:3 169:5

**ways** 13:11 139:2
  169:3
**we'll** 48:9 61:17
  78:18 88:1 92:25
  93:17 126:16
  153:25,25 164:12
  174:21
**we're** 4:7 6:18 7:2
  50:22 52:12 56:5
  72:3 93:10 125:9
  126:10,12,14
  141:22 153:19
  155:18 161:16
**we've** 126:17
**weapon** 37:1 40:1,3
  41:16,19,21
  42:18 43:2 44:15
  53:16 162:16
**weapons** 157:1
  158:1,2,5 162:13
**weather** 164:16
**Wednesday** 1:15 4:6
**week** 27:22 28:5,7
**weekend** 20:21
  120:10
**weight** 13:25 16:1
  16:3,5 17:17
  82:21 163:10,22
**weights** 60:17,21
**welcome** 98:19
**went** 64:9 82:5
  91:15 106:13,13
  107:1,10,13,25
  108:11 111:21
  115:19 148:14
  149:10
**weren't** 18:1 69:15
  77:12 88:13
  122:15 147:13
**west** 1:2,8,17 2:8
  3:4,10 4:8,11,22
  5:18,21 6:3 41:3
  88:4 98:1 100:10
  119:6 122:7,10
  123:25 129:1
  139:8 141:4
  147:8 152:19,25
  174:4 177:7
  178:4
**westbound** 25:5
**Weston** 2:4,12,16
**whatnot** 142:23
**Whitehead** 2:7
**wish** 172:23
**wished** 171:22
**witness** 1:20 4:17
  5:4 9:14 13:21

28:1 34:6 48:11
  50:16,19 59:7
  61:14 64:6 73:15
  80:11 83:16
  91:22 102:7
  103:14 110:16,25
  112:20 117:17
  118:17 120:6
  121:5 123:9
  130:3 137:4
  151:25 173:18
  174:19,20 177:1
  177:11,12
**witnessed** 135:10
**witnesses** 66:10,11
  135:25 170:22
  171:4,8,12
**wonder** 21:13
**word** 8:14 47:7
  53:7 110:5,8
  155:6
**words** 56:7 85:8,11
  85:15,19 115:2,8
  123:14
**work** 5:24 60:11
  136:7 164:1
**worked** 5:22
**working** 27:7,7
**works** 14:9
**world** 13:24 154:24
**worried** 156:1
**wouldn't** 40:23
  41:1 54:9 60:3
  62:23 67:17,22
  117:8 120:24
  124:18 136:13
  140:11,14 163:12
  166:18
**wrestled** 14:22
**wrestling** 14:24
**wrist** 68:6 70:8,14
**write** 90:25 91:3
  93:7 103:16
  110:5,8 118:23
  119:13,17 120:7
  120:13,19 121:11
  122:5,8 123:1,2
  123:16,20 125:5
  126:6,8 178:2
**writing** 92:18
  98:11 118:20
  119:11 121:6
  126:2
**written** 7:2 92:11
  93:8 95:12
  122:11,16,21
  123:5,6,9,11,24

123:25
**wrote** 20:23 21:1,4
  21:9,12 78:10
  95:2,4 97:6,9
  98:17,22 103:9
  103:25 104:2,7,7
  106:21 114:6
  115:11 118:25
  119:19,20 120:18
  125:22 126:20,23
  127:4,12

---

**X**

---

**Y**

**yanked** 71:18 73:2
  73:10
**yeah** 9:15 11:18
  23:9 29:19 53:21
  66:10 91:8,19
  98:21 113:17
  129:23 131:13
  133:14 137:6
  138:22 153:23
  162:3,14 174:9
**year** 94:24 96:8,18
  96:22 97:2,3
  104:8 129:12,14
**years** 5:23 19:8,14
  61:4
**yell** 73:9
**yelling** 43:10,14
  54:22 55:6,12
  73:17,18,19
**yesterday** 20:4
  37:3 38:10 41:8
  42:2 59:2 67:5
  67:19 72:1,25
  74:7 75:19,20
  76:10 78:16,23
  79:1,7 128:16
  130:23 131:2,14
  131:19 134:20
  135:11,20 152:8
  158:22,24 159:5
  159:23 160:22
  164:8 166:23
  168:14 172:16
**yesterday's** 19:24
  158:23
**York** 134:13
**young** 10:25
**younger** 57:24

---

**Z**

**Zamora** 27:6,11
  83:4,5 94:15

96:8 102:10,12
  104:2 106:2
  107:3 108:4,7
  114:17 116:2
  139:16,19,20
  161:17
**Zamore** 91:2

---

**0**

**03.15** 11:21 98:8
**03.15.02.02** 10:19
**03.15.02.07** 98:7
**03.15.04.12** 99:2

---

**1**

**1** 2:12,16 10:24
  176:9
**10:26** 93:23
**10:38** 94:3
**1000** 2:20 177:5
**10th** 175:11 176:18
**11/28** 122:7
**11:30** 142:4,7
**11:39** 142:11
**113** 3:23
**118614** 3 177:8
**12** 177:2
**12/2** 122:5
**12:10** 1:15 174:24
  174:25
**1250** 177:18
**13** 158:17
**14-10028-CIV** 4:10
**14-10028-CIV-M...**
  1:3
**1604** 5:16
**17150** 2:3,12,16
**174** 176:9
**175** 3:17
**176** 3:17
**177** 3:18
**178** 3:18
**195** 163:23

---

**2**

**2** 2:3 10:25
**20** 127:5,10 129:15
  130:11
**200** 60:7
**2010** 11:23
**2012** 118:20
**2013** 24:7 94:13
  107:16,21 108:23
  109:3 114:7
  118:21 122:5,7
  139:9,14
**2014** 1:15 4:7

114:9 175:9,11
176:18 177:2,8
178:5
**2017** 175:16
**217-0150** 2:13,17
**22** 145:22
**220** 61:11
**225** 61:6
**2455** 2:20
**2488** 177:5
**27** 175:16
**28** 24:7
**294-4585** 2:8
**294-7822** 2:8
**2nd** 92:13 94:12
107:16,21 109:2
114:7 118:21,25
120:16

---

**3**
**3** 10:25 99:2,3
**3/21** 11:23
**30** 129:17 177:13
**301** 1:16
**305** 2:8,8 177:19
**33040** 1:17 2:8
**33131** 177:19
**33304** 2:21 177:6
**33326** 2:4
**33327** 2:12,16
**33409** 3:4
**373-8404** 177:19
**384-6226** 2:4

---

**4**
**4** 10:25
**4.5** 145:22
**45** 32:15
**463-0100** 2:21
**463-2444** 2:21
**470** 3:3

---

**5**
**5** 1:15 3:15 11:1
177:8 178:5
**50** 58:2
**561** 3:4,4
**57** 58:1
**5th** 4:6 175:9

---

**6**
**6** 3:22 91:10,11,13
91:14,23 94:5
**60** 23:20
**608** 2:7
**688-2343** 3:4
**688-6560** 3:4

---

**7**
**7** 3:23 113:14,18
113:20

---

**8**
**8:55** 1:15 4:7
**876-4344** 2:4
**888-9877** 2:13,17

---

**9**
**90** 129:18
**90-degree** 59:21
**91** 3:22
**954** 2:4,4,13,13,17
2:17,21,21