UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal
Representative of the Estate of
CHARLES EIMERS, Deceased,

**ORIGINAL**

              Plaintiff,

vs.

CITY OF KEY WEST, a Florida Municipality,
HENRY DEL VALLE, an Officer with the City
of Key West Police Department, et al.,

              Defendants.

_____/

VIDEO DEPOSITION OF SERGEANT FRANCISCO ZAMORA

Wednesday, November 26, 2014
10:07 a.m. - 1:18 p.m.
Law Office of Horan Wallace & Higgins, LLP
608 Whitehead Street
Key West, Florida  33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter
Florida Professional Reporter

```
 1                        APPEARANCES

 2

    On Behalf of the Plaintiff:
 3        HORAN WALLACE & HIGGINS, LLP
          608 Whitehead Street
 4        Key West, Florida  33040
          (305) 294-4585 / Fax (305) 294-7822
 5        dph@horan-wallace.com / darren@horan-wallace.com
          BY:  DAVID PAUL HORAN, ESQUIRE
 6        BY:  DARREN M. HORAN, ESQUIRE

 7

          THE MCKEE LAW GROUP, LLC
 8        17150 Royal Palm Boulevard, Suite 1
          Weston, Florida  33327
 9        (954) 888-9877 / (954) 217-0150
          rmckee@themckeelawgroup.com
10        BY:  ROBERT J. MCKEE, ESQUIRE

11

    On Behalf of the Defendants:
12        JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
          2455 East Sunrise Boulevard, Suite 1000
13        Fort Lauderdale, Florida  33304
          (954) 463-0100 / Fax (954) 463-2444
14        hgill@jambg.com / burke@jambg.com
          BY:  HUDSON C. GILL, ESQUIRE
15

16  On Behalf of the Defendant Gary Lee Lovette:
          ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
17        470 Columbia Drive, Building C-101
          West Palm Beach, Florida  33409
18        (561) 688-6560 / Fax (561) 688-2343
          aamigo@rrbpa.com
19        BY:  ANDREA G. AMIGO, ESQUIRE

20

    Also Present:
21        MARTIN STONELY, US LEGAL SUPPORT VIDEOGRAPHER
          NAJA GIRARD, KEY WEST THE NEWSPAPER
22        ARNAUD GIRARD, KEY WEST THE NEWSPAPER

23
                          --oo0oo--
24

25    .                                                    .
```

INDEX OF PROCEEDINGS

Page

Video Deposition of SERGEANT FRANCISCO ZAMORA
        Direct Examination by Mr. McKee  . . . . . . . . . . 5




Certificate of Oath . . . . . . . . . . . . . . . . . 132
Certificate of Reporter . . . . . . . . . . . . . . . 133
Read Letter . . . . . . . . . . . . . . . . . . . . . 134
Errata Sheet  . . . . . . . . . . . . . . . . . . . . 135

INDEX OF PLAINTIFF EXHIBITS

Page

No. 25     Zamora's Supplemental Report  . . . . . . . . . 14
No. 26     FDLE Report with Dispatch Record  . . . . . . . 52
No. 27     One Page of FDLE Report . . . . . . . . . . . . 79

4

1    Deposition taken before Suzanne Ex, Certified Verbatim

2  Reporter, Florida Professional Reporter and Notary Public in

3  and for the State of Florida at Large in the above cause.

4                       - - - - - - - -

5        THE VIDEOGRAPHER:  The time is approximately 10:07

6    a.m.  We're on the video record.

7        THE COURT REPORTER:  Today is Wednesday, November

8    26th, 2014.  We're at the Law Offices of Horan Wallace

9    and Higgins, 608 Whitehead Street in Key West, Florida,

10   for the purpose of taking the video deposition of

11   Officer Francisco Zamora in Case Number 14-10028-CIV,

12   Treavor Eimers as Personal Representative of the Estate

13   of Charles Eimers, Deceased, Plaintiff vs. City of Key

14   West, et al., Defendant.  The court reporter is Suzanne

15   Ex and the videographer is Martin Stonely, both of U.S.

16   Legal Support.  Would counsel please state their

17   appearances for the record and then I will swear in the

18   witness.

19        MR. MCKEE:  Robert McKee, Darren Horan, David Horan

20   for the Eimers.

21        MR. GILL:  Hudson Gill on behalf of the City of Key

22   West and the individual officers, including Sergeant

23   Zamora, with the exception of Officer Lovette.

24        MS. AMIGO:  Andrea Amigo on behalf of Officer

25   Lovette.

1      THE COURT REPORTER:  Would you raise your right

2   hand.  Do you swear or affirm the testimony you are

3   giving in this cause will be the whole truth and nothing

4   but the truth?

5      THE WITNESS:  I do.

6   THEREUPON,

7           SERGEANT FRANCISCO ZAMORA

8   having been first duly sworn, was examined and testified as

9   follows:

10           DIRECT EXAMINATION

11   BY MR. MCKEE:

12   Q.   Good morning, sir.  Could you tell us your full

13   name and your office address.

14   A.   Francisco Zamora.  I work at 1604 North Roosevelt

15   Boulevard, Key West Police Department.

16   Q.   Okay.  You've been employed with the Key West

17   Police Department for how long?

18   A.   Twenty-seven years.

19   Q.   Did you start your career in law enforcement with

20   them?

21   A.   Yes.

22   Q.   Are you current -- were you current on all your

23   required training as of November 28, 2013?

24   A.   Yes.

25   Q.   In coming here today, are you aware that virtually

1    all of the other officers that were involved in the Eimers

2    incident have been deposed?

3        A.   Yes.

4        Q.   Have you read any of their testimony?

5        A.   No.

6        Q.   Have you spoken to any of them about their

7    testimony?

8        A.   We spoke, yes.

9        Q.   Who did you speak with?

10       A.   Medina.  I believe, Galbo.  I was sitting here for

11   Lovette's deposition.  And, Officer Del Valle.

12       Q.   Do you recall what you discussed with any of them?

13       A.   Some of their testimony in the Eimers case.

14       Q.   What specifically about the testimony did you

15   discuss, if you recall?

16           MR. GILL:  I'm just going to instruct the witness,

17       if any of these conversations involved counsel for the

18       City, I'd ask you not to disclose the contents of those

19       conversations based on attorney-client privilege.

20           MR. MCKEE:  Well, and I'd also like to make sure

21       that if there is, you'll say so, because we're going to

22       attempt to overcome attorney-client privilege on

23       participation in a crime in fraud.

24   BY MR. MCKEE:

25       Q.   But, with that said, what I'd like to know is,

1     first, were those conversations at all with counsel present?

2        A.   No.

3        Q.   Okay.  Then we don't have that issue.

4            So tell me what you understand or recall from those

5     conversations?

6        A.   I believe there was an issue with, I guess when

7     they were giving the deposition, that they talked about

8     lifting Mr. Eimers to move him.  And apparently, one of the

9     attorneys said that it doesn't show that on the video.

10    That's what we talked about.

11        Q.   Have you reviewed any of the videos prior to coming

12    here today?

13        A.   Yes.

14        Q.   Which one or ones have you reviewed?

15        A.   The ones that are on The Blue Paper.

16        Q.   Okay.  So did you review the one that first came to

17    light shortly after this incident a year ago?

18        A.   Yes.

19        Q.   Have you watched the entire video of the one that

20    was recently found?

21        A.   Yes.

22        Q.   And did you see it more than once?

23        A.   Yes.

24        Q.   Did you see it by yourself or with others?

25        A.   By myself.

1    Q.   Did you watch it repetitiously, more than one time?

2    A.   More than one time, yes.

3    Q.   How many times did you watch it?

4    A.   Three, four times.

5    Q.   Okay.  Apart from that issue that was discussed,

6    did you have the discussion with those other officers before

7    you saw that second, newer video, or after?

8    A.   I believe, before.

9    Q.   And then, subsequent to that discussion, you've now

10   seen the new video, correct?

11   A.   Yes.

12   Q.   We will get to that topic shortly.

13        MR. DAVID PAUL HORAN:  He's got to verbalize.

14        MR. MCKEE:  Yeah, good point.

15   BY MR. MCKEE:

16   Q.   You've been deposed many times in the past, right?

17   A.   Yes.

18   Q.   As you know, although you're on videotape, we are

19   making a written record, so I have to make sure that when you

20   answer, and we all fall into the trap of nodding heads and

21   whatnot --

22   A.   Okay.

23   Q.   -- because of just, we get comfortable, but I need

24   oral answers, okay?

25   A.   Yes.

1  Q.   And if I forget, someone else will point at me,

2  what was that answer.   Okay?   Thanks.

3          So you had this discussion with the other officers

4  about whether or not the officers lifted him or attempted to

5  lift him, and then you saw the later videotape, the --

6  actually, the later-discovered videotape?

7  A.   Yes.

8  Q.   And did you look at it, in particular, about that

9  issue?

10  A.   I looked at the whole thing.

11  Q.   But as you think now, when you reviewed the late-

12  discovered videotape, did you also look at it from the

13  concept of, oh, I discussed this matter with the officers and

14  it shows such-and-such?

15  A.   It doesn't show --

16          MR. GILL:   Object to the form of the question.

17          MS. AMIGO:   Join.

18          THE WITNESS:   It doesn't show us lifting him.

19  Q.   Right.   So every time an officer put in his report,

20  after this incident, that they were lifting him, that was all

21  untrue?

22          MR. GILL:   Object to the form of the question.

23          MS. AMIGO:   Join.

24  BY MR. MCKEE:

25  Q.   Correct?

1      MR. GILL:  Object to the form of the question.

2      MS. AMIGO:  Join.

3   A.   No.

4   **Q.   No, it was not untrue?**

5   A.   No.  It's not untrue.

6   **Q.   You saw them lift him?**

7   A.   I lifted him myself.

8   **Q.   And does it show that on the video?**

9   A.   No.

10  **Q.   Well, if you lifted him yourself and it's not on**

11  **the video, are you saying the video is not an accurate**

12  **depiction of the scene that day?**

13     MR. GILL:  Object to the form of the question.

14     MS. AMIGO:  Join.

15  A.   It's accurate to when it's filming us and Mr.

16  Eimers, yes.

17  **Q.   Okay.  Let me nail that down right off the get-go,**

18  **because we're going to talk a lot about some, what I perceive**

19  **as discrepancies.**

20     **That videotape that was recently viewed by you and**

21  **recently obtained from a Columbian man, you've watched it**

22  **many times, correct?**

23  A.   Yes.

24     MR. GILL:  Object to the form of the question.

25     MS. AMIGO:  Join.

1       Q.   Based on what you saw, does that videotape, in the

2   time frame in which it's running, accurately depict the scene

3   events as they were occurring?

4          MR. GILL:  Object to the form of the question.

5          MS. AMIGO:  Join.

6   A.   Yes.

7       Q.   Okay.  There's nothing about that videotape that

8   you think does not appear authentic to you?

9          MR. GILL:  Object to the form of the question.

10         MS. AMIGO:  Join.

11  A.   No.

12     Q.   It looks authentic to you?

13  A.   Yes.

14     Q.   And as what you saw, did it help refresh your

15  recollection on certain issues?

16  A.   Yes.

17     Q.   So you would also be using it, when we discuss in

18  your testimony here under oath, you're using those images

19  that you saw on that videotape to assist you in recalling

20  events, correct?

21  A.   Yes.

22     Q.   You're the only police officer that was there that

23  has that benefit, I want you to know that, and so my

24  questions may be a little different than what I've asked

25  others.  Okay?

1      A.   Okay.

2      Q.   **My goal is not to have an officer incriminating**

3  **himself with his statements.   I want you to know that.**

4           MR. GILL:   Object to the form of the question.

5           MR. MCKEE:   I know that's not a question, but I

6      want to make sure --

7           MS. AMIGO:   Join.

8           MR. MCKEE:   Was that an objection?   No.

9  BY MR. MCKEE:

10     Q.   **I want to make sure we're communicating, sir.**

11     A.   Yes.

12     Q.   **My goal is not to insult you in any way.   I have a**

13 **job that I have to do.   Okay?**

14     A.   I understand that.

15     Q.   **These are tough issues for you and for me.   Okay?**

16 **I respect police officers, I truly do.   And so, I don't want**

17 **anything coming out of my mouth seem to you that I'm just a**

18 **lowlife scumbag asking questions.   That's never my intention**

19 **here.   Okay?**

20     A.   Okay.

21          MR. GILL:   Move to strike counsel's testimony.

22          MR. MCKEE:   That's fair.   I'm communicating with

23     him, okay?

24          MS. AMIGO:   Join.

25          MR. MCKEE:   As far as I'm concerned, it can be off

the record.

Q.   I just want to make sure you understand me.

A.   Yes.

Q.   Because as difficult as it is to sit in that chair, it's not always easy to sit here, too.   Okay?

          MR. GILL:  Move to strike testimony.

          MS. AMIGO:  Join.

BY MR. MCKEE:

Q.   We're in a community that deserves to know answers and I have a family that needs to know answers.   Okay?

A.   Okay.

          MR. GILL:  Move to strike testimony.

          MS. AMIGO:  Join.

Q.   Perfect.   Now, on the day of the incident -- well, before I go there, have you reviewed anything else other than videotapes and your conversation with your fellow officers to prepare for today's deposition?

A.   Just glanced over my report.

Q.   Okay.  And it was a single-page report, a supplemental report?

A.   Yes, sir.

          MR. MCKEE:  We might as well get that out of the way right off, because that's my first area of conversation.  I'm going to mark that as the next exhibit, which I think is Exhibit 25.  And I put the

1  highlighting on it.  Okay?

2  (Plaintiff's Exhibit 25 was marked.)

3  Q.  Could you tell us what Exhibit 25 is?

4  A.  This is my supplemental report.

5  Q.  Okay.  The first paragraph, we've had all kinds of

6  testimony about it, and I'm not interested in what you talked

7  to lawyers about and whatnot.

8  More important, with regard to that first paragraph

9  that indicates that you were ordered to write this report,

10  where's the report that you wrote before you were ordered

11  that was required as part of your business activities as a

12  police officer?

13  MR. GILL:  Object to the form of the question.

14  A.  I was advised by my attorney not to make any

15  statements or write any reports.

16  Q.  Okay.  So then, with whatever advice was given and

17  however it was given, you weren't going to write a report,

18  correct?

19  A.  Not at that time, no, we were not.

20  Q.  Isn't police reporting of these events required

21  without your captain or your chief ordering you to write

22  reports?

23  MR. GILL:  Object to the form of the question.

24  MS. AMIGO:  Join.

25  A.  Yes.

1    Q.   Okay.  But in this instance, none of the involved

2    officers were going to write a report unless they were

3    ordered to write one?

4         MR. GILL:  Object to the form of the question.

5         MS. AMIGO:  Join.

6    A.   We were going to write the report.  We just got

7    ordered to write it, I guess, sooner than.

8    Q.   But without talking to lawyers, if this is an

9    ordinary course of business, nothing happened that could even

10   implicate us sort of day, a report's going to get written

11   without being ordered to write one, correct?

12        MR. GILL:  Object to the form of the question.

13        MS. AMIGO:  Join.

14   A.   Yes.

15   Q.   So right off the bat, the officers involved knew

16   that this event rose to a level that there would be focus on

17   those actions, correct?

18        MR. GILL:  Object to the form of the question.

19        MS. AMIGO:  Join.

20   A.   Yes.

21   Q.   Okay.  And then, you wrote a report which is

22   Exhibit 25 in compliance and conformance with that order,

23   correct?

24   A.   Yes.

25   Q.   Does that report reflect everything you saw and

1    heard and did that day at the Eimers location?

2         MR. GILL:  Object to the form of the question.

3    A.   Yes.

4    Q.   Okay.  Because I didn't bring an extra copy, I'm

5    going to ask a couple questions about this.

6         You -- by the way, were these reports done under

7    oath, signed like an affidavit?

8    A.   No.

9    Q.   Okay.  But they were intended to be true and

10   accurate as of the date they were written, correct?

11   A.   Yes.

12        MR. GILL:  Object to the form of the question.

13   Q.   And when you're writing this, at that time, you

14   were just a few days out from the incident, correct?

15   A.   Yes.

16   Q.   So the events were fairly fresh in your mind?

17   A.   Yes.

18   Q.   Do you have any, did you at that time, have any

19   impediment to your ability to recall short-term instances?

20   A.   No.

21   Q.   You say in this report that when you arrived, you

22   saw several of your officers struggling with a subject who

23   was actively resisting.

24   A.   Yes.

25   Q.   Did you arrive before the right handcuff was put on

1   or after?

2       A.   I'm not sure.

3       Q.   **Did you see any struggle at all --**

4       A.   Yes.

5       Q.   **Let me finish the question.**

6            **-- before the right handcuff was put on?**

7            MR. GILL:  Object to the form of the question.

8            MS. AMIGO:  Join.

9       A.   I saw struggle.  I saw Mr. Eimers kicking his legs.

10      Q.   **Okay.**

11      A.   And they were still struggling with him to handcuff

12  him.

13      Q.   **Well, have you seen the -- you have seen the latest**

14  **videotape, correct?**

15      A.   Yes.

16      Q.   **Did you notice that he started struggling when the**

17  **right arm was pulled back for the right cuff to be put on?**

18           MR. GILL:  Object to the form of the question.

19           MS. AMIGO:  Join.

20      A.   I couldn't see that, that up close.

21      Q.   **Okay.  You did not, you did not arrive at the scene**

22  **when Mr. Eimers got out of his car, walked, and immediately**

23  **followed the orders of police, correct?**

24           MR. GILL:  Object to the form of the question.

25           MS. AMIGO:  Join.

1    A.   Correct.

2    Q.   **And you saw that he did that on the videos, too,**

3  **correct?**

4    A.   Yes.

5         MR. GILL:   Object to the form of the question.

6         MS. AMIGO:   Join.

7    Q.   **But you weren't there at that time?**

8    A.   Correct.

9    Q.   **Okay.  And you saw that he laid down following**

10  **police orders?**

11        MR. GILL:   Object to the form of the question.

12   A.   Yes.

13        MS. AMIGO:   Join.

14   Q.   **And he laid face down, correct?**

15   A.   Yes.

16   Q.   **But he laid prone, face down with his head up, face**

17  **not in the sand?**

18   A.   Yes.

19   Q.   **You remember, you saw that, right?  Yes?**

20   A.   Yes.

21   Q.   **Okay.  And then, Officer Garrido approached him,**

22  **correct?**

23   A.   Yes.

24   Q.   **Straddled him, correct?**

25   A.   I saw the officers approach him.  I'm not sure if I

1    saw him straddle him or not.

2        Q.    Were you present at Officer Garrido's deposition?

3        A.    No.

4        Q.    So you have not read his deposition?

5        A.    No.

6        Q.    Would you agree that as the officer charged with

7    handcuffing Mr. Eimers, his observation would most likely be

8    the most accurate of what was occurring at that time?

9            MR. GILL:  Object to the form of the question.

10           MS. AMIGO:  Join.

11       A.    It should have been, should be.

12       Q.    Okay.  Do you know when Officer Lovette started

13   Tasering him?

14           MR. GILL:  Object to the form of the question.

15           MS. AMIGO:  Join.

16       A.    I was not aware of any Tasers being used.

17       Q.    Did you see his hand, his right hand, pressing a

18   Taser into the back of Mr. Eimers' neck as Officer Wanciak

19   testified had happened?

20           MR. GILL:  Object to the form of the question.

21       A.    No.

22           MS. AMIGO:  Join.

23       Q.    And yet, you were there with your knee on his right

24   shoulder?

25           MR. GILL:  Object to the form of the question.

1          MS. AMIGO:  Join.

2     A.   I was there with my knee after I told Officer

3  Lovette to move, go clean himself, then I took his place.

4     Q.   Okay.  So you weren't actually in the pile of

5  officers until you asked Officer Lovette to leave and go

6  clean?

7     A.   Yes.

8          MR. GILL:  Object to the form of the question.

9          MS. AMIGO:  Join.

10     Q.   And where were you standing prior to that time?

11     A.   I was just walking in, onto the beach.

12     Q.   So that's when you arrived, at that point?

13     A.   Yes.

14     Q.   So you wouldn't even know, by your own personal

15  observations, whether Officer Lovette had Tased Mr. Eimers up

16  until that time when you arrived?

17          MR. GILL:  Object to the form of the question.

18          MS. AMIGO:  Join.

19     A.   Correct.

20     Q.   So if there's a, quote/unquote, "resisting" or a

21  "struggling," you don't know whether it's Mr. Eimers reacting

22  in convulsions to the application of a Taser from Officer

23  Lovette?

24          MS. AMIGO:  Object.

25  BY MR. MCKEE:

1    Q.    You don't know one way or the other?

2          MR. GILL:  Object.

3          MS. AMIGO:  Objection, form.

4          MR. GILL:  Join.

5    A.    No.

6    Q.    So his resisting could actually have been reaction

7    to Tasering?

8          MR. GILL:  Object to the form of the question.

9          MS. AMIGO:  Join.

10   A.    Could have been.

11   Q.    Yes?

12   A.    Yes.  But when I got there, I didn't see anybody

13   with a Taser on him.

14   Q.    Okay.  Have you seen -- you have seen the

15   videotape.  Did you see the position of Mr. or Officer

16   Lovette and his right hand on the back of Mr. Eimers' neck?

17   A.    I remember seeing Officer Lovette on -- on his

18   shoulder.  I don't remember seeing his right hand on his

19   neck.

20   Q.    Okay.  That does not mean -- strike that.

21         We showed that footage to Officer Wanciak and she

22   agreed that's exactly what was happening, that Lovette had

23   the Taser on the back of Mr. Eimers' neck at that time in

24   those frames.

25         MS. AMIGO:  Form.

1   BY MR. MCKEE:

2       Q.   Do you have any reason, any factual reason to

3   disagree with her perspective?

4           MR. GILL:  Object to the form of the question.

5           MS. AMIGO:  Join.

6       A.   Yes.  I did not see it.  I myself didn't see that.

7       Q.   But we've also indicated you weren't yet there,

8   right?

9           MR. GILL:  Object to the form of the question.

10      A.   Yes.

11          MS. AMIGO:  Join.

12      Q.   Okay.  And is it likely that the blood on Officer

13  Lovette's right hand was from the right ear of Mr. Eimers?

14          MR. GILL:  Object to the form of the question.

15          MS. AMIGO:  Join.

16      A.   Could have been.

17      Q.   Okay.  Do you have any knowledge why, other than

18  Lovette was Tasing him near the right side of his neck, that

19  he would have gotten blood on his right hand during that

20  altercation?

21          MR. GILL:  Object to the form of the question.

22          MS. AMIGO:  Join.

23      A.   No.

24      Q.   Okay.  Where did Officer Lovette go to clean his

25  hands?

1       A.   Don't know.

2       Q.   **Did you notice in the film he doesn't leave at all?**

3            MR. GILL:  Object to the form of the question.

4       A.   Yes.

5            MS. AMIGO:  Join.

6       Q.   **Did you notice he doesn't even clean his hands?**

7            MR. GILL:  Object to the form of the question.

8            MS. AMIGO:  Join.

9       A.   I saw him standing there.

10      Q.   **Right.  But looking at the tape, did you see any**

11  **indication that he left the scene to go clean his hands?**

12      A.   No.

13      Q.   **Matter of fact, the only thing we see him doing**

14  **with his hands is, one, putting on gloves, right?**

15      A.   Yes.

16           MR. GILL:  Object to the form of the question.

17           MS. AMIGO:  Join.

18      Q.   **And two, flexing his left hand as if he had just**

19  **used it to lay a blow on someone.**

20           MR. GILL:  Object to the form of the question.

21  BY MR. MCKEE:

22      Q.   **Did you see that?**

23      A.   No.

24           MS. AMIGO:  Join.

25      Q.   **You were the supervising officer that day, correct?**

1       A.    Yes.

2       Q.    Okay.  Tell me what that means to you as you

3   understand your job responsibilities.

4       A.    I'm responsible for it all, the actions of my

5   officers.  As long as they, you know, they're within policy.

6       Q.    And that is through the event itself, as well as

7   any subsequent investigation, correct?

8       A.    Yes.

9       Q.    Okay.  You were the reporting officer for that day,

10  correct?

11      A.    The reporting --

12      Q.    Were you the officer that had to review the reports

13  of your officers that day?

14      A.    Yes.

15      Q.    And in doing that, are you verifying their

16  accuracy?

17          MR. GILL:  Object to the form of the question.

18      A.    Yes.

19      Q.    So in every single report that has information in

20  it that is false, is that something you let get past you?

21          MR. GILL:  Object to the form of the question.

22          MS. AMIGO:  Join.

23      A.    Not if I can help it, no.

24      Q.    But have you looked at the reports and compared

25  them to the videotape?

1          MR. GILL:  Object to the form of the question.

2          MS. AMIGO:  Join.

3     A.   I didn't have access to the videotape until the

4     other day.

5     Q.   Well, that's my point.  Since that time?

6     A.   No, I have not.

7     Q.   Okay.  Now, you, in your report, indicated that

8     you, "assisted by holding the subject down by placing my

9     right knee on his left shoulder."  Right?

10    A.   Yes.

11    Q.   And by that, you mean you're applying force with

12    your right knee, that includes your body weight, to pin his

13    shoulder to the ground, correct?

14         MR. GILL:  Object to the form of the question.

15    A.   Yes.

16         MS. AMIGO:  Join.

17    Q.   Who was on the other side of you?

18    A.   Don't remember if it was Garrido or if it was Henry

19    Del Valle.  They were still trying to handcuff him.

20    Q.   But there was another person applying knee pressure

21    also on the upper torso, correct?

22    A.   I can't say for sure.

23    Q.   Was there an officer applying shoulder [sic] to the

24    other shoulder?

25    A.   If there were someone, I don't remember seeing

1     someone doing that.

2         Q.    Would you agree that if another testified he was

3     doing so, that it was likely happening?

4             MR. GILL:  Object to the form of the question.

5             MS. AMIGO:  Join.

6         A.    If somebody testified to that, then they might have

7     been doing it.  I wasn't aware of what -- you know.

8         Q.    Okay.  But as you put your knee onto his upper

9     torso while he is handcuffed in a prone position, did you

10    ever learn that that could cause a problem with his ability

11    to breath?

12            MR. GILL:  Object to the form of the question.

13            MS. AMIGO:  Join.

14        A.    He was still struggling.  He was still being

15    handcuffed.

16        Q.    Okay.  So during the time that you were applying

17    your body weight, the entire time, he was still being --

18    struggling while being handcuffed.

19            MR. GILL:  Object to the form of the question.

20            MS. AMIGO:  Join.

21    BY MR. MCKEE:

22        Q.    Is that what you saw on the video?

23            MR. GILL:  Object to the form of the question.

24            MS. AMIGO:  Join.

25        A.    When I put my knee on his shoulder, he was still

1   struggling with the officers.

2       Q.   My question, though, related to whether he was yet

3   handcuffed when that was happening.

4            Was he already handcuffed when you had your knee on

5   his shoulder?

6       A.   No.  He was still struggling and still kicking and

7   during that time, he was finally handcuffed.

8       Q.   And that's what you think you saw happening on the

9   videotape?

10      A.   Yes.

11      Q.   Okay.  And you say, "Once handcuffed," I'm quoting

12  you, "I attempted to lift him up and noticed he stopped

13  moving."

14           You've seen the video, the most recent one that we

15  have.

16      A.   Yes.

17      Q.   Did you see that occur on that video anywhere?

18      A.   It doesn't show that.

19      Q.   Did you see anything that indicated that there was

20  a stoppage of time on the little timer that indicated some

21  part of it was missing?

22           MR. GILL:  Object to the form of the question.

23           MS. AMIGO:  Join.

24      A.   No.

25      Q.   No.  And did you see anything on that videotape to

1    indicate that that camera was turned off for any period of

2    time while you were on the scene doing what you were doing,

3    up to and including when you think or when you state that you

4    lifted him up?

5              MR. GILL:  Object to the form of the question.

6              MS. AMIGO:  Join.

7         A.    No, but I see the video moving away from the scene.

8         Q.    Right.  But the point where he is handcuffed, after

9    he's handcuffed, do you see, at all, a time on that videotape

10   where you lifted him?

11             MR. GILL:  Object to the form of the question.

12             MS. AMIGO:  Join.

13        A.    No.

14        Q.    But you do see on that videotape the time when he

15   stops moving, right?

16             MR. GILL:  Object to the form of the question.

17             MS. AMIGO:  Join.

18        A.    No.

19        Q.    Did you see videotape that showed him not moving,

20   face down in the sand?

21             MR. GILL:  Object to the form of the question.

22             MS. AMIGO:  Join.

23        A.    No.

24        Q.    You didn't see that on that videotape, either?

25        A.    No.  I saw myself on top of him un-cuffing him.

1   Q.   And you uncuffed him immediately after you

2   attempted to lift him, right, based on your report?

3   A.   As soon as he stopped moving, he was unresponsive.

4   I immediately, you know, we placed him down and I uncuffed

5   him.

6   Q.   But, Officer, the video shows no one lifting him.

7   Officers are rolling him over, and then you un-cuffing him.

8   Isn't that what the video shows?

9   MR. GILL:  Object to the form of the question.

10   MS. AMIGO:  Join.

11   A.   I uncuffed him first, and then I flipped him over.

12   He was face down.

13   Q.   And you're saying the video shows that he was face

14   down being uncuffed?

15   A.   When we were lifting him, yes, he was face down.

16   Q.   My question is whether you saw the video showing

17   that?

18   MR. GILL:  Object to the form of the question.

19   MS. AMIGO:  Join.

20   A.   The video doesn't show that, no.

21   Q.   Okay.  Yet the video does show him being rolled and

22   then uncuffed.  You saw that, right?

23   MR. GILL:  Object to the form of the question.

24   MS. AMIGO:  Join.

25   A.   Uncuffed and then rolled.

1    Q.    That's what you think you saw?

2    A.    That's what I did.

3    Q.    No, that's not what I asked.  I asked, on the

4    video, did you see --

5    A.    No.

6    Q.    -- you un-cuff him and then roll him?

7          MR. GILL:  Object to the form of the question.

8    A.    No.

9          MS. AMIGO:  Join.

10   Q.    And on the video, did you see him rolled and then

11   uncuffed?

12         MR. GILL:  Object to the form of the question.

13         MS. AMIGO:  Join.

14   A.    I did not see that, no.

15   Q.    Okay.  Prior to you seeing Mr. Eimers lose motion,

16   did you see anyone monitoring him in a prone position

17   restraint for breathing or heartbeat?

18         MR. GILL:  Object to the form of the question.

19         MS. AMIGO:  Join.

20   A.    No.  He was, like I said, he was actively moving

21   and resisting.

22   Q.    No, my question is, during that time, was anyone

23   monitoring his ability to breath?

24         MR. GILL:  Object to the form of the question.

25         MS. AMIGO:  Join.

A.   No.  Not to my knowledge, no.

Q.   **Did you notice how much time passed between when Mr. Eimers stopped moving and the time when CPR finally started being administered?**

MR. GILL:  Object to the form of the question.

MS. AMIGO:  Join.

A.   Seconds.

Q.   **Our count was over two minutes.  You saw just seconds?**

MR. GILL:  Object to the form of the question.

A.   Yes.

MS. AMIGO:  Join.

Q.   **Did you actually look at that film for that purpose so that you could --**

A.   I looked at the film just to refresh my memory.

Q.   **Okay.  Did you look at the timer and see how long it went from when he stopped moving until the first time a chest compression was given?**

A.   No.

Q.   **Would two minutes seem to be a long time to you in that life-threatening situation for him?**

MR. GILL:  Object to the form of the question.

MS. AMIGO:  Join.

A.   Could be, yes.

Q.   **You were the verifying officer for the other**

1    officers' reports that day, correct?

2        A.    Yes.

3        Q.    What did you do to verify that anything they said

4    was accurate?

5        A.    Just read the report.

6        Q.    So you took them on whatever they said?

7        A.    Yes.

8            MR. GILL:  Object to the form of the question.

9            MS. AMIGO:  Join.

10       Q.    So it's really not verifying anything.  It's

11   verifying that the officer gave you a report?

12           MR. GILL:  Object to the form of the question.

13           MS. AMIGO:  Join.

14       A.    Their stories, yes.

15       Q.    But as far as their story, what they wrote in it,

16   you did nothing to verify it?

17           MR. GILL:  Object to the form of the question.

18           MS. AMIGO:  Join.

19       A.    What is there to verify?

20       Q.    Well, for example, Officer Lovette, did you know

21   that day that there was a witness, more than one witness,

22   that said they saw Tasing?

23           MR. GILL:  Object to the form of the question.

24           MS. AMIGO:  Join.

25       A.    Yes.

Q.   Okay.  Isn't it true that Officer Lovette was allowed to leave the scene at the time that the EMS folks came and go to another call?

MR. GILL:  Object to the form of the question.

A.   Yes.

MS. AMIGO:  Join.

Q.   Did you or anyone that you're aware of in the police department ask him for his Taser before he left?

A.   No.

Q.   So he left with his Taser?

A.   Yes.

Q.   He left with -- whether or not there's blood on his Taser?

MR. GILL:  Object to the form of the question.

MS. AMIGO:  Join.

BY MR. MCKEE:

Q.   Right?

A.   Yes.

Q.   He left with the evidence, right?

MR. GILL:  Object to the form of the question.

MS. AMIGO:  Join.

A.   Yes.

Q.   And did he come back to the scene that day?

A.   I don't believe so.

Q.   As a matter of fact, by ten or eleven in the

34

1   morning, he was off the scene and no one could interview him,

2   right?

3             MR. GILL:   Object to the form of the question.

4             MS. AMIGO:   Join.

5        A.   He was in service, taking calls.

6        Q.   Right.   And so if someone called back in to

7   dispatch before eleven in the morning that Mr. Eimers wasn't

8   Tased, they certainly hadn't dealt with any of the evidence

9   of Officer Lovette, had they?

10             MR. GILL:   Object to the form of the question.

11        A.   Yes.

12             MS. AMIGO:   Join.

13        Q.   Correct?

14        A.   Yes.

15        Q.   And you were at Officer Lovette's deposition and

16   you heard him say he had activated his Taser, correct?

17             MR. GILL:   Object to the form of the question.

18        A.   Yes.

19             MS. AMIGO:   Join.

20        Q.   That means the recorder is on, right?

21             MR. GILL:   Object to the form of the question.

22        A.   Yes.

23        Q.   And if the recorder was on, then we should have

24   video and audio of the moment he activated it to the moment

25   he turned it off, right?

1      MR. GILL:  Object to the form of the question.

2      MS. AMIGO:  Join.

3   A.   If it was on, yes.

4      MS. AMIGO:  Join.

5   Q.   **And you're aware that footage doesn't resist,**

6   **right?**

7      MR. GILL:  Object to the form of the question.

8      MS. AMIGO:  Join.

9   A.   I'm not aware, no.

10   Q.   **You're not aware of that?**

11   A.   I'm not aware of that.

12   Q.   **Have you looked to find out where that footage is?**

13   A.   No.

14      MR. GILL:  Object to the form of the question.

15      MS. AMIGO:  Join.

16   Q.   **If you were an investigating officer on some person**

17   **that was not a police officer who had used a Taser on**

18   **somebody, and you know the Taser records, and you're missing**

19   **the part when he was Tasing the person, because you know it**

20   **was turned on, you would probably think that he destroyed**

21   **evidence, wouldn't you?**

22      MR. GILL:  Object to the form of the question.

23      MS. AMIGO:  Join.

24   A.   You can think that, yes.

25   Q.   **That would be a legitimate conclusion based on your**

1  police knowledge, correct?

2          MR. GILL:  Object to the form of the question.

3          MS. AMIGO:  Join.

4      A.  Yes.

5      Q.  Okay.  Now, I'm intrigued because I thought FDLE

6  doesn't come in until a man is dead before they get involved

7  in an investigation; isn't that normally the case?

8          MR. GILL:  Object to the form of the question.

9          MS. AMIGO:  Join.

10     A.  It is.

11     Q.  Of an in-custody death?

12     A.  Yes.

13     Q.  And yet, FDLE was there on the scene quickly after

14  these events occurred, correct?

15     A.  Correct.

16     Q.  Why was that?

17         MR. GILL:  Object to the form of the question.

18         MS. AMIGO:  Join.

19  BY MR. MCKEE:

20     Q.  What's your understanding of why they were there

21  already?

22         MR. GILL:  Object to the form of the question.

23         MS. AMIGO:  Join.

24     A.  I believe any time you have serious injuries or a

25  serious -- or death, they usually come in.

1   Q.   So, and they come in because there's an

2   investigation regarding police officers in the in-custody

3   severe injury or death of somebody, right?

4   A.   Yes.

5   Q.   And this was an incident involving a response to

6   resistance, right?

7        MR. GILL:   Object to the form of the question.

8        MS. AMIGO:   Join.

9   A.   It didn't meet the criteria for response to

10  resistance.

11  Q.   Well, we'll discuss that.   Was this a severe injury

12  of a person during his altercation with police?

13       MR. GILL:   Object to the form of the question.

14       MS. AMIGO:   Join.

15  A.   It seemed like a medical problem.

16  Q.   Yeah, I guess so.   He's blue and he's not breathing

17  and he's got blood coming out of an ear.   It sounds like a

18  medical problem.   Are you saying blood coming out of his ear

19  came from a heart attack?

20       MR. GILL:   Object to the form of the question.

21       MS. AMIGO:   Join.

22  A.   I don't know where the blood came from.   I know he

23  had blood on the face and the back of the ear.   I don't know

24  where that blood came from.

25  Q.   Now, all the officers, except one, said his face

1     was never in the sand.

2           MR. GILL:  Object to the form.

3     BY MR. MCKEE:

4           Q.   You were there.  Was his face in the sand?

5           MR. GILL:  Object to the form of the question.

6           MS. AMIGO:  Join.

7           A.   Like I put in my report, he -- when I got there,

8     his face was in the sand facing away from me, looking towards

9     the restaurant.

10          Q.   But you had, you had your knee on his right

11    shoulder.  You know that means you're right next to his head.

12    Was his head face down at times during that altercation while

13    he was still conscious?

14          A.   Not when I was there.

15          Q.   Were you looking?

16          A.   Yes.

17          Q.   You were looking at his face?

18          A.   Yes.

19          MR. MCKEE:  Hand me that photo behind you, please.

20    Just pull it out of the sack.

21          Q.   So this comes from the videotape that you most

22    recently saw.  Just hold it up so we can get it on camera, as

23    well.  That's Officer Lovette above Mr. Eimers, correct?

24          A.   Yes.

25          Q.   Do you know whether you're in that frame at all,

1   can you tell?

2        A.   I believe I'm somewhere --

3        Q.   Further out of this frame?

4        A.   Out, yes.

5        Q.   Okay.  His hand is entirely encased in sand -- I

6   mean, his face is entirely encased in sand, correct?

7             MR. GILL:  Object to the form of the question.

8             MS. AMIGO:  Join.

9        A.   Yes.

10       Q.   Okay.  Hard to breath that way, isn't it?

11            MR. GILL:  Object to the form of the question.

12            MS. AMIGO:  Join.

13       A.   If your face is in the sand, yes.

14       Q.   Right.  And so, is it your testimony that he was

15   breathing while in that position, face in the sand?

16            MR. GILL:  Object to the form of the question.

17            MS. AMIGO:  Join.

18       A.   When I was there, he wasn't facing -- his face was

19   not in the sand.

20       Q.   Okay.  But you arose -- you arrived after Mr.

21   Lovette, Officer Lovette had put the Taser on the back of his

22   neck, you were there after that, right?

23            MR. GILL:  Object to the form of the question.

24            MS. AMIGO:  Join.

25       A.   Yes.

 1          MR. MCKEE:  Okay.  Put this aside.

 2      Q.   I think your report implies and your testimony

 3  indicates that you were literally replacing Lovette at one

 4  moment in time there, right?

 5      A.   Yes.

 6      Q.   Why would you be replacing Officer Lovette if the

 7  handcuff wasn't already on?

 8      A.   Because he had blood on his hand and I told him,

 9  just move, I'll take your place, go clean yourself up.

10      Q.   So you had time, in what we saw on that videotape,

11  you had time to tell him, ah, you have blood on your hands,

12  you should leave, let me jump on him, put my knee on him so

13  we can still get the handcuffs on him.  You're doing all that

14  in that period of time on that videotape?

15          MR. GILL:  Object to the form of the question.

16          MS. AMIGO:  Join.

17      A.   No.

18      Q.   Or isn't it true that the handcuff was already on,

19  but his feet are still kicking, so you're applying pressure

20  to his shoulder while someone's dealing with his feet?

21          MR. GILL:  Object to the form of the question.

22          MS. AMIGO:  Join.

23  BY MR. MCKEE:

24      Q.   Isn't that really what was happening?

25          MR. GILL:  Object to the form of the question.

1    MS. AMIGO:  Join.

2    A.   He was still kicking and I don't believe the

3    handcuffs were still on.

4    Q.   **Well, did you notice he wasn't kicking anymore when**

5    **they put a hobble around his legs?**

6         MR. GILL:  Object to the form of the question.

7         MS. AMIGO:  Join.

8    A.   As soon as they put the hobble on, he stopped

9    moving.

10    Q.   **Well, I thought it was as soon as officers lifted**

11    **him.**

12         MR. GILL:  Object to the form of the question.

13         MS. AMIGO:  Join.

14    A.   Yes.  He was lifted when they put the hobble on.

15    Q.   **Sir, didn't you see them put the hobble on with him**

16    **on the ground, officers lifted his legs from behind and put**

17    **the hobble on him?  Didn't you see that?**

18         MR. GILL:  Object to the form of the question.

19         MS. AMIGO:  Join.

20    A.   I'd have to look at the video again.

21    Q.   **Why would officers put a hobble on a man who's not**

22    **moving?**

23         MR. GILL:  Object to the form of the question.

24         MS. AMIGO:  Join.

25    A.   He was kicking.

1    Q.   **They should have checked to see if he had already**

2    **passed out before they put the hobble on, shouldn't they?**

3         MR. GILL:  Object to the form of the question.

4         MS. AMIGO:  Join.

5    A.   He didn't pass out until I lifted him.

6    Q.   **Say that one more time to that camera.**

7    A.   He did not --

8         MR. GILL:  Object to the form of the question,

9    argumentative.

10        MS. AMIGO:  Join.

11        MR. GILL:  Ask him a question.

12        MR. MCKEE:  No.  No, no.  I want him to say that

13   again to the camera.

14        MR. GILL:  Ask him a question.

15        MS. AMIGO:  Asked and answered.

16        MR. GILL:  You can't get him to, order him to --

17        MR. MCKEE:  I'll ask him the question again.

18        MR. GILL:  Ask him a question.  Don't order him to

19   do things.

20   BY MR. MCKEE:

21   Q.   **Tell the jury that regardless of what they see on**

22   **that videotape, I lifted him before he passed out.  Tell**

23   **them.**

24        MS. AMIGO:  Objection, form.

25        MR. GILL:  Object to the form of the question.

```
 1   BY MR. MCKEE:
 2        Q.    Don't look at me.  Tell them.
 3              MS. AMIGO:  Objection.
 4        A.    He was moving.
 5              MR. GILL:  Object, you can answer however you want.
 6              THE WITNESS:  He was moving.  I lifted him up and
 7        at that time, he stopped moving.
 8        Q.    And you're the supervising officer of all of these
 9   officers at the scene, right?
10        A.    Yes.
11        Q.    Okay.  Do you understand why some of the officers
12   whom you supervise say a hobble was never used?
13              MR. GILL:  Object to the form of the question.
14              MS. AMIGO:  Join.
15        A.    Don't know.
16        Q.    That would be false, wouldn't it?
17              MR. GILL:  Object to the form of the question.
18              MS. AMIGO:  Join.
19        A.    It would be.
20        Q.    So it's false under oath, right?
21              MR. GILL:  Object to the form of the question.
22              MS. AMIGO:  Join.
23   BY MR. MCKEE:
24        Q.    If they said it during their deposition?
25              MR. GILL:  Object to the form of the question.
```

1          MS. AMIGO:  Join.

2     A.   Yes.

3     Q.   **Have you spoken to any of those who testified no**

4  **hobble was used, as to why they would say so under oath?**

5          MR. GILL:  Object to the form of the question.

6     A.   No.

7          MS. AMIGO:  Join.

8     Q.   **Are you still their supervising officer?**

9     A.   Yes.

10    Q.   **You answered in an interrogatory that I asked, did**

11 **Lovette Tase Charles Eimers and your answer was no.**

12         **How would you be able to answer that if you never**

13 **were there when he was in his position?**

14    A.   He would have told me if he did.  If he would have

15 done it, he would have told me.  It's policy.  If you take

16 somebody or you drive-stun somebody, it's use of force.

17    Q.   **Did you ask him?**

18         MR. GILL:  Object to the form of the question.

19         MS. AMIGO:  Join.

20    A.   No.

21    Q.   **So after all this goes down, even after witnesses**

22 **at the scene said they saw officers Tasing, you never**

23 **asked --**

24         MR. GILL:  Object.

25    A.   No.

1      Q.    -- as supervising officer?

2            MR. GILL:  Object to the form of the question.

3      A.    No.

4            MS. AMIGO:  Join.

5      Q.    You didn't want to know?

6            MR. GILL:  Object to the form of the question.

7            MS. AMIGO:  Join.

8      A.    I never asked.

9      Q.    Didn't want to know?

10           MR. GILL:  Object to the form of the question.

11           MS. AMIGO:  Join.

12     A.    Never asked.

13     Q.    Why not?

14     A.    Because it didn't happen.

15     Q.    Well, how would you know if you didn't ask?

16     A.    He never told me.

17     Q.    But he's not at the scene anymore.  He left,

18  contrary to his post rules.

19           MR. GILL:  Object to the form of the question.

20           MS. AMIGO:  Join.

21           MR. GILL:  Argumentative.

22  BY MR. MCKEE:

23     Q.    How would you have had him tell you if he left?

24           MR. GILL:  Object to the form of the question.

25           MS. AMIGO:  Join.

1   A.   We --

2   **Q.   He left with the evidence.**

3        MR. GILL:  Object to the form of the question.

4        MS. AMIGO:  Join.

5   A.   Communication.  We have radios.  He would have

6   contacted me.

7   **Q.   What's the only way you know whether an officer**

8   **used their Taser other than their own voice?**

9        MR. GILL:  Object to the form of the question.

10        MS. AMIGO:  Join.

11   A.   We get called to the scene and we get notified.

12   **Q.   Isn't it that you check the downloads on their**

13   **Taser?**

14        MR. GILL:  Object to the form of the question.

15        MS. AMIGO:  Join.

16   A.   When they use it, yes.

17   **Q.   Yeah.  And so, did you ask Officer Lovette for his**

18   **Taser that day so you could check whether it was actually**

19   **used?**

20        MR. GILL:  Object to the form of the question.

21        MS. AMIGO:  Join.

22   A.   It was asked later on that day, yes.

23   **Q.   By whom?**

24   A.   Sergeant Williamson.

25   **Q.   From FDLE?**

A.   No.  From our department.

Q.   **Well, we've been told under oath by, including the chief, that no investigation occurred; is that false, too?**

MR. GILL:  Object to the form of the question.

MS. AMIGO:  Join.

A.   Everybody turned in their Tasers that day, later on that day, and they were downloaded by Officer -- Sergeant Williamson.

Q.   **So that would mean Officer Lovette's Taser, which he has testified under oath that he activated it, then at that moment in time, somebody eliminated his at-the-scene Taser footage, right?**

MR. GILL:  Object to the form of the question.

MS. AMIGO:  Join.

A.   If he did activate it, yes.

Q.   **Yes.  And you don't have any evidence to suggest he didn't activate it?**

MR. GILL:  Object to the form of the question.

MS. AMIGO:  Join.

A.   Correct.

MS. AMIGO:  Is everything all right?  I see --

MR. MCKEE:  Yeah, there's a lot of simultaneous.

THE COURT REPORTER:  I need a pause from you for their objections --

THE WITNESS:  Okay.

1        THE COURT REPORTER:  -- so I don't miss your

2    answer, please.  Thank you.

3        MR. MCKEE:  I'll try to slow down, too.

4        MR. DARREN HORAN:  For the record, Hudson's got a

5    standing objection.

6        MR. GILL:  Well, no, I don't.  One out of ten is an

7    okay question, so.

8        MS. AMIGO:  Right.

9        MR. MCKEE:  Gee, it's amazing, because I get like

10    nine and-a-half out of ten, actually, going to a jury,

11    so we'll see how that goes.

12        MS. AMIGO:  Yeah, we'll see.

13        MR. MCKEE:  Yeah, we will.  I've been doing this a

14    long time, ma'am.  I think it's an adverse witness.

15    BY MR. MCKEE:

16    **Q.    Did you ever listen to the part of Officer**

17    **Lovette's Taser that did record that day?**

18    A.    No.

19    **Q.    You were at his deposition, right?**

20    A.    Yes.

21    **Q.    And parts of that were played and questions were**

22    **made of Officer Lovette about what he said; do you remember**

23    **that?**

24    A.    Yes.

25    **Q.    Remember where his Taser surreptitiously taped him**

1    stating that he laid a F-ing bomb -- I won't use the word he

2    used for this depo -- on Mr. Eimers; remember that?

3         A.   Yes.

4         Q.   And you remember he admitted saying that, right?

5         A.   Yes.

6         Q.   An F-ing bomb on someone's head can cause their ear

7    to bleed, right?

8              MR. GILL:  Object to the form of the question.

9              MS. AMIGO:  Join.

10         A.   It could.

11         Q.   Did you see anything other than that, that day, and

12    I know you said you didn't see that happen, but did you see

13    anything other that day at the incident scene that caused Mr.

14    Eimers' ear to be bleeding from inside of it?

15              MR. GILL:  Object to the form of the question.

16              MS. AMIGO:  Join.

17         A.   No.

18         Q.   Did you hear the discussion under oath with Officer

19    Lovette where also his Taser audio had captured him saying,

20    Gabe killed that man?  Do you remember that?

21              MR. GILL:  Object to the form of the question.

22              MS. AMIGO:  Join.

23         A.   Yes.

24         Q.   Do you know who he was talking to on his Taser when

25    he was recorded?

50

1     A.    I have no idea.

2     Q.    **Do you know whether it was one of his fellow**

3  **officer?**

4     A.    I have no idea.

5     Q.    **To this day, other than at the deposition, you've**

6  **not listened to it?**

7     A.    Correct.

8     Q.    **As his supervising officer, you've not listened to**

9  **it?**

10          MR. GILL:  Object to the form of the question.

11    A.    Correct.

12    Q.    **Prior to the deposition, did you even know it**

13  **existed?**

14    A.    Heard about it.  Wasn't sure until I sat here.

15    Q.    **And never asked, as his supervising officer, to**

16  **listen to it?**

17          MR. GILL:  Object to the form of the question.

18    A.    It was all being under investigation; so, no, I did

19  not.

20    Q.    **Well, not by your police department, right?**

21    A.    By FDLE.

22    Q.    **Well, they're not your police department, are they?**

23    A.    No.

24    Q.    **Doesn't the Key West Police Department have a**

25  **vested interest in knowing what their officers did at a scene**

1    of a man who eventually dies while in their custody?

2           MR. GILL:  Object to the form of the question.

3           MS. AMIGO:  Join.

4       A.    Yes.

5       Q.    And Key West Police Department chose not to do an

6    investigation themselves?

7           MR. GILL:  Object to the form of the question.

8       A.    That's above my pay grade.  That's not -- I don't

9    make those decisions.

10      Q.    But isn't it true Key West Police Department made a

11   decision not to investigate this man's death?

12          MR. GILL:  Object to the form of the question.

13      A.    I believe it was being investigated by FDLE.

14      Q.    That's not my question.  I'm asking about Key West

15   Police Department.

16      A.    I can't answer that.

17      Q.    Have you seen anything to indicate that Key West

18   Police Department did any investigation of this man's death

19   up until now?

20      A.    No.

21      Q.    I'd like to ask about the Key West Police

22   Department dispatch system and that which you might know

23   about it.  Okay?

24      A.    I will try to help you.  I don't know much about

25   dispatch.

1   Q.   I'm glad you said that.   That will limit some of my

2   questions, trust me.   But, what I am looking for is certain

3   of the codes.   Do you know some of the codes that are used?

4   A.   Some of the codes.   I'm used to the old codes.

5   We've got some new codes and now just go to plain talk.

6   Q.   What I'm getting at is whether there's a code for

7   "Suspect Tased."

8   A.   I'm not aware of one.   If there's one, I haven't

9   used it and I don't remember it being used.

10   Q.   Let me show you the next exhibit, which would be

11   26.   It's a copy of an investigative report from Florida

12   Department of Law Enforcement which includes the dispatch

13   records.   Okay?   I'll represent that's my understanding.   You

14   can look at it and tell me if you agree first.   Okay?

15        (Plaintiff's Exhibit 26 was marked.)

16   A.   Thank you.

17   Q.   And the pending question is, does that appear to be

18   an investigative report from the FDLE that attaches the Key

19   West Police Department CAD call information?   Call

20   information -- C-A-D call information from the Key West

21   Police Department.

22        MR. GILL:   Object to the form of the question.

23   A.   Yes.

24   Q.   Looking at the first page, third paragraph says,

25   quote, "On November 28, 2013," that's the date of the

1    incident, right?

2        A.    Yes.

3        Q.    Before Mr. Eimers has died?

4        A.    Yes.

5        Q.    By almost six days, right?

6        A.    Yes.

7        Q.    "FDLE S/A Smith" -- and S/A stands for Special

8    Agent, right?

9        A.    Yes.

10       Q.    And that would be Kathy Smith, right?

11       A.    Correct.

12       Q.    It proceeds, "met with KWPD Sergeant Jeff

13   Williamson."  On pay grade, as you had termed it, is he above

14   you in rank, same?

15       A.    No, he's the same as me?

16       Q.    Okay.  And did he have any particular involvement

17   in the investigation by FDLE that you're aware of?

18       A.    The only involvement, I believe, was just

19   downloading the Taser videos.

20       Q.    Okay.  So that would have been his job, to download

21   the Taser videos?

22       A.    Yes.

23       Q.    And audios?

24       A.    Yes.

25       Q.    And that's done at the Key West Police Department?

1      A.   Yes.

2      Q.   So he personally would have been the person in

3  charge of that operation?

4      A.   Yes.

5      Q.   So he would be the person that we or a jury would

6  need to talk to as to what happened to Officer Lovette's

7  incident time frame for his recordings, right?

8           MR. GILL:  Object to the form of the question.

9           MS. AMIGO:  Join.

10     A.   Yes.  I'm assuming, yes.

11     Q.   Now, it says here, continuing in that paragraph --

12  I'll start again.  "On November 28, 2013, FDLE S/A Smith met

13  with KWPD Sergeant Jeff Williamson to obtain the 911 calls

14  and CAD information made by the KWPD officers that were

15  involved in the incident regarding Eimers."  Do you see that?

16     A.   Yes.

17     Q.   And then it says in the next sentence, "A copy of

18  the KWPD 911 calls, along with the CAD information, will be

19  maintained in the Related Items section of KW-730628."

20          Do you know whether that place is with Florida

21  Department of Law Enforcement or Key West Police Department?

22     A.   That case number is not our case number.

23     Q.   Okay.  Do you know whether this information, these

24  tapes, these downloads, their originals, were given to the

25  Florida Department of Law Enforcement?

1          MR. GILL:  Object to the form of the question.

2     BY MR. MCKEE:

3          Q.  Do you know?

4          A.  No.

5          Q.  If you know.

6          A.  No.

7          Q.  Do you know whether Key West Police Department

8     retained the original and gave copies to the FDLE?

9          A.  No.

10          MR. GILL:  Object to the form of the question.

11          Q.  I'd like you to go to the next page, the first page

12     of the CAD report for the date in question, November 28,

13     2013.  Okay?  I want to learn a little bit about the coding

14     as to what you understand it to be.  And, in particular, I'd

15     like to know what your understanding is as to how the second-

16     to-last line on this page would have come about.  S-U-S-P

17     T-A-Z-E-D.  Do you understand that to mean "Suspect Tazed"?

18          A.  Yes.

19          Q.  And that came in at what time?

20          A.  8:34.

21          Q.  And 8:34:15?

22          A.  Yes.

23          Q.  Fifteen seconds after the hour, right?

24          A.  Yes.

25          Q.  So is it your understanding that a recording of

1   that would have been made?

2          MR. GILL:  Object to the form of the question.

3   BY MR. MCKEE:

4      Q.   A voice recording?

5      A.   If the officer calls it in, yes.

6      Q.   Okay.  And is it your understanding that this CAD

7   report is an indication that at 8:34:15 in the morning, an

8   officer called in, "Suspect Tazed"?

9          MR. GILL:  Object to the form of the question.

10         MS. AMIGO:  Join.

11     A.   Yes.

12     Q.   And it would have been an officer with knowledge at

13  the scene, correct?

14         MR. GILL:  Object to the form of the question.

15         MS. AMIGO:  Join.

16     A.   Yes.

17     Q.   And based on your reading of a Key West Police

18  Department document that we're handling right now, who was it

19  that made that call in?

20     A.   I'm not sure.

21     Q.   Looking at this document, is there a way to

22  determine that?  For example, in the couple lines above, it

23  indicates P48.  Is that a police officer?

24     A.   That's a number.  O48 is, at that time, was Officer

25  Wanciak.

1          Q.    Right.  Who's MB -- no, M36?

2          A.    M36, it was -- that was Officer Lovette's number.

3     The numbers changed in the last few months.

4          Q.    Okay.  But -- and you're right in going back to

5     that time frame.  I appreciate your cooperation on that.

6               Is it your understanding that this report, as

7     written, from 8:29:41 through the end of the page at 8:34:15,

8     would all likely be Wanciak?

9               MR. GILL:  Object to the form of the question.

10              MS. AMIGO:  Join.

11         A.    From 8:29?

12         Q.    Yes, sir.  8:29:41.

13         A.    Yes.

14         Q.    Now, I want you to understand that we requested

15    these tapes.  Felt they should have been produced a long time

16    ago, but we requested them and they were delivered to us

17    yesterday.  And do you know what's missing from those tapes?

18              MR. GILL:  Object to the form of the question.

19              MS. AMIGO:  Join.

20         A.    No idea.

21         Q.    "8:34:15, Suspect Tazed."  Do you know where that

22    piece of the tape is?

23              MR. GILL:  Object to the form of the question.

24              MS. AMIGO:  Join.

25         A.    I have no idea.

58

Q.    It should be on tape, right?

A.    Should be on tape.

      MR. GILL:  Object to the form of the question.

      MS. AMIGO:  Join.

Q.    As a matter of fact, what did get produced to us is "Roll Rescue, 10:18."  But "Suspect Tazed" is missing from those tapes.  Do you have an explanation for that?

      MR. GILL:  Object to the form of the question.

      MS. AMIGO:  Join.

A.    I don't.

Q.    Do you understand in your training that destruction of evidence is a crime?

A.    Yes.

      MR. GILL:  Object to the form of the question.

Q.    And since discovery is over in about five more days and it hasn't been produced to date and it wasn't produced yesterday, would you agree that that's evidence that was in the possession and control of the department and is now missing?

      MR. GILL:  Objection to the form of the question.

      MS. AMIGO:  Join.

A.    Yes.

      MR. MCKEE:  You chuckle.  Where is it?

      MR. GILL:  The first I heard of this was last night.  I told them look into it.

1     MR. MCKEE:  Yeah.  And we were told on the record

2     we'd received it all before this man's deposition.  I

3     don't have "Suspect Tazed" on the tape yet.  I wanted to

4     play it today.  It's interfering with my ability to

5     prosecute this case.  And if lawyers are involved, we'll

6     go there, too.  But somebody has destroyed that part of

7     these tapes because they weren't produced to us.  That's

8     very offensive.  And if --

9           MR. GILL:  File a motion with the court.

10          MR. MCKEE:  And if -- we will.  It's called motion

11    to strike pleadings for all of the perjury and missing

12    evidence.  You chuckle again.  I can only tell you in

13    arguments with Arthur England as my opponent for Dupont,

14    those pleadings were stricken, too.  I don't know about

15    you, but I find it offensive when evidence that should

16    exist disappears in the hands, especially, of police

17    officers.  I find that offensive and you're smiling

18    about it.  I think you shouldn't be, but you can smile

19    all you want.

20          MR. GILL:  Move to strike testimony of counsel.

21          MR. MCKEE:  I'm not testifying yet.

22          MR. GILL:  Are you going to start testifying?

23          MR. MCKEE:  Maybe.  It's called Bar grievances.

24    BY MR. MCKEE:

25          Q.   Let's look at the next page.  Is there any code

1  that you're aware of that means "Suspect Tazed"?

2      A.   No.

3      Q.   So if it's in this report, it would have been

4  actual language that the dispatch put into this report?

5          MR. GILL:  Object to the form of the question.

6          MS. AMIGO:  Join.

7      A.   I believe.

8      Q.   So it's not someone said a number or some -- and

9  then they translated that to "Suspect Tazed"?

10         MR. GILL:  Object to the form of the question.

11         MS. AMIGO:  Join.

12     A.   I don't believe so.  I'm not too familiar with

13  dispatch.

14     Q.   But your understanding is if the words "Suspect

15  Tazed" is on this report, it came because the words "Suspect

16  Tazed" were uttered by an officer at the scene?

17         MR. GILL:  Object to the form of the question.

18         MS. AMIGO:  Join.

19     A.   Must have been.

20     Q.   That's a yes?

21     A.   Yes.

22         MS. AMIGO:  Join.  Objection.

23     Q.   Then I'd like you to look at what's numbered page

24  two of this report.  I'd like to take you in your mind,

25  before we look at the report, to where you were at around

1   10:30 in the morning, and I'm looking at you for what you

2   recall.  Were you still at the scene?

3       A.   No.

4       Q.   Where had you gone?

5       A.   Went to another call.

6       Q.   The same call as Lovette?

7       A.   I believe so.  It was a guy with a gun.

8       Q.   Okay.  Same call as Garrido?

9       A.   I believe so.

10      Q.   How many of the officers from the Eimers scene went

11  to that scene?

12      A.   I think, two or three.

13      Q.   Including yourself or in addition to yourself?

14      A.   In addition to myself.

15      Q.   Do you remember when you left?

16      A.   It started getting busy and I'm not sure of the

17  time I left.

18      Q.   Could you review this dispatch summary to see if

19  there's anything that indicates you leaving?  And I'm not

20  challenging that you did.  I'm just trying to find it.  What

21  was your call number at the time?

22      A.   Fourteen.  It's still the same.

23      Q.   Okay.  I'm just trying to find if we have something

24  here --

25      A.   CR14.

1      Q.   -- that says you're leaving.  That's all I'm

2  looking for so I can get --

3      A.   No.  Probably, you know, just got in my car and

4  took off.  I mean, we got a guy with a gun.

5      Q.   So the only reason dispatch would be putting

6  anything down is if someone called it in?

7      A.   Yes.

8      Q.   Okay.  And just so we're clear, dispatch is not

9  somebody or some group of persons who take a prior record and

10  then call it in to themselves to put it onto this.  This is

11  done as it occurs, as it's radioed in, right?

12          MR. GILL:   Object to the form of the question.

13          MS. AMIGO:   Join.

14      A.   Yes.

15      Q.   Okay.  So at the scene, you, the supervisor, were

16  not likely there at 10:38 in the morning, correct?

17      A.   Correct.

18      Q.   Lovette was not there, correct?

19      A.   Correct.

20      Q.   Garrido was not there?

21      A.   Correct.

22      Q.   Nor were any of their Tasers at that time?

23      A.   Correct.

24      Q.   No one investigating this incident would have had

25  access to Lovette, Garrido, or yourself, or any other officer

1   that left prior to 10:38, to have investigated whether they

2   utilized their Tasers, correct?

3          MR. GILL:  Object to the form of the question.

4          MS. AMIGO:  Join.

5   A.    Correct.

6   Q.    So look at the top of the page, "Suspect Not Tazed,

7   Tazer Deployed," 10:38:11 in the morning.  Who did that come

8   from?

9          MR. GILL:  Object to the form of the question.

10         MS. AMIGO:  Join.

11  A.    Where?  Which one?

12  Q.    Where did that language come from, "Suspect Not

13  Tazed"?

14         MR. GILL:  Object to the form of the question.

15         MS. AMIGO:  Join.

16  BY MR. MCKEE:

17  Q.    "Tazer Deployed."

18  A.    What page are we looking at?

19  Q.    Page two.  It's the third page in, I think, but

20  it's numbered page two, for some reason.  It actually may be

21  four pages in.  It looks like you have it.  It starts at this

22  page right here, so that we're clear.

23  A.    Page two.  Alex --

24  Q.    Let me help you.

25  A.    Okay.  Alex --

1  Q. Okay.  You see that?

2  A. Okay.  Yeah, I see it.

3  Q. Okay.  Do you know, based on this report, who that

4 information is coming from?

5  A. No.

6  Q. Who's S14?

7  A. That's me.

8  Q. Okay.  Do you see anyone else identified above

9 "Suspect Not Tazed, Tazer Deployed"?

10  A. No.

11  Q. Other than you?

12  A. Correct.

13  Q. In order for it to be here, does it have to come in

14 by radio?

15  A. Yes.

16  Q. So somebody said "Suspect Not Tazed, Tazer

17 Deployed," right?

18  A. Yes.

19  Q. Do you know that part of the tape's missing, too,

20 that was produced to us yesterday?

21    MR. GILL:  Object to the form of the question.

22    MS. AMIGO:  Join.

23  A. No.

24  Q. If it was on tape, it should still be there, right?

25    MR. GILL:  Object to the form of the question.

1          MS. AMIGO:  Join.

2     A.    It should.

3     Q.    And if it was produced to us without it being

4  there, that would be destruction of evidence, wouldn't it?

5          MR. GILL:  Object to the form of the question.

6          MS. AMIGO:  Join.

7     A.    Yes.

8     Q.    And other than the police department and FDLE, has

9  anyone else had possession of Key West Police Department's

10  tapes, CAD tapes?

11         MR. GILL:  Object to the form of the question.

12    A.    No.

13    Q.    Did you radio in at 8:49 a.m. to have a detective

14  respond to the scene?

15    A.    Yes.

16    Q.    And what detective was that to be?

17    A.    I believe it was Todd Stevens.

18    Q.    Knowing -- how long were you on the other scene

19  after you, Lovette and Garrido left, how long were you at

20  that scene?

21    A.    The man with a gun?

22    Q.    Yes, yes.

23    A.    Fifteen, 20 minutes.

24    Q.    Did you return back to the Eimers scene that day?

25    A.    No.  I believe Officer -- Detective Stevens was

1    there.

2        Q.    Do you know whether Officer Lovette or Garrido

3    returned back to the scene that day?

4        A.    No.

5        Q.    So prior to 10:38:11 in the morning when somebody

6    calls in, "Suspect Not Tazed, Tazer Deployed," the very

7    witness that would be needed to ascertain that had never

8    returned back to that scene, right?

9              MR. GILL:   Object to the form of the question.

10             MS. AMIGO:   Join.

11       A.    Yes.

12       Q.    Officer Lovette never returned back to the scene

13   prior to that time, right?

14             MR. GILL:   Object to the form of the question.

15             MS. AMIGO:   Join.

16       A.    Yes.

17       Q.    Is there any sort of rule, regulation or order that

18   says a police officer shall not use the radio system to send

19   in intentionally false information?

20             MR. GILL:   Object to the form of the question.

21             MS. AMIGO:   Join.

22       A.    We have rules and policies, yes.

23       Q.    And if they didn't have any basis because they

24   never even investigated the point such as whether a Taser was

25   used, it would be improper under the rules to radio in,

1    "Suspect Not Tazed, Tazer Deployed," right?

2          MR. GILL:  Object to the form of the question.

3          MS. AMIGO:  Join.

4    A.    Yes.

5    Q.    By 10:38:11, there were two eyewitnesses who had

6    already given statements that they saw Mr. Eimers being

7    repeatedly Tased.  Did you see those, those witness

8    statements?

9    A.    No.

10         MR. GILL:  Object to the form of the question.

11         MS. AMIGO:  Join.

12   Q.    Do you know when Key West Police Department got the

13   phone video that day?

14   A.    No.  Detectives came out and, you know, they did

15   their thing and I wasn't aware of the video until weeks

16   later.

17   Q.    Well, we heard from the detectives, under oath, and

18   Officer Stevens said he was given no assets with which to do

19   an investigation; are you aware of that?

20         MR. GILL:  Object to the form of the question.

21   A.    No.

22   Q.    Did, that day, the police department have no assets

23   to do an investigation?

24         MR. GILL:  Object to the form of the question.

25         MS. AMIGO:  Join.

1     A.   I don't believe so.

2     Q.   **You don't believe they had assets?**

3     A.   They had assets.

4     Q.   **Yeah.  Do you know of anyone who had knowledge of**

5   **the status of use of Garrido's or Lovette's Tasers before**

6   **11:00 a.m. that morning?**

7     A.   No.

8     Q.   **Or even later in the day?  Anyone else have access**

9   **to that information?**

10       MR. GILL:  Object to the form of the question.

11     A.   The Tasers?

12       MS. AMIGO:  Join.

13     Q.   **Yes.**

14     A.   They were turned in later on that day.

15     Q.   **Much later on that day, right?**

16     A.   Yeah.  Late afternoon, I believe.

17     Q.   **Yeah.  After that Taser is still recording things**

18   **that Lovette is saying, right?**

19     A.   I guess so.

20     Q.   **So there's, as you sit here, as the supervisor of**

21   **these officers, under oath today, you're not aware of any**

22   **person who had knowledge as to these involved officers'**

23   **Tasers and whether they were used until much later in the**

24   **day, right?**

25       MR. GILL:  Object to form.

1        MS. AMIGO:  Objection.

2        MR. GILL:  Join.

3    A.   Yes.

4        MR. GILL:  Bob, if you're switching subjects, can

5    we take a little break?

6        MR. MCKEE:  Yeah.  Let's take a break.  Off the

7    record.

8        THE VIDEOGRAPHER:  Just hang on a second, please.

9    The time is approximately 11:09 a.m.  We're going off

10   the record.

11       (Brief recess.)

12       THE VIDEOGRAPHER:  The time is approximately 11:17

13   and we're back on the video record.

14   BY MR. MCKEE:

15   Q.   Sir, the employees of Key West Police Department in

16   dispatch were not at this scene at any time, correct?

17   A.   Correct.

18   Q.   Based on what you understand dispatch is supposed

19   to be doing is making sure that there's communication with

20   the officers in the field who are at the scene, correct?

21   A.   Yes.

22   Q.   And they don't -- dispatch does not have the leeway

23   to change the words or intent of the words of the officers in

24   the field, correct?

25       MR. GILL:  Object to the form of the question.

1          MS. AMIGO:  Join.

2     A.   Correct.

3     Q.   **They are to report what the officers either tell**

4  **them or what the officers are recorded saying, correct?**

5     A.   Correct.

6     Q.   **So, and as you read this report, "Suspect Tazed,"**

7  **does that mean to you, in plain language and what you know**

8  **dispatch is supposed to be doing, that someone told dispatch**

9  **that Eimers was Tased?**

10         MR. GILL:  Objection to the form of the question.

11         MS. AMIGO:  Join.

12    A.   Correct.

13    Q.   **You've had Taser training, correct?**

14    A.   Yes.

15    Q.   **Multiple times?**

16    A.   Yes.

17    Q.   **You know your Taser backwards and forwards?**

18         MR. GILL:  Object to the form of the question.

19         MS. AMIGO:  Join.

20    A.   Yes.

21    Q.   **Just like your weapon, it's part of your important**

22  **tools?**

23    A.   Yes.

24    Q.   **Oftentimes, something very important to you for the**

25  **safety of yourself and of others, correct?**

1    A.   Correct.

2    Q.   Are you aware of whether or not your Taser -- well,

3    first of all, is your Taser the same as it was that day a

4    year ago?

5    A.   Yes.

6    Q.   Are you aware of whether or not the police

7    officers, when they're provided their Taser, that the serial

8    number of the unit that contains the video and audio is

9    recorded in some way?

10        MR. GILL:   Object to the form of the question.

11        MS. AMIGO:   Join.

12   A.   Yes.

13   Q.   And so, if an officer has a particular Taser on a

14   given day, the serial number or some identifying numbers or

15   letters would be available for someone to look to see if it's

16   the same Taser after an event, correct?

17   A.   Yes.

18   Q.   Do you know where that identifying number is

19   located on the Taser?

20   A.   It's on the Taser.  I'll have to look.

21   Q.   Is it on the cartridge that contains the video and

22   the battery?

23   A.   No, it's on the Taser.

24   Q.   Okay.  Is there an identifier?  And, so long as

25   you're not pointing it at me, and I'm saying that with a

1   smile on my face, you're free to look at your Taser just to

2   make sure, because I need this information.  I'm trying to

3   find out, and you may look all you wish, whether there's an

4   identifier on the battery and on the section that contains

5   the video.

6       A.   I believe, without taking it apart, that the video,

7   the camera has an identifying number, and so does the Taser.

8       Q.   But what I'm trying to get at, let's say an

9   investigator, at the time, had said to Officer Lovette, we

10  want your cartridge and we want to make sure there's no

11  switch-out.  We know that didn't happen, right?

12          MS. AMIGO:  Objection.

13          MR. GILL:  Object to the form of the question.

14          MS. AMIGO:  Join.

15  BY MR. MCKEE:

16      Q.   We know that inquiry and request was never made of

17  Lovette before he left the scene, correct?

18      A.   Correct.

19      Q.   So what I'm trying to get it is whether there's any

20  possibility that what we really have in evidence now is a

21  Taser recording that arose after Lovette changed out his

22  battery and video pack that day.  That's what I'm trying to

23  find out.  It may be fiction, I don't know, but it's my job

24  to find these things, as I thought it might be the police

25  department's job, but I'm doing it now.

1          So what I want to do is hear from you whether or

2     not there is a mechanism by which an officer could change out

3     his video pack after he used it and not be able to be caught.

4     That's all I'm asking.

5          MR. GILL:  Object to the form of the question.

6          MS. AMIGO:  Join.

7     A.    I don't believe so.

8     Q.    Okay.  Now, with that belief, I want you to tell me

9     why, why you believe that, that it can't happen?

10    A.    We haven't been trained to do that.  I mean, even

11    as a supervisor, I don't have the ability to do that.

12    Q.    Well, Taser is a public company that an individual

13    can buy a Taser from, right?

14    A.    Yes.

15    Q.    Can an individual buy a replacement pack for the

16    video?

17         MR. GILL:  Object to the form of the question.

18         MS. AMIGO:  Join.

19    A.    I'm assuming, yes, they can.

20    Q.    Okay.  So an officer could, too, if they wanted to,

21    correct?

22         MR. GILL:  Object to the form of the question.

23         MS. AMIGO:  Join.

24    A.    Yes.

25    Q.    And are spares available at the department to

1  replace a cartridge that has the video and audio in it?

2      A.   Yes.

3      Q.   My question that I don't have the answer for yet,

4  and if you don't know, that's fine, but I just want to make

5  sure, and I'd like you to look if you could -- let me finish

6  the question.

7          MR. GILL:  Yeah.

8  BY MR. MCKEE:

9      Q.   I'd like you to look if you could, if you don't

10  remember, as to whether that pack, that video pack, --

11      A.   Cartridge.

12      Q.   -- the cartridge has an identifier on it.  That's

13  all I'm looking for.  I don't want to know what yours is.  I

14  just want to know if it has it on that as opposed to the

15  entire Taser.

16      A.   I believe it --

17          MR. GILL:  I'm going to object.  Well, you can

18      answer the question.  I'm going to object to him

19      inspecting the Taser.

20      Q.   Go ahead.

21      A.   I believe it does.

22      Q.   Okay.  And when those cartridges are assigned -- is

23  the cartridge assigned or is the whole tool assigned?

24      A.   The cartridge is assigned.  I mean, it --

25      Q.   So there would be something that said what

1  cartridge Lovette had the morning he started his day of work

2  on November 28, 2013?

3          MR. GILL:  Object to the form of the question.

4          MS. AMIGO:  Join.

5      A.   There should be some record, yes.

6      Q.   Okay.  And do you know who would be the person that

7  would hold such a record?

8      A.   Either the quartermasters or training.

9      Q.   Okay.

10     A.   I don't have -- I don't have cartridges to issue,

11 so they don't come to me.  I usually refer them to the

12 quartermasters or training.

13     Q.   Okay.  Is there some order that requires that if

14 the quartermaster is asked for a replacement cartridge, he

15 must make note of it before issuing it?

16     A.   Yes.

17     Q.   Is there any order that precludes an officer from

18 buying his own replacement cartridge?

19     A.   Order?  Not to my knowledge, no.

20     Q.   Have you seen anything to indicate that Key West

21 Police Department investigated whether Officer Lovette

22 changed out -- well, let me re-say that even broader.

23          Have you seen anything to indicate that the Key

24 West Police Department has checked whether the cartridges in

25 the officer's weapons, Tasers, when they turn them in was the

1    same as the cartridges they were assigned originally?

2            MR. GILL:  Object to the form of the question.

3            MS. AMIGO:  Join.

4        A.   No.

5        Q.   Have you seen anything to indicate that the Florida

6    Department of Law Enforcement did such a check?

7            MR. GILL:  Object to the form of the question.

8            MS. AMIGO:  Join.

9        A.   No.

10       Q.   Are the officers at the scene supposed to tell the

11   truth about what happened to EMS when EMS is entering the

12   scene and asking what happened?

13       A.   Come -- yes.

14       Q.   You saw the videotape of when Mr. Eimers got out of

15   his vehicle, right?

16       A.   Yes.

17       Q.   He did not collapse out of his vehicle, did he?

18       A.   No.

19       Q.   So if the officers said to EMS that he had

20   collapsed out of his vehicle, that would be false, correct?

21           MR. GILL:  Object to the form of the question.

22           MS. AMIGO:  Join.

23       A.   It would be, yes.

24       Q.   And other than to cover up what happened, there's

25   no reason for a Key West police officer to say that he

1   collapsed out of his vehicle.  Why not just tell the truth?

2   He collapsed after a struggle with us.  Right?  Other than

3   covering it up, why would a police officer say, collapsed out

4   of his vehicle?

5           MR. GILL:  Object to the form of the question.

6           MS. AMIGO:  Join.

7       A.  Don't know.

8       Q.  Of course, when they're saying that, they don't

9   know a tourist is videotaping them on a camera, right?

10          MR. GILL:  Object to the form of the question.

11          MS. AMIGO:  Join.

12      A.  Correct.

13      Q.  And you saw that when he left his vehicle, he

14  didn't run and then collapse, did he?

15      A.  No.

16      Q.  He actually walked and obeying orders, knelt down

17  and then laid down with his arms out to his side, right?

18          MR. GILL:  Object to the form of the question.

19          MS. AMIGO:  Join.

20      A.  Yes.

21      Q.  So when EMS says, quote, "KWPD reported patient

22  left vehicle and ran, then collapsed," that would be false,

23  too, right?

24          MR. GILL:  Object to the form of the question.

25          MS. AMIGO:  Join.

1     A.    I guess, yes.

2     Q.    **There should be no reason for a police officer at**

3  **that scene to make that kind of report to EMS, is -- other**

4  **than covering this up, right?**

5          MR. GILL:  Object to the form of the question.

6          MS. AMIGO:  Join.

7  BY MR. MCKEE:

8     Q.    **Correct?**

9     A.    Yes.

10    Q.    **Have you ever seen the notes from the EMT that day?**

11    A.    No.

12         MR. MCKEE:  Let me show them to you, Sergeant.  I

13         would think that I've marked this, but just in case I

14         haven't --

15         MR. DARREN HORAN:  You have.

16         MR. MCKEE:  I have?

17         MR. DARREN HORAN:  Yeah, it's in --

18         MS. AMIGO:  Yeah.

19         MR. MCKEE:  Well, I don't want to make duplicative

20         exhibits, so --

21         MR. GILL:  Well, just for this depo, I mean, we

22         don't have it in front of us.  Why don't we just --

23         MR. MCKEE:  I'll make it an ID, an exhibit for ID,

24         okay?  That's one I don't need my copy anymore.  I'll

25         just make the page an exhibit; 27, Exhibit 27.

1        (Plaintiff's Exhibit 27 was marked.)

2    Q.    And I've highlighted for your review what I just

3    read.  And my question, so you can think about it for a

4    minute after you review it, is, why are you seeing that today

5    for the first time?

6            MR. GILL:  Object to the form of the question.

7            MS. AMIGO:  Join.

8    BY MR. MCKEE:

9    Q.    As supervisor of these officers?

10           MR. GILL:  Object to the form of the question.

11           MS. AMIGO:  Join.

12   A.    Seeing?

13   Q.    This report of what they told EMT.

14           Why, as supervisor of these officers, are you

15   seeing for the first time, the handwritten notes of EMT that

16   indicated the false statements made to them about your

17   officers?

18           MR. GILL:  Objection to the form of the question.

19           MS. AMIGO:  Join.

20   A.    First of all, I don't have access to this report

21   and I am not involved in the investigation.

22   Q.    Well, there isn't one from Key West Police

23   Department, right?

24   A.    FDLE.

25           MR. GILL:  Object to the form of the question.

1          MS. AMIGO:  Join.

2     Q.   Key West Police Department is not the FDLE, is it?

3     A.   Correct.

4     Q.   I haven't asked this question of any of the

5 officers and maybe it's time to ask it, especially since

6 you've seen the second videotape.

7          Did the FDLE participate in destroying any evidence

8 that might have the ability to cause charges to be brought

9 against these officers, to your knowledge?

10         MR. GILL:  Object to the form of the question.

11         MS. AMIGO:  Join.

12    A.   No.

13    Q.   As you answer that, and the form objection is well

14 taken, because the first thing I should have asked is do you

15 know what FDLE investigators Kathy Smith and others did while

16 handling the evidence in this matter?

17    A.   No.

18    Q.   Okay.  So if they participated, alone or with the

19 police department, in destroying video and audiotape, that's

20 something that you would have no personal knowledge about

21 because you weren't in those meetings, right?

22    A.   Correct.

23    Q.   If Key West Police Department did not destroy these

24 videotapes and audiotapes, and the only other party to have

25 possession of them was FDLE, then it would have to be on

1   FDLE, wouldn't it?

2           MR. GILL:  Object to the form of the question.

3           MS. AMIGO:  Join.

4       A.   I'm assuming so.

5       Q.   Do you know whether the -- were you a participant

6   in the grand jury proceedings?

7       A.   Yes.

8       Q.   Do you know whether the FDLE informed the grand

9   jury that evidence had been destroyed or missing while in the

10  custody of the police?

11          MR. GILL:  Object to the form of the question.

12          MS. AMIGO:  Join.

13      A.   No.

14      Q.   Did anyone tell that grand jury that there should

15  have been Taser recordings of Lovette, but they don't exist?

16  Did anyone tell them that?

17          MR. GILL:  Object to the form of the question.

18          MS. AMIGO:  Join.

19      A.   No.

20      Q.   Did anyone tell them that Officer Wanciak saw

21  Lovette place the Taser on the back of Mr. Eimers' neck,

22  based on what you saw and heard?

23          MR. GILL:  Object to the form of the question.

24          MS. AMIGO:  Join.

25      A.   No.

1    Q.   Did anyone tell them that Mr. Eimers had his face

2    pushed into the sand during this in-custody event?

3         MR. GILL:   Object to the form of the question.

4         MS. AMIGO:   Join.

5    A.   No.

6    Q.   Did anyone show them a picture of Mr. Eimers'

7    condition while in the hands of the police department?

8         MR. GILL:   Object to the form of the question.

9         MS. AMIGO:   Join.

10   A.   No.

11   Q.   Did anyone tell the grand jury that dispatch

12   recorded officers saying that Mr. Eimers was Tased, but that

13   recording has been destroyed?

14        MR. GILL:   Object to the form of the question.

15        MS. AMIGO:   Join.

16   A.   That, I don't know.

17   Q.   You didn't ever hear that in those proceedings, did

18   you?

19   A.   No.

20   Q.   You've been substantially trained in Taser use,

21   correct?

22   A.   You can say that.   I mean --

23   Q.   You know that their own instructions indicate to

24   not Tase while someone is in handcuffs, especially in a prone

25   position, right?

1          MR. GILL:  Object to the form of the question.

2          MS. AMIGO:  Join.

3     A.    Yes.

4     Q.    So if Tasing occurred while Mr. Eimers was in

5 handcuffs, that would be unreasonable use of force, based on

6 your own training, right?

7          MR. GILL:  Object to the form of the question.

8          MS. AMIGO:  Join.

9     A.    Correct.

10     Q.    And if it was used while he had a hobble on in a

11 prone position and with handcuffs, that would also be an

12 unreasonable use of force, wouldn't it?

13          MR. GILL:  Object to the form of the question.

14          MS. AMIGO:  Join.

15     A.    Correct.

16     Q.    And if it was done while his face is in the sand,

17 while in handcuffs, that would also be unreasonable use of

18 force, wouldn't it?

19          MR. GILL:  Object to the form of the question.

20          MS. AMIGO:  Join.

21     A.    Correct.

22     Q.    And there's no question that his face was in the

23 sand, right?

24          MR. GILL:  Object to the form of the question.

25          MS. AMIGO:  Join.

1    A.    No.

2    Q.    **There is no question?**

3    A.    No.

4    Q.    **And there is no question that when you rolled him**

5    **over, his face looked like that, right?**

6    A.    Correct.

7    Q.    **And he was handcuffed at that time, right?**

8    A.    No.

9          MR. GILL:  Object to the form of the question.

10         MS. AMIGO:  Join.

11         THE WITNESS:  No, he wasn't.

12   Q.    **When you rolled him over?**

13   A.    He was already uncuffed.

14   Q.    **Okay.  But my point being, at the time when he has**

15   **lost his ability to respond, when he was rolled over, he had**

16   **just been in handcuffs and he had been face down in the sand,**

17   **right?**

18         MR. GILL:  Object to the form of the question.

19         MS. AMIGO:  Join.

20   A.    Yes.

21   Q.    **When Mr. Eimers left his car, followed orders of**

22   **police officers, laid down with his head raised and his arms**

23   **at his side, was he exhibiting passive resistance at that**

24   **time?**

25         MR. GILL:  Object to the form of the question.

1          MS. AMIGO:  Join.

2      A.   At the time, he was complying, yes.

3      Q.   **Meaning he was not passively resisting, he was**

4  **complying?**

5      A.   Yes.

6      Q.   **Nor was he actively resisting at that time, he was**

7  **complying?**

8      A.   Correct.

9      Q.   **Nor was he doing aggressive resistance at that**

10  **time, he was complying, right?**

11     A.   Correct.

12     Q.   **Nor was he giving deadly force resistance at that**

13  **time, correct?**

14     A.   Correct.

15     Q.   **Therefore, he should never have had force applied**

16  **to him at that time, correct?**

17          MR. GILL:  Object to the form of the question.

18          MS. AMIGO:  Join.

19  BY MR. MCKEE:

20     Q.   **Based on the guidelines of the City?**

21     A.   There was no force applied to Mr. Eimers.

22     Q.   **And then, no officer approached asking him if they**

23  **could have his hands for handcuffing, correct?**

24     A.   I wasn't there.  I can't answer that.

25     Q.   **When you did get there, was he actively resisting?**

1    A.    Yes.

2    Q.    **And therefore, the officers applied some action to**

3    **the resistance, correct?**

4         MR. GILL:   Object to the form of the question.

5         MS. AMIGO:   Join.

6    A.    They were just trying to control his legs.

7    Q.    **Well, it's more than that, sir.   It was pulling his**

8    **arms back to handcuff him, back, with his arms back, right?**

9         MR. GILL:   Object to the form of the question.

10        MS. AMIGO:   Join.

11   A.    Yes.

12   Q.    **By the way, did you hear Officer Garrido scream**

13   **like a girl on that videotape?**

14        MR. GILL:   Object to the form of the question.

15        MS. AMIGO:   Join.

16   A.    If he did, I don't remember hearing it.

17   Q.    **Nor do you remember hearing it at the scene,**

18   **either, right?**

19   A.    Correct.

20   Q.    **As a matter of fact, when you were there, his**

21   **finger was not caught in the handcuff, was it?**

22   A.    I don't remember.   I know it took us a little bit

23   to handcuff him.

24   Q.    **Yeah, but his finger wasn't in the handcuff, was**

25   **it?**

1      A.   I can't -- I can't answer that.

2      Q.   **You didn't see that, did you?**

3      A.   No.

4      Q.   **Okay.  So the only reason an officer might say that**

5   **in his report, which you signed, is to indicate that some**

6   **sort of aggression was occurring to him, right?**

7           MR. GILL:  Object to the form of the question.

8           MS. AMIGO:  Join.

9   BY MR. MCKEE:

10     Q.   **There's other reason to say it, correct?**

11          MR. GILL:  Object to the form of the question.

12          MS. AMIGO:  Join.

13     A.   You'll have to ask the officer.  I mean, not --

14     Q.   **Well, I have, and he said it happened.  You were**

15   **his supervising officer and you were there.  You said you**

16   **didn't see it.**

17     A.   I did not see it.

18     Q.   **So the only reason for an officer to say that it**

19   **happened is to give some idea that he was fearing for**

20   **himself, he was being injured by this altercation, right?**

21          MR. GILL:  Object to the form of the question.

22          MS. AMIGO:  Join.

23     A.   Don't know.

24     Q.   **But from your view, it never happened, --**

25          MR. GILL:  Object to the form of the question.

1          MS. AMIGO:  Join.

2     BY MR. MCKEE:

3          Q.    -- right?

4          A.    I didn't see it.

5          Q.    And did any other officer tell you that that

6     happened?

7          A.    They talked about it, yes.

8          Q.    Well, that was Garrido, right?

9          A.    Don't know who it was, but they talked about

10    Garrido's finger being stuck in the handcuff.

11         Q.    No injury report was filed, right?

12         A.    Correct.

13         Q.    No injury to his finger was even seen, correct?

14         A.    Correct.

15         Q.    And if it had been, if it really occurred, the

16    investigation of the incident at the scene should have had

17    that in the report, right?

18         MR. GILL:  Object to the form of the question.

19         MS. AMIGO:  Join.

20         A.    Should have been a notice of injury, yes.

21         Q.    Yeah.  You've seen no evidence to suggest that that

22    actually occurred, that Garrido had his finger, due to the

23    resistance of my client, stuck in the right cuff, right?

24         MR. GILL:  Object to the form of the question.

25         MS. AMIGO:  Join.

1    A.   Yes.

2    Q.   But what we have seen is the photographs of

3 Detective Stevens at the hospital showing his right -- my

4 client's right wrist lacerated from the handcuffs, right?

5       MR. GILL:  Object to the form of the question.

6       MS. AMIGO:  Join.

7 BY MR. MCKEE:

8    Q.   Have you seen those photos?

9    A.   No, I haven't.

10    Q.   Are you aware of the fact that if handcuffs are put

11 on too tight, they can be painful?

12       MR. GILL:  Object to the form of the question.

13       MS. AMIGO:  Join.

14    A.   Could be.

15    Q.   They could be so painful as to damage the flesh?

16       MR. GILL:  Object to the form of the question.

17       MS. AMIGO:  Join.

18    A.   They could, yes.

19    Q.   And they could be a reason why a man who is face

20 down in the sand might start to struggle when the right cuff

21 is put on so tight, right?

22       MR. GILL:  Object to the form of the question.

23       MS. AMIGO:  Join.

24    A.   Yes.

25    Q.   And on that day, at that scene, where you were

1    present, there was no finger caught with an officer screaming

2    like a girl, as has been testified here, was there?

3        MR. GILL:  Object to the form of the question.

4        MS. AMIGO:  Join.

5    A.    There wasn't, to my knowledge, there wasn't.

6    Q.    And you were there?

7        MR. GILL:  Object to the form of the question.

8    A.    I was there.

9    Q.    And you're the head man?

10        MR. GILL:  Object to the form of the question.

11    A.    I'm the guy in charge, yes.

12    Q.    At the scene, at the scene before you've left,

13    before any investigation by anyone has occurred, but from

14    your own senses, your own knowledge, your own knowledge of

15    your own rules, did it appear to you that someone at that

16    event, meaning Mr. Eimers, sustained an apparent substantial

17    or potentially fatal injury as a result of the officers'

18    response to resistance?

19        MR. GILL:  Object to the form of the question.

20        MS. AMIGO:  Join.

21    A.    No.

22    Q.    So he's just in the sand for no reason,

23    unconscious, blue, no heartbeat, bleeding from his ear?

24        MR. GILL:  Object to the form of the question.

25        MS. AMIGO:  Join.

1    A.   Medical condition, that's the first thing that came

2  to my mind.

3    Q.   **Then let me put it a different way.**

4         **The only meaning for that response is that my**

5  **client was never resisting, was he?**

6         MR. GILL:   Objection to the form of the question.

7         MS. AMIGO:   Join.

8    A.   He was resisting.

9    Q.   **Oh.**

10   A.   When I got there, he was moving his -- kicking his

11  legs.

12   Q.   **And then there was a response to that resistance,**

13  **wasn't there, --**

14        MR. GILL:   Object to the form of the question.

15  BY MR. MCKEE:

16   Q.   **-- by the officers?**

17        MS. AMIGO:   Join.

18        MR. GILL:   Object to the form of the question.

19   A.   Trying to handcuff him?

20   Q.   **Yeah.**

21   A.   We handcuff people every day, take them to jail.

22  They -- we don't write response to resistance on there.

23   Q.   **Oh, but they don't end up not breathing, having no**

24  **heartbeat, having sand up their nose, in their mouth, in**

25  **their eyes, with an eyewitness officer saying a Taser was put**

1  on the back of his neck, and eyewitnesses saying he was being

2  excessively Tased.   That's not an ordinary event at Key West,

3  is it?

4           MR. GILL:  Object to the form of the question.

5           MS. AMIGO:  Join.

6      A.   No.

7      Q.   Okay.   In this case, where eyewitnesses at the

8  scene are telling officers they saw excessive Tasing --

9  that's, by the way, from a New York police officer that, for

10 some reason, your department didn't bother to get his name or

11 address.

12          MR. GILL:  Move to strike testimony.

13          MS. AMIGO:  Join.

14 BY MR. MCKEE:

15     Q.   Other witnesses said they saw the appearance of

16 Tasing.  Officer Wanciak said they saw the Taser at the back

17 of his neck.  And every officer here said his face was never

18 in the sand, and we know otherwise, based on your testimony

19 and this videotape.  You're saying that -- let me make sure I

20 understand what you're saying.

21          Are you saying that Mr. Eimers, on that day, had he

22 just stepped out of his car, was going to be dead of a heart

23 attack at 8:34:15?  Is that what you're saying?

24          MR. GILL:  Object to the form of the question.

25          MS. AMIGO:  Join.

1    A.    I'm not saying that.

2    Q.    You've been taught physiological response to the

3    stress that this kind of prone restraint can cause, right?

4    A.    Yes.

5    Q.    And you knew that day, when your officers are

6    telling EMT he just collapsed on the beach, you knew that day

7    and so did your officers that this man died with a potential

8    that it was caused by police resistance to force, right?

9         MR. GILL:   Object to the form of the question.

10        MS. AMIGO:   Join.

11   A.    No.

12   Q.    Okay.   So let me walk through the scene then.

13   Officer Garrido approaches my client who is prone in the sand

14   and, without asking him, yanks his left arm back and puts a

15   handcuff on him.   No negative response from Mr. Eimers,

16   right, based on what you saw?

17        MR. GILL:   Object to the form of the question.

18        MS. AMIGO:   Join.

19   A.    Yes.

20   Q.    And then he yanks his right arm back, without

21   bending it at the elbow, and pulls his upper torso off the

22   ground in the force of that action; you saw that on the

23   video?

24        MR. GILL:   Object to the form of the question.

25        MS. AMIGO:   Join.

1    A.   I saw that on the video, yes.

2    Q.   **And puts it on so tightly that it lacerates my**

3    **client's right wrist.  Did you see that?**

4         MR. GILL:  Object to the form of the question.

5         MS. AMIGO:  Join.

6    A.   I couldn't see that up close.

7    Q.   **And he didn't trap his own finger in it, right?**

8         MR. GILL:  Object to the form of the question.

9         MS. AMIGO:  Join.

10   A.   I don't know that.

11   Q.   **And you saw and heard nothing to indicate that he**

12   **was screaming like a girl because of that, right, meaning**

13   **Garrido?**

14        MR. GILL:  Object to the form of the question.

15        MS. AMIGO:  Join.

16   BY MR. MCKEE:

17   Q.   **That didn't happen?**

18   A.   Not to my knowledge, no.

19   Q.   **And not to what you saw on the video, either, --**

20        MR. GILL:  Object to the form of the question.

21        MS. AMIGO:  Join.

22   BY MR. MCKEE:

23   Q.   **-- right?**

24   A.   Yes.

25   Q.   **Okay.  And then, with my client in pain and face**

1  down with handcuffs on, officers are putting their body

2  weight on his upper torso, right?

3          MR. GILL:  Object to the form of the question.

4          MS. AMIGO:  Join.

5      A.   Yes.

6      Q.   And when one has their hands and arms unable to be

7  used, and has their upper torso being forced down with the

8  weight of large police officers, and a face is face down, do

9  you think legs might thrash to avoid suffocating to death?

10  Do you think that might be a physiologic response?

11          MR. GILL:  Object to the form of the question.

12          MS. AMIGO:  Join.

13      A.   His face was no in the sand at that time.

14      Q.   Regardless of what the videotape shows?

15          MR. GILL:  Object to the form of the question.

16          MS. AMIGO:  Join.

17      A.   Regardless of what the videotape shows, I can tell

18  you, I was there.  When I placed my right knee, he was

19  looking away from me, so his face was not in the sand.

20      Q.   Well, that's interesting, because we have his head

21  between the legs of Mr. Lovette on that videotape.  Did you

22  notice that?

23          MR. GILL:  Object to the form of the question.

24      A.   No.

25          MS. AMIGO:  Join.

1        THE WITNESS:  No.

2    Q.   His head wasn't even visible to anyone.  Lovette's

3    straddling his head on that video.  Did you notice that?

4        MR. GILL:  Object to the form of the question.

5        MS. AMIGO:  Join.

6    A.   I noticed Lovette on top of him.  I couldn't look

7    at it that up close.

8    Q.   And how, if Lovette dropped an F-ing bomb on his

9    head, did you not see that?

10        MR. GILL:  Object to the form of the question.

11        MS. AMIGO:  Join.

12    A.   I did not see that.

13    Q.   It happened before you arrived?

14        MR. GILL:  Object to the form of the question.

15        MS. AMIGO:  Join.

16    BY MR. MCKEE:

17    Q.   Was his ear bleeding before you arrived?

18    A.   His ear was bleeding when I got there.

19    Q.   Did it start bleeding when you got there or was it

20    bleeding when you arrived?

21    A.   Was it bleed -- it was bleeding when I got there.

22    Q.   Okay.  So whatever happened to his head, likely

23    happened before you got there?

24    A.   Whatever happened, yes.

25    Q.   And with that blood flowing from his ear, enough to

1  make you concerned enough to replace Lovette, to wash his

2  hands, you think that there was no force being applied by

3  officers in this altercation?

4          MR. GILL:  Object to the form of the question.

5          MS. AMIGO:  Join.

6     A.   He had a smear of blood, not blood flowing from his

7  ear.  And Officer Lovette had blood on his hands, yes, on his

8  hands.

9     Q.   And you have no indication, even today, to say that

10 didn't happen to the officers' resistance -- the officers'

11 response to the resistance, right?

12    A.   Correct.

13    Q.   So, at the scene, that injury, that blood flowing

14 from his ear, was something that still was unknown whether it

15 was caused by the officers' response to resistance, right?

16         MR. GILL:  Object to the form of the question.

17         MS. AMIGO:  Join.

18    A.   Yes.

19    Q.   But the reporting and investigation required is to

20 occur that same day, right, under the rules?

21         MR. GILL:  Object to the form of the question.

22         MS. AMIGO:  Join.

23    A.   Yes.

24    Q.   But none was done that day, was there?

25    A.   Correct.

1    Q.    None was done any day, all the way until now, a

2    year later, literally a year minus one day, we're the day

3    before Thanksgiving today.  That's never been done in this

4    case, has it?

5        A.    Investigation?

6        Q.    The investigation by the Key West Police Department

7    under the response to resistance requirement.

8        A.    Correct.

9        Q.    So let's talk about what should have happened if it

10   was recognized as a response to resistance event, because I

11   think you'll agree with me at the end of this questioning,

12   we'd have a whole lot more evidence, and that's where I'm

13   heading with this line of questions.

14            MR. GILL:  Move to strike testimony.

15            MS. AMIGO:  Join.

16            MR. MCKEE:  I don't know what that means.  You can

17        speak up.  I'll ask again.

18            MR. DAVID PAUL HORAN:  Ten ribs.

19            MR. MCKEE:  Oh, yeah.

20   BY MR. MCKEE:

21        Q.    Are you aware that there's a discrepancy between

22   what the hospital found of the physical condition of my

23   client and what the autopsy found?  Are you aware of it?

24        A.    No.

25            MR. GILL:  Object to the form of the question.

1          MS. AMIGO:  Join.

2      Q.    Do you have an explanation how the hospital didn't

3  report ten broken ribs, and yet the medical examiner did?

4          MR. GILL:  Object to the form of the question.

5          MS. AMIGO:  Join.

6      A.    I have no idea.

7      Q.    When the hospital has run all kinds of scans and

8  not seen broken ribs?  Do you have an explanation for that?

9          MR. GILL:  Object to the form of the question.

10         MS. AMIGO:  Join.

11     A.    No.

12     Q.    When ribs are broken, and they weren't broken

13  before the event happened, prior to an investigation even yet

14  occurring, is broken ribs something that can be happening due

15  to an officer's response to resistance?

16         MR. GILL:  Object to the form of the question.

17         MS. AMIGO:  Join.

18     A.    It could happen.

19     Q.    Are you aware, were you aware until this moment,

20  that Mr. Eimers had multiple fractured ribs?

21     A.    What I read in the paper.

22     Q.    And would you agree with me that large men exerting

23  force can break an older man's ribs when they're kneeing him

24  and putting their body weight on top of his torso?  Would you

25  agree that is something physiologically that can happen?

1          MR. GILL:  Object to the form of the question.

2          MS. AMIGO:  Join.

3     A.   What do you mean by kneeing him?

4     Q.   **Putting their knees on top of him, putting force on**

5  **his upper torso where his ribs are.**

6          MR. GILL:  Object to the form of the question.

7          MS. AMIGO:  Join.

8     A.   I placed my knee on his shoulder, not on his ribs.

9     Q.   **Okay.  When an officer applies force to an older**

10  **man's ribs, can they break?**

11          MR. GILL:  Object to the form of the question.

12          MS. AMIGO:  Join.

13     A.   It could happen.

14     Q.   **And if that happened, you wouldn't know that in the**

15  **field until later, right?**

16     A.   Correct.

17     Q.   **So, in the field that day, with a man with multiple**

18  **broken ribs, there's nothing the police officer could**

19  **construe other than this could be a physiologic response to**

20  **the force applied during this response, right?**

21          MR. GILL:  Object to the form of the question.

22          MS. AMIGO:  Join.

23     A.   Yes.

24     Q.   **So let's talk about some of the things that the**

25  **response to resistance policy requires.  I'll do it from the**

1    standpoint of the lesser of eventualities, which is the non-

2    lethal incident, okay?  You would agree with me a lethal

3    incident might actually have more requirements than a non-

4    lethal incident?

5         A.   Yes.

6         Q.   SO we'll take it from the lesseer of the two,

7    although eventually Mr. Eimers died, but we'll take it from

8    the non-lethal incident category, 02.08.06.

9              And it says that, "Any member involved in an non-

10   lethal response to resistance incident is responsible for the

11   following:"  Okay?

12             "Immediately notifying communications and the on-

13   duty watch supervisor or supervisor having command over a

14   particular operation while the incident occurred."  That

15   would have been you, right?

16        A.   Yes.

17        Q.   Okay.  So there would be no need to do -- would

18   there be a need to do a further notification above you in the

19   command level?

20        A.   There would be, yes.

21        Q.   Did that happen that day?

22        A.   No.

23        Q.   "Collecting the name of witnesses and other members

24   for reporting purposes."  Did that happen that day?

25        A.   I believe they collected some witnesses.

1       **Q.   Two, right?**

2       MR. GILL:  Object to the form of the question.

3       MS. AMIGO:  Join.

4       A.   I believe so, or more.  I'm not sure.

5       **Q.   Have you seen more than two?**

6       A.   I'm not familiar with the investigation.  That was

7  Detective Stevens, so I don't have information on that.

8       **Q.   Well, let's make sure we're clear.  I don't want to**

9  **be a surprise to you or try to mislead you.  This is what the**

10  **members involved in the event are supposed to do, isn't it?**

11       A.   Yes.

12       MR. GILL:  Object to the form of the question.

13       **Q.   That was what my question was at.  I'm on the**

14  **section about what the members involved in the incident are**

15  **supposed to do.**

16       **Did any member involved in this incident collect**

17  **the names of witnesses for reporting purpose?**

18       MR. GILL:  Object to the form of the question.

19       A.   Other than the two you mentioned, I'm not aware of

20  any other names.

21       **Q.   Well, did the members involved collect those two**

22  **names or was it someone that came later?**

23       A.   I'm not sure.

24       **Q.   If you think it was an involved member, who was it**

25  **that collected those two names?**

1    A.   There was ten, eleven, twelve of us there.  I'm not

2  sure who did.

3    Q.   Well, certainly, you didn't collect names of

4  witnesses, did you?

5    A.   Correct.

6    Q.   And, as an event-involved member, according to

7  this, if this was a response to resistance, you should have

8  been there collecting names, correct?

9         MR. GILL:  Object to the form of the question.

10        MS. AMIGO:  Join.

11   A.   Yes.

12   Q.   Same with every other involved member, right; each

13  should have been doing it, right?

14        MR. GILL:  Object to the form of the question.

15        MS. AMIGO:  Join.

16   A.   Yes.

17   Q.   But neither you, Lovette or Garrido and maybe one

18  other, could, because they were sent to another scene, right?

19   A.   Yes.

20   Q.   What also should have happened is, "Thoroughly

21  briefing the supervisor on all details of the incident in

22  cooperating with any inquiry or investigation conducted by

23  the supervisor or other assigned authority."  You didn't do

24  an investigation, did you?

25   A.   Correct.

1        Q.    And nor did you then do a thorough briefing of each

2   of the members yourself, did you?

3        A.    Correct.

4        Q.    Correct, meaning you did not do it?

5        A.    Did not do that.

6        Q.    And then, as a regularly-required work product, I'm

7   quoting -- no, I'm not quoting -- not one ordered by your

8   supervisor after going to a lawyer, or so on and so forth.

9   I'm saying, as part of this directive, "As a regularly-

10  required work product preparing a detailed report of the

11  incident to include, but not limited to, any medical

12  treatment provided."  Did you do that?

13       A.    Not at that time, I did not.

14       Q.    Well, let's make sure we're clear here.  The only

15  report you did was Exhibit 25, right?

16       A.    Yes.

17       Q.    Show that up to the jury, please.  I'm going to ask

18  you a question.

19            Is it your testimony that that is a detailed report

20  of the incident, including the medical treatment provided?

21       A.    The CPR?

22       Q.    Is this, Exhibit 25, the only report you ever

23  wrote, a detailed report?

24       A.    Yes.

25       Q.    Tell me where it describes the medical care

1  provided.

2     A.    Officers started, you know, giving CPR and then

3  rescue showed up and they took over CPR.

4     Q.    **Tell me where it has Officer Wanciak, who you**

5  **interviewed, stating that she saw the Taser of Lovette at the**

6  **back of my client's neck.**

7        MR. GILL:   Object to the form of the question.

8        MS. AMIGO:   Join.

9     A.    I wasn't aware of that until today.

10    Q.    **That means you didn't do a thorough investigation,**

11 **right?**

12        MR. GILL:   Object to the form of the question.

13        MS. AMIGO:   Join.

14 BY MR. MCKEE:

15    Q.    **You never did a thorough investigation, did you?**

16        MR. GILL:   Object to the form of the question.

17    A.    No.

18        MS. AMIGO:   Join.

19    Q.    **So you couldn't possibly do a thorough report from**

20 **that day, could you?**

21    A.    The report on my actions.

22    Q.    **No, I'm asking whether you could possibly do a**

23 **thorough report if you didn't do a thorough investigation.**

24    A.    No.

25    Q.    **Did you do an initiation, promptly, of an inquiry**

1   into the circumstances that day?

2       A.   No.

3       Q.   And you were the supervisor?

4       A.   Yes.

5       Q.   And your 02.08.06.02 C. 1. requires a prompt

6   initiation of inquiry into the circumstances, right?

7           MR. GILL:  Object to the form of the question.

8       A.   Yes.

9       Q.   And that initiation should include a review of the

10  circumstances and to determine if further investigation is

11  required beyond the scope of your inquiry, right?

12      A.   Yes.

13      Q.   And you didn't do that that day, either, did you?

14          MR. GILL:  Object to the form of the question.

15      A.   No.  I called the duty detective.

16      Q.   Well, your rules don't have you calling the duty

17  detective, they have you doing it, right?

18          MR. GILL:  Object to the form of the question.

19          MS. AMIGO:  Join.

20      A.   Yes.

21      Q.   Did you or any other involved member speak with any

22  witnesses and obtain their written statements?

23      A.   I believe there was a couple showed up there and I

24  believe Officer Wanciak gave them a statement.

25      Q.   And took their statement, right?

1     A.    I believe so, yes.

2     Q.    And they're the ones that said they saw Tasing

3  occurring, right?

4     A.    No.   This couple got run off the road by Mr.

5  Eimers.

6     Q.    Ah, okay.   So as far as the witnesses to the events

7  with the officers on the beach, no involved member spoke to

8  witnesses and obtained their written statements, to your

9  knowledge?

10    A.    Correct.

11    Q.    Nor did you or any member ensure that physical

12 evidence was preserved or collected, including the Tasers,

13 the tapes, the dash cams and their tapes, et cetera, correct?

14          MR. GILL:   Object to the form of the question.

15          MS. AMIGO:   Join.

16    A.    It was done.

17    Q.    Okay.   Do you have any, an explanation of where the

18 dash cam footage that's missing from Lovette's car, where it

19 went?

20          MR. GILL:   Object to the form of the question.

21          MS. AMIGO:   Join.

22    A.    No.

23    Q.    Do you know whether any officer at the scene

24 photographed Mr. Eimers?

25    A.    No.

Q.   No, it didn't or no --

A.   No, I'm not aware.

Q.   And did you, supervisor, prepare a response to resistance report?

A.   No, I did not.

Q.   Was there any issue regarding officer safety after this event that caused them to leave the scene?

A.   What do you mean, officer safety?

Q.   The rule requires, E) "Remain at the scene, unless necessary for safety considerations or to receive necessary medical attention, all involved officers must remain at the scene until released by the supervisor."

Did -- were you aware of that requirement?

A.   Yes.

Q.   Were you the one that released other officers from the scene?

A.   Yes.

Q.   Is there any directive that requires that if you are an involved officer, that you're relieved of the supervisory capacity under this rule and a higher-level person must be that supervisor?

A.   Yes.

Q.   Did that happen that day?

A.   No.

Q.   Did you direct resources to assure that evidence

1    was preserved as required under 02.08.07.02, supervisor

2    responsibilities?

3          MR. GILL:  Object to the form of the question.

4    A.    Yes.

5    Q.    What did you do to ensure that evidence was

6    preserved?

7    A.    Notified the duty detective.

8    Q.    And that was Officer Stevens?

9    A.    Yes.

10   Q.    When did he get there?

11   A.    Minutes after the incident.

12   Q.    Minutes or hours?

13   A.    I believe, minutes; 15, 20 minutes.  He was on duty

14   that day.

15   Q.    And his testimony is that he was not given

16   resources to preserve evidence.  Was he not telling the

17   truth?

18         MR. GILL:  Object to the form of the question.

19         MS. AMIGO:  Join.

20   A.    I can't answer that for Detective Stevens.

21   Q.    Well, do you know whether he was given resources to

22   preserve evidence?

23   A.    I believe some detectives came out.  I believe FDLE

24   ended up coming out, too.

25   Q.    Well, why wasn't the evidence preserved?

1          MR. GILL:  Object to the form of the question.

2          MS. AMIGO:  Join.

3     A.    I'm not aware of no evidence being not preserved.

4     Q.    Well, let's talk about Del Valle's sworn testimony.

5     In taking charge of the scene, he sent witnesses away without

6     preserving who they were and what they saw.  Are you aware of

7     that?

8          MR. GILL:  Object to the form of the question.

9          MS. AMIGO:  Join.

10    A.    I'm aware of it now.

11    Q.    That should not have occurred, right?

12         MR. GILL:  Object to the form of the question.

13         MS. AMIGO:  Join.

14    A.    Correct.

15    Q.    The witnesses that were there, and there were many

16    based on your own knowledge, right?  There were many

17    witnesses?

18    A.    There were a few people out there, yes.

19    Q.    Well, just looking at the videotape we get well

20    past a few, right?

21    A.    Yes.

22    Q.    Every one of them should have been identified by

23    who they are, name, address, so that they could be approached

24    for a statement, if necessary, in the future, right?

25    A.    Could have been, yes.

1      Q.    Should have been under the regulations that you're

2  aware of, right?

3            MR. GILL:  Object to the form of the question.

4            MS. AMIGO:  Join.

5      A.    In a perfect world, yes.

6      Q.    In a world governed by the rules under which you're

7  to work from your department, they should have been

8  identified, right?

9            MR. GILL:  Object to the form of the question.

10           MS. AMIGO:  Join.

11     A.    Yes.

12     Q.    And if they had videotaped what they saw, that

13  should have been made note of and obtained, if legally

14  possible, right?

15     A.    Yes.

16     Q.    And you're aware that no officer obtained videos

17  that day, right?

18           MR. GILL:  Object to the form of the question.

19           MS. AMIGO:  Join.

20     A.    Not to my knowledge.

21     Q.    Were you present when the last witness was

22  testifying here today?

23     A.    No.

24     Q.    Okay.  He described how a motorcycle officer was

25  told that an English-speaking, non-Latino, reported that he

1   had videotaped it on his phone.  Have you seen a non-Latino's

2   videotape of this scene?

3          MR. GILL:  Object to the form of the question.

4          MS. AMIGO:  Join.

5      A.   Non-Latino's?

6      Q.   Right.

7      A.   No.

8      Q.   Again, I'm not looking for information you received

9   from your lawyers, but do you know whether the two videotapes

10  you have now seen were actually made by Columbians who were

11  visiting as tourists?

12     A.   I believe I heard the name was Spanish, Columbian.

13     Q.   And so, have you seen or heard of a third video by

14  a non-Latino on his phone that day?

15     A.   No.

16     Q.   If one existed, if one of the officers there at the

17  scene was told that one existed, that should have been

18  acquired, correct?

19         MR. GILL:  Object to the form of the question.

20         MS. AMIGO:  Join.

21     A.   Correct.

22     Q.   And the name and identity of the person who made

23  that recording should also have been obtained?

24         MR. GILL:  Object to the form of the question.

25         MS. AMIGO:  Join.

1    A.    Correct.

2    Q.    Do you know when anyone from FDLE got at the scene,

3    got to the scene?

4    A.    No.

5    Q.    Have you seen the reprimand letter delivered to

6    Officer Stevens about this event?

7    A.    No.

8    Q.    By the way, at that time, was Officer Stevens the

9    higher-level employee, equal to or lower level in ranking as

10   to you?

11   A.    Lower ranking.

12   Q.    But he was not one over whom you exerted

13   supervision at the time?

14   A.    Correct.

15        MR. MCKEE:  Because our tape is running out and

16        because I'm getting hungry, and I'll bet you might be

17        too, let's take a lunch break for about 40 minutes or

18        so.

19        MR. GILL:  Okay.  How much more time?

20        MR. MCKEE:  Less than an hour.

21        MR. GILL:  Okay.

22        MR. MCKEE:  Could be an hour, but I think less than

23        an hour.  Plus, it will allow me to focus and it might

24        even get shorter.

25        MR. GILL:  All right.  I mean --

1        MR. MCKEE:  I know it's the day before

2    Thanksgiving.

3        MR. GILL:  Yeah.

4        MR. MCKEE:  Trust me, I think you know, I don't

5    prolong depos.  I'm trying to get this done, sir.

6        THE VIDEOGRAPHER:  The time is approximately 12:07

7    p.m.  We're going off record to change tapes.

8        (Lunch recess.)

9        THE VIDEOGRAPHER:  All right.  The time is

10   approximately 12:57 p.m. and we're back on the video

11   record with tape two, Officer Francisco Zamora.

12   BY MR. MCKEE:

13   Q.   Sir, what training did you receive as a mandatory

14   part of your training prior to this event relating how to

15   utilize the response to resistance policy with the mentally

16   ill?

17   A.   Training?

18   Q.   Yes.

19   A.   None.

20   Q.   Have you ever received training as to under what

21   circumstances you may apply force of different levels to

22   someone who is mentally ill?

23   A.   No.

24   Q.   Has the City ever required that the department

25   train its officers with regard to individuals who have mental

1    illness and how to handle them if they resist?

2        A.   We have officers trained that go through CIT class.

3        Q.   Okay.  And what is CIT class?

4        A.   I know we have a few that are certified with CIT.

5    They are officers --

6        Q.   CIT?

7        A.   CIT.  They deal with the homeless, help the

8    homeless.

9        Q.   Okay.  You haven't received that training?

10       A.   No.

11       Q.   Do you know whether any of the officers involved in

12   this Eimers incident had that training?

13       A.   I believe, Del Valle.

14       Q.   Now, you mentioned it's to help the homeless.  I'm

15   specifically asking about mentally ill.

16            Is there such training of officers mandated by the

17   City for its officers regarding how to deal with someone who

18   may be behaving erratically and may have an appearance of

19   being mentally ill?

20       A.   Well, that training, it's for the homeless,

21   mentally ill persons.

22       Q.   Is there a reason why only a small group of

23   officers receive that training?

24            MR. GILL:  Object to the form of the question.

25            MS. AMIGO:  Join.

```
 1    BY MR. MCKEE:

 2         Q.   If you know?

 3         A.   Don't know.

 4         Q.   Certainly, you didn't have it, that training?

 5         A.   Correct.

 6         Q.   And if we looked at the other officers involved in

 7    this incident and the recap of what their training were, how

 8    would you think it would be referenced if they received that

 9    training?

10         A.   How would it be --

11         Q.   How would it be referenced as far as what their

12    training was?  Is it CIT?

13         A.   CIT, yes.

14         Q.   What does that stand for, if you know?

15         A.   I --

16         Q.   Don't know?

17         A.   No.

18         Q.   When did that training start to occur?

19         A.   I want to say two, three years ago, or longer.

20         Q.   Was it before the Eimers issue?

21         A.   Yes.

22         Q.   Of the officers under your supervision that day,

23    November 28, 2013, do you know whether any of them knew how

24    to, based on training, deal with Mr. Eimers in light of the

25    fact that Officer Celcer reported over the radio that he was
```

1   saying some very odd things?   Paraphrasing, I'm paraphrasing.

2        A.   I don't remember.

3             MS. AMIGO:   Objection, form.

4             MR. GILL:   Object to the form of the question.   You

5        can answer.

6             MS. AMIGO:   Join.

7             THE WITNESS:   I don't remember that.

8        Q.   As a matter of fact, when you went to the scene,

9   had you heard through the radio broadcasts from anyone that

10  Mr. Eimers may not be in good mental or physical health?

11       A.   I don't remember that.

12       Q.   And so, similarly, having -- you had your radio

13  with you in your car, right?

14       A.   Yes.

15       Q.   Do you recall any of the officers actually being

16  informed about Mr. Eimers as to whether a different way of

17  handling him should be used in light of what Officer Celcer

18  had encountered?

19            MR. GILL:   Object to the form of the question.

20            MS. AMIGO:   Join.

21       A.   No.

22       Q.   When you were at the scene, was Mr. Eimers put in a

23  sitting-up position?

24       A.   No.

25       Q.   So if Officer Galbo testified under oath that my

1   client was put in a sitting position before he lost

2   consciousness, that would be false, correct?

3           MR. GILL:   Object to the form of the question.

4           MS. AMIGO:   Join.

5   BY MR. MCKEE:

6       Q.   That would be false?

7           MR. GILL:   Object to the form of the question.

8           MS. AMIGO:   Join.

9       A.   It would be, yeah.

10      Q.   And he testified that Mr. Eimers was not struggling

11  when he was put into a sitting position.   Did that happen?

12          MR. GILL:   Object to the form of the question.

13          MS. AMIGO:   Join.

14      A.   He was never put in a sitting position.

15      Q.   And when Officer Galbo testified under oath that

16  Mr. Eimers never had his legs hobbled, that was also false,

17  wasn't it?

18          MR. GILL:   Object to the form of the question.

19          MS. AMIGO:   Join.

20      A.   I guess.

21      Q.   You saw that he was hobbled, right?

22      A.   Yes.

23      Q.   And had the officers decided to stand Mr. Eimers up

24  to try to walk him over to the patrol car?

25      A.   We were -- we lifted him up, yes.

119

1    Q.    Into a standing position?

2    A.    No.  We never got to that point.

3    Q.    Okay.  So if -- strike that.

4          And sand was on Mr. Eimers' face at the scene,

5    correct?

6    A.    Yes.

7    Q.    And so, if Officer Galbo testified under oath that

8    there was never any sand on his face, that would be false,

9    correct?

10         MR. GILL:  Object to the form of the question.

11         MS. AMIGO:  Join.

12   A.    It would be.

13   Q.    Did you see sand in his eyes?

14   A.    No.

15   Q.    Did you see it in his nose?

16   A.    On his face.

17   Q.    All over his face, right?

18   A.    His face, yes.

19   Q.    Including his nose, eyes and mouth, right?

20   A.    All over his face.

21   Q.    But I want to be sure, because I broke it down to

22   Officer Galbo, and he said he saw no sand in his eyes, his

23   nose or his mouth.  That would have been false, wouldn't it?

24         MR. GILL:  Object to the form of the question.

25         MS. AMIGO:  Join.

1    A.   Yes.

2    Q.   Officer Calvert was at the scene, correct?

3    A.   Yes.

4    Q.   He was there at the time when Mr. Eimers was

5 hobbled, correct?

6    A.   Yes.

7    Q.   He was actually near the legs of Mr. Eimers at

8 various times, including after he was hobbled, right?

9    A.   I believe so.

10    Q.   So if he was asked, under oath, the following

11 question:

12         "Is it your testimony that the only device used for

13 restraint was handcuffs?"

14         And he answered:  "Yes."

15         Then there was a follow-up question:  "There was

16 nothing used for his legs?"

17         His answer:  "I never saw a hobble."

18         That would also be false, correct?

19         MR. GILL:  Object to the form of the question.

20         MS. AMIGO:  Join.

21    A.   Correct.

22    Q.   We've already had your testimony that you saw the

23 film that shows Mr. Eimers did not resist until the point

24 when the right-hand handcuff was being applied, correct?

25         MR. GILL:  Object to the form of the question.

1          MS. AMIGO:  Join.

2     A.    When I got there, he was resisting.

3     Q.    **So if an officer who was there, Officer Medina,**

4  **said, "He was resisting the entire time until we lifted him**

5  **up," that would be false, wouldn't it?**

6          MR. GILL:  Object to the form of the question.

7          MS. AMIGO:  Join.

8     A.    He was resisting when I got there and to the point

9  we lifted him up.

10     Q.    **Okay.  Well, the entire time starts from when he**

11  **got out of his car, right?  Right?**

12     A.    Right.

13     Q.    **He was not resisting until that right-hand handcuff**

14  **was forcibly put onto his right wrist, correct?**

15     A.    Correct.

16          MR. GILL:  Object to the form of the question.

17          MS. AMIGO:  Join.

18     Q.    **So he was not resisting the entire time of this**

19  **event, was he?**

20     A.    Correct.

21     Q.    **And then, if he said that, "Mr. Eimers did not go**

22  **unconscious until he was lifted up," that's not true, either,**

23  **is it?**

24          MR. GILL:  Object to the form of the question.

25          MS. AMIGO:  Join.

1     A.   He went unconscious when we lifted him up.

2     **Q.   And as you have already testified, the video never**

3  **shows you lifting him up, correct?**

4     A.   Correct.

5     **Q.   If Officer Medina said that he never saw a device**

6  **around his legs, that would also be false, right?**

7        MR. GILL:  Object to the form of the question.

8        MS. AMIGO:  Join.

9     A.   Correct.

10    **Q.   When he specifically was asked, quote, "Did you**

11  **ever see a hobble used?"  And answered, "No."**

12       **The hobble was used, wasn't it?**

13        MR. GILL:  Object to the form of the question.

14        MS. AMIGO:  Join.

15     A.   Yes.

16    **Q.   Did you ever see Officer Wanciak up by Mr. Eimers'**

17  **face checking his breathing?**

18     A.   No.

19    **Q.   So if she said, quote, "I checked his breathing the**

20  **whole time with his face because his face was to the side and**

21  **I could see that he was still breathing," that wouldn't be a**

22  **true statement, would it?**

23        MR. GILL:  Object to the form of the question.

24        MS. AMIGO:  Join.

25     A.   Don't remember seeing her looking at Mr. Eimers.

1    Q.    Or his face?

2    A.    Or his face.

3    Q.    Or checking on his vital signs during this in-

4  custody activity?

5          MR. GILL:  Object to --

6  BY MR. MCKEE:

7    Q.    Never saw any of that, right?

8          MR. GILL:  Object to the form of the question.

9          MS. AMIGO:  Join.

10   A.    No.

11   Q.    By the way, isn't it true -- strike that.

12         When you saw the most recent videotape that has

13 been produced, did you see the point where an officer lifted

14 his legs or at least one leg?

15   A.    No.  I have to look at it again.  I mean, I know we

16 were around him.

17   Q.    Isn't that a method which you've been trained,

18 which your officers have been trained, that could help reduce

19 resistant action by the subject?

20         MR. GILL:  Object to the form of the question.

21         MS. AMIGO:  Join.

22 BY MR. MCKEE:

23   Q.    In a prone position?

24   A.    To lift him up by the legs?

25   Q.    To lift just his legs up to put more force on his

```
 1    upper torso?

 2         A.    I've never been trained --

 3               MS. AMIGO:  Objection, form.

 4               THE WITNESS:  I've never been trained on that.

 5         Q.    Are you aware, physiologically, that if you lift

 6    the legs with officers applying force to the upper torso, you

 7    reduce his ability to breath?

 8               MR. GILL:  Object to the form of the question.

 9               MS. AMIGO:  Join.

10         A.    No.

11         Q.    Never received that training?

12         A.    No.

13         Q.    Was that training ever offered by the City?

14               MR. GILL:  Object to the form of the question.

15         A.    I don't believe so.

16         Q.    Officer Del Valle was at the scene during these

17    events, correct?

18         A.    Yes.

19         Q.    He also states, quote, "I can't recall seeing a

20    hobble on Mr. Eimers."  We know one was on Mr. Eimers, right?

21               MR. GILL:  Object to the form of the question.

22               MS. AMIGO:  Join.

23         A.    Yes.

24         Q.    So that would be a false statement, correct?

25               MR. GILL:  Object to the form of the question.
```

1          MS. AMIGO:  Join.

2     A.    Correct.

3     Q.    **And you've testified that Mr. Eimers was never**

4  **actually brought such that he came up to his feet, correct,**

5  **in a standing position?**

6     A.    No.

7     Q.    **So if Officer Del Valle said, "Two officers, and I**

8  **can't recall who the officers were, two officers assisted Mr.**

9  **Eimers in standing.  When he came up to his feet, it looked**

10 **like he was having -- he was struggling to get up to his feet**

11 **and he never stood completely upright, from my perspective,**

12 **never stood completely upright."**

13        **As described there, did you see any of that on the**

14 **most recently-produced deposition [sic] from the Columbian**

15 **who videotaped the scene?**

16        MR. GILL:  Object to the form of the question.

17        MS. AMIGO:  Join.

18    A.    No.

19    Q.    **You saw the video that showed Mr. Eimers walking**

20 **away from the officers who were coming from the street side,**

21 **correct?**

22        MR. GILL:  Object to the form of the question.

23        MS. AMIGO:  Join.

24    A.    Saw him walking away, yes, from the -- from his

25 car.

Q.    Right.   He was not walking towards the officers in a threatening manner, was he?

A.    No.

Q.    He was not walking towards the officers at all, he was walking away from them, correct?

A.    Yes.

Q.    Do you have an explanation why officers would have put in their reports that they were ordered to put into -- to make from this event, that my client was walking towards them?

MR. GILL:   Object to the form of the question.

MS. AMIGO:   Join.

A.    Can you repeat that question?

Q.    As the verifying officer, now that you've seen the videotape, you saw that he was not walking towards the officers, do you have an explanation why at least one officer said Mr. Eimers was walking towards him when he left his car?

A.    No.

MR. GILL:   Object to the form of the question.

MS. AMIGO:   Join.

THE WITNESS:   No.

Q.    The only plausible reason would be to make it that he felt threatened  by Mr. Eimers.   There's no other reason to report a false event other than that in this instance, is there?

1          MR. GILL:  Object to the form of the question.

2          MS. AMIGO:  Join.

3     BY MR. MCKEE:

4          Q.   I'll ask that in pieces.

5               Can you think of any other reason, other than they

6     wanted to make it sound like Mr. Eimers was a threat to them,

7     in order to write in their reports that he was walking

8     towards them?

9          MR. GILL:  Object to the form of the question.

10         MS. AMIGO:  Join.

11         A.   No.

12         Q.   As you sit here today, sir, almost one year to the

13    day later, is there anything you would have done differently

14    at that scene?

15         A.   I can't think of anything that we could have done

16    different.

17         Q.   So even after this incident, after seeing these

18    videotapes and after reviewing your own training, in your own

19    mind, there's nothing you would have done differently that

20    day?

21         A.   I can't think of anything.

22         Q.   Is there anything you would have had your officers

23    that you were supervising do differently that day?

24         MR. GILL:  Object to the form of the question.

25         MS. AMIGO:  Join.

1  BY MR. MCKEE:

2      Q.  **As you sit here today?**

3        MR. GILL:  Object to the form of the question.

4        MS. AMIGO:  Join.

5      A.  Maybe try to get more witness statements, more

6  witnesses.

7      Q.  **And if the witnesses that are independent have**

8  **nothing in this fight, if the independent witnesses are**

9  **correct and Officer Lovette used his Taser while my client**

10  **was handcuffed, prone in the sand, is that something that you**

11  **would have changed?**

12        MR. GILL:  Object to the form of the question.

13        MS. AMIGO:  Join.

14      A.  Yes.

15        MR. MCKEE:  I don't have any other questions, sir.

16  Thank you.  Happy Thanksgiving.

17        MS. AMIGO:  I don't have any questions.

18        MR. GILL:  I have no questions for the witness.  We

19  will read and take a copy if it's ordered.

20        THE VIDEOGRAPHER:  Permission to go off the record.

21        MR. MCKEE:  Oh, don't go off yet.  I'm sorry.  My

22  apologies.  I totally forgot one area.  And I'm going to

23  ask it and I know what the response is going to be from

24  counsel, but I have to ask it because of certain things

25  that may arise at trial.

BY MR. MCKEE:

Q.   Will you tell me what your net worth is, approximately?

A.   I went bankrupt two years ago, so I still pay a mortgage.  I have a kid in college that I still owe probably like $80,000.  So --

Q.   Probably pretty small?  Probably pretty small net worth right now?

A.   Yeah.  My salary, yeah, that's --

Q.   And do you have a pension?

A.   Yes.

Q.   Is it vested?

A.   Yes.

Q.   And do you know what its value is?

A.   Not right offhand, no.

Q.   Is that something you would have access to if we needed it for trial?

A.   I believe so.

Q.   And would you produce it voluntarily if you're called to trial?  Because I have certain -- just so you know, I have certain requirements if there's a potential for punitive damages.  And if it's opposed, I might not have those requirements.

So I'm just verifying that you're willing to produce the information about your assets at trial, if

1    requested.

2            MR. GILL:  Well, we'll --

3            MR. MCKEE:  All he has to do is say yes or no, and

4    then we go from there.

5            MR. GILL:  Yeah, I mean, I'm -- we're not going to

6    stipulate on the record what we're going to produce.  I

7    mean, you've got your --

8            MR. MCKEE:  Right.  No, I'm not asking for a

9    stipulation.

10   BY MR. MCKEE:

11       Q.   I'm just saying, you're willing to produce your

12   asset information at trial if you happen to go there?

13           MR. GILL:  Subject to any objections of counsel,

14   you can answer how you want.  I mean --

15       A.   Yeah.

16           MR. MCKEE:  Okay.  That's my last question.

17           MR. GILL:  I have no questions for the witness.  We

18   will read and we'll take a copy if it's ordered.

19           MR. MCKEE:  Now that we're off the record, and

20   truly, I want this off.  I don't want anyone recording.

21           THE VIDEOGRAPHER:  All right.  The time is

22   approximately --

23           MR. MCKEE:  No recording.

24           THE VIDEOGRAPHER:  The time is approximately 1:18

25   p.m. and we're going off the record.  This does complete

1    the deposition of Officer Francisco Zamora consisting of

2    two tapes, two master DVDs and backup media.  Thank you

3    -- they shall remain in the custody of U.S. Legal in

4    Miami.  Thank you and good day everyone.

5         MS. AMIGO:  Thank you.

6         (The deposition was concluded at 10:01 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA )

 4   COUNTY OF MONROE )

 5

 6           I, Suzanne F. Ex, Certified Verbatim Reporter,

 7   Florida Professional Reporter, Notary Public, State of

 8   Florida, certify that SERGEANT FRANCISCO ZAMORA personally

 9   appeared before me on the 26th day of November, 2014, and was

10   duly sworn.

11           Signed this 29th day of November, 2014.

12

13

14                         _____

15                         Suzanne F. Ex, CVR-M, FPR
                           Notary Public, State of Florida
16                         Commission No.:  FF015913
                           Commission Expires:  July 27, 2017

17

18

19

20

21

22

23

24

25     .                                                    .
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA )

 4    COUNTY OF MONROE )

 5

 6          I, Suzanne Ex, Certified Verbatim Reporter and

 7    Florida Professional Reporter, certify that I was authorized

 8    to and did report the deposition of SERGEANT FRANCISCO

 9    ZAMORA, pages 1 through 131; that the review of the

10    transcript was requested; and that the transcript is a true

11    record.

12

13          I further certify that I am not a relative,

14    employee, attorney, or counsel of any of the parties, nor am

15    I a relative or employee of any of the parties' attorneys or

16    counsel connected with the action, nor am I financially

17    interested in the action.

18

19          Dated this 29th day of November, 2014.

20

21

22          _____

23          Suzanne Ex, CVR-M, FPR
            Certified Verbatim Reporter-Master
24          Florida Professional Reporter

25      .                                          .
```

```
 1                      WITNESS NOTIFICATION LETTER

 2

    December 1, 2014
 3

 4  Sergeant Francisco Zamora
    c/o Michael T. Burke, Esquire
 5  Johnson Anselmo Murdoch Burke Piper & Hochman, P.A.
    2488 East Sunrise Boulevard, Suite 1000
 6  Fort Lauderdale, Florida  33304

 7
    RE:  Treavor Eimers vs. City of Key West, et al.
 8       Deposition Taken November 26, 2014
         U.S. Legal Support Job No. 1215299
 9

10  The transcript of the above-referenced proceeding has been
    prepared and is being provided to your office for review by
11  the witness.

12
    We respectfully request that the witness complete their
13  review within 30 days and return the errata sheet to our
    office.
14

15  Sincerely,

16

17
    Suzanne Ex, CVR-M, FPR
18  U.S. Legal Support, Inc.
    One Southeast Third Avenue, Suite 1250
19  Miami, Florida  33131
    (305) 373-8404
20

21  CC via transcript:

22
    David W. Brill, Esquire
23  Jeannete C. Lewis, Esquire
    Robert J. McKee, Esquire
24  David Paul Horan, Esquire
    Darren M. Horan, Esquire
25  Lyman H. Reynolds, Jr., Esquire                          .
```

ERRATA SHEET


DO NOT WRITE ON THE TRANSCRIPT ~ ENTER CHANGES ON THIS PAGE


IN RE:  Treavor Eimers vs. City of Key West, et al.
Sergeant Francisco Zamora
November 26, 2014


| Page No.   Line No. | Change | Reason |
|---|---|---|

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.


_____
Date          Sergeant Francisco Zamora

**A**

$80,000 129:6
**a.m** 1:17 4:6 65:13
  68:6 69:9 131:6
**aamigo@rrbpa.com**
  2:18
**ability** 16:19
  26:10 30:23 59:4
  73:11 80:8 84:15
  124:7
**able** 44:12 73:3
**above-referenced**
  134:10
**access** 25:3 62:25
  68:8 79:20
  129:16
**accuracy** 24:16
**accurate** 10:11,15
  16:10 19:8 32:4
**accurately** 11:2
**acquired** 112:18
**action** 86:2 93:22
  123:19 133:16,17
**actions** 15:17 24:4
  105:21
**activate** 47:15,17
**activated** 34:16,24
  47:10
**actively** 16:23
  30:20 85:6,25
**activities** 14:11
**activity** 123:4
**actual** 60:4
**addition** 61:13,14
**address** 5:13 92:11
  110:23
**administered** 31:4
**admitted** 49:4
**adverse** 48:14
**advice** 14:16
**advised** 14:14
**affidavit** 16:7
**affirm** 5:2
**afternoon** 68:16
**Agent** 53:8
**aggression** 87:6
**aggressive** 85:9
**ago** 7:17 57:16
  71:4 116:19
  129:4
**agree** 19:6 26:2
  52:14 58:17
  98:11 99:22,25
  101:2
**agreed** 21:22
**ah** 40:11 107:6
**ahead** 74:20

**al** 1:10 4:14 134:7
  135:4
**Alex** 63:23,25
**allow** 113:23
**allowed** 33:2
**altercation** 22:20
  37:12 38:12
  87:20 97:3
**amazing** 48:9
**Amigo** 2:19 4:24,24
  9:17,23 10:2,14
  10:25 11:5,10
  12:7,24 13:7,13
  14:24 15:5,13,19
  17:8,19,25 18:6
  18:13 19:10,15
  19:22 20:1,9,18
  20:24 21:3,9,25
  22:5,11,15,22
  23:5,8,17,24
  24:22 25:2,16
  26:5,13,20,24
  27:23 28:6,12,17
  28:22 29:10,19
  29:24 30:9,13,19
  30:25 31:6,12,23
  32:9,13,18,24
  33:6,15,21 34:4
  34:12,19 35:2,4
  35:8,15,23 36:3
  36:9,18,23 37:8
  37:14,21 38:6
  39:8,12,17,24
  40:16,22 41:1,7
  41:13,19,24 42:4
  42:10,15,24 43:3
  43:14,18,22 44:1
  44:7,19 45:4,7
  45:11,20,25 46:4
  46:10,15,21 47:5
  47:14,19,21 48:8
  48:12 49:9,16,22
  51:3 54:9 56:10
  56:15 57:10,19
  57:24 58:4,9,21
  60:6,11,18,22
  62:13 63:4,10,15
  64:22 65:1,6
  66:10,15,21 67:3
  67:11,25 68:12
  69:1 70:1,11,19
  71:11 72:12,14
  73:6,18,23 75:4
  76:3,8,22 77:6
  77:11,19,25 78:6
  78:18 79:7,11,19
  80:1,11 81:3,12

  81:18,24 82:4,9
  82:15 83:2,8,14
  83:20,25 84:10
  84:19 85:1,18
  86:5,10,15 87:8
  87:12,22 88:1,19
  88:25 89:6,13,17
  89:23 90:4,20,25
  91:7,17 92:5,13
  92:25 93:10,18
  93:25 94:5,9,15
  94:21 95:4,12,16
  95:25 96:5,11,15
  97:5,17,22 98:15
  99:1,5,10,17
  100:2,7,12,22
  102:3 103:10,15
  105:8,13,18
  106:19 107:15,21
  109:19 110:2,9
  110:13 111:4,10
  111:19 112:4,20
  112:25 115:25
  117:3,6,20 118:4
  118:8,13,19
  119:11,25 120:20
  121:1,7,17,25
  122:8,14,24
  123:9,21 124:3,9
  124:22 125:1,17
  125:23 126:12,20
  127:2,10,25
  128:4,13,17
  131:5
**and-a-half** 48:10
**Andrea** 2:19 4:24
**Anselmo** 2:12 134:5
**answer** 8:20 9:2
  43:5 44:11,12
  48:2 51:16 74:3
  74:18 80:13
  85:24 87:1
  109:20 117:5
  120:17 130:14
**answered** 42:15
  44:10 120:14
  122:11
**answers** 8:24 13:9
  13:10
**anybody** 21:12
**anymore** 41:4 45:17
  78:24
**apart** 8:5 72:6
**apologies** 128:22
**apparent** 90:16
**apparently** 7:8
**appear** 11:8 52:17

  90:15
**appearance** 92:15
  115:18
**appearances** 2:1
  4:17
**appeared** 132:9
**application** 20:22
**applied** 85:15,21
  86:2 97:2 100:20
  120:24
**applies** 100:9
**apply** 114:21
**applying** 25:11,20
  25:23 26:16
  40:19 124:6
**appreciate** 57:5
**approach** 18:25
**approached** 18:21
  85:22 110:23
**approaches** 93:13
**approximately** 4:5
  69:9,12 114:6,10
  129:3 130:22,24
**area** 13:23 128:22
**argumentative** 42:9
  45:21
**arguments** 59:13
**arm** 17:17 93:14,20
**arms** 77:17 84:22
  86:8,8 95:6
**ARNAUD** 2:22
**arose** 39:20 72:21
**arrive** 16:25 17:21
**arrived** 16:21
  20:12,16 39:20
  96:13,17,20
**Arthur** 59:13
**ascertain** 66:7
**aside** 40:1
**asked** 11:24 20:5
  30:3,3 42:15
  44:10,23 45:8,12
  46:22 50:15
  75:14 80:4,14
  120:10 122:10
**asking** 12:18 51:14
  73:4 76:12 85:22
  93:14 105:22
  115:15 130:8
**asset** 130:12
**assets** 67:18,22
  68:2,3 129:25
**assigned** 74:22,23
  74:23,24 76:1
  103:23
**assist** 11:19
**assisted** 25:8

125:8
**assuming** 54:10
  73:19 81:4
**assure** 108:25
**at-the-scene** 47:11
**attaches** 52:18
**attack** 37:19 92:23
**attempt** 6:22
**attempted** 9:4
  27:12 29:2
**attention** 108:11
**attorney** 14:14
  133:14
**attorney-client**
  6:19,22
**attorneys** 7:9
  133:15
**audio** 34:24 49:19
  71:8 74:1
**audios** 53:23
**audiotape** 80:19
**audiotapes** 80:24
**authentic** 11:8,12
**authority** 103:23
**authorized** 133:7
**autopsy** 98:23
**available** 71:15
  73:25
**Avenue** 134:18
**avoid** 95:9
**aware** 5:25 19:16
  26:7 33:7 35:5,9
  35:10,11 52:8
  53:17 60:1 67:15
  67:19 68:21 71:2
  71:6 89:10 98:21
  98:23 99:19,19
  102:19 105:9
  108:2,13 110:3,6
  110:10 111:2,16
  124:5

——————————
          B
——————————
**back** 17:17 19:18
  21:16,23 33:23
  34:6 37:23 39:21
  57:4 65:24 66:3
  66:8,12 69:13
  81:21 86:8,8,8
  92:1,16 93:14,20
  105:6 114:10
**backup** 131:2
**backwards** 70:17
**bankrupt** 129:4
**Bar** 59:23
**based** 6:19 11:1
  29:2 35:25 56:17

64:3 69:18 81:22
  83:5 85:20 92:18
  93:16 110:16
  116:24
**basis** 66:23
**bat** 15:15
**battery** 71:22 72:4
  72:22
**beach** 2:17 20:11
  93:6 107:7
**BEDARD** 2:16
**behalf** 2:2,11,16
  4:21,24
**behaving** 115:18
**belief** 73:8
**believe** 6:10 7:6
  8:8 33:24 36:24
  39:2 41:2 51:13
  53:18 60:7,12
  61:7,9 65:17,25
  68:1,2,16 72:6
  73:7,9 74:16,21
  101:25 102:4
  106:23,24 107:1
  109:13,23,23
  112:12 115:13
  120:9 124:15
  129:18
**bending** 93:21
**benefit** 11:23
**bet** 113:16
**beyond** 106:11
**bit** 55:13 86:22
**bleed** 49:7 96:21
**bleeding** 49:14
  90:23 96:17,18
  96:19,20,21
**blood** 22:12,19
  33:12 37:17,18
  37:22,23,24 40:8
  40:11 96:25 97:6
  97:6,7,13
**blow** 23:19
**blue** 7:15 37:16
  90:23
**Bob** 69:4
**body** 25:12 26:17
  95:1 99:24
**bomb** 49:1,6 96:8
**bother** 92:10
**Boulevard** 2:8,12
  5:15 134:5
**break** 69:5,6 99:23
  100:10 113:17
**breath** 26:11 30:23
  39:10 124:7
**breathing** 30:17

37:16 39:15
  91:23 122:17,19
  122:21
**Brief** 69:11
**briefing** 103:21
  104:1
**Brill** 134:22
**bring** 16:4
**broadcasts** 117:9
**broader** 75:22
**broke** 119:21
**broken** 99:3,8,12
  99:12,14 100:18
**brought** 80:8 125:4
**Building** 2:17
**Burke** 2:12 134:4,5
**burke@jambg.com**
  2:14
**business** 14:11
  15:9
**busy** 61:16
**buy** 73:13,15
**buying** 75:18

——————————
          C
——————————
**C** 2:14 106:5
  134:23
**C-101** 2:17
**C-A-D** 52:20
**c/o** 134:4
**CAD** 52:19 54:14,18
  55:12 56:6 65:10
**call** 33:3 52:19,19
  52:20 56:19 61:5
  61:6,8,21 62:10
**called** 34:6 46:11
  56:8 59:10,23
  62:6 106:15
  129:20
**calling** 106:16
**calls** 34:5 54:13
  54:18 56:5 66:6
**Calvert** 120:2
**cam** 107:18
**camera** 28:1 38:22
  42:6,13 72:7
  77:9
**cams** 107:13
**capacity** 108:20
**captain** 14:21
**captured** 49:19
**car** 17:22 62:3
  84:21 92:22
  107:18 117:13
  118:24 121:11
  125:25 126:17
**care** 104:25

**career** 5:19
**cartridge** 71:21
  72:10 74:1,11,12
  74:23,24 75:1,14
  75:18
**cartridges** 74:22
  75:10,24 76:1
**case** 1:3 4:11 6:13
  36:7 54:22,22
  59:5 78:13 92:7
  98:4
**category** 101:8
**caught** 73:3 86:21
  90:1
**cause** 4:3 5:3
  26:10 49:6 80:8
  93:3
**caused** 49:13 93:8
  97:15 108:7
**CC** 134:21
**Celcer** 116:25
  117:17
**certain** 11:15 52:2
  128:24 129:20,21
**certainly** 34:8
  103:3 116:4
**Certificate** 3:8,9
  132:1 133:1
**certified** 1:24 4:1
  115:4 132:6
  133:6,23
**certify** 132:8
  133:7,13
**cetera** 107:13
**chair** 13:4
**challenging** 61:20
**change** 69:23 73:2
  114:7 135:7
**changed** 57:3 72:21
  75:22 128:11
**CHANGES** 135:2
**charge** 54:3 90:11
  110:5
**charged** 19:6
**charges** 80:8
**Charles** 1:6 4:13
  44:11
**check** 46:12,18
  76:6
**checked** 42:1 75:24
  122:19
**checking** 122:17
  123:3
**chest** 31:18
**chief** 14:21 47:3
**chose** 51:5
**chuckle** 58:23

59:12
**circumstances**
106:1,6,10
114:21
**CIT** 115:2,3,4,6,7
116:12,13
**City** 1:9,10 4:13
4:21 6:18 85:20
114:24 115:17
124:13 134:7
135:4
**class** 115:2,3
**clean** 20:3,6 22:24
23:6,11 40:9
**clear** 62:8 63:22
102:8 104:14
**client** 88:23 91:5
93:13 94:25
98:23 118:1
126:9 128:9
**client's** 89:4 94:3
105:6
**close** 17:20 94:6
96:7
**code** 52:6 59:25
**codes** 52:3,3,4,4,5
**coding** 55:13
**collapse** 76:17
77:14
**collapsed** 76:20
77:1,2,3,22 93:6
**collect** 102:16,21
103:3
**collected** 101:25
102:25 107:12
**collecting** 101:23
103:8
**college** 129:5
**Columbia** 2:17
**Columbian** 10:21
112:12 125:14
**Columbians** 112:10
**come** 33:23 36:6,25
37:1 55:16 63:7
63:12 64:13
75:11 76:13
**comes** 38:21
**comfortable** 8:23
**coming** 5:25 7:11
12:17 37:17,18
64:4 109:24
125:20
**command** 101:13,19
**Commission** 132:15
132:16
**communicating**
12:10,22

**communication** 46:5
69:19
**communications**
101:12
**community** 13:9
**company** 73:12
**compared** 24:24
**complete** 130:25
134:12
**completely** 125:11
125:12
**compliance** 15:22
**complying** 85:2,4,7
85:10
**compression** 31:18
**concept** 9:13
**concerned** 12:25
97:1
**concluded** 131:6
**conclusion** 35:25
**condition** 82:7
91:1 98:22
**conducted** 103:22
**conformance** 15:22
**connected** 133:16
**conscious** 38:13
**consciousness**
118:2
**considerations**
108:10
**consisting** 131:1
**construe** 100:19
**contacted** 46:6
**contains** 71:8,21
72:4
**contents** 6:18
**continuing** 54:11
**contrary** 45:18
**control** 58:18 86:6
**conversation** 13:16
13:24
**conversations** 6:17
6:19 7:1,5
**convulsions** 20:22
**cooperating** 103:22
**cooperation** 57:5
**copies** 55:8
**copy** 16:4 52:11
54:17 78:24
128:19 130:18
**correct** 8:10 9:25
10:22 11:20
14:18 15:11,17
15:23 16:10,14
17:14,23 18:1,3
18:8,14,22,24
20:19 23:25 24:7

24:10 25:13,21
32:1 34:13,16
36:1,14,15 38:23
39:6 47:20 50:7
50:11 53:11
56:13 62:16,17
62:18,19,21,23
63:2,5 64:12
69:16,17,20,24
70:2,4,5,12,13
70:25 71:1,16
72:17,18 73:21
76:20 77:12 78:8
80:3,22 82:21
83:9,15,21 84:6
85:8,11,13,14,16
85:23 86:3,19
87:10 88:12,13
88:14 97:12,25
98:8 100:16
103:5,8,25 104:3
104:4 107:10,13
110:14 112:18,21
113:1,14 116:5
118:2 119:5,9
120:2,5,18,21,24
121:14,15,20
122:3,4,9 124:17
124:24 125:2,4
125:21 126:5
128:9
**counsel** 4:16 6:17
7:1 59:20 128:24
130:13 133:14,16
**counsel's** 12:21
**count** 31:8
**COUNTY** 132:4 133:4
**couple** 16:5 56:22
106:23 107:4
**course** 15:9 77:8
**court** 1:1 4:7,14
5:1 47:23 48:1
59:9
**cover** 76:24
**covering** 77:3 78:4
**CPR** 31:3 104:21
105:2,3
**CR14** 61:25
**crime** 6:23 58:12
**criteria** 37:9
**cuff** 17:17 88:23
89:20
**current** 5:22,22
**custody** 51:1 81:10
123:4 131:3
**CVR-M** 1:24 132:14
133:22 134:17

**D**

**damage** 89:15
**damages** 129:22
**Darren** 2:6 4:19
48:4 78:15,17
134:24
**darren@horan-w...**
2:5
**dash** 107:13,18
**date** 16:10 52:25
55:12 58:16
135:25
**Dated** 133:19
**David** 2:5 4:19
8:13 98:18
134:22,24
**day** 10:12 13:14
15:10 16:1 23:25
24:9,13 25:4
32:1,21 33:23
46:18,22 47:6,7
48:17 49:11,13
50:5 65:24 66:3
67:13,22 68:8,14
68:15,24 71:3,14
72:22 75:1 78:10
89:25 91:21
92:21 93:5,6
97:20,24 98:1,2
98:2 100:17
101:21,24 105:20
106:1,13 108:23
109:14 111:17
112:14 114:1
116:22 127:13,20
127:23 131:4
132:9,11 133:19
**days** 16:14 53:5
58:15 134:13
**dead** 36:6 92:22
**deadly** 85:12
**deal** 115:7,17
116:24
**dealing** 40:20
**dealt** 34:8
**death** 36:11,25
37:3 51:11,18
95:9
**Deceased** 1:6 4:13
**December** 134:2
**decided** 118:23
**decision** 51:11
**decisions** 51:9
**declare** 135:22
**Defendant** 2:16
4:14
**Defendants** 1:11

2:11
**Del** 1:10 6:11
  25:19 110:4
  115:13 124:16
  125:7
**delivered** 57:16
  113:5
**department** 1:10
  5:15,17 33:8
  47:1 50:20,22,24
  51:5,10,15,18,22
  52:12,19,21
  53:25 54:21,21
  54:25 55:7 56:18
  58:18 65:8 67:12
  67:22 69:15
  73:25 75:21,24
  76:6 79:23 80:2
  80:19,23 82:7
  92:10 98:6 111:7
  114:24
**department's** 65:9
  72:25
**depict** 11:2
**depiction** 10:12
**Deployed** 63:7,17
  64:9,17 66:6
  67:1
**depo** 49:2 78:21
**depos** 114:5
**deposed** 6:2 8:16
**deposition** 1:15
  3:3 4:1,10 6:11
  7:7 13:17 19:2,4
  34:15 43:24
  48:19 50:5,12
  59:2 125:14
  131:1,6 133:8
  134:8
**described** 111:24
  125:13
**describes** 104:25
**deserves** 13:9
**destroy** 80:23
**destroyed** 35:20
  59:6 81:9 82:13
**destroying** 80:7,19
**destruction** 58:11
  65:4
**detailed** 104:10,19
  104:23
**details** 103:21
**detective** 65:13,16
  65:25 89:3 102:7
  106:15,17 109:7
  109:20
**detectives** 67:14

**67**:17 109:23
**determine** 56:22
  106:10
**device** 120:12
  122:5
**died** 53:3 93:7
  101:7
**dies** 51:1
**different** 11:24
  91:3 114:21
  117:16 127:16
**differently** 127:13
  127:19,23
**difficult** 13:4
**direct** 3:3 5:10
  108:25
**directive** 104:9
  108:18
**disagree** 22:3
**disappears** 59:16
**disclose** 6:18
**discovered** 9:12
**discovery** 58:15
**discrepancies**
  10:19
**discrepancy** 98:21
**discuss** 6:15 11:17
  37:11
**discussed** 6:12 8:5
  9:13
**discussion** 8:6,9
  9:3 49:18
**dispatch** 3:16 34:7
  51:22,25 52:12
  60:4,13 61:18
  62:5,8 69:16,18
  69:22 70:8,8
  82:11
**DISTRICT** 1:1,1
**DIVISION** 1:2
**document** 56:18,21
  135:23
**doing** 23:13 24:15
  26:1,3,7 28:2,2
  40:13 48:13
  69:19 70:8 72:25
  85:9 103:13
  106:17
**download** 53:20
**downloaded** 47:7
**downloading** 53:19
**downloads** 46:12
  54:24
**dph@horan-wall...**
  2:5
**Drive** 2:17
**drive-stun** 44:16

**dropped** 96:8
**due** 88:22 99:14
**duly** 5:8 132:10
**duplicative** 78:19
**Dupont** 59:13
**duty** 101:13 106:15
  106:16 109:7,13
**DVDs** 131:2

**E**

**E** 108:9
**ear** 22:13 37:17,18
  37:23 49:6,14
  90:23 96:17,18
  96:25 97:7,14
**East** 2:12 134:5
**easy** 13:5
**Eimers** 1:5,6 4:12
  4:13,20 6:1,13
  7:8 10:16 16:1
  17:9,22 19:7,18
  20:15,21 21:16
  21:23 22:13
  30:15 31:3 34:7
  38:23 44:11 49:2
  49:14 53:3 54:15
  61:10 65:24 67:6
  70:9 76:14 81:21
  82:1,6,12 83:4
  84:21 85:21
  90:16 92:21
  93:15 99:20
  101:7 107:5,24
  115:12 116:20,24
  117:10,16,22
  118:10,16,23
  119:4 120:4,7,23
  121:21 122:16,25
  124:20,20 125:3
  125:9,19 126:17
  126:23 127:6
  134:7 135:4
**either** 28:24 70:3
  75:8 86:18 94:19
  106:13 121:22
**elbow** 93:21
**eleven** 33:25 34:7
  103:1
**eliminated** 47:11
**employed** 5:16
**employee** 113:9
  133:14,15
**employees** 69:15
**EMS** 33:2 76:11,11
  76:19 77:21 78:3
**EMT** 78:10 79:13,15
  93:6

**encased** 39:5,6
**encountered** 117:18
**ended** 109:24
**enforcement** 5:19
  52:12 54:21,25
  76:6
**England** 59:13
**English-speaking**
  111:25
**ensure** 107:11
  109:5
**ENTER** 135:2
**entering** 76:11
**entire** 7:19 26:17
  74:15 121:4,10
  121:18
**entirely** 39:5,6
**equal** 113:9
**errata** 3:10 134:13
  135:1
**erratically** 115:18
**especially** 59:16
  80:5 82:24
**Esquire** 2:5,6,10
  2:14,19 134:4,22
  134:23,23,24,24
  134:25
**Estate** 1:5 4:12
**et** 1:10 4:14
  107:13 134:7
  135:4
**event** 15:16 24:6
  71:16 82:2 90:16
  92:2 98:10 99:13
  102:10 108:7
  113:6 114:14
  121:19 126:9,24
**event-involved**
  103:6
**events** 11:3,20
  14:20 16:16
  36:14 107:6
  124:17
**eventualities**
  101:1
**eventually** 51:1
  101:7
**Everybody** 47:6
**evidence** 33:19
  34:8 35:21 46:2
  47:16 58:12,17
  59:12,15 65:4
  72:20 80:7,16
  81:9 88:21 98:12
  107:12 108:25
  109:5,16,22,25
  110:3

**Ex** 1:24 4:1,15
  132:6,14 133:6
  133:22 134:17
**exactly** 21:22
**Examination** 1:22
  3:3 5:10
**examined** 5:8
**examiner** 99:3
**example** 32:20
  56:22
**exception** 4:23
**excessive** 92:8
**excessively** 92:2
**exerted** 113:12
**exerting** 99:22
**exhibit** 13:25,25
  14:2,3 15:22
  52:10,15 78:23
  78:25,25 79:1
  104:15,22
**exhibiting** 84:23
**exhibits** 3:14
  78:20
**exist** 59:16 81:15
**existed** 50:13
  112:16,17
**Expires** 132:16
**explanation** 58:7
  99:2,8 107:17
  126:7,16
**extra** 16:4
**eyes** 91:25 119:13
  119:19,22
**eyewitness** 91:25
**eyewitnesses** 67:5
  92:1,7

**F**

**F** 132:6,14
**F-ing** 49:1,6 96:8
**face** 18:14,16,16
  28:20 29:12,13
  29:15 37:23,25
  38:4,8,12,17
  39:6,13,15,18
  72:1 82:1 83:16
  83:22 84:5,16
  89:19 92:17
  94:25 95:8,8,13
  95:19 119:4,8,16
  119:17,18,20
  122:17,20,20
  123:1,2
**facing** 38:8 39:18
**fact** 23:13 33:25
  58:5 86:20 89:10
  116:25 117:8

**facts** 135:23
**factual** 22:2
**fair** 12:22
**fairly** 16:16
**fall** 8:20
**false** 24:20 43:16
  43:20 47:3 66:19
  76:20 77:22
  79:16 118:2,6,16
  119:8,23 120:18
  121:5 122:6
  124:24 126:24
**familiar** 60:12
  102:6
**family** 13:10
**far** 12:25 32:15
  107:6 116:11
**fatal** 90:17
**Fax** 2:4,13,18
**FDLE** 3:16,17 36:5
  36:13 46:25
  50:21 51:13
  52:18 53:7,17
  54:12 55:8 65:8
  79:24 80:2,7,15
  80:25 81:1,8
  109:23 113:2
**fearing** 87:19
**feet** 40:19,20
  125:4,9,10
**fellow** 13:16 50:2
**felt** 57:15 126:23
**FF015913** 132:15
**fiction** 72:23
**field** 69:20,24
  100:15,17
**Fifteen** 55:23
  65:23
**fight** 128:8
**File** 59:9
**filed** 88:11
**film** 23:2 31:13,15
  120:23
**filming** 10:15
**finally** 27:7 31:3
**financially** 133:16
**find** 35:12 59:15
  59:17 61:20,23
  72:3,23,24
**fine** 74:4
**finger** 86:21,24
  88:10,13,22 90:1
  94:7
**finish** 17:5 74:5
**first** 5:8 7:1,16
  13:23 14:5,8
  29:11 31:17

52:14,24 55:11
  58:24 71:3 79:5
  79:15,20 80:14
  91:1
**five** 58:15
**flesh** 89:15
**flexing** 23:18
**flipped** 29:11
**Florida** 1:1,9,19
  1:25 2:4,8,13,17
  4:2,3,9 52:11
  54:20,25 76:5
  132:3,7,8,15
  133:3,7,23 134:6
  134:19
**flowing** 96:25 97:6
  97:13
**focus** 15:16 113:23
**folks** 33:2
**follow-up** 120:15
**followed** 17:23
  84:21
**following** 18:9
  101:11 120:10
**follows** 5:9
**footage** 21:21 35:5
  35:12 47:12
  107:18
**force** 25:11 44:16
  83:5,12,18 85:12
  85:15,21 93:8,22
  97:2 99:23 100:4
  100:9,20 114:21
  123:25 124:6
**forced** 95:7
**forcibly** 121:14
**foregoing** 135:23
**forget** 9:1
**forgot** 128:22
**form** 9:16,22 10:1
  10:13,24 11:4,9
  12:4 14:13,23
  15:4,12,18 16:2
  16:12 17:7,18,24
  18:5,11 19:9,14
  19:20,25 20:8,17
  21:3,8,25 22:4,9
  22:14,21 23:3,7
  23:16,20 24:17
  24:21 25:1,14
  26:4,12,19,23
  27:22 28:5,11,16
  28:21 29:9,18,23
  30:7,12,18,24
  31:5,10,22 32:8
  32:12,17,23 33:4
  33:14,20 34:3,10

34:17,21 35:1,7
  35:14,22 36:2,8
  36:17,22 37:7,13
  37:20 38:2,5
  39:7,11,16,23
  40:15,21,25 41:6
  41:12,18,23 42:3
  42:8,24,25 43:13
  43:17,21,25 44:5
  44:18 45:2,6,10
  45:19,24 46:3,9
  46:14,20 47:4,13
  47:18 49:8,15,21
  50:10,17 51:2,7
  51:12 52:22 54:8
  55:1,10 56:2,9
  56:14 57:9,18,23
  58:3,8,14,20
  60:5,10,17 62:12
  63:3,9,14 64:21
  64:25 65:5,11
  66:9,14,20 67:2
  67:10,20,24
  68:10,25 69:25
  70:10,18 71:10
  72:13 73:5,17,22
  75:3 76:2,7,21
  77:5,10,18,24
  78:5 79:6,10,18
  79:25 80:10,13
  81:2,11,17,23
  82:3,8,14 83:1,7
  83:13,19,24 84:9
  84:18,25 85:17
  86:4,9,14 87:7
  87:11,21,25
  88:18,24 89:5,12
  89:16,22 90:3,7
  90:10,19,24 91:6
  91:14,18 92:4,24
  93:9,17,24 94:4
  94:8,14,20 95:3
  95:11,15,23 96:4
  96:10,14 97:4,16
  97:21 98:25 99:4
  99:9,16 100:1,6
  100:11,21 102:2
  102:12,18 103:9
  103:14 105:7,12
  105:16 106:7,14
  106:18 107:14,20
  109:3,18 110:1,8
  110:12 111:3,9
  111:18 112:3,19
  112:24 115:24
  117:3,4,19 118:3
  118:7,12,18

119:10,24 120:19
120:25 121:6,16
121:24 122:7,13
122:23 123:8,20
124:3,8,14,21,25
125:16,22 126:11
126:19 127:1,9
127:24 128:3,12
**Fort** 2:13 134:6
**forth** 104:8
**forwards** 70:17
**found** 7:20 98:22
98:23
**four** 8:4 63:21
**Fourteen** 61:22
**FPR** 1:24 132:14
133:22 134:17
**fractured** 99:20
**frame** 11:2 38:25
39:3 54:7 57:5
**frames** 21:24
**Francisco** 1:15 3:3
4:11 5:7,14
114:11 131:1
132:8 133:8
134:4 135:4,25
**fraud** 6:23
**free** 72:1
**fresh** 16:16
**front** 78:22
**full** 5:12
**further** 39:3
101:18 106:10
133:13
**future** 110:24

---
**G**
---

**G** 2:19
**Gabe** 49:20
**Galbo** 6:10 117:25
118:15 119:7,22
**Garrido** 18:21
25:18 61:8 62:20
62:25 65:19 66:2
86:12 88:8,22
93:13 94:13
103:17
**Garrido's** 19:2
68:5 88:10
**Gary** 2:16
**Gee** 48:9
**get-go** 10:17
**getting** 52:6 61:16
113:16
**Gill** 2:14 4:21,21
6:16 9:16,22
10:1,13,24 11:4

11:9 12:4,21
13:6,12 14:13,23
15:4,12,18 16:2
16:12 17:7,18,24
18:5,11 19:9,14
19:20,25 20:8,17
21:2,4,8 22:4,9
22:14,21 23:3,7
23:16,20 24:17
24:21 25:1,14
26:4,12,19,23
27:22 28:5,11,16
28:21 29:9,18,23
30:7,12,18,24
31:5,10,22 32:8
32:12,17,23 33:4
33:14,20 34:3,10
34:17,21 35:1,7
35:14,22 36:2,8
36:17,22 37:7,13
37:20 38:2,5
39:7,11,16,23
40:15,21,25 41:6
41:12,18,23 42:3
42:8,11,14,16,18
42:25 43:5,13,17
43:21,25 44:5,18
44:24 45:2,6,10
45:19,21,24 46:3
46:9,14,20 47:4
47:13,18 48:6
49:8,15,21 50:10
50:17 51:2,7,12
52:22 54:8 55:1
55:10 56:2,9,14
57:9,18,23 58:3
58:8,14,20,24
59:9,20,22 60:5
60:10,17 62:12
63:3,9,14 64:21
64:25 65:5,11
66:9,14,20 67:2
67:10,20,24
68:10,25 69:2,4
69:25 70:10,18
71:10 72:13 73:5
73:17,22 74:7,17
75:3 76:2,7,21
77:5,10,18,24
78:5,21 79:6,10
79:18,25 80:10
81:2,11,17,23
82:3,8,14 83:1,7
83:13,19,24 84:9
84:18,25 85:17
86:4,9,14 87:7
87:11,21,25

88:18,24 89:5,12
89:16,22 90:3,7
90:10,19,24 91:6
91:14,18 92:4,12
92:24 93:9,17,24
94:4,8,14,20
95:3,11,15,23
96:4,10,14 97:4
97:16,21 98:14
98:25 99:4,9,16
100:1,6,11,21
102:2,12,18
103:9,14 105:7
105:12,16 106:7
106:14,18 107:14
107:20 109:3,18
110:1,8,12 111:3
111:9,18 112:3
112:19,24 113:19
113:21,25 114:3
115:24 117:4,19
118:3,7,12,18
119:10,24 120:19
120:25 121:6,16
121:24 122:7,13
122:23 123:5,8
123:20 124:8,14
124:21,25 125:16
125:22 126:11,19
127:1,9,24 128:3
128:12,18 130:2
130:5,13,17
**GIRARD** 2:21,22
**girl** 86:13 90:2
94:12
**give** 87:19
**given** 14:16,17
31:18 54:24 67:6
67:18 71:14
109:15,21
**giving** 5:3 7:7
85:12 105:2
**glad** 52:1
**glanced** 13:18
**gloves** 23:14
**go** 13:15 20:3,5
22:24 23:11 33:3
40:9 52:5 55:11
59:6 74:20 115:2
121:21 128:20,21
130:4,12
**goal** 12:2,12
**goes** 44:21 48:11
**going** 6:16,21
10:18 13:24
14:17 15:2,6,10
16:5 48:10 57:4

59:22 69:9 74:17
74:18 92:22
104:8,17 114:7
128:22,23 130:5
130:6,25
**good** 5:12 8:14
117:10 131:4
**gotten** 22:19
**governed** 11:6
**grade** 51:8 53:13
**grand** 81:6,8,14
82:11
**grievances** 59:23
**ground** 25:13 41:16
93:22
**group** 2:7 62:9
115:22
**guess** 7:6 15:7
37:16 68:19 78:1
118:20
**guidelines** 85:20
**gun** 61:7 62:4
65:21
**guy** 61:7 62:4
90:11

---
**H**
---

**H** 134:25
**hand** 5:2 19:17,17
21:16,18 22:13
22:19 23:18
38:19 39:5 40:8
**handcuff** 16:25
17:6,11 25:19
40:7,18 86:8,21
86:23,24 88:10
91:19,21 93:15
120:24 121:13
**handcuffed** 26:9,15
26:18 27:3,4,7
27:11 28:8,9
84:7 128:10
**handcuffing** 19:7
85:23
**handcuffs** 40:13
41:3 82:24 83:5
83:11,17 84:16
89:4,10 95:1
120:13
**handle** 115:1
**handling** 56:18
80:16 117:17
**hands** 22:25 23:6
23:11,14 40:11
59:16 82:7 85:23
95:6 97:2,7,8
**handwritten** 79:15

hang 69:8
happen 45:14 49:12
  72:11 73:9 94:17
  97:10 99:18,25
  100:13 101:21,24
  108:23 118:11
  130:12
happened 15:9
  19:19 54:6 76:11
  76:12,24 87:14
  87:19,24 88:6
  96:13,22,23,24
  98:9 99:13
  100:14 103:20
happening 21:22
  26:3 27:3,8
  40:24 99:14
Happy 128:16
Hard 39:10
head 18:16 38:11
  38:12 49:6 84:22
  90:9 95:20 96:2
  96:3,9,22
heading 98:13
heads 8:20
health 117:10
hear 49:18 73:1
  82:17 86:12
heard 16:1 34:16
  50:14 58:24
  67:17 81:22
  94:11 112:12,13
  117:9
hearing 86:16,17
heart 37:19 92:22
heartbeat 30:17
  90:23 91:24
help 11:14 24:23
  51:24 63:24
  115:7,14 123:18
Henry 1:10 25:18
hgill@jambg.com
  2:14
Higgins 1:18 2:3
  4:9
higher-level
  108:20 113:9
highlighted 79:2
highlighting 14:1
hobble 41:5,8,14
  41:15,17,21 42:2
  43:12 44:4 83:10
  120:17 122:11,12
  124:20
hobbled 118:16,21
  120:5,8
Hochman 2:12 134:5

hold 38:22 75:7
holding 25:8
homeless 115:7,8
  115:14,20
Horan 1:18 2:3,5,6
  4:8,19,19 8:13
  48:4 78:15,17
  98:18 134:24,24
hospital 89:3
  98:22 99:2,7
hour 55:23 113:20
  113:22,23
hours 109:12
Hudson 2:14 4:21
Hudson's 48:4
hungry 113:16

I
ID 78:23,23
idea 50:1,4 57:20
  57:25 87:19 99:6
identified 64:8
  110:22 111:8
identifier 71:24
  72:4 74:12
identifying 71:14
  71:18 72:7
identity 112:22
ill 114:16,22
  115:15,19,21
illness 115:1
images 11:18
immediately 17:22
  29:1,4 101:12
impediment 16:19
implicate 15:10
implies 40:2
important 14:8
  70:21,24
improper 66:25
in-custody 36:11
  37:2 82:2
incident 6:2 7:17
  9:20 13:14 16:14
  37:5 49:13 53:1
  54:7,15 62:24
  88:16 101:2,3,4
  101:8,10,14
  102:14,16 103:21
  104:11,20 109:11
  115:12 116:7
  127:17
include 104:11
  106:9
includes 25:12
  52:12
including 4:22

28:3 47:2 61:13
  104:20 107:12
  119:19 120:8
incriminating 12:2
independent 128:7
  128:8
INDEX 3:1,14
indicate 28:1
  51:17 75:20,23
  76:5 82:23 87:5
  94:11
indicated 22:7
  25:7 27:19,20
  79:16
indicates 14:9
  40:3 56:23 61:19
indication 23:11
  56:7 97:9
individual 4:22
  73:12,15
individuals 114:25
information 24:19
  52:19,20,20
  54:14,18,23 64:4
  66:19 68:9 72:2
  102:7 112:8
  129:25 130:12
informed 81:8
  117:16
initiation 105:25
  106:6,9
injured 87:20
injuries 36:24
injury 37:3,11
  88:11,13,20
  90:17 97:13
inquiry 72:16
  103:22 105:25
  106:6,11
inside 49:14
inspecting 74:19
instance 15:1
  126:24
instances 16:19
instruct 6:16
instructions 82:23
insult 12:12
intended 16:9
intent 69:23
intention 12:18
intentionally
  66:19
interest 50:25
interested 14:6
  133:17
interesting 95:20
interfering 59:4

interrogatory
  44:10
interview 34:1
interviewed 105:5
intrigued 36:5
investigate 51:11
investigated 51:13
  63:1 66:24 75:21
investigating
  35:16 62:24
investigation 24:7
  36:7 37:2 47:3
  50:18 51:6,18
  53:17 67:19,23
  79:21 88:16
  90:13 97:19 98:5
  98:6 99:13 102:6
  103:22,24 105:10
  105:15,23 106:10
investigative
  52:11,18
investigator 72:9
investigators
  80:15
involved 6:1,17
  15:1,15 36:6
  54:15 59:5 68:22
  79:21 101:9
  102:10,14,16,21
  102:24 103:12
  106:21 107:7
  108:11,19 115:11
  116:6
involvement 53:16
  53:18
involving 37:5
issue 7:3,6 8:5
  9:9 75:10 108:6
  116:20
issues 11:15 12:15
issuing 75:15
Items 54:19

J
J 2:10 134:23
jail 91:21
Jeannette 134:23
Jeff 53:12 54:13
job 12:13 24:3
  53:20 72:23,25
  134:8
Johnson 2:12 134:5
Join 9:17,23 10:2
  10:14,25 11:5,10
  12:7,24 13:7,13
  14:24 15:5,13,19
  17:8,19,25 18:6

18:13 19:10,15
19:22 20:1,9,18
21:4,9 22:5,11
22:15,22 23:5,8
23:17,24 24:22
25:2,16 26:5,13
26:20,24 27:23
28:6,12,17,22
29:10,19,24 30:9
30:13,19,25 31:6
31:12,23 32:9,13
32:18,24 33:6,15
33:21 34:4,12,19
35:2,4,8,15,23
36:3,9,18,23
37:8,14,21 38:6
39:8,12,17,24
40:16,22 41:1,7
41:13,19,24 42:4
42:10 43:14,18
43:22 44:1,7,19
45:4,7,11,20,25
46:4,10,15,21
47:5,14,19 49:9
49:16,22 51:3
54:9 56:10,15
57:10,19,24 58:4
58:9,21 60:6,11
60:18,22 62:13
63:4,10,15 64:22
65:1,6 66:10,15
66:21 67:3,11,25
68:12 69:2 70:1
70:11,19 71:11
72:14 73:6,18,23
75:4 76:3,8,22
77:6,11,19,25
78:6 79:7,11,19
80:1,11 81:3,12
81:18,24 82:4,9
82:15 83:2,8,14
83:20,25 84:10
84:19 85:1,18
86:5,10,15 87:8
87:12,22 88:1,19
88:25 89:6,13,17
89:23 90:4,20,25
91:7,17 92:5,13
92:25 93:10,18
93:25 94:5,9,15
94:21 95:4,12,16
95:25 96:5,11,15
97:5,17,22 98:15
99:1,5,10,17
100:2,7,12,22
102:3 103:10,15
105:8,13,18

106:19 107:15,21
109:19 110:2,9
110:13 111:4,10
111:19 112:4,20
112:25 115:25
117:6,20 118:4,8
118:13,19 119:11
119:25 120:20
121:1,7,17,25
122:8,14,24
123:9,21 124:9
124:22 125:1,17
125:23 126:12,20
127:2,10,25
128:4,13
**Jr** 134:25
**July** 132:16
**jump** 40:12
**jury** 42:21 48:10
54:5 81:6,9,14
82:11 104:17

### K

**Kathy** 53:10 80:15
**Key** 1:2,9,10,19
2:4,21,22 4:9,13
4:21 5:15,16
50:24 51:5,10,14
51:17,21 52:18
52:20 53:25
54:21 55:7 56:17
65:9 67:12 69:15
75:20,23 76:25
79:22 80:2,23
92:2 98:6 134:7
135:4
**kicking** 17:9 27:6
40:19 41:2,4,25
91:10
**kid** 129:5
**killed** 49:20
**kind** 78:3 93:3
**kinds** 14:5 99:7
**knee** 19:23 20:2
25:9,12,20 26:8
26:25 27:4 38:10
40:12 95:18
100:8
**kneeing** 99:23
100:3
**knees** 100:4
**knelt** 77:16
**knew** 15:15 93:5,6
116:23
**know** 6:25 8:18
11:23 12:3,5
13:9,10 19:12

20:14,21 21:1
23:1 24:5 26:7
29:4 32:20 35:18
35:19 37:22,22
37:23 38:11,25
43:15 45:5,9,15
46:7 49:12,24
50:2,12 51:22,24
52:3 54:20,23
55:3,5,7,15
57:17,21 59:14
62:3 64:3,19
66:2 67:12,14
68:4 70:7,17
71:18 72:11,16
72:23 74:4,13,14
75:6 77:7,9
80:15 81:5,8
82:16,23 86:22
87:23 88:9 92:18
94:10 98:16
100:14 105:2
107:23 109:21
112:9 113:2
114:1,4 115:4,11
116:2,3,14,16,23
123:15 124:20
128:23 129:14,20
**knowing** 50:25
65:18
**knowledge** 22:17
31:1 36:1 56:12
68:4,22 75:19
80:9,20 90:5,14
90:14 94:18
107:9 110:16
111:20
**KW-730628** 54:19
**KWPD** 53:12 54:13
54:14,18 77:21

### L

**lacerated** 89:4
**lacerates** 94:2
**laid** 18:9,14,16
49:1 77:17 84:22
**language** 60:4
63:12 70:7
**large** 4:3 95:8
99:22
**late** 9:11 68:16
**later-discovered**
9:6
**latest** 17:13
**Lauderdale** 2:13
134:6
**law** 1:18 2:7 4:8

5:19 52:12 54:21
54:25 76:6
**lawyer** 104:8
**lawyers** 14:7 15:8
59:5 112:9
**lay** 23:19
**learn** 26:10 55:13
**leave** 20:5 23:2
33:2 40:12 108:7
**leaving** 61:19 62:1
**Lee** 2:16
**leeway** 69:22
**left** 23:11,18 25:9
33:8,10,12,19
45:17,23 46:2
61:15,17 63:1
65:19 72:17
77:13,22 84:21
90:12 93:14
126:17
**leg** 123:14
**Legal** 2:21 4:16
131:3 134:8,18
**legally** 111:13
**legitimate** 35:25
**legs** 17:9 41:5,16
86:6 91:11 95:9
95:21 118:16
120:7,16 122:6
123:14,24,25
124:6
**lesseer** 101:6
**lesser** 101:1
**let's** 59:25 69:6
72:8 98:9 100:24
102:8 104:14
110:4 113:17
**lethal** 101:2,2,4
101:10
**letter** 3:9 113:5
134:1
**letters** 71:15
**level** 15:16 101:19
113:9
**levels** 114:21
**Lewis** 134:23
**life-threatening**
31:21
**lift** 9:5 10:6
27:12 29:2
123:24,25 124:5
**lifted** 9:4 10:7,10
28:4,10 41:10,14
41:16 42:5,22
43:6 118:25
121:4,9,22 122:1
123:13

**lifting** 7:8 9:18
  9:20 29:6,15
  122:3
**light** 7:17 116:24
  117:17
**limit** 52:1
**limited** 104:11
**line** 55:16 98:13
  135:7
**lines** 56:22
**listen** 48:16 50:16
**listened** 50:6,8
**literally** 40:3
  98:2
**little** 11:24 27:20
  55:13 69:5 86:22
**LLC** 2:7
**LLP** 1:18 2:3
**located** 71:19
**location** 16:1
**long** 5:17 24:5
  31:16,20 48:14
  57:15 65:18,19
  71:24
**longer** 116:19
**look** 9:8,12 31:13
  31:16 41:20 43:2
  52:14 58:25
  59:25 60:23,25
  63:6 71:15,20
  72:1,3 74:5,9
  96:6 123:15
**looked** 9:10 24:24
  31:15 35:12 84:5
  116:6 125:9
**looking** 23:10 38:8
  38:15,17 52:2,24
  56:21 61:1 62:2
  63:18 74:13
  95:19 110:19
  112:8 122:25
**looks** 11:12 63:21
**lose** 30:15
**lost** 84:15 118:1
**lot** 10:18 47:22
  98:12
**Lovette** 2:16 4:23
  4:25 19:12 20:3
  20:5,15,23 21:16
  21:17,22 22:18
  22:24 32:20 33:1
  34:9 38:23 39:21
  39:21 40:3,6
  44:11 46:17
  48:22 49:19 61:6
  62:18,25 65:19
  66:2,12 68:18

  72:9,17,21 75:1
  75:21 81:15,21
  95:21 96:6,8
  97:1,7 103:17
  105:5 128:9
**Lovette's** 6:11
  22:13 34:15 47:9
  48:17 54:6 57:2
  68:5 96:2 107:18
**lower** 113:9,11
**lowlife** 12:18
**lunch** 113:17 114:8
**Lyman** 134:25

**M**

**M** 2:6 134:24
**M36** 57:1,2
**ma'am** 48:14
**maintained** 54:19
**making** 8:19 69:19
**man** 10:21 36:6
  41:21 49:20 51:1
  65:21 89:19 90:9
  93:7 100:17
**man's** 51:11,18
  59:2 99:23
  100:10
**mandated** 115:16
**mandatory** 114:13
**manner** 126:2
**mark** 13:24
**marked** 14:2 52:15
  78:13 79:1
**Martin** 2:21 4:15
**master** 131:2
**matter** 9:13 23:13
  33:25 58:5 80:16
  86:20 117:8
**MB** 57:1
**McKee** 2:7,10 3:3
  4:19,19 5:11
  6:20,24 8:14,15
  9:24 12:5,8,9,22
  12:25 13:8,22
  20:25 22:1 23:21
  26:21 33:16
  36:19 38:3,19
  40:1,23 42:12,17
  42:20 43:1,23
  45:22 47:22 48:3
  48:9,13,15 55:2
  56:3 58:23 59:1
  59:10,21,23,24
  63:16 69:6,14
  72:15 74:8 78:7
  78:12,16,19,23
  79:8 85:19 87:9

  88:2 89:7 91:15
  92:14 94:16,22
  96:16 98:16,19
  98:20 105:14
  113:15,20,22
  114:1,4,12 116:1
  118:5 123:6,22
  127:3 128:1,15
  128:21 129:1
  130:3,8,10,16,19
  130:23 134:23
**mean** 21:20 25:11
  39:6 47:9 55:17
  62:4 70:7 73:10
  74:24 78:21
  82:22 87:13
  100:3 108:8
  113:25 123:15
  130:5,7,14
**meaning** 85:3 90:16
  91:4 94:12 104:4
**means** 24:2 34:20
  38:11 60:1 98:16
  105:10
**mechanism** 73:2
**media** 131:2
**medical** 37:15,18
  91:1 99:3 104:11
  104:20,25 108:11
**Medina** 6:10 121:3
  122:5
**meet** 37:9
**meetings** 80:21
**member** 101:9
  102:16,24 103:6
  103:12 106:21
  107:7,11
**members** 101:23
  102:10,14,21
  104:2
**memory** 31:15
**men** 99:22
**mental** 114:25
  117:10
**mentally** 114:15,22
  115:15,19,21
**mentioned** 102:19
  115:14
**met** 53:12 54:12
**method** 123:17
**Miami** 131:4 134:19
**Michael** 134:4
**mind** 16:16 60:24
  91:2 127:19
**minus** 98:2
**minute** 79:4
**minutes** 31:8,20

  65:23 109:11,12
  109:13,13 113:17
**mislead** 102:9
**missing** 27:21
  35:18 57:17 58:6
  58:19 59:11
  64:19 81:9
  107:18
**moment** 34:24,24
  40:4 47:11 99:19
**monitoring** 30:16
  30:23
**MONROE** 132:4 133:4
**months** 57:3
**morning** 5:12 34:1
  34:7 56:7 61:1
  62:16 63:7 66:5
  68:6 75:1
**mortgage** 129:5
**motion** 30:15 59:9
  59:10
**motorcycle** 111:24
**mouth** 12:17 91:24
  119:19,23
**move** 7:8 12:21
  13:6,12 20:3
  40:9 59:20 92:12
  98:14
**moving** 27:13 28:7
  28:15,19 29:3
  30:20 31:3,17
  41:9,22 43:4,6,7
  91:10
**multiple** 70:15
  99:20 100:17
**Municipality** 1:9
**Murdoch** 2:12 134:5

**N**

**nail** 10:17
**NAJA** 2:21
**name** 5:13 92:10
  101:23 110:23
  112:12,22
**names** 102:17,20,22
  102:25 103:3,8
**near** 22:18 120:7
**necessary** 108:10
  108:10 110:24
**neck** 19:18 21:16
  21:19,23 22:18
  39:22 81:21 92:1
  92:17 105:6
**need** 8:23 47:23
  54:6 72:2 78:24
  101:17,18
**needed** 66:7 129:17

**needs** 13:10
**negative** 93:15
**neither** 103:17
**net** 129:2,7
**never** 12:18 38:1
   43:12 44:12,22
   45:8,12,16 50:15
   66:7,12,24 72:16
   85:15 87:24 91:5
   92:17 98:3
   105:15 118:14,16
   119:2,8 120:17
   122:2,5 123:7
   124:2,4,11 125:3
   125:11,12
**new** 8:10 52:5 92:9
**newer** 8:7
**NEWSPAPER** 2:21,22
**night** 58:25
**nine** 48:10
**nodding** 8:20
**non** 101:1,3,9
**non-Latino** 111:25
   112:14
**non-Latino's** 112:1
   112:5
**non-lethal** 101:8
**normally** 36:7
**North** 5:14
**nose** 91:24 119:15
   119:19,23
**Notary** 4:2 132:7
   132:15
**note** 75:15 111:13
**notes** 78:10 79:15
**notice** 17:16 23:2
   23:6 31:2 41:4
   88:20 95:22 96:3
**noticed** 27:12 96:6
**notification**
   101:18 134:1
**notified** 46:11
   109:7
**notifying** 101:12
**November** 1:17 4:7
   5:23 52:25 54:12
   55:12 75:2
   116:23 132:9,11
   133:19 134:8
   135:5
**number** 4:11 54:22
   54:22 56:24 57:2
   60:8 61:21 71:8
   71:14,18 72:7
**numbered** 60:23
   63:20
**numbers** 57:3 71:14

o
**O** 48 56:24
**oath** 3:8 11:18
   16:7 43:20 44:4
   47:2,10 49:18
   67:17 68:21
   117:25 118:15
   119:7 120:10
   132:1
**obeying** 77:16
**object** 9:16,22
   10:1,13,24 11:4
   11:9 12:4 14:13
   14:23 15:4,12,18
   16:2,12 17:7,18
   17:24 18:5,11
   19:9,14,20,25
   20:8,17,24 21:2
   21:8 22:4,9,14
   22:21 23:3,7,16
   23:20 24:17,21
   25:1,14 26:4,12
   26:19,23 27:22
   28:5,11,16,21
   29:9,18,23 30:7
   30:12,18,24 31:5
   31:10,22 32:8,12
   32:17,23 33:4,14
   33:20 34:3,10,17
   34:21 35:1,7,14
   35:22 36:2,8,17
   36:22 37:7,13,20
   38:2,5 39:7,11
   39:16,23 40:15
   40:21,25 41:6,12
   41:18,23 42:3,8
   42:25 43:5,13,17
   43:21,25 44:5,18
   44:24 45:2,6,10
   45:19,24 46:3,9
   46:14,20 47:4,13
   47:18 49:8,15,21
   50:10,17 51:2,7
   51:12 52:22 54:8
   55:1,10 56:2,9
   56:14 57:9,18,23
   58:3,8,14 60:5
   60:10,17 62:12
   63:3,9,14 64:21
   64:25 65:5,11
   66:9,14,20 67:2
   67:10,20,24
   68:10,25 69:25
   70:18 71:10
   72:13 73:5,17,22
   74:17,18 75:3
   76:2,7,21 77:5

77:10,18,24 78:5
79:6,10,25 80:10
81:2,11,17,23
82:3,8,14 83:1,7
83:13,19,24 84:9
84:18,25 85:17
86:4,9,14 87:7
87:11,21,25
88:18,24 89:5,12
89:16,22 90:3,7
90:10,19,24
91:14,18 92:4,24
93:9,17,24 94:4
94:8,14,20 95:3
95:11,15,23 96:4
96:10,14 97:4,16
97:21 98:25 99:4
99:9,16 100:1,6
100:11,21 102:2
102:12,18 103:9
103:14 105:7,12
105:16 106:7,14
106:18 107:14,20
109:3,18 110:1,8
110:12 111:3,9
111:18 112:3,19
112:24 115:24
117:4,19 118:3,7
118:12,18 119:10
119:24 120:19,25
121:6,16,24
122:7,13,23
123:5,8,20 124:8
124:14,21,25
125:16,22 126:11
126:19 127:1,9
127:24 128:3,12
**objection** 12:8
   21:3 42:24 43:3
   48:5 58:20 60:22
   69:1 70:10 72:12
   79:18 80:13 91:6
   117:3 124:3
**objections** 47:24
   130:13
**observation** 19:7
**observations** 20:15
**obtain** 54:13
   106:22
**obtained** 10:21
   107:8 111:13,16
   112:23
**occur** 27:17 97:20
   116:18
**occurred** 36:14
   47:3 83:4 88:15
   88:22 90:13

101:14 110:11
**occurring** 11:3
   19:8 87:6 99:14
   107:3
**occurs** 62:11
**odd** 117:1
**offensive** 59:8,15
   59:17
**offered** 124:13
**offhand** 129:15
**office** 1:18 5:13
   134:10,13
**officer** 1:10 4:11
   4:23,24 6:11
   9:19 11:22 12:2
   14:12 18:21 19:2
   19:6,12,18 20:2
   20:5,15,22 21:15
   21:17,21 22:12
   22:24 23:25 24:9
   24:12 25:23 29:6
   31:25 32:11,20
   33:1 34:9,15
   35:16,17 38:23
   39:21 40:6 43:8
   44:8 45:1 46:7
   46:17 47:7,9
   48:16,22 49:18
   50:3,8,15 54:6
   56:5,8,12,23,24
   57:2 60:16 62:25
   65:25 66:2,12,18
   67:18 71:13 72:9
   73:2,20 75:17,21
   76:25 77:3 78:2
   81:20 85:22
   86:12 87:4,13,15
   87:18 88:5 90:1
   91:25 92:9,16,17
   93:13 97:7 100:9
   100:18 105:4
   106:24 107:23
   108:6,8,19 109:8
   111:16,24 113:6
   113:8 114:11
   116:25 117:17,25
   118:15 119:7,22
   120:2 121:3,3
   122:5,16 123:13
   124:16 125:7
   126:14,16 128:9
   131:1
**officer's** 75:25
   99:15
**officers** 4:22 6:1
   8:6 9:3,4,13
   12:16 13:16 15:2

15:15 16:22
18:25 20:5 24:5
24:13 27:1 29:7
32:1 37:2,25
41:10,16,21 43:9
43:11 44:22
50:25 54:14
59:17 61:10
68:21,22 69:20
69:23 70:3,4
71:7 76:10,19
79:9,14,17 80:5
80:9 82:12 84:22
86:2 90:17 91:16
92:8 93:5,7 95:1
95:8 97:3,10,10
97:15 105:2
107:7 108:11,15
112:16 114:25
115:2,5,11,16,17
115:23 116:6,22
117:15 118:23
123:18 124:6
125:7,8,8,20
126:1,4,7,16
127:22
**Offices** 4:8
**Oftentimes** 70:24
**oh** 9:13 91:9,23
98:19 128:21
**okay** 5:16 7:3,16
8:5,22,24 9:2
10:17 11:7,25
12:1,13,15,19,20
12:23 13:5,10,11
13:19 14:1,5,16
15:1,21 16:4,9
17:10,21 18:9,21
19:12 20:4 21:14
21:20 22:12,17
22:24 24:2,9
25:7 26:8,16
27:11 29:21
30:15 31:16 33:1
36:5 39:5,10,20
40:1 43:11 47:25
48:7 51:23 52:13
52:14 53:16,20
54:23 55:13 56:6
57:4 61:8,23
62:8,15 63:25
64:1,2,3,8 71:24
73:8,20 74:22
75:6,9,13 78:24
80:18 84:14 87:4
92:7 93:12 94:25
96:22 100:9

101:2,11,17
107:6,17 111:24
113:19,21 115:3
115:9 119:3
121:10 130:16
**old** 52:4
**older** 99:23 100:9
**once** 7:22 27:11
**ones** 7:14,15 107:2
**oo0oo** 2:23
**operation** 54:3
101:14
**opponent** 59:13
**opposed** 74:14
129:22
**oral** 8:24
**order** 15:22 42:16
42:18 64:13
66:17 75:13,17
75:19 127:7
**ordered** 14:9,10
15:3,7,11 104:7
126:8 128:19
130:18
**ordering** 14:21
**orders** 17:23 18:10
77:16 84:21
**ordinary** 15:9 92:2
**original** 55:8
**originally** 76:1
**originals** 54:24
**overcome** 6:22
**owe** 129:5

_____

**P**

**P.A** 2:12 134:5
**p.m** 1:17 114:7,10
130:25
**P48** 56:23
**pack** 72:22 73:3,15
74:10,10
**page** 3:1,14,17
52:24 55:11,11
55:16 57:7 59:25
60:23 63:6,18,19
63:19,20,22,23
78:25 135:2,7
**pages** 63:21 133:9
**pain** 94:25
**painful** 89:11,15
**Palm** 2:8,17
**paper** 7:15 99:21
**paragraph** 14:5,8
52:24 54:11
**paraphrasing** 117:1
117:1
**part** 14:11 27:21

35:19 48:16 59:6
64:19 70:21
104:9 114:14
**participant** 81:5
**participate** 80:7
**participated** 80:18
**participation** 6:23
**particular** 9:8
53:16 55:14
71:13 101:14
**parties** 133:14,15
**parts** 48:21
**party** 80:24
**pass** 42:5
**passed** 31:2 42:2
42:22
**passive** 84:23
**passively** 85:3
**patient** 77:21
**patrol** 118:24
**Paul** 2:5 8:13
98:18 134:24
**pause** 47:23
**pay** 51:8 53:13
129:4
**penalties** 135:22
**pending** 52:17
**pension** 129:10
**people** 91:21
110:18
**perceive** 10:18
**perfect** 13:14
111:5
**period** 28:1 40:14
**perjury** 59:11
135:22
**Permission** 128:20
**person** 25:20 35:16
35:19 37:12 54:2
54:5 68:22 75:6
108:21 112:22
**personal** 1:5 4:12
20:14 80:20
**personally** 54:2
132:8
**persons** 62:9
115:21
**perspective** 22:3
125:11
**phone** 67:13 112:1
112:14
**photo** 38:19
**photographed**
107:24
**photographs** 89:2
**photos** 89:8
**physical** 98:22

107:11 117:10
**physiologic** 95:10
100:19
**physiological** 93:2
**physiologically**
99:25 124:5
**picture** 82:6
**piece** 57:22
**pieces** 127:4
**pile** 20:4
**pin** 25:12
**Piper** 2:12 134:5
**place** 20:3 40:9
54:20 81:21
**placed** 29:4 95:18
100:8
**placing** 25:8
**plain** 52:5 70:7
**Plaintiff** 1:7 2:2
3:14 4:13
**Plaintiff's** 14:2
52:15 79:1
**plausible** 126:22
**play** 59:4
**played** 48:21
**pleadings** 59:11,14
**please** 4:16 38:19
48:2 69:8 104:17
**PLLC** 2:16
**Plus** 113:23
**point** 8:14 9:1
20:12 25:5 28:8
66:24 84:14
119:2 120:23
121:8 123:13
**pointing** 71:25
**police** 1:10 5:15
5:17 11:22 12:16
14:12,20 17:23
18:10 33:8 35:17
36:1 37:2,12
50:20,22,24 51:5
51:10,15,18,21
52:19,21 53:25
54:21 55:7 56:17
56:23 59:16 65:8
65:9 66:18 67:12
67:22 69:15 71:6
72:24 75:21,24
76:25 77:3 78:2
79:22 80:2,19,23
81:10 82:7 84:22
92:9 93:8 95:8
98:6 100:18
**policies** 66:22
**policy** 24:5 44:15
100:25 114:15

position 21:15
  26:9 30:16 39:15
  44:13 82:25
  83:11 117:23
  118:1,11,14
  119:1 123:23
  125:5
possession 58:18
  65:9 80:25
possibility 72:20
possible 111:14
possibly 105:19,22
post 45:18
potential 93:7
  129:21
potentially 90:17
precludes 75:17
prepare 13:17
  108:3
prepared 134:10
preparing 104:10
present 2:20 7:1
  19:2 90:1 111:21
preserve 109:16,22
preserved 107:12
  109:1,6,25 110:3
preserving 110:6
pressing 19:17
pressure 25:20
  40:19
pretty 129:7,7
prior 7:11 20:10
  30:15 50:12 62:9
  63:1 66:5,13
  99:13 114:14
privilege 6:19,22
probably 35:20
  62:3 129:5,7,7
problem 26:10
  37:15,18
proceeding 134:10
proceedings 3:1
  81:6 82:17
proceeds 53:12
produce 129:19,25
  130:6,11
produced 57:15
  58:5,16,16 59:7
  64:20 65:3
  123:13
product 104:6,10
Professional 1:25
  4:2 132:7 133:7
  133:23
prolong 114:5
prompt 106:5
promptly 105:25

prone 18:16 26:9
  30:16 82:24
  83:11 93:3,13
  123:23 128:10
prosecute 59:5
provided 71:7
  104:12,20 105:1
  134:10
public 4:2 73:12
  132:7,15
pull 38:20
pulled 17:17
pulling 86:7
pulls 93:21
punitive 129:22
purpose 4:10 31:13
  102:17
purposes 101:24
pushed 82:2
put 9:19 13:25
  16:25 17:6,17
  26:8,25 38:7
  39:21 40:1,12
  41:5,8,14,15,16
  41:21 42:2 60:4
  62:10 89:10,21
  91:3,25 117:22
  118:1,11,14
  121:14 123:25
  126:8,8
puts 93:14 94:2
putting 23:14 62:5
  95:1 99:24 100:4
  100:4

Q

quartermaster
  75:14
quartermasters
  75:8,12
question 9:16,22
  10:1,13,24 11:4
  11:9 12:4,5
  14:13,23 15:4,12
  15:18 16:2,12
  17:5,7,18,24
  18:5,11 19:9,14
  19:20,25 20:8,17
  21:8 22:4,9,14
  22:21 23:3,7,16
  23:20 24:17,21
  25:1,14 26:4,12
  26:19,23 27:2,22
  28:5,11,16,21
  29:9,16,18,23
  30:7,12,18,22,24
  31:5,10,22 32:8

32:12,17,23 33:4
  33:14,20 34:3,10
  34:17,21 35:1,7
  35:14,22 36:2,8
  36:17,22 37:7,13
  37:20 38:5 39:7
  39:11,16,23
  40:15,21,25 41:6
  41:12,18,23 42:3
  42:8,11,14,17,18
  42:25 43:13,17
  43:21,25 44:5,18
  45:2,6,10,19,24
  46:3,9,14,20
  47:4,13,18 48:7
  49:8,15,21 50:10
  50:17 51:2,7,12
  51:14 52:17,22
  54:8 55:1,10,12
  56:2,9,14 57:9
  57:18,23 58:3,8
  58:14,20 60:5,10
  60:17 62:12 63:3
  63:9,14 64:5,25
  65:5,11 66:9,14
  66:20 67:2,10,20
  67:24 68:10
  69:25 70:10,18
  71:10 72:13 73:5
  73:17,22 74:3,6
  74:18 75:3 76:2
  76:7,21 77:5,10
  77:18,24 78:5
  79:3,6,10,18,25
  80:4,10 81:2,11
  81:17,23 82:3,8
  82:14 83:1,7,13
  83:19,22,24 84:2
  84:4,9,18,25
  85:17 86:4,9,14
  87:7,11,21,25
  88:18,24 89:5,12
  89:16,22 90:3,7
  90:10,19,24 91:6
  91:14,18 92:4,24
  93:9,17,24 94:4
  94:8,14,20 95:3
  95:11,15,23 96:4
  96:10,14 97:4,16
  97:21 98:25 99:4
  99:9,16 100:1,6
  100:11,21 102:2
  102:12,13,18
  103:9,14 104:18
  105:7,12,16
  106:7,14,18
  107:14,20 109:3

109:18 110:1,8
  110:12 111:3,9
  111:18 112:3,19
  112:24 115:24
  117:4,19 118:3,7
  118:12,18 119:10
  119:24 120:11,15
  120:19,25 121:6
  121:16,24 122:7
  122:13,23 123:8
  123:20 124:8,14
  124:21,25 125:16
  125:22 126:11,13
  126:19 127:1,9
  127:24 128:3,12
  130:16

questioning 98:11
questions 11:24
  12:18 16:5 48:21
  52:2 98:13
  128:15,17,18
  130:17
quickly 36:13
quote 52:25 77:21
  122:10,19 124:19
quote/unquote
  20:20
quoting 27:11
  104:7,7

R

radio 64:14 65:13
  66:18,25 116:25
  117:9,12
radioed 62:11
radios 46:5
raise 5:1
raised 84:22
ran 77:22
rank 53:14
ranking 113:9,11
re-say 75:22
reacting 20:21
reaction 21:6
read 3:9 6:4 19:4
  32:5 70:6 79:3
  99:21 128:19
  130:18 135:22
reading 56:17
really 32:10 40:24
  72:20 88:15
reason 22:2,2 62:5
  63:20 76:25 78:2
  87:4,10,18 89:19
  90:22 92:10
  115:22 126:22,23
  127:5 135:7

recall 6:12,15 7:4
  16:19 61:2
  117:15 124:19
  125:8
recalling 11:19
recap 116:7
receive 108:10
  114:13 115:23
received 59:2
  112:8 114:20
  115:9 116:8
  124:11
recently-produced
  125:14
recess 69:11 114:8
recognized 98:10
recollection 11:15
record 3:16 4:6,17
  8:19 13:1 48:4
  48:17 59:1 62:9
  69:7,10,13 75:5
  75:7 114:7,11
  128:20 130:6,19
  130:25 133:11
recorded 49:25
  70:4 71:9 82:12
recorder 34:20,23
recording 55:25
  56:4 68:17 72:21
  82:13 112:23
  130:20,23
recordings 54:7
  81:15
records 35:18
  52:13
reduce 123:18
  124:7
refer 75:11
referenced 116:8
  116:11
reflect 15:25
refresh 11:14
  31:15
regard 14:8 114:25
regarding 37:2
  54:15 108:6
  115:17
regardless 42:21
  95:14,17
regularly 104:9
regularly-requ...
  104:6
regulation 66:17
regulations 111:1
related 27:2 54:19
relating 114:14
relative 133:13,15

released 108:12,15
relieved 108:19
remain 108:9,11
  131:3
remember 18:19
  21:17,18 25:18
  25:25 48:22,25
  49:2,4,20 52:9
  61:15 74:10
  86:16,17,22
  117:2,7,11
  122:25
repeat 126:13
repeatedly 67:7
repetitiously 8:1
replace 74:1 97:1
replacement 73:15
  75:14,18
replacing 40:3,6
report 3:16,16,17
  9:19 13:18,19,20
  14:4,9,10,17
  15:2,6,21,25
  16:21 24:19 25:7
  29:2 32:5,11
  38:7 40:2 52:11
  52:18 55:12 56:7
  57:6 60:3,4,15
  60:24,25 64:3
  70:3,6 78:3
  79:13,20 87:5
  88:11,17 99:3
  104:10,15,19,22
  104:23 105:19,21
  105:23 108:4
  126:24 133:8
report's 15:10
reported 77:21
  111:25 116:25
reporter 1:24,25
  3:9 4:2,2,7,14
  5:1 47:23 48:1
  132:6,7 133:1,6
  133:7,23
Reporter-Master
  133:23
reporting 14:20
  24:9,11 97:19
  101:24 102:17
reports 14:15,22
  16:6 24:12,24
  32:1 126:8 127:7
represent 52:13
Representative 1:5
  4:12
reprimand 113:5
request 72:16

134:12
requested 57:14,16
  130:1 133:10
required 5:23
  14:11,20 97:19
  104:10 106:11
  109:1 114:24
requirement 98:7
  108:13
requirements 101:3
  129:21,23
requires 75:13
  100:25 106:5
  108:9,18
rescue 58:6 105:3
resist 35:5 115:1
  120:23
resistance 37:6,10
  84:23 85:9,12
  86:3 88:23 90:18
  91:12,22 93:8
  97:10,11,15 98:7
  98:10 99:15
  100:25 101:10
  103:7 108:4
  114:15
resistant 123:19
resisting 16:23
  20:20 21:6 30:21
  85:3,6,25 91:5,8
  121:2,4,8,13,18
resources 108:25
  109:16,21
respect 12:16
respectfully
  134:12
respond 65:14
  84:15
response 37:5,9
  90:18 91:4,12,22
  93:2,15 95:10
  97:11,15 98:7,10
  99:15 100:19,20
  100:25 101:10
  103:7 108:3
  114:15 128:23
responsibilities
  24:3 109:2
responsible 24:4
  101:10
restaurant 38:9
restraint 30:17
  93:3 120:13
result 90:17
retained 55:8
return 65:24
  134:13

returned 66:3,8,12
review 7:16 24:12
  61:18 79:2,4
  106:9 133:9
  134:10,13
reviewed 7:11,14
  9:11 13:15
reviewing 127:18
Reynolds 2:16
  134:25
ribs 98:18 99:3,8
  99:12,14,20,23
  100:5,8,10,18
right 5:1 8:16
  9:19 10:17 13:23
  15:15 16:25 17:6
  17:17,17 18:19
  19:17,23 21:16
  21:18 22:8,13,13
  22:18,19 23:10
  23:14 25:9,9,12
  28:8,15 29:2,22
  33:17,19 34:2,6
  34:20,25 35:6
  37:3,6 38:10,11
  39:14,22 40:4
  43:9,20 47:12,21
  48:8,19 49:4,7
  50:20 53:1,5,8
  53:10 54:7 55:23
  56:18 57:1,4
  58:1 62:11 63:22
  64:17,24 66:8,13
  67:1 68:15,18,24
  72:11 73:13
  76:15 77:2,9,17
  77:23 78:4 79:23
  80:21 82:25 83:6
  83:23 84:5,7,17
  85:10 86:8,18
  87:6,20 88:3,8
  88:11,17,23,23
  89:3,4,4,20,21
  93:3,8,16,20
  94:3,7,12,23
  95:2,18 97:11,15
  97:20 100:15,20
  101:15 102:1
  103:12,13,18
  104:15 105:11
  106:6,11,17,25
  107:3 110:11,16
  110:20,24 111:2
  111:8,14,17
  112:6 113:25
  114:9 117:13
  118:21 119:17,19

120:8 121:11,11
121:12,14 122:6
123:7 124:20
126:1 129:8,15
130:8,21
**right-hand** 120:24
121:13
**rmckee@themcke...**
2:9
**road** 107:4
**Robert** 2:10 4:19
134:23
**ROBERTS** 2:16
**roll** 30:6 58:6
**rolled** 29:21,25
30:10 84:4,12,15
**rolling** 29:7
**Roosevelt** 5:14
**rose** 15:16
**Royal** 2:8
**rule** 66:17 108:9
108:20
**rules** 45:18 66:22
66:25 90:15
97:20 106:16
111:6
**run** 77:14 99:7
107:4
**running** 11:2
113:15

---

**S**

**S-U-S-P** 55:16
**S/A** 53:7,7 54:12
**S14** 64:6
**sack** 38:20
**safety** 70:25 108:6
108:8,10
**salary** 129:9
**sand** 18:17 28:20
38:1,4,8 39:5,6
39:13,15,19 82:2
83:16,23 84:16
89:20 90:22
91:24 92:18
93:13 95:13,19
119:4,8,13,22
128:10
**sat** 50:14
**saw** 8:7 9:5 10:6
11:1,14,19 15:25
16:22 17:9,9
18:2,9,19,25
19:1 23:9 26:22
27:8 28:25 29:16
29:22 30:1 31:8
32:22 38:22

40:10 44:22 67:6
76:14 77:13
81:20,22 92:8,15
92:16 93:16,22
94:1,11,19 105:5
107:2 110:6
111:12 118:21
119:22 120:17,22
122:5 123:7,12
125:19,24 126:15
**saying** 10:11 29:13
37:18 49:4,19
68:18 70:4 71:25
77:8 82:12 91:25
92:1,19,20,21,23
93:1 104:9 117:1
130:11
**says** 52:24 54:11
54:17 62:1 66:18
77:21 101:9
**scans** 99:7
**scene** 10:12 11:2
17:21 23:11 28:2
28:7 33:2,23
34:1 36:13 43:9
44:22 45:17
46:11 49:13
50:25 56:13
60:16 61:2,10,11
62:15 65:14,18
65:20,24 66:3,8
66:12 69:16,20
72:17 76:10,12
78:3 86:17 88:16
89:25 90:12,12
92:8 93:12 97:13
103:18 107:23
108:7,9,12,16
110:5 112:2,17
113:2,3 117:8,22
119:4 120:2
124:16 125:15
127:14
**scope** 106:11
**scream** 86:12
**screaming** 90:1
94:12
**scumbag** 12:18
**second** 8:7 55:15
69:8 80:6
**seconds** 31:7,9
55:23
**section** 54:19 72:4
102:14
**see** 7:22,24 17:3
17:20 19:17
21:12,15 22:6,6

23:10,13,22
27:17,19,25 28:7
28:9,14,19,24
30:4,10,14,16
31:16 41:15,17
42:1,21 47:21
48:11,12 49:11
49:12,12 54:15
61:18 64:1,2,8
67:7 71:15 87:2
87:16,17 88:4
94:3,6 96:9,12
119:13,15 122:11
122:16,21 123:13
125:13
**seeing** 21:17,18
25:25 30:15 79:4
79:12,15 122:25
124:19 127:17
**seen** 8:10 17:13,13
21:14,14 27:14
51:17 75:20,23
76:5 78:10 80:6
88:13,21 89:2,8
99:8 102:5 112:1
112:10,13 113:5
126:14
**send** 66:18
**senses** 90:14
**sent** 103:18 110:5
**sentence** 54:17
**Sergeant** 1:15 3:3
4:22 5:7 46:24
47:7 53:12 54:13
78:12 132:8
133:8 134:4
135:4,25
**serial** 71:7,14
**serious** 36:24,25
**service** 34:5
**severe** 37:3,11
**sheet** 3:10 134:13
135:1
**short-term** 16:19
**shorter** 113:24
**shortly** 7:17 8:12
**shoulder** 19:24
21:18 25:9,13,23
25:24 26:25 27:5
38:11 40:20
100:8
**show** 7:9 9:15,18
10:8 27:18 29:20
29:21 52:10
78:12 82:6
104:17
**showed** 21:21 28:19

105:3 106:23
125:19
**showing** 29:16 89:3
**shows** 9:14 29:6,8
29:13 95:14,17
120:23 122:3
**sic** 25:23 125:14
**side** 22:18 25:17
77:17 84:23
122:20 125:20
**signed** 16:7 87:5
132:11
**signs** 123:3
**similarly** 117:12
**simultaneous** 47:22
**Sincerely** 134:15
**single** 24:19
**single-page** 13:19
**sir** 5:12 12:10
13:21 41:15
57:12 69:15 86:7
114:5,13 127:12
128:15
**sit** 13:4,5 68:20
127:12 128:2
**sitting** 6:10 118:1
118:11,14
**sitting-up** 117:23
**situation** 31:21
**six** 53:5
**slow** 48:3
**small** 115:22 129:7
129:7
**smear** 97:6
**smile** 59:18 72:1
**smiling** 59:17
**Smith** 53:7,10
54:12 80:15
**somebody** 26:6
35:18 37:3 44:16
44:16 47:11 59:6
62:9 64:16 66:5
**someone's** 40:20
49:6
**soon** 29:3 41:8,10
**sooner** 15:7
**sorry** 128:21
**sort** 15:10 66:17
87:6
**sound** 127:6
**sounds** 37:17
**Southeast** 134:18
**SOUTHERN** 1:1
**Spanish** 112:12
**spares** 73:25
**speak** 6:9 98:17
106:21

Special 53:7
specifically 6:14
  115:15 122:10
spoke 6:8 107:7
spoken 6:6 44:3
stand 116:14
  118:23
standing 20:10
  23:9 48:5 119:1
  125:5,9
standpoint 101:1
stands 53:7
start 5:19 54:12
  59:22 89:20
  96:19 116:18
started 17:16
  19:12 31:4 61:16
  75:1 105:2
starts 63:21
  121:10
state 4:3,16 28:3
  132:3,7,15 133:3
stated 135:23
statement 106:24
  106:25 110:24
  122:22 124:24
statements 12:3
  14:15 67:6,8
  79:16 106:22
  107:8 128:5
states 1:1 124:19
stating 49:1 105:5
status 68:5
stepped 92:22
Stevens 65:17,25
  67:18 89:3 102:7
  109:8,20 113:6,8
stipulate 130:6
stipulation 130:9
Stonely 2:21 4:15
stood 125:11,12
stoppage 27:20
stopped 27:12 29:3
  31:3,17 41:8
  43:7
stops 28:15
stories 32:14
story 32:15
straddle 19:1
Straddled 18:24
straddling 96:3
street 1:18 2:3
  4:9 125:20
stress 93:3
stricken 59:14
strike 12:21 13:6
  13:12 21:20

59:11,20 92:12
  98:14 119:3
  123:11
struggle 17:3,9
  77:2 89:20
struggling 16:22
  17:11,16 20:21
  26:14,18 27:1,6
  118:10 125:10
stuck 88:10,23
subject 16:22 25:8
  123:19 130:13
subjects 69:4
subsequent 8:9
  24:7
substantial 90:16
substantially
  82:20
such-and-such 9:14
suffocating 95:9
suggest 47:16
  88:21
Suite 2:8,12 134:5
  134:18
summary 61:18
Sunrise 2:12 134:5
supervise 43:12
supervising 23:25
  43:8 44:8 45:1
  50:8,15 87:15
  127:23
supervision 113:13
  116:22
supervisor 62:15
  68:20 73:11 79:9
  79:14 101:13,13
  103:21,23 104:8
  106:3 108:3,12
  108:21 109:1
supervisory 108:20
supplemental 3:16
  13:20 14:4
Support 2:21 4:16
  134:8,18
supposed 69:18
  70:8 76:10
  102:10,15
sure 6:20 8:19
  12:6,10 13:2
  17:2 18:25 25:22
  50:14 56:20
  61:16 69:19 72:2
  72:10 74:5 92:19
  102:4,8,23 103:2
  104:14 119:21
surprise 102:9
surreptitiously

48:25
Suspect 52:7 55:17
  56:8 57:21 58:6
  59:3 60:1,9,14
  60:15 63:6,12
  64:9,16 66:6
  67:1 70:6
sustained 90:16
Suzanne 1:24 4:1
  4:14 132:6,14
  133:6,22 134:17
swear 4:17 5:2
switch-out 72:11
switching 69:4
sworn 5:8 110:4
  132:10
system 51:22 66:18

**T**

T 134:4
T-A-Z-E-D 55:17
take 40:9 44:15
  60:24 62:9 69:5
  69:6 91:21 101:6
  101:7 113:17
  128:19 130:18
taken 1:22 4:1
  80:14 134:8
talk 10:18 52:5
  54:6 98:9 100:24
  110:4
talked 7:7,10 14:6
  88:7,9
talking 15:8 49:24
tape 23:10 57:22
  58:1,2 59:3
  64:24 113:15
  114:11
tape's 64:19
taped 48:25
tapes 54:24 57:15
  57:17 58:7 59:7
  65:10,10 107:13
  107:13 114:7
  131:2
Tase 44:11 82:24
Tased 20:15 34:8
  52:7 67:7 70:9
  82:12 92:2
Taser 19:18 20:22
  21:13,23 33:8,10
  33:13 34:16
  35:17,18 39:21
  46:8,13,18 47:9
  47:12 48:17,25
  49:19,24 53:19
  53:21 66:24

68:17 70:13,17
  71:2,3,7,13,16
  71:19,20,23 72:1
  72:7,21 73:12,13
  74:15,19 81:15
  81:21 82:20
  91:25 92:16
  105:5 128:9
Tasering 19:13
  21:7
Tasers 19:16 47:6
  62:22 63:2 68:5
  68:11,23 75:25
  107:12
Tasing 22:18 32:22
  35:19 44:22 83:4
  92:8,16 107:2
taught 93:2
Tazed 55:17 56:8
  57:21 58:6 59:3
  60:1,9,15,16
  63:6,13 64:9,16
  66:6 67:1 70:6
Tazer 63:7,17 64:9
  64:16 66:6 67:1
tell 5:12 7:4 14:3
  24:2 39:1 40:11
  42:21,22 43:2
  45:23 52:14
  59:12 70:3 73:8
  76:10 77:1 81:14
  81:16,20 82:1,11
  88:5 95:17
  104:25 105:4
  129:2
telling 92:8 93:6
  109:16
ten 33:25 48:6,10
  98:18 99:3 103:1
termed 53:13
testified 5:8
  19:19 26:2,6
  44:3 47:10 90:2
  117:25 118:10,15
  119:7 122:2
  125:3
testifying 59:21
  59:22 111:22
testimony 5:2 6:4
  6:7,13,14 11:18
  12:21 13:6,12
  14:6 39:14 40:2
  59:20 92:12,18
  98:14 104:19
  109:15 110:4
  120:12,22
Thank 48:2 52:16

128:16 131:2, 4, 5
**Thanks** 9:2
**Thanksgiving** 98:3
114:2 128:16
**thing** 9:10 23:13
67:15 80:14 91:1
**things** 42:19 68:17
72:24 100:24
117:1 128:24
**think** 9:11 11:8
13:25 27:8 28:3
30:1 35:20, 24
40:2 48:14 59:18
61:12 63:19
78:13 79:3 95:9
95:10 97:2 98:11
102:24 113:22
114:4 116:8
127:5, 15, 21
**third** 52:24 63:19
112:13 134:18
**thorough** 104:1
105:10, 15, 19, 23
105:23
**Thoroughly** 103:20
**thought** 36:5 41:10
72:24
**thrash** 95:9
**threat** 127:6
**threatened** 126:23
**threatening** 126:2
**three** 8:4 61:12
116:19
**tight** 89:11, 21
**tightly** 94:2
**time** 4:5 8:1, 2
9:19 11:2 14:19
16:13, 18 18:7
19:8 20:10, 16
21:23 25:5 26:16
26:17 27:7, 20
28:2, 9, 14 30:22
31:2, 3, 17, 20
33:2 36:24 40:4
40:10, 11, 14 42:6
43:7 47:11 48:14
54:7 55:19 56:24
57:5, 15 61:17, 21
62:22 66:13 69:9
69:12, 16 72:9
79:5, 15 80:5
84:7, 14, 24 85:2
85:6, 10, 13, 16
95:13 104:13
113:8, 13, 19
114:6, 9 120:4
121:4, 10, 18

122:20 130:21, 24
**timer** 27:20 31:16
**times** 8:3, 4, 16
10:22 38:12
70:15 120:8
**to-last** 55:16
**today** 4:7 5:25
7:12 59:4 68:21
79:4 97:9 98:3
105:9 111:22
127:12 128:2
**today's** 13:17
**Todd** 65:17
**told** 20:2 40:8
44:14, 15 45:16
47:2 58:25 59:1
70:8 79:13
111:25 112:17
**tool** 74:23
**tools** 70:22
**top** 28:25 63:6
96:6 99:24 100:4
**topic** 8:12
**torso** 25:21 26:9
93:21 95:2, 7
99:24 100:5
124:1, 6
**totally** 128:22
**tough** 12:15
**tourist** 77:9
**tourists** 112:11
**train** 114:25
**trained** 73:10
82:20 115:2
123:17, 18 124:2
124:4
**training** 5:23
58:11 70:13 75:8
75:12 83:6
114:13, 14, 17, 20
115:9, 12, 16, 20
115:23 116:4, 7, 9
116:12, 18, 24
124:11, 13 127:18
**transcript** 133:10
133:10 134:10, 21
135:2
**translated** 60:9
**trap** 8:20 94:7
**treatment** 104:12
104:20
**Treavor** 1:5 4:12
134:7 135:4
**trial** 128:25
129:17, 20, 25
130:12
**true** 16:9 33:1

40:18 51:10
121:22 122:22
123:11 133:10
135:23
**truly** 12:16 130:20
**trust** 52:2 114:4
**truth** 5:3, 4 76:11
77:1 109:17
**try** 48:3 51:24
102:9 118:24
128:5
**trying** 25:19 61:20
61:23 72:2, 8, 19
72:22 86:6 91:19
114:5
**turn** 75:25
**turned** 28:1 34:25
35:20 47:6 68:14
**TUZZIO** 2:16
**twelve** 103:1
**Twenty-seven** 5:18
**two** 23:18 31:8, 20
60:24 61:12
63:19, 20, 23 67:5
101:6 102:1, 5, 19
102:21, 25 112:9
114:11 116:19
125:7, 8 129:4
131:2, 2

**U**

**U.S** 4:15 131:3
134:8, 18
**un-cuff** 30:6
**un-cuffing** 28:25
29:7
**unable** 95:6
**unconscious** 90:23
121:22 122:1
**uncuffed** 29:1, 4, 11
29:14, 22, 25
30:11 84:13
**understand** 7:4
12:14 13:2 24:3
43:11 55:14, 17
57:14 58:11
69:18 92:20
**understanding**
36:20 52:13
55:15, 25 56:6
57:6 60:14
**unit** 71:8
**UNITED** 1:1
**unknown** 97:14
**unreasonable** 83:5
83:12, 17
**unresponsive** 29:3

**untrue** 9:21 10:4, 5
**upper** 25:21 26:8
93:21 95:2, 7
100:5 124:1, 6
**upright** 125:11, 12
**use** 44:16 46:16
49:1 66:18 68:5
82:20 83:5, 12, 17
**usually** 36:25
75:11
**utilize** 114:15
**utilized** 63:2
**uttered** 60:16

**V**

**Valle** 1:10 6:11
25:19 115:13
124:16 125:7
**Valle's** 110:4
**value** 129:14
**various** 120:8
**vehicle** 76:15, 17
76:20 77:1, 4, 13
77:22
**verbalize** 8:13
**Verbatim** 1:24 4:1
132:6 133:6, 23
**verify** 32:3, 16, 19
**verifying** 24:15
31:25 32:10, 11
126:14 129:24
**vested** 50:25
129:12
**video** 1:15 3:3 4:6
4:10 7:9, 19 8:7
8:10 10:8, 11, 11
26:22 27:14, 17
28:7 29:6, 8, 13
29:16, 20, 21 30:4
30:10 34:24
41:20 67:13, 15
69:13 71:8, 21
72:5, 6, 22 73:3
73:16 74:1, 10
80:19 93:23 94:1
94:19 96:3
112:13 114:10
122:2 125:19
**videographer** 2:21
4:5, 15 69:8, 12
114:6, 9 128:20
130:21, 24
**videos** 7:11 18:2
53:19, 21 111:16
**videotape** 8:18 9:5
9:6, 12 10:20
11:1, 7, 19 17:14

21:15 24:25 25:3
27:9,25 28:9,14
28:19,24 38:21
40:10,14 42:22
76:14 80:6 86:13
92:19 95:14,17
95:21 110:19
112:2 123:12
126:15
**videotaped** 111:12
112:1 125:15
**videotapes** 13:16
80:24 112:9
127:18
**videotaping** 77:9
**view** 87:24
**viewed** 10:20
**virtually** 5:25
**visible** 96:2
**visiting** 112:11
**vital** 123:3
**voice** 46:8 56:4
**voluntarily** 129:19
**vs** 1:8 4:13 134:7
135:4

---

**W**

**W** 134:22
**walk** 93:12 118:24
**walked** 17:22 77:16
**walking** 20:11
125:19,24 126:1
126:4,5,9,15,17
127:7
**Wallace** 1:18 2:3
4:8
**Wanciak** 19:18
21:21 56:25 57:8
81:20 92:16
105:4 106:24
122:16
**want** 11:23 12:3,6
12:10,16 13:2
42:12 43:5 45:5
45:9 55:13 57:14
59:19 72:10,10
73:1,8 74:4,13
74:14 78:19
102:8 116:19
119:21 130:14,20
130:20
**wanted** 59:3 73:20
127:6
**wash** 97:1
**wasn't** 26:7 34:7
39:18 40:7 41:4
50:14 58:16

67:15 84:11
85:24 86:24 90:5
90:5 91:13 96:2
105:9 109:25
118:17 122:12
**watch** 8:1,3 101:13
**watched** 7:19 10:21
**way** 12:12 13:23
16:6 21:1 39:10
46:7 56:21 71:9
86:12 91:3 92:9
98:1 113:8
117:16 123:11
**we'll** 37:11 48:11
48:12 59:5 101:6
101:7 130:2,18
**we're** 4:6,8 6:21
10:18 12:10 13:9
56:18 62:8 63:22
69:9,13 98:2
102:8 104:14
114:7,10 130:5,6
130:19,25
**we've** 14:5 22:7
47:2 52:5 120:22
**weapon** 70:21
**weapons** 75:25
**Wednesday** 1:17 4:7
**weeks** 67:15
**weight** 25:12 26:17
95:2,8 99:24
**went** 31:17 61:5,10
107:19 117:8
122:1 129:4
**weren't** 14:11 18:7
20:4 22:7 59:7
80:21 99:12
**West** 1:2,9,10,19
2:4,17,21,22 4:9
4:14,22 5:15,16
50:24 51:5,10,14
51:17,21 52:19
52:20 53:25
54:21 55:7 56:17
65:9 67:12 69:15
75:20,24 76:25
79:22 80:2,23
92:2 98:6 134:7
135:4
**Weston** 2:8
**whatnot** 8:21 14:7
**Whitehead** 1:18 2:3
4:9
**Williamson** 46:24
47:8 53:13 54:13
**willing** 129:24
130:11

**wish** 72:3
**witness** 1:22 4:18
5:5 6:16 9:18
32:21,21 43:6
47:25 48:14 66:7
67:7 84:11 96:1
111:21 117:7
124:4 126:21
128:5,18 130:17
134:1,11,12
**witnesses** 44:21
92:15 101:23,25
102:17 103:4
106:22 107:6,8
110:5,15,17
128:6,7,8
**word** 49:1
**words** 60:14,15
69:23,23
**work** 5:14 75:1
104:6,10 111:7
**world** 111:5,6
**worth** 129:2,8
**wouldn't** 20:14
35:21 43:16 65:4
81:1 83:12,18
100:14 119:23
121:5 122:21
**wrist** 89:4 94:3
121:14
**write** 14:9,15,17
14:21 15:2,3,6,7
15:11 91:22
127:7 135:2
**writing** 16:13
**written** 8:19 15:10
16:10 57:7
106:22 107:8
**wrote** 14:10 15:21
32:15 104:23

---

**X**

---

**Y**

**yanks** 93:14,20
**yeah** 8:14 37:16
46:17 47:22
48:12,13 59:1
64:2 68:4,16,17
69:6 74:7 78:17
78:18 86:24
88:21 91:20
98:19 114:3
118:9 129:9,9
130:5,15
**year** 7:17 71:4
98:2,2 127:12

**years** 5:18 116:19
129:4
**yesterday** 57:17
58:17 64:20
**York** 92:9

---

**Z**

**Zamora** 1:15 3:3
4:11,23 5:7,14
114:11 131:1
132:8 133:9
134:4 135:4,25
**Zamora's** 3:16

---

**0**

**02.08.06** 101:8
**02.08.06.02** 106:5
**02.08.07.02** 109:1

---

**1**

**1** 2:8 106:5 133:9
134:2
**1:18** 1:17 130:24
**10:01** 131:6
**10:07** 1:17 4:5
**10:18** 58:6
**10:30** 61:1
**10:38** 62:16 63:1
**10:38:11** 63:7 66:5
67:5
**1000** 2:12 134:5
**11:00** 68:6
**11:09** 69:9
**11:17** 69:12
**12:07** 114:6
**12:57** 114:10
**1215299** 134:8
**1250** 134:18
**131** 133:9
**132** 3:8
**133** 3:9
**134** 3:9
**135** 3:10
**143** 3:16
**14-10028-CIV** 4:11
**14-10028-CIV-M...**
1:3
**15** 109:13
**1604** 5:14
**17150** 2:8

---

**2**

**20** 65:23 109:13
**2013** 5:23 52:25
54:12 55:13 75:2
116:23
**2014** 1:17 4:8

```
132:9,11 133:19
 134:2,8 135:5
2017 132:16
217-0150 2:9
2455 2:12
2488 134:5
25 3:16 13:25 14:2
 14:3 15:22
 104:15,22
26 1:17 3:16 52:11
 52:15 134:8
 135:5
26th 4:8 132:9
27 3:17 78:25,25
 79:1 132:16
28 5:23 52:25
 54:12 55:12 75:2
 116:23
294-4585 2:4
294-7822 2:4
29th 132:11 133:19
```

```
                3
30 134:13
305 2:4,4 134:19
33040 1:19 2:4
33131 134:19
33304 2:13 134:6
33327 2:8
33409 2:17
373-8404 134:19
```

```
                4
40 113:17
463-0100 2:13
463-2444 2:13
470 2:17
```

```
                5
5 3:3
52 3:16
561 2:18,18
```

```
                6
608 1:18 2:3 4:9
688-2343 2:18
688-6560 2:18
```

```
                7
79 3:17
```

```
                8
8:29 57:11
8:29:41 57:7,12
8:34 55:20
8:34:15 55:21 56:7
 57:7,21 92:23
```

```
8:49 65:13
888-9877 2:9
```

```
                9
911 54:13,18
954 2:9,9,13,13
```