**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO.: 14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,

      Plaintiff,

vs.

CITY OF KEY WEST, a Florida municipality, et al.,

      Defendants.

_____/

VIDEO DEPOSITION OF GARY LEE LOVETTE
Volume I of III
(Pages 1 - 31)

Monday, November 3, 2014
9:02 a.m. - 10:47 a.m.
Law Office of Horan Wallace & Higgins, LLP
608 Whitehead Street
Key West, Florida  33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter
Florida Professional Reporter

**2**

APPEARANCES

On Behalf of the Plaintiff:
BRILL & RINALDI, THE LAW FIRM
17150 Royal Palm Boulevard, Suite 2
Weston, Florida 33326
(954) 876-4344 / Fax (954) 384-6226
david@brillrinaldi.com
BY: DAVID W. BRILL, ESQUIRE

HORAN WALLACE & HIGGINS, LLP
608 Whitehead Street
Key West, Florida 33040
(305) 294-4585 / Fax (305) 294-7822
dph@horan-wallace.com / darren@horan-wallace.com
chiggins@horan-wallace.com
BY: DAVID PAUL HORAN, ESQUIRE
BY: DARREN M. HORAN, ESQUIRE
BY: CARA HIGGINS, ESQUIRE

THE MCKEE LAW GROUP, LLC
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / (954) 217-0150
rmckee@themckeelawgroup.com
BY: ROBERT J. MCKEE, ESQUIRE

LEWIS LEGAL GROUP, P.A.
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / Fax (954) 217-0150
jlewis@lewislegalgroup.com
BY: JEANNETTE C. LEWIS, ESQUIRE

On Behalf of the Defendants:
JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
2455 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida 33304
(954) 463-0100 / Fax (954) 463-2444
burke@jambg.com
BY: MICHAEL T. BURKE, ESQUIRE

**3**

APPEARANCES CONTINUED

On Behalf of the Defendant Gary Lee Lovette:
ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
470 Columbia Drive, Building C-101
West Palm Beach, Florida 33409
(561) 688-6560 / Fax (561) 688-2343
lreynolds@rrbpa.com
BY: LYMAN H. REYNOLDS, JR., ESQUIRE

Also Present:
RODERICK PRATT, LEGAL VIDEOGRAPHER
FRANCISCO ZAMORA
KATHYANN WANCIAK
GABRIEL HUMBERTO GARRIDO
GUSTAVO ADOLFO MEDINA

--oo0oo--

INDEX OF PROCEEDINGS

                                 Page
Video Deposition of GARY LEE LOVETTE
Direct Examination by Mr. Brill . . . . . . . . . . 5

**4**

1    Deposition taken before Suzanne Ex, Certified Verbatim
2    Reporter, Florida Professional Reporter and Notary Public in
3    and for the State of Florida at Large in the above cause.
4    - - - - - - -
5    THE COURT REPORTER:  Good morning.  We are now on
6    the video record.  Today is Monday, November 3rd, 2014,
7    at 9:02 a.m.  We're here at the offices of Horan Wallace
8    and Higgins in Key West, Florida for the purpose of
9    taking the video deposition of Gary Lee Lovette, taken
10    by the Plaintiff in Case Number 14-10028.  The case is
11    Treavor Eimers vs. City of Key West, et al.  It's a U.S.
12    District Court Case filed in the Southern District of
13    Florida.  The court reporter is Suzanne Ex of U.S. Legal
14    Support.  The videographer is Roderick Pratt, also of
15    U.S. Legal Support.
16    Would all counsel please state their appearance for
17    the record and then I will swear in the witness.
18    MR. BRILL:  My name is David Brill.  I represent
19    the Eimers Family.
20    MS. LEWIS:  Jeannette Lewis.  I represent the
21    Eimers Family.
22    MR. DARREN HORAN:  Darren Horan, represent the
23    Eimers Family.
24    MR. MCKEE:  Bob McKee.  I represent the Eimers
25    Family.

5

1    MR. DAVID PAUL HORAN:  David Paul Horan.  I
2  represent the Eimers Family.
3    MR. REYNOLDS:  Lyman Reynolds.  I represent Officer
4  Lovette.
5    MR. BURKE:  Michael Burke.  I represent the
6  Defendants City of Key West, Gabriel Garrido, Matthew
7  Johnson, Thad Calvert, Todd Stevens, Derek Wallis,
8  Nicholas Galbo, Kathyann Wanciak, Gustavo Medina, Henry
9  Del Valle.  That should be enough.
10    THE COURT REPORTER:  Would you raise your right
11  hand, please, sir.  Do you swear or affirm the testimony
12  you are giving in this cause will be the whole truth and
13  nothing but the truth?
14    THE WITNESS:  Yes, ma'am.
15  THEREUPON,
16    GARY LEE LOVETTE
17  having been first duly sworn, was examined and testified as
18  follows:
19    DIRECT EXAMINATION
20  BY MR. BRILL:
21    Q.  Mr. Lovette, I had sent an email to counsel of
22  record for the defense asking that no deponent, individual
23  officer, bring a firearm to the deposition.  You understood
24  that, correct?
25    A.  Yes, sir.

6

1    Q.  But you did so anyway?
2    A.  I'm on duty.  Yes, sir.
3    Q.  You're on duty as we have a civil deposition in
4  this case?
5    A.  Yes, sir.
6    Q.  You're getting paid by the City?
7    A.  Yes, I am.
8    Q.  Nonetheless, it requires you in this deposition
9  where we, frankly, do not trust your ability to remain calm
10  and composed and not lose your temper, and therefore have a
11  concern that you will brandish your firearm to us, but you
12  think it's appropriate to have your firearm today, despite
13  our request?
14    A.  I'm here to protect you as well as myself.
15    Q.  Who are you protecting me from?
16    A.  Any crime that may be committed.
17    Q.  By whom?
18    A.  I don't know.
19    Q.  What was the point of bringing a firearm today?
20    A.  Because I'm on duty.
21    Q.  None of the other officers besides — and Sergeant
22  Lovette is on duty -- or, Sergeant Zamora is on duty, as
23  well?
24    A.  Yes, sir.
25    Q.  None of the other officers here are on duty?

7

1    A.  They're on duty.
2    Q.  But they're not dressed in their uniform.
3    A.  No, sir.  They're not.
4    Q.  And they don't have their firearm.
5    A.  No, sir.  They don't.
6    Q.  But the difference is that you're being deposed
7  today?
8    A.  Yes, sir.
9    Q.  Okay.  So they're here attending the deposition, on
10  duty, but they're not in uniform and they don't have their
11  firearms.
12    A.  No, sir.  I don't believe they do.
13    Q.  Well, I mean, it's not, "I don't believe."  We can
14  see them with our own eyes, can't we?
15    So, again, I reiterate the question, why is it you
16  think it'd be necessary to wear your uniform and have your
17  firearm when you're on duty the same way those three are on
18  duty?
19    MR. REYNOLDS:  Objection, form, argumentative,
20  attempting to intimidate the witness.
21    MR. BRILL:  I don't have the firearm.  I'm not the
22  one intimidating.
23    MR. REYNOLDS:  Move to strike inappropriate comment
24  of counsel.
25    MR. BRILL:  It's not inappropriate.

8

1  BY MR. BRILL:
2    Q.  I want to know why you felt it necessary to come,
3  despite our request, with no response by any defense counsel
4  to the contrary, that it would not be acceded to, that you
5  would not respect our request, that you thought it necessary
6  to wear a firearm?
7    MR. REYNOLDS:  Again, objection, asked and
8  answered.  If you want to take his deposition, please
9  proceed.
10  BY MR. BRILL:
11    Q.  Why are they not in uniform and you are?
12    MR. REYNOLDS:  Objection, argumentative,
13  inappropriate.  Do you want to cancel --
14    MR. BRILL:  Well, --
15    MR. REYNOLDS:  -- the deposition?
16    MR. BRILL:  -- there's one objection, Counsel.
17    MR. REYNOLDS:  If you're intimidated and want to
18  cancel the deposition --
19    MR. BRILL:  I'm just disappointed at least, I'm
20  apprehensive at worst, and I'm not the only one in this
21  room that feels that way.  And it would have been
22  appropriate to give a heads up.  I asked for it --
23    MR. MCKEE:  We want him without the weapon.  Let's
24  call the judge.  Let's call --
25    MR. BRILL:  I tried to call the judge and --

2 (Pages 5 to 8)

9

1  MR. MCKEE: Call him again. Let's put it on the
2  record.
3  MR. BRILL: Yeah.
4  MR. MCKEE: We want the judge involved with a man
5  who came, even though we requested him to be unarmed,
6  when he's here with his fellow officers, and there's not
7  a single person in this room that's a hazard to him in
8  any way.
9  MR. REYNOLDS: As the witness has testified, he's
10 on duty, he's an armed police officer, and there is no
11 reason for him not to be armed. He has not in any way
12 acted or in any way intimidated plaintiff's counsel.
13 And he's here to provide his deposition in a civil
14 manner.
15 MR. MCKEE: I disagree. He's a very large man with
16 history --
17 MR. BURKE: Counsel, are you --
18 MR. REYNOLDS: Move to strike?
19 MR. BURKE: -- taking the deposition? I mean --
20 MR. MCKEE: He's on the phone trying to get the
21 judge, so I'm following --
22 MR. REYNOLDS: Move to strike inappropriate
23 continued counsel statements in this case. We now have
24 two attorneys for the plaintiff out of the five --
25 MR. MCKEE: Listen, I feel threatened by him and

10

1  I'm speaking up, and I'm on this record.
2  MR. REYNOLDS: Well, then you can leave.
3  MR. MCKEE: No.
4  MR. REYNOLDS: Okay.
5  MR. MCKEE: I'm here because this man did something
6  to my client and I'm here for that reason. I don't like
7  the fact that after we ask him to be here without a
8  weapon, he shows up with a weapon. I don't like that.
9  I think the federal judge should know about it. That's
10 all I'm saying.
11 MR. BRILL: And, for the record, I tried calling a
12 second time. It is now 9:08 a.m. It continues to go to
13 voice mail. We will continue to try.
14 BY MR. BRILL:
15 Q. What is the problem with you putting your firearm
16 in a locked device right now?
17 A. I'm on duty, sir. This is not a secure facility.
18 Q. What's going to happen here? The other three
19 officers felt completely comfortable. You don't?
20 A. No, sir.
21 Q. I don't have a firearm, Bob doesn't have a firearm,
22 Darren doesn't have a firearm, Jeannete, David, we're all
23 here unarmed.
24 MR. REYNOLDS: Again, the officer's answered the
25 question. If you want to proceed with a civil

11

1  deposition, please do so.
2  MR. BRILL: I didn't get an answer to my question
3  about why the distinction between you being in uniform
4  today, on duty, and three of your fellow officers, who
5  you have identified here as being on duty as well, are
6  not in uniform.
7  MR. REYNOLDS: This witness cannot testify for
8  them. You have their depositions --
9  MR. BRILL: Listen, Counsel, I'm not going to ask
10 you repeatedly throughout the day. You make a form
11 objection. That's a legitimate question. You want to
12 tell him not to answer, tell him not to answer. I
13 didn't ask for your testimony. I've asked for Officer
14 Lovette's.
15 MR. REYNOLDS: I move again to strike your
16 inappropriate --
17 MR. BRILL: You can move to strike. Counsel.
18 MR. REYNOLDS: Counsel.
19 MR. BRILL: I'm asking him the question.
20 MR. REYNOLDS: You're arguing with the witness.
21 MR. BRILL: I've asked three times, the same
22 question.
23 MR. REYNOLDS: And he's answered it --
24 MR. BRILL: I haven't gotten an answer.
25 MR. REYNOLDS: -- to the best of his ability. You

12

1  have --
2  MR. BRILL: I haven't got -- I've gotten your
3  answer. I appreciate your testimony. You're not a
4  sworn witness, Lyman. He is.
5  BY MR. BRILL:
6  Q. I want to know if he can tell us why it is that
7  you, sir, Mr. Lovette, are in uniform and these three other
8  officers who are likewise on duty, are not. Is that a
9  difficult question for you?
10 MR. REYNOLDS: Move to strike.
11 A. I don't know why they're not in uniform.
12 Q. Is there a policy that says that you have to be in
13 uniform when on duty?
14 A. Yes.
15 Q. So all three of your fellow officers are violating
16 that particular policy?
17 A. They've had an order, not from me, and not from a
18 superior officer, then yeah, they would be.
19 Q. Now, these same fellow officers appear to have, for
20 lack of a better term, thrown you to the bus, haven't they?
21 MR. REYNOLDS: Objection, move to strike.
22 MR. BURKE: You know, we're going to go ahead and
23 have Judge Goodman -- I think we should wait until Judge
24 Goodman can take our call, if this is what you want to
25 do. We can just go ahead and wait and he can proceed.

WWW.USLEGALSUPPORT.COM
1-888-311-4240

13

1   MR. BRILL: I'm asking if your --
2   MR. BURKE: Ask questions or let's get --
3   MR. BRILL: I'm asking the questions, Counsel.
4   MR. BURKE: Well, then ask questions.
5   MR. BRILL: Okay. You are also not representing
6   him. You don't --
7   MR. BURKE: I'm not representing him.
8   MR. BRILL: So then, just remain quiet with it.
9   Let me ask my questions.
10   MR. BURKE: Are you finished?
11   MR. BRILL: No. I have -- you actually interrupted
12   me twice now.
13   BY MR. BRILL:
14   **Q. Did your fellow officers throw you to the wolves in**
15   **the representation of your defense in this case?**
16   MR. REYNOLDS: Objection, form.
17   MR. BURKE: Objection.
18   BY MR. BRILL:
19   **Q. While every other defendant that has been named and**
20   **sued in this lawsuit as an individual officer defendant are**
21   **represented by this counsel here, Mr. Michael Burke, you are**
22   **not, you're by yourself. Why is that?**
23   MR. REYNOLDS: He's not by himself. He's
24   represented by me, Counsel. I've made my appearance on
25   his behalf.

14

1   MR. BRILL: No, I understand that. Yes,
2   represented by you, as opposed to everybody else being
3   represented by Mr. Burke. Why is that?
4   MR. BURKE: Well, look, Counsel. I believe that
5   Judge Goodman will stop --
6   MR. BRILL: Wait, now --
7   MR. BURKE: Let me finish, please. You've been
8   talking. I have an objection for the record.
9   MR. BRILL: Yes, because I actually noticed the
10   deposition with plaintiff's counsel. It is not your
11   stage, Counsel. You have one job, object to form.
12   MR. BURKE: This isn't a stage. This is a
13   deposition.
14   MR. BRILL: It is object to form. I've asked
15   nothing improper.
16   MR. BURKE: No, I have other -- I have other
17   remedies and I can ask for a protective order.
18   MR. BRILL: Yes, you can.
19   MR. BURKE: And I'm going to terminate the
20   deposition in three minutes. If you do this again,
21   we're done. Judge Goodman will take it up and will hear
22   it.
23   MR. BRILL: You do what you want.
24   MR. BURKE: He's going to love this video.
25   MR. BRILL: I've asked him a question.

15

1   MR. BURKE: Your stage is going to be before Judge
2   Goodman. You're going to have a good time with him.
3   MR. BRILL: I promise you that right now, the way
4   this video is playing, it is not me that is violating
5   every rule.
6   MR. BURKE: Well, Judge Goodman will be the judge
7   of that.
8   MR. BRILL: You have to make an objection to form.
9   So, I've asked him the question, why --
10   MR. BURKE: I have an objection to your harassing,
11   intimidating, outrageous behavior.
12   MR. BRILL: Okay.
13   MR. BURKE: That's my objection.
14   MR. BRILL: Thank you. Are you done now?
15   MR. BURKE: I am done.
16   BY MR. BRILL:
17   **Q. Okay. Why?**
18   A. Why to what, sir?
19   **Q. Why are you the only one being represented by --**
20   **Lyman's a very good lawyer, I don't take anything against**
21   **that. Why are you the only one being represented by Lyman**
22   **and everybody else is represented by Mr. Burke?**
23   A. Sir --
24   MR. BURKE: Objection, argumentative, calls for
25   speculation.

16

1   MR. REYNOLDS: Join.
2   BY MR. BRILL:
3   **Q. You can answer.**
4   A. Sir, I was informed that I was being represented by
5   Mr. Lyman Reynolds and I don't know why.
6   **Q. By whom were you informed?**
7   MR. REYNOLDS: That's attorney-client privilege,
8   Counsel.
9   MR. BRILL: If it's attorney, I understand.
10   MR. REYNOLDS: My discussions with my client as to
11   my representation of him are inappropriate.
12   MR. BRILL: Agreed.
13   BY MR. BRILL:
14   **Q. Were you informed by anyone other than Lyman?**
15   A. I don't recall who informed me.
16   **Q. Was it someone other than Lyman?**
17   A. Yes.
18   **Q. And was it someone other than Mr. Burke?**
19   A. I don't know.
20   **Q. Was it someone within your police department?**
21   A. I don't know.
22   **Q. When was it that you were informed? It hasn't been**
23   **that long that you've been represented by Lyman.**
24   A. Within the past month, I'd say.
25   **Q. But you have no recollection of with whom they were**

4 (Pages 13 to 16)

17

1 even affiliated or connected?
2    A. No. Mr. Burke's office contacted me. I don't know
3 who set that up.
4    Q. Okay. Are you concerned that your proverbial
5 brothers or sister in blue will testify against you --
6    A. No, sir.
7    Q. -- because you're being represented by your own
8 counsel and they're represented by their own?
9      MR. BURKE: Objection, argumentative and harassing.
10      MR. REYNOLDS: Join.
11    A. No, sir.
12    Q. How about your Fifth Amendment, are you going to be
13 invoking any of your Fifth Amendment privileges today or do
14 you plan on testifying to every question asked?
15    A. I plan on testifying.
16    Q. Despite the fact that the City of Key West State
17 Attorney's Office, in their infinite wisdom and abilities,
18 could not get an indictment against you or any of your fellow
19 officers, you do realize you do still have potential criminal
20 exposure by the feds --
21      MR. BURKE: Objection, argue --
22 BY MR. BRILL:
23    Q. -- for your actions?
24      MR. BURKE: Objection, argumentative and harassing.
25      MR. REYNOLDS: Join.

18

1 BY MR. BRILL:
2    Q. Do you realize that?
3    A. No, sir. I do not.
4    Q. You also still have potential and always will have
5 potential exposure by both the federal government and the
6 state government for any perjurious statements that you've
7 made before today and if you make any here today?
8      MR. BURKE: Objection, argumentative and harassing.
9      MR. REYNOLDS: Join.
10    A. Yes, sir. I understand that.
11    Q. And despite those concerns, you -- or issues, you
12 are going to be testifying fully without invoking Fifth
13 Amendment?
14    A. Yes, sir.
15    Q. Were you given any immunity by any prosecuting
16 agency for any type of event or testimony that you have
17 offered or will offer in this case?
18    A. No, sir.
19    Q. Have you met with the FBI in this case?
20    A. No, sir.
21    Q. Met with any Assistant U.S. Attorney?
22    A. No, sir.
23      MR. BRILL: I do want to note on the record,
24 incidentally, Counsel Mike Burke, that it appears to me,
25 and do correct me if I'm wrong, that the City, in its

19

1 production responses that were provided to us late, a
2 day late and we agreed, but be that as it may, failed to
3 provide any information or material responsive to our
4 requests relative to Officer Lovette; is that correct?
5      MR. BURKE: I don't know, sir. And I'm not here to
6 answer your questions. If you have an issue about
7 discovery --
8      MR. BRILL: Yeah, I'm reserve --
9      MR. BURKE: -- we'll be happy to take it up with
10 you.
11      MR. BRILL: Yeah. I'm reserving the right to have
12 -- bring up motions and -- as we all are, and also to
13 seek depositions again, because the material explicitly
14 excluded out, despite your representation of the City of
15 Key West, any of the material regarding Officer Lovette,
16 any material.
17      It also did not include any training material or
18 any policy material relative to use of force or any of
19 the other types of related training and procedures that,
20 for years, all the officers that we named in this
21 lawsuit underwent. Not a single particular training
22 program material was provided.
23      MR. BURKE: We'll have to take that up. I'm not
24 aware of that. If you need to, if you need to continue
25 the deposition, we'll be happy to do so, if you'd like.

20

1      MR. BRILL: No, we're going to take it because
2 we're running out of time in the discovery proceeding,
3 but you knew that.
4 BY MR. BRILL:
5    Q. What's your weight, Officer Lovette?
6    A. About 225, sir.
7    Q. What's your height?
8    A. About six feet.
9    Q. And is that the same height and weight that you
10 were at the date of the incident when Mr. Eimers was killed?
11    A. About that. Yes, sir.
12    Q. Have you done --
13      MR. BRILL: Oh, I'm sorry. I'm stealing your
14 water.
15 BY MR. BRILL:
16    Q. Have you yourself done any reading or studying on
17 the mind of the psychopath?
18    A. No, sir.
19    Q. Have you heard that recent literature on the topic,
20 comprehensively done, identifies that what used to be the
21 theory that psychopaths don't experience empathy, is actually
22 not really what the exact dynamic implicated is, but rather
23 that psychopaths can turn their empathy on whenever they feel
24 like it.
25      MR. BURKE: Objection, argue --

5 (Pages 17 to 20)

21

```
1    BY MR. BRILL:
2         Q.  It's not a natural response.  Have you heard any of
3    that?
4         MR. BURKE:  Objection, argumentative and harassing.
5         MR. REYNOLDS:  Join.
6         A.  No, sir.
7         Q.  And you've heard how when people -- surely, tell me
8    if I'm incorrect here -- that when people are alone or with
9    friends and they don't think they're being videoed or audio
10   taped that they speak the truth?
11        MR. REYNOLDS:  Objection, form.
12        A.  I don't know.
13        Q.  When you're alone or with friends or loved ones and
14   there's no one around, there's no video camera, there's no
15   audio camera, you don't believe, and recognizing you are
16   under oath today, too, Officer, that you are more apt to be
17   honest and candid, because those are the people with whom you
18   have a trusting relationship?
19        MR. BURKE:  Objection, argumentative and harassing.
20        MR. REYNOLDS:  Join.
21        A.  Sir, it depends on the situation.
22        Q.  Okay.  With family, with your wife, with your
23   siblings, parents, are you more or less likely to be telling
24   the truth, being candid?
25        A.  Again, it depends on the situation.
```

22

```
1         Q.  Well, what depends?  Are you going to -- is it
2    something that you, with your wife and your family and your
3    friends, that you, at times, lie to them?
4         MR. REYNOLDS:  Objection, form.
5    BY MR. BRILL:
6         Q.  About, particularly about important stuff, like
7    whether you killed a man?
8         MR. REYNOLDS:  Objection, form, argumentative,
9    harassing.
10        A.  Yes.
11        Q.  And for what purpose?  You can answer.
12        A.  Embellishment.
13        Q.  For what reason?
14        A.  Decompression.
15        Q.  What does that mean?
16        A.  To decompress.
17        Q.  Yeah, what does that mean?  What are you
18   decompressing?
19        A.  About dealing with situations.
20        Q.  Uh-huh.  So every single statement that we, on this
21   side of the table, and we think any reasonable person is
22   going to hear and think is a confession by you of your guilt
23   and culpability in the death of Mr. Eimers, is just your
24   chalking up to decompression or exaggeration?
25        MR. REYNOLDS:  Objection, form, harassment.
```

23

```
1         MR. BURKE:  Object to form.
2         A.  Yes.
3         Q.  Every single one, for that hour and-a-half plus?
4         A.  I wouldn't know about every single one.
5         Q.  Well, we'll go over them in that regard.
6              You didn't know when you were making those
7    statements that your late Taser audio was recording the
8    event, did you?
9         A.  No, I did not.
10        Q.  But you were trained in the use of that particular
11   Taser, correct?
12        A.  Yes, sir.
13        Q.  And you knew that when you activate it, it records
14   audio and video footage, correct?
15        (Ms. Higgins entered the deposition room.)
16        A.  Yes, sir.
17        Q.  And you believe -- you activated it at the scene.
18   We'll get to whether you discharged it or not later, but you
19   activated it, correct?
20        A.  On the scene?
21        Q.  Yes.
22        A.  Yes, sir.
23        Q.  And at what point did you think that you turned it
24   off, deactivation?
25        A.  As soon as I re-holstered it.
```

24

```
1         Q.  So it was your belief that you would have footage
2    of the events, until you holstered it, of Eimers' death?
3         A.  Yes, sir.
4         Q.  But, conveniently, we don't have that?
5         MR. REYNOLDS:  Objection, form.
6         MR. BURKE:  Object to form.
7         MR. REYNOLDS:  Calls for speculation on the part of
8    the witness.
9    BY MR. BRILL:
10        Q.  Well, you've seen the footage.  Do we have it?
11        A.  No, sir.  I have not.
12        Q.  You know that we don't have the footage from your
13   Taser, whether you've seen it or not; is that correct?
14        A.  I did not know that.
15        MR. REYNOLDS:  Objection, form.
16   BY MR. BRILL:
17        Q.  Well, you know how long this footage tapes on your
18   Taser, do you not?  You got trained.
19        A.  From -- not -- from another event.  I was told it
20   was, what, an hour and 32 minutes had recorded?
21        Q.  Approximately.
22        A.  Okay.
23        Q.  And that after it records for four hours, three
24   hours, whatever amount after that, I don't have.  Everything
25   that's the starting point beyond the hour and-a-half is now
```

25

1 taped over; do you know that?

2 A. I did not know that, no.

3 Q. Well, what do you think happens; that first hour

4 and-a-half records and then it stops recording?

5 A. Sir --

6 MR. REYNOLDS: Objection, form. Calls for

7 speculation on the part of the witness.

8 THE WITNESS: -- as soon as that incident was over,

9 as soon as we got a chance that day, my Taser was

10 downloaded. I did not review that tape.

11 BY MR. BRILL:

12 Q. No, but you did shoot it or test fire it with your

13 or somebody's dog later in the day?

14 A. There was a test fire. I don't know if it was with

15 a dog or not.

16 Q. And you're --

17 A. Like I said, I have not reviewed the video.

18 Q. And you're, at that point when you did that, you

19 didn't notice that it was recording?

20 A. No, sir.

21 Q. Your intent in test firing it after that hour and

22 some minutes was not a, oops, it's been activated this whole

23 time and I'm going to test fire it so I can get rid of all

24 that testimony?

25 A. No, sir

26

1 MR. REYNOLDS: Objection, form.

2 BY MR. BRILL:

3 Q. All that video evidence?

4 A. I didn't realize it would do that.

5 Q. Well, when you test fired it after that day, late

6 in the day with the dog, did you in fact notice that it was

7 still on activate?

8 A. No.

9 Q. So the entire time you had the Taser up to the

10 point through downloading, you never knew it was still on

11 activate?

12 A. No, sir.

13 Q. What does it require to activate a Taser?

14 A. To turn it on.

15 Q. And how do you do that?

16 A. By flipping a switch.

17 Q. And after you finished that day, you gave your

18 Taser to someone at the department?

19 A. I was called to the station at some point

20 throughout the day to download it.

21 Q. And tell us, walk us through how you actually did

22 that. Did you take your Taser out of your holster?

23 A. And give it to a sergeant.

24 Q. And you never bothered to look at it or say, here

25 it is? Did you take out the cartridge?

27

1 A. I would take both cartridges off it and hand it to

2 him.

3 Q. But didn't notice, incredibly enough, that it was

4 -- had been activated, un-activated or in what position it

5 was in?

6 A. No, sir.

7 MR. REYNOLDS: Objection, form.

8 MR. DAVID PAUL HORAN: I'm sorry. I just got a

9 call from Judge Goodman. He will hear us in 10 minutes.

10 I just need defense counsel on the phone. And, he's

11 expecting a call back.

12 MR. BURKE: Okay.

13 MR. MCKEE: Can you handle that with --

14 MR. DAVID PAUL HORAN: I can handle that.

15 MR. MCKEE: Thank you.

16 MR. DAVID PAUL HORAN: Do you want to go off the

17 record now?

18 MR. MCKEE: I think we should go off for 10

19 minutes. I think we should.

20 MR. BRILL: That's fine.

21 MR. MCKEE: I think we should bring it to the

22 judge.

23 MR. BRILL: Okay.

24 THE VIDEOGRAPHER: Off the video record at 9:23

25 a.m.

28

1 (Brief recess.)

2 THE VIDEOGRAPHER: Back on the video record at

3 10:43 a.m.

4 MR. BRILL: David Brill here on behalf of the

5 Eimers Family. Fundamentally, what's occurred since our

6 break in the deposition is the following:

7 Certainly, counsel for defense, correct me if I'm

8 wrong.

9 The Court, His Honor Magistrate Judge Goodman,

10 heard a motion regarding the continuing ability of the

11 deponent officer and others in the future during the

12 week to carry their weapons in the deposition. At the

13 end of that hearing, and there's a transcript at the

14 Magistrate Judge's courtroom that is available for

15 ordering, so it will obviously speak for itself.

16 But, fundamentally, what the Court did was give

17 plaintiffs a choice, plaintiff's counsel a choice, to

18 either continue with the deposition as is with the

19 officers being permitted to carry their weapons, and

20 also not allowing any plaintiff counsel to have their

21 own weapon, even with a valid CCF permit; or,

22 alternatively, to terminate the depositions and reset

23 them at a -- for a location at which the officers would

24 be required to place their firearms in a protective

25 environment, such location being particularly the

29

1  Federal Courthouse, for instance.
2      If we choose that latter option, then the
3  cancellation of the depositions would be at the
4  defendant's pro rata expense for the resetting and costs
5  of the court reporter and videographer.
6      In light of that, we chose the latter, at least for
7  today's depositions, to be reset, to get a different
8  location for them. Those two depositions today were, of
9  course, of Lovette, and later for Wanciak. Is that
10  correct?
11      MS. LEWIS: Zamora.
12      MR. BRILL: Zamora, pardon. Sergeant Zamora.
13      We are going to, by agreement of counsel, reset
14  Lovette for tomorrow at 9:00 a.m. at the Federal
15  Courthouse, presuming that our continuing efforts to
16  secure the federal courthouse location does in fact
17  prove fruitful, and that will commence at 9:00 a.m. And
18  then, following his deposition, we will then have
19  Officer Wanciak, who was previously set for Wednesday --
20  or, Tuesday morning, in where Lovette's position will
21  now be, we're going to push her up to the afternoon in
22  that same deposition location.
23      Sergeant Zamora will now be moved to November 21st.
24  That is a date that has been previously set for the
25  audiovisual deposition of Defendant City of Key West.

30

1  The deposition for the City and the Sergeant, those
2  depositions, one or the other, that will be worked out
3  which one will go first, but they will begin at 9:00
4  a.m.
5      MS. LEWIS: 9:30.
6      MR. REYNOLDS: 9:30.
7      MR. BRILL: Oh, pardon me. Thank you. 9:30. 9:30
8  a.m., let me correct. And, again, the order of them
9  will be worked out among the parties. And, I think that
10  should -- well, --
11      MR. MCKEE: One last point. If these depos were to
12  continue this week at this location, would those police
13  officer deponents be wearing a weapon with their
14  uniform?
15      MR. BURKE: Yes, they would.
16      MR. MCKEE: Okay. So, then we'll re-notice all of
17  them for the federal courthouse in light of that
18  representation.
19      MR. BRILL: We have agreed to communicate with each
20  other, the parties have, their counsel, through emails,
21  to identify that the locations are set.
22      MR. DAVID PAUL HORAN: Failing the federal
23  courthouse being available, we will then inquire as to
24  the state courthouse, which is a block away.
25      MR. BRILL: Can you hear that okay?

31

1      THE COURT REPORTER: Uh-huh.
2      MR. BRILL: Perfect. And, failing all that, we're
3  back to the drawing board and we'll have to address
4  exactly how we follow through with our having chosen the
5  latter choice that His Honor Judge Goodman gave us.
6  That should do it. Any comments from anybody, changes,
7  suggestions?
8      MR. BURKE: No. I'm going to order the transcript
9  of the digital record from earlier today, just so that
10  you know. And you can --
11      MR. BRILL: That's perfect.
12      MR. BURKE: -- get a copy of that as need be.
13      MR. BRILL: Sounds good. Thank you very much.
14      THE VIDEOGRAPHER: Off the video record at 10:47
15  a.m.
16      (The deposition was adjourned at 10:47 a.m.)
17      (Deposition continued November 4, 2014, in Volume
18  II.)
19
20
21
22
23
24
25

**A**

**a.m** 1:16,16  4:7
  10:12  27:25  28:3
  29:14,17  30:4,8
  31:15,16
**abilities** 17:17
**ability** 6:9  11:25
  28:10
**acceded** 8:4
**acted** 9:12
**actions** 17:23
**activate** 23:13
  26:7,11,13
**activated** 23:17,19
  25:22  27:4
**address** 31:3
**adjourned** 31:16
**ADOLFO** 3:9
**affiliated** 17:1
**affirm** 5:11
**afternoon** 29:21
**agency** 18:16
**agreed** 16:12  19:2
  30:19
**agreement** 29:13
**ahead** 12:22,25
**al** 1:8  4:11
**allowing** 28:20
**alternatively**
  28:22
**Amendment** 17:12,13
  18:13
**amount** 24:24
**and-a-half** 23:3
  24:25  25:4
**ANSELMO** 2:21
**answer** 11:2,12,12
  11:24  12:3  16:3
  19:6  22:11
**answered** 8:8  10:24
  11:23
**anybody** 31:6
**anyway** 6:1
**appear** 12:19
**appearance** 4:16
  13:24
**APPEARANCES** 2:1
  3:1
**appears** 18:24
**appreciate** 12:3
**apprehensive** 8:20
**appropriate** 6:12
  8:22
**Approximately**
  24:21
**apt** 21:16
**argue** 17:21  20:25

**arguing** 11:20
**argumentative** 7:19
  8:12  15:24  17:9
  17:24  18:8  21:4
  21:19  22:8
**armed** 9:10,11
**asked** 8:7,22  11:13
  11:21  14:14,25
  15:9  17:14
**asking** 5:22  11:19
  13:1,3
**Assistant** 18:21
**attempting** 7:20
**attending** 7:9
**attorney** 16:9
  18:21
**Attorney's** 17:17
**attorney-client**
  16:7
**attorneys** 9:24
**audio** 21:9,15  23:7
  23:14
**audiovisual** 29:25
**available** 28:14
  30:23
**aware** 19:24

**B**

**back** 27:11  28:2
  31:3
**Beach** 3:4
**BEDARD** 3:3
**behalf** 2:2,20  3:2
  13:25  28:4
**behavior** 15:11
**belief** 24:1
**believe** 7:12,13
  14:4  21:15  23:17
**best** 11:25
**better** 12:20
**beyond** 24:25
**block** 30:24
**blue** 17:5
**board** 31:3
**Bob** 4:24  10:21
**bothered** 26:24
**Boulevard** 2:3,13
  2:17,21
**brandish** 6:11
**break** 28:6
**Brief** 28:1
**Brill** 2:3,5  3:14
  4:18,18  5:20
  7:21,25  8:1,10
  8:14,16,19,25
  9:3  10:11,14
  11:2,9,17,19,21

**11:24**  12:2,5
  13:1,3,5,8,11,13
  13:18  14:1,6,9
  14:14,18,23,25
  15:3,8,12,14,16
  16:2,9,12,13
  17:22  18:1,23
  19:8,11  20:1,4
  20:13,15  21:1
  22:5  24:9,16
  25:11  26:2  27:20
  27:23  28:4,4
  29:12  30:7,19,25
  31:2,11,13
**bring** 5:23  19:12
  27:21
**bringing** 6:19
**brothers** 17:5
**Building** 3:3
**Burke** 2:21,23  5:5
  5:5  9:17,19
  12:22  13:2,4,7
  13:10,17,21  14:3
  14:4,7,12,16,19
  14:24  15:1,6,10
  15:13,15,22,24
  16:18  17:9,21,24
  18:8,24  19:5,9
  19:23  20:25  21:4
  21:19  23:1  24:6
  27:12  30:15  31:8
  31:12
**Burke's** 17:2
**burke@jambg.com**
  2:23
**bus** 12:20

**C**

**C** 2:19
**C-101** 3:3
**call** 8:24,24,25
  9:1  12:24  27:9
  27:11
**called** 26:19
**calling** 10:11
**calls** 15:24  24:7
  25:6
**calm** 6:9
**Calvert** 5:7
**camera** 21:14,15
**cancel** 8:13,18
**cancellation** 29:3
**candid** 21:17,24
**CARA** 2:11
**carry** 28:12,19
**cartridge** 26:25
**cartridges** 27:1

**case** 1:3  4:10,10
  4:12  6:4  9:23
  13:15  18:17,19
**cause** 4:3  5:12
**CCF** 28:21
**Certainly** 28:7
**Certified** 1:24  4:1
**chalking** 22:24
**chance** 25:9
**changes** 31:6
**Charles** 1:5
**chiggins@horan...**
  2:9
**choice** 28:17,17
  31:5
**choose** 29:2
**chose** 29:6
**chosen** 31:4
**City** 1:8  4:11  5:6
  6:6  17:16  18:25
  19:14  29:25  30:1
**civil** 6:3  9:13
  10:25
**client** 10:6  16:10
**Columbia** 3:3
**come** 8:2
**comfortable** 10:19
**commence** 29:17
**comment** 7:23
**comments** 31:6
**committed** 6:16
**communicate** 30:19
**completely** 10:19
**composed** 6:10
**comprehensively**
  20:20
**concern** 6:11
**concerned** 17:4
**concerns** 18:11
**confession** 22:22
**connected** 17:1
**contacted** 17:2
**continue** 10:13
  19:24  28:18
  30:12
**continued** 3:1  9:23
  31:17
**continues** 10:12
**continuing** 28:10
  29:15
**contrary** 8:4
**conveniently** 24:4
**copy** 31:12
**correct** 5:24  18:25
  19:4  23:11,14,19
  24:13  28:7  29:10
  30:8

costs 29:4
counsel 4:16 5:21
  7:24 8:3,16 9:12
  9:17,23 11:9,18
  13:3,21,24 14:4
  14:10,11 16:8
  17:8 18:24 27:10
  28:7,17,20 29:13
  30:20
course 29:9
court 1:1 4:5,12
  4:13 5:10 28:9
  28:16 29:5 31:1
courthouse 29:1,15
  29:16 30:17,23
  30:24
courtroom 28:14
crime 6:16
criminal 17:19
culpability 22:23
CVR-M 1:23

**D**

Darren 2:10 4:22
  4:22 10:22
darren@horan-w...
  2:9
date 20:10 29:24
David 2:5,10 4:18
  5:1,1 10:22 27:8
  27:14,16 28:4
  30:22
david@brillrin...
  2:5
day 11:10 19:2
  25:9,13 26:5,6
  26:17,20
deactivation 23:24
dealing 22:19
death 22:23 24:2
Deceased 1:5
decompress 22:16
decompressing
  22:18
decompression
  22:14,24
defendant 3:2
  13:19,20 29:25
defendant's 29:4
Defendants 1:9
  2:20 5:6
defense 5:22 8:3
  13:15 27:10 28:7
Del 5:9
department 16:20
  26:18
depends 21:21,25

22:1
deponent 5:22
  28:11
deponents 30:13
depos 30:11
deposed 7:6
deposition 1:13
  3:14 4:1,9 5:23
  6:3,8 7:9 8:8,15
  8:18 9:13,19
  11:1 14:10,13,20
  19:25 23:15 28:6
  28:12,18 29:18
  29:22,25 30:1
  31:16,17
depositions 11:8
  19:13 28:22 29:3
  29:7,8 30:2
Derek 5:7
despite 6:12 8:3
  17:16 18:11
  19:14
device 10:16
difference 7:6
different 29:7
difficult 12:9
digital 31:9
Direct 3:14 5:19
disagree 9:15
disappointed 8:19
discharged 23:18
discovery 19:7
  20:2
discussions 16:10
distinction 11:3
District 1:1,1
  4:12,12
DIVISION 1:2
dog 25:13,15 26:6
download 26:20
downloaded 25:10
downloading 26:10
dph@horan-wall...
  2:9
drawing 31:3
dressed 7:2
Drive 3:3
duly 5:17
duty 6:2,3,20,22
  6:22,25 7:1,10
  7:17,18 9:10
  10:17 11:4,5
  12:8,13
dynamic 20:22

**E**

earlier 31:9

East 2:21
efforts 29:15
Eimers 1:5,5 4:11
  4:19,21,23,24
  5:2 20:10 22:23
  24:2 28:5
either 28:18
email 5:21
emails 30:20
Embellishment
  22:12
empathy 20:21,23
entered 23:15
entire 26:9
environment 28:25
ESQUIRE 2:5,10,10
  2:11,15,19,23
  3:5
Estate 1:5
et 1:8 4:11
event 18:16 23:8
  24:19
events 24:2
everybody 14:2
  15:22
evidence 26:3
Ex 1:23 4:1,13
exact 20:22
exactly 31:4
exaggeration 22:24
Examination 1:21
  3:14 5:19
examined 5:17
excluded 19:14
expecting 27:11
expense 29:4
experience 20:21
explicitly 19:13
exposure 17:20
  18:5
eyes 7:14

**F**

facility 10:17
fact 10:7 17:16
  26:6 29:16
failed 19:2
failing 30:22 31:2
family 4:19,21,23
  4:25 5:2 21:22
  22:2 28:5
Fax 2:4,8,18,22
  3:4
FBI 18:19
federal 10:9 18:5
  29:1,14,16 30:17
  30:22

feds 17:20
feel 9:25 20:23
feels 8:21
feet 20:8
fellow 9:6 11:4
  12:15,19 13:14
  17:18
felt 8:2 10:19
Fifth 17:12,13
  18:12
filed 4:12
fine 27:20
finish 14:7
finished 13:10
  26:17
fire 25:12,14,23
firearm 5:23 6:11
  6:12,19 7:4,17
  7:21 8:6 10:15
  10:21,21,22
firearms 7:11
  28:24
fired 26:5
firing 25:21
FIRM 2:3
first 5:17 25:3
  30:3
five 9:24
flipping 26:16
Florida 1:1,8,18
  1:25 2:4,8,13,17
  2:22 3:4 4:2,3,8
  4:13
follow 31:4
following 9:21
  28:6 29:18
follows 5:18
footage 23:14 24:1
  24:10,12,17
force 19:18
form 7:19 11:10
  13:16 14:11,14
  15:8 21:11 22:4
  22:8,25 23:1
  24:5,6,15 25:6
  26:1 27:7
Fort 2:22
four 24:23
FPR 1:23
FRANCISCO 3:8
frankly 6:9
friends 21:9,13
  22:3
fruitful 29:17
fully 18:12
fundamentally 28:5
  28:16

future 28:11

**G**
Gabriel 3:9 5:6
Galbo 5:8
Garrido 3:9 5:6
Gary 1:13 3:2,14
  4:9 5:16
getting 6:6
give 8:22 26:23
  28:16
given 18:15
giving 5:12
go 10:12 12:22,25
  23:5 27:16,18
  30:3
going 10:18 11:9
  12:22 14:19,24
  15:1,2 17:12
  18:12 20:1 22:1
  22:22 25:23
  29:13,21 31:8
good 4:5 15:2,20
  31:13
Goodman 12:23,24
  14:5,21 15:2,6
  27:9 28:9 31:5
gotten 11:24 12:2
government 18:5,6
GROUP 2:12,16
guilt 22:22
Gustavo 3:9 5:8

**H**
H 3:5
hand 5:11 27:1
handle 27:13,14
happen 10:18
happens 25:3
happy 19:9,25
harassing 15:10
  17:9,24 18:8
  21:4,19 22:9
harassment 22:25
hazard 9:7
heads 8:22
hear 14:21 22:22
  27:9 30:25
heard 20:19 21:2,7
  28:10
hearing 28:13
height 20:7,9
Henry 5:8
Higgins 1:17 2:7
  2:11 4:8 23:15
history 9:16
HOCHMAN 2:21

holster 26:22
holstered 24:2
honest 21:17
Honor 28:9 31:5
Horan 1:17 2:7,10
  2:10 4:7,22,22
  5:1,1 27:8,14,16
  30:22
hour 23:3 24:20,25
  25:3,21
hours 24:23,24
HUMBERTO 3:9

**I**
identified 11:5
identifies 20:20
identify 30:21
II 31:18
III 1:13
immunity 18:15
implicated 20:22
important 22:6
improper 14:15
inappropriate 7:23
  7:25 8:13 9:22
  11:16 16:11
incident 20:10
  25:8
incidentally 18:24
include 19:17
incorrect 21:8
incredibly 27:3
INDEX 3:12
indictment 17:18
individual 5:22
  13:20
infinite 17:17
information 19:3
informed 16:4,6,14
  16:15,22
inquire 30:23
instance 29:1
intent 25:21
interrupted 13:11
intimidate 7:20
intimidated 8:17
  9:12
intimidating 7:22
  15:11
invoking 17:13
  18:12
involved 9:4
issue 19:6
issues 18:11
it'd 7:16

**J**

J 2:15
Jeannete 2:19
  10:22
Jeannette 4:20
jlewis@lewisle...
  2:18
job 14:11
Johnson 2:21 5:7
Join 16:1 17:10,25
  18:9 21:5,20
JR 3:5
judge 8:24,25 9:4
  9:21 10:9 12:23
  12:23 14:5,21
  15:1,6,6 27:9,22
  28:9 31:5
Judge's 28:14

**K**
Kathyann 3:8 5:8
Key 1:2,8,18 2:8
  4:8,11 5:6 17:16
  19:15 29:25
killed 20:10 22:7
knew 20:3 23:13
  26:10
know 6:18 8:2 10:9
  12:6,11,22 16:5
  16:19,21 17:2
  19:5 21:12 23:4
  23:6 24:12,14,17
  25:1,2,14 31:10

**L**
lack 12:20
large 4:3 9:15
late 19:1,2 23:7
  26:5
Lauderdale 2:22
Law 1:17 2:3,12
lawsuit 13:20
  19:21
lawyer 15:20
leave 10:2
Lee 1:13 3:2,14
  4:9 5:16
Legal 2:16 3:7
  4:13,15
legitimate 11:11
let's 8:23,24 9:1
  13:2
Lewis 2:16,19 4:20
  4:20 29:11 30:5
lie 22:3
light 29:6 30:17
likewise 12:8
Listen 9:25 11:9

literature 20:19
LLC 2:12
LLP 1:17 2:7
location 28:23,25
  29:8,16,22 30:12
locations 30:21
locked 10:16
long 16:23 24:17
look 14:4 26:24
lose 6:10
love 14:24
loved 21:13
Lovette 1:13 3:2
  3:14 4:9 5:4,16
  5:21 6:22 12:7
  19:4,15 20:5
  29:9,14
Lovette's 11:14
  29:20
lreynolds@rrbp...
  3:5
Lyman 3:5 5:3 12:4
  15:21 16:5,14,16
  16:23
Lyman's 15:20

**M**
M 2:10
ma'am 5:14
Magistrate 28:9,14
mail 10:13
making 23:6
man 9:4,15 10:5
  22:7
manner 9:14
material 19:3,13
  19:15,16,17,18
  19:22
Matthew 5:6
McKee 2:12,15 4:24
  4:24 8:23 9:1,4
  9:15,20,25 10:3
  10:5 27:13,15,18
  27:21 30:11,16
mean 7:13 9:19
  22:15,17
Medina 3:9 5:8
met 18:19,21
Michael 2:23 5:5
  13:21
Mike 18:24
mind 20:17
minutes 14:20
  24:20 25:22 27:9
  27:19
Monday 1:16 4:6
month 16:24

morning 4:5 29:20
motion 28:10
motions 19:12
move 7:23 9:18,22
  11:15,17 12:10
  12:21
moved 29:23
municipality 1:8
MURDOCH 2:21

**N**

name 4:18
named 13:19 19:20
natural 21:2
necessary 7:16 8:2
  8:5
need 19:24,24
  27:10 31:12
never 26:10,24
Nicholas 5:8
Notary 4:2
note 18:23
notice 25:19 26:6
  27:3
noticed 14:9
November 1:16 4:6
  29:23 31:17
Number 4:10

**O**

oath 21:16
object 14:11,14
  23:1 24:6
objection 7:19 8:7
  8:12,16 11:11
  12:21 13:16,17
  14:8 15:8,10,13
  15:24 17:9,21,24
  18:8 20:25 21:4
  21:11,19 22:4,8
  22:25 24:5,15
  25:6 26:1 27:7
obviously 28:15
occurred 28:5
offer 18:17
offered 18:17
office 1:17 17:2
  17:17
officer 5:3,23
  9:10 11:13 12:18
  13:20 19:4,15
  20:5 21:16 28:11
  29:19 30:13
officer's 10:24
officers 6:21,25
  9:6 10:19 11:4
  12:8,15,19 13:14

17:19 19:20
  28:19,23
offices 4:7
Oh 20:13 30:7
okay 7:9 10:4 13:5
  15:12,17 17:4
  21:22 24:22
  27:12,23 30:16
  30:25
ones 21:13
oo0oo 3:11
oops 25:22
opposed 14:2
option 29:2
order 12:17 14:17
  30:8 31:8
ordering 28:15
outrageous 15:11

**P**

P.A 2:16,21
Page 3:13
Pages 1:14
paid 6:6
Palm 2:3,13,17 3:4
pardon 29:12 30:7
parents 21:23
part 24:7 25:7
particular 12:16
  19:21 23:10
particularly 22:6
  28:25
parties 30:9,20
Paul 2:10 5:1,1
  27:8,14,16 30:22
people 21:7,8,17
perfect 31:2,11
perjurious 18:6
permit 28:21
permitted 28:19
person 9:7 22:21
Personal 1:5
phone 9:20 27:10
PIPER 2:21
place 28:24
plaintiff 1:6 2:2
  4:10 9:24 28:20
plaintiff's 9:12
  14:10 28:17
plaintiffs 28:17
plan 17:14,15
playing 15:4
please 4:16 5:11
  8:8 11:1 14:7
PLLC 3:3
plus 23:3
point 6:19 23:23

24:25 25:18
  26:10,19 30:11
police 9:10 16:20
  30:12
policy 12:12,16
  19:18
position 27:4
  29:20
potential 17:19
  18:4,5
Pratt 3:7 4:14
Present 3:7
presuming 29:15
previously 29:19
  29:24
privilege 16:7
privileges 17:13
pro 29:4
problem 10:15
procedures 19:19
proceed 8:9 10:25
  12:25
proceeding 20:2
PROCEEDINGS 3:12
production 19:1
Professional 1:25
  4:2
program 19:22
promise 15:3
prosecuting 18:15
protect 6:14
protecting 6:15
protective 14:17
  28:24
prove 29:17
proverbial 17:4
provide 9:13 19:3
provided 19:1,22
psychopath 20:17
psychopaths 20:21
  20:23
Public 4:2
purpose 4:8 22:11
push 29:21
put 9:1
putting 10:15

**Q**

question 7:15
  10:25 11:2,11,19
  11:22 12:9 14:25
  15:9 17:14
questions 13:2,3,4
  13:9 19:6
quiet 13:8

**R**

raise 5:10
rata 29:4
re-holstered 23:25
re-notice 30:16
reading 20:16
realize 17:19 18:2
  26:4
really 20:22
reason 9:11 10:6
  22:13
reasonable 22:21
recall 16:15
recess 28:1
recognizing 21:15
recollection 16:25
record 4:6,17 5:22
  9:2 10:1,11 14:8
  18:23 27:17,24
  28:2 31:9,14
recorded 24:20
recording 23:7
  25:4,19
records 23:13
  24:23 25:4
regard 23:5
regarding 19:15
  28:10
reiterate 7:15
related 19:19
relationship 21:18
relative 19:4,18
remain 6:9 13:8
remedies 14:17
repeatedly 11:10
reporter 1:24,25
  4:2,2,5,13 5:10
  29:5 31:1
represent 4:18,20
  4:22,24 5:2,3,5
representation
  13:15 16:11
  19:14 30:18
Representative 1:5
represented 13:21
  13:24 14:2,3
  15:19,21,22 16:4
  16:23 17:7,8
representing 13:5
  13:7
request 6:13 8:3,5
requested 9:5
requests 19:4
require 26:13
required 28:24
requires 6:8
reserve 19:8
reserving 19:11

reset 28:22 29:7
  29:13
resetting 29:4
respect 8:5
response 8:3 21:2
responses 19:1
responsive 19:3
review 25:10
reviewed 25:17
Reynolds 3:3,5 5:3
  5:3 7:19,23 8:7
  8:12,15,17 9:9
  9:18,22 10:2,4
  10:24 11:7,15,18
  11:20,23,25
  12:10,21 13:16
  13:23 16:1,5,7
  16:10 17:10,15,20
  18:9 21:5,11,20
  22:4,8,25 24:5,7
  24:15 25:6 26:1
  27:7 30:6
rid 25:23
right 5:10 10:16
  15:3 19:11
RINALDI 2:3
rmckee@themcke...
  2:14
ROBERT 2:15
ROBERTS 3:3
Roderick 3:7 4:14
room 8:21 9:7
  23:15
Royal 2:3,13,17
rule 15:5
running 20:2

**S**
saying 10:10
says 12:12
scene 23:17,20
second 10:12
secure 10:17 29:16
see 7:14
seek 19:13
seen 24:10,13
sent 5:21
sergeant 6:21,22
  26:23 29:12,23
  30:1
set 17:3 29:19,24
  30:21
shoot 25:12
shows 10:8
siblings 21:23
side 22:21
single 9:7 19:21

22:20 23:3,4
sir 5:11,25 6:2,5
  6:24 7:3,5,8,12
  10:17,20 12:7
  15:18,23 16:4
  17:6,11 18:3,10
  18:14,18,20,22
  19:5 20:6,11,18
  21:6,21 23:12,16
  23:22 24:3,11
  25:5,20,25 26:12
  27:6
sister 17:5
situation 21:21,25
situations 22:19
six 20:8
somebody's 25:13
soon 23:25 25:8,9
sorry 20:13 27:8
Sounds 31:13
Southern 1:1 4:12
speak 21:10 28:15
speaking 10:1
speculation 15:25
  24:7 25:7
stage 14:11,12
  15:1
starting 24:25
state 4:3,16 17:16
  18:6 30:24
statement 22:20
statements 9:23
  18:6 23:7
STATES 1:1
station 26:19
stealing 20:13
Stevens 5:7
stop 14:5
stops 25:4
Street 1:17 2:7
strike 7:23 9:18
  9:22 11:15,17
  12:10,21
studying 20:16
stuff 22:6
sued 13:20
suggestions 31:7
Suite 2:3,13,17,21
Sunrise 2:21
superior 12:18
Support 4:14,15
surely 21:7
Suzanne 1:23 4:1
  4:13
swear 4:17 5:11
switch 26:16
sworn 5:17 12:4

**T**
T 2:23
table 22:21
take 8:8 12:24
  14:21 15:20 19:9
  19:23 20:1 26:22
  26:25 27:1
taken 1:21 4:1,9
talking 14:8
tape 25:10
taped 21:10 25:1
tapes 24:17
Taser 23:7,11
  24:13,18 25:9
  26:9,13,18,22
tell 11:12,12 12:6
  21:7 26:21
telling 21:23
temper 6:10
term 12:20
terminate 14:19
  28:22
test 25:12,14,21
  25:23 26:5
testified 5:17 9:9
testify 11:7 17:5
testifying 17:14
  17:15 18:12
testimony 5:11
  11:13 12:3 18:16
  25:24
Thad 5:7
Thank 15:14 27:15
  30:7 31:13
theory 20:21
think 6:12 7:16
  10:9 12:23 21:9
  22:21,22 23:23
  25:3 27:18,19,21
  30:9
thought 8:5
threatened 9:25
three 7:17 10:18
  11:4,21 12:7,15
  14:20 24:23
throw 13:14
thrown 12:20
time 10:12 15:2
  20:2 25:23 26:9
today 4:6 6:12,19
  7:7 14:4 17:13
  18:7,7 21:16
  29:8 31:9
today's 29:7
Todd 5:7
told 24:19

tomorrow 29:14
topic 20:19
trained 23:10
  24:18
training 19:17,19
  19:21
transcript 28:13
  31:8
Treavor 1:5 4:11
tried 8:25 10:11
trust 6:9
trusting 21:18
truth 5:12,13
  21:10,24
try 10:13
trying 9:20
Tuesday 29:20
turn 20:23 26:14
turned 23:23
TUZZIO 3:3
twice 13:12
two 9:24 29:8
type 18:16
types 19:19

**U**
U.S 4:11,13,15
  18:21
Uh-huh 22:20 31:1
un-activated 27:4
unarmed 9:5 10:23
understand 14:1
  16:9 18:10
understood 5:23
underwent 19:21
uniform 7:2,10,16
  8:11 11:3,6 12:7
  12:11,13 30:14
UNITED 1:1
use 19:18 23:10

**V**
valid 28:21
Valle 5:9
Verbatim 1:24 4:1
video 1:13 3:14
  4:6,9 14:24 15:4
  21:14 23:14
  25:17 26:3 27:24
  28:2 31:14
videoed 21:9
videographer 3:7
  4:14 27:24 28:2
  29:5 31:14
violating 12:15
  15:4
voice 10:13

**Volume** 1:13  31:17
**vs** 1:7  4:11

---

**W**

**W** 2:5
**wait** 12:23,25  14:6
**walk** 26:21
**Wallace** 1:17  2:7
  4:7
**Wallis** 5:7
**Wanciak** 3:8  5:8
  29:9,19
**want** 8:2,8,13,17
  8:23  9:4  10:25
  11:11  12:6,24
  14:23  18:23
  27:16
**water** 20:14
**way** 7:17  8:21  9:8
  9:11,12  15:3
**we'll** 19:9,23,25
  23:5,18  30:16
  31:3
**we're** 4:7  10:22
  12:22  14:21  20:1
  20:2  29:21  31:2
**weapon** 8:23  10:8,8
  28:21  30:13
**weapons** 28:12,19
**wear** 7:16  8:6
**wearing** 30:13
**Wednesday** 29:19
**week** 28:12  30:12
**weight** 20:5,9
**West** 1:2,8,18  2:8
  3:4  4:8,11  5:6
  17:16  19:15
  29:25
**Weston** 2:4,13,17
**Whitehead** 1:17  2:7
**wife** 21:22  22:2
**wisdom** 17:17
**witness** 1:21  4:17
  5:14  7:20  9:9
  11:7,20  12:4
  24:8  25:7,8
**wolves** 13:14
**worked** 30:2,9
**worst** 8:20
**wouldn't** 23:4
**wrong** 18:25  28:8

---

**X**

---

**Y**

**yeah** 9:3  12:18
  19:8,11  22:17

---

**years** 19:20

---

**Z**

**Zamora** 3:8  6:22
  29:11,12,12,23

---

**0**

---

**1**

**1** 1:14  2:13,17
**10** 27:9,18
**10:43** 28:3
**10:47** 1:16  31:14
  31:16
**1000** 2:21
**14-10028** 4:10
**14-10028-CIV-M...**
  1:3
**17150** 2:3,13,17

---

**2**

**2** 2:3
**2014** 1:16  4:6
  31:17
**217-0150** 2:14,18
**21st** 29:23
**225** 20:6
**2455** 2:21
**294-4585** 2:8
**294-7822** 2:8

---

**3**

**3** 1:16
**305** 2:8,8
**31** 1:14
**32** 24:20
**33040** 1:18  2:8
**33304** 2:22
**33326** 2:4
**33327** 2:13,17
**334409** 3:4
**384-6226** 2:4
**3rd** 4:6

---

**4**

**4** 31:17
**463-0100** 2:22
**463-2444** 2:22
**470** 3:3

---

**5**

**5** 3:14
**561** 3:4,4

---

**6**

**608** 1:17  2:7
**688-2343** 3:4

---

**688-6560** 3:4

---

**7**

---

**8**

**876-4344** 2:4
**888-9877** 2:14,18

---

**9**

**9:00** 29:14,17  30:3
**9:02** 1:16  4:7
**9:08** 10:12
**9:23** 27:24
**9:30** 30:5,6,7,7
**954** 2:4,4,14,14,18
  2:18,22,22

---

32

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
                   KEY WEST DIVISION


      CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,


          Plaintiff,

vs.

CITY OF KEY WEST, a Florida municipality, et al.,


          Defendants.
_____/


      VIDEO DEPOSITION OF GARY LEE LOVETTE
                   Volume II
               (Pages 32 - 176)


            Tuesday, November 4, 2014
            9:01 a.m. - 12:07 p.m.
         United States Federal Courthouse
              301 Simonton Street
              Key West, Florida  33040



    Examination of the witness taken before:


            Suzanne Ex, CVR-M, FPR
            Certified Verbatim Reporter
            Florida Professional Reporter
```

33

```
                  APPEARANCES

On Behalf of the Plaintiff:
    BRILL & RINALDI, THE LAW FIRM
    17150 Royal Palm Boulevard, Suite 2
    Weston, Florida 33326
    (954) 876-4344 / Fax (954) 384-6226
    david@brillrinaldi.com
    BY:  DAVID W. BRILL, ESQUIRE

    HORAN WALLACE & HIGGINS, LLP
    608 Whitehead Street
    Key West, Florida 33040
    (305) 294-4585 / Fax (305) 294-7822
    dph@horan-wallace.com / darren@horan-wallace.com
    BY:  DAVID PAUL HORAN, ESQUIRE
    BY:  DARREN M. HORAN, ESQUIRE

    THE MCKEE LAW GROUP, LLC
    17150 Royal Palm Boulevard, Suite 1
    Weston, Florida 33327
    (954) 888-9877 / (954) 217-0150
    rmckee@themckeelawgroup.com
    BY:  ROBERT J. MCKEE, ESQUIRE

    LEWIS LEGAL GROUP, P.A.
    17150 Royal Palm Boulevard, Suite 1
    Weston, Florida 33327
    (954) 888-9877 / Fax (954) 217-0150
    jlewis@lewislegalgroup.com
    BY:  JEANNETE C. LEWIS, ESQUIRE

On Behalf of the Defendants:
    JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
    2455 East Sunrise Boulevard, Suite 1000
    Fort Lauderdale, Florida 33304
    (954) 463-0100 / Fax (954) 463-2444
    burke@jambg.com
    BY:  MICHAEL T. BURKE, ESQUIRE
```

34

```
            APPEARANCES CONTINUED

On Behalf of the Defendant Gary Lee Lovette:
    ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
    470 Columbia Drive, Building C-101
    West Palm Beach, Florida 33409
    (561) 688-6560 / Fax (561) 688-2343
    lreynolds@rrbpa.com
    BY:  LYMAN H. REYNOLDS, JR., ESQUIRE

Also Present:
    RODERICK PRATT, LEGAL VIDEOGRAPHER
    FRANCISCO ZAMORA
    KATHYANN WANCIAK
    GABRIEL HUMBERTO GARRIDO
    GUSTAVO ADOLFO MEDINA
    NAJA GIRARD, KEY WEST THE NEWSPAPER
    ARNAUD GIRARD, KEY WEST THE NEWSPAPER

                  --oo0oo--
```

INDEX OF PROCEEDINGS
                                          Page
Video Deposition of GARY LEE LOVETTE
Direct Examination Resumed by Mr. Brill ...... 35


INDEX OF PLAINTIFF'S EXHIBITS
                                          Page
No. 1   FDLE Mandatory Retraining Report ....... 111
No. 2   KWPD Training Summary ............. 115

35

```
1          (Continued from November 3, 2014, Volume I.)
2          THE COURT REPORTER:  We're here, Tuesday morning
3    November 4th, 2014, for the continuation of the
4    deposition of Gary Lee Lovette.  And, sir, I would just
5    remind you, you're still under oath.
6          THE WITNESS:  Yes, ma'am.
7          DIRECT EXAMINATION RESUMED
8    BY MR. BRILL:
9      Q.  Mr. Lovette, let's go back to discussing the Taser
10   first for today.  Am I understanding correctly that the
11   footage that identifies the last of the one minute and thirty
12   -- I'm sorry, one hour and thirty-some minutes of footage
13   from the Taser shows you -- is that your home or is that
14   a home of a friend or family member?
15     A.  I haven't seen the video.
16     Q.  It identifies in the footage that certainly, you're
17   in someone's home.  Again, we'll pull it up shortly.
18         (News reporters entered the deposition room.)
19         MR. BURKE:  I'm sorry to interrupt, but could we
20   ask for just who is present for the court reporter, if
21   that's all right.
22         MS. GIRARD:  Yeah.  Naja and Arnaud Girard with Key
23   West The Newspaper.
24         MR. BURKE:  Thank you.
25         MR. BRILL:  Good morning.
```

1 (Pages 32 to 35)

36

BY MR. BRILL:

Q.  You're in uniform.  You're on duty.  You're in a home.  And, again, we'll look at the video together and you'll tell me whose home, and you fire the Taser.  You can distinctly hear.  I'll proffer it to you and, again, you'll see it and hear it yourself, a thwacka-thwacka-thwacka sound as you do that.

Is it appropriate, within policy, guidelines, procedure, protocol, what have you, for an officer on duty, in uniform, to fire at a home or in his home?

MR. REYNOLDS:  Objection, form.

A.  To test fire it; yes, sir.

Q.  How is that done, mechanically speaking?  Describe how you go about firing to get that sound with this particular Taser that day.

A.  The Taser would be removed from the holster.  The firing cartridge would be taken off the front of it.  It would be turned on, and you would do a test fire by pulling the trigger.

Q.  And what, if anything, comes out of the Taser end?

A.  At the Taser end, it would be the electricity, at both ends.

Q.  Now, you've taken out the cartridge, you say?

A.  Correct.

Q.  What does that facilitate?

37

A.  By taking out the cartridge, when I pull the trigger, it doesn't fire the probes.

Q.  So the electricity is at the end of the Taser with the probes remaining in place?

A.  Well, the probes would be in the cartridge.  That would be in my hand.

Q.  The probes are in your hand.

What is emitting the electrical output at the end of the Taser then?  Is it -- are they, for lack of better terms, prongs also, of a different type?

A.  No, sir.  It's just the metal tips.

Q.  Metal tips; okay.

Now, what's important to me is that you said in that discussion, description, that you would have to remove the Taser, obviously, from your holster, take out the cartridge and key turn it on, correct?

A.  Correct.

Q.  And you described that to us a bit yesterday, before we had to reset this deposition for today, that that involves a switch on the Taser item, correct?

A.  Yes, sir.

Q.  And that is where on the physical part of the Taser?

A.  On the back end.

Q.  Do you have your Taser with you right now?

38

A.  Yes, sir.

MR. BRILL:  Do you have any objection to him showing it to the video?

MR. REYNOLDS:  I do, yes.

MR. BRILL:  Why?

MR. REYNOLDS:  Well, this isn't a demonstration.  This is a videotape deposition.

MR. BRILL:  Okay.

MR. REYNOLDS:  If you want to do a request to produce or a request for inspection --

MR. BRILL:  I'm requesting an inspection right now.

MR. REYNOLDS:  And I'm declining it at this time.

MR. BRILL:  On what basis or grounds.

MR. REYNOLDS:  The grounds are that this is not a demonstration for purposes of the camera.

MR. BRILL:  So what?

MR. REYNOLDS:  This is a videotape deposition.

MR. BRILL:  I get one shot to depose him.  It's today.  We all do.  There's a video right here.  I don't understand why him describing how he activated that particular feature on his Taser, that's the basis of objection.  I don't.

MR. REYNOLDS:  He can describe it for you, yes.  I am not going to have this witness pull out and do demonstrations with regard to his Taser.  There's been

39

no such request.  This is not --

MR. BRILL:  Well, that comment is conflict with our request that they don't come with any weapons.  So it's impossible for me to have requested that he come to demonstrate the Taser if our belief, as of September 26th, as we noted to the Court, was that no weapons would even be used.  But now that he has one, I don't see the point.

MR. REYNOLDS:  It's been declined.  Go on with your question, counsel.

MR. BRILL:  Interesting.  This will be something we'll also raise with the Court.  I see no legal basis.

BY MR. BRILL:

Q.  So, to fire and turn it on, is that different from the activation or the turning on of the Taser that you did, sir, at the time on the beach when you were with Mr. Eimers?

MR. REYNOLDS:  Objection, form.

THE WITNESS:  I turned on my Taser at the beach.  I removed the cartridge, but I never fired it.

BY MR. BRILL:

Q.  Not my question.  Move to strike.

I asked if the way in which you turned on the Taser at the home, whether it was your home or someone else's home, was the same way in which you turned it on at the beach with Mr. Eimers?

2  (Pages 36 to 39)

**40**

1   MR. BURKE:  Turned it on or fired it?
2   MR. BRILL:  Turned it on.
3   MR. BURKE:  Okay.
4   MR. BRILL:  I could say turn it on --
5   MR. BURKE:  I'm sorry.  Go ahead.
6   MR. BRILL:  -- in a different language, perhaps.
7   But, turn it on.
8   A.  Yes, sir.  I would turn on the same way.
9   Q.  Okay.  So, at the time you took out your Taser at
10  the home and turned it on, you're going to tell me, all of us
11  in this room, now that we have even press here, under oath
12  that you did not notice at that instant that it was already
13  turned on?
14  MR. BURKE:  Objection, argumentative.
15  MR. REYNOLDS:  Join.
16  A.  No, sir, I did not.
17  Q.  So you went to turn it on, and what?  What
18  happened?  If it was already on, what happened?
19  A.  I didn't -- I didn't notice it was on.
20  Q.  Pardon?
21  A.  When I pulled it out of my holster, I did not
22  notice that it was on.
23  Q.  When you go to physically, how do you turn it on?
24  Do you use a thumb, a finger?  What do you use?
25  A.  My thumb.

**41**

1   Q.  Which thumb do you use?
2   A.  My right thumb.
3   Q.  Do you have any problems with your ability or
4   sensory perception in the thumb that you use to turn on this
5   Taser?
6   A.  No, sir.
7   Q.  So you have the ability to feel the object, and
8   including the on and off button, correct?
9   A.  Yes, sir.
10  Q.  So nothing prevented you from having the senses,
11  the synapses from the method of touching an item, travel up
12  your arm  and to your brain to say, I feel this, correct?
13  A.  Feel what, that it's already on?
14  Q.  That you have a button that you have to move.  I
15  take it you move it up or down to turn it on?
16  A.  Correct.
17  Q.  When you went to do that and it didn't move up or
18  down, whichever direction it goes to turn it on, what did you
19  think?
20  A.  I don't know.
21  Q.  Was there a risk to anyone when you test fire and
22  get that thwacka sound as you Taser?
23  A.  With the cartridge off; no, sir.
24  Q.  But there was a risk somehow in your mind when you
25  were at the scene on the beach with it thrust up, jabbed up

**42**

1   against Mr. Eimers' body to turn it on?
2   MR. BURKE:  Objection.
3   BY MR. BRILL:
4   Q.  To activate it, I should say?
5   MR. BURKE:  Objection, argumentative.
6   MR. REYNOLDS:  Join.  Form.
7   A.  I don't remember ever putting it up against Mr.
8   Eimers.
9   Q.  Well, as we will address later, you have repeatedly
10  said that you were glad you didn't activate it --
11  A.  Correct.
12  Q.  -- or discharge it in what's called a drive option.
13  For what reason?  What was the concern?  Your fellow
14  officers, you said?
15  A.  Absolutely.
16  MR. REYNOLDS:  Objection, form.
17  Q.  You were concerned ostensibly that when you drive
18  fired that Taser that it would travel somehow through Eimers'
19  body to Gabe's hand that was stuck in the cuff.  That was
20  your claim.
21  A.  That was one of my concerns.
22  Q.  But you're saying that there was no concern in
23  drive firing it at the home with civilians, apparently even
24  loved ones or friends.  Why the difference?
25  MR. BURKE:  Objection, argumentative.

**43**

1   MR. REYNOLDS:  Join.
2   MR. BRILL:  It's amazing every one of my questions
3   are argumentative.
4   MR. REYNOLDS:  Move to strike improper comment of
5   counsel.
6   MR. BRILL:  Go ahead, you can answer.
7   MR. BURKE:  I find it amazing as well, but it is.
8   MR. BRILL:  Yeah, I know, because it's inquiring of
9   very important information that's not actually --
10  MR. BURKE:  No, you're making argument.  That's why
11  the questions are argumentative.
12  MR. BRILL:  -- in favor for the defense, so you
13  deem it argumentative.
14  BY MR. BRILL:
15  Q.  Go ahead.  You can answer.
16  What's the difference?
17  A.  The drive stun would be activated when someone was
18  actively resisting.
19  Q.  No, but what's the difference of the risk that you
20  deemed allegedly that discharging that Taser on Mr. Eimers'
21  body, and how you deemed it to be a safe thing to do on duty,
22  in your home or a home, to test fire at that moment?  Why no
23  risk there?
24  A.  Test firing is some thing we do every shift.  When
25  Mr. Eimers was resisting, that's a whole different thing.  I

3  (Pages 40 to 43)

44

would drive stun Mr. Eimers to prevent his resistance.

Q.  Which then leads to the next question.  If you do it once every shift, how many times in your, what is it, 11-year career?

A.  Close, yes.

Q.  Have you gone home during the middle -- you were still on duty when you were home at approximately 3:45 in the afternoon, correct?

MR. REYNOLDS:  Objection, form.

A.  I don't know.

Q.  Are you allowed, by the way, to just go home when you're on duty and hang out for a while?

A.  I don't believe I was home.

Q.  You were -- were you -- are you allowed to hang out at anybody's house just to hang out for, I don't know, five minutes, ten minutes, whatever the amount of time, while you're on duty on the taxpayer's dime?

A.  Yes.

Q.  No procedures or protocols regarding that?

A.  No, sir.

Q.  And your understanding of the procedures and rules regarding when you're allowed to just, you know, ah, take a load off, park your car, go to somebody's house, sit on a couch, talk about things, what governs when you're allowed to do that?

45

MR. BURKE:  Object to form.

MR. REYNOLDS:  Objection, form.

BY MR. BRILL:

Q.  What criteria do you use?

A.  There's a policy.  I'd have to review it.

Q.  You don't know it as you sit here?

MR. REYNOLDS:  Objection, form.

A.  No, sir.

Q.  Is that something that, incidentally, you habitually do, just decide at any point in a shift, ah, you know, I'll take a load off, stop my car, go the Joe Schmo's house, whoever it is, and just sit around and watch TV, talk?

A.  Sir, based on the tape --

MR. BURKE:  Objection, argumentative.

MR. REYNOLDS:  Join.

BY MR. BRILL:

Q.  Go ahead.

MR. BURKE:  You're going to have to give us a chance to arctic -- just hold on a second.  Let me finish my statement, and then you can speak.  That's why the court reporter's having trouble doing this.  Let me, let us indicate our objection.  Don't talk over our objections, if you would be so kind.

MR. BRILL:  I'm not talking over the objection. When I ask the question, you object.  Perhaps you could

46

ask your witness to pause a beat.  My question's done and you object.  I'm not interrupting your objection.

MR. BURKE:  Well, I think that some of us are talking over one another.

MR. BRILL:  Okay.

MR. BURKE:  And I'm sure it's not you, but if we could all try to be cognizant of that.

MR. BRILL:  Sure.

BY MR. BRILL:

Q.  Did you get the question?  Do you want to have the reporter read it back?

A.  That's okay.

No, I don't think it's against policy for me to stop at a friend's house or at my house and go to the restroom or something like that.  No, sir.

Q.  In all respect, I'm not saying go to the restroom. You have bodily functions you've got to deal with.  If you have a favorite bathroom to go to, good for you.

I'm talking about going to a house, whether it's your house, a friend's house, a loved one's house, anybody's house, and hanging out.  Is that allowed?

MR. BURKE:  Objection, argumentative.

MR. REYNOLDS:  Join.

A.  Sir, I don't believe there's a policy saying that I can't stop at someone's house.

47

Q.  Maybe we're missing each other.

When I use the terminology, "hanging out," what does that mean to you?

MR. REYNOLDS:  Objection, form.

A.  What does that mean to you, so I can answer the question for you?

Q.  No.  I mean, are you saying — how old are you?

A.  Thirty-four.

Q.  Thirty-four.  So in thirty-four years, you've never used the term, "hanging out."

A.  I have.

MR. REYNOLDS:  Objection, form.

Q.  Okay.  So what does it mean to you when you use it?

A.  To stop by, to say hello.  You've seen the video. I have not.

Q.  Well, leaving aside the video.  We'll get there. I'm asking generically, when you go to a house, whether it's yours, a friend's, a loved one's, as I've said, anybody's, during a shift and sit and rest and talk, watch television, and just chat up for minutes, you give me the length of time, when is that appropriate or inappropriate?

MR. REYNOLDS:  Objection, form.

A.  I don't know.

Q.  So here's, to me, and that's at least on this side of the table, the next key question about this case.  We'll

4  (Pages 44 to 47)

48

1  go through later today about all of the training that you've
2  had, but for just this moment in time and purposes of further
3  discussion with you, Mr. Lovette, you recognize that you have
4  had a significant amount of training and retraining on this
5  Taser.
6      MR. BURKE:  Object to the narrative.
7  BY MR. BRILL:
8      Q.  Correct?
9      MR. BURKE:  Object to the narrative which preceded
10  the question, and to the form of the question.
11      MR. REYNOLDS:  Join, and move to strike.
12  BY MR. BRILL:
13      Q.  Have you, in fact --
14      A.  Yes, sir.  I've had training.
15      Q.  And retraining?
16      A.  Yes, sir.
17      Q.  And, in fact, if memory serves, and I candidly
18  admit I could be wrong in the exact amount, but it's nearly
19  every year, if not every year, that you have Taser re-
20  updates, correct?
21      A.  Yes, sir.
22      Q.  So knowing that and knowing, therefore, that you
23  knew that when you activate or turn a Taser, it's going to
24  record audio and video, how can you, with this case, when you
25  left that beach thinking Mr. Eimers was dead, that you don't

49

1  do the most fundamental thing of law enforcement, and
2  immediately turn over that footage, that Taser, for
3  preservation of evidence?
4      MR. BURKE:  Objection, argumentative.
5      MR. REYNOLDS:  Join.
6      A.  At that time, I didn't know Mr. Eimers had passed.
7      Q.  You believed that Mr. Eimers was dead.
8      A.  No, sir.
9      MR. REYNOLDS:  Objection, form, argumentative.
10      Q.  You saw that he could not be resuscitated on the
11  beach despite efforts, correct?
12      A.  No, sir.
13      Q.  Okay.  Let's change the question if we want to play
14  that.
15      MR. REYNOLDS:  Objection, move to strike comment of
16  counsel.
17  BY MR. BRILL:
18      Q.  You recognized that Mr. Eimers, if he wasn't dead,
19  was damn close to it.  Fair?
20      MR. REYNOLDS:  Objection, form.
21      A.  Sir, I'm not a medical technician.
22      Q.  I'm not asking you if you're a doctor, Officer
23  Lovette.  I'm asking you if you understood --
24      A.  When I left the beach, he was in the custody of
25  EMTs and firefighters, not me.

50

1      Q.  Sir, I'm going to remind you again, you're under
2  oath.
3      A.  I understand that.
4      Q.  Okay.  So are you going to say, under oath, that
5  you, yourself, as a human being, not as Dr. Gary Lee Lovette,
6  M.D., that you did not believe that Mr. Eimers, at the time
7  of leaving the custody of the police and into that ambulance,
8  was not either dead or close to it?
9      MR. BURKE:  Object to the form of the question.
10      MR. REYNOLDS:  Object --
11  BY MR. BRILL:
12      Q.  Is that your testimony?
13      MR. BURKE:  Object to the form of the question, and
14  it's argumentative.
15      MR. REYNOLDS:  Join.
16      A.  No, sir.  I don't know what Mr. Eimers' condition
17  was when I left.
18      Q.  Again, I didn't ask what you knew.  I asked if you
19  were going to testify under oath that you did not believe
20  that Mr. Eimers was either dead or close to it when he went
21  into that ambulance?
22      MR. REYNOLDS:  Objection, form.
23      A.  No, sir, that was not my belief.
24      Q.  What was your belief?
25      A.  I was actually dispatched to another call.  I left

51

1  the scene.
2      Q.  Oh, you didn't leave the scene for quite a while.
3      MR. REYNOLDS:  Objection, form.
4  BY MR. BRILL:
5      Q.  What was your belief about Mr. Eimers' state of
6  health as Gary Lee Lovette, II, Officer, Key West Police
7  Department, not as a fictional medical doctor?
8      MR. REYNOLDS:  Objection, form.  Move to strike,
9  improper comment of counsel.
10      MR. BURKE:  Join.
11      A.  Sir, again, I didn't have a belief on Mr. Eimers'
12  condition at that time.
13      Q.  Wow.  Okay.  So, whatever your belief was or
14  wasn't, explain to us, please why you did not do one of the
15  most fundamental responsibilities as a law-enforcement
16  officer in a police-involved use of force incident that
17  resulted in Mr. Eimers being -- attempted to be resuscitated
18  on the beach with a restaurant-supplied defibrillator device,
19  and then placed into an ambulance to be rushed to the
20  hospital, why you did not save immediately your Taser audio
21  and video?
22      MR. REYNOLDS:  Objection, form.
23      MR. BURKE:  Argumentative and compound.
24      A.  Sir, I can't save or delete anything on my Taser.
25  If it was turned on, that video footage was saved.  I can't

5 (Pages 48 to 51)

52

1 remove it. I can't download it. I don't have that access.
2   Q. You didn't give it to any detective, officer, crime
3 scene technologist, IT personnel, to do it, as was later done
4 that day, did you?
5     MR. REYNOLDS: Objection, form.
6   A. Sir, the only person I would have relinquished my
7 Taser to would be a sergeant or superior officer.
8   Q. And you didn't do that.
9   A. I wasn't asked for it. No, sir.
10   Q. That wasn't the point. Again, you're an officer
11 with 11 years of experience or thereabout, correct?
12   A. Yes, sir.
13   Q. You got trained and retrained and retrained again
14 on this Taser, as we've established, correct?
15   A. Correct.
16   Q. You understood that as you turned on that Taser, it
17 activates, correct?
18   A. Correct.
19   Q. And you understood that when you activate, it
20 triggers the video and audio of this Taser, for filming of
21 upwards of one minute and thirty-six seconds or thereabout.
22     MR. MCKEE: One hour.
23 BY MR. BRILL:
24   Q. Or, one hour and thirty-six minutes -- excuse me,
25 or thereabout, correct?

53

1   A. Did it film that one hour and thirty-two from the
2 beach scene?
3   Q. It triggers the filming — I'll restate so we're
4 very clear with each other.
5   A. Okay.
6   Q. -- from the moment of activation, until the moment
7 of deactivation, up to one hour and thirty-some minutes,
8 correct?
9   A. I believe so; yes, sir.
10   Q. And you knew that you, which is another point we'll
11 get to shortly, were the only officer that brandished his
12 Taser and activated it at the scene?
13   A. I activated, but never fired it.
14   Q. Didn't ask that. My question again, to be very
15 clear, is you knew you were the only one at the scene on the
16 beach who took out his Taser and activated it, correct?
17   A. Not correct.
18   Q. No?
19   A. No, sir.
20   Q. Who else did it?
21   A. I don't know.
22   Q. Well, you —
23   A. I can't speak for other officers, so I don't now if
24 any other Tasers were brandished or turned on.
25   Q. But you knew yours was?

54

1   A. Yes, it was.
2   Q. And you know yours was activated?
3   A. Yes, it was.
4   Q. And you knew yours had filmed. Could you think —
5 correct?
6   A. Yes, sir. I believe so.
7   Q. For as long as it was activated until whenever it
8 was deactivated, correct?
9   A. Correct.
10   Q. Which we learned later wasn't until hours later at
11 the home?
12   A. Yes, sir.
13   Q. So, I ask you again in a different way, knowing
14 that, can you, first of all, think of a better piece, more
15 objective piece, of evidence of what actually transpired on
16 that beach than this footage?
17     MR. REYNOLDS: Objection, form, argumentative.
18     MR. BURKE: Objection, argumentative. Calls for
19 speculation.
20   A. Sir, where I'm confused is on your time line.
21 You're stating that I turned it on at the beach, and it
22 recorded for an hour thirty-two some-odd minutes. You said
23 that. But then, you also said that I did a discharge at the
24 end of that hour and thirty-two, around 3:45 p.m., which
25 would have been more than hour.

55

1   Q. Many hours later.
2   A. Many, many hours.
3   Q. That's not what I'm saying.
4   A. So I'm confused on your time line.
5   Q. Okay. I'm happy to clarify.
6     When you turned on your Taser at the beach, --
7   A. Yes, sir.
8   Q. -- that starts the clock ticking.
9   A. Correct.
10   Q. For the hour and thirty-some-odd minutes of the
11 audio and video footage, correct?
12   A. I don't know. I don't know what —
13   Q. That's what the Taser is supposed to do.
14     MR. REYNOLDS: Wait, don't interrupt the witness.
15     MR. BRILL: I apologize.
16   A. When the Taser was turned on at the beach, I can't
17 tell you when it was turned off. I haven't reviewed videos.
18 You keep saying an hour and thirty-two minutes, but I don't
19 know when the hour and thirty-two minutes started and ended.
20 I don't know if it was turned on later, and then shut off and
21 hour and thirty-two minutes later. I don't know what was
22 recorded at the beach. I have not reviewed that, sir.
23   Q. You're missing my point, and I will try to go back
24 so that we don't miss each other.
25   A. Yes, sir.

56

Q.  Despite my attempts to be clear, I'll be attempting making it more clear.

When you are on the beach and you activate the Taser -- we're going to take it in little baby steps -- that starts the clock for the audio and video on the Taser, correct?

A.  Yes, correct.

Q.  Okay.  Now, if you did, in fact, what you thought and what you were supposed to do, you would have turned off the Taser and put it into your holster at the time you were finished using it with the threat of discharging it, correct?

MR. BURKE:  Object to form.

MR. REYNOLDS:  Join.

A.  It would have been re-holstered; yes, sir.

Q.  And turned off?

A.  If it wasn't secured in the holster, it would have shut off.  No, sir.

Q.  When you take your Taser off of Mr. Eimers, and the event at the scene of the beach is over, what do you do with it?  What are you -- let me ask you this.  What are you supposed to do with it, sir?

MR. REYNOLDS:  Objection, form.

A.  Re-holster the Taser and secure it.

Q.  And when you secure it, you're not supposed to keep it on, are you?

57

A.  The way our Taser holsters are set up, when the holster gets secured, it would shut off the Taser.

Q.  Okay.  So my point again, is if it did that, if you -- if you, yourself, did that, and confirmed that it would turn off, from that moment we would have had "X" number of minutes, nowhere near an hour and thirty-some-odd minutes, of the particulars of what happened from the moment you activated it on the beach to the moment you put it back in your holster, correct?

MR. BRILL:  Object to form.

A.  Yes.  If my Taser was secured in my holster, it would have shut off.

Q.  Whose job is it to secure it properly in the holster so it's not on active?

A.  Mine.

Q.  So we know that was not done.

A.  That's correct.

Q.  We know it kept recording.  So I go back to the point.

After you're done at the scene of the beach where Mr. Eimers is transported by ambulance to the hospital, why did you do the most basic of officer requirements, and take yourself with your Taser over to a sergeant, and say:  Sarge, I activated my Taser.  I turned it on, thus triggering critical evidence of video and audio footage.  I put it back

58

in my holster.  Here it is.  This is evidence of the case.

MR. REYNOLDS:  Objection, form.

MR. BURKE:  Object to form, argumentative.

BY MR. BRILL:

Q.  Why didn't you do anything like that, sir?

MR. BURKE:  Argumentative.

MR. REYNOLDS:  Join.

A.  Sir, as far as I for the policy, when a Taser is activated and deactivated and not fired, it's not policy to have it downloaded.

At that point, with everything going on, I had not been asked to relinquish my Taser for evidentiary value until later on that day.

Q.  Someone would have to know to ask you for it.  Someone would had have known that you activated it and put it onto the person.

Who would have to tell that sergeant or whoever it is you think has to direct you of that information?  Who's responsibility is that?

MR. BURKE:  Object to form.

MR. REYNOLDS:  Objection, form.

A.  I don't recall ever telling anybody.

Q.  Exactly.  How is someone supposed to, in your supervisory role that you claim is required to direct you to do this most very fundamental thing of preserving key audio

59

and video evidence?  Sergeant, whoever he is:  Hey, Officer Lovette, did you take out your Taser?  Did you turn it on?  Did you put it on Mr. Eimers' body or threaten to discharge it on him and, thus, capture critical evidence?  Oh, did you?  Okay.  Give me that.  Is that required for you?

MR. REYNOLDS:  Objection.

MR. BURKE:  Objection, argumentative and extremely redundant.

MR. REYNOLDS:  Join.

A.  I don't believe by policy it is.

Q.  With all of the training you have undergone in all of your years, are you telling me you don't -- or, telling us, under oath, you don't appreciate how critically valuable such evidence is in any case?

MR. BURKE:  Objection.

BY MR. BRILL:

Q.  Video and audio of the actual events that transpire?

MR. REYNOLDS:  Objection, form, argumentative.

MR. BURKE:  Join.

A.  Sir, if I capture that audio and video, whether it was downloaded immediately or downloaded six hours later, it's still on my Taser.

Q.  Unless you continue to record all the way through the day without recognition that you had not turned off your

7  (Pages 56 to 59)

60

1  Taser, so that the events of the day in the beginning simply
2  were recorded over, right?
3       MR. REYNOLDS:  Objection, form.
4       A.  I did know that.
5       Q.  Well, then, if you're right, you're saying someone
6  deleted that critical footage from the beach because it was
7  preserved when you put your Taser back into your holster,
8  necessarily turning off the Taser automatically, preserving
9  that footage.  That's what you think.
10      MR. BURKE:  Object to form.
11      MR. REYNOLDS:  Objection, form, argumentative.
12  Assumes facts not in evidence.
13      A.  Sir, I don't have that ability, and I don't know if
14  our sergeants or anybody above us have that ability to delete
15  footage.
16      Q.  But I want to make sure that I understand your
17  testimony.  Your belief is that when you take — if you take
18  out your Taser, turn it on, don't discharge it, but
19  activating, therefore, the audio and video, and place it back
20  into your holster, it's supposed to automatically turn off
21  the Taser by the activation switch?
22      A.  When you holster the Taser and you secure it, it
23  will shut if off.
24      Q.  And if that happened, your belief is, whether this
25  is true or not, is that the footage that was just secured

61

1  from the time on the beach would have been preserved there
2  forever, until download, correct?
3       MR. REYNOLDS:  Objection, form.
4  BY MR. BRILL:
5       Q.  That's your belief?
6       A.  I believe so; yes, sir.
7       Q.  Then later, if you were to turn on footage -- to
8  turn on the, pardon, the Taser, activating more footage, your
9  belief is that footage from earlier in the day would still be
10 there.  This is a new download, a new triggering event,
11 correct?
12      A.  Yes, sir.
13      MR. BRILL:  Can we take a break for two minutes,
14 please.
15      THE VIDEOGRAPHER:  Off the video record at 9:28
16 a.m.
17      (Brief recess.)
18      THE VIDEOGRAPHER:  Back on the video record at 9:3?
19 a.m.
20 BY MR. BRILL:
21      Q.  I want to see if I can essentially recap a little
22 bit of where we are with the Taser thing.
23      When you were at the beach, you take it out of your
24 holster, you turn it on with the button as you described,
25 right?

62

1       A.  Yes, sir.
2       Q.  Okay.  And we agree with each other that when you
3  turn it on or activate it, that triggers that audio/video?
4       A.  Yes, sir.
5       Q.  You believe that when you holstered the weapon
6  back, that after you put the — first of all, you put the
7  cartridge back in?
8       A.  Correct.  When I remove — I removed it at the
9  beach.
10      Q.  Right.
11      A.  With the intention of delivering a drive stun.
12      Q.  And so we're clear on that, too, when you're at the
13 beach, and you first take your Taser out, right out of the
14 holster?
15      A.  Correct.
16      Q.  It doesn't automatically turn on?
17      A.  No, sir.
18      Q.  You have to turn it on with the button on the
19 thumb?
20      A.  Yes, sir.
21      Q.  And as we talked about a little bit, you have two
22 ways that a Taser can be used, this particular Taser anyway?
23      A.  Yes, sir.
24      Q.  It could — you could fire it like a gun, and it
25 will send out wires connected to these points that will --

63

1  probes that will go onto the body if connected?
2       A.  Yes, sir.
3       Q.  Or you can take out that cartridge that has those
4  probes as you've talked about, right?
5       A.  Yes.
6       Q.  And then you just have the, what you'd call the —
7  if I get it wrong, forgive me — the points at the end?
8       A.  Yes, sir.
9       Q.  And then, by touching the body of someone, it could
10 generate the electricity as a drive stun?
11      A.  Yes, sir.
12      Q.  Is force required to do that?  Like if I — that
13 is, if I just touch it to the person's skin, is that enough
14 to send the drive fire, or do I have to push with some force?
15      A.  As soon as it's close enough to the skin, it will
16 deliver even stun.
17      Q.  Can it drive stun even just off the skin, but
18 close?
19      A.  If you were close, it could arc; yes, sir.
20      Q.  Arc, a-r-c?
21      A.  I believe so.  I believe that's the spelling.
22      Q.  Kind of like a bridge between the points of the
23 Taser and the body of the person?
24      A.  Yes, sir.
25      Q.  And as you've testified earlier, and please correct

8  (Pages 60 to 63)

64

1 me if I'm wrong, when you get done with the threat of the use
2 of the drive stun, you then put the cartridge back into the
3 Taser?
4     A.  Yes, sir.
5     Q.  You then -- is there anything else after that that
6 you have to do before placing it into the holster?
7     A.  No, sir.
8     Q.  And the holster and the Taser are -- they're made
9 for each other?
10     A.  Yes, sir.
11     Q.  You're not using an after-market holster for this
12 particular Taser device?
13     A.  No, sir.
14     Q.  It comes together as one package?
15     A.  I believe so.  Yes, sir.
16     Q.  Or whether it comes together or separately might --
17 the point that we're making here together is that they sister
18 perfectly?
19     A.  Yes.
20     Q.  And when you place it back into the holster, it is
21 supposed to turn off what you have activated as on?
22     A.  Not until you secure the hood.
23     Q.  Okay.  Explain that to us.
24     A.  On the top of the Taser there's a hood, almost like
25 car or gun holsters, that flips over to secure the -- secure

65

1 the Taser in the holster.
2     Now, it will flip over and it will hold it, but if
3 you push it a little bit more, it will click, and that's what
4 would actually shut off the Taser.
5     Q.  Is it audible if there's not enough ambient noise
6 or noise around you?
7     A.  Yes, sir.
8     Q.  You can hear the click --
9     A.  Yes, sir.
10     Q.  -- of it turning off?  Do you recall hearing a
11 click that day?
12     A.  No, sir.
13     Q.  But you have no doubt, at least in your brain, and
14 tell me if I'm wrong, that when you put that -- is it a --
15 you said a hood?
16     A.  The hood.
17     Q.  The hood over the Taser, you put it all the way
18 down?
19     A.  I don't remember doing that.
20     Q.  But that's what you believe you did?
21     MR. BURKE:  Objection, argumentative and leading.
22     MR. REYNOLDS:  Join.
23     A.  I remembering holstering the Taser because my hands
24 were free.  I couldn't tell you if I flipped the hood over,
25 if I partially flipped it over, if I flipped it over and

66

1 secured it.  I don't know.
2     Q.  You believe there's an actual chance that you would
3 put your Taser in the cart -- in the holster, but not put the
4 hood over it?
5     A.  Depending on the situation, yes, sir.  There was a
6 lot going on during that time, from the point I holster my
7 Taser.
8     Q.  Under your scenario of placing the Taser back into
9 the holster, but before putting the hood just yet, so the
10 footage that's automatically recorded when you turned it on
11 would capture, it will be documented on audio/video as it
12 goes into the holster?
13     A.  If my Taser was still on; yes, sir.
14     Q.  And it would, as you were testifying moments ago,
15 if that's correct, your testimony, then it necessarily would
16 still be on until the hood goes over the weapon?
17     A.  If the Taser was still on when I holstered it, and
18 the hood was not secured, the Taser would stay on.
19     Q.  When you take your Taser out to test fire it, do
20 you have to turn it on with the thumb?
21     A.  Yes, sir.
22     Q.  The same switch we've been talking about?
23     A.  Yes, sir.
24     Q.  When you do that each day, do you turn it off
25 before holstering it, or do you just holster it and place the

67

1 hood to turn it off automatically?
2     A.  I don't know.
3     Q.  Well, I want you to close your eyes and I want you
4 to think.  Just go through the motions in your brain about
5 how you would just every day -- how long have you had a
6 Taser?
7     MR. REYNOLDS: Objection, form.
8 BY MR. BRILL:
9     Q.  Years?
10     A.  A few years.
11     Q.  And you test fire it every day, if not pretty much
12 every day?
13     A.  Almost every day.
14     Q.  So this is an action you do on a regular basis,
15 hundreds, thousands of times if you've had it for years.
16     MR. BURKE:  Object to form.
17 BY MR. BRILL:
18     Q.  Fair?
19     MR. REYNOLDS:  Join.
20     A.  Not thousands of times.  I only --
21     Q.  How many --
22     A.  We only work a few days a month.  We only work 13
23 or 14 days a month.
24     Q.  Okay.  So, let's say you're working roughly 180
25 days a year, how many years have you said you had it?  I'm

9  (Pages 64 to 67)

**68**

```
 1   sorry.
 2       A.  I believe, three.
 3       Q.  Okay.
 4       A.  Maybe more.
 5       Q.  All right.  So, let's say six, seven-hundred times,
 6   correct?
 7       A.  If done every shift; yes, sir.
 8       Q.  So, that's a lot of times doing something of a
 9   repeated activity.  As you envision doing it, what is your
10   habit when you place -- or, when you finish test firing?  Are
11   you turning it off with your thumb, or are you putting it
12   into the holster with the hood to make it turn off?
13           MR. REYNOLDS:  Objection, form.
14       A.  In a sterile test, testing environment?
15       Q.  Yes.
16       A.  No threat?  I would believe I'd shut it off with my
17   thumb.  I would re-secure it and shut it off before I
18   holstered it.
19       Q.  So we can draw two fair -- two conclusions from
20   that fairly.  Correct me if I'm wrong again.
21           One, that if you are doing what you normally,
22   habitually do, albeit it in a we'll call a less stressful
23   environment, you're -- you would be turning it off with your
24   thumb before holstering it?
25           MR. REYNOLDS:  Objection, form.
```

**69**

```
 1   BY MR. BRILL:
 2       Q.  Correct?
 3       A.  Yes, sir.
 4       Q.  So, if you did what you normally, habitually do on
 5   the day of Mr. Eimers' beach situation, that's what you would
 6   have done, again, all stress of the situation aside?
 7           MR. REYNOLDS:  Objection, form.
 8           MR. BURKE:  Object to form, calls for speculation.
 9   BY MR. BRILL:
10       Q.  Correct?
11       A.  Yes.
12       Q.  Alternatively, if it wasn't already off by your
13   actions in turning it off by yourself, you're going to put it
14   in the holster, as we said, with it still on, correct?
15       A.  Yes.
16       Q.  Filming and audio recording, right?
17       A.  I would have put it in my holster on; yes, sir.
18       Q.  And then you would put the hood over the weapon?
19           MR. BURKE:  Objection to form.
20   BY MR. BRILL:
21       Q.  At some point, whether it's immediately after
22   holstering it or some point after, surely, Mr. Eimers' is
23   cleared from the scene?
24           MR. REYNOLDS:  Objection, form.
25           MR. BURKE:  Objection, compound.  Calls for
```

**70**

```
 1   speculation.
 2   BY MR. BRILL:
 3       Q.  Fair?
 4           MR. REYNOLDS:  Join.
 5       A.  Yes, sir.
 6       Q.  And that's because, forgetting everything about
 7   this particular case, you would not leave, it's just
 8   ingrained in your head, you're not going to leave either your
 9   firearm or your Taser without a hood on it?
10           MR. REYNOLDS:  Objection, form.
11   BY MR. BRILL:
12       Q.  Because then, it's just -- someone could grab it
13   right out of your holster, right?
14           MR. REYNOLDS:  Objection, form.
15   BY MR. BRILL:
16       Q.  You can answer.
17       A.  As I said earlier, the hood that comes over, you
18   can push the hood over and it will cover the Taser, and it
19   may even appear secure.  But until that extra pressure is
20   added, and it might have just gotten holstered and my hand
21   flipped it, it might not have been secure.  And in this
22   situation, it sounds like that's what happened.  It wasn't
23   secure because it was still on.
24       Q.  Well, there is an alternative, and we'll get to
25   that.
```

**71**

```
 1       A.  Okay.
 2       Q.  But I understand that is one option.
 3       A.  Yes, sir.
 4           MR. REYNOLDS:  Objection, form.
 5       Q.  Going back to my question is that you would have,
 6   without any doubt, at some point after Mr. Eimers is taken
 7   away by ambulance, and certainly well within that one hour
 8   and thirty-some minute time frame, secured your weapon, that
 9   Taser, with the hood, whether all the way or part of the way,
10   correct?
11           MR. REYNOLDS:  Objection, form.
12           MR. BURKE:  Compound, argumentative.
13           MR. REYNOLDS:  Join.
14           MR. BURKE:  Calls for speculation.
15       A.  Yes, the Taser would have been covered, either
16   partially or fully secured.
17       Q.  In the five, six-hundred, whatever number of times
18   that you've test fired your Taser or whatever, have you ever
19   told your sergeant that somehow, your Taser remained
20   activated in your holster?
21       A.  Not that recall.  No sir.
22       Q.  Have you ever, yourself, just realized the next day
23   or the next time that you took your Taser out, that, oh, wow,
24   I didn't turn it off, or the hood didn't go all the way to
25   turn it off?  Anything?
```

72

1     A.  Yes, sir.  I've had those situations.
2     Q.  After you had turned it on?
3     A.  After using it; yes, sir.
4     Q.  When?
5     A.  I couldn't tell you when.
6     Q.  When you say after you used it, was it in an actual
7 use-of-force event or a test-fire event?
8     A.  It could have been a test fire.  It could have been
9 videoing something.
10     Q.  What do you mean by video something?
11     A.  We can videotape evidentiary stuff.  If we're
12 dealing with someone and we don't have a way of recording it,
13 we can turn our Taser on and record it that way.  I've done
14 that before.
15     Q.  In what type of situations have you done that?
16     A.  Aggravated battery situations when talking to a
17 witness or a suspect.
18     Q.  So that's a -- that opens up a whole other line
19 here.  Of all the officers, including those in this room that
20 were present at the scene of Mr. Eimers' incident on the
21 beach, do you know of a single officer, some of whom had
22 weapons drawn, some of whom didn't, that used their Taser
23 just to record the event?
24     MR. REYNOLDS:  Objection, form.
25     A.  Sir, I can't speak for other officers.  You'd have

73

1 to ask them.
2     Q.  What made this event any less compelling or
3 appropriate for the securement or the use of a Taser video
4 than an aggravated battery?
5     MR. REYNOLDS:  Objection, form.
6     MR. BURKE:  Objection, calls for speculation.
7     A.  In this situation, I don't -- I can't speak for
8 other officers, like I said, but it wasn't my thought process
9 to get all that video evidence from my Taser of this
10 incident.  It was to secure Mr. Eimers.
11     Q.  Fair enough, for what you were using the Taser for.
12     A.  Correct.
13     Q.  Leaving aside, as we've discussed a little bit and
14 we'll get back to, the securement of that evidence from
15 yours, I'm simply asking generically, hypothetically,
16 whatever, what made this event any less worthy of somebody,
17 any one of those officers that were there on the scene, to
18 audit it, video it from their Tasers?
19     MR. REYNOLDS:  Objection, form.
20 BY MR. BRILL:
21     Q.  Like an aggravated battery?
22     MR. REYNOLDS:  Objection, form.  Compound,
23 argumentative.
24     A.  Like I said a few minutes ago, it's not something
25 that we videotape.  We don't videotape batteries in progress.

74

1 We don't -- it's after the fact, talking to witnesses,
2 talking to suspects, that I have recorded from my Taser,
3 stuff like that.
4     In this situation, I don't -- I don't think I
5 thought, hey, I should videotape this whole incident.  It was
6 let me assist these officers in securing Mr. Eimers.
7     Q.  But in the training that you undergo for the Taser,
8 the key reason, if not the reason, why Taser and other
9 companies that make these devices have the audio/video is to
10 capture the moment as soon as it's activated for just this
11 type of thing, what's the police-involved event, right?
12 That's why they have the footage?
13     MR. REYNOLDS:  Objection, form.
14     MR. BURKE:  Objection, argumentative.
15     MR. REYNOLDS:  Argumentative.
16     MR. BURKE:  Calls for speculation.
17     MR. REYNOLDS:  Calls for speculation on the part of
18 the witness.
19     MR. BRILL:  I don't think it's speculative.  He
20 went through the training.
21 BY MR. BRILL:
22     Q.  Isn't that — am I correct?
23     A.  Yes.
24     MR. REYNOLDS:  He's not testifying for the Taser.
25 Move to strike.

75

1     Q.  Am I correct?
2     A.  When we turn our Taser on, it's to catch the
3 evidence, correct.
4     Q.  Go back to my question then.
5     Forgetting that you're at the head of Mr. Eimers,
6 literally his head, and you're using your Taser for the
7 threat of discharge of the drive fire, can you think of a
8 good reason, any good reason at all, that not a single other
9 officer would have had their Taser out to record this event?
10     MR. REYNOLDS:  Objection, form.  Calls for
11 speculation.
12     A.  Sir, again, I can't speak for the other officers.
13     Q.  I'm not asking you to speak for them.
14     I'm asking you, as an officer who underwent this
15 training, and retraining, and retraining, and described for
16 us the reason for the audio/video feature, can you think of a
17 good reason why nobody filmed it?
18     MR. REYNOLDS:  Objection, form, argumentative.
19     MR. BURKE:  Objection, calls for speculation, and
20 it's argumentative.
21     A.  No, sir.
22     Q.  So let's go back.  So, in your mind, at that moment
23 and after, the only audio/video recording from a Taser device
24 that you know of is your own?
25     A.  Yes, sir.

11 (Pages 72 to 75)

76

1    Q.  Is the Key West Police Department discussing body
2    cameras?
3    A.  I believe so; yes, sir.
4    Q.  How long have they been discussing that?
5    A.  I do not know.
6    Q.  A while?
7    A.  I do not know.
8    Q.  What's the reason they're discussing the use of
9    them?
10   A.  I do not know.
11   Q.  So if, in your mind, at that time, you believe your
12   Taser is the only Taser on the scene that's recorded anything
13   of this event, why is it that you don't take that Taser on
14   your own to evidence, to sergeants, to whatever?
15       MR. REYNOLDS:  Objection, form, argumentative,
16   calls for speculation on the part of the witness.
17   A.  Sir, I never thought at that time who's Taser was
18   out, who recorded, who did what.  I assisted in securing Mr.
19   Eimers.
20       When I re-holstered my Taser, I continued to assist
21   with securing him.  I never thought of, I need to get this
22   Taser to a sergeant as soon as possible, because, like I
23   stated earlier, whatever was recorded stays in the Taser.
24   Q.  So then, we go back to that issue, staying in the
25   Taser.  One of the options, and as I see it there are only

77

1    two, but I'm going to ask you if you see any others, is you,
2    in fact, as we discussed, either turned it off physically
3    with your thumb before putting it back in your holster, or it
4    turned off when you put the hood over, as all those hundreds
5    of times you've done, with the rare exception, and it
6    captured the audio and video footage and it should stay
7    there, right?
8        MR. BURKE:  Object to form.
9        MR. REYNOLDS:  Join.
10   A.  Yes, sir.
11   Q.  And then, as you're going through the day after
12   this event, it turned on or you turned it on somehow in a
13   subsequent event, whether to audio, video, or make sure you
14   had it available to use, right?
15       MR. REYNOLDS:  Objection, form.
16       MR. BURKE:  Object to form.
17   A.  I don't remember how it got turned on.  I couldn't
18   tell you how it got turned on.
19   Q.  Understood.  But that is the -- if we have later
20   footage, audio and video footage from that day, and if it in
21   fact turned off in one of the two ways we've described, it
22   had to get turned on somehow?
23       MR. REYNOLDS:  Objection, form.
24   BY MR. BRILL:
25   Q.  Afterwards, right?

78

1        MR. BURKE:  Object to form, compound.
2        MR. REYNOLDS:  Objection, form.
3    BY MR. BRILL:
4    Q.  To trigger the video and audio?
5        MR. BURKE:  Compound.
6        MR. BURKE:  Object to form, compound, calls for
7    speculation.
8        MR. REYNOLDS:  Join.
9    A.  The stuff you said earlier about the hour and 32
10   minutes, I haven't see the video, so I can't tell you the
11   beginning of that video.  If I see the beginning of the
12   video, I could tell you exactly how it got turned on.
13   Q.  Okay.  Well, and we'll get there.  I promise.  I
14   have it, but it's long, and I want to go into it one
15   statement or issue at a time.  So right now, I'm just talking
16   about generalities, but I -- absolutely, you're going to --
17   we're going to hear it.
18       But for -- to my point is, for it to come on later
19   in the day or to have footage later in the day, if it was
20   turned off, it had to have come back on, right?
21       MR. BURKE:  Object to form.
22       MR. REYNOLDS:  Objection, form.
23   BY MR. BRILL:
24   Q.  That switch?
25       MR. REYNOLDS:  Objection, form.

79

1        MR. BURKE:  Object to form, calls for speculation
2    and it's compound.
3    A.  Yes.
4    Q.  And that's because, as we talked about, it can't
5    audio and video by itself without the switch turning on?
6        MR. REYNOLDS:  Objection, form.
7    BY MR. BRILL:
8    Q.  Right?
9    A.  Not that I know of; no, sir.
10   Q.  Now, is it your testimony you don't remember any
11   event between Mr. Eimers' event and later in the day that
12   required you to remove your Taser from your holster?
13       MR. REYNOLDS:  Objection, form.
14   BY MR. BRILL:
15   Q.  Was there any, any call -- well, you mentioned, I'm
16   sorry.  You mentioned that there was, that you were called to
17   a subsequent call.
18   A.  Almost -- well, close to after Mr. Eimers'
19   incident, on Northside Drive.
20   Q.  I'm sorry.  Where?
21   A.  On Northside Drive behind the movie theater.
22   Q.  And what type of call was that?
23   A.  We got a call of a gentlemen with a, I believe, a
24   gun, pointing it at cars.
25   Q.  Okay.  And that event ended up being a guy, correct

80

1   me if I'm wrong, dressed in all black, with one of those hand
2   exercise devices?
3     A.  Yes, sir.
4     Q.  That he was pointing at cars that drove through, as
5   if that's a fun thing to do, to scare the drivers, right?
6     A.  Yes, sir.
7     Q.  And drivers, reasonably, thought that he might have
8   a weapon in his hand?
9     A.  Yes, sir.
10     Q.  For that event, did you pull out your Taser or
11   activate it in anticipation of needing to use it?
12     A.  I don't remember.
13     Q.  Is it possible?
14     A.  Yes, sir.
15     Q.  That's the type of call that you might do that for?
16     A.  Yes, sir.
17     Q.  If that's what happened, or it otherwise was turned
18   on for any other call or any other reason, then it would
19   record until you turned it off or it got turned off with the
20   hood, right?
21     A.  Yes.
22     MR. BURKE:  Objection, lack --
23     THE WITNESS:  Sorry.
24     MR. BURKE:  That's all right.  Objection, lack of
25   foundation and predicate with respect to the use of the

81

1   recording capabilities on the Taser.
2     MR. REYNOLDS:  Join.
3     Q.  Was the Taser out of your possession at all from
4   the time on the beach with Mr. Eimers to the time you
5   ultimately turned it in to whomever you turned it in?
6     A.  I don't believe so; no, sir.
7     Q.  And who did you give it to?
8     A.  Sergeant Jeff Williamson.
9     Q.  Is Sergeant Jeff Williams [sic] a sergeant with the
10   Key West Police Department?
11     A.  Yes, sir, he is.
12     Q.  What is his job description, besides being a
13   sergeant?
14     A.  He's a road patrol day shift sergeant.
15     Q.  Was he your sergeant that day, as your boss?
16     A.  No, sir.
17     Q.  Is he a different shift?
18     A.  Yes, sir.
19     Q.  Why to him?
20     A.  I do not know.
21     Q.  Were you instructed to give it to him?
22     A.  Yes.
23     Q.  By whom?
24     A.  I do not know.
25     Q.  Someone that is your boss on your shift?

82

1     A.  I don't recall.
2     Q.  Would there be any record of who instructed you to
3   give your Taser to Sergeant Williams [sic]?
4     A.  Unless it was aired over, over the radio.
5     Q.  Do you recall what was said about -- to you about
6   giving the Taser over to Sergeant Williams [sic]?
7     A.  No, sir.
8     Q.  Do you recall the method that it was delivered,
9   whether over a radio or phone?
10     A.  No, sir.
11     Q.  How many officers, incidently, were on shift?  Is
12   it a Bravo or Alpha shift?
13     A.  On Bravo, days.
14     Q.  And how many officers are on Bravo that day?
15     A.  I do not know.
16     Q.  How many, roughly, are typically on Bravo shift?
17     MR. REYNOLDS:  Objection, form.
18   BY MR. BRILL:
19     Q.  Give us a range, if you can.
20     A.  Between six and twelve.
21     Q.  How many were on the beach at one time with Eimers?
22     MR. REYNOLDS:  Objection, form.
23     A.  I don't know.
24     Q.  The maximum number that were available?
25     A.  I couldn't tell you.

83

1     Q.  Was there anyone not on the beach at some point
2   with regarding Mr. Eimers' event that was on duty on Bravo
3   then?
4     MR. REYNOLDS:  Objection, form.
5     A.  I don't know.
6     Q.  Is that a normal response, that is the normal
7   number of officers that respond to a scene?
8     MR. REYNOLDS:  Objection, form.
9     A.  I couldn't tell you.
10     Q.  How many responded to the scene of the man thought
11   to be brandishing a firearm immediately after Mr. Eimers'
12   event there in the middle of a street somewhere?
13     A.  I don't know.
14     Q.  Far less than the numbers that were on Eimers'
15   beach, right?
16     MR. REYNOLDS:  Objection, form.
17     A.  Sir, you can actually check CAD, and it will tell
18   you everybody that responded.
19     Q.  I think it was -- best recollection, wasn't it you
20   and another?
21     MR. REYNOLDS:  Objection, form.
22     A.  There was multiple people there.  We're talking
23   about the Northside Drive, correct?
24     Q.  Yes.
25     A.  I could tell you at least three.

13 (Pages 80 to 83)

84

```
 1        Q.  But less that with -- let's see, one, two, three --
 2   eight, nine officers with Mr. Eimers?  Ten?
 3        A.  I don't know how many were there.
 4        Q.  Eleven, actually.
 5        MR. REYNOLDS:  Objection, form.
 6   BY MR. BRILL:
 7        Q.  So, if -- if there's anywhere between six and
 8   twelve that are on duty on Bravo shift, the best case
 9   scenario is there was one officer that was maybe not at the
10   beach?
11        MR. BURKE:  Objection, calls for speculation.
12        MR. REYNOLDS:  Join.
13        A.  Sir, you have to also realize, during the day, you
14   have detectives, you have mounted units, you have water
15   units, you have traffic units.  There could be, you know, 25
16   people on duty during the day.
17        Q.  So then, going back to the all-important Taser
18   issue, your understanding is that the entire Eimers' episode
19   was recorded and stayed recorded in the video and audio
20   memory?
21        MR. BURKE:  Objection, lack of --
22   BY MR. BRILL:
23        Q.  Correct?
24        MR. BURKE:  Objection, lack of foundation.
25        MR. BRILL:  That's --
```

85

```
 1        MR. BURKE:  Well, when you're done, let me know.
 2        MR. BRILL:  I'm sorry, I --
 3        MR. BURKE:  You stop and start.
 4        MR. BRILL:  It's just that I'm so used to folks in
 5   federal court following the local rule requirement to
 6   just say form, that I'm jumping the gun.  But if you
 7   want to say more than that, I'll try to get better.
 8        MR. BURKE:  Well, I say the particular form
 9   objection so that in the event you wish to correct the
10   question, you'd be able to.
11        MR. BRILL:  How about, if it's -- you know, I would
12   like to be the way I was taught, where you say
13   "form," and if I really care about what you think is
14   wrong with my objection [sic], I'll ask for you to
15   clarify.
16        MR. BURKE:  That'd be fine.
17        MR. BRILL:  If that's --
18        MR. BURKE:  I'll be happy to do that.
19        MR. BRILL:  Okay.  Thank you.
20        MR. BURKE:  If you're going to stipulate to that.
21        MR. BRILL:  Because I don't -- that would be great.
22   That would be great.  I appreciate that, because I'm not
23   cutting you off on purpose.  It's just, I'm so triggered
24   that way.
25        MR. BURKE:  Well, I object to the form of the
```

86

```
 1   question, and there are multiple reasons for it.
 2        MR. BRILL:  Well, could you just say, "objection to
 3   form"?
 4        MR. BURKE:  Well, there are a bunch of form
 5   objections.
 6        MR. BRILL:  Well, form -- we can have a -- I will
 7   stipulate that when you say form, it could mean any of
 8   the legal bases for a form objection.  And if I need to
 9   ask for clarification because I think there may be merit
10   enough to your objection that I care to rephrase, I'll
11   do that.  Is that fair?
12        MR. BURKE:  That is fair.  I'll be happy to do
13   that.
14        MR. BRILL:  I appreciate it.
15        MR. BURKE:  So I object to the form of that
16   question.
17   BY MR. BRILL:
18        Q.  Your understanding, therefore, is that the entire
19   Eimers' episode was recorded and stayed in the video/audio
20   memory?
21        MR. REYNOLDS:  Objection, form.
22        A.  Yes, sir.
23        Q.  Is it also your understanding that the only way the
24   audio/video memory could be lost is if it was erased by
25   someone?
```

87

```
 1        MR. BURKE:  Form.
 2        MR. REYNOLDS:  Form.  Join.
 3        A.  I didn't know it could be erased.
 4        Q.  But is it -- now, you didn't erase it?
 5        A.  I didn't know it could be erased at all.
 6        Q.  So, if you didn't know it could be erased, you made
 7   no effort to attempt to touch that data, let alone erase it.
 8   Correct?
 9        A.  No, sir.
10        MR. REYNOLDS:  Objection, form.
11        Q.  And so, when you handed your Taser to Sergeant
12   Williams [sic], as ordered later in the day, you had it
13   in your custody the whole time?
14        A.  Yes, sir.
15        MR. REYNOLDS:  Objection, form.
16        Q.  And you gave it with the belief that the Eimers'
17   episode material was still in there?
18        A.  Yes, sir.
19        MR. BURKE:  Form.
20        MR. REYNOLDS:  Objection, form.
21        Q.  And you made no effort yourself, as we've talked
22   about, to destroy it or alter it or tamper with it, right?
23        A.  No, sir.
24        Q.  So if it is not there, and if it was recorded and
25   stayed recorded, the only way we don't have it is because
```

14  (Pages 84 to 87)

88

1  someone else erased it?
2      MR. REYNOLDS:  Objection, form.
3  BY MR. BRILL:
4      Q.  Not you, but someone else?
5      MR. BURKE:  Form.
6      MR. REYNOLDS:  Objection, form.
7  BY MR. BRILL:
8      Q.  Correct?
9      A.  I don't know.
10     Q.  Can you think of any other reason under the sun
11 that that data, the audio and video, is gone?
12     MR. BURKE:  Form.
13     MR. REYNOLDS:  Objection, form.
14     A.  No.
15     Q.  Is Sergeant Williams [sic], to your knowledge --
16     A.  Williamson.
17     Q.  I'm sorry.
18     A.  Williams is retired.
19     Q.  Williamson.
20     A.  Yes, sir.
21     Q.  I apologize.
22        Did he have anything to do with the download of the
23 data?
24     A.  I believe he was the one who downloaded my Taser.
25     Q.  Can you identify for us who besides Sergeant

89

1  Williamson would have access to the data on your Taser?
2      A.  I know my sergeants have access to it.  Above them,
3  I don't know who has access to it.
4      Q.  So, whatever additional audio and video we have on
5  your Taser from after, your belief, when you turn in your
6  Taser, is that it would have had that data, as well as the
7  Eimers' episode?
8      MR. BURKE:  Form.
9      MR. REYNOLDS:  Join.
10     A.  Sir, I didn't know it had that extra data.  That
11 hour and 32 minutes was unbeknownst to me.
12 BY MR. BRILL:
13     Q.  I understand.
14     A.  But Eimers -- I was under the belief Eimers' video
15 was on there.
16     Q.  And if, in fact, as we now know happened, the Taser
17 got turned on again by you at some point after the Eimers'
18 episode, and recorded, it was -- it would be your belief that
19 we would then see that audio/video from that time frame, plus
20 the Eimers' stuff.
21     MR. REYNOLDS:  Objection, form.
22 BY MR. BRILL:
23     Q.  Correct?
24     MR. BURKE:  Same objection, form.
25     A.  Whenever my Taser was turned on and shut off, it

90

1  would have a recorded episode.
2      Q.  So we'd have -- we should have both?
3      A.  Yes, sir.
4      MR. REYNOLDS:  Objection, form.
5      MR. BURKE:  Same objection.
6      THE WITNESS:  Sorry.
7      Q.  Do you find it unusual that every one of your
8  brother and sister officers in their sworn statements fail to
9  mention that you activated your Taser?
10     MR. BURKE:  Form.
11     MR. REYNOLDS:  Objection, form.
12     A.  I can't speak for them, sir.
13     Q.  Do you find it unusual that every one of your
14 brother officers, except for your sister officer, Ms.
15 Wanciak, don't even mention your name?
16     MR. BURKE:  Form.
17     MR. REYNOLDS:  Join.
18     A.  I can't speak for their writing abilities.
19     Q.  Is it the responsible, procedural, required thing
20 to do, to identify what officers are on scene --
21     MR. REYNOLDS:  Objection, form.
22 BY MR. BRILL:
23     Q.  -- who have involvement in an episode such as this?
24     MR. REYNOLDS:  Objection, form.
25     A.  Sir, after an incident like we were on, and you're

91

1  saying there was 11, 11 officers there, I couldn't name all
2  of the officers that were there, so couldn't put that in my
3  report.
4         I could tell you what I did on that, on that scene,
5  and I believe I put that in my report.  But, other than that,
6  I don't believe I named anybody else.
7      Q.  If you, in fact, levied a powerful blow to the back
8  of Mr. Eimers' head, should your officers have put that in
9  their report?
10     MR. BURKE:  Form.
11     MR. REYNOLDS:  Objection, form.
12     A.  If they witnessed it; yes, sir.
13     Q.  And if you were, in fact, not just one of the
14 officers that were on the outskirts of the scene with a
15 weapon or -- but actually in the position in which you found
16 yourself that day, in which you placed yourself that day, you
17 should have been named in everybody's report?
18     MR. REYNOLDS:  Objection.
19     MR. BURKE:  Form.
20     MR. REYNOLDS:  Objection, form.
21     A.  Again, I can't speak for what they put in their
22 reports.
23     Q.  I understand that.  But they should have?
24     MR. BURKE:  Form.
25     MR. REYNOLDS:  Objection, form.

15  (Pages 88 to 91)

92

BY MR. BRILL:

Q. You were --

A. That's not a policy thing for people to put other people's names. It's not saying you shall put everybody's name on scene in your report.

Q. Shouldn't they put, for lack of a better term, you're a featured player, someone that did something significant on the scene?

MR. BURKE: Form.

BY MR. BRILL:

Q. In their reports?

A. Again, if that's something they witnessed, and they thought it was important, then they should have written that.

Q. Can we agree with each other that you were a -- you were involved in a significant manner in the detention and episode of Mr. Eimers?

MR. BURKE: Form.

MR. REYNOLDS: Objection, form.

A. I was involved with his -- with his detention and his restraints.

Q. And if you were making the call, if it was your responsibility to follow up with your fellow officers, everyone should have done what Officer Wanciak did, and put your name in that report as to what you did?

MR. BURKE: Form.

---

93

BY MR. BRILL:

Q. Correct?

A. Sir, I've never read Officer Wanziak's report.

Q. Respectfully, not my question, sir.

My question is, if it was your call to make and the officers, your fellow officers were to follow their responsibilities in report writing, given what role you played, they should have mentioned your name, just like Officer Wanziak put it in.

MR. REYNOLDS: Objection, form.

MR. BURKE: Form.

A. Again, sir, I can't tell you want they were supposed to write in their reports. I would -- I would like them to write what they witnessed, and that was it.

Q. Is it a policy that all witnesses to serious incidents be recorded by officers, all officers, that were present?

MR. REYNOLDS: Objection, form.

A. I don't know. I'd have to review policy.

Q. I was going to touch on this later, but while we're on the issue of witnesses, the one incredible thing to me, among many, regarding witnesses, is we have this one witness, this female from Columbia, who we find out later recorded the episode on a smart phone. Right, we've learned that?

MR. BURKE: Form.

---

94

MR. REYNOLDS: Objection, form.

A. I don't know her nationality or who she is; but, yes, there is a video.

Q. Exactly. We don't know a name.

I think there's one spot in all of this material we've all been provided that purports to give a number in Columbia, and every other name we have come to know, but this key, key witness.

Are you going to say that that complies with departmental policy, not to get the name, address, telephone number, email address, everything you can about this one witness who is, incredibly enough, fortuitous enough to record the events of the Eimers' episode on her cell phone?

MR. BURKE: Form.

MR. REYNOLDS: Objection, form.

A. That was not my responsibility that day. I can't speak for other officers, and I can't speak for the policy for that.

Q. Well, you're — isn't that what policy dictates, whether it's your job or someone else's job, that woman's name, her contact information, should have been secured?

MR. BURKE: Objection.

BY MR. BRILL:

Q. Correct?

---

95

MR. REYNOLDS: Objection, form.

A. I don't know.

Q. You really don't know?

MR. REYNOLDS: Objection, form.

A. No, sir.

Q. Didn't you do undercover detective work as part of your job?

A. Yes, sir. I did.

Q. And is it your testimony under oath today that you were not given any policies, standards, requirements, education, training of any kind that says, get the names and contact information of important witnesses to events?

MR. REYNOLDS: Objection.

MR. BURKE: Form.

A. I'd have to review the policy, but there were a lot of witness statements handed out. I couldn't tell you filled them out, and I can't tell who they talked to and who they didn't.

Q. You're aware that one of your sergeants in your police department managed to contact this witness, get email from her of two different portions, one nine seconds longer than the other one, of this footage, emailed to him?

A. No, I did not.

MR. REYNOLDS: Objection, form.

THE WITNESS: Sorry.

96

1    Q.  And yet, do you know her name?
2    A.  No, sir.
3    Q.  Do you know anybody who knows her name?
4    A.  No, sir.
5    Q.  Do you know her address in Columbia, or wherever
6    she may live?
7    A.  No, sir.
8    Q.  Do you know anyone who does?
9    A.  No, sir.
10   Q.  Shouldn't we have that information?
11       MR. REYNOLDS:  Objection, form.
12       MR. BURKE:  Object to form.
13   A.  I couldn't tell you.
14   Q.  Do you know when — what type of smart phone do you
15   have; iPhone?
16   A.  Yes, sir.
17   Q.  You know when you capture some footage for minutes,
18   that if you want to send it by email or by text, you can do
19   that?
20   A.  Yes, sir.
21   Q.  But if it's more than "X" number of minutes or
22   seconds long, you have to send it in portions, right?
23   A.  I didn't know that.
24   Q.  Because if it's too long, it's going to be too long
25   to carry over either Wi-Fi or the data plan, whichever you

97

1    might have, to the receiver.  So you've got to -- it
2    automatically will shorten it in the iPhone.
3        MR. BURKE:  Object to form.
4        MR. REYNOLDS:  Objection, form.
5    A.  I didn't know that.
6    Q.  So, if we've got these portions of footage, one
7    that starts the time that Mr. Eimers, a point we'll get to
8    later, goes down on his knees on the beach, but ends nine
9    seconds earlier than a second portion, does it stand to
10   reason we have maybe a third, a fourth, a fifth, of the whole
11   event by this woman?
12       MR. BURKE:  Object to form.
13       MR. REYNOLDS:  Objection, form.
14   A.  I don't know.
15   Q.  If you were filming this event, if you were in that
16   woman's shoes, would you stop filming only a minute and nine
17   seconds in?
18       MR. BURKE:  Object to form.
19       MR. REYNOLDS:  Objection, form.
20   A.  Sir, I can't speak for her.  I can't speak for what
21   I would do.
22   Q.  I mean, it's at the most important part.  The
23   officers are on this man, around this man, and it just stops.
24       MR. REYNOLDS:  Objection, form.
25       MR. BURKE:  Object --

98

1    BY MR. BRILL:
2    Q.  Have you seen that footage?
3        MR. BURKE:  Object to form.
4    A.  I have seen the footage.
5    Q.  And would you agree with me, it just stops?
6    A.  I can't tell you why.
7    Q.  That would be great, wouldn't it, if we could
8    contact her and ask her, hey, you have more of that footage
9    you can send us?
10       MR. REYNOLDS:  Objection.
11   BY MR. BRILL:
12   Q.  Wouldn't that be great?
13       MR. BURKE:  Object to form.
14       MR. REYNOLDS:  Objection, form.
15   BY MR. BRILL:
16   Q.  Wouldn't it?
17   A.  Absolutely.
18       MR. REYNOLDS:  Join.  Form.
19   Q.  It would be evidence in this case if we had it.
20       MR. REYNOLDS:  Objection, form.
21   BY MR. BRILL:
22   Q.  More footage from the minute and nine seconds on,
23   right?
24       MR. REYNOLDS:  Form.
25   A.  I assume so; yes, sir.

99

1    Q.  On the date of the incident, what was your cell
2    phone number?
3        MR. REYNOLDS:  That's privileged.  That's -- a
4    police officer's cell phone is not to be given out.
5        MR. BRILL:  Or, we can write it down.  We won't put
6    it on the paper record.
7        MR. REYNOLDS:  No, it's something we need to take
8    up.  It's --
9        MR. BRILL:  Yes.
10       MR. REYNOLDS:  -- protected by statute.
11       MR. BRILL:  Oh, I -- I understand -- I'm sorry.  I
12   didn't mean to interrupt you, Lyman.
13       MR. REYNOLDS:  That's okay.  And I'm sure you're
14   aware of that.
15       MR. BRILL:  Oh, yeah.
16       MR. REYNOLDS:  Okay.  So we'll go on.
17   BY MR. BRILL:
18   Q.  But as we'll see from this footage from the video
19   from your Taser, you were receiving texts and sending texts
20   throughout the day about this event?
21   A.  I couldn't tell you what I sent on that day.
22   Q.  But you say it on the Taser.  In fact, I think the
23   words were, and we'll point to it again.  We're going to get
24   there.  It says, "I received 17 million texts," obviously an
25   exaggeration, for it wasn't exactly 17 million, "about all

100

1  this, asking me things like did I shoot the guy." There's
2  even spots where you're texting and driving, which is
3  obviously not the right thing to be doing, but that's another
4  story.
5      Do you recall that you were sending and receiving
6  texts throughout that day about this episode?
7      A.  I don't recall what --
8      MR. BURKE:  Object to form.
9      MR. REYNOLDS:  Join.
10     THE WITNESS:  I don't recall what texts were sent
11  and received that day; but, yes.
12  BY MR. BRILL:
13     Q.  Who's your carrier?
14     MR. REYNOLDS:  Same, same objection.  That's
15  privileged, counsel.
16     MR. BRILL:  You know, the point of the privilege,
17  just so we're -- you know, my point is clear on the
18  record, is so that outsiders don't have that information
19  to be able to then go and identify where an officer
20  might reside.
21     I am offering, at this point, in the protection of
22  that statute, to go off the video and paper record and
23  have him write it down, and we can send the subpoena, or
24  we can have an authorization directly from counsel and
25  the officer, to secure this obviously relevant data.

101

1      That's -- I'm making that option, too.
2      MR. REYNOLDS:  We will have to take this up with
3  the Court with regard to a protective order.  You have
4  the press here and, again, you send out a subpoena,
5  that's public record.  Again, that is for his
6  protection, privilege, recognized by statute.  If you
7  want to address that with the Court, we will.
8      MR. BRILL:  Would he be willing to sign an
9  authorization, send the records to you, and then you, in
10  turn, to us --
11     MR. REYNOLDS:  We'll take this up --
12     MR. BRILL:  -- with a redacted phone number, and
13  carrier information.
14     MR. REYNOLDS:  We will take this up with the Court.
15     MR. BRILL:  So that, I take that is a no.
16     MR. REYNOLDS:  That is a no.
17  BY MR. BRILL:
18     Q.  Is it the same phone and carrier information that
19  you have today, without apparently being allowed to tell us
20  what it is?  Have you changed your phone number or carrier
21  since Eimers' death?
22     MR. REYNOLDS:  Again, any questions with regard to
23  his --
24     MR. BRILL:  That is not protected, Lyman.  I'm
25  asking him if it's the same, so we have the information

102

1  for a subsequent motion.  Not what it is, even though I
2  think I'm entitled to it.  I'm just asking if it's
3  changed.
4      MR. REYNOLDS:  The only relevant question is, that
5  you're entitled to seek, is apparently you're seeking
6  what was taken on that day.  So whether it's changed or
7  not changed is, again, from my perspective, privileged
8  information with regard to a police officer.
9      MR. BRILL:  I disagree, but you're entitled to
10  instruct him not to answer at your risk.
11  BY MR. BRILL:
12     Q.  Have you texted about this event in the days
13  following the event?
14     A.  Specifics, I don't know if I have or not.
15     Q.  Any -- so you're going to tell me it stopped only
16  on the day of the incident, and at no other day since that
17  day have you sent or received a text about Mr. Eimers' death
18  or the event on the beach?
19     Is that -- I just want to be sure.  You honestly do
20  not know or recall any text received or sent at any day after
21  that November date?
22     MR. REYNOLDS:  Objection, form.
23     A.  Regarding specifics, I don't know.  Regarding
24  specifics, about specific texts about the case, I couldn't
25  tell you.

103

1      Q.  I'm going to rephrase it so we're plain as day on
2  what I'm -- I'm asking if you recall having sent or received
3  texts about the Eimers' episode on any other day, other than
4  the day of the event?
5      A.  No, I don't recall.
6      Q.  On your phone, do you have email?
7      A.  Yes.
8      Q.  I'm going to ask.  I'm anticipating Lyman is going
9  to tell you not to answer.  What is your email address?
10     MR. REYNOLDS:  You are correct.  That's privileged
11  under the statute for the police officer, and he is not
12  to answer.  We're asserting the privilege.  And, as a
13  matter of fact, I think that's the subject of a prior
14  request that you have that we're having a hearing on, on
15  Friday, aren't we?
16     MR. BRILL:  On another day, when the members of --
17  of people testifying before a grand jury were threatened
18  with things as juvenile as a toy soldier placed outside
19  their hotel rooms.  Yeah, that's the subject of Friday.
20     MR. REYNOLDS:  Move to strike inappropriate comment
21  of counsel.
22     MR. BRILL:  You just -- I can't win today.
23  Everything I say is inappropriate.
24  BY MR. BRILL:
25     Q.  Is your email address connected to your smart

18  (Pages 100 to 103)

104

```
1   phone?
2         MR. REYNOLDS:  Again, this is asking information
3   with regard to the protected information involving a
4   police officer.  He is not to answer.
5   BY MR. BRILL:
6         Q.  Is your -- has your email changed since the date of
7   the incident?
8         MR. REYNOLDS:  Again, same -- same instruction.
9   BY MR. BRILL:
10        Q.  Do you have more than one email, a personal and a
11  professional email?
12        MR. REYNOLDS:  Same instruction.
13  BY MR. BRILL:
14        Q.  Do you have a Key West email address that you give,
15  for example, to members of the public?
16        MR. REYNOLDS:  That, you can answer.
17        A.  Yes, we have a City email.
18        Q.  What is that email?
19        THE WITNESS:  It's okay?
20        MR. REYNOLDS:  If it's your City --
21        A.  The Key West police email is "g" for my first name,
22  and my last name, "lovette," at keywestcity.com.
23        Q.  Have you made any emails at any point in time, from
24  the date of the Eimers' episode to today, concerning Eimers'
25  event to anyone?  Did you send or receive any with that
```

105

```
1   address?
2         A.  Yes.
3         Q.  To whom, and how many, and when?  Give us the
4   details.
5         A.  To my PBA attorney.
6         Q.  Anyone other than your PBA attorney?
7         A.  No, sir.
8         Q.  Do you have a police department issued cell phone?
9         A.  No, sir.
10        Q.  Is the cell phone that you carry with you,
11  including on the date of the Eimers' episode, your own
12  personal cell phone?
13        A.  Yes.
14        Q.  Do you pay the bill yourself for that cell phone?
15        A.  Yes, sir.
16        Q.  Is any of the bill paid or contributed to payment
17  by any State entity?
18        A.  No, sir.
19        Q.  Or City entity?
20        A.  No, sir.
21        Q.  Do you give you cell phone to friends and family,
22  cell phone number?
23        A.  Yes.
24        Q.  People outside of the Key West Police Department?
25        A.  Yes.
```

106

```
1         Q.  When they ask you for your cell phone, people in
2   Key West, do you say to them, I can't give you it, it's
3   protected by Florida statute?
4         A.  No, sir.
5         Q.  When you say a PBA attorney, who is your -- who is
6   the PBA attorney, the name of him or her?
7         A.  Andrew Axelrod.
8         Q.  Do you get -- is Lyman your current PBA attorney?
9   Is that how it works?
10        A.  No, sir.
11        Q.  While I'm on the topic, I know I wrote this down,
12  so let me just get my notes to it.  And you may -- if you
13  don't, if you're not familiar with these terms, please advise
14  and I'll explain.
15        Is the insurer, the underlying insurance company or
16  the excess insurance company or both, paying for your defense
17  for Lyman's representation?  And, if so, are they doing so
18  under any reservation of rights?
19        A.  I don't know who's paying for it, sir.
20        Q.  But you're not?
21        A.  No, sir.
22        Q.  Someone's making provision of your defense in that
23  regard.  Do you know if it's an insurance company or anything
24  like that?
25        A.  No, sir.
```

107

```
1         Q.  Have you ever heard of the term, "reservation of
2   rights"?
3         A.  No, sir.
4         Q.  It would be where they would give a letter of
5   communication to you as someone who would be what's called an
6   insured, or someone who's entitled to coverage under a
7   policy, to say, we're going to provide you this defense at
8   the expense of the insurance company, for example, with an
9   able, a very able lawyer like Lyman, but we're going to do
10  so, reserving the right to deny you coverage later for a
11  number of what they call coverage defenses?
12        A.  Not that I know of.
13        Q.  You never received any such letter like that?
14        A.  Most of my correspondence is from Mr. Burke and Mr.
15  Lyman's office.
16        Q.  Has any insurance company advised you what would
17  happen with any judgment that would be secured against you in
18  this case, as to whether the insurance company or you would
19  be liable for that event?
20        A.  No, sir.  Not that I know of.
21        Q.  Do you have any understanding of that?  If it's
22  from your lawyers, I don't want to know that, but anybody at
23  all explain it to you, like a PBA rep, your former PBA
24  attorney?
25        A.  No, sir.
```

19  (Pages 104 to 107)

108

1   Q.  If we're correct that you were the only one to
2   brandish your Taser on that day, why would that be the case?
3   Or is this, to ask it differently to and restate the
4   question, was this not a Taser event —
5       MR. BURKE:  Object to form.
6   BY MR. BRILL:
7       Q.  -- to others, or under the police policy and
8   procedures?
9       MR. BURKE:  Object to form.
10      A.  Active physical resistance falls under the police
11  policy for the use of a Taser.  It may have just be my
12  position and Mr. Eimers' that would have made it optimal to
13  deploy the drive stun, but I can't speak for other officers,
14  why they didn't deploy their Taser, or why they didn't pull
15  it out or videotape it.
16      Q.  During the — I just want to ask a few more
17  questions about just the footage recorded of the event on
18  your Taser.
19      Do you know where the footage recorded of the event
20  is?
21      A.  No, sir.
22      Q.  Who are the only persons who would have had access
23  to the Taser on the day of the incident until it was turned
24  in?
25      A.  Whoever would have had -- whoever downloaded it, it

109

1   would have been on that computer or in the Taser system.  I
2   don't know how that program works.
3       Q.  No, but I mean until it was turned in.  Only you?
4       A.  Yes, sir.
5       Q.  And you already identified to whom you gave it,
6   right?  That would have been to Sergeant Williamson?
7       A.  Yes, sir.
8       Q.  Whose name I unilaterally shortened.
9       Are you aware of anyone outside of the police
10  department who has possessed your Taser after the incident,
11  until the time that the data of the event was intentionally
12  removed?
13      A.  I don't know.  After the incident, I would say
14  within the last few months, there was, I guess, a request to
15  download my Taser or download whatever was on my Taser.  And
16  at that point, it was -- I want to say I relinquished it to
17  Lieutenant Ream, who actually, when they went to return it,
18  it wouldn't turn on.  So now I'm in possession of her camera,
19  my Taser, but her camera, or vice versa.  But until that
20  point, no, my Taser's always been in my possession.
21      Q.  And from whom did you get a request of that nature?
22      A.  I don't remember who did the request, but I
23  remember relinquishing my Taser to Lieutenant Ream, and I
24  know -- I want to say Officer Rich Thomas was the one
25  downloading it for the request, second request.

110

1   Q.  And, I apologize.  I know you said roughly when,
2   but could you reiterate the point of when, roughly, that was
3   in relation to today?
4       A.  Within the last few months.
5       Q.  Huh, that's interesting.  Did they say why?
6       A.  No, sir.
7       Q.  Was the data from at least the event after Eimers,
8   that is this hour and thirty-some minutes, still on your
9   Taser at that time, months later when it was requested?
10      MR. BURKE:  Object to form.
11      MR. REYNOLDS:  Join.
12      A.  I don't know.
13      Q.  Do you recall during the Eimers' episode that, is
14  it — you call him Gabe, right?
15      A.  Officer Garrido.
16      Q.  Garrido.  And he's here today?
17      A.  Yes, sir.
18      Q.  That he said "Ow."
19      A.  He made some sort of sound.
20      Q.  Because he had gotten his finger caught?
21      A.  I believe so; yes, sir.
22      Q.  Was that, if I'm --
23      MR. BRILL:  Sorry.  Do we need to stop now?
24  BY MR. BRILL:
25      Q.  Was that before Officer Wanciak runs for the

111

1   hobble, when Officer Garrido expressed pain in some way with
2   an "Ow" or something?
3       MR. REYNOLDS:  Objection, form.
4       A.  I believe that would be before, yes.
5       MR. BRILL:  Let's then -- I want to go transition
6   into a little bit regarding training.  And I mentioned
7   to counsel before we got on that there was one page that
8   I want to look at in particular, and my co-counsel and
9   friend, Darren, is a lifesaver  and did manage to bring
10  that over to us.  And I'll just put it on the back for
11  the court reporter's ease as a 1 for today's date,
12  Plaintiff's Exhibit.
13      MR. BURKE:  Do you have any copies of these?
14      MR. BRILL:  I just have the one, but I'll show it
15  to you, of course.
16      MR. BURKE:  Okay.
17      (Plaintiff's Exhibit 1 was marked.)
18      MR. BRILL:  And all I'm asking about is this
19  portion, which is Use of Force Training for Law
20  Enforcement.  And I'll just make reference real quick,
21  guys, and I'll give it over to you.
22      This is what's called -- it was given to me last
23  night by email.  It's the first of 81 pages of the first
24  of three .pdf documents.  It has on the top of it,
25  Mandatory Retraining Report.  And it's got your name on

112

1    it, but your social security has been redacted, and it's
2    just one page of that set of documentation.  I'm going
3    to show that to both counsel.
4         There is a section, and the paper record should
5    reflect that the Exhibit 1 is now in front of Mr.
6    Lovette, and he's looking at it.
7    BY MR. BRILL:
8         Q.  What I'd like to draw your attention to, please, is
9    the section that talks about the use of force requirements.
10   And if you could, do you see it?  It's about halfway down and
11   it's in capitals.  And it says exactly, and I'm getting my
12   notes to it, "Use of Force Training for Law Enforcement and
13   Correctional Officers."  Do you see that section?
14        A.  Yes, sir.
15        Q.  Okay.  Would you be so kind as to read that
16   to yourself just for a moment, and let me know when you get to
17   the very end, which says, "End of officer's four-year cycle."
18        A.  Yes, sir.
19        Q.  Okay.  Now, just so that those who might later
20   listen and/or watch this footage know what we're talking
21   about, I'm going to read it.
22        It says, "Effective on or after July 1, 2005,
23   complete once every two years, training in scenario-based
24   firearms training, physiological response dynamics training,
25   use-of-force matrix and less-lethal force options available

113

1    within the agency, agency policies on use-of-force training,
2    and legal aspects regarding use-of-force training, and
3    reporting such training at the end of the officer's four-year
4    cycle."
5         Did I read that correctly?
6         A.  Yes, sir.
7         Q.  Now, what that says, can we agree with each other,
8    is you've got to do certain training every two years, and
9    then the recording of that has to be made by the end of a
10   four-year cycle, correct?
11        A.  Yes, sir.
12        MR. BURKE:  Form.
13        Q.  Now, the type of training that this says you're
14   supposed to do, not just you, but all officers, supposed to
15   do every two years includes, first, separated by commas,
16   training in scenario-based firearms training, right?
17        A.  Yes.
18        Q.  That's one of them.  So we have one of those.
19        Then you have physiological response dynamics
20   training, right?
21        A.  Yes.
22        Q.  Then you have, thirdly, use-of-force matrix and
23   less-lethal force options available within the agency?
24        A.  Yes.
25        Q.  Those are — it has an "and" in there, but that's

114

1    one combined thing, right?
2         A.  Yes.
3         Q.  That's our third one.
4         Then we've got agency policies on use-of-force
5    training.  That's our fourth one.
6         And then the fifth one are legal aspects regarding
7    use-of-force training.  Right?
8         A.  Yes.
9         Q.  Each one of those, you and all the officers in the
10   department have to do every two years, right?
11        MR. BURKE:  Object to form.
12        MR. REYNOLDS:  Join.
13        A.  Yes.
14        Q.  It's not good enough to do four of them, you've got
15   to do all five.  You can't do three, you've got to do all
16   five.
17        MR. BURKE:  Object to form.
18        A.  I don't know.
19        Q.  Are you aware that under Florida law, if you don't
20   keep up with your training, that you — and these continuing
21   types of education-type stuff, you become unable to work as a
22   sworn officer?
23        MR. BURKE:  Object to form.
24        A.  Yes, sir.
25        MR. BRILL:  So I'm going to now show you Exhibit 2,

115

1    which I'll marked on the back, trying to make life
2    easier for my court reporter, who would otherwise kill
3    me.
4         (Plaintiff's Exhibit 2 was marked.)
5         MR. BRILL:  I'm going to show that, this is a copy,
6    to the counsel.  And it is, again, an item that we were
7    provided yesterday.  And it, for the record, is Training
8    Summary.  And it reads up at the top, "This report
9    reflects all training entered by the Key West Police
10   Department's Training Division since March 5, 2002, for
11   Lovette, II, Gary Lee, Number 2689."
12   BY MR. BRILL:
13        Q.  Now, I would like you take your time.  If you want
14   to do this even at a break, we could take a break now.  I've
15   looked at it and, certainly, I admit, I'm only human.  I
16   certainly could make a mistake.  But, I see that a lot of
17   these five training items are within the two-year period of
18   time leading up to the Eimers episode are on here, but I
19   don't see that all five were actually done within that two-
20   year period, and then recorded within four years.  Do you
21   understand my point?
22        A.  Yes, sir.
23        MR. BURKE:  Object to form.
24        Q.  Would you take your time and look from — and,
25   again, we could — it might be a good time to take a few-

116

1    minute break for you to do that and not have you just look at
2    it on video, but I'll leave that up to your counsel.
3        MR. REYNOLDS:  It's a good time for a break, sure.
4    BY MR. BRILL:
5        Q.  And take a look and review that.  Again, maybe I'm
6    reading it wrong, but I would like you to see if you can
7    confirm for us which courses, and I'll get you a pen, are
8    within that critical two-year period, these five requirements
9    that are needed to be completed in two years.  Okie-doke?
10       MR. BURKE:  Object to form.
11       A.  Now, sir, you're asking within the two years of
12   this, of this, and this is based out of 2008?
13       Q.  Okay.  That's a very good question, and I maybe
14   didn't phrase it properly and I'll restate.
15       I mean in any two-year period that's on this
16   summary leading up to Mr. Eimers' episode.
17       I only gave you what is Plaintiff's Exhibit 1, just
18   to have you be able to look at the use-of-force requirements,
19   so it's more of a reference than for you to use as a date
20   guide.
21       A.  Yes, sir.
22       Q.  I'm looking at it from the two-year period leading
23   up to the Eimers episode.  Does that clarify that okay?
24       A.  Yes, sir.
25       MR. BRILL:  Okay.  So is that okay with everyone,

117

1    we take a break?
2        MR. BURKE:  Take a break.
3        MR. REYNOLDS:  Take a break.
4        THE VIDEOGRAPHER:  Off the video record at 10:37
5    a.m.
6        (Brief recess.)
7        THE VIDEOGRAPHER:  Back on the video record at
8    10:52 a.m.
9    BY MR. BRILL:
10       Q.  Have you had an opportunity to look at what I just
11   -- Plaintiff's Exhibit 2, to identify in that two-year period
12   if the five categories or types of those trainings were done
13   in that period?
14       MR. BURKE:  Object to form.
15       MR. REYNOLDS:  Join.
16       A.  And my question is, I don't know if one or all
17   those have to be reviewed, but at some point in every year,
18   something on this list was reviewed.
19       Q.  I apologize.  It might be me.  I might have mis-
20   heard.  What was your question?
21       A.  You listed -- you read off five or six things?
22       Q.  Yes, sir.  Five, I think it's five.
23       A.  I don't know if every single one of those has to be
24   reviewed within that two-year period, or if one of -- one or
25   two of those has to be reviewed.

118

1        In my training summary, at least one of those
2    things was reviewed every year.
3        Q.  Okay.  So if I understand your testimony correctly,
4    can we agree with each other that within the two-year period,
5    you've not done all five of the listed items?
6        A.  Within what two years?  I'm sorry.
7        Q.  Within any two-year period.
8        MR. BURKE:  Objection, form.
9        A.  On here?  No, sir.
10       Q.  And I should have asked this, too, as a predicate,
11   that the -- I can only go by what I've been provided.  So
12   what was Plaintiff's 2, which is the multiple-page summary
13   document.
14       A.  Yes, the Training Summary.
15       Q.  Yes, thank you.  Does that accurately reflect all
16   the training you did?
17       A.  I believe so; yes, sir.
18       Q.  So that identifies correctly that none -- that not
19   all five of the items listed in Plaintiff's 1 for use of
20   force were done in any two-year period?
21       MR. BURKE:  Object to form.
22       MR. REYNOLDS:  Objection, form.
23   BY MR. BRILL:
24       Q.  But rather -- and, please, correct me if I'm wrong
25   -- you've done all five, but in a span of more than two

119

1    years?
2        MR. BURKE:  Object to form.
3        MR. REYNOLDS:  Join.
4    BY MR. BRILL:
5        Q.  Am I correct?
6        A.  And from what you're saying, there's a couple --
7    there was a couple discrepancies I saw.  Like one of the ones
8    was the use-of-force matrix, which is on here.  The State of
9    Florida and FDLE hasn't used the use-of-force matrix in
10   years.
11       So I don't know what would be considered the use-
12   of-force matrix.  I mean, there's response to resistance
13   policy reviews, which I assume would cover that.  In this
14   period, I mean, there's the psychological response dynamics
15   training, things like that, that are verbatim.  But there's
16   other ones, like Taser re-certification, legal updates.  I
17   couldn't tell you what legal updates would cover some things
18   in here.
19       On these, I mean, 2014, there was two covered;
20   2013, there was four, four things that I marked that were
21   covered; 2012, there was three that were covered; 2011, there
22   was three; 2010, two; 2009, four.
23       So, I mean, verbatim, each one of these, I don't
24   know exactly, but in a two-year period, there's up to six,
25   six, five, seven, six.

120

Q.   Okay.

A.   So, I mean, there's multiple things in two-year periods.  In any two-year period, it looks like there's been more than five things covered.  2004, 2005, I only marked two.  Actually, it would be three in 2005 -- or, two in 2005.  But in 2006 and 2007, there were five things covered, and so on.  So, I mean, verbatim, for each of these things?  No.  But could they have been covered?  Absolutely.

Q.   For -- let's take it from 2010, from the summary sheet, through to 2013.

A.   Okay.

Q.   Okay?  And in -- let's go first from 2010 through 2012, so those two-year period -- that two-year period.

A.   Okay.

Q.   Now, we may have overlap, I understand.  But, can you tell us, by looking at your summary, what you believe is or maybe be the names of the courses that you took that may or does comply with use-of-force training for law enforcement and correctional officers?

MR. REYNOLDS:  Objection, form.

A.   In 2010, I would say legal updates, legal aspects regarding use-of-force training.

Q.   Okay.

A.   There's a secondary legal update.  I couldn't tell you what was on there.  That would be in our training files.

121

Q.   Okay.  But, and I'm going to stop you, if we can, as we go.

A.   Okay.

Q.   Those are two legal updates.  So, your suggestion is --

A.   Okay.

Q.   And I don't know.  That's why I'm asking you.

A.   Yes, sir.

Q.   That could be, one or both of them could fit within the use-of-force legal update, okay.  Let's say that does.  Next?

A.   After that would be Taser user re-certification, and then after that would be response to resistance policy review.

Q.   Is it your belief that Taser may fit within one of these categories then?

A.   Yes, sir.

Q.   Which one would it be in your understanding?

A.   I mean, use of force isn't -- like use-of-force matrix isn't there anymore, but use-of-force matrix and less-lethal force options available within the agency, Taser user re-certification would fall under that because it is less lethal.

Q.   Okay.  So we have legal updates, Taser being the equivalent of less-lethal force option, perhaps.  And

122

response to resistance being --

A.   Which was right after that, agency policies on use-of-force training and legal aspects regarding use-of-force training.  I mean, I guess that would hit both of those legal updates.

Q.   Okay.  Then, 2011.  Is that all for 2011 -- 10?

A.   Yes, sir.

Q.   I'm sorry if it was -- 2011.

A.   Physiological response dynamics training, which is, I think, verbatim.

Q.   What is that, by the way?

A.   That's a -- I'd have to review that.

Q.   The general point of it then, you don't recall?

A.   Response to situations.

MR. BRILL:  And we had some email discourse, I'll proffer with counsel.  We don't have any of this data, the material, which we do require.  Not your fault, but we don't have it.  That's why I'm asking about it.

Q.   All right.  So, I didn't mean to digress and I apologize.

2011, you've got the physiological.  Then what's the next one, if any?

A.   After that would be response to resistance policy review.

Q.   Okay.

123

A.   After that would be the legal updates, 2011 track training.  Again, I don't know.  You'd have to look in our training to see what was reviewed then.

Q.   Okay.

A.   And they actually listed the psychological response dynamic, or physiological response dynamic training twice.  So I don't know if we took two different types, or it just got double-printed.

Q.   Anything else in 2011?

A.   We actually had a Taser re-certification, Taser user re-certification.

Q.   Okay.

A.   It's at the top of the fourth page.

Q.   Now, anything else in 2011?

A.   No, sir.

Q.   Okay.  Now, in 2010, and if you look at 2010 and 2011, are there the same start dates?  In other words, are we talking a full calendar year for each of those?

A.   Started in 6/7 of 2010, and we ended in 8/27 of 2010 for the -- for that training.

Q.   Now, I probably phrased it poorly.  I'm sorry.  Let me restate it this way.

In other words, for the 2010 training, it would include any training that you would have received throughout that calendar year of 2010.

23  (Pages 120 to 123)

124

```
1        A.  Yes, sir.  I believe this is our -- this is our
2   track training, our yearly track training.
3        Q.  And same with 2011, any training you would have
4   received would have been reflected in 2011?
5        A.  There's also, I mean, on a few of other ones,
6   depending on different courses I had gone to, there's
7   different dates.
8        Q.  Right.  But, I mean, if you did any in 2011, it
9   would be reflected under the category of Summary, 2011?
10       A.  Yes, sir.
11       Q.  And anything -- and when we talk about 2011, it's
12  anything from January 1 to December 31?
13       A.  I believe so; yes, sir.
14       Q.  So in this two-year period, 2010 -- well, to 2011,
15  we've identified the training you would have -- you had that
16  could be covered under use-of-force training for law
17  enforcement and correctional officers?
18       A.  Yes, sir.  I believe so.
19       Q.  Okay.  So, 2012.
20       A.  Taser user re-certification.
21       Q.  Yeah.
22       A.  There's -- under that is legal updates, legal
23  aspects regarding use-of-force training.
24       Q.  Okay.
25       A.  Under that's response to resistance policy review.
```

125

```
1        Q.  Yeah.
2        A.  And then, after that, there's a defensive tactics
3   update.
4        Q.  Which one, in your understanding or belief, would
5   the defensive tactics update be covered for the use-of-force
6   training for law enforcement and correctional officers from
7   Plaintiff's 1?
8            MR. REYNOLDS:  Objection, form.
9            MR. BURKE:  Object to form.
10       A.  Based on the old, the old would be the use-of-force
11  matrix.  That would be my -- my thought.
12       Q.  Okay.  Is there anything else in 2012 or we covered
13  that?
14       A.  That would be it for 2012.
15       Q.  And 2013, please?
16       A.  There is the firearms qualification, which is our
17  basic qualification.  I don't know if that would be
18  considered under the scenario-based firearms training.
19       Q.  Okay.
20       A.  Directly after that is the physiological response
21  dynamics training, which is verbatim.  Under that's defensive
22  tactics update, response to resistance, which would, I
23  believe, would fall under the use-of-force matrix.  There's
24  less-lethal training, which is less-lethal force options
25  available.  Taser user re-certification.
```

126

```
1            Again, there's another legal updates.  I don't know
2   what was on there, you would have to check.  And then, a
3   response to resistance policy review.
4        Q.  How many of those for 2013 were in December?  Any
5   of them?
6        A.  No, sir.
7        Q.  And that covers all the training?
8        A.  I believe so; yes, sir.
9        Q.  All right.  We'll come back to some training issues
10  later, but I do thank you for clarifying that.
11           Going back, by the way, briefly to the Taser.  And
12  again, I know we're still going to that footage.  How is
13  the -- you said, first of all, how long were you on the beach
14  before the call for the fellow dressed in black with what
15  might have been a gun, but turned out to be hand thing?
16       A.  I don't know.  You'd have to check CAD.
17       Q.  But would we agree with each other, or can we agree
18  with each other, better said, that you were not on the beach
19  for hours?
20       A.  No, sir.
21       Q.  Can we agree with each other that not long after
22  Mr. Eimers was placed in the ambulance that you got this
23  subsequent call and had to go?
24       A.  I believe it was a short time after.
25       Q.  And if the events on the beach with Mr. Eimers
```

127

```
1   began on or about 8:30 a.m., does that sound right to you?
2            MR. REYNOLDS:  Objection, form.
3        A.  You'd have to check CAD, sir.
4        Q.  But, morning hours?
5        A.  Yes, sir.
6        Q.  And the CAD's reflecting an 8:30 start time, we can
7   all trust as being correct of an actual start time?
8        A.  If that's what CAD says; yes, sir.
9        Q.  And just so that we understand, CADs are computer
10  aided --
11       A.  Computer aided dispatch.
12       Q.  -- dispatch.
13           And so, the time that's on those things is
14  important, for a variety of reasons, to be correct?
15       A.  Yes, sir.
16       Q.  So that, you know, not just for a case like this,
17  but for anything, you can look back and see when someone was
18  summoned to do this, and responded to do that, and have the
19  times be correct?
20       A.  Yes.
21       Q.  And it goes hour, minute, and seconds, right?
22       A.  I believe so; yes, sir.
23       Q.  So, if you get that call shortly after -- well, let
24  me ask about -- let me back, let me ask a wholly different
25  question.
```

24  (Pages 124 to 127)

128

```
 1            The Taser itself has a clock on it, right?
 2       A. Yes, sir. If that's what you're telling me.
 3       Q. Oh, no. I'm asking. Do you know? If you know.
 4       MR. BURKE: Object to the form of the question.
 5       A. I don't know.
 6       Q. Do you have to set it?
 7       A. No, sir.
 8       Q. Does the time on the Taser have to correlate with,
 9   for example, actual time?
10       A. I don't know.
11       Q. And you've, I think, said this, but I just want to
12   be sure that I'm hearing right.
13            There was an investigation by FDLE into this,
14   right?
15       A. Yes.
16       MR. REYNOLDS: Objection, form.
17       Q. Obviously, the civil suit investigated and now
18   pending, right?
19       MR. BURKE: Object to form.
20       MR. REYNOLDS: Join.
21   BY MR. BRILL:
22       Q. Right? This --
23       A. Yes.
24       Q. -- lawsuit. And you gave your Taser to Sergeant
25   Williamson that day?
```

129

```
 1       A. I believe so; yes, sir.
 2       Q. And you have never before today seen any or heard
 3   any of the Taser footage?
 4       A. No, sir.
 5       Q. You weren't shown that by any investigator, be it
 6   with FDLE, or Key West, or the FBI?
 7       A. When I had my meeting with FDLE, they asked if I
 8   wanted to review it when I was with my PBA representative,
 9   and there was no need to review it. They had questions
10   specific from there that were quotes, and they asked about
11   those. So I never did review the video.
12       Q. If on the Taser footage we'll soon, very soon,
13   hear, it identifies that someone says to the effect of, we're
14   rolling Mr. Eimers out on the backboard, and you comment to
15   the effect of, we'd be better off just to bury him, leaving
16   aside the significance of that statement, would I be correct
17   to understand that, therefore, that was very close in time to
18   when the incident on the actual sand had ended?
19       MR. BURKE: Object to form.
20       MR. REYNOLDS: Objection, form.
21       A. I don't what the time stamp on that would be; but,
22   yes.
23       Q. Can you explain to us then why the Taser footage
24   stamped on it, and we'll see it ourselves, I'll throw out a
25   rough of 11:30-something, as I recall it, from the get-go,
```

130

```
 1   a.m., when we know it can't be three hours after Mr. Eimers
 2   first appeared on the beach?
 3       A. I don't --
 4       MR. REYNOLDS: Objection to form.
 5       Q. Do you have any idea?
 6       A. I don't understand your question.
 7       Q. If the Taser footage has a time stamp on it, and it
 8   appears, and then it comes off, and then appears again like
 9   15 seconds later, the very first time we see it, when that
10   footage from your Taser starts, reads to be something like
11   11:30 or so, and we'll see it exactly. I could be wrong on
12   the exact time, but it's around there in the morning. Any
13   explanation why that is?
14       MR. REYNOLDS: Objection, form.
15       A. That time; no, sir. I don't.
16       Q. And if -- have you, at any point in your career,
17   ever synchronized the time on your Taser to actual time?
18       A. No, sir. And just to reiterate on that, I know
19   when we plug our Tasers in to charge them, that they sync
20   with updates and stuff like that. But I've never -- I have
21   no way to access that information.
22       Q. Does a actual time appear anywhere on the Taser?
23       A. No, sir; not that I know of.
24       Q. Like a clock or digital readout?
25       A. It's only a two-digit screen.
```

131

```
 1       Q. If you turn it on, does the time appear on it?
 2       A. No, sir.
 3       Q. And you've touched on this just now. To your
 4   knowledge, when you sync it or plug it in or what have you,
 5   is it supposed to put the correct time or alter it in such a
 6   way so it's synchronized?
 7       MR. REYNOLDS: Objection, form.
 8       A. I don't know.
 9       Q. If, as we'll see, the Taser starts with the
10   audio/video at that exact moment where that comment is made
11   about Mr. Eimers being placed on the backboard to be rolled
12   out to fire rescue, and the comment by you, we should just
13   bury him, or to that effect, is it your testimony here today
14   that it is just remarkable coincidence that it starts then,
15   moments after the event on the beach when Mr. Eimers is being
16   taken out on the backboard?
17       MR. REYNOLDS: Objection, form.
18       MR. BURKE: Object to form.
19       A. I don't remember when it got turned on and turned
20   off.
21       Q. But if the situation is it was turned on, and we
22   talked about this, I know, at length earlier, and remained
23   on, we would have to, all of us and anybody later listening
24   to this footage or reading the deposition transcript, believe
25   that mere happenstance, it recorded just minutes long enough
```

25  (Pages 128 to 131)

132

1  so that the footage just minutes earlier from when it
2  started, was taped over?
3      MR. REYNOLDS: Objection, form.
4      MR. BURKE: Object to form.
5      A. I don't know. I had stated earlier, sir, that I
6  didn't know that footage could be deleted, and I don't know
7  how it could be deleted.
8      Q. So, and it's either it was started, or the later
9  footage taped it over, or, as we discussed, someone, not you,
10 deleted it?
11     MR. BURKE: Object to form.
12     MR. REYNOLDS: Objection, form.
13     A. I can't speak for anybody else.
14     Q. But that's the only option or conclusion you would
15 draw?
16     A. I would --
17     MR. BURKE: Object to form.
18     MR. REYNOLDS: Objection, form.
19     THE WITNESS: I would draw that I couldn't do that.
20 I don't have access to software that could do that. I
21 didn't know it could be done.
22     Q. And as we had discussed, and you had reiterated,
23 and we'll do so again here, as far as you were concerned, and
24 as far as you believed when you handed that Taser over, it
25 would have had the footage, including of the beach detention?

133

1      A. Yes.
2      MR. REYNOLDS: Objection, form.
3      MR. BURKE: Object to form.
4      THE WITNESS: Sorry.
5      Q. Let's just say for sake of discussion that you,
6  yourself, wanted to find that footage. How would you go
7  about doing it?
8      MR. REYNOLDS: Objection, form.
9  BY MR. BRILL:
10     Q. Where would you go? Who would you ask?
11 Procedurally, administratively, what would you do?
12     MR. REYNOLDS: Form.
13     A. The only people that I know that have access to
14 that is sergeants and superior officers.
15     Q. And so, walk me through. Let's say we are having a
16 discussion and you say, you know, I want to go look at it.
17 What do you do? Who do you go ask? You, yourself.
18     A. I would use my chain of command. I would go to my
19 sergeant, either Sergeant Zamora or Sergeant Allen, and ask.
20     Q. You were instructed at the scene by Sergeant Zamora
21 to wash your hands of blood that was on them, right?
22     A. Yes.
23     Q. In order to do that, you had to put your Taser back
24 in the cart -- in the holster, correct?
25     A. Yes, sir.

134

1      Q. And you did that?
2      A. Yes, sir.
3      Q. Where did you go to wash your hands?
4      A. I don't remember.
5      Q. Was it a sink? Is it to the ocean, or --
6      A. If I was going to go, you know, detox my hands from
7  blood, I would have gone to my car or someone's car that
8  would have had the proper wipes and wiped it off.
9      Q. Oh, I didn't know that they had that. Forgive me
10 my ignorance. They have -- you have wipes in your -- in a
11 car, or all units have them?
12     A. Disinfectant wipes; yes, sir.
13     Q. Are they like in a, like if I go to a restaurant
14 kind of thing and I get a wipey, I open it up.
15     A. I believe they're called P.A.W.S. P.A.W.S., or we
16 call them red wipes. They're a disinfectant wipe.
17     Q. And the first word is paws, like on a dog?
18     A. P.A.W.S., P-A -- yeah. I don't know what the
19 acronym stands for.
20     Q. You mentioned that you would go up the chain of
21 command if you wanted to access that footage on the Taser
22 yourself, and you would start with one of your sergeants,
23 either Sergeant Zamora or Sergeant Allen.
24     What's then the next, the chain of the command to
25 get that in a department of this modest size?

135

1      A. I don't know. I have never requested to see a
2  video before.
3      Q. Would you show us where, on your hand or hands, the
4  blood that was on it was?
5      A. I don't recall.
6      Q. Was it on -- do you recall it to be the back of the
7  hand, the palm of a hand, on the fingers?
8      A. No, sir. I don't.
9      Q. Do you recall which hand?
10     A. No, sir. I don't.
11     Q. Do you recall whether it was on both hands?
12     A. No, sir. I don't.
13     Q. Do you recall the volume of the blood, how much it
14 was?
15     A. No, sir. I don't.
16     Q. Was it in -- do you recall what type of form it
17 was? Was it dripping, or drops, or was it smeared? Do you
18 recall any -- can you give us any description whatsoever?
19     A. No, sir. I don't.
20     Q. Do you know whose blood it was?
21     A. No, sir. I don't.
22     Q. It wasn't yours.
23     A. No, sir. It was not.
24     Q. But there was blood on Eimers head by his ear, his
25 right ear?

26 (Pages 132 to 135)

**136**

1    A.  I believe so, yes.

2    Q.  And yet, you wouldn't draw the conclusion that it

3  was Eimers' blood from that area?

4        MR. BURKE:  Objection to form.

5        MR. REYNOLDS:  Objection, form.

6    A.  I couldn't tell you whose blood it was.

7    Q.  Well, you were concerned that it was Eimers' blood,

8  which is why you went to wash it off?

9        MR. REYNOLDS:  Objection, form.

10    A.  I didn't -- I don't recall ever noticing the blood.

11  It was Sergeant Zamora who actually told me it was blood on

12  my hand, and relieved me of my position.

13    Q.  Right.  And the reason why he directed you and you,

14  in turn, went to go wash it off, was because you thought it

15  — you knew it wasn't your own?

16        MR. REYNOLDS:  Objection, form.

17    A.  Yeah, I didn't know whose blood it was.

18    Q.  And your number one concern was that it was Mr.

19  Eimers'?

20        MR. REYNOLDS:  Objection, form.

21    A.  I was concerned I had blood on my hand.  I didn't

22  know whose it was.

23    Q.  Well, did you later uncover that anyone else, any

24  of your fellow officers, had any bleeding?

25    A.  I don't recall anybody.

**137**

1    Q.  Nobody else had any bleeding but Eimers?

2    A.  I don't believe so.

3    Q.  Even Officer Garrido, Gabe, who had caught his

4  finger in the cuff, did not have bleeding?

5    A.  I don't know.

6    Q.  As far as you know?

7    A.  As far as I know.

8    Q.  And you had your hands positioned at Eimers' head?

9    A.  My body -- my body and hands were on his upper

10  torso and neck area, yes.

11    Q.  And your hand made contact with his head?

12    A.  At some point; yes, sir.

13    Q.  Are you right or left-handed?

14    A.  I'm right-handed.

15    Q.  Where is your Taser on your belt?

16    A.  On my left side in a cross-draw position.

17    Q.  Do you would reach across your stomach, your body,

18  and grab the Taser with your right hand?

19    A.  It's on my front, left side; yes, sir.

20    Q.  And when you describe that position, you mean that

21  the handle or the grip of the Taser is facing across your

22  body to the right?

23    A.  Correct.

24    Q.  And your firearm would be normally on your right

25  hip?

**138**

1    A.  Yes, sir.

2    Q.  In its own separate holster?

3    A.  Yes, sir.

4    Q.  And that's how it was that day, too?

5    A.  Yes, sir.

6    Q.  And you had different microphones, like one you're

7  wearing across your chest today?

8    A.  I have one; yes, sir.

9    Q.  Is there any other microphone on your body when

10  you're on duty?

11    A.  There would be our ones that are attached to our

12  in-car cameras.

13    Q.  Where is that positioned on the body?

14    A.  When I have it on me, I have it in this pocket

15  (indicating).

16    Q.  And you're pointing, just so the paper record is

17  clear, to the left —

18    A.  Yeah.

19    Q.  — bottom cargo pocket?

20    A.  Left.  Yes, sir.

21    Q.  Of your vest?

22    A.  Yes, sir.

23    Q.  Did you have it that day?

24    A.  No, sir.  I did not.

25    Q.  Why?

**139**

1    A.  I didn't record on the beach.

2    Q.  Perhaps it was my question, and I apologize.

3        Did you have, when you began your shift, your mic,

4  that was for that left section of your vest, with you and on

5  you?

6    A.  Now, that day, I don't know if I wearing an outer

7  -- this is considered an outer carrier.  We also wear an

8  undervest.  If I was wearing an undervest, then I would have

9  had it clipped on my belt, or I would have had it clipped on

10  my shoulder, depending on where I was.  I don't what I was --

11  I don't remember what I was wearing that day.

12    Q.  Is it policy to always wear that mic?

13    A.  It's to record, when you record incidents, you have

14  to have the mic with you.

15    Q.  But in order for you to record, you've got to have

16  — you have to have the mic, whether it's in your belt if

17  you're wearing an undervest, or in that pocket if you're

18  wearing an overvest?

19        MR. REYNOLDS:  Objection, form.

20    A.  Or --

21    Q.  Go ahead.

22    A.  Or readily accessible to you, yes.

23    Q.  When — so we can conclude that unless you violated

24  that procedure, you had the mic, whether you — in the left

25  pocket if you had the overvest, or on your belt if you had

27  (Pages 136 to 139)

140

1  the undervest, with you that day?
2      MR. REYNOLDS:  Objection, form.
3      A.  Yes, I would have had it with me that day.
4      Q.  When you say you didn't take it with you to the
5  beach, what do you mean?
6      A.  It was in my car.  When I first engaged Eimers on
7  the traffic stop, and it was in the car.
8      Q.  And that's what has me confused.  Wouldn't it
9  necessarily have to be on your person?
10     A.  No.  There's a charging dock right next to me, so
11 as soon as the lights -- as soon as COBAN starts recording,
12 it would come on.
13     Q.  When do you take it off the charging station?
14     A.  Whenever I leave the vehicle or do something like
15 that.  Like if I'm on a traffic stop, it would be on.  As
16 soon as I get out of the car, I put it on me so that it has a
17 full charge.
18     Q.  Okay.  But you didn't take it with you in this
19 instance?
20     A.  No.  In that instance, I did not.
21     Q.  Why?
22     A.  Because I bailed out of the car to go assist them,
23 and I didn't think about it.
24     Q.  But you're supposed to take it with you?
25     A.  It should be on me; yes, sir.

141

1      Q.  So that would provide, if you had taken with you,
2  audio evidence of what transpired?
3      MR. REYNOLDS:  Objection, form.
4      A.  If it would have recorded, yes.  But I believe my
5  video cut off at some point in Bahama Village.
6      Q.  Pardon me?  I did not --
7      A.  The video in my car, from what I recall from
8  watching that video, is it cut off at some point.
9      Q.  I will tell you that -- well, let me ask you that.
10     You, did you ever see your dash-cam footage?
11     A.  I did.
12     Q.  And it had some events of what happened that day on
13 it?
14     A.  It had -- yeah, it had, I believe, to Amelia
15 Street.  I can't be for sure --
16     Q.  And --
17     A.  -- where it cut off.
18     Q.  Oh, I'm so sorry.
19     A.  That's all right.
20     Q.  But you saw this with your own eyes.
21     A.  I've seen my dash-cam video.
22     Q.  When you watched it, did you hear also in the car
23 because of the --
24     A.  I don't recall.
25     Q.  But if your mic was either in the charging station

142

1  or on your person, and the dash cam -- you have to physically
2  turn that on at a certain point?
3      A.  If you activate your emergency overheads, it will
4  automatically come on, or you can manually do it.
5      Q.  Okay.  And let me make sure I got that straight.
6      If you turn on your overheads, meaning the colored
7  lights on the top of the car, --
8      A.  Yes, sir.
9      Q.  -- the dash-cam video will automatically come on.
10 You don't have any choice about that.
11     A.  Yes, sir.
12     Q.  You can elect to turn just the dash cam video on,
13 but without the lights?
14     A.  Yes, sir.
15     Q.  In this instance, you turned on which?
16     A.  My overheads to initiate a traffic stop.
17     Q.  And that automatically, as we just said, turns on
18 the audio?
19     A.  Yes.
20     Q.  Or, the video.
21     Does it also automatically turn on audio?
22     A.  Yes, sir.
23     Q.  So then, absent any malfunction or defect in the
24 system, we would then be able to hear and see for as long as
25 that dash-cam footage remained on?

143

1      A.  Yes, sir.
2      Q.  And as far as you know, you did not have on that
3  date, any defect or malfunction with the footage, the audio
4  or video?
5      A.  And that's what I was just saying, that I remember
6  watching the video and it cut off.  I want to say it's Amelia
7  Street.  I can't be sure, but it was in Bahama Village that
8  the video cut off, and I don't know why.
9      Q.  When it cut off, did you still have your overheads
10 on?
11     A.  I wouldn't have had my overhead lights on because I
12 was not pursuing him.
13     Q.  Okay.  And I'll make it clear, we are not having --
14 we have no dispute or concern with any aspect of the pursuit
15 or non-pursuit of Mr. Eimers' to the beach, so I won't get
16 into that.
17     But, I want to just clarify, the dash-cam footage,
18 when you say, turned off for some reason, was it at the time
19 you turned off your overheads?
20     A.  No, sir.
21     Q.  So it turned off for some unknown reason to you?
22     A.  I never pursued Mr. Eimers.  I initiated a traffic
23 stop at Truman and White and he sped away from me, and I
24 disengaged with my overhead lights, and I began calling his
25 direction of travel.

28  (Pages 140 to 143)

144

1    But my lights were off through Truman Avenue
2  through Bahama Village. And, like I said, when we were
3  reviewing the video, it shut off, I want to say at Amelia
4  Street. It shut off, and I don't know why.
5    Q. Right, and that's what I'm trying to get at. And
6  if I'm not doing a good job, again, I apologize.
7    A. And if it shut off, then my audio would have shut
8  off, too.
9    Q. Understand that. But what I'm trying to make sure
10 I first understand is, it -- it, being the video -- shut off
11 after you turned off your overhead? Well after, not at the
12 same time?
13   A. Yes, sir. As far as I -- as far as I remember.
14   Q. And why it shut off, you don't --
15   A. No, sir.
16   Q. You don't understand. Now, would it surprise you
17 to learn that we were provided material in discovery,
18 including from the FDLE that says you had no dash-cam footage
19 at all? MR. BURKE: Object to form.
20   MR. BURKE: Object to form.
21   MR. REYNOLDS: Objection, form.
22 BY MR. BRILL:
23   Q. Do you know where that dash-cam footage is?
24   A. No, sir. Again, that system is a closed system,
25 and when we pull up to the police department, it

145

1  automatically downloads. We don't -- I don't even think the
2  sergeants have access to touch our hard drives.
3    Q. Do you know if, when you went to look at the
4  footage and saw that it turned off for some reason, whether
5  someone destroyed that evidence?
6    MR. REYNOLDS: Objection, form.
7    MR. BURKE: Object to form.
8    A. No, sir. I don't.
9    Q. You didn't?
10   A. No, sir.
11   Q. And when you went to watch it, you expected to see
12 all of the footage from the moment that it went -- the actual
13 cam and everything came on in the car while you were on the
14 original street location when you first heard about the call,
15 to -- to the end?
16   A. Yes, sir.
17   Q. You were expecting to see that?
18   A. Yes, sir.
19   MR. BURKE: Object to form.
20   THE WITNESS: Sorry.
21   MR. REYNOLDS: Join.
22   Q. You were surprised to see it abruptly stop for no
23 reason?
24   A. Yes, sir.
25   MR. BURKE: Object to form.

146

1    Q. Who has access to that stuff?
2    A. I know sergeants can review it, and I don't know
3  about above them. I'm sure, I'm sure they can also,
4  lieutenants and captains.
5    Q. And did anyone fix the camera or make any attempts
6  to repair the audio or video of that after this event?
7    A. Of that event or -- with my COBAN --
8    Q. No, in your car.
9    A. I've had multiple issues with COBAN. Multiple
10 officers have had multiple issues with COBAN, and we have
11 worked it out with IT multiple times to get that fixed.
12   Q. And COBAN is C-O-B-A-N?
13   A. Yes, sir. I believe so.
14   Q. Do we know what that stands for?
15   A. No, sir.
16   Q. After this incident when -- well, let me ask you
17 first, when did you see the dash cam in relation to when this
18 happened?
19   A. I don't remember.
20   Q. But, I mean, roughly; days, weeks, months,
21 recently?
22   A. I think it would recent to, recent to the incident,
23 close to the incident.
24   Q. Close to the incident?
25   A. Not recently. I haven't seen it in close to a

147

1  year, I'm sure.
2    Q. Okay. So it was about or more than a year ago?
3    A. No.
4    Q. Or, no, it couldn't be --
5    A. It couldn't be more than a year ago.
6    Q. Couldn't be more. Forgive my -- yeah. But about a
7  year ago?
8    A. It would have, it would have been --
9    Q. Close to a year?
10   A. It would have been closer to the incident.
11 Reviewing it, reviewing policies, you know. You know,
12 critiquing.
13   Q. When that happened, when you went and saw the dash
14 cam had stopped, did you say to anyone what happened and ask
15 them to check into it or to repair it if need be?
16   A. I remember. I remember watching the video and
17 saying, you know, where's the rest of it. I clearly remember
18 that. And, you know, it was not like anything I could bring
19 up. I don't know if it just didn't finish downloading or
20 what, but I don't why it didn't record.
21   Q. And to whom did you say that to?
22   A. I don't remember.
23   Q. Do you remember where you watched it?
24   A. It would have been at the police station.
25   Q. I'm sorry. I should have been more specific.

148

1  Where in the police station?
2      A.  I don't know.
3      Q.  But you don't know that it didn't record.  In fact,
4  you believe it did record?
5      MR. BURKE:  Object to form.
6      MR. REYNOLDS:  Objection, form.
7      A.  Yes, I was under the impression the entire incident
8  was recorded, until I reviewed and saw that it hadn't been.
9      Q.  That the rest of it wasn't there?
10     A.  The rest of it was not there.
11     Q.  As long as that audio -- pardon me.  Let me restate
12  it.  As long as the video is on, then the microphone is on.
13  Is that fair?
14     A.  Yes, sir.  I don't believe you can shut one off and
15  have the other.
16     Q.  And even if you left the car to go to the scene,
17  whatever the audio could pick up from its location in the car
18  would be heard?
19     MR. BURKE:  Object to form.
20  BY MR. BRILL:
21     Q.  And recorded?
22     MR. REYNOLDS:  Join.
23     A.  Yes.
24     Q.  Did you, when you left your car, leave the car door
25  open?

149

1      A.  I don't think so.
2      Q.  Now, you have a wireless microphone?
3      A.  Yes, sir.
4      Q.  Is that different than this particular microphone
5  we're talking about that's hooked up to the dash cam, or is
6  that the same?
7      A.  There's internal microphones in the car for the
8  backseat, but this one's like a old school pager size that we
9  wear on our body.
10     Q.  Okay.  And that's a separate, altogether separate
11  auditory microphone that is a hearing thing than the
12  microphone equipped to the dash cam, that you mentioned that
13  either goes into that left pocket --
14     A.  That's -- that's the one.
15     Q.  Oh, it's the same.
16     A.  If I go on a traffic stop, you know, that's what I
17  have on me.  That's what I carry to the car, so the
18  interaction can be -- can be recorded.
19     Q.  Are you able to turn off the microphone by the
20  microphone while at a stop or any other thing?
21     A.  I don't believe so.
22     Q.  When we look at the ICOP MMS viewer stuff that's
23  given to us where we can look at the dash cam stuff, which is
24  probably, I'm guessing, what you looked at, but I don't know.
25     A.  ICOP's a completely separate system from COBAN.

150

1      Q.  Okay.  What's ICOP from COBAN?
2      A.  ICOP's the old ones that we have in our Crown
3  Victorias.
4      Q.  Okay.  But it's the same principle, basically?
5      A.  Yes and no.  The ICOP has to -- the hard drive has
6  to be pulled from the car and downloaded by someone who has
7  access to the system.  COBAN automatically uploads.  We don't
8  have property or anything.  It goes right into a system.
9      Q.  Can you take COBAN's stuff and download it into
10  ICOP?
11     A.  I don't believe so.
12     Q.  But you had COBAN?
13     A.  Yes, sir.
14     Q.  Did everybody else to your knowledge have COBAN, or
15  does everybody have ICOP?
16     A.  We're in a tran --
17     MR. REYNOLDS:  Objection, form.
18     THE WITNESS:  Sorry.
19  BY MR. BRILL:
20     Q.  Go ahead.
21     A.  We're in a transition of everybody going to ICOP --
22  or, to COBAN.  But, at that time, I'm sure whoever had a
23  Crown Victoria car had -- all the new Interceptors have
24  COBAN.  All the Crown Victorias, I believe, at that time, had
25  ICOP.

151

1      Q.  Ah.  Did both ICOP and COBAN have internal mics and
2  wireless mics both?
3      A.  I don't remember ICOP.  I don't remember the old
4  ICOP system.
5      Q.  What's an internal mic versus a wireless mic mean?
6      A.  An internal mic is wired inside the car, let's say,
7  for the back seat, for the cameras in the back seat and the
8  audio, to collect that.
9      Q.  And the wireless is the one we were talking about?
10     A.  Is what we carry on ourselves.
11     Q.  During -- I'm going to call it without meaning
12  anything by it.  If it's the wrong terminology, please
13  correct me.  But during the low-speed chase of Eimers, is
14  that the right term of art?
15     MR. BURKE:  Object to form.
16     MR. REYNOLDS:  Join.
17     A.  No.  I attempted a traffic stop of Mr. Eimers, and
18  after that, I did not chase him.  I followed what I could see
19  and called it out over the radio.
20     Q.  I understand that.
21          What would be -- I mean, he was, I understand,
22  going through intersections and red lights and things like
23  that, obviously not obeying traffic laws, but not at a high
24  speed.  It wasn't like a speeding vehicle?
25     MR. BURKE:  Object to form.

152

1      MR. REYNOLDS:  Objection, form.
2   BY MR. BRILL:
3      Q.  Am I incorrect on that?
4      A.  I can't tell you what his speed was, but at certain
5   points, Mr. Eimers was going a lot faster than I could keep
6   up at a legal speed and stop at stop signs.
7      Q.  Okay.  Fair enough.  And I understand that.  That's
8   why -- what can I call it between us as we talk about this
9   next set of -- your action.  Would we call it low-speed
10  follow?
11     A.  You could say follow.
12     Q.  Okay.
13     A.  I was following.  I think my words were parallel.
14  Because at certain points when he went down Fort Street, I
15  paralleled on a different street, which means I drove on a
16  street parallel to him.
17          And I believe, well, and from what I remember, I
18  came -- he went down Duval Street, and I paralleled on
19  Whitehead Street.  So I couldn't call it, I could just drive
20  to wherever they were calling his location.
21     Q.  Got it.  During that low-speed follow, there was a
22  radio order to turn on all car video.  Did you hear that?
23     MR. BURKE:  Object to form.
24     MR. REYNOLDS:  Join.
25     A.  I believe so.

153

1      Q.  And, at that time, did you turn it on, or was it
2   already on?
3      A.  I think mine had already come on, because I had
4   already tried to initiate a traffic stop on Mr. Eimers.
5      Q.  So as, at least as you would recall that it was
6   already on, and you would have obeyed that order and kept it
7   on?
8      A.  Yes, sir.
9      MR. BURKE:  Object to form.
10     THE WITNESS:  Sorry.
11     MR. REYNOLDS:  Join.
12     Q.  But you believe you did that?
13     A.  Yes, sir.
14     Q.  And the only thing relative to the microphone,
15  then, is you, in your haste to get out of the vehicle to Mr.
16  Eimers on the beach, left your microphone in the car, you
17  think?
18     A.  Yes, sir.
19     Q.  On the charging station?
20     A.  It was either on the charging station or it was
21  close by.
22     MR. BRILL:  How's everybody doing?  Are we okay to
23  keep going?  Anybody need a break?
24     MR. REYNOLDS:  Sure.
25     Q.  So do you have any explanation why that video from

154

1   your dash cam is missing?
2      MR. REYNOLDS:  Objection, form.
3      A.  No, sir.
4      Q.  Now, yesterday, I began some of my questioning
5   after the discussion about coming with firearms with
6   discussions about psychopath nature and truth.  Do you recall
7   those things?
8      A.  Yes, sir.
9      Q.  And what I mentioned to you was that, I had asked
10  you if you had read any literature on the topic of how
11  someone with psychopathic characteristics would, recent
12  literature says, have the ability to turn on and off empathy.
13     MR. REYNOLDS:  Object, form.
14  BY MR. BRILL:
15     Q.  Do you recall that discussion we had yesterday?
16     A.  Yes, sir.
17     Q.  What does empathy mean to you?
18     MR. REYNOLDS:  Objection, form.
19     A.  Just, you know, having -- having feelings towards
20  something.
21     Q.  Towards some thing?
22     A.  Someone, something.
23     Q.  What kind of feelings in your understanding of the
24  word?
25     MR. BURKE:  Object to form.

155

1      MR. REYNOLDS:  Objection, form.
2      A.  Again, it depends on the situation.
3      Q.  Okay.  In the situation involving the death of
4   another human being, --
5      MR. REYNOLDS:  Objection, form.
6   BY MR. BRILL:
7      Q.  What does it mean to you, empathy?
8      MR. BURKE:  Object to form.
9      A.  To Mr. Eimers, it would be -- you know, it's a sad
10  situation.
11     Q.  And we then talked about whether you can appreciate
12  or agree that when we're alone, just as people with ourselves
13  or with friends or family, and we don't believe we're being
14  recorded, that we tell the truth, we speak frankly.  Do you
15  remember talking about that yesterday?
16     MR. REYNOLDS:  Objection, form.
17     MR. BURKE:  Object to form.
18     A.  Yes, sir.
19     Q.  And you said, it just, it depends on the situation?
20     A.  Yes, sir.
21     Q.  But you did, and correct me if I'm wrong, did agree
22  with me ultimately that, by and large, you're apt to tell the
23  truth when you're with friends or with yourself when you
24  don't think you're being recorded?
25     MR. REYNOLDS:  Objection, form.

31  (Pages 152 to 155)

**156**

1     MR. BURKE: Object to form.

2     A. Depends on the situation.

3     Q. Now, I want to now finally get to some of this

4 footage. The video is just almost exclusively showing your

5 hip because of the position of the camera. So the sound, the

6 audio portion, is what's significant for our purposes here

7 today.

8     And I marked down points, and for everybody's

9 reference here, including the court reporter and counsel,

10 I'll identify this, the portions of the footage that I'm

11 going to play, so that you can go back and get right on it.

12 And it's pretty close, if it's not definitive.

13     The first spot is at approximately 19:47 of the,

14 what I provided, one minute -- excuse me. I keep saying

15 minute and I apologize to everyone, especially the court

16 reporter for having to rewrite minute to hour.

17     It's one hour, thirty-five minutes, and thirty-six

18 seconds of footage provided to us. And if we go to 19:47, or

19 thereabout, that's the first one I want to get and ask you to

20 listen to, sir.

21     And what I'm going to ask you for each of these is

22 if you can at least appreciate that, for us, or anyone

23 listening to this footage, that you would -- that they would

24 reasonably draw the conclusion that either you are a

25 psychopath, or you're telling the truth, or both. That's

**157**

1 what I'm going to ask you, same question after each of these.

2     MR. REYNOLDS: Objection, form.

3     MR. BURKE: Object to form.

4     MR. REYNOLDS: And do you want to put your laptop

5 in front of him so he can see it.

6     MR. BRILL: Oh, it's just the audio part. That's

7 what I said. The video is just -- it's nothing.

8     MR. REYNOLDS: Well, I understand, but --

9     MR. BRILL: Oh, so he can hear it?

10     MR. REYNOLDS: He hasn't seen it, and if you'll

11 just show him what you're referencing. Because that's

12 what you're -- you're then --

13     MR. BRILL: Well, yeah, but I only downloaded the

14 audio. That's what I'm saying.

15     MR. REYNOLDS: Okay.

16     MR. BRILL: On this particular thing.

17     MR. REYNOLDS: So there's no --

18     MR. BRILL: I did download the video portion, but

19 it just shows a hip. There's nothing. I'm only

20 concentrating on the audio portion. You see what I'm

21 saying?

22     MR. REYNOLDS: Okay. So for this line of

23 questioning, you're not looking at a video because you

24 didn't download the video.

25     MR. BRILL: I have it on a Dropbox separately, but

**158**

1 when I download it onto my laptop through iTunes, it's -

2 - I'm able to move it along the audio bar with ease, and

3 I can't do that with the download from the Dropbox that

4 was provided to me that has the video component.

5     But I'm happy to show you the video portion as

6 well, but for right now, I'm only talking about the

7 audio. Does that makes sense?

8     MR. REYNOLDS: It makes sense. I just want to make

9 sure we were on the record that that's all that you're

10 referencing.

11     MR. BRILL: Yes. Yes, indeed.

12     That is not -- that's, I think, AC/DC, not your

13 Taser.

14     MR. BURKE: That's your Taser recording.

15     MR. MCKEE: Yeah.

16     MR. BRILL: Exactly.

17 BY MR. BRILL:

18     Q. It is not the best quality, and I can come sit over

19 there, too, so you can hear it better. And I have, I should

20 have headphones if you want to listen to it there. But I'm

21 going to go to 19:47

22     (Audio being played.)

23     Okay. Now, right there. First of all, do you hear

24 your voice?

25     A. All I hear is mumbling, sir.

**159**

1     Q. Okay. Let me bring it closer to you.

2     MR. BRILL: May I do that, Counsel? Do you mind if

3 I set by the side of him?

4     THE VIDEOGRAPHER: Excuse me, Counsel. Could we go

5 off the record for a second?

6     MR. BRILL: Of course.

7     THE VIDEOGRAPHER: Off the video record at 11:41

8 a.m.

9     (Brief recess.)

10     THE VIDEOGRAPHER: Back on the video record at

11 11:42 a.m.

12     MR. BRILL: And I don't know if Lyman feels

13 differently. I certainly don't wish to be on the

14 footage, so, just the deponent.

15 BY MR. BRILL:

16     Q. Anyway, let's just listen. This is not exactly

17 19:47 anymore. This is 19:56. I stopped it right after the

18 point you heard. I'm going to hit play.

19     (Audio being played.) I'm going to go back to

20 19:47. (Audio being played.) That's you. Can you tell

21 whose voice that is?

22     A. Uh-huh.

23     Q. Who's that?

24     A. That's Officer Galbo.

25     Q. Isn't that your voice, "The outcome would have been

160

1  the same. He would have fought." Did you hear that?
2       MR. REYNOLDS: Objection, form.
3       A. Yeah, I couldn't tell. I couldn't tell whose voice
4  that was.
5       Q. And it's -- you say, if it is your voice, we'll
6  hear more of it, obviously, there's a bunch, says, "If he
7  runs the gate," speaking of the military base, "and he gets
8  to the -- and let the military light him up." Do you recall
9  saying that?
10      MR. REYNOLDS: Objection, form.
11      A. No, sir. I don't.
12      Q. If you said that, I go back to my question, is that
13 something that truly a psychopath would say, or that you
14 truthfully wish that it would make your life and every other
15 officer involved in this incident's life a lot easier, and in
16 speaking the truth, if the military had simply shot him down?
17      MR. BURKE: Object to form.
18      MR. REYNOLDS: Objection, form.
19 BY MR. BRILL:
20      Q. And he went to the military base, rather than to
21 the Southernmost Beach?
22      A. I don't know.
23      MR. REYNOLDS: Objection, form.
24      Q. If you said that -- why would you say such a thing?
25      MR. BURKE: Object to form.

161

1       MR. REYNOLDS: Join.
2       A. Embellishment.
3       Q. I've heard that and I've read that in the words in
4  the FDLE report. To what end?
5       MR. BURKE: Object to form.
6       MR. REYNOLDS: Join.
7       A. Shop talk. Decompression.
8       Q. Okay. And then if we go to 36:58 or thereabout.
9  This is 36:29. I'll tell you when we get to 36:58. Bear
10 with me. (Audio being played.) Is that your laugh, by the
11 way, right there? 56. Do you hear that? Is that you
12 talking?
13      A. I heard Henry's -- I remember seeing Henry's gun in
14 the dirt.
15      Q. That's you?
16      A. Yes, sir.
17      Q. And before that, you said, "Gabe's finger got
18 stuck."
19      A. Okay. I didn't hear that, but --
20      MR. REYNOLDS: Objection, form.
21      Q. And then, "I remember seeing Henry's gun in the
22 dirt."
23      A. Yes, I just heard that.
24      Q. Now, am I correct that the gun that Henry had, and
25 that's Henry Del Valle?

162

1       A. Yes, sir.
2       Q. Was what? Is that AR15 rifle?
3       A. It's a patrol rifle. I don't know what make or
4  brand it is.
5       Q. Is it appropriate police policy or procedure for an
6  officer, first of all, to even take out, whether it's an
7  AR15, but whatever high-powered rifle, in this circumstance?
8       MR. REYNOLDS: Objection, form.
9       MR. BURKE: Object to form.
10      A. I can't speak for Officer Del Valle's decision to
11 take that out.
12      Q. No, no. I'm not asking you to speak to his
13 decision. I'm asking you to speak to whether him having made
14 that decision comports with police department policy or
15 procedure?
16      MR. REYNOLDS: Objection, form.
17      A. We didn't know what we were dealing with at that
18 time, so for his decision to take that out, you know, you'd
19 have to review policy, but I don't have a problem with it.
20      Q. What is it to your understanding that the policy is
21 regarding procurement out of a vehicle of a rifle of that
22 nature for any problem?
23      MR. REYNOLDS: Objection, form.
24      A. To have that rifle out wasn't against policy.
25      Q. And where would I look to confirm that?

163

1       A. In our policy and procedure.
2       Q. In what section or portion?
3       A. Probably response to resistance.
4       Q. Is it appropriate to leave that, any firearm, but
5  that in particular, in the dirt?
6       MR. BURKE: Object to form.
7       MR. REYNOLDS: Join.
8       A. The gun wasn't left in the dirt. He had it
9  holstered, slung on his body. And when he was performing
10 lifesaving techniques, the barrel of it was going in the
11 dirt.
12      Q. That's what you meant by saying, "I remember seeing
13 Henry's gun in the dirt"?
14      A. Yes.
15      Q. Let's go to --
16      A. With regards to that policy, I think we might even
17 have a patrol rifle policy. I don't carry one.
18      Q. You don't carry patrol rifle?
19      A. I don't carry a patrol rifle.
20      Q. It's optional?
21      A. Yes.
22      Q. The next is at 37:11, which is just seven seconds
23 from where I've stopped, and I'm going to proffer, and all I
24 can tell you is I have listened to this very carefully, so,
25 you can, you know, later listen, any of you, and tell me that

33 (Pages 160 to 163)

164

```
 1    I'm wrong, but I'm not.
 2         Someone says, "We're all going to have to do
 3    supplementals.  Let's get together and work that shit out."
 4    See if you agree that that's what's said.  (Audio being
 5    played.)
 6         MR. REYNOLDS:  Objection, form.
 7         MR. BURKE:  Object to the form.  It's
 8    unintelligible.
 9    BY MR. BRILL:
10         Q.  Who says that?
11         MR. REYNOLDS:  Objection, form.
12         A.  I can't tell you who said that.
13         Q.  You can't -- you don't recognize that voice?
14         A.  I don't know who said that.
15         Q.  What is "supplementals"?
16         A.  Secondary reports off the original.
17         MR. BURKE:  Did the witness say he understood what
18    was said?  Did you understand that?
19         THE WITNESS:  I heard the supplemental report
20    thing, but I can't tell you who said it.
21         MR. BURKE:  Gotcha.
22         THE WITNESS:  And a supplemental report would be a
23    report to Gary Celcer, who would have been the original
24    person's report.
25         Q.  That's because Gary Celcer was the original officer
```

165

```
 1    who pulled over Eimers in the street.
 2         A.  Yes, sir.
 3         Q.  And, now these supplementals are all sworn reports.
 4    Anytime you write one of these reports, sign your name to
 5    them or submit them electronically, they are under oath?
 6         A.  As far as I know; yes, sir.
 7         Q.  And this, someone with your -- in your group, one
 8    of your fellow officers, is suggesting to get together and
 9    work that shit out.  What does that mean to you?
10         MR. BURKE:  Object to form.
11         MR. REYNOLDS:  Objection, form.
12         A.  I didn't -- I didn't hear that.  I heard the
13    supplemental part.
14         Q.  If that's what he said, you don't think that's
15    damning?  That's not suggesting a conspiracy among officers
16    that's going to happen?  We're going to get together and make
17    sure we get our stories straight?
18         MR. BURKE:  Object to form.
19         MR. REYNOLDS:  Objection, form.
20         A.  I don't recall who was there and who said that.
21         Q.  If I said to you, as your fellow officer, we're
22    going to do, have to do supplementals, let's get together and
23    work that shit out, how would you interpret that to mean?
24         MR. BURKE:  Object to form.
25         MR. REYNOLDS:  Objection, form.
```

166

```
 1         A.  My first thought was we'd have to call our PBA
 2    representative and see what they wanted us to do.
 3         Q.  You take, "We're going to have to get together and
 4    work that shit out," to say we're going to get our lawyer,
 5    and coordinate our efforts that way?
 6         MR. BURKE:  Object to form.
 7    BY MR. BRILL:
 8         Q.  Not, we're going to have to get our -- work the
 9    shit out and make sure we get our stories straight?
10         MR. REYNOLDS:  Objection, form.
11    BY MR. BRILL:
12         Q.  I want to make sure what you believe, under oath,
13    "Let's get together and work that shit out" means?
14         A.  I don't recall my thoughts then.
15         Q.  Okay.
16         THE COURT REPORTER:  I'm having trouble, if you
17    could just speak up.
18         THE WITNESS:  Sorry.  Yes, ma'am.
19         MR. BRILL:  You heard what he said?  He said, "I
20    don't recall my thoughts then."
21    BY MR. BRILL:
22         Q.  Forget what your thoughts then were.  Today,
23    someone says to you, we're going to have -- "Let's get
24    together and work that shit out," meaning supplementals, how
25    do you -- how do you understand that terminology here today
```

167

```
 1    right now?
 2         MR. REYNOLDS:  Objection, form.
 3         MR. BURKE:  Object to form.
 4         A.  My first thought is the same as before.  We need to
 5    get with our lawyer.
 6         Q.  Did you guys, any of you, get together and work out
 7    what your supplementals would read?
 8         A.  I don't recall.  I know there's a section on all of
 9    our reports that we received an email from Andrew Axelrod,
10    who is our counsel, that stated we needed to put a certain --
11         MR. REYNOLDS:  Wait.
12         MR. BRILL:  Oh, yeah.  I don't want --
13         MR. REYNOLDS:  You're not going to --
14         MR. BRILL:  I did hear what --
15         MR. REYNOLDS:  I understood.  He was volunteering
16    it, and so that's why I needed to stop him, because
17    you're not to state what -- attorney-client privilege
18    communication.
19         THE WITNESS:  Okay.
20         MR. BRILL:  My fault.  I didn't mean it, but I'll
21    take the blame.  I don't want to hear what Mr. Axelrod
22    said.  That's privileged for you.
23         Q.  But my question remains, did you get together with
24    your fellow officers and work out what to put on your
25    supplemental reports?
```

168

1  A.  No.
2  Q.  Who prepared your supplemental report?
3  A.  I did.
4  Q.  Who typed it out?
5  A.  I did.
6  Q.  Did you review it before you submitted it?
7  A.  I believe so; yes, sir.
8  Q.  And you attested what you wrote in there was true
9  and correct?
10  A.  Yes, sir.
11  Q.  Did you only submit one report?
12  A.  I believe so; yes, sir.
13  Q.  If what was meant here was we're going to all have
14  to do supplementals; let's get together and work that shit
15  out, meant, let's get together and get our stories straight,
16  that would not be proper police procedure, would it?
17  MR. BURKE:  Object to form.
18  MR. REYNOLDS:  Objection, form.
19  A.  No.
20  Q.  That would be illegal, wouldn't it?
21  MR. REYNOLDS:  Objection, form.
22  A.  Depending on the situation, yes.
23  Q.  That would be a conspiracy, correct?
24  MR. BURKE:  Object to form.
25  MR. REYNOLDS:  Objection, form.

169

1  A.  Yes.
2  Q.  And at 41 minutes, I hear — which is 40 minutes
3  and 51 seconds.  We'll get to 41.  I hear the sound of a text
4  coming from your phone.
5  MR. REYNOLDS:  Objection, form.
6  BY MR. BRILL:
7  Q.  (Audio being played.)  Do you hear the clicking?
8  A.  Uh-huh.
9  Q.  Yes?
10  A.  Yes.
11  Q.  Do you hear the whoosh sound that just emitted as
12  you sent a text?
13  MR. REYNOLDS:  Objection, form.
14  A.  If it's whoosh --
15  Q.  Do you want to hear it again?
16  A.  If it's a whoosh sound, then it was an email.
17  Q.  Okay.  Let me rewind that, and tell me if that's
18  your email sound or your text sound?  (Audio being played.)
19  Did you hear that, whoosh?
20  A.  That whoosh would have been an email.
21  Q.  It's being sent by your personal phone?
22  A.  Yes.
23  Q.  To whom would you have sent that email?
24  A.  Andrew Axelrod.
25  Q.  That same day as this, right away?

170

1  A.  I'm sure, yes.
2  Q.  And is your phone, and we talked about -- I think I
3  asked this.  If I did, I don't mean to be repetitive for
4  repetitive's sake, I promise.  Is your cell phone connected
5  to your professional email address and your personal, or just
6  one or the other?
7  A.  Both.
8  Q.  At 41:57, you make a phone call to your wife.  Do
9  you recall that?
10  MR. REYNOLDS:  And what was the time?
11  MR. BRILL:  41:57.
12  BY MR. BRILL:
13  Q.  This is 41:38, 39, 40.  (Audio being played.)
14  That's, "Hey, baby."  (Audio being played.)  That's your
15  voice, right?
16  A.  That's me talking, yeah.
17  Q.  You're talking to your wife on the phone, but also
18  now talking about that incident we talked about earlier?
19  A.  Yes.
20  Q.  If my memory serves, I think the rest of it has to
21  do with some recipe or something that you talk about with
22  your wife.
23  But in this communication we just heard, you state
24  to your wife, "I murdered him.  I'm going to go -- going to
25  IA."  You heard that?

171

1  A.  I heard the IA.  I never --
2  MR. REYNOLDS:  Objection, form.
3  THE WITNESS:  I'm sorry.  I didn't hear the "I
4  murdered him."  I heard the "I'm going to IA."
5  Q.  If you said, "I murdered him.  I'm going to IA,"
6  what is that?  Is that another one of, what did you call
7  that?
8  MR. BURKE:  Object to form.
9  MR. REYNOLDS:  Objection, form.
10  BY MR. BRILL:
11  Q.  Embellishment, decompression?
12  A.  Yes, sir.
13  Q.  By the way, on that topic of decompression, did you
14  ever seek psychological or psychiatric counseling?
15  A.  No, sir.
16  Q.  Have you talked to any professional, be it a member
17  of the clergy or anyone, in order to relieve any of the
18  stress or the compression you felt?
19  A.  No, sir.
20  Q.  Did you seek any medical attention to get any
21  treatment, whether it be holistic or pharmaceutical, you
22  know, prescription care, to deal with the decompression?
23  A.  No, sir.
24  Q.  Or the stress?  Or, I know right after this, you
25  went with your family to Disney World, correct?

35  (Pages 168 to 171)

172

```
1        A.  I believe so, in December.
2        Q.  Was Disney World the method by which you chose to
3    decompress?
4            MR. REYNOLDS:  Objection, form.
5            MR. BURKE:  Object to form.
6        A.  I'm sure it helped.
7        Q.  You then say, "It's a police-involved death."  Is
8    that -- that's true, right?
9            MR. REYNOLDS:  Objection, form.
10           MR. BURKE:  Object to form.
11       A.  Yeah.  I mean, at that time, that was our -- that
12   was my assumption.
13       Q.  But now, you're contending that Mr. Eimers died
14   having nothing to do with the police involvement?
15           MR. REYNOLDS:  Objection, form.
16   BY MR. BRILL:
17       Q.  He died of, what is it, natural causes?
18           MR. REYNOLDS:  Objection, form.
19   BY MR. BRILL:
20       Q.  That's your belief?
21       A.  I don't remember what the autopsy said.
22       Q.  But what's your belief?  Is this a police-involved
23   death, like you told your wife, or do you believe differently
24   today?
25       A.  Today, I believe --
```

173

```
1            MR. BURKE:  Object to form.
2            THE WITNESS:  Today, I believe differently.
3    BY MR. BRILL:
4        Q.  You talked about how you held the Taser because,
5    your words, "Gabe had his finger stuck in the handcuff."
6    That's true, right?
7        A.  Yes, sir.
8        Q.  Okay.  So, that part's true, but all this other
9    stuff that's incriminating is embellishment or decompression.
10           MR. BURKE:  Object to form.
11           MR. REYNOLDS:  Objection, form.
12   BY MR. BRILL:
13       Q.  That what we need to believe?
14           MR. REYNOLDS:  Objection, form.
15       A.  Sir, you're taking sections out of an hour and
16   thirty-five minutes.
17       Q.  Yup.  And exactly, which is an hour and thirty-five
18   minutes of your statements.  That's exactly what I'm doing.
19           MR. REYNOLDS:  Objection, form.
20   BY MR. BRILL:
21       Q.  So, if we go to, for example, remember I talked at
22   the beginning of how it was easier just to bury him.  That's
23   at 48 seconds in, which I'll proffer to you -- and I was
24   wrong.  It's on the footage.  It actually didn't say 11-
25   something a.m.  It was 1:55 p.m.  So when you look at the
```

174

```
1    actual video, you'll see.  We know that it wasn't 1:55 p.m.
2            MR. BURKE:  Object to form.
3            MR. REYNOLDS:  Objection, form.
4    BY MR. BRILL:
5        Q.  Right?
6        A.  I don't know.
7        Q.  But we know that you didn't stay on the beach, but
8    for, as you testified a couple of times, but for a few
9    moments after Mr. Eimers was removed and placed in the
10   ambulance.
11       A.  Like I said, I don't know what happened on the time
12   stamp on that.  I don't have access to that.
13       Q.  Understood.  So if we go to 0:48 --
14           MR. BURKE:  Can we take a break when it's
15   convenient?
16           MR. BRILL:  Oh, absolutely.
17           MR. BURKE:  I just I have to use the facilities.
18   I'm sorry.
19           MR. BRILL:  Sure.  Do you want me to play this
20   first, or do you want to go now?  Your choice.
21           MR. BURKE:  Well, how long do you think you're
22   going to be?  When it's a convenient time for a break,
23   we'll stop.
24           MR. BRILL:  I could just play the :48 and take a
25   break, if that's okay with you.
```

175

```
1            MR. BURKE:  Absolutely.
2    BY MR. BRILL:
3        Q.  I'll start it at :23, :31, :32, :33.  (Audio being
4    played.)  Can you hear that?  Do you want me to replay it?
5        A.  Yeah.  I don't know what it said.
6        Q.  "It would be easier for us just to bury him."
7            MR. REYNOLDS:  Objection, form.
8    BY MR. BRILL:
9        Q.  Twenty seconds from now.  (Audio being played.)
10       A.  What was that right there?
11       Q.  Six seconds.  (Audio being played.)
12       A.  I hear that, but I don't know what initiated that
13   response, what was said to initiate that response.
14       Q.  Would there be anything at all, anything at all
15   that could be said that would warrant that response?
16           MR. REYNOLDS:  Objection, form.
17       A.  I don't know.
18       Q.  Regardless of what was said that prompt it or, in
19   your mind, prompt it, can you appreciate, as I said I would
20   ask when these questions came up or these statements were
21   made by you, can you appreciate how you sound to others, like
22   a psychopath saying something like that?
23           MR. BURKE:  Object to form.
24           MR. REYNOLDS:  Objection, form.
```

**WWW.USLEGALSUPPORT.COM**
**1-888-311-4240**

176

BY MR. BRILL:

Q.  **Easier for us just to bury him?**

MR. REYNOLDS:  Objection, form.

A.  Decompression and embellishment.

Q.  **Not my question.**

**Can you appreciate how that sounds to a listener?**

MR. BURKE:  Object to form.

MR. REYNOLDS:  Join.

A.  No.

Q.  **No, you can't appreciate it at all?**

A.  I don't appreciate it at all.  I can understand how it comes off that way.

Q.  **That's what I mean.**

A.  I understand that.  But like I said, that was embellishment, that was decompression.  That was shop talk with other officers.

MR. BRILL:  Okay.  You want to take that break?

MR. BURKE:  Sure.

THE VIDEOGRAPHER:  Off the video record at 12:07 p.m.

(Lunch recess.)

(Continued in Volume III.)

**A**

a-r-c 63:20
a.m 32:16 61:16,19
  117:5,8 127:1
  130:1 159:8,11
  173:25
abilities 90:18
ability 41:3,7
  60:13,14 154:12
able 85:10 100:19
  107:9,9 116:18
  142:24 149:19
  158:2
abruptly 145:22
absent 142:23
absolutely 42:15
  78:16 98:17
  120:8 174:16
  175:1
AC/DC 158:12
access 52:1 89:1,2
  89:3 108:22
  130:21 132:20
  133:13 134:21
  145:2 146:1
  150:7 174:12
accessible 139:22
accurately 118:15
acronym 134:19
action 67:14 152:9
actions 69:13
activate 42:4,10
  48:23 52:19 56:3
  62:3 80:11 142:3
activated 38:20
  43:17 53:12,13
  53:16 54:2,7
  57:8,24 58:9,15
  64:21 71:20
  74:10 90:9
activates 52:17
activating 60:19
  61:8
activation 39:15
  53:6 60:21
active 57:14
  108:10
actively 43:18
activity 68:9
actual 59:17 66:2
  72:6 127:7 128:9
  129:18 130:17,22
  145:12 174:1
added 70:20
additional 89:4
address 42:9 94:10
  94:11 96:5 101:7

103:9,25 104:14
  105:1 170:5
administratively
  133:11
admit 48:18 115:15
ADOLFO 34:9
advise 106:13
advised 107:16
after-market 64:11
afternoon 44:8
agency 113:1,1,23
  114:4 121:21
  122:2
aggravated 72:16
  73:4,21
ago 66:14 73:24
  147:2,5,7
agree 62:2 92:14
  98:5 113:7 118:4
  126:17,17,21
  155:12,21 164:4
ah 44:22 45:10
  151:1
ahead 40:5 43:6,15
  45:17 139:21
  150:20
aided 127:10,11
aired 82:4
al 32:8
albeit 68:22
all-important
  84:17
allegedly 43:20
Allen 133:19
  134:23
allowed 44:11,14
  44:22,24 46:21
  101:19
Alpha 82:12
alter 87:22 131:5
alternative 70:24
Alternatively
  69:12
altogether 149:10
amazing 43:2,7
ambient 65:5
ambulance 50:7,21
  51:19 57:21 71:7
  126:22 174:10
Amelia 141:14
  143:6 144:3
amount 44:16 48:4
  48:18
and/or 112:20
Andrew 106:7 167:9
  169:24
ANSELMO 33:20

answer 43:6,15
  47:5 70:16
  102:10 103:9,12
  104:4,16
anticipating 103:8
anticipation 80:11
anybody 58:22
  60:14 91:6 96:3
  107:22 131:23
  132:13 136:25
  153:23
anybody's 44:15
  46:20 47:18
anymore 121:20
  159:17
Anytime 165:4
anyway 62:22
  159:16
apologize 55:15
  88:21 110:1
  117:19 122:20
  139:2 144:6
  156:15
apparently 42:23
  101:19 102:5
appear 70:19
  130:22 131:1
APPEARANCES 33:1
  34:1
appeared 130:2
appears 130:8,8
appreciate 59:13
  85:22 86:14
  155:11 156:22
  175:20,22 176:6
  176:10,11
appropriate 36:8
  47:21 73:3 162:5
  163:4
approximately 44:7
  156:13
apt 155:22
AR15 162:2,7
arc 63:19,20
arctic 45:19
area 136:3 137:10
argument 43:10
argumentative
  40:14 42:5,25
  43:3,11,13 45:14
  46:22 49:4,9
  50:14 51:23
  54:17,18 58:3,6
  59:7,19 60:11
  65:21 71:12
  73:23 74:14,15
  75:18,20 76:15

arm 41:12
Arnaud 34:10 35:22
art 151:14
aside 47:16 69:6
  73:13 129:16
asked 39:22 50:18
  52:9 58:12
  118:10 129:7,10
  154:9 170:3
asking 47:17 49:22
  49:23 73:15
  75:13,14 100:1
  101:25 102:2
  103:2 104:2
  111:18 116:11
  121:7 122:18
  128:3 162:12,13
aspect 143:14
aspects 113:2
  114:6 120:21
  122:3 124:23
asserting 103:12
assist 74:6 76:20
  140:22
assisted 76:18
assume 98:25
  119:13
Assumes 60:12
assumption 172:12
attached 138:11
attempt 87:7
attempted 51:17
  151:17
attempting 56:1
attempts 56:1
  146:5
attention 112:8
  171:20
attested 168:8
attorney 105:5,6
  106:5,6,8 107:24
attorney-client
  167:17
audible 65:5
audio 48:24 51:20
  52:20 55:11 56:5
  57:25 58:25
  59:17,21 60:19
  69:16 73:18 77:6
  77:13,20 78:4
  79:5 84:19 88:11
  89:4 141:2
  142:18,21 143:3
  144:7 146:6
  148:11,17 151:8
  156:6 157:6,14
  157:20 158:2,7

158:22 159:19,20
161:10 164:4
169:7,18 170:13
170:14 175:3,9
175:11
**audio/video** 62:3
66:11 74:9 75:16
75:23 86:24
89:19 131:10
**auditory** 149:11
**authorization**
100:24 101:9
**automatically** 60:8
60:20 62:16
66:10 67:1 97:2
142:4,9,17,21
145:1 150:7
**autopsy** 172:21
**available** 77:14
82:24 112:25
113:23 121:21
125:25
**Avenue** 144:1
**aware** 95:19 99:14
109:9 114:19
**Axelrod** 106:7
167:9,21 169:24

**B**

**baby** 56:4 170:14
**back** 35:9 37:24
46:11 55:23 57:8
57:18,25 60:7,19
61:18 62:6,7
64:2,20 66:8
71:5 73:14 75:4
75:22 76:24 77:3
78:20 84:17 91:7
111:10 115:1
117:7 126:9,11
127:17,24 133:23
135:6 151:7,7
156:11 159:10,19
160:12
**backboard** 129:14
131:11,16
**backseat** 149:8
**Bahama** 141:5 143:7
144:2
**bailed** 140:22
**bar** 158:2
**barrel** 163:10
**base** 160:7,20
**based** 45:13 116:12
125:10
**bases** 86:8
**basic** 57:22 125:17

**basically** 150:4
**basis** 38:13,21
39:12 67:14
**bathroom** 46:18
**batteries** 73:25
**battery** 72:16 73:4
73:21
**beach** 34:4 39:16
39:18,24 41:25
48:25 49:11,24
51:18 53:2,16
54:16,21 55:6,16
55:22 56:3,19
57:8,20 60:6
61:1,23 62:9,13
69:5 72:21 81:4
82:21 83:1,15
84:10 97:8
102:18 126:13,18
126:25 130:2
131:15 132:25
139:1 140:5
143:15 153:16
160:21 174:7
**Bear** 161:9
**beat** 46:1
**BEDARD** 34:3
**began** 127:1 139:3
143:24 154:4
**beginning** 60:1
78:11,11 173:22
**Behalf** 33:2,19
34:2
**belief** 39:5 50:23
50:24 51:5,11,13
60:17,24 61:5,9
87:16 89:5,14,18
121:15 125:4
172:20,22
**believe** 44:13
46:24 50:6,19
53:9 54:6 59:10
61:6 62:5 63:21
63:21 64:15
65:20 66:2 68:2
68:16 76:3,11
79:23 81:6 88:24
91:5,6 110:21
111:4 118:17
120:16 124:1,13
124:18 125:23
126:8,24 127:22
129:1 131:24
134:15 136:1
137:2 141:4,14
146:13 148:4,14
149:21 150:11,24

152:17,25 153:12
155:13 166:12
168:7,12 172:1
172:23,25 173:2
173:13
**believed** 49:7
132:24
**belt** 137:15 139:9
139:16,25
**best** 83:19 84:8
158:18
**better** 37:9 54:14
85:7 92:6 126:18
129:15 158:19
**bill** 105:14,16
**bit** 37:18 61:22
62:21 65:3 73:13
111:6
**black** 80:1 126:14
**blame** 167:21
**bleeding** 136:24
137:1,4
**blood** 133:21 134:7
135:4,13,20,24
136:3,6,7,10,11
136:17,21
**blow** 91:7
**bodily** 46:17
**body** 42:1,19 43:21
59:3 63:1,9,23
76:1 137:9,9,17
137:22 138:9,13
149:9 163:9
**boss** 81:15,25
**bottom** 138:19
**Boulevard** 33:3,12
33:16,20
**brain** 41:12 65:13
67:4
**brand** 162:4
**brandish** 108:2
**brandished** 53:11
53:24
**brandishing** 83:11
**Bravo** 82:12,13,14
82:16 83:2 84:8
**break** 61:13 115:14
115:14 116:1,3
117:1,2,3 153:23
174:14,22,25
176:17
**bridge** 63:22
**Brief** 61:17 117:6
159:9
**briefly** 126:11
**Brill** 33:3,5 34:15
35:8,25 36:1

38:2,5,8,11,13
38:16,18 39:2,11
39:13,20 40:2,4
40:6 42:3 43:2,6
43:8,12,14 45:3
45:16,24 46:5,8
46:9 48:7,12
49:17 50:11 51:4
52:23 55:15
57:10 58:4 59:16
61:4,13,20 67:8
67:17 69:1,9,20
70:2,11,15 73:20
74:19,21 77:24
78:3,23 79:7,14
82:18 84:6,22,25
85:2,4,11,17,19
85:21 86:2,6,14
86:17 88:3,7
89:12,22 90:22
92:1,10 93:1
94:24 98:1,11,15
98:21 99:5,9,11
99:15,17 100:12
100:16 101:8,12
101:15,17,24
102:9,11 103:16
103:22,24 104:5
104:9,13 108:6
110:23,24 111:5
111:14,18 112:7
114:25 115:5,12
116:4,25 117:9
118:23 119:4
122:15 128:21
133:9 144:22
148:20 150:19
152:2 153:22
154:14 155:6
157:6,9,13,16,18
157:25 158:11,16
158:17 159:2,6
159:12,15 160:19
164:9 166:7,11
166:19,21 167:12
167:14,20 169:6
170:11,12 171:10
172:16,19 173:3
173:12,20 174:4
174:16,19,24
175:2,8 176:1,17
**bring** 111:9 147:18
159:1
**brother** 90:8,14
**Building** 34:3
**bunch** 86:4 160:6
**Burke** 33:20,22

35:19,24 40:1,3
40:5,14 42:2,5
42:25 43:7,10
45:1,14,18 46:3
46:6,22 48:6,9
49:4 50:9,13
51:10,23 54:18
56:12 58:3,6,20
59:7,15,20 60:10
65:21 67:16 69:8
69:19,25 71:12
71:14 73:6 74:14
74:16 75:19 77:8
77:16 78:1,6,21
79:1 80:22,24
84:11,21,24 85:1
85:3,8,16,18,20
85:25 86:4,12,15
87:1,19 88:5,12
89:8,24 90:5,10
90:16 91:10,19
91:24 92:9,17,25
93:11,25 94:14
94:23 95:14
96:12 97:3,12,18
97:25 98:3,13
100:8 107:14
108:5,9 110:10
111:13,16 113:12
114:11,17,23
115:23 116:10
117:2,14 118:21
119:2 125:9
128:4,19 129:19
131:18 132:4,11
132:17 133:3
136:4 144:20
145:7,19,25
148:5,19 151:15
151:25 152:23
153:9 154:25
155:8,17 156:1
157:3 158:14
160:17,25 161:5
162:9 163:6
164:7,17,21
165:10,18,24
166:6 167:3
168:17,24 171:8
172:5,10 173:1
173:10 174:2,14
174:17,21 175:1
175:24 176:7,18
**burke@jambg.com**
33:22
**bury** 129:15 131:13
173:22 175:6

176:2
**button** 41:8,14
61:24 62:18

─────────────
            **C**
─────────────

**C** 33:18
**C-101** 34:3
**C-O-B-A-N** 146:12
**CAD** 83:17 126:16
127:3,8
**CAD's** 127:6
**CADs** 127:9
**calendar** 123:18,25
**call** 50:25 63:6
68:22 79:15,17
79:22,23 80:15
80:18 92:21 93:5
107:11 110:14
126:14,23 127:23
134:16 145:14
151:11 152:8,9
152:19 166:1
170:8 171:6
**called** 42:12 79:16
107:5 111:22
134:15 151:19
**calling** 143:24
152:20
**calls** 54:18 69:8
69:25 71:14 73:6
74:16,17 75:10
75:19 76:16 78:6
79:1 84:11
**cam** 142:1,12
145:13 146:17
147:14 149:5,12
149:23 154:1
**camera** 38:15
109:18,19 146:5
156:5
**cameras** 76:2
138:12 151:7
**candidly** 48:17
**capabilities** 81:1
**capitals** 112:11
**captains** 146:4
**capture** 59:4,21
66:11 74:10
96:17
**captured** 77:6
**car** 44:23 45:11
64:25 134:7,7,11
140:6,7,16,22
141:7,22 142:7
145:13 146:8
148:16,17,24,24
149:7,17 150:6

150:23 151:6
152:22 153:16
**care** 85:13 86:10
171:22
**career** 44:4 130:16
**carefully** 163:24
**cargo** 138:19
**carrier** 100:13
101:13,18,20
139:7
**carry** 96:25 105:10
149:17 151:10
163:17,18,19
**cars** 79:24 80:4
**cart** 66:3 133:24
**cartridge** 36:17,23
37:1,5,16 39:19
41:23 62:7 63:3
64:2
**case** 32:3 47:25
48:24 58:1 59:14
70:7 84:8 98:19
102:24 107:18
108:2 127:16
**catch** 75:2
**categories** 117:12
121:16
**category** 124:9
**caught** 110:20
137:3
**causes** 172:17
**Celcer** 164:23,25
**cell** 94:13 99:1,4
105:8,10,12,14
105:21,22 106:1
170:4
**certain** 113:8
142:2 152:4,14
167:10
**certainly** 35:16
71:7 115:15,16
159:13
**Certified** 32:24
**chain** 133:18
134:20,24
**chance** 45:19 66:2
**change** 49:13
**changed** 101:20
102:3,6,7 104:6
**characteristics**
154:11
**charge** 130:19
140:17
**charging** 140:10,13
141:25 153:19,20
**Charles** 32:5
**chase** 151:13,18

**chat** 47:20
**check** 83:17 126:2
126:16 127:3
147:15
**chest** 138:7
**choice** 142:10
174:20
**chose** 172:2
**circumstance** 162:7
**City** 32:8 104:17
104:20 105:19
**civil** 128:17
**civilians** 42:23
**claim** 42:20 58:24
**clarification** 86:9
**clarify** 55:5 85:15
116:23 143:17
**clarifying** 126:10
**clear** 53:4,15 56:1
56:2 62:12
100:17 138:17
143:13
**cleared** 69:23
**clearly** 147:17
**clergy** 171:17
**click** 65:3,8,11
**clicking** 169:7
**clipped** 139:9,9
**clock** 55:8 56:5
128:1 130:24
**close** 44:5 49:19
50:8,20 63:15,18
63:19 67:3 79:18
129:17 146:23,24
146:25 147:9
153:21 156:12
**closed** 144:24
**closer** 147:10
159:1
**co-counsel** 111:8
**COBAN** 140:11 146:7
146:9,10,12
149:25 150:1,7
150:12,14,22,24
151:1
**COBAN's** 150:9
**cognizant** 46:7
**coincidence** 131:14
**collect** 151:8
**colored** 142:6
**Columbia** 34:3
93:23 94:7 96:5
**combined** 114:1
**come** 39:3,4 78:18
78:20 94:7 126:9
140:12 142:4,9
153:3 158:18

comes 36:20 64:14
 64:16 70:17
 130:8 176:12
coming 154:5 169:4
command 133:18
 134:21,24
commas 113:15
comment 39:2 43:4
 49:15 51:9
 103:20 129:14
 131:10,12
communication
 107:5 167:18
 170:23
companies 74:9
company 106:15,16
 106:23 107:8,16
 107:18
compelling 73:2
complete 112:23
completed 116:9
completely 149:25
complies 94:9
comply 120:18
component 158:4
comports 162:14
compound 51:23
 69:25 71:12
 73:22 78:1,5,6
 79:2
compression 171:18
computer 109:1
 127:9,11
concentrating
 157:20
concern 42:13,22
 136:18 143:14
concerned 42:17
 132:23 136:7,21
concerning 104:24
concerns 42:21
conclude 139:23
conclusion 132:14
 136:2 156:24
conclusions 68:19
condition 50:16
 51:12
confirm 116:7
 162:25
confirmed 57:4
conflict 39:2
confused 54:20
 55:4 140:8
connected 62:25
 63:1 103:25
 170:4
considered 119:11

125:18 139:7
conspiracy 165:15
 168:23
contact 94:21
 95:12,20 98:8
 137:11
contending 172:13
continuation 35:3
continue 59:24
continued 34:1
 35:1 76:20
 176:22
continuing 114:20
contributed 105:16
convenient 174:15
 174:22
coordinate 166:5
copies 111:13
copy 115:5
correct 36:24
 37:16,17,20 41:8
 41:12,16 42:11
 44:8 48:8,20
 49:11 52:11,14
 52:15,17,18,25
 53:8,16,17 54:5
 54:8,9 55:9,11
 56:6,7,11 57:9
 57:17 61:2,11
 62:8,15 63:25
 66:15 68:6,20
 69:2,10,14 71:10
 73:12 74:22 75:1
 75:3 79:25 83:23
 84:23 85:9 87:8
 88:8 89:23 93:2
 94:25 103:10
 108:1 113:10
 118:24 119:5
 127:7,14,19
 129:16 131:5
 133:24 137:23
 151:13 155:21
 161:24 168:9,23
 171:25
correctional
 112:13 120:19
 124:17 125:6
correctly 35:10
 113:5 118:3,18
correlate 128:8
correspondence
 107:14
couch 44:24
counsel 39:10 43:5
 49:16 51:9
 100:15,24 103:21

111:7 112:3
 115:6 116:2
 122:16 156:9
 159:2,4 167:10
counseling 171:14
couple 119:6,7
 174:8
course 111:15
 159:6
courses 116:7
 120:17 124:6
court 32:1 35:2,20
 39:6,12 45:21
 85:5 101:3,7,14
 111:11 115:2
 156:9,15 166:16
Courthouse 32:17
cover 70:18 119:13
 119:17
coverage 107:6,10
 107:11
covered 71:15
 119:19,21,21
 120:4,6,8 124:16
 125:5,12
covers 126:7
crime 52:2
criteria 45:4
critical 57:25
 59:4 60:6 116:8
critically 59:13
critiquing 147:12
cross-draw 137:16
Crown 150:2,23,24
cuff 42:19 137:4
current 106:8
custody 49:24 50:7
 87:13
cut 141:5,8,17
 143:6,8,9
cutting 85:23
CVR-M 32:23
cycle 112:17 113:4
 113:10

—————————
          D
—————————
damn 49:19
damning 165:15
Darren 33:10 111:9
darren@horan-w...
 33:9
dash 142:1,12
 146:17 147:13
 149:5,12,23
 154:1
dash-cam 141:10,21
 142:9,25 143:17

144:18,23
data 87:7 88:11,23
 89:1,6,10 96:25
 100:25 109:11
 110:7 122:16
date 99:1 102:21
 104:6,24 105:11
 111:11 116:19
 143:3
dates 123:17 124:7
DAVID 33:5,9
david@brillrin...
 33:5
day 36:15 52:4
 58:13 59:25 60:1
 61:9 65:11 66:24
 67:5,11,12,13
 69:5 71:22 77:11
 77:20 78:19,19
 79:11 81:14,15
 82:14 84:13,16
 87:12 91:16,16
 94:16 99:20,21
 100:6,11 102:6
 102:16,16,17,20
 103:1,3,4,16
 108:2,23 128:25
 138:4,23 139:6
 139:11 140:1,3
 141:12 169:25
days 67:22,23,25
 82:13 102:12
 146:20
deactivated 54:8
 58:9
deactivation 53:7
dead 48:25 49:7,18
 50:8,20
deal 46:17 171:22
dealing 72:12
 162:17
death 101:21
 102:17 155:3
 172:7,23
Deceased 32:5
December 124:12
 126:4 172:1
decide 45:10
decision 162:10,13
 162:14,18
declined 39:9
declining 38:12
decompress 172:3
decompression
 161:7 171:11,13
 171:22 173:9
 176:4,15

**deem** 43:13
**deemed** 43:20,21
**defect** 142:23
  143:3
**Defendant** 34:2
**Defendants** 32:9
  33:19
**defense** 43:12
  106:16,22 107:7
**defenses** 107:11
**defensive** 125:2,5
  125:21
**defibrillator**
  51:18
**definitive** 156:12
**Del** 161:25 162:10
**delete** 51:24 60:14
**deleted** 60:6 132:6
  132:7,10
**deliver** 63:16
**delivered** 82:8
**delivering** 62:11
**demonstrate** 39:5
**demonstration** 38:6
  38:15
**demonstrations**
  38:25
**deny** 107:10
**department** 51:7
  76:1 81:10 95:20
  105:8,24 109:10
  114:10 134:25
  144:25 162:14
**Department's**
  115:10
**departmental** 94:10
**depending** 66:5
  124:6 139:10
  168:22
**depends** 155:2,19
  156:2
**deploy** 108:13,14
**deponent** 159:14
**depose** 38:18
**deposition** 32:13
  34:15 35:4,18
  37:19 38:7,17
  131:24
**describe** 36:13
  38:23 137:20
**described** 37:18
  61:24 75:15
  77:21
**describing** 38:20
**description** 37:14
  81:12 135:18
**despite** 49:11 56:1

**destroy** 87:22
**destroyed** 145:5
**details** 105:4
**detective** 52:2
  95:6
**detectives** 84:14
**detention** 92:15,19
  132:25
**detox** 134:6
**device** 51:18 64:12
  75:23
**devices** 74:9 80:2
**dictates** 94:19
**died** 172:13,17
**difference** 42:24
  43:16,19
**different** 37:10
  39:14 40:6 43:25
  54:13 81:17
  95:21 123:7
  124:6,7 127:24
  138:6 149:4
  152:15
**differently** 108:3
  159:13 172:23
  173:2
**digital** 130:24
**digress** 122:19
**dime** 44:17
**direct** 34:15 35:7
  58:18,24
**directed** 136:13
**direction** 41:18
  143:25
**directly** 100:24
  125:20
**dirt** 161:14,22
  163:5,8,11,13
**disagree** 102:9
**discharge** 42:12
  54:23 59:3 60:18
  75:7
**discharging** 43:20
  56:11
**discourse** 122:15
**discovery** 144:17
**discrepancies**
  119:7
**discussed** 73:13
  77:2 132:9,22
**discussing** 35:9
  76:1,4,8
**discussion** 37:14
  48:3 133:5,16
  154:5,15
**discussions** 154:6
**disengaged** 143:24

**disinfectant**
  134:12,16
**Disney** 171:25
  172:2
**dispatch** 127:11,12
**dispatched** 50:25
**dispute** 143:14
**distinctly** 36:5
**DISTRICT** 32:1,1
**Division** 32:2
  115:10
**dock** 140:10
**doctor** 49:22 51:7
**document** 118:13
**documentation**
  112:2
**documented** 66:11
**documents** 111:24
**dog** 134:17
**doing** 45:21 65:19
  68:8,9,21 100:3
  106:17 133:7
  144:6 153:22
  173:18
**door** 148:24
**double-printed**
  123:8
**doubt** 65:13 71:6
**download** 52:1 61:2
  61:10 88:22
  109:15,15 150:9
  157:18,24 158:1
  158:3
**downloaded** 58:10
  59:22,22 88:24
  108:25 150:6
  157:13
**downloading** 109:25
  147:19
**downloads** 145:1
**dph@horan-wall...**
  33:9
**Dr** 50:5
**draw** 68:19 112:8
  132:15,19 136:2
  156:24
**drawn** 72:22
**dressed** 80:1
  126:14
**dripping** 135:17
**drive** 34:3 42:12
  42:17,23 43:17
  44:1 62:11 63:10
  63:14,16,17 64:2
  75:7 79:19,21
  83:23 108:13
  150:5 152:19

**drivers** 80:5,7
**drives** 145:2
**driving** 100:2
**Dropbox** 157:25
  158:3
**drops** 135:17
**drove** 80:4 152:15
**duty** 36:2,9 43:21
  44:7,12,17 83:2
  84:8,16 138:10
**Duval** 152:18
**dynamic** 123:6,6
**dynamics** 112:24
  113:19 119:14
  122:9 125:21

---

**E**

**ear** 135:24,25
**earlier** 61:9 63:25
  70:17 76:23 78:9
  97:9 131:22
  132:1,5 170:18
**ease** 111:11 158:2
**easier** 115:2
  160:15 173:22
  175:6 176:2
**East** 33:20
**education** 95:11
**education-type**
  114:21
**effect** 129:13,15
  131:13
**Effective** 112:22
**effort** 87:7,21
**efforts** 49:11
  166:5
**eight** 84:2
**Eimers** 32:5,5
  39:16,25 42:1,8
  42:18 43:20,25
  44:1 48:25 49:6
  49:7,18 50:6,16
  50:20 51:5,11,17
  56:18 57:21 59:3
  69:5,22 71:6
  72:20 73:10 74:6
  75:5 76:19 79:11
  79:18 81:4 82:21
  83:2,11,14 84:2
  84:18 86:19
  87:16 89:7,14,14
  89:17,20 91:8
  92:16 94:13 97:7
  101:21 102:17
  103:3 104:24,24
  105:11 108:12
  110:7,13 115:18

116:16,23 126:22
126:25 129:14
130:1 131:11,15
135:24 136:3,7
136:19 137:1,8
140:6 143:15,22
151:13,17 152:5
153:4,16 155:9
165:1 172:13
174:9
**either** 50:8,20
70:8 71:15 77:2
96:25 132:8
133:19 134:23
141:25 149:13
153:20 156:24
**elect** 142:12
**electrical** 37:8
**electricity** 36:21
37:3 63:10
**electronically**
165:5
**Eleven** 84:4
**else's** 39:23 94:20
**email** 94:11 95:20
96:18 103:6,9,25
104:6,10,11,14
104:17,18,21
111:23 122:15
167:9 169:16,18
169:20,23 170:5
**emailed** 95:22
**emails** 104:23
**embellishment**
161:2 171:11
173:9 176:4,15
**emergency** 142:3
**emitted** 169:11
**emitting** 37:8
**empathy** 154:12,17
155:7
**EMTs** 49:25
**ended** 55:19 79:25
123:19 129:18
**ends** 36:22 97:8
**enforcement** 49:1
111:20 112:12
120:18 124:17
125:6
**engaged** 140:6
**entered** 35:18
115:9
**entire** 84:18 86:18
148:7
**entitled** 102:2,5,9
107:6
**entity** 105:17,19

**environment** 68:14
68:23
**envision** 68:9
**episode** 84:18
86:19 87:17 89:7
89:18 90:1,23
92:16 93:24
94:13 100:6
103:3 104:24
105:11 110:13
115:18 116:16,23
**equipped** 149:12
**equivalent** 121:25
**erase** 87:4,7
**erased** 86:24 87:3
87:5,6 88:1
**especially** 156:15
**ESQUIRE** 33:5,9,10
33:14,18,22 34:5
**essentially** 61:21
**established** 52:14
**Estate** 32:5
**et** 32:8
**event** 56:19 61:10
72:7,7,23 73:2
73:16 74:11 75:9
76:13 77:12,13
79:11,11,25
80:10 83:2,12
85:9 97:11,15
99:20 102:12,13
102:18 103:4
104:25 107:19
108:4,17,19
109:11 110:7
131:15 146:6,7
**events** 59:17 60:1
94:13 95:12
126:25 141:12
**everybody** 83:18
150:14,15,21
153:22
**everybody's** 91:17
92:4 156:8
**evidence** 49:3
54:15 57:25 58:1
59:1,4,14 60:12
73:9,14 75:3
76:14 98:19
141:2 145:5
**evidentiary** 58:12
72:11
**Ex** 32:23
**exact** 48:18 130:12
131:10
**exactly** 58:23
78:12 94:4 99:25

112:11 119:24
130:11 158:16
159:16 173:17,18
**exaggeration** 99:25
**Examination** 32:21
34:15 35:7
**example** 104:15
107:8 128:9
173:21
**exception** 77:5
**excess** 106:16
**exclusively** 156:4
**excuse** 52:24
156:14 159:4
**exercise** 80:2
**Exhibit** 111:12,17
112:5 114:25
115:4 116:17
117:11
**EXHIBITS** 34:18
**expected** 145:11
**expecting** 145:17
**expense** 107:8
**experience** 52:11
**explain** 51:14
64:23 106:14
107:23 129:23
**explanation** 130:13
153:25
**expressed** 111:1
**extra** 70:19 89:10
**extremely** 59:7
**eyes** 67:3 141:20

**F**

**facilitate** 36:25
**facilities** 174:17
**facing** 137:21
**fact** 48:13,17 56:8
74:1 77:2,21
89:16 91:7,13
99:22 103:13
148:3
**facts** 60:12
**fail** 90:8
**fair** 49:19 67:18
68:19 70:3 73:11
86:11,12 148:13
152:7
**fairly** 68:20
**fall** 121:22 125:23
**falls** 108:10
**familiar** 106:13
**family** 35:14
105:21 155:13
171:25
**far** 58:8 83:14

132:23,24 137:6
137:7 143:2
144:13,13 165:6
**faster** 152:5
**fault** 122:17
167:20
**favor** 43:12
**favorite** 46:18
**Fax** 33:4,8,17,21
34:4
**FBI** 129:6
**FDLE** 34:20 119:9
128:13 129:6,7
144:18 161:4
**feature** 38:21
75:16
**featured** 92:7
**federal** 32:17 85:5
**feel** 41:7,12,13
**feelings** 154:19,23
**feels** 159:12
**fellow** 42:13 92:22
93:6 126:14
136:24 165:8,21
167:24
**felt** 171:18
**female** 93:23
**fictional** 51:7
**fifth** 97:10 114:6
**files** 120:25
**filled** 95:16
**film** 53:1
**filmed** 54:4 75:17
**filming** 52:20 53:3
69:16 97:15,16
**finally** 156:3
**find** 43:7 90:7,13
93:23 133:6
**fine** 85:16
**finger** 40:24
110:20 137:4
161:17 173:5
**fingers** 135:7
**finish** 45:20 68:10
147:19
**finished** 56:11
**fire** 36:4,10,12,18
37:2 39:14 41:21
43:22 62:24
63:14 66:19
67:11 72:8 75:7
131:12
**firearm** 70:9 83:11
137:24 163:4
**firearms** 112:24
113:16 125:16,18
154:5

**fired** 39:19 40:1
42:18 53:13 58:9
71:18
**firefighters** 49:25
**firing** 36:14,17
42:23 43:24
68:10
**FIRM** 33:3
**first** 35:10 54:14
62:6,13 104:21
111:23,23 113:15
120:12 126:13
130:2,9 134:17
140:6 144:10
145:14 146:17
156:13,19 158:23
162:6 166:1
167:4 174:20
**fit** 121:9,15
**five** 44:15 71:17
114:15,16 115:17
115:19 116:8
117:12,21,22,22
118:5,19,25
119:25 120:4,6
**fix** 146:5
**fixed** 146:11
**flip** 65:2
**flipped** 65:24,25
65:25 70:21
**flips** 64:25
**Florida** 32:1,8,18
32:25 33:4,8,12
33:16,21 34:4
106:3 114:19
119:9
**folks** 85:4
**follow** 92:22 93:6
152:10,11,21
**followed** 151:18
**following** 85:5
102:13 152:13
**footage** 35:11,12
35:16 49:2 51:25
54:16 55:11
57:25 60:6,9,15
60:25 61:7,8,9
66:10 74:12 77:6
77:20,20 78:19
95:22 96:17 97:6
98:2,4,8,22
99:18 108:17,19
112:20 126:12
129:3,12,23
130:7,10 131:24
132:1,6,9,25
133:6 134:21

141:10 142:25
143:3,17 144:18
144:23 145:4,12
156:4,10,18,23
159:14 173:24
**force** 51:16 63:12
63:14 111:19
112:9,12,25
113:23 118:20
121:19,21,25
125:24
**forever** 61:2
**Forget** 166:22
**forgetting** 70:6
75:5
**forgive** 63:7 134:9
147:6
**form** 36:11 39:17
42:6,16 44:9
45:1,2,7 47:4,12
47:22 48:10 49:9
49:20 50:9,13,22
51:3,8,22 52:5
54:17 56:12,22
57:10 58:2,3,20
58:21 59:19 60:3
60:10,11 61:3
67:7,16 68:13,25
69:7,8,19,24
70:10,14 71:4,11
72:24 73:5,19,22
74:13 75:10,18
76:15 77:8,15,16
77:23 78:1,2,6
78:21,22,25 79:1
79:6,13 82:17,22
83:4,8,16,21
84:5 85:6,8,13
85:25 86:3,4,6,7
86:8,15,21 87:1
87:2,10,15,19,20
88:2,5,6,12,13
89:8,21,24 90:4
90:10,11,16,21
90:24 91:10,11
91:19,20,24,25
92:9,17,18,25
93:10,11,18,25
94:1,14,15,23
95:1,4,14,24
96:11,12 97:3,4
97:12,13,18,19
97:24 98:3,13,14
98:18,20,24
100:8 102:22
108:5,9 110:10
111:3 113:12

114:11,17,23
115:23 116:10
117:14 118:8,21
118:22 119:2
120:20 125:8,9
127:2 128:4,16
128:19 129:19,20
130:4,14 131:7
131:17,18 132:3
132:4,11,12,17
132:18 133:2,3,8
133:12 135:16
136:4,5,9,16,20
139:19 140:2
141:3 144:20,21
145:6,7,19,25
148:5,6,19
150:17 151:15,25
152:1,23 153:9
154:2,13,18,25
155:1,5,8,16,17
155:25 156:1
157:2,3 160:2,10
160:17,18,23,25
161:5,20 162:8,9
162:16,23 163:6
164:6,7,11
165:10,11,18,19
165:24,25 166:6
166:10 167:2,3
168:17,18,21,24
168:25 169:5,13
171:2,8,9 172:4
172:5,9,10,15,18
173:1,10,11,14
173:19 174:2,3
175:7,12,17,24
175:25 176:3,7
**former** 107:23
**Fort** 33:21 152:14
**fortuitous** 94:12
**fought** 160:1
**found** 91:15
**foundation** 80:25
84:24
**four** 114:14 115:20
119:20,20,22
**four-year** 112:17
113:3,10
**fourth** 97:10 114:5
123:13
**FPR** 32:23
**frame** 71:8 89:19
**FRANCISCO** 34:8
**frankly** 155:14
**free** 65:24
**Friday** 103:15,19

**friend** 35:14 111:9
**friend's** 46:14,20
47:18
**friends** 42:24
105:21 155:13,23
**front** 36:17 112:5
137:19 157:5
**full** 123:18 140:17
**fully** 71:16
**fun** 80:5
**functions** 46:17
**fundamental** 49:1
51:15 58:25
**further** 48:2

_____

**G**

**g** 104:21
**Gabe** 110:14 137:3
173:5
**Gabe's** 42:19
161:17
**GABRIEL** 34:9
**Galbo** 159:24
**Garrido** 34:9
110:15,16 111:1
137:3
**Gary** 32:13 34:2,15
35:4 50:5 51:6
115:11 164:23,25
**gate** 160:7
**general** 122:13
**generalities** 78:16
**generate** 63:10
**generically** 47:17
73:15
**gentlemen** 79:23
**get-go** 129:25
**getting** 112:11
**Girard** 34:10,10
35:22,22
**give** 45:18 47:20
52:2 59:5 81:7
81:21 82:3,19
94:6 104:14
105:3,21 106:2
107:4 111:21
135:18
**given** 93:7 95:10
99:4 111:22
149:23
**giving** 82:6
**glad** 42:10
**go** 35:9 36:14 39:9
40:5,23 43:6,15
44:11,23 45:11
45:17 46:14,16
46:18 47:17 48:1

55:23 57:18 63:1
67:4 71:24 75:4
75:22 76:24
78:14 99:16
100:19,22 111:5
118:11 120:12
121:2 126:23
133:6,10,16,17
133:18 134:3,6
134:13,20 136:14
139:21 140:22
148:16 149:16
150:20 156:11,18
158:21 159:4,19
160:12 161:8
163:15 170:24
173:21 174:13,20
**goes** 41:18 66:12
66:16 97:8
127:21 149:13
150:8
**going** 38:24 40:10
45:18 46:19
48:23 50:1,4,19
56:4 58:11 66:6
69:13 70:8 71:5
77:1,11 78:16,17
84:17 85:20
93:20 94:9 96:24
99:23 102:15
103:1,8,8 107:7
107:9 112:2,21
114:25 115:5
121:1 126:11,12
134:6 150:21
151:11,22 152:5
153:23 156:11,21
157:1 158:21
159:18,19 163:10
163:23 164:2
165:16,16,22
166:3,4,8,23
167:13 168:13
170:24,24 171:4
171:5 174:22
**good** 35:25 46:18
75:8,8,17 114:14
115:25 116:3,13
144:6
**Gotcha** 164:21
**gotten** 70:20
110:20
**governs** 44:24
**grab** 70:12 137:18
**grand** 103:17
**great** 85:21,22
98:7,12

**grip** 137:21
**grounds** 38:13,14
**group** 33:11,15
165:7
**guess** 109:14 122:4
**guessing** 149:24
**guide** 116:20
**guidelines** 36:8
**gun** 64:22 64:25
79:24 85:6
126:15 161:13,21
161:24 163:8,13
**GUSTAVO** 34:9
**guy** 79:25 100:1
**guys** 111:21 167:6

---

### H

**H** 34:5
**habit** 68:10
**habitually** 45:10
68:22 69:4
**halfway** 112:10
**hand** 37:6,7 42:19
70:20 80:1,8
126:15 135:3,7,7
135:9 136:12,21
137:11,18
**handcuff** 173:5
**handed** 87:11 95:16
132:24
**handle** 137:21
**hands** 65:23 133:21
134:3,6 135:3,11
137:8,9
**hang** 44:12,14,15
**hanging** 46:21 47:2
47:10
**happen** 107:17
165:16
**happened** 40:18,18
57:7 60:24 70:22
80:17 89:16
141:12 146:18
147:13,14 174:11
**happenstance**
131:25
**happy** 55:5 85:18
86:12 158:5
**hard** 145:2 150:5
**haste** 153:15
**head** 70:8 75:5,6
91:8 135:24
137:8,11
**headphones** 158:20
**health** 51:6
**hear** 36:5,6 65:8
78:17 129:13

141:22 142:24
152:22 157:9
158:19,23,25
160:1,6 161:11
161:19 165:12
167:14,21 169:2
169:3,7,11,15,19
171:3 175:4,13
**heard** 107:1 117:20
129:2 145:14
148:18 159:18
161:3,13,23
164:19 165:12
166:19 170:23,25
171:1,4
**hearing** 65:10
103:14 128:12
149:11
**held** 173:4
**hello** 47:14
**helped** 172:6
**Henry** 161:24,25
**Henry's** 161:13,13
161:21 163:13
**hey** 59:1 74:5 98:8
170:14
**HIGGINS** 33:7
**high** 151:23
**high-powered** 162:7
**hip** 137:25 156:5
157:19
**hit** 122:4 159:18
**hobble** 111:1
**HOCHMAN** 33:20
**hold** 45:19 65:2
**holistic** 171:21
**holster** 36:16
37:15 40:21
56:10,16 57:2,9
57:11,14 58:1
60:7,20,22 61:24
62:14 64:6,8,11
64:20 65:1 66:3
66:6,9,12,25
68:12 69:14,17
70:13 71:20 77:3
79:12 133:24
138:2
**holstered** 62:5
66:17 68:18
70:20 163:9
**holstering** 65:23
66:25 68:24
69:22
**holsters** 57:1
64:25
**home** 35:13,14,17

36:3,4,10,10
39:23,23,23
40:10 42:23
43:22,22 44:6,7
44:11,13 54:11
**honestly** 102:19
**hood** 64:22,24
65:15,16,17,24
66:4,9,16,18
67:1 68:12 69:18
70:9,17,18 71:9
71:24 77:4 80:20
**hooked** 149:5
**HORAN** 33:7,9,10
**hospital** 51:20
57:21
**hotel** 103:19
**hour** 35:12 52:22
52:24 53:1,7
54:22,24,25
55:10,18,19,21
57:6 71:7 78:9
89:11 110:8
127:21 156:16,17
173:15,17
**hours** 54:10 55:1,2
59:22 126:19
127:4 130:1
**house** 44:15,23
45:12 46:14,14
46:19,20,20,20
46:21,25 47:17
**How's** 133:22
**Huh** 110:5
**human** 50:5 115:15
155:4
**HUMBERTO** 34:9
**hundreds** 67:15
77:4
**hypothetically**
73:15

---

### I

**IA** 170:25 171:1,4
171:5
**ICOP** 149:22 150:1
150:5,10,15,21
150:25 151:1,3,4
**ICOP's** 149:25
150:2
**idea** 130:5
**identified** 109:5
124:15
**identifies** 35:11
35:16 118:18
129:13
**identify** 88:25

90:20 100:19
117:11 156:10
ignorance 134:10
II 32:13 51:6
115:11
III 176:22
illegal 168:20
immediately 49:2
51:20 59:22
69:21 83:11
important 37:13
43:9 92:13 95:12
97:22 127:14
impossible 39:4
impression 148:7
improper 43:4 51:9
in-car 138:12
inappropriate
47:21 103:20,23
incident 51:16
72:20 73:10 74:5
79:19 90:25 99:1
102:16 104:7
108:23 109:10,13
129:18 146:16,22
146:23,24 147:10
148:7 170:18
incident's 160:15
incidentally 45:9
incidently 82:11
incidents 93:16
139:13
include 123:24
includes 113:15
including 41:8
72:19 105:11
132:25 144:18
156:9
incorrect 152:3
incredible 93:21
incredibly 94:12
incriminating
173:9
INDEX 34:13,18
indicate 45:22
indicating 138:15
information 43:9
58:18 94:21
95:12 96:10
100:18 101:13,18
101:25 102:8
104:2,3 130:21
ingrained 70:8
initiate 142:16
153:4 175:14
initiated 143:22
175:13

inquiring 43:8
inside 151:6
inspection 38:10
38:11
instance 140:19,20
142:15
instant 40:12
instruct 102:10
instructed 81:21
82:2 133:20
instruction 104:8
104:12
insurance 106:15
106:16,23 107:8
107:16,18
insured 107:6
insurer 106:15
intention 62:11
intentionally
109:11
interaction 149:18
Interceptors
150:23
interesting 39:11
110:5
internal 149:7
151:1,5,6
interpret 165:23
interrupt 35:19
55:14 99:12
interrupting 46:2
intersections
151:22
investigated
128:17
investigation
128:13
investigator 129:5
involved 92:15,19
160:15
involvement 90:23
172:14
involves 37:20
involving 104:3
155:3
iPhone 96:15 97:2
issue 76:24 78:15
84:18 93:21
issued 105:8
issues 126:9 146:9
146:10
item 37:20 41:11
115:6
items 115:17 118:5
118:19
iTunes 158:1

J

J 33:14
jabbed 41:25
January 124:12
JEANNETE 33:18
Jeff 81:8,9
jlewis@lewisle...
33:17
job 57:13 81:12
94:20,20 95:7
144:6
Joe 45:11
JOHNSON 33:20
Join 40:15 42:6
43:1 45:15 46:23
48:11 49:5 50:15
51:10 56:13 58:7
59:9,20 65:22
67:19 70:4 71:13
77:9 78:8 81:2
84:12 87:2 89:9
90:17 98:18
100:9 110:11
114:12 117:15
119:3 128:20
145:21 148:22
151:16 152:24
153:11 161:1,6
163:7 176:8
JR 34:5
judgment 107:17
July 112:22
jumping 85:6
jury 103:17
juvenile 103:18

K

KATHYANN 34:8
keep 55:18 56:24
114:20 152:5
153:23 156:14
kept 57:18 153:6
key 32:2,8,18 33:8
34:10,10 35:22
37:16 47:25 51:6
58:25 74:8 76:1
81:10 94:8,8
104:14,21 105:24
106:2 115:9
129:6
keywestcity.com
104:22
kill 115:2
kind 45:23 63:22
95:11 112:15
134:14 154:23
knees 97:8

knew 48:23 50:18
53:10,15,25 54:4
136:15
know 41:20 43:8
44:10,15,22 45:6
45:11 47:23 49:6
50:16 53:21 54:2
55:12,12,19,20
55:21 57:16,18
58:14 60:4,13
66:1 67:2 72:21
75:24 76:5,7,10
79:9 81:20,24
82:15,23 83:5,13
84:3,15 85:1,11
87:3,5,6 88:9
89:2,3,10,16
93:19 94:2,4,7
95:2,3 96:1,3,5
96:8,14,17,23
97:5,14 100:16
100:17 102:14,20
102:23 106:11,19
106:23 107:12,20
107:22 108:19
109:2,13,24
110:1,12 112:16
112:20 114:18
117:16,23 119:11
119:24 121:7
123:2,7 125:17
126:1,12,16
127:16 128:3,3,5
128:10 130:1,18
130:23 131:8,22
132:5,6,6,21
133:13,16 134:6
134:9,18 135:1
135:20 136:17,22
137:5,6,7 139:6
143:2,8 144:4,23
145:3 146:2,2,14
147:11,11,17,18
147:19 148:2,3
149:16,24 154:19
155:9 159:12
160:22 162:3,17
162:18 163:25
164:14 165:6
167:8 171:22,24
174:1,6,7,11
175:5,13,18
knowing 48:22,22
54:13
knowledge 88:15
131:4 150:14
known 58:15

knows 96:3
KWPD 34:20

**L**

lack 37:9 80:22,24
  84:21,24 92:6
language 40:6
laptop 157:4 158:1
large 155:22
Lauderdale 33:21
laugh 161:10
law 33:3,11 49:1
  111:19 112:12
  114:19 120:18
  124:16 125:6
law-enforcement
  51:15
laws 151:23
lawsuit 128:24
lawyer 107:9 166:4
  167:5
lawyers 107:22
leading 65:21
  115:18 116:16,22
leads 44:2
learn 144:17
learned 54:10
  93:24
leave 51:2 70:7,8
  116:2 140:14
  148:24 163:4
leaving 47:16 50:7
  73:13 129:15
Lee 32:13 34:2,15
  35:4 50:5 51:6
  115:11
left 48:25 49:24
  50:17,25 137:16
  137:19 138:17,20
  139:4,24 148:16
  148:24 149:13
  153:16 163:8
left-handed 137:13
legal 33:15 34:7
  39:12 86:8 113:2
  114:6 119:16,17
  120:21,21,24
  121:4,10,24
  122:3,4 123:1
  124:22,22 126:1
  152:6
length 47:20
  131:22
less-lethal 112:25
  113:23 121:25
  125:24,24
let's 35:9 49:13

67:24 68:5 75:22
  84:1 111:5 120:9
  120:12 121:10
  133:5,15 151:6
  159:16 163:15
  164:3 165:22
  166:13,23 168:14
  168:15
lethal 121:21,23
letter 107:4,13
levied 91:7
LEWIS 33:15,18
liable 107:19
Lieutenant 109:17
  109:23
lieutenants 146:4
life 115:1 160:14
  160:15
lifesaver 111:9
lifesaving 163:10
light 160:8
lights 140:11
  142:7,13 143:11
  143:24 144:1
  151:22
line 54:20 55:4
  72:18 157:22
list 117:18
listed 117:21
  118:5,19 123:5
listen 112:20
  156:20 158:20
  159:16 163:25
listened 163:24
listener 176:6
listening 131:23
  156:23
literally 75:6
literature 154:10
  154:12
little 56:4 61:21
  62:21 65:3 73:13
  111:6
live 96:6
LLC 33:11
LLP 33:7
load 44:23 45:11
local 85:5
location 145:14
  148:17 152:20
long 54:7 67:5
  76:4 78:14 96:22
  96:24,24 126:13
  126:21 131:25
  142:24 148:11,12
  174:21
longer 95:21

look 36:3 111:8
  115:24 116:1,5
  116:18 117:10
  123:2,16 127:17
  133:16 145:3
  149:22,23 162:25
  173:25
looked 115:15
  149:24
looking 112:6
  116:22 120:16
  157:23
looks 120:3
lost 86:24
lot 66:6 68:8
  95:15 115:16
  152:5 160:15
loved 42:24 46:20
  47:18
lovette 32:13 34:2
  34:15 35:4,9
  48:3 49:23 50:5
  51:6 59:2 104:22
  112:6 115:11
low-speed 151:13
  152:9,21
lreynolds@rrbp...
  34:5
Lunch 176:21
Lyman 34:5 99:12
  101:24 103:8
  106:8 107:9
  159:12
Lyman's 106:17
  107:15

**M**

M 33:10
M.D 50:6
ma'am 35:6 166:18
making 43:10 56:2
  64:17 92:21
  101:1 106:22
malfunction 142:23
  143:3
man 83:10 97:23,23
manage 111:9
managed 95:20
Mandatory 34:20
  111:25
manner 92:15
manually 142:4
March 115:10
marked 111:17
  115:1,4 119:20
  120:4 156:8
material 87:17

94:5 122:17
  144:17
matrix 112:25
  113:22 119:8,9
  119:12 121:20,20
  125:11,23
matter 103:13
maximum 82:24
MCKEE 33:11,14
  52:22 158:15
mean 47:3,5,7,13
  72:10 86:7 97:22
  99:12 109:3
  116:15 119:12,14
  119:19,23 120:2
  120:7 121:19
  122:4,19 124:5,8
  137:20 140:5
  146:20 151:5,21
  154:17 155:7
  165:9,23 167:20
  170:3 172:11
  176:13
meaning 142:6
  151:11 166:24
means 152:15
  166:13
meant 163:12
  168:13,15
mechanically 36:13
medical 49:21 51:7
  171:20
MEDINA 34:9
meeting 129:7
member 35:14
  171:16
members 103:16
  104:15
memory 48:17 84:20
  86:20,24 170:20
mention 90:9,15
mentioned 79:15,16
  93:8 111:6
  134:20 149:12
  154:9
mere 131:25
merit 86:9
metal 37:11,12
method 41:11 82:8
  172:2
mic 139:3,12,14,16
  139:24 141:25
  151:5,5,6
MICHAEL 33:22
microphone 138:9
  148:12 149:2,4
  149:11,12,19,20

microphones 138:6
149:7
mics 151:1,2
middle 44:6 83:12
military 160:7,8
160:16,20
million 99:24,25
mind 41:24 75:22
76:11 159:2
175:20
mine 57:15 153:3
minute 35:11 52:21
71:8 97:16 98:22
116:1 127:21
156:14,15,16
minutes 35:12
44:16,16 47:20
52:24 53:7 54:22
55:10,18,19,21
57:6,6 61:13
73:24 78:10
89:11 96:17,21
110:8 131:25
132:1 156:17
169:2,2 173:16
173:18
mis 117:19
missing 47:1 55:23
154:1
mistake 115:16
MMS 149:22
modest 134:25
moment 43:22 48:2
53:6,6 57:5,7,8
74:10 75:22
112:16 131:10
145:12
moments 66:14
131:15 174:9
month 67:22,23
months 109:14
110:4,9 146:20
morning 35:2,25
127:4 130:12
motion 102:1
motions 67:4
mounted 84:14
move 39:21 41:14
41:15,17 43:4
48:11 49:15 51:8
74:25 103:20
158:2
movie 79:21
multiple 83:22
86:1 120:2 146:9
146:9,10,11

multiple-page
118:12
mumbling 158:25
municipality 32:8
murdered 170:24
171:4,5
MURDOCH 33:20

N

Naja 34:10 35:22
name 90:15 91:1
92:5,24 93:8
94:4,7,10,21
96:1,3 104:21,22
106:6 109:8
111:25 165:4
named 91:6,17
names 92:4 95:11
120:17
narrative 48:6,9
nationality 94:2
natural 172:17
nature 109:21
154:6 162:22
near 57:6
nearly 48:18
necessarily 60:8
66:15 140:9
neck 137:10
need 76:21 86:8
99:7 110:23
129:9 147:15
153:23 167:4
173:13
needed 116:9
167:10,16
needing 80:11
never 39:19 47:9
53:13 76:17,21
93:3 107:13
129:2,11 130:20
135:1 143:22
171:1
new 61:10,10
150:23
News 35:18
Newspaper 34:10,10
35:23
night 111:23
nine 84:2 95:21
97:8,16 98:22
noise 65:5,6
non-pursuit 143:15
normal 83:6,6
normally 68:21
69:4 137:24
Northside 79:19,21

83:23
noted 39:6
notes 106:12
112:12
notice 40:12,19,22
noticing 136:10
November 32:16
35:1,3 102:21
number 57:5 71:17
82:24 83:7 94:6
94:11 96:21 99:2
101:12,20 105:22
107:11 115:11
136:18
numbers 83:14

O

oath 35:5 40:11
50:2,4,19 59:13
95:9 165:5
166:12
obeyed 153:6
obeying 151:23
object 41:7 45:1
45:25 46:2 48:6
48:9 50:9,10,13
56:12 57:10 58:3
58:20 60:10
67:16 69:8 77:8
77:16 78:1,6,21
79:1 85:25 86:15
96:12 97:3,12,18
97:25 98:3,13
100:8 108:5,9
110:10 114:11,17
114:23 115:23
116:10 117:14
118:21 119:2
125:9 128:4,19
129:19 131:18
132:4,11,17
133:3 144:20
145:7,19,25
148:5,19 151:15
151:25 152:23
153:9 154:13,25
155:8,17 156:1
157:3 160:17,25
161:5 162:9
163:6 164:7
165:10,18,24
166:6 167:3
168:17,24 171:8
172:5,10 173:1
173:10 174:2
175:24 176:7
objection 36:11

38:2,22 39:17
40:14 42:2,5,16
42:25 44:9 45:2
45:7,14,22,24
46:2,22 47:4,12
47:22 49:4,9,15
49:20 50:22 51:3
51:8,22 52:5
54:17,18 56:22
58:2,21 59:6,7
59:15,19 60:3,11
61:3 65:21 67:7
68:13,25 69:7,19
69:24,25 70:10
70:14 71:4,11
72:24 73:5,6,19
73:22 74:13,14
75:10,18,19
76:15 77:15,23
78:2,22,25 79:6
79:13 80:22,24
82:17,22 83:4,8
83:16,21 84:5,11
84:21,24 85:9,14
86:2,8,10,21
87:10,15,20 88:2
88:6,13 89:21,24
90:4,5,11,21,24
91:11,18,20,25
92:18 93:10,18
94:1,15,22 95:1
95:4,13,24 96:11
97:4,13,19,24
98:10,14,20
100:14 102:22
111:3 118:8,22
120:20 125:8
127:2 128:16
129:20 130:4,14
131:7,17 132:3
132:12,18 133:2
133:8 136:4,5,9
136:16,20 139:19
140:2 141:3
144:21 145:6
148:6 150:17
152:1 154:2,18
155:1,5,16,25
157:2 160:2,10
160:18,23 161:20
162:8,16,23
164:6,11 165:11
165:19,25 166:10
167:2 168:18,21
168:25 169:5,13
171:2,9 172:4,9
172:15,18 173:11

173:14,19 174:3
175:7,12,17,25
176:3
**objections** 45:23
86:5
**objective** 54:15
**obviously** 37:15
99:24 100:3,25
128:17 151:23
160:6
**ocean** 134:5
**of-force** 119:12
122:3
**offering** 100:21
**office** 107:15
**officer** 36:9 49:22
51:6,16 52:2,7
52:10 53:11
57:22 59:1 72:21
75:9,14 84:9
90:14 92:23 93:3
93:9 100:19,25
102:8 103:11
104:4 109:24
110:15,25 111:1
114:22 137:3
159:24 160:15
162:6,10 164:25
165:21
**officer's** 99:4
112:17 113:3
**officers** 42:14
53:23 72:19,25
73:8,17 74:6
75:12 82:11,14
83:7 84:2 90:8
90:14,20 91:1,2
91:8,14 92:22
93:6,6,16,16
94:17 97:23
108:13 112:13
113:14 114:9
120:19 124:17
125:6 133:14
136:24 146:10
165:8,15 167:24
176:16
**oh** 51:2 59:4 71:23
99:11,15 128:3
134:9 141:18
149:15 157:6,9
167:12 174:16
**okay** 37:12 38:8
40:3,9 46:5,12
47:13 49:13 50:4
51:13 53:5 55:5
56:8 57:3 59:5

62:2 64:23 67:24
68:3 71:1 78:13
79:25 85:19
99:13,16 104:19
111:16 112:15,16
116:13,23,25,25
118:3 120:1,11
120:12,14,23
121:1,3,6,10,24
122:6,25 123:4
123:12,16 124:19
124:24 125:12,19
140:18 142:5
143:13 147:2
149:10 150:1,4
152:7,12 153:22
155:3 157:15,22
158:23 159:1
161:8,19 166:15
167:19 169:17
173:8 174:25
176:17
**Okie-doke** 116:9
**old** 47:7 125:10,10
149:8 150:2
151:3
**once** 44:3 112:23
**one's** 46:20 47:18
149:8
**ones** 42:24 119:7
119:16 124:5
138:11 150:2
**oo0oo** 34:12
**open** 134:14 148:25
**opens** 72:18
**opportunity** 117:10
**optimal** 108:12
**option** 42:12 71:2
101:1 121:25
132:14
**optional** 163:20
**options** 76:25
112:25 113:23
121:21 125:24
**order** 101:3 133:23
139:15 152:22
153:6 171:17
**ordered** 87:12
**original** 145:14
164:16,23,25
**ostensibly** 42:17
**outcome** 159:25
**outer** 139:6,7
**output** 37:8
**outside** 103:18
105:24 109:9
**outsiders** 100:18

**outskirts** 91:14
**overhead** 143:11,24
144:11
**overheads** 142:3,6
142:16 143:9,19
**overlap** 120:15
**overvest** 139:18,25
**Ow** 110:18 111:2

---

**P**

**P-A** 134:18
**P.A** 33:15,20
**P.A.W.S** 134:15,15
134:18
**p.m** 32:16 54:24
173:25 174:1
176:20
**package** 64:14
**page** 34:14,18
111:7 112:2
123:13
**pager** 149:8
**pages** 32:14 111:23
**paid** 105:16
**pain** 111:1
**palm** 33:3,12,16
34:4 135:7
**paper** 99:6 100:22
112:4 138:16
**parallel** 152:13,16
**paralleled** 152:15
152:18
**pardon** 40:20 61:8
141:6 148:11
**park** 44:23
**part** 37:22 71:9
74:17 76:16 95:6
97:22 157:6
165:13
**part's** 173:8
**partially** 65:25
71:16
**particular** 36:15
38:21 62:22
64:12 70:7 85:8
111:8 149:4
157:16 163:5
**particulars** 57:7
**passed** 49:6
**patrol** 81:14 162:3
163:17,18,19
**PAUL** 33:9
**pause** 46:1
**paws** 134:17
**pay** 105:14
**paying** 106:16,19
**payment** 105:16

**PBA** 105:5,6 106:5
106:6,8 107:23
107:23 129:8
166:1
**pdf** 111:24
**pen** 116:7
**pending** 128:18
**people** 83:22 84:16
92:3 103:17
105:24 106:1
133:13 155:12
**people's** 92:4
**perception** 41:4
**perfectly** 64:18
**performing** 163:9
**period** 115:17,20
116:8,15,22
117:11,13,24
118:4,7,20
119:14,24 120:3
120:13,13 124:14
**periods** 120:3
**person** 52:6 58:16
63:23 140:9
142:1
**person's** 63:13
164:24
**personal** 32:5
104:10 105:12
169:21 170:5
**personnel** 52:3
**persons** 108:22
**perspective** 102:7
**pharmaceutical**
171:21
**phone** 82:9 93:24
94:13 96:14 99:2
99:4 101:12,18
101:20 103:6
104:1 105:8,10
105:12,14,21,22
106:1 169:4,21
170:2,4,8,17
**phrase** 116:14
**phrased** 123:21
**physical** 37:22
108:10
**physically** 40:23
77:2 142:1
**physiological**
112:24 113:19
122:9,21 123:6
125:20
**pick** 148:17
**piece** 54:14,15
**PIPER** 33:20
**place** 37:4 60:19

64:20 66:25
68:10
**placed** 51:19 91:16
103:18 126:22
131:11 174:9
**placing** 64:6 66:8
**plain** 103:1
**Plaintiff** 32:6
33:2
**Plaintiff's** 34:18
111:12,17 115:4
116:17 117:11
118:12,19 125:7
**plan** 96:25
**play** 49:13 156:11
159:18 174:19,24
**played** 93:8 158:22
159:19,20 161:10
164:5 169:7,18
170:13,14 175:4
175:9,11
**player** 92:7
**please** 51:14 61:14
63:25 106:13
112:8 118:24
125:15 151:12
**PLLC** 34:3
**plug** 130:19 131:4
**plus** 89:19
**pocket** 138:14,19
139:17,25 149:13
**point** 39:8 45:10
52:10 53:10
55:23 57:3,19
58:11 64:17 66:6
69:21,22 71:6
78:18 83:1 89:17
97:7 99:23
100:16,17,21
104:23 109:16,20
110:2 115:21
117:17 122:13
130:16 137:12
141:5,8 142:2
159:18
**pointing** 79:24
80:4 138:16
**points** 62:25 63:7
63:22 152:5,14
156:8
**police** 50:7 51:6
76:1 81:10 95:20
99:4 102:8
103:11 104:4,21
105:8,24 108:7
108:10 109:9
115:9 144:25

147:24 148:1
162:5,14 168:16
172:14
**police-involved**
51:16 74:11
172:7,22
**policies** 95:10
113:1 114:4
122:2 147:11
**policy** 36:8 45:5
46:13,24 58:8,9
59:10 92:3 93:15
93:19 94:10,17
94:19 95:15
107:7 108:7,11
119:13 121:13
122:23 124:25
126:3 139:12
162:5,14,19,20
162:24 163:1,16
163:17
**poorly** 123:21
**portion** 97:9
111:19 156:6
157:18,20 158:5
163:2
**portions** 95:21
96:22 97:6
156:10
**position** 91:15
108:12 136:12
137:16,20 156:5
**positioned** 137:8
138:13
**possessed** 109:10
**possession** 81:3
109:18,20
**possible** 76:22
80:13
**powerful** 91:7
**PRATT** 34:7
**preceded** 48:9
**predicate** 80:25
118:10
**prepared** 168:2
**prescription**
171:22
**present** 34:7 35:20
72:20 93:17
**preservation** 49:3
**preserved** 60:7
61:1
**preserving** 58:25
60:8
**press** 40:11 101:4
**pressure** 70:19
**pretty** 67:11

156:12
**prevent** 44:1
**prevented** 41:10
**principle** 150:4
**prior** 103:13
**privilege** 100:16
101:6 103:12
167:17
**privileged** 99:3
100:15 102:7
103:10 167:22
**probably** 123:21
149:24 163:3
**probes** 37:2,4,5,7
63:1,4
**problem** 162:19,22
**problems** 41:3
**procedural** 90:19
**Procedurally**
133:11
**procedure** 36:9
139:24 162:5,15
163:1 168:16
**procedures** 44:19
44:21 108:8
**PROCEEDINGS** 34:13
**process** 73:8
**procurement** 162:21
**produce** 38:10
**professional** 32:25
104:11 170:5
171:16
**proffer** 36:5
122:16 163:23
173:23
**program** 109:2
**progress** 73:25
**promise** 78:13
170:4
**prompt** 175:19,20
**prongs** 37:10
**proper** 134:8
168:16
**properly** 57:13
116:14
**property** 150:8
**protected** 99:10
101:24 104:3
106:3
**protection** 100:21
101:6
**protective** 101:3
**protocol** 36:9
**protocols** 44:19
**provide** 107:7
141:1
**provided** 94:6

115:7 118:11
144:17 156:14,18
158:4
**provision** 106:22
**psychiatric** 171:14
**psychological**
119:14 123:5
171:14
**psychopath** 154:6
156:25 160:13
175:23
**psychopathic**
154:11
**public** 101:5
104:15
**pull** 35:17 37:1
38:24 80:10
108:14 144:25
**pulled** 40:21 150:6
165:1
**pulling** 36:18
**purports** 94:6
**purpose** 85:23
**purposes** 38:15
48:2 156:6
**pursued** 143:22
**pursuing** 143:12
**pursuit** 143:14
**push** 63:14 65:3
70:18
**put** 56:10 57:8,25
58:15 59:3 60:7
62:6,6 64:2
65:14,17 66:3,3
69:13,17,18 77:4
91:2,5,8,21 92:3
92:4,6,23 93:9
99:5 111:10
131:5 133:23
140:16 157:4
167:10,24
**putting** 42:7 66:9
68:11 77:3

_____
**Q**

**qualification**
125:16,17
**quality** 158:18
**question** 39:10,21
44:2 45:25 46:10
47:6,25 48:10,10
49:13 50:9,13
53:14 71:5 75:4
85:10 86:1,16
93:4,5 102:4
108:4 116:13
117:16,20 127:25

128:4 130:6
139:2 157:1
160:12 167:23
176:5
**question's** 46:1
**questioning** 154:4
157:23
**questions** 43:2,11
101:22 108:17
129:9 175:21
**quick** 111:20
**quite** 51:2
**quotes** 129:10

**R**
**radio** 82:4,9
151:19 152:22
**raise** 39:12
**range** 82:19
**rare** 77:5
**re-certification**
119:16 121:12,22
123:10,11 124:20
125:25
**Re-holster** 56:23
**re-holstered** 56:14
76:20
**re-secure** 68:17
**reach** 137:17
**read** 46:11 93:3
112:15,21 113:5
117:21 154:10
161:3 167:7
**readily** 139:22
**reading** 116:6
131:24
**readout** 130:24
**reads** 115:8 130:10
**real** 111:20
**realize** 84:13
**realized** 71:22
**really** 85:13 95:3
**Ream** 109:17,23
**reason** 42:13 74:8
74:8 75:8,8,16
75:17 76:8 80:18
88:10 97:10
136:13 143:18,21
145:4,23
**reasonably** 80:7
156:24
**reasons** 86:1
127:14
**recall** 58:22 65:10
71:21 82:1,5,8
100:5,7,10
102:20 103:2,5

110:13 122:13
129:25 135:5,6,9
135:11,13,16,18
136:10,25 141:7
141:24 153:5
154:6,15 160:8
165:20 166:14,20
167:8 170:9
**recap** 61:21
**receive** 104:25
**received** 99:24
100:11 102:17,20
103:2 107:13
123:24 124:4
167:9
**receiver** 97:1
**receiving** 99:19
100:5
**recess** 61:17 117:6
159:9 176:21
**recipe** 170:21
**recognition** 59:25
**recognize** 48:3
164:13
**recognized** 49:18
101:6
**recollection** 83:19
**record** 48:24 59:24
61:15,18 72:13
72:23 75:9 80:19
82:2 94:13 99:6
100:18,22 101:5
112:4 115:7
117:4,7 138:16
139:1,13,13,15
147:20 148:3,4
158:9 159:5,7,10
176:19
**recorded** 54:22
55:22 60:2 66:10
74:2 76:12,18,23
84:19,19 86:19
87:24,25 89:18
90:1 93:16,23
108:17,19 115:20
131:25 141:4
148:8,21 149:18
155:14,24
**recording** 57:18
69:16 72:12
75:23 81:1 113:9
140:11 158:14
**records** 101:9
**red** 134:16 151:22
**redacted** 101:12
112:1
**redundant** 59:8

**reference** 111:20
116:19 156:9
**referencing** 157:11
158:10
**reflect** 112:5
118:15
**reflected** 124:4,9
**reflecting** 127:6
**reflects** 115:9
**regard** 38:25 101:3
101:22 102:8
104:3 106:23
**regarding** 44:19,22
83:2 93:22
102:23,23 111:6
113:2 114:6
120:22 122:3
124:23 162:21
**Regardless** 175:19
**regards** 163:16
**regular** 67:14
**reiterate** 110:2
130:18
**reiterated** 132:22
**relation** 110:3
146:17
**relative** 153:14
**relevant** 100:25
102:4
**relieve** 171:17
**relieved** 136:12
**relinquish** 58:12
**relinquished** 52:6
109:16
**relinquishing**
109:23
**remained** 71:19
131:22 142:25
**remaining** 37:4
**remains** 167:23
**remarkable** 131:14
**remember** 42:7
65:19 77:17
79:10 80:12
109:22,23 131:19
134:4 139:11
143:5 144:13
146:19 147:16,16
147:17,22,23
151:3,3 152:17
155:15 161:13,21
163:12 172:21
173:21
**remembering** 65:23
**remind** 35:5 50:1
**remove** 37:14 52:1
62:8 79:12

**reference** 111:20
**removed** 36:16
39:19 62:8
109:12 174:9
**rep** 107:23
**repair** 146:6
147:15
**repeated** 68:9
**repeatedly** 42:9
**repetitive** 170:3
**repetitive's** 170:4
**rephrase** 86:10
103:1
**replay** 175:4
**report** 34:20 91:3
91:5,9,17 92:5
92:24 93:3,7
111:25 115:8
161:4 164:19,22
164:23,24 168:2
168:11
**reporter** 32:24,25
35:2,20 46:11
115:2 156:9,16
166:16
**reporter's** 45:21
111:11
**reporters** 35:18
**reporting** 113:3
**reports** 91:22
92:11 93:13
164:16 165:3,4
167:9,25
**representation**
106:17
**representative**
32:5 129:8 166:2
**request** 38:9,10
39:1,3 103:14
109:14,21,22,25
109:25
**requested** 39:4
110:9 135:1
**requesting** 38:11
**require** 122:17
**required** 58:24
59:5 63:12 79:12
90:19
**requirement** 85:5
**requirements** 57:22
95:10 112:9
116:8,18
**rescue** 131:12
**reservation** 106:18
107:1
**reserving** 107:10
**reset** 37:19
**reside** 100:20

**resistance** 44:1
  108:10 119:12
  121:13 122:1,23
  124:25 125:22
  126:3 163:3
**resisting** 43:18,25
**respect** 46:16
  80:25
**Respectfully** 93:4
**respond** 83:7
**responded** 83:10,18
  127:18
**response** 83:6
  112:24 113:19
  119:12,14 121:13
  122:1,9,14,23
  123:5,6 124:25
  125:20,22 126:3
  163:3 175:14,14
  175:16
**responsibilities**
  51:15 93:7
**responsibility**
  58:19 92:22
  94:16
**responsible** 90:19
**rest** 47:19 147:17
  148:9,10 170:20
**restate** 53:3 108:3
  116:14 123:22
  148:11
**restaurant** 134:13
**restaurant-sup...**
  51:18
**restraints** 92:20
**restroom** 46:15,16
**resulted** 51:17
**Resumed** 34:15 35:7
**resuscitated** 49:10
  51:17
**retired** 88:18
**retrained** 52:13,13
**retraining** 34:20
  48:4,15 75:15,15
  111:25
**return** 109:17
**review** 45:5 93:19
  95:15 116:5
  121:14 122:12,24
  124:25 126:3
  129:8,9,11 146:2
  162:19 168:6
**reviewed** 55:17,22
  117:17,18,24,25
  118:2 123:3
  148:8
**reviewing** 144:3

147:11,11
**reviews** 119:13
**rewind** 169:17
**rewrite** 156:16
**REYNOLDS** 34:3,5
  36:11 38:4,6,9
  38:12,14,17,23
  39:9,17 40:15
  42:6,16 43:1,4
  44:9 45:2,7,15
  46:23 47:4,12,22
  48:11 49:5,9,15
  49:20 50:10,15
  50:22 51:3,8,22
  52:5 54:17 55:14
  56:13,22 58:2,7
  58:21 59:6,9,19
  60:3,11 61:3
  65:22 67:7,19
  68:13,25 69:7,24
  70:4,10,14 71:4
  71:11,13 72:24
  73:5,19,22 74:13
  74:15,17,24
  75:10,18 76:15
  77:9,15,23 78:2
  78:5,8,22,25
  79:6,13 81:2
  82:17,22 83:4,8
  83:16,21 84:5,12
  86:21 87:2,10,15
  87:20 88:2,6,13
  89:9,21 90:4,11
  90:17,21,24
  91:11,18,20,25
  92:18 93:10,18
  94:1,15,22 95:1
  95:4,13,24 96:11
  97:4,13,19,24
  98:10,14,18,20
  98:24 99:3,7,10
  99:13,16 100:9
  100:14 101:2,11
  101:14,16,22
  102:4,22 103:10
  103:20 104:2,8
  104:12,16,20
  110:11 111:3
  114:12 116:3
  117:3,15 118:8
  118:22 119:3
  120:20 125:8
  127:2 128:16,20
  129:20 130:4,14
  131:7,17 132:3
  132:12,18 133:2
  133:8,12 136:5,9

136:16,20 139:19
  140:2 141:3
  144:21 145:6,21
  148:6,22 150:17
  151:16 152:1,24
  153:11,24 154:2
  154:13,18 155:1
  155:5,16,25
  157:2,4,8,10,15
  157:17,22 158:8
  160:2,10,18,23
  161:1,6,20 162:8
  162:16,23 163:7
  164:6,11 165:11
  165:19,25 166:10
  167:2,11,13,15
  168:18,21,25
  169:5,13 170:10
  171:2,9 172:4,9
  172:15,18 173:11
  173:14,19 174:3
  175:7,12,17,25
  176:3,8
**Rich** 109:24
**rifle** 162:2,3,7,21
  162:24 163:17,18
  163:19
**right** 35:21 37:25
  38:11,19 41:2
  60:2,5 61:25
  62:10,13 63:4
  68:5 69:16 70:13
  70:13 74:11 77:7
  77:14,25 78:15
  78:20 79:8 80:5
  80:20,24 83:15
  87:22 93:24
  96:22 98:23
  100:3 107:10
  109:6 110:14
  113:16,20 114:1
  114:7,10 122:2
  122:19 124:8
  126:9 127:1,21
  128:1,12,14,18
  128:22 133:21
  135:25 136:13
  137:13,18,22,24
  140:10 141:19
  144:5 150:8
  151:14 156:11
  158:6,23 159:17
  161:11 167:1
  169:25 170:15
  171:24 172:8
  173:6 174:5
  175:10

**right-handed**
  137:14
**rights** 106:18
  107:2
**RINALDI** 33:3
**risk** 41:21,24
  43:19,23 102:10
**rmckee@themcke...**
  33:13
**road** 81:14
**ROBERT** 33:14
**ROBERTS** 34:3
**RODERICK** 34:7
**role** 58:24 93:7
**rolled** 131:11
**rolling** 129:14
**room** 35:18 40:11
  72:19
**rooms** 103:19
**rough** 129:25
**roughly** 67:24
  82:16 110:1,2
  146:20
**Royal** 33:3,12,16
**rule** 85:5
**rules** 44:21
**runs** 110:25 160:7
**rushed** 51:19

---
S
---

**sad** 155:9
**safe** 43:21
**sake** 133:5 170:4
**sand** 129:18
**Sarge** 57:23
**save** 51:20,24
**saved** 51:25
**saw** 49:10 119:7
  141:20 145:4
  147:13 148:8
**saying** 42:22 46:16
  46:24 47:7 55:3
  55:18 60:5 91:1
  92:4 119:6 143:5
  147:17 156:14
  157:14,21 160:9
  163:12 175:23
**says** 95:11 99:24
  112:11,17,22
  113:7,13 127:8
  129:13 144:18
  154:12 160:6
  164:2,10 166:23
**scare** 80:5
**scenario** 66:8 84:9
**scenario-based**
  112:23 113:16

125:18
**scene** 41:25 51:1,2 52:3 53:2,12,15 56:19 57:20 69:23 72:20 73:17 76:12 83:7 83:10 90:20 91:4 91:14 92:5,8 133:20 148:16
**Schmo's** 45:11
**school** 149:8
**screen** 130:25
**seat** 151:7,7
**second** 45:19 97:9 109:25 159:5
**secondary** 120:24 164:16
**seconds** 52:21 95:21 96:22 97:9 97:17 98:22 127:21 130:9 156:18 163:22 169:3 173:23 175:9,11
**section** 112:4,9,13 139:4 163:2 167:8
**sections** 173:15
**secure** 56:23,24 57:13 60:22 64:22,25,25 70:19,21,23 73:10 100:25
**secured** 56:16 57:2 57:11 60:25 66:1 66:18 71:8,16 94:21 107:17
**securement** 73:3,14
**securing** 74:6 76:18,21
**security** 112:1
**see** 36:6 39:8,12 61:21 76:25 77:1 78:10,11 84:1 89:19 99:18 112:10,13 115:16 115:19 116:6 123:3 127:17 129:24 130:9,11 131:9 135:1 141:10 142:24 145:11,17,22 146:17 151:18 157:5,20 164:4 166:2 174:1
**seeing** 161:13,21 163:12
**seek** 102:5 171:14 171:20
**seeking** 102:5
**seen** 35:15 47:14 98:2,4 129:2 141:21 146:25 157:10
**send** 62:25 63:14 96:18,22 98:9 100:23 101:4,9 104:25
**sending** 99:19 100:5
**sense** 158:7,8
**senses** 41:10
**sensory** 41:4
**sent** 99:21 100:10 102:17,20 103:2 169:12,21,23
**separate** 138:2 149:10,10,25
**separated** 113:15
**separately** 64:16 157:25
**September** 39:5
**sergeant** 52:7 57:23 58:17 59:1 71:19 76:22 81:8 81:9,9,13,14,15 82:3,6 87:11 88:15,25 109:6 128:24 133:19,19 133:19,20 134:23 134:23 136:11
**sergeants** 60:14 76:14 89:2 95:19 133:14 134:22 145:2 146:2
**serious** 93:15
**serves** 48:17 170:20
**set** 57:1 112:2 128:6 152:9 159:3
**seven** 119:25 163:22
**seven-hundred** 68:5
**sheet** 120:10
**shift** 43:24 44:3 45:10 47:19 68:7 81:14,17,25 82:11,12,16 84:8 139:3
**shit** 164:3 165:9 165:23 166:4,9 166:13,24 168:14
**shoes** 97:16
**shoot** 100:1
**shop** 161:7 176:15
**short** 126:24
**shorten** 97:2
**shortened** 109:8
**shortly** 35:17 53:11 127:23
**shot** 38:18 160:16
**shoulder** 139:10
**show** 111:14 112:3 114:25 115:5 135:3 157:11 158:5
**showing** 38:3 156:4
**shown** 129:5
**shows** 35:13 157:19
**shut** 55:20 56:17 57:2,12 60:23 65:4 68:16,17 89:25 144:3,4,7 144:7,10,14 148:14
**sic** 81:9 82:3,6 85:14 87:12 88:15
**side** 47:24 137:16 137:19 159:3
**sign** 101:8 165:4
**significance** 129:16
**significant** 48:4 92:8,15 156:6
**signs** 152:6
**Simonton** 32:17
**simply** 60:1 73:15 160:16
**single** 72:21 75:8 117:23
**sink** 134:5
**sir** 35:4 36:12 37:11,21 38:1 39:16 40:8,16 41:6,9,23 44:20 45:8,13 46:15,24 48:14,16,21 49:8 49:12,21 50:1,16 50:23 51:11,24 52:6,9,12 53:9 53:19 54:6,12,20 55:7,22,25 56:14 56:17,21 58:5,8 59:21 60:13 61:6 61:12 62:1,4,17 62:20,23 63:2,8 63:11,19,24 64:4 64:7,10,13,15 65:7,9,12 66:5 66:13,21,23 68:7 69:3,17 70:5 71:3,21 72:1,3 72:25 75:12,21 75:25 76:3,17 77:10 79:9 80:3 80:6,9,14,16 81:6,11,16,18 82:7,10 83:17 84:13 86:22 87:9 87:14,18,23 88:20 89:10 90:3 90:12,25 91:12 93:3,4,12 95:5,8 96:2,4,7,9,16,20 97:20 98:25 105:7,9,15,18,20 106:4,10,19,21 106:25 107:3,20 107:25 108:21 109:4,7 110:6,17 110:21 112:14,18 113:6,11 114:24 115:22 116:11,21 116:24 117:22 118:9,17 121:8 121:17 122:7 123:15 124:1,10 124:13,18 126:6 126:8,20 127:3,5 127:8,15,22 128:2,7 129:1,4 130:15,18,23 131:2 132:5 133:25 134:2,12 135:8,10,12,15 135:19,21,23 137:12,19 138:1 138:3,5,8,20,22 138:24 140:25 142:8,11,14,22 143:1,20 144:13 144:15,24 145:8 145:10,16,18,24 146:13,15 148:14 149:3 150:13 153:8,13,18 154:3,8,16 155:18,20 156:20 158:25 160:11 161:16 162:1 165:2,6 168:7,10 168:12 171:12,15 171:19,23 173:7 173:15
**sister** 64:17 90:8 90:14

sit 44:23  45:6,12
    47:19  158:18
situation 66:5
    69:5,6  70:22
    73:7  74:4  131:21
    155:2,3,10,19
    156:2  168:22
situations 72:1,15
    72:16  122:14
six 59:22  68:5
    82:20  84:7
    117:21  119:24,25
    119:25  175:11
six-hundred 71:17
size 134:25  149:8
skin 63:13,15,17
slung 163:9
smart 93:24  96:14
    103:25
smeared 135:17
social 112:1
software 132:20
soldier 103:18
some-odd 54:22
somebody 73:16
somebody's 44:23
someone's 35:17
    46:25  106:22
    134:7
soon 63:15  74:10
    76:22  129:12,12
    140:11,11,16
sorry 35:12,19
    40:5  68:1  79:16
    79:20  80:23  85:2
    88:17  90:6  95:25
    99:11  110:23
    118:6  122:8
    123:21  133:4
    141:18  145:20
    147:25  150:18
    153:10  166:18
    171:3  174:18
sort 110:19
sound 36:6,14
    41:22  110:19
    127:1  156:5
    169:3,11,16,18
    169:18  175:22
sounds 70:22  176:6
SOUTHERN 32:1
Southernmost
    160:21
span 118:25
speak 45:20  53:23
    72:25  73:7  75:12
    75:13  90:12,18

91:21  94:17,17
    97:20,20  108:13
    132:13  155:14
    162:10,12,13
    166:17
speaking 36:13
    160:7,16
specific 102:24
    129:10  147:25
specifics 102:14
    102:23,24
speculation 54:19
    69:8  70:1  71:14
    73:6  74:16,17
    75:11,19  76:16
    78:7  79:1  84:11
speculative 74:19
sped 143:23
speed 151:24  152:4
    152:6
speeding 151:24
spelling 63:21
spot 94:5  156:13
spots 100:2
stamp 129:21  130:7
    174:12
stamped 129:24
stand 97:9
standards 95:10
stands 134:19
    146:14
start 85:3  123:17
    127:6,7  134:22
    175:3
started 55:19
    123:19  132:2,8
starts 55:8  56:5
    97:7  130:10
    131:9,14  140:11
state 51:5  105:17
    119:8  167:17
    170:23
stated 76:23  132:5
    167:10
statement 45:20
    78:15  129:16
statements 90:8
    95:16  173:18
    175:21
States 32:1,17
stating 54:21
station 140:13
    141:25  147:24
    148:1  153:19,20
statute 19:10
    100:22  101:6
    103:11  106:3

stay 66:18  77:6
    174:7
stayed 84:19  86:19
    87:25
staying 76:24
stays 76:23
steps 56:4
sterile 68:14
stipulate 85:20
    86:7
stomach 137:17
stop 45:11  46:14
    46:25  47:14  85:3
    97:16  110:23
    121:1  140:7,15
    142:16  143:23
    145:22  149:16,20
    151:17  152:6,6
    153:4  167:16
    174:23
stopped 102:15
    147:14  159:17
    163:23
stops 97:23  98:5
stories 165:17
    166:9  168:15
story 100:4
straight 142:5
    165:17  166:9
    168:15
street 32:17  33:7
    83:12  141:15
    143:7  144:4
    145:14  152:14,15
    152:16,18,19
    165:1
stress 69:6  171:18
    171:24
stressful 68:22
strike 39:21  43:4
    48:11  49:15  51:8
    74:25  103:20
stuck 42:19  161:18
    173:5
stuff 72:11  74:3
    78:9  89:20
    114:21  130:20
    146:1  149:22,23
    150:9  173:9
stun 43:17  44:1
    62:11  63:10,16
    63:17  64:2
    108:13
subject 103:13,19
submit 165:5
    168:11
submitted 168:6

subpoena 100:23
    101:4
subsequent 77:13
    79:17  102:1
    126:23
suggesting 165:8
    165:15
suggestion 121:4
suit 128:17
Suite 33:3,12,16
    33:20
summary 34:20
    115:8  116:16
    118:1,12,14
    120:9,16  124:9
summoned 127:18
sun 88:10
Sunrise 33:20
superior 52:7
    133:14
supervisory 58:24
supplemental
    164:19,22  165:13
    167:25  168:2
supplementals
    164:3,15  165:3
    165:22  166:24
    167:7  168:14
supposed 55:13
    56:9,21,24  58:23
    60:20  64:21
    93:13  113:14,14
    131:5  140:24
sure 46:6,8  60:16
    77:13  99:13
    102:19  116:3
    128:12  141:15
    142:5  143:7
    144:9  146:3,3
    147:1  150:22
    153:24  158:9
    165:17  166:9,12
    170:1  172:6
    174:19  176:18
surely 69:22
surprise 144:16
surprised 145:22
suspect 72:17
suspects 74:2
Suzanne 32:23
switch 37:20  60:21
    66:22  78:24  79:5
sworn 90:8  114:22
    165:3
synapses 41:11
sync 130:19  131:4
synchronized

130:17 131:6
**system** 109:1
  142:24 144:24,24
  149:25 150:7,8
  151:4

**T**

**T** 33:22
**table** 47:25
**tactics** 125:2,5,22
**take** 37:15 41:15
  44:22 45:11 56:4
  56:18 57:22 59:2
  60:17,17 61:13
  61:23 62:13 63:3
  66:19 76:13 99:7
  101:2,11,14,15
  115:13,14,24,25
  116:5 117:1,2,3
  120:9 140:4,13
  140:18,24 150:9
  162:6,11,18
  166:3 167:21
  174:14,24 176:17
**taken** 32:21 36:17
  36:23 71:6 102:6
  131:16 141:1
**talk** 44:24 45:12
  45:22 47:19
  124:11 152:8
  161:7 170:21
  176:15
**talked** 62:21 63:4
  79:4 87:21 95:17
  131:22 155:11
  170:2,18 171:16
  173:4,21
**talking** 45:24 46:4
  46:19 66:22
  72:16 74:1,2
  78:15 83:22
  112:20 123:18
  149:5 151:9
  155:15 158:6
  161:12 170:16,17
  170:18
**talks** 112:9
**tamper** 87:22
**tape** 45:13
**taped** 132:2,9
**Taser** 35:9,13 36:4
  36:15,16,20,21
  37:3,9,15,20,23
  37:25 38:21,25
  39:5,15,18,22
  40:9 41:5,22
  42:18 43:20 48:5

48:19,23 49:2
  51:20,24 52:7,14
  52:16,20 53:12
  53:16 55:6,13,16
  56:4,5,10,18,23
  57:1,2,11,23,24
  58:8,12 59:2,23
  60:1,7,8,18,21
  60:22 61:8,22
  62:13,22,22
  63:23 64:3,8,12
  64:24 65:1,4,17
  65:23 66:3,7,8
  66:13,17,18,19
  67:6 70:9,18
  71:9,15,18,19,23
  72:13,22 73:3,9
  73:11 74:2,7,8
  74:24 75:2,6,9
  75:23 76:12,12
  76:13,17,20,22
  76:23,25 79:12
  80:10 81:1,3
  82:3,6 84:17
  87:11 88:24 89:1
  89:5,6,16,25
  90:9 99:19,22
  108:2,4,11,14,18
  108:23 109:1,10
  109:15,15,19,23
  110:9 119:16
  121:12,15,21,24
  123:10,10 124:20
  125:25 126:11
  128:1,8,24 129:3
  129:12,23 130:7
  130:10,17,22
  131:9 132:24
  133:23 134:21
  137:15,18,21
  158:13,14 173:4
**Taser's** 109:20
**Tasers** 53:24 73:18
  130:19
**taught** 85:12
**taxpayer's** 44:17
**technician** 49:21
**techniques** 163:10
**technologist** 52:3
**telephone** 94:10
**television** 47:19
**tell** 36:4 40:10
  55:17 58:17
  65:14,24 72:5
  77:18 78:10,12
  82:25 83:9,17,25
  91:4 93:12 95:16

95:17 96:13 98:6
  99:21 101:19
  102:15,25 103:9
  119:17 120:16,24
  136:6 141:9
  152:4 155:14,22
  159:20 160:3,3
  161:9 163:24,25
  164:12,20 169:17
**telling** 58:22
  59:12,12 128:2
  156:25
**ten** 44:16 84:2
**term** 47:10 92:6
  107:1 151:14
**terminology** 47:2
  151:12 166:25
**terms** 37:10 106:13
**test** 36:12,18
  41:21 43:22,24
  66:19 67:11
  68:10,14 71:18
  72:8
**test-fire** 72:7
**testified** 63:25
  174:8
**testify** 50:19
**testifying** 66:14
  74:24 103:17
**testimony** 50:12
  60:17 66:15
  79:10 95:9 118:3
  131:13
**testing** 68:14
**text** 96:18 102:17
  102:20 169:3,12
  169:18
**texted** 102:12
**texting** 100:2
**texts** 99:19,19,24
  100:6,10 102:24
  103:3
**thank** 35:24 85:19
  118:15 126:10
**That'd** 85:16
**theater** 79:21
**thereabout** 52:11
  52:21,25 156:19
  161:8
**thing** 43:21,24,25
  49:1 58:25 61:22
  74:11 80:5 90:19
  92:3 93:21 100:3
  114:1 126:15
  134:14 149:11,20
  153:14 154:21
  157:16 160:24

164:20
**things** 44:24 100:1
  103:18 117:21
  118:2 119:15,17
  119:20 120:2,4,6
  120:7 127:13
  151:22 154:7
**think** 41:19 46:3
  46:13 54:4,14
  58:18 60:9 67:4
  74:4,19 75:7,16
  83:19 85:13 86:9
  88:10 94:5 99:22
  102:2 103:13
  117:22 122:10
  128:11 140:23
  145:1 146:22
  149:1 152:13
  153:3,17 155:24
  158:12 163:16
  165:14 170:2,20
  174:21
**thinking** 48:25
**third** 97:10 114:3
**thirdly** 113:22
**thirty** 35:11
**thirty-five** 156:17
  173:16,17
**thirty-four** 47:8,9
  47:9
**thirty-six** 52:21
  52:24 156:17
**thirty-some** 35:12
  53:7 71:8 110:8
**thirty-some-odd**
  55:10 57:6
**thirty-two** 53:1
  54:22,24 55:18
  55:19,21
**Thomas** 109:24
**thought** 56:8 73:8
  74:5 76:17,21
  80:7 83:10 92:13
  125:11 136:14
  166:1 167:4
**thoughts** 166:14,20
  166:22
**thousands** 67:15,25
**threat** 56:11 64:1
  68:16 75:7
**threaten** 59:3
**threatened** 103:17
**three** 68:2 83:25
  84:1 111:24
  114:15 119:21,22
  120:5 130:1
**throw** 129:24

**thumb** 40:24,25
  41:1,2,4 62:19
  66:20 68:11,17
  68:24 77:3
**thwacka** 41:22
**thwacka-thwack...**
  36:6
**ticking** 55:8
**time** 38:12 39:16
  40:9 44:16 47:20
  48:2 49:6 50:6
  51:12 54:20 55:4
  56:10 61:1 66:6
  71:8,23 76:11,17
  78:15 81:4,4
  82:21 87:13
  89:19 97:7
  104:23 109:11
  110:9 115:13,18
  115:24,25 116:3
  126:24 127:6,7
  127:13 128:8,9
  129:17,21 130:7
  130:9,12,15,17
  130:17,22 131:11
  131:5 143:18
  144:12 150:22,24
  153:1 162:18
  170:10 172:11
  174:11,22
**times** 44:3 67:15
  67:20 68:5,8
  71:17 77:5
  127:19 146:11
  174:8
**tips** 37:11,12
**today** 35:10 37:19
  38:19 48:1 95:9
  101:19 103:22
  104:24 110:3,16
  129:2 131:13
  138:7 156:7
  166:22,25 172:24
  172:25 173:2
**today's** 111:11
**told** 71:19 136:11
  172:23
**top** 64:24 111:24
  115:8 123:13
  142:7
**topic** 106:11
  154:10 171:13
**torso** 137:10
**touch** 63:13 87:7
  93:20 145:2
**touched** 131:3
**touching** 41:11

  63:9
**toy** 103:18
**track** 123:1 124:2
  124:2
**traffic** 84:15
  140:7,15 142:16
  143:22 149:16
  151:17,23 153:4
**trained** 52:13
**training** 34:20
  48:1,4,14 59:11
  74:7,20 75:15
  95:11 111:6,19
  112:12,23,24,24
  113:1,2,3,8,13
  113:16,16,20
  114:5,7,20 115:7
  115:9,10,17
  118:1,14,16
  119:15 120:18,22
  120:25 122:3,4,9
  123:2,3,6,20,23
  123:24 124:2,2,3
  124:15,16,23
  125:6,18,21,24
  126:7,9
**trainings** 117:12
**tran** 150:16
**transcript** 131:24
**transition** 111:5
  150:21
**transpire** 59:18
**transpired** 54:15
  141:2
**transported** 57:21
**travel** 41:11 42:18
  143:25
**treatment** 171:21
**TREAVOR** 32:5
**tried** 153:4
**trigger** 36:19 37:2
  78:4
**triggered** 85:23
**triggering** 57:24
  61:10
**triggers** 52:20
  53:3 62:3
**trouble** 45:21
  166:16
**true** 60:25 168:8
  172:8 173:6,8
**truly** 160:13
**Truman** 143:23
  144:1
**trust** 127:7
**truth** 154:6 155:14
  155:23 156:25

  160:16
**truthfully** 160:14
**try** 46:7 55:23
  85:7
**trying** 115:1 144:5
  144:9
**Tuesday** 32:16 35:2
**turn** 37:16 39:14
  40:4,7,8,17,23
  41:4,15,18 42:1
  48:23 49:2 57:5
  59:2 60:18,20
  61:7,8,24 62:3
  62:16,18 64:21
  66:20,24 67:1
  68:12 71:24,25
  72:13 75:2 89:5
  101:10 109:18
  131:1 136:14
  142:2,6,12,21
  149:19 152:22
  153:1 154:12
**turned** 36:18 39:18
  39:22,24 40:1,2
  40:10,13 51:25
  52:16 53:24
  54:21 55:6,16,17
  55:20 56:9,15
  57:24 59:25
  66:10 72:2 77:2
  77:4,12,12,17,18
  77:21,22 78:12
  78:20 80:17,19
  80:19 81:5,5
  89:17,25 108:23
  109:3 126:15
  131:19,21
  142:15 143:18,19
  143:21 144:11
  145:4
**turning** 39:15 60:8
  65:10 68:11,23
  69:13 79:5
**turns** 142:17
**TUZZIO** 34:3
**TV** 45:12
**twelve** 82:20 84:8
**Twenty** 175:9
**twice** 123:6
**two** 61:13 62:21
  68:19,19 77:1,21
  84:1 95:21
  112:23 113:8,15
  114:10 115:19
  116:9,11 117:25
  118:6,25 119:19
  119:22 120:5,5

  121:4 123:7
**two-digit** 130:25
**two-year** 115:17
  116:8,15,22
  117:11,24 118:4
  118:7,20 119:24
  120:2,3,13,13
  124:14
**type** 37:10 72:15
  74:11 79:22
  80:15 96:14
  113:13 135:16
**typed** 168:4
**types** 114:21
  117:12 123:7
**typically** 82:16

_____
          **U**

**Uh-huh** 159:22
  169:8
**ultimately** 81:5
  155:22
**unable** 114:21
**unbeknownst** 89:11
**uncover** 136:23
**undercover** 95:6
**undergo** 74:7
**undergone** 59:11
**underlying** 106:15
**understand** 38:20
  50:3 60:16 71:2
  89:13 91:23
  99:11 115:21
  118:3 120:15
  127:9 129:17
  130:6 144:9,10
  144:16 151:20,21
  152:7 157:8
  164:18 166:25
  176:11,14
**understanding**
  35:10 44:21
  84:18 86:18,23
  107:21 121:18
  125:4 154:23
  162:20
**understood** 49:23
  52:16,19 77:19
  164:17 167:15
  174:13
**undervest** 139:8,8
  139:17 140:1
**underwent** 75:14
**uniform** 36:2,10
**unilaterally** 109:8
**unintelligible**
  164:8

**United** 32:1, 17
**units** 84:14, 15, 15
  134:11
**unknown** 143:21
**unusual** 90:7, 13
**update** 120:24
  121:10 125:3, 5
  125:22
**updates** 48:20
  119:16, 17 120:21
  121:4, 24 122:5
  123:1 124:22
  126:1 130:20
**uploads** 150:7
**upper** 137:9
**upwards** 52:21
**use** 40:24, 24 41:1
  41:4 45:4 47:2
  47:13 51:16 64:1
  73:3 76:8 77:14
  80:11, 25 108:11
  111:19 112:9, 12
  116:19 118:19
  119:11 121:19
  122:2 133:18
  174:17
**use-of-force** 72:7
  112:25 113:1, 2
  113:22 114:4, 7
  116:18 119:8, 9
  120:18, 22 121:10
  121:19, 20 122:3
  124:16, 23 125:5
  125:10, 23
**user** 121:12, 21
  123:11 124:20
  125:25

_____
              **V**
_____
**Valle** 161:25
**Valle's** 162:10
**valuable** 59:13
**value** 58:12
**variety** 127:14
**vehicle** 140:14
  151:24 153:15
  162:21
**verbatim** 32:24
  119:15, 23 120:7
  122:10 125:21
**versa** 109:19
**versus** 151:5
**vest** 138:21 139:4
**vice** 109:19
**Victoria** 150:23
**Victorias** 150:3, 24
**video** 32:13 34:15

35:15 36:3 38:3
38:19 47:14, 16
48:24 51:21, 25
52:20 55:11 56:5
57:25 59:1, 17, 21
60:19 61:15, 18
72:10 73:3, 9, 18
77:6, 13, 20 78:4
78:10, 11, 12 79:5
84:19 88:11 89:4
89:14 94:3 99:18
100:22 116:2
117:4, 7 129:11
135:2 141:5, 7, 8
141:21 142:9, 12
142:20 143:4, 6, 8
144:3, 10 146:6
147:16 148:12
152:22 153:25
156:4 157:7, 18
157:23, 24 158:4
158:5 159:7, 10
174:1 176:19
**video/audio** 86:19
**VIDEOGRAPHER** 34:7
  61:15, 18 117:4, 7
  159:4, 7, 10
  176:19
**videoing** 72:9
**videos** 55:17
**videotape** 38:7, 17
  72:11 73:25, 25
  74:5 108:15
**viewer** 149:22
**Village** 141:5
  143:7 144:2
**violated** 139:23
**voice** 158:24
  159:21, 25 160:3
  160:5 164:13
  170:15
**volume** 32:13 35:1
  135:13 176:22
**volunteering**
  167:15
**vs** 32:7

_____
              **W**
_____
**W** 33:5
**Wait** 55:14 167:11
**walk** 133:15
**WALLACE** 33:7
**Wanciak** 34:8 90:15
  92:23 110:25
**want** 38:9 46:10
  49:13 60:16
  61:21 67:3, 3

78:14 85:7 93:12
96:18 101:7
102:19 107:22
108:16 109:16, 24
111:5, 8 115:13
128:11 133:16
143:6, 17 144:3
156:3, 19 157:4
158:8, 20 166:12
167:12, 21 169:15
174:19, 20 175:4
176:17
**wanted** 129:8 133:6
  134:21 166:2
**Wanziak** 93:9
**Wanziak's** 93:3
**warrant** 175:16
**wash** 133:21 134:3
  136:8, 14
**wasn't** 49:18 51:14
  52:9, 10 54:10
  56:16 69:12
  70:22 73:8 83:19
  99:25 135:22
  136:15 148:9
  151:24 162:24
  163:8 174:1
**watch** 45:12 47:19
  112:20 145:11
**watched** 141:22
  147:23
**watching** 141:8
  143:6 147:16
**water** 84:14
**way** 39:22, 24 40:8
  44:11 54:13 57:1
  59:24 65:17 71:9
  71:9, 24 72:12, 13
  85:12, 24 86:23
  87:25 111:1
  122:11 123:22
  126:11 130:21
  131:6 161:11
  166:5 171:13
  176:12
**ways** 62:22 77:21
**we'll** 35:17 36:3
  39:12 47:16, 25
  53:10 68:22
  70:24 73:14
  78:13 97:7 99:16
  99:18, 23 101:11
  126:9 129:12, 24
  130:11 131:9
  132:23 160:5
  169:3 174:23
**we're** 35:2 47:1

53:3 56:4 62:12
64:17 72:11
78:17 83:22
93:20 99:23
100:17 103:1, 12
103:14 107:7, 9
108:1 112:20
126:12 129:13
149:5 150:16, 21
155:12, 13 164:2
165:16, 21 166:3
166:4, 8, 23
168:13
**we've** 52:14 66:22
  73:13 77:21
  87:21 93:24 94:6
  97:6 114:4
  124:15
**weapon** 62:5 66:16
  69:18 71:8 80:8
  91:15
**weapons** 39:3, 6
  72:22
**wear** 139:7, 12
  149:9
**wearing** 138:7
  139:6, 8, 11, 17, 18
**weeks** 146:20
**went** 40:17 41:17
  50:20 74:20
  109:17 136:8, 14
  145:3, 11, 12
  147:13 152:14, 18
  160:20 171:25
**weren't** 129:5
**West** 32:2, 8, 18
  33:8 34:4, 10, 10
  35:23 51:6 76:1
  81:10 104:14, 21
  105:24 106:2
  115:9 129:6
**Weston** 33:4, 12, 16
**whatsoever** 135:18
**whichever** 41:18
  96:25
**White** 143:23
**Whitehead** 33:7
  152:19
**wholly** 127:24
**whoosh** 169:11, 14
  169:16, 19, 20
**Wi-Fi** 96:25
**wife** 170:8, 17, 22
  170:24 172:23
**Williams** 81:9 82:3
  82:6 87:12 88:15
  88:18

**Williamson** 81:8
88:16,19 89:1
109:6 128:25
**willing** 101:8
**win** 103:22
**wipe** 134:16
**wiped** 134:8
**wipes** 134:8,10,12
134:16
**wipey** 134:14
**wired** 151:6
**wireless** 149:2
151:2,5,9
**wires** 62:25
**wish** 85:9 159:13
160:14
**witness** 32:21 35:6
38:24 39:18 46:1
55:14 72:17
74:18 76:16
80:23 90:6 93:22
94:8,12 95:16,20
95:25 100:10
104:19 132:19
133:4 145:20
150:18 153:10
164:17,19,22
166:18 167:19
171:3 173:2
**witnessed** 91:12
92:12 93:14
**witnesses** 74:1
93:15,21,22
95:12
**woman** 97:11
**woman's** 94:20
97:16
**word** 134:17 154:24
**words** 99:23 123:17
123:23 152:13
161:3 173:5
**work** 67:22,22 95:6
114:21 164:3
165:9,23 166:4,8
166:13,24 167:6
167:24 168:14
**worked** 146:11
**working** 67:24
**works** 106:9 109:2
**World** 171:25 172:2
**worthy** 73:16
**wouldn't** 98:7,12
98:16 109:18
136:2 140:8
143:11 168:20
**wow** 51:13 71:23
**write** 93:13,14

99:5 100:23
165:4
**writing** 90:18 93:7
**written** 92:13
**wrong** 48:18 63:7
64:1 65:14 68:20
80:1 85:14 116:6
118:24 130:11
151:12 155:21
164:1 173:24
**wrote** 106:11 168:8

**X**

**X** 57:5 96:21

**Y**

**yeah** 35:22 43:8
99:15 103:19
124:21 125:1
134:18 136:17
138:18 141:14
147:6 157:13
158:15 160:3
167:12 170:16
172:11 175:5
**year** 44:4 48:19,19
67:25 115:20
117:17 118:2
123:18,25 147:1
147:2,5,7,9
**yearly** 124:2
**years** 47:9 52:11
59:12 67:9,10,15
67:25 112:23
113:8,15 114:10
115:20 116:9,11
118:6 119:1,10
**yesterday** 37:18
115:7 154:4,15
155:15
**Yup** 173:17

**Z**

**Zamora** 34:8 133:19
133:20 134:23
136:11

**0**

**0:48** 174:13

**1**

**1** 33:12,16 34:20
111:11,17 112:5
112:22 116:17
118:19 124:12
125:7
**1:55** 173:25 174:1

**10** 122:16
**10:37** 117:4
**10:52** 117:8
**1000** 33:20
**11** 44:3 52:11 91:1
91:1 173:24
**11:30** 130:11
**11:30-something**
129:25
**11:41** 159:7
**11:42** 159:11
**111** 34:20
**115** 34:20
**12:07** 32:16 176:19
**13** 67:22
**14** 67:23
**14-10028-CIV-M...**
32:3
**15** 130:9
**17** 99:24,25
**17150** 33:3,12,16
**176** 32:14
**180** 67:24
**19:47** 156:13,18
158:21 159:17,20
**19:56** 159:17

**2**

**2** 33:3 34:20
114:25 115:4
117:11 118:12
**2002** 115:10
**2004** 120:4
**2005** 112:22 120:4
120:5,5
**2006** 120:6
**2007** 120:6
**2008** 116:12
**2009** 119:22
**2010** 119:22 120:9
120:12,21 123:16
123:16,19,20,23
123:25 124:14
**2011** 119:21 122:6
122:6,8,21 123:1
123:9,14,17
124:3,4,8,9,11
124:14
**2012** 119:21 120:13
124:19 125:12,14
**2013** 119:20 120:10
125:15 126:4
**2014** 32:16 35:1,3
119:19
**217-0150** 33:13,17
**23** 175:3
**2455** 33:20

**25** 84:15
**2689** 115:11
**26th** 39:6
**294-4585** 33:8
**294-7822** 33:8

**3**

**3** 35:1
**3:45** 44:7 54:24
**301** 32:17
**305** 33:8,8
**31** 124:12 175:3
**32** 32:14 78:9
89:11 175:3
**33** 175:3
**33040** 32:18 33:8
**33304** 33:21
**33326** 33:4
**33327** 33:12,16
**33409** 34:4
**35** 34:15
**36:29** 161:9
**36:58** 161:8,9
**37:11** 163:22
**384-6226** 33:4
**39** 170:13

**4**

**4** 32:16
**40** 169:2 170:13
**41** 169:2,3
**41:38** 170:13
**41:57** 170:8,11
**463-0100** 33:21
**463-2444** 33:21
**470** 34:3
**48** 173:23 174:24
**4th** 35:3

**5**

**5** 115:10
**51** 169:3
**56** 161:11
**561** 34:4,4

**6**

**6/7** 123:19
**608** 33:7
**688-2343** 34:4
**688-6560** 34:4

**7**

**8**

**8/27** 123:19
**8:30** 127:1,6
**81** 111:23

**876-4344** 33:4
**888-9877** 33:13,17

---

**9**

**9:01** 32:16
**9:28** 61:15
**9:35** 61:18
**954** 33:4,4,13,13
    33:17,17,21,21

177

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,

        Plaintiff,

vs.

CITY OF KEY WEST, a Florida municipality, et al.,

        Defendants.
_____/

VIDEO DEPOSITION OF GARY LEE LOVETTE
Volume III
(Pages 177 - 307)

Tuesday, November 4, 2014
1:09 p.m. - 3:53 p.m.
United States Federal Courthouse
301 Simonton Street
Key West, Florida  33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter
Florida Professional Reporter

---

178

APPEARANCES

On Behalf of the Plaintiff:
BRILL & RINALDI, THE LAW FIRM
17150 Royal Palm Boulevard, Suite 2
Weston, Florida 33326
(954) 876-4344 / Fax (954) 384-6226
david@brillrinaldi.com
BY: DAVID W. BRILL, ESQUIRE

HORAN WALLACE & HIGGINS, LLP
608 Whitehead Street
Key West, Florida 33040
(305) 294-4585 / Fax (305) 294-7822
dph@horan-wallace.com / darren@horan-wallace.com
BY: DAVID PAUL HORAN, ESQUIRE
BY: DARREN M. HORAN, ESQUIRE

THE MCKEE LAW GROUP, LLC
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / (954) 217-0150
rmckee@themckeelawgroup.com
BY: ROBERT J. MCKEE, ESQUIRE

LEWIS LEGAL GROUP, P.A.
17150 Royal Palm Boulevard, Suite 1
Weston, Florida 33327
(954) 888-9877 / Fax (954) 217-0150
jlewis@lewislegalgroup.com
BY: JEANNETTE C. LEWIS, ESQUIRE

On Behalf of the Defendants:
JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
2455 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida 33304
(954) 463-0100 / Fax (954) 463-2444
burke@jambg.com
BY: MICHAEL T. BURKE, ESQUIRE

---

179

APPEARANCES CONTINUED

On Behalf of the Defendant Gary Lee Lovette:
ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
470 Columbia Drive, Building C-101
West Palm Beach, Florida 33409
(561) 688-6560 / Fax (561) 688-2343
lreynolds@rrbpa.com
BY: LYMAN H. REYNOLDS, JR., ESQUIRE

Also Present:
RODERICK PRATT, LEGAL VIDEOGRAPHER
FRANCISCO ZAMORA
KATHYANN WANCIAK
GABRIEL HUMBERTO GARRIDO
GUSTAVO ADOLFO MEDINA
NAJA GIRARD, KEY WEST THE NEWSPAPER
ARNAUD GIRARD, KEY WEST THE NEWSPAPER

--oo0oo--

INDEX OF PROCEEDINGS
Page
Video Deposition of GARY LEE LOVETTE
    Direct Examination Resumed by Mr. Brill . . . . . . 180
    Cross-Examination by Mr. Burke . . . . . . . . . . 285
    Redirect Examination by Mr. Brill . . . . . . . . 303

Certificate of Oath . . . . . . . . . . . . . . . . . 304
Certificate of Reporter . . . . . . . . . . . . . . . 305
Read Letter . . . . . . . . . . . . . . . . . 306
Errata Sheet . . . . . . . . . . . . . . . . . 307

---

180

1   (Continued from November 4, 2014, Volume II.)
2       THE VIDEOGRAPHER:  Now on the video record at 1:12
3   p.m.
4       DIRECT EXAMINATION RESUMED
5   BY MR. BRILL:
6       Q.  We're talking about some of this footage, and in
7   the interest of time, I won't be playing all of it, just talk
8   some about -- playing some of it and talking about more of
9   it.
10      Question for you.  What is an ILO?  There was a
11  spot in here, and I'll tell you guys roughly where the time
12  is, so you can mark this down, Lyman and Mike, if you wish.
13      Somewhere at around the 10 minute, 52 mark, you
14  state, "The good news is, if Gabe didn't get his finger, I'd
15  have drive-stunned him," meaning Eimers.  And then you go on
16  to say, "That won't be part of my ILO."  What does that mean,
17  ILO?
18      MR. REYNOLDS:  Objection, form.
19      MR. BURKE:  Object to form.
20  BY MR. BRILL:
21      Q.  At least that's how I heard it.  I could be wrong
22  on ILO.  It sounds like ILO.
23      A.  I don't know what that acronym would stand for.
24      Q.  Is there an acronym for a report of any kind that
25  you use for a supplemental or an original report?  Is there

1  (Pages 177 to 180)

181

1    something for that?

2    A.  No, sir.

3    Q.  What do you call a report that you initially write,

4    an investigative report?  Does it got a short --

5    A.  It's a report, incident report.

6    Q.  Incident report.  Does that have an acronym, like

7    an IRO, or anything like that?

8    A.  You might be thinking RRI.

9    Q.  I don't know, but I was wondering.  What it sounds

10   like to me, but if you get an opportunity to listen to it.

11   It's around the 10:52 mark.

12        You had commented, as I said, "That the good news

13   is, if Gabe didn't get a finger, I'd have drive-stunned him,"

14   around the 10:52 mark.  And also, the first time was about

15   1:49.  "Good thing I didn't" -- something.  "If Gabe didn't,

16   I'd have drive-stunned him."  I point that out so that you

17   can, again, go back and listen to it yourself and hear that,

18   firstly.

19        But, secondly, to ask this:  Why is it good news?

20   What's good about it, that is, if Gabe didn't get his finger

21   stuck, you would have drive-stunned him?

22   MR. BURKE:  Object to form.

23   MR. REYNOLDS:  Objection, form.

24   A.  If I would have drive-stunned him, there would have

25   been what's called a RRI, response to resistance, and that

182

1    would be paperwork that the sergeants then would fill out.

2    Q.  RRI.  Well, maybe that's what you're saying, that

3    won't be part of my RRI report?

4    MR. BURKE:  Object to form.

5    MR. REYNOLDS:  Objection, form.

6    A.  I don't do a report for an RRI.  It would be

7    something that's done by the sergeants.

8    Q.  Oh, I see.

9    A.  As a response to resistance.

10   Q.  Gotcha.  Forgive my ignorance.

11   A.  But if I didn't Tase him, then they wouldn't have

12   to do that report.

13   Q.  I'll proffer that, gentlemen, around 14:18,

14   roughly, someone, and it could be Celcer, it appears from the

15   sound of it -- we can queue it up if it helps -- but talks to

16   you about how Eimers was saying at the time he was pulled

17   over to the effect of that he was, you know, helping God,

18   saving lives, or to that effect.  And you, your response at

19   that time was "Uck, that's always a bad sign."

20        Is it safe for me to conclude by that exchange that

21   the first time you were advised of the response that Eimers

22   gave at the scene about this, you know, these very curious

23   statements, concerning statements about him, you know, God

24   and savings lives and all that, was then at the beach after

25   the event?

183

1    MR. BURKE:  Object to form.

2    MR. REYNOLDS:  Objection, form.

3    A.  I don't know where that took place at.

4    Q.  Okay.  If I proffer to you that it's after Mr.

5    Eimers is now gone from the beach and in the ambulance or

6    even by that time, at the hospital, you had this

7    conversation.

8        What I'd like to know is, am I correct to conclude

9    that the first time you ever heard anything about what

10   Charles Eimers said at the scene with -- at the stop with

11   Officer Celcer, was after all of that?

12   MR. BURKE:  Object to form.

13   MR. REYNOLDS:  Join.

14   A.  I don't recall, but if that's what you're hearing

15   there, and you didn't hear it anywhere else, I don't know.

16   Q.  In other words, there was no time in which Officer

17   Celcer or anybody else noted, either in Channel 1 or Channel

18   2 communication, or any other way, to the effect of what

19   Eimers said at that stop.  Is that fair?

20   MR. BURKE:  Object to form.

21   MR. REYNOLDS:  Form.

22   A.  Yeah.  I wouldn't know if that would be unrecorded.

23   That would be unrecorded radio.  I don't recall ever hearing

24   anyone saying anything like that on the radio.

25   Q.  And when you're there on the beach engaged in the

184

1    incident with Eimers, you're not told that either?

2    A.  I don't --

3    MR. REYNOLDS:  Objection, form.

4    BY MR. BRILL:

5    Q.  That you recall anything like that?

6    A.  I don't recall anything like that.

7    Q.  Now, I ask that because in your training, correct

8    me if I am wrong here, that you're educated about how people

9    with maybe a mental infirmity or even a physical infirmity

10   that's affecting their mind, need to be treated differently

11   than someone who may be on drugs or something else, correct?

12   MR. BURKE:  Object to form.

13   MR. REYNOLDS:  Join.

14   A.  Correct.

15   Q.  You have to aware of all of those possibilities,

16   right?

17   MR. BURKE:  Object to form?

18   MR. REYNOLDS:  Join.

19   A.  Yes.

20   Q.  Now, it is possible that with the comments that Mr.

21   Eimers was making that he could have been having some mental

22   aspect or affect that was affecting his judgment in driving

23   and listening to officers out there on the scene, correct?

24   MR. BURKE:  Object to form.

25   MR. REYNOLDS:  Objection, form.

185

1    A.  Absolutely, that's a possibility.

2    Q.  And those, when -- given what you now know, not

3  then, but now know about what he said, Mr. Eimers, those are

4  the things that you were taught to be alert for, right?

5       MR. BURKE:  Object to form.

6       MR. REYNOLDS:  Objection, form.

7    A.  Yes.

8    Q.  Doesn't it make a difference then that you and all

9  the other officers on the scene were not informed by radio

10  communication of what Eimers' conduct, and expressions, and

11  what he was saying, were before the detention?

12       MR. BURKE:  Object to form.

13       MR. REYNOLDS:  Objection, form.

14    A.  Mr. Eimers didn't give us that, the ability to put

15  that out when he fled the scene.

16    Q.  Officer Celcer had access to his radio.

17       MR. REYNOLDS:  Objection, form.

18       MR. BURKE:  Object to form.

19  BY MR. BRILL:

20    Q.  Correct?

21    A.  Yes, sir.

22    Q.  There was ample time between the stop and the time

23  when Mr. Eimers gets bogged down on the sand on the beach for

24  Officer Celcer to communicate to all of you, hey, heads up,

25  this is what you're dealing with.

186

1       MR. BURKE:  Object to form.

2  BY MR. BRILL:

3    Q.  Right?

4       MR. REYNOLDS:  Join.

5    A.  I can't speak for him.

6    Q.  No.  Ample time, as in the clock.

7    A.  I don't -- I don't know the --

8       MR. REYNOLDS:  Objection, form.

9       THE WITNESS:  I don't know the time frame, from the

10  time of the stop to the time we all began to engage Mr.

11  Eimers.

12  BY MR. BRILL:

13    Q.  Well, from the time you engaged, just yourself, at,

14  what was the street?

15    A.  Truman and White.

16    Q.  Truman and White, to the time of the beach.  Plenty

17  of discussion on the radio; where he is, what he's going,

18  who's paralleling where.  Right, all that?

19       MR. BURKE:  Object to form.

20       MR. REYNOLDS:  Objection, form.

21  BY MR. BRILL:

22    Q.  But there's no communication, despite all that

23  radio time and availability of this is what Eimers or this

24  man has said?

25       MR. BURKE:  Object to form.

187

1       MR. REYNOLDS:  Join.

2  BY MR. BRILL:

3    Q.  Right?

4    A.  There was not, no.

5    Q.  And my only point is, that's important, isn't it?

6       MR. BURKE:  Object to form.

7       MR. REYNOLDS:  Objection, form.

8    A.  To you, yes.

9    Q.  To you, as well?

10    A.  I can't Monday morning quarterback that situation,

11  sir.

12    Q.  Well, it makes a difference if you think you're

13  dealing with someone who's just flat-out disregarding police

14  directive without anything going on in his head, in a mental

15  state or otherwise, I mean, and someone who is, in fact,

16  having some sort of mental effect?

17       MR. BURKE:  Object to form.

18  BY MR. BRILL:

19    Q.  You just said that, right?

20       MR. BURKE:  Object to form.

21       MR. REYNOLDS:  Objection, form.

22    A.  I can't speak for Mr. Eimers and why he did what he

23  did.

24    Q.  No, but there's a difference for how you, as a

25  police officer, and all your brethren police officer, will

188

1  treat a suspect of that type?

2       MR. BURKE:  Object to form.

3       MR. REYNOLDS:  Objection, form.

4    A.  It's the situation he put us in.  We have to let

5  our situation dictate our tactics.

6    Q.  And information is key on how you dictate your

7  tactics?

8       MR. BURKE:  Object to form.

9       MR. REYNOLDS:  Objection, form.

10    A.  Yes.

11    Q.  And you were lacking what is a key piece of

12  information, right?

13       MR. BURKE:  Object to form.

14       MR. REYNOLDS:  Objection, form.

15  BY MR. BRILL:

16    Q.  What was Eimers' conduct?  What was he saying?  How

17  was he acting?  What did he look like during this stop?  Was

18  he just fleeing to flee, or was there something wrong there?

19       MR. BURKE:  Object to form.

20       MR. REYNOLDS:  Objection, form.

21  BY MR. BRILL:

22    Q.  Right?

23    A.  That's something you'd have to ask Officer Celcer.

24    Q.  Okay.  Do you know how even sometimes someone could

25  suffer even a stroke and start talking nonsensically, not

3  (Pages 185 to 188)

189

```
 1   because of anything other than there's like an occlusion or a
 2   blockage that's affecting their ability to communicate
 3   properly, right?
 4           MR. BURKE:  Object to form.
 5   BY MR. BRILL:
 6       Q.  You've been educated with that?
 7       A.  Yes.
 8           MR. REYNOLDS:  Objection, form.
 9       Q.  And you wouldn't gang tackle or detain the same
10   way, someone who's potentially suffering a medical condition
11   the same way you would take someone who is a violent,
12   conscious, and acting with complete regard and with his
13   senses, someone who's just violating all kinds of laws and
14   norms, would you?
15           MR. BURKE:  Object to form.
16           MR. REYNOLDS:  Objection, form.
17       A.  Those things weren't known when we engaged Mr.
18   Eimers.
19       Q.  But they were known by Officer Celcer?
20           MR. BURKE:  Object to form.
21           MR. REYNOLDS:  Objection, form.
22       A.  Again, you'd have to ask Officer Celcer.
23       Q.  If it were you, and you had had that stop, and you
24   had had that information relayed to you, would you have
25   communicated that to your fellow officers?
```

190

```
 1           MR. BURKE:  Object to form.
 2           MR. REYNOLDS:  Objection, form.
 3       A.  It I felt it was important, yes.
 4       Q.  Do you think it's important?
 5       A.  It depends on the situation.
 6       Q.  Knowing what you do now, isn't that important?
 7           MR. BURKE:  Object to form.
 8           MR. REYNOLDS:  Objection, form.
 9       A.  I also know it's a medical issue that Mr. Eimers
10   died from.
11       Q.  Uh-huh.
12       A.  Not a mental issue.
13       Q.  Well, he had suffered, as we'll discuss, death
14   because he's got six officers on him and he's struggling to
15   breath.
16           MR. BURKE:  Object to form.
17           MR. REYNOLDS:  Objection, form.
18       A.  That's your opinion; yes, sir.
19       Q.  That's not just my opinion.
20           MR. REYNOLDS:  Objection, form.  Move to strike.
21   BY MR. BRILL:
22       Q.  Were six officers on him?
23       A.  I don't recall how many officers were there.
24       Q.  Let's go back to the key question for the moment.
25   Wouldn't you like to think that if you, with your
```

191

```
 1   training, were in Officer Celcer's position, you would have
 2   adhered to police protocol, procedures and standards, and
 3   communicated, look, heads up, to this effect, this guy was
 4   speaking some strange stuff about God and saving lives.
 5           MR. BURKE:  Object to form.
 6           MR. BURKE:  Objection, form.
 7   BY MR. BRILL:
 8       Q.  Just be careful with how you're dealing with him.
 9           MR. REYNOLDS:  Objection, form.
10       A.  But we still would have followed him, and we still
11   would have done what we did.
12       Q.  You wouldn't have changed a thing?
13       A.  He was still putting lives in danger.
14       Q.  Whose life was in danger?
15       A.  Every red light he ran, every stop sign he ran, he
16   endangered people's lives.
17       Q.  Fair enough.  Of course.  That's fair enough.  I
18   don't dispute that.  I'm talking when he's at the beach, when
19   you're detaining him, you wouldn't have changed anything of
20   your strategies or tactics or what you did to this man if you
21   had known this is what he communicated to Celcer?
22           MR. REYNOLDS:  Objection, form.
23       A.  No.
24       Q.  Well, let's take it another step.
25   Looking back on it now, would you change anything,
```

192

```
 1   separate and apart from what you now know Officer Celcer was
 2   told by Eimers, would you change anything about any of your
 3   conduct today if you could?
 4           MR. REYNOLDS:  Objection, form.
 5       A.  Besides the amount of officers dealing with him and
 6   how they were dealing with him when I entered in, he was
 7   struggling.  He was fighting.  That was resistance.  So
 8   that's why I engaged Mr. Eimers.  So, based on that, no, I
 9   wouldn't have changed what I have done.
10   BY MR. BRILL:
11       Q.  I'm --
12       A.  Knowing his medical condition, that's a whole
13   different ball game.  Not mental, but physical, medical
14   condition.  No, we would have handled it probably different,
15   but we didn't know that; all we knew is he was resisting.
16       Q.  Well, isn't it true, though, with anybody that
17   you're going to encounter, and that's part of your training,
18   you don't know if the person you're pulling over has a
19   medical condition?
20       A.  No, we don't.
21       Q.  So, if you knew by looking at Eimers that he was an
22   older gentleman, correct, in his late fifties, early sixties?
23           MR. BURKE:  Object to form.
24           MR. REYNOLDS:  Objection, form.
25       A.  I didn't know how old Mr. Eimers was.
```

193

```
1        Q.  Well, Celcer had his license and registration.
2        MR. REYNOLDS:  Objection, form.
3   BY MR. BRILL:
4        Q.  Right?
5        A.  I can't tell you what Officer Celcer was reading.
6   I didn't know he had his license and registration until after
7   the incident.
8        Q.  And Celcer — so, among other things Celcer didn't
9   communicate also was the age of the individual?
10       A.  He gave a vehicle description, I remember that, and
11  the direction of travel.
12       Q.  But he had communicated with the man.  Did he give
13  a description of the man, the age, anything about him?
14       A.  You would have to check the radio communication.
15       Q.  Do you recall that?
16       A.  I do not.
17       Q.  Isn't it important to know if you're dealing with
18  an older person versus a younger person?
19       MR. BURKE:  Object to form.
20       MR. REYNOLDS:  Join.
21  BY MR. BRILL:
22       Q.  In the detention and arrest of someone?
23       A.  It depends on the situation.
24       Q.  This situation.
25       A.  At that time, I don't know if it was or now.
```

194

```
1        Q.  You knew he was obese.
2        MR. REYNOLDS:  Objection, form.
3        THE WITNESS:  No, I did not
4   BY MR. BRILL:
5        Q.  Did anybody communicate that?  You didn't see him
6   on the beach as obese?
7        A.  I don't recall.  I don't remember his size on the
8   beach.  I was at his head and his shoulders.
9        Q.  Right.  And we'll get to that, too.
10       A.  Okay.
11       Q.  But it isn't important to know that with the type
12  of detention that's going to be effectuated, whether you're
13  dealing with someone who is — looks physically fit, is
14  obese, versus someone who is not?
15       A.  Mr. Eimers was extremely strong.
16       Q.  Not my question.
17       A.  I can't tell you if he was obese or not.  I don't
18  know your definition of obese.
19       Q.  Mr. Eimers, he had a large stomach.
20       MR. REYNOLDS:  Objection, form.
21       A.  Never saw it.  I don't remember looking at it.
22       Q.  He was not a skinny, tall, young man in the prime
23  of his life.  He was a 50-some year-old, or 63 year-old man,
24  who had -- was short and stocky with a large stomach,
25  correct?
```

195

```
1        MR. REYNOLDS:  Objection, form.
2        MR. BURKE:  Object to form.
3        A.  I don't know.
4        Q.  That's what you know now?
5        A.  I know now --
6        Q.  But you didn't —
7        A.  -- from what you're telling me.
8        Q.  And you saw him at the beach after he was taken off
9   — lifted up and put onto a backboard, too.
10       A.  I wasn't there for that.
11       Q.  But it is important so that you know how to, as
12  officers, it's part of your training, to know basics about
13  the man you're about to detain to the extent possible?
14       MR. BURKE:  Object to form.
15       MR. REYNOLDS:  Join.
16  BY MR. BRILL:
17       Q.  Right?
18       A.  We had to deal with the situation at hand.  We
19  couldn't size him up.  We couldn't, you know, get his mental
20  ability, because he was resisting and we took him into
21  custody.
22       Q.  And we're going to get to the resisting
23  momentarily, or the claim of resisting.  But I just want to
24  make sure that it's your testimony that before you did your
25  part, and the seizure, the attempted arrest, detention,
```

196

```
1   whatever you want to call it, of Mr. Eimers, you had no
2   knowledge of what he said to Officer Celcer?
3        A.  No, sir.  I don't recall ever hearing it on the
4   radio.
5        Q.  You had no information relayed to you about his,
6   Mr. Eimers' estimated size, weight, and age?
7        A.  I don't recall ever hearing that on the radio.
8        MR. BRILL:  I mention this for your edification,
9   Counsel.  The spot at the footage for the 17 million
10  texts asking me what happened is at 56:15 or thereabout.
11       Q.  You don't dispute making that comment?
12       MR. REYNOLDS:  Objection, form.
13       MR. BURKE:  Object to form.
14       A.  No, sir.
15       Q.  At 56:45, thereabout, you say, "Gabe killed him."
16  Do you remember making that comment?
17       MR. REYNOLDS:  Objection, form.
18       A.  No, sir, I don't.
19       Q.  Do you want to hear that?
20       A.  If it's in quotes, I'm sure I said it.
21       MR. BURKE:  Well, don't be sure of anything.  Why
22  don't you --
23       MR. REYNOLDS:  Yeah.  Lets him play it for you.
24  That's what it's there for.
25       THE WITNESS:  Yeah, that's fine.
```

197

1    (Audio being played.)
2  BY MR. BRILL:
3    Q.  Now, let me pause it there.  Did you hear that
4  part?  That's at 57:03:07.
5    A.  Message of God, and that's why had it right there,
6  that's why we dealt with that right there?
7    Q.  "That should be your first clue right there."  Do
8  you remember saying that?
9    MR. BURKE:  What is the question?
10 BY MR. BRILL:
11   Q.  Do you remember saying that?
12   MR. BURKE:  Saying what?  I didn't hear it.  I'm
13 sorry.
14   MR. BRILL:  Oh, I'm sorry.
15   MR. BURKE:  I just couldn't hear it.
16   MR. BRILL:  Sure.  He said, to the effect, that
17 he's talking about how Celcer had communicated with them
18 to advise that he was on a message from God, or to that
19 effect, like the old Blues Brother movie, I suppose.
20 And that you say in here, "That should have been your
21 first clue right there."
22 BY MR. BRILL:
23   Q.  What did you mean by that?
24   MR. BURKE:  Object to form.
25   MR. REYNOLDS:  Objection, form.

198

1    A.  That's what we were dealing with.
2    Q.  Right.  You point out an hour or so later how
3  relevant what Mr. Eimers said, "That should be your first
4  clue right there."  Right?
5    MR. BURKE:  Object to form.
6    MR. REYNOLDS:  Objection, form.
7    A.  That's not when that happened.  That's hours later
8  after the incident.
9    Q.  That's making my point, Officer.  That, yes, Celcer
10 should -- that should have been his first clue, it should
11 have been all of your clues.  It should have been your first
12 -- everybody should have been informed, this is what he said
13 to me, so that you know how to treat him appropriately.
14   MR. BURKE:  Object to form.
15   MR. REYNOLDS:  Objection, form.
16 BY MR. BRILL:
17   Q.  Do you disagree with that proposition?
18   A.  I don't know if we would have treated him
19 differently.
20   Q.  I don't know what to tell you.
21   MR. BURKE:  Well, you can ask questions.  That's
22 what you're here for.
23   (Audio being played.)
24 BY MR. BRILL:
25   Q.  What's so funny?  What's so funny, talking about

199

1  this?
2    MR. REYNOLDS:  Objection, form.
3    A.  I don't know.  I don't know what was said there.
4    Q.  Well, it's talking the Eimers' incident.  I
5  mean, you don't have to take my word for it, guys.  You just
6  have to listen to it.  What is so funny --
7    A.  I don't know what happened right there.
8    MR. BURKE:  Object to form.
9    MR. REYNOLDS:  Objection, form.
10   THE WITNESS:  Sorry.
11   Q.  Is any of it amusing?
12   MR. BURKE:  Any of what?
13   MR. REYNOLDS:  Objection, form.
14   MR. BRILL:  Any of the fact that Eimers was
15 murdered on the beach in your city.  That's what.
16   MR. BURKE:  Object to the form.
17 BY MR. BRILL:
18   Q.  I mean, is it any of it funny?  I just, I have to
19 understand the mentality that you -- do you have any level of
20 appreciation how your laughter like that an hour after this
21 man was murdered sounds?
22   MR. BURKE:  Object to form.
23   MR. REYNOLDS:  Join.
24 BY MR. BRILL:
25   Q.  That's my question.

200

1    MR. BURKE:  I hear it.  Well, that's your
2  statement, actually, but --
3    MR. REYNOLDS:  Objection, form.
4    A.  I didn't hear what was said before that, before the
5  laughter.
6    Q.  Who cares?
7    A.  So, if someone told a joke and I laughed at joke
8  that had nothing to do with Eimers, then I may have laughed.
9    Q.  No.  It was right in the -- listen to it.
10   MR. BURKE:  Can we ask questions?  This is just
11 argument.  You know --
12   MR. BRILL:  Stop.  Stop.
13   MR. BURKE:  No, I'm not going to stop.
14   MR. BRILL:  Okay.  Well --
15   MR. BURKE:  We're going to take this before
16 Goodman.  If you want to keep --
17   MR. BRILL:  Take it.
18   MR. BURKE:  Okay.  We will.
19   MR. BRILL:  I just don't want to argue with you.  I
20 don't want to argue with you.
21   MR. BURKE:  I want to go on the record and indicate
22 that I'd like this video available tomorrow, or as soon
23 as we possibly can, so that we can present these
24 comments that you've been making, to Judge Goodman.  And
25 you say, take it before Judge Goodman, I don't care.

6  (Pages 197 to 200)

## 201

1    MR. BRILL:  This is what --

2    MR. BURKE:  We're going to do that.

3    MR. BRILL:  Go for it.

4    MR. BURKE:  We are.

5    MR. BRILL:  But I don't need to have this discourse

6  with you.  You do your job, I'll do mine.  If you don't

7  like the job I'm doing, you have recourse under the

8  rules.

9    MR. BURKE:  We do.

10    MR. BRILL:  I don't want to be lectured by you.

11    MR. BURKE:  Well, I don't want you to keep

12  lecturing him.

13    MR. BRILL:  Okay.  Then make your objections.

14    MR. BURKE:  You don't have a right.

15    MR. BRILL:  Yes, I do.

16    MR. BURKE:  No, you don't.

17    MR. BRILL:  That's what this is.

18    MR. BURKE:  No.

19    MR. BRILL:  This is a deposition.

20    MR. BURKE:  This is a deposition, sir; not a

21  lecture.

22    MR. BRILL:  That's right.  And he's alive to take

23  the deposition, and he's also not your client, and

24  Lyman's not saying anything.

25    MR. BURKE:  I don't care if he's not my client.

## 202

1    MR. BRILL:  So why don't you mind your own business

2  and deal with your own client.

3    MR. BURKE:  If you're going to sit here and be an

4  idiot on the record.

5    MR. BRILL:  I'm an idiot?

6    MR. BURKE:  Yeah.

7    MR. BRILL:  You're an idiot.

8    MR. BURKE:  Okay.  Great.

9    MR. BRILL:  Do we got that straight?  You got

10  anything else to say?  You're going to call me an idiot?

11    MR. BURKE:  Yes.

12    MR. BRILL:  Good for you.

13    MR. BURKE:  And I think Judge Goodman, when he

14  hears this, is going to say that.

15    MR. BRILL:  Oh, do you think so?

16    MR. BURKE:  I do.

17    MR. BRILL:  I don't think Judge Goodman is going to

18  call me an idiot.  But why don't you get done doing your

19  little drama that you want to show off for your fellow

20  officer clients to let them know, hey, just because I

21  haven't prepared like this side of the table is, it's

22  okay, I'm here to protect your interests.  That's what

23  you're doing.

24    MR. BURKE:  We're not here to --

25    MR. BRILL:  You're showing off.

## 203

1    MR. BURKE:  We're not here to --

2    MR. BRILL:  Showing off.

3    MR. BURKE:  -- violate the ruling like you are,

4  sir.

5    MR. BRILL:  Like you are.  What happened to

6  objection, form?  We had a stipulation, counsel, just a

7  few hours ago.

8    MR. BURKE:  You've continued to argue with him ad

9  nauseam.

10    MR. BRILL:  No.  No.  I'm arguing only with you

11  right now, because you started the argument.  You wanted

12  to ask a question of what.  I answered you.  I asked it

13  to him.  How funny is this to him?  That's not argument.

14  That's what any normal human being would like to know.

15  What is so damn funny after a man was just killed in

16  police custody, an hour later, laughing like that?

17  That's a legitimate question.  I want to know, and I

18  betcha anybody else that would be reading about this,

19  watching this, or be sitting on a jury would like to

20  know the same thing.

21    MR. BURKE:  I think this deposition should be

22  terminated, and we should go before Judge Goodman.

23    MR. BRILL:  Well, that's a good thing you brought

24  that up.

25    MR. BURKE:  Well, let me just finish.  Let me just

## 204

1  finish.

2    MR. BRILL:  No.

3    MR. BURKE:  Let me just finish, please.  And since

4  that apparently is not going to happen, I'm going to sit

5  back and not say anything else.

6    MR. BRILL:  It's your call.

7    MR. BURKE:  And I do fully intend to bring this

8  before him on Friday, and we'll see if he agrees.

9    MR. BRILL:  That's fine.  Share it.  Listen, I

10  don't argue with you about what you can do under the

11  rules of procedure.  I don't.  I just don't care to

12  engage in an argument with you.  That's not my job here

13  My job is to represent the Eimers family, and

14  that's what I'm trying to do.  If you feel that I've

15  done anything improper, there's all sorts of procedural

16  mechanisms.  You know it.  If you feel that a motion for

17  protective order is required for right now, do that.  I

18  don't see --

19    MR. BURKE:  I do.

20    MR. BRILL:  -- Officer Lovette's attorney doing it.

21  I know he's objecting to form, and that's fine.  He can

22  do it, too, but he hasn't.

23    MR. BURKE:  All right.

24  BY MR. BRILL:

25    Q.  So my question, I don't know if it was answered,

**WWW.USLEGALSUPPORT.COM**
**1-888-311-4240**

205

1 Officer, and if it was, I apologize.
2         MR. REYNOLDS: I object to the form.
3 BY MR. BRILL:
4     Q. What is so funny?
5         MR. REYNOLDS: I object to the form --
6 BY MR. BRILL:
7     Q. What is --
8         MR. REYNOLDS: -- and --
9         MR. BRILL: Sorry, sorry. I didn't mean to cut you
10 off.
11        MR. REYNOLDS: I object to the form and move to
12 strike inappropriate comment of counsel.
13 BY MR. BRILL:
14    Q. What is so funny an hour after?
15    A. I could not hear what was said before my laughter,
16 so I couldn't tell you what I was laughing at.
17    Q. Do you think that it says anything about your
18 character, as a human being even, that you have the capacity,
19 the capability, to laugh that way just an hour after this
20 event?
21        MR. BURKE: Object to the form.
22        MR. REYNOLDS: Objection, form.
23    A. No.
24    Q. That's normal human behavior to you?
25        MR. REYNOLDS: Objection, form.

206

1    A. That's your opinion.
2    Q. I'm asking you. I have my opinion. I'm not giving
3 that. I'm asking you my question, whether you think that's
4 normal human behavior?
5        MR. BURKE: Object to form.
6        MR. REYNOLDS: Join.
7    A. Whatever was said that made me laugh, I laughed.
8    Q. At 1:05:55, or thereabout, do you say, and I want
9 to know if you dispute saying this in response to something
10 someone said, quote, "That would be funny if we didn't just
11 kill someone." Do you remember saying that?
12    A. No, sir. Can you play it?
13    Q. Absolutely. (Audio being played.)
14        I might have missed it. Let me go back. I
15 apologize. It's at 1:05:35 right now, 36, 37. Do you hear
16 that?
17    A. Yes.
18    Q. Do you recall what happened in that situation?
19    A. No, sir. I do not.
20    Q. Why would you say something like that if it weren't
21 true?
22        MR. BURKE: What was said? I'm sorry. We can't
23 hear it.
24        MR. BRILL: He admitted, he agreed that it said,
25 "That would be funny if we didn't just kill someone."

207

1        MR. BURKE: That's what was said?
2        MR. BRILL: Yes.
3        MR. BURKE: That's what was said?
4        MR. BRILL: Yes.
5    A. I don't -- I don't know what brought me to say
6 that, and I don't know what was said after that. It was very
7 quiet there, and then I said something. So I don't know what
8 -- what was said to me that made me say that.
9    Q. Why would you say it, regardless of what was said
10 to you first, if it weren't true?
11    A. Shop talk.
12        MR. REYNOLDS: Objection, form.
13        THE WITNESS: Sorry. Shop talk and embellishing.
14    Q. To whom, and what shop talk?
15    A. I don't know who I was talking to. That's why I
16 said, it was so quiet, I couldn't hear what was said.
17    Q. Was Mr. Eimers still alive at that point?
18    A. If this was the same day that this incident
19 happened, yes.
20    Q. Did you know that?
21    A. No.
22    Q. You thought you had -- he was dead?
23    A. I didn't know.
24        MR. REYNOLDS: Objection, form.
25        THE WITNESS: Sorry.

208

1 BY MR. BRILL:
2    Q. When he, Mr. Eimers, left the beach -- well, strike
3 that.
4        Even before he left the actual beach in ambulance
5 custody, attempts were made with the defibrillator from the
6 restaurant to resuscitate him, correct?
7    A. Yes.
8    Q. And you understand, and you understood then, that
9 those attempts were unsuccessful to generate a pulse?
10   A. I understand that the AED didn't want to shock, but
11 that doesn't mean that he didn't have a pulse.
12   Q. There was a member of your team who has paramedic
13 experience. Who was that again, please? Is that Medina?
14   A. Officer Celcer and Officer Del Valle --
15   Q. Del Valle.
16   A. -- are both trained.
17   Q. And one or -- one of them was giving CPR?
18   A. Both.
19   Q. Both. You knew from them that they could not find
20 a pulse, correct?
21   A. They were relieved by EMTs and firefighters, and
22 then he was transported in the bus. As far as I knew, when I
23 left, that he -- they had regained -- he not regained, not
24 consciousness, but they had a pulse on him.
25   Q. When your officers were doing CPR before the

8 (Pages 205 to 208)

209

1  ambulance came, was your understanding that they were able to
2  get a pulse or the ambulance?  I want to make sure I
3  understand.
4      A.  I don't recall.
5      Q.  Then at 1:06:30, or thereabout.  Ten, ten more
6  seconds.  (Audio being played.)  Oh, I missed it.  I went a
7  little bit too far.  (Audio being played.)
8          Can you recognize, by the way, the female voice in
9  this?  Is this your wife?  Or, do you have a sister, by any
10  chance, or sister-in-law?
11      A.  I have two.
12      Q.  Two sisters or --
13      A.  Two sisters and two sisters-in-law.
14      Q.  Are they -- do they live in this area?  I don't
15  want an address.
16      A.  Yes.
17      Q.  Did you recall visiting one of them during the day
18  after, shortly after?
19      A.  It was Thanksgiving Day.  I'm sure there was a
20  family dinner.
21      Q.  All right.  It's about a minute from here.  Bear
22  with me.  It's very hard to get it exact on the little
23  curser.  All right.  It's about 30 seconds away.  (Audio
24  being played.)  Do you know who is that that you're speaking
25  to, this woman?

210

1      A.  I don't recognize any of that.
2      Q.  Okay.  If you listen, if you have an opportunity,
3  you're talking and it appears to me to be in a serious tone,
4  not joking, to a female at whose house you stayed from that
5  point until the end of the recording.  But you don't remember
6  whose that was?
7      A.  Whose house?
8      Q.  Yes, or who that was you were speaking to?
9      MR. BURKE:  Object to the form.
10     MR. REYNOLDS:  Join.
11     A.  No.
12     Q.  And then, at about -- and there it said, it started
13  -- I will proffer to you again, and again, I know that the
14  quality on a MAC laptop is not the best.
15         But it starts out with, again, I proffer to you, in
16  a serious tone, "We just killed someone."  And then you go on
17  to explain.  You're asked if you shot the person or what.
18  You said no.
19         But here, at about 1:07:29, tell me if this not you
20  saying, and I quote, "He has blunt-force trauma on the head
21  from me."  you talk about Gabe getting his hand caught, and
22  you said, "Boom, I dropped a fucking bomb on him."
23     MR. BURKE:  Object to form.
24     MR. REYNOLDS:  Join.
25         (Audio being played.)

211

1  BY MR. BRILL:
2      Q.  "I dropped a fucking bomb on his head."
3      MR. REYNOLDS:  Objection, form.
4  BY MR. BRILL:
5      Q.  Is that what was said there?
6      A.  Yes.
7      Q.  By you?
8      A.  Yes.
9      Q.  What -- but we're -- that's what you said?
10     A.  Yes.
11         MS. LEWIS:  Can you clarify what was said?
12     Q.  "Boom."  Right?  Is it boom.  Is that the word?
13     A.  I know I heard, "dropped a fucking bomb on his
14  head."
15     Q.  And then, just before that is, "He has blunt-force
16  trauma on the head from me."  (Audio being played.)  Did you
17  hear that?
18     A.  "He had blunt-force trauma to the head."
19     Q.  Yes.  It says "from me."
20     A.  I didn't hear that.  (Audio being played.)  I hear,
21  "He had blunt-force trauma to the head."
22     Q.  Well, who else would it be if --
23         MR. BURKE:  I couldn't understand the witness.  I'm
24  sorry.  What did you say?
25         THE WITNESS:  I hear it.  I hear it say, "He had

212

1  blunt-force trauma to the head."
2      MR. BURKE:  Okay.
3      THE WITNESS:  I didn't hear the -- what --
4  BY MR. BRILL:
5      Q.  At 1:20 --
6      A.  -- "from me."
7      Q.  Sorry.  I didn't mean to cut you off, sir.
8      A.  I didn't hear the "from me" part.
9      Q.  Okay.  One -- it goes from wherever, whose ever
10  house you're at, from that point through to the end, 1:29
11  roughly :10.  Again, this is rough, and you're asked, "Who
12  beat Eimers?"  And you say, "Mainly, it was me."
13     MR. REYNOLDS:  Objection, form.
14     MR. BURKE:  Object to the narrative.
15         (Audio being played.)
16     A.  I didn't hear what was said before the, "Mainly, it
17  was me."
18     MR. BURKE:  Well, it seems kind of important.
19     Q.  I'm back at 1:28:23 is the start.  (Audio being
20  played.)
21     MR. BURKE:  And the question is?
22     MR. REYNOLDS:  Objection, form.
23     MR. BURKE:  I'm sorry.
24  BY MR. BRILL:
25     Q.  Do you hear the "mainly, it was me"?

9  (Pages 209 to 212)

213

1    A. I heard that.
2    Q. Okay. And then you --
3    MR. REYNOLDS: Objection, form.
4  BY MR. BRILL:
5    Q. -- go on to say, correct me if I'm wrong, Gabe was
6  picked on. "Gabe was crying like a girl," comment?
7    MR. REYNOLDS: Objection, form.
8    (Audio being played.)
9  BY MR. BRILL:
10    Q. "Yelling like a girl," right?
11    A. Yes.
12    MR. BURKE: What did he say? I didn't -- I can't
13  hear.
14    MR. BRILL: Gabe was yelling like a girl.
15    THE WITNESS: Gabe was yelling like girl.
16    MR. BURKE: Okay.
17    Q. Again, I know it's -- we'll enhance that stuff, but
18  I just want to confirm those are all your statements.
19    Can you appreciate how saying, in particularly that
20  type of setting, with loved ones around on Thanksgiving Day,
21  "He has blunt-force trauma on the head," and "dropped like a
22  fucking bomb on his head," would sound --
23    MR. REYNOLDS: Objection, form.
24  BY MR. BRILL:
25    Q. -- to people listening?

214

1    MR. BURKE: Object to form.
2    A. The things before that, though, I couldn't make out
3  that would get that reaction from me. So I don't know what
4  was said before those things, just like the me laughing that
5  you hit on. I don't know what was said that made me laugh.
6  I don't know what was said that had me say those things, what
7  my reaction of those things were.
8    Was it shop talk? Was it embellishment? Was it
9  decompressing? It could have been all those. Those are all
10  things that, you know, we were dealing with on Thanksgiving
11  Day.
12    Q. The footage that we do have from the tourist, as we
13  discussed earlier, stops about an hour and nine -- a minute.
14  Now, I say an hour, right? Pardon me. Let me restate that.
15    The footage we have is about a minute and nine
16  seconds. We know that the incident on the sand with Eimers
17  continued. There was ample time in that continuation, about
18  two minutes additional, right?
19    MR. BURKE: Object to form.
20    MR. REYNOLDS: Objection, form.
21    A. For the whole situation?
22    Q. Yeah.
23    A. I couldn't give you a time line.
24    Q. It was more than a minute and nine when it stopped,
25  because we saw that it stops?

215

1    A. Yes, sir.
2    MR. REYNOLDS: Objection, form.
3    Q. And then there's more time on the beach with you
4  and all your fellow officers with Eimers. There was ample
5  time --
6    MR. BURKE: Was there an answer to that question?
7  I didn't hear it.
8    MR. BRILL: I thought he said, "Uh-huh."
9    MR. BURKE: I didn't hear it.
10    MR. REYNOLDS: Objection, form. I didn't hear an
11  answer.
12  BY MR. BRILL:
13    Q. Is that correct?
14    A. Yes.
15    MR. REYNOLDS: I didn't know if he'd finished.
16    THE WITNESS: There was time after, after that
17  video.
18    Q. So there would be ample time that would not be
19  captured on that footage during which you could have
20  delivered a blow to Mr. Eimers' head?
21    MR. BURKE: Object to form.
22    MR. REYNOLDS: Objection, form.
23  BY MR. BRILL:
24    Q. Correct?
25    A. Could there be video? Yes. Was there? No.

216

1    Q. We know there was blood on Mr. Eimers' head, as we
2  discussed earlier?
3    A. Yes.
4    Q. We know that you were the one closest to his head
5  in the positioning?
6    A. Yes.
7    Q. We know you had blood on your person, on your hands
8  in particular that you were asked to wash off, correct?
9    A. Yes.
10    Q. And we now have you about an hour and, say, ten
11  minutes after the event exclaiming to loved ones that you
12  dropped a fucking bomb on his head?
13    MR. BURKE: Object to form.
14    MR. REYNOLDS: Objection, form.
15    A. Yes.
16    Q. But we're to believe that you didn't actually mean
17  what you said?
18    MR. BURKE: Object to form.
19    MR. REYNOLDS: Objection, form.
20  BY MR. BRILL:
21    Q. Is that correct?
22    A. Yes. The autopsy said there was no blunt force
23  trauma to the head or upper torso.
24    Q. You expected the blow that you delivered to the
25  head to show up in autopsy days later?

217

1    MR. REYNOLDS: Objection, form.
2    A. I'm not a medical examiner.
3    Q. Do you believe, even nearly a year after the death
4    of the -- yeah, the death of Mr. Eimers, that everything that
5    you did on the beach in regards to the detention and arrest
6    of Mr. Eimers complied with your police training and
7    protocols and procedures?
8    A. Yes.
9    MR. REYNOLDS: Objection, form.
10   MR. BRILL: For that, I'll actually ask what was
11   wrong with the form.
12   MR. REYNOLDS: It was compound.
13   MR. BRILL: It was?
14   MR. REYNOLDS: I believe it was. If I'm wrong,
15   then --
16   MR. BRILL: Okay. I don't --
17   MR. REYNOLDS: -- I'll stand corrected.
18   MR. BRILL: Understood.
19   BY MR. BRILL:
20   Q. Do you believe the conduct of your fellow officers
21   in the securement, detention, or arrest of Mr. Eimers, from
22   beginning to end, complied likewise with all your police
23   department's procedures, standards, and protocols?
24   A. I can't speak for them.
25   Q. From what you witnessed?

218

1    A. From what I witnessed? Yes.
2    Q. As I read your personnel file material, there was
3    mention of you in repeated yearly evaluations having had
4    knowledge and specific involvement in what they call quality
5    of life ordinances?
6    A. Yes, sir.
7    Q. Now, have you ever read the New York Times article
8    on Key West's quality of life ordinances?
9    A. No, sir.
10   Q. Do you know what a lot of folks, other than maybe
11   yourself, think about the quality of life ordinances and what
12   the negative of them are?
13   MR. BURKE: Object to form.
14   MR. REYNOLDS: Objection, form.
15   A. No, sir.
16   Q. What do you believe the quality of life ordinances
17   are about
18   MR. REYNOLDS: Objection, form.
19   A. About maintaining quality of life in the city with
20   our vagrancy problem.
21   Q. It's, again, correct me if I'm wrong, from your
22   perspective, the, let's call it, rules or laws passed locally
23   to permit police officers, such as yourself, to move homeless
24   away from areas where tourists frequent?
25   MR. BURKE: Object to form.

219

1    MR. REYNOLDS: Join.
2    BY MR. BRILL:
3    Q. Is that correct?
4    A. To move homeless just to move them?
5    Q. No, so that tourists coming down to enjoy what Key
6    West -- all the wonderful things Key West has to offer, can
7    do so without having to be bothered by the vagrants?
8    A. No, sir.
9    Q. Why is it that you feel that you have been singled
10   out as having such a positive involvement in the quality of
11   life ordinance work?
12   MR. REYNOLDS: Objection, form.
13   A. I was assigned to the quality of life unit for two,
14   almost three, years.
15   Q. Did you like it?
16   A. It was a good job.
17   Q. What did you like about it?
18   A. I got to help people. I dealt with vagrants the
19   way they wanted to be dealt with, which was go to jail, get
20   healthcare, and then get back out on the street. And the
21   people that didn't want to be on the streets, like homeless,
22   I would go out of my way to try to get them housing, try to
23   get them a license, jobs, things like that.
24   Q. But you were also sanctioned or punished for taking
25   a particular homeless man when he was sleeping on a wall, and

220

1    taking his feet and swinging them so he would fall off the
2    wall?
3    A. That was the --
4    MR. REYNOLDS: Objection, form.
5    THE WITNESS: That was the accusation by a witness.
6    Q. And do you dispute that?
7    A. Yes.
8    Q. But you signed the document affirming it?
9    MR. REYNOLDS: Objection, form.
10   A. Yes, I did.
11   Q. You believed, from the information that was relayed
12   on the communications during the slow pursuit -- I forget if
13   that's the term we --
14   A. Follow.
15   Q. Slow follow. Thank you.
16   That Mr. Eimers was someone living out of his car?
17   A. That was after the fact.
18   Q. Is the fact that Mr. Eimers was believed by you and
19   fellow officers to be a Michigan transient living out of his
20   car, something that we're supposed to just discount as being
21   a factor in the way you treated him?
22   A. I didn't know --
23   MR. REYNOLDS: Objection, form.
24   MR. BURKE: Object to form.
25   THE WITNESS: Sorry. I didn't know anything about

11 (Pages 217 to 220)

221

1  Eimers and that incident until after. I didn't know he
2  was living out of his car.
3      Q.  Your fellow officers were going through the car and
4  identifying all the things that were in it, even while Mr.
5  Eimers was still present on the beach.
6          MR. REYNOLDS:  Objection, form.
7  BY MR. BRILL:
8      Q.  Do you recall that?
9      A.  I wasn't involved with that.
10     Q.  It was relayed that he had Michigan plates during
11 the slow follow, correct?
12     A.  I don't remember.
13     Q.  If that's the case, do you treat people that are
14 out of state different than you do the folks that reside
15 here?
16     A.  No.
17     Q.  Can you agree with me that you and your fellow
18 officers, some or all of them, at least, were going to lie
19 about how Mr. Eimers suffered on the beach --
20         MR. REYNOLDS:  Objection -- sorry.
21 BY MR. BRILL:
22     Q.  -- until you learned of this very important phone
23 footage from the tourist?
24         MR. REYNOLDS:  Objection, form.
25     A.  Agreeing with you?  No, I don't agree with you that

222

1  we were going to -- we were going to make up a story.
2      Q.  Well, the EMS report indicated that, and I quote,
3  "KWPD reported PT left vehicle, ran, and then collapsed on
4  the beach," end quote.  You're aware of that, aren't you?
5      A.  No, sir.
6          MR. REYNOLDS:  Objection, form.
7      Q.  Who's KWPD?
8      A.  We are.
9      Q.  Who's PT?  Patient.
10     A.  Patient.
11     Q.  So, Key West Police Department reported patient
12 left vehicle and ran, and then collapsed on the beach.
13 That's in the EMS report.
14         MR. REYNOLDS:  Objection, form.
15 BY MR. BRILL:
16     Q.  Who at Key West Police Department, other than you
17 and all the other fellow officers of, I think you said 11
18 officers on Bravo shift, would have any contact with EMS in
19 the first place?
20         MR. REYNOLDS:  Objection, form.
21     A.  I didn't have any contact with EMS.
22     Q.  But who else besides you and your fellow officers
23 from Bravo that were on the beach at the time EMS came to
24 transport Eimers would have even had the ability to
25 communicate with EMS?

223

1          MR. REYNOLDS:  Objection, form.
2          MR. BURKE:  Object to form.
3      A.  I don't know.
4      Q.  Anybody else?
5          MR. REYNOLDS:  Same objection.
6      A.  I said earlier, there could have been water units,
7  there could have been traffic units, there could have been
8  detectives, there could have been lieutenants, sergeants
9  there on that scene.  I don't remember who was on that scene.
10     Q.  Do you --
11     A.  I did not talk to EMS.
12     Q.  I'm sorry.  I didn't mean to interrupt you.
13         Do you know who reported, who of KWPD reported that
14 to EMS?
15         MR. REYNOLDS:  Objection, form.
16     A.  No.
17     Q.  I saw you look over because you knew he was going
18 to object.  You're getting the hang of it.
19         You don't dispute that EMS would have written that
20 accurately, do you?
21         MR. REYNOLDS:  Objection, form.
22         MR. BURKE:  Object to form.
23 BY MR. BRILL:
24     Q.  You have no reason to believe — I'm sorry.  I need
25 to let you answer.

224

1      A.  I don't know who they talked to and who wrote that.
2      Q.  Do you have any basis to dispute the accuracy of
3  the writing?
4          MR. BURKE:  Object to form.
5          MR. REYNOLDS:  Objection, form.
6      A.  Again, I don't know.  That wasn't my involvement.
7      Q.  Then in the emergency room report, it's indicated,
8  "Found," and I quote, "without a pulse by police."
9          Did you report that to the emergency room personnel
10 who wrote that report?
11         MR. REYNOLDS:  Objection, form.
12         MR. BURKE:  Object to form.
13     A.  No.
14     Q.  Do you know who reported that to the emergency room
15 personnel?
16     A.  No.
17     Q.  That's not true, right?
18         MR. REYNOLDS:  Objection, form.
19 BY MR. BRILL:
20     Q.  Mr. Eimers was not simply found without a pulse by
21 police, was he?
22         MR. REYNOLDS:  Objection, form.
23     A.  I don't know who said that.
24     Q.  No, but --
25     A.  I don't know who would have given that narrative,

12  (Pages 221 to 224)

225

1    and how it would have been translated by a nurse or a doctor
2    at the ER.
3        Q.  Right, but that's not my question.
4        My question is, it's not true that Mr. Eimers was
5    merely found on the beach without a pulse by police, right?
6        MR. REYNOLDS:  Objection, form.
7    BY MR. BRILL:
8        Q.  Like, walking around and, oops, there's Mr. Eimers?
9        A.  No.
10       MR. REYNOLDS:  Objection, form.
11       Q.  And, likewise, it's not true that Mr. Eimers left
12   the vehicle and then ran, and then collapsed on the each.
13   That's not true either?
14       MR. BURKE:  Object to form.
15       MR. REYNOLDS:  Objection, form.
16       A.  I never saw him do that, no.
17       Q.  And it's your testimony that if this phone footage
18   that came out didn't come up, that story wouldn't have
19   been the story that remained?
20       MR. REYNOLDS:  Objection, form.
21       A.  I don't know.
22       Q.  Well, you talk about in your discussions with FDLE
23   and the FDLE reports that you did what was called a modified
24   three-point pin.  Is that a real term in your training?
25       A.  A three-point pin is a restraining maneuver.

226

1        Q.  A three-point pin is?
2        A.  Yes.
3        Q.  What is a -- before I get to the modified three-
4    point pin again, what is a three-point pin?
5        A.  It's a way of restraining someone on the ground,
6    and controlling their arms and upper body.
7        Q.  And how is it, from your training and education,
8    actually performed?
9        A.  With someone on the ground resisting.
10       Q.  No.  I'm sorry.  Let me restate it.  It could have
11   been my question.  I apologize.
12       How do you effectuate, how do you actually perform
13   a three-point pin?  Describe it.
14       A.  Approaching the subject, the upper body or torso
15   area, you would -- you'd actually pin the -- pin the upper
16   body with your shins or knees.  The foot would be by the
17   face.  Your legs should be across the torso, and you'd have
18   control of the hand, and that would prevent them from rolling
19   or turning.
20       Q.  Okay.  So, what then is a modified three-point pin?
21       A.  He was already in the attempt to being handcuffed,
22   so I wouldn't have had control of his arms.  So my leg would
23   have been down by his head, his head pushed away, and my knee
24   would have been across the back of his upper back, so that he
25   couldn't push or turn or roll.

227

1        Q.  But you also told FDLE that you had both of your
2    shins across his -- or, on his shoulders with your face
3    facing his legs.  Is that incorrect now?
4        A.  I don't recall saying that.
5        MR. REYNOLDS:  Objection, form.
6        Q.  Your testimony here today then is you were
7    positioned how exactly?
8        A.  At his head and upper torso.  His head was turned
9    away towards the restaurant, away from me, and my body was
10   placed between his neck, neck and shoulders, and upper torso.
11   So I would essentially be towards his feet, --
12       Q.  Which --
13       A.  -- but not both shins on his back.  That wouldn't
14   make any sense.
15       Q.  What leg is on him, and how is it on him?
16       A.  It would have been my right leg.  My right shin
17   would be across his left shoulder.
18       Q.  Okay.  And where is your left leg positioned?
19       A.  My left leg would have been positioned next to his
20   head, with his head turned away, so that he wouldn't be able
21   to turn back towards us.
22       Q.  When you say next to his head, do you mean next to
23   the side or the portion of the head abutting the other
24   shoulder?
25       A.  If --

228

1        Q.  The right shoulder?
2        A.  If he was laying -- where he was laying down, if
3    his head was turned towards the restaurant, which would have
4    been, I guess, west, facing away from me, my knee would have
5    been on the backside on the ground by his head, preventing it
6    from turning back towards me, and my right knee would have
7    been across over his shoulders, preventing him from rolling
8    or getting up.
9        Q.  How close was your groin area to the -- to Eimers'
10   head?  Was there contact or was there space between?
11       A.  My groin area would have been by his left shoulder,
12   by his arm area coming down.
13       Q.  How much space was -- but your interior part of
14   your thigh --
15       A.  Would have been up in his shoulder area.
16       Q.  But then, he has -- his head is basically
17   positioned between your legs?
18       A.  No.  His head is positioned away from me, away from
19   me with the back of his head resting against my knee.  My
20   knee would be in the sand, and his head would be against it,
21   so that he couldn't turn towards us.
22       Q.  Okay.  It's my fault, not yours.  I'm trying to
23   envision it, and I'm not doing a good job.
24       Would you mind terribly if try to figure this out
25   again?

WWW.USLEGALSUPPORT.COM
1-888-311-4240

229

1   A. No problem.
2   Q. Your testimony is that Eimers is -- when you
3   effectuate whatever position this is, modified three-point
4   pin, is he is on his stomach, hands back with someone else
5   dealing with the hands?
6   A. Yes.
7   Q. His head is turned, this -- to the left shoulder or
8   to the right shoulder?
9   A. His head would have been down and towards his right
10  shoulder.
11  Q. You are facing the direction of his feet?
12  A. For the most part, yeah. I would have been facing
13  sort of at an angle, but that way.
14  Q. Your right leg, or as you say, shin, is on the left
15  shoulder of Eimers?
16  A. It would be on his left shoulder coming across his
17  shoulder up onto his back.
18  Q. Your knee would then be positioned where on that
19  leg, for that leg?
20  A. My right or left knee?
21  Q. I said for on that leg. So, forgive me. I'll say
22  right. Your knee of your right leg would have been
23  positioned where?
24  A. Pretty much by his like, shoulder area, shoulder,
25  center spine area.

230

1   Q. How far behind where the neck begin -- ends, and
2   the shoulder area starts is your knee? How, down -- how far
3   down is it?
4   A. My left knee or my right knee?
5   Q. Your right knee. I'm still talking about the
6   right.
7   A. My right knee would have been down his back. It
8   wouldn't have been near his head.
9   Q. And I'm trying to establish how far down the back.
10  A. As far as my legs would have let me travel to
11  safely secure him on both ends.
12  Q. So then, what I'm trying to understand is where
13  your -- then your left leg is in relation to Mr. Eimers'
14  head?
15  A. My left leg --
16  Q. Yes, sir.
17  A. -- would have been down in the sand, my right knee
18  behind his head, his head turned away from me. So his head
19  would have been looking towards his right shoulder, and my
20  knee would have been behind his head, preventing it from
21  rolling back.
22  Q. Now, when you first arrived, as I read your
23  statements and listen to the audio that you gave FDLE, and
24  you position yourself that way, Eimers -- you had to turn
25  Eimers' head to the right, in the direction away from your

231

1   right leg.
2   A. From my right leg or my left.
3   Q. Away from your right leg.
4   A. My right leg would have not been by his head,
5   though. My left leg would have been by his head. And I
6   don't -- I don't recall moving his head, but I may have.
7   Q. Let me ask it this way, so we don't mix too many of
8   the right and left leg issues then.
9        When you were arrived there, in order to get --
10  have Mr. Eimers face in the direction that you wanted his
11  head to be, you had to -- you had to move his head in that
12  direction and keep it there?
13  A. I don't recall --
14  MR. REYNOLDS: Objection, form.
15  THE WITNESS: Sorry. I don't recall which way his
16  head was pointed for that to happen. I don't see myself
17  grabbing by his face or his mouth. That's not safe to
18  move his head. So I don't know how, you know, how it
19  would have gotten there, unless I was positioning myself
20  to do that.
21  Q. How else would his head get to be facing that
22  direction without your modified three-point pin, as you call
23  it, forcing that to happen?
24  MR. BURKE: Object to form.
25  MR. REYNOLDS: Objection, form.

232

1   A. It could have been already facing that way, and I
2   think that's why I positioned my knee where I did, so that
3   tactically, he couldn't come back and try to bite me.
4   Q. Okay. If he was in that position, whether
5   originally or you placed him in some way, if he was to take
6   his head and move it at all down to the ground, where would
7   it go?
8   A. If he was to try to turn his head?
9   Q. Yes.
10  A. If he could turn his head, he would turn down into
11  the sand.
12  Q. And that happened, didn't it?
13  MR. REYNOLDS: Objection, form.
14  A. I don't recall that ever happening.
15  Q. You saw the pictures from Mr. Eimers after getting
16  to the emergency room with sand in his nose and his ears, and
17  all over his body?
18  MR. REYNOLDS: Objection, form.
19  MR. BURKE: Object to form.
20  A. No.
21  Q. If Mr. Eimers attempted to change -- turn his head
22  to the left, his head would go in the sand, as you describe.
23  If he could somehow manage to look further to the left, is he
24  then, at that point, not going to be basically confronting
25  your -- the inner thigh of your leg?

14  (Pages 229 to 232)

233

```
1        A.  Yes.  That never happened.
2        Q.  Is that so-called modified three-point pin
3    identified in any training materials?
4        A.  No.
5        Q.  Who came up with it?
6        MR. REYNOLDS:  Objection, form.
7        A.  No one came up with it.  I positioned myself to
8    best restrain him.  They wanted a description of what I would
9    call it, and the closest position that we're taught is a
10   three-point pin.
11       Q.  Can you appreciate that you were on sand?
12       A.  Yes.
13       Q.  Do you find that in your training, any distinction
14   made between having someone pinned by one officer, let alone
15   more than one, in soft surfaces such as sand, as opposed to
16   harder surfaces like dirt, cement or grass?
17       MR. BURKE:  Object to form.
18       MR. REYNOLDS:  Join.
19       A.  Do I appreciate that it's different?  Yes, I
20   understand that it's different.
21       Q.  And how is it different.  What were you taught?
22       MR. REYNOLDS:  Objection, form.
23       A.  You still have maneuvers that you do to try
24   restrain someone, and that's what we did.
25       Q.  How is it different?  What were you taught?
```

234

```
1        A.  I don't understand your question.
2        Q.  What --
3        A.  What were we taught?
4        Q.  What -- yeah.
5        A.  We were taught to try to take him into custody with
6    the least amount of resistance possible.
7        Q.  Right.  And what was different, in your training,
8    that you've experienced about trying to detain someone in
9    sand, like a beach, as opposed to on a harder surface?  What
10   are the risks?  What are the --
11       A.  I've never had sand training, --
12       MR. REYNOLDS:  Objection, form.
13       THE WITNESS:  -- resistance in sand training.
14       Q.  Who was monitoring Mr. Eimers' ability to breathe
15   during this restraint that you have labeled the modified
16   three-point pin?
17       A.  I don't know.
18       Q.  Anybody?
19       A.  Not that I know of; no, sir.
20       Q.  Were you trained for your three-point pin, let
21   alone the modified three-point pin as you call it, that
22   monitoring for safe breathing is required protocol?
23       MR. BURKE:  Object to form.
24       MR. REYNOLDS:  Join.
25       A.  Mr. Eimers was -- we were telling him to stop
```

235

```
1    resisting, and I remember him yelling, "No, no."  And if he
2    was yelling, then he was breathing.
3        Q.  I would agree that for part of this detention, we
4    hear that, and he is moving and he is breathing.  But he
5    obviously stopped somewhere along the line, sir.  Right?
6        MR. REYNOLDS:  Objection, form.
7        A.  Yes.
8        Q.  And so, I'm asking is if training that you had went
9    through taught that someone should be monitoring for
10   continued safe breathing?
11       A.  When I was positioned on Mr. Eimers' head, he was
12   breathing the entire time.
13       Q.  Well, we know that you attempted to lift him with
14   your fellow officers, and he was not breathing at that time.
15       MR. REYNOLDS:  Objection, form.
16       A.  And I was not at his head at that time.
17       Q.  Okay.  How long after you left his head was there
18   someone saying he was not breathing?
19       A.  We had already applied the hobble restraint to his
20   legs and were trying to lift him up.  He had already been
21   handcuffed, and he was breathing when we stood him up.
22       Q.  He was breathing when you stood him up?
23       A.  He was still fighting and talking.  We didn't get
24   very far before we were told that he was out.
25       Q.  Were you trained that restricting one's breathing
```

236

```
1    can trigger harm heart effects -- harmful heart effects?
2        MR. REYNOLDS:  Objection, form.
3        A.  Was I trained that?
4        Q.  Yes.
5        A.  I don't recall training about restraining someone's
6    breathing.
7        Q.  Were you trained at all that in doing any type of
8    three-point pin or detention that required someone to be
9    placed in a prone position, such as Mr. Eimers, that
10   breathing -- that that restricts breathing in any way?
11       A.  No, sir.  Those maneuvers do not.
12       Q.  Pardon?
13       A.  That maneuver does not restrict breathing in any
14   way.
15       Q.  Were you trained that that type of maneuver, if
16   this -- can we call it prone restrain?  Is that what this is?
17       MR. REYNOLDS:  Objection, form.
18       A.  You can call it that, yes.
19       Q.  Is that fair?
20       A.  Sure.
21       Q.  Is that what you would call it?
22       A.  I call it a modified three-point pin.
23       Q.  No.  I mean, the restraint overall of Mr. Eimers'
24   position by all officers?
25       A.  He was, he was in the prone position; yes, sir.
```

237

1    Q.  Were you taught that whether it actually causes a
2 restriction physiologically, that is, with the body actually
3 not being able to breathe, that the person being detained
4 feels that they can't breathe?
5    MR. REYNOLDS:  Objection, form.
6 BY MR. BRILL:
7    Q.  Were you trained in that?
8    MR. REYNOLDS:  Objection, form.
9    A.  I don't recall.
10    Q.  Can you appreciate that if someone is on top of
11 another person's back with a knee, or more than one knee,
12 that the person can feel like they're having a difficulty to
13 get an adequate breath?
14    MR. BURKE:  Object to form.
15    MR. REYNOLDS:  Objection, form.
16    A.  I can't attest to how someone's feeling, what
17 they're feeling for breath.
18    If you're saying about my knee?  No.  My knees
19 weren't on his back to a point where it would restrict his
20 breathing.
21    Q.  Were you trained at all about those effects of any
22 prone restraint causing someone to feel the panic of being
23 unable or feeling like they're unable to breathe?
24    MR. REYNOLDS:  Objection, form.
25    A.  No.

238

1    Q.  The prone restraint with a hobble, can you describe
2 what you were taught about what a hobble does?
3    A.  A hobble restrains leg movements.
4    Q.  Was the hobble at any point connected to the
5 handcuff?
6    A.  No.
7    Q.  Was that ultimately what was going to be done?
8    A.  No.
9    Q.  Was Mr. Eimers' legs necessarily lifted in order to
10 put the hobble on?
11    A.  Yes.
12    Q.  Were you taught about what would happen to the
13 upper body when you lift, in the prone restraint, legs up in
14 the air?
15    A.  Describe up in the air.  We had to lift them up
16 about two inches off the sand to get it under.
17    Q.  Whatever distance.
18    A.  And those were his ankles, not his legs.
19    Q.  What would happen to the upper body?
20    A.  I don't know.
21    Q.  You appreciate that the actual consequence, if not
22 at least the sensation, is the sense is the upper body going
23 further down into the sand, the face further into the sand?
24    MR. REYNOLDS:  Objection, form.
25    MR. BURKE:  Object to form.

239

1    A.  I don't know.
2    Q.  What you characterized as resisting, can you not
3 appreciate was really Mr. Eimers struggling desperately to
4 breathe?
5    MR. BURKE:  Object to form.
6    MR. REYNOLDS:  Objection to me to fight.
7    A.  With his yelling, his kicking and his pushing
8 around, I wouldn't consider that him struggling to breathe.
9 He was resisting us.
10    Q.  If I were to have me and five other people have you
11 on a prone position on the beach, and put my knee on the back
12 of your shoulders, and put your arms behind you for a
13 handcuff, and then grab your legs for a hobble, do you think
14 you would feel comfortable with the ability to take a full
15 breath?
16    MR. REYNOLDS:  Objection, form.
17    A.  I wouldn't resist.
18    Q.  That's not what I asked.
19    MR. REYNOLDS:  Objection, form.
20    A.  I can't tell you what I would be feeling, or what
21 someone would be feeling.
22    Q.  Could you tell me how you would be feeling?
23    MR. BURKE:  Object to form.
24    MR. REYNOLDS:  Objection, form.
25    A.  I'd be feeling like someone's trying to handcuff

240

1 me.
2    Q.  And how about the ability to breathe?
3    MR. REYNOLDS:  Objection, form.
4 BY MR. BRILL:
5    Q.  Did it ever occur to you to try?
6    A.  It wouldn't occur to me to fight.
7    Q.  Did it ever occur to you to find out what it would
8 feel like to be in a prone restraint and have someone on your
9 back, grabbing your arms to handcuff you, and lifting your
10 legs for a hobble?
11    MR. REYNOLDS:  Objection, form.
12    A.  No.
13    Q.  Did they ever do that to in any of the training
14 that you went through all these years?
15    A.  Yes.
16    Q.  They subjected you to a prone restraint?
17    A.  Yes.
18    Q.  Tell us the difference in what you went through
19 versus what you put Mr. Eimers through?
20    MR. REYNOLDS:  Objection, form.
21    A.  I don't know what Mr. Eimers was put through.
22    Q.  What you and your fellow officers put him through?
23    MR. BURKE:  Object to form.
24    MR. REYNOLDS:  Objection, form.
25    A.  I can't tell you what he went through.  I can't

16  (Pages 237 to 240)

241

1  tell you his physical feeling at that time and what he was
2  feeling.
3      Q.  What prone restraint were you practiced on?
4      A.  I've been placed in handcuffs on my stomach, I've
5  been placed in a three-point pin, and I've also been hobbled.
6      Q.  Have you had all of those things happen at one time
7  with five officers on you?
8      A.  No.
9      Q.  Were each of the things that you described where
10  you were prone and handcuffed, one event that you went
11  through?
12      A.  I've been through that event many times.
13      Q.  Were you also put in that event, handcuffed with a
14  hobble?
15      A.  Yes.
16      Q.  At the same time?
17      A.  I have been hobbled and handcuffed; yes, sir.
18      Q.  Were you hobbled, handcuffed, with someone on a
19  three-point stance on you, all three?
20      A.  You can't do that.  You'd use a three-point pin to
21  put someone in handcuffs.  And then from handcuffs, a hobble
22  would be placed on after that.
23      Q.  Were you given any, what you called the modified
24  three-point pin, while handcuffed and on a hobble?
25      A.  No, sir.

242

1      Q.  Were you ever put in a prone restraint on sand?
2      A.  No.
3      Q.  That was not part of any of the training you
4  experienced?
5      A.  No, sir.  I've never been trained in restraints in
6  sand.
7      Q.  When you experienced your being in a prone
8  restraint just in the limited fashion that we've described
9  with your handcuff and a hobble, how did you feel in
10  breathing?
11      A.  I couldn't tell you.  I didn't think about that.
12      Q.  Do they do that kind of training with any officers
13  over the age of 60 years of age?
14      A.  Not that I recall, no.
15      Q.  Were you trained that the use of the prone
16  restraint has been outlawed in other states of the United
17  States --
18      MR. REYNOLDS:  Objection, form.
19  BY MR. BRILL:
20      Q.  -- prior to the time the restraint on Mr. Eimers
21  occurred.
22      MR. BURKE:  Object to form.
23      A.  No.
24      Q.  Were you trained that it was outlawed in other
25  countries, as well, prior to the time Mr. Eimers was

243

1  restrained?
2      MR. REYNOLDS:  Objection, form.
3      MR. BURKE:  Same objection.
4      A.  No.
5      Q.  At any point, did you have more than one knee on
6  Mr. Eimers' back at any given time?
7      A.  No.
8      Q.  So if you said shins, plural, on the FDLE
9  statements, on either one of them that you gave, which
10  statement do we believe?
11      MR. BURKE:  Object to form.
12      MR. REYNOLDS:  Objection, form.
13      A.  Even in my description of a three-point pin, I
14  wouldn't have put both shins on someone.  Even a modified
15  three-point pin, both shins wouldn't have been on him.  My
16  right shin would have been across his shoulder and torso, but
17  my left shin would have never been up there.
18      Q.  Would you agree that if I was your suspect, and I
19  got down on my knees like this, let the record reflect I'm on
20  both knees, and my hands behind my head, like this, am I
21  detained?
22      MR. BURKE:  Object to form.
23      MR. REYNOLDS:  Join.
24      A.  Yes.
25      MR. BRILL:  What was that?

244

1      MR. BURKE:  Object to form.
2      MR. BRILL:  Foin, foin?
3      MR. BURKE:  I was yawning.  I'm sorry.  I beg your
4  pardon.
5      MR. BRILL:  Is that f-o-i-n?
6      THE WITNESS:  If you're complying to verbal
7  commands, then, yes, you are considered detained.
8      Q.  And, again, I'm on my knees, my hands are behind my
9  head, elbows out.  What were you trained in how to go from
10  there to handcuff me and take me into custody?
11      A.  From a kneeling position like that?
12      Q.  Yes, sir.
13      A.  I would walk up behind you and put your hands
14  behind your back, and I'd handcuff you right there.
15      Q.  And you would do that by taking one cuff on the one
16  wrist --
17      A.  Bring your hand behind your back, and then
18  handcuffing the other one.
19      Q.  Would you tell me, particularly if were on the
20  sand, to get down on my stomach from there?
21      MR. REYNOLDS:  Objection, form.
22      A.  I would let the situation dictate the tactics.  I -
23  - me, personally?  No, I wouldn't.  If you were already in
24  that position, I would wait for a backup officer and detain
25  you there.

245

Q. If I'm in a prone position, and you have had this practiced on you so I'm confident that you would have experienced it, correct me if I'm wrong. If I am in a prone position and my hands are behind me, and someone grabs them to put the cuffs on, what happens to my upper body and head area?

MR. REYNOLDS: Objection, form.

A. Depends on your positioning.

Q. If I'm -- if I'm on my stomach and prone.

A. You would -- if you're talking about Mr. Eimers, you told me he was obese, so if his stomach was in the sand, then his upper body would be much higher off the sand.

Q. And when I move the hands back to grab the handcuffs, my head would then teeter on my stomach in the downward direction into the sand, wouldn't it?

MR. REYNOLDS: Objection, form.

A. Your assumption, but due to his probably lack of flexibility because of his size, it would probably bring him up.

Q. It would bring the back of the arms up.

A. If you're laying down and you're pulling your arms back, and you don't have flexibility because you're obese, it's going to pull you up. It's not going to push you into the ground.

Q. And then when you cuff, what's going to happen?

246

A. He's going to be -- he's going to be reared up.

Q. But you're at his head, right?

A. Yes.

Q. And your knee or your shin is across his back.

A. That's because he wasn't handcuffed and he was still resisting us.

Q. I understand your testimony, but hear me out, please.

You're preventing the head from rising up with the hands pulled back, right?

MR. REYNOLDS: Objection.

BY MR. BRILL:

Q. You're preventing movement, you said.

A. I'm preventing his head from moving and his upper body from moving, pushing away from us.

Q. Right. So when you're there in what you called your modified stance, or three-point pin, pardon, --

A. Yes, sir.

Q. -- and someone pulls back on the arms to facilitate the handcuffing, you're preventing the elderly man, which you've identified aptly, appropriately, as being less than nimble or what have you, you're preventing the body from being able to accommodate that movement with the handcuff, aren't you?

MR. BURKE: Object to form.

247

MR. REYNOLDS: Objection, form.

A. But it was his fighting that made us put him in that position, not the handcuffing. If he would have put his hands behind his back, we would handcuffed there. You would not need any of us.

Q. Did any -- I'm sorry. I didn't mean to interrupt you. Did anyone ask him that? In all of the time that was there, did anyone ask him, give me your hands so I can handcuff you.

A. We advised him to stop resisting, and that's when he was telling us no.

Q. That's not what I'm asking.

Did anyone ask him to give you a hand so we can handcuff him?

MR. REYNOLDS: Objection, form.

A. I don't recall, no.

Q. Now, I take it that you had not yet arrived to see Mr. Eimers, like you saw in the footage, on his knees with his hands behind his head, as I just demonstrated, right?

MR. REYNOLDS: Objection, form.

A. No, sir.

Q. No, I'm wrong, or --

A. No, I didn't see him in that position.

Q. I just wanted to clarify. Thank you.

Can you appreciate how that is compliant, right?

248

A. Yes.

Q. But under your analysis here today, and the testimony you gave in your reports and to FDLE, you suggest that he went from that to also complying to get onto his stomach, right?

A. He was on his stomach when I arrived.

Q. If he did that because one of your fellow officers said, get down on your stomach, that would also be Mr. Eimers complying, correct?

MR. REYNOLDS: Objection, form.

A. I can't speak for what was said.

Q. Understood.

A. If that's what you're saying --

Q. Yes.

A. If you're giving a scenario, then, yes, that sounds like compliance.

Q. If you said, put your hands back, and he did that, that, too, would be complying?

A. Yes.

Q. If at that point, everybody gets into the position that we see on the footage with you in their so-called modified three-point pin, others trying to cuff him, Officer Garrido getting his finger caught, and someone else grabbing the huddle -- the hobble, pardon me, can you not -- what transpired in your mind that would have taken Mr. Eimers from

249

1  being fully compliant to writhing like he did, if not that he
2  was struggling to breathe?
3      MR. BURKE:  Object to form.
4      MR. REYNOLDS:  Objection, form.
5  A.  I can't tell you why he resisted.
6      Q.  And your testimony under oath today is it never
7  crossed your mind that maybe this guy, who obviously was less
8  than compliant during the traffic maneuvers, but once he got
9  to the beach, fully complied with getting on his knees, hands
10  behind his back, getting on his stomach, moving his arms
11  behind for a cuff, went from that to writhing and screaming
12  "no" and moving desperately was, in fact, struggling to
13  breath, he wasn't resisting arrest?
14      MR. BURKE:  Object to form.
15  A.  When I engaged Eimers, he was resisting our arrest.
16      Q.  Yes, but to what end?  For what purpose?
17      MR. BURKE:  Object to form.
18      MR. REYNOLDS:  Objection, form.
19  A.  To not be handcuffed.
20      Q.  And that's my question to you.  For what purpose?
21  If he complied all the way up to then, did it ever cross your
22  mind, even once, any of you, that he's resisting, as you
23  called it, because he can't breathe or feels he can't
24  breathe?
25      MR. BURKE:  Object to form.

250

1      MR. REYNOLDS:  Join.
2  A.  At that time, no.
3      Q.  How about now?
4  A.  I couldn't tell you.  I can't Monday morning
5  quarterback what was going on.  What he was feeling, I can't
6  tell you what his feelings were.
7      Q.  I'm asking you your feelings.  Do you really
8  believe, this long after, having had the opportunity to
9  review, listening to my questions, looking at the reports,
10  that Mr. Eimers was really resisting to just resist, or was
11  he resisting because he was desperate to try to get a good
12  breath of air?
13      MR. REYNOLDS:  Objection, form.
14  A.  I believe that the proper force necessary was used
15  to take Mr. Eimers into custody.
16      MR. BRILL:  Okay.  I move to strike as non-
17  responsive.
18      Q.  My question is, looking at it now, appreciating the
19  moment, understanding how many officers were involved in this
20  thing, and the movements of Mr. Eimers at the time as
21  compared to before, when he complied fully with directions on
22  the beach, can you really dispute that Mr. Eimers was not,
23  quote/unquote, resisting, as you call it, for any reason than
24  he was struggling to gain precious oxygen in his lungs?
25      MR. BURKE:  Object to form.

251

1      MR. REYNOLDS:  Objection, form.
2  A.  I don't know why he resisted.
3      Q.  Do you discount that that's a probability?
4      MR. REYNOLDS:  Objection, form.
5  A.  Is it a possibility?  Absolutely.
6      Q.  Is it, in fact, a probability?
7      MR. REYNOLDS:  Objection, form.
8  A.  I can't tell you that.
9      Q.  Let's show, then, the footage to you.  What we'll
10  do, I think -- Jean and I were talking about this, folks, and
11  I think the best way is to give you, Mr. Lovette, the footage
12  from the -- there's really two pieces from the cell phone,
13  and have you look at it on an iPad.  And then, for the
14  videographer, we'll turn my laptop around so that you can see
15  it, and counsel can see it, and we'll synch our watching of
16  it, if you will.
17  A.  Okay.
18      Q.  How many times, by the way, before today have you
19  seen this footage?
20  A.  With FDLE, I saw it a few times.
21      MR. BRILL:  And, by the way, I don't know if we'll
22  get to it in a little bit -- yeah, I think that's a good
23  question.  Let's do -- yeah, is the right one the one
24  that starts earlier in time?  Yes.  I'm going to queue
25  it up.

252

1      MR. BURKE:  As long as we're past the screen, are
2  we okay here?
3      THE VIDEOGRAPHER:  I'm only on his laptop.
4      MR. BURKE:  Okay.  You're on the laptop.  Thank
5  you.
6      MR. BRILL:  If I don't get it now, it's just taking
7  me completely fumbling through my technology.  I'm too
8  old for this stuff.
9      All right.  Let's see.  I'm on it, ready to hit on
10  three.  You got it?  Do you need me to tilt this at all
11  or --
12      THE VIDEOGRAPHER:  You're fine.
13      MR. BRILL:  Is the brightness okay?  Bring it back?
14      THE VIDEOGRAPHER:  Yes.
15      MR. BRILL:  Okay.  You have it?  54 seconds it
16  says, right?  That one?
17      THE WITNESS:  It doesn't say.
18      MS. LEWIS:  I don't have the time.
19      MR. BRILL:  Okay.  No worries.
20      MR. REYNOLDS:  Guy on a bicycle?
21      MR. BRILL:  Yes.  Guy on bicycle.  Okay.  Three,
22  two, one, go.
23      (Video being played.)
24      MR. BRILL:  Just get ready and I'll pause it.
25  We'll watch it once the way through, and then we can

19 (Pages 249 to 252)

253

1   come back to it.
2       THE WITNESS:  He turned to try to kick out.
3       MR. BRILL:  Okay.  Now, let's go to the second one
4   and just watch it through to the end.  And this, I'll
5   proffer, as we've been told, starts a little later, but
6   goes nine seconds later, and goes nine seconds further.
7   Is that good for you?  Okay.  On three, two, one, go.
8       (Video being played.)
9       MR. BRILL:  Okay.  So what I'd like to do is start
10  with the first of those for one moment, and we can go
11  back to the second one, the one, therefore, with the
12  bicyclist in the picture.  I'm not sure which one that
13  is, so -- okay.  Here we go.  On three, two, one.
14      (Video being played.)
15      MR. BRILL:  Pause it there.
16  BY MR. BRILL:
17      Q.  See, right there, you heard someone, which I
18  believe is Officer Wanciak say, "Get on the ground, and do it
19  now."  Yes?
20      A.  Yes.
21      Q.  Is Mr. Eimers complying?
22      A.  Yes.
23      Q.  Now, if that were you at the scene, would have told
24  him to get down on the ground on his stomach like that, or on
25  his knees?

254

1       MR. REYNOLDS:  Objection, form.
2       A.  I would have probably had him prone out on the
3   ground, also.
4       Q.  Despite it being on a sandy surface?
5       A.  Yes.
6       Q.  And why is that?
7       A.  It's a safer position for all of us.
8       Q.  Now, let's go.  (Video being played.)  "Put your
9   hands behind your back."  Pause.  Does he not do so
10  immediately?
11      A.  No, sir, he does not.  His hands are -- he's
12  sitting up on his elbows, from what it appears.
13      MS. LEWIS:  Are you stopping it?
14      MR. BRILL:  I stopped it.
15  BY MR. BRILL:
16      Q.  Okay.  Let's back up again then to the spot where
17  we hear Office Wanciak say --
18      A.  I don't think you have gotten to that yet.
19      MS. LEWIS:  We're at 21 seconds.
20      MR. BRILL:  Can you back up to 33?
21      MS. LEWIS:  I haven't gotten there yet.
22      MR. BRILL:  Oh, wait, I'm at 21.  I'm at 21.
23      MS. LEWIS:  Okay.
24      MR. BRILL:  Sorry.  I was looking at the other
25  number, the one that -- so, 21; three, two, one.

255

1       (Video being played.)
2       THE WITNESS:  Whoever that --
3       MR. BRILL:  Pause it at 29.
4       THE WITNESS:  Whoever that officer was that went to
5   go take him into custody had to swing his arm out from
6   under him.  So it appears that he was up on elbows, and
7   they swung his arm out.
8   BY MR. BRILL:
9       Q.  Did he resist?
10      A.  I can't tell from there.
11      Q.  Okay.  Now, how many -- this reminds me of an
12  extraordinarily cruel version of a joke of how many officers
13  does it take.  What I don't understand is, how many officers
14  did it take to kneel and get on him?
15      Let's look at this point right here, at 29 seconds.
16  Are you 29 seconds in?
17      MR. BURKE:  Object to form.
18      MR. REYNOLDS:  Object to form, move to strike,
19  inappropriate comment of counsel.
20  BY MR. BRILL:
21      Q.  At 29 seconds in, how many officers do you see at
22  or around Eimers at that point?
23      A.  It looks like two by his body, and one off to the
24  right.
25      Q.  Do you have an officer to the right with the

256

1   lettering on the back?  It looks like KWPD probably?
2       A.  Yes.
3       Q.  Now, my understanding is that that's Officer
4   Wanziak; is that correct?
5       A.  I didn't see it from the beginning.  I saw her come
6   around the front side of the car by the pier.  I don't recall
7   where she went to.
8       Q.  All right.  Now, who is the officer that is
9   directly behind Eimers' feet?
10      A.  Don't know.
11      Q.  Not you, though?
12      A.  No, sir.
13      Q.  Who is the officer with the firearm, the rifle, to
14  the left?
15      A.  Officer Del Valle.  Henry Del Valle.
16      Q.  Where are you at this point?
17      A.  Not on scene yet.
18      Q.  Now, I noticed in your training that this year, you
19  took a course involving the number of officers for arrest and
20  detention, to that effect, this year.  Do you remember the
21  name of that?
22      A.  No, sir.
23      Defensive take-down defense and multiple officer
24  suspect control?
25      Q.  Did that teach you as the name implies, how many

257

1  officers should be used in a specific take-down and sequence?
2       MR. REYNOLDS: Objection, form.
3       A. I don't recall.
4       Q. When was it taken?
5       A. In April.
6       Q. Five months ago, roughly? Or, no. Seven months
7  ago? Do you have the raw material from that training?
8       A. I don't recall if I do or not.
9       Q. How many hours was it?
10      A. Two.
11      Q. And you don't recall if -- what it dealt with?
12      MR. REYNOLDS: Objection, form.
13      A. No, it was multiple -- you know, multiple officer
14 arrests, but I don't recall, you know, the specifics of it.
15      Q. How can you implement the training that you got in
16 those two hours just seven months ago, if you don't remember
17 the specifics of it?
18      MR. REYNOLDS: Objection, form.
19      A. I remember the uses, how to do it, but I believe it
20 was only with two officers. Two, and one of them was with
21 three officers.
22      Q. Did they talk about using more than three officers
23 for one person?
24      A. Sir, I can't tell you what they said, but you have
25 to let the situation dictate your tactics.

258

1       Q. In your 11 years, has there ever been a case that
2  you can think of where this many officers were on one man?
3       A. Yes.
4       Q. How many times?
5       MR. REYNOLDS: Objection, form.
6       A. One for sure.
7       Q. What was the nature of that situation?
8       A. The individual was involved with grand theft, and
9  we went to take him into custody on the 200 block of Duval,
10 and he ended putting three of us in the hospital. It ended
11 up, I'd say, at least five or six of us fighting him.
12      Q. How old was the guy?
13      A. A younger man.
14      Q. How big was the guy?
15      A. I don't recall.
16      Q. Did he have a weapon on him?
17      A. No.
18      Q. What's the name of that case, do you remember?
19      A. No, sir, I don't.
20      Q. Do you remember how long ago it was?
21      A. A long time ago.
22      MR. BRILL: Okay. So then let's continue forward
23 with the footages for a couple of seconds, please.
24      THE VIDEOGRAPHER: One second. Could we go off the
25 record for --

259

1       MR. BRILL: Oh, sure.
2       THE VIDEOGRAPHER: Off the video record at 2:43
3  p.m.
4       (Brief recess.)
5       THE VIDEOGRAPHER: Back on the video record at 2:52
6  p.m.
7       MR. BRILL: Thank you.
8  BY MR. BRILL:
9       Q. So up until the point where Mr. Eimers is on the
10 ground on his elbows, head off of the sand, we can see that
11 he was visibly not armed with any weapon, correct?
12      MR. BURKE: Object to form.
13      MR. REYNOLDS: Join.
14      A. I believe he had a jacket on and we couldn't see if
15 he was armed or not.
16      Q. No weapon in his hands?
17      A. No weapon in his hands.
18      Q. His hands were, in fact, empty?
19      A. As far as I know, yes.
20      Q. No suggestion, leading up to this, that he was
21 armed?
22      MR. REYNOLDS: Objection, form.
23 BY MR. BRILL:
24      Q. Correct?
25      A. Unknown.

260

1       Q. Unlike, for example, the call you got later in the
2  day with the fellow with the hand, the exercise item in this
3  hand.
4       MR. REYNOLDS: Objection, form.
5  BY MR. BRILL:
6       Q. Correct?
7       A. Yes.
8       Q. By the way, on that topic, was that particular
9  fellow seized or detained in any way?
10      A. He was detained.
11      Q. But, I mean, seized physically, like Mr. Eimers
12 was?
13      A. I don't believe so, no.
14      Q. How did you approach that man?
15      A. When I got there, he was already compliant and I
16 believe -- I don't remember if someone had him at gunpoint or
17 not.
18      Q. Now, there's a guy that, as we discussed, there was
19 a belief he may have a firearm, threatening passer-bys with
20 it, right?
21      A. Yes.
22      MR. REYNOLDS: Objection, form.
23      Q. And, as far as we know, no one ever ordered him to
24 the ground?
25      A. I believe Officer Galbo was the first person on

21  (Pages 257 to 260)

261

```
 1   scene.  You'd have to ask him.
 2       Q.  But certainly, nobody got a hobble, nobody got put
 3   in a three-point modified pin, nobody forced his arms behind
 4   for a cuff or anything like that, correct?
 5       MR. BURKE:  Object to form.
 6       MR. REYNOLDS:  Objection, form.
 7       A.  Not that I know of.
 8       Q.  As we addressed, he was compliant to -- with the
 9   order by Officer, I believe, Wanziak to get on the ground,
10   correct?
11       A.  Yes.
12       Q.  But when asked to put his arms behind his back,
13   your point is that he didn't comply instantly, right?
14       MR. REYNOLDS:  Objection, form.
15       A.  No, he did not.
16       Q.  So, at that point, one of the officers on the
17   screen grabbed the left arm of Officer -- or, of Mr. Eimers,
18   correct?
19       A.  Yes.
20       Q.  And would it be fair to describe it as forcibly
21   pulling it from the position on the elbows back for a
22   handcuffing?
23       A.  He pulled the arm behind his back.  Whether Eimers
24   volunteered it or not, I don't know.
25       Q.  If it was forcibly that way, would that be painful
```

262

```
 1   for a 61-year old man?
 2       MR. BURKE:  Object to form.
 3       MR. REYNOLDS:  Objection, form.
 4       A.  I don't know.
 5       Q.  Could it be painful?
 6       MR. REYNOLDS:  Objection, form.
 7       A.  Absolutely.
 8       Q.  Is it meant to be painful?
 9       A.  No, sir.
10       Q.  Then when the attempt was made with the other arm,
11   as well, correct?
12       A.  I believe so, yes.
13       Q.  It was ultimately secured?
14       A.  He was not secured.  That was the issue from his
15   resistance.
16       Q.  The right arm — I mean, the arm was ultimately
17   secured?
18       MR. REYNOLDS:  Objection, form.
19       A.  I can't tell you which arm got handcuffed first.  I
20   don't know.
21       Q.  So, then, looking at this footage where we stopped
22   it at about the 29 second mark, if we move forward, let's
23   see, and stop it at 31.  There are now two officers, correct
24   me if I'm wrong, attempting to cuff him?
25       A.  Yes, sir.  It looks like Mr. Eimers, at that point,
```

263

```
 1   threw his right arm up.
 2       Q.  So now, at this point, he's complying with the
 3   effort to handcuff him?
 4       MR. BURKE:  Object to form.
 5       MR. REYNOLDS:  Objection, form.
 6       A.  That's speculative.  I mean, it looks like he just
 7   threw his right arm up.  It looks like it almost hit whoever
 8   that officer is trying to handcuff him.  If you go from 30 to
 9   31, the right arm comes up pretty fast.
10       Q.  Let's go back from 20, roughly 28 — or, let's go
11   back to, pardon me, 26.  It's 26?  This is where the one
12   officer is bent knee, right at the left side of Mr. Eimers.
13   Are you there?  Okay.  And if we move forward through from 26
14   to 31.  On three, two, one.  (Video being played.)
15       A.  I'm not there.
16       Q.  Are you suggesting that that --
17       MS. LEWIS:  Wait.
18       A.  Nothing's played.
19       Q.  Oh, I'm sorry.
20       MS. LEWIS:  I'm not --
21       MR. BRILL:  Usually, that would be me.
22       (Video being played.)
23   BY MR. BRILL:
24       Q.  Are you there?
25       A.  The timing was off.
```

264

```
 1       Q.  Do you want me to go to the second footage instead?
 2       A.  You have to go much earlier.  There you go, from
 3   there.  There's the right arm going back.
 4       MR. BRILL:  You have it there?
 5       MS. LEWIS:  Do you want to play it again?
 6       MR. BRILL:  Yeah.  I was just going to ask if you
 7   could get from 27 --
 8       MS. LEWIS:  I'm on -- maybe I'm on the video that's
 9   been --
10       MR. BRILL:  Oh, you want me to go to -- it doesn't
11   -- well, you tell me which one you're at.  You want to
12   go to the very beginning and look at which you're at?
13       MS. LEWIS:  Here's the one where he gets out of his
14   car.
15       MR. BRILL:  Okay.  With the bicyclist.
16       MS. LEWIS:  Uh-huh.
17       MR. BRILL:  Okay.  That's the one I'm on.  Scroll
18   over to where 26 seconds have elapsed and pause there,
19   and then just go from 26 to -- make it 32.
20   BY MR. BRILL:
21       Q.  And I'd like to know if -- my question will be,
22   watching that portion, Officer Lovette, if it's still your
23   belief that his left and right arm were not forcibly pulled
24   up by the officers present for handcuffing --
25       MR. REYNOLDS:  Objection, form.
```

WWW.USLEGALSUPPORT.COM
1-888-311-4240

265

BY MR. BRILL:

Q.  -- as he laid there otherwise slack.

MR. BURKE:  Object to form.

MR. REYNOLDS:  Objection, form.

(Video being played.)

A.  It looks like he started to comply there, actually, until you got to 35.  To right there.

Q.  When we get -- get to 35.  Now, at 35, how many officers are there still?

A.  Two on him, and one off to the right.

Q.  Now, why does the next officer, the third officer, come in?  Do you know?

A.  I have to see it.

Q.  At 36 --

A.  Right there.  Right there, he escaped his hips.  He turned his -- he turned his entire body towards the restaurant.

Q.  Okay.  You take that to be a resisting maneuver?

A.  He didn't stay in a prone position.  He turned his body away.

Q.  Could it be that the police officer now drags him into that position?

MR. REYNOLDS:  Objection, form.

A.  It could be, yes.

Q.  Now, is that you that's arriving at 39?

266

A.  I'm at 35.  That's me walking up, yes.

Q.  Now, therefore, we have a total of four officers, including yourself?

A.  Yes.

Q.  And it's your testimony that you then get -- kneel down, correct, with your right shin on him?

A.  Across his shoulder and torso, yes.

Q.  Now, we talked about this yesterday, but you're a pretty sizable guy.

A.  Yes, sir.

Q.  You're six-one, about 235?

A.  Six foot, 225.

Q.  Okay.  Was I incorrect to hear six-one, 235 yesterday?

A.  I didn't say that, no.

Q.  Would it be safe to say that your even one knee on this man at the location you have him, served the purpose of pinning his upper body to the ground so he couldn't move?

A.  And the way he's positioned right there, his body is facing towards the restaurant.  He's trying to turn.  So I positioned my knee to put him back down.  His head would have been facing the way I said it was facing, towards the restaurant.  And my body position, to hold him in that position, yes.

Q.  Okay.  At that point, what is the necessity with

267

three other officers present to force him back into the sand?

MR. REYNOLDS:  Object to form.

MR. REYNOLDS:  Objection, form.

A.  To get him -- not forcing him back in the sand, but forcing back in a prone position so he could properly handcuffed.

Q.  Well, and that's what I want to know.  Isn't the prone position into the sand?

MR. REYNOLDS:  Objection, form.

A.  His body, yes.

Q.  Okay.  If we move forward more.  We're at 46, 47.  She turns away to see all the lights.  Coming up to 52, 53, 54, and it ends.

A.  I think he just kicked K.A.

Q.  On the one I'm looking at, I don't -- I'm not -- it's not panned back.

MR. REYNOLDS:  I'm sorry.  What did you say?  I heard you say something.

THE WITNESS:  I said it looked like he kicked K.A.

MR. REYNOLDS:  Okay.

BY MR. BRILL:

Q.  He looked like -- where do you want me to go back to?

A.  At the very end, right before it pans, when he -- when his body's flipping, it looks like, at one point, he

268

kicked -- I assume that K.A., Officer Wanciak.

Q.  All right.  I'm at 45.  Is there a section, a second?  And I want to be for the camera and for you.  Is there a spot you want me to look at?

A.  There's his legs, just his legs kicking.

Q.  Okay.  So then if we then go to the other image, and footage, and we get to -- I'm going to stop at 12.  That's you standing up towards the back.  You have not yet kneeled.

And we go back to the point where it pans back to the other side.  I'll get there.  Okay.  Now, at 29, let me know when you're there.  I paused it at 29.  Okay.  Are you, at 29, is that your body that's still at the top of Eimers' head?

A.  That's my left knee on the ground, and my right knee across his torso.

Q.  Who else is still present?

A.  I don't know.

Q.  At this point, the hobble has not yet been placed; is that correct?

A.  No, sir.

Q.  On three, ready?  One -- is that correct?  That the hobble had not yet been placed?

A.  No, it had not.

Q.  On three, two, one.  Now, there, if we stop it at

269

1 36 — or, 38, I'm sorry.  How many officers are present?

2    A.  It still looks like three on his body.

3    Q.  And am I correct that now Eimers' body has been

4 moved by the officers, rotating it counter-clockwise.  Isn't

5 that correct?

6    A.  It looks like he's on his side.  I can't tell you

7 which way he's facing.

8    Q.  But compared to the direction his body was moments

9 ago, it appears it was moved counter-clockwise a bit.  Let's

10 back up, if we could —

11    A.  I don't know.

12    Q.  — to 31, and see where his legs are, and the

13 positioning of the police officers there.

14     Do you see that — 31, let me know when you're

15 there.  And on three, when you're ready.  Tell me when you're

16 ready, Jeannete.

17    MS. LEWIS:  Okay.

18 BY MR. BRILL:

19    Q.  Three, two, one, let's move it.  Watch the movement

20 of the officers and Eimers' body moving counter-clockwise.

21 Do you see that?

22    A.  It looks like he flipped over.

23    Q.  The legs are now positioned, and if we stop it at

24 45, more left to right than facing me, correct?

25    MR. REYNOLDS:  Objection, form?

270

1 BY MR. BRILL:

2    Q.  Yes?

3    A.  Yes.

4    Q.  Now, there seems to be another officer arriving on

5 Mr. Eimers, isn't there?

6    A.  Yes, between the PT Cruiser and the group of

7 people.

8    Q.  And there is someone at second 45 at Mr. Eimers'

9 feet.

10    A.  That looks like Officer Del Valle, who didn't

11 arrive -- he was on scene the entire time between the PT

12 Cruiser and the crowd.  And at his feet, I would -- I'd

13 venture to say that's Officer Calvert.

14    Q.  So how many people are now on Eimers?

15    A.  It still looks like three.

16    Q.  Let's back up one more time, because I believe that

17 there are four, and then ultimately five.

18    MR. REYNOLDS:  Move to strike.

19 BY MR. BRILL:

20    Q.  Okay.  Let's see there.  We have Garrido at the

21 cuffs, correct?

22    A.  I can't see.  I'm looking at a mound of people.

23    Q.  Well, the people that you know were there, you know

24 Garrido had his hand stuck in the cuff?

25    A.  Yes, I do.

271

1    Q.  And that occurred just before the hobble was

2 placed?

3    A.  Yes.

4    MR. REYNOLDS:  Objection, form.

5    Q.  You have K.A. Wanciak present, you have you, and

6 then you have an officer that's coming from the PT Cruiser,

7 lifts up the PT Cruiser's.

8    A.  Sir, you're explaining stuff I'm not seeing right

9 now.  You're watching the video.  I'm looking at a paused

10 screen.

11    Q.  Okay.  Can you go back for me to 32?  Okay.  And

12 there's — are you at 32 or 33, and there's someone opening

13 the back of the PT Cruiser's door?

14    A.  You've got two officers there.  I couldn't tell you

15 exactly who they were.

16    Q.  And this officer now is just going to the feet.

17 There are five officers on Mr. Eimers; is that correct?

18    MR. BURKE:  Object to form.

19    MR. REYNOLDS:  Objection, form.

20    A.  Yes, four.

21    Q.  Five.

22    MR. REYNOLDS:  Objection, form.

23 BY MR. BRILL:

24    Q.  Am I correct?  One at the foot that came from the

25 -- you saw the person come from the -- officer come from

272

1 the PT Cruiser?

2    MR. REYNOLDS:  Wait.  It's paused.  It stopped

3 again.

4    A.  Your video is all over the place over here.

5    Q.  Do you see the officer come from --

6    A.  Yes, I'd say there's five.  It's -- I thought

7 Officer Calvert was there, but then another set of legs

8 popped out.

9    Q.  And now, looking at this, I ask a question I asked

10 earlier.  Do you believe that that is an appropriate number

11 of officers for one 61 year-old man on the beach to be

12 handcuffed?

13    MR. BURKE:  Object to the form.

14    MR. REYNOLDS:  Objection, form.

15    A.  A man resisting the way he was, it took that amount

16 of officers to take him into custody.

17    Q.  And your testimony here today is that that was in

18 compliance with all of the training that you have gotten in

19 your career through the Key West Police Department?

20    A.  To me, his response resistance, I believe an

21 appropriate number of officers were used.

22    Q.  And you wouldn't change anything about what you did

23 that day?

24    A.  No.

25    Q.  Now, on the screen, if you could go to 41.  Let me

273

1  know when you're there, and just freeze it, if you could.
2      MR. BRILL:  Got it?
3      MS. LEWIS:  Uh-huh.
4  BY MR. BRILL:
5      Q.  On the left of the screen, all the way at the left,
6  there's a man in a -- it looks like --
7      MR. REYNOLDS:  Wait.  She's, I think, repositioning
8  it now.  What second number?
9      MR. BRILL:  41 elapsed, with 12 remaining.
10     A.  I think he's talking about that, a different time.
11  The man with the video?
12     Q.  Yes.  There's a man with, it looks like, dark hair,
13  maybe jeans and a long shirt with a hood, who is at or near
14  this concrete block with a -- it looks like a light post
15  right near the -- I guess it would be the -- across from the
16  rocks or debris at the beach edge, obviously closer than the
17  person who's recording the footage we're watching.
18     A.  Yes, sir.
19     Q.  And he has what appears to be a recording device in
20  his hand, does he not?
21     A.  Yes, sir.
22     Q.  Who talked to him?
23     A.  I don't know.
24     Q.  What if I were to tell you that it's -- that there
25  is a witness who says that a Key West Police Officer

274

1  confronted this man at the scene, took this man's phone with
2  the footage, or camera, because it looks like it's actually a
3  handheld camera, and deleted all of the footage that he had.
4  Do you know anything about that?
5      MR. BURKE:  Object to form.
6      MR. REYNOLDS:  Objection, form.
7      A.  No, sir.
8      Q.  And if that's true, what do you think of that?
9      MR. REYNOLDS:  Objection, form.
10     A.  If that's true, that's an integrity issue.
11     Q.  Do you know where that footage is?
12     A.  No, sir.
13     MR. REYNOLDS:  Objection, form.
14     Q.  Do you know anyone that secured that as evidence in
15  this case?
16     A.  No.
17     Q.  Have you seen it ever?
18     MR. REYNOLDS:  Objection, form.
19     A.  No.
20     Q.  Do you know what it shows?
21     MR. REYNOLDS:  Objection, form.
22     A.  No.
23     Q.  All right.  Do you -- have you seen any evidence or
24  any material whatsoever that identifies whether anyone even
25  communicated with that man, took a statement, or procured his

275

1  contact information?
2      A.  Not that I know of; no, sir.
3      Q.  And at that time, we see all the police units that
4  are present on the street, correct?
5      A.  Yes.
6      Q.  Key West Police Department had this scene under
7  control, subsequent to the detention of Mr. Eimers, correct?
8      MR. BURKE:  Objection to form.
9      MR. REYNOLDS:  Join.
10     A.  Yes.
11     Q.  And had the ability to and, in fact, did procure
12  statements from other people, correct?
13     A.  Yes.  I know there were witness statements taken.
14     Q.  And there was, in fact, the ability, therefore, to
15  take this particular unknown male with the camera's statement
16  and secure his footage, but we don't have that.  Fair?
17     MR. BURKE:  Object to form.
18     MR. REYNOLDS:  Objection, form.
19     A.  Yes.
20     Q.  There was also some camera footage at the
21  restaurant.  Did you know that?
22     A.  No, sir.
23     Q.  Someone on behalf of Key West Police Department
24  purportedly looked at itm and said it didn't actually show
25  anything, but didn't save that.  Did you know that?

276

1      MR. REYNOLDS:  Objection, form.
2      A.  No.
3      Q.  If there is, in fact, footage that would be at a
4  potential scene, or at a scene that could potentially show
5  something, but doesn't, is it the practice of Key West Police
6  Department, by standard protocol or procedure, to nonetheless
7  not secure the footage and just take -- we're supposed to
8  take their word for it that it didn't show anything of value?
9      MR. BURKE:  Objection to form.
10     MR. REYNOLDS:  Objection, form.
11     A.  That's not my call.  No, that's not a common
12  practice.
13     Q.  You should secure it even if it doesn't show the
14  scene, just to be able to prove what it did show?
15     MR. REYNOLDS:  Objection, form.
16     A.  Yes.
17     Q.  Just a last few.  One last question about this
18  footage that you saw.
19     Is it your contention that not a single screen of
20  this footage shows you having two knees or your full body
21  weight on Mr. Eimers?
22     MR. REYNOLDS:  Objection, form.
23     A.  No.
24     Q.  I'm sorry.  I'll ask you to clarify.
25     When you say no; no, it isn't your contention, or,

**WWW.USLEGALSUPPORT.COM**
**1-888-311-4240**

277

no, you didn't have your knees?

A. No, I never put both knees on Mr. Eimers.

Q. Did you testify at the grand jury?

A. Yes, I did.

Q. Are you allowed to get your testimony from the grand jury?

A. I'm not --

Q. Do you know?

A. I'm not sure.

Q. Did you have any role in the hiring of the so-called use-of-force expert that testified in the grand jury?

A. No, sir.

Q. Do you know why an expert in the use of force was not retained to testify relative to the use of force from Mr. Eimers' perspective, but only to the police officer's perspective?

A. No.

MR. REYNOLDS: Objection, form.

MR. BRILL: Can you go back to the footage? Or, I can show it to him. I'm going to show one last spot. Can you zoom in? This is at the very, very last frame.

MR. REYNOLDS: Wait a minute. Wait, wait.

MR. BRILL: I'll give this to you in just a second.

MR. REYNOLDS: I understand. I just want him to be able to see it.

278

MR. BRILL: Absolutely. I'm going to give him my laptop so we don't have the technical thing. I'm just going to show it here, unless you have it up on the screen already. Okay, cool. The very, very last frame, frame 54 seconds.

MR. REYNOLDS: Okay. Just a second.

MR. BRILL: Let me know when you're ready.

BY MR. BRILL:

Q. And as she readies that for you, it's the very last frame. I'm going to have it on the footage. What I want to know is, do you agree that it would be inappropriate and excess use of force to have two knees on Mr. Eimers?

MR. BURKE: Object to form.

MR. REYNOLDS: Join.

A. Depending on how he was positioned, you know, I didn't have two knees on him, but if they were, it depends on the situation.

MR. BRILL: I can show him mine if you don't have it ready.

MS. LEWIS: From 52:10?

MR. BRILL: Just -- no, just stop at the last frame, at 54 seconds. Just freeze it.

BY MR. BRILL:

Q. Here, let me give it to you. I'm going to --

A. I saw it. It looked like I was on -- my both knees were

279

on the ground and I was raising my right knee back up to place it on his body, because his body was kicked out there.

Q. I'm going to point to it on the screen here, and then I'll bring mine over to you.

A. That's fine.

Q. This particular person right here appears to have -- I have no other way to do it than -- two knees on the person. I'm going to point to this same individual to Officer Lovette, and make sure we can identify who that individual is, and if they two knees, in fact, there.

MR. REYNOLDS: Objection, form.

BY MR. BRILL:

Q. So we know we're looking at the same thing.

A. Oh, your screen's much nicer.

Q. Oh, thanks. This guy right here.

A. I don't know who that is.

Q. That is not you?

A. No, I'm to the left.

Q. That's you to the left of him?

A. That's me.

Q. Does that appear to be, to you, two knees by that person on Mr. Eimers?

A. I can see one leg there. It looks like the person is sitting. It looks like this person here, it looks like that's their leg, and they have a knee bent here. I can't

280

tell. I can see one leg here, but I can't see where their other leg is. And that's my right knee, and my left knee's on the ground.

Q. If that is a person with two knees bending like this, and we can rewind it --

A. Eimers' legs look like they're facing --

Q. To the right?

A. Yeah.

Q. Agreed. And if we --

A. And someone's pressed out here.

No offense, your computer's much better.

Someone -- there's one knee down there, and one pushed out.

Q. Uh-huh.

A. I don't know who that was.

Q. And this is two knees by one person, isn't that right here?

A. Can you back up a little bit?

Q. Sure.

MR. REYNOLDS: Objection, form.

MR. BRILL: Bring it all the way back.

A. It looks like whoever that is, is standing up. They're standing up, but they're over that person. It looks like Mr. Eimers is, what did you say, counter-clockwise, cocked back.

281

Q.  You don't think there are two knees on him?

A.  I can't tell.

Q.  If there were actually two knees on him, would that be proper or excessive use of force?

MR. REYNOLDS:  Objection, form.

A.  If he was rolling over, it looks like they would have been getting pushed over.  They might have just been trying to maintain their balance, but I can't speak for that officer.

Q.  Would it be proper or improper?

MR. BURKE:  Object to form.

BY MR. BRILL:

Q.  Or excessive?

MR. REYNOLDS:  Objection, form.

A.  If they stuck both knees in his back, that would be -- you know, that seems like it would be a little excessive.

Q.  Off this topic now, and just to conclude, I just have a series of questions and I'll be done.

You mentioned earlier, touched on it briefly, but there was this -- everybody had the same language at the beginning of the reports where you -- it says to the effect of how you have been ordered to do this report, you're doing the reports under potential penalty of being terminated.  What was that about?

A.  That was --

282

MR. REYNOLDS:  Objection, form.  If he's asking you what your PBA attorney told you, then he's not meaning to do that and --

MR. BRILL:  Right.

BY MR. BRILL:

Q.  I mean, did that come from the department -- okay.

A.  The attorney.

Q.  Did anyone ever give -- you obviously know what the Miranda rights are.  You've issued them enough in your career, I'm sure.

A.  Yes.

Q.  Were you ever Mirandized?

A.  No.

Q.  In your report, everybody writes to the effect of —

A.  Excuse me one second.  I may have at FDLE.  I'm not sure.  During my FDLE interview, I don't recall if I was or not.

Q.  It says to the effect in these reports, "It's my understanding that by refusing to obey the order to write this report that I can be disciplined for insubordination, with the punishment up to including termination.  This is made only pursuant to such orders," and on and on about punishment.

My question is, who ordered you?

283

A.  To write the report?

Q.  Yes.

A.  I believe it was Captain Smith.

Q.  Do you know why he ordered -- he had to order you?

MR. REYNOLDS:  Objection, form.

A.  No.

Q.  Were you not going to write a supplemental report absent that order?

A.  At that time, I don't know what we were going to do.

Q.  Why was it written five days later, the reports, and not that day?

A.  I don't know.

Q.  And what's the point of that whole preparatory paragraph there?

A.  I don't know.

Q.  If you believed then and now that you were in the right, why is there a need to wait to write the report?

MR. BURKE:  Object to form.

MR. REYNOLDS:  Objection, form.

A.  I don't know.

Q.  So why not write it up the same day?

MR. REYNOLDS:  Objection, form.

A.  That wasn't what we were told.

Q.  You had immediate contact with someone?  This is —

284

you're saying you had contact with a PBA lawyer that day?

A.  Yes.

Q.  Was that your decision, or was that decision made for you, to contact your PBA lawyer?

A.  That decision, we were told to contact them and see what their advice was.

Q.  And who advised you to do that?

A.  I don't recall.

Q.  When did you learn of the tourist footage?

A.  I don't recall.

Q.  After you wrote that report, though?

A.  I don't -- I don't remember, sir.

Q.  Was Michael Burke ever your lawyer?

A.  I believe so.

Q.  Have you had conversations with Mr. Burke after he's no longer been your lawyer?

A.  Not about this case, no.

Q.  What did you do when you learned of the tourist footage?

MR. BURKE:  Learned of what now?

MR. BRILL:  The tourist footage.

MR. BURKE:  Thank you.

MR. BRILL:  You're welcome.

A.  I don't -- nothing.

Q.  Did you say anything to anyone or write anything to

27  (Pages 281 to 284)

285

anyone about what you saw in that footage?

A. Not that I recall.

MR. BRILL: Okay. I have nothing further for you. I appreciate the time.

MR. BURKE: I have a few questions.

CROSS-EXAMINATION

BY MR. BURKE:

Q. Officer --

MR. BURKE: Are we back on the video record and everything's good? All right.

BY MR. BURKE:

Q. Officer Lovette, again, Michael Burke. A few questions for you.

On Thanksgiving Day, 2013, were you employed by the City of Key West as a police officer?

A. Yes, sir.

Q. At that time, were you a certified law-enforcement officer, certified through the Florida Department of Law Enforcement?

A. Yes, sir.

Q. For how long had you been a certified law enforcement officer back in Thanksgiving of 2013?

A. I believe a little over 11 years.

Q. And what shift were you working on Thanksgiving Day, 2013?

286

A. Bravo, days.

Q. And Bravo, that's the "B" shift?

A. Yes, sir.

Q. And your day shift, when does it start, and when does it end, approximately?

A. 6:00 a.m. to 6:00 p.m.

Q. And during the course of your shift on Thanksgiving Day, 2013, you came to learn of a matter involving someone who you later learned was Charles Eimers; is that right?

A. Yes, sir.

Q. How did you come to be aware of this incident?

A. He fled on a traffic stop and it was called out over the radio.

Q. It was -- was it your understanding that Mr. Eimers had stopped in response to a marked police unit?

A. Yes, sir.

Q. And was it your understanding that Mr. Eimers had fled the scene after being stopped by a marked police unit?

A. Yes, sir.

Q. That's a felony, isn't it?

A. Yes, sir.

Q. With respect to the radio transmissions concerning that, did you position your vehicle in an effort to apprehend the person who you later learned was Charles Eimers?

A. Yes, sir.

287

Q. Where did you position your vehicle?

A. I was on the outbound lane parked in a legal parking spot at the intersection of Truman and White.

Q. And did you wait at that location?

A. I did.

Q. And did anything ever happen that caused you to leave that location?

A. When Mr. Eimers came past my location, I initiated a traffic stop.

Q. And when you saym initiated a traffic stop, does that mean that you started your vehicle forward?

A. I made a U-turn, turned on my lights and sirens in an attempt to stop Mr. Eimers.

Q. Did Mr. Eimers stop his vehicle?

A. No, sir.

Q. Did you subsequently turn off your lights and siren?

A. Yes, sir.

Q. And approximately where did you do that, if you recall?

A. As I was approaching Windsor, Windsor Lane and Truman Avenue.

Q. And what did you do then after you turned off your lights and siren?

A. Officer Del Valle picked up behind Officer -- or,

288

behind Mr. Eimers and attempted to do a traffic stop on him, and I had disengaged my lights and sirens, and I called out their position and their movements.

Q. You called that over the radio?

A. Over the radio; yes, sir.

Q. All right. So, and then did you continue to follow in some way to try and see where Mr. Eimers was going?

A. In an attempt. Mr. Eimers was going at a speed that I couldn't -- I wouldn't keep up. It was -- that would have been a pursuit. So I followed as far as I could see him, and I was calling out his position as far as I could see him.

Q. Did you observe Mr. Eimers go through traffic control devices?

A. Yes, sir.

Q. Did you observe Mr. Eimers speeding in his vehicle?

A. Yes.

Q. At this point in time, did you know anything at all about Mr. Eimers as to why Mr. Eimers would be fleeing from the police?

A. No, sir.

Q. Did you know anything about his background in terms of his criminal history, whether there was a warrant for his arrest, or anything of the kind?

A. No, sir.

289

Q. All right. You tell us then what you did. You continued at some distance, calling out information, and then did what?

A. Mr. Eimers traveled down Truman Avenue to Fort Street, which is the last street before the military fence.

Q. Did you say Fort?

A. Fort Street, yeah. He made a right turn, which would have been northbound on Fort Street. At that point, I was approaching Emma Street, which is a parallel street to Fort. I made a right turn northbound on Fort -- or, on Emma Street, calling it out. You know, I couldn't see where he was, but I knew the direction of travel.

As I was approaching the intersection of Petronia and Emma, Fort Street turns into Geraldine, not that end, but turns into Geraldine and comes back at Emma Street. Mr. Eimers came through there, almost hit me head on, continued past me.

By the time I was able to make a three-point turn and turn around to see his location, he had already approached Amelia Street, which was six blocks away.

Q. Were you in a marked police vehicle?

A. Yes, sir.

Q. All right. And as Mr. Eimers, in his vehicle, got up to Amelia Street, what did you observe?

A. He made a left turn outbound on Amelia Street.

290

Again, I had to stop at Olivia Street, I had to stop at Truman Avenue. I got to Amelia Street, made a left-hand turn at that point. I had lost sight of Mr. Eimers. He had crossed over Thomas, Whitehead, and then he was on Duval.

I don't know officers picked him up, but they called out, you know, Eimers made a right-hand turn southbound on Duval.

I believe I called out over the radio that I was heading -- I was going to parallel on Whitehead Street. I made a right-hand turn southbound on Whitehead Street and continued to follow. And by the time I hit South, which would be about the Southernmost Point, they had -- someone had called out that he had driven up on the beach.

Q. And Duval ends, the south part of Duval ends at the Southernmost Cafe?

A. Yes, sir.

Q. And there's a beach in front of that restaurant, and along the side of it as well?

A. Yes, sir.

Q. And what did you do then after you heard this on the radio that Mr. Eimers had brought his vehicle to a stop near the Southernmost Cafe?

A. When he drove it up on -- my first thought was that he ran people over, but I got there. I was a block, I guess a block and-a-half away. I pulled up. I got out of my

291

vehicle and I started heading towards their location where they were dealing with him.

Q. So you stopped your vehicle about a block and-a-half away?

A. No, no. I was about a block and-a-half away when I heard them call out he had driven up on the beach.

Q. Okay.

A. So I was -- you know, if I was at the Southernmost Point, the only stop sign would have been at Duval.

Q. And you brought your vehicle to where?

A. I drove it onto the, I guess it would be the 1400 block right there by Southernmost Cafe. I don't know where I parked it or where I placed it.

Q. And were your lights and siren activated as you pulled up there?

A. No, sir.

Q. Do you know if your vehicle was facing the Southernmost Cafe or in a different direction?

A. I don't know if I had pulled into a parking spot. I don't know if I had just pulled up to the street and I got out of the vehicle. I couldn't tell you where my final stop was.

Q. I think you described earlier that you bailed out of the vehicle?

A. Yes.

292

Q. What does that mean?

A. Just, I got out of the vehicle very quickly.

Q. And what did you do?

A. I approached. I came up through the main gate of Southernmost Beach Cafe, came around. There's a stack of chairs. As I came around, I encountered Mr. Eimers and engaged him.

Q. Where was Mr. Eimers when you first saw him then outside of his vehicle?

A. On the ground.

Q. And was he -- was he prone then on his stomach?

A. He was on his stomach. I don't know if he was flat-out with his arms out or not. I don't recall if they were already attempting to handcuff him or not.

Q. Can you recall any of the officers that were there as you approached?

A. I remember Gabe being there from the handcuff incident.

Q. Officer Garrido?

A. Yes, sir; I'm sorry.

Q. Okay. Anyone else that you can specifically recall?

A. From the beginning or from the entire incident?

Q. As you put —

A. As I approached, I remember Officer Garrido being

29  (Pages 289 to 292)

293

there. I can't remember who else. I remember, you know, Officer Del Valle being there, but I can't remember at what point he was there.

Q. All right. And as you came upon the scene there, what was your intention as you approached Mr. Eimers?

A. To assist them in placing him in the handcuffs, taking him into custody.

Q. Now, over the course of your 11 years prior to this, had you made a number of arrests?

A. Yes, sir.

Q. Can you give us any approximation?

A. High hundreds.

Q. Okay. And have you had occasions where in arresting someone you do so without the use of any force, other than the handcuffing of the person?

A. Many times.

Q. Is handcuffing a person, is that a standard procedure when someone is being arrested?

A. Yes.

Q. And would it be consistent, would it be proper, at least in your mind, where someone had fled and alluded from the police in the manner in which Mr. Eimers had, to place him in handcuffs, as opposed to having him sit in his car, for instance?

A. Yes, sir.

294

Q. All right. And have persons who you have arrested before complied with directions to put their hands behind their back to allow handcuffing?

A. Yes.

Q. And have you handcuffed persons before who were required to get down flat on the ground so that they could be handcuffed?

MR. REYNOLDS: Objection, form.

Q. The ground, in fact, acts like another person, does it, to help the officer?

A. Yes.

Q. Someone can't go through the ground?

A. Correct.

Q. It restricts their ability to flee and move or to injure you?

A. Correct.

Q. And when you approached Mr. Eimers, what can you recall you did initially?

A. I remember just seeing where the people were positioned and trying to take him into custody. And I saw that his upper torso and head, if I could control that, that it would help control his body, because, as from the video you saw, he was moving back and forth.

Q. When you approached Mr. Eimers, was he resisting

295

attempts to place him in handcuffs in any way?

A. Yes.

Q. What was he doing that you observed that amounted to resistance at that point?

A. He was kicking and trying to, for lack of a better term, escape his hips. He was trying to turn hips out to either turn around or turn over.

Q. And do you recall whether a handcuff had been placed, a cuff had been placed on either of his wrists at the point you first arrived?

A. No, sir, I don't remember.

Q. All right. And where did you position yourself then in an effort to assist in handcuffing and detaining Mr. Eimers?

A. His upper body.

Q. As you have just been describing?

A. Yes, sir.

Q. And if I understand that correctly, you attempted to use one of your legs or shins to keep him from moving his upper body and spinning out of the position he was in?

A. Yes, sir.

Q. And then you put your other leg in a position to where his head would not be able to turn back towards the officers?

A. Or down into the sand; yes, sir.

296

Q. As I understand it, while you were there, you were very close to Mr. Eimers?

A. Yes, sir.

Q. And you told us that his head was positioned towards the South Beach Cafe?

A. Yes, sir.

Q. Was Mr. Eimers saying anything during the course of efforts to place him under arrest?

A. When we were telling him to stop resisting, he was telling us no.

Q. The audible sound, "no"?

A. Yes.

Q. At any time while you were there by Mr. Eimers, did he ever give any indication to you that he was having any difficulty breathing?

A. No.

Q. Do you know who placed the handcuffs on Mr. Eimers?

A. No.

Q. If I understand it, at some point in time, you removed you Taser from its holster; is that correct?

A. Yes.

Q. Did you fire that Taser?

A. No.

Q. At any point in time, did you punch or strike Mr. Eimers?

30 (Pages 293 to 296)

297

1      A.  No.

2      Q.  At any point in time, did you kick Mr. Eimers?

3      A.  No.

4      Q.  At any point in time, did you attempt to choke Mr.

5  Eimers?

6      A.  No.

7      Q.  Did you see anyone else punch or strike Mr. Eimers?

8      A.  No.

9      Q.  Did you see any of the other officers kick Mr.

10  Eimers?

11      A.  No.

12      Q.  Did you see any of the other officers choke Mr.

13  Eimers?

14      A.  No.

15      Q.  Did you see any of the other officers have a Taser

16  out of its holster?

17      A.  No.

18      Q.  There came a point in time that an attempt was made

19  to lift Mr. Eimers to walk him to one of the police vehicles;

20  is that correct?

21      A.  Yes.

22      Q.  And it was discovered that he was in need of

23  medical attention?

24      A.  Yes.

25      Q.  Was — what was done then to provide — to take

298

1  care of Mr. Eimers?

2      A.  He was immediately placed on the ground on his

3  back.  I believe the handcuffs were taken off, and we exposed

4  his chest so that we could start lifesaving techniques.

5      Q.  Who did that?  Who assisted with those, as you say,

6  lifesaving techniques?  Did you see that?

7      A.  I unbuttoned his denim jacket, and I cut off his

8  shirt.  And then Officer Celcer and Officer Henry Del Valle

9  started lifesaving techniques.  And I believe Officer Wallis

10  ran to the restaurant and retrieved an AED.

11      Q.  An AED is a machine like a defibrillator?

12      A.  Yes, sir.

13      Q.  Did you stay there while Officer Celcer and Del

14  Valle did CPR and ventilated Mr. Eimers?

15      A.  I don't recall if I did.  I think when rescue

16  showed up, I assisted them with getting their gear.  I

17  believe fire got there first actually.

18      Q.  When you say, "getting there gear," you mean the

19  fire department?

20      A.  The — no, the fire — not — the EMTs.

21      Q.  Okay.

22      A.  Helping them get their gear.

23      Q.  Bringing the gear from the car out to the sandy

24  area?

25      A.  Yes, sir.

299

1      Q.  Do you know for certain that you turned your Taser

2  on, I mean, activated it, when you took it out of its

3  holster?

4      A.  No, sir.

5      Q.  The Taser has a button or some kind of device —

6      A.  A switch.

7      Q.  A switch.

8      A.  Yes, sir.

9      Q.  Your habit is, when you put it into the holster, is

10  to turn the switch, to turn it, if you had previously

11  activated it?

12      A.  Either shut it off as I'm putting it in, or when

13  you put it in, if you fully secure it, it will shut off.

14      Q.  Did you stay there while rescue removed Mr. Eimers

15  from the beach and took him to Lower Keys Medical Center?

16      A.  I don't believe I was still on scene when he left.

17      Q.  You were called — you were sent to another call?

18      A.  I believe so.

19      Q.  Did you have anything to do with the efforts to use

20  the AED?

21      A.  No.

22      Q.  After the call — where was that again, Northside

23  Drive?

24      A.  Yes, sir.

25      Q.  After that call, where did you go?

300

1      A.  I don't remember.

2      Q.  All right.  Did there come a point in time that day

3  where you test-fired the Taser?

4      A.  Yes, sir.

5      Q.  Where did you do that at?

6      A.  I don't recall.

7      Q.  And why was the Taser test-fired?

8      A.  Because of the incident at the beach and the sand,

9  I wanted to make sure that it was still properly working.

10      Q.  And did it function?

11      A.  Yes, sir.

12      Q.  Other than test firing the Taser, did you do

13  anything else with the Taser that day before you turned it

14  over to Sergeant Williamson?

15      A.  No, sir.

16      Q.  Do you know if Sergeant Williamson requested the

17  Tasers of the other officers as well?

18      A.  I don't know.

19      Q.  Do you recall how much time elapsed approximately

20  between the time you first arrived on scene and were next to

21  Mr. Eimers, and when an effort was made to raise him up and

22  walk him to the vehicle?

23      A.  No, sir.  It wasn't very long.

24      Q.  Was it a short period of time?

25      A.  Yes, sir.

31  (Pages 297 to 300)

301

1   Q.  Was it less than five minutes?
2   A.  I would probably say that's a good time frame.
3   Q.  I'm sorry?
4   A.  I would probably say that's a good time frame.
5   Q.  The training, I think it's Plaintiff's Exhibit
6   Number 2, the Training Summary that's in front of you.
7   A.  Yes, sir.
8   Q.  Could you tell us, please, in the year of 2013,
9   does it show the actual dates that you -- that the training
10  took place?
11  A.  Yes, sir.
12  Q.  Prior to Thanksgiving of 2013, but in 2013, how
13  many training courses had you completed that year?
14  A.  Thirteen.
15  Q.  And how many courses the prior year, 2012?
16  A.  Nine.
17  Q.  If at any time Mr. Eimers had indicated in some way
18  to you that he was having difficulty breathing, what, if
19  anything, would you have done?
20  A.  We would have assisted him.  We would have
21  positioned him that he would have been able to breath, but
22  still been taken into custody.
23  Q.  When you were dealing with Mr. Eimers in attempting
24  to restrain him and place him under arrest, did you know
25  anything at all about his medical condition?

302

1   A.  No, sir.
2   Q.  When you're attempting to arrest someone, is your
3   actions dictated by their actions?
4   A.  Absolutely.
5   Q.  So, in other words, if that person resists, even if
6   they're older or heavier or have some sort of underlying
7   medical condition, is it part of your job to get control of
8   them, even though they have those conditions?
9   A.  Yes.
10  Q.  With respect to your use of a -- the Taser video to
11  document things, has that generally been done after a suspect
12  is detained and in custody?
13  A.  Or prior, prior to taking them into custody; or
14  getting a witness statement we've recorded.
15  Q.  When you were -- when you were dealing with Mr.
16  Eimers, what were you focused on trying to do?
17  A.  Get him into custody as quick as possible.
18  Q.  Do you make it a practice of filming the people
19  that you handcuff as you are handcuffing them?
20  A.  No, sir.
21      MR. BURKE:  Thank you, sir.  That's all the
22  questions I have at this time.
23      MR. REYNOLDS:  I don't have any questions.
24      MR. BRILL:  No redirect.  Do you want to talk about
25  reading?

303

1       MR. REYNOLDS:  Yes.  Thank you.
2       MR. BRILL:  Oh, wait.  Oh, you know what.  I do
3   have one.  One question.  I apologize.
4       REDIRECT EXAMINATION
5   BY MR. BRILL:
6   Q.  Did Mr. Eimers deserve to die for his felony
7   traffic violation?
8       MR. BURKE:  Object to the form.
9       MR. REYNOLDS:  Objection, form.
10  A.  Mr. Eimers put himself in that situation.
11  Q.  That's not what I asked.
12      Did he deserve to die for a felony traffic
13  violation?
14  A.  For a felony traffic stop, no.
15      MR. REYNOLDS:  Objection, form.
16      MR. BRILL:  Thanks.  That's all I have.
17      MR. REYNOLDS:  He'll read.
18      THE VIDEOGRAPHER:  Off the video record at 3:53
19  p.m.
20      (The deposition was adjourned at 3:53 p.m.)
21
22
23
24
25

304

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MONROE )

I, Suzanne F. Ex, Certified Verbatim Reporter,
Florida Professional Reporter, Notary Public, State of
Florida, certify that GARY LEE LOVETTE personally appeared
before me on the 3rd and 4th day of November, 2014, and was
duly sworn.
    Signed this 12th day of November, 2014.

_Suzanne F. Ex_

Suzanne F. Ex, CVR-M, FPR
Notary Public, State of Florida
Commission No.:  FF015913
Commission Expires:  July 27, 2017

305

## CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF MONROE )

I, Suzanne Ex, Certified Verbatim Reporter and Florida Professional Reporter, certify that I was authorized to and did report the deposition of GARY LEE LOVETTE, pages 1 through 303; that the review of the transcript was requested; and that the transcript is a true record.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 12th day of November, 2014.

_Suzanne F. Ex_
Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter-Master
Florida Professional Reporter

306

## WITNESS NOTIFICATION LETTER

November 12, 2014

Gary Lee Lovette
c/o Lyman H. Reynolds, Jr., Esquire
Roberts Reynolds Bedard & Tuzzio, PLLC
7501 Wiles Road, Suite 201
Coral Gables, Florida 33067

RE: Treavor Eimers vs. City of Key West, et al.
Deposition Taken November 4, 2014
U.S. Legal Support Job No. 1186137

The transcript of the above-referenced proceeding has been prepared and is being provided to your office for review by the witness.

We respectfully request that the witness complete their review within 30 days and return the errata sheet to our office.

Sincerely,

_Suzanne F. Ex_
U.S. Legal Support, Inc.
One Southeast Third Avenue, Suite 1250
Miami, Florida 33131
(305) 373-8404

CC via transcript:

David W. Brill, Esquire
Jeannete C. Lewis, Esquire
Robert J. McKee, Esquire
David Paul Horan, Esquire
Darren M. Horan, Esquire
Michael T. Burke, Esquire

307

## ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT – ENTER CHANGES ON THIS PAGE

IN RE: Treavor Eimers vs. City of Key West, et al.
Gary Lee Lovette
November 3 & 4, 2014

| Page No. | Line No. | Change | Reason |
|---|---|---|---|
| | | | |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____
Date       Gary Lee Lovette

**WWW.USLEGALSUPPORT.COM**
**1-888-311-4240**

**A**

a.m 286:6
ability 185:14
  189:2 195:20
  222:24 234:14
  239:14 240:2
  275:11,14 294:15
able 209:1 227:20
  237:3 246:23
  276:14 277:25
  289:18 295:23
  301:21
above-referenced
  306:10
absent 283:8
Absolutely 185:1
  206:13 251:5
  262:7 278:1
  302:4
abutting 227:23
access 185:16
accommodate 246:23
accuracy 224:2
accurately 223:20
accusation 220:5
acronym 180:23,24
  181:6
acting 188:17
  189:12
action 305:15,16
actions 302:3,3
activated 291:14
  299:2,11
acts 294:10
actual 208:4
  238:21 301:9
ad 203:8
additional 214:18
address 209:15
addressed 261:8
adequate 237:13
adhered 191:2
adjourned 303:20
admitted 206:24
ADOLFO 179:9
advice 284:6
advise 197:18
advised 182:21
  247:10 284:7
AED 208:10 298:10
  298:11 299:20
affect 184:22
affirming 220:8
age 193:9,13 196:6
  242:13,13
ago 203:7 257:6,7
  257:16 258:20,21

269:9
agree 221:17,25
  235:3 243:18
  278:11
agreed 206:24
  280:9
Agreeing 221:25
agrees 204:8
air 238:14,15
  250:12
al 177:8 306:7
  307:4
alert 185:4
alive 201:22
  207:17
allow 294:3
allowed 277:5
alluded 293:21
ambulance 183:5
  208:4 209:1,2
Amelia 289:20,24
  289:25 290:2
amount 192:5 234:6
  272:15
amounted 295:3
ample 185:22 186:6
  214:17 215:4,18
amusing 199:11
analysis 248:2
and-a 291:3
and-a-half 290:25
  291:5
angle 229:13
ankles 238:18
ANSELMO 178:20
answer 215:6,11
  223:25
answered 203:12
  204:25
anybody 183:17
  192:16 194:5
  203:18 223:4
  234:18
apart 192:1
apologize 205:1
  206:15 226:11
  303:3
apparently 204:4
appear 279:21
APPEARANCES 178:1
  179:1
appeared 304:8
appears 182:14
  210:3 254:12
  255:6 269:9
  273:19 279:6
applied 235:19

appreciate 213:19
  233:11,19 237:10
  238:21 239:3
  247:25 285:4
appreciating
  250:18
appreciation
  199:20
apprehend 286:23
approach 260:14
approached 289:20
  292:4,16,25
  293:5 294:18,25
approaching 226:14
  287:21 289:9,13
appropriate 272:10
  272:21
appropriately
  198:13 246:21
approximately
  286:5 287:19
  300:19
approximation
  293:11
April 257:5
aptly 246:21
area 209:14 226:15
  228:9,11,12,15
  229:24,25 230:2
  245:6 298:24
areas 218:24
argue 200:19,20
  203:8 204:10
arguing 203:10
argument 200:11
  203:11,13 204:12
arm 228:12 255:5,7
  261:17,23 262:10
  262:16,16,19
  263:1,7,9 264:3
  264:23
armed 259:11,15,21
arms 226:6,22
  239:12 240:9
  245:20,21 246:19
  249:10 261:3,12
  292:13
ARNAUD 179:10
arrest 193:22
  195:25 217:5,21
  249:13,15 256:19
  288:24 296:8
  301:24 302:2
arrested 293:18
  294:1
arresting 293:14
arrests 257:14

293:9
arrive 270:11
arrived 230:22
  231:9 247:17
  248:6 295:10
  300:20
arriving 265:25
  270:4
article 218:7
asked 203:12
  210:17 212:11
  216:8 239:18
  261:12 272:9
  303:11
asking 196:10
  206:2,3 235:8
  247:12 250:7
  282:1
aspect 184:22
assigned 219:13
assist 293:6
  295:13
assisted 298:5,16
  301:20
assume 268:1
assumption 245:17
attempt 226:21
  262:10 287:13
  288:8 297:4,18
attempted 195:25
  232:21 235:13
  288:1 295:18
attempting 262:24
  292:14 301:23
  302:2
attempts 208:5,9
  295:1
attention 297:23
attest 237:16
attorney 204:20
  282:2,7 305:13
attorneys 305:14
audible 296:11
audio 197:1 198:23
  206:13 209:6,7
  209:23 210:25
  211:16,20 212:15
  212:19 213:8
  230:23
authorized 305:7
autopsy 216:22,25
availability
  186:23
available 200:22
Avenue 287:22
  289:4 290:2
  306:18

**aware** 184:15 222:4
  286:11

**B**

**B** 286:2
**back** 181:17 190:24
  191:25 204:5
  206:14 212:19
  219:20 226:24,24
  227:13,21 228:6
  228:19 229:4,17
  230:7,9,21 232:3
  237:11,19 239:11
  240:9 243:6
  244:14,17 245:13
  245:20,22 246:4
  246:10,19 247:1
  248:17 249:10
  252:13 253:1,11
  254:9,16,20
  256:1 259:5
  261:12,21,23
  263:10,11 264:3
  266:21 267:1,4,5
  267:16,22 268:8
  268:10,10 269:10
  270:16 271:11,13
  277:19 279:1
  280:18,21,25
  281:15 285:9,22
  289:15 294:3,24
  295:23 298:3
**backboard** 195:9
**background** 288:22
**backside** 228:5
**backup** 244:24
**bad** 182:19
**bailed** 291:23
**balance** 281:8
**ball** 192:13
**based** 192:8
**basically** 228:16
  232:24
**basics** 195:12
**basis** 224:2
**beach** 179:4 182:24
  183:5,25 185:23
  186:16 191:18
  194:6,8 195:8
  199:15 208:2,4
  215:3 217:5
  221:5,19 222:4
  222:12,23 225:5
  234:9 239:11
  249:9 250:22
  272:11 273:16
  290:13,17 291:6

292:5 296:5
  299:15 300:8
**Bear** 209:21
**beat** 212:12
**Bedard** 179:3 306:5
**beg** 244:3
**began** 186:10
**beginning** 217:22
  256:5 264:12
  281:21 292:23
**behalf** 178:2,19
  179:2 275:23
**behavior** 205:24
  206:4
**belief** 260:19
  264:23
**believe** 216:16
  217:3,14,20
  218:16 223:24
  243:10 250:8,14
  253:18 257:19
  259:14 260:13,16
  260:25 261:9
  262:12 270:16
  272:10,20 283:3
  284:14 285:23
  290:8 298:3,9,17
  299:16,18
**believed** 220:11,18
  283:17
**bending** 280:4
**bent** 263:12 279:25
**best** 210:14 233:8
  251:11
**betcha** 203:18
**better** 280:11
  295:5
**bicycle** 252:20,21
**bicyclist** 253:12
  264:15
**big** 258:14
**bit** 209:7 251:22
  269:9 280:18
**bite** 232:3
**block** 258:9 273:14
  290:24,25 291:3
  291:5,12
**blockage** 189:2
**blocks** 289:20
**blood** 216:1,7
**blow** 215:20 216:24
**Blues** 197:19
**blunt** 216:22
**blunt-force** 210:20
  211:15,18,21
  212:1 213:21
**body** 226:6,14,16

227:9 232:17
  237:2 238:13,19
  238:22 245:5,12
  246:15,22 255:23
  265:16,20 266:18
  266:20,23 267:10
  268:13 269:2,3,8
  269:20 276:20
  279:2,2 294:23
  295:15,20
**body's** 267:25
**bogged** 185:23
**bomb** 210:22 211:2
  211:13 213:22
  216:12
**boom** 210:22 211:12
  211:12
**bothered** 219:7
**Boulevard** 178:3,12
  178:16,20
**Bravo** 222:18,23
  286:1,2
**breath** 190:15
  237:13,17 239:15
  249:13 250:12
  301:21
**breathe** 234:14
  237:3,4,23 239:4
  239:8 240:2
  249:2,23,24
**breathing** 234:22
  235:2,4,10,12,14
  235:18,21,22,25
  236:6,10,10,13
  237:20 242:10
  296:15 301:18
**brethren** 187:25
**Brief** 259:4
**briefly** 281:19
**brightness** 252:13
**Brill** 178:3,5
  179:15,16 180:5
  180:20 184:4
  185:19 186:2,12
  186:21 187:2,18
  188:15,21 189:5
  190:21 191:7
  192:10 193:3,21
  194:4 195:16
  196:8 197:2,10
  197:14,16,22
  198:16,24 199:14
  199:17,24 200:12
  200:14,17,19
  201:1,3,5,10,13
  201:15,17,19,22
  202:1,5,7,9,12

202:15,17,25
  203:2,5,10,23
  204:2,6,9,20,24
  205:3,6,9,13
  206:24 207:2,4
  208:1 211:1,4
  212:4,24 213:4,9
  213:14,24 215:8
  215:12,23 216:20
  217:10,13,16,18
  217:19 219:2
  221:7,21 222:15
  223:23 224:19
  225:7 237:6
  240:4 242:19
  243:25 244:2,5
  246:12 250:16
  251:21 252:6,13
  252:15,19,21,24
  253:3,9,15,16
  254:14,15,20,22
  254:24 255:3,8
  255:20 258:22
  259:1,7,8,23
  260:5 263:21,23
  264:4,6,10,15,17
  264:20 265:1
  267:21 269:18
  270:1,19 271:23
  273:2,4,9 277:19
  277:23 278:1,7,8
  278:18,21,23
  279:12 280:21
  281:12 282:4,5
  284:21,23 285:3
  302:24 303:2,5
  303:16 306:22
**bring** 204:7 244:17
  245:18,20 252:13
  279:4 280:21
**Bringing** 298:23
**Brother** 197:19
**brought** 203:23
  207:5 290:21
  291:10
**Building** 179:3
**Burke** 178:20,22
  179:16 180:19
  181:22 182:4
  183:1,12,20
  184:12,17,24
  185:5,12,18
  186:1,19,25
  187:6,17,20
  188:2,8,13,19
  189:4,15,20
  190:1,7,16 191:5

191:6 192:23
193:19 195:2,14
196:13,21 197:9
197:12,15,24
198:5,14,21
199:8,12,16,22
200:1,10,13,15
200:18,21 201:2
201:4,9,11,14,16
201:18,20,25
202:3,6,8,11,13
202:16,24 203:1
203:3,8,21,25
204:3,7,19,23
205:21 206:5,22
207:1,3 210:9,23
211:23 212:2,14
212:18,21,23
213:12,16 214:1
214:19 215:6,9
215:21 216:13,18
218:13,25 220:24
223:2,22 224:4
224:12 225:14
231:24 232:19
233:17 234:23
237:14 238:25
239:5,23 240:23
242:22 243:3,11
243:22 244:1,3
246:25 249:3,14
249:17,25 250:25
252:1,4 255:17
259:12 261:5
262:2 263:4
265:3 271:18
272:13 274:5
275:8,17 276:9
278:13 281:11
283:19 284:13,15
284:20,22 285:5
285:7,9,11,12
302:21 303:8
306:25
**burke@jambg.com**
178:22
**bus** 208:22
**business** 202:1
**button** 299:5

-----

**C**

**C** 178:18 306:23
**C-101** 179:3
**c/o** 306:4
**Cafe** 290:15,22
291:12,18 292:5
296:5

**call** 181:3 196:1
202:10,18 204:6
218:4,22 231:22
233:9 234:21
236:16,18,21,22
250:23 260:1
276:11 291:6
299:17,22,25
**called** 181:25
225:23 241:23
246:16 249:23
277:11 286:12
288:2,4 290:6,8
290:13 299:17
**calling** 288:11
289:2,11
**Calvert** 270:13
272:7
**camera** 268:3 274:2
274:3 275:20
**camera's** 275:15
**capability** 205:19
**capacity** 205:18
**Captain** 283:3
**captured** 215:19
**car** 220:16,20
221:2,3 256:6
264:14 293:23
298:23
**care** 200:25 201:25
204:11 298:1
**career** 272:19
282:10
**careful** 191:8
**cares** 200:6
**case** 177:3 221:13
258:1,18 274:15
284:17
**caught** 210:21
248:23
**caused** 287:6
**causes** 237:1
**causing** 237:22
**CC** 306:21
**Celcer** 182:14
183:11,17 185:16
185:24 188:23
189:19,22 191:21
192:1 193:1,5,8
193:8 196:2
197:17 198:9
208:14 298:8,13
**Celcer's** 191:1
**cell** 251:12
**cement** 233:16
**center** 229:25
299:15

**certain** 299:1
**certainly** 261:2
**Certificate** 179:19
179:20 304:1
305:1
**certified** 177:24
285:17,18,21
304:6 305:6,22
**certify** 304:8
305:7,12
**chairs** 292:6
**chance** 209:10
**change** 191:25
192:2 232:21
272:22 307:7
**changed** 191:12,19
192:9
**CHANGES** 307:2
**Channel** 183:17,17
**character** 205:18
**characterized**
239:2
**Charles** 177:5
183:10 286:9,24
**check** 193:14
**chest** 298:4
**choke** 297:4,12
**city** 177:8 199:15
218:19 285:15
306:7 307:4
**claim** 195:23
**clarify** 211:11
247:24 276:24
**client** 201:23,25
202:2
**clients** 202:20
**clock** 186:6
**close** 228:9 296:2
**closer** 273:16
**closest** 216:4
233:9
**clue** 197:7,21
198:4,10
**clues** 198:11
**cocked** 280:25
**collapsed** 222:3,12
225:12
**Columbia** 179:3
**come** 225:18 232:3
253:1 256:5
265:12 271:25,25
272:5 282:6
286:11 300:2
**comes** 263:9 289:15
**comfortable** 239:14
**coming** 219:5
228:12 229:16

267:12 271:6
**commands** 244:7
**comment** 196:11,16
205:12 213:6
255:19
**commented** 181:12
**comments** 184:20
200:24
**Commission** 304:15
304:16
**common** 276:11
**communicate** 185:24
189:2 193:9
194:5 222:25
**communicated**
189:25 191:3,21
193:12 197:17
274:25
**communication**
183:18 185:10
186:22 193:14
**communications**
220:12
**compared** 250:21
269:8
**complete** 189:12
306:12
**completed** 301:13
**completely** 252:7
**compliance** 248:16
272:18
**compliant** 247:25
249:1,8 260:15
261:8
**complied** 217:6,22
249:9,21 250:21
294:2
**comply** 261:13
265:6
**complying** 244:6
248:4,9,18
253:21 263:2
**compound** 217:12
**computer's** 280:11
**concerning** 182:23
286:22
**conclude** 182:20
183:8 281:17
**concrete** 273:14
**condition** 189:10
192:12,14,19
301:25 302:7
**conditions** 302:8
**conduct** 185:10
188:16 192:3
217:20
**confident** 245:2

**confirm** 213:18
**confronted** 274:1
**confronting** 232:24
**connected** 238:4
  305:15
**conscious** 189:12
**consciousness**
  208:24
**consequence** 238:21
**consider** 239:8
**considered** 244:7
**consistent** 293:20
**contact** 222:18,21
  228:10 275:1
  283:25 284:1,4,5
**contention** 276:19
  276:25
**continuation**
  214:17
**continue** 258:22
  288:6
**continued** 179:1
  180:1 203:8
  214:17 235:10
  289:2,16 290:11
**control** 226:18,22
  256:24 275:7
  288:14 294:22,23
  302:7
**controlling** 226:6
**conversation** 183:7
**conversations**
  284:15
**cool** 278:4
**Coral** 306:6
**correct** 183:8
  184:7,11,14,23
  185:20 192:22
  194:25 208:6,20
  213:5 215:13,24
  216:8,21 218:21
  219:3 221:11
  245:3 248:9
  256:4 259:11,24
  260:6 261:4,10
  261:18 262:11,23
  266:6 268:20,22
  269:3,5,24
  270:21 271:17,24
  275:4,7,12
  294:14,17 296:20
  297:20
**corrected** 217:17
**correctly** 295:18
**counsel** 196:9
  203:6 205:12
  251:15 255:19

305:13,15
**counter-clockwise**
  269:4,9,20
  280:24
**countries** 242:25
**COUNTY** 304:4 305:4
**couple** 258:23
**course** 191:17
  256:19 286:7
  293:8 296:7
**courses** 301:13,15
**COURT** 177:1
**Courthouse** 177:17
**CPR** 208:17,25
  298:14
**criminal** 288:23
**cross** 249:21
**Cross-Examination**
  179:16 285:6
**crossed** 249:7
  290:4
**crowd** 270:12
**cruel** 255:12
**Cruiser** 270:6,12
  271:6,7 272:1
**Cruiser's** 271:13
**crying** 213:6
**cuff** 244:15 245:25
  248:22 249:11
  261:4 262:24
  270:24 295:9
**cuffs** 245:5 270:21
**curious** 182:22
**curser** 209:23
**custody** 195:21
  203:16 208:5
  234:5 244:10
  250:15 255:5
  258:9 272:16
  293:7 294:21
  301:22 302:12,13
  302:17
**cut** 205:9 212:7
  298:7
**CVR-M** 177:23
  304:14 305:21
  306:17

_____

**D**

**damn** 203:15
**danger** 191:13,14
**dark** 273:12
**Darren** 178:10
  306:24
**darren@horan-w...**
  178:9
**Date** 307:25

**Dated** 305:18
**dates** 301:9
**David** 178:5,9
  306:22,24
**david@brillrin...**
  178:5
**day** 207:18 209:17
  209:19 213:20
  214:11 260:2
  272:23 283:12,22
  284:1 285:14,25
  286:4,8 300:2,13
  304:9,11 305:18
**days** 216:25 283:11
  286:1 306:13
**dead** 207:22
**deal** 195:18 202:2
**dealing** 185:25
  187:13 191:8
  192:5,6 193:17
  194:13 198:1
  214:10 229:5
  291:2 301:23
  302:15
**dealt** 197:6 219:18
  219:19 257:11
**death** 190:13 217:3
  217:4
**debris** 273:16
**Deceased** 177:5
**decision** 284:3,3,5
**declare** 307:22
**decompressing**
  214:9
**Defendant** 179:2
**Defendants** 177:9
  178:19
**defense** 256:23
**Defensive** 256:23
**defibrillator**
  208:5 298:11
**definition** 194:18
**Del** 208:14,15
  256:15,15 270:10
  287:25 293:2
  298:8,13
**deleted** 274:3
**delivered** 215:20
  216:24
**demonstrated**
  247:19
**denim** 298:7
**department** 222:11
  222:16 272:19
  275:6,23 276:6
  282:6 285:18
  298:19

**department's**
  217:23
**Depending** 278:15
**depends** 190:5
  193:23 245:8
  278:16
**deposition** 177:13
  179:15 201:19,20
  201:23 203:21
  303:20 305:8
  306:8
**describe** 226:13
  232:22 238:1,15
  261:20
**described** 241:9
  242:8 291:23
**describing** 295:16
**description** 193:10
  193:13 233:8
  243:13
**deserve** 303:6,12
**desperate** 250:11
**desperately** 239:3
  249:12
**despite** 186:22
  254:4
**detain** 189:9
  195:13 234:8
  244:24
**detained** 237:3
  243:21 244:7
  260:9,10 302:12
**detaining** 191:19
  295:13
**detectives** 223:8
**detention** 185:11
  193:22 194:12
  195:25 217:5,21
  235:3 236:8
  256:20 275:7
**device** 273:19
  299:5
**devices** 288:14
**dictate** 188:5,6
  244:22 257:25
**dictated** 302:3
**die** 303:6,12
**died** 190:10
**difference** 185:8
  187:12,24 240:18
**different** 192:13
  192:14 221:14
  233:19,20,21,25
  234:7 273:10
  291:18
**differently** 184:10
  198:19

difficulty 237:12
296:15 301:18
dinner 209:20
Direct 179:15
180:4
direction 193:11
229:11 230:25
231:10,12,22
245:15 269:8
289:12 291:18
directions 250:21
294:2
directive 187:14
directly 256:9
dirt 233:16
disagree 198:17
disciplined 282:21
discount 220:20
251:3
discourse 201:5
discovered 297:22
discuss 190:13
discussed 214:13
216:2 260:18
discussion 186:17
discussions 225:22
disengaged 288:2
dispute 191:18
196:11 206:9
220:6 223:19
224:2 250:22
disregarding
187:13
distance 238:17
289:2
distinction 233:13
DISTRICT 177:1,1
DIVISION 177:2
doctor 225:1
document 220:8
302:11 307:23
doing 201:7 202:18
202:23 204:20
208:25 228:23
236:7 281:22
295:3
door 271:13
downward 245:15
dph@horan-wall...
178:9
drags 265:21
drama 202:19
Drive 179:3 299:23
drive-stunned
180:15 181:13,16
181:21,24
driven 290:13

291:6
driving 184:22
dropped 210:22
211:2,13 213:21
216:12
drove 290:23
291:11
drugs 184:11
due 245:17
duly 304:10
Duval 258:9 290:4
290:7,14,14
291:9

_____

**E**

earlier 214:13
216:2 223:6
251:24 264:2
272:10 281:19
291:23
early 192:22
ears 232:16
East 178:20
edge 273:16
edification 196:8
educated 184:8
189:6
education 226:7
effect 182:17,18
183:18 187:16
191:3 197:16,19
256:20 281:21
282:14,19
effects 236:1,1
237:21
effectuate 226:12
229:3
effectuated 194:12
effort 263:3
286:23 295:13
300:21
efforts 296:8
299:19
Eimers 177:5,5
180:15 182:16,21
183:5,10,19
184:1,21 185:3
185:10,14,23
186:11,23 187:22
188:16 189:18
190:9 192:2,8,21
192:25 194:15,19
196:1,6 198:3
199:4,14 200:8
204:13 207:17
208:2 212:12
214:16 215:4,20

216:1 217:4,6,21
220:16,18 221:1
221:5,19 222:24
224:20 225:4,8
225:11 228:9
229:2,15 230:13
230:24,25 231:10
232:15,21 234:14
234:25 235:11
236:9,23 238:9
239:3 240:19,21
242:20,25 243:6
245:10 247:18
248:8,25 249:15
250:10,15,20,22
253:21 255:22
256:9 259:9
260:11 261:17,23
262:25 263:12
268:13 269:3,20
270:5,8,14
271:17 275:7
276:21 277:2,15
278:12 279:22
280:6,24 286:9
286:14,17,24
287:8,13,14
288:1,7,8,13,16
288:19,19 289:4
289:16,23 290:3
290:6,21 292:6,8
293:5,22 294:18
294:25 295:14
296:2,7,13,17,25
297:2,5,7,10,13
297:19 298:1,14
299:14 300:21
301:17,23 302:16
303:6,10 306:7
307:4
either 183:17
184:1 225:13
243:9 295:7,9
299:12
elapsed 264:18
273:9 300:19
elbows 244:9
254:12 255:6
259:10 261:21
elderly 246:20
embellishing
207:13
embellishment
214:8
emergency 224:7,9
224:14 232:16
Emma 289:9,10,14

289:15
employed 285:14
employee 305:13,14
empty 259:18
EMS 222:2,13,18,21
222:23,25 223:11
223:14,19
EMTs 208:21 298:20
encounter 192:17
encountered 292:6
endangered 191:16
ended 258:10,10
ends 230:1,11
267:13 290:14,14
enforcement 285:19
285:22
engage 186:10
204:12
engaged 183:25
186:13 189:17
192:8 249:15
292:7
enhance 213:17
enjoy 219:5
ENTER 307:2
entered 192:6
entire 235:12
265:16 270:11
292:23
envision 228:23
ER 225:2
errata 179:21
306:13 307:1
escape 295:6
escaped 265:15
Esquire 178:5,9,10
178:14,18,22
179:5 306:4,22
306:23,23,24,24
306:25
essentially 227:11
establish 230:9
Estate 177:5
estimated 196:6
et 177:8 306:7
307:4
evaluations 218:3
event 182:25
205:20 216:11
241:10,12,13
everybody 198:12
248:20 281:20
282:14
everything's
285:10
evidence 274:14,23
Ex 177:23 304:6,14

305:6, 21 306:17
**exact** 209:22
**exactly** 227:7
  271:15
**Examination** 177:21
  179:15, 16 180:4
  303:4
**examiner** 217:2
**example** 260:1
**excess** 278:12
**excessive** 281:4, 13
  281:16
**exchange** 182:20
**exclaiming** 216:11
**Excuse** 282:16
**exercise** 260:2
**Exhibit** 301:5
**expected** 216:24
**experience** 208:13
**experienced** 234:8
  242:4, 7 245:3
**expert** 277:11, 13
**Expires** 304:16
**explain** 210:17
**explaining** 271:8
**exposed** 298:3
**expressions** 185:10
**extent** 195:13
**extraordinarily**
  255:12
**extremely** 194:15

---

**F**

**F** 304:6, 14
**f-o-i-n** 244:5
**face** 226:17 227:2
  231:10, 17 238:23
**facilitate** 246:19
**facing** 227:3 228:4
  229:11, 12 231:21
  232:1 266:20, 22
  266:22 269:7, 24
  280:6 291:17
**fact** 187:15 199:14
  220:17, 18 249:12
  251:6 259:18
  275:11, 14 276:3
  279:10 294:10
**factor** 220:21
**facts** 307:23
**fair** 183:19 191:17
  191:17 236:19
  261:20 275:16
**fall** 220:1
**family** 204:13
  209:20
**far** 208:22 209:7

230:1, 2, 9, 10
  235:24 259:19
  260:23 288:10, 11
**fashion** 242:8
**fast** 263:9
**fault** 228:22
**Fax** 178:4, 8, 17, 21
  179:4
**FDLE** 225:22, 23
  227:1 230:23
  243:8 248:3
  251:20 282:16, 17
**Federal** 177:17
**feel** 204:14, 16
  219:9 237:12, 22
  239:14 240:8
  242:9
**feeling** 237:16, 17
  237:23 239:20, 21
  239:22, 25 241:1
  241:2 250:5
**feelings** 250:6, 7
**feels** 237:4 249:23
**feet** 220:1 227:11
  229:11 256:9
  270:9, 12 271:16
**fellow** 189:25
  202:19 215:4
  217:20 220:19
  221:3, 17 222:17
  222:22 235:14
  240:22 248:7
  260:2, 9
**felony** 286:20
  303:6, 12, 14
**felt** 190:3
**female** 209:8 210:4
**fence** 289:5
**FF015913** 304:15
**fifties** 192:22
**fight** 240:6
**fighting** 192:7
  235:23 247:2
  258:11
**figure** 228:24
**file** 218:2
**fill** 182:1
**filming** 302:18
**final** 291:21
**financially** 305:15
**find** 208:19 233:13
  240:7
**fine** 196:25 204:9
  204:21 252:12
  279:5
**finger** 180:14
  181:13, 20 248:23

**finish** 203:25
  204:1, 3
**finished** 215:15
**fire** 296:22 298:17
  298:19, 20
**firearm** 256:13
  260:19
**firefighters**
  208:21
**firing** 300:12
**FIRM** 178:3
**first** 181:14
  182:21 183:9
  197:7, 21 198:3
  198:10, 11 207:10
  222:19 230:22
  253:10 260:25
  262:19 290:23
  292:8 295:10
  298:17 300:20
**firstly** 181:18
**fit** 194:13
**five** 239:10 241:7
  257:6 258:11
  270:17 271:17, 21
  272:6 283:11
  301:1
**flat** 294:6
**flat-out** 187:13
  292:13
**fled** 185:15 286:12
  286:18 293:21
**flee** 188:18 294:15
**fleeing** 188:18
  288:19
**flexibility** 245:18
  245:22
**flipped** 269:22
**flipping** 267:25
**Florida** 177:1, 8, 18
  177:25 178:4, 8
  178:12, 16, 21
  179:4 285:18
  304:3, 7, 8, 15
  305:3, 7, 22 306:6
  306:19
**focused** 302:16
**foin** 244:2, 2
**folks** 218:10
  221:14 251:10
**follow** 220:14, 15
  221:11 288:6
  290:11
**followed** 191:10
  288:10
**foot** 226:16 266:12
  271:24

**footage** 180:6
  196:9 214:12, 15
  215:19 221:23
  225:17 247:18
  248:21 251:9, 11
  251:19 262:21
  264:1 268:7
  273:17 274:2, 3
  274:11 275:16, 20
  276:3, 7, 18, 20
  277:19 278:10
  284:9, 19, 21
  285:1
**footages** 258:23
**force** 216:22
  250:14 267:1
  277:13, 14 278:12
  281:4 293:14
**forced** 261:3
**forcibly** 261:20, 25
  264:23
**forcing** 231:23
  267:4, 5
**foregoing** 307:23
**forget** 220:12
**forgive** 182:10
  229:21
**form** 180:18, 19
  181:22, 23 182:4
  182:5 183:1, 2, 12
  183:20, 21 184:3
  184:12, 17, 24, 25
  185:5, 6, 12, 13, 17
  185:18 186:1, 8
  186:19, 20, 25
  187:6, 7, 17, 20, 21
  188:2, 3, 8, 9, 13
  188:14, 19, 20
  189:4, 8, 15, 16, 20
  189:21 190:1, 2, 7
  190:8, 16, 17, 20
  191:5, 6, 9, 22
  192:4, 23, 24
  193:2, 19 194:2
  194:20 195:1, 2
  195:14 196:12, 13
  196:17 197:24, 25
  198:5, 6, 14, 15
  199:2, 8, 9, 13, 16
  199:22 200:3
  203:6 204:21
  205:2, 5, 11, 21, 22
  205:25 206:5
  207:12, 24 210:9
  210:23 211:3
  212:13, 22 213:3
  213:7, 23 214:1

214:19,20 215:2
215:10,21,22
216:13,14,18,19
217:1,9,11
218:13,14,18,25
219:12 220:4,9
220:23,24 221:6
221:24 222:6,14
222:20 223:1,2
223:15,21,22
224:4,5,11,12,18
224:22 225:6,10
225:14,15,20
227:5 231:14,24
231:25 232:13,18
232:19 233:6,17
233:22 234:12,23
235:6,15 236:2
236:17 237:5,8
237:14,15,24
238:24,25 239:5
239:6,16,19,23
239:24 240:3,11
240:20,23,24
242:18,22 243:2
243:11,12,22
244:1,21 245:7
245:16 246:25
247:1,15,20
248:10 249:3,4
249:14,17,18,25
250:13,25 251:1
251:4,7 254:1
255:17,18 257:2
257:12,18 258:5
259:12,22 260:4
260:22 261:5,6
261:14 262:2,3,6
262:18 263:4,5
264:25 265:3,4
265:23 267:2,3,9
269:25 271:4,18
271:19,22 272:13
272:14 274:5,6,9
274:13,18,21
275:8,17,18
276:1,9,10,15,22
277:18 278:13
279:11 280:20
281:5,11,14
282:1 283:5,19
283:20,23 294:8
303:8,9,15
**Fort** 178:21 289:4
289:6,7,8,10,10
289:14
**forth** 294:24

**forward** 258:22
262:22 263:13
267:11 287:11
**found** 224:8,20
225:5
**four** 266:2 270:17
271:20
**FPR** 177:23 304:14
305:21 306:17
**frame** 186:9 277:21
278:4,5,10,22
301:2,4
**FRANCISCO** 179:8
**freeze** 273:1
278:22
**frequent** 218:24
**Friday** 204:8
**front** 256:6 290:17
301:6
**fucking** 210:22
211:2,13 213:22
216:12
**full** 239:14 276:20
**fully** 204:7 249:1
249:9 250:21
299:13
**fumbling** 252:7
**function** 300:10
**funny** 198:25,25
199:6,18 203:13
203:15 205:4,14
206:10,25
**further** 232:23
238:23,23 253:6
285:3 305:12

---
| G |
---

**Gabe** 180:14 181:13
181:15,20 196:15
210:21 213:5,6
213:14,15 292:17
**Gables** 306:6
**GABRIEL** 179:9
**gain** 250:24
**Galbo** 260:25
**game** 192:13
**gang** 189:9
**Garrido** 179:9
248:23 270:20,24
292:19,25
**Gary** 177:13 179:2
179:15 304:8
305:8 306:4
307:4,25
**gate** 292:4
**gear** 298:16,18,22
298:23

**generally** 302:11
**generate** 208:9
**gentleman** 192:22
**gentlemen** 182:13
**Geraldine** 289:14
289:15
**getting** 210:21
223:18 228:8
232:15 248:23
249:9,10 281:7
298:16,18 302:14
**GIRARD** 179:10,10
**girl** 213:6,10,14
213:15
**give** 185:14 193:12
214:23 247:8,13
251:11 277:23
278:1,24 282:8
293:11 296:14
**given** 185:2 224:25
241:23 243:6
**giving** 206:2
208:17 248:15
**go** 180:15 181:17
190:24 200:21
201:3 203:22
206:14 210:16
213:5 219:19,22
232:7,22 244:9
252:22 253:3,7
253:10,13 254:8
255:5 258:24
263:8,10,10
264:1,2,2,10,12
264:19 267:22
268:6,10 271:11
272:25 277:19
288:13 294:13
299:25
**God** 182:17,23
191:4 197:5,18
**goes** 212:9 253:6,6
**going** 186:17
187:14 192:17
194:12 195:22
200:13,15 201:2
202:3,10,14,17
204:4,4 221:3,18
222:1,1 223:17
232:24 238:7,22
245:23,23,25
246:1,1 250:5
251:24 264:3,6
268:7 271:16
277:20 278:1,3
278:10,24 279:3
279:8 283:7,9

288:7,8 290:9
**good** 180:14 181:12
181:15,19,20
202:12 203:23
219:16 228:23
250:11 251:22
253:7 285:10
301:2,4
**Goodman** 200:16,24
200:25 202:13,17
203:22
**Gotcha** 182:10
**gotten** 231:19
254:18,21 272:18
**grab** 239:13 245:13
**grabbed** 261:17
**grabbing** 231:17
240:9 248:23
**grabs** 245:4
**grand** 258:8 277:3
277:6,11
**grass** 233:16
**Great** 202:8
**groin** 228:9,11
**ground** 226:5,9
228:5 232:6
245:24 253:18,24
254:3 259:10
260:24 261:9
266:18 268:15
279:1 280:3
292:10 294:6,10
294:13 298:2
**group** 178:11,15
270:6
**guess** 228:4 273:15
290:24 291:11
**gunpoint** 260:16
**GUSTAVO** 179:9
**guy** 191:3 249:7
252:20,21 258:12
258:14 260:18
266:9 279:15
**guys** 180:11 199:5

---
| H |
---

**H** 179:5 306:4
**habit** 299:9
**hair** 273:12
**half** 291:4
**hand** 195:18 210:21
226:18 244:17
247:13 260:2,3
270:24 273:20
**handcuff** 238:5
239:13,25 240:9
242:9 244:10,14

246:23 247:9,14
263:3,8 292:14
292:17 295:8
302:19
**handcuffed** 226:21
235:21 241:10,13
241:17,18,24
246:5 247:4
249:19 262:19
267:6 272:12
294:5,7
**handcuffing** 244:18
246:20 247:3
261:22 264:24
293:15,17 294:3
295:13 302:19
**handcuffs** 241:4,21
241:21 245:14
293:6,23 295:1
296:17 298:3
**handheld** 274:3
**handled** 192:14
**hands** 216:7 229:4
229:5 243:20
244:8,13 245:4
245:13 246:10
247:4,8,19
248:17 249:9
254:9,11 259:16
259:17,18 294:2
**hang** 223:18
**happen** 204:4
231:16,23 238:12
238:19 241:6
245:25 287:6
**happened** 196:10
198:7 199:7
203:5 206:18
207:19 232:12
233:1
**happening** 232:14
**happens** 245:5
**hard** 209:22
**harder** 233:16
234:9
**harm** 236:1
**harmful** 236:1
**He'll** 303:17
**head** 187:14 194:8
210:20 211:2,14
211:16,18,21
212:1 213:21,22
215:20 216:1,4
216:12,23,25
226:23,23 227:8
227:8,20,20,22
227:23 228:3,5

228:10,16,18,19
228:20 229:7,9
230:8,14,18,18
230:18,20,25
231:4,5,6,11,11
231:16,18,21
232:6,8,10,21,22
235:11,16,17
243:20 244:9
245:5,14 246:2,9
246:14 247:19
259:10 266:22
268:14 289:16
294:22 295:23
296:4
**heading** 290:9
291:1
**heads** 185:24 191:3
**healthcare** 219:20
**hear** 181:17 183:15
196:19 197:3,12
197:15 200:1,4
205:15 206:15,23
207:16 211:17,20
211:20,25,25
212:3,8,16,25
213:13 215:7,9
215:10 235:4
246:7 254:17
266:13
**heard** 180:21 183:9
211:13 213:1
253:17 267:18
290:20 291:6
**hearing** 183:14,23
196:3,7
**hears** 202:14
**heart** 236:1,1
**heavier** 302:6
**help** 219:18 294:11
294:23
**helping** 182:17
298:22
**helps** 182:15
**Henry** 256:15 298:8
**hey** 185:24 202:20
**HIGGINS** 178:7
**High** 293:12
**higher** 245:12
**hips** 265:15 295:6
295:6
**hiring** 277:10
**history** 288:23
**hit** 214:5 252:9
263:7 289:16
290:11
**hobble** 235:19

238:1,2,3,4,10
239:13 240:10
241:14,21,24
242:9 248:24
261:2 268:19,23
271:1
**hobbled** 241:5,17
241:18
**HOCHMAN** 178:20
**hold** 266:23
**holster** 296:20
297:16 299:3,9
**homeless** 218:23
219:4,21,25
**hood** 273:13
**Horan** 178:7,9,10
306:24,24
**hospital** 183:6
258:10
**hour** 198:2 199:20
203:16 205:14,19
214:13,14 216:10
**hours** 198:7 203:7
257:9,16
**house** 210:4,7
212:10
**housing** 219:22
**huddle** 248:24
**human** 203:14
205:18,24 206:4
**HUMBERTO** 179:9
**hundreds** 293:12

---

**I**

**identified** 233:3
246:21
**identifies** 274:24
**identify** 279:9
**identifying** 221:4
**idiot** 202:4,5,7,10
202:18
**ignorance** 182:10
**II** 180:1
**III** 177:13
**ILO** 180:10,16,17
180:22,22
**image** 268:6
**immediate** 283:25
**immediately** 254:10
298:2
**implement** 257:15
**implies** 256:25
**important** 187:5
190:3,4,6 193:17
194:11 195:17
212:18 221:22
**improper** 204:15

281:10
**inappropriate**
205:12 255:19
278:11
**inches** 238:16
**incident** 181:5,6
184:1 193:7
198:8 199:4
207:18 214:16
221:1 286:11
292:18,23 300:8
**including** 266:3
282:22
**incorrect** 227:3
266:13
**INDEX** 179:13
**indicate** 200:21
**indicated** 222:2
224:7 301:17
**indication** 296:14
**individual** 193:9
258:8 279:8,10
**infirmity** 184:9,9
**information** 188:6
188:12 189:24
196:5 220:11
275:1 289:2
**informed** 185:9
198:12
**initially** 181:3
294:19
**initiated** 287:8,10
**injure** 294:16
**inner** 232:25
**instance** 293:24
**instantly** 261:13
**insubordination**
282:21
**integrity** 274:10
**intend** 204:7
**intention** 293:5
**interest** 180:7
**interested** 305:16
**interests** 202:22
**interior** 228:13
**interrupt** 223:12
247:6
**intersection** 287:3
289:13
**interview** 282:17
**investigative**
181:4
**involved** 221:9
250:19 258:8
**involvement** 218:4
219:10 224:6
**involving** 256:19

286:8
iPad 251:13
IRO 181:7
issue 190:9,12
  262:14 274:10
issued 282:9
issues 231:8
item 260:2
itm 275:24

**J**

J 178:14 306:23
jacket 259:14
  298:7
jail 219:19
Jean 251:10
Jeannete 178:18
  269:16 306:23
jeans 273:13
jlewis@lewisle...
  178:17
job 201:6,7 204:12
  204:13 219:16
  228:23 302:7
  306:8
jobs 219:23
JOHNSON 178:20
Join 183:13 184:13
  184:18 186:4
  187:1 193:20
  195:15 199:23
  206:6 210:10,24
  219:1 233:18
  234:24 243:23
  250:1 259:13
  275:9 278:14
joke 200:7,7
  255:12
joking 210:4
Jr 179:5 306:4
Judge 200:24,25
  202:13,17 203:22
judgment 184:22
July 304:16
jury 203:19 277:3
  277:6,11

**K**

K.A 267:14,19
  268:1 271:5
KATHYANN 179:8
keep 200:16 201:11
  231:12 288:9
  295:19
key 177:2,8,18
  178:8 179:10,10
  188:6,11 190:24

218:8 219:5,6
222:11,16 272:19
273:25 275:6,23
276:5 285:15
306:7 307:4
Keys 299:15
kick 253:2 297:2,9
kicked 267:14,19
  268:1 279:2
kicking 239:7
  268:5 295:5
kill 206:11,25
killed 196:15
  203:15 210:16
kind 180:24 212:18
  242:12 288:24
  299:5
kinds 189:13
knee 226:23 228:4
  228:6,19,20
  229:18,20,22
  230:2,4,4,5,7,17
  230:20 232:2
  237:11,11,18
  239:11 243:5
  246:4 263:12
  266:16,21 268:15
  268:16 279:1,25
  280:2,12
knee's 280:2
kneel 255:14 266:5
kneeled 268:9
kneeling 244:11
knees 226:16
  237:18 243:19,20
  244:8 247:18
  249:9 253:25
  276:20 277:1,2
  278:12,16,25
  279:7,10,21
  280:4,16 281:1,3
  281:15
knew 192:15,21
  194:1 208:19,22
  223:17 289:12
know 180:23 181:9
  182:17,22,23
  183:3,8,15,22
  185:2,3 186:7,9
  188:24 190:9
  192:1,15,18,25
  193:6,17,25
  194:11,18 195:3
  195:4,5,11,12,19
  198:13,18,20
  199:3,3,7 200:11
  202:20 203:14,17

203:20 204:16,21
204:25 206:9
207:5,6,7,15,20
207:23 209:24
210:13 211:13
213:17 214:3,5,6
214:10,16 215:15
216:1,4,7 218:10
220:22,25 221:1
223:3,13 224:1,6
224:14,23,25
225:21 231:18,18
234:17,19 235:13
238:20 239:1
240:21 251:2,21
256:10 257:13,14
259:19 260:23
261:7,24 262:4
262:20 264:21
265:12 267:7
268:12,18 269:11
269:14 270:23,23
273:1,23 274:4
274:11,14,20
275:2,13,21,25
277:8,13 278:7
278:11,15 279:13
279:16 280:15
281:16 282:8
283:4,9,13,16,21
288:18,22 289:11
290:6 291:8,12
291:17,19,20
292:12 293:1
296:17 299:1
300:16,18 301:24
303:2
Knowing 190:6
  192:12
knowledge 196:2
  218:4
known 189:17,19
  191:21
KWPD 222:3,7
  223:13 256:1

**L**

labeled 234:15
lack 245:17 295:5
lacking 188:11
laid 265:2
lane 287:2,21
language 281:20
laptop 210:14
  251:14 252:3,4
  278:2
large 194:19,24

late 192:22
Lauderdale 178:21
laugh 205:19 206:7
  214:5
laughed 200:7,8
  206:7
laughing 203:16
  205:16 214:4
laughter 199:20
  200:5 205:15
law 178:3,11
  285:18,21
law-enforcement
  285:17
laws 189:13 218:22
lawyer 284:1,4,13
  284:16
laying 228:2,2
  245:21
leading 259:20
learn 284:9 286:8
learned 221:22
  284:18,20 286:9
  286:24
leave 287:7
lecture 201:21
lectured 201:10
lecturing 201:12
Lee 177:13 179:2
  179:15 304:8
  305:8 306:4
  307:4,25
left 208:2,4,23
  222:3,12 225:11
  227:17,18,19
  228:11 229:7,14
  229:16,20 230:4
  230:13,15 231:2
  231:5,8 232:22
  232:23 235:17
  243:17 256:14
  261:17 263:12
  264:23 268:15
  269:24 273:5,5
  279:18,19 280:2
  289:25 299:16
left-hand 290:2
leg 226:22 227:15
  227:16,18,19
  229:14,19,19,21
  229:22 230:13,15
  231:1,2,3,4,5,8
  232:25 238:3
  279:23,25 280:1
  280:2 295:22
legal 178:15 179:7
  287:2 306:8,18

legitimate 203:17
legs 226:17 227:3
  228:17 230:10
  235:20 238:9,13
  238:18 239:13
  240:10 268:5,5
  269:12,23 272:7
  280:6 295:19
let's 190:24
  191:24 218:22
  251:9,23 252:9
  253:3 254:8,16
  255:15 258:22
  262:22 263:10,10
  269:9,19 270:16
  270:20
Letter 179:20
  306:1
lettering 256:1
level 199:19
Lewis 178:15,18
  211:11 252:18
  254:13,19,21,23
  263:17,20 264:5
  264:8,13,16
  269:17 273:3
  278:20 306:23
license 193:1,6
  219:23
lie 221:18
lieutenants 223:8
life 191:14 194:23
  218:5,8,11,16,19
  219:11,13
lifesaving 298:4,6
  298:9
lift 235:13,20
  238:13,15 297:19
lifted 195:9 238:9
lifting 240:9
lifts 271:7
light 191:15
  273:14
lights 267:12
  287:12,16,24
  288:2 291:14
likewise 217:22
  225:11
limited 242:8
line 214:23 235:5
  307:7
listen 181:10,17
  199:6 200:9
  204:9 210:2
  230:23
listening 184:23
  213:25 250:9

little 202:19
  209:7,22 251:22
  253:5 280:18
  281:16 285:23
live 209:14
lives 182:18,24
  191:4,13,16
living 220:16,19
  221:2
LLC 178:11
LLP 178:7
locally 218:22
location 266:17
  287:4,7,8 289:19
  291:1
long 235:17 250:8
  252:1 258:20,21
  273:13 285:21
  300:23
longer 284:16
look 188:17 191:3
  223:17 232:23
  251:13 255:15
  264:12 268:4
  280:6
looked 267:19,22
  275:24 278:25
looking 191:25
  192:21 194:21
  230:19 250:9,18
  254:24 262:21
  267:15 270:22
  271:9 272:9
  279:13
looks 194:13
  255:23 256:1
  262:25 263:6,7
  265:6 267:25
  269:2,6,22
  270:10,15 273:6
  273:12,14 274:2
  279:23,24,24
  280:22,23 281:6
lost 290:3
lot 218:10
loved 213:20
  216:11
Lovette 177:13
  179:2,15 251:11
  264:22 279:9
  285:12 304:8
  305:8 306:4
  307:4,25
Lovette's 204:20
Lower 299:15
lreynolds@rrbp...
  179:5

lungs 250:24
Lyman 179:5 180:12
  306:4
Lyman's 201:24

─────────────────
        M
─────────────────
M 178:10 306:24
MAC 210:14
machine 298:11
main 292:4
maintain 281:8
maintaining 218:19
making 184:21
  196:11,16 198:9
  200:24
male 275:15
man 186:24 191:20
  193:12,13 194:22
  194:23 195:13
  199:21 203:15
  219:25 246:20
  258:2,13 260:14
  262:1 266:17
  272:11,15 273:6
  273:11,12 274:1
  274:25
man's 274:1
manage 232:23
maneuver 225:25
  236:13,15 265:18
maneuvers 233:23
  236:11 249:8
manner 293:22
mark 180:12,13
  181:11,14 262:22
marked 286:15,18
  289:21
material 218:2
  257:7 274:24
materials 233:3
matter 286:8
McKee 178:11,14
  306:23
mean 180:16 187:15
  197:23 199:5,18
  205:9 208:11
  212:7 216:16
  223:12 227:22
  236:23 247:6
  260:11 262:16
  263:6 282:6
  287:11 292:1
  298:18 299:2
meaning 180:15
  282:2
meant 262:8
mechanisms 204:16

medical 189:10
  190:9 192:12,13
  192:19 217:2
  297:23 299:15
  301:25 302:7
Medina 179:9
  208:13
member 208:12
mental 184:9,21
  187:14,16 190:12
  192:13 195:19
mentality 199:19
mention 196:8
  218:3
mentioned 281:19
merely 225:5
message 197:5,18
Miami 306:19
Michael 178:22
  284:13 285:12
  306:25
Michigan 220:19
  221:10
Mike 180:12
military 289:5
million 196:9
mind 184:10 202:1
  228:24 248:25
  249:7,22 293:21
mine 201:6 278:18
  279:4
minute 180:13
  209:21 214:13,15
  214:24 277:22
minutes 214:18
  216:11 301:1
Miranda 282:9
Mirandized 282:12
missed 206:14
  209:6
mix 231:7
modified 225:23
  226:3,20 229:3
  231:22 233:2
  234:15,21 236:22
  241:23 243:14
  246:17 248:22
  261:3
moment 190:24
  250:19 253:10
momentarily 195:23
moments 269:8
Monday 187:10
  250:4
monitoring 234:14
  234:22 235:9
MONROE 304:4 305:4

months 257:6, 6, 16
morning 187:10
  250:4
motion 204:16
mound 270:22
mouth 231:17
move 190:20 205:11
  218:23 219:4, 4
  231:11, 18 232:6
  245:13 250:16
  255:18 262:22
  263:13 266:18
  267:11 269:19
  270:18 294:15
moved 269:4, 9
movement 246:13, 23
  269:19
movements 238:3
  250:20 288:3
movie 197:19
moving 231:6 235:4
  246:14, 15 249:10
  249:12 269:20
  294:24 295:19
multiple 256:23
  257:13, 13
municipality 177:8
murdered 199:15, 21
MURDOCH 178:20

**N**

NAJA 179:10
name 256:21, 25
  258:18
narrative 212:14
  224:25
nature 258:7
nauseam 203:9
near 230:8 273:13
  273:15 290:22
nearly 217:3
necessarily 238:9
necessary 250:14
necessity 266:25
neck 227:10, 10
  230:1
need 184:10 201:5
  223:24 247:5
  252:10 283:18
  297:22
negative 218:12
never 194:21
  225:16 233:1
  234:11 242:5
  243:17 249:6
  277:2
New 218:7

news 180:14 181:12
  181:19
NEWSPAPER 179:10
  179:10
nicer 279:14
nimble 246:22
nine 214:13, 15, 24
  253:6, 6 301:16
non 250:16
nonsensically
  188:25
normal 203:14
  205:24 206:4
norms 189:14
northbound 289:8
  289:10
Northside 299:22
nose 232:16
Notary 304:7, 15
noted 183:17
Nothing's 263:18
noticed 256:18
NOTIFICATION 306:1
November 177:16
  180:1 304:9, 11
  305:18 306:2, 8
  307:5
number 254:25
  256:19 272:10, 21
  273:8 293:9
  301:6
nurse 225:1

**O**

oath 179:19 249:6
  304:1
obese 194:1, 6, 14
  194:17, 18 245:11
  245:22
obey 282:20
object 180:19
  181:22 182:4
  183:1, 12, 20
  184:12, 17, 24
  185:5, 12, 18
  186:1, 19, 25
  187:6, 17, 20
  188:2, 8, 13, 19
  189:4, 15, 20
  190:1, 7, 16 191:5
  192:23 193:19
  195:2, 14 196:13
  197:24 198:5, 14
  199:8, 16, 22
  205:2, 5, 11, 21
  206:5 210:9, 23
  212:14 214:1, 19

215:21 216:13, 18
218:13, 25 220:24
223:2, 18, 22
224:4, 12 225:14
231:24 232:19
233:17 234:23
237:14 238:25
239:5, 23 240:23
242:22 243:11, 22
244:1 246:25
249:3, 14, 17, 25
250:25 255:17, 18
259:12 261:5
262:2 263:4
265:3 267:2
271:18 272:13
274:5 275:17
278:13 281:11
283:19 303:8
objecting 204:21
objection 180:18
  181:23 182:5
  183:2 184:3, 25
  185:6, 13, 17
  186:8, 20 187:7
  187:21 188:3, 9
  188:14, 20 189:8
  189:16, 21 190:2
  190:8, 17, 20
  191:6, 9, 22 192:4
  192:24 193:2
  194:2, 20 195:1
  196:12, 17 197:25
  198:6, 15 199:2, 9
  199:13 200:3
  203:6 205:22, 25
  207:12, 24 211:3
  212:13, 22 213:3
  213:7, 23 214:20
  215:2, 10, 22
  216:14, 19 217:1
  217:9 218:14, 18
  219:12 220:4, 9
  220:23 221:6, 20
  221:24 222:6, 14
  222:20 223:1, 5
  223:15, 21 224:5
  224:11, 18, 22
  225:6, 10, 15, 20
  227:5 231:14, 25
  232:13, 18 233:6
  233:22 234:12
  235:6, 15 236:2
  236:17 237:5, 8
  237:15, 24 238:24
  239:6, 16, 19, 24
  240:3, 11, 20, 24

242:18 243:2, 3
243:12 244:21
245:7, 16 246:11
247:1, 15, 20
248:10 249:4, 18
250:3 251:1, 4, 7
254:1 257:2, 12
257:18 258:5
259:22 260:4, 22
261:6, 14 262:3, 6
262:18 263:5
264:25 265:4, 23
267:3, 9 269:25
271:4, 19, 22
272:14 274:6, 9
274:13, 18, 21
275:8, 18 276:1, 9
276:10, 15, 22
277:18 279:11
280:20 281:5, 14
282:1 283:5, 20
283:23 294:8
303:9, 15
objections 201:13
observe 288:13, 16
  289:24
observed 295:3
obviously 235:5
  249:7 273:16
  282:8
occasions 293:13
occlusion 189:1
occur 240:5, 6, 7
occurred 242:21
  271:1
offense 280:11
offer 219:6
office 254:17
  306:10, 13
officer 183:11, 16
  185:16, 24 187:25
  187:25 188:23
  189:19, 22 191:1
  192:1 193:5
  196:2 198:9
  202:20 204:20
  205:1 208:14, 14
  233:14 244:24
  248:22 253:18
  255:4, 25 256:3, 8
  256:13, 15, 23
  257:13 260:25
  261:9, 17 263:8
  263:12 264:22
  265:11, 11, 21
  268:1 270:4, 10
  270:13 271:6, 16

271:25 272:5,7
273:25 279:9
281:9 285:8,12
285:15,18,22
287:25,25 292:19
292:25 293:2
294:11 298:8,8,9
298:13
**officer's** 277:15
**officers** 184:23
185:9 189:25
190:14,22,23
192:5 195:12
208:25 215:4
217:20 218:23
220:19 221:3,18
222:17,18,22
235:14 236:24
240:22 241:7
242:12 248:7
250:19 255:12,13
255:21 256:19
257:1,20,21,22
258:2 261:16
262:23 264:24
265:9 266:2
267:1 269:1,4,13
269:20 271:14,17
272:11,16,21
290:5 292:15
295:24 297:9,12
297:15 300:17
**Oh** 182:8 197:14
202:15 209:6
254:22 259:1
263:19 264:10
279:14,15 303:2
303:2
**okay** 183:4 188:24
194:10 200:14,18
201:13 202:8,22
210:2 212:2,9
213:2,16 217:16
226:20 227:18
228:22 232:4
235:17 250:16
251:17 252:2,4
252:13,15,19,21
253:3,7,9,13
254:16,23 255:11
258:22 263:13
264:15,17 265:18
266:13,25 267:11
267:20 268:6,11
268:12 269:17
270:20 271:11,11
278:4,6 282:6

285:3 291:7
292:21 293:13
298:21
**old** 192:25 197:19
252:8 258:12
262:1
**older** 192:22
193:18 302:6
**Olivia** 290:1
**once** 249:8,22
252:25
**one's** 235:25
**ones** 213:20 216:11
**oo0oo** 179:12
**oops** 225:8
**opening** 271:12
**opinion** 190:18,19
206:1,2
**opportunity** 181:10
210:2 250:8
**opposed** 233:15
234:9 293:23
**order** 204:17 231:9
238:9 261:9
282:20 283:4,8
**ordered** 260:23
281:22 282:25
283:4
**orders** 282:23
**ordinance** 219:11
**ordinances** 218:5,8
218:11,16
**original** 180:25
**originally** 232:5
**outbound** 287:2
289:25
**outlawed** 242:16,24
**outside** 292:9
**overall** 236:23
**oxygen** 250:24

___

**P**

**P.A** 178:15,20
**p.m** 177:16,16
180:3 259:3,6
286:6 303:19,20
**Page** 179:14 307:2
307:7
**pages** 177:14 305:8
**painful** 261:25
262:5,8
**Palm** 178:3,12,16
179:4
**panic** 237:22
**panned** 267:16
**pans** 267:24 268:10
**paperwork** 182:1

**paragraph** 283:15
**parallel** 289:9
290:9
**paralleling** 186:18
**paramedic** 208:12
**pardon** 214:14
236:12 244:4
246:17 248:24
263:11
**parked** 287:2
291:13
**parking** 287:3
291:19
**part** 180:16 182:3
192:17 195:12,25
197:4 212:8
228:13 229:12
235:3 242:3
290:14 302:7
**particular** 216:8
219:25 260:8
275:15 279:6
**particularly**
213:19 244:19
**parties** 305:13,14
**passed** 218:22
**passer-bys** 260:19
**patient** 222:9,10
222:11
**Paul** 178:9 306:24
**pause** 197:3 252:24
253:15 254:9
255:3 264:18
**paused** 268:12
271:9 272:2
**PBA** 282:2 284:1,4
**penalties** 307:22
**penalty** 281:23
**people** 184:8
213:25 219:18,21
221:13 239:10
270:7,14,22,23
275:12 290:24
294:20 302:18
**people's** 191:16
**perform** 226:12
**performed** 226:8
**period** 300:24
**perjury** 307:22
**permit** 218:23
**person** 192:18
193:18,18 210:17
216:7 233:7,12
257:23 260:25
271:25 273:17
279:6,8,22,23,24
280:4,16,23

286:24 293:15,17
294:10 302:5
**person's** 237:11
**Personal** 177:5
**personally** 244:23
304:8
**personnel** 218:2
224:9,15
**persons** 294:1,5
**perspective** 218:22
277:15,16
**Petronia** 289:13
**phone** 221:22
225:17 251:12
274:1
**physical** 184:9
192:13 241:1
**physically** 194:13
260:11
**physiologically**
237:2
**picked** 213:6
287:25 290:5
**picture** 253:12
**pictures** 232:15
**piece** 188:11
**pieces** 251:12
**pier** 256:6
**pin** 225:24,25
226:1,4,4,13,15
226:15,20 229:4
231:22 233:2,10
234:16,20,21
236:8,22 241:5
241:20,24 243:13
243:15 246:17
248:22 261:3
**pinned** 233:14
**pinning** 266:18
**PIPER** 178:20
**place** 183:3 222:19
272:4 279:2
293:22 295:1
296:8 301:10,24
**placed** 227:10
232:5 236:9
241:4,5,22
268:19,23 271:2
291:13 295:9,9
296:17 298:2
**placing** 293:6
**Plaintiff** 177:6
178:2
**Plaintiff's** 301:5
**plates** 221:10
**play** 196:23 206:12
264:5

played 197:1
  198:23 206:13
  209:6,7,24
  210:25 211:16,20
  212:15,20 213:8
  252:23 253:8,14
  254:8 255:1
  263:14,18,22
  265:5
playing 180:7,8
please 204:3
  208:13 246:8
  258:23 301:8
Plenty 186:16
PLLC 179:3 306:5
plural 243:8
point 181:16 187:5
  198:2,9 207:17
  210:5 212:10
  226:4 232:24
  237:19 238:4
  243:5 248:20
  255:15,22 256:16
  259:9 261:13,16
  262:25 263:2
  266:25 267:25
  268:10,19 279:3
  279:8 283:14
  288:18 289:8
  290:3,12 291:9
  293:3 295:4,10
  296:19,24 297:2
  297:4,18 300:2
pointed 231:16
police 187:13,25
  187:25 191:2
  203:16 217:6,22
  218:23 222:11,16
  224:8,21 225:5
  265:21 269:13
  272:19 273:25
  275:3,6,23 276:5
  277:15 285:15
  286:15,18 288:20
  289:21 293:22
  297:19
popped 272:8
portion 227:23
  264:22
position 191:1
  229:3 230:24
  232:4 233:9
  236:9,24,25
  239:11 244:11,24
  245:1,4 247:3,23
  248:20 254:7
  261:21 265:19,22

266:23,24 267:5
  267:8 286:23
  287:1 288:3,11
  295:12,20,22
positioned 227:7
  227:18,19 228:17
  228:18 229:18,23
  232:2 233:7
  235:11 266:19,21
  269:23 278:15
  294:21 296:4
  301:21
positioning 216:5
  231:19 245:8
  269:13
positive 219:10
possibilities
  184:15
possibility 185:1
  251:5
possible 184:20
  195:13 234:6
  302:17
possibly 200:23
post 273:14
potential 276:4
  281:23
potentially 189:10
  276:4
practice 276:5,12
  302:18
practiced 241:3
  245:2
PRATT 179:7
precious 250:24
preparatory 283:14
prepared 202:21
  306:10
present 179:7
  200:23 221:5
  264:24 267:1
  268:17 269:1
  271:5 275:4
pressed 280:10
pretty 229:24
  263:9 266:9
prevent 226:18
preventing 228:5,7
  230:20 246:9,13
  246:14,20,22
previously 299:10
prime 194:22
prior 242:20,25
  293:8 301:12,15
  302:13,13
probability 251:3
  251:6

probably 192:14
  245:17,18 254:2
  256:1 301:2,4
problem 218:20
  229:1
procedural 204:15
procedure 204:11
  276:6 293:18
procedures 191:2
  217:7,23
proceeding 306:10
PROCEEDINGS 179:13
procure 275:11
procured 274:25
Professional
  177:25 304:7
  305:7,22
proffer 182:13
  183:4 210:13,15
  253:5
prone 236:9,16,25
  237:22 238:1,13
  239:11 240:8,16
  241:3,10 242:1,7
  242:15 245:1,3,9
  254:2 265:19
  267:5,8 292:11
proper 250:14
  281:4,10 293:20
properly 189:3
  267:5 300:9
proposition 198:17
protect 202:22
protective 204:17
protocol 191:2
  234:22 276:6
protocols 217:7,23
prove 276:14
provide 297:25
provided 306:10
PT 222:3,9 270:6
  270:11 271:6,7
  271:13 272:1
Public 304:7,15
pull 245:23
pulled 182:16
  246:10 261:23
  264:23 290:25
  291:15,19,20
pulling 192:18
  245:21 261:21
pulls 246:19
pulse 208:9,11,20
  208:24 209:2
  224:8,20 225:5
punch 296:24 297:7
punished 219:24

punishment 282:22
  282:24
purportedly 275:24
purpose 249:16,20
  266:17
pursuant 282:23
pursuit 220:12
  288:10
push 226:25 245:23
pushed 226:23
  280:13 281:7
pushing 239:7
  246:15
put 185:14 188:4
  195:9 238:10
  239:11,12 240:19
  240:21,22 241:13
  241:21 242:1
  243:14 244:13
  245:5 247:2,3
  248:17 254:8
  261:2,12 266:21
  277:2 292:24
  294:2 295:22
  299:9,13 303:10
putting 191:13
  258:10 299:12

Q

quality 210:14
  218:4,8,11,16,19
  219:10,13
quarterback 187:10
  250:5
question 180:10
  190:24 194:16
  197:9 199:25
  203:12,17 204:25
  206:3 212:21
  215:6 225:3,4
  226:11 234:1
  249:20 250:18
  251:23 264:21
  272:9 276:17
  282:25 303:3
questions 198:21
  200:10 250:9
  281:18 285:5,13
  302:22,23
queue 182:15
  251:24
quick 302:17
quickly 292:2
quiet 207:7,16
quote 206:10
  210:20 222:2,4
  224:8

quote/unquote
  250:23
quotes 196:20

**R**
radio 183:23,24
  185:9,16 186:17
  186:23 193:14
  196:4,7 286:13
  286:22 288:4,5
  290:8,21
raise 300:21
raising 279:1
ran 191:15,15
  222:3,12 225:12
  290:24 298:10
raw 257:7
reaction 214:3,7
read 179:20 218:2
  218:7 230:22
  303:17 307:22
readies 278:9
reading 193:5
  203:18 302:25
ready 252:9,24
  268:22 269:15,16
  278:7,19
real 225:24
really 239:3 250:7
  250:10,22 251:12
reared 246:1
reason 223:24
  250:23 307:7
recall 183:14,23
  184:5,6 190:23
  193:15 194:7
  196:3,7 206:18
  209:4,17 221:8
  227:4 231:6,13
  231:15 232:14
  236:5 237:9
  242:14 247:16
  256:6 257:3,8,11
  257:14 258:15
  282:17 284:8,10
  285:2 287:20
  292:13,15,22
  294:19 295:8
  298:15 300:6,19
recess 259:4
recognize 209:8
  210:1
record 180:2
  200:21 202:4
  243:19 258:25
  259:2,5 285:9
  303:18 305:10

recorded 302:14
recording 210:5
  273:17,19
recourse 201:7
red 191:15
redirect 179:16
  302:24 303:4
reflect 243:19
refusing 282:20
regained 208:23,23
regard 189:12
regardless 207:9
regards 217:5
registration 193:1
  193:6
relation 230:13
relative 277:14
  305:12,14
relayed 189:24
  196:5 220:11
  221:10
relevant 198:3
relieved 208:21
remained 225:19
remaining 273:9
remember 193:10
  194:7,21 196:16
  197:8,11 206:11
  210:5 221:12
  223:9 235:1
  256:20 257:16,19
  258:18,20 260:16
  284:12 292:17,25
  293:1,1,2 294:20
  295:11 300:1
reminds 255:11
removed 296:20
  299:14
repeated 218:3
report 180:24,25
  181:3,4,5,5,6
  182:3,6,12 222:2
  222:13 224:7,9
  224:10 281:22
  282:14,21 283:1
  283:7,18 284:11
  305:8
reported 222:3,11
  223:13,13 224:14
Reporter 177:24,25
  179:20 304:6,7
  305:1,6,7,22
Reporter-Master
  305:22
reports 225:23
  248:3 250:9
  281:21,23 282:19

283:11
repositioning
  273:7
represent 204:13
Representative
  177:5
request 306:12
requested 300:16
  305:9
required 204:17
  234:22 236:8
  294:6
rescue 298:15
  299:14
reside 221:14
resist 239:17
  250:10 255:9
resistance 181:25
  182:9 192:7
  234:6,13 262:15
  272:20 295:4
resisted 249:5
  251:2
resisting 192:15
  195:20,22,23
  226:9 235:1
  239:2,9 246:6
  247:10 249:13,15
  249:22 250:10,11
  250:23 265:18
  272:15 294:25
  296:9
resists 302:5
respect 286:22
  302:10
respectfully
  306:12
response 181:25
  182:9,18,21
  206:9 272:20
  286:15
responsive 250:17
restate 214:14
  226:10
restaurant 208:6
  227:9 228:3
  265:17 266:20,23
  275:21 290:17
  298:10
resting 228:19
restrain 233:8,24
  236:16 301:24
restrained 243:1
restraining 225:25
  226:5 236:5
restrains 238:3
restraint 234:15

235:19 236:23
  237:22 238:1,13
  240:8,16 241:3
  242:1,8,16,20
restraints 242:5
restrict 236:13
  237:19
restricting 235:25
restriction 237:2
restricts 236:10
  294:15
Resumed 179:15
  180:4
resuscitate 208:6
retained 277:14
retrieved 298:10
return 306:13
review 250:9 305:9
  306:10,13
rewind 280:5
Reynolds 179:3,5
  180:18 181:23
  182:5 183:2,13
  183:21 184:3,13
  184:18,25 185:6
  185:13,17 186:4
  186:8,20 187:1,7
  187:21 188:3,9
  188:14,20 189:8
  189:16,21 190:2
  190:8,17,20
  191:9,22 192:4
  192:24 193:2,20
  194:2,20 195:1
  195:15 196:12,17
  196:23 197:25
  198:6,15 199:2,9
  199:13,23 200:3
  205:2,5,8,11,22
  205:25 206:6
  207:12,24 210:10
  210:24 211:3
  212:13,22 213:3
  213:7,23 214:20
  215:2,10,15,22
  216:14,19 217:1
  217:9,12,14,17
  218:14,18 219:1
  219:12 220:4,9
  220:23 221:6,20
  221:24 222:6,14
  222:20 223:1,5
  223:15,21 224:5
  224:11,18,22
  225:6,10,15,20
  227:5 231:14,25
  232:13,18 233:6

233:18,22 234:12
234:24 235:6,15
236:2,17 237:5,8
237:15,24 238:24
239:6,16,19,24
240:3,11,20,24
242:18 243:2,12
243:23 244:21
245:7,16 246:11
247:1,15,20
248:10 249:4,18
250:1,13 251:1,4
251:7 252:20
254:1 255:18
257:2,12,18
258:5 259:13,22
260:4,22 261:6
261:14 262:3,6
262:18 263:5
264:25 265:4,23
267:2,3,9,17,20
269:25 270:18
271:4,19,22
272:2,14 273:7
274:6,9,13,18,21
275:9,18 276:1
276:10,15,22
277:18,22,24
278:6,14 279:11
280:20 281:5,14
282:1 283:5,20
283:23 294:8
302:23 303:1,9
303:15,17 306:4
306:5
**rifle** 256:13
**right** 184:16 185:4
186:3,18 187:3
187:19 188:12,22
189:3 193:4
194:9 195:17
197:5,6,7,21
198:2,4,4 199:7
200:9 201:14,22
203:11 204:17,23
206:15 209:21,23
211:12 213:10
214:14,18 224:17
225:3,5 227:16
227:16 228:1,6
229:8,9,14,20,22
229:22 230:4,5,6
230:7,17,19,25
231:1,2,3,4,8
234:7 235:5
243:16 244:14
246:2,10,16

247:19,25 248:5
251:23 252:9,16
253:17 255:15,24
255:25 256:8
260:20 261:13
262:16 263:1,7,9
263:12 264:3,23
265:7,10,15,15
266:6,19 267:24
268:2,15 269:24
271:8 273:15
274:23 279:1,6
279:15 280:2,7
280:17 282:4
283:18 285:10
286:9 288:6
289:1,7,10,23
291:12 293:4
294:1 295:12
300:2
**right-hand** 290:6
290:10
**rights** 282:9
**RINALDI** 178:3
**rising** 246:9
**risks** 234:10
**rmckee@themcke...**
178:13
**Road** 306:5
**Robert** 178:14
306:23
**Roberts** 179:3
306:5
**rocks** 273:16
**RODERICK** 179:7
**role** 277:10
**roll** 226:25
**rolling** 226:18
228:7 230:21
281:6
**room** 224:7,9,14
232:16
**rotating** 269:4
**rough** 212:11
**roughly** 180:11
182:14 212:11
257:6 263:10
**Royal** 178:3,12,16
**RRI** 181:8,25 182:2
182:3,6
**rules** 201:8 204:11
218:22
**ruling** 203:3

─────────────
      **S**
─────────────
**safe** 182:20 231:17
234:22 235:10

266:16
**safely** 230:11
**safer** 254:7
**sanctioned** 219:24
**sand** 185:23 214:16
228:20 230:17
232:11,16,22
233:11,15 234:9
234:11,13 238:16
238:23,23 242:1
242:6 244:20
245:11,12,15
259:10 261:1,4,8
295:25 300:8
**sandy** 254:4 298:23
**save** 275:25
**saving** 182:18
191:4
**savings** 182:24
**saw** 194:21 195:8
214:25 223:17
225:16 232:15
247:18 251:20
256:5 271:25
276:18 278:25
285:1 292:8
294:21,24
**saying** 182:2,16
183:24 185:11
188:16 197:8,11
197:12 201:24
206:9,11 210:20
213:19 227:4
235:18 237:18
248:13 284:1
296:7
**saym** 287:10
**says** 205:17 211:19
252:16 273:25
281:21 282:19
**scenario** 248:15
**scene** 182:22
183:10 184:23
185:9,15 223:9,9
253:23 256:17
261:1 270:11
274:1 275:6
276:4,4,14
286:18 293:4
299:16 300:20
**screaming** 249:11
**screen** 252:1
261:17 271:10
272:25 273:5
276:19 278:4
279:3
**screen's** 279:14

**Scroll** 264:17
**second** 253:3,11
258:24 262:22
264:1 268:3
270:8 273:8
277:23 278:6
282:16
**secondly** 181:19
**seconds** 209:6,23
214:16 252:15
253:6,6 254:19
255:15,16,21
258:23 264:18
278:5,22
**section** 268:2
**secure** 230:11
275:16 276:7,13
299:13
**secured** 262:13,14
262:17 274:14
**securement** 217:21
**see** 182:8 194:5
204:8,18 231:16
247:17,23 248:21
251:14,15 252:9
253:17 255:21
256:5 259:10,14
262:23 265:13
267:12 269:12,14
269:21 270:20,22
272:5 275:3
277:25 279:23
280:1,1 284:5
288:7,10,11
289:11,19 297:7
297:9,12,15
298:6
**seeing** 271:8
294:20
**seen** 251:19 274:17
274:23
**seized** 260:9,11
**seizure** 195:25
**sensation** 238:22
**sense** 227:14
238:22
**senses** 189:13
**sent** 299:17
**separate** 192:1
**sequence** 257:1
**Sergeant** 300:14,16
**sergeants** 182:1,7
223:8
**series** 281:18
**serious** 210:3,16
**served** 266:17
**set** 272:7

**setting** 213:20
**seven** 257:6,16
**Share** 204:9
**sheet** 179:21
  306:13 307:1
**shift** 222:18
  285:24 286:2,4,7
**shin** 227:16 229:14
  243:16,17 246:4
  266:6
**shins** 226:16 227:2
  227:13 243:8,14
  243:15 295:19
**shirt** 273:13 298:8
**shock** 208:10
**shop** 207:11,13,14
  214:8
**short** 181:4 194:24
  300:24
**shortly** 209:18
**shot** 210:17
**shoulder** 227:17,24
  228:1,11,15
  229:7,8,10,15,16
  229:17,24,24
  230:2,19 243:16
  266:7
**shoulders** 194:8
  227:2,10 228:7
  239:12
**show** 202:19 216:25
  251:9 275:24
  276:4,8,13,14
  277:20,20 278:3
  278:18 301:9
**showed** 298:16
**showing** 202:25
  203:2
**shows** 274:20
  276:20
**shut** 299:12,13
**side** 202:21 227:23
  256:6 263:12
  268:11 269:6
  290:18
**sight** 290:3
**sign** 182:19 191:15
  291:9
**signed** 220:8
  304:11
**Simonton** 177:17
**simply** 224:20
**Sincerely** 306:15
**single** 276:19
**singled** 219:9
**sir** 181:2 185:21
  187:11 190:18

196:3,14,18
201:20 203:4
206:12,19 212:7
215:1 218:6,9,15
219:8 222:5
230:16 234:19
235:5 236:11,25
241:17,25 242:5
244:12 246:18
247:21 254:11
256:12,22 257:24
258:19 262:9,25
266:10 268:21
271:8 273:18,21
274:7,12 275:2
275:22 277:12
284:12 285:16,20
286:3,10,16,19
286:21,25 287:15
287:18 288:5,15
288:21,25 289:22
290:16,19 291:16
292:20 293:10,25
295:11,17,21,25
296:3,6 298:12
298:25 299:4,8
299:24 300:4,11
300:15,23,25
301:7,11 302:1
302:20,21
**siren** 287:17,24
  291:14
**sirens** 287:12
  288:2
**sister** 209:9
**sister-in-law**
  209:10
**sisters** 209:12,13
**sisters-in-law**
  209:13
**sit** 202:3 204:4
  293:23
**sitting** 203:19
  254:12 279:24
**situation** 187:10
  188:4,5 190:5
  193:23,24 195:18
  206:18 214:21
  244:22 257:25
  258:7 278:17
  303:10
**six** 190:14,22
  258:11 266:12
  289:20
**six-one** 266:11,13
**sixties** 192:22
**sizable** 266:9

**size** 194:7 195:19
  196:6 245:18
**skinny** 194:22
**slack** 265:2
**sleeping** 219:25
**slow** 220:12,15
  221:11
**Smith** 283:3
**so-called** 233:2
  248:21
**soft** 233:15
**someone's** 236:5
  237:16 239:25
  280:10
**soon** 200:22
**sorry** 197:13,14
  199:10 205:9,9
  206:22 207:13,25
  211:24 212:7,23
  220:25 221:20
  223:12,24 226:10
  231:15 244:3
  247:6 254:24
  263:19 267:17
  269:1 276:24
  292:20 301:3
**sort** 187:16 229:13
  302:6
**sorts** 204:15
**sound** 182:15
  213:22 296:11
**sounds** 180:22
  181:9 199:21
  248:15
**south** 290:11,14
  296:5
**southbound** 290:7
  290:10
**Southeast** 306:18
**SOUTHERN** 177:1
**Southernmost**
  290:12,15,22
  291:8,12,18
  292:5
**space** 228:10,13
**speak** 186:5 187:22
  217:24 248:11
  281:8
**speaking** 191:4
  209:24 210:8
**specific** 218:4
  257:1
**specifically**
  292:21
**specifics** 257:14
  257:17
**speculative** 263:6

**speed** 288:8
**speeding** 288:16
**spine** 229:25
**spinning** 295:20
**spot** 180:11 196:9
  254:16 268:4
  277:20 287:3
  291:19
**stack** 292:5
**stance** 241:19
  246:17
**stand** 180:23
  217:17
**standard** 276:6
  293:17
**standards** 191:2
  217:23
**standing** 268:8
  280:22,23
**start** 188:25
  212:19 253:9
  286:4 298:4
**started** 203:11
  210:12 265:6
  287:11 291:1
  298:9
**starts** 210:15
  230:2 251:24
  253:5
**state** 180:14
  187:15 221:14
  304:3,7,15 305:3
**stated** 307:23
**statement** 200:2
  243:10 274:25
  275:15 302:14
**statements** 182:23
  182:23 213:18
  230:23 243:9
  275:12,13
**states** 177:1,17
  242:16,17
**stay** 265:19 298:13
  299:14
**stayed** 210:4
**step** 191:24
**stipulation** 203:6
**stocky** 194:24
**stomach** 194:19,24
  229:4 241:4
  244:20 245:9,11
  245:14 248:5,6,8
  249:10 253:24
  292:11,12
**stood** 235:21,22
**stop** 183:10,19
  185:22 186:10

188:17 189:23
191:15 200:12,12
200:13 234:25
247:10 262:23
268:7,25 269:23
278:21 286:12
287:9,10,13,14
288:1 290:1,1,21
291:9,21 296:9
303:14
**stopped** 214:24
235:5 254:14
262:21 272:2
286:15,18 291:3
**stopping** 254:13
**stops** 214:13,25
**story** 222:1 225:18
225:19
**straight** 202:9
**strange** 191:4
**strategies** 191:20
**street** 177:17
178:7 186:14
219:20 275:4
289:5,5,7,8,9,9
289:11,14,15,20
289:24,25 290:1
290:2,9,10
291:20
**streets** 219:21
**strike** 190:20
205:12 208:2
250:16 255:18
270:18 296:24
297:7
**stroke** 188:25
**strong** 194:15
**struggling** 190:14
192:7 239:3,8
249:2,12 250:24
**stuck** 181:21
270:24 281:15
**stuff** 191:4 213:17
252:8 271:8
**subject** 226:14
**subjected** 240:16
**subsequent** 275:7
**subsequently**
287:16
**suffer** 188:25
**suffered** 190:13
221:19
**suffering** 189:10
**suggest** 248:3
**suggesting** 263:16
**suggestion** 259:20
**Suite** 178:3,12,16

178:20 306:5,18
**Summary** 301:6
**Sunrise** 178:20
**supplemental**
180:25 283:7
**Support** 306:8,18
**suppose** 197:19
**supposed** 220:20
276:7
**sure** 195:24 196:20
196:21 197:16
209:2,19 236:20
253:12 258:6
259:1 277:9
279:9 280:19
282:10,17 300:9
**surface** 234:9
254:4
**surfaces** 233:15,16
**suspect** 188:1
243:18 256:24
302:11
**Suzanne** 177:23
304:6,14 305:6
305:21 306:17
**swing** 255:5
**swinging** 220:1
**switch** 299:6,7,10
**sworn** 304:10
**swung** 255:7
**synch** 251:15

---

**T**

**T** 178:22 306:25
**table** 202:21
**tackle** 189:9
**tactically** 232:3
**tactics** 188:5,7
191:20 244:22
257:25
**take** 189:11 191:24
199:5 200:15,17
200:25 201:22
232:5 234:5
239:14 244:10
247:17 250:15
255:5,13,14
258:9 265:18
272:16 275:15
276:7,8 294:21
297:25
**take-down** 256:23
257:1
**taken** 177:21 195:8
248:25 257:4
275:13 298:3
301:22 306:8

**talk** 180:7 207:11
207:13,14 210:21
214:8 223:11
225:22 257:22
302:24
**talked** 224:1 266:8
273:22
**talking** 180:6,8
188:25 191:18
197:17 198:25
199:4 207:15
210:3 230:5
235:23 245:10
251:10 273:10
**talks** 182:15
**tall** 194:22
**Tase** 182:11
**Taser** 296:20,22
297:15 299:1,5
300:3,7,12,13
302:10
**Tasers** 300:17
**taught** 185:4 233:9
233:21,25 234:3
234:5 235:9
237:1 238:2,12
**teach** 256:25
**team** 208:12
**technical** 278:2
**techniques** 298:4,6
298:9
**technology** 252:7
**teeter** 245:14
**tell** 180:11 193:5
194:17 198:20
205:16 210:19
239:20,22 240:18
240:25 241:1
242:11 244:19
249:5 250:4,6
251:8 255:10
257:24 262:19
264:11 269:6,15
271:14 273:24
280:1 281:2
289:1 291:21
301:8
**telling** 195:7
234:25 247:11
296:9,10
**ten** 209:5,5 216:10
**term** 220:13 225:24
295:6
**terminated** 203:22
281:23
**termination** 282:22
**terms** 288:22

**terribly** 228:24
**test** 300:12
**test-fired** 300:3,7
**testified** 277:11
**testify** 277:3,14
**testimony** 195:24
225:17 227:6
229:2 246:7
248:3 249:6
266:5 272:17
277:5
**texts** 196:10
**Thank** 220:15
247:24 252:4
259:7 284:22
302:21 303:1
**thanks** 279:15
303:16
**Thanksgiving**
209:19 213:20
214:10 285:14,22
285:24 286:7
301:12
**theft** 258:8
**thereabout** 196:10
196:15 206:8
209:5
**thigh** 228:14
232:25
**thing** 181:15
191:12 203:20,23
250:20 278:2
279:13
**things** 185:4
189:17 193:8
214:2,4,6,7,10
219:6,23 221:4
241:6,9 302:11
**think** 187:12 190:4
190:25 202:13,15
202:17 203:21
205:17 206:3
218:11 222:17
232:2 239:13
242:11 251:10,11
251:22 254:18
258:2 267:14
273:7,10 274:8
281:1 291:23
298:15 301:5
**thinking** 181:8
**third** 265:11
306:18
**Thirteen** 301:14
**Thomas** 290:4
**thought** 207:22
215:8 272:6

290:23
**threatening** 260:19
**three** 219:14 226:3
  241:19 252:10,21
  253:7,13 254:25
  257:21,22 258:10
  263:14 267:1
  268:22,25 269:2
  269:15,19 270:15
**three-point** 225:24
  225:25 226:1,4
  226:13,20 229:3
  231:22 233:2,10
  234:16,20,21
  236:8,22 241:5
  241:19,20,24
  243:13,15 246:17
  248:22 261:3
  289:18
**threw** 263:1,7
**tilt** 252:10
**time** 180:7,11
  181:14 182:16,19
  182:21 183:6,9
  183:16 185:22,22
  186:6,9,10,10,13
  186:16,23 193:25
  214:17,23 215:3
  215:5,16,18
  222:23 235:12,14
  235:16 241:1,6
  241:16 242:20,25
  243:6 247:7
  250:2,20 251:24
  252:18 258:21
  270:11,16 273:10
  275:3 283:9
  285:4,17 288:18
  289:18 290:11
  296:13,19,24
  297:2,4,18 300:2
  300:19,20,24
  301:2,4,17
  302:22
**times** 218:7 241:12
  251:18,20 258:4
  293:16
**timing** 263:25
**today** 192:3 227:6
  248:2 249:6
  251:18 272:17
**told** 184:1 192:2
  200:7 227:1
  235:24 245:11
  253:5,23 282:2
  283:24 284:5
  296:4

**tomorrow** 200:22
**tone** 210:3,16
**top** 237:10 268:13
**topic** 260:8 281:17
**torso** 216:23
  226:14,17 227:8
  227:10 243:16
  266:7 268:16
  294:22
**total** 266:2
**touched** 281:19
**tourist** 214:12
  221:23 284:9,18
  284:21
**tourists** 218:24
  219:5
**traffic** 223:7
  249:8 286:12
  287:9,10 288:1
  288:13 303:7,12
  303:14
**trained** 208:16
  234:20 235:25
  236:3,7,15 237:7
  237:21 242:5,15
  242:24 244:9
**training** 184:7
  191:1 192:17
  195:12 217:6
  225:24 226:7
  233:3,13 234:7
  234:11,13 235:8
  236:5 240:13
  242:3,12 256:18
  257:7,15 272:18
  301:5,6,9,13
**transcript** 305:9
  305:10 306:10,21
  307:2
**transient** 220:19
**translated** 225:1
**transmissions**
  286:22
**transpired** 248:25
**transport** 222:24
**transported** 208:22
**trauma** 210:20
  211:16,18,21
  212:1 213:21
  216:23
**travel** 193:11
  230:10 289:12
**traveled** 289:4
**treat** 188:1 198:13
  221:13
**treated** 184:10
  198:18 220:21

**Treavor** 177:5
  306:7 307:4
**trigger** 236:1
**true** 192:16 206:21
  207:10 224:17
  225:4,11,13
  274:8,10 305:10
  307:23
**Truman** 186:15,16
  287:3,22 289:4
  290:2
**try** 219:22,22
  228:24 232:3,8
  233:23 234:5
  240:5 250:11
  253:2 288:7
**trying** 204:14
  228:22 230:9,12
  234:8 235:20
  239:25 248:22
  263:8 266:20
  281:8 294:21
  295:5,6 302:16
**Tuesday** 177:16
**turn** 226:25 227:21
  228:21 230:24
  232:8,10,10,21
  251:14 266:21
  287:16 289:7,10
  289:18,19,25
  290:2,6,10 295:6
  295:7,7,23
  299:10,10
**turned** 227:8,20
  228:3 229:7
  230:18 253:2
  265:16,16,19
  287:12,23 299:1
  300:13
**turning** 226:19
  228:6
**turns** 267:12
  289:14,15
**Tuzzio** 179:3 306:5
**two** 209:11,12,13
  209:13 214:18
  219:13 238:16
  251:12 252:22
  253:7,13 254:25
  255:23 257:10,16
  257:20,20 262:23
  263:14 265:10
  268:25 269:19
  271:14 276:20
  278:12,16 279:7
  279:10,21 280:4
  280:16 281:1,3

**type** 188:1 194:11
  213:20 236:7,15

___

**U**

**U-turn** 287:12
**U.S** 306:8,18
**Uck** 182:19
**Uh-huh** 190:11
  215:8 264:16
  273:3 280:14
**ultimately** 238:7
  262:13,16 270:17
**unable** 237:23,23
**unbuttoned** 298:7
**underlying** 302:6
**understand** 199:19
  208:8,10 209:3
  211:23 230:12
  233:20 234:1
  246:7 255:13
  277:24 295:18
  296:1,19
**understanding**
  209:1 250:19
  256:3 282:20
  286:14,17
**understood** 208:8
  217:18 248:12
**unit** 219:13 286:15
  286:18
**United** 177:1,17
  242:16
**units** 223:6,7
  275:3
**unknown** 259:25
  275:15
**unrecorded** 183:22
  183:23
**unsuccessful** 208:9
**upper** 216:23 226:6
  226:14,15,24
  227:8,10 238:13
  238:19,22 245:5
  245:12 246:14
  266:18 294:22
  295:15,20
**use** 180:25 241:20
  242:15 277:13,14
  278:12 281:4
  293:14 295:19
  299:19 302:10
**use-of-force**
  277:11
**uses** 257:19
**Usually** 263:21

___

**V**

**vagrancy** 218:20
**vagrants** 219:7,18
**Valle** 208:14,15
  256:15,15 270:10
  287:25 293:2
  298:8,14
**value** 276:8
**vehicle** 193:10
  222:3,12 225:12
  286:23 287:1,11
  287:14 288:16
  289:21,23 290:21
  291:1,3,10,17,21
  291:24 292:2,9
  300:22
**vehicles** 297:19
**ventilated** 298:14
**venture** 270:13
**verbal** 244:6
**Verbatim** 177:24
  304:6 305:6,22
**version** 255:12
**versus** 193:18
  194:14 240:19
**video** 177:13
  179:15 180:2
  200:22 215:17,25
  252:23 253:8,14
  254:8 255:1
  259:2,5 263:14
  263:22 264:8
  265:5 271:9
  272:4 273:11
  285:9 294:23
  302:10 303:18
**videographer** 179:7
  180:2 251:14
  252:3,12,14
  258:24 259:2,5
  303:18
**violate** 203:3
**violating** 189:13
**violation** 303:7,13
**violent** 189:11
**visibly** 259:11
**visiting** 209:17
**voice** 209:8
**Volume** 177:13
  180:1
**volunteered** 261:24
**vs** 177:7 306:7
  307:4

---
**W**
---
**W** 178:5 306:22
**wait** 244:24 254:22
  263:17 272:2

273:7 277:22,22
277:22 283:18
287:4 303:2
**walk** 244:13 297:19
  300:22
**walking** 225:8
  266:1
**wall** 219:25 220:2
**WALLACE** 178:7
**Wallis** 298:9
**Wanciak** 179:8
  253:18 254:17
  268:1 271:5
**want** 195:23 196:1
  196:19 200:16,19
  200:20,21 201:10
  201:11 202:19
  203:17 206:8
  208:10 209:2,15
  213:18 219:21
  264:1,5,10,11
  267:7,22 268:3,4
  277:24 278:10
  302:24
**wanted** 203:11
  219:19 231:10
  233:8 247:24
  300:9
**Wanziak** 256:4
  261:9
**warrant** 288:23
**wash** 216:9
**wasn't** 195:10
  221:9 224:6
  246:5 249:13
  283:24 300:23
**watch** 252:25 253:4
  269:19
**watching** 203:19
  251:15 264:22
  271:9 273:17
**water** 223:6
**way** 183:18 189:10
  189:11 205:19
  209:8 219:19,22
  220:21 226:5
  229:13 230:24
  231:7,15 232:1,5
  236:10,14 249:21
  251:11,18,21
  252:25 260:8,9
  261:25 266:19,19
  266:22 269:7
  272:15 273:5
  279:7 280:21
  288:7 295:1
  301:17

**we'll** 190:13 194:9
  204:8 213:17
  251:9,14,15,21
  252:25
**we're** 180:6 195:22
  200:15 201:2
  202:24 203:1
  211:9 216:16
  220:20 233:9
  252:1 254:19
  267:11 273:17
  276:7 279:13
**we've** 242:8 253:5
  302:14
**weapon** 258:16
  259:11,16,17
**weight** 196:6
  276:21
**welcome** 284:23
**went** 209:6 235:8
  240:14,18,25
  241:10 248:4
  249:11 255:4
  256:7 258:9
**weren't** 189:17
  206:20 207:10
  237:19
**west** 177:2,8,18
  178:8 179:4,10
  179:10 219:6,6
  222:11,16 228:4
  272:19 273:25
  275:6,23 276:5
  285:15 306:7
  307:4
**West's** 218:8
**Weston** 178:4,12,16
**whatsoever** 274:24
**White** 186:15,16
  287:3
**Whitehead** 178:7
  290:4,9,10
**wife** 209:9
**Wiles** 306:5
**Williamson** 300:14
  300:16
**Windsor** 287:21,21
**wish** 180:12
**witness** 177:21
  186:9 194:3
  196:25 199:10
  207:13,25 211:23
  211:25 212:3
  213:15 215:16
  220:5,5,25
  231:15 234:13
  244:6 252:17

253:2 255:2,4
267:19 273:25
275:13 302:14
306:1,11,12
**witnessed** 217:25
  218:1
**woman** 209:25
**wonderful** 219:6
**wondering** 181:9
**word** 199:5 211:12
  276:8
**words** 183:16 302:5
**work** 219:11
**working** 285:24
  300:9
**worries** 252:19
**wouldn't** 182:11
  183:22 189:9
  190:25 191:12,19
  192:9 225:18
  226:22 227:13,20
  230:8 239:8,17
  240:6 243:14,15
  244:23 245:15
  272:22 288:9
**wrist** 244:16
**wrists** 295:9
**write** 181:3 282:20
  283:1,7,18,22
  284:25 307:2
**writes** 282:14
**writhing** 249:1,11
**writing** 224:3
**written** 223:19
  283:11
**wrong** 180:21 184:8
  188:18 213:5
  217:11,14 218:21
  245:3 247:22
  262:24
**wrote** 224:1,10
  284:11

---
**X**
---

---
**Y**
---
**yawning** 244:3
**yeah** 183:22 196:23
  196:25 202:6
  214:22 217:4
  229:12 234:4
  251:22,23 264:6
  280:8 289:7
**year** 217:3 256:18
  256:20 301:8,13
  301:15
**year-old** 194:23,23

272:11
**yearly** 218:3
**years** 219:14
  240:14 242:13
  258:1 285:23
  293:8
**yelling** 213:10,14
  213:15 235:1,2
  239:7
**yesterday** 266:8,14
**York** 218:7
**young** 194:22
**younger** 193:18
  258:13

---

**Z**

**ZAMORA** 179:8
**zoom** 277:21

---

**0**

---

**1**

**1** 178:12,16 183:17
  305:8
**1:05:35** 206:15
**1:05:55** 206:8
**1:06:30** 209:5
**1:07:29** 210:19
**1:09** 177:16
**1:12** 180:2
**1:20** 212:5
**1:28:23** 212:19
**1:29** 212:10
**1:49** 181:15
**10** 180:13 212:11
**10:52** 181:11,14
**1000** 178:20
**11** 222:17 258:1
  285:23 293:8
**1186137** 306:8
**12** 268:7 273:9
  306:2
**1250** 306:18
**12th** 304:11 305:18
**14-10028-CIV-M...**
  177:3
**14:18** 182:13
**1400** 291:11
**17** 196:9
**17150** 178:3,12,16
**177** 177:14
**180** 179:15

---

**2**

**2** 178:3 183:18
  301:6
**2:43** 259:2

**2:52** 259:5
**20** 263:10
**200** 258:9
**201** 306:5
**2012** 301:15
**2013** 285:14,22,25
  286:8 301:8,12
  301:12
**2014** 177:16 180:1
  304:9,11 305:18
  306:2,8 307:5
**2017** 304:16
**21** 254:19,22,22,25
**217-0150** 178:13,17
**225** 266:12
**235** 266:11,13
**2455** 178:20
**26** 263:11,11,13
  264:18,19
**27** 264:7 304:16
**28** 263:10
**285** 179:16
**29** 255:3,15,16,21
  262:22 268:11,12
  268:13
**294-4585** 178:8
**294-7822** 178:8

---

**3**

**3** 307:5
**3:53** 177:16 303:18
  303:20
**30** 209:23 263:8
  306:13
**301** 177:17
**303** 179:16 305:9
**304** 179:19
**305** 178:8,8 179:20
  306:19
**306** 179:20
**307** 177:14 179:21
**31** 262:23 263:9,14
  269:12,14
**32** 264:19 271:11
  271:12
**33** 254:20 271:12
**33040** 177:18 178:8
**33067** 306:6
**33131** 306:19
**33304** 178:21
**33326** 178:4
**33327** 178:12,16
**33409** 179:4
**35** 265:7,8,8 266:1
**36** 206:15 265:14
  269:1
**37** 206:15

**373-8404** 306:19
**38** 269:1
**384-6226** 178:4
**39** 265:25
**3rd** 304:9

---

**4**

**4** 177:16 180:1
  306:8 307:5
**41** 272:25 273:9
**45** 268:2 269:24
  270:8
**46** 267:11
**463-0100** 178:21
**463-2444** 178:21
**47** 267:11
**470** 179:3
**4th** 304:9

---

**5**

**50-some** 194:23
**52** 180:13 267:12
**52:10** 278:20
**53** 267:12
**54** 252:15 267:13
  278:5,22
**56:15** 196:10
**56:45** 196:15
**561** 179:4,4
**57:03:07** 197:4

---

**6**

**6:00** 286:6,6
**60** 242:13
**608** 178:7
**61** 272:11
**61-year** 262:1
**63** 194:23
**688-2343** 179:4
**688-6560** 179:4

---

**7**

**7501** 306:5

---

**8**

**876-4344** 178:4
**888-9877** 178:13,17

---

**9**

**954** 178:4,4,13,13
  178:17,17,21,21