**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,

        Plaintiff,

vs.

CITY OF KEY WEST, a Florida municipality, et al.,

        Defendants.

_____/

VIDEO DEPOSITION OF HENRY JOSE DEL VALLE

Thursday, November 6, 2014
9:17 a.m. - 10:40 a.m.
Freeman Justice Centere
302 Fleming Street
Key West, Florida  33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter
Florida Professional Reporter

**2**

APPEARANCES

On Behalf of the Plaintiff:
HORAN WALLACE & HIGGINS, LLP
608 Whitehead Street
Key West, Florida  33040
(305) 294-4585 / Fax (305) 294-7822
dph@horan-wallace.com / darren@horan-wallace.com
chiggins@horan-wallace.com
BY:  DAVID PAUL HORAN, ESQUIRE
BY:  DARREN M. HORAN, ESQUIRE
BY:  CARA HIGGINS, ESQUIRE

THE MCKEE LAW GROUP, LLC
17150 Royal Palm Boulevard, Suite 1
Weston, Florida  33327
(954) 888-9877 / (954) 217-0150
rmckee@themckeelawgroup.com
BY:  ROBERT J. MCKEE, ESQUIRE

On Behalf of the Defendants:
JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
2455 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida  33304
(954) 463-0100 / Fax (954) 463-2444
hgill@jambg.com / burke@jambg.com
BY:  HUDSON C. GILL, ESQUIRE

On Behalf of the Defendant Gary Lee Lovette:
ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
470 Columbia Drive, Building C-101
West Palm Beach, Florida  33409
(561) 688-6560 / Fax (561) 688-2343
lreynolds@rrbpa.com
BY:  LYMAN H. REYNOLDS, JR., ESQUIRE

Also Present:
RODERICK PRATT, LEGAL VIDEOGRAPHER
TODD STEVENS
NAJA GIRARD, KEY WEST THE NEWSPAPER
ARNAUD GIRARD, KEY WEST THE NEWSPAPER

--ooOoo--

**3**

INDEX OF PROCEEDINGS
Page

Video Deposition of HENRY DEL VALLE
  Direct Examination by Mr. McKee . . . . . . . . . . 5

Certificate of Oath . . . . . . . . . . . . . . . . . . 90
Certificate of Reporter . . . . . . . . . . . . . . . . 91
Read Letter . . . . . . . . . . . . . . . . . . . . . . 92
Errata Sheet . . . . . . . . . . . . . . . . . . . . . . 93

INDEX OF PLAINTIFF'S EXHIBITS
Page

No. 11   Taser Handheld CEW Warnings . . . . . . . . . 13

**4**

1    Deposition taken before Suzanne Ex, Certified Verbatim
2  Reporter, Florida Professional Reporter and Notary Public in
3  and for the State of Florida at Large in the above cause.
4      - - - - - - -
5    THE COURT REPORTER:  Good morning.  We are now on
6  the video record.  Today is Thursday, November 6th at
7  9:17 a.m.  We are at the Freeman Justice Center in Key
8  West, for the purpose of taking the video deposition of
9  Henry Del Valle in Case Number 14-10028-CIV, Treavor
10  Eimers vs. City of Key West, et al., a U.S. District
11  Court case filed in the Southern District of Florida.
12  The court reporter is Suzanne Ex og U.S. Legal Support.
13  The videographer is Roderick Pratt, also of U.S. Legal
14  Support.
15    Would all counsel please state their appearance for
16  the record and then I will swear in the witness.
17    MR. MCKEE:  Robert McKee, David Horan, Darren
18  Horan, Cara Higgins on behalf of Plaintiff Eimers.
19    MR. GILL:  Hudson Gill on behalf of Officer Del
20  Valle.
21    MR. REYNOLDS:  Lyman Reynolds on behalf of Officer
22  Lovette.
23    MR. MCKEE:  You may swear him in?
24    THE COURT REPORTER:  Would you raise your right
25  hand.  Do you swear or affirm the testimony you are

5

```
 1    giving in this cause will be the whole truth and nothing
 2    but the truth?
 3            THE WITNESS:  I do.
 4    THEREUPON,
 5                HENRY JOSE DEL VALLE
 6    having been first duly sworn, was examined and testified as
 7    follows:
 8                DIRECT EXAMINATION
 9    BY MR. MCKEE:
10        Q.  Good day, sir.  Could you tell us your name and the
11    address where you work?
12        A.  Yes, sir.  My name is Henry Jose Del Valle.  I work
13    at 1604 North Roosevelt Boulevard in Key West, Florida.
14        Q.  By whom are you currently employed?
15        A.  The City of Key West Police Department.
16        Q.  For how long have you been employed by the
17    department?
18        A.  Two, just over two years.
19        Q.  When did you start your employment, by exact date,
20    if you remember?
21        A.  I remember.  August 16th, 2012, sir.
22        Q.  Were you in police or law enforcement prior to that
23    date?
24        A.  Yes, sir.  I was.
25        Q.  Where?
```

6

```
 1        A.  Monroe County Sheriff's Office as a reserve deputy
 2    beginning in 1998, and then continued on and came in full
 3    time, I believe, in 2003.
 4        Q.  As of November 13th -- excuse me.  As of November
 5    28th, 2013, were you in full compliance with your mandatory
 6    training under Florida law and the regulations of your
 7    department?
 8        A.  As far as I know, sir.  Yeah.
 9        Q.  What was your rank at that time?
10        A.  Patrol officer.
11        Q.  Have you ever been a detective?
12        A.  Yes, I have, sir.
13        Q.  As a detective, did you learn how to parse the
14    truth from staements?
15            MR. GILL:  Object to the form of the question.
16            MR. REYNOLDS:  Join.
17        A.  Please explain parse the truth.
18        Q.  Okay.  Sometimes you'll receive a conflicting
19    statement from the same person.  Did you ever learn that
20    conflicting statements on facts likely mean that which is
21    being said is not true?
22            MR. GILL:  Object to the form of the question.
23            MR. REYNOLDS:  Join.
24        A.  I learned that it could be, but not always.
25        Q.  Similarly, if there are multiple witnesses to an
```

7

```
 1    event and one of the statements about the event is different
 2    in material ways from the other, is it likely that one of
 3    those stories is not true?
 4            MR. GILL:  Object to the form of the question.
 5            MR. REYNOLDS:  Objection, form.
 6        A.  Not necessarily.
 7        Q.  Prior to today, have you reviewed the other
 8    officers', involved in the Eimers matters, reports as they
 9    filed them with the department?
10        A.  Only one.
11        Q.  Whose?
12        A.  Officer Celcer's.
13        Q.  When did you do that?
14        A.  It was prior to our grand jury investigation where
15    I brought up his report and read that one.
16        Q.  Did you review any witness statements of
17    eyewitnesses who were not police officers to these events?
18        A.  No, sir.
19        Q.  Never?
20        A.  Never.
21        Q.  Have you reviewed the videotape of a tourist?
22        A.  I saw the videotape during our grand jury on a
23    screen inside the courtroom.
24        Q.  Since that's a closed meeting, do you know whether
25    you saw the entire videotape?
```

8

```
 1        A.  I don't know.  They showed me a segment and I'm not
 2    sure if that was the entire videotape.
 3        Q.  Have you ever inquired from your department whether
 4    they ever received the entire videotape of that tourist?
 5        A.  No, sir.
 6        Q.  Have you witnessed any of the dash cams of the
 7    involved officers from the date of the incident?
 8        A.  I have.  Mine.
 9        Q.  When did you do that?
10        A.  It's been months.  I can't give you an exact date.
11        Q.  Wasn't it done in days immediately after the event
12    with your supervisor present?
13        A.  Not mine.  I don't remember mine during that
14    period; but later on, I do remember it.
15        Q.  And why did you review that?
16        A.  It, I believe it was prior to the grand jury where
17    we saw that, you know, I saw that.
18        Q.  Did you ever see any of the other officers' dash-
19    cam footage?
20        A.  I believe there was one other officer's, but I
21    can't remember who it was.
22        Q.  Was it Lovette?
23        A.  No, I can't even -- I can't tell you.
24        Q.  When did that occur?
25        A.  Right during the same sitting, because we were -- I
```

**9**

1  guess they were up on the screen, possibly.  And I wasn't
2  operating the computer.  I saw mine, and then there was
3  another that was running.  I didn't see the whole thing.
4      Q.  Is it your understanding that every officer's dash
5  cams were operating the day of the Eimers event?
6          MR. GILL:  Object to the form of the question.
7          MR. REYNOLDS:  Objection, form.
8      A.  I don't know whose.  I can't answer for the other
9  officers.  I can answer for mine.
10     Q.  Officer Calvert testified yesterday that after this
11 event, --
12     A.  Uh-huh.
13     Q.  -- shortly after the event, supervisors had the
14 involved officers review their dash cams with them.  Did you
15 have that happen to you?
16         MR. GILL:  Object to the form of the question.
17         MR. REYNOLDS:  Objection, form.
18     A.  I don't recall that at all.
19     Q.  Have you ever seen Officer Lovette's dash-cam
20 footage?
21         MR. GILL:  Object to the form of the question.
22         MR. REYNOLDS:  Join.
23     A.  Specifically, to say this is Officer Lovette?
24     Q.  Yes.
25     A.  No, sir.

**10**

1      Q.  Have you ever been told why his footage is missing?
2          MR. GILL:  Object to the form of the question.
3          MR. REYNOLDS:  Join.
4      A.  I haven't heard those words from anyone, only you
5  now, but --
6      Q.  Were you aware that Officer Lovette turned on his
7  Taser during the event?
8          MR. REYNOLDS:  Objection, form.
9          MR. GILL:  Object to the form of the question.
10     A.  No, sir.
11     Q.  Were you aware that he recorded himself --
12         MR. GILL:  Objection --
13 BY MR. MCKEE:
14     Q.  -- with his Taser device?
15         MR. REYNOLDS:  Objection, form.
16         MR. GILL:  Object to the form of the question.
17     A.  Based on the media, yes, after the fact.
18     Q.  When did you learn that?
19     A.  Oh, that's been a while.  That's when it came out,
20 whenever that was.  I didn't write the date down, but --
21     Q.  Was it before the grand jury testimony?
22     A.  I believe so.  I mean, I'm guessing here.
23     Q.  In light of that, did you ask to hear it yourself?
24     A.  Oh, no.
25     Q.  Why not?

**11**

1      A.  I'm concerned with what I can tell you and attest
2  to under oath that I know is true and I did.
3      Q.  Okay.  So as we speak here today, you're under
4  oath.
5      A.  Yes, sir.
6      Q.  The only information you have is that which you
7  remember having experienced yourself?
8      A.  Yes, sir.
9      Q.  Your own dash cam?
10     A.  Right.
11     Q.  Perhaps Celcer's statement?
12     A.  Right.
13     Q.  Your own statement?
14     A.  Correct.
15     Q.  Did you review your own FDLE statement?
16     A.  I did.
17     Q.  When was the last time you reviewed it?
18     A.  Last night.
19     Q.  Did you review it before that?
20     A.  No, sir.
21     Q.  What training do you have with a high-powered
22 rifle?
23     A.  I've been through a patrol officer's class with the
24 Monroe County Sheriff's Office.  A number of years, I've
25 trained with the Army Marksmanship Unit for long-distance

**12**

1  shooting at Fort Benning, Georgia.  I did that twice; from a
2  competitive perspective, not from a law-enforcement
3  perspective.
4      Q.  In 2013, November.
5      A.  Yes, sir.
6      Q.  What was your height and weight, approximately?
7      A.  Approximately two -- I've gained a little weight.
8  So, approximately 220 or 218, I was fighting that mark.
9      Q.  Okay.  And how tall?
10     A.  Six foot, sir.
11     Q.  Pretty big guy?
12     A.  Yes, sir.
13     Q.  Try to keep fit?
14     A.  For a 54 year-old, yes, sir.
15     Q.  You look it.  Credit to you.
16         I see your hair endowed like myself.  Were you
17 similarly so back in November of 2013?
18     A.  Absolutely.
19     Q.  Meaning, in jest, since we have a written record,
20 you have a shaved head?
21     A.  I do, sir.
22     Q.  Did you, at that time, also have a shaved head?
23     A.  I'm almost certain.
24     Q.  In other words, you would not have been described
25 by a witness at the scene as one of the officers being young,

3  (Pages 9 to 12)

WWW.USLEGALSUPPORT.COM
1-888-311-4240

13

1  of slight build, and dark black hair, right?
2      A.  No, sir.  Absolutely not.
3      Q.  Okay.
4      A.  It's been a long time since that.
5      Q.  For me, it was 27.  I know the feeling.  And I
6  can't grow a beard or a mustache, so you're luckier than I.
7          I want to take you to the day of the scene.
8      A.  Okay.
9      Q.  But before I go there, I want to hear what your
10  training was regarding Taser use.
11      A.  The standard Taser training every officer attends
12  or goes through with the City of Key West.
13      Q.  Did that include reviewing the manufacturer's
14  literature regarding the Taser?
15      A.  Absolutely.
16      Q.  I'd like to hand you the next exhibit, Exhibit 10.
17      A.  Sure.
18          (Plaintiff's Exhibit 11 was marked.)
19      Q.  Excuse me, 11.
20      A.  Keep this water from spilling.
21      Q.  And the question will be, have you ever seen that
22  literature before?
23      A.  Yes, sir; or a close representation of it.  I'm not
24  sure if they've updated it since I went through the Taser
25  training two years ago in 2012.

14

1      Q.  Okay.  For the record, so that we're clear and I'm
2  not surprising you or confusing you.
3      A.  Sure.
4      Q.  At the bottom of the first page, what's the date of
5  the copyright on that document?
6      A.  The 1st of March of 2013.
7      Q.  So that's after your training?
8      A.  Correct.
9      Q.  But before the Eimers incident?
10      A.  Yes.  Yes, sir.
11      Q.  We're going to go through it in some detail.  If
12  there's something you see that you're saying, oh, that's the
13  first time I ever saw something like that, I'd like to know
14  about it, okay?
15      A.  Okay.  Sure.
16      Q.  Otherwise, I'm going to assume it's probably very
17  much the same as the one you trained with.  Okay?
18      A.  Okay, sir.
19      Q.  And I'll give you that opportunity, but I want to
20  make sure that during your training, before the Eimers event,
21  did you read the safety information regarding CEW risks and
22  risk avoidance?
23      A.  Yes, sir.
24      Q.  Did you read the part, and I'll quote it for the
25  record, on the first page.

15

1      A.  Okay.  I've got it.
2      Q.  Quote, "Warning.  Cumulative Effects.  CEW exposure
3  causes certain effects, including physiologic and metabolic
4  changes, stress and pain."
5          By the way, have you ever been Tased?
6      A.  Yes, sir.  I have.
7      MR. REYNOLDS:  Objection, form.
8      THE WITNESS:  Oh.
9      MR. REYNOLDS:  It's compound.  You just made a
10  statement --
11      MR. MCKEE:  Have you ever been Tased?
12      MR. REYNOLDS:  That wasn't your only question.
13      MR. MCKEE:  Well, that's the question I asked.
14      MR. REYNOLDS:  You want her to have to read it back
15  to you?
16      MR. MCKEE:  That's the question I meant.
17      MR. REYNOLDS:  No.  He gave this whole
18  dissertation, but then he said, --
19      MR. MCKEE:  No, I'm --
20      MR. REYNOLDS:  -- have you ever been Tased.
21      MR. MCKEE:  I'm reading the document.  That was --
22  BY MR. MCKEE:
23      Q.  Question.
24      A.  All right, sir.
25      Q.  Have you ever been Tased?

16

1      A.  Yes, sir.  I have.
2      Q.  Did you experience physiologic and metabolic
3  changes?
4      A.  I don't know about metabolic, because I didn't do a
5  blood draw on myself.
6      Q.  Right.
7      A.  But physiologically, absolutely.
8      Q.  Was it painful?
9      A.  Extremely.
10      Q.  Was it stressful?
11      A.  Extremely.
12      Q.  It goes on to state in this warning, quote, "In
13  some individuals, the risk of death or serious injury may
14  increase with cumulative CEW exposure."  Were you trained to
15  that?
16      A.  Oh, yes, sir.
17      Q.  It says, quote, "Repeated prolonged or continuous
18  CEW applications may contribute to cumulative exhaustion,
19  stress, cardiac, physiologic, metabolic, respiratory and
20  associated medical risks."  Were you trained about that?
21      A.  Yes, sir.
22      Q.  On the next page, were you trained, as found at the
23  top of the page under Physiologic and Metabolic Effects,
24  quote, "CEW use causes physiologic and/or metabolic efects
25  that may increase the risk of death or serious injury."  You

4  (Pages 13 to 16)

## 17

1 were trained that, correct?

2     A.  Yes, sir.  Uh-huh.

3     Q.  And those effects include, quote, "changes in blood

4 chemistry, blood pressure, respiration, heart rate and

5 rhythm, and adrenalin and stress hormones, among others."

6 Were you aware of that prior to the Eimers incident?

7     A.  Yes, sir.

8     Q.  "In human studies of electrical discharge from a

9 single CEW of up to 15 seconds, the effects on acid/base

10 balance, creatine, kinase, electrolytes, stress hormones, and

11 vital signs were comparable to or less than changes expected

12 from physical exertion similar to struggling, resistance,

13 fighting, fleeing, or from the application of some other

14 force tools or techniques."  Were you trained that?

15     A.  Yes, sir.

16     Q.  It also states, quote, "Some individuals may be

17 particularly susceptible to the effects of CEW use."  Were

18 you trained that?

19     A.  Yes, sir.

20     Q.  And, "Those susceptible individuals include the

21 elderly, those with heart conditions, asthma or other

22 pulmonary conditions, and people suffering from excited

23 delirium, profound agitation, severe exhaustion, drug

24 intoxication or chronic drug abuse, and/or over-exertion from

25 physical struggle."  Were you trained in that prior to the

## 18

1 Eimers event?

2     A.  Yes, sir.

3     Q.  Under Stress and Pain, this document states, "CEW

4 use, anticipation of use or response to use can cause

5 startle, panic, fear, anger, rage, temporary discomfort,

6 pain, or stress, which may be injurious or fatal to some

7 people."  Were you trained to that prior to the Eimers event?

8     A.  Yes, sir.

9     Q.  There's a continuing part that says, "To reduce the

10 risk from CEW exposure."  Were you trained about ways to

11 reduce the risk from CEW exposure?

12     A.  Yes, sir.

13     Q.  Were you trained not to use multiple CEWs or

14 multiple completed circuits at the same time?

15     A.  Right.

16     Q.  So two officers should not be Tasing a person at

17 the same time, right?

18     A.  Correct.

19     Q.  And you were trained that before the Eimers event?

20     A.  Based on what you're reading.

21     Q.  But do you have a recollection of that training as

22 well?

23     A.  Yes, and reading everything we're reading now.

24     Q.  It would have been improper to have two officers

25 Tasing Mr. Eimers at or about the same time.

## 19

1     MR. REYNOLDS:  Objection, form.

2     MR. GILL:  Object to the form of the question.

3     A.  Or anyone.

4     Q.  Dangerous, right?

5     MR. GILL:  Object to the form of the question.

6     MR. REYNOLDS:  Join.

7     A.  Based on what they're saying here, it's an improper

8 technique.

9     Q.  And it could kill someone?

10     MR. GILL:  Object to the form of the question.

11     MR. REYNOLDS:  Objection, form.

12 BY MR. MCKEE:

13     Q.  Right?

14     A.  Based on what you read; yes, sir.

15     Q.  But you were trained that before the Eimers event,

16 right?

17     A.  Sure.

18     Q.  Do you believe the other officers involved in this

19 event had that same kind of training?

20     MR. GILL:  Object to the form of the question.

21     MR. REYNOLDS:  Join.

22     A.  I can't answer for them, sir.  I would hope that

23 being certified in this Taser, certified with Tasers, they

24 would have had the same nomenclature.

25     Q.  So if we look at the reporting of each of these

## 20

1 officers and what their training was, --

2     A.  Right.

3     Q.  -- if it shows Taser training, that's the kind of

4 training you're virtually certain they would have had?

5     A.  Absolutely.  It's the same, it's the same, same

6 content.

7     Q.  You can put that aside, sir.

8     A.  Thank you.

9     Q.  I want to go through a little bit of a time line on

10 the day of the incident.  Okay?

11     A.  Sure.

12     Q.  You have a recollection, to some extent, of those

13 events with your current mental abilities?

14     A.  Yes, sir.

15     Q.  Okay.  If we need to look at a report to refresh

16 your, any of your memory, I'll be happy to try and give you

17 what you're looking for, or I might actually use it with you

18 just to help.

19     A.  Sure.

20     Q.  But I want to go through as much of this that you

21 can remember before we go that route.  Okay?

22     A.  That will be good.

23     Q.  I'm going to take you right to the point in time

24 when Mr. Eimers is entering the beach at the Southernmost

25 Hotel.

21

1    A.  Okay, sir.
2    Q.  Okay.  Were you right behind him in your cruiser at
3    that time?
4    A.  I was behind him.
5    Q.  Were you alone in your vehicle?
6    A.  Yes.
7    Q.  Was your dash cam on?
8    A.  Yes.
9    Q.  In what direction was your vehicle pointing when
10   you stopped it?
11   A.  I was pointing --
12   Q.  Front to back.
13   A.  Front to back?
14   Q.  Yeah.
15   A.  My front end of my vehicle was pointing due south
16   toward --
17   Q.  Into the sea?
18   A.  Yes.
19   Q.  It was not pointed towards Eimers' vehicle?
20   A.  No, sir.
21   Q.  Did you see Mr. Eimers exit his vehicle?
22   A.  I did.
23   Q.  Were you stopped yet?
24   A.  He -- yes, I was.
25   Q.  In your vehicle, did you have a microphone that

22

1    would allow you to project your voice by speaker?
2    A.  Yes.
3    Q.  Did you use it?
4    A.  I didn't.
5    Q.  Why not?
6    A.  In the rush to get out my car, it stays on a
7    charger, and this one in particular, if you leave it out for
8    too long, the battery.  So, I had it behind me and I forgot
9    to grab it and put it on me.
10   Q.  Instead, you grabbed your rifle?
11   A.  I already had it in my lap.
12   Q.  Okay.  Did you see my client with a weapon during
13   the time you were following him?
14   A.  Not when -- you mean, following him in my vehicle?
15   Q.  In your vehicle, yes.
16   A.  No, sir.
17   Q.  Did you see my client with a weapon when he exited
18   his car?
19   A.  I -- no, no.
20   Q.  Eventually, when he followed your command and laid
21   down, his arms out, --
22   A.  Right.
23   Q.  -- did he have a weapon?
24       MR. GILL:  Object to the form of the question.
25       MR. REYNOLDS:  Join.

23

1    A.  Not in his hands.
2    Q.  Did he have one on his body?
3    A.  Subsequently, later, no.
4    Q.  So at no time did you see a weapon with my client?
5    A.  In plain view, no.
6    Q.  Or even later?
7    A.  Later, no, no.
8    Q.  No?
9    A.  No.
10   Q.  Eimers got out on the driver's side, which would be
11   on the side facing the ocean?
12   A.  Correct, sir.
13   Q.  Away from you?
14   A.  Right.
15   Q.  Not towards you?
16   A.  Correct.
17   Q.  And he walked away from you, not towards you?
18   A.  He walked towards the rear of the vehicle, by
19   memory.
20   Q.  Right.  Which was on the way to the restaurant?
21   A.  Correct.
22       MR. REYNOLDS:  Objection, form.
23       MR. GILL:  Join.
24   Q.  It was not on the way to you, right?
25       MR. REYNOLDS:  Objection, form.

24

1    A.  Correct.  He came around from his side.
2    Q.  Right.
3    A.  And then around the back of his vehicle where I
4    first saw him completely.
5    Q.  Okay.  But he was walking towards the hotel?
6    A.  Yes, sir.
7    Q.  Not towards you?
8    A.  Initially, no.
9    Q.  Right.  So if you said he was walking towards you
10   initially, that would have been false?
11       MR. REYNOLDS:  Objection, form.
12       MR. GILL:  Join.
13   A.  It would have been a -- it would have been -- my
14   assessment of him walking towards me would have been after he
15   made, made it around the back of his car.
16   Q.  So when he got out of his car, had walked past the
17   back of his car --
18   A.  Yes.
19   Q.  -- towards the center of the beach, he still had
20   not looked at you, correct.
21       MR. GILL:  Object to the form of the question.
22   A.  I can't remember if he looked at me.
23   Q.  Oh, but you told the FDLE that he looked at you
24   with an angry face then.
25   A.  That's when -- that's when he did walk towards me,

25

1  sir, and I was giving him loud, verbal commands.
2  **Q.  Oh, when you were pointing your high-powered rifle**
3  **at his face?**
4       MR. GILL:  Object to the form of the question.
5       MR. REYNOLDS:  Join.
6  A.  Not his face.  Just his center of mass.
7  **Q.  Oh, the part that would kill him?**
8       MR. GILL:  Object to the form of the question.
9       MR. REYNOLDS:  Objection, form.
10 BY MR. MCKEE:
11      **Q.  That's when he kind of had a bad look on his face?**
12      MR. GILL:  Object to the form of the question.
13 A.  I'm not sure why --
14      MR. REYNOLDS:  Join.
15      THE WITNESS:  I'm not sure what prompted him to
16 have that look, sir.
17      **Q.  Have you ever had a gun pointed at your chest with**
18 **the belief that someone might use it on you?**
19      MR. GILL:  Object to the form of the question.
20 A.  One time, yes.
21      **Q.  Do you think you had a happy face?**
22      MR. GILL:  Object to the form of the question.
23      MR. REYNOLDS:  Join.
24 A.  It was not, no.
25      **Q.  Scared?**

26

1       MR. GILL:  Object to the form of the question.
2       MR. REYNOLDS:  Join.
3  A.  Absolutely.
4  **Q.  Bejeezus, right?**
5  A.  Yeah.
6       MR. GILL:  Object to the form of the question.
7       MR. REYNOLDS:  Join.
8  **Q.  So his facial expression is as you would have**
9  **expected it in confronting an officer with a high-powered**
10 **rifle pointed at his center of body mass, right?**
11      MR. GILL:  Object to the form of the question.
12      MR. REYNOLDS:  Join.
13 A.  I can't understand why he had that look on his
14 face.  I don't know if it was for the rifle or why.
15 **Q.  Ah, okay.**
16 A.  And I'm telling you the truth here.
17 **Q.  Well, by then, where were you standing?**
18 A.  I was, I'd worked my way between him, Mr. Eimers,
19 and the people towards -- I kept inching over, not knowing
20 what was going on with this individual and his car and
21 feeling that it may be a threat for the people in the
22 restaurant.
23      So, I inched over at an angle, I wish I could show
24 you, and still faced MR. Eimers towards his car at an angle
25 with the restaurant behind me.

27

1  **Q.  If I have any problem with your description, I'll**
2  **let you know, but I've seen the video many times, so.**
3  A.  Okay.
4  **Q.  I understand what you're saying.**
5  A.  I'm just going by memory.
6  **Q.  I understand what you're saying.**
7       MR. REYNOLDS:  Objection, form.
8       MR. GILL:  Join
9       MR. REYNOLDS:  Move to strike comment of counsel.
10 BY MR. MCKEE:
11      **Q.  When you yelled at him, the order to get down on**
12 **the ground, --**
13 A.  Yes, sir.
14 **Q.  -- in less than two seconds, he did so, correct?**
15      MR. GILL:  Object to the form of the question.
16      MR. REYNOLDS:  Join.
17 A.  Approximately.  It might have been, it may have
18 been longer.  It seemed like I had to keep giving him loud
19 verbal commands to get down.
20 **Q.  Having reviewed the video, did you count how many**
21 **seconds it was that he took to kneel and then lay prostrate**
22 **on the ground with his hands out to his sides?**
23 A.  No, sir.
24      MR. REYNOLDS:  Objection, form.
25 **Q.  Do you think it was more than two seconds?**

28

1  A.  It could have been.
2  **Q.  Do you think it was, based on your recollection?**
3  A.  I think it -- I think it was.
4  **Q.  He followed your instructions, knelt and lay prone**
5  **on the ground, face down, according to your instructions, --**
6  A.  Yes.
7  **Q.  -- right?**
8  A.  Yes, sir.
9       MR. GILL:  Object to the form.
10 **Q.  And then, who showed up from the police department?**
11 A.  I remember seeing Officer Garrido.
12 **Q.  Gun drawn?**
13 A.  Say again?
14 **Q.  Handgun drawn?**
15 A.  Can't remember if he had it.  I imagine he did, you
16 know.
17 **Q.  You saw the video, right?**
18 A.  I did, but --
19 **Q.  If it shows him with his handgun in his hand, --**
20 A.  Yes, sir.
21 **Q.  -- and told the FDLE he had never un-holstered his**
22 **gun, it would have been false, wouldn't it?**
23      MR. GILL:  Object to the form of the question.
24      MR. REYNOLDS:  Objection, form.
25 A.  I don't know what he told the FDLE, sir.  I'm

**29**

```
1   telling you the truth and I'm telling you from my
2   perspective, what I recall.  You want the truth, I'm giving
3   it to you.
4       Q.  I do.  But you know that he drew his weapon, right?
5       MR. GILL:  Object to the form of the question.
6       MR. REYNOLDS:  Objection, form.
7       A.  Ultimately, --
8       Q.  Yes.
9       A.  -- he may have, but I was focused on Mr. Eimers.
10  It was a very high-pressure situation, sir.
11      Q.  High pressured of an elderly man in hospital robes?
12      MR. GILL:  Object to the form of the question.
13      MR. REYNOLDS:  Objection, form.
14      A.  High pressure with someone running from the police,
15  placing other peoples' lives in jeopardy, sir.  I didn't know
16  what to expect from the gentleman, now I know as Mr. Eimers.
17  At the time, I only knew that it was an individual that could
18  be placing other lives in jeopardy.
19      Q.  Was he in hospital robes when you saw him?
20      A.  I can remember the top, I think, of a hospital
21  robe, like a scrub.  But I -- I'm vaguely, I'm doing that
22  from sheer memory.  I didn't write a description of Mr.
23  Eimers.
24      Q.  Apart from Garrido, who also arrived right around
25  the same time?
```

**30**

```
1       MR. GILL:  Object to the form of the question.
2       A.  From memory?
3       Q.  Yes, sir.
4       A.  I remember seeing Officer Calvert.  He would have
5   been almost on the ocean side.  Thad Calvert.  And --
6       Q.  The male Calvert?
7       A.  Yes, sir.
8           And then, I remember seeing Wanciak come up behind
9   somewhere in that area.
10      Q.  Female officer?
11      A.  Yes, sir.  But this is just, you know, people that
12  eventually were there on the scene.
13      Q.  Was Officer Wanciak also yelling commands to Mr
14  Eimers?
15      A.  I can't recall.  I remember there was an officer
16  yelling commands.
17      Q.  Apart --
18      A.  Stop, stop resisting.
19      Q.  Apart from you?
20      A.  My commands, I gave the -- I'm sorry.  I gave Mr.
21  Eimers the commands to, let me see your hands, and to get
22  down.  Once he did that and the officers were attempting to
23  secure his hands, there was another officer yelling, stop
24  resisting, but I can't remember who that officer -- or, I
25  can't identify who that officer was.
```

**31**

```
1           But there was an officer yelling, stop resisting.
2   It wasn't me.  My commands ended at the point Mr. Eimers did
3   comply and he was -- he was fighting, fighting the officers
4   who were attempting to handcuff him.
5       Q.  As of the time that he laid down and Officer
6   Garrido was approaching him, --
7       A.  Right.
8       Q.  -- he was compliant to your orders, correct?
9       A.  To lay down.  He complied with my --
10      Q.  Yes.
11      A.  He absolutely complied with my orders.
12      Q.  Did you ever hear anyone to ask him to put his left
13  arm behind his back to be cuffed?
14      A.  Sir, I don't remember hearing that.
15      Q.  And you didn't give that order, either, did you?
16      A.  There was another officer already giving orders, so
17  I stopped giving -- I stopped giving.  In other words, my
18  orders to him, which he complied.
19      Q.  Right.
20      A.  I asked him to, you know, let me see your hands,
21  and he did.  Get on, get on the ground.  Which, you know,
22  I'd say reluctantly, he did.  He just didn't do it like,
23  right away.  He went down slow.
24          And after that, the other officers were attempting
25  to handcuff him.  At one point, I did reach -- reach down to
```

**32**

```
1   assist, but that rifle was in my way.  I had it slung.  I
2   moved out of the way.  Other officers came in and they were
3   handcuffing him at that time.
4       Q.  Let's not move that far ahead.
5       A.  I'm sorry about that.
6       Q.  That's okay.  You can answer it as you please.  I
7   just, I'm trying to take this step-by-step.
8       A.  Sure, sure.
9       Q.  So we may have to backtrack from time to time.
10          When Officer Garrido approached, did you hear him
11  say to Mr. Eimers, sir, please extend your left arm back
12  behind you so I can put the cuff on you?
13      A.  I didn't hear that.
14      Q.  And when the left hand was cuffed, --
15      A.  Yeah.
16      Q.  -- did you hear Officer Garrido, who was proceeding
17  in the cuffing action, --
18      A.  Right.
19      Q.  -- by himself, right?
20      A.  No, there was --
21      Q.  He was the only one cuffing him at the time, right?
22      A.  Oh, manually, --
23      Q.  Yes.
24      A.  -- you mean, sir?
25      Q.  Yes.
```

WWW.USLEGALSUPPORT.COM
1-888-311-4240

33

1  A. Yeah.

2  **Q. Did you hear him ask Mr. Eimers to extend his right**

3  **arm back behind him so he could cuff the other hand?**

4  A. I don't recall that. I just recall, stop

5  resisting.

6  **Q. The training that you've received --**

7  A. Right.

8  **Q. -- first asks for a compliant person to extend**

9  **their arms for cuffing, right?**

10  A. Correct, sir.

11  **Q. That didn't happen that day, did it?**

12  A. If it did, I didn't hear it.

13  **Q. Right. And you certainly didn't do it?**

14  A. I had to stop -- I didn't want to give commands

15  over the top of the person that's already giving commands.

16  We're not supposed to like, have three people confuse

17  someone.

18  **Q. Right. So there shouldn't be multiple officers**

19  **giving commands?**

20  A. Right. My commands went to the point to have him

21  -- and he complied with mine.

22  **Q. Right. And then, did you see Officer Garrido when**

23  **he pulled the left arm back without asking for it to be**

24  **cuffed?**

25  MR. GILL: Object to the form of the question.

34

1  A. I didn't see, you know, pulling an arm back. I saw

2  him attempting to bring his wrist close enough to cuff him.

3  **Q. Okay. So, you did watch the video, though, right?**

4  A. I did.

5  MR. GILL: Object to the form of the question.

6  **Q. And the video would show --**

7  A. I didn't study it, it was during, you know --

8  MR. REYNOLDS: Objection, form.

9  **Q. The video shows what it shows, right?**

10  A. It does.

11  **Q. And if it shows him ripping his left arm out from**

12  **under his body backwards and cuffing it, you have no way to**

13  **dispute that, do you?**

14  MR. GILL: Object to the form of the question.

15  MR. REYNOLDS: Join.

16  A. It's not my perception that that's what took place.

17  I can only tell you what, under oath, I can -- I am telling

18  you the truth and what I perceived and took place here.

19  **Q. Well, see, you told the FDLE that you helped in the**

20  **cuffing.**

21  A. I did, and I explained that to you. I attempted to

22  bring his arm around. However, the rifle bouncing off of me

23  was in my way. I had it over my, slung over my shoulder.

24  Another officer came up and took over that where I

25  didn't continue that cuffing process.

35

1  **Q. Which arm were you helping with?**

2  A. That would be his left arm.

3  **Q. If the video doesn't even show you there, that**

4  **you're still away from the pile --**

5  A. Momentarily, I was there momentarily. So I don't

6  know when that video began or where it ended, because I saw

7  an excerpt of it. But I'm telling you the truth here, sir.

8  I momentarily bent down to assist. I saw the rifle was

9  getting in the way and I stood up. And I don't know if you

10  want me to stop, but --

11  **Q. No, I'm listening. I'm listening so I can --**

12  A. And I walked around the front of Mr. Eimers and the

13  rest of the officers towards, back towards the restaurant.

14  **Q. Hold it. Hold it.**

15  **After doing the left arm -- well, after Officer**

16  **Garrido, --**

17  A. Yes, sir.

18  **Q. -- who has already testified, --**

19  A. Right.

20  **Q. -- put the cuff on his left wrist, --**

21  A. Right.

22  **Q. -- did you see how he caused the right wrist to be**

23  **cuffed?**

24  A. No, sir. There were already other officers

25  assisting him.

36

1  **Q. When you reviewed the videotape, did you see how it**

2  **happened?**

3  A. No, sir.

4  **Q. You didn't notice how it was yanked backwards**

5  **without bending the elbow, lifting him partly off the ground**

6  **with the force being applied?**

7  A. No, sir.

8  MR. GILL: Object to the form of the question.

9  MR. REYNOLDS: Join.

10  **Q. If someone did that to you even, with a high-powered**

11  **rifle pointed at you even, do you think maybe you're dying**

12  **about right now and might start fighting?**

13  MR. GILL: Object to the form of the question.

14  MR. REYNOLDS: Join.

15  A. I'd like to clarify something, sir.

16  **Q. Answer that question first.**

17  A. Of course. I imagine it would be a difficult

18  situation where I might react in that manner.

19  **Q. So if he pulled that right arm back without asking**

20  **for it, would that have violated police policy?**

21  MR. GILL: Object to the form of the question.

22  MR. REYNOLDS: Join.

23  A. Not necessarily.

24  **Q. If he pulled it back with force and not bending it**

25  **at the elbow, without advance notice, is that against police**

9 (Pages 33 to 36)

37

```
1   policy?
2       A.  Not necessarily.
3           MR. GILL:  Object to the form of the question.
4           MR. REYNOLDS:  Objection, form.
5       Q.  With a compliant person?
6           MR. GILL:  Object to the form of the question.
7           MR. REYNOLDS:  Join.
8       A.  He wasn't complying on the ground.
9       Q.  Not until he had to start fighting for his life,
10  right?
11          MR. GILL:  Object to the form of the question.
12          MR. REYNOLDS:  Objection, form.
13      A.  I'd like to also -- may I clarify something for all
14  of you?
15      Q.  Sure.  Anything you want to say.
16      A.  The rifle, the only time I had that rifle trained
17  towards Mr. Eimers --
18      Q.  Right.
19      A.  -- was at the time until he made it down to the
20  ground and one of the officers attempted to secure him.  From
21  that point on, I was down at the low ready and not pointing.
22  Those other officers plus he was now being subdued.
23      Q.  I appreciate that.  I think that's what the video
24  shows, actually, the part that we have.
25      A.  Okay.  I just wanted you to know that.
```

38

```
1       Q.  I appreciate that, but my point being, I'd like you
2   to pretend that Mr. Eimers, center of his body, --
3       A.  Yes, sir.
4       Q.  -- and show how you'd have been looking at him with
5   that rifle pointed at him?
6       A.  Like this.
7           MR. GILL:  Object to the form of the question.
8           MR. REYNOLDS:  Join.
9       Q.  Show, show it.
10      A.  Like this.
11      Q.  In a very intimidating way, right?
12          MR. GILL:  Object to the form of the question.
13          MR. REYNOLDS:  Objection, form.
14      A.  Effectively defending myself and others if it had
15  -- if it turned bad, not knowing his intent.
16      Q.  But he was walking slowly from the moment he got
17  out of the car into the center area of the beach, right?
18      A.  Yes, sir.  Police officers have been shot by people
19  walking slowly.  And I'm just telling you, sir.  This is --
20  everything I'm giving you here is solid.  It is the truth.
21      Q.  By the way, do you know how many Key West police
22  officers have died in the lien of duty since 1903?
23      A.  I remember -- Key West police officers dying in the
24  line of duty would be Norman Drew, and it was a non -- he was
25  riding his motorcycle on the way to a call.
```

39

```
1       Q.  So he wasn't shot by somebody?
2       A.  No, sir.
3       Q.  He got in an accident.
4           Isn't it true that the last Key West police officer
5   to be shot and die was in 1905?
6       A.  I don't know.
7       Q.  So now, --
8       A.  I'm glad you told me.
9       Q.  Now, Garrido, when he closed the lock on the right
10  wrist, locked his own finger into it, right?
11      A.  He did, sir.
12      Q.  Screamed like a woman, right?
13          MR. GILL:  Object to the form of the question.
14          MR. REYNOLDS:  Join.
15      A.  I didn't say that.
16      Q.  No, you didn't.
17      A.  But I heard.
18      Q.  Yeah.  He was actually a butt of jokes around the
19  offices, right?
20          MR. GILL:  Object to the form of the question.
21          MR. REYNOLDS:  Join.
22  BY MR. MCKEE:
23      Q.  After the event?
24      A.  I heard it mentioned, sir.
25      Q.  Made him mad as hell, didn't it?
```

40

```
1           MR. GILL:  Object to the form of the question.
2           MR. REYNOLDS:  Objection, form.
3       A.  I don't know about mad.  I can't speak for his
4   emotions.  Only he knows that.  But, I can tell you that he
5   did yell.
6       Q.  And right after that, he was positioned at Mr.
7   Eimers' right shoulder, correct?
8       A.  Correct.
9       Q.  And then, according to an eyewitness at the hotel,
10  he repeatedly Tased Mr. Eimers in the chest in the right
11  quadrant.
12          MR. GILL:  Object to the form of the question.
13  BY MR. MCKEE:
14      Q.  Are you aware of that?
15          MR. GILL:  Object to the form of the question.
16          MR. REYNOLDS:  Objection, form.
17      A.  No.  I'm going to tell you, he didn't Tase -- as
18  far as what I observed, from my perspective, Mr. Eimers
19  wasn't Tased.
20      Q.  You weren't looking anymore.  You walked around and
21  positioned your body so that eyewitnesses at the hotel
22  couldn't see past you.
23          MR. GILL:  Object to the form of the question.
24          MR. REYNOLDS:  Objection, form.
25      A.  That's not why I did that, sir.
```

10  (Pages 37 to 40)

41

1   Q.  That's exactly where your body was, though, wasn't
2   it?
3       MR. GILL:  Object to the form of the question.
4       MR. REYNOLDS:  Join.
5   A.  But that's not why I did that.
6   Q.  But you walked around and you weren't watching Mr.
7   Garrido, Officer Garrido at that time when you were walking
8   away, were you?
9       MR. REYNOLDS:  Objection, form.
10      MR. GILL:  Join.
11  A.  I probably couldn't have seen him completely.
12  Q.  Right.
13  A.  But --
14  Q.  And at that time, Lovette had put his knees on top
15  of the torso in response to that screaming.  Right?
16      MR. GILL:  Object to the form of the question.
17      MR. REYNOLDS:  Objection, form.
18  A.  I didn't see Lovette's knees on his torso.
19  Q.  So if he said he had put at least one on his torso
20  and told FDLE he had both of his shins on his body, you
21  couldn't see that, either?
22      MR. REYNOLDS:  Objection, form.
23      MR. GILL:  Object to the form of the question.
24  A.  I didn't see that.  What I saw --
25  Q.  Go ahead.

42

1   A.  What I saw was a cluster of the officers once I
2   walked around, attempting to handcuff this gentleman.
3   And please make it clear, I'm an honorable man, I'm
4   going to tell you, sir, and I did not stand or purposely
5   stand to block view of anyone.
6   Q.  Whether purposeful or not, your body was such that
7   witnesses at the hotel --
8   A.  Right.
9   Q.  -- had their vision obscured somewhat, right?
10      MR. GILL:  Object to the form of the question.
11      MR. REYNOLDS:  Objection, form.
12  A.  Maybe.  I don't know.  I wasn't looking behind me.
13  But I want you to know that.
14  Q.  I'm fine with that.  But at that time, Lovette is
15  up at his head area, right?
16      MR. GILL:  Object to the form of the question.
17  A.  Toward his shoulder.
18  Q.  Did you know that on his Taser recording, he said,
19  when he didn't know he was being recorded, he dropped a
20  fucking bomb on Eimers' head.  Were you aware of that?
21      MR. GILL:  Object to the form of the question.
22      MR. REYNOLDS:  Objection, form.
23  A.  No.
24  Q.  Do you have an explanation why, at that time,
25  Eimers' ear canal was bleeding?

43

1       MR. GILL:  Object to the form of the question.
2       MR. REYNOLDS:  Objection, form.
3   A.  I have no idea, sir.
4   Q.  Are you aware that Trauma can cause that effect?
5       MR. REYNOLDS:  Objection, form.
6       MR. GILL:  Join.
7   A.  I'm aware that a lot can cause bleeding.
8   Q.  Head trauma can cause the ears to bleed, correct?
9       MR. REYNOLDS:  Objection, form.
10      MR. GILL:  Join.
11  A.  It can.
12  Q.  Okay.  And, oh, another witness said an officer at
13  the top of the body Tased him in the neck.  Were you aware of
14  that, from an eyewitness --
15      MR. GILL:  Object --
16  BY MR. MCKEE:
17  Q.  -- that has nothing at stake in this matter?
18      MR. GILL:  Objection.
19      MR. REYNOLDS:  Objection, form.
20  A.  No, sir.
21      MR. GILL:  Join.
22  Q.  You haven't seen the witness statements, have you?
23  A.  No, I haven't.
24  Q.  Okay.  So if one witness said he saw him getting
25  Tased in the neck, --

44

1   A.  Right.
2   Q.  -- and another witness said he saw him repeatedly
3   being Tased in the right chest area, repeatedly, --
4   A.  Right.
5   Q.  -- the use of two Tasers at the same time is
6   against the regulations, right?
7   A.  That's correct, sir.
8       MR. GILL:  Object to the form of the question.
9       MR. REYNOLDS:  Objection, form.
10      THE WITNESS:  According to -- according to what you
11  read me.
12  Q.  And within seconds of those events, in seconds,
13  Eimers' heart stopped, just like as what happens with
14  Tasering, right?
15      MR. REYNOLDS:  Objection, form.
16      MR. GILL:  Join.
17  A.  Sir, I never heard any Taser go off.  The Taser
18  makes a distinct sound.  It never -- that sound is very
19  distinct.
20  Q.  That's right.  And when someone's screaming like a
21  girl, it's hard to hear it, isn't it?
22      MR. GILL:  Object to --
23      MR. REYNOLDS:  Objection, form.
24      MR. GILL:  Join.
25  A.  I never heard a Taser sound, sir.

11  (Pages 41 to 44)

45

```
 1        Q.  You heard someone screaming like a girl?
 2        A.  I did.
 3        MR. REYNOLDS:  Objection, form.
 4        MR. GILL:  Join.
 5        THE WITNESS:  For just a couple of seconds.
 6        Q.  Yeah.
 7        A.  Sir, I'm being straight up with you here.
 8        Q.  I know.  And I am, too.
 9        A.  And I want you to know that.
10        Q.  I appreciate that.  But I've got a lot of different
11   stories that all tell different stories from the same guys
12   that were there.
13        MR. REYNOLDS:  Objection, form, move to strike --
14        MR. GILL:  Join, join the move to strike.
15        MR. REYNOLDS:  -- inappropriate comment of counsel.
16        A.  Could I get a glass of water, please?
17        MR. GILL:  Could we take a break?
18        MR. MCKEE:  Sure.  Yeah, let's take five minutes.
19        MR. GILL:  Just two seconds.
20        MR. MCKEE:  Yeah.
21        THE VIDEOGRAPHER:  Off the video record at 9:56
22   a.m.
23        (Brief recess.)
24        THE VIDEOGRAPHER:  Back on the video record at
25   10:03 a.m.
```

46

```
 1   BY MR. MCKEE:
 2        Q.  Sir, after you ordered Mr. Eimers to show you his
 3   hands and get on the ground, he complied?
 4        A.  Yes.
 5        Q.  He also lay prone with his arms outstretched?
 6        A.  Yes.
 7        Q.  Officer Garrido approached and did not tell him
 8   what he was about to do?  You certainly didn't hear it, let's
 9   put it that way.
10        A.  I certainly didn't hear it.
11        Q.  We have Officer Garrido's testimony, but you never
12   heard any further request of Mr. Eimers --
13        MR. GILL:  Object to the form of the question.
14   BY MR. MCKEE:
15        Q.  -- by an officer on the scene --
16        MR. REYNOLDS:  Objection, form.
17   BY MR. MCKEE:
18        Q.  -- at that time?
19        MR. REYNOLDS:  Objection, form.
20        A.  Only to stop resisting.
21        Q.  Later?
22        A.  Yes.
23        THE VIDEOGRAPHER:  Can we go off the record for a
24   second?
25        MR. MCKEE:  Yup.
```

47

```
 1        THE VIDEOGRAPHER:  Off the video record at 10:04
 2   a.m.
 3        (Brief pause to adjust microphones.)
 4        THE VIDEOGRAPHER:  Back on the video record at
 5   10:05 a.m.
 6   BY MR. MCKEE:
 7        Q.  Handcuffing a subject in a prone position is a
 8   multi-step event, correct?
 9        A.  It can be, yeah.
10        Q.  So when Officer Garrido approached, Mr. Eimers was
11   still completely compliant with your orders?
12        A.  Yes.
13        Q.  And as Officer Garrido approached, Mr. Eimers was
14   not fighting, correct?
15        A.  Correct.
16        Q.  And then, as Officer Garrido made contact with Mr.
17   Eimers, there was no vocal order that you heard from anyone
18   regarding what was about to next happen?
19        A.  Correct.
20        Q.  And then, the left cuff was placed on by Officer
21   Garrido?
22        A.  Correct.
23        Q.  And there was still no fighting?
24        MR. GILL:  Object to the form of the question.
25        MR. REYNOLDS:  Join.
```

48

```
 1        A.  I can't remember if he started fighting after the
 2   cuff went on or sub -- the first cuff or subsequent.
 3        Q.  Okay.  Then, right cuff.
 4        A.  Uh-huh.
 5        Q.  Again, you heard no order from anyone about what
 6   was next going to happen to Mr. Eimers and to ask for his
 7   compliance, correct?
 8        A.  Correct.  I don't remember any --
 9        Q.  And then, Officer Garrido pulled his right arm back
10   and cuffed him, but locked his own finger in, at the same
11   time, correct?
12        A.  I remember that clearly.
13        Q.  And then, with the screaming, hollering and jerking
14   around, --
15        A.  Uh-huh.
16        Q.  -- that's when Mr. Eimers started to be combative?
17        MR. GILL:  Object to the form of the question.
18        A.  Before that.
19        MR. REYNOLDS:  Object to form.
20        THE WITNESS:  He was already combative before that.
21   BY MR. MCKEE:
22        Q.  Will you agree that the video would be the best
23   evidence if how he was behaving if it was showing him at that
24   time?
25        MR. GILL:  Object to the form of the question.
```

12  (Pages 45 to 48)

49

1  MR. REYNOLDS:  Objection, form.
2  A.  Sure.
3  **Q.  Okay.**
4  A.  It would be a good component of it.
5  **Q.  When you joined the fray, so to speak, the group of**
6  **officers and Mr. Eimers, he had already had the right cuff**
7  **put on, and your fellow officer was entrapped in it.**
8  MR. GILL:  Object to the form of the question.
9  BY MR. MCKEE:
10  **Q.  That's when you joined in, right?**
11  MR. GILL:  Object to the form.
12  MR. REYNOLDS:  Join.
13  A.  Before that.
14  **Q.  When?**
15  A.  When, to my recollection, when Officer Garrido was,
16  I guess you could say, cross-cuffing, he was on one side, but
17  he cuffed Mr. Eimers' left hand.  I was attempting to secure
18  that arm.
19  **Q.  Which arm?**
20  A.  It would be his left arm, where the first cuff went
21  on.
22  **Q.  Okay.**
23  A.  And I was having a significant issue doing that
24  with the long gun in front of me, and another officer stepped
25  in, and I got up and walked around.

50

1  **Q.  Okay.  So an officer stepped in before Officer**
2  **Garrido locked the right cuff onto the wrist and trapping his**
3  **own finger?**
4  A.  Absolutely.
5  **Q.  Okay.**
6  A.  That's -- that's my recollection.
7  **Q.  So that, however, happened with the conduct you**
8  **saw, after the right hand was already pulled backwards**
9  **without an instruction to Mr. Eimers of what was happening,**
10  **right?**
11  MR. GILL:  Object to the form of the question.
12  MR. REYNOLDS:  Join.
13  BY MR. MCKEE:
14  **Q.  That's when the first aspect of Mr. Eimers**
15  **displaying some sort of antagonism to these events started to**
16  **arise, correct?**
17  A.  That sounds accurate.
18  MR. REYNOLDS:  Objection, form.
19  MR. GILL:  Object.
20  **Q.  And when your arms are pulled backwards in a prone**
21  **position, where is your face going?**
22  MR. REYNOLDS:  Objection, form.
23  MR. GILL:  Join.
24  A.  Forward.
25  **Q.  Yeah.**

51

1  A.  It could be.
2  **Q.  Down into the sand, right?**
3  MR. REYNOLDS:  Objection, form.
4  MR. GILL:  Join.
5  A.  I didn't see, at any time, did I see Mr. Eimers'
6  face planted in the sand.
7  **Q.  That's right.  But you didn't see when Officer**
8  **Lovette laid a fucking bomb on his head, the back of his**
9  **head, right?**
10  MR. GILL:  Object to --
11  MR. REYNOLDS:  Objection, form.
12  MR. GILL:  Join.
13  A.  I did not see that ever happen.
14  **Q.  So if he said it happened, and if it happened, you**
15  **never saw it because you weren't in that direction facing**
16  **him, right?**
17  A.  Correct.
18  MR. REYNOLDS:  Objection, form.
19  MR. GILL:  Join.
20  **Q.  But if that happened, the back of his head, where**
21  **would his face have gone?**
22  MR. REYNOLDS:  Objection, form.
23  A.  I don't know.
24  MR. GILL:  Join.
25  **Q.  It could only go in the sand, right?**

52

1  MR. REYNOLDS:  Objection, form.
2  MR. GILL:  Join.
3  A.  Depends on what direction his head was turned.
4  **Q.  If he said he hit the back of his head --**
5  A.  Right.
6  **Q.  -- and laid a bomb on it,--**
7  MR. REYNOLDS:  Objection, form.
8  BY MR. MCKEE:
9  **Q.  -- his elbow, --**
10  MR. REYNOLDS:  Objection, form.  With his elbow?
11  Is that what you just said, Counsel?
12  MR. MCKEE:  Yeah.
13  MR. REYNOLDS:  Really.  You're making that
14  representation on the record to this witness?
15  MR. MCKEE:  What else do you think he hit him with?
16  MR. REYNOLDS:  No, no, no.  You just said that
17  Lovette said that, which he did not.
18  MR. MCKEE:  Well, I'll rephrase the question if
19  that helps you.
20  MR. REYNOLDS:  Objection, form.  And I think --
21  MR. MCKEE:  I'll rephrase it as he said it.
22  BY MR. MCKEE:
23  **Q.  When he laid a fucking bomb on my client's head,**
24  **which direction do you think his head went?**
25  MR. GILL:  Object.

13  (Pages 49 to 52)

53

1    MR. REYNOLDS: Objection, form.

2    MR. GILL: Join.

3    A. Calm down, sir.

4    Q. Yeah.

5    A. Sir, you don't have to yell at me. I'll answer the

6    questions.

7    Q. That wasn't at you, that was at Counsel. He knows

8    better than that. That's not a form objection. That's not

9    proper what he just did.

10   MR. REYNOLDS: Objection, form, move to strike

11   inappropriate comments of counsel.

12   BY MR. MCKEE:

13   Q. And I apologize to you.

14   A. Thank you.

15   Q. Did you see Mr. Eimers before he was being dealt

16   with by the paramedics?

17   MR. GILL: Objection.

18   BY MR. MCKEE:

19   Q. After --

20   A. I'm sorry, I don't understand.

21   Q. After he lost consciousness, did you see his face?

22   A. I did. I saw it as he lost consciousness.

23   Q. Was there sand up his nose?

24   A. No, I didn't see -- it's only residual sand on the

25   outside.

54

1    Q. Why was there sand in his nose when Officer Stevens

2    took his picture at the hospital?

3    MR. REYNOLDS: Objection, form.

4    A. Residual sand. I mean, that's all I saw.

5    Q. In his nostrils?

6    MR. REYNOLDS: Objection, form.

7    A. I didn't look up in his nostrils, per se, like

8    inside, but --

9    Q. Have you seen the photos that your own Officer

10   Stevens --

11   A. No, sir.

12   Q. -- took?

13   A. No, sir.

14   Q. Okay. So before the right hand was cuffed and all

15   of the aggression started with the locked finger in the right

16   cuff, with all the screaming, you did what?

17   MR. GILL: Object to the form of the question.

18   MR. REYNOLDS: Objection, form.

19   A. I walked around the front of Mr. Eimers.

20   Q. By the front, do you mean towards his feet or

21   towards his head?

22   A. I'm sorry. Towards his head, facing him as I moved

23   around towards my position further away, I mean, just around

24   the other side of him.

25   Q. And so, in his prone position, you would have been

55

1    standing to his right by the time you finished moving?

2    A. Yes. Right. Like, kind of wrapped around.

3    Q. And in between him and the non-involved witnesses

4    at the hotel restaurant?

5    MR. GILL: Object to the form of the question.

6    MR. REYNOLDS: Objection, form.

7    A. In that direction of the restaurant structure.

8    Q. Okay. And did you squat or did you stand?

9    A. I was standing and walking, you know, I walked

10   around.

11   Q. And when you were doing that, were there multiple

12   officers on and around Mr. Eimers?

13   MR. REYNOLDS: Objection, form.

14   A. Yes, sir.

15   Q. Such that you would not have been able to see all

16   of those officers' movements?

17   A. That's fair to say, yeah.

18   Q. Okay. And when was the hobble taken out of the

19   car?

20   A. I don't have a time line for how that hobble got

21   there.

22   Q. Was there a hobble?

23   A. I believe there was.

24   Q. Why do some officers say there wasn't?

25   MR. REYNOLDS: Objection, form.

56

1    MR. GILL: Join.

2    BY MR. MCKEE:

3    Q. If you know?

4    A. They may not -- I can't answer for those officers.

5    And I tell you, I have no recoll -- I've heard someone say,

6    get the hobble, possibly, but no recollection of even seeing

7    the hobble.

8    Q. Okay. So as you sit here today, you have no

9    recollection of having seen a hobble?

10   A. Answering for myself, I don't know if they applied

11   it. I cannot remember that, sir.

12   Q. Did you see in the videotape, the hobble in the

13   hands of an officer?

14   MR. GILL: Object to the form of the question.

15   MR. REYNOLDS: Objection, form.

16   A. I can't recall that.

17   Q. Was he hobbled before he lost consciousness?

18   MR. GILL: Object to the form of the question.

19   MR. REYNOLDS: Objection, form.

20   A. I don't know a hundred percent that he was hobbled.

21   Q. Is it your perspective that based on your

22   knowledge, --

23   A. Uh-huh.

24   Q. -- he was not hobbled?

25   MR. GILL: Object to the form of the question.

14 (Pages 53 to 56)

**57**

```
1        MR. REYNOLDS:  Objection, form.
2     A.  I don't know if he was or not.  I didn't focus on
3  that, sir.
4     Q.  Was he being hobbled at any time?
5        MR. GILL:  Object to the form of the question.
6        MR. REYNOLDS:  Objection, form.
7     A.  I don't know if he, if he was or not.  I can't
8  recall seeing that hobble on Mr. Eimers.
9     Q.  How long does a hobble take to put on someone?
10    A.  Depends on how much they're resisting and thrashing
11 their legs about.
12    Q.  Can it be 15 to 30 seconds?
13       MR. REYNOLDS:  Objection, form.
14    A.  It could be.
15    Q.  Could it be a minute?
16    A.  If the person's resisting continually, yes.
17    Q.  How long does it take to Tase someone?
18       MR. GILL:  Object to the form of the question.
19       MR. REYNOLDS:  Objection, form.
20    A.  I mean --
21    Q.  A second?
22    A.  A second, yeah.
23    Q.  Fifteen seconds?
24       MR. REYNOLDS:  Objection, form.
25       MR. GILL:  Join.
```

**58**

```
1  BY MR. MCKEE:
2     Q.  Thirty seconds?  Does it take that long?
3     A.  A second, two seconds maybe.
4        MR. REYNOLDS:  Objection, form.
5     Q.  But then you can apply it for as long as you apply
6  it, right?  Right.
7     A.  If the -- you mean, as far as pulling the trigger
8  on it?
9     Q.  Like holding it in place with exposed probes,
10 either way, can you have it operate for more than a second?
11       MR. REYNOLDS:  Objection, form.
12    A.  Once it goes off, it's a five-second -- automatic.
13 And the only way it would go for another five seconds is if
14 the trigger would be depressed again.
15    Q.  Okay.  And how about with a direct prong?
16    A.  Still, it's still a five-second, you know, five-
17 second duration.
18    Q.  And when it's a direct prong attachment, does the
19 trigger still have to be done or just the compression of the
20 prongs onto the skin cause it to fire?
21    A.  The trigger.
22       MR. REYNOLDS:  Objection, form.
23    Q.  So you still have to fire the trigger?
24    A.  Correct.
25    Q.  And if you didn't see the hobble go on, similarly,
```

**59**

```
1  if it was happening at the same time as a Tasing event, you
2  wouldn't have seen that either?
3        MR. GILL:  Object to the form of the question.
4        MR. REYNOLDS:  Objection, form.
5        MR. GILL:  Join.
6  BY MR. MCKEE:
7     Q.  Right?
8        MR. REYNOLDS:  Objection, form.
9     A.  Based on, from my perspective, I may not have seen
10 it.
11    Q.  I've had some officers say he was unresponsive
12 while prone face down on the sand, and some say he was
13 partially raised when he went unconscious, and I've had some
14 say he was standing when he went unconscious.  Which was it
15 from your perspective?
16    A.  From my perspective?
17       MR. GILL:  Object to the form of the question.
18       MR. REYNOLDS:  Objection, form.
19       MR. GILL:  Join.
20    Q.  Yes.
21    A.  From my perspective, sir, two officers, and I can't
22 recall who the officer were, two officers assisted Mr. Eimers
23 in standing.  When he came up to his feet, it looked like he
24 was having -- he was struggling to get up to his feet, and he
25 never stood completely upright from my perspective.  Never
```

**60**

```
1  stood completely upright.  He leaned forward, you know, and
2  that's what I saw.
3     Q.  Based on your experience and training --
4     A.  Yes.
5     Q.  -- is that the kind of body appearance of someone
6  who is hobbled, or someone who is having some physical
7  difficulties, or both?
8        MR. GILL:  Object to the form of the question.
9        MR. REYNOLDS:  Objection, form.
10       MR. GILL:  Join.
11 BY MR. MCKEE:
12    Q.  If you know?
13    A.  I don't know.
14    Q.  Is that the kind of appearance someone would have
15 if their heart was stopping when officers are trying to lift
16 them in a standing position?
17       MR. GILL:  Object to the form of the question.
18       MR. REYNOLDS:  Objection, form.
19    A.  Could be.  If -- he was assisting himself in
20 standing.  Didn't fully come upright.
21    Q.  Were you visibly watching when the handcuffs were
22 being removed after he lost responsiveness?
23    A.  I wasn't focusing on his hands, but I was there
24 when they were removing the handcuffs.
25    Q.  Were you there when a hobble was removed?
```

**61**

1       MR. GILL:  Object to the form of the question.
2     A.  I don't remember seeing a hobble, sir, I told you.
3       Q.  Okay.  How long, for what period of time did
4 Officer Garrido yell like a woman?
5       MR. REYNOLDS:  Objection, form.
6       MR. GILL:  Join.
7     A.  He was yelling for seconds.  I know --
8       Q.  He's a quiet man, right?
9       MR. GILL:  Object to the form of the question.
10     A.  Yes, sir.
11       Q.  But he has a temper, doesn't he?
12       MR. GILL:  Object to the form of the question.
13       MR. REYNOLDS:  Objection, form.
14     A.  I don't know him from that perspective at all.
15       Q.  When he trapped his own hand in that right cuff, he
16 got angry, didn't he?
17       MR. GILL:  Object to the form of the question.
18       MR. REYNOLDS:  Objection, form.
19     A.  He was responding to pain.  I don't know about
20 anger, sir.  I can't say.  I can't attest to his feelings.
21       Q.  And he was also embarrassed, wasn't he?
22       MR. GILL:  Object to the form of the question.
23       MR. REYNOLDS:  Objection, form.
24     A.  Maybe.  I don't know.
25       Q.  Was his yelling as long as five seconds?

**62**

1       MR. REYNOLDS:  Objection, form.
2       MR. GILL:  Join.
3     A.  Could have been.  Three seconds, three to five
4 seconds maybe.
5       Q.  So about the same length as a Taser burst?
6       MR. GILL:  Objection.
7       MR. REYNOLDS:  Objection, form.
8 BY MR. MCKEE:
9       Q.  Right?
10       MR. REYNOLDS:  Objection, form.
11     A.  I don't know.
12       Q.  Well, you told us, a Taser burst is five seconds.
13     A.  Yes.
14       MR. REYNOLDS:  Objection, form.
15       Q.  I just asked you if he was screaming for about five
16 seconds, and you said, three to five seconds.
17       MR. REYNOLDS:  Objection to the form.
18     A.  Five seconds for both.  Yes, sir.
19       Q.  Okay.  How many -- how much time passed between the
20 time that the right cuff was able to be extricated from
21 around Garrido's finger and the time that you notice Mr.
22 Eimers being unresponsive?
23     A.  And I'm guessing here, because I didn't have a
24 stopwatch.
25       MR. REYNOLDS:  Objection, form.

**63**

1       Q.  You may estimate.
2     A.  I'm estimating.
3       Q.  Okay.
4     A.  I'm estimating possibly a minute, maybe two minutes
5 time, that time frame.
6       Q.  Well, what was happening in that one or two minutes
7 when the right cuff was already on --
8     A.  Uh-huh.
9       Q.  -- and Garrido was extricated?  What was happening
10 in that minute or two?
11       MR. REYNOLDS:  Objection, form.
12       MR. GILL:  Join.
13     A.  From who, from whose perspective?
14       Q.  Yours.  You now had him cuffed.
15     A.  Yeah.
16       Q.  Prone on the ground.
17     A.  Mr. Eimers is still, you know, thrashing about and
18 resisting.
19       Q.  Now, interestingly, since you haven't had the
20 benefit, and I'll be happy to show you some of the eyewitness
21 accounts, they said he was jerking as if he was being Tased.
22       MR. GILL:  Object to the form.
23 BY MR. MCKEE:
24       Q.  Did you see that kind of jerking motion?
25     A.  Not at all.

**64**

1       MR. GILL:  Object to the form of the question.
2       MR. REYNOLDS:  Objection, form.
3       Q.  And that's what happens when you get Tased, you go
4 into involuntary jerking motions, right?
5       MR. GILL:  Object to the form of the question.
6       MR. REYNOLDS:  Objection, form.
7     A.  It actually stiffens everything up where you may
8 not even move at all.
9       Q.  And actually, if we read the Taser guides, it
10 describes how you can actually hurt yourself with the jerking
11 motions caused by Tasering, right?
12       MR. GILL:  Object to the form of the question.
13       MR. REYNOLDS:  Objection, form.
14     A.  Yes, sir.  I guess people respond differently.
15       Q.  Okay.  But at that time, he's fully cuffed and,
16 according to some officers, hobbled.
17     A.  Okay.
18       Q.  Right?
19       MR. REYNOLDS:  Objection, form.
20 BY MR. MCKEE:
21       Q.  What's happening in that minute or two before he's
22 unresponsive?  What's going on?
23       MR. GILL:  Object to the form of the question.
24     A.  Attempted to stand him up.
25       Q.  So it took a minute or two to attempt to stand him

WWW.USLEGALSUPPORT.COM
1-888-311-4240

65

1 up?
2    A.  I don't know if it was a minute or two, sir.
3    Q.  So it was probably a much shorter time --
4    A.  Could be.
5    Q.  -- from the point that he was cuffed to the point
6 that officers were trying to stand him up?
7    A.  It could be.
8       MR. REYNOLDS:  Objection, form.
9       MR. GILL:  Join.
10    Q.  And then, in your own view, --
11    A.  Yes, sir.
12    Q.  -- you've had paramedic training.
13    A.  Right.
14    Q.  You saw his color leave him?
15    A.  Absolutely.
16    Q.  You checked his carotid?
17    A.  I -- after, after he was, you know, they laid him
18 back down; yes, sir.
19    Q.  And that took how much time?
20    A.  Seconds to lay him back down maybe.
21    Q.  By the time that happened, he had no pulse?
22       MR. REYNOLDS:  Objection, form.
23    A.  I didn't feel a pulse, sir.
24    Q.  He might not have had a pulse even when he was
25 being stood up, correct?

66

1       MR. REYNOLDS:  Objection, form.
2       MR. GILL:  Join.
3    A.  You saw his legs moving to try to stand up. I saw
4 him moving.  So he may have had a pulse up to the point he
5 stood, because he was moving.
6    Q.  But you're aware you can move without a pulse,
7 right?
8       MR. GILL:  Object to the form of the question.
9       MR. REYNOLDS:  Objection, form.
10    A.  I'm not aware of that.
11    Q.  No?  Okay.
12       After Officer -- the officer removed his finger
13 from his right cuff, did you see two officers jump back?  No?
14    A.  No, sir.
15    Q.  Would there be any reason to jump back other than
16 if someone's getting shocked with a Taser?
17       MR. REYNOLDS:  Objection, form.
18       MR. GILL:  Object to the form.
19    A.  Sir, I don't know why they jumped back or why that
20 happened.
21    Q.  Can you get shocked if you're touching the body
22 that's being Tased?
23       MR. REYNOLDS:  Objection, form.
24    A.  I don't believe so.
25    Q.  But you don't want to get touched by the Taser if

67

1 Tasing is happening, so you might jump back, right?
2       MR. REYNOLDS:  Objection, form.
3       MR. GILL:  Join.
4    A.  Could be.
5    Q.  Now, let's talk about when an officer elects to use
6 a Taser for a second.
7    A.  Okay, sir.
8    Q.  They're trained in it before they're allowed to use
9 it, right?
10    A.  Yes, sir.
11    Q.  And so, Officer Garrido and Officer Lovette had
12 been trained to use it or they wouldn't have been issued it,
13 right?
14    A.  Correct, sir.
15    Q.  And that all was the status of the facts as of the
16 date of Mr. Eimers' event, they were trained, Lovette and
17 Garrido, yes?
18       MR. GILL:  Object to the form of the question.
19    A.  They were trained.
20    Q.  And they were issued Tasers?
21    A.  Correct.
22    Q.  And having been trained, they knew that in order to
23 use it, they would have to turn it on to be able to use it,
24 correct?
25    A.  Correct, sir.

68

1    Q.  So in order to use it, you would have to
2 intentionally turn it on?
3    A.  For it to function, sure.
4    Q.  Yeah.  You'd have to intentionally de-holster it,
5 right?
6    A.  Yes.
7    Q.  You'd have to intentionally turn on the switch and
8 in order to shock somebody, you'd have to either shoot it at
9 them or depress the trigger and stick it to contact, right?
10    A.  You'd have to remove the cartridge --
11    Q.  Right.
12    A.  -- in order to go direct.
13    Q.  Correct.
14    A.  Or fire it with that cartridge in it.
15    Q.  So lots of intentional, volitional action has to
16 happen for an officer to actually use it, right?
17       MR. GILL:  Object to the form of the question.
18       MR. REYNOLDS:  Objection, form.
19    A.  Yes.
20    Q.  And when they do use it, they've been trained that
21 they can kill someone if more than one of them is doing it at
22 the same time, right?
23       MR. REYNOLDS:  Objection, form.
24       MR. GILL:  Join.
25    A.  Correct.

17  (Pages 65 to 68)

69

1    Q.  So on that day, if Garrido and Lovette were using
2    it simultaneously, not only were they violating policy, they
3    were doing it intentionally, and if that results in a death,
4    that's called murder, isn't it?
5    MR. GILL:  Object to the form of the question.
6    MR. REYNOLDS:  Objection, form.
7    BY MR. MCKEE:
8    Q.  Under Florida law, as a police officer, that's
9    murder, isn't it?
10   MR. GILL:  Object to the form of the question.
11   MR. REYNOLDS:  Objection, form.
12   A.  I'm not a lawyer, sir.  I don't know what the
13   standards of this type of event would be.
14   Q.  Okay.  Intentional intent to bring harm that you
15   know can result in death falls under the murder statues,
16   doesn't it, sir, based as a police officer?
17   MR. GILL:  Object.
18   MR. REYNOLDS:  Objection, form.
19   MR. GILL:  Join.
20   A.  What you're saying is valid.
21   Q.  Now let's look at the departmental coverup after
22   that, okay?
23   MR. REYNOLDS:  Objection, form.
24   MR. GILL:  Join.
25   MR. REYNOLDS:  Move to strike.

70

1    MR. GILL:  Join.
2    BY MR. MCKEE:
3    Q.  That's where we're going now.
4    A.  Okay.
5    Q.  After this happened, --
6    A.  Right.
7    Q.  -- what were you ordered to do at the beach, if
8    anything?
9    A.  To secure the perimeter and set up tape.
10   Q.  Secure the perimeter.
11   A.  Which is normal when something, a crime scene or
12   some type of event takes place.
13   Q.  Does that include making sure witnesses remain?
14   A.  It does.
15   Q.  Did you do that that day?
16   A.  Not from the area I was protecting.  I was -- there
17   were people coming in from the south side, from the pier.
18   There's a pier that runs out there and people continually --
19   so I put tape on that corner and just stayed there, and
20   that's where I stayed at my post.
21   Q.  Did you require the people on the pier to stay
22   there?
23   A.  I asked them move along.
24   Q.  You asked them to leave?
25   A.  The ones that were attempting to walk into the --

71

1    into the sand area, which was the crime scene, I asked them
2    to go.  In other words, when they were walking in, cutting
3    through the beach, I asked them, please don't do that.  So I
4    necessitated setting up crime scene tape.
5    Q.  Weren't they likely witnesses?
6    MR. REYNOLDS:  Objection, form.
7    MR. GILL:  Join.
8    BY MR. MCKEE:
9    Q.  You told them to leave?
10   MR. GILL:  Join.
11   A.  From the beach area.
12   Q.  Yeah, that's where this all happened, right?
13   MR. REYNOLDS:  Objection, form.
14   A.  I didn't want them within five feet of Mr. Eimers
15   or ten feet of Mr. Eimers' car, so I asked them to please,
16   you know, to move.
17   Q.  And you didn't take down their names and addresses?
18   A.  I didn't, sir.
19   Q.  Did any police officer after --
20   A.  I know there were multiple officers there speaking
21   with people, so.
22   Q.  Did you see any police officer, at the area where
23   you were in charge, taking names and addresses of potential
24   eyewitnesses?
25   A.  I saw officers speaking to people.  I did.

72

1    Q.  Now, it's interesting.  Right down from the pier,
2    there's a pole.
3    A.  Right.
4    Q.  When you watched the video, did you see someone
5    else with a handheld camera videotaping?
6    A.  No, sir.
7    Q.  Did you know that we have a witness that says two
8    police officers came up to him and asked to see his camera?
9    MR. REYNOLDS:  Objection, form.
10   BY MR. MCKEE:
11   Q.  Did you know that?
12   A.  No, sir.  Not at all.
13   MR. REYNOLDS:  Objection, form.
14   MR. GILL:  Objection.  Join.
15   Q.  And when he got it back, all of his footage was
16   deleted.  That shouldn't have happened in the hands of police
17   officers, should it?
18   MR. GILL:  Object to the form of the question.
19   MR. REYNOLDS:  Objection, form.
20   A.  Of course not.
21   Q.  Okay.  So if that did happen, if the jury finds
22   that that's credible evidence, that would be police officers
23   deleting evidence of a crime, right?
24   MR. REYNOLDS:  Objection, form.
25   MR. GILL:  Join.

18  (Pages 69 to 72)

73

1    A.  Sounds like it to me.
2    Q.  Have you ever heard of the Sarbanes-Oxley Act?
3    A.  I heard you gentlemen speaking of it just a few
4  minutes go.
5    Q.  Have you ever been trained about that act?
6    A.  No, sir.
7       MR. REYNOLDS:  Objection, form.
8    Q.  Federal law that makes it illegal, a crime, to
9  destroy evidence?
10       MR. REYNOLDS:  Objection, form.
11       MR. GILL:  Join.
12    A.  Never been trained.
13    Q.  You never heard of that?
14    A.  This is the first time I heard of it was this
15  morning.
16    Q.  Passed on 2002.
17    A.  Oh.
18    Q.  So all these years, you've never been trained about
19  that federal act?
20    A.  That's correct.
21    Q.  Can be up to a 20-year prison for -- term --
22    A.  Yeah.
23    Q.  -- for destroying evidence of a crime.
24    A.  Okay.
25       MR. GILL:  Object to the form.

74

1       MR. REYNOLDS:  Join.
2    Q.  You're aware of that?  Just now?
3    A.  Just now.
4    Q.  Okay.  Who were the other officers in the area that
5  you were describing as being under your control at the time,
6  after this event, --
7       MR. GILL:  Object to the form.
8  BY MR. MCKEE:
9    Q.  -- securing it?
10       MR. GILL:  Object to the form of the question.
11    A.  Can't remember by name, per se, who was in that
12  area.  I remember seeing Officer Wanciak in the area.
13  Detectives showed up.  Sergeant Rodriguez was there.  Anyone
14  listed on that list.  And that's what, that's what I recall.
15    Q.  Why is it in your report that you asked witnesses
16  to leave?  Why wouldn't that be in your report?
17       MR. GILL:  Object to the form of the question.
18       MR. REYNOLDS:  Objection, form.
19    A.  I didn't write it down.  And they weren't, they
20  weren't, per se, witnesses.  They were people that were
21  walking up to the scene.  I don't know that these people saw
22  anything.  And, of course, I just asked them to get off the
23  sand and I stayed on my post.
24    Q.  There's at least ten police cars there with
25  flashing lights as of the time they're walking up, right?

75

1    A.  Say again, sir?
2       MR. GILL:  Object to the form of the question.
3       MR. REYNOLDS:  Join.
4    Q.  There's at least ten police cars there with
5  flashing lights, right?
6    A.  That's correct.
7       MR. GILL:  Object to the form of the question.
8    Q.  Okay.  So anybody that was there at that time
9  likely knew something was going on and might be looking,
10  right?
11       MR. REYNOLDS:  Objection, form.
12       MR. GILL:  Join.
13    A.  Could be there, sure, just checking up.
14    Q.  What type of person is a possible witness, right?
15       MR. GILL:  Object to the form of the question.
16  BY MR. MCKEE:
17    Q.  And you told them to go home?
18       MR. GILL:  Object to the form of the question.
19  BY MR. MCKEE:
20    Q.  Leave the scene?
21       MR. GILL:  Object to the form of the question.
22    A.  I didn't tell them to leave the scene.  I asked
23  them to leave the sandy area close to Mr. Eimers' car.
24    Q.  But you took no action to see if they were
25  witnesses to what happened?

76

1    A.  I didn't speak with them.
2    Q.  Were you trained to do that, to tell them to leave
3  the scene as opposed to stay around --
4    A.  No, sir.
5    Q.  -- to see if they were witnesses?
6       MR. GILL:  Object to the form of the question.
7    A.  No, sir.
8    Q.  You're trained --
9    A.  Right.
10    Q.  -- to try and get every witness you can, right?
11       MR. GILL:  Object to the form of the question.
12    A.  My objective is to stay on that beach and keep
13  people away.
14    Q.  Yeah, but nothing's happening at that point.
15  Eimers is going into an ambulance.
16    A.  Right.
17    Q.  There's no one else there involved in this other
18  than --
19    A.  His car.
20    Q.  -- the police officers and him, right?
21    A.  His car.
22       MR. REYNOLDS:  Objection, form.
23       THE WITNESS:  His car was there.  That's -- I
24  stayed on that, right there in that corner of that beach
25  to keep people from coming in.

19  (Pages 73 to 76)

77

1    Q.  And you did nothing to procure evidence?
2        MR. GILL:  Object to the form of the question.
3        MR. REYNOLDS:  Join.
4    A.  Evidence?
5    Q.  Relating to people, --
6    A.  No.
7    Q.  -- witnesses, --
8        MR. GILL:  Object to the form of the question.
9    BY MR. MCKEE:
10   Q.  -- right?
11   A.  I did not.
12   Q.  You didn't track down the fellow that had the
13   additional camera --
14   A.  Never saw --
15   Q.  -- that was closer to the scene?
16       MR. GILL:  Object to the form of the question.
17   A.  Never saw anyone with a camera, sir.
18   Q.  Did you ask if other officers saw him and deleted
19   his footage?
20       MR. GILL:  Object to the form of the question.
21   A.  I didn't, sir.  This is the first I know about it
22   here.
23   Q.  Did you ever hear the officer's statement at the
24   scene, after the event, "Get that SOB away from me before I
25   arrest him myself"?

78

1    A.  I never heard that.
2        MR. GILL:  Object to the form of the question.
3    Q.  Did you hear that --
4        MR. REYNOLDS:  Join.
5    BY MR. MCKEE:
6    Q.  -- Lovette said on his Taser recording, when he
7    didn't know he was being recorded, "Gabe killed that man"?
8    Did you know he said that?
9    A.  No.
10       MR. REYNOLDS:  Objection, form.
11       MR. GILL:  Join.
12   Q.  Do you know Officer Lovette to be someone who tells
13   falsehoods about what happened at the scene?
14       MR. GILL:  Object to the form of the question.
15       MR. REYNOLDS:  Objection, form.
16       MR. GILL:  Join.
17   A.  I don't know him in that manner, and I can't speak
18   for him.
19   Q.  Did you have any dealings with Officer Stevens
20   after this event, relating to this event?
21   A.  No, sir.
22   Q.  None whatsoever?
23   A.  After the event?
24   Q.  Yes, sir.
25   A.  No, sir.

79

1    Q.  When there's an in-custody death, what's supposed
2    to happen --
3        MR. GILL:  Object to the form of the question.
4    BY MR. MCKEE:
5    Q.  -- based on your training with the Key West Police
6    Department?
7        MR. GILL:  Object to the form of the question.
8    A.  In-custody death, you contact a supervisor.  The
9    supervisor takes action, contacts the coroner.  And, from my
10   perspective from the patrol division, we secure, again,
11   secure the area and write a basic report as to what happened
12   and detectives take over.
13   Q.  Did you do that that day?
14   A.  I wrote a report, not that day, but after the fact.
15   Q.  Why after the fact instead of what ordinary
16   protocol was?
17   A.  I was ordered by --
18       MR. GILL:  Object to the form of the question.
19       THE WITNESS:  I was ordered by our attorney, Mr.
20   Axelrod, to --
21   Q.  Don't know what -- I don't want to know what your
22   attorney had to say.  I only want folks in your department,
23   fellow officers, --
24   A.  Uh-huh.
25   Q.  -- not your attorney communications.  You're

80

1    entitled to privilege there, okay?
2    A.  Okay, sir.
3    Q.  I didn't mean to cut you off, --
4    A.  That's all right.
5    Q.  -- but I don't want to hear what you say to your
6    attorney or what he said to you.
7    A.  Okay.
8    Q.  What I'm talking about, under circumstances of that
9    day, --
10   A.  Yes, sir.
11   Q.  -- you were supposed to have written a report on
12   your own.
13   A.  Yes.
14   Q.  You didn't?
15   A.  Correct.
16   Q.  And I don't want content, but I want to make it
17   clear, you didn't talk to your attorney that day, did you?
18       MR. REYNOLDS:  Objection, form.
19       MR. GILL:  Join.
20   A.  I think I did.
21   Q.  Okay.
22   A.  I did.
23   Q.  Without -- I don't want content of any
24   communication.  I just want to know why you thought you
25   needed to talk to an attorney that day.

20  (Pages 77 to 80)

81

1  A.  It's customary or -- let me back up.
2     There was an in-custody death.  I am not a lawyer
3  and I needed an attorney to -- that is knowledgeable and as
4  far as when there is an in-custody death.
5     Q.  But he wasn't dead yet.  You knew that, right?
6        MR. REYNOLDS:  Objection, form.
7        MR. GILL:  Join.
8     A.  I'm not sure when he died.  And when I spoke to the
9  attorney, it was late in the day.
10    Q.  You thought he was going to die?
11    A.  I thought, I thought he may have already been dead.
12  Because when he left, I didn't get a report, but when he left
13  there, there was no pulse.  They were still performing CPR,
14  in other words.
15    Q.  And then, you were going to write a report
16  eventually?
17    A.  Yes, sir.
18    Q.  But then you got ordered to write a report, right?
19    A.  We did.
20    Q.  Why would you be ordered to write a report if
21  that's ordinary protocol, by your department?
22        MR. GILL:  Object to the form.
23        MR. REYNOLDS:  Objection, form.
24        MR. GILL:  Join.
25    A.  Based on, and you don't want details from my

82

1  attorney, but that's the only --
2     Q.  I don't want your lawyer's --
3     A.  That's the only answer I have.
4     Q.  Okay.  But you were ordered by your captain to
5  write a report, right?
6     A.  Correct.  Not directly, but via our sergeant.
7     Q.  But you should have been doing it anyway, right?
8        MR. REYNOLDS:  Objection, form.
9        MR. GILL:  Object to the form of the question.
10    A.  I followed my attorney's advice, sir.
11    Q.  Actually, what was happening is exactly what
12  Officer Lovette said when he was being recorded and didn't
13  know it on his own Taser, --
14        MR. REYNOLDS:  Objection, form.
15        MR. GILL:  Join.
16  BY MR. MCKEE:
17    Q.  -- that the officers needed to get together to talk
18  about that shit on what they're going to put on their
19  supplemental reports, right?
20        MR. REYNOLDS:  Objection, form.
21    A.  That's --
22    Q.  Are you aware he said that?
23    A.  No.
24    Q.  The other thing that's supposed to happen with an
25  in-custody death is notification to the FDLE to begin an

83

1  independent investigation of the officers, right?
2     A.  Okay.
3     Q.  Right?
4     A.  Sounds -- sounds plausible, yes.
5     Q.  Well, do you know that to be the case, based on
6  your training?
7     A.  I don't know that.
8     Q.  But until the man's dead, there's no need to
9  notify, right?
10        MR. GILL:  Object to the form of the question.
11        MR. REYNOLDS:  Join.
12    A.  Makes sense.
13    Q.  Did you know Officer Stevens was appointed to keep
14  in touch with the hospital to verify when the man dies so
15  that the FDLE could then be notified?
16        MR. GILL:  Object to the form of the question.
17        MR. REYNOLDS:  Join.
18    A.  It's my understanding that Officer Stevens was
19  assigned to the case and was there on the scene.
20    Q.  Why did it take him 14 days after the events and
21  seven days after the man had died --
22    A.  I don't know.
23    Q.  -- to notify the FDLE?
24        MR. GILL:  Object to the form of the question.
25    A.  I don't know, sir.

84

1     Q.  Do you know what happened in those 14 days?
2     A.  No, sir.
3        MR. GILL:  Object to the form of the question.
4        MR. GILL:  Join.
5     Q.  The Taser footage of Lovette was gone.
6        MR. GILL:  Object.
7        MR. REYNOLDS:  Objection, form.
8        MR. GILL:  Join.
9  BY MR. MCKEE:
10    Q.  All the stuff that happened at the scene on the
11  Tasers was gone.
12        MR. GILL:  Object to the form of the question.
13        MR. REYNOLDS:  Objection, form.
14  BY MR. MCKEE:
15    Q.  Are you aware of that?
16    A.  No, sir.
17        MR. GILL:  Objection.
18    Q.  Are you aware that the dash cam footage of Lovette,
19  gone?
20        MR. GILL:  Object to the form of the question.
21    A.  I'm not aware of that, sir.
22        MR. REYNOLDS:  Join.
23    Q.  The video of the man at the pole about 20 yards
24  from the event, gone.
25        MR. GILL:  Object to the form of the question.

21 (Pages 81 to 84)

85

1    MR. REYNOLDS:  Objection, form.
2    A.  I'm not aware of that.
3    Q.  All of the direct evidence, other than the
4    eyewitnesses at the hotel and one Columbian tourist who did
5    it on her own, gone.
6    MR. GILL:  Object to the form of the question.
7    MR. REYNOLDS:  Objection, form.
8    BY MR. MCKEE:
9    Q.  Are you aware of a whistle-blower lawsuit against
10   the City of Key West by Officer Matthew Klosowski?
11   MR. GILL:  Object to the form of the question.
12   MR. REYNOLDS:  Join.
13   A.  I don't know who that is.  The lawsuit or the -- or
14   that name.
15   Q.  Were you aware that in 2007, he alleged that his
16   supervisor, Sergeant Rodriguez, told him, a Key West police
17   officer, to delete and destroy the ICOP video reflecting the
18   incident that was being complained about?
19   MR. GILL:  Object to the form.
20   A.  No, sir.
21   MR. REYNOLDS:  Objection, form.
22   MR. GILL:  Join.
23   Q.  Are you aware the City settled that case for
24   substantial dollars?
25   A.  No, sir.

86

1    MR. GILL:  Object to the form of the question.
2    MR. REYNOLDS:  Objection, form.
3    Q.  Rodriguez was involved in this event, wasn't he?
4    A.  He was there, sir.
5    Q.  He was actually involved with Detective Stevens in
6    post-incident investigation, wasn't he?
7    MR. GILL:  Object to the form of the question.
8    A.  I don't know to what extent, but he was.
9    Q.  I'd like to know if you know where Mr. Lovette's
10   dash-cam footage is.
11   MR. GILL:  Object to the form of the question.
12   MR. REYNOLDS:  Objection, form.
13   A.  I have no idea, sir.
14   Q.  Do you know where the incident minutes of his Taser
15   recording are?
16   MR. GILL:  Object to the form of the question.
17   MR. REYNOLDS:  Objection, form.
18   A.  I have no idea.  I do not.
19   Q.  Have you ever seen that eyewitness who was
20   videotaping at the scene, his footage?
21   MR. GILL:  Object to the form.
22   A.  No, sir.  Not at all.
23   MR. REYNOLDS:  Join.
24   Q.  Have you ever seen an identification -- have you
25   ever seen the identification of the volunteer police officer

87

1    whom Officer Wanciak actually spoke to who said, "They," it's
2    plural, right?  "They" --
3    A.  Yes, sir.
4    MR. GILL:  Object to the form of the question.
5    Q.  -- "were Tasing excessively."
6    Have you ever seen the identity of that volunteer
7    police officer from New York?
8    A.  Not at all.
9    MR. GILL:  Object to the form of the question.
10   MR. REYNOLDS:  Objection, form.
11   Q.  If Officer Wanciak spoke to him --
12   A.  Right.
13   Q.  -- and heard what he was saying in anger, should
14   she have taken down his name and address --
15   MR. GILL:  Object to the form of the question.
16   MR. REYNOLDS:  Objection, form.
17   BY MR. MCKEE:
18   Q.  -- under police policy?
19   MR. GILL:  Object to the form of the question.
20   MR. REYNOLDS:  Join.
21   A.  I imagine she would have.  I can't answer for her,
22   but yeah.  Under policy, yeah.
23   Q.  And so that piece of evidence disappears if you
24   never find who that was, right?
25   MR. GILL:  Object to the form of the question.

88

1    MR. REYNOLDS:  Objection, form.
2    A.  It sounds -- it sounds like it, sir.
3    Q.  If these events happened as I've just gone through
4    them with you, and it was your father that it happened to,
5    would you be mad as hell?
6    MR. GILL:  Object to the form of the question.
7    MR. REYNOLDS:  Objection, form.
8    A.  If anything happened to my father, I'd be mad,
9    upset, more than mad.
10   Q.  Would you expect the police department members that
11   were involved to be telling a consistent truthful story in
12   their statements?
13   MR. GILL:  Object to the form of the question.
14   MR. REYNOLDS:  Join.
15   A.  Yes.
16   Q.  And if they really did Tase him, you'd expect them
17   to admit it and not cover it up, right?
18   MR. GILL:  Object to the form of the question.
19   MR. REYNOLDS:  Objection, form.
20   A.  Yes.
21   Q.  You'd expect them to preserve evidence, right?
22   A.  Absolutely.
23   MR. GILL:  Object to the form of the question.
24   MR. REYNOLDS:  Objection, form.
25   Q.  It would be a crime in your mind as a police

22  (Pages 85 to 88)

89

1   officer if that evidence was destroyed or hidden or lied
2   about, right?
3         MR. GILL:  Object to the form of the question.
4         MR. REYNOLDS:  Objection, form.
5       A.  Absolutely.
6       **Q.  And heads should fall if that's the case, right?**
7         MR. GILL:  Object to the form of the question.
8         MR. REYNOLDS:  Objection, form.
9       A.  It's not up to me, but it would -- you're accurate.
10        MR. MCKEE:  I have no further questions.  Thank
11  you, sir.
12        MR. REYNOLDS:  No questions.
13        MR. GILL:  No questions for the witness.  We'll
14  read and take a copy if it's ordered.
15        THE WITNESS:  Gentlemen, thank you.
16        THE VIDEOGRAPHER:  Off the video record at 10:40
17  a.m.
18        (The deposition was concluded at 10:40 a.m.)
19
20
21
22
23
24
25

90

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MONROE )

        I, Suzanne F. Ex, Certified Verbatim Reporter,
Florida Professional Reporter, Notary Public, State of
Florida, certify that HENRY JOSE DEL VALLE personally
appeared before me on the 6th day of November, 2014, and was
duly sworn.

        Signed this 13th day of November, 2014.


_____
Suzanne F. Ex, CVR-M, FPR
Notary Public, State of Florida
Commission No.:  FF015913
Commission Expires:  July 27, 2017

91

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF MONROE )

        I, Suzanne Ex, Certified Verbatim Reporter and
Florida Professional Reporter, certify that I was authorized
to and did report the deposition of HENRY JOSE DEL VALLE,
pages 1 through 89; that the review of the transcript was
requested; and that the transcript is a true record.

        I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor am
I a relative or employee of any of the parties' attorneys or
counsel connected with the action, nor am I financially
interested in the action.

        Dated this 13th day of November, 2014.


_____
Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter-Master
Florida Professional Reporter

92

WITNESS NOTIFICATION LETTER

November 17, 2014

Henry Jose Del Valle
c/o Michael T. Burke, Esquire
Johnson Anselmo Murdoch Burke Piper & Hochman, P.A.
2488 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida  33304

RE:  Treavor Eimers vs. City of Key West, et al.
     Deposition Taken November 6, 2014
     U.S. Legal Support Job No. 1186149

The transcript of the above-referenced proceeding has been
prepared and is being provided to your office for review by
the witness.

We respectfully request that the witness complete their
review within 30 days and return the errata sheet to our
office.

Sincerely,


_____
Suzanne Ex, CVR-M, FPR
U.S. Legal Support, Inc.
One Southeast Third Avenue, Suite 1250
Miami, Florida  33131
(305) 373-8404

CC via transcript:

David W. Brill, Esquire
Jeannete C. Lewis, Esquire
Robert J. McKee, Esquire
David Paul Horan, Esquire
Darren M. Horan, Esquire
Lyman H. Reynolds, Jr., Esquire

93

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT ~ ENTER CHANGES ON THIS PAGE

IN RE:  Treavor Eimers vs. City of Key West, et al.
Henry Jose Del Valle
November 6, 2014

| Page No. | Line No. | Change | Reason |
|----------|----------|--------|--------|
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |
|          |          |        |        |

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

_____
Date        Henry Jose Del Valle

WWW.USLEGALSUPPORT.COM
1-888-311-4240

**A**

**a.m** 1:15,15  4:7
  45:22,25  47:2,5
  89:17,18
**abilities** 20:13
**able** 55:15  62:20
  67:23
**above-referenced**
  92:10
**absolutely** 12:18
  13:2,15  16:7
  20:5  26:3  31:11
  50:4  65:15  88:22
  89:5
**abuse** 17:24
**accident** 39:3
**accounts** 63:21
**accurate** 50:17
  89:9
**acid/base** 17:9
**act** 73:2,5,19
**action** 32:17  68:15
  75:24  79:9  91:15
  91:16
**additional** 77:13
**address** 5:11  87:14
**addresses** 71:17,23
**adjust** 47:3
**admit** 88:17
**adrenalin** 17:5
**advance** 36:25
**advice** 82:10
**affirm** 4:25
**aggression** 54:15
**agitation** 17:23
**ago** 13:25
**agree** 48:22
**Ah** 26:15
**ahead** 32:4  41:25
**al** 1:8  4:10  92:7
  93:4
**alleged** 85:15
**allow** 22:1
**allowed** 67:8
**ambulance** 76:15
**and/or** 16:24  17:24
**anger** 18:5  61:20
  87:13
**angle** 26:23,24
**angry** 24:24  61:16
**Anselmo** 2:13  92:5
**answer** 9:8,9  19:22
  32:6  36:16  53:5
  56:4  82:3  87:21
**Answering** 56:10
**antagonism** 50:15
**anticipation** 18:4

**anybody** 75:8
**anymore** 40:20
**anyway** 82:7
**Apart** 29:24  30:17
  30:19
**apologize** 53:13
**appearance** 4:15
  60:5,14
**APPEARANCES** 2:1
**appeared** 90:9
**application** 17:13
**applications** 16:18
**applied** 36:6  56:10
**apply** 58:5,5
**appointed** 83:13
**appreciate** 37:23
  38:1  45:10
**approached** 32:10
  46:7  47:10,13
**approaching** 31:6
**approximately** 12:6
  12:7,8  27:17
**area** 30:9  38:17
  42:15  44:3  70:16
  71:1,11,22  74:4
  74:12,12  75:23
  79:11
**arm** 31:13  32:11
  33:3,23  34:1,11
  34:22  35:1,2,15
  36:19  48:9  49:18
  49:19,20
**arms** 22:21  33:9
  46:5  50:20
**Army** 11:25
**ARNAUD** 2:23
**arrest** 77:25
**arrived** 29:24
**aside** 20:7
**asked** 15:13  31:20
  62:15  70:23,24
  71:1,3,15  72:8
  74:15,22  75:22
**asking** 33:23  36:19
**asks** 33:8
**aspect** 50:14
**assessment** 24:14
**assigned** 83:19
**assist** 32:1  35:8
**assisted** 59:22
**assisting** 35:25
  60:19
**associated** 16:20
**assume** 14:16
**asthma** 17:21
**attachment** 58:18
**attempt** 64:25

**attempted** 34:21
  37:20  64:24
**attempting** 30:22
  31:4,24  34:2
  42:2  49:17  70:25
**attends** 13:11
**attest** 11:1  61:20
**attorney** 79:19,22
  79:25  80:6,17,25
  81:3,9  82:1
  91:13
**attorney's** 82:10
**attorneys** 91:14
**August** 5:21
**authorized** 91:7
**automatic** 58:12
**Avenue** 92:18
**avoidance** 14:22
**aware** 10:6,11  17:6
  40:14  42:20  43:4
  43:7,13  66:6,10
  74:2  82:22  84:15
  84:18,21  85:2,9
  85:15,23
**Axelrod** 79:20

**B**

**back** 12:17  15:14
  21:12,13  24:3,15
  24:17  31:13
  32:11  33:3,23
  34:1  35:13  36:19
  36:24  45:24  47:4
  48:9  51:8,20
  52:4  65:18,20
  66:13,15,19  67:1
  72:15  81:1
**backtrack** 32:9
**backwards** 34:12
  36:4  50:8,20
**bad** 25:11  38:15
**balance** 17:10
**based** 10:17  18:20
  19:7,14  28:2
  56:21  59:9  60:3
  69:16  79:5  81:25
  83:5
**basic** 79:11
**battery** 22:8
**beach** 2:18  20:24
  24:19  38:17  70:7
  71:3,11  76:12,24
**beard** 13:6
**BEDARD** 2:17
**began** 35:6
**beginning** 6:2
**behalf** 2:2,12,17

  4:18,19,21
**behaving** 48:23
**Bejeezus** 26:4
**belief** 25:18
**believe** 6:3  8:16
  8:20  10:22  19:18
  55:23  66:24
**bending** 36:5,24
**benefit** 63:20
**Benning** 12:1
**bent** 35:8
**best** 48:22
**better** 53:8
**big** 12:11
**bit** 20:9
**black** 13:1
**bleed** 43:8
**bleeding** 42:25
  43:7
**block** 42:5
**blood** 16:5  17:3,4
**body** 23:2  26:10
  34:12  38:2  40:21
  41:1,20  42:6
  43:13  60:5  66:21
**bomb** 42:20  51:8
  52:6,23
**bottom** 14:4
**Boulevard** 2:9,13
  5:13  92:5
**bouncing** 34:22
**break** 45:17
**Brief** 45:23  47:3
**Brill** 92:22
**bring** 34:2,22
  69:14
**brought** 7:15
**build** 13:1
**Building** 2:18
**Burke** 2:13  92:4,5
**burke@jambg.com**
  2:15
**burst** 62:5,12
**butt** 39:18

**C**

**C** 2:15  92:23
**C-101** 2:18
**c/o** 92:4
**call** 38:25
**called** 69:4
**Calm** 53:3
**Calvert** 9:10  30:4
  30:5,6
**cam** 8:19  11:9  21:7
  84:18
**camera** 72:5,8

77:13,17
**cams** 8:6 9:5,14
**canal** 42:25
**captain** 82:4
**car** 22:6,18 24:15
  24:16,17 26:20
  26:24 38:17
  55:19 71:15
  75:23 76:19,21
  76:23
**Cara** 2:7 4:18
**cardiac** 16:19
**carotid** 65:16
**cars** 74:24 75:4
**cartridge** 68:10,14
**case** 1:3 4:9,11
  83:5,19 85:23
  89:6
**cause** 4:3 5:1 18:4
  43:4,7,8 58:20
**caused** 35:22 64:11
**causes** 15:3 16:24
**CC** 92:21
**Celcer's** 7:12
  11:11
**center** 4:7 24:19
  25:6 26:10 38:2
  38:17
**Centere** 1:16
**certain** 12:23 15:3
  20:4
**certainly** 33:13
  46:8,10
**Certificate** 3:6,6
  90:1 91:1
**certified** 1:24 4:1
  19:23,23 90:6
  91:6,22
**certify** 90:8 91:7
  91:12
**CEW** 3:12 14:21
  15:2 16:14,18,24
  17:9,17 18:3,10
  18:11
**CEWs** 18:13
**Change** 93:7
**changes** 15:4 16:3
  17:3,11 93:2
**charge** 71:23
**charger** 22:7
**Charles** 1:5
**checked** 65:16
**checking** 75:13
**chemistry** 17:4
**chest** 25:17 40:10
  44:3
**chiggins@horan...**

2:5
**chronic** 17:24
**circuits** 18:14
**circumstances** 80:8
**City** 1:8 4:10 5:15
  13:12 85:10,23
  92:7 93:4
**clarify** 36:15
  37:13
**class** 11:23
**clear** 14:1 42:3
  80:17
**clearly** 48:12
**client** 22:12,17
  23:4
**client's** 52:23
**close** 13:23 34:2
  75:23
**closed** 7:24 39:9
**closer** 77:15
**cluster** 42:1
**color** 65:14
**Columbia** 2:18
**Columbian** 85:4
**combative** 48:16,20
**come** 30:8 60:20
**coming** 70:17 76:25
**command** 22:20
**commands** 25:1
  27:19 30:13,16
  30:20,21 31:2
  33:14,15,19,20
**comment** 27:9 45:15
**comments** 53:11
**Commission** 90:15
  90:16
**communication**
  80:24
**communications**
  79:25
**comparable** 17:11
**competitive** 12:2
**complained** 85:18
**complete** 92:12
**completed** 18:14
**completely** 24:4
  41:11 47:11
  59:25 60:1
**compliance** 6:5
  48:7
**compliant** 31:8
  33:8 37:5 47:11
**complied** 31:9,11
  31:18 33:21 46:3
**comply** 31:3
**complying** 37:8
**component** 49:4

**compound** 15:9
**compression** 58:19
**computer** 9:2
**concerned** 11:1
**concluded** 89:18
**conditions** 17:21
  17:22
**conduct** 50:7
**conflicting** 6:18
  6:20
**confronting** 26:9
**confuse** 33:16
**confusing** 14:2
**connected** 91:15
**consciousness**
  53:21,22 56:17
**consistent** 88:11
**contact** 47:16 68:9
  79:8
**contacts** 79:9
**content** 20:6 80:16
  80:23
**continually** 57:16
  70:18
**continue** 34:25
**continued** 6:2
**continuing** 18:9
**continuous** 16:17
**contribute** 16:18
**control** 74:5
**copy** 89:14
**copyright** 14:5
**corner** 70:19 76:24
**coroner** 79:9
**correct** 11:14 14:8
  17:1 18:18 23:12
  23:16,21 24:1,20
  27:14 31:8 33:10
  40:7,8 43:8 44:7
  47:8,14,15,19,22
  48:7,8,11 50:16
  51:17 58:24
  65:25 67:14,21
  67:24,25 68:13
  68:25 73:20 75:6
  80:15 82:6
**counsel** 4:15 27:9
  45:15 52:11 53:7
  53:11 91:13,15
**count** 27:20
**County** 6:1 11:24
  90:4 91:4
**couple** 45:5
**course** 36:17 72:20
  74:22
**court** 1:1 4:5,11
  4:12,24

**courtroom** 7:23
**cover** 88:17
**coverup** 69:21
**CPR** 81:13
**creatine** 17:10
**credible** 72:22
**Credit** 12:15
**crime** 70:11 71:1,4
  72:23 73:8,23
  88:25
**cross-cuffing**
  49:16
**cruiser** 21:2
**cuff** 32:12 33:3
  34:2 35:20 47:20
  48:2,2,3 49:6,20
  50:2 54:16 61:15
  62:20 63:7 66:13
**cuffed** 31:13 32:14
  33:24 35:23
  48:10 49:17
  54:14 63:14
  64:15 65:5
**cuffing** 32:17,21
  33:9 34:12,20,25
**cumulative** 15:2
  16:14,18
**current** 20:13
**currently** 5:14
**customary** 81:1
**cut** 80:3
**cutting** 71:2
**CVR-M** 1:23 90:14
  91:21 92:17

---

**D**

**Dangerous** 19:4
**dark** 13:1
**Darren** 2:6 4:17
  92:24
**darren@horan-w...**
  2:5
**dash** 8:6,18 9:4,14
  11:9 21:7 84:18
**dash-cam** 9:19
  86:10
**date** 5:19,23 8:7
  8:10 10:20 14:4
  67:16 93:25
**Dated** 91:18
**David** 2:6 4:17
  92:22,24
**day** 5:10 9:5 13:7
  20:10 33:11 69:1
  70:15 79:13,14
  80:9,17,25 81:9
  90:9,11 91:18

**days** 8:11 83:20,21
  84:1 92:13
**de-holster** 68:4
**dead** 81:5,11 83:8
**dealings** 78:19
**dealt** 53:15
**death** 16:13,25
  69:3,15 79:1,8
  81:2,4 82:25
**Deceased** 1:5
**declare** 93:22
**Defendant** 2:17
**Defendants** 1:9
  2:12
**defending** 38:14
**Del** 1:13 3:2 4:9
  4:19 5:5,12 90:8
  91:8 92:4 93:4
  93:25
**delete** 85:17
**deleted** 72:16
  77:18
**deleting** 72:23
**delirium** 17:23
**department** 5:15,17
  6:7 7:9 8:3
  28:10 79:6,22
  81:21 88:10
**departmental** 69:21
**Depends** 52:3 57:10
**deposition** 1:13
  3:2 4:1,8 89:18
  91:8 92:8
**depress** 68:9
**depressed** 58:14
**deputy** 6:1
**described** 12:24
**describes** 64:10
**describing** 74:5
**description** 27:1
  29:22
**destroy** 73:9 85:17
**destroyed** 89:1
**destroying** 73:23
**detail** 14:11
**details** 81:25
**detective** 6:11,13
  86:5
**detectives** 74:13
  79:12
**device** 10:14
**die** 39:5 81:10
**died** 38:22 81:8
  83:21
**dies** 83:14
**different** 7:1
  45:10,11

**differently** 64:14
**difficult** 36:17
**difficulties** 60:7
**direct** 3:3 5:8
  58:15,18 68:12
  85:3
**direction** 21:9
  51:15 52:3,24
  55:7
**directly** 82:6
**disappears** 87:23
**discharge** 17:8
**discomfort** 18:5
**displaying** 50:15
**dispute** 34:13
**dissertation** 15:18
**distinct** 44:18,19
**District** 1:1,1
  4:10,11
**division** 1:2 79:10
**document** 14:5
  15:21 18:3 93:23
**doing** 29:21 35:15
  49:23 55:11
  68:21 69:3 82:7
**dollars** 85:24
**dph@horan-wall...**
  2:5
**draw** 16:5
**drawn** 28:12,14
**drew** 29:4 38:24
**Drive** 2:18
**driver's** 23:10
**dropped** 42:19
**drug** 17:23,24
**due** 21:15
**duly** 5:6 90:10
**duration** 58:17
**duty** 38:22,24
**dying** 36:11 38:23

---
**E**
---

**ear** 42:25
**ears** 43:8
**East** 2:13 92:5
**efects** 16:24
**effect** 43:4
**Effectively** 38:14
**effects** 15:2,3
  16:23 17:3,9,17
**Eimers** 1:5,5 4:10
  4:18 7:8 9:5
  14:9,20 17:6
  18:1,7,19,25
  19:15 20:24
  21:19,21 23:10
  26:18,24 29:9,16

**29**:23 30:14,21
  31:2 32:11 33:2
  35:12 37:17 38:2
  40:7,10,18 42:20
  42:25 44:13 46:2
  46:12 47:10,13
  47:17 48:6,16
  49:6,17 50:9,14
  51:5 53:15 54:19
  55:12 57:8 59:22
  62:22 63:17
  67:16 71:14,15
  75:23 76:15 92:7
  93:4
**either** 31:15 41:21
  58:10 59:2 68:8
**elbow** 36:5,25 52:9
  52:10
**elderly** 17:21
  29:11
**electrical** 17:8
**electrolytes** 17:10
**elects** 67:5
**embarrassed** 61:21
**emotions** 40:4
**employed** 5:14,16
**employee** 91:13,14
**employment** 5:19
**ended** 31:2 35:6
**endowed** 12:16
**enforcement** 5:22
**ENTER** 93:2
**entering** 20:24
**entire** 7:25 8:2,4
**entitled** 80:1
**entrapped** 49:7
**errata** 3:7 92:13
  93:1
**Esquire** 2:6,6,7,11
  2:15,20 92:4,22
  92:23,23,24,24
  92:25
**Estate** 1:5
**estimate** 63:1
**estimating** 63:2,4
**et** 1:8 4:10 92:7
  93:4
**event** 7:1,1 8:11
  9:5,11,13 10:17
  14:20 18:1,7,19
  19:15,19 39:23
  47:8 59:1 67:16
  69:13 70:12 74:6
  77:24 78:20,20
  78:23 84:24 86:3
**events** 7:17 20:13
  44:12 50:15

**83**:20 88:3
**eventually** 22:20
  30:12 81:16
**evidence** 48:23
  72:22,23 73:9,23
  77:1,4 85:3
  87:23 88:21 89:1
**Ex** 1:23 4:1,12
  90:6,14 91:6,21
  92:17
**exact** 5:19 8:10
**exactly** 41:1 82:11
**Examination** 1:20
  3:3 5:8
**examined** 5:6
**excerpt** 35:7
**excessively** 87:5
**excited** 17:22
**excuse** 6:4 13:19
**exertion** 17:12
**exhaustion** 16:18
  17:23
**exhibit** 13:16,16
  13:18
**EXHIBITS** 3:10
**exit** 21:21
**exited** 22:17
**expect** 29:16 88:10
  88:16,21
**expected** 17:11
  26:9
**experience** 16:2
  60:3
**experienced** 11:7
**Expires** 90:16
**explain** 6:17
**explained** 34:21
**explanation** 42:24
**exposed** 58:9
**exposure** 15:2
  16:14 18:10,11
**expression** 26:8
**extend** 32:11 33:2
  33:8
**extent** 20:12 86:8
**Extremely** 16:9,11
**extricated** 62:20
  63:9
**eyewitness** 40:9
  43:14 63:20
  86:19
**eyewitnesses** 7:17
  40:21 71:24 85:4

---
**F**
---

**F** 90:6,14
**face** 24:24 25:3,6

25:11,21 26:14
28:5 50:21 51:6
51:21 53:21
59:12
**faced** 26:24
**facial** 26:8
**facing** 23:11 51:15
54:22
**fact** 10:17 79:14
79:15
**facts** 6:20 67:15
93:23
**fair** 55:17
**fall** 89:6
**falls** 69:15
**false** 24:10 28:22
**falsehoods** 78:13
**far** 6:8 32:4 40:18
58:7 81:4
**fatal** 18:6
**father** 88:4,8
**Fax** 2:4,14,19
**FDLE** 11:15 24:23
28:21,25 34:19
41:20 82:25
83:15,23
**fear** 18:5
**federal** 73:8,19
**feel** 65:23
**feeling** 13:5 26:21
**feelings** 61:20
**feet** 54:20 59:23
59:24 71:14,15
**fellow** 49:7 77:12
79:23
**Female** 30:10
**FF015913** 90:15
**Fifteen** 57:23
**fighting** 12:8
17:13 31:3,3
36:12 37:9 47:14
47:23 48:1
**filed** 4:11 7:9
**financially** 91:15
**find** 87:24
**finds** 72:21
**fine** 42:14
**finger** 39:10 48:10
50:3 54:15 62:21
66:12
**finished** 55:1
**fire** 58:20,23
68:14
**first** 5:6 14:4,13
14:25 24:4 33:8
36:16 48:2 49:20
50:14 73:14

77:21
**fit** 12:13
**five** 45:18 58:13
58:16 61:25 62:3
62:12,15,16,18
71:14
**five-second** 58:12
58:16
**flashing** 74:25
75:5
**fleeing** 17:13
**Fleming** 1:16
**Florida** 1:1,8,17
1:25 2:4,9,14,18
4:2,3,11 5:13
6:6 69:8 90:3,7
90:8,15 91:3,7
91:22 92:6,19
**focus** 57:2
**focused** 29:9
**focusing** 60:23
**folks** 79:22
**followed** 22:20
28:4 82:10
**following** 22:13,14
**follows** 5:7
**foot** 12:10
**footage** 8:19 9:20
10:1 72:15 77:19
84:5,18 86:10,20
**force** 17:14 36:6
36:24
**foregoing** 93:23
**forgot** 22:8
**form** 6:15,22 7:4,5
9:6,7,16,17,21
10:2,8,9,15,16
15:7 19:1,2,5,10
19:11,20 22:24
23:22,25 24:11
24:21 25:4,8,9
25:12,19,22 26:1
26:6,11 27:7,15
27:24 28:9,23,24
29:5,6,12,13
30:1 33:25 34:5
34:8,14 36:8,13
36:21 37:3,4,6
37:11,12 38:7,12
38:13 39:13,20
40:1,2,12,15,16
40:23,24 41:3,9
41:16,17,22,23
42:10,11,16,21
42:22 43:1,2,5,9
43:19 44:8,9,15
44:23 45:3,13

46:13,16,19
47:24 48:17,19
48:25 49:1,8,11
50:11,18,22 51:3
51:11,18,22 52:1
52:7,10,20 53:1
53:8,10 54:3,6
54:17,18 55:5,6
55:13,25 56:14
56:15,18,19,25
57:1,5,6,13,18
57:19,24 58:4,11
58:22 59:3,4,8
59:17,18 60:8,9
60:17,18 61:1,5
61:9,12,13,17,18
61:22,23 62:1,7
62:10,14,17,25
63:11,22 64:1,2
64:5,6,12,13,19
64:23 65:8,22
66:1,8,9,17,18
66:23 67:2,18
68:17,18,23 69:5
69:6,10,11,18,23
71:6,13 72:9,13
72:18,19,24 73:7
73:10,25 74:7,10
74:17,18 75:2,7
75:11,15,18,21
76:6,11,22 77:2
77:8,16,20 78:2
78:10,14,15 79:3
79:7,18 80:18
81:6,22,23 82:8
82:9,14,20 83:10
83:16,24 84:3,7
84:12,13,20,25
85:1,6,7,11,19
85:21 86:1,2,7
86:11,12,16,17
86:21 87:4,9,10
87:15,16,19,25
88:1,6,7,13,18
88:19,23,24 89:3
89:4,7,8
**Fort** 2:14 12:1
92:6
**forward** 50:24 60:1
**found** 16:22
**FPR** 1:23 90:14
91:21 92:17
**frame** 63:5
**fray** 49:5
**Freeman** 1:16 4:7
**front** 21:12,13,15
35:12 49:24

54:19,20
**fucking** 42:20 51:8
52:23
**full** 6:2,5
**fully** 60:20 64:15
**function** 68:3
**further** 46:12
54:23 89:10
91:12

_____

**G**

**Gabe** 78:7
**gained** 12:7
**Garrido** 28:11
29:24 31:6 32:10
32:16 33:22
35:16 39:9 41:7
41:7 46:7 47:10
47:13,16,21 48:9
49:15 50:2 61:4
63:9 67:11,17
69:1
**Garrido's** 46:11
62:21
**Gary** 2:17
**gentleman** 29:16
42:2
**gentlemen** 73:3
89:15
**Georgia** 12:1
**getting** 35:9 43:24
66:16
**Gill** 2:15 4:19,19
6:15,22 7:4 9:6
9:16,21 10:2,9
10:16 19:2,5,10
19:20 22:24
23:23 24:12,21
25:4,8,12,19,22
26:1,6,11 27:8
27:15 28:9,23
29:5,12 30:1
33:25 34:5,14
36:8,13,21 37:3
37:6,11 38:7,12
39:13,20 40:1,12
40:15,23 41:3,10
41:16,23 42:10
42:16,21 43:1,6
43:10,15,18,21
44:8,16,22,24
45:4,14,17,19
46:13 47:24
48:17,25 49:8,11
50:11,19,23 51:4
51:10,12,19,24
52:2,25 53:2,17

54:17 55:5 56:1
56:14,18,25 57:5
57:18,25 59:3,5
59:17,19 60:8,10
60:17 61:1,6,9
61:12,17,22 62:2
62:6 63:12,22
64:1,5,12,23
65:9 66:2,8,18
67:3,18 68:17,24
69:5,10,17,19,24
70:1 71:7,10
72:14,18,25
73:11,25 74:7,10
74:17 75:2,7,12
75:15,18,21 76:6
76:11 77:2,8,16
77:20 78:2,11,14
78:16 79:3,7,18
80:19 81:7,22,24
82:9,15 83:10,16
83:24 84:3,6,8
84:12,17,20,25
85:6,11,19,22
86:1,7,11,16,21
87:4,9,15,19,25
88:6,13,18,23
89:3,7,13
GIRARD 2:23,23
girl 44:21 45:1
give 8:10 14:19
  20:16 31:15
  33:14
giving 5:1 25:1
  27:18 29:2 31:16
  31:17,17 33:15
  33:19 38:20
glad 39:8
glass 45:16
go 13:9 14:11 20:9
  20:20,21 41:25
  44:17 46:23
  51:25 58:13,25
  64:3 68:12 71:2
  73:4 75:17
goes 13:12 16:12
  58:12
going 14:11,16
  20:23 26:20 27:5
  40:17 42:4 48:6
  50:21 64:22 70:3
  75:9 76:15 81:10
  81:15 82:18
good 4:5 5:10
  20:22 49:4
grab 22:9
grabbed 22:10

grand 7:14,22 8:16
  10:21
ground 27:12,22
  28:5 31:21 36:5
  37:8,20 46:3
  63:16
group 2:8 49:5
grow 13:6
guess 9:1 49:16
  64:14
guessing 10:22
  62:23
guides 64:9
gun 25:17 28:12,22
  49:24
guy 12:11
guys 45:11

H

H 2:20 92:25
hair 12:16 13:1
hand 4:25 13:16
  28:19 32:14 33:3
  49:17 50:8 54:14
  61:15
handcuff 31:4,25
  42:2
handcuffing 32:3
  47:7
handcuffs 60:21,24
handgun 28:14,19
handheld 3:12 72:5
hands 23:1 27:22
  30:21,23 31:20
  46:3 56:13 60:23
  72:16
happen 9:15 33:11
  47:18 48:6 51:13
  68:16 72:21 79:2
  82:24
happened 36:2 50:7
  51:14,14,20
  65:21 66:20 70:5
  71:12 72:16
  75:25 78:13
  79:11 84:1,10
  88:3,4,8
happening 50:9
  59:1 63:6,9
  64:21 67:1 76:14
  82:11
happens 44:13 64:3
happy 20:16 25:21
  63:20
hard 44:21
harm 69:14
head 12:20,22

42:15,20 43:8
  51:8,9,20 52:3,4
  52:23,24 54:21
  54:22
heads 89:6
hear 10:23 13:9
  31:12 32:10,13
  32:16 33:2,12
  44:21 46:8,10
  77:23 78:3 80:5
heard 10:4 39:17
  39:24 44:17,25
  45:1 46:12 47:17
  48:5 56:5 73:2,3
  73:13,14 78:1
  87:13
hearing 31:14
heart 17:4,21
  44:13 60:15
height 12:6
hell 39:25 88:5
help 20:18
helped 34:19
helping 35:1
helps 52:19
Henry 1:13 3:2 4:9
  5:5,12 90:8 91:8
  92:4 93:4,25
hgill@jambg.com
  2:15
hidden 89:1
Higgins 2:3,7 4:18
High 29:11,14
high-powered 11:21
  25:2 26:9 36:10
high-pressure
  29:10
hit 52:4,15
hobble 55:18,20,22
  56:6,7,9,12 57:8
  57:9 58:25 60:25
  61:2
hobbled 56:17,20
  56:24 57:4 60:6
  64:16
Hochman 2:13 92:5
Hold 35:14,14
holding 58:9
hollering 48:13
home 75:17
honorable 42:3
hope 19:22
Horan 2:3,6,6 4:17
  4:18 92:24,24
hormones 17:5,10
hospital 29:11,19
  29:20 54:2 83:14

hotel 20:25 24:5
  40:9,21 42:7
  55:4 85:4
Hudson 2:15 4:19
human 17:8
hundred 56:20
hurt 64:10

I

ICOP 85:17
idea 43:3 86:13,18
identification
  86:24,25
identify 30:25
identity 87:6
illegal 73:8
imagine 28:15
  36:17 87:21
immediately 8:11
improper 18:24
  19:7
in-custody 79:1,8
  81:2,4 82:25
inappropriate
  45:15 53:11
inched 26:23
inching 26:19
incident 8:7 14:9
  17:6 20:10 85:18
  86:14
include 13:13 17:3
  17:20 70:13
including 15:3
increase 16:14,25
independent 83:1
INDEX 3:1,10
individual 26:20
  29:17
individuals 16:13
  17:16,20
information 11:6
  14:21
initially 24:8,10
injurious 18:6
injury 16:13,25
inquired 8:3
inside 7:23 54:8
instruction 50:9
instructions 28:4
  28:5
intent 38:15 69:14
intentional 68:15
  69:14
intentionally 68:2
  68:4,7 69:3
interested 91:16
interesting 72:1

**interestingly**
63:19
**intimidating** 38:11
**intoxication** 17:24
**investigation** 7:14
83:1 86:6
**involuntary** 64:4
**involved** 7:8 8:7
9:14 19:18 76:17
86:3,5 88:11
**issue** 49:23
**issued** 67:12,20

**J**

**J** 2:11 92:23
**Jeannete** 92:23
**jeopardy** 29:15,18
**jerking** 48:13
63:21,24 64:4,10
**jest** 12:19
**Job** 92:8
**Johnson** 2:13 92:5
**join** 6:16,23 9:22
10:3 19:6,21
22:25 23:23
24:12 25:5,14,23
26:2,7,12 27:8
27:16 34:15 36:9
36:14,22 37:7
38:8 39:14,21
41:4,10 43:6,10
43:21 44:16,24
45:4,14,14 47:25
49:12 50:12,19
50:23 51:4,12,19
51:24 52:2 53:2
56:1 57:25 59:5
59:19 60:10 61:6
62:2 63:12 65:9
66:2 67:3 68:24
69:19,24 70:1
71:7,10 72:14,25
73:11 74:1 75:3
75:12 77:3 78:4
78:11,16 80:19
81:7,24 82:15
83:11,17 84:4,8
84:22 85:12,22
86:23 87:20
88:14
**joined** 49:5,10
**jokes** 39:18
**Jose** 1:13 5:5,12
90:8 91:8 92:4
93:4,25
**Jr** 2:20 92:25
**July** 90:16

**jump** 66:13,15 67:1
**jumped** 66:19
**jury** 7:14,22 8:16
10:21 72:21
**Justice** 1:16 4:7

**K**

**keep** 12:13 13:20
27:18 76:12,25
83:13
**kept** 26:19
**Key** 1:2,8,17 2:4
2:23,23 4:7,10
5:13,15 13:12
38:21,23 39:4
79:5 85:10,16
92:7 93:4
**kill** 19:9 25:7
68:21
**killed** 78:7
**kinase** 17:10
**kind** 19:19 20:3
25:11 55:2 60:5
60:14 63:24
**Klosowski** 85:10
**kneel** 27:21
**knees** 41:14,18
**knelt** 28:4
**knew** 29:17 67:22
75:9 81:5
**know** 6:8 7:24 8:1
8:17 9:8 11:2
13:5 14:13 16:4
26:14 27:2 28:16
28:25 29:4,15,16
30:11 31:20,21
34:1,7 35:6,9
37:25 38:21 39:6
40:3 42:12,13,18
42:19 45:8,9
51:23 55:9 56:3
56:10,20 57:2,7
58:16 60:1,12,13
61:7,14,19,24
62:11 63:17 65:2
65:17 66:19
69:12,15 71:16
71:20 72:7,11
74:21 77:21 78:7
78:8,12,17 79:21
79:21 80:24
82:13 83:5,7,13
83:22,25 84:1
85:13 86:8,9,9
86:14
**knowing** 26:19
38:15

**knowledge** 56:22
**knowledgeable** 81:3
**knows** 40:4 53:7

**L**

**laid** 22:20 31:5
51:8 52:6,23
65:17
**lap** 22:11
**Large** 4:3
**late** 81:9
**Lauderdale** 2:14
92:6
**law** 2:8 5:22 6:6
69:8 73:8
**law-enforcement**
12:2
**lawsuit** 85:9,13
**lawyer** 69:12 81:2
**lawyer's** 82:2
**lay** 27:21 28:4
31:9 46:5 65:20
**leaned** 60:1
**learn** 6:13,19
10:18
**learned** 6:24
**leave** 22:7 65:14
70:24 71:9 74:16
75:20,22,23 76:2
**Lee** 2:17
**left** 31:12 32:11
32:14 33:23
34:11 35:2,15,20
47:20 49:17,20
81:12,12
**Legal** 2:22 4:12,13
92:8,18
**legs** 57:11 66:3
**length** 62:5
**let's** 32:4 45:18
46:8 67:5 69:21
**Letter** 3:7 92:1
**Lewis** 92:23
**lied** 89:1
**lien** 38:22
**life** 37:9
**lift** 60:15
**lifting** 36:5
**light** 10:23
**lights** 74:25 75:5
**line** 20:9 38:24
55:20 93:7
**list** 74:14
**listed** 74:14
**listening** 35:11,11
**literature** 13:14
13:22

**little** 12:7 20:9
**lives** 29:15,18
**LLC** 2:8
**LLP** 2:3
**lock** 39:9
**locked** 39:10 48:10
50:2 54:15
**long** 5:16 13:4
22:8 49:24 57:9
57:17 58:2,5
61:3,25
**long-distance**
11:25
**longer** 27:18
**look** 12:15 19:25
20:15 25:11,16
26:13 54:7 69:21
**looked** 24:20,22,23
59:23
**looking** 20:17 38:4
40:20 42:12 75:9
**lost** 53:21,22
56:17 60:22
**lot** 43:7 45:10
**lots** 68:15
**loud** 25:1 27:18
**Lovette** 2:17 4:22
8:22 9:23 10:6
41:14 42:14 51:8
52:17 67:11,16
69:1 78:6,12
82:12 84:5,18
**Lovette's** 9:19
41:18 86:9
**low** 37:21
**lreynolds@rrbp...**
2:19
**luckier** 13:6
**Lyman** 2:20 4:21
92:25

**M**

**M** 2:6 92:24
**mad** 39:25 40:3
88:5,8,9
**making** 52:13 70:13
**male** 30:6
**man** 29:11 42:3
61:8 78:7 83:14
83:21 84:23
**man's** 83:8
**mandatory** 6:5
**manner** 36:18 78:17
**manually** 32:22
**manufacturer's**
13:13
**March** 14:6

mark 12:8
marked 13:18
Marksmanship 11:25
mass 25:6 26:10
material 7:2
matter 43:17
matters 7:8
Matthew 85:10
McKee 2:8,11 3:3
  4:17,17,23 5:9
  10:13 15:11,13
  15:16,19,21,22
  19:12 25:10
  27:10 39:22
  40:13 43:16
  45:18,20 46:1,14
  46:17,25 47:6
  48:21 49:9 50:13
  52:8,12,15,18,21
  52:22 53:12,18
  56:2 58:1 59:6
  60:11 62:8 63:23
  64:20 69:7 70:2
  71:8 72:10 74:8
  75:16,19 77:9
  78:5 79:4 82:16
  84:9,14 85:8
  87:17 89:10
  92:23
mean 6:20 10:22
  22:14 32:24 54:4
  54:20,23 57:20
  58:7 80:3
Meaning 12:19
meant 15:16
media 10:17
medical 16:20
meeting 7:24
members 88:10
memory 20:16 23:19
  27:5 29:22 30:2
mental 20:13
mentioned 39:24
metabolic 15:3
  16:2,4,19,23,24
Miami 92:19
Michael 92:4
microphone 21:25
microphones 47:3
mind 88:25
mine 8:8,13,13 9:2
  9:9 33:21
minute 57:15 63:4
  63:10 64:21,25
  65:2
minutes 45:18 63:4
  63:6 73:4 86:14

missing 10:1
moment 38:16
momentarily 35:5,5
  35:8
Monroe 6:1 11:24
  90:4 91:4
months 8:10
morning 4:5 73:15
motion 63:24
motions 64:4,11
motorcycle 38:25
move 27:9 32:4
  45:13,14 53:10
  64:8 66:6 69:25
  70:23 71:16
moved 32:2 54:22
movements 55:16
moving 55:1 66:3,4
  66:5
multi-step 47:8
multiple 6:25
  18:13,14 33:18
  55:11 71:20
municipality 1:8
murder 69:4,9,15
Murdoch 2:13 92:5
mustache 13:6

N

NAJA 2:23
name 5:10,12 74:11
  85:14 87:14
names 71:17,23
necessarily 7:6
  36:23 37:2
necessitated 71:4
neck 43:13,25
need 20:15 83:8
needed 80:25 81:3
  82:17
never 7:19,20
  28:21 44:17,18
  44:25 46:11
  51:15 59:25,25
  73:12,13,18
  77:14,17 78:1
  87:24
New 87:7
NEWSPAPER 2:23,23
night 11:18
nomenclature 19:24
non 38:24
non-involved 55:3
normal 70:11
Norman 38:24
North 5:13
nose 53:23 54:1

nostrils 54:5,7
Notary 4:2 90:7,15
nothing's 76:14
notice 36:4,25
  62:21
notification 82:25
  92:1
notified 83:15
notify 83:9,23
November 1:15 4:6
  6:4,4 12:4,17
  90:9,11 91:18
  92:2,8 93:5
number 4:9 11:24

O

oath 3:6 11:2,4
  34:17 90:1
Object 6:15,22 7:4
  9:6,16,21 10:2,9
  10:16 19:2,5,10
  19:20 22:24
  24:21 25:4,8,12
  25:19,22 26:1,6
  26:11 27:15 28:9
  28:23 29:5,12
  30:1 33:25 34:5
  34:14 36:8,13,21
  37:3,6,11 38:7
  38:12 39:13,20
  40:1,12,15,23
  41:3,16,23 42:10
  42:16,21 43:1,15
  44:8,22 46:13
  47:24 48:17,19
  48:25 49:8,11
  50:11 51:10
  52:25 54:17 55:5
  56:14,18,25 57:5
  57:18 59:3,17
  60:8,17 61:1,9
  61:12,17,22
  63:22 64:1,5,12
  64:23 66:8,18
  67:18 68:17 69:5
  69:10,17 72:18
  73:25 74:7,10,17
  75:2,7,15,18,21
  76:6,11 77:2,8
  77:16,20 78:2,14
  79:3,7,18 81:22
  82:9 83:10,16,24
  84:3,6,12,20,25
  85:6,11,19 86:1
  86:7,11,16,21
  87:4,9,15,19,25
  88:6,13,18,23

89:3,7
objection 7:5 9:7
  9:17 10:8,12,15
  15:7 19:1,11
  23:22,25 24:11
  25:9 27:7,24
  28:24 29:6,13
  34:8 37:4,12
  38:13 40:2,16,24
  41:9,17,22 42:11
  42:22 43:2,5,9
  43:18,19 44:9,15
  44:23 45:3,13
  46:16,19 49:1
  50:18,22 51:3,11
  51:18,22 52:1,7
  52:10,20 53:1,8
  53:10,17 54:3,6
  54:18 55:6,13,25
  56:15,19 57:1,6
  57:13,19,24 58:4
  58:11,22 59:4,8
  59:18 60:9,18
  61:5,13,18,23
  62:1,6,7,10,14
  62:17,25 63:11
  64:2,6,13,19
  65:8,22 66:1,9
  66:17,23 67:2
  68:18,23 69:6,11
  69:18,23 71:6,13
  72:9,13,14,19,24
  73:7,10 74:18
  75:11 76:22
  78:10,15 80:18
  81:6,23 82:8,14
  82:20 84:7,13,17
  85:1,7,21 86:2
  86:12,17 87:10
  87:16 88:1,7,19
  88:24 89:4,8
objective 76:12
obscured 42:9
observed 40:18
occur 8:24
ocean 23:11 30:5
office 6:1 11:24
  92:10,13
officer 4:19,21
  6:10 7:12 9:10
  9:19,23 10:6
  13:11 26:9 28:11
  30:4,10,13,15,23
  30:24,25 31:1,5
  31:16 32:10,16
  33:22 34:24
  35:15 39:4 41:7

43:12 46:7,11,15
47:10,13,16,20
48:9 49:7,15,24
50:1,1 51:7 54:1
54:9 56:13 59:22
61:4 66:12,12
67:5,11,11 68:16
69:8,16 71:19,22
74:12 78:12,19
82:12 83:13,18
85:10,17 86:25
87:1,7,11 89:1
**officer's** 8:20 9:4
11:23 77:23
**officers** 7:8,17
8:7,18 9:9,14
12:25 18:16,24
19:18 20:1 30:22
31:3,24 32:2
33:18 35:13,24
37:20,22 38:18
38:22,23 42:1
49:6 55:12,16,24
56:4 59:11,21,22
60:15 64:16 65:6
66:13 71:20,25
72:8,17,22 74:4
76:20 77:18
79:23 82:17 83:1
**offices** 39:19
**og** 4:12
**oh** 10:19,24 14:12
15:8 16:16 24:23
25:2,7 32:22
43:12 73:17
**okay** 6:18 11:3
12:9 13:3,8 14:1
14:14,15,17,18
15:1 20:10,15,21
21:1,2 22:12
24:5 26:15 27:3
32:6 34:3 37:25
43:12,24 48:3
49:3,22 50:1,5
54:14 55:8,18
56:8 58:15 61:3
62:19 63:3 64:15
64:17 66:11 67:7
69:14,22 70:4
72:21 73:24 74:4
75:8 80:1,2,7,21
82:4 83:2
**once** 30:22 42:1
58:12
**ones** 70:25
**oo0oo** 2:25
**operate** 58:10

**operating** 9:2,5
**opportunity** 14:19
**opposed** 76:3
**order** 27:11 31:15
47:17 48:5 67:22
68:1,8,12
**ordered** 46:2 70:7
79:17,19 81:18
81:20 82:4 89:14
**orders** 31:8,11,16
31:18 47:11
**ordinary** 79:15
81:21
**outside** 53:25
**outstretched** 46:5
**over-exertion**
17:24

---

**P**

**P.A** 2:13 92:5
**page** 3:1,11 14:4
14:25 16:22,23
93:2,7
**pages** 91:9
**pain** 15:4 18:3,6
61:19
**painful** 16:8
**Palm** 2:9,18
**panic** 18:5
**paramedic** 65:12
**paramedics** 53:16
**parse** 6:13,17
**part** 14:24 18:9
25:7 37:24
**partially** 59:13
**particular** 22:7
**particularly** 17:17
**parties** 91:13,14
**partly** 36:5
**passed** 62:19 73:16
**patrol** 6:10 11:23
79:10
**Paul** 2:6 92:24
**pause** 47:3
**penalties** 93:22
**people** 17:22 18:7
26:19,21 30:11
33:16 38:18
64:14 70:17,18
70:21 71:21,25
74:20,21 76:13
76:25 77:5
**peoples** 29:15
**perceived** 34:18
**percent** 56:20
**perception** 34:16
**performing** 81:13

**perimeter** 70:9,10
**period** 8:14 61:3
**perjury** 93:22
**person** 6:19 18:16
33:8,15 37:5
75:14
**person's** 57:16
**Personal** 1:5
**personally** 90:8
**perspective** 12:2,3
29:2 40:18 56:21
59:9,15,16,21,25
61:14 63:13
79:10
**photos** 54:9
**physical** 17:12,25
60:6
**physiologic** 15:3
16:2,19,23,24
**physiologically**
16:7
**picture** 54:2
**piece** 87:23
**pier** 70:17,18,21
72:1
**pile** 35:4
**Piper** 2:13 92:5
**place** 34:16,18
58:9 70:12
**placed** 47:20
**placing** 29:15,18
**plain** 23:5
**Plaintiff** 1:6 2:2
4:18
**Plaintiff's** 3:10
13:18
**planted** 51:6
**plausible** 83:4
**please** 4:15 6:17
32:6,11 42:3
45:16 71:3,15
**PLLC** 2:17
**plural** 87:2
**plus** 37:22
**point** 20:23 31:2
31:25 33:20
37:23 38:1 65:5
65:5 66:4 76:14
**pointed** 21:19
25:17 26:10
36:11 38:5
**pointing** 21:9,11
21:15 25:2 37:21
**pole** 72:2 84:23
**police** 5:15,22
7:17 28:10 29:14
36:20,25 38:18

38:21,23 39:4
69:8,16 71:19,22
72:8,16,22 74:24
75:4 76:20 79:5
85:16 86:25 87:7
87:18 88:10,25
**policy** 36:20 37:1
69:2 87:18,22
**position** 47:7
50:21 54:23,25
60:16
**positioned** 40:6,21
**possible** 75:14
**possibly** 9:1 56:6
63:4
**post** 70:20 74:23
**post-incident** 86:6
**potential** 71:23
**Pratt** 2:22 4:13
**prepared** 92:10
**present** 2:21 8:12
**preserve** 88:21
**pressure** 17:4
29:14
**pressured** 29:11
**pretend** 38:2
**Pretty** 12:11
**prior** 5:22 7:7,14
8:16 17:6,25
18:7
**prison** 73:21
**privilege** 80:1
**probably** 14:16
41:11 65:3
**probes** 58:9
**problem** 27:1
**proceeding** 32:16
92:10
**PROCEEDINGS** 3:1
**process** 34:25
**procure** 77:1
**Professional** 1:25
4:2 90:7 91:7,22
**profound** 17:23
**project** 22:1
**prolonged** 16:17
**prompted** 25:15
**prone** 28:4 46:5
47:7 50:20 54:25
59:12 63:16
**prong** 58:15,18
**prongs** 58:20
**proper** 53:9
**prostrate** 27:21
**protecting** 70:16
**protocol** 79:16
81:21

provided 92:10
Public 4:2 90:7,15
pulled 33:23 36:19
  36:24 48:9 50:8
  50:20
pulling 34:1 58:7
pulmonary 17:22
pulse 65:21,23,24
  66:4,6 81:13
purpose 4:8
purposeful 42:6
purposely 42:4
put 20:7 22:9
  31:12 32:12
  35:20 41:14,19
  46:9 49:7 57:9
  70:19 82:18

**Q**

quadrant 40:11
question 6:15,22
  7:4 9:6,16,21
  10:2,9,16 13:21
  15:12,13,16,23
  19:2,5,10,20
  22:24 24:21 25:4
  25:8,12,19,22
  26:1,6,11 27:15
  28:23 29:5,12
  30:1 33:25 34:5
  34:14 36:8,13,16
  36:21 37:3,6,11
  38:7,12 39:13,20
  40:1,12,15,23
  41:3,16,23 42:10
  42:16,21 43:1
  44:8 46:13 47:24
  48:17,25 49:8
  50:11 52:18
  54:17 55:5 56:14
  56:18,25 57:5,18
  59:3,17 60:8,17
  61:1,9,12,17,22
  64:1,5,12,23
  66:8 67:18 68:17
  69:5,10 72:18
  74:10,17 75:2,7
  75:15,18,21 76:6
  76:11 77:2,8,16
  77:20 78:2,14
  79:3,7,18 82:9
  83:10,16,24 84:3
  84:12,20,25 85:6
  85:11 86:1,7,11
  86:16 87:4,9,15
  87:19,25 88:6,13
  88:18,23 89:3,7

questions 53:6
  89:10,12,13
quiet 61:8
quote 14:24 15:2
  16:12,17,24 17:3
  17:16

**R**

rage 18:5
raise 4:24
raised 59:13
rank 6:9
rate 17:4
reach 31:25,25
react 36:18
read 3:7 7:15
  14:21,24 15:14
  19:14 44:11 64:9
  89:14 93:22
reading 15:21
  18:20,23,23
ready 37:21
really 52:13 88:16
rear 23:18
reason 66:15 93:7
recall 9:18 29:2
  30:15 33:4,4
  56:16 57:8 59:22
  74:14
receive 6:18
received 8:4 33:6
recess 45:23
recoil 56:5
recollection 18:21
  20:12 28:2 49:15
  50:6 56:6,9
record 4:6,16
  12:19 14:1,25
  45:21,24 46:23
  47:1,4 52:14
  89:16 91:10
recorded 10:11
  42:19 78:7 82:12
recording 42:18
  78:6 86:15
reduce 18:9,11
reflecting 85:17
refresh 20:15
regarding 13:10,14
  14:21 47:18
regulations 6:6
  44:6
relating 77:5
  78:20
relative 91:12,14
reluctantly 31:22
remain 70:13

remember 5:20,21
  8:13,14,21 11:7
  20:21 24:22
  28:11,15 29:20
  30:4,8,15,24
  31:14 38:23 48:1
  48:8,12 56:11
  61:2 74:11,12
remove 68:10
removed 60:22,25
  66:12
removing 60:24
Repeated 16:17
repeatedly 40:10
  44:2,3
rephrase 52:18,21
report 7:15 20:15
  74:15,16 79:11
  79:14 80:11
  81:12,15,18,20
  82:5 91:8
reporter 1:24,25
  3:6 4:2,2,5,12
  4:24 90:6,7 91:1
  91:6,7,22
Reporter-Master
  91:22
reporting 19:25
reports 7:8 82:19
representation
  13:23 52:14
Representative 1:5
request 46:12
  92:12
requested 91:10
require 70:21
reserve 6:1
residual 53:24
  54:4
resistance 17:12
resisting 30:18,24
  31:1 33:5 46:20
  57:10,16 63:18
respectfully 92:12
respiration 17:4
respiratory 16:19
respond 64:14
responding 61:19
response 18:4
  41:15
responsiveness
  60:22
rest 35:13
restaurant 23:20
  26:22,25 35:13
  55:4,7
result 69:15

results 69:3
return 92:13
review 7:16 8:15
  9:14 11:15,19
  91:9 92:10,13
reviewed 7:7,21
  11:17 27:20 36:1
reviewing 13:13
Reynolds 2:17,20
  4:21,21 6:16,23
  7:5 9:7,17,22
  10:3,8,12,15
  15:7,9,12,14,17
  15:20 19:1,6,11
  19:21 22:25
  23:22,25 24:11
  25:5,9,14,23
  26:2,7,12 27:7,9
  27:16,24 28:24
  29:6,13 34:8,15
  36:9,14,22 37:4
  37:7,12 38:8,13
  39:14,21 40:2,16
  40:24 41:4,9,17
  41:22 42:11,22
  43:2,5,9,19 44:9
  44:15,23 45:3,13
  45:15 46:16,19
  47:25 48:19 49:1
  49:12 50:12,18
  50:22 51:3,11,18
  51:22 52:1,7,10
  52:13,16,20 53:1
  53:10 54:3,6,18
  55:6,13,25 56:15
  56:19 57:1,6,13
  57:19,24 58:4,11
  58:22 59:4,8,18
  60:9,18 61:5,13
  61:18,23 62:1,7
  62:10,14,17,25
  63:11 64:2,6,13
  64:19 65:8,22
  66:1,9,17,23
  67:2 68:18,23
  69:6,11,18,23,25
  71:6,13 72:9,13
  72:19,24 73:7,10
  74:1,18 75:3,11
  76:22 77:3 78:4
  78:10,15 80:18
  81:6,23 82:8,14
  82:20 83:11,17
  84:4,7,13,22
  85:1,7,12,21
  86:2,12,17,23
  87:10,16,20 88:1

88:7,14,19,24
89:4,8,12 92:25
**rhythm** 17:5
**riding** 38:25
**rifle** 11:22 22:10
25:2 26:10,14
32:1 34:22 35:8
36:11 37:16,16
38:5
**right** 4:24 8:25
11:10,12 13:1
15:24 16:6 18:15
18:17 19:4,13,16
20:2,23 21:2
22:22 23:14,20
23:24 24:2,9
26:4,10 28:7,17
29:4,24 31:7,19
31:23 32:18,19
32:21 33:2,7,9
33:13,18,20,22
34:3,9 35:19,21
35:22 36:12,19
37:10,18 38:11
38:17 39:9,10,12
39:19 40:6,7,10
41:12,15 42:8,9
42:15 44:1,3,4,6
44:14,20 48:3,9
49:6,10 50:2,8
50:10 51:2,7,9
51:16,25 52:5
54:14,15 55:1,2
58:6,6 59:7 61:8
61:15 62:9,20
63:7 64:4,11,18
65:13 66:7,13
67:1,9,13 68:5,9
68:11,16,22 70:6
71:12 72:1,3,23
74:25 75:5,10,14
76:9,10,16,20,24
77:10 80:4 81:5
81:18 82:5,7,19
83:1,3,9 87:2,12
87:24 88:17,21
89:2,6
**ripping** 34:11
**risk** 14:22 16:13
16:25 18:10,11
**risks** 14:21 16:20
**rmckee@themcke...**
2:10
**robe** 29:21
**Robert** 2:11 4:17
92:23
**ROBERTS** 2:17

**robes** 29:11,19
**Roderick** 2:22 4:13
**Rodriguez** 74:13
85:16 86:3
**Roosevelt** 5:13
**route** 20:21
**Royal** 2:9
**running** 9:3 29:14
**runs** 70:18
**rush** 22:6

——————
S
——————
**safety** 14:21
**sand** 51:2,6,25
53:23,24 54:1,4
59:12 71:1 74:23
**sandy** 75:23
**Sarbanes-Oxley**
73:2
**saw** 7:22,25 8:17
8:17 9:2 14:13
24:4 28:17 29:19
34:1 35:6,8
41:24 42:1 43:24
44:2 50:8 51:15
53:22 54:4 60:2
65:14 66:3,3
71:25 74:21
77:14,17,18
**saying** 14:12 19:7
27:4,6 69:20
87:13
**says** 16:17 18:9
72:7
**Scared** 25:25
**scene** 12:25 13:7
30:12 46:15
70:11 71:1,4
74:21 75:20,22
76:3 77:15,24
78:13 83:19
84:10 86:20
**Screamed** 39:12
**screaming** 41:15
44:20 45:1 48:13
54:16 62:15
**screen** 7:23 9:1
**scrub** 29:21
**se** 54:7 74:11,20
**sea** 21:17
**second** 46:24 57:21
57:22 58:3,10,17
67:6
**seconds** 17:9 27:14
27:21,25 44:12
44:12 45:5,19
57:12,23 58:2,3

58:13 61:7,25
62:3,4,12,16,16
62:18 65:20
**secure** 30:23 37:20
49:17 70:9,10
79:10,11
**securing** 74:9
**see** 8:18 9:3 12:16
14:12 21:21
22:12,17 23:4
30:21 31:20
33:22 34:1,19
35:22 36:1 40:22
41:18,21,24 51:5
51:5,7,13 53:15
53:21,24 55:15
56:12 58:25
63:24 66:13
71:22 72:4,8
75:24 76:5
**seeing** 28:11 30:4
30:8 56:6 57:8
61:2 74:12
**seen** 9:19 13:21
27:2 41:11 43:22
54:9 56:9 59:2,9
86:19,24,25 87:6
**segment** 8:1
**sense** 83:12
**sergeant** 74:13
82:6 85:16
**serious** 16:13,25
**set** 70:9
**setting** 71:4
**settled** 85:23
**seven** 83:21
**severe** 17:23
**shaved** 12:20,22
**sheer** 29:22
**sheet** 3:7 92:13
93:1
**Sheriff's** 6:1
11:24
**shins** 41:20
**shit** 82:18
**shock** 68:8
**shocked** 66:16,21
**shoot** 68:8
**shooting** 12:1
**shorter** 65:3
**shortly** 9:13
**shot** 38:18 39:1,5
**shoulder** 34:23
40:7 42:17
**show** 23:6 34:6
35:3 38:4,9,9
46:2 63:20

**showed** 8:1 28:10
74:13
**showing** 48:23
**shows** 20:3 28:19
34:9,9,11 37:24
**side** 23:10,11 24:1
30:5 49:16 54:24
70:17
**sides** 27:22
**Signed** 90:11
**significant** 49:23
**signs** 17:11
**similar** 17:12
**similarly** 6:25
12:17 58:25
**simultaneously**
69:2
**Sincerely** 92:15
**single** 17:9
**sir** 5:10,12,21,24
6:8,12 7:18 8:5
9:25 10:10 11:5
11:8,20 12:5,10
12:12,14,21 13:2
13:23 14:10,18
14:23 15:6,24
16:1,16,21 17:2
17:7,15,19 18:2
18:8,12 19:14,22
20:7,14 21:1,20
22:16 23:12 24:6
25:1,16 27:13,23
28:8,20,25 29:10
29:15 30:3,7,11
31:14 32:11,24
33:10 35:7,17,24
36:3,7,15 38:3
38:18,19 39:2,11
39:24 40:25 42:4
43:3,20 44:7,17
44:25 45:7 46:2
53:3,5 54:11,13
55:14 56:11 57:3
59:21 61:2,10,20
62:18 64:14 65:2
65:11,18,23
66:14,19 67:7,10
67:14,25 69:12
69:16 71:18 72:6
72:12 73:6 75:1
76:4,7 77:17,21
78:21,24,25 80:2
80:10 81:17
82:10 83:25 84:2
84:16,21 85:20
85:25 86:4,13,22
87:3 88:2 89:11

sit 56:8
sitting 8:25
situation 29:10
  36:18
Six 12:10
skin 58:20
slight 13:1
slow 31:23
slowly 38:16,19
slung 32:1 34:23
SOB 77:24
solid 38:20
somebody 39:1 68:8
someone's 44:20
  66:16
somewhat 42:9
sorry 30:20 32:5
  53:20 54:22
sort 50:15
sound 44:18,18,25
sounds 50:17 73:1
  83:4,4 88:2,2
south 21:15 70:17
Southeast 92:18
Southern 1:1 4:11
Southernmost 20:24
speak 11:3 40:3
  49:5 76:1 78:17
speaker 22:1
speaking 71:20,25
  73:3
Specifically 9:23
spilling 13:20
spoke 81:8 87:1,11
squat 55:8
staements 6:14
stake 43:17
stand 42:4,5 55:8
  64:24,25 65:6
  66:3
standard 13:11
standards 69:13
standing 26:17
  55:1,9 59:14,23
  60:16,20
start 5:19 36:12
  37:9
started 48:1,16
  50:15 54:15
startle 18:5
state 4:3,15 16:12
  90:3,7,15 91:3
stated 93:23
statement 6:19
  11:11,13,15
  15:10 77:23
statements 6:20

7:1,16 43:22
  88:12
states 1:1 17:16
  18:3
statues 69:15
status 67:15
stay 70:21 76:3,12
stayed 70:19,20
  74:23 76:24
stays 22:6
step-by-step 32:7
stepped 49:24 50:1
Stevens 2:22 54:1
  54:10 78:19
  83:13,18 86:5
stick 68:9
stiffens 64:7
stood 35:9 59:25
  60:1 65:25 66:5
stop 30:18,18,23
  31:1 33:4,14
  35:10 46:20
stopped 21:10,23
  31:17,17 44:13
stopping 60:15
stopwatch 62:24
stories 7:3 45:11
  45:11
story 88:11
straight 45:7
Street 1:16 2:3
stress 15:4 16:19
  17:5,10 18:3,6
stressful 16:10
strike 27:9 45:13
  45:14 53:10
  69:25
structure 55:7
struggle 17:25
struggling 17:12
  59:24
studies 17:8
study 34:7
stuff 84:10
sub 48:2
subdued 37:22
subject 47:7
subsequent 48:2
Subsequently 23:3
substantial 85:24
suffering 17:22
Suite 2:9,13 92:5
  92:18
Sunrise 2:13 92:5
supervisor 8:12
  79:8,9 85:16
supervisors 9:13

supplemental 82:19
Support 4:12,14
  92:8,18
supposed 33:16
  79:1 80:11 82:24
sure 8:2 13:17,24
  14:3,15,20 19:17
  20:11,19 25:13
  25:15 32:8,8
  37:15 45:18 49:2
  68:3 70:13 75:13
  81:8
surprising 14:2
susceptible 17:17
  17:20
Suzanne 1:23 4:1
  4:12 90:6,14
  91:6,21 92:17
swear 4:16,23,25
switch 68:7
sworn 5:6 90:10

_____
        T
_____
T 92:4
take 13:7 20:23
  32:7 45:17,18
  57:9,17 58:2
  71:17 79:12
  83:20 89:14
taken 1:20 4:1
  55:18 87:14 92:8
takes 70:12 79:9
talk 67:5 80:17,25
  82:17
talking 80:8
tall 12:9
tape 70:9,19 71:4
Tase 40:17 57:17
  88:16
Tased 15:5,11,20
  15:25 40:10,19
  43:13,25 44:3
  63:21 64:3 66:22
Taser 3:12 10:7,14
  13:10,11,14,24
  19:23 20:3 42:18
  44:17,17,25 62:5
  62:12 64:9 66:16
  66:25 67:6 78:6
  82:13 84:5 86:14
Tasering 44:14
  64:11
Tasers 19:23 44:5
  67:20 84:11
Tasing 18:16,25
  59:1 67:1 87:5
technique 19:8

techniques 17:14
tell 5:10 8:23
  11:1 34:17 40:4
  40:17 42:4 45:11
  46:7 56:5 75:22
  76:2
telling 26:16 29:1
  29:1 34:17 35:7
  38:19 88:11
tells 78:12
temper 61:11
temporary 18:5
ten 71:15 74:24
  75:4
term 73:21
testified 5:6 9:10
  35:18
testimony 4:25
  10:21 46:11
Thad 30:5
thank 20:8 53:14
  89:10,15
thing 9:3 82:24
think 25:21 27:25
  28:2,3,3 29:20
  36:11 37:23
  52:15,20,24
  80:20
Third 92:18
Thirty 58:2
thought 80:24
  81:10,11,11
thrashing 57:10
  63:17
threat 26:21
three 33:16 62:3,3
  62:16
Thursday 1:15 4:6
time 6:3,9 11:17
  12:22 13:4 14:13
  18:14,17,25 20:9
  20:23 21:3 22:13
  23:4 25:20 29:17
  29:25 31:5 32:3
  32:9,9,21 37:16
  37:19 41:7,14
  42:14,24 44:5
  46:18 48:11,24
  51:5 55:1,20
  57:4 59:1 61:3
  62:19,20,21 63:5
  63:5 64:15 65:3
  65:19,21 68:22
  73:14 74:5,25
  75:8
times 27:2
today 4:6 7:7 11:3

**Page 12**

56:8
TODD 2:22
told 10:1 24:23
  28:21,25 34:19
  39:8 41:20 61:2
  62:12 71:9 75:17
  85:16
tools 17:14
top 16:23 29:20
  33:15 41:14
  43:13
torso 41:15,18,19
touch 83:14
touched 66:25
touching 66:21
tourist 7:21 8:4
  85:4
track 77:12
trained 11:25
  14:17 16:14,20
  16:22 17:1,14,18
  17:25 18:7,10,13
  18:19 19:15
  37:16 67:8,12,16
  67:19,22 68:20
  73:5,12,18 76:2
  76:8
training 6:6 11:21
  13:10,11,25 14:7
  14:20 18:21
  19:19 20:1,3,4
  33:6 60:3 65:12
  79:5 83:6
transcript 91:9,10
  92:10,21 93:2
trapped 61:15
trapping 50:2
trauma 43:4,8
Treavor 1:5 4:9
  92:7 93:4
trigger 58:7,14,19
  58:21,23 68:9
true 6:21 7:3 11:2
  39:4 91:10 93:23
truth 5:1,2 6:14
  6:17 26:16 29:1
  29:2 34:18 35:7
  38:20
truthful 88:11
try 12:13 20:16
  66:3 76:10
trying 32:7 60:15
  65:6
turn 67:23 68:2,7
turned 10:6 38:15
  52:3
TUZZIO 2:17

twice 12:1
two 5:18,18 12:7
  13:25 18:16,24
  27:14,25 44:5
  45:19 58:3 59:21
  59:22 63:4,6,10
  64:21,25 65:2
  66:13 72:7
type 69:13 70:12
  75:14

**U**

U.S 4:10,12,13
  92:8,18
Uh-huh 9:12 17:2
  48:4,15 56:23
  63:8 79:24
Ultimately 29:7
un-holstered 28:21
unconscious 59:13
  59:14
understand 26:13
  27:4,6 53:20
understanding 9:4
  83:18
Unit 11:25
UNITED 1:1
unresponsive 59:11
  62:22 64:22
updated 13:24
upright 59:25 60:1
  60:20
upset 88:9
use 13:10 16:24
  17:17 18:4,4,4
  18:13 20:17 22:3
  25:18 44:5 67:5
  67:8,12,23,23
  68:1,16,20

**V**

vaguely 29:21
valid 69:20
Valle 1:13 3:2 4:9
  4:20 5:5,12 90:8
  91:8 92:4 93:4
  93:25
vehicle 21:5,9,15
  21:19,21,25
  22:14,15 23:18
  24:3
verbal 25:1 27:19
Verbatim 1:24 4:1
  90:6 91:6,22
verify 83:14
video 1:13 3:2 4:6
  4:8 27:2,20

28:17 34:3,6,9
  35:3,6 37:23
  45:21,24 47:1,4
  48:22 72:4 84:23
  85:17 89:16
videographer 2:22
  4:13 45:21,24
  46:23 47:1,4
  89:16
videotape 7:21,22
  7:25 8:2,4 36:1
  56:12
videotaping 72:5
  86:20
view 23:5 42:5
  65:10
violated 36:20
violating 69:2
virtually 20:4
visibly 60:21
vision 42:9
vital 17:11
vocal 47:17
voice 22:1
volitional 68:15
volunteer 86:25
  87:6
vs 1:7 4:10 92:7
  93:4

**W**

W 92:22
walk 24:25 70:25
walked 23:17,18
  24:16 35:12
  40:20 41:6 42:2
  49:25 54:19 55:9
walking 24:5,9,14
  38:16,19 41:7
  55:9 71:2 74:21
  74:25
WALLACE 2:3
Wanciak 30:8,13
  74:12 87:1,11
want 13:7,9 14:19
  15:14 20:9,20
  29:2 33:14 35:10
  37:15 42:13 45:9
  66:25 71:14
  79:21,22 80:5,16
  80:16,23,24
  81:25 82:2
wanted 37:25
warning 15:2 16:12
Warnings 3:12
wasn't 8:11 9:1
  15:12 31:2 37:8

39:1 40:19 41:1
  42:12 53:7 55:24
  60:23 61:21 81:5
  86:3,6
watch 34:3
watched 72:4
watching 41:6
  60:21
water 13:20 45:16
way 15:5 23:20,24
  26:18 32:1,2
  34:12,23 35:9
  38:11,21,25 46:9
  58:10,13
ways 7:2 18:10
We'll 89:13
we're 14:1,11
  18:23 33:16 70:3
weapon 22:12,17,23
  23:4 29:4
weight 12:6,7
went 13:24 31:23
  33:20 48:2 49:20
  52:24 59:13,14
weren't 40:20 41:6
  51:15 71:5 74:19
  74:20
West 1:2,8,17 2:4
  2:18,23,23 4:8
  4:10 5:13,15
  13:12 38:21,23
  39:4 79:5 85:10
  85:16 92:7 93:4
Weston 2:9
whatsoever 78:22
whistle-blower
  85:9
Whitehead 2:3
wish 26:23
witness 1:20 4:16
  5:3 7:16 12:25
  15:8 25:15 43:12
  43:22,24 44:2,10
  45:5 48:20 52:14
  72:7 75:14 76:10
  76:23 79:19
  89:13,15 92:1,11
  92:12
witnessed 8:6
witnesses 6:25
  42:7 55:3 70:13
  71:5 74:15,20
  75:25 76:5 77:7
woman 39:12 61:4
words 10:4 12:24
  31:17 71:2 81:14
work 5:11,12

**1-888-311-4240**

**worked** 26:18
**wouldn't** 28:22
  59:2 67:12 74:16
**wrapped** 55:2
**wrist** 34:2 35:20
  35:22 39:10 50:2
**write** 10:20 29:22
  74:19 79:11
  81:15,18,20 82:5
  93:2
**written** 12:19
  80:11
**wrote** 79:14

---
X
---

---
Y
---
**yanked** 36:4
**yards** 84:23
**yeah** 6:8 21:14
  26:5 32:15 33:1
  39:18 45:6,18,20
  47:9 50:25 52:12
  53:4 55:17 57:22
  63:15 68:4 71:12
  73:22 76:14
  87:22,22
**year-old** 12:14
**years** 5:18 11:24
  13:25 73:18
**yell** 40:5 53:5
  61:4
**yelled** 27:11
**yelling** 30:13,16
  30:23 31:1 61:7
  61:25
**yesterday** 9:10
**York** 87:7
**young** 12:25
**Yup** 46:25

---
Z
---

---
0
---

---
1
---
**1** 2:9 91:9
**10** 13:16
**10:03** 45:25
**10:04** 47:1
**10:05** 47:5
**10:40** 1:15 89:16
  89:18
**1000** 2:13 92:5
**11** 3:12 13:18,19
**1186149** 92:8
**1250** 92:18

**13** 3:12
**13th** 6:4 90:11
  91:18
**14** 83:20 84:1
**14-10028-CIV** 4:9
**14-10028-CIV-M...**
  1:3
**15** 17:9 57:12
**1604** 5:13
**16th** 5:21
**17** 92:2
**17150** 2:9
**1903** 38:22
**1905** 39:5
**1998** 6:2
**1st** 14:6

---
2
---
**20** 84:23
**20-year** 73:21
**2002** 73:16
**2003** 6:3
**2007** 85:15
**2012** 5:21 13:25
**2013** 6:5 12:4,17
  14:6
**2014** 1:15 90:9,11
  91:18 92:2,8
  93:5
**2017** 90:16
**217-0150** 2:10
**218** 12:8
**220** 12:8
**2455** 2:13
**2488** 92:5
**27** 13:5 90:16
**28th** 6:5
**294-4585** 2:4
**294-7822** 2:4

---
3
---
**30** 57:12 92:13
**302** 1:16
**305** 2:4,4 92:19
**33040** 1:17 2:4
**33131** 92:19
**33304** 2:14 92:6
**33327** 2:9
**33409** 2:18
**373-8404** 92:19

---
4
---
**463-0100** 2:14
**463-2444** 2:14
**470** 2:18

---
5
---

**5** 3:3
**54** 12:14
**561** 2:19,19

---
6
---
**6** 1:15 92:8 93:5
**608** 2:3
**688-2343** 2:19
**688-6560** 2:19
**6th** 4:6 90:9

---
7
---

---
8
---
**888-9877** 2:10
**89** 91:9

---
9
---
**9:17** 1:15 4:7
**9:56** 45:21
**90** 3:6
**91** 3:6
**92** 3:7
**93** 3:7
**954** 2:10,10,14,14