**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,

        Plaintiff,

vs.

CITY OF KEY WEST, a Florida municipality, et al.,

        Defendants.

_____/

VIDEO DEPOSITION OF THADDEUS CALVERT

Wednesday, November 5, 2014
2:59 p.m. - 4:54 p.m.
United States Federal Courthouse
301 Simonton Street
Key West, Florida  33040

Examination of the witness taken before:

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter
Florida Professional Reporter

**2**

APPEARANCES

On Behalf of the Plaintiff:
HORAN WALLACE & HIGGINS, LLP
608 Whitehead Street
Key West, Florida  33040
(305) 294-4585 / Fax (305) 294-7822
darren@horan-wallace.com
BY:  DARREN M. HORAN, ESQUIRE

THE MCKEE LAW GROUP, LLC
17150 Royal Palm Boulevard, Suite 1
Weston, Florida  33327
(954) 888-9877 / (954) 217-0150
rmckee@themckeelawgroup.com
BY: ROBERT J. MCKEE, ESQUIRE

On Behalf of the Defendants:
JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
2455 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida  33304
(954) 463-0100 / Fax (954) 463-2444
burke@jambg.com
BY:  MICHAEL T. BURKE, ESQUIRE

On Behalf of the Defendant Gary Lee Lovette:
ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
470 Columbia Drive, Building C-101
West Palm Beach, Florida  33409
(561) 688-6560 / Fax (561) 688-2343
lreynolds@rrbpa.com
BY:  LYMAN H. REYNOLDS, JR., ESQUIRE

Also Present:
RODERICK PRATT, LEGAL VIDEOGRAPHER
HENRY DEL VALLE
TODD STEVENS
NAJA GIRARD, KEY WEST THE NEWSPAPER

--ooOoo--

**3**

INDEX OF PROCEEDINGS
Page

Video Deposition of THADDEUS CALVERT
  Direct Examination by Mr. McKee . . . . . . . . . . 5

Certificate of Oath . . . . . . . . . . . . . . . . . . 102
Certificate of Reporter . . . . . . . . . . . . . . . . 103
Read Letter . . . . . . . . . . . . . . . . . . . . . . 104
Errata Sheet . . . . . . . . . . . . . . . . . . . . . 105

INDEX OF PLAINTIFF'S EXHIBITS
Page

No. 10   T. Calvert's KWPD Incident Report . . . . . . 42

**4**

1     Deposition taken before Suzanne Ex, Certified Verbatim
2  Reporter, Florida Professional Reporter and Notary Public in
3  and for the State of Florida at Large in the above cause.
4     - - - - - - -
5     THE COURT REPORTER:  Good afternoon.  We are now on
6  the video record.  Today is Wednesday, November 5th,
7  2014, at 2:59 p.m., at the Federal Courthouse in Key
8  West, Florida, for the purpose of taking the video
9  deposition of Thaddeus Calvert in Case Number 14-10028-
10  CIV, Treavor Eimers vs. City of Key West, et al., a U.S.
11  District Court case filed in the Southern District of
12  Florida.  The court reporter is Suzanne Ex and the
13  videographer is Roderick Pratt, both of U.S. Legal
14  Support.
15     Would all counsel please state their appearance for
16  the record and then I will swear in the witness.
17     MR. MCKEE:  Robert McKee and Darren Horan for the
18  Plaintiffs.
19     MR. BURKE:  Michael Burke for the Defendant City of
20  Key West and Thad Calvert.
21     MR. REYNOLDS:  Lyman Reynolds on behalf of Officer
22  Lovette.
23     THE COURT REPORTER:  Would you raise your right
24  hand.  Do you swear or affirm the testimony you are
25  giving in this cause will be the whole truth and nothing

**5**

1  but the truth?
2      THE WITNESS:  Yes.
3  THEREUPON,
4          THADDEUS CALVERT
5  having been first duly sworn, was examined and testified as
6  follows:
7          DIRECT EXAMINATION
8  BY MR. MCKEE:
9      Q.  Good afternoon, Officer.  Could you tell us your
10  name and work address, please.
11      A.  Thaddeus Calvert.  I work at 1604 North Roosevelt
12  Boulevard, Key West, Florida, 33040.
13      Q.  By whom are you employed?
14      A.  The City of Key West.  The Key West Police
15  Department.
16      Q.  For how long have you been employed by them?
17      A.  Seven years in February.
18      Q.  To your knowledge, were you compliant with all
19  training and -- all mandatory training and retraining as you
20  were required by law to do, prior to the Eimers incident on
21  November 28, 2013?
22      A.  I believe I'm answering the question correctly if I
23  say yes, in that I was up to date on my training.
24      Q.  That's what I'm getting at, yes.
25      A.  Yes.

**6**

1      Q.  Okay.  Have you been here today listening to
2  testimony of other officers during this civil proceeding?
3      A.  I have.
4      Q.  You were not here yesterday?
5      A.  No, I was not.
6      Q.  Are you currently on duty?
7      A.  Yes.
8      Q.  To whom are you married?
9      A.  Janeth Calvert.
10      Q.  Is she also a defendant in this case?
11      A.  Yes.
12      Q.  What's your daughter's name?
13      A.  Ariana Brook Calvert.
14      Q.  Do you remember telling her that no one gives a
15  fuck about Charles Eimers?
16      A.  Do I?
17      Q.  Uh-huh.  To your daughter.
18      A.  I had a conversation with my daughter who was
19  expressing some political points and was using the Eimers to
20  express them.  And we had a conversation about how people
21  have expressed concern about Eimers before and after his
22  death.
23      Q.  And did you tell her to the effect of, no one gives
24  a fuck about Charles Eimers?
25      A.  I don't believe it was expressed that way.

**7**

1      Q.  How do you believe it was expressed?
2      A.  I was expressing that if the people that were
3  giving a fuck about Charles Eimers today were caring about
4  him on Thanksgiving a year ago, that he may not have been in
5  this position.
6      Q.  Meaning dead?
7      A.  Yes.
8      Q.  And the people on Thanksgiving day dealing with him
9  were also the police officers on this department, right?
10      A.  Yes.  They were not his family.
11      Q.  And is that how you believe your daughter will
12  relate what your discussion was?
13      A.  I have no idea.
14      Q.  Are you at odds with your daughter?
15      A.  No.
16      Q.  Were you, in the past year, at odds with your
17  daughter?
18      A.  No.
19      Q.  At the time that you made that statement, did you
20  have any knowledge about the interaction of the members of
21  the Eimers family with their father?
22      A.  Did I have --
23      MR. BURKE:  Objection.
24      THE WITNESS:  I mean, I don't understand.  Can you
25  rephrase that?

**8**

1      Q.  I think, by implication, you were stating that had
2  his family been here, what happened to him that day wouldn't
3  have happened.  Is that what you're trying to imply?
4      MR. BURKE:  To his daughter --
5      MR. MCKEE:  Yes.
6      MR. BURKE:  -- he's trying to imply?
7      MR. MCKEE:  Yes.
8      MR. BURKE:  What was he -- okay.
9  BY MR. MCKEE:
10      Q.  Is that what you were trying to imply by that
11  statement that you claim to have made to your daughter?  That
12  if the people that cared about him were here that day, what
13  happened wouldn't have happened to him?  Is that what you
14  were trying to imply?
15      A.  In the conversation that I had with my daughter, we
16  were exploring, we were speaking -- really, the conversation
17  began more politically.  She's a little bit -- she's
18  politically charged and more of the opposite side than I am.
19  I have not had any disagreements or, how did you say it, you
20  had asked me twice if I was adversarial with daughter?
21      MR. BURKE:  At odds, I think it was.
22      Q.  At odds.
23      A.  At odds?  So, no.  I have been with her mom for
24  really a long time and -- but my daughter and I will have
25  conversations quite regularly.  And we -- she'll talk about a

**9**

1  lot of different things.  We've had in-depth conversations
2  about Trayvon Martin, about different things, and in our
3  conversations about many of the other hot topic political
4  things that are going on, she, you know, she's got accepted
5  at WVU.  She wants to be close to the FBI school that they
6  have there and that's in that part of West Virginia.  And
7  she's been doing like other, other things.  So she's very
8  like, driven to learn and talk about, discuss.
9       And in our conversations, you know, this case had
10  come up and I had brought -- it brought up that there seems
11  to be a lot, like, criminally what has happened with the
12  grand jury and what has happened with the investigation
13  through FDLE, that as those things have gone, they have been
14  seen or viewed by the people that have gotten that and that have
15  had the opportunity to review everything that was available
16  to them, and that now it's about money.  And that now, the
17  people who are expressing their concern for -- on behalf of
18  Charles Eimers, I believe, yes, the inference is that they're
19  now here because they want money.  Absolutely.
20       **Q.  Well, did you tell your daughter that the police**
21  **department never even told this man's family what had**
22  **happened to him?**
23       A.  No.  I didn't -- I didn't get into what the police
24  department did or didn't do.  We were just speaking
25  ideologically about the case in general and how it is that

**10**

1  one thing can become another thing.
2       In other words, one thing that can be a criminal
3  case or it could be an investigation will then go into what
4  it is now, which is a civil case.
5       **Q.  And it can be an entirely disrupted criminal case**
6  **when the department loses or destroys the only direct**
7  **evidence of what happened in the recordings, right?**
8       MR. BURKE:  Object to the form of the question.
9       MR. REYNOLDS:  Join.
10       A.  Well, I have no knowledge of that.
11       **Q.  Are you aware of --**
12       A.  I never had any communications about that with my
13  daughter and I have no knowledge of that.
14       **Q.  So, in making your political statement to your**
15  **daughter, would you agree that to make such a political**
16  **statement, that you ought to have the facts, too?**
17       MR. BURKE:  Object to the form of the question.
18       MR. REYNOLDS:  Join.
19  BY MR. MCKEE:
20       **Q.  Right?**
21       A.  I don't understand because -- well, what -- say
22  that again?
23       **Q.  When making such commentary --**
24       A.  What was the commentary?
25       **Q.  That you were making with your daughter about**

**11**

1  Charles Eimers.
2       A.  Can you rephrase it?  Because I'm not sure that I'm
3  -- because many things have been said.  So I'm not sure that
4  we're speaking about the same one now.
5       **Q.  Well, I'm talking about where she indicated --**
6       A.  Yes.
7       **Q.  -- that you said, no one gives a fuck about Charles**
8  **Eimers.**
9       A.  Well, that's not the exact words and that's a
10  little bit out of context.  But, and given that, and as I've
11  already explained to you about how I interpret that context
12  to be, what was the follow on?
13       **Q.  Why was Charles Eimers de-arrested at the hospital?**
14       A.  I have no idea.
15       **Q.  So that Key West wouldn't have to pay for his**
16  **medical care?**
17       MR. BURKE:  Object to the form.
18       A.  I was not a part of anything that happened off of
19  South Beach.
20       **Q.  What is required with an in-custody death with the**
21  **body?**
22       A.  From a patrol standpoint, which is where I am
23  currently assigned --
24       **Q.  Well, police department standpoint.**
25       A.  Well, I don't know.  That would be for people that

**12**

1  do not -- that are not in my position.
2       **Q.  He's not supposed to be taken to a crematorium so**
3  **that the medical examiner can't examine him, right?**
4       MR. BURKE:  Object to form.
5       MR. REYNOLDS:  Join.
6       THE WITNESS:  What's objection to form?
7       MR. BURKE:  That's -- we're just making an
8  objection.
9       THE WITNESS:  Yeah, well, I don't really know what
10  that means.
11       MR. BURKE:  That means that later on, a judge may
12  determine that the question that was asked was in an
13  improper form or may determine that none of Mr. McKee's
14  questions should be -- should be asked and presented to
15  the jury.
16       THE WITNESS:  Oh.
17       MR. BURKE:  But, we can't -- we don't have a judge
18  or a jury here to deal with that today, so you still, if
19  you're able to answer the question, you answer the
20  question as best you can, and we'll have to bring all
21  these matters before Judge Goodman and Judge Martinez.
22       THE WITNESS:  Okay.
23  BY MR. MCKEE:
24       **Q.  Were you aware that Mr. Eimers was de-arrested at**
25  **the hospital, according to the hospital administrator?**

13

1    A.  I was not made aware of that.
2    Q.  Were you aware that Mr. Eimers' family was not
3  timely notified of his injuries?
4    A.  I was not aware of that.
5    Q.  Were you aware that his body was sent to a funeral
6  parlor for cremation rather than to the medical examiner?
7    A.  I was not -- I was made aware of that after the
8  fact, much after the fact, but I did not -- I was not aware
9  of that as it was happening.
10    Q.  By whom were you made aware of that fact?
11    A.  I don't know.
12    Q.  Someone on the police department?
13    A.  I had just heard it, and I don't remember where or
14  from whom.
15    Q.  Prior to today, were you aware that Mr. -- or,
16  Officer Lovette had activated his audio-video portion of his
17  Taser a the time of the incident?
18    MR. REYNOLDS:  Objection, form.
19    A.  I had been made aware that his had been activated
20  prior to this, but not until much after the incident.  But, I
21  can't know like, when it's happening, like, if a Taser is
22  activated.  In other words, if it's deployed, I would know if
23  I was in earshot of the Taser.  But if it was simply turned
24  on, I would have no way of knowing.
25    Q.  And my question is, prior -- I think you've

14

1  answered it.  Prior to today, you did know that his audio-
2  video portion was activated at the scene?
3    A.  Yes.
4    MR. REYNOLDS:  Objection, form.
5    Q.  Where is that footage?
6    A.  I don't know.
7    Q.  Do you know why it's not here?
8    MR. REYNOLDS:  Objection, form.
9    A.  I don't know anything about the Taser video other
10  than I had heard that it was turned on at some point either
11  during or after the incident.
12    Q.  Were you aware of any of the content of that Taser
13  that was preserved?
14    A.  No.
15    Q.  Other than what you've heard me say today in
16  questioning of other witnesses, were you aware that part of
17  it indicated that Officer Lovette dropped a fucking bomb on
18  Mr. Eimers' head?
19    MR. BURKE:  Object to form.
20    MR. REYNOLDS:  Objection, form.
21    A.  I had not heard that language spoken until today,
22  sitting in the back listening to other peoples being deposed.
23    Q.  And so, have you ever heard the Taser recording?
24    A.  No.
25    Q.  Have you seen a summary of their content?

15

1    A.  No.
2    Q.  Were you aware that on the Taser recording, Officer
3  Lovette said that Gabe killed Mr. Eimers?
4    MR. REYNOLDS:  Object --
5    A.  No.
6    MR. REYNOLDS:  Objection, form.
7    Q.  Are you hearing that for the first time today?
8    A.  Yes.
9    Q.  Was any of that presented to the investigators at
10  the FDLE?
11    MR. REYNOLDS:  Objection, form.
12    A.  I don't know what was presented to them other than
13  what I had presented to them.
14    Q.  And you didn't present that to them?
15    A.  No.
16    Q.  Have you ever seen the videotape of the event taken
17  by that Columbian woman on her cell phone?
18    A.  Was it a beheading?
19    Q.  No, no.  Of this event.
20    A.  Oh, okay.  I thought you were talking about a
21  Columbian woman that --
22    Q.  No.
23    A.  I haven't seen that one.  If you're talking about
24  my daughter, we can go anywhere with this, I guess.  We could
25  go anywhere.

16

1    Q.  I like to -- you know.  No.
2    A.  No, I didn't know that there was a Columbian woman
3  that had made a recording, but I had seen a video, but I did
4  not know who made the video.
5    Q.  Okay.  That video, did it portray the events as a
6  recording, a video recording of what was happening with Mr.
7  Eimers at the Southernmost Beach?
8    A.  I believe it recorded from the perspective of the
9  pier at the Southernmost Beach, --
10    Q.  That's the one.
11    A.  -- towards the restaurant, and between the pier and
12  the restaurant is where the incident had occurred.
13    Q.  In your training, in your experience as an officer,
14  should the person who acquired that audiovisual presentation
15  on behalf of the police have gotten the contact information
16  for that witness?
17    A.  I would believe so.
18    Q.  Do you have any understanding why we don't yet have
19  that information?
20    A.  I have no idea.
21    Q.  When you witnessed that video, viewed it, did you
22  notice there was another man videotaping in the scene?
23    A.  There was -- in the video, there was somebody else
24  videoing?
25    Q.  Yeah.

4 (Pages 13 to 16)

17

```
 1        A.  I didn't -- I didn't pay close enough attention.
 2   I've actually only seen it once on somebody's phone, much
 3   after the fact.  And then again, I believe I saw a snippet of
 4   it in the FDLE or just before, somewhere right around my FDLE
 5   interview.  And then, I saw it again in the grand jury
 6   testimony.
 7        Q.  Okay.
 8        A.  And I tried to see it again, but I was unsuccessful
 9   in even locating it, so.
10        Q.  Okay.  I want you to assume that there appears to
11   be an individual by a telephone pole, closer than the person
12   who's taking the video that you've seen, with something in
13   his hands, by his eyes, looking towards the events.  It looks
14   like a recording device.  Have you ever seen that footage?
15        A.  No.
16        Q.  Are you aware that there's a witness that says two
17   police officers walked up to that person, asked to view what
18   he taped, subsequently gave it back, and that witness says
19   his footage was gone?
20        A.  I was not aware of that.
21        MR. BURKE:  Object to form.
22        MR. REYNOLDS:  Objection, form.
23        Q.  If that happened, that would be a crime, wouldn't
24   it?
25        MR. REYNOLDS:  Objection, form.
```

18

```
 1        A.  It would be wrong, I would imagine, yes.
 2        Q.  Okay.
 3        A.  I don't know how it would fall.
 4        Q.  If those two officers, or even one officer,
 5   actually saw that recording, it should have been preserved,
 6   correct?
 7        A.  I believe so.
 8        MR. BURKE:  Object to form.
 9        MR. REYNOLDS:  Join.
10        Q.  The identity of the individual taking it should
11   have been discovered and recorded, correct?
12        A.  If -- yes, if that happened, that -- I would agree
13   that that person should also be identified.
14        Q.  And then, were you at the scene after the
15   paramedics came, and maybe even when they had already left?
16        A.  Briefly.
17        Q.  Were you listening to any of the witnesses to what
18   happened there over by Southernmost Beach?
19        A.  No.  I had -- was helping moving cars around so
20   that the ambulance and the fire truck could get as close as
21   they could.  I do remember, because I remember it was Andy
22   Harris who came and relieved Gary Celcer who was performing
23   CPR, and Andy Harris continued CPR as they were getting
24   Eimers onto a stretcher and then to the ambulance.  And I
25   remember that I was --
```

19

```
 1        MR. BURKE:  You can wait for his question.  He'll
 2   have a question for you in a moment, Officer Calvert.
 3        THE WITNESS:  Okay.
 4        Q.  Do you remember hearing from any of your fellow
 5   officers, the statement, Thad, it might just be easier to
 6   bury him?
 7        A.  I've never heard that, no.
 8        Q.  Not from Officer Lovette at the scene?
 9        A.  No.
10        MR. REYNOLDS:  Objection, form.
11        Q.  Did you learn about a police officer from another
12   jurisdiction who was witnessing what happened and was
13   appalled by the police conduct?
14        MR. REYNOLDS:  Objection, form.
15        A.  No.
16        Q.  If such a witness existed, should that witness'
17   statement have been taken by police and his identification
18   preserved?
19        MR. BURKE:  Object to form.
20        MR. REYNOLDS:  Join.
21        A.  If a witness existed in that capacity, yes.
22        Q.  So, if Officer Wanciak says that such a witness did
23   exist and she spoke to him, she should have preserved that in
24   a statement, shouldn't she?
25        MR. BURKE:  Object to form.
```

20

```
 1        MR. REYNOLDS:  Join.
 2        A.  We're -- we're trying to get statements.
 3        Q.  Right.
 4        A.  Collect information.
 5        Q.  And if that --
 6        A.  That's what we do.
 7        Q.  And if that happened, it's a violation of policy,
 8   right?
 9        MR. BURKE:  Object to form.
10        A.  Well, I can't -- because there -- it is case-by-
11   case and situational, so I don't know.  If that person was
12   uncooperative or then left, or was told to wait here while I
13   go do something else and then come back to you, because I
14   don't have the means, I don't have a witness statement.  I
15   don't know, case-by-case, what happened, if that happened at
16   all, if there was this person.
17        But so, it's really hard to think punitively about
18   what can happen to somebody for failing to get something that
19   maybe became unattainable.  I don't know that.  It's really
20   case-by-case.
21        Q.  Well, don't you think it would be important, if the
22   means are available to preserve his statement and his
23   identification, that the officer should do so?
24        A.  They should try.
25        Q.  Yeah.
```

21

1    A.  Absolutely.
2    Q.  **Especially when it's someone trained in the same**
3    **field as yourselves, right?**
4    A.  I would imagine that that person would also
5    understand that there are a lot of moving parts and can make
6    themselves available in many means, and that they would not
7    disappear or go away, that they would still be available and
8    they would know that.
9    Q.  **Isn't this a tourist town?**
10   A.  Is --
11   Q.  **People don't stay here.**
12   A.  Is he a tourist or is he a cop?  I don't know.
13   Q.  **A cop from New York.**
14   A.  Okay.  Okay.  So there's a tourist or a cop.
15   Q.  **A cop from New York as a tourist staying at**
16   **Southernmost.**
17   A.  Okay.  So he would know.  He would understand.
18   Q.  **Did the police --**
19   A.  That's how I would understand.  That's what I would
20   believe.
21   Q.  **Did the Key West Police Department put him on a**
22   **witness list?**
23   MR. REYNOLDS:  Objection, form.
24   A.  I don't know.
25   Q.  **Have you seen any statement from him?**

22

1    A.  No.
2    Q.  **Are you aware of anything, any officer from Key**
3    **West did to preserve his identity or his observations?**
4    A.  I'm not even aware of him.  I don't even know that
5    he exists.
6    Q.  **Assuming he did, and we already have testimony on**
7    **it, isn't it true that not taking a statement and keeping his**
8    **identification, helps cover up the incident?**
9    MR. BURKE:  Object to form.
10   MR. REYNOLDS:  Join.
11   BY MR. MCKEE:
12   Q.  **Right?  It's missing info.**
13   MR. REYNOLDS:  Objection, form.
14   A.  It would be exculpatory, I imagine.  Is that what
15   they call it?  I don't know.  If you're -- if something lends
16   to -- yeah, it's -- okay.
17   Q.  **Did you write a report regarding the Eimers**
18   **incident sometime shortly after the incident?**
19   A.  Yes.
20   Q.  **When did you write it?**
21   A.  I believe I wrote it either that day or the next
22   day on my computer, and then I saved it there until I was
23   going to actually complete a report.
24   Q.  **Were you, as a matter of practice and procedure,**
25   **supposed to write a report about the event without being**

23

1    ordered to do so?
2    A.  Generally, the primary officer will write a report
3    and supplementing officers will write supplemental reports.
4    Q.  **Were you a supplementing officer?**
5    A.  Yes.
6    Q.  **And in a case such as the Eimers incident, would**
7    **each of the officers who participated be supplementing**
8    **officers?**
9    A.  Yes.
10   Q.  **And so, they would have been writing a report**
11   **regardless, correct?**
12   A.  Yes.
13   Q.  **And yet, in the report you wrote, there's a first**
14   **paragraph that indicates you were being ordered to do this**
15   **report.  Do you remember that?**
16   A.  Yes.
17   Q.  **Why were you being ordered to write the report?**
18   A.  That's what I was --
19   Q.  **As far as you --**
20   A.  That's what I was instructed to put into my report.
21   Q.  **Do you know why, and I'm not asking for --**
22   A.  I don't.
23   Q.  **-- a lawyer's advice, I'm asking from your**
24   **department --**
25   A.  I don't know.

24

1    Q.  **Let me finish the question.**
2    **Do you know why you were being ordered to put that**
3    **paragraph in the report?**
4    A.  I would imagine because we were initially told not
5    to write one until --
6    MR. BURKE:  No, no, no, no.
7    THE WITNESS:  I don't know.
8    MR. BURKE:  You don't have to get into what your
9    lawyer told you.
10   THE WITNESS:  Okay.  All right.  I don't know.
11   Q.  **Were you initially told by an officer or another**
12   **person in your department, not to write the report?**
13   A.  I wasn't -- I had a phone conversation with an
14   attorney and I was advised not to --
15   Q.  **No, no, no.**
16   MR. BURKE:  You don't have to get into that.
17   A.  That's how, that's how it went.
18   MR. BURKE:  That's all the questions we're going to
19   answer --
20   THE WITNESS:  I was with other officers.
21   MR. MCKEE:  My question is with his department.
22   THE WITNESS:  I was with other officers --
23   MR. BURKE:  Yeah, but there's no way to --
24   THE WITNESS:  -- but there was a phone conversation
25   that was taking place between my sergeant, Frank Zamora,

6 (Pages 21 to 24)

25

1    and I believe it was Alex --
2         MR. BURKE:  Axelrod.
3         THE WITNESS:  -- Axelrod.  And --
4         MR. BURKE:  You don't have to get into that --
5         MR. MCKEE:  Well, --
6         THE WITNESS:  -- when the phone was --
7         MR. MCKEE:  -- so that's what occurred.
8         THE WITNESS:  -- passed to me, as it went around
9    from each thing and then that --
10        MR. BURKE:  Well, then we'll take it up.
11        MR. MCKEE:  No, no, no.
12        MR. BURKE:  We represent both of these.  There's a
13   joint defense effort, so we'll take that up.
14   BY MR. MCKEE:
15        Q.  Is it your understanding that that lawyer
16   represented your captain, your chief?
17        A.  I have no idea.
18        MR. BURKE:  Zamora.
19        THE WITNESS:  I have no idea.
20        MR. BURKE:  He said he was with Zamora.
21        THE WITNESS:  I have no idea.
22        Q.  Was the officer that ordered you to write this
23   report or to include this in your report, Officer Zamora?
24        A.  I don't directly remember.  It just became common
25   knowledge to me that we were all going to go write our

26

1    reports and that it was going to include this.
2         Q.  Because I heard something, and we can re-read the
3    transcript later, were you saying that you had been ordered
4    not to do the report by someone first?
5         MR. BURKE:  No, we're not going to get into any --
6    if you want to ask if he was asked --
7         MR. MCKEE:  In the police department, not by a
8    lawyer.
9         A.  Oh, no.  Not in the police department, no.
10        Q.  Okay.  Now, is there any, anyone outside of the
11   police department, that could order you to do a supplemental
12   report?
13        A.  Outside of the police department --
14        Q.  Yeah.
15        A.  -- that could order me to do it.
16        Q.  Right.
17        A.  I don't believe so.
18        Q.  Okay.  So in this case, somebody ordered you to do
19   this report?
20        A.  That is -- that is how it reads, yes.
21        Q.  But you had already done it?
22        A.  Well, I had written something documenting what I
23   remembered at the time or very close to the time.
24        Q.  So there was never an issue that you'd be refusing
25   to obey the order to write the report, because you already

27

1    wrote it?
2         A.  Well, I hadn't submitted a report.  I hadn't
3    written anything.  I had just made notes, essentially.
4         Q.  And on what did you make notes?
5         A.  I don't remember if I made them on a, like the
6    computer at the desktop or in my laptop?
7         Q.  Did you preserve those notes?
8         A.  I'm -- to be honest, I'm not sure if they're on my
9    P-drive file or if they're on my laptop or I had them on a
10   thumb drive.  To be honest with you, I'm not sure where I --
11   if I preserved them, where.  Well, I know I preserved them,
12   because I used them later, but I don't know where I saved
13   them.
14        Q.  Have you done anything to destroy them as of
15   today's date?
16        A.  I don't -- I don't think so.
17        Q.  Okay.  So they would likely be available on one of
18   those described locations, correct?
19        A.  It's possible, unless it's on a thumb drive, and
20   I'm not sure, because I do use a thumb drive regularly.
21        Q.  But this was eventually an in-custody death, right?
22        A.  Yes.
23        Q.  Oh, so you know you should have kept everything,
24   right?
25        MR. BURKE:  Object to the form of the question.

28

1    BY MR. MCKEE:
2         Q.  You know under the law --
3         A.  Well, it was -- it was exactly used in my report --
4    well, not exactly, but within fairly close is what was
5    submitted to my report.
6         Q.  As you're sitting here today, can you testify under
7    oath that you have already destroyed that information?
8         A.  I don't know.
9         Q.  Can you say you did not destroy it as of today?
10        A.  I don't know.
11        Q.  Have you ever looked for it?
12        A.  No.
13        Q.  Is there anything about your own course and conduct
14   that would make you think that, under these circumstances,
15   you likely destroyed it or likely preserved it?
16        A.  I can't say one way or the other.  It was
17   unnecessary once I had -- once I had it put into the report.
18        Q.  You realize that investigators, including police
19   officers, look for all writings that someone wrote that might
20   be a witness to see if there's differences in the story,
21   right?  You know that?
22        MR. BURKE:  What does that have to do with
23   anything?
24        MR. MCKEE:  Because I want all he wrote and said,
25   not --

29

```
 1        MR. BURKE:  Then send a request to produce.
 2        MR. MCKEE:  Not what got written after being --
 3        THE WITNESS:  I can look.  That's all I know.
 4        MR. MCKEE:  -- verified by Zamora.  You asked a
 5   question, I'm answering.
 6        MR. BURKE:  If they have a request to produce,
 7   we'll respond to it.
 8        THE WITNESS:  All I can do is look.  It may be on
 9   the P-drive, it may be on my laptop, I don't know.
10        My laptop got flashed.  In other words, we had a
11   new thing, so if it was on my laptop, I lost everything
12   that was on my laptop.  I was doing all my FTO work.  I
13   had to redo everything.  So if it was on my laptop, it's
14   gone.  If I saved it on the P-drive, it could still be
15   there.  And it's documentable how my laptop was flashed.
16        MR. BURKE:  You don't have to explain your answers.
17        THE WITNESS:  There's a date.  But if I saved it on
18   the P-drive, which I don't know if I did, then it would
19   still be there.
20   BY MR. MCKEE:
21    Q.  Do you still have your laptop?
22    A.  I still have my laptop.
23    Q.  And you have not destroyed its hard drive?
24    A.  It -- IT did something to it where I lost all of
25   the work that I had on my --
```

30

```
 1    Q.  When did they do that?
 2    A.  Do you -- I don't remember the date.
 3    Q.  Was it after the officers were sued?
 4    A.  I have no idea.  Just, they update.  They got these
 5   new computers.  I have an old Toughbook and then they had
 6   these GTEK new ones, and there was a compatibility issue
 7   between the new computers and the other ones, so they had to
 8   update the software in the other ones so that everything
 9   could be -- because there's a bunch of different programs
10   that they run, that have to run simultaneously and work
11   together.  And so, at some point along, you know, the
12   technological progression, the Toughbooks had to play
13   catchup.  And so, at some point, mine had been in the --
14   redone.
15    Q.  Did that happen after November 28th, 2013?
16    A.  I would have to go back and find out, but I believe
17   so, yes.
18    Q.  And did that happen with every officer's --
19    A.  No.  Just the ones that had the older Toughbooks.
20    Q.  And would that have included any of the other
21   officers that were involved in the Eimers incident?
22    A.  I have -- I have no idea.
23        MR. REYNOLDS:  Objection, form.
24    Q.  Do you know whether anyone from the police
25   department gave notice that information that may be on that
```

31

```
 1   computer was going to be lost if it wasn't inspected during
 2   the course of this litigation?
 3    A.  I know I was advised.  I was actually, I think, out
 4   of town when -- and somebody actually came and got my
 5   computer out of my car.  And I was upset about it because I
 6   had done a bunch of -- I'll do FTO field training, so I'm
 7   training a newer officer and he'll drive and I'll sit there
 8   with the laptop and I'll write on my laptop what he's doing
 9   right and what he's doing wrong, and I'll save it.  I don't
10   -- I -- can I speak to him while I'm doing this?
11    Q.  No.
12        MR. BURKE:  No, no.
13    A.  He would -- he would remember the day and times --
14        MR. BURKE:  Why don't you just try to answer --
15        MR. MCKEE:  I wish you could, but --
16        THE WITNESS:  -- because we were FTOing at the same
17   time and so I might be able to --
18        MR. MCKEE:  I wish I had known it before --
19        MR. BURKE:  Thad --
20        MR. MCKEE:  -- I finished with him, quite frankly.
21        MR. BURKE:  Thad, just listen to his question and
22   then answer his question.
23        THE WITNESS:  Okay.
24        MR. BURKE:  That's all you have to do.
25        THE WITNESS:  All right.
```

32

```
 1   BY MR. MCKEE:
 2    Q.  Are you finished with the answer to that last
 3   question?
 4    A.  What was the last question.
 5    Q.  That's a good question, at this point.
 6        MR. BURKE:  I don't he remembers.
 7        MR. MCKEE:  I'll just give another question,
 8   related question.
 9   BY MR. MCKEE:
10    Q.  Did you have a course of practice in your daily
11   activities as an officer --
12    A.  Did I have a what?
13    Q.  A practice, procedure, during your daily activities
14   as an officer for the Key West Police Department, to take
15   notes of what was happening during the course of a given day
16   in the time frame around November 28th, 2013?
17    A.  No.  Not unless I'm FTO-ing, I don't take notes
18   about what's going on unless I'm FTO-ing.
19    Q.  As to this particular event involving Mr. Eimers,
20   do you recall writing into some device, or even a pad of
21   paper, what you perceived to have happened?
22    A.  I remember writing something so I could remember,
23   because I knew I was eventually going to write a report, but
24   I was told at some point that -- hold off on writing a
25   report, because we're going to put something in it, and that
```

8  (Pages 29 to 32)

33

1　hadn't been decided what it was. So, but I had prepared what
2　I wanted to submit to my report as I remembered it then.
3　　　Q. But you had typed something up to refresh your
4　recollection?
5　　　A. Yes.
6　　　Q. And you used that in helping you draft this
7　supplemental report?
8　　　A. Yes.
9　　　Q. And it was on police equipment that you did that
10　preservation of information?
11　　　A. Yes.
12　　　Q. And then, at some time when you were away, they
13　came and took it from you without even asking you?
14　　　MR. BURKE: Object to the form of the question.
15　　　MR. REYNOLDS: Join.
16　BY MR. MCKEE:
17　　　Q. Right?
18　　　A. I don't know that.
19　　　Q. I thought you said you were angry about it because
20　they did it without telling you.
21　　　A. Well, they did that with my FTO, I lost FTO work,
22　but I don't know if I lost that or not because I don't -- it
23　might be on the P-drive. It might not. It might just be on
24　my -- it might have been -- if it was on my desktop like, of
25　my laptop, then it would be lost. And some things were --

34

1　that's where I saved some things, like my FTO paperwork.
2　Because I didn't always have a connection to the P-drive.
3　And if I had it on the P-drive, then I -- and I was going to
4　go print out the FTO paperwork, it would create a long pause
5　and then it would never -- so I would routinely just put it
6　on the --
7　　　MR. BURKE: You've answered his question.
8　　　THE WITNESS: Yes.
9　　　MR. MCKEE: Don't, don't do that again. I'll go
10　straight to the judge if you cut him off again.
11　　　MR. BURKE: Well, go to the judge any time you
12　want, Bob, but if we've got to be here --
13　　　MR. MCKEE: You know that's improper. Don't do
14　that.
15　　　MR. BURKE: He's just --
16　　　MR. MCKEE: You can't cut your -- the witness off
17　with his answer and he's your own witness.
18　　　MR. BURKE: Well, he's rambling.
19　　　MR. MCKEE: I don't care. I'm getting good
20　information.
21　　　MR. BURKE: He's rambling, he's being non-
22　responsive.
23　　　MR. MCKEE: No, I thought his information was very
24　responsive.
25　　　MR. BURKE: Well, then ask him all the follow ups

35

1　you want.
2　BY MR. MCKEE:
3　　　Q. So we'll cut to the chase.
4　　　A. Yes.
5　　　Q. That laptop, they didn't even tell you they were
6　going to take it from you, right?
7　　　A. I -- I knew that they were going to be doing
8　updates, but I didn't know that they were doing them as soon
9　as they did.
10　　　Q. And did you tell them, hey, I might have some
11　important data on there that's part of an investigation by
12　the FDLE or the plaintiffs in the civil --
13　　　A. No.
14　　　Q. -- action brought against me?
15　　　A. No.
16　　　Q. And did you do anything to preserve the information
17　in the event of investigation by the FDLE or investigations
18　in this lawsuit?
19　　　A. No.
20　　　Q. And it was your own police force that -- someone
21　there that took that from you, right?
22　　　MR. BURKE: That took his laptop?
23　　　MR. MCKEE: Yeah.
24　　　MR. BURKE: Is that the question?
25　　　MR. MCKEE: Yeah.

36

1　　　A. Yes.
2　　　Q. Who was it?
3　　　A. I don't know.
4　　　Q. What division was it?
5　　　A. I'm not sure.
6　　　Q. As part of your supplemental report, did you review
7　the video of your dash cam?
8　　　A. It was reviewed, in part, in a briefing afterwards.
9　We were going over the supervisors, how they review the
10　videos, and we did see parts. I did see parts of it, but
11　there was more of a call regarding something else that
12　actually happened the same day. There was another, another
13　call when we were reviewing it. So I did see portions of it,
14　but not in its entirety.
15　　　Q. Is that a standard practice to have the supervisor
16　review the dash cam when an event occurs?
17　　　A. The supervisors review it, but it's not a common
18　practice that they review it with the -- with everybody.
19　　　Q. Right. But in this case, the Eimers case, they
20　were reviewing the dash cams?
21　　　A. We did. Yes, I'm sure all of them were reviewed.
22　　　Q. Ah, okay. Did that -- was Officer Lovette's
23　reviewed?
24　　　A. I would imagine.
25　　　MR. REYNOLDS: Objection, form.

9 (Pages 33 to 36)

37

1   MR. BURKE:  Object to the form.
2   **Q.  You think so?  You think so?**
3   MR. REYNOLDS:  Objection, form.
4   A.  I think so.
5   **Q.  Were you there when all of those dash cams were**
6   **being reviewed?**
7   A.  We -- no.
8   **Q.  Were you there when yours was being reviewed?**
9   A.  I was there at one instance when mine was reviewed
10  partially.
11  **Q.  Okay.  Now, what specifically in that review was**
12  **being viewed?**
13  A.  Just, I think had -- I was going to the bathroom
14  when the call came out.  I came out.  I activated my stuff.
15  I pulled out in front of the police department and cars drove
16  by.  And you could see the PT Cruiser, and then a couple
17  other patrol cars, and then I pulled out, and then I -- I
18  made it to Truman and White, and then we stopped reviewing.
19  **Q.  Okay.  So you stopped reviewing at the point that**
20  **you were approaching the scene?**
21  A.  No.  Truman and White, which is probably still ten
22  minutes from the scene.  I don't know how good a -- you could
23  estimate time.
24  **Q.  Do you know why that part was being reviewed?**
25  A.  Well, I know why most likely the stop was being

38

1   reviewed, because it didn't really show much, because I never
2   got close enough to the other, the other officers who were
3   following behind Eimers.
4   **Q.  Was Lovette one of the officers following behind**
5   **Eimers?**
6   MR. REYNOLDS:  Objection, form.
7   A.  I believe so.
8   **Q.  You know you're the first officer to describe this**
9   **review of dash cams?  Did you know that?**
10  MR. REYNOLDS:  Objection, form.
11  A.  No.
12  **Q.  Did you know that Officer Lovette's dash cam**
13  **doesn't have data?**
14  MR. REYNOLDS:  Objection, form.
15  A.  I'm sorry?
16  **Q.  Doesn't have data?  Did you know that?**
17  A.  Doesn't have data?
18  **Q.  Right.**
19  MR. REYNOLDS:  Objection, form.
20  A.  I don't know what other peoples' vehicles do.
21  **Q.  Okay.**
22  A.  I'm responsible to test mine and report if it
23  doesn't work.
24  **Q.  Let me make it clear, though.  In an unusual**
25  **occurrence, the supervisors started reviewing all of the**

39

1   **involved officers' dash cams, according to you, correct?**
2   MR. BURKE:  Object to the form of the question.
3   MR. REYNOLDS:  Join.
4   A.  According to me, the supervisors are required to
5   review, daily, all of the or most of the calls that they
6   have.  Like, different traffic stops to periodically review.
7   That's my understanding.
8   **Q.  So if someone's dash cam had malfunctioned at an**
9   **in-custody death, that's something that probably should be**
10  **made note of in that review process, right?**
11  MR. BURKE:  Object to the form of the question.
12  MR. REYNOLDS:  Join.
13  BY MR. MCKEE:
14  **Q.  Right?**
15  A.  What was the question?
16  **Q.  If one involved officer's dash cam was missing the**
17  **data at the scene, although it had been activated, that's**
18  **something that should have been documented by the police**
19  **department in that review, right?**
20  MR. BURKE:  Object to the form of the question.
21  MR. REYNOLDS:  Objection, form.
22  A.  I don't know what the police department would
23  document.  The officer may document what his equipment did,
24  but I don't know what the police department would document.
25  **Q.  But when they're reviewing his dash cam and nothing**

40

1   **comes on the screen, are you aware of anybody doing an**
2   **investigation of why Mr. Lovette's or Officer Lovette's dash**
3   **cam had no data of the scene?**
4   MR. BURKE:  Object to the form of the question.
5   MR. REYNOLDS:  Objection, form.
6   A.  I'm not aware.
7   **Q.  Did, as part of this investigation after the Eimers**
8   **incident, did they ask you for your Taser info?**
9   A.  Yes.
10  **Q.  Did you supply it?**
11  A.  Yes.
12  **Q.  Did you ever activate yours?**
13  A.  No.
14  **Q.  Are you aware of anyone else that did?**
15  A.  No.
16  **Q.  Are you aware that Mr. Lovette admits that he did**
17  **activate his?**
18  A.  I became --
19  MR. REYNOLDS:  Objection, form.
20  MR. BURKE:  Object to form.
21  THE WITNESS:  I became aware that his had been
22  turned on, --
23  **Q.  Right.**
24  A.  -- but not activated.
25  **Q.  Okay.  You're aware -- and did you ever turn yours**

10  (Pages 37 to 40)

41

```
 1   on?
 2       A.  No.  Not to my -- not intentionally, not to my
 3   knowledge.  And I wasn't told anything back when I received
 4   it after it had been reviewed.
 5       Q.  You were at the scene during these events, some of
 6   these event with Mr. Eimers, correct?
 7           MR. BURKE:  Object to form.
 8           MR. REYNOLDS:  Join.
 9       A.  I as at the scene.
10       Q.  When the detention and activities relating to the
11   detention was occurring with Mr. Eimers?
12       A.  Yes.
13       Q.  Did you see Officer Lovette?
14       A.  I did see Officer Lovette on scene at some point,
15   yes.
16       Q.  Did you see him with his Taser in his hand?
17       A.  No.
18       Q.  At no time?
19       A.  At no time did I see him with his Taser in his
20   hand.
21       Q.  Do you have an explanation why his Taser recording,
22   once activated,  we don't have voice or video from the
23   scene?
24           MR. BURKE:  Object to form.
25           MR. REYNOLDS:  Objection, form.
```

42

```
 1   BY MR. MCKEE:
 2       Q.  If he activated it at the scene?  If he turned it
 3   on at the scene?
 4           MR. REYNOLDS:  Objection, form.
 5       A.  I'm going to need the -- because you changed it.
 6       Q.  I'll restate it and make it clear.
 7           Assuming it's true that he turned it on, --
 8       A.  Okay.
 9       Q.  -- that would have turned on audio and video,
10   correct?
11       A.  Yes.
12       Q.  Do you have any explanation why, if he admits to
13   having done so, that footage is missing?
14           MR. REYNOLDS:  Objection, form.
15       A.  I -- I don't know.  I don't know anything about
16   that.
17           MR. MCKEE:  Let me mark as the next Exhibit, I
18   think it's 10.
19           (Plaintiff's Exhibit 10 was marked.)
20       Q.  And if you could tell us what that is, sir?
21       A.  Oh, this is my supplemental report.
22       Q.  Did you file this under oath?
23       A.  Yes.
24       Q.  It says up at the top, the date the report was
25   prepared, 12/2, 2013, at 17:13 p.m., right?
```

43

```
 1       A.  That's what it says.
 2       Q.  That's not true, is it?
 3       A.  That's when this Key West Police Department
 4   Incident Report --
 5       Q.  Okay.
 6       A.  -- was prepared.
 7       Q.  But what you wrote was in the day or so, right
 8   after the incident, right?
 9       A.  I wrote the body of it sooner.
10       Q.  Okay.  Taking you to the third paragraph.  I take
11   that back.  The fourth paragraph where it starts, "I made my
12   way to South Beach" -- do you see that?
13       A.  Yes.
14       Q.  -- "and saw two officers struggling to put
15   restraint devices on a white male who was laying stomach-down
16   in the sand."  Do you see that?
17       A.  Yes.
18       Q.  Did you ever tell the FDLE that what you saw is
19   that it appeared the suspect was originally complying with
20   the arresting officers and then he started resisting?
21           MR. BURKE:  Object to form.  Go ahead.
22       A.  I'm -- I'm not a hundred-percent sure.
23       Q.  Not sure that you said that to FDLE investigators?
24       A.  I'm not sure that I said that, but I'm also not
25   sure that I didn't see that or didn't see it in the video.
```

44

```
 1       Q.  Okay.  That's fair enough.
 2       A.  Because I did see something in the video and that
 3   alters my memory.  And this, this I have to, I have to take
 4   as being closer to the incident.  And by the time I did the
 5   FDLE, I had been exposed to videos, which could alter my
 6   memory.  And, to be honest, I don't remember what I remember
 7   seeing and what I remember doing as clearly.  So, I don't
 8   know.
 9       Q.  Since you said videos, how many videos did you
10   review?
11       A.  I've seen the video that was on the internet.
12       Q.  And none other?
13       A.  That's the -- I don't know if there's more versions
14   of it, but just saw a video that was on the internet.
15       Q.  Well, you said videos, and I'm wondering which
16   videos did you see?
17       A.  Just video.
18       Q.  Okay.  But as of the time that you drafted this
19   supplemental report, had you seen the video?
20       A.  No.
21       Q.  When is the first time you learned of the video?
22       A.  I don't remember exactly when, but it was a while
23   after the incident, so.
24       Q.  And in that video, you saw events preserved on film
25   that caused you to change your supplemental report to a
```

11  (Pages 41 to 44)

45

1    different version of facts, right?
2        A.  I'm sorry?
3        MR. BURKE:  Object to the form of the question.
4        MR. REYNOLDS:  Join.
5        Q.  After seeing the video, you changed what you
6    believe you saw?
7        A.  No.
8        MR. REYNOLDS:  Objection, form.
9        Q.  No?  So if there's a difference between your
10   supplemental report and what you told the FDLE after seeing
11   the video --
12       A.  Well, the FDLE happened much later.
13       Q.  Right.
14       A.  So if there's -- there's another difference, too.
15   I remember, and I didn't -- I didn't write this because I
16   didn't -- I wasn't concentrating on this as I was writing it,
17   because I was concentrating on what I saw as it pertained to
18   Eimers.
19       But, I also, because I remember doing it in grand
20   jury, they showed a video, hey, where are you?  And they had
21   it very big and highlighted with ovals that are lightened up.
22   And I could clearly see that that was me going and clearing a
23   car.  But I had never mentioned clearing a car.  And it's
24   just something that didn't register in my memory as I wrote
25   about what had happened with Charles Eimers.

46

1        And it -- I became, I later became, oh, yeah, I did
2    do that.  So there, you know, there are mistakes.
3        Q.  Okay.  So the supplemental report --
4        A.  I would like to think that my memory is better,
5    but --
6        Q.  I'm with you, man.  But my point being, sometimes
7    people point to reports and say that it's absolutely,
8    everything is absolutely true.  You're admitting that there
9    are some errors in your supplemental report?
10       A.  Yes.
11       Q.  Okay.  We're going to go through those to make sure
12   we have a clear understanding from your perspective, okay?
13       A.  Okay.
14       Q.  And so that I'm being completely fair with you, if
15   I have -- oh, don't tell me I don't have one.  Do have
16   another one of these, Thaddeus Calvert?
17       I'll show it to you if I have to, but I have also
18   the FDLE summary of your statement.  Have you ever seen that
19   before, the FDLE?
20       A.  Yes.
21       Q.  Okay.  If I need it, I'll point it out to you.  I
22   only have one copy here.
23       But looking at your supplemental report, I taking
24   you to the fourth paragraph.  When you made your way to South
25   Beach over there by the restaurant beach area, is the first

47

1    thing that you saw, two officers struggling with Mr. Eimers
2    while Mr. Eimers is being compliant?
3        A.  I remember seeing that there were officers engaged
4    with him.  And I do remember seeing Henry Del Valle with a
5    long gun, and he was walking behind where the officers were
6    struggling as if to go back to the cars.  And there was only
7    like a, like a -- like a snapshot, and then I paid attention,
8    because they were doing what they do and it didn't require
9    me.
10       And I went and I paid attention to the car, because
11   that was the unknown at the time.  And I had opened the
12   driver's door.  I had opened up the thing, not checking it
13   like searching it, but just making sure there was nobody else
14   in it or there wasn't anything dangerous.
15       And then, something got my attention and I turned
16   back around, and then I saw officers struggling.  And I
17   really believe that that's where my memory is.
18       Q.  Okay.
19       A.  That when I turn around, that's when I see officers
20   struggling, and that's really where my brain goes to in
21   recollection of what happened with Charles Eimers.
22       Q.  But now, in retrospect, having seen the video --
23       A.  Yes.
24       Q.  -- and using your own recollection, you probably
25   weren't even at the scene when Mr. Eimers got out of his car?

48

1        A.  That's true.  I was not.
2        Q.  And having seen the video, you were not there
3    seeing him walk slowly away from his car?
4        A.  Yes.
5        Q.  And you were not there when he, listening to the
6    orders of some voice from a police officer to get down on the
7    ground, when he compliantly got down on the ground.  You saw
8    all that happen on video, right?
9        A.  I saw -- I did see on video, him walking towards
10   the center of the beach, away from his car, half -- like
11   maybe a quarter of the way between where his car was parked
12   and where the restaurant was.
13       Q.  And you saw him get down on his knees at first --
14       A.  Well, I'm not -- I -- I'm not sure that I saw that,
15   but I do remember seeing something to the effect of him --
16       Q.  And then he got down on the ground, face down.  You
17   saw that?
18       MR. BURKE:  Saw that on the video or the scene?
19       MR. MCKEE:  On the video.
20       A.  I don't -- like, I'm not -- I'm not, I'm not clear
21   on that.
22       Q.  Point being, I think what you're telling me, and
23   correct me if I'm wrong, in your supplemental report where
24   you indicate you saw two officers struggling to put restraint
25   devices on a white male who was laying stomach down, that's

12  (Pages 45 to 48)

49

the first person -- that's the first vision you're seeing personally when you arrive there?

A.   And I wouldn't even say when I first arrived, because when I first arrived, I -- I know that they're interacting with him, but I don't know exactly what they're doing. I'm not paying attention to it. I know that there are enough officers paying attention to Eimers, and I pay attention to the car.

Q.   Did you see what conduct of the officers caused Mr. Eimers to start reacting physically?

MR. BURKE:  Object to the form of the question.

MR. REYNOLDS:  Join.

A.   No, I had my -- I was paying attention to the car. There was a block of time when I'm going -- I'm looking into the driver's seat. I go back and I open up the back of the car. And then I come back around. Something gets my attention and then I go back. I had holstered my weapon, because I had had it out when I was clearing the car. I had holstered my weapon, and then I went back and I assisted with Eimers' foot.

Q.   So you, Officer Zamora and Officer Garrido all had your weapons drawn?

MR. BURKE:  Object to form.

MR. REYNOLDS:  Join.

A.   I had my weapon drawn when I was checking the car.

50

And then, after that, I holstered my weapon.

Q.   But did you see the others with their weapons drawn?

A.   The only person that I know had their weapon drawn that I saw was Henry Del Valle.

Q.   Del Valle.

A.   Because he had a long rifle and he had walked behind it and I don't -- I can't place exactly where, but I believe that's when I was first walking up.

Q.   All right.

A.   Like, I want to tell you that he was like, when I first came up, that he was either standing up or on his feet or on his knees, engaged with other officers.  And then, I gave my attention to the car.

And then, something happened while I was clearing the car.  And I don't know if it's Garrido screaming or something, but I went back to dealing with -- or, I went, started dealing with them, who were having difficulty putting restraint devices on Eimers.

Q.   But when you first arrived then, based on what you've described to me, Mr. Eimers was being compliant without resistance, then you turned your back to work on the car?

A.   Yes.

Q.   So you don't know from firsthand knowledge what

51

happened to change the discourse of activities between Mr. Eimers and the police officers --

A.   Yes.

Q.   -- from that point?

A.   Yes, I would agree with that.

Q.   Okay.  And, by the way, after searching through the car as you did, whether it be cursory or otherwise, did you ever find a weapon, some dangerous object that could have been used in that scene?  There was no weapons, is that right?

MR. REYNOLDS:  Objection, form.

A.   I did not find anything.

Q.   And you're not aware of any other officer that found some sort of weapon there?

A.   I'm not aware of that.

Q.   When you received training on how to apply handcuffs to a prone restrained victim, person, perpetrator, whatever you want to call him, are you trained on moving the arm back to use a point to bend the elbow, to put it into position?

A.   At some point, the elbow is bent?

Q.   Yes.

A.   Him doing that?

Q.   Yes.

A.   Yes, at some point, the elbow bends.

52

Q.   Do you recognize that when it's not bent, it becomes very painful to the shoulder; when it's pulled back and not bent, and then forced to go inwards towards the other hand?

MR. BURKE:  Object to form.

MR. REYNOLDS:  Join.

A.   We simulate handcuffing each other in annual training frequently, and in defensive tactics in the academy. And I have provided resistance in being handcuffed myself and I personally can't speak to that.

Q.   Okay.  You're how old?

A.   Thirty-eight.

Q.   Do you know what that would be like in a 60 year-old man who might have arthritic changes?

A.   Not yet.  I imagine I'm going to find out, maybe.

Q.   You will, trust me.  Speaking from experience myself.

But were you ever trained that in an older man, to not bend his elbow could be very painful to him?

A.   It is, I think, widely accepted that there are people -- there are the elderly and other people of different conditions or -- that you could, yes.

Q.   It could be.

A.   But I don't, it's -- I think it -- how you make the determination is very difficult visually.  Looking an age,

13  (Pages 49 to 52)

53

1  certainly, you wouldn't jump to the conclusion that somebody
2  is immobile just because they look older.
3      Q.  I agree.  But in pulling the arm forcibly back
4  without bending it at the elbow, --
5      A.  Yes.
6      Q.  -- do you present a risk of a painful encounter
7  with that person?
8      MR. BURKE:  Object to form.
9      A.  I would say anytime something is jerked, then maybe
10 the odds go up that it could be more painful.
11     Q.  And were you trained that if that occurred and pain
12 was induced, that it could cause a reaction, an adverse
13 reaction by that person where he's trying to protect himself?
14 Were you ever trained to that?
15     A.  Was I trained that --
16     Q.  That when you do it in a way that can inflict pain,
17 you'll often get a negative response, a resisting response?
18     MR. BURKE:  Object to form.
19     MR. REYNOLDS:  Join.
20     A.  I'm trying to think of a moment where I've been
21 trained that I might get -- I mean, we use pain compliance
22 and we're taught about certain pressure points and
23 transporters and things, but I don't think it -- I don't
24 think, in what you're trying to say, I would say that, no, I
25 have not received training like that.

54

1      Q.  And you've actually stated something I didn't hear
2  from anyone else before.  You were trained how to use pain to
3  make compliance happen, correct?
4      A.  Yes.
5      Q.  But you don't recall being trained how someone who
6  would ordinarily be compliant, who evinces evidence of being
7  compliant, would be simply asked to do something, that when
8  you force him to do it and hurt him, that it could give the
9  appearance of resisting?  You were never trained that?
10     MR. BURKE:  Object to form.
11     MR. REYNOLDS:  Join.
12     A.  I don't know if you're suggesting that he received
13 pain before he resisted or he resisted and then he got jerked
14 and then received pain.  I can't answer that.
15     Q.  No.  I'm asking whether you were trained whether --
16     A.  To recognize that somebody might be in pain?
17     Q.  That inflicting pain was something that may have
18 been done with compliance if simply asked --
19     A.  I -- I don't --
20     MR. BURKE:  Object to form.
21     Q.  Let me finish the question.
22     That inflicting the pain can cause an adverse
23 reaction that is not resisting arrest, it's trying to protect
24 your own well being.
25     MR. BURKE:  Object to form.

55

1  BY MR. MCKEE:
2      Q.  Have you ever been trained that?
3      MR. BURKE:  Object to form.
4      MR. REYNOLDS:  Join.
5      A.  I -- like that, no, I can't say that I have.
6      Q.  Similarly, in a prone restraint scenario on soft
7  sand, not a hard surface, where the surface itself may be
8  inhalable and your face is being pressed in that direction,
9  your upper torso is being forced in that direction, and the
10 weight of officers is on top of you, were you ever trained
11 that rather than being actions of resistance to arrest, it's
12 preservation of life reaction?  Were you ever given that kind
13 of training?
14     MR. REYNOLDS:  Objection, form.
15 BY MR. MCKEE:
16     Q.  To avoid suffocating?
17     MR. REYNOLDS:  Same objection.
18     A.  I'm sorry.  One more -- one more time.
19     Q.  I'll do it again.
20     A.  So I can understand.
21     Q.  And I'll take it piece by piece.
22     A.  Okay.
23     Q.  In your training about prone restraint, have you
24 ever had training on a soft surface as opposed to a hard
25 surface?

56

1      A.  No.
2      Q.  Did you ever get trained in a shallow body of water
3  for a prone restraint?
4      A.  No.
5      Q.  Did you ever get trained in any surface area where
6  a prone restraint could present the risk of suffocation?
7      A.  No.
8      MR. REYNOLDS:  Objection, form.
9      Q.  Then, with those answers, did you have any training
10 that would indicate to you that what might seem like
11 resisting arrest, is resisting suffocating?
12     MR. REYNOLDS:  Objection, form.
13 BY MR. MCKEE:
14     Q.  Did you ever get that kind of training?
15     A.  Recognizing that resisting, suffocating --
16     Q.  That his body movements --
17     A.  -- could --
18     Q.  Let me finish.  Let me do it for you.
19     A.  That his --
20     Q.  Were you ever trained that in a prone restraint
21 where a risk of suffocation on the surface on which he's
22 being pressed exists, that his body action may actually be
23 self preservation as opposed to resisting arrest?  Were you
24 ever trained in that regard?
25     MR. REYNOLDS:  Objection, form.

57

1      MR. BURKE:  Object to form.

2      A.  I'm going to say no.

3      Q.  Are you aware of any reason why Mr. Eimers was not

4  asked to get on his back and present his hands for cuffing as

5  an obese man, as the rules allow you to do?

6      MR. BURKE:  Object to form.

7      MR. REYNOLDS:  Join.

8      A.  I never experienced that in law enforcement, in

9  law-enforcement training.  I've never experienced any command

10  to have somebody lay on their back.

11      Q.  So whether they're overweight has no bearing on how

12  you're going to cuff them, in front or back?

13      MR. REYNOLDS:  Objection, form.

14      A.  I have not been trained to observe somebody being

15  overweight and ask them to get on their back, no.

16      Q.  So if another officer said he received that kind of

17  training, that would be training you never received?

18      A.  Yes.

19      MR. REYNOLDS:  Objection, form.

20      Q.  Are you trained prior to cuffing someone, to ask

21  them for their arm voluntarily or their wrist?

22      A.  We're trained, there's like a -- you know, there's

23  presence.  There's verbal commands or there's -- it goes --

24  so he would be given verbal commands to do what was required

25  of him from law enforcement's perspective.

58

1      Q.  Sure.  And when someone is actually positively

2  responding to such commands, should it give an inducement to

3  continue using verbal commands to get what you're trying to

4  accomplish as a police officer?

5      A.  I would agree with that.

6      Q.  And as part of handcuffing of somebody, would you

7  agree that proper procedure is to first ask, whether it be

8  politely or gruffly, I need your wrist because we're going to

9  cuff you?

10      A.  I would say that commonly, we're trained that

11  someone would go to their knees, they'd cross their feet, put

12  their hands on their head.  And then, you'd have them put

13  your left arm behind your back and you put a handcuff, leave

14  the other one on your hand.

15      So there is a procedure for different scenarios.

16  That's generally one used for felony stops that we would do

17  training on annually.

18      Having somebody lay down on the ground is not

19  uncommon, but it would also be the same.  Once you have them

20  on the ground, put your left hand behind your back and then

21  put your -- you know, you would give them, continue to give

22  them commands until they resisted.

23      Q.  And you're doing that because it helps de-escalate

24  the situation, too, right?

25      MR. BURKE:  Object to the form.

59

1  BY MR. MCKEE:

2      Q.  You're communicating?

3      A.  Well, anytime you can get someone to do something

4  on your behalf is better than you having to --

5      Q.  Right.  And that's part of the training of officers

6  with the Key West Police Department, right?

7      A.  Recognizing that or --

8      Q.  Being trained.

9      A.  Yes.  Those procedures are trained during training.

10      Q.  So if someone simply strolled up to Mr. Eimers

11  while he's at rifle gunpoint and jerked his left arm behind

12  his back without first asking if he could do it, that would

13  not be compliant with police procedure, would it?

14      MR. BURKE:  Object to form.

15      MR. REYNOLDS:  Join.

16      A.  Asking would -- certainly, asking would not be.

17  But giving commands to put his hands behind his back would be

18  normal.

19      Q.  To ask him for his left arm first is something that

20  you would expect should have happened at that scene that day,

21  right?

22      MR. BURKE:  Object to form.

23      MR. REYNOLDS:  Join.

24  BY MR. MCKEE:

25      Q.  Telling him that you're going to cuff his left

60

1  hand?

2      A.  Put his hands, put his hands behind his back, yes.

3  I don't know right hand, left hand.  I don't know, one hand

4  at a time, depending on how that person saw fit to do it.

5  But, yes, giving verbal commands is generally accepted

6  procedure.

7      Q.  Are you aware that Officer Garrido did not give him

8  oral commands, did not give Eimers oral commands --

9      A.  I am not.

10      Q.  -- during handcuffing?

11      A.  I don't know that to be true.

12      Q.  Well, he testified earlier and you were here.

13      A.  Okay.

14      Q.  Did you hear him?

15      A.  I was paying attention, but -- I know I was hearing

16  verbal commands.  I don't know who was giving them.

17      Q.  Okay.  Should the officer doing the cuffing be the

18  one giving the commands so as to avoid confusion?

19      MR. BURKE:  Object to form.

20      A.  Generally, there's like one, like, person that

21  would take charge of the scene.  But as you close the

22  distance between somebody, you may take over and provide

23  commands just because you are very close and they can be very

24  direct and personal commands.  But it is normal that one

25  person would give commands holding cover.

15  (Pages 57 to 60)

61

1    Q.  Not only normal, that is the procedure, correct?
2        MR. REYNOLDS:  Objection, form.
3        Which?
4    Q.  The taught procedure is that one person should be
5    giving commands?
6        MR. BURKE:  Object to the form.
7    BY MR. MCKEE:
8    Q.  Not multiple people?
9    A.  It's not as exact.  It's -- in the training I've
10   received, it's been very normal that you'll have a primary
11   car, like in a -- and I'm used to only traffic stops because
12   they're something that we train routinely, where you'll have
13   somebody and you'll be on a loudspeaker and you'll tell them,
14   hey, step-by-step, how to get out of the car, what to do with
15   the keys, back up, lift up your shirt, turn around, back up
16   some more, get down on your knees, cross your feet.
17       So there will be an exact procedure that the person
18   will be expected to follow and he will be given these
19   commands by somebody speaking over a PA from the primary stop
20   vehicle, usually.
21       But, the person that's going to put handcuffs on
22   them may take over voice command as they close in and get
23   close to the person, because now it's me talking to you and
24   I'm expecting something from you right now, and then that
25   person may not.  And that, I have not ever seen anyone do

62

1    that and that been called as being deficient in training for doing
2    that.
3    Q.  Okay.  So --
4    A.  There's no exact set standard for every single
5    thing that you're going to do.
6    Q.  But Mr. Eimers, while he was being compliant,
7    should have first been told, we're going to cuff you, give us
8    your left arm behind your back, correct?
9        MR. BURKE:  Object to form.
10       MR. REYNOLDS:  Join.
11   A.  All I can say is that he would be given verbal
12   commands.
13   Q.  And would the verbal commands, according to policy
14   and procedure with the Key West Police Department, be
15   something to the effect of, Mr. Eimers, you're being ordered
16   to give us your left hand behind your back, we're going to
17   handcuff you; should that have happened?
18       MR. BURKE:  Object to form.
19       MR. REYNOLDS:  Join.
20   A.  I don't know that I would give it the same dialog,
21   but something to the effect of getting your hands behind your
22   back.
23   Q.  What dialog would you have used if it was you that
24   day?
25   A.  Put your hands behind your back.

63

1    Q.  Okay.
2    A.  And if I already had one hand, I'd put your left
3    hand or whatever hand I thought.  Or, I'd tap the shoulder
4    and say, put this hand behind your back.  I would try to
5    communicate what I wanted to the person.
6    Q.  Because when you do that, you might get some
7    cooperation?
8    A.  Yes.
9    Q.  But if you rip it out from under somebody, they
10   oftentimes will resist because they think you're about to
11   beat them up, right?
12       MR. REYNOLDS:  Objection.
13       MR. BURKE:  Object to form.
14       MR. REYNOLDS:  Objection, form.
15   A.  I can't answer that.
16   Q.  You know that.  When you rip someone's body part
17   away from them without telling them what you're about to do,
18   you can get somebody who might get very disturbed by that,
19   right?
20       MR. BURKE:  Object to form.
21       MR. REYNOLDS:  Objection, form.
22   A.  You can't predict how people will respond.
23   Q.  But if you do it that way, contrary to procedure
24   and policy, you could be the actual inciting event of someone
25   who would ordinarily have been compliant, right?

64

1        MR. BURKE:  Object to form.
2        MR. REYNOLDS:  Objection, form.
3    A.  Is it possible to -- I guess it would be possible
4    to, in your conduct, to aggravate a situation into a further
5    noncompliant.  I don't -- if that's what you're getting at.
6    Q.  Yeah, that's what I'm getting at.
7    A.  Okay.
8    Q.  And when you saw the videotape, did you notice that
9    when Officer Garrido approached and got right next to him, he
10   pulled the left hand out from under him?  Did you see that?
11       MR. REYNOLDS:  Objection, form.
12   A.  I did not.  I did not see that, no.
13   Q.  And then, it's on tape, did you hear anyone asking
14   him before he did that to please give me your left hand, I'm
15   going to cuff it?
16   A.  I did not hear anything on tape, but while I was
17   there, I was hearing verbal commands about getting hands
18   behind the back, but I don't know who was giving them.
19   Q.  Did you see on the tape that when the right hand
20   was sought, there was no command on the videotape audio to
21   say, give me your right hand now?  Did you hear such a
22   command?
23       MR. BURKE:  Object to form.
24       MR. REYNOLDS:  Join.
25   A.  I did not hear on the video, no.

16 (Pages 61 to 64)

65

1    Q.   And did you see the right hand was pulled so hard
2  by Mr. Garrido that it lifted part of the torso of Mr. Eimers
3  up off the sand?  Did you see that?
4        MR. BURKE:  Object to the form.
5        MR. REYNOLDS:  Objection, form.
6    A.   No, I didn't see that.
7    Q.   And if that's what we see when we see this
8  videotape, that kind of conduct is not in accordance with
9  police procedure at Key West Police Department, is it?
10       MR. BURKE:  Object to form.
11       MR. REYNOLDS:  Join.
12   A.   I can't answer.
13   Q.   Well, is it in compliance if you --
14   A.   I don't -- I don't know what he was feeling in
15 resistance.
16       If two people are arm wrestling and both people are
17 applying pressure, you can't see the tension and resistance
18 that one -- they're giving each other.  I can't speak to you
19 about what Garrido was feeling and what he was sensing from
20 Eimers.
21   Q.   Well, did you see --
22   A.   I can't speak to that.  I was hearing verbal
23 commands, but I wasn't looking at it, and I can't place those
24 commands in correspondence with what individual actions were
25 taking place.  All I can tell you is that I heard verbal

66

1  commands to try to get him to put -- so we could get
2  restraint devices on him.  What Garrido felt in resistance
3  from Eimers, I don't know.
4    Q.   Did --
5    A.   So I don't know if what he did was reasonable or I
6  can't answer that.  I have no way of knowing.
7    Q.   In watching the videotape, did you see that it was
8  a split second of time that it took for Garrido to grab his
9  right hand, jerk it backwards without bending it at the elbow
10 and lifting Mr. Eimers off the sand?
11   A.   I didn't see that.
12       MR. REYNOLDS:  Objection, form.
13   Q.   If he did that, was that proper procedure?
14       MR. REYNOLDS:  Objection, form.
15   A.   I don't know.  It would be in response to what he
16 was seeing and feeling.  I don't know.  I can't speak to it.
17 There could be a situation where that would be necessary and
18 I don't know if that existed for him.
19   Q.   And it could also be because he's just angry and
20 full of adrenalin?
21       MR. REYNOLDS:  Objection, form.
22       MR. BURKE:  Object to form.
23   A.   I don't know that.
24   Q.   That can happen, though, right, --
25       MR. REYNOLDS:  Objection, form.

67

1  BY MR. MCKEE:
2    Q.   -- with a police officer?
3        MR. REYNOLDS:  Same.
4    A.   Is it possible?
5    Q.   Yeah.
6    A.   Yes, it's possible.
7    Q.   Did you see anything up to the point of the
8  handcuff going on the first arm that showed at the site of
9  the beach, that Mr. Eimers was anything but compliant with
10 the orders being stated at the beach?
11       MR. BURKE:  Object to the form.
12       MR. REYNOLDS:  Join.
13   A.   I wasn't paying attention to the encounter between
14 the officers and Eimers until I believe he was already
15 handcuffed or very close to getting handcuffed.  And then, I
16 was paying attention to his feet.
17   Q.   Okay.  And in paying attention to his feet, what
18 did you next do?
19   A.   I saw that he was trying to turn his body and like,
20 if somebody is like, planked out flat and they try to bend
21 their body, it creates like a, you know, the bending his
22 body.  He's leveraging his feet and his knees against the
23 ground and his shoulder or chest, so he's moving that way.
24 So I was just trying to assist them so that they could
25 facilitate getting restraint devices on him.

68

1    Q.   Did you assume that that was resisting or did you
2  think it might be so that he could keep breathing?
3        MR. REYNOLDS:  Objection, form.
4    A.   At this point, given what I'm hearing and what I'm
5  seeing, I'm seeing what I have seen over and over again with
6  people that resist, as resisting.
7    Q.   How many times have you done that face down on a
8  beach prior to the Eimers event?
9        MR. REYNOLDS:  Objection, form.
10   A.   Face down on a beach?  Never.
11       I take that back.  Actually, I have arrested
12 somebody on -- right next to White Street Pier and Rest
13 Beach, but it was many years ago.
14   Q.   Did you do a prone restraint?
15   A.   Not so much.  The guy just wanted to -- he lunged
16 at me and we ended up tussling for a moment and I ended up
17 getting handcuffs on him.  But he was, at some point, chest
18 down on the sand, but it was very quick.
19   Q.   Okay.  I'm talking about a prone restraint on a
20 beach where the man's face was towards the sand.  Have you
21 ever seen the conduct of what the body does to avoid inhaling
22 sand, avoid having it stuffed up your nose and down your
23 throat and trying to avoid what that can cause you, just
24 choking and suffocation?  Have you ever seen that or trained
25 in that scenario?

69

1  A.  No.

2      MR. BURKE:  Object to the form.

3      MR. REYNOLDS:  Objection, form.

4  Q.  So as you were on that beach, you had no idea what

5  the physiological responses would be of someone being

6  detained that way on a beach surface because you were never

7  trained in it?

8      MR. BURKE:  Object to the form.

9  A.  One more time.

10  Q.  You had no idea what kind of physiologic body

11  movements that you'd be encountering from someone who might

12  be actually trying to preserve his life rather than resisting

13  arrest.  You had never been trained and you had no experience

14  of that in your prior career, right?

15     MR. BURKE:  Object to form.

16     MR. REYNOLDS:  Objection, form.

17  A.  I would -- yes, I would agree with that.

18  Q.  So when you saw that, what did you next do?

19  A.  I was holding his feet because his feet were what

20  he was using.

21  Q.  Were you standing or kneeling or prone?

22  A.  I was standing.

23  Q.  Okay.

24  A.  And I just, I grabbed one of his feet and I just

25  kind of pulled him.  He was turning this way, I kind of

70

1  pulled him that way so that they could -- whatever they were

2  doing with his arms.

3  Q.  Okay.  But he was already cuffed then, right?

4  A.  Well, he had -- I'm pretty sure they had one cuff

5  on.  I'm not sure if they had the second cuff on or if that

6  was when Gabe was trying to get his finger free.  I'm not

7  exactly sure what state the cuffing was in, but there was

8  movement from him and there was officers doing something.

9  They were manipulating cuffs in some fashion.  I don't know

10  what they were doing exactly.

11  Q.  Did you see the cuff on his right hand?

12  A.  No.

13  Q.  Did you see the cuff with Officer Garrido's finger

14  trapped under it?

15  A.  No, I never saw it.

16  Q.  Is it possible that the detainee is hearing an

17  officer bellowing and screaming after he's just jerked both

18  arms back and cuffed him, but the witness can't see, because

19  he's face down, here's this officer going berserk behind him,

20  does that sound like something a detainee might react

21  negatively to?

22     MR. BURKE:  Object to form.

23     MR. REYNOLDS:  Objection, form.

24  A.  Yeah.  I'm not even sure I understand.

25  Q.  Well, let's put it this way.  Did you know that Mr.

71

1  Lovette stated on his Taser recording that Gabe screamed like

2  a girl?

3      MR. REYNOLDS:  Objection, form.

4  BY MR. MCKEE:

5  Q.  Are you aware of that?

6  A.  I'm aware that Gabe -- we had talked about Gabe

7  screaming, yes.

8  Q.  Okay.  Does he scream like a girl sometimes?

9  A.  I wasn't paying attention, so I'm not sure what I

10  was hearing from whom, but I heard --

11  Q.  You were there.

12  A.  Yes, but I wasn't looking.  My attention was on a

13  car, and then I turned around.  I'm fairly certain that

14  either one of his -- that when I was dealing with his foot

15  and I think that he was trying to free his finger, but there

16  was something going on with the cuffs.  I think my attention

17  got diverted from the car because of the screaming.  And so,

18  I want to say that he was already handcuffed, but I can't

19  sure.  It's not that clear to me.

20  Q.  And to be clear, it was Officer Garrido who

21  screaming?

22  A.  That's what I understand.  He is, yes.

23  Q.  And it was so loud that it was actually humorous to

24  the officers who were there after the fact when they

25  discussed it?

72

1      MR. REYNOLDS:  Objection, form.

2  A.  It was brought up.

3  Q.  Well, I know how guys will be guys.  But the

4  reality is there was some joking about his howling, his

5  screaming in that event, later; yes?

6      MR. REYNOLDS:  Objection, form.

7  A.  Yes.

8  Q.  But at that point, so that we're clear, he had

9  locked the cuff caught his finger, right?

10  A.  I can't tell you for certain that it's at that

11  point, because I don't know exactly what they were doing.  I

12  simply believed that that's when.

13  Q.  Okay.

14  A.  But I don't know, I can't tell you that I saw for

15  certain, his finger in it.  I don't know.

16     There was a heightened alert of what was going on.

17  My attention quickly became, you know, hey, what's going on

18  right now.  And I didn't really get a good look at what was

19  going on so much as let me try to be helpful.

20  Q.  Isn't it true that at that moment, when an officer

21  now is screaming in excruciating pain, that the other

22  officers there became more aggressive with Mr. Eimers?

23     MR. BURKE:  Object to form.

24     MR. REYNOLDS:  Objection, form.

25  A.  Oh, I can't, I can't testify to that.

18  (Pages 69 to 72)

73

1　Q.　To pin him to the ground?
2　MR. REYNOLDS: Objection, form.
3　BY MR. MCKEE:
4　Q.　To stop his feet from moving?
5　MR. REYNOLDS: Objection, form.
6　A.　I can't -- I can't know what -- how that affected
7　them.
8　Q.　Well, you know what you were doing, right?
9　A.　I wanted to be more helpful.
10　Q.　You were grabbing his legs, right?
11　A.　Yes.
12　Q.　To help pin him, right?
13　A.　Well, just to help facilitate the restraint device
14　so we could move beyond that.
15　Q.　What restraint device?
16　A.　Handcuffs.
17　Q.　Well, you say devices in your report. Were there
18　more than one device?
19　A.　Do you know where in my report?
20　Q.　Yeah. Let me find it for you. I know I saw it
21　here somewhere. Let me find it. As I read this, I can't
22　find it.
23　　Is it your testimony that the only device used for
24　restraint was handcuffs?
25　A.　Yes.

74

1　Q.　There was nothing for his legs?
2　A.　I never saw a hobble.
3　Q.　And you were at his legs?
4　A.　Yes. Well, momentarily. I was quickly relieved by
5　Officer Galbo who had gloves on.
6　Q.　So if an officer, in his report or his testimony,
7　has said that they used a hobble, is that false?
8　MR. REYNOLDS: Objection, form.
9　A.　I just can't testify to its use. I didn't see it
10　and I had -- did not participate in putting a hobble on.
11　Q.　Is a hobble used when someone's particularly
12　unruly?
13　A.　The times that I have seen people hobbled is, in
14　fact, only when they're in the process of being transported
15　and generally, they turn themselves in a car and they really
16　kick out windows and destroy cages. That's when I've seen
17　hobbles used.
18　Q.　So it would have been even inappropriate to be
19　using a hobble on Mr. Eimers in the way -- if it was used at
20　this beach site?
21　MR. BURKE: Object to form.
22　MR. REYNOLDS: Objection, form.
23　A.　I didn't see one used.
24　Q.　Okay. So your testimony is one was not used?
25　A.　Not in my presence, I never saw one there.

75

1　Q.　During the time that you're there with Mr. Eimers
2　with his legs, with any part of that activity, that scene,
3　did you personally monitor his physical condition?
4　A.　Yes.
5　Q.　What did you do?
6　A.　Shortly after I was relieved, and I was only with
7　Eimers' foot for seconds, moments, I walked back around
8　towards where -- on the other side of him and I started
9　noticing that he was turning blue. But the minute that my
10　brain recognizes what I see, Sergeant Zamora had already --
11　was already yelling, get the cuffs off of him, get the cuffs
12　off of him.
13　　And then, something came out about getting an
14　ambulance and then COM-1 said they wanted updates. And I
15　just told them to get an ambulance as quick as possible.
16　　But I did see, observe that he was getting blue. I
17　walked from where his feet were along the east side and
18　towards where his head was, and then I noticed that he was
19　turning blue.
20　Q.　Were you ever trained why someone turns blue?
21　A.　I don't know that I was specifically trained, but I
22　would gather that over my life, I've known that's from oxygen
23　deprivation.
24　Q.　Have you ever been trained in choke holds?
25　A.　I used to wrestle in high school and I have done,

76

1　you know, different -- you know, I was in the military and I
2　did some other things, so I have been trained to do those
3　kinds of things as applies to the sport.
4　Q.　And you've been trained that in an athletic
5　endeavor, a way to stop it is to tap out?
6　A.　Yes.
7　Q.　Because what happens if you're not fast enough in
8　tapping out?
9　A.　You could black out.
10　MR. REYNOLDS: Objection, form.
11　Q.　Like that, right?
12　A.　Yes.
13　Q.　Seconds? Maybe even less than seconds, right?
14　MR. REYNOLDS: Objection, form.
15　BY MR. MCKEE:
16　Q.　With certain holds?
17　A.　Conditional, based on the health of the person, a
18　lot of things. I don't know.
19　Q.　But that doesn't turn you blue, does it?
20　A.　Again, it's conditional. I don't know about the
21　health of the person. I can't speak to that like --
22　Q.　But the kind of --
23　A.　I've seen, I've seen healthy -- we've done training
24　where we do like, round robins where you get gassed and you
25　go in and you roll with somebody, basically you wrestle with

19 (Pages 73 to 76)

77

1  somebody, and they give you constant, you know, attention so
2  that you have to be fighting then until you get gassed, and
3  I've watched people turn blue just from -- and not even
4  having restricted, I've watched people turn blue just from --
5  just from effort.
6      Q.  And with that compression of his diaphragm, the
7  adrenalin of the moment, the pressure from body weight, all
8  of that, based on your training and your own personal
9  experience, that can cause one to start losing the
10  oxygenation to the brain?
11     MR. REYNOLDS:  Objection, form.
12     MR. BURKE:  Object to form.
13 BY MR. MCKEE:
14     Q.  Right?
15     A.  I'm sorry, what exactly are you asking?
16     Q.  Have you been trained, either through the
17 department, the military, or through your own life
18 experiences, that that kind of activity, compression of the
19 torso, especially in a face-down position on a beach with
20 sand, where there might be inhalable particles, that all can
21 contribute, at the Eimers scene, to him turning blue?
22     MR. REYNOLDS:  Objection, form.
23     A.  I've been trained to recognize that turning blue
24 isn't good, but given all of the possible things that can
25 make a person turn blue and considering those, the ones that

78

1  you've mentioned, in training, I can't say that I've been
2  trained specifically to look for those, but to identify that
3  somebody turning blue is in need of help.
4      Q.  And have you been trained medically, scientifically
5  or otherwise that when you have a lack of oxygen, it can
6  actually affect your heart function?
7      MR. REYNOLDS:  Objection, form.
8      A.  I would imagine, but I've not been trained
9  medically or scientific or like any of those things that you
10 mentioned.
11     Q.  Well, what I'm getting at is when you're doing
12 prone restraints where the risk of partial or total
13 asphyxiation occurs, were you trained that that process is
14 not just that you lose your ability to breath, but it may
15 affect a brain or a heart during the same process?
16     MR. BURKE:  Object to form.
17     MR. REYNOLDS:  Objection, form.
18 BY MR. MCKEE:
19     Q.  Were you ever given that training so that you're
20 aware of that when you're applying these methods of
21 detention?
22     MR. REYNOLDS:  Same objection.
23     A.  I can't say that it's been specifically identified
24 that it -- as it affects the heart.
25     Q.  Are you aware, through whatever you've read since

79

1  the Eimers event, that anoxia can affect the heart and its
2  function?
3      A.  What is the term?
4      Q.  Anoxia, asphyxia, lack of oxygen.
5      MR. REYNOLDS:  Objection, form.
6      MR. BURKE:  Object to form.
7      A.  I would imagine.  Just sitting here being
8  questioned is affecting my heart rate, my blood.  So, yes.
9      Q.  Don't take it out on me, Officer.
10     A.  So, I can't imagine that -- you know, everything
11 does, I would imagine.  But, as far as receiving specific
12 training to that, I can't say that.
13     Q.  And you actually feel that tension right now, don't
14 you?
15     A.  Oh, absolutely.
16     Q.  And the only thing pointing at you right now is me
17 and that camera, right?
18     A.  Well, they say most people -- more people are
19 afraid of speaking in front of large groups than jumping out
20 of planes.
21     Q.  But it can affect you, right?
22     A.  Oh, it's absolutely affecting me.
23     Q.  And I'm ugly and old, compared to what you're
24 normally used to looking at, right?
25     MR. BURKE:  Stipulated.

80

1      MR. MCKEE:  I was hoping he'd say that, but that's
2  okay.  No.  Joking aside.  I'm glad you have a
3  personality.  It's a good thing.
4  BY MR. MCKEE:
5      Q.  When you saw him turn blue, what did you do?
6      A.  I was just getting ready to say, hey, he's turning
7  blue, and then Zamora had already -- was already screaming,
8  get the cuffs off of him.  I don't know if he said he was
9  going unconscious or said something else, but he was like,
10 get the -- and you could hear the panic in his voice.  And
11 everyone just started moving towards doing what they needed
12 to do.  They didn't need me yelling anything else.
13     And then, I tried to make myself available to move
14 cars and get -- making it so ambulances could get as
15 absolutely close to him as they could.
16     Q.  So there was a lot of yelling and discussion right
17 at that time?
18     A.  I know there were like, because he had never gotten
19 moved up, but it looked like they, like, were rolling him
20 over or were doing something.  But he was still, as far as
21 I'm -- as far as I can remember or, you know, with the -- to
22 the ground.  And they were just trying to get the cuffs off
23 of him and I don't know if -- Henry Del Valle was there and I
24 know Gary arrived quickly, and I know Gary was the primary
25 person who was giving him CPR, but I don't know if Henry De

81

1    Valle did as well.
2        Q.  Gary?
3        A.  Celcer, sorry.
4        Q.  Okay.  That's okay.
5            Was he being lifted at the time he was found to be
6    unresponsive or was he still on the ground face down?
7        A.  I thought he was on his side.
8        Q.  On his side.
9        A.  Yes.  And I don't know if he was being rolled or
10   they were attempting to lift him.  I'm not quite sure what
11   was going on as I came around, but it appeared to me that he
12   was on his side, like, his head was still, was looking
13   towards me, only at my feet.
14       Q.  From the time you arrived at the scene to the time
15   you left his feet when they were about to lift him, did you
16   see any officer that was actually monitoring Mr. Eimers'
17   health; breathing, color, so on and so forth, as the other
18   officers were doing the detention activities?
19       MR. REYNOLDS:  Objection, form.
20       A.  I don't.  I wasn't -- I was paying this way, I
21   wasn't looking to see what the officers next to me were
22   doing.  I -- I was looking down at Eimers.
23       Q.  That's fair.  My only point is, you never saw such
24   activity by any other officer, regardless what --
25       A.  I didn't, no.  I didn't see it.  I didn't recognize

82

1    it.  I didn't say, that's what that is, no.
2        Q.  And as part of the training that you receive in
3    prone restraints, is there any guideline that when multiple
4    officers are doing a prone restraint, that one must be
5    assigned to monitor the health condition of the detainee?
6        MR. REYNOLDS:  Objection, form.
7        A.  Generally, one person is doing like an over-watch
8    and that person often becomes the verbal command person.  But
9    being designated to look for signs of weakening health or
10   something like that, I don't know that that's been
11   specifically trained.
12       Q.  Are you aware through your training, through your
13   own reading, through your own investigations, personal,
14   private or professional, that certain other locations,
15   certain other jurisdictions in the United States and other
16   countries, have banned prone restraint as a method for police
17   detention of a suspect?
18       A.  I am not aware of that.
19       Q.  We're trying to find the police officer that told
20   the emergency, the EMT folks, what was put in the EMT report,
21   that the police officers told them that what had happened
22   there was that Eimers left his vehicle, ran, and then
23   collapsed.
24            Do you know of an officer that would have told that
25   to the EMT folks?

83

1        A.  No.
2        Q.  That's not what happened, is it?
3        A.  That's not what I had testified to.
4        MR. REYNOLDS:  Objection, form.
5        Q.  Right.  That would be false if that indeed was told
6    by a police officer to EMT, correct?
7        A.  If that was told, that would not be true.
8        THE VIDEOGRAPHER:  Counsel, can we go off the
9    record?
10       MR. MCKEE:  Yeah.
11       THE VIDEOGRAPHER:  Off the video record at 4:29
12   p.m.
13            (Brief pause.)
14       THE VIDEOGRAPHER:  Back on the video record at 4:34
15   p.m.
16   BY MR. MCKEE:
17       Q.  Now, sir, in our discussions, has it been your
18   intention to have considered what you remember, considered
19   your sources of information and tell the truth about what had
20   happened there at the scene?
21       A.  Yes.
22       Q.  Do you remember giving testimony to the FDLE
23   Special Agent Kathy Smith and Mike Langston on February 20th,
24   2014?
25       A.  I remember that testimony, yes.

84

1        Q.  And was that under oath?
2        A.  Yes.
3        Q.  And it was voluntary?
4        A.  Yes.
5        Q.  It was audio recorded?
6        A.  I believe so.
7        Q.  Isn't it true that after you grabbed control of Mr.
8    Eimers' feet, Officer Galbo relieved you because you weren't
9    wearing gloves?
10       A.  Yes.
11       Q.  And you went to conduct crowd control?
12       A.  I did something.  At some point, I did talk to
13   people in the crowd, but it was extremely brief.  And I don't
14   know if it's before -- I'm not sure when.
15       Q.  I thought you told me you went around --
16       A.  Yes.
17       Q.  -- and noticed my client turning blue.
18       A.  Yes.  I did notice that.  I just, I can't -- from
19   where to where, when I -- the things that are important to
20   remember, I don't remember how I got from one place to
21   another.
22       Q.  Well, why did you tell the FDLE that while you were
23   walking away, it was Sergeant Frank Zamora yelling that the
24   suspect was turning blue?
25       A.  I don't know.

21  (Pages 81 to 84)

85

1  Q. Who was it, you or him?

2  A. I recognized him turning blue. I don't -- I

3  remember looking at him and recognizing that he was turning

4  blue. If that was after he said that and that's how I

5  recalled it right then, and --

6  Q. And it was about one minute from the time Mr.

7  Eimers was being handcuffed until the time he turned blue.

8  Is that what you told the FDLE?

9  A. I don't know if it was a minute. I don't know.

10  They asked me, you know, how much time had passed and I told

11  them that I wasn't sure. And I even made reference to the

12  fact that we have a physical agilities test where we run 200

13  yards, we run here, we go through an obstacle, we drag 150-

14  pound dummy, and I do that in, you know, around two and-a-

15  half minutes or -- so, like what I'm capable of accomplishing

16  in a time, and then what's happening in front of me in an

17  emergency situation where you're like, thinking about things

18  very quickly, I'm not -- but, I may have told them a minute,

19  but I don't know precisely. I know I tried to explain to

20  them in my deposition with them that I can't be clear on how

21  much time was elapsing between each points of memory.

22  Q. When the FDLE was doing its investigation of

23  police, potential police criminal activity, that's what you

24  understood it to be, right?

25  A. Yes.

86

1  Q. And they inquired of you, you told them you never

2  drew your weapon, didn't you?

3  A. Yeah. As it relates to Charles Eimers and dealing

4  with him, I had never had my weapon drawn while I was engaged

5  with him. But I did learn that I had it engaged while I was

6  clearing the car, that I had drawn it during clearing of the

7  car.

8  Q. Did you tell the FDLE folks that actually, you had

9  drawn your weapon?

10  A. I don't -- whatever it says.

11  Q. Well, you know that you told them that you didn't

12  draw your weapon?

13  A. Yeah. In my testimony, I was more or less

14  compartmentalizing it to as it relates to dealing with

15  Charles Eimers as he was on the beach. And I -- I didn't

16  even remember clearing the car at all until I had seen it on

17  video.

18  Q. And you were under oath during all this discussion?

19  A. Yes. And testifying to my memory, which is proving

20  to be not the best.

21  Q. And you knew that Garrido drew his weapon?

22  A. I don't know that Garrido drew his weapon.

23  The only person I know that I saw with a weapon

24  drawn was Officer Del Valle and I, as it pertains to clearing

25  the car, had my weapon drawn. But I didn't have that in my

87

1  report at all. It's just not something that I focused on

2  later on when I was writing about the in-custody death. I

3  focused on how I, you know, what was happening with Eimers

4  and how I was relating what I saw.

5  Q. Yeah, but when you were testifying in this criminal

6  investigation with the police officers, you arrived when Del

7  Valle actually had his rifle pointed at Mr. Eimers, right?

8  A. No.

9  Q. No?

10  A. I don't believe so. I believe he was walking with

11  it down. That's what I remember. But I --

12  Q. Did you see the video?

13  A. I did see the video.

14  Q. He was pointing it right at Eimers' head, wasn't

15  he?

16  MR. BURKE: Object to form.

17  MR. REYNOLDS: Join.

18  A. But, I don't, like, that's not what I -- that's not

19  what I saw. But I saw in the video. And, again, here we go.

20  Q. And you were on the scene in that video, right?

21  A. At some point, in the scene, yes, I was clearing

22  the car.

23  Q. You were in that scene when he was actually

24  pointing the rifle at Mr. Eimers, right?

25  A. But I didn't see that.

88

1  Q. And so, of course, you told the police,

2  investigators from the FDLE that Officer Del Valle had an

3  AR15 slung over his back? That's what you told them in his

4  police investigation of misconduct or possible criminal

5  activity?

6  A. Well, he had one slung.

7  MR. BURKE: Object to form.

8  MR. REYNOLDS: Join.

9  THE WITNESS: But I would -- it was around his

10  back, but he had one slung like, at the low ready, is

11  how I -- how I see it.

12  Q. So you're saying that when you told them that

13  Officer Del Valle had an AR15 slung over his back, that that

14  meant to you that the sling was over his back, but the rifle

15  was pointed on Mr. Eimers? Is that what you're saying that

16  you meant by that?

17  A. I just remember seeing him with an AR15 and it was

18  in his hands, but it was not pointed at him. I remember

19  seeing him walking.

20  If there was a moment where I walked by and he was

21  doing something, I don't remember that. That's not what I

22  have in my memory.

23  Q. What you're really telling them, in an effort to

24  diffuse the situation, that no officer was using a gun or a

25  rifle in a way that would have threatened Mr. Eimers.

WWW.USLEGALSUPPORT.COM
1-888-311-4240

89

1    MR. BURKE:  Object to form.
2  BY MR. MCKEE:
3    Q.  Isn't that what you're really to imply?
4    A.  I didn't see -- I just don't have a strong visual
5  memory or image of anyone using weapons to interact with
6  Eimers.  I -- I don't.  I don't.  Me, personally, I used one
7  to clear a car.  And then, I went, dealt with his feet.  I
8  don't have a memory of that, no.
9    Q.  But you already saw the video by then, didn't you?
10   A.  Yeah.  Now it's trying to differentiate between
11  what I saw that day, that morning, and then what I saw on
12  videos.  I -- I'm trying my best.
13   Q.  And then, you testified to the police investigating
14  agency, FDLE, after you saw the video.  You saw it before
15  that testimony, right?
16   MR. BURKE:  Saw the video?
17   MR. MCKEE:  Yeah.
18   A.  Yes.
19   Q.  Before February.  And in it, you see Garrido with
20  his handgun drawn.  You see you with your handgun drawn.  And
21  you see Del Valle with his rifle pointed.  You saw all that
22  before that testimony with the FDLE, right?
23   MR. BURKE:  Object to form.
24   A.  I didn't study it like maybe you have.  I briefly
25  saw it on somebody's phone and I was more or less paying

90

1  attention to what I believed to be me.
2    Q.  Well, you recognize that your liberty was
3  potentially at stake in that investigation, right?
4    A.  I'm sorry?
5    Q.  If you were criminally prosecuted, your --
6    A.  I never felt, I never felt like I did anything
7  wrong at any point.
8    Q.  That's not my question.
9    A.  So, no, I never felt like my liberty was at stake.
10   Q.  Okay.  And so, you just told, decided to tell them
11  that there was no weaponry involved in pointing at and
12  threatening Mr. --
13   A.  That I observed.
14   Q.  Let me finish the question.
15    No weaponry pointed at my client?
16   A.  That I observed.  I don't have any memory of that.
17  I cannot recall anything of weapons being pointed at him, no.
18   Q.  Do you have a relatively good memory?
19   A.  Generally, I like to think that I do.
20   Q.  But before February 20th, 2014, how long was it
21  before that you saw the video of the events.  It's only a
22  couple minutes.  It's a minute and-a-half long.  When did you
23  see it?
24   A.  I don't remember when.  I saw it on somebody else's
25  phone.

91

1    Q.  Do you know whether stress affects your memory,
2  yours --
3    A.  I believe it does, absolutely.
4    Q.  Do you feel that there's some things that you told
5  the FDLE that actually weren't accurate?
6    MR. BURKE:  Object to form.
7    A.  I'm finding that there are things I put on here
8  that aren't accurate, that there are things that I'm telling
9  you now that may or may not be accurate.  I'm doing the best
10  I can to tell you what I remember a year ago.  And some of it
11  has been changed by what I've heard other people say.  Some
12  of it's been changed by what I've seen, what I seen in the
13  grand jury where they had -- yes, my memory is affect -- you
14  know, is subject to -- I think they say testimonial evidence
15  is recalling your memory.  I --
16   Q.  And would you agree that based on how you know
17  yourself, and know there are certain things that make me lose
18  a recollection of things, too.  So I know what you're saying.
19    As far as what you reported happened at the Eimers
20  scene, there may be material parts that are not accurate?
21   MR. BURKE:  Object to the form of the question.
22   MR. REYNOLDS:  Join.
23  BY MR. MCKEE:
24   Q.  Right?
25   A.  I'm not sure I understand what you mean.

92

1    Q.  Are there facts about what happened that you either
2  withheld from talking about or misstated what actually
3  happened, based on what you now know, what we've reviewed,
4  what you've seen?
5    MR. BURKE:  You're referring to his report, his
6  incident report?
7    MR. MCKEE:  Everything about this from A to Z, now.
8    MR. BURKE:  Object to the form.
9    MR. REYNOLDS:  Join.
10   A.  I -- it's the best I can -- I can recall.  It's the
11  best I got.  It's the best I can recall.
12   Q.  Well, let's put it this way very bluntly, sir.  It
13  was Frank Zamora who found him blue, not you.
14   A.  I remember seeing him blue.  If he found him blue,
15  okay, but I remember seeing him blue.
16   Q.  You did take your weapons from your holster?
17   A.  To clear the car, yes.
18   Q.  You took your weapon from your holster at that
19  scene.
20   A.  Yes, to clear the car.  But at that point, I had
21  not engaged myself in any of the interactions that were
22  taking place between officers and Charles Eimers.
23   Q.  You told the FDLE investigator on oath, under oath,
24  that you never took any weapons out of your holster.
25   A.  Yeah, that -- I believe that's what I had said.

23   (Pages 89 to 92)

93

1      Q.  And rather than telling the FDLE that Officer Del
2  Valle had his AR15 pointed directly at Mr. Eimers, you say he
3  had it slung over his back.
4      A.  Well, I'm still not telling you he had it pointed
5  at them.  I'm just saying that he had it in his hands.  I
6  have an image of him walking behind where it looked like he
7  was going to secure it.
8      Q.  You saw it on the video that he was pointing.
9      A.  That may be true.  My memory may be affected by
10  what I've seen and what I've heard.  That's possible.
11      MR. REYNOLDS:  Objection, form.
12      Q.  And then, Mr. Eimers was in a hospital gown, right?
13      A.  I think you mean it was something that looked like
14  it came from a hospital like scrubs or something like,
15  similar like that.
16      Q.  So every one of those police officers when they
17  first encountered him, encountered somebody who might have
18  been just out of the hospital, right?
19      MR. BURKE:  Object to form.
20      MR. REYNOLDS:  Join.
21  BY MR. MCKEE:
22      Q.  That was visible to them all, right?
23      MR. REYNOLDS:  Objection, form.
24      A.  Yes.
25      Q.  Okay.  And then, were you there when the EMT

94

1  arrived?
2      A.  I was moving cars.  I remember when they, when they
3  started.  The fire truck arrived first, and I only remember
4  that because Andy Harris was the first -- because I know him,
5  that I saw him performing CPR and he was from a fire engine.
6  And then, an ambulance arrived and I don't know exactly where
7  I was and what I was doing when he went from fire engine
8  people to ambulance people.
9      Q.  Which police officers first started CPR matters
10  with Mr. Eimers?
11      A.  I believe it's Henry Del Valle and Gary Celcer.
12      Q.  Did you see them performing it?
13      A.  I saw them, yes.
14      Q.  Did you see anyone clear Mr. Eimers' airway first?
15      A.  I did not see specifically that, no.
16      Q.  Did you ever see them clear his airway?
17      A.  I remember them using the thing that goes over the
18  mouth with the bag and doing chest compressions.
19      Q.  Oh, my gosh.  So they were actually pushing air
20  into him rather than trying to --
21      A.  I believe --
22      Q.  -- extract things --
23      A.  I believe so, yes.
24      Q.  -- first?
25      A.  Well, I don't know if they extracted or not.  You

95

1  would have to ask them.
2      Q.  You never saw that happen?
3      A.  I don't have a memory of seeing that.
4      Q.  And then, how long does it take to drive from south
5  -- Southernmost Beach to the hospital where they were taking
6  him, ordinarily?
7      A.  On a Thanksgiving morning traffic might take 10 or
8  15 minutes.
9      Q.  It shouldn't take 22 minutes, should it?
10      MR. BURKE:  Object to form.
11      A.  A lot of times, they'll put them in the car and
12  they'll work on them in the car and they'll do different
13  things.  In the bus, I guess as they say.  I don't know.  So
14  I don't know how long they were actually on scene and I don't
15  know anything about the timing of when the arrived and when
16  they departed and when they arrived at the next location, how
17  that's reported.  I don't.
18      Q.  Should transport time actually take 22 minutes to
19  go from that location to the hospital?
20      MR. BURKE:  Object to form.
21      A.  I don't know that it did.
22      Q.  Well, assuming we have a report that says that,
23  should it take that long?
24      MR. BURKE:  Object to form.
25      MR. REYNOLDS:  Objection, form.

96

1      A.  No, I don't think so.
2      Q.  Do you know whether any police officer asked them
3  not to go very fast?
4      MR. REYNOLDS:  Objection, form.
5      A.  No, I don't.  I don't know of that.
6      Q.  Do you know where his body was first brought?
7      A.  No.
8      Q.  In an in-custody death, who should get that body
9  first?
10      MR. BURKE:  Object to form.
11  BY MR. MCKEE:
12      Q.  Under police rules, regulations and law?
13      A.  There would -- my understanding that when he left,
14  that he was not declared dead by anybody.  And it had been a
15  while after he had been at the hospital.  So, and I didn't
16  even know what the -- I don't have any idea what the time
17  limit was, just that he wasn't dead that day, I don't even
18  believe.
19      Q.  That wasn't my question.
20      In an in-custody death, who's supposed to get the
21  body first, a crematorium or the medical examiner?
22      MR. BURKE:  Object to form.
23      A.  I don't know.
24      Q.  You don't know?
25      A.  I don't know.

24  (Pages 93 to 96)

97

1   Q.  Do you know whether it was Key West police that had
2   him delivered to a funeral parlor for cremation?
3       MR. BURKE:  Object to form.
4   A.  I don't know that.
5   Q.  Are you aware that the EMT folks were 15 minutes on
6   the scene and 22 minutes en route?
7   A.  No.
8   Q.  Does that sound like a long time to be en route?
9       MR. REYNOLDS:  Objection, form.
10  A.  I don't know.  They would be evaluating his, the
11  patient's stability and determining that on themselves.
12  Q.  When EMTs showed up, did their work -- and this may
13  be entirely false, I don't know, but I'm going to ask the
14  question because a witness told us this -- was Mr. Eimers put
15  in a white van instead of an ambulance?
16  A.  No.  I don't remember seeing a white van.  I
17  remember seeing, we have an Ambucare white and blue
18  ambulance.  I remember, that's -- that's what I have a memory
19  of.  A white and blue ambulance, Ambucare.
20  Q.  And it wasn't one of those big red ones, it was
21  that white and blue vehicle?
22  A.  Yes.  That's how I remember.
23  Q.  Okay.  That makes sense.  Okay.
24      When you were at the scene with Mr. Eimers, was he
25  bleeding?

98

1   A.  Not that I -- I didn't see any obvious signs of
2   like, bleeding.
3   Q.  Did you see anything bleeding from his ear?
4   A.  No.
5   Q.  Did you look?
6   A.  No.
7   Q.  Did you notice he had some gold earrings that had
8   feathers?
9   A.  No.
10  Q.  Do you know where those went?
11  A.  No.
12  Q.  Do you know an Officer Stevenson?
13  A.  Officer Stevens.
14  Q.  Stevens, excuse me.
15  A.  Yes.
16  Q.  Are you aware that he went to the hospital to take
17  pictures of Mr. Eimers?
18  A.  I'm aware that he showed up to do an investigation.
19  I don't know exactly what he was doing.
20  Q.  Did you examine Mr. Eimers' body before he left the
21  scene such as you would have looked in his nostrils or in his
22  mouth?
23  A.  Are you asking if I did that?
24  Q.  Yes.
25  A.  I did not.

99

1   Q.  Would it be accurate to state that in performing
2   CPR and EMT functions, that it's likely, if they are doing it
3   right, that they would have been clearing sand from him if it
4   was there in his nose and in his mouth?
5       MR. BURKE:  Object to form.
6       MR. REYNOLDS:  Join.
7   A.  If sand was there, I would imagine that they would
8   clear it.
9   Q.  Okay.  And so, when he got to the hospital, if he
10  still has sand in his nose, he probably even had more at the
11  scene?
12      MR. BURKE:  Object to form.
13  A.  I don't know.
14      MR. REYNOLDS:  Join.
15  Q.  Do you know who ripped the earring out of Mr.
16  Eimers' ear?
17  A.  No.
18  Q.  Do you know who stole his earring?
19      MR. BURKE:  Object to form.
20      MR. REYNOLDS:  Join.
21  A.  No.
22  Q.  Do you know how it disappeared during the
23  photographing session of Officer Stevens?
24  A.  No.
25      MR. BURKE:  Object to form.

100

1       MR. REYNOLDS:  Join.
2       MR. MCKEE:  I don't have anything else, sir.  Thank
3   you for your time.
4       MR. REYNOLDS:  No questions.
5       MR. BURKE:  No questions at this time --
6       MR. MCKEE:  Hold on one second.
7       MR. BURKE:  I'm sorry.
8       MR. MCKEE:  I forgot to look at co-counsel here.
9   BY MR. MCKEE:
10  Q.  Do you know how far it is from Southernmost to the
11  hospital?
12  A.  I'm told it's a two-by-four island.  I would
13  guesstimate that from -- that's pretty near, as far away as
14  you can get.  It might be around four and-a-half, five miles,
15  with turns and stuff like that, and then you've got to go
16  another probably mile and-a-half.  Six or seven miles, maybe
17  eight at the most.  I don't know.  Depending on the route.
18  Q.  Depending on the route.
19      You would expect it to be the shortest, least-
20  congested route if they have someone who may be on the verge
21  of dying, right?
22      MR. BURKE:  Object to form.
23      MR. REYNOLDS:  Join.
24  A.  They also might take the smoothest if -- depending
25  on the person's condition.  I don't know.  I have no idea

25 (Pages 97 to 100)

101

1   what -- how medical -- I have no idea how they're trained.

2       Q.  Does Key West Police Department ever give an escort

3   to an ambulance?

4       A.  I have never participated in an escort.

5       MR. MCKEE:  Okay.  I don't have anything else.

6   Thank you.

7       MR. BURKE:  No questions at this time.  The witness

8   will read and we'll take a copy if it's ordered.

9       MR. MCKEE:  Very good.

10      THE VIDEOGRAPHER:  Off the video record at 4:54

11  p.m.

12      (The deposition was concluded at 4:54 p.m.)

---

102

CERTIFICATE OF OATH

STATE OF FLORIDA )

COUNTY OF MONROE )

I, Suzanne F. Ex, Certified Verbatim Reporter, Florida Professional Reporter, Notary Public, State of Florida, certify that THADDEUS CALVERT personally appeared before me on the 5th day of November, 2014, and was duly sworn.

Signed this 11th day of November, 2014.

_____

Suzanne F. Ex, CVR-M, FPR
Notary Public, State of Florida
Commission No.:  FF015913
Commission Expires:  July 27, 2017

---

103

CERTIFICATE OF REPORTER

STATE OF FLORIDA )

COUNTY OF MONROE )

I, Suzanne Ex, Certified Verbatim Reporter and Florida Professional Reporter, certify that I was authorized to and did report the deposition of THADDEUS CALVERT, pages through 101; that the review of the transcript was requested; and that the transcript is a true record.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 11th day of November, 2014.

_____

Suzanne Ex, CVR-M, FPR
Certified Verbatim Reporter-Master
Florida Professional Reporter

---

104

WITNESS NOTIFICATION LETTER

November 12, 2014

Thaddeus Calvert
c/o Michael T. Burke, Esquire
Johnson Anselmo Murdoch Burke Piper & Hochman, P.A.
2488 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida  33304

RE:  Treavor Eimers vs. City of Key West, et al.
      Deposition Taken November 5, 2014
      U.S. Legal Support Job No. 1186143

The transcript of the above-referenced proceeding has been prepared and is being provided to your office for review by the witness.

We respectfully request that the witness complete their review within 30 days and return the errata sheet to our office.

Sincerely,

_____

Suzanne F. Ex
U.S. Legal Support, Inc.
One Southeast Third Avenue, Suite 1250
Miami, Florida  33131
(305) 373-8404

CC via transcript:

David W. Brill, Esquire
Jeannete C. Lewis, Esquire
Robert J. McKee, Esquire
David Paul Horan, Esquire
Darren M. Horan, Esquire
Lyman H. Reynolds, Jr., Esquire

26  (Pages 101 to 104)

105

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT ~ ENTER CHANGES ON THIS PAGE

IN RE:  Treavor Eimers vs. City of Key West, et al.
        Thaddeus Calvert
        November 5, 2014

| Page No. | Line No. | Change | Reason |
|----------|----------|--------|--------|
|          |          |        |        |

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

_____
Date        Thaddeus Calvert

27 (Page 105)

**A**

**ability** 78:14
**able** 12:19 31:17
**above-referenced** 104:10
**absolutely** 9:19 21:1 46:7,8 79:15,22 80:15 91:3
**academy** 52:8
**accepted** 9:4 52:20 60:5
**accomplish** 58:4
**accomplishing** 85:15
**accurate** 91:5,8,9 91:20 99:1
**acquired** 16:14
**action** 35:14 56:22 103:15,16
**actions** 55:11 65:24
**activate** 40:12,17
**activated** 13:16,19 13:22 14:2 37:14 39:17 40:24 41:22 42:2
**activities** 32:11 32:13 41:10 51:1 81:18
**activity** 75:2 77:18 81:24 85:23 88:5
**actual** 63:24
**address** 5:10
**administrator** 12:25
**admits** 40:16 42:12
**admitting** 46:8
**adrenalin** 66:20 77:7
**adversarial** 8:20
**adverse** 53:12 54:22
**advice** 23:23
**advised** 24:14 31:3
**affect** 78:6,15 79:1,21 91:13
**affirm** 4:24
**afraid** 79:19
**afternoon** 4:5 5:9
**age** 52:25
**agency** 89:14
**Agent** 83:23
**aggravate** 64:4
**aggressive** 72:22
**agilities** 85:12

**ago** 7:4 68:13 91:10
**agree** 10:15 18:12 51:5 53:3 58:5,7 69:17 91:16
**Ah** 36:22
**ahead** 43:21
**air** 94:19
**airway** 94:14,16
**al** 1:8 4:10 104:7 105:4
**alert** 72:16
**Alex** 25:1
**allow** 57:5
**alter** 44:5
**alters** 44:3
**Ambucare** 97:17,19
**ambulance** 18:20,24 75:14,15 94:6,8 97:15,18,19 101:3
**ambulances** 80:14
**and-a** 85:14
**and-a-half** 90:22 100:14,16
**Andy** 18:21,23 94:4
**angry** 33:19 66:19
**annual** 52:7
**annually** 58:17
**anoxia** 79:1,4
**Anselmo** 2:11 104:5
**answer** 12:19,19 24:19 31:14,22 32:2 34:17 54:14 63:15 65:12 66:6
**answered** 14:1 34:7
**answering** 5:22 29:5
**answers** 29:16 56:9
**anybody** 40:1 96:14
**anytime** 53:9 59:3
**appalled** 19:13
**appearance** 4:15 54:9
**APPEARANCES** 2:1
**appeared** 43:19 81:11 102:8
**appears** 17:10
**applies** 76:3
**apply** 51:16
**applying** 65:17 78:20
**approached** 64:9
**approaching** 37:20
**AR15** 88:3,13,17 93:2
**area** 46:25 56:5

**Ariana** 6:13
**arm** 51:19 53:3 57:21 58:13 59:11,19 62:8 65:16 67:8
**arms** 70:2,18
**arrest** 54:23 55:11 56:11,23 69:13
**arrested** 68:11
**arresting** 43:20
**arrive** 49:2
**arrived** 49:3,4 50:20 80:24 81:14 87:6 94:1 94:3,6 95:15,16
**arthritic** 52:14
**aside** 80:2
**asked** 8:20 12:12 12:14 17:17 26:6 29:4 54:7,18 57:4 85:10 96:2
**asking** 23:21,23 33:13 54:15 59:12,16,16 64:13 77:15 98:23
**asphyxia** 79:4
**asphyxiation** 78:13
**assigned** 11:23 82:5
**assist** 67:24
**assisted** 49:19
**assume** 17:10 68:1
**assuming** 22:6 42:7 95:22
**athletic** 76:4
**attempting** 81:10
**attention** 17:1 47:7,10,15 49:6 49:7,8,13,17 50:14 60:15 67:13,16,17 71:9 71:12,16 72:17 77:1 90:1
**attorney** 24:14 103:13
**attorneys** 103:14
**audio** 14:1 42:9 64:20 84:5
**audio-video** 13:16
**audiovisual** 16:14
**authorized** 103:7
**available** 9:15 20:22 21:6,7 27:17 80:13
**Avenue** 104:18
**avoid** 55:16 60:18

68:21,22,23
**aware** 10:11 12:24 13:1,2,4,5,7,8 13:10,15,19 14:12,16 15:2 17:16,20 22:2,4 40:1,6,14,16,21 40:25 51:13,15 57:3 60:7 71:5,6 78:20,25 82:12 82:18 97:5 98:16 98:18
**Axelrod** 25:2,3

**B**

**back** 14:22 17:18 20:13 30:16 41:3 43:11 47:6,16 49:15,15,16,17 49:19 50:17,22 51:19 52:2 53:3 57:4,10,12,15 58:13,20 59:12 59:17 60:2 61:15 61:15 62:8,16,22 62:25 63:4 64:18 68:11 70:18 75:7 83:14 88:3,10,13 88:14 93:3
**backwards** 66:9
**bag** 94:18
**banned** 82:16
**based** 50:20 76:17 77:8 91:16 92:3
**basically** 76:25
**bathroom** 37:13
**beach** 2:17 11:19 16:7,9 18:18 43:12 46:25,25 48:10 67:9,10 68:8,10,13,20 69:4,6 74:20 77:19 86:15 95:5
**bearing** 57:11
**beat** 63:11
**BEDARD** 2:16
**began** 8:17
**behalf** 2:2,11,15 4:21 9:17 16:15 59:4
**beheading** 15:18
**believe** 5:22 6:25 7:1,11 9:18 16:8 16:17 17:3 18:7 21:20 22:21 25:1 26:17 30:16 38:7 45:6 47:17 50:9

67:14 84:6 87:10
87:10 91:3 92:25
94:11,21,23
96:18
**believed** 72:12
90:1
**bellowing** 70:17
**bend** 51:19 52:19
67:20
**bending** 53:4 66:9
67:21
**bends** 51:25
**bent** 51:21 52:1,3
**berserk** 70:19
**best** 12:20 86:20
89:12 91:9 92:10
92:11,11
**better** 46:4 59:4
**beyond** 73:14
**big** 45:21 97:20
**bit** 8:17 11:10
**black** 76:9
**bleeding** 97:25
98:2,3
**block** 49:14
**blood** 79:8
**blue** 75:9,16,19,20
76:19 77:3,4,21
77:23,25 78:3
80:5,7 84:17,24
85:2,4,7 92:13
92:14,14,15
97:17,19,21
**bluntly** 92:12
**Bob** 34:12
**body** 11:21 13:5
43:9 56:2,16,22
63:16 67:19,21
67:22 68:21
69:10 77:7 96:6
96:8,21 98:20
**bomb** 14:17
**Boulevard** 2:7,12
5:12 104:5
**brain** 47:20 75:10
77:10 78:15
**breath** 78:14
**breathing** 68:2
81:17
**brief** 83:13 84:13
**briefing** 36:8
**briefly** 18:16
89:24
**Brill** 104:22
**bring** 12:20
**Brook** 6:13
**brought** 9:10,10

35:14 72:2 96:6
**Building** 2:16
**bunch** 30:9 31:6
**Burke** 2:11,14 4:19
4:19 7:23 8:4,6
8:8,21 10:8,17
11:17 12:4,7,11
12:17 14:19
17:21 18:8 19:1
19:19,25 20:9
22:9 24:6,8,16
24:18,23 25:2,4
25:10,12,18,20
26:5 27:25 28:22
29:1,6,16 31:12
31:14,19,21,24
32:6 33:14 34:7
34:11,15,18,21
34:25 35:22,24
37:1 39:2,11,20
40:4,20 41:7,24
43:21 45:3 48:18
49:11,23 52:5
53:8,18 54:10,20
54:25 55:3 57:1
57:6 58:25 59:14
59:22 60:19 61:6
62:9,18 63:13,20
64:1,23 65:4,10
66:22 67:11 69:2
69:8,15 70:22
72:23 74:21
77:12 78:16 79:6
79:25 87:16 88:7
89:1,16,23 91:6
91:21 92:5,8
93:19 95:10,20
95:24 96:10,22
97:3 99:5,12,19
99:25 100:5,7,22
101:7 104:4,5
**burke@jambg.com**
2:13
**bury** 19:6
**bus** 95:13

—————————————
**C**
—————————————
**C** 104:23
**C-101** 2:16
**c/o** 104:4
**cages** 74:16
**call** 22:15 36:11
36:13 37:14
51:18
**called** 62:1
**calls** 39:5
**Calvert** 1:13 3:2

4:9,20 5:4,11
6:9,13 19:2
46:16 102:8
103:8 104:4
105:4,25
**Calvert's** 3:12
**cam** 36:7,16 38:12
39:8,16,25 40:3
**camera** 79:17
**cams** 36:20 37:5
38:9 39:1
**capable** 85:15
**capacity** 19:21
**captain** 25:24
**car** 31:5 45:23,23
47:10,25 48:3,10
48:11 49:8,13,16
49:18,25 50:14
50:16,23 51:7
61:11,14 71:13
71:17 74:15 86:6
86:7,16,25 87:22
89:7 92:17,20
95:11,12
**care** 11:16 34:19
**cared** 8:12
**career** 69:14
**caring** 7:3
**cars** 18:19 37:15
37:17 47:6 80:14
94:2
**case** 1:3 4:9,11
6:10 9:9,25 10:3
10:4,5 20:11
23:6 26:18 36:19
36:19
**case-by** 20:10
**case-by-case** 20:15
20:20
**catchup** 30:13
**caught** 72:9
**cause** 4:3,25 53:12
54:22 68:23 77:9
**caused** 44:25 49:9
**CC** 104:21
**Celcer** 18:22 81:3
94:11
**cell** 15:17
**center** 48:10
**certain** 53:22
71:13 72:10,15
76:16 82:14,15
91:17
**certainly** 53:1
59:16
**Certificate** 3:6,6
102:1 103:1

**Certified** 1:24 4:1
102:6 103:6,22
**certify** 102:8
103:7,12
**change** 44:25 51:1
105:7
**changed** 42:5 45:5
91:11,12
**changes** 52:14
105:2
**charge** 60:21
**charged** 8:18
**Charles** 1:5 6:15
6:24 7:3 9:18
11:1,7,13 45:25
47:21 86:3,15
92:22
**chase** 35:3
**checking** 47:12
49:25
**chest** 67:23 68:17
94:18
**chief** 25:16
**choke** 75:24
**choking** 68:24
**circumstances**
28:14
**City** 1:8 4:10,19
5:14 104:7 105:4
**CIV** 4:10
**civil** 6:2 10:4
35:12
**claim** 8:11
**clear** 38:24 42:6
46:12 48:20
71:19,20 72:8
85:20 89:7 92:17
92:20 94:14,16
99:8
**clearing** 45:22,23
49:18 50:15 86:6
86:6,16,24 87:21
99:3
**clearly** 44:7 45:22
**client** 84:17 90:15
**close** 9:5 17:1
18:20 26:23 28:4
38:2 60:21,23
61:22,23 67:15
80:15
**closer** 17:11 44:4
**co-counsel** 100:8
**collapsed** 82:23
**Collect** 20:4
**color** 81:17
**Columbia** 2:16
**Columbian** 15:17,21

16:2
**COM-1** 75:14
**come** 9:10 20:13
  49:16
**comes** 40:1
**command** 57:9 61:22
  64:20,22 82:8
**commands** 57:23,24
  58:2,3,22 59:17
  60:5,8,8,16,18
  60:23,24,25 61:5
  61:19 62:12,13
  64:17 65:23,24
  66:1
**commentary** 10:23
  10:24
**Commission** 102:15
  102:16
**common** 25:24 36:17
**commonly** 58:10
**communicate** 63:5
**communicating** 59:2
**communications**
  10:12
**compared** 79:23
**compartmentali...**
  86:14
**compatibility** 30:6
**complete** 22:23
  104:12
**completely** 46:14
**compliance** 53:21
  54:3,18 65:13
**compliant** 5:18
  47:2 50:21 54:6
  54:7 59:13 62:6
  63:25 67:9
**compliantly** 48:7
**complying** 43:19
**compression** 77:6
  77:18
**compressions** 94:18
**computer** 22:22
  27:6 31:1,5
**computers** 30:5,7
**concentrating**
  45:16,17
**concern** 6:21 9:17
**concluded** 101:12
**conclusion** 53:1
**condition** 75:3
  82:5 100:25
**conditional** 76:17
  76:20
**conditions** 52:22
**conduct** 19:13
  28:13 49:9 64:4

65:8 68:21 84:11
**confusion** 60:18
**congested** 100:20
**connected** 103:15
**connection** 34:2
**considered** 83:18
  83:18
**considering** 77:25
**constant** 77:1
**contact** 16:15
**content** 14:12,25
**context** 11:10,11
**continue** 58:3,21
**continued** 18:23
**contrary** 63:23
**contribute** 77:21
**control** 84:7,11
**conversation** 6:18
  6:20 8:15,16
  24:13,24
**conversations** 8:25
  9:1,3,9
**cooperation** 63:7
**cop** 21:12,13,14,15
**copy** 46:22 101:8
**correct** 18:6,11
  23:11 27:18 39:1
  41:6 42:10 48:23
  54:3 61:1 62:8
  83:6
**correctly** 5:22
**correspondence**
  65:24
**counsel** 4:15 83:8
  103:13,15
**countries** 82:16
**COUNTY** 102:4 103:4
**couple** 37:16 90:22
**course** 28:13 31:2
  32:10,15 88:1
**court** 1:1 4:5,11
  4:12,23
**Courthouse** 1:16
  4:7
**cover** 22:8 60:25
**CPR** 18:23,23 80:25
  94:5,9 99:2
**create** 34:4
**creates** 67:21
**cremation** 13:6
  97:2
**crematorium** 12:2
  96:21
**crime** 17:23
**criminal** 10:2,5
  85:23 87:5 88:4
**criminally** 9:11

90:5
**cross** 58:11 61:16
**crowd** 84:11,13
**Cruiser** 37:16
**cuff** 57:12 58:9
  59:25 62:7 64:15
  70:4,5,11,13
  72:9
**cuffed** 70:3,18
**cuffing** 57:4,20
  60:17 70:7
**cuffs** 70:9 71:16
  75:11,11 80:8,22
**currently** 6:6
  11:23
**cursory** 51:7
**cut** 34:10,16 35:3
**CVR-M** 1:23 102:14
  103:21 104:17

———————

**D**

**daily** 32:10,13
  39:5
**dangerous** 47:14
  51:8
**Darren** 2:5 4:17
  104:24
**darren@horan-w...**
  2:5
**dash** 36:7,16,20
  37:5 38:9,12
  39:1,8,16,25
  40:2
**data** 35:11 38:13
  38:16,17 39:17
  40:3
**date** 5:23 27:15
  29:17 30:2 42:24
  105:25
**Dated** 103:18
**daughter** 6:17,18
  7:11,14,17 8:4
  8:11,15,20,24
  9:20 10:13,15,25
  15:24
**daughter's** 6:12
**David** 104:22,24
**day** 7:8 8:2,12
  22:21,22 31:13
  32:15 36:12 43:7
  59:20 62:24
  89:11 96:17
  102:9,11 103:18
**days** 104:13
**de-arrested** 11:13
  12:24
**de-escalate** 58:23

**dead** 7:6 96:14,17
**deal** 12:18
**dealing** 7:8 50:17
  50:18 71:14 86:3
  86:14
**dealt** 89:7
**death** 6:22 11:20
  27:21 39:9 87:2
  96:8,20
**Deceased** 1:5
**decided** 33:1 90:10
**declare** 105:22
**declared** 96:14
**defendant** 2:15
  4:19 6:10
**Defendants** 1:9
  2:11
**defense** 25:13
**defensive** 52:8
**deficient** 62:1
**Del** 2:21 47:4 50:5
  50:6 80:23,25
  86:24 87:6 88:2
  88:13 89:21 93:1
  94:11
**delivered** 97:2
**departed** 95:16
**department** 5:15
  7:9 9:21,24 10:6
  11:24 13:12
  21:21 23:24
  24:12,21 26:7,9
  26:11,13 30:25
  32:14 37:15
  39:19,22,24 43:3
  59:6 62:14 65:9
  77:17 101:2
**depending** 60:4
  100:17,18,24
**deployed** 13:22
**deposed** 14:22
**deposition** 1:13
  3:2 4:1,9 85:20
  101:12 103:8
  104:8
**deprivation** 75:23
**describe** 38:8
**described** 27:18
  50:21
**designated** 82:9
**desktop** 27:6 33:24
**destroy** 27:14 28:9
  74:16
**destroyed** 28:7,15
  29:23
**destroys** 10:6
**detained** 69:6

detainee 70:16,20
82:5
detention 41:10,11
78:21 81:18
82:17
determination
52:25
determine 12:12,13
determining 97:11
device 17:14 32:20
73:13,15,18,23
devices 43:15
48:25 50:19 66:2
67:25 73:17
dialog 62:20,23
diaphragm 77:6
difference 45:9,14
differences 28:20
different 9:1,2
30:9 39:6 45:1
52:21 58:15 76:1
95:12
differentiate
89:10
difficult 52:25
difficulty 50:18
diffuse 88:24
direct 3:3 5:7
10:6 60:24
direction 55:8,9
directly 25:24
93:2
disagreements 8:19
disappear 21:7
disappeared 99:22
discourse 51:1
discovered 18:11
discuss 9:8
discussed 71:25
discussion 7:12
80:16 86:18
discussions 83:17
disrupted 10:5
distance 60:22
District 1:1,1
4:11,11
disturbed 63:18
diverted 71:17
division 1:2 36:4
document 39:23,23
39:24 105:23
documentable 29:15
documented 39:18
documenting 26:22
doing 9:7 29:12
31:8,9,10 35:7,8
40:1 44:7 45:19

47:8 49:6 51:23
58:23 60:17 62:1
70:2,8,10 72:11
73:8 78:11 80:11
80:20 81:18,22
82:4,7 85:22
88:21 91:9 94:7
94:18 98:19 99:2
door 47:12
draft 33:6
drafted 44:18
drag 85:13
draw 86:12
drawn 49:22,25
50:3,4 86:4,6,9
86:24,25 89:20
89:20
drew 86:2,21,22
drive 2:16 27:10
27:19,20 29:23
31:7 95:4
driven 9:8
driver's 47:12
49:15
dropped 14:17
drove 37:15
duly 5:5 102:9
dummy 85:14
duty 6:6
dying 100:21

———————————
**E**
———————————
ear 98:3 99:16
earlier 60:12
earring 99:15,18
earrings 98:7
earshot 13:23
easier 19:5
east 2:12 75:17
104:5
effect 6:23 48:15
62:15,21
effort 25:13 77:5
88:23
eight 100:17
Eimers 1:5,5 4:10
5:20 6:15,19,21
6:24 7:3,21 9:18
11:1,8,13 12:24
13:2 14:18 15:3
16:7 18:24 22:17
23:6 30:21 32:19
36:19 38:3,5
40:7 41:6,11
45:18,25 47:1,2
47:21,25 49:7,10
49:20 50:19,21

51:2 57:3 59:10
60:8 62:6,15
65:2,20 66:3,10
67:9,14 68:8
72:22 74:19 75:1
75:7 77:21 79:1
81:16,22 82:22
84:8 85:7 86:3
86:15 87:3,7,14
87:24 88:15,25
89:6 91:19 92:22
93:2,12 94:10,14
97:14,24 98:17
98:20 99:16
104:7 105:4
either 14:10 22:21
50:12 71:14
77:16 92:1
elapsing 85:21
elbow 51:19,21,25
52:19 53:4 66:9
elderly 52:21
else's 90:24
emergency 82:20
85:17
employed 5:13,16
employee 103:13,14
EMT 82:20,20,25
83:6 93:25 97:5
99:2
EMTs 97:12
en 97:6,8
encounter 53:6
67:13
encountered 93:17
93:17
encountering 69:11
endeavor 76:5
ended 68:16,16
enforcement 57:8
enforcement's
57:25
engaged 47:3 50:13
86:4,5 92:21
engine 94:5,7
ENTER 105:2
entirely 10:5
97:13
entirety 36:14
equipment 33:9
39:23
errata 3:7 104:13
105:1
errors 46:9
escort 101:2,4
especially 21:2
77:19

Esquire 2:5,9,14
2:18 104:4,22,23
104:23,24,24,25
essentially 27:3
Estate 1:5
estimate 37:23
et 1:8 4:10 104:7
105:4
evaluating 97:10
event 15:16,19
22:25 32:19
35:17 36:16 41:6
63:24 68:8 72:5
79:1
events 16:5 17:13
41:5 44:24 90:21
eventually 27:21
32:23
everybody 36:18
evidence 10:7 54:6
91:14
evinces 54:6
Ex 1:23 4:1,12
102:6,13 103:6
103:21 104:17
exact 11:9 61:9,17
62:4
exactly 28:3,4
44:22 49:5 50:8
70:7,10 72:11
77:15 94:6 98:19
Examination 1:20
3:3 5:7
examine 12:3 98:20
examined 5:5
examiner 12:3 13:6
96:21
excruciating 72:21
exculpatory 22:14
excuse 98:14
Exhibit 42:17,19
EXHIBITS 3:10
exist 19:23
existed 19:16,21
66:18
exists 22:5 56:22
expect 59:20
100:19
expected 61:18
expecting 61:24
experience 16:13
52:16 69:13 77:9
experienced 57:8,9
experiences 77:18
Expires 102:16
explain 29:16
85:19

| | | | |
|---|---|---|---|
| **explained** 11:11 | 90:20 | 61:18 | 92:13,14 |
| **explanation** 41:21 | **Federal** 1:16 4:7 | **following** 38:3,4 | **four** 100:14 |
| 42:12 | **feel** 79:13 91:4 | **follows** 5:6 | **fourth** 43:11 46:24 |
| **exploring** 8:16 | **feeling** 65:14,19 | **foot** 49:20 71:14 | **FPR** 1:23 102:14 |
| **exposed** 44:5 | 66:16 | 75:7 | 103:21 104:17 |
| **express** 6:20 | **feet** 50:12 58:11 | **footage** 14:5 17:14 | **frame** 32:16 |
| **expressed** 6:21,25 | 61:16 67:16,17 | 17:19 42:13 | **Frank** 24:25 84:23 |
| 7:1 | 67:22 69:19,19 | **force** 35:20 54:8 | 92:13 |
| **expressing** 6:19 | 69:24 73:4 75:17 | **forced** 52:3 55:9 | **frankly** 31:20 |
| 7:2 9:17 | 81:13,15 84:8 | **forcibly** 53:3 | **free** 70:6 71:15 |
| **extract** 94:22 | 89:7 | **foregoing** 105:23 | **frequently** 52:8 |
| **extracted** 94:25 | **fellow** 19:4 | **forgot** 100:8 | **front** 37:15 57:12 |
| **extremely** 84:13 | **felony** 58:16 | **form** 10:8,17 11:17 | 79:19 85:16 |
| **eyes** 17:13 | **felt** 66:2 90:6,6,9 | 12:4,6,13 13:18 | **FTO** 29:12 31:6 |
| | **FF015913** 102:15 | 14:4,8,19,20 | 33:21,21 34:1,4 |
| **F** | **field** 21:3 31:6 | 15:6,11 17:21,22 | **FTO-ing** 32:17,18 |
| **F** 102:6,14 | **fighting** 77:2 | 17:25 18:19 19:10 | **FTOing** 31:16 |
| **face** 48:16 55:8 | **file** 27:9 42:22 | 19:14,19,25 20:9 | **fuck** 6:15,24 7:3 |
| 68:7,10,20 70:19 | **filed** 4:11 | 21:23 22:9,13 | 11:7 |
| 81:6 | **film** 44:24 | 27:25 30:23 | **fucking** 14:17 |
| **face-down** 77:19 | **financially** 103:15 | 33:14 36:25 37:1 | **full** 66:20 |
| **facilitate** 67:25 | **find** 30:16 51:8,12 | 37:3 38:6,10,14 | **function** 78:6 79:2 |
| 73:13 | 52:15 73:20,21 | 38:19 39:2,11,20 | **functions** 99:2 |
| **fact** 13:8,8,10 | 73:22 82:19 | 39:21 40:4,5,19 | **funeral** 13:5 97:2 |
| 17:3 71:24 74:14 | **finding** 91:7 | 40:20 41:7,24,25 | **further** 64:4 |
| 85:12 | **finger** 70:6,13 | 42:4,14 43:21 | 103:12 |
| **facts** 10:16 45:1 | 71:15 72:9,15 | 45:3,8 49:11,23 | |
| 92:1 105:23 | **finish** 24:1 54:21 | 51:11 52:5 53:8 | **G** |
| **failing** 20:18 | 56:18 90:14 | 53:18 54:10,20 | **Gabe** 15:3 70:6 |
| **fair** 44:1 46:14 | **finished** 31:20 | 54:25 55:3,14 | 71:1,6,6 |
| 81:23 | 32:2 | 56:8,12,25 57:1 | **Galbo** 74:5 84:8 |
| **fairly** 28:4 71:13 | **fire** 18:20 94:3,5 | 57:6,13,19 58:25 | **Garrido** 49:21 |
| **fall** 18:3 | 94:7 | 59:14,22 60:19 | 50:16 60:7 64:9 |
| **false** 74:7 83:5 | **first** 5:5 15:7 | 61:2,6 62:9,18 | 65:2,19 66:2,8 |
| 97:13 | 23:13 26:4 38:8 | 63:13,14,20,21 | 71:20 86:21,22 |
| **family** 7:10,21 8:2 | 44:21 46:25 | 64:1,2,11,23 | 89:19 |
| 9:21 13:2 | 48:13 49:1,1,3,4 | 65:4,5,10 66:12 | **Garrido's** 70:13 |
| **far** 23:19 79:11 | 50:9,12,20 58:7 | 66:14,21,22,25 | **Gary** 2:15 18:22 |
| 80:20,21 91:19 | 59:12,19 62:7 | 67:11 68:3,9 | 80:24,24 81:2 |
| 100:10,13 | 67:8 93:17 94:3 | 69:2,3,8,15,16 | 94:11 |
| **fashion** 70:9 | 94:4,9,14,24 | 70:22,23 71:3 | **gassed** 76:24 77:2 |
| **fast** 76:7 96:3 | 96:6,9,21 | 72:1,6,23,24 | **gather** 75:22 |
| **father** 7:21 | **firsthand** 50:25 | 73:2,5 74:8,21 | **general** 9:25 |
| **Fax** 2:4,13,17 | **fit** 60:4 | 74:22 76:10,14 | **generally** 23:2 |
| **FBI** 9:5 | **five** 100:14 | 77:11,12,22 78:7 | 58:16 60:5,20 |
| **FDLE** 9:13 15:10 | **flashed** 29:10,15 | 78:16,17 79:5,6 | 74:15 82:7 90:19 |
| 17:4,4 35:12,17 | **flat** 67:20 | 81:19 82:6 83:4 | **getting** 5:24 18:23 |
| 43:18,23 44:5 | **Florida** 1:1,8,17 | 87:16 88:7 89:1 | 34:19 62:21 64:5 |
| 45:10,12 46:18 | 1:25 2:4,8,12,17 | 89:23 91:6,21 | 64:6,17 67:15,25 |
| 46:19 83:22 | 4:2,3,8,12 5:12 | 92:8 93:11,19,23 | 68:17 75:13,16 |
| 84:22 85:8,22 | 102:3,7,8,15 | 95:10,20,24,25 | 78:11 80:6 |
| 86:8 88:2 89:14 | 103:3,7,22 104:6 | 96:4,10,22 97:3 | **GIRARD** 2:22 |
| 89:22 91:5 92:23 | 104:19 | 97:9 99:5,12,19 | **girl** 71:2,8 |
| 93:1 | **focused** 87:1,3 | 99:25 100:22 | **give** 32:7 54:8 |
| **feathers** 98:8 | **folks** 82:20,25 | **Fort** 2:12 104:6 | 58:2,21,21 60:7 |
| **February** 5:17 | 86:8 97:5 | **forth** 81:17 | 60:8,25 62:7,16 |
| 83:23 89:19 | **follow** 11:12 34:25 | **found** 51:14 81:5 | 62:20 64:14,21 |

77:1 101:2
**given** 11:10 32:15
  55:12 57:24
  61:18 62:11 68:4
  77:24 78:19
**gives** 6:14,23 11:7
**giving** 4:25 7:3
  59:17 60:5,16,18
  61:5 64:18 65:18
  80:25 83:22
**glad** 80:2
**gloves** 74:5 84:9
**go** 10:3 15:24,25
  20:13 21:7 25:25
  30:16 34:4,9,11
  43:21 46:11 47:6
  49:15,17 52:3
  53:10 58:11
  76:25 83:8 85:13
  87:19 95:19 96:3
  100:15
**goes** 47:20 57:23
  94:17
**going** 9:4 22:23
  24:18 25:25 26:1
  26:5 31:1 32:18
  32:23,25 34:3
  35:6,7 36:9
  37:13 42:5 45:22
  46:11 49:14
  52:15 57:2,16
  58:8 59:25 61:21
  62:5,7,16 64:15
  67:8 70:19 71:16
  72:16,17,19 80:9
  81:11 93:7 97:13
**gold** 98:7
**good** 4:5 5:9 32:5
  34:19 37:22
  72:18 77:24 80:3
  90:18 101:9
**Goodman** 12:21
**gosh** 94:19
**gotten** 9:14 16:15
  80:18
**gown** 93:12
**grab** 66:8
**grabbed** 69:24 84:7
**grabbing** 73:10
**grand** 9:12 17:5
  45:19 91:13
**ground** 48:7,7,16
  58:18,20 67:23
  73:1 80:22 81:6
**GROUP** 2:7
**groups** 79:19
**gruffly** 58:8

**GTEK** 30:6
**guess** 15:24 64:3
  95:13
**guesstimate** 100:13
**guideline** 82:3
**gun** 47:5 88:24
**gunpoint** 59:11
**guy** 68:15
**guys** 72:3,3

**H**

**H** 2:18 104:25
**half** 48:10 85:15
**hand** 4:24 41:16,20
  52:4 58:14,20
  60:1,3,3,3 62:16
  63:2,3,3,4 64:10
  64:14,19,21 65:1
  66:9 70:11
**handcuff** 58:13
  62:17 67:8
**handcuffed** 52:9
  67:15,15 71:18
  85:7
**handcuffing** 52:7
  58:6 60:10
**handcuffs** 51:17
  61:21 68:17
  73:16,24
**handgun** 89:20,20
**hands** 17:13 57:4
  58:12 59:17 60:2
  60:2 62:21,25
  64:17 88:18 93:5
**happen** 20:18 30:15
  30:18 48:8 54:3
  66:24 95:2
**happened** 8:2,3,13
  8:13 9:11,12,22
  10:7 11:18 17:23
  18:12,18 19:12
  20:7,15,15 32:21
  36:12 45:12,25
  47:21 50:15 51:1
  59:20 62:17
  82:21 83:2,20
  91:19 92:1,3
**happening** 13:9,21
  16:6 32:15 85:16
  87:3
**happens** 76:7
**hard** 20:17 29:23
  55:7,24 65:1
**Harris** 18:22,23
  94:4
**he'll** 19:1 31:7
**head** 14:18 58:12

75:18 81:12
  87:14
**health** 76:17,21
  81:17 82:5,9
**healthy** 76:23
**hear** 54:1 60:14
  64:13,16,21,25
  80:10
**heard** 13:13 14:10
  14:15,21,23 19:7
  26:2 65:25 71:10
  91:11 93:10
**hearing** 15:7 19:4
  60:15 64:17
  65:22 68:4 70:16
  71:10
**heart** 78:6,15,24
  79:1,8
**heightened** 72:16
**help** 73:12,13 78:3
**helpful** 72:19 73:9
**helping** 18:19 33:6
**helps** 22:8 58:23
**Henry** 2:21 47:4
  50:5 80:23,25
  94:11
**hey** 35:10 45:20
  61:14 72:17 80:6
**HIGGINS** 2:3
**high** 75:25
**highlighted** 45:21
**hobble** 74:2,7,10
  74:11,19
**hobbled** 74:13
**hobbles** 74:17
**Hochman** 2:11 104:5
**hold** 32:24 100:6
**holding** 60:25
  69:19
**holds** 75:24 76:16
**holster** 92:16,18
  92:24
**holstered** 49:17,19
  50:1
**honest** 27:8,10
  44:6
**hoping** 80:1
**Horan** 2:3,5 4:17
  104:24,24
**hospital** 11:13
  12:25,25 93:12
  93:14,18 95:5,19
  96:15 98:16 99:9
  100:11
**hot** 9:3
**howling** 72:4
**humorous** 71:23

**hundred-percent**
  43:22
**hurt** 54:8

**I**

**idea** 7:13 11:14
  16:20 25:17,19
  25:21 30:4,22
  69:4,10 96:16
  100:25 101:1
**identification**
  19:17 20:23 22:8
**identified** 18:13
  78:23
**identify** 78:2
**identity** 18:10
  22:3
**ideologically** 9:25
**image** 89:5 93:6
**imagine** 18:1 21:4
  22:14 24:4 36:24
  52:15 78:8 79:7
  79:10,11 99:7
**immobile** 53:2
**implication** 8:1
**imply** 8:3,6,10,14
  89:3
**important** 20:21
  35:11 84:19
**improper** 12:13
  34:13
**in-custody** 11:20
  27:21 39:9 87:2
  96:8,20
**in-depth** 9:1
**inappropriate**
  74:18
**incident** 3:12 5:20
  13:17,20 14:11
  16:12 22:8,18,18
  23:6 30:21 40:8
  43:4,8 44:4,23
  92:6
**inciting** 63:24
**include** 25:23 26:1
**included** 30:20
**including** 28:18
**INDEX** 3:1,10
**indicate** 48:24
  56:10
**indicated** 11:5
  14:17
**indicates** 23:14
**individual** 17:11
  18:10 65:24
**induced** 53:12
**inducement** 58:2

**inference** 9:18
**inflict** 53:16
**inflicting** 54:17
54:22
**info** 22:12 40:8
**information** 16:15
16:19 20:4 28:7
30:25 33:10
34:20,23 35:16
83:19
**inhalable** 55:8
77:20
**inhaling** 68:21
**initially** 24:4,11
**injuries** 13:3
**inquired** 86:1
**inspected** 31:1
**instance** 37:9
**instructed** 23:20
**intention** 83:18
**intentionally** 41:2
**interact** 89:5
**interacting** 49:5
**interaction** 7:20
**interactions** 92:21
**interested** 103:16
**internet** 44:11,14
**interpret** 11:11
**interview** 17:5
**investigating**
89:13
**investigation** 9:12
10:3 35:11,17
40:2,7 85:22
87:6 88:4 90:3
98:18
**investigations**
35:17 82:13
**investigator** 92:23
**investigators** 15:9
28:18 43:23 88:2
**involved** 30:21
39:1,16 90:11
**involving** 32:19
**inwards** 52:3
**island** 100:12
**issue** 26:24 30:6

———— J ————
**J** 2:9 104:23
**Janeth** 6:9
**Jeannete** 104:23
**jerk** 66:9
**jerked** 53:9 54:13
59:11 70:17
**Job** 104:8
**Johnson** 2:11 104:5

**Join** 10:9,18 12:5
18:9 19:20 20:1
22:10 33:15 39:3
39:12 41:8 45:4
49:12,24 52:6
53:19 54:11 55:4
57:7 59:15,23
62:10,19 64:24
65:11 67:12
87:17 88:8 91:22
92:9 93:20 99:6
99:14,20 100:1
100:23
**joint** 25:13
**joking** 72:4 80:2
**Jr** 2:18 104:25
**judge** 12:11,17,21
12:21 34:10,11
**July** 102:16
**jump** 53:1
**jumping** 79:19
**jurisdiction** 19:12
**jurisdictions**
82:15
**jury** 9:12 12:15,18
17:5 45:20 91:13

———— K ————
**Kathy** 83:23
**keep** 68:2
**keeping** 22:7
**kept** 27:23
**Key** 1:2,8,17 2:4
2:22 4:7,10,20
5:12,14,14 11:15
21:21 22:2 32:14
43:3 59:6 62:14
65:9 99:7 101:2
104:7 105:4
**keys** 61:15
**kick** 74:16
**killed** 15:3
**kind** 55:12 56:14
57:16 65:8 69:10
69:25,25 76:22
77:18
**kinds** 76:3
**kneeling** 69:21
**knees** 48:13 50:13
58:11 61:16
67:22
**knew** 32:23 35:7
86:21
**know** 9:4,9 11:25
12:9 13:11,21,22
14:1,6,7,9 15:12
16:1,2,4 18:3

20:11,15,19 21:8
21:12,17,24 22:4
22:15 23:21,25
24:2,7,10 27:11
27:12,23 28:2,8
28:10,21 29:3,9
29:18 30:11,24
31:3 33:18,22
34:13 35:8 36:3
37:22,24,25 38:8
38:9,12,16,20
39:22,24 42:15
42:15 44:8,13
46:2 49:4,5,6
50:4,16,25 52:13
54:12 57:22
58:21 60:3,3,11
60:15,16 62:20
63:16 64:18
65:14 66:3,5,15
66:16,18,23
67:21 70:9,25
72:3,11,14,15,17
73:6,8,19,20
75:21 76:1,1,18
76:20 77:1 79:10
80:8,18,21,23,24
80:24,25 81:9
82:10,24 84:14
84:25 85:9,9,10
85:14,19,19
86:11,22,23 87:3
91:1,14,16,17,18
92:3 94:4,6,25
95:13,14,15,21
96:2,5,6,16,23
96:24,25 97:1,4
97:10,13 98:10
98:12,19 99:13
99:15,18,22
100:10,17,25
**knowing** 13:24 66:6
**knowledge** 5:18
7:20 10:10,13
25:25 41:3 50:25
**known** 31:18 75:22
**KWPD** 3:12

———— L ————
**lack** 78:5 79:4
**Langston** 83:23
**language** 14:21
**laptop** 27:6,9 29:9
29:10,11,12,13
29:15,21,22 31:8
31:8 33:25 35:5
35:22

**large** 4:3 79:19
**Lauderdale** 2:12
104:6
**law** 2:7 5:20 28:2
57:8,25 96:12
**law-enforcement**
57:9
**lawsuit** 35:18
**lawyer** 24:9 25:15
26:8
**lawyer's** 23:23
**lay** 57:10 58:18
**laying** 43:15 48:25
**learn** 9:8 19:11
86:5
**learned** 44:21
**leave** 58:13
**Lee** 2:15
**left** 18:15 20:12
58:13,20 59:11
59:19,25 60:3
62:8,16 63:2
64:10,14 81:15
82:22 96:13
98:20
**Legal** 2:20 4:13
104:8,18
**legs** 73:10 74:1,3
75:2
**lends** 22:15
**let's** 70:25 92:12
**Letter** 3:7 104:1
**leveraging** 67:22
**Lewis** 104:23
**liberty** 90:2,9
**life** 55:12 69:12
75:22 77:17
**lift** 61:15 81:10
81:15
**lifted** 65:2 81:5
**lifting** 66:10
**lightened** 45:21
**limit** 96:17
**Line** 105:7
**list** 21:22
**listen** 31:21
**listening** 6:1
14:22 18:17 48:5
**litigation** 31:2
**little** 8:17 11:10
**LLC** 2:7
**LLP** 2:3
**locating** 17:9
**location** 95:16,19
**locations** 27:18
82:14
**locked** 72:9

long 5:16 8:24
  34:4 47:5 50:7
  90:20,22 95:4,14
  95:23 97:8
look 28:19 29:3,8
  53:2 72:18 78:2
  82:9 98:5 100:8
looked 28:11 80:19
  93:6,13 98:21
looking 17:13
  46:23 49:14
  52:25 65:23
  71:12 79:24
  81:12,21,22 85:3
looks 17:13
lose 78:14 91:17
loses 10:6
losing 77:9
lost 29:11,24 31:1
  33:21,22,25
lot 9:1,11 21:5
  76:18 80:16
  95:11
loud 71:23
loudspeaker 61:13
Lovette 2:15 4:22
  13:16 14:17 15:3
  19:8 38:4 40:16
  41:13,14 71:1
Lovette's 36:22
  38:12 40:2,2
low 88:10
lreynolds@rrbp...
  2:18
lunged 68:15
Lyman 2:18 4:21
  104:25

**M**

M 2:5 104:24
making 10:14,23,25
  12:7 47:13 80:14
male 43:15 48:25
malfunctioned 39:8
man 16:22 46:6
  52:14,18 57:5
man's 9:21 68:20
mandatory 5:19
manipulating 70:9
mark 42:17
marked 42:19
married 6:8
Martin 9:2
Martinez 12:21
material 91:20
matter 22:24
matters 12:21 94:9

McKee 2:7,9 3:3
  4:17,17 5:8 8:5
  8:7,9 10:19
  12:23 22:11
  24:21 25:5,7,11
  25:14 26:7 28:1
  28:24 29:2,4,20
  31:15,18,20 32:1
  32:7,9 33:16
  34:9,13,16,19,23
  35:2,23,25 39:13
  42:1,17 48:19
  55:1,15 56:13
  59:1,24 61:7
  67:1 71:4 73:3
  76:15 77:13
  78:18 80:1,4
  83:10,16 89:2,17
  91:23 92:7 93:21
  96:11 100:2,6,8
  100:9 101:5,9
  104:23
McKee's 12:13
mean 7:24 53:21
  91:25 93:13
Meaning 7:6
means 12:10,11
  20:14,22 21:6
meant 88:14,16
medical 11:16 12:3
  13:6 96:21 101:1
medically 78:4,9
members 7:20
memory 44:3,6
  45:24 46:4 47:17
  85:21 86:19
  88:22 89:5,8
  90:16,18 91:1,13
  91:15 93:9 95:3
  97:18
mentioned 45:23
  78:1,10
method 82:16
methods 78:20
Miami 104:19
Michael 2:14 4:19
  104:4
Mike 83:23
mile 100:16
miles 100:14,16
military 76:1
  77:17
mine 30:13 37:9
  38:22
minute 75:9 85:6,9
  85:18 90:22
minutes 37:22

85:15 90:22 95:8
  95:9,18 97:5,6
misconduct 88:4
missing 22:12
  39:16 42:13
misstated 92:2
mistakes 46:2
mom 8:23
moment 19:2 53:20
  68:16 72:20 77:7
  88:20
momentarily 74:4
moments 75:7
money 9:16,19
monitor 75:3 82:5
monitoring 81:16
MONROE 102:4 103:4
morning 89:11 95:7
mouth 94:18 98:22
  99:4
move 73:14 80:13
moved 80:19
movement 70:8
movements 56:16
  69:11
moving 18:19 21:5
  51:18 67:23 73:4
  80:11 94:2
multiple 61:8 82:3
municipality 1:8
Murdoch 2:11 104:5

**N**

NAJA 2:22
name 5:10 6:12
near 100:13
necessary 66:17
need 42:5 46:21
  58:8 78:3 80:12
needed 80:11
negative 53:17
negatively 70:21
never 9:21 10:12
  19:7 26:24 34:5
  38:1 45:23 54:9
  57:8,9,17 68:10
  69:6,13 70:15
  74:2,25 80:18
  81:23 86:1,4
  90:6,6,9 92:24
  95:2 101:4
new 21:13,15 29:11
  30:5,6,7
newer 31:7
NEWSPAPER 2:22
non 34:21
noncompliant 64:5

normal 59:18 60:24
  61:1,10
normally 79:24
North 5:11
nose 68:22 99:4,10
nostrils 98:21
Notary 4:2 102:7
  102:15
note 39:10
notes 27:3,4,7
  32:15,17
notice 16:22 30:25
  64:8 84:18 98:7
noticed 75:18
  84:17
noticing 75:9
NOTIFICATION 104:1
notified 13:3
November 1:15 4:6
  5:21 30:15 32:16
  102:9,11 103:18
  104:2,8 105:5
Number 4:9

**O**

oath 3:6 28:7
  42:22 84:1 86:18
  92:23,23 102:1
obese 57:5
obey 26:25
object 10:8,17
  11:17 12:4 14:19
  15:4 17:21 18:8
  19:19,25 20:9
  22:9 27:25 33:14
  37:1 39:2,11,20
  40:4,20 41:7,24
  43:21 45:3 49:11
  49:23 51:8 52:5
  53:8,18 54:10,20
  54:25 55:3 57:1
  57:6 58:25 59:14
  59:22 60:19 61:6
  62:9,18 63:13,20
  64:1,23 65:4,10
  66:22 67:11 69:2
  69:8,15 70:22
  72:23 74:21
  77:12 78:16 79:6
  87:16 88:7 89:1
  89:23 91:6,21
  92:8 93:19 95:10
  95:20,24 96:10
  96:22 97:3 99:5
  99:12,19,25
  100:22
objection 7:23

12:6,8 13:18
14:4,8,20 15:6
15:11 17:22,25
19:10,14 21:23
22:13 30:23
36:25 37:3 38:6
38:10,14,19
39:21 40:5,19
41:25 42:4,14
45:8 51:11 55:14
55:17 56:8,12,25
57:13,19 61:2
63:12,14,21 64:2
64:11 65:5 66:12
66:14,21,25 68:3
68:9 69:3,16
70:23 71:3 72:1
72:6,24 73:2,5
74:8,22 76:10,14
77:11,22 78:7,17
78:22 79:5 81:19
82:6 83:4 93:11
93:23 95:25 96:4
97:9
**observations** 22:3
**observe** 57:14
  75:16
**observed** 90:13,16
**obstacle** 85:13
**obvious** 98:1
**occurred** 16:12
  25:7 53:11
**occurrence** 38:25
**occurring** 41:11
**occurs** 36:16 78:13
**odds** 7:14,16 8:21
  8:22,23 53:10
**office** 104:10,13
**officer** 4:21 5:9
  13:16 14:17 15:2
  16:13 18:4 19:2
  19:8,11,22 20:23
  22:2 23:2,4
  24:11 25:22,23
  31:7 32:11,14
  36:22 38:8,12
  39:23 40:2 41:13
  41:14 48:6 49:21
  49:21 51:13
  57:16 58:4 60:7
  60:17 64:9 67:2
  70:13,17,19
  71:20 72:20 74:5
  74:6 79:9 81:16
  81:24 82:19,24
  83:6 84:8 86:24
  88:2,13,24 93:1

96:2 98:12,13
  99:23
**officer's** 30:18
  39:16
**officers** 6:2 7:9
  17:17 18:4 19:5
  23:3,7,8 24:20
  24:22 28:19 30:3
  30:21 38:2,4
  39:1 43:14,20
  47:1,3,5,16,19
  48:24 49:7,9
  50:13 51:2 55:10
  59:5 67:14 70:8
  71:24 72:22
  81:18,21 82:4,21
  87:6 92:22 93:16
  94:9
**oftentimes** 63:10
**oh** 12:16 15:20
  26:9 27:23 42:21
  46:1,15 72:25
  79:15,22 94:19
**okay** 6:1 8:8 12:22
  15:20 16:5 17:7
  17:10 18:2 19:3
  21:14,14,17
  22:16 24:10
  26:10,18 27:17
  31:23 36:22
  37:11,19 38:21
  40:25 42:8 43:5
  43:10 44:1,18
  46:3,11,12,13,21
  47:18 51:6 52:11
  55:22 60:13,17
  62:3 63:1 64:7
  67:17 68:19
  69:23 70:3 71:8
  72:13 74:24 80:2
  81:4,4 90:10
  92:15 93:25
  97:23,23 99:9
  101:5
**old** 30:5 52:11,14
  79:23
**older** 30:19 52:18
  53:2
**once** 17:2 28:17,17
  41:22 58:19
**ones** 30:6,7,8,19
  77:25 97:20
**oo0oo** 2:25
**open** 49:15
**opened** 47:11,12
**opportunity** 9:15
**opposed** 55:24

56:23
**opposite** 8:18
**oral** 60:8,8
**order** 26:11,15,25
**ordered** 23:1,14,17
  24:2 25:22 26:3
  26:18 62:15
  101:8
**orders** 48:6 67:10
**ordinarily** 54:6
  63:25 95:6
**originally** 43:19
**ought** 10:16
**outside** 26:10,13
**ovals** 45:21
**over-watch** 82:7
**overweight** 57:11
  57:15
**oxygen** 75:22 78:5
  79:4
**oxygenation** 77:10

---

**P**

**P-drive** 27:9 29:9
  29:14,18 33:23
  34:2,3
**P.A** 2:11 104:5
**p.m** 1:15,15 4:7
  42:25 83:12,15
  101:11,12
**PA** 61:19
**pad** 32:20
**Page** 3:1,11 105:2
  105:7
**pages** 103:8
**paid** 47:7,10
**pain** 53:11,16,21
  54:2,13,14,16,17
  54:22 72:21
**painful** 52:2,19
  53:6,10
**Palm** 2:7,17
**panic** 80:10
**paper** 32:21
**paperwork** 34:1,4
**paragraph** 23:14
  24:3 43:10,11
  46:24
**paramedics** 18:15
**parked** 48:11
**parlor** 13:6 97:2
**part** 9:6 11:18
  14:16 35:11 36:6
  36:8 37:24 40:7
  58:6 59:5 63:16
  65:2 75:2 82:2
**partial** 78:12

**partially** 37:10
**participate** 74:10
**participated** 23:7
  101:4
**particles** 77:20
**particular** 32:19
**particularly** 74:11
**parties** 103:13,14
**parts** 21:5 36:10
  36:10 91:20
**passed** 25:8 85:10
**patient's** 97:11
**patrol** 11:22 37:17
**Paul** 104:24
**pause** 34:4 83:13
**pay** 11:15 17:1
  49:7
**paying** 49:6,7,13
  60:15 67:13,16
  67:17 71:9 81:20
  89:25
**penalties** 105:22
**people** 6:20 7:2,8
  8:12 9:14,17
  11:25 21:11 46:7
  52:21,21 61:8
  63:22 65:16,16
  68:6 74:13 77:3
  77:4 79:18,18
  84:13 91:11 94:8
  94:8
**peoples** 14:22
  38:20
**perceived** 32:21
**performing** 18:22
  94:5,12 99:1
**periodically** 39:6
**perjury** 105:22
**perpetrator** 51:17
**person** 16:14 17:11
  17:17 18:13
  20:11,16 21:4
  24:12 49:1 50:4
  51:17 53:7,13
  60:4,20,25 61:4
  61:17,21,23,25
  63:5 76:17,21
  77:25 80:25 82:7
  82:8,8 86:23
**person's** 100:25
**personal** 1:5 60:24
  77:8 82:13
**personality** 80:3
**personally** 49:2
  52:10 75:3 89:6
  102:8
**perspective** 16:8

46:12 57:25
**pertained** 45:17
**pertains** 86:24
**phone** 15:17 17:2
  24:13,24 25:6
  89:25 90:25
**photographing**
  99:23
**physical** 75:3
  85:12
**physically** 49:10
**physiologic** 69:10
**physiological** 69:5
**pictures** 98:17
**piece** 55:21,21
**pier** 16:9,11 68:12
**pin** 73:1,12
**Piper** 2:11 104:5
**place** 24:25 50:8
  65:23,25 84:20
  92:22
**Plaintiff** 1:6 2:2
**Plaintiff's** 3:10
  42:19
**plaintiffs** 4:18
  35:12
**planes** 79:20
**planked** 67:20
**play** 30:12
**please** 4:15 5:10
  64:14
**PLLC** 2:16
**point** 14:10 30:11
  30:13 32:5,24
  37:19 41:14 46:6
  46:7,21 48:22
  51:4,19,21,25
  67:7 68:4,17
  72:8,11 81:23
  84:12 87:21 90:7
  92:20
**pointed** 87:7 88:15
  88:18 89:21
  90:15,17 93:2,4
**pointing** 79:16
  87:14,24 90:11
  93:8
**points** 6:19 53:22
  85:21
**pole** 17:11
**police** 5:14 7:9
  9:20,23 11:24
  13:12 16:15
  17:17 19:11,13
  19:17 21:18,21
  26:7,9,11,13
  28:18 30:24

32:14 33:9 35:20
  37:15 39:18,22
  39:24 43:3 48:6
  51:2 58:4 59:6
  59:13 62:14 65:9
  65:9 67:2 82:16
  82:19,21 83:6
  85:23,23 87:6
  88:1,4 89:13
  93:16 94:9 96:2
  96:12 97:1 101:2
**policy** 20:7 62:13
  63:24
**politely** 58:8
**political** 6:19 9:3
  10:14,15
**politically** 8:17
  8:18
**portion** 13:16 14:2
**portions** 36:13
**portray** 16:5
**position** 7:5 12:1
  51:20 77:19
**positively** 58:1
**possible** 27:19
  64:3,3 67:4,6
  70:16 75:15
  77:24 88:4 93:10
**potential** 85:23
**potentially** 90:3
**pound** 85:14
**practice** 22:24
  32:10,13 36:15
  36:18
**Pratt** 2:20 4:13
**precisely** 85:19
**predict** 63:22
**prepared** 33:1
  42:25 43:6
  104:10
**presence** 57:23
  74:25
**present** 2:20 15:14
  53:6 56:6 57:4
**presentation** 16:14
**presented** 12:14
  15:9,12,13
**preservation** 33:10
  55:12 56:23
**preserve** 20:22
  22:3 27:7 35:16
  69:12
**preserved** 14:13
  18:5 19:18,23
  27:11,11 28:15
  44:24
**pressed** 55:8 56:22

**pressure** 53:22
  65:17 77:7
**pretty** 70:4 100:13
**primary** 23:2 61:10
  61:19 80:24
**print** 34:4
**prior** 5:20 13:15
  13:20,25 14:1
  57:20 68:8 69:14
**private** 82:14
**probably** 37:21
  39:9 47:24 99:10
  100:16
**procedure** 22:24
  32:13 58:7,15
  59:13 60:6 61:1
  61:4,17 62:14
  63:23 65:9 66:13
**procedures** 59:9
**proceeding** 6:2
  104:10
**PROCEEDINGS** 3:1
**process** 39:10
  74:14 78:13,15
**produce** 29:1,6
**professional** 1:25
  4:2 82:14 102:7
  103:7,22
**programs** 30:9
**progression** 30:12
**prone** 51:17 55:6
  55:23 56:3,6,20
  68:14,19 69:21
  78:12 82:3,4,16
**proper** 58:7 66:13
**prosecuted** 90:5
**protect** 53:13
  54:23
**provide** 60:22
**provided** 52:9
  104:10
**proving** 86:19
**PT** 37:16
**Public** 4:2 102:7
  102:15
**pulled** 37:15,17
  52:2 64:10 65:1
  69:25 70:1
**pulling** 53:3
**punitively** 20:17
**purpose** 4:8
**pushing** 94:19
**put** 21:21 23:20
  24:2 28:17 32:25
  34:5 43:14 48:24
  51:19 58:11,12
  58:13,20,21

59:17 60:2,2
  61:21 62:25 63:2
  63:4 66:1 70:25
  82:20 91:7 92:12
  95:11 97:14
**putting** 50:18
  74:10

---

### Q

**quarter** 48:11
**question** 5:22 10:8
  10:17 12:12,19
  12:20 15:23 19:1
  19:2 24:1,21
  27:25 29:5 31:21
  31:22 32:3,4,5,7
  32:8 33:14 34:7
  35:24 39:2,11,15
  39:20 40:4 45:3
  49:11 54:21 90:8
  90:14 91:21
  96:19 97:14
**questioned** 79:8
**questioning** 14:16
**questions** 12:14
  24:18 100:4,5
  101:7
**quick** 68:18 75:15
**quickly** 72:17 74:4
  80:24 85:18
**quite** 8:25 31:20
  81:10

---

### R

**raise** 4:23
**rambling** 34:18,21
**ran** 82:22
**rate** 79:8
**re-read** 26:2
**react** 70:20
**reacting** 49:10
**reaction** 53:12,13
  54:23 55:12
**read** 3:7 73:21
  78:25 101:8
  105:22
**reading** 82:13
**reads** 26:20
**ready** 80:6 88:10
**reality** 72:4
**realize** 28:18
**really** 8:16,24
  12:9 20:17,19
  38:1 47:17,20
  72:18 74:15
  88:23 89:3
**reason** 57:3 105:7

reasonable 66:5
recall 32:20 54:5
  90:17 92:10,11
recalled 85:5
recalling 91:15
receive 82:2
received 41:3
  51:16 53:25
  54:12,14 57:16
  57:17 61:10
receiving 79:11
recognize 52:1
  54:16 77:23
  81:25 90:2
recognized 85:2
recognizes 75:10
recognizing 56:15
  59:7 85:3
recollection 33:4
  47:21,24 91:18
record 4:6,16 83:9
  83:11,14 101:10
  103:10
recorded 16:8
  18:11 84:5
recording 14:23
  15:2 16:3,6,6
  17:14 18:5 41:21
  71:1
recordings 10:7
red 97:20
redo 29:13
redone 30:14
reference 85:11
referring 92:5
refresh 33:3
refusing 26:24
regard 56:24
regarding 22:17
  36:11
regardless 23:11
  81:24
register 45:24
regularly 8:25
  27:20
regulations 96:12
relate 7:12
related 32:8
relates 86:3,14
relating 41:10
  87:4
relative 103:12,14
relatively 90:18
relieved 18:22
  74:4 75:6 84:8
remember 6:14
  13:13 18:21,21

18:25 19:4 23:15
  25:24 27:5 30:2
  31:13 32:22,22
  44:6,6,7,22
  45:15,19 47:3,4
  48:15 80:21
  83:18,22,25
  84:20,20 85:3
  86:16 87:11
  88:17,18,21
  90:24 91:10
  92:14,15 94:2,3
  94:17 97:16,17
  97:18,22
remembered 26:23
  33:2
remembers 32:6
rephrase 7:25 11:2
report 3:12 22:17
  22:23,25 23:2,10
  23:13,15,17,20
  24:3,12 25:23,23
  26:4,12,19,25
  27:2 28:3,5,17
  32:23,25 33:2,7
  36:6 38:22 42:21
  42:24 43:4 44:19
  44:25 45:10 46:3
  46:9,23 48:23
  73:17,19 74:6
  82:20 87:1 92:5
  92:6 95:22 103:8
reported 91:19
  95:17
reporter 1:24,25
  3:6 4:2,2,5,12
  4:23 102:6,7
  103:1,6,7,22
Reporter-Master
  103:22
reports 23:3 26:1
  46:7
represent 25:12
Representative 1:5
represented 25:16
request 29:1,6
  104:12
requested 103:9
require 47:8
required 5:20
  11:20 39:4 57:24
resist 63:10 68:6
resistance 50:22
  52:9 55:11 65:15
  65:17 66:2
resisted 54:13,13
  58:22

resisting 43:20
  53:17 54:9,23
  56:11,11,15,23
  68:1,6 69:12
respectfully
  104:12
respond 29:7 63:22
responding 58:2
response 53:17,17
  66:15
responses 69:5
responsible 38:22
responsive 34:22
  34:24
Rest 68:12
restate 42:6
restaurant 16:11
  16:12 46:25
  48:12
restrained 51:17
restraint 43:15
  48:24 50:19 55:6
  55:23 56:3,6,20
  66:2 67:25 68:14
  68:19 73:13,15
  73:24 82:4,16
restraints 78:12
  82:3
restricted 77:4
retraining 5:19
retrospect 47:22
return 104:13
review 9:15 36:6,9
  36:16,17,18
  37:11 38:9 39:5
  39:6,10,19 44:10
  103:9 104:10,13
reviewed 36:8,21
  36:23 37:6,8,9
  37:24 38:1 41:4
  92:3
reviewing 36:13,20
  37:18,19 38:25
  39:25
Reynolds 2:16,18
  4:21,21 10:9,18
  12:5 13:18 14:4
  14:8,20 15:4,6
  15:11 17:22,25
  18:9 19:10,14,20
  20:1 21:23 22:10
  22:13 30:23
  33:15 36:25 37:3
  38:6,10,14,19
  39:3,12,21 40:5
  40:19 41:8,25
  42:4,14 45:4,8

49:12,24 51:11
  52:6 53:19 54:11
  55:4,14,17 56:8
  56:12,25 57:7,13
  57:19 59:15,23
  61:2 62:10,19
  63:12,14,21 64:2
  64:11,24 65:5,11
  66:12,14,21,25
  67:3,12 68:3,9
  69:3,16 70:23
  71:3 72:1,6,24
  73:2,5 74:8,22
  76:10,14 77:11
  77:22 78:7,17,22
  79:5 81:19 82:6
  83:4 87:17 88:8
  91:22 92:9 93:11
  93:20,23 95:25
  96:4 97:9 99:6
  99:14,20 100:1,4
  100:23 104:25
rifle 50:7 59:11
  87:7,24 88:14,25
  89:21
right 4:23 7:9
  10:7,20 12:3
  17:4 20:3,8 21:3
  22:12 24:10
  26:16 27:21,24
  28:21 31:9,25
  33:17 35:6,21
  36:19 38:18
  39:10,14,19
  40:23 42:25 43:7
  43:8 45:1,13
  48:8 50:10 51:10
  58:24 59:5,6,21
  60:3 61:24 63:11
  63:19,25 64:9,19
  64:21 65:1 66:9
  66:24 68:12
  69:14 70:3,11
  72:9,18 73:8,10
  73:12 76:11,13
  77:14 79:13,16
  79:17,21,24
  80:16 83:5 85:5
  85:24 87:7,14,20
  87:24 89:15,22
  90:3 91:24 93:12
  93:18,22 99:3
  100:21
rip 63:9,16
ripped 99:15
risk 53:6 56:6,21
  78:12

rmckee@themcke...
  2:9
Robert 2:9 4:17
  104:23
ROBERTS 2:16
robins 76:24
Roderick 2:20 4:13
roll 76:25
rolled 81:9
rolling 80:19
Roosevelt 5:11
round 76:24
route 97:6,8
  100:17,18,20
routinely 34:5
  61:12
Royal 2:7
rules 57:5 96:12
run 30:10,10 85:12
  85:13

_____ S _____
sand 43:16 55:7
  65:3 66:10 68:18
  68:20,22 77:20
  99:3,7,10
save 31:9
saved 22:22 27:12
  29:14,17 34:1
saw 17:3,5 18:5
  43:14,18 44:14
  44:24 45:6,17
  47:1,16 48:7,9
  48:13,14,17,18
  48:24 50:5 60:4
  64:8 67:19 69:18
  70:15 72:14
  73:20 74:2,25
  80:5 81:23 86:23
  87:4,19,19 89:9
  89:11,11,14,14
  89:16,21,25
  90:21,24 93:8
  94:5,13 95:2
saying 26:3 88:12
  88:15 91:18 93:5
says 17:16,18
  19:22 42:24 43:1
  86:10 95:22
scenario 55:6
  68:25
scenarios 58:15
scene 14:2 16:22
  18:14 19:8 37:20
  37:22 39:17 40:3
  41:5,9,14,23
  42:2,3 47:25

48:18 51:9 59:20
  60:21 75:2 77:21
  81:14 83:20
  87:20,21,23
  91:20 92:19
  95:14 97:6,24
  98:21 99:11
school 9:5 75:25
scientific 78:9
scientifically
  78:4
scream 71:8
screamed 71:1
screaming 50:16
  70:17 71:7,17,21
  72:5,21 80:7
screen 40:1
scrubs 93:14
searching 47:13
  51:6
seat 49:15
second 66:8 70:5
  100:6
seconds 75:7 76:13
  76:13
secure 93:7
see 17:8 28:20
  36:10,10,13
  37:16 41:13,14
  41:16,19 43:12
  43:16,25,25 44:2
  44:16 45:22
  47:19 48:9 49:9
  50:2 64:10,12,19
  65:1,3,6,7,7,17
  65:21 66:7,11
  67:7 70:11,13,18
  74:9,23 75:10,16
  81:16,21,25
  87:12,13,25
  88:11 89:4,19,20
  89:21 90:23
  94:12,14,15,16
  98:1,3
seeing 44:7 45:5
  45:10 47:3,4
  48:3,15 49:1
  66:16 68:5,5
  88:17,19 92:14
  92:15 95:3 97:16
  97:17
seen 9:14 14:25
  15:16,23 16:3
  17:2,12,14 21:25
  44:11,19 46:18
  47:22 48:2 61:25
  68:5,21,24 74:13

74:16 76:23,23
  86:16 91:12,12
  92:4 93:10
self 56:23
send 29:1
sense 97:23
sensing 65:19
sent 13:5
sergeant 24:25
  75:10 84:23
session 99:23
set 62:4
seven 5:17 100:16
shallow 56:2
she'll 8:25
sheet 3:7 104:13
  105:1
shirt 61:15
shortest 100:19
shortly 22:18 75:6
shoulder 52:2 63:3
  67:23
show 38:1 46:17
showed 45:20 67:8
  97:12 98:18
side 8:18 75:8,17
  81:7,8,12
Signed 102:11
signs 82:9 98:1
similar 93:15
Similarly 55:6
Simonton 1:16
simply 13:23 54:7
  54:18 59:10
  72:12
simulate 52:7
simultaneously
  30:10
Sincerely 104:15
single 62:4
sir 42:20 83:17
  92:12 100:2
sit 31:7
site 67:8 74:20
sitting 14:22 28:6
  79:7
situation 58:24
  64:4 66:17 85:17
  88:24
situational 20:11
Six 100:16
sling 88:14
slowly 48:3
slung 88:3,6,10,13
  93:3
Smith 83:23
smoothest 100:24

snapshot 47:7
snippet 17:3
soft 55:6,24
software 30:8
somebody 16:23
  20:18 26:18 31:4
  53:1 54:16 57:10
  57:14 58:6,18
  60:22 61:13,19
  63:9,18 67:20
  68:12 76:25 77:1
  78:3 90:24 93:17
somebody's 17:2
  89:25
someone's 39:8
  63:16 74:11
soon 35:8
sooner 43:9
sorry 38:15 45:2
  55:18 77:15 81:3
  90:4 100:7
sort 51:14
sought 64:20
sound 70:20 97:8
sources 83:19
south 11:19 43:12
  46:24 95:4
Southeast 104:18
Southern 1:1 4:11
Southernmost 16:7
  16:9 18:18 21:16
  95:5 100:10
speak 31:10 52:10
  65:18,22 66:16
  76:21
speaking 8:16 9:24
  11:4 52:16 61:19
  79:19
Special 83:23
specific 79:11
specifically 37:11
  75:21 78:2,23
  82:11 94:15
split 66:8
spoke 19:23
spoken 14:21
sport 76:3
stability 97:11
stake 90:3,9
standard 36:15
  62:4
standing 50:12
  69:21,22
standpoint 11:22
  11:24
start 49:10 77:9
started 38:25

**starts** 43:11
**state** 4:3,15 70:7
  99:1 102:3,7,15
  103:3
**stated** 54:1 67:10
  71:1 105:23
**statement** 7:19
  8:11 10:14,16
  19:5,17,24 20:14
  20:22 21:25 22:7
  46:18
**statements** 20:2
**States** 1:1,16
  82:15
**stating** 8:1
**stay** 21:11
**staying** 21:15
**step-by-step** 61:14
**Stevens** 2:21 98:13
  98:14 99:23
**Stevenson** 98:12
**Stipulated** 79:25
**stole** 99:18
**stomach** 48:25
**stomach-down** 43:15
**stop** 37:25 61:19
  73:4 76:5
**stopped** 37:18,19
**stops** 39:6 58:16
  61:11
**story** 28:20
**straight** 34:10
**Street** 1:16 2:3
  68:12
**stress** 91:1
**stretcher** 18:24
**strolled** 59:10
**strong** 89:4
**struggling** 43:14
  47:1,6,16,20
  48:24
**study** 89:24
**stuff** 37:14 100:15
**stuffed** 68:22
**subject** 91:14
**submit** 33:2
**submitted** 27:2
  28:5
**subsequently** 17:18
**sued** 30:3
**suffocating** 55:16
  56:11,15
**suffocation** 56:6
  56:21 68:24
**suggesting** 54:12

**Suite** 2:7,12 104:5
  104:18
**summary** 14:25
  46:18
**Sunrise** 2:12 104:5
**supervisor** 36:15
**supervisors** 36:9
  36:17 38:25 39:4
**supplemental** 23:3
  26:11 33:7 36:6
  42:21 44:19,25
  45:10 46:3,9,23
  48:23
**supplementing** 23:3
  23:4,7
**supply** 40:10
**Support** 4:14 104:8
  104:18
**supposed** 12:2
  22:25 96:20
**sure** 11:2,3 27:8
  27:10,20 36:5,21
  43:22,23,24,25
  46:11 47:13
  48:14 58:1 70:4
  70:5,7,24 71:9
  71:19 81:10
  84:14 85:11
  91:25
**surface** 55:7,7,24
  55:25 56:5,21
  69:6
**suspect** 43:19
  82:17 84:24
**Suzanne** 1:23 4:1
  4:12 102:6,14
  103:6,21 104:17
**swear** 4:16,24
**sworn** 5:5 102:10

---

**T**

**T** 2:14 3:12 104:4
**tactics** 52:8
**take** 25:10,13
  32:14,17 35:6
  43:10 44:3 55:21
  60:21,22 61:22
  68:11 79:9 92:16
  95:4,7,9,18,23
  98:16 100:24
  101:8
**taken** 1:20 4:1
  12:2 15:16 19:17
  104:8
**talk** 8:25 9:8
  84:12
**talked** 71:6

**talking** 11:5 15:20
  15:23 61:23
  68:19 92:2
**tap** 63:3 76:5
**tape** 64:13,16,19
**taped** 17:18
**tapping** 76:8
**Taser** 13:17,21,23
  14:9,12,23 15:2
  40:8 41:16,19,21
  71:1
**taught** 53:22 61:4
**technological**
  30:12
**telephone** 17:11
**tell** 5:9 6:23 9:20
  35:5,10 42:20
  43:18 46:15
  50:11 61:13
  65:25 72:10,14
  83:19 84:22 86:8
  90:10 91:10
**telling** 6:14 33:20
  48:22 59:25
  63:17 88:23 91:8
  93:1,4
**ten** 37:21
**tension** 65:17
  79:13
**term** 79:3
**test** 38:22 85:12
**testified** 5:5
  60:12 83:3 89:13
**testify** 28:6 72:25
  74:9
**testifying** 86:19
  87:5
**testimonial** 91:14
**testimony** 4:24 6:2
  17:6 22:6 73:23
  74:6,24 83:22,25
  86:13 89:15,22
**Thad** 4:20 19:5
  31:19,21
**Thaddeus** 1:13 3:2
  4:9 5:4,11 46:16
  102:8 103:8
  104:4 105:4,25
**Thank** 100:2 101:6
**Thanksgiving** 7:4,8
  95:7
**they'd** 58:11
**thing** 10:1,1,2
  25:9 29:11 47:1
  47:12 62:5 79:16
  80:3 94:17
**things** 9:1,2,4,7

**9:13 11:3 33:25
  34:1 53:23 76:2
  76:3,18 77:24
  78:9 84:19 85:17
  91:4,7,8,17,18
  94:22 95:13
**think** 8:1,21 13:25
  20:17,21 27:16
  28:14 31:3 37:2
  37:2,4,13 42:18
  46:4 48:22 52:20
  52:24 53:20,23
  53:24 63:10 68:2
  71:15,16 90:19
  91:14 93:13 96:1
**thinking** 85:17
**third** 43:10 104:18
**Thirty-eight** 52:12
**thought** 15:20
  33:19 34:23 63:3
  81:7 84:15
**threatened** 88:25
**threatening** 90:12
**throat** 68:23
**thumb** 27:10,19,20
**time** 7:19 8:24
  13:17 15:7 26:23
  26:23 31:17
  32:16 33:12
  34:11 37:23
  41:18,19 44:4,18
  44:21 47:11
  49:14 55:18 60:4
  66:8 69:9 75:1
  80:17 81:5,14,14
  85:6,7,10,16,21
  95:18 96:16 97:8
  100:3,5 101:7
**timely** 13:3
**times** 31:13 68:7
  74:13 95:11
**timing** 95:15
**today** 4:6 6:1 7:3
  12:18 13:15 14:1
  14:15,21 15:7
  28:6,9
**today's** 27:15
**TODD** 2:21
**told** 9:21 20:12
  24:4,9,11 32:24
  41:3 45:10 62:7
  75:15 82:19,21
  82:24 83:5,7
  84:15 85:8,10,18
  86:1,11 88:1,3
  88:12 90:10 91:4
  92:23 97:14

100:12
**top** 42:24 55:10
**topic** 9:3
**torso** 55:9 65:2
77:19
**total** 78:12
**Toughbook** 30:5
**Toughbooks** 30:12
30:19
**tourist** 21:9,12,14
21:15
**town** 21:9 31:4
**traffic** 39:6 61:11
95:7
**train** 61:12
**trained** 21:2 51:18
52:18 53:11,14
53:15,21 54:2,5
54:9,15 55:2,10
56:2,5,20,24
57:14,20,22
58:10 59:8,9
68:24 69:7,13
75:20,21,24 76:2
76:4 77:16,23
78:2,4,8,13
82:11 101:1
**training** 5:19,19
5:23 16:13 31:6
31:7 51:16 52:8
53:25 55:13,23
55:24 56:9,14
57:9,17,17 58:17
59:5,9 61:9 62:1
76:23 77:8 78:1
78:19 79:12 82:2
82:12
**transcript** 26:3
103:9,10 104:10
104:21 105:2
**transport** 95:18
**transported** 74:14
**transporters** 53:23
**trapped** 70:14
**Trayvon** 9:2
**Treavor** 1:5 4:10
104:7 105:4
**tried** 17:8 80:13
85:19
**truck** 18:20 94:3
**true** 22:7 42:7
43:2 46:8 48:1
60:11 72:20 83:7
84:7 93:9 103:10
105:23
**Truman** 37:18,21
**trust** 52:16

**truth** 4:25 5:1
83:19
**try** 20:24 31:14
63:4 66:1 67:20
72:19
**trying** 8:3,6,10,14
20:2 53:13,20,24
54:23 58:3 67:19
67:24 68:23
69:12 70:6 71:15
80:22 82:19
89:10,12 94:20
**turn** 40:25 47:19
61:15 67:19
74:15 76:19 77:3
77:4,25 80:5
**turned** 13:23 14:10
40:22 42:2,7,9
47:15 50:22
71:13 85:7
**turning** 69:25 75:9
75:19 77:21,23
78:3 80:6 84:17
84:24 85:2,3
**turns** 75:20 100:15
**tussling** 68:16
**TUZZIO** 2:16
**twice** 8:20
**two** 17:16 18:4
43:14 47:1 48:24
65:16 85:14
**two-by-four** 100:12
**typed** 33:3

**U**

**U.S** 4:10,13 104:8
104:18
**ugly** 79:23
**Uh-huh** 6:17
**unattainable** 20:19
**uncommon** 58:19
**unconscious** 80:9
**uncooperative**
20:12
**understand** 7:24
10:21 21:5,17,19
55:20 70:24
71:22 91:25
**understanding**
16:18 25:15 39:7
46:12 96:13
**understood** 85:24
**United** 1:1,16
82:15
**unknown** 47:11
**unnecessary** 28:17
**unresponsive** 81:6

**unruly** 74:12
**unsuccessful** 17:8
**unusual** 38:24
**update** 30:4,8
**updates** 35:8 75:14
**upper** 55:9
**ups** 34:25
**upset** 31:5
**use** 27:20 51:19
53:21 54:2 74:9
**usually** 61:20

**V**

**Valle** 2:21 47:4
50:5,6 80:23
81:1 86:24 87:7
88:2,13 89:21
93:2 94:11
**van** 97:15,16
**vehicle** 61:20
82:22 97:21
**vehicles** 38:20
**verbal** 57:23,24
58:3 60:5,16
62:11,13 64:17
65:22,25 82:8
**Verbatim** 1:24 4:1
102:6 103:6,22
**verge** 100:20
**verified** 29:4
**version** 45:1
**versions** 44:13
**victim** 51:17
**video** 1:13 3:2 4:6
4:8 14:2,9 16:3
16:4,5,6,21,23
17:12 36:7 41:22
42:9 43:25 44:2
44:11,14,17,19
44:21,24 45:5,11
45:20 47:22 48:2
48:8,9,18,19
64:25 83:11,14
86:17 87:12,13
87:19,20 89:9,14
89:16 90:21 93:8
101:10
**videographer** 2:20
4:13 83:8,11,14
101:10
**videoing** 16:24
**videos** 36:10 44:5
44:9,9,15,16
89:12
**videotape** 15:16
64:8,20 65:8
66:7

**videotaping** 16:22
**view** 17:17
**viewed** 9:14 16:21
37:12
**violation** 20:7
**Virginia** 9:6
**visible** 93:22
**vision** 49:1
**visual** 89:4
**visually** 52:25
**voice** 41:22 48:6
61:22 80:10
**voluntarily** 57:21
**voluntary** 84:3
**vs** 1:7 4:10 104:7
105:4

**W**

**W** 104:22
**wait** 19:1 20:12
**walk** 48:3
**walked** 17:17 50:7
75:7,17 88:20
**walking** 47:5 48:9
50:9 84:23 87:10
88:19 93:6
**WALLACE** 2:3
**Wanciak** 19:22
**want** 9:19 17:10
26:6 28:24 34:12
35:1 50:11 51:18
71:18
**wanted** 33:2 63:5
68:15 73:9 75:14
**wants** 9:5
**wasn't** 24:13 31:1
41:3 45:16 47:14
65:23 67:13 71:9
71:12 81:20,21
85:11 87:14
96:17,19 97:20
**watched** 77:3,4
**watching** 66:7
**water** 56:2
**way** 6:25 13:24
24:23 28:16
43:12 46:24
48:11 51:6 53:16
63:23 66:6 67:23
69:6,25 70:1,25
74:19 76:5 81:20
88:25 92:12
**we'll** 12:20 25:10
25:13 29:7 35:3
101:8
**we're** 11:4 12:7
20:2,2 24:18

26:5 32:25 46:11
53:22 57:22 58:8
58:10 62:7,16
72:8 82:19
**we've** 9:1 34:12
76:23 92:3
**weakening** 82:9
**weapon** 49:17,19,25
50:1,4 51:8,14
86:2,4,9,12,21
86:22,23,25
92:18
**weaponry** 90:11,15
**weapons** 49:22 50:2
51:9 89:5 90:17
92:16,24
**wearing** 84:9
**Wednesday** 1:15 4:6
**weight** 55:10 77:7
**went** 24:17 25:8
47:10 49:19
50:17,17 84:11
84:15 89:7 94:7
98:10,16
**weren't** 47:25 84:8
91:5
**West** 1:2,8,17 2:4
2:17,22 4:8,10
4:20 5:12,14,14
9:6 11:15 21:21
22:3 32:14 43:3
59:6 62:14 65:9
97:1 101:2 104:7
105:4
**Weston** 2:8
**white** 37:18,21
43:15 48:25
68:12 97:15,16
97:17,19,21
**Whitehead** 2:3
**widely** 52:20
**windows** 74:16
**wish** 31:15,18
**withheld** 92:2
**witness** 1:20 4:16
5:2 7:24 12:6,9
12:16,22 16:16
17:16,18 19:3,16
19:16,21,22
20:14 21:22 24:7
24:10,20,22,24
25:3,6,8,19,21
28:20 29:3,8,17
31:16,23,25 34:8
34:16,17 40:21
70:18 88:9 97:14
101:7 104:1,11

104:12
**witnessed** 16:21
**witnesses** 14:16
18:17
**witnessing** 19:12
**woman** 15:17,21
16:2
**wondering** 44:15
**words** 10:2 11:9
13:22 29:10
**work** 5:10,11 29:12
29:25 30:10
33:21 38:23
50:22 95:12
97:12
**wouldn't** 8:2,13
11:15 17:23 49:3
53:1
**wrestle** 75:25
76:25
**wrestling** 65:16
**wrist** 57:21 58:8
**write** 22:17,20,25
23:2,3,17 24:5
24:12 25:22,25
26:25 31:8 32:23
45:15 105:2
**writing** 23:10
32:20,22,24
45:16 87:2
**writings** 28:19
**written** 26:22 27:3
29:2
**wrong** 18:1 31:9
48:23 90:7
**wrote** 22:21 23:13
27:1 28:19,24
43:7,9 45:24
**WVU** 9:5

**X**

**Y**

**yards** 85:13
**yeah** 12:9 16:25
20:25 22:16
24:23 26:14
35:23,25 46:1
64:6 67:5 70:24
73:20 83:10 86:3
86:13 87:5 89:10
89:17 92:25
**year** 7:4,16 52:13
91:10
**years** 5:17 68:13
**yelling** 75:11
80:12,16 84:23

**yesterday** 6:4
**York** 21:13,15

**Z**

**Z** 92:7
**Zamora** 24:25 25:18
25:20,23 29:4
49:21 75:10 80:7
84:23 92:13

**0**

**1**

**1** 2:7 103:8
**10** 3:12 42:18,19
95:7
**1000** 2:12 104:5
**101** 103:9
**102** 3:6
**103** 3:6
**104** 3:7
**105** 3:7
**1186143** 104:8
**11th** 102:11 103:18
**12** 104:2
**12/2** 42:25
**1250** 104:18
**14-10028** 4:9
**14-10028-CIV-M...**
1:3
**15** 95:8 97:5
**150** 85:13
**1604** 5:11
**17:13** 42:25
**17150** 2:7

**2**

**2:59** 1:15 4:7
**200** 85:12
**2013** 5:21 30:15
32:16 42:25
**2014** 1:15 4:7
83:24 90:20
102:9,11 103:18
104:2,8 105:5
**2017** 102:16
**20th** 83:23 90:20
**217-0150** 2:8
**22** 95:9,18 97:6
**2455** 2:12
**2488** 104:5
**27** 102:16
**28** 5:21
**28th** 30:15 32:16
**294-4585** 2:4
**294-7822** 2:4

**3**

**30** 104:13
**301** 1:16
**305** 2:4,4 104:19
**33040** 1:17 2:4
5:12
**33131** 104:19
**33304** 2:12 104:6
**33327** 2:8
**33409** 2:17
**373-8404** 104:19

**4**

**4:29** 83:11
**4:34** 83:14
**4:54** 1:15 101:10
101:12
**42** 3:12
**463-0100** 2:13
**463-2444** 2:13
**470** 2:16

**5**

**5** 1:15 3:3 104:8
105:5
**561** 2:17,17
**5th** 4:6 102:9

**6**

**60** 52:13
**608** 2:3
**688-2343** 2:17
**688-6560** 2:17

**7**

**8**

**888-9877** 2:8

**9**

**954** 2:8,8,13,13