1

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
                    KEY WEST DIVISION

        CASE NO.:  14-10028-CIV-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative of
the Estate of Charles Eimers, Deceased,


            Plaintiff,


vs.


CITY OF KEY WEST, a Florida municipality, et al.,


            Defendants.

_____/


      VIDEO DEPOSITION OF GUSTAVO ADOLFO MEDINA


            Wednesday, November 5, 2014
              1:21 p.m. - 2:45 p.m.
          United States Federal Courthouse
                301 Simonton Street
              Key West, Florida  33040



     Examination of the witness taken before:



            Suzanne Ex, CVR-M, FPR
          Certified Verbatim Reporter
          Florida Professional Reporter
```

2

APPEARANCES

On Behalf of the Plaintiff:
  HORAN WALLACE & HIGGINS, LLP
  608 Whitehead Street
  Key West, Florida  33040
  (305) 294-4585 / Fax (305) 294-7822
  dph@horan-wallace.com / darren@horan-wallace.com
  BY:  DAVID PAUL HORAN, ESQUIRE
  BY:  DARREN M. HORAN, ESQUIRE

  THE MCKEE LAW GROUP, LLC
  17150 Royal Palm Boulevard, Suite 1
  Weston, Florida  33327
  (954) 888-9877 / (954) 217-0150
  rmckee@themckeelawgroup.com
  BY:  ROBERT J. MCKEE, ESQUIRE

On Behalf of the Defendants:
  JOHNSON ANSELMO MURDOCH BURKE PIPER & HOCHMAN, P.A.
  2455 East Sunrise Boulevard, Suite 1000
  Fort Lauderdale, Florida  33304
  (954) 463-0100 / Fax (954) 463-2444
  burke@jambg.com
  BY:  MICHAEL T. BURKE, ESQUIRE

On Behalf of the Defendant Gary Lee Lovette:
  ROBERTS REYNOLDS BEDARD & TUZZIO, PLLC
  470 Columbia Drive, Building C-101
  West Palm Beach, Florida  33409
  (561) 688-6560 / Fax (561) 688-2343
  lreynolds@rrbpa.com
  BY:  LYMAN H. REYNOLDS, JR., ESQUIRE

Also Present:
  RODERICK PRATT, LEGAL VIDEOGRAPHER
  THADDEUS CALVERT
  HENRY DEL VALLE
  TODD STEVENS
  NAJA GIRARD, KEY WEST THE NEWSPAPER

--oo0oo--

3

INDEX OF PROCEEDINGS
Page

Video Deposition of GUSTAVO ADOLFO MEDINA
  Direct Examination by Mr. McKee . . . . . . . . . . 5


Certificate of Oath . . . . . . . . . . . . . . . . . 86
Certificate of Reporter . . . . . . . . . . . . . . . 87
Read Letter . . . . . . . . . . . . . . . . . . . . . 88
Errata Sheet . . . . . . . . . . . . . . . . . . . . 89


INDEX OF PLAINTIFF'S EXHIBITS
Page

No. 8   Medina's KWPD Incident Report . . . . . . . . 23
No. 9   FDLE Investigative Report . . . . . . . . . . 60

4

1    Deposition taken before Suzanne Ex, Certified Verbatim
2  Reporter, Florida Professional Reporter and Notary Public in
3  and for the State of Florida at Large in the above cause.
4          - - - - - - -
5      THE COURT REPORTER:  Good afternoon.  We are now on
6  the video record.  Today is Wednesday, November 5th,
7  2014, at 1:21 p.m.  We're at the Federal Courthouse on
8  Simonton Street in Key West, Florida, for the purpose of
9  taking the video deposition of Gustavo Adolfo Medina in
10  Case Number 14-10028-CIV, Treavor Eimers vs. City of Key
11  West, et al., filed in U.S. District Court, Southern
12  District of Florida.  The court reporter is Suzanne Ex
13  of U.S. Legal Support.  The videographer is Roderick
14  Pratt, also of U.S. Legal Support.
15      Would all counsel please state their appearance for
16  the record and then I will swear in the witness.
17      MR. MCKEE:  Robert McKee, David Horan, Darren
18  Horan, on behalf of the Plaintiffs.
19      MR. BURKE:  Michael Burke on behalf of the
20  Defendant City of Key West and Gus Medina, as well as
21  others.
22      MR. REYNOLDS:  Lyman Reynolds on behalf of Officer
23  Lovette.
24      THE COURT REPORTER:  Would you raise your right
25  hand.  Do you swear or affirm the testimony you are

1 (Pages 1 to 4)

5

```
1   giving in this cause will be the whole truth and nothing
2   but the truth?
3       THE WITNESS:  Yes, I do.
4   THEREUPON,
5               GUSTAVO ADOLFO MEDINA
6   having been first duly sworn, was examined and testified as
7   follows:
8               DIRECT EXAMINATION
9   BY MR. MCKEE:
10      Q.  Good afternoon, sir.  Could you please tell us your
11  name and, as a police officer, your office or business
12  address.
13      A.  Okay.  Gustavo Adolfo Medina and I'm employed for
14  Key West Police Department at 1604 North Roosevelt.
15      Q.  How long have you been employed with the
16  department?
17      A.  About three years and two months.
18      Q.  Did you have any prior police experience?
19      A.  No, I did not.
20      Q.  Are you -- through November 28th, 2013, were you
21  compliant with all your mandatory required training --
22      A.  Yes.
23      Q.  -- as you understand it to be?
24      A.  Yes, I was.
25      Q.  Not to be personal, but as part of this case, I'm
```

6

```
1   going to ask you these questions.  How tall are you?
2       A.  About six-two.
3       Q.  How -- what's your weight as of November of 2013?
4       A.  Roughly, around 220.
5       Q.  Are you a fit man, in your opinion?
6       A.  Not really.
7       Q.  I'm in the same boat here.
8           Do you work out as part of your training and skills
9   development with the police department?
10      A.  Not as much as I should.
11      Q.  But prior to November of 2013, did you work out
12  from time to time?
13      A.  Yes.
14      Q.  Was it at a fitness facility, at home, a friends
15  house; where was it typically that you --
16      A.  At the station.
17      Q.  At the station.  Does that include lifting weights?
18      A.  Yes.
19      Q.  Do you know what your bench press ability was back
20  then?
21      A.  No, I do not.
22      Q.  Know what your clean and jerk ability was back
23  then?
24      A.  I've never done clean and jerk.
25      Q.  You've been present during yesterday's depositions
```

7

```
1   of your fellow officers, and today, correct?
2       A.  Yes, I have.
3       Q.  You've seen how the processes go, has going -- has
4   gone?
5       A.  Yes.
6       Q.  And you've heard the testimony?
7       A.  Yes.
8       Q.  You've seen some of the exhibits?
9       A.  Yes.
10      Q.  You saw a videotape?
11      A.  Yes.
12      Q.  Prior to today -- or, excuse me.  Prior to
13  yesterday, had you ever seen the Columbian lady's videotape
14  of the events as they transpired on November 28, 2013?
15      A.  Yes.
16      Q.  When had you seen it before?
17      A.  I don't recall.
18      Q.  Had you seen it prior to writing a report after the
19  occurrence of this incident?
20      A.  No.
21      Q.  Had you seen it -- so, common sense, but I have to
22  ask dumb questions sometimes.  So the first time you saw it
23  was after you had written your report?
24      A.  I believe so, yes.
25      Q.  Were you aware of its existence at the time you
```

8

```
1   wrote your report?
2       A.  No.
3       Q.  Are you aware of any officer that did know of its
4   existence prior to the writing of the report?
5       A.  No.
6       Q.  How long have you known Officer Lovette?
7       A.  Two years.
8       Q.  Do you know him on anything other than a business
9   capacity?
10      A.  Yes.
11      Q.  Is he a friend of yours?
12      A.  Yes.
13      Q.  When he's not at the office, so to speak, --
14      A.  Uh-huh.
15      Q.  -- does he tell false stories, to your knowledge?
16          MR. REYNOLDS:  Objection, form.
17      A.  I don't know.
18      Q.  For example, when describing events that arose at
19  work, have you found, in listening to those stories, that he
20  tells false stories?
21          MR. REYNOLDS:  Objection, form.
22      A.  From the statements of his Taser video?
23      Q.  No.  I'm just talking in general right now.  I'll
24  get to the Taser, sir.
25      A.  Okay.
```

9

1  Q.  As far as knowing him for these past two years --
2  A.  No.
3  Q.  Let me finish the question.
4     Knowing him for the past two years, have you heard
5  him tell stories about occurrences at work?
6     MR. REYNOLDS:  Objection, form.
7  A.  Yes.
8  Q.  When you've heard them, did they appear to you to
9  be untruthful statements about what happened at work?
10    MR. REYNOLDS:  Objection, form.
11 A.  I don't know.
12 Q.  Is there anything about those stories that you
13 thought were false when you heard them?
14    MR. REYNOLDS:  Objection, form.
15 A.  I don't -- I don't -- depends on the story.
16 Q.  Do you --
17 A.  If I was there, then I would say yes or no.
18 Q.  And when he's told stories when you were present at
19 the events that he was describing, did he tell false stories?
20    MR. REYNOLDS:  Objection, form.
21 A.  I don't -- I don't think so.
22 Q.  Okay.  He's a friend of yours?
23 A.  Yes, as everyone is.
24 Q.  Okay.  Do you find that he's typically an honest
25 person?

10

1     MR. REYNOLDS:  Objection, form.
2  A.  I believe so.  I would hope so.
3  Q.  He typically doesn't tell false stories, correct?
4     MR. REYNOLDS:  Objection, form.
5  A.  I don't believe so.
6  Q.  Do you have a personal recollection today of the
7  events that happened regarding Mr. Eimers on November 28,
8  2013?
9  A.  From my perspective, I do, yes.
10 Q.  Did there come a time, sometime in the past, that
11 you also wrote a sworn report about it?
12 A.  Yes.
13 Q.  Did you also have an interview with the Florida
14 Department of Law Enforcement?
15 A.  Yes, I did.
16 Q.  And was that interview under oath?
17 A.  Yes, it was.
18 Q.  I'm having some sinus problems right now.  I
19 apologize, I did not hear your answer.
20 A.  Yes, I did.
21 Q.  Okay.  And have you ever seen their report, your
22 summary of what you told them?
23 A.  Yes.
24 Q.  Was that something you saw recently or just --
25 A.  Yeah, just yesterday.

11

1  Q.  And have you seen the report you wrote back in
2  December of 2013 --
3  A.  Yes.
4  Q.  -- since you wrote it?
5  A.  Yes, I did.
6  Q.  When is the last time you saw it?
7  A.  Yesterday.
8  Q.  In between yesterday and the time you wrote it, had
9  you seen it before?
10 A.  No.
11 Q.  You've been here through this testimony the last
12 day-and-a-half and I'm going to cut to the chase with you on
13 certain topics, okay, since you heard the questioning leading
14 up to it.
15    In your experience -- I'll lay a foundation first
16 -- are you issued a Taser?
17 A.  Yes.
18 Q.  Were you, back in 2013?
19 A.  Yes.
20 Q.  In your experience with your own Taser, had there
21 ever been a time that its recording was deleted and you
22 didn't know about it?
23 A.  No.
24    MR. REYNOLDS:  Objection, form.
25 Q.  Have you, other than hearing what you heard

12

1  yesterday from Officer Lovette, have you heard of any other
2  police officer in the department whose Taser recorded and the
3  information had not been preserved?
4     MR. BURKE:  Object to form.
5     MR. REYNOLDS:  Objection, form.
6  A.  No.
7  Q.  Were you ever given any training as to the protocol
8  of how to preserve Taser recordings?
9  A.  Yes.
10 Q.  What was that training?  Describe it for me.
11 A.  Handing the Taser to your supervisor.
12 Q.  Okay.  That's the only step that you, as the field
13 officer with the Taser, is supposed to do?
14 A.  Are able to do.
15 Q.  Okay.  Have you ever learned what they do with it?
16 A.  No.
17 Q.  Never heard anyone describe what they do with it?
18 A.  No.
19 Q.  Do you know whether the department has the capacity
20 to download that information onto some computer in Key West
21 Police Department?
22 A.  I believe so, yes.
23 Q.  Is that your understanding of what typically
24 happens to that information?
25 A.  Yes.

13

```
 1        Q.  Have you had any experience by hearing about it,
 2   having it happen to you, hearing that somebody else had it
 3   happen to them, that the downloaded information was lost?
 4        A.  No.
 5        Q.  Have you ever heard of anyone, other than Officer
 6   Lovette yesterday, who after an event that resulted
 7   eventually in someone dying, and Tasers were activated, and
 8   any of that Taser information was ever lost by the
 9   department?
10        MR. BURKE:  Object to form.
11   BY MR. MCKEE:
12        Q.  Have you ever heard of it, other than what you
13   heard yesterday?
14        MR. REYNOLDS:  Objection, form.
15        A.  Yes.
16        Q.  When?
17        A.  When an event takes longer than whatever is allowed
18   to be recorded.
19        Q.  Is there a policy that requires the officer in an
20   event that ended up with some sort of bodily harm to someone
21   being detained that requires them to turn in that Taser
22   information before it can be taped over?
23        MR. REYNOLDS:  Objection, form.
24        A.  Only if that officer deemed that evidence was
25   evidentiary.
```

14

```
 1        Q.  Well, is that left up to the individual officer or
 2   is there a department requirement to preserve evidence?
 3        MR. REYNOLDS:  Objection.
 4        A.  Well, if it was used, then the officer has to turn
 5   it in.
 6        Q.  If it was used, the officer has to turn it in.
 7   Should it --
 8        A.  As in activating the probes.
 9        Q.  And should he -- well, activating the probes or
10   turning it on to record?
11        A.  No.  Turning it on, you don't have to turn in that
12   evidence.  I mean, you're recording it in case something
13   happens on that event, but if you believe that it wasn't of
14   evidentiary value, then you wouldn't turn it in.
15        Q.  Well, based on what you've learned on your policy,
16   when Mr. Lovette activated it to use it --
17        A.  Okay.
18        Q.  -- with Mr. Eimers, should he have turned that in
19   before it taped over itself?
20        MR. REYNOLDS:  Objection, form.
21        A.  It was never used, though.
22        Q.  Well, it was activated -- didn't you hear him
23   testify he turned it on and was on top of Mr. Eimers with it?
24        MR. BURKE:  Object to form.
25        MR. REYNOLDS:  Objection, form.
```

15

```
 1        MR. BURKE:  Go ahead, sir.
 2        A.  I heard him say that, yes.
 3        Q.  Okay.  So it's being used in the event, right?
 4        A.  Correct.
 5        MR. REYNOLDS:  Objection, form.
 6        Q.  It actually be used as a non-Tasering device,
 7   right?  It can be used as a recording device, right?
 8        A.  Correct.
 9        Q.  And you heard him describe how he had turned it on
10   and he believed it was recording at that time, right?
11        A.  (No audible response.)
12        MR. BURKE:  Object to form.
13        MR. REYNOLDS:  Objection, form.
14        Q.  And that event lasted about how long?
15        A.  I don't know.
16        Q.  Less than an hour?
17        MR. BURKE:  Object to form.
18        MR. REYNOLDS:  Objection, form.
19        A.  Yes.
20        Q.  Which is less than the tape-over recording time,
21   right?
22        A.  Yes.
23        MR. REYNOLDS:  Objection, form.
24        Q.  Are you aware of Mr. Lovette ever turning in that
25   portion of his taping of that incident to the department?
```

16

```
 1        A.  No.
 2        MR. REYNOLDS:  Objection, form.
 3        Q.  Have you ever seen that portion of the recorded
 4   event?
 5        MR. REYNOLDS:  Objection, form.
 6        A.  No.
 7        Q.  Do you know what happened to it?
 8        MR. REYNOLDS:  Objection, form.
 9        A.  No.
10        Q.  Have you heard anyone talk about what happened to
11   it?
12        MR. REYNOLDS:  Objection, form.
13        A.  No.
14        Q.  Have you heard anyone describe that there was a
15   malfunction in that Taser?
16        A.  No.
17        Q.  Have you heard anyone describe that that Taser was
18   subsequently repaired if there was some malfunction?
19        A.  I did not.
20        Q.  Let's talk about the dash camera of your vehicle.
21   Are you assigned a vehicle?
22        A.  Yes, sir.
23        Q.  When you activate your lights, does it turn on the
24   dash cam?
25        MR. BURKE:  Is that today or back then?  I don't
```

17

1  know if it's changed.
2      MR. MCKEE:  Back then.  You're right.
3      MR. BURKE:  Okay.
4      MR. MCKEE:  You're right.
5  BY MR. MCKEE:
6      Q.  Back then, back in November of 2013, same vehicle?
7      A.  No -- well, yes, I had the same vehicle.
8      Q.  Okay.  Same equipment for operating the dash cam?
9      A.  Similar, but two different companies.
10     Q.  But it turns on when you activate the siren and
11  lights?
12     A.  If -- there's three options on that vehicle.
13     Q.  Okay.  Tell me about it.
14     A.  There's one, two and three.  If you --
15     MR. BURKE:  Are we talking about the current one or
16  the prior?
17     THE WITNESS:  In all the vehicles right now.
18     MR. BURKE:  I'm sorry.  Go ahead.  Beg your pardon.
19     THE WITNESS:  If you turn on the number three,
20  which activates every -- lights on the vehicle, then it
21  automatically turns on.  The other capability is
22  pressing the button on your mic.  Or, manually pressing
23  it on.
24     Q.  You said one, two and three.  What -- I heard two,
25  your explanation.  What's the third?

18

1      A.  If you turn it on, the actual device itself, in the
2  car.
3      Q.  Okay.  And when it's on, until it's deactivated,
4  it's recording?
5      A.  Correct.
6      Q.  Does it have a time frame on which it will either
7  re-record over itself or stop recording?
8      A.  I believe there is, at some point.  I don't know
9  what it is, though.
10     Q.  In your vehicle --
11     A.  I know it stays.
12     Q.  I'm sorry.  In your vehicle, since you were issued
13  it, --
14     A.  Uh-huh.
15     Q.  -- has there been a time when it was activated, it
16  was recording, and for some reason the recording ended
17  without being intentionally stopped?
18     A.  I don't recall.
19     Q.  Have you ever had that experience, to your
20  knowledge?
21     A.  I've had issues with my ICOP, yes.
22     Q.  But have you had an issue of it no longer recording
23  when it should be recording?
24     A.  No, I don't think so.
25     Q.  Have you heard of anyone other than Officer Lovette

19

1  yesterday, have you heard of anyone else that had a problem
2  with his dash cam where it turned off during an event and it
3  shouldn't have?
4      A.  No.
5      Q.  Have you heard anything to suggest that after this
6  Eimers event, Officer Lovette's car was sent to repair a
7  malfunction in the functioning of its recording devices?
8      A.  No.
9      Q.  Have you ever seen the footage from Officer
10  Lovette's dash cam which he described yesterday as no longer
11  existing?
12     A.  No.
13     MR. REYNOLDS:  Objection, form.
14     Q.  You saw the video yesterday that was on a camera
15  phone from a tourist.  Remember?
16     A.  Yes.
17     Q.  And you said you had seen it at some time after you
18  wrote your report as well, --
19     A.  Yes.
20     Q.  -- correct?
21     A.  Yes.
22     Q.  Are you aware that that video had -- was provided
23  two separate ways involving this case?
24     A.  No.
25     Q.  Are you aware that there's an officer at the police

20

1  department who actually has had email communications with the
2  person that took that film?
3      A.  No.
4      Q.  Have you seen anything in any report that
5  identified the name of the person, her address or her email?
6      A.  I never look through other peoples' stuff.
7      Q.  But you've never seen such identification?
8      A.  I wouldn't have the capabilities of going through
9  all of everyone's stuff.
10     Q.  Were you ever in an investigation with the FDLE in
11  this Eimers matter?
12     A.  Yes.
13     Q.  As part of your preparation for defending yourself,
14  did you try to access all sources of information such as
15  videos of the event?
16     A.  No.
17     Q.  Why not?
18     A.  Because I know what I did.
19     Q.  Was the investigation of the FDLE of more than just
20  you?
21     A.  Yes.
22     Q.  Did they ask you for sources of video, the FDLE?
23     A.  No.
24     Q.  You saw in the video yesterday, a man near a
25  telephone pole with another handheld device.  Did you see,

21

1  remember that?
2      A.  Yes, I saw that.
3      Q.  Did you ever notice that before?
4      A.  No, I did not.
5      Q.  I'm going to represent to you that we believe that
6  there are witnesses, at least one, who will say two officers
7  walked up to that man, asked to review what he filmed, gave
8  his camera back, and the man will testify he no longer had
9  the footage.
10         Prior to me telling that to you today, had you
11  heard anything about that?
12      A.  No, I did not.
13      MR. REYNOLDS:  Objection, form.
14      Q.  Who were the officers, after this incident, to your
15  knowledge, that were dealing with the crowd that were in the
16  vicinity of this incident, after it?
17      A.  I don't know.
18      Q.  Were you one of them?
19      A.  No, I was not.
20      Q.  Have you ever seen the footage from that video, the
21  one, the man by that telephone pole?
22      A.  No, I did not.
23      Q.  Have you ever seen anything to indicate that the
24  police preserved it?
25      A.  No.

22

1      Q.  I think you were here when Officer Wanciak was
2  testifying about a visiting police officer from a northern
3  jurisdiction.  Do you remember that?
4      A.  Yes.
5      Q.  Did you ever confront that individual?
6      A.  No, I didn't.
7      Q.  Did you ever speak to him?
8      A.  No.
9      Q.  Is the protocol of the Key West Police Department
10  in dealing with eyewitnesses to not take down contact
11  information of witnesses or is it to preserve that
12  information?
13      A.  I would hope that they would preserve it.
14      Q.  So for Officer Wanciak and any other member of the
15  police department that interviewed that police officer who
16  was irate at what he saw happen, it is outside of police
17  protocol to not preserve that information, right?
18      MR. BURKE:  Object to form.
19      MR. REYNOLDS:  Join.
20      A.  I can't testify to what other officers do or don't
21  do.
22      Q.  Well, I'm asking about the policies and procedures,
23  actually, and I'm wondering if, and based on your education
24  in this field, if a police officer from New York or some
25  other jurisdiction had witnessed police activities and

23

1  actually spoke to police officers from Key West about what he
2  saw, should that have been preserved --
3      MR. REYNOLDS:  Objection.
4  BY MR. MCKEE:
5      Q.  -- under policies and procedures of the Key West
6  Police Department?
7      MR. BURKE:  Object to form.
8      MR. REYNOLDS:  Objection, form.
9      A.  I don't know if it's in policies or procedures.
10      Q.  Would you have preserved it?
11      A.  My opinion?  Yes.
12      Q.  Have you seen any identity of the police officer
13  that Ms. -- Officer Wanciak was talking about yesterday?
14      A.  No.
15      MR. MCKEE:  I think the next exhibit is 8, I think.
16      (Plaintiff's Exhibit 8 was marked.)
17      Q.  I'm handing you Exhibit 8, sir.
18      A.  Uh-huh.
19      Q.  Could you identify this for me?
20      A.  This is my incident report.
21      Q.  Do you know exactly when you drafted it?
22      A.  The date says December 3rd.
23      MR. BURKE:  What are you -- where are you reading
24  from?
25      THE WITNESS:  Or, December 2nd, sorry.  Case status

24

1  is still the same.  Date report prepared.
2      Q.  It says that Sergeant Francisco Zamora was the
3  verifying officer?
4      A.  Yes.
5      Q.  And would the date and time to the right be when he
6  verified it, December 3rd, 2013, at 11:16?
7      A.  I would assume so, yes.
8      Q.  When you wrote it, did you draft it yourself?
9      A.  Yes.
10      Q.  Including the first paragraph?
11      A.  Yes, I -- I wrote it.
12      Q.  By drafting and writing, I'm kind of not
13  communicating well.
14         Did you think up the words and sentences to put
15  into the first sentence, first paragraph?
16      A.  I believe that's privileged with my PBA attorney.
17      Q.  Well, you told me you wrote this and so --
18      A.  Yeah.  Everything I wrote is what I wrote on the
19  computer.
20      Q.  Okay.
21      A.  I physically typed it up.
22      Q.  But did that paragraph come from your own mind, the
23  first paragraph?
24      A.  Again, I believe that's privileged with my PBA
25  attorney.

25

Q. How is that privileged? You wrote it here.

A. Yeah, I just answered you that I wrote everything here.

Q. We'll let the judge decide if that question is privileged, but unless you're told not to answer it, I want an answer.

A. Okay.

Q. Did you think of the words of that first paragraph?

A. No. I was instructed.

Q. Okay. Were you ordered by your captain to draft this report?

A. Yes.

Q. Why?

MR. BURKE: Why did the captain order him?

MR. MCKEE: Yes.

MR. BURKE: Object to form.

BY MR. MCKEE:

Q. To your knowledge, why were you ordered to do so?

A. I don't know.

Q. Had you ever been ordered to draft a report before?

A. No.

Q. Have you been ordered since to draft a report?

A. No.

Q. Because I missed how you -- how others had been responding to this, I'll be a little more careful how I ask.

26

On the rest of the paragraphs, did you think up the words used there?

A. Excuse me?

Q. On the remaining paragraphs, two, two of them, --

A. Yes.

Q. -- did you think up the words used there?

A. Yes.

Q. Did anyone help you with it?

A. No.

Q. Did anyone review it?

A. Yes. My supervisor.

Q. Are these words the exact words you used --

A. Yes.

Q. -- until it was finalized?

A. Yes.

Q. When you arrived at the end of Duval Street, down by the Southernmost, who was already there at the scene?

A. I don't --

Q. As far as police officers you saw?

A. I know that I saw Officer Lovette, Officer Garrido and Officer Calvert was right in front of me.

Q. Okay. And by right in front of you, meaning in his vehicle?

A. Yes. And then we exited at the same time.

Q. And when you exited, what did you next do?

27

A. We went to the beach.

Q. And did you walk or run?

A. Jogged, I guess.

Q. Okay. When you arrived at the scene where Mr. Eimers was located, what was the current status of what was going on there? What did you see?

A. He was fighting and resisting the officers on scene.

Q. He was fighting?

A. Well, the terminology of bracing and pulling is, you know, actively resisting.

Q. Did you see the initiating events when Mr. Eimers first started acting in a way that you say was resisting?

A. No, I wasn't present.

Q. So you have no personal knowledge of his conduct, his demeanor or anything until the time that you arrived and multiple officers are attempting to handcuff him?

MR. BURKE: Object to form.

MR. REYNOLDS: Join.

A. That is correct.

Q. How many people at that time were involved with him when you first came upon the scene where they're trying to handcuff him?

A. As I told you, I only saw Officer Lovette and Officer Garrido, and Officer Calvert was in front of me.

28

Q. You didn't see Officer Del Valle?

A. No, I did not.

Q. Was Officer Del Valle --

A. At the time of the event, I didn't see him, but through the video --

MR. BURKE: Let him, let him ask his question and then you'll have a chance to answer it, Officer.

BY MR. MCKEE:

Q. You were just here when the prior officer testified and he said there was him and Officer Del Valle, right?

A. Correct.

Q. You didn't see Officer Del Valle?

A. No, I did not.

Q. But you saw Officer Lovette?

A. Yes.

Q. And he was actively involved?

A. Correct.

Q. How was he positioned?

A. As he stated, he was in a three-point pin.

Q. Why was he using a three-point pin, if you know?

MR. REYNOLDS: Objection, form.

A. Again, that's something you would have to ask him.

Q. How do you do a three-point pin with Officer Del Valle on one shoulder and the other officer on the other shoulder?

29

1    MR. REYNOLDS: Objection, form.
2    A. Again, I didn't see Officer Del Valle.
3    Q. Was the prior officer incorrect in his recitation
4  of the facts?
5    A. No, that's his --
6    MR. BURKE: He didn't say that.
7    THE WITNESS: That's --
8    MR. BURKE: You just -- you're making a mistake,
9  Bob.
10   MR. MCKEE: That's not a form.
11   THE WITNESS: My perspective is completely
12 different than others.
13 BY MR. MCKEE:
14   Q. Was Officer Zamora there?
15   A. Not at that time.
16   Q. So when the handcuffing is going on, who did you
17 see to be there?
18   A. Officer Garrido, Officer Calvert and Officer
19 Lovette.
20   Q. So Zamora wasn't there?
21   A. Not at that time.
22   Q. So, as you heard Officer Garrido explain what he
23 saw, was he wrong?
24   MR. REYNOLDS: Objection, form.
25   A. It's his perspective.

30

1    Q. Wasn't he the officer doing the handcuffing?
2    A. Yes, he was.
3    Q. Should it be the officer doing the cuffing that
4  does the three-point pin?
5    MR. REYNOLDS: Objection, form.
6    MR. BURKE: Object to form.
7    A. It's up to him to determine that.
8    Q. It's not up to the officer on the scene that's in
9  charge?
10   MR. REYNOLDS: Objection, form.
11   A. I -- can you rephrase that?
12   Q. Who was the officer on the scene who was in charge?
13   A. Not until Zamora gets there, is he --
14   Q. Nobody, no one was in charge?
15   A. Well, we all have our duties and we all try to do
16 everything that we can do in our power.
17   Q. Who was supposed to be giving orders to Mr. Eimers
18 at the scene?
19   A. I don't know.
20   Q. Do you know who was giving orders to Mr. Eimers at
21 the scene?
22   A. No. I was not.
23   Q. Should one officer be the only one giving orders at
24 the scene?
25   A. Usually, yes.

31

1    Q. Otherwise, it can be confusing to the person that
2  you're attempting to detain, correct?
3    A. Correct.
4    Q. It could also be confusing to the officers who are
5  attempting to perform the tasks, correct?
6    A. Correct.
7    Q. You say in your report that the individual was
8  given clear, loud, verbal commands. Who was giving them?
9    A. From my perspective, it was Officer Lovette.
10   Q. Officer Lovette was giving the commands?
11   A. Yes.
12   Q. Do you remember what he said to the individual?
13   A. Stop resisting.
14   Q. Do you know why he didn't testify that he gave
15 those commands?
16   MR. REYNOLDS: Objection, form.
17   A. Again, that's his perspective. My perspective was
18 that.
19   Q. How does one -- have you received training on the
20 physiology of someone who is suffocating?
21   A. No.
22   MR. REYNOLDS: Objection, form.
23   Q. How does one stop resisting the desire to breath?
24   MR. REYNOLDS: Objection, form.
25   A. I don't know that.

32

1    Q. Never trained that?
2    A. No.
3    MR. REYNOLDS: Objection, form.
4    Q. So if you put someone in a position that they
5  either cannot breath, their breathing is reduced or they fear
6  they will not be able to breath, you've never received
7  training on how to deal with that type of person?
8    MR. BURKE: Object to form.
9    MR. REYNOLDS: Join.
10   A. No.
11   Q. Have you ever had training prior to 2013, November,
12 on the physiological effects of a prone restraint?
13   A. No.
14   Q. Isn't that one of the required trainings that you
15 had to have in the two-year period before this event?
16   A. The prone position in handcuffing, yes.
17   Q. Yes. And during that training, did you receive it?
18   A. I believe so, yes.
19   Q. And during that training, did you learn about the
20 dangers to the person being restrained of that type of
21 restraint?
22   A. I don't know. Maybe.
23   Q. Do you remember it?
24   A. I don't recall.
25   Q. So your training wasn't very good then?

8 (Pages 29 to 32)

33

```
 1        MR. BURKE:  Object to form.
 2        MR. REYNOLDS:  Objection, form.
 3   BY MR. MCKEE:
 4        Q.  I mean that sincerely.  You don't remember anything
 5   about that training?
 6        MR. REYNOLDS:  Objection, form.
 7        A.  I don't recall that.
 8        Q.  As you sit here today, as an officer who's gone
 9   through this experience, have you been trained to know the
10   source of physiological difficulties that a prone restraint
11   might cause on an individual?
12        A.  From my --
13        Q.  From your own training.
14        A.  From my training or my --
15        Q.  From your training.
16        A.  No, I don't -- I don't know if I have or not.
17        Q.  You have no recollection of it as you sit here?
18        A.  No, I don't recall.
19        Q.  How did you assist in securing Mr. Eimers' hands?
20        A.  I took his left arm and I assisted in trying to
21   place the other handcuff.
22        Q.  His left arm was already handcuffed?
23        A.  Yes, but I was holding it.
24        Q.  Okay.  You were just here for Officer Garrido's
25   description of the events.  Did you hear him describe that
```

34

```
 1   you assisted him with the handcuffing?
 2        A.  No.
 3        Q.  Were you the person that pulled Mr. Eimers' right
 4   arm back?
 5        A.  No.
 6        Q.  Who was that?
 7        A.  I don't know.
 8        Q.  You heard Mr. -- or, Officer Garrido admit that he
 9   had done it, right?
10        A.  Yes.
11        Q.  But somehow, Officer Garrido had gotten his own
12   finger caught and he clasped the latching mechanism on the
13   right handcuff, correct?
14        A.  I believe so.  That's what he said.
15        Q.  And so, did that happen before you got into the mix
16   or after?
17        A.  No, he was already in discomfort when I got there.
18        Q.  So you didn't actually do anything with handcuffing
19   this man?
20        A.  No.
21        Q.  He was already cuffed?
22        A.  Correct.
23        Q.  So what you just said a few minutes ago was not
24   true.
25        MR. REYNOLDS:  Objection, form.
```

35

```
 1   BY MR. MCKEE:
 2        Q.  You said you assisted in handcuffing.
 3        A.  Yeah, in the left -- with his left arm.
 4        Q.  No, the left arm was already done.
 5        A.  Yes, but I have to -- you have to put both hands in
 6   handcuffs.
 7        Q.  Yeah, I know, but it was the right hand that got
 8   the finger of --
 9        A.  Right.
10        Q.  The right hand of Mr. Eimers that had caught --
11        A.  It wasn't fully in there when his fingers jammed in
12   the other handcuff.
13        Q.  So it wasn't locked yet?
14        A.  I don't believe so.
15        Q.  Well, did you have to unlock anything to get his
16   finger out?
17        A.  No.
18        Q.  Did you have to open the cuffs?
19        A.  I didn't, no.
20        Q.  Didn't you say that in your report, that you
21   assisted in securing the individual's hands and clearing
22   Officer Garrido's hands from the cuffs?
23        A.  Yes.
24        Q.  Well, how many hands were in the cuffs?
25        A.  His one hand was in --
```

36

```
 1        Q.  Why did you say two in your report?
 2        MR. BURKE:  Object to form.
 3   BY MR. MCKEE:
 4        Q.  There's only --
 5        A.  Misspelling.
 6        Q.  Ah.  Did you say that you put the cuffs on this man
 7   in any way, shape or form in your report?
 8        A.  No.  I said I assisted.
 9        Q.  The reality is, the cuffs were already on and you
10   helped pull Officer Garrido's finger out from the cuff that
11   you locked in on, right?
12        A.  I believe so.
13        Q.  Okay.  Did you see how Officer Garrido got his
14   finger stuck in the handcuff?
15        A.  No, I did not.
16        Q.  So you, when you said that he had stuck due to the
17   individual's resistance, you don't really know how it got
18   stuck, do you?
19        A.  No.
20        Q.  So that statement was without knowledge in this
21   report, right?
22        MR. BURKE:  Object to form.
23        A.  Well, I was there and I visually saw he was stuck
24   in the handcuff.
25        Q.  Yeah, but you didn't see how he got stuck, did you?
```

9 (Pages 33 to 36)

37

1    A.  I saw him resisting, so.
2    **Q.  So you guessed?**
3         MR. BURKE:  Object to form.
4    BY MR. MCKEE:
5    **Q.  Right?**
6    A.  Through my opinion and my perspective, and my
7    experience of handcuffing people and officers handcuffing
8    people, they wouldn't normally put their finger in the
9    handcuff without resistance.
10   **Q.  Well, possibly, but it could have been that in his**
11   **speed and direction of force, he just accidentally locked**
12   **himself in with Mr. Eimers when he latched -- it caught shut,**
13   **right?**
14        MR. BURKE:  Object to form.
15   A.  Could be a possibility, but generally not.
16   **Q.  But you don't know because you didn't see it,**
17   **right?**
18   A.  It's a possibility.
19   **Q.  You don't know because you didn't see it, right?**
20   A.  It's a possibility.
21   **Q.  Is it a possibility that you didn't know?**
22   A.  Generally, we are trained to handcuff several
23   thousands of times and never have I once had a finger stuck
24   in my handcuff without resistance.
25   **Q.  But you don't know about Officer Garrido, right?**

38

1    You don't know about his dexterity?
2    A.  Again, that's a possibility.
3    **Q.  My question to you, though, is you didn't see it**
4    **happen when the finger got stuck, did you?**
5    A.  No, I did not.
6    **Q.  Officer Garrido said in his report of December**
7    **2013, that Mr. Eimers became unresponsive while he was on the**
8    **ground, after handcuffing.  Is that inaccurate?**
9         MR. BURKE:  Object to form.
10   A.  From my perspective, it was inaccurate.
11   **Q.  What's your perspective as to when he became**
12   **unresponsive?**
13   A.  He was resisting the entire time until we lifted
14   him up.
15   **Q.  And so it's not until you exerted more force,**
16   **lifting him, that he went unconscious?**
17        MR. REYNOLDS:  Objection, form.
18        MR. BURKE:  Object to form.
19   A.  When we brought him up is when he went unconscious.
20   **Q.  During the time that you arrived to the scene of**
21   **Mr. Eimers and the other officers, did you personally check**
22   **on the health status of Mr. Eimers?**
23   A.  I did not personally.
24   **Q.  Did you see any officer check on the health status**
25   **of Mr. Eimers up to the point where he is noticed to be**

39

1    unconscious?
2    A.  I don't know what other officers did.
3    **Q.  Did you -- do you have a recollection of any**
4    **officer doing that?**
5    A.  Not from my vantage point, no.
6    **Q.  In your training, prior to this event, were you**
7    **aware of a requirement to monitor the health of a person**
8    **being put in a prone restraint?**
9         MR. REYNOLDS:  Objection, form.
10        MR. BURKE:  Object to form.
11   A.  No.
12   **Q.  Were you aware of the health consequences that**
13   **could occur due to the prone restraint activities?**
14   A.  No.
15   **Q.  To the person being constrained?**
16   A.  No.
17   **Q.  Never received that training?**
18        MR. REYNOLDS:  Objection, form.
19   A.  I don't believe so.
20   **Q.  Were you aware that in a prone position, a person**
21   **can have a loss of oxygenation face down with pressure**
22   **applied to his torso?**
23   A.  Yes.
24   **Q.  Were you trained that or just common sense?**
25   A.  Just common sense.

40

1    **Q.  Ever play football?**
2    A.  Yes.
3    **Q.  Ever get the wind knocked out of you?**
4    A.  Yes.
5    **Q.  And have the panic of not thinking you can breath**
6    **again?**
7    A.  Yes.
8    **Q.  Very disconcerting, wasn't it?**
9    A.  Yes, it is.
10   **Q.  Feel like you're going to suffocate, right?**
11        MR. BURKE:  Object to form.
12        MR. REYNOLDS:  Join.
13   BY MR. MCKEE:
14   **Q.  You experienced it yourself, right?**
15   A.  Yes.
16   **Q.  And when you were feeling that feeling, scared to**
17   **death?**
18        MR. BURKE:  Object to form.
19        MR. REYNOLDS:  Join.
20   BY MR. MCKEE:
21   **Q.  Right?**
22   A.  No, I wasn't.
23   **Q.  You weren't?**
24   A.  No.
25   **Q.  So you thought you'd probably breath again?**

10  (Pages 37 to 40)

41

1    A. Yes.
2    Q. But that wasn't with three guns pointed at you,
3  either, was it?
4    MR. BURKE: Object to form.
5    MR. REYNOLDS: Objection, form.
6    A. I don't know when guns were pointed or not.
7    Q. When you arrived --
8    MR. BURKE: He's talking about you. Did you have
9  three guns pointed at -- he's asking about you.
10    THE WITNESS: No, I have never had three. I've
11  only had one gun in front of me.
12    MR. MCKEE: Me, too.
13  BY MR. MCKEE:
14    Q. When you arrived at the scene, did you see officers
15  with weapons drawn?
16    A. No, I did not.
17    Q. Had they -- did you learn that they had drawn
18  weapons?
19    A. Yes, through the video.
20    Q. Do you remember seeing three with drawn weapons?
21    A. No, I did not.
22    Q. How many did you see?
23    A. I saw only the rifle.
24    Q. You heard Officer Garrido say he had drawn his own,
25  correct?

42

1    A. Yes.
2    Q. Okay. So the two individuals coming at Mr. Eimers
3  on that beach, after he had laid down, were with drawn
4  weapons, right?
5    MR. BURKE: Object to form.
6    MR. REYNOLDS: Join.
7    A. That's what they stated.
8    Q. Did you ever, prior to writing your report, did you
9  speak to any of the other officers about when the resistance
10  started?
11    A. No.
12    Q. Did you think it was important for a full, fair
13  exposition of the facts in your report, to investigate before
14  writing as to whether someone was resisting or someone was
15  fighting to save his own life?
16    MR. REYNOLDS: Objection, form.
17    A. From my vantage point, he was resisting when I got
18  there.
19    Q. Did you do any investigation to check out another
20  vantage point such as whether he was fully compliant until
21  someone ripped his arms back to put cuffs on him?
22    MR. BURKE: Object to form.
23    MR. REYNOLDS: Objection, form.
24    A. That's not my duty.
25    Q. So you didn't do it?

43

1    A. No.
2    Q. I don't notice anything in your report about
3  anything being put around his legs.
4    A. I didn't --
5    Q. Did that --
6    A. I didn't see anything on that.
7    Q. So you didn't see that happen?
8    A. Uh-uh.
9    Q. No?
10    A. No. No.
11    Q. So after he was handcuffed, you don't have anything
12  in your report to say that any sort of device was put around
13  his feet or legs, correct?
14    A. I didn't see anything.
15    Q. So, as far as you're concerned, that didn't happen,
16  right?
17    MR. BURKE: Object to form.
18    MR. REYNOLDS: Join.
19    A. You would have to ask the officers by the legs.
20    Q. But you were there.
21    MR. REYNOLDS: Objection, form.
22    A. Yeah, but from my vantage point, I was focusing on
23  the handcuffing.
24    Q. Well, one thing we've learned, I think, is that the
25  restraint to his legs didn't happen until after the

44

1  handcuffs, if we believe anyone on this, right?
2    MR. BURKE: Object to the form.
3    MR. REYNOLDS: Objection, form.
4    A. I don't know. You'd have to ask --
5    Q. You arrived at the point of handcuffing, right?
6    A. Correct.
7    Q. And you were there until the paramedics came,
8  right?
9    A. Correct.
10    Q. And you didn't see anything about his lower legs
11  being bound, too?
12    A. No.
13    Q. Is it that you didn't see it or you decided not to
14  report it?
15    MR. REYNOLDS: Objection, form.
16    A. No, I didn't see it.
17    Q. So you didn't see anyone run to the car and get
18  such a device?
19    A. I heard it, but I don't know if they did or not.
20    Q. And while you're there, you're there with Mr.
21  Eimers the whole time, right?
22    A. No.
23    Q. Where did you go?
24    A. I was tasked to look inside the car.
25    Q. Okay. Is that before or after he was handcuffed?

11 (Pages 41 to 44)

45

A. No, that was after.

Q. After he was handcuffed, had he become unresponsive at that point?

A. No. When we lifted him up.

Q. Oh. So up to the time you lifted him up, had anyone put anything on his lower legs?

A. I don't know. I wasn't by his lower leg area.

Q. But you were with him throughout that time frame, right?

A. Yes.

Q. And you didn't see anyone go to the car, police cruiser, and get some equipment to bind his legs as well?

A. You would have to ask them.

Q. You didn't see it?

A. I did not.

Q. How was Mr. Eimers lifted?

MR. BURKE: I couldn't hear the question. I'm sorry.

MR. MCKEE: How was Mr. Eimers lifted.

A. I had his under-stomach. I believe Zamora was to my left, and several other people were on the other side and by his feet.

Q. So you lifted him face down?

A. No. We were lifting him upwards off the ground.

Q. Yeah, but I'm trying to understand. Was he in the

46

prone position when he was being lifted?

A. Yes.

Q. And you lifted him in a prone position upward?

A. Yeah. And then, eventually, hopefully, to his feet.

Q. But that was face down that you were doing it?

A. Yes.

Q. So when Officer Garrido said he was face up before that happened, was that accurate?

MR. REYNOLDS: Objection, form.

A. No, I don't believe he said that.

Q. Well, we have his transcript. I asked him specifically that, but it says what it says.

But your recollection is that he was face down when you lifted him physically --

A. Yes.

Q. -- to put him in a standing position?

A. Yes.

Q. Did anyone bother to look at his face at that time?

A. I didn't.

Q. How about the color of his skin? Did you look?

A. No.

Q. Did you make any conscious effort to see whether he was already turning blue or sort of purple?

A. No.

47

Q. And then, you put compressive force to his belly and lifted him and his body weight upwards, right?

A. Yes.

Q. And when -- did you get him to a standing position?

A. No.

Q. What happened next?

A. Sergeant Zamora noticed he was unconscious.

Q. At what position was he when that notification came out?

A. I don't know.

Q. Was he almost standing, was he at an angle or was he still prone?

A. I have no idea.

Q. When it was found that he was unconscious, what was next done with his body?

A. He was placed down on the ground, hand -- un-handcuffed, and then lifesaving techniques were administered.

Q. So your story is the handcuffs came off after an attempt to stand him up occurred and he was found to be unresponsive?

A. That is correct.

Q. And so, you heard Mr. Garrido and you saw in his report, and I'll quote, quote, "Sergeant Zamora and I remained in control of his upper body and other officers began attempting to secure his legs." You didn't see that?

48

A. No, I did not.

Q. "While waiting for other officers to secure the suspect's legs, Sergeant Zamora announced that the subject was unconscious." You didn't see that, either, or hear that?

A. No, I heard that when we were lifting him up.

Q. Well, that's in securing the legs. So when his legs were being secured is when Sergeant Zamora is --

A. No. When we were lifting him up.

Q. And Officer Garrido says, "I also noticed that the subject was not responsive."

MR. BURKE: And your question?

BY MR. MCKEE:

Q. And then he says, quote, "As other officers began to un-cuff the suspect to assess him for medical problems, I ran to my patrol vehicle and grabbed my medical bag."

Were you within inches of Officer Garrido when all this was happening?

MR. BURKE: Object to form.

MR. REYNOLDS: Join.

A. Inches of what?

Q. Of his body.

A. Of what?

Q. Of his body, of this action.

A. Of -- at what point?

Q. When officers are attempting to secure Mr. Eimers'

49

1   legs?
2       A.  I was across from Garrido.
3       Q.  How far away?
4       A.  The size of Eimers, I guess.
5       Q.  And you didn't see officers attempting to secure
6   his legs?
7       A.  No, I was not --
8       Q.  Where were you facing?
9       A.  Right there by his arms and the handcuffs.
10      Q.  So you were facing Mr. Eimers?
11      A.  Yes.
12      Q.  After he was uncuffed, was anything removed from
13  his legs?
14      A.  I don't recall.
15      Q.  Was he placed back down on the ground face up or
16  face down?
17      A.  Face up.
18      Q.  Who attempted to do anything to help him physically
19  at that point?
20      A.  Officer Del Valle and Officer Gary Celcer.
21      Q.  Do you remember what was done?
22      A.  CPR.
23      Q.  Who was doing what?
24      A.  I don't recall who was doing what.
25      Q.  Did anyone -- did you see them doing it?

50

1       A.  Briefly, yes.
2       Q.  Did you see anyone clear his tongue?
3       A.  No, I did not.
4       Q.  Did you see anyone verify his airway was clear?
5       A.  No, I did not.
6       Q.  Did you see anyone attempt to remove sand from his
7   nose or his mouth?
8       A.  No, I did not.
9       Q.  Did you see anyone check his pulse?
10      A.  No, I did not.
11      Q.  Who called the paramedics?
12      A.  I have no idea.
13      Q.  Do you know when the call went out?
14      A.  No, I don't.
15      Q.  Was there an intentional delay in calling the
16  paramedics?
17      A.  No.
18      Q.  Have you ever been trained in rescue techniques?
19      A.  Yes.
20      Q.  Have you ever been trained in dealing with someone
21  who has drowned?
22      A.  Yes.
23      Q.  Have you ever been trained in dealing with someone
24  who may have swallowed objects that would block his airway?
25      A.  Yes.

51

1       Q.  Do you agree that one of the first steps you do is
2   clear the air passage?
3       A.  Yes.
4       Q.  You never saw anyone do that that day, did you?
5       A.  I wasn't the ones that were administering CPR.
6       Q.  Were you there?
7       A.  I saw it from, you know, --
8       Q.  Couple feet?
9       A.  -- a distance.
10      Q.  Couple feet?
11      A.  I have no idea.
12      Q.  Did you see anyone do an airway clearance?
13      A.  I personally did not.
14      Q.  How many total officers were in physical presence
15  of Mr. Eimers that morning?
16      A.  I don't know.  That would be in CAD.
17      Q.  At least five?
18      MR. BURKE:  Object to form.
19      MR. REYNOLDS:  Join.
20      A.  Yes.
21      Q.  As many as ten?
22      MR. REYNOLDS:  Object, form.
23      A.  I don't know.
24      Q.  When you were approaching the scene, do you recall
25  hearing the radio order, turn on the ICOP?

52

1       A.  Yes.
2       Q.  And you obeyed?
3       A.  Yes.
4       Q.  All officers should have obeyed, correct?
5       A.  Yes.
6       Q.  And all officers should have obeyed with
7   functioning systems, correct?
8       MR. BURKE:  Object to form.
9       MR. REYNOLDS:  Objection, form.
10      MR. BURKE:  Go ahead.
11      A.  Yes.
12      Q.  When you were in the presence of Mr. Eimers during
13  the activities of the handcuffing, his loss of responsiveness
14  and the CPR efforts, if you were to pretend that what you're
15  now leaning on is Mr. Eimers, would you have been as close as
16  you currently are on that desk?
17      A.  I -- I don't know.
18      Q.  Well, there were times where you were actually
19  physically on Mr. Eimers, right?
20      A.  No.
21      Q.  How did you clear his arms?
22      A.  With my hands.
23      Q.  So you were touching him?
24      A.  Yes.
25      Q.  And he was on the ground?

13 (Pages 49 to 52)

53

1    A. Yes.
2    Q. Were you standing or kneeling?
3    A. I was kneeling in the sand.
4    Q. And so you were literally physically touching him?
5    A. Yes.
6    Q. So if this table was Mr. Eimers, you were
7    practically just like that, right?
8    A. Yes.
9    Q. Except it's on the ground?
10   A. Correct.
11   Q. And when CPR was happening, if this desk is Mr.
12   Eimers, --
13   A. Uh-huh.
14   Q. -- where are you?
15   A. By the car.
16   Q. About eight feet away?
17   A. I -- I don't know.
18   Q. Let me clarify. Which car, the PT Cruiser?
19   A. His PT Cruiser.
20   Q. About eight, ten feet away?
21   MR. BURKE: Object to form.
22   MR. REYNOLDS: Join.
23   A. Possibly, yes.
24   Q. You approximate distances a lot of times in your
25   career, right?

54

1    A. Yes.
2    Q. So it was about eight or ten feet away, right?
3    A. Possibly.
4    Q. Was your back turned to him or were you looking at
5    him? What was going on?
6    A. My back was turned.
7    Q. The whole time?
8    A. When I saw Gary and Henry administering CPR, that's
9    all I needed, and then I was -- my back was turned to them.
10   Q. When did Mr. Eimers become unresponsive?
11   MR. BURKE: Object to the form, redundant.
12   MR. REYNOLDS: Objection, form.
13   BY MR. MCKEE:
14   Q. If you know. If you know.
15   A. I already just told you.
16   Q. Well, do you know whether he was already
17   unresponsive before Mr. Zamora --
18   A. No.
19   Q. -- noticed it? That's what I'm getting at. I'm
20   not trying to --
21   A. He was resisting all the way up to when we lifted
22   him up.
23   Q. Do you find that there's a difference between
24   resisting and trying to survive with your body actions?
25   MR. REYNOLDS: Objection, form.

55

1    A. I don't know.
2    Q. Is resisting arrest different than trying to avoid
3    dying?
4    MR. BURKE: Object to form.
5    MR. REYNOLDS: Objection, form.
6    BY MR. MCKEE:
7    Q. In your mind?
8    A. I don't know.
9    Q. In your training, were you ever trained that
10   there's a difference?
11   A. No.
12   Q. For example, when you're writing reports, if you
13   felt the actions of the person that you were trying to arrest
14   were because of some other physical issues he was dealing
15   with, would you include that in your report?
16   A. If I knew the, you know, the circumstances
17   beforehand, then yes; but all that was unknown.
18   Q. Have you ever found yourself on sand, face down,
19   under the control of another person?
20   A. Personally, yes.
21   Q. And under what circumstances did that occur?
22   A. Playing football in the sand.
23   Q. Okay. Was that person attempting to subdue you and
24   keep you in that position?
25   A. I don't -- I don't recall, honestly.

56

1    Q. Because typically, in football, unless you've got
2    some animal out there, the goal is to simply get you down,
3    right?
4    A. Yes.
5    Q. So what I'm getting at is were you -- have you
6    ever, either in practice, training or real life, been face
7    down in something that could cause you to suffocate --
8    MR. BURKE: Object to --
9    BY MR. MCKEE:
10   Q. -- where you are not controlling yourself, --
11   MR. BURKE: Object to form.
12   BY MR. MCKEE:
13   Q. -- someone else is?
14   MR. REYNOLDS: Join.
15   A. Yes.
16   Q. Describe that condition.
17   A. My cousin played a bad joke and almost drowned me
18   to death.
19   Q. Okay. When you were in that circumstance, not a
20   police detention but a cousin pulling a prank, whatever, did
21   you fear that you actually could drown?
22   A. Of course.
23   Q. Did you fight back?
24   A. No.
25   Q. You were going to just let it happen?

14  (Pages 53 to 56)

57

1    A.  The circumstances wouldn't let me fight.

2    Q.  What circumstances were those?

3    A.  I was very little.

4    Q.  How old were you?

5    A.  Eleven.

6    Q.  So you weren't strong enough to fight back?

7    A.  No.

8    Q.  Had you been your size now, would you have fought

9    back?

10   A.  Most likely.

11   Q.  And you recognize that that's probably a typical

12   trait of most people who have the survival instinct in them,

13   right?

14       MR. REYNOLDS:  Objection, form.

15   A.  Most likely.

16   Q.  So in a prone restraint on loose sand, face down,

17   with multiple large men and a woman on your body, would you

18   anticipate that there may be a response to fight back to

19   preserve oneself?

20       MR. BURKE:  Object to form.

21       MR. REYNOLDS:  Join.

22   A.  From my perspective and opinion, he wasn't

23   struggling.  It was controlled resistance.

24   Q.  But you weren't monitoring his breathing, were you?

25       MR. REYNOLDS:  Objection, form.

58

1    A.  I was not.

2    Q.  You didn't look at his face as to whether he had

3    sand up his nose and in his mouth?

4    A.  No, I was not.

5    Q.  After this event, did you look?

6    A.  No.

7    Q.  Have you seen the hospital photos?

8    A.  No, I did not.

9    Q.  Do you have an understanding why the ME didn't find

10   sand in his nose when the photos showed it at the hospital?

11       MR. REYNOLDS:  Objection, form.

12   A.  No, I don't.

13   Q.  Do you know whether the police, paramedics or the

14   hospital cleaned him up before the ME ever saw him?

15   A.  No.

16       MR. REYNOLDS:  Objection, form.

17   Q.  You don't know one way or the other?

18   A.  No.

19       MR. REYNOLDS:  Same objection.

20   Q.  For how long did you stay on the scene after the

21   paramedics arrived?

22   A.  I don't know.

23   Q.  Do you remember seeing Officer Wanciak there?

24   A.  No, I never saw her there.

25   Q.  You never saw her there?

59

1    A.  No.

2    Q.  At no time?

3    A.  Only through what people have stated and --

4    Q.  You saw the video yesterday, right?

5    A.  Yes.

6    Q.  Did you see her in the video?

7    A.  I saw her in the video.

8    Q.  Did you see yourself in the video?

9    A.  I believe so.

10   Q.  But you don't remember that she was even there

11   other than seeing the video?

12   A.  Correct.

13   Q.  While at the scene, did you hear an officer, and we

14   discussed it yesterday with her, Officer Wanciak, saying

15   something about, "Get that SOB away from me, he just killed

16   that man"?

17   A.  No, I never heard that.

18   Q.  Did you hear any witness say that?

19   A.  No.

20   Q.  If you had, what would you have done?

21       MR. BURKE:  Object to the form of the question.

22       MR. REYNOLDS:  Objection, form.

23   BY MR. MCKEE:

24   Q.  Based on your training, procedures, and heard a

25   witness exclaim something like that about a police action,

60

1    would you have done anything?

2        MR. REYNOLDS:  Objection, form.

3    A.  My opinion, yes.

4    Q.  What would you have done?

5    A.  Taken a statement.

6    Q.  Taken a statement, which would have included

7    identifying who the person was, contact information, and what

8    they saw to cause that exclamation?

9    A.  Correct.

10   Q.  When he was found unresponsive and you lifted him,

11   who turned him over?  Who moved him from prone down to --

12   A.  We all did.

13   Q.  -- prone up?

14   A.  We all did.

15   Q.  And when you say, we all did, who is that?

16   A.  Zamora, me and Gabe, and whoever else was on --

17   Q.  Was Lovette also there during that?

18   A.  I honestly don't know at that point.

19       MR. MCKEE:  Number 9?

20       MR. BURKE:  I believe so.

21       (Plaintiff's Exhibit 9 was marked.)

22       MR. MCKEE:  I even have one more.

23       MR. BURKE:  Thank you.

24   Q.  Have you ever seen this before, sir?

25   A.  Yes.

15  (Pages 57 to 60)

61

1    Q.  What is it?
2    A.  The FDLE report.
3    Q.  Did you ever have an opportunity to review it for
4  its accuracy?
5    A.  Yesterday.
6    Q.  Okay.  Was it accurate?
7    A.  Somewhat.  I believe so, yes.
8    Q.  Is there anything in it that you recognize to not
9  be accurate?
10       MR. BURKE:  This is the summary of his statement?
11       MR. MCKEE:  Yeah.
12       MR. BURKE:  Okay.
13  BY MR. MCKEE:
14    Q.  And you may certainly take the time to review.
15    A.  Oh, this is just my --
16    Q.  Having the opportunity to review it, --
17    A.  Yeah.
18    Q.  -- did you find anything that was not accurate or
19  true?
20    A.  I believe most of it is true.  I don't recall
21  exactly what I said, but --
22    Q.  Well, what I'm getting at is, upon review, and you
23  may do so now -- that's why I was waiting.
24    A.  Uh-huh.
25    Q.  I'm sorry, I stopped looking at you -- was there

62

1  anything about that which was written as a summary that you
2  found to be not accurate?
3       MR. BURKE:  Object to form.
4    A.  No, I don't believe so.
5    Q.  And I take you to the summary portion, second
6  paragraph.  It indicates that you assisted Officer Garrido
7  while handcuffing the suspect, correct?
8    A.  Yes.
9    Q.  And that's what you've testified today, too.
10       Do you have any understanding why Officer Garrido
11  would say that he was the one doing it and no one else was?
12       MR. REYNOLDS:  Objection, form.
13       MR. BURKE:  Object to form.
14    A.  He was in discomfort and pain.
15    Q.  Well, as he's locked himself into the right-hand
16  cuff, right?
17    A.  I believe so, yes.
18    Q.  But up to that time, he was doing the whole
19  operation?
20    A.  Correct.
21    Q.  Then it states here that you relieved Officer
22  Garrido because Officer Garrido's hand was injured while
23  attempting to handcuff the subject.
24    A.  Yes, he was in pain and discomfort.
25    Q.  By relief, what did you mean?

63

1    A.  When it was finally jarred loose, I guess, his
2  finger.
3    Q.  Did he leave the scene?
4    A.  No.  He might have just walked away a little bit.
5    Q.  Okay.  Why did you take Mr. Eimers' left hand?
6    A.  Because that was my position.  I was on his left
7  side.
8    Q.  But didn't Officer Garrido lock his right finger
9  into the right cuff?
10    A.  Yes.
11    Q.  Meaning both left and right hands are cuffed at
12  that point, right?
13    A.  I don't know what finger or hand of his was, you
14  know, jammed into the handcuff.  All I know is I grabbed the
15  left arm because that was from my vantage point and my
16  position.
17    Q.  You grabbed his left arm, but that arm was already
18  cuffed, right?
19    A.  I believe so, yes.
20    Q.  And the right hand was already cuffed, too,
21  correct?
22    A.  At --
23    Q.  With officer Garrido's finger caught in it?
24    A.  I believe so, yes.
25    Q.  So as far as this report that you continued to

64

1  struggle to get him handcuffed, --
2    A.  Uh-huh.
3    Q.  -- he was already handcuffed, right?
4    A.  Well, once his finger is released, we have to
5  secure the handcuffs.
6    Q.  Oh, I thought you said you didn't have to unlock it
7  again, that you just pulled it out.  Was I wrong hearing
8  that?
9    A.  Well, when you pull out his finger, there still
10  might be space for the subject's hands to be out of the
11  handcuffs.  You have to actually lock handcuffs in place to
12  actually secure them.
13    Q.  Which finger was it that was caught?
14    A.  I have no idea what finger.
15    Q.  Tip of a finger?
16    A.  I have no idea.
17    Q.  Are you saying that you made the cuffs tighter
18  after the finger was removed?
19    A.  You always have to have about two fingers of length
20  of that person's wrist to the handcuffs.  And that's what --
21    Q.  Are you saying that you made it tighter after you
22  pulled Officer Garrido's finger out of it?
23    A.  I don't believe I did or not.  I don't know.
24    Q.  You don't believe that you did or not, I don't
25  know.  I don't know what that means.

16  (Pages 61 to 64)

65

1    A.  All I know is he was in discomfort and pain.  We
2    try to assist in that.  I assisted in holding Mr. Eimers'
3    left arm.
4        Q.  Which was already cuffed --
5        A.  In that process --
6        Q.  -- with his right arm?
7        A.  I was holding his left arm.
8        Q.  Which was already cuffed to his right arm?
9        A.  Yes.
10       Q.  During this process with -- where you're arriving
11   with both hands cuffed, how is Eimers grabbing the officers'
12   hands?
13            MR. BURKE:  Object to form.
14   BY MR. MCKEE:
15       Q.  Which is what you say in this report.
16       A.  Yes, he was grabbing my -- my hands.
17       Q.  Because you've put your hands where his cuffed
18   hands are, right?
19       A.  Yes, I was holding his arms.
20       Q.  Was he pulling against you or pushing against you?
21       A.  Both.
22       Q.  Because you'd be the one piece of momentum he could
23   use to pull himself up out of the sand, right?
24            MR. BURKE:  Object to form.
25       A.  No.

66

1        Q.  No?  So you don't think that body mechanism, that
2    physiologic response is something someone would do who wanted
3    to pull himself up out of being pushed into the sand?
4        A.  No, because he was pulling his arm into his body,
5    not away.
6        Q.  Exactly, which would mean he's pulling against your
7    weight to lift his arm, right?  That's how it works.
8            MR. BURKE:  Object to form.
9            MR. REYNOLDS:  Objection, form.
10       A.  No, I don't know.
11       Q.  If you pull towards yourself with another person on
12   you, that will lift you.  It's called a lever, right?
13            MR. BURKE:  Object to form.
14            MR. REYNOLDS:  Objection, form.
15       A.  I don't know.
16       Q.  Now, it states here that, "While handcuffing him,"
17   I'm quoting, "Officer Medina noticed the suspect had blood in
18   his right ear."
19       A.  That is correct.
20       Q.  Was that where his right earring was ripped out of
21   his earlobe?
22            MR. REYNOLDS:  Objection, form.
23       A.  No.
24       Q.  Was it coming out of his ear canal?
25       A.  Yes.

67

1        Q.  How did that happen?
2        A.  I don't know.
3            MR. REYNOLDS:  Objection, form.
4        Q.  Have you seen anyone bleed through their ears
5    through any mechanism other than head trauma?
6            MR. BURKE:  Object to form.
7            MR. REYNOLDS:  Objection, form.
8        A.  No, I don't believe I did.
9        Q.  Had you been watching what Officer Lovette had done
10   to this man?
11            MR. REYNOLDS:  Objection, form.
12   BY MR. MCKEE:
13       Q.  Did you watch his conduct with this man?
14       A.  I believe so.
15       Q.  Throughout the entire time?
16       A.  No.
17       Q.  So you won't -- you don't know whether what Officer
18   Lovette said on his Taser recording is false, that I dropped
19   a fucking bomb on this man's head?
20            MR. REYNOLDS:  Objection, form.
21   BY MR. MCKEE:
22       Q.  You don't know whether that's accurate or not
23   because you weren't watching him, right?
24            MR. BURKE:  Object to form.
25            MR. REYNOLDS:  Objection, form.

68

1        A.  I don't believe he did.
2        Q.  No, that's not my question.
3            You weren't watching him the whole time, were you?
4            MR. REYNOLDS:  Objection, form.
5        A.  Again, you would have to ask him.
6        Q.  I'm asking, were you watching him the whole time?
7        A.  No, I was not.
8        Q.  We already asked him.
9            But you also told us he doesn't normally tell false
10   stories about what happens at work, right?
11            MR. REYNOLDS:  Objection, form.
12   BY MR. MCKEE:
13       Q.  Right?
14            MR. REYNOLDS:  Objection, form.
15       A.  I believe so.
16       Q.  You believe that he does not tell false stories
17   about what happens at work, right?
18            MR. REYNOLDS:  Objection, form.
19       A.  I don't know.  People embellish things.
20       Q.  You've not heard one from him, have you?
21       A.  Excuse me?
22            MR. REYNOLDS:  Objection.
23   BY MR. MCKEE:
24       Q.  You've not heard one from him, have you?
25            MR. REYNOLDS:  Objection, form.

17 (Pages 65 to 68)

69

1     A.  I don't know whether or not anything he said is
2    true or not.
3     Q.  Okay.  But you're aware now that he didn't know he
4    was recording himself that day, right?
5     MR. REYNOLDS:  Objection, form.
6     A.  I -- I believe so, yes.
7     Q.  You believe so what?
8     A.  That he did not.
9     Q.  Now, here it says, "The officers placed the suspect
10   back on the ground and uncuffed him," right?
11    MR. BURKE:  Reading now from the summary of the
12   FDLE?
13    MR. MCKEE:  Correct.  Yes.
14    MR. BURKE:  Okay.
15  BY MR. MCKEE:
16    Q.  It says that, right?
17    MR. BURKE:  Object to form.
18    MR. REYNOLDS:  Join.
19  BY MR. MCKEE:
20    Q.  Was that accurate?
21    A.  On what?
22    Q.  What I just read, the summary.
23    MR. BURKE:  Does it say that?
24    MR. MCKEE:  I'll read it again.
25    A.  Uh-huh.

70

1     Q.  "The officers placed the suspect back on the ground
2    and uncuffed him."
3     A.  Correct.
4     Q.  So he wasn't uncuffed, found unresponsive on the
5    ground.  He was uncuffed after being placed back on the
6    ground, right?
7     A.  Correct.
8     Q.  According to you?
9     A.  Yes.
10    Q.  Do you know why Officer Garrido says something
11   else?
12    MR. BURKE:  Object to form.
13    MR. REYNOLDS:  Objection, form.
14    A.  I don't know what he said.
15    Q.  Is there a reason why you didn't speak to any
16   witnesses at the scene?
17    A.  I was tasked to look in the car.  And then, after
18   that, I was dispatched to another call.
19    Q.  Find any weapons in the car?
20    A.  No.
21    Q.  Any weapons on his body?
22    A.  I didn't search him.
23    Q.  Are you aware of any weapons having been found on
24   his person or in his property?
25    A.  No, I don't think so.

71

1     Q.  When did you first see blood in Mr. Eimers' right
2    ear?
3     A.  When Sergeant Zamora got there on scene and his
4    head was facing the cafe.
5     Q.  And during the handcuffing, where was Officer
6    Lovette?
7     MR. REYNOLDS:  Objection, form.
8     A.  Towards my left.
9     Q.  Was he at the suspect's, Mr. Eimers' head and
10   shoulder area?
11    MR. REYNOLDS:  Objection, form.
12    A.  Yes.
13    Q.  What do these words mean to you in this, in this
14   summary of your statement:  "After securing the suspect."
15   What does that mean to you?
16    MR. BURKE:  Object to the form of the question.
17    MR. REYNOLDS:  Join.
18    A.  What do you mean?
19    Q.  What did -- did you tell the investigator that you,
20   after, after you secured the suspect, the officers tried to
21   stand him up?
22    A.  That is correct.
23    Q.  What did you mean by "after securing the suspect"?
24    A.  Once everything -- when we knew that he was under
25   control and detained, that's when we lifted him up, because

72

1    he was resisting us the entire time.
2     Q.  And does "after securing the suspect" mean after he
3    was handcuffed and had the device around his legs?
4     A.  Again, I don't know if the device around his legs
5    was in place or not.
6     Q.  According to you, you're not aware of one even
7    being used?
8     A.  I wasn't by his legs, so.
9     Q.  Isn't it true that the story about putting that
10   around his legs actually was intended to show that he was
11   being violent, but it never really happened?
12    MR. BURKE:  Object to the form of the question.
13    MR. REYNOLDS:  Join.
14  BY MR. MCKEE:
15    Q.  It never was used?
16    MR. REYNOLDS:  Objection, form.
17  BY MR. MCKEE:
18    Q.  That's a story made up for these reports, right?
19    MR. BURKE:  Object to form.
20    MR. REYNOLDS:  Objection, form.
21    A.  No.
22    Q.  You never saw it, did you?
23    MR. REYNOLDS:  Objection, form.
24  BY MR. MCKEE:
25    Q.  You never saw it happen?

18 (Pages 69 to 72)

73

1    MR. REYNOLDS:  Same objection.
2    A.  I -- I saw him resisting.
3    Q.  No, no.  My question is, the device.  What is that
4  called again?
5    MR. DARREN HORAN:  Hobble.
6    MR. PAUL HORAN:  Hobble.
7  BY MR. MCKEE:
8    Q.  Was the hobble used?
9    A.  Again, I wasn't by his feet, so I wouldn't know.
10    Q.  But you're there next to his body.  You never saw
11  it used, right?
12    MR. BURKE:  Twenty-five times you've at least asked
13  that question.
14    MR. MCKEE:  And I'm going to ask it again until I
15  get --
16  BY MR. MCKEE:
17    Q.  Did you ever see it used?
18    MR. BURKE:  He told you, no, didn't see it.
19    MR. REYNOLDS:  Objection, form.
20    MR. BURKE:  How many times has he got to tell you?
21    MR. MCKEE:  Well, I'll keep asking until you stop
22  answering and he answers.
23    THE WITNESS:  No, I answered it several times.  You
24  can --
25    MR. BURKE:  Well, he's answered it 25 times.  I

74

1  mean, come on, let's get going.
2    MR. MCKEE:  I want to make sure it's clean here.
3  BY MR. MCKEE:
4    Q.  Did you ever see a hobble used?
5    A.  No.
6    MR. REYNOLDS:  Objection, form.
7    Q.  Did you ever see --
8    A.  I did not see anything by the feet because I was
9  not by the feet.
10    Q.  Okay.  So when he became unresponsive, did you see
11  them take the hobble off of him?
12    A.  No, I did not see that.
13    Q.  Did you ever see a hobble right there by his body
14  at any time?
15    A.  I don't know.  I wasn't by his feet.
16    Q.  But you were by his body.  Did you ever seen it
17  used?
18    A.  No, I did not.
19    Q.  Okay.  Have you ever seen a photo that shows a
20  hobble on his legs?
21    A.  No.
22    Q.  Have you seen anything to indicate that the use of
23  a hobble actually occurred?
24    A.  I have never seen any photographs.
25    Q.  Have you seen films showing it was in place and

75

1  used on Mr. Eimers?
2    A.  No, I never saw it in videos.
3    Q.  Have you seen anything other than a story made up
4  to sound like he was more violent than what he was?
5    MR. BURKE:  Object to form.
6    MR. REYNOLDS:  Objection, form.
7    A.  No.
8    Q.  If it wasn't used, why would anyone talk about it
9  as being used?
10    MR. BURKE:  Object to form.
11    MR. REYNOLDS:  Join.
12  BY MR. MCKEE:
13    Q.  Right?  Makes no sense, does it?
14    MR. BURKE:  Object to form.
15  BY MR. MCKEE:
16    Q.  Unless you're trying to cover something up?
17    MR. REYNOLDS:  Join.
18    A.  No.
19    MR. REYNOLDS:  Move to strike, argumentative,
20  assumes facts not in evidence.
21    Q.  In your career at the Key West Police Department,
22  have you ever had an event involving a police action where
23  all the direct evidence created by the police has been lost?
24  Have you ever seen that?
25    A.  No.

76

1    MR. BURKE:  Object to the form.
2    MR. REYNOLDS:  Objection, form.
3    Q.  Have you ever seen it where it's been destroyed?
4    MR. REYNOLDS:  Objection, form.
5    A.  No.
6    Q.  Have you ever seen it where it's been tampered with
7  by police officers --
8    A.  No.
9    Q.  -- at Key West?
10    A.  No.
11    MR. REYNOLDS:  Objection, form.
12    Q.  Including any supervisory person in the recent
13  past?
14    A.  Yes.
15    Q.  Tell me about that.
16    A.  No -- you -- the way you asked me was --
17    Q.  Well, then let me make sure I clarify the question.
18    Are you aware of allegations that a --
19    A.  No.
20    Q.  Let me finish.
21    MR. BURKE:  Let him finish his question.
22  BY MR. MCKEE:
23    Q.  -- that a superior officer in the police department
24  was alleged to have altered evidence?
25    A.  No, I've never heard those allegations.

19 (Pages 73 to 76)

77

1    Q.  Are you aware of a recent settlement with the
2  police department about that activity?
3    A.  No.
4    Q.  Is that something you would know about if it
5  happened?
6       MR. BURKE:  Object to form.
7       MR. REYNOLDS:  Join.
8    A.  I would hope so.
9    Q.  But are you in the chain of command such that it
10 would be disclosed to you normally?
11   A.  No.
12   Q.  Do you know where the footage that should have been
13 on the Taser of Officer Lovette is?
14      MR. BURKE:  Object to form.
15      MR. REYNOLDS:  Join.
16   A.  Again, I don't have any capabilities of the Taser.
17   Q.  Do you have any knowledge where the evidence that
18 should have been on the dash cam of Officer Lovette has gone?
19      MR. BURKE:  Object to form.
20      MR. REYNOLDS:  Objection, form.
21   A.  I also don't have capabilities of that.
22   Q.  But do you know?  Do you have any knowledge?
23   A.  No.
24   Q.  Do you have any knowledge where the footage of the
25 man that you saw standing next to that telephone pole in that

78

1  videotape, where that footage has gone?
2    A.  No.
3    Q.  Should all of that evidence, based on your
4  knowledge of protocol and of the law, should all that
5  evidence still exist?
6       MR. BURKE:  Object to form.
7       MR. REYNOLDS:  Join.
8    A.  If all that --
9    Q.  If it ever did?
10   A.  Yeah.  If that information was there, then yes.
11   Q.  It should exist?
12      MR. REYNOLDS:  Objection, form.
13 BY MR. MCKEE:
14   Q.  It should be somewhere in safekeeping?
15      MR. BURKE:  Object to form.
16 BY MR. MCKEE:
17   Q.  Right?
18   A.  I believe so, yes.
19   Q.  And do you know why it hasn't been produced to us?
20      MR. REYNOLDS:  Objection, form.
21   A.  No.
22   Q.  Do you know why it wasn't produced to the FDLE?
23   A.  No.
24   Q.  Do you know why the FDLE reports that Lovette
25 didn't have a dash cam recording?

79

1       MR. REYNOLDS:  Objection, form.
2       MR. BURKE:  Object to form.
3  BY MR. MCKEE:
4    Q.  Were they lied to, too?
5       MR. BURKE:  Object to form.
6       MR. REYNOLDS:  Objection, form.  Move to strike,
7  argumentative, assumes facts not in evidence.
8  BY MR. MCKEE:
9    Q.  Were they lied to --
10      MR. BURKE:  Object to form.
11 BY MR. MCKEE:
12   Q.  -- as to the nonexistence of dash-cam footage?
13   A.  I don't believe so.
14   Q.  Then why would they report that he had no dash-cam
15 footage?
16      MR. BURKE:  Object to form.
17      MR. REYNOLDS:  Objection, form.
18   A.  I don't know.
19   Q.  Do you know who Kathy Smith is?
20   A.  I do now.
21   Q.  Did she interview you?
22   A.  Yes, with someone else.
23   Q.  With someone else?
24   A.  Uh-huh.
25   Q.  Who else?

80

1    A.  Another FDLE agent.
2    Q.  Do you know who --
3    A.  He's the one that did all the questioning.
4    Q.  Do you know who she was as it relates to this
5  investigation?
6    A.  At that time, no.
7    Q.  Do you know now?
8    A.  Yes.
9    Q.  Who was she?
10   A.  I believe she was married or is still married to
11 our captain or our former captain.
12   Q.  Well, is she still married to him?
13   A.  I have no idea.  I don't --
14      THE COURT REPORTER:  Wait a minute, the plane.
15      MR. MCKEE:  Yeah.
16      THE WITNESS:  I'm sorry.
17      MR. MCKEE:  We've got a plane passing overhead.
18 We'll wait for the sound to clear up.
19 BY MR. MCKEE:
20   Q.  Did your chief tell you that -- who Kathy Smith
21 was?
22   A.  No.
23   Q.  Never?
24   A.  No.
25   Q.  Did he tell you that he had tendered his

81

1    resignation at or about this time?
2       A. No.
3       Q. And was going to go to work for the FDLE?
4       A. No.
5       Q. The same investigative body that was going to be
6    investigating his officers. Did he tell you that?
7       A. No.
8       Q. Did he say that the investigator assigned to the
9    job was his ex-wife?
10      A. No.
11      Q. Did he tell you that he owes child support to her?
12      A. No. I don't know their dynamics.
13      Q. Did he tell you that he had filled out an insurance
14    form -- when we brought up the issue of whether that's a
15    conflict of interest, the FDLE said it wasn't. Do you know
16    whether he ever informed the FDLE that they had jointly
17    filled out an insurance form saying they were still living
18    together?
19        MR. BURKE: Objection to form.
20      A. I don't know any of that.
21      Q. Did you know that he said in the insurance form
22    they were still married?
23        MR. BURKE: Object to form.
24      A. Again, I don't know their dynamics of their
25    relationship.

82

1       Q. So when you testified at the very beginning of this
2    line of questioning that she's either his wife or divorced
3    from him, you were told that it could have been either?
4        MR. REYNOLDS: Objection, form.
5      A. Yeah, I don't know their dynamics.
6      Q. Do you find --
7      A. I still don't know the answer.
8      Q. Do you find in an investigation of alleged police
9    misconduct that the police chief's wife or ex-wife to whom he
10    owes --
11        MR. DARREN HORAN: Captain.
12        MR. MCKEE: Excuse me. Captain. Thank you.
13 BY MR. MCKEE:
14      Q. Do you find that you think it's a conflict of
15    interest to have the captain's ex-wife to whom he owes child
16    support and is going to be working for the very same agency
17    because he's tendered his resignation, is a conflict of
18    interest?
19        MR. BURKE: Object to form.
20        MR. REYNOLDS: Objection, form.
21      A. I don't believe so.
22      Q. No?
23      A. There was another agent there. He's the one that
24 was questioning me.
25      Q. Do you know who was in charge of the investigation?

83

1      A. I have no idea.
2      Q. Do you know whether your captain was involved in
3    the destruction of evidence in this case?
4      A. No.
5        MR. REYNOLDS: Objection, form.
6      Q. Do you know why, if it is indeed true, that the
7    captain and Kathy Smith filled out an insurance form that
8    said they were still married when they weren't, why he would
9    do such a thing?
10        MR. BURKE: Object to form.
11        MR. REYNOLDS: Objection, form.
12      A. Again, I don't know their dynamics.
13      Q. Isn't that to get an advantage, to get a certain
14    coverage because if you're married, you get a lower rate?
15        MR. BURKE: Object to form.
16      A. Again, I don't know.
17        MR. REYNOLDS: Objection, form.
18      Q. That would be an act of dishonesty, wouldn't it?
19        MR. BURKE: Object to form.
20 BY MR. MCKEE:
21      Q. If it happened, right?
22        MR. REYNOLDS: Objection, form.
23 BY MR. MCKEE:
24      Q. It would be an act of dishonesty if it happened,
25    right?

84

1        MR. BURKE: Object to form.
2        MR. REYNOLDS: Join.
3      A. Again, I don't know.
4      Q. It would actually -- well, you know the law. It
5    would be an act of fraud if it happened?
6        MR. BURKE: Object to form.
7        MR. REYNOLDS: Objection, form.
8      A. Only they should know their dynamics of their
9    relationship.
10      Q. Well, see, I'm not asking you -- I'm asking, if it
11    happened, would that be a fraud?
12        MR. BURKE: Object to form.
13        MR. REYNOLDS: Join.
14 BY MR. MCKEE:
15      Q. Filling out an insurance statement indicating
16    you're married when you're not?
17      A. I don't know if they were or not.
18      Q. That's not my question.
19        I said, if it did happen, would that be a fraud?
20    You're a police officer.
21        MR. REYNOLDS: Objection, form.
22      A. Yes, I guess so.
23        MR. MCKEE: Okay. I have no further questions.
24    Thank you, sir.
25        MR. BURKE: Lyman?

21 (Pages 81 to 84)

85

1    MR. REYNOLDS:  No questions.

2    MR. BURKE:  I have no questions at this time.  The

3  witness will read.  And, again, I'd like the video just

4  as soon as you can get it.

5    THE VIDEOGRAPHER:  Off the video record at 2:45

6  p.m.

7    (The deposition was concluded at 2:45 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

86

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF MONROE )

    I, Suzanne F. Ex, Certified Verbatim Reporter,
Florida Professional Reporter, Notary Public, State of
Florida, certify that GUSTAVO ADOLFO MEDINA personally
appeared before me on the 5th day of November, 2014, and was
duly sworn.

    Signed this 11th day of November, 2014.


    Suzanne F. Ex
    Suzanne F. Ex, CVR-M, FPR
    Notary Public, State of Florida
    Commission No.:  FF015913
    Commission Expires:  July 27, 2017

87

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF MONROE )

    I, Suzanne Ex, Certified Verbatim Reporter and
Florida Professional Reporter, certify that I was authorized
to and did report the deposition of GUSTAVO ADOLFO MEDINA,
pages 1 through 85; that the review of the transcript was
requested; and that the transcript is a true record.

    I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties, nor am
I a relative or employee of any of the parties' attorneys or
counsel connected with the action, nor am I financially
interested in the action.

    Dated this 11th day of November, 2014.


    Suzanne F. Ex
    Suzanne Ex, CVR-M, FPR
    Certified Verbatim Reporter-Master
    Florida Professional Reporter

88

WITNESS NOTIFICATION LETTER

November 12, 2014

Gustavo Adolfo Medina
c/o Michael T. Burke, Esquire
Johnson Anselmo Murdoch Burke Piper & Hochman, P.A.
2488 East Sunrise Boulevard, Suite 1000
Fort Lauderdale, Florida  33304

RE:  Treavor Eimers vs. City of Key West, et al.
    Deposition Taken November 5, 2014
    U.S. Legal Support Job No. 1186143

The transcript of the above-referenced proceeding has been
prepared and is being provided to your office for review by
the witness.

We respectfully request that the witness complete their
review within 30 days and return the errata sheet to our
office.

Sincerely,


Suzanne F. Ex
U.S. Legal Support, Inc.
One Southeast Third Avenue, Suite 1250
Miami, Florida  33131
(305) 373-8404

CC via transcript:

David W. Brill, Esquire
Jeannete C. Lewis, Esquire
Robert J. McKee, Esquire
David Paul Horan, Esquire
Darren M. Horan, Esquire
Lyman H. Reynolds, Jr., Esquire

22  (Pages 85 to 88)

89

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT ~ ENTER CHANGES ON THIS PAGE

IN RE:  Treavor Eimers vs. City of Key West, et al.
Gustavo Adolfo Medina
November 5, 2014

| Page No. | Line No. | Change | Reason |
|----------|----------|--------|--------|
|          |          |        |        |

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are true.

_____
Date          Gustavo Adolfo Medina

## A

**ability** 6:19,22
**able** 12:14 32:6
**above-referenced** 88:10
**access** 20:14
**accidentally** 37:11
**accuracy** 61:4
**accurate** 46:9 61:6 61:9,18 62:2 67:22 69:20
**act** 83:18,24 84:5
**acting** 27:13
**action** 48:23 59:25 75:22 87:15,16
**actions** 54:24 55:13
**activate** 16:23 17:10
**activated** 13:7 14:16,22 18:15
**activates** 17:20
**activating** 14:8,9
**actively** 27:11 28:16
**activities** 22:25 39:13 52:13
**activity** 77:2
**actual** 18:1
**address** 5:12 20:5
**administered** 47:17
**administering** 51:5 54:8
**admit** 34:8
**Adolfo** 1:13 3:2 4:9 5:5,13 86:8 87:8 88:4 89:4 89:25
**advantage** 83:13
**affirm** 4:25
**afternoon** 4:5 5:10
**agency** 82:16
**agent** 80:1 82:23
**ago** 34:23
**agree** 51:1
**Ah** 36:6
**ahead** 15:1 17:18 52:10
**air** 51:2
**airway** 50:4,24 51:12
**al** 1:8 4:11 88:7 89:4
**allegations** 76:18 76:25
**alleged** 76:24 82:8
**allowed** 13:17

**altered** 76:24
**and-a-half** 11:12
**angle** 47:11
**animal** 56:2
**announced** 48:3
**Anselmo** 2:12 88:5
**answer** 10:19 25:5 25:6 28:7 82:7
**answered** 25:2 73:23,25
**answering** 73:22
**answers** 73:22
**anticipate** 57:18
**apologize** 10:19
**appear** 9:8
**appearance** 4:15
**APPEARANCES** 2:1
**appeared** 86:9
**applied** 39:22
**approaching** 51:24
**approximate** 53:24
**area** 45:7 71:10
**argumentative** 75:19 79:7
**arm** 33:20,22 34:4 35:3,4 63:15,17 63:17 65:3,6,7,8 66:4,7
**arms** 42:21 49:9 52:21 65:19
**arose** 8:18
**arrest** 55:2,13
**arrived** 26:16 27:4 27:16 38:20 41:7 41:14 44:5 58:21
**arriving** 65:10
**asked** 21:7 46:12 68:8 73:12 76:16
**asking** 22:22 41:9 68:6 73:21 84:10 84:10
**assess** 48:14
**assigned** 16:21 81:8
**assist** 33:19 65:2
**assisted** 33:20 34:1 35:2,21 36:8 62:6 65:2
**assume** 24:7
**assumes** 75:20 79:7
**attempt** 47:19 50:6
**attempted** 49:18
**attempting** 27:17 31:2,5 47:25 48:25 49:5 55:23 62:23
**attorney** 24:16,25

87:13
**attorneys** 87:14
**audible** 15:11
**authorized** 87:7
**automatically** 17:21
**Avenue** 88:18
**avoid** 55:2
**aware** 7:25 8:3 15:24 19:22,25 39:7,12,20 69:3 70:23 72:6 76:18 77:1

## B

**back** 6:19,22 11:1 11:18 16:25 17:2 17:6,6 21:8 34:4 42:21 49:15 54:4 54:6,9 56:23 57:6,9,18 69:10 70:1,5
**bad** 56:17
**bag** 48:15
**based** 14:15 22:23 59:24 78:3
**beach** 2:17 27:1 42:3
**BEDARD** 2:16
**Beg** 17:18
**began** 47:25 48:13
**beginning** 82:1
**behalf** 2:2,11,16 4:18,19,22
**believe** 7:24 10:2 10:5 12:22 14:13 18:8 21:5 24:16 24:24 32:18 34:14 35:14 36:12 39:19 44:1 45:20 46:11 59:9 60:20 61:7,20 62:4,17 63:19,24 64:23,24 67:8,14 68:1,15,16 69:6 69:7 78:18 79:13 80:10 82:21
**believed** 15:10
**belly** 47:1
**bench** 6:19
**bind** 45:12
**bit** 63:4
**bleed** 67:4
**block** 50:24
**blood** 66:17 71:1
**blue** 46:24
**boat** 6:7

**Bob** 29:9
**bodily** 13:20
**body** 47:2,15,24 48:21,23 54:24 57:17 66:1,4 70:21 73:10 74:13,16 81:5
**bomb** 67:19
**bother** 46:19
**Boulevard** 2:8,12 88:5
**bound** 44:11
**bracing** 27:10
**breath** 31:23 32:5 32:6 40:5,25
**breathing** 32:5 57:24
**Briefly** 50:1
**Brill** 88:22
**brought** 38:19 81:14
**Building** 2:17
**Burke** 2:12,14 4:19 4:19 12:4 13:10 14:24 15:1,12,17 16:25 17:3,15,18 22:18 23:7,23 25:14,16 27:18 28:6 29:6,8 30:6 32:8 33:1 36:2 36:22 37:3,14 38:9,18 39:10 40:11,18 41:4,8 42:5,22 43:17 44:2 45:17 48:11 48:18 51:18 52:8 52:10 53:21 54:11 55:4 56:8 56:11 57:20 59:21 60:20,23 61:10,12 62:3,13 65:13,24 66:8,13 67:6,24 69:11,14 69:17,23 70:12 71:16 72:12,19 73:12,18,20,25 75:5,10,14 76:1 76:21 77:6,14,19 78:6,15 79:2,5 79:10,16 81:19 81:23 82:19 83:10,15,19 84:1 84:6,12,25 85:2 88:4,5
**burke@jambg.com** 2:14
**business** 5:11 8:8

button 17:22

**C**

C 88:23
C-101 2:17
c/o 88:4
CAD 51:16
cafe 71:4
call 50:13 70:18
called 50:11 66:12
  73:4
calling 50:15
Calvert 2:21 26:21
  27:25 29:18
cam 16:24 17:8
  19:2,10 77:18
  78:25
camera 16:20 19:14
  21:8
canal 66:24
capabilities 20:8
  77:16,21
capability 17:21
capacity 8:9 12:19
captain 25:10,14
  80:11,11 82:11
  82:12 83:2,7
captain's 82:15
car 18:2 19:6
  44:17,24 45:11
  53:15,18 70:17
  70:19
career 53:25 75:21
careful 25:25
case 1:3 4:10 5:25
  14:12 19:23
  23:25 83:3
caught 34:12 35:10
  37:12 63:23
  64:13
cause 4:3 5:1
  33:11 56:7 60:8
CC 88:21
Celcer 49:20
certain 11:13
  83:13
certainly 61:14
Certificate 3:6,6
  86:1 87:1
Certified 1:24 4:1
  86:6 87:6,22
certify 86:8 87:7
  87:12
chain 77:9
chance 28:7
Change 89:7
changed 17:1

CHANGES 89:2
charge 30:9,12,14
  82:25
Charles 1:5
chase 11:12
check 38:21,24
  42:19 50:9
chief 80:20
chief's 82:9
child 81:11 82:15
circumstance 56:19
circumstances
  55:16,21 57:1,2
City 1:8 4:10,20
  88:7 89:4
clarify 53:18
  76:17
clasped 34:12
clean 6:22,24 74:2
cleaned 58:14
clear 31:8 50:2,4
  51:2 52:21 80:18
clearance 51:12
clearing 35:21
close 52:15
color 46:21
Columbia 2:17
Columbian 7:13
come 10:10 24:22
  74:1
coming 42:2 66:24
command 77:9
commands 31:8,10
  31:15
Commission 86:15
  86:16
common 7:21 39:24
  39:25
communicating
  24:13
communications
  20:1
companies 17:9
complete 88:12
completely 29:11
compliant 5:21
  42:20
compressive 47:1
computer 12:20
  24:19
concerned 43:15
concluded 85:7
condition 56:16
conduct 27:15
  67:13
conflict 81:15
  82:14,17

confront 22:5
confusing 31:1,4
connected 87:15
conscious 46:23
consequences 39:12
constrained 39:15
contact 22:10 60:7
continued 63:25
control 47:24
  55:19 71:25
controlled 57:23
controlling 56:10
correct 7:1 10:3
  15:4,8 18:5
  19:20 27:20
  28:11,17 31:2,3
  31:5,6 34:13,22
  41:25 43:13 44:6
  44:9 47:21 52:4
  52:7 53:10 59:12
  60:9 62:7,20
  63:21 66:19
  69:13 70:3,7
  71:22
counsel 4:15 87:13
  87:15
COUNTY 86:4 87:4
Couple 51:8,10
course 56:22
court 1:1 4:5,11
  4:12,24 80:14
Courthouse 1:16
  4:7
cousin 56:17,20
cover 75:16
coverage 83:14
CPR 49:22 51:5
  52:14 53:11 54:8
created 75:23
crowd 21:15
cruiser 45:12
  53:18,19
cuff 36:10 62:16
  63:9
cuffed 34:21 63:11
  63:18,20 65:4,8
  65:11,17
cuffing 30:3
cuffs 35:18,22,24
  36:6,9 42:21
  64:17
current 17:15 27:5
currently 52:16
cut 11:12
CVR-M 1:23 86:14
  87:21 88:17

**D**

dangers 32:20
Darren 2:6 4:17
  73:5 82:11 88:24
darren@horan-w...
  2:5
dash 16:20,24 17:8
  19:2,10 77:18
  78:25
dash-cam 79:12,14
date 23:22 24:1,5
  89:25
Dated 87:18
David 2:5 4:17
  88:22,24
day 11:12 51:4
  69:4 86:9,11
  87:18
days 88:13
deactivated 18:3
deal 32:7
dealing 21:15
  22:10 50:20,23
  55:14
death 40:17 56:18
Deceased 1:5
December 11:2
  23:22,25 24:6
  38:6
decide 25:4
decided 44:13
declare 89:22
deemed 13:24
Defendant 2:16
  4:20
Defendants 1:9
  2:11
defending 20:13
Del 2:22 28:1,3,10
  28:12,23 29:2
  49:20
delay 50:15
deleted 11:21
demeanor 27:16
department 5:14,16
  6:9 10:14 12:2
  12:19,21 13:9
  14:2 15:25 20:1
  22:9,15 23:6
  75:21 76:23 77:2
depends 9:15
deposition 1:13
  3:2 4:1,9 85:7
  87:8 88:8
depositions 6:25
describe 12:10,17
  15:9 16:14,17

33:25 56:16
**described** 19:10
**describing** 8:18
  9:19
**description** 33:25
**desire** 31:23
**desk** 52:16 53:11
**destroyed** 76:3
**destruction** 83:3
**detain** 31:2
**detained** 13:21
  71:25
**detention** 56:20
**determine** 30:7
**development** 6:9
**device** 15:6,7 18:1
  20:25 43:12
  44:18 72:3,4
  73:3
**devices** 19:7
**dexterity** 38:1
**difference** 54:23
  55:10
**different** 17:9
  29:12 55:2
**difficulties** 33:10
**direct** 3:3 5:8
  75:23
**direction** 37:11
**disclosed** 77:10
**discomfort** 34:17
  62:14,24 65:1
**disconcerting** 40:8
**discussed** 59:14
**dishonesty** 83:18
  83:24
**dispatched** 70:18
**distance** 51:9
**distances** 53:24
**District** 1:1,1
  4:11,12
**DIVISION** 1:2
**divorced** 82:2
**document** 89:23
**doing** 30:1,3 39:4
  46:6 49:23,24,25
  62:11,18
**download** 12:20
**downloaded** 13:3
**dph@horan-wall...**
  2:5
**draft** 24:8 25:10
  25:20,22
**drafted** 23:21
**drafting** 24:12
**drawn** 41:15,17,20
  41:24 42:3

**Drive** 2:17
**dropped** 67:18
**drown** 56:21
**drowned** 50:21
  56:17
**due** 36:16 39:13
**duly** 5:6 86:10
**dumb** 7:22
**duties** 30:15
**duty** 42:24
**Duval** 26:16
**dying** 13:7 55:3
**dynamics** 81:12,24
  82:5 83:12 84:8

**E**

**ear** 66:18,24 71:2
**earlobe** 66:21
**earring** 66:20
**ears** 67:4
**East** 2:12 88:5
**education** 22:23
**effects** 32:12
**effort** 46:23
**efforts** 52:14
**eight** 53:16,20
  54:2
**Eimers** 1:5,5 4:10
  10:7 14:18,23
  19:6 20:11 27:5
  27:12 30:17,20
  33:19 34:3 35:10
  37:12 38:7,21,22
  38:25 42:2 44:21
  45:16,19 48:25
  49:4,10 51:15
  52:12,15,19 53:6
  53:12 54:10 63:5
  65:2,11 71:1,9
  75:1 88:7 89:4
**either** 18:6 32:5
  41:3 48:4 56:6
  82:2,3
**Eleven** 57:5
**email** 20:1,5
**embellish** 68:19
**employed** 5:13,15
**employee** 87:13,14
**ended** 13:20 18:16
**Enforcement** 10:14
**ENTER** 89:2
**entire** 38:13 67:15
  72:1
**equipment** 17:8
  45:12
**errata** 3:7 88:13
  89:1

**Esquire** 2:5,6,10
  2:14,19 88:4,22
  88:23,23,24,24
  88:25
**Estate** 1:5
**et** 1:8 4:11 88:7
  89:4
**event** 13:6,17,20
  14:13 15:3,14
  16:4 19:2,6
  20:15 28:4 32:15
  39:6 58:5 75:22
**events** 7:14 8:18
  9:19 10:7 27:12
  33:25
**eventually** 13:7
  46:4
**everyone's** 20:9
**evidence** 13:24
  14:2,12 75:20,23
  76:24 77:17 78:3
  78:5 79:7 83:3
**evidentiary** 13:25
  14:14
**Ex** 1:23 4:1,12
  86:6,14 87:6,21
  88:17
**ex-wife** 81:9 82:9
  82:15
**exact** 26:12
**exactly** 23:21
  61:21 66:6
**Examination** 1:20
  3:3 5:8
**examined** 5:6
**example** 8:18 55:12
**exclaim** 59:25
**exclamation** 60:8
**excuse** 7:12 26:3
  68:21 82:12
**exerted** 38:15
**exhibit** 23:15,16
  23:17 60:21
**exhibits** 3:10 7:8
**exist** 78:5,11
**existence** 7:25 8:4
**existing** 19:11
**exited** 26:24,25
**experience** 5:18
  11:15,20 13:1
  18:19 33:9 37:7
**experienced** 40:14
**Expires** 86:16
**explain** 29:22
**explanation** 17:25
**exposition** 42:13
**eyewitnesses** 22:10

**F**

**F** 86:6,14
**face** 39:21 45:23
  46:6,8,14,19
  49:15,16,17
  55:18 56:6 57:16
  58:2
**facility** 6:14
**facing** 49:8,10
  71:4
**facts** 29:4 42:13
  75:20 79:7 89:23
**fair** 42:12
**false** 8:15,20 9:13
  9:19 10:3 67:18
  68:9,16
**far** 9:1 26:19
  43:15 49:3 63:25
**Fax** 2:4,13,18
**FDLE** 3:13 20:10,19
  20:22 61:2 69:12
  78:22,24 80:1
  81:3,15,16
**fear** 32:5 56:21
**Federal** 1:16 4:7
**Feel** 40:10
**feeling** 40:16,16
**feet** 43:13 45:22
  46:5 51:8,10
  53:16,20 54:2
  73:9 74:8,9,15
**fellow** 7:1
**felt** 55:13
**FF015913** 86:15
**field** 12:12 22:24
**fight** 56:23 57:1,6
  57:18
**fighting** 27:7,9
  42:15
**filed** 4:11
**filled** 81:13,17
  83:7
**Filling** 84:15
**film** 20:2
**filmed** 21:7
**films** 74:25
**finalized** 26:14
**finally** 63:1
**financially** 87:15
**find** 9:24 54:23
  58:9 61:18 70:19
  82:6,8,14
**finger** 34:12 35:8
  35:16 36:10,14
  37:8,23 38:4
  63:2,8,13,23
  64:4,9,13,14,15

64:18,22
**fingers** 35:11
64:19
**finish** 9:3 76:20
76:21
**first** 5:6 7:22
11:15 24:10,15
24:15,23 25:8
27:13,22 51:1
71:1
**fit** 6:5
**fitness** 6:14
**five** 51:17
**Florida** 1:1,8,17
1:25 2:4,8,13,17
4:2,3,8,12 10:13
86:3,7,8,15 87:3
87:7,22 88:6,19
**focusing** 43:22
**follows** 5:7
**footage** 19:9 21:9
21:20 77:12,24
78:1 79:12,15
**football** 40:1
55:22 56:1
**force** 37:11 38:15
47:1
**foregoing** 89:23
**form** 8:16,21 9:6
9:10,14,20 10:1
10:4 11:24 12:4
12:5 13:10,14,23
14:3,20,24,25
15:5,12,13,17,18
15:23 16:2,5,8
16:12 19:13
21:13 22:18 23:7
23:8 25:16 27:18
28:21 29:1,10,24
30:5,6,10 31:16
31:22,24 32:3,8
33:1,2,6 34:25
36:2,7,22 37:3
37:14 38:9,17,18
39:9,10,18 40:11
40:18 41:4,5
42:5,16,22,23
43:17,21 44:2,3
44:15 46:10
48:18 51:18,22
52:8,9 53:21
54:11,12,25 55:4
55:5 56:11 57:14
57:20,25 58:11
58:16 59:21,22
60:2 62:3,12,13
65:13,24 66:8,9

66:13,14,22 67:3
67:6,7,11,20,24
67:25 68:4,11,14
68:18,25 69:5,17
70:12,13 71:7,11
71:16 72:12,16
72:19,20,23
73:19 74:6 75:5
75:6,10,14 76:1
76:2,4,11 77:6
77:14,19,20 78:6
78:12,15,20 79:1
79:2,5,6,10,16
79:17 81:14,17
81:19,21,23 82:4
82:19,20 83:5,7
83:10,11,15,19
83:22 84:1,6,7
84:12,21
**former** 80:11
**Fort** 2:13 88:6
**fought** 57:8
**found** 8:19 47:14
47:19 55:18
60:10 62:2 70:4
70:23
**foundation** 11:15
**FPR** 1:23 86:14
87:21 88:17
**frame** 18:6 45:8
**Francisco** 24:2
**fraud** 84:5,11,19
**friend** 8:11 9:22
**friends** 6:14
**front** 26:21,22
27:25 41:11
**fucking** 67:19
**full** 42:12
**fully** 35:11 42:20
**functioning** 19:7
52:7
**further** 84:23
87:12

### G

**Gabe** 60:16
**Garrido** 26:20
27:25 29:18,22
34:8,11 36:13
37:25 38:6 41:24
46:8 47:22 48:9
48:16 49:2 62:6
62:10,22 63:8
70:10
**Garrido's** 33:24
35:22 36:10
62:22 63:23

64:22
**Gary** 2:16 49:20
54:8
**general** 8:23
**generally** 37:15,22
**getting** 54:19 56:5
61:22
**GIRARD** 2:23
**given** 12:7 31:8
**giving** 5:1 30:17
30:20,23 31:8,10
**go** 7:3 15:1 17:18
44:23 45:11
52:10 81:3
**goal** 56:2
**going** 6:1 7:3
11:12 20:8 21:5
27:6 29:16 40:10
54:5 56:25 73:14
74:1 81:3,5
82:16
**good** 4:5 5:10
32:25
**gotten** 34:11
**grabbed** 48:15
63:14,17
**grabbing** 65:11,16
**ground** 38:8 45:24
47:16 49:15
52:25 53:9 69:10
70:1,5,6
**GROUP** 2:7
**guess** 27:3 49:4
63:1 84:22
**guessed** 37:2
**gun** 41:11
**guns** 41:2,6,9
**Gus** 4:20
**Gustavo** 1:13 3:2
4:9 5:5,13 86:8
87:8 88:4 89:4
89:25

### H

**H** 2:19 88:25
**hand** 4:25 35:7,10
35:25 47:16
62:22 63:5,13,20
**handcuff** 27:17,23
33:21 34:13
35:12 36:14,24
37:9,22,24 62:23
63:14
**handcuffed** 33:22
43:11 44:25 45:2
47:17 64:1,3
72:3

**handcuffing** 29:16
30:1 32:16 34:1
34:18 35:2 37:7
37:7 38:8 43:23
44:5 52:13 62:7
66:16 71:5
**handcuffs** 35:6
44:1 47:18 49:9
64:5,11,11,20
65:16,17,18
**handheld** 20:25
**handing** 12:11
23:17
**hands** 33:19 35:5
35:21,22,24
52:22 63:11
64:10 65:11,12
65:16,17,18
**happen** 13:2,3
22:16 34:15 38:4
43:7,15,25 56:25
67:1 72:25 84:19
**happened** 9:9 10:7
16:7,10 46:9
47:6 72:11 77:5
83:21,24 84:5,11
**happening** 48:17
53:11
**happens** 12:24
14:13 68:10,17
**harm** 13:20
**head** 67:5,19 71:4
71:9
**health** 38:22,24
39:7,12
**hear** 10:19 14:22
33:25 45:17 48:4
59:13,18
**heard** 7:6 9:4,8,13
11:13,25 12:1,17
13:5,12,13 15:2
15:9 16:10,14,17
17:24 18:25 19:1
19:5 21:11 29:22
34:8 41:24 44:19
47:22 48:5 59:17
59:24 68:20,24
76:25
**hearing** 11:25 13:1
13:2 51:25 64:7
**help** 26:8 49:18
**helped** 36:10
**Henry** 2:22 54:8
**HIGGINS** 2:3
**hobble** 73:5,6,8
74:4,11,13,20,23
**Hochman** 2:12 88:5
**holding** 33:23 65:2

65:7,19
**home** 6:14
**honest** 9:24
**honestly** 55:25
  60:18
**hope** 10:2 22:13
  77:8
**hopefully** 46:4
**Horan** 2:3,5,6 4:17
  4:18 73:5,6
  82:11 88:24,24
**hospital** 58:7,10
  58:14
**hour** 15:16
**house** 6:15

**I**
**ICOP** 18:21 51:25
**idea** 47:13 50:12
  51:11 64:14,16
  80:13 83:1
**identification**
  20:7
**identified** 20:5
**identify** 23:19
**identifying** 60:7
**identity** 23:12
**important** 42:12
**inaccurate** 38:8,10
**inches** 48:16,20
**incident** 3:12 7:19
  15:25 21:14,16
  23:20
**include** 6:17 55:15
**included** 60:6
**Including** 24:10
  76:12
**incorrect** 29:3
**INDEX** 3:1,10
**indicate** 21:23
  74:22
**indicates** 62:6
**indicating** 84:15
**individual** 14:1
  22:5 31:7,12
  33:11
**individual's** 35:21
  36:17
**individuals** 42:2
**information** 12:3
  12:20,24 13:3,8
  13:22 20:14
  22:11,12,17 60:7
  78:10
**informed** 81:16
**initiating** 27:12
**injured** 62:22

**inside** 44:24
**instinct** 57:12
**instructed** 25:9
**insurance** 81:13,17
  81:21 83:7 84:15
**intended** 72:10
**intentional** 50:15
**intentionally**
  18:17
**interest** 81:15
  82:15,18
**interested** 87:16
**interview** 10:13,16
  79:21
**interviewed** 22:15
**investigate** 42:13
**investigating** 81:6
**investigation**
  20:10,19 42:19
  80:5 82:8,25
**investigative** 3:13
  81:5
**investigator** 71:19
  81:8
**involved** 27:21
  28:16 83:2
**involving** 19:23
  75:22
**irate** 22:16
**issue** 18:22 81:14
**issued** 11:16 18:12
**issues** 18:21 55:14

**J**
**J** 2:10 88:23
**jammed** 35:11 63:14
**jarred** 63:1
**Jeannete** 88:23
**jerk** 6:22,24
**job** 81:9 88:8
**Jogged** 27:3
**Johnson** 2:12 88:5
**Join** 22:19 27:19
  32:9 40:12,19
  42:6 43:18 48:19
  51:19 53:22
  56:14 57:21
  69:18 71:17
  72:13 75:11,17
  77:7,15 78:7
  83:17 84:2,13
**jointly** 81:16
**joke** 56:17
**Jr** 2:19 88:25
**judge** 25:4
**July** 86:16
**jurisdiction** 22:3

22:25

**K**
**Kathy** 79:19 80:20
  83:7
**keep** 55:24 73:21
**Key** 1:2,8,17 2:4
  2:23 4:8,10,20
  5:14 12:20 22:9
  23:1,5 75:21
  76:9 88:7 89:4
**killed** 59:15
**kind** 24:12
**kneeling** 53:2,3
**knew** 55:16 71:24
**knocked** 40:3
**know** 6:19,22 8:3,8
  8:17 9:11 11:22
  12:19 15:15 16:7
  17:1 18:8,11
  20:18 21:17 23:9
  23:21 25:19
  26:20 27:11
  28:20 30:19,20
  31:14,25 32:22
  33:9,16 34:7
  35:7 36:17 37:16
  37:19,21,25 38:1
  39:2 41:6 44:4
  44:19 45:7 47:10
  50:13 51:7,16,23
  52:17 53:17
  54:14,14,16 55:1
  55:8,16 58:13,17
  58:22 60:18
  63:13,14,14
  64:23,25,25 65:1
  66:10,15 67:2,17
  67:22 68:19 69:1
  69:3 70:10,14
  72:4 73:9 74:15
  77:4,12,22 78:19
  78:22,24 79:18
  79:19 80:2,4,7
  81:12,15,20,21
  81:24 82:5,7,25
  83:2,6,12,16
  84:3,4,8,17
**knowing** 9:1,4
**knowledge** 8:15
  18:20 21:15
  25:18 27:15
  36:20 77:17,22
  77:24 78:4
**known** 8:6
**KWPD** 3:12

**L**
**lady's** 7:13
**laid** 42:3
**large** 4:3 57:17
**lasted** 15:14
**latched** 37:12
**latching** 34:12
**Lauderdale** 2:13
  88:6
**law** 2:7 10:14 78:4
  84:4
**lay** 11:15
**leading** 11:13
**leaning** 52:15
**learn** 32:19 41:17
**learned** 12:15
  14:15 43:24
**leave** 63:3
**Lee** 2:16
**left** 14:1 33:20,22
  35:3,3,4 45:21
  63:5,6,11,15,17
  65:3,7 71:8
**leg** 45:7
**Legal** 2:21 4:13,14
  88:8,18
**legs** 43:3,13,19,25
  44:10 45:6,12
  47:25 48:3,6,7
  49:1,6,13 72:3,4
  72:8,10 74:20
**length** 64:19
**let's** 16:20 74:1
**Letter** 3:7 88:1
**lever** 66:12
**Lewis** 88:23
**lied** 79:4,9
**life** 42:15 56:6
**lifesaving** 47:17
**lift** 66:7,12
**lifted** 38:13 45:4
  45:5,16,19,23
  46:1,3,15 47:2
  54:21 60:10
  71:25
**lifting** 6:17 38:16
  45:24 48:5,8
**lights** 16:23 17:11
  17:20
**line** 82:2 89:7
**listening** 8:19
**literally** 53:4
**little** 25:25 57:3
  63:4
**living** 81:17
**LLC** 2:7
**LLP** 2:3

located 27:5
lock 63:8 64:11
locked 35:13 36:11
  37:11 62:15
long 5:15 8:6
  15:14 58:20
longer 13:17 18:22
  19:10 21:8
look 20:6 44:24
  46:19,21 58:2,5
  70:17
looking 54:4 61:25
loose 57:16 63:1
loss 39:21 52:13
lost 13:3,8 75:23
lot 53:24
loud 31:8
Lovette 2:16 4:23
  8:6 12:1 13:6
  14:16 15:24
  18:25 26:20
  27:24 28:14
  29:19 31:9,10
  60:17 67:9,18
  71:6 77:13,18
  78:24
Lovette's 19:6,10
lower 44:10 45:6,7
  83:14
lreynolds@rrbp...
  2:18
Lyman 2:19 4:22
  84:25 88:25

**M**

M 2:6 88:24
making 29:8
malfunction 16:15
  16:18 19:7
man 6:5 20:24 21:7
  21:8,21 34:19
  36:6 59:16 67:10
  67:13 77:25
man's 67:19
mandatory 5:21
manually 17:22
marked 23:16 60:21
married 80:10,10
  80:12 81:22 83:8
  83:14 84:16
matter 20:11
McKee 2:7,10 3:3
  4:17,17 5:9
  13:11 17:2,4,5
  23:4,15 25:15,17
  28:8 29:10,13
  33:3 35:1 36:3

37:4 40:13,20
  41:12,13 45:19
  48:12 54:13 55:6
  56:9,12 59:23
  60:19,22 61:11
  61:13 65:14
  67:12,21 68:12
  68:23 69:13,15
  69:19,24 72:14
  72:17,24 73:7,14
  73:16,21 74:2,3
  75:12,15 76:22
  78:13,16 79:3,8
  79:11 80:15,17
  80:19 82:12,13
  83:20,23 84:14
  84:23 88:23
mean 14:12 33:4
  62:25 66:6 71:13
  71:15,18,23 72:2
  74:1
meaning 26:22
  63:11
means 64:25
mechanism 34:12
  66:1 67:5
medical 48:14,15
Medina 1:13 3:2
  4:9,20 5:5,13
  66:17 86:8 87:8
  88:4 89:4,25
Medina's 3:12
member 22:14
men 57:17
Miami 88:19
mic 17:22
Michael 2:14 4:19
  88:4
mind 24:22 55:7
minute 80:14
minutes 34:23
misconduct 82:9
missed 25:24
Misspelling 36:5
mistake 29:8
mix 34:15
momentum 65:22
monitor 39:7
monitoring 57:24
MONROE 86:4 87:4
months 5:17
morning 51:15
mouth 50:7 58:3
Move 75:19 79:6
moved 60:11
multiple 27:17
  57:17

municipality 1:8
Murdoch 2:12 88:5

**N**

NAJA 2:23
name 5:11 20:5
near 20:24
needed 54:9
never 6:24 12:17
  14:21 20:6,7
  32:1,6 37:23
  39:17 41:10 51:4
  58:24,25 59:17
  72:11,15,22,25
  73:10 74:24 75:2
  76:25 80:23
New 22:24
NEWSPAPER 2:23
non-Tasering 15:6
nonexistence 79:12
normally 37:8 68:9
  77:10
North 5:14
northern 22:2
nose 50:7 58:3,10
Notary 4:2 86:7,15
notice 21:3 43:2
noticed 38:25 47:7
  48:9 54:19 66:17
notification 47:8
  88:1
November 1:15 4:6
  5:20 6:3,11 7:14
  10:7 17:6 32:11
  86:9,11 87:18
  88:2,8 89:5
number 4:10 17:19
  60:19

**O**

oath 3:6 10:16
  86:1
obeyed 52:2,4,6
Object 12:4 13:10
  14:24 15:12,17
  22:18 23:7 25:16
  27:18 30:6 32:8
  33:1 36:2,22
  37:3,14 38:9,18
  39:10 40:11,18
  41:4 42:5,22
  43:17 44:2 48:18
  51:18,22 52:8
  53:21 54:11 55:4
  56:8,11 57:20
  59:21 62:3,13
  65:13,24 66:8,13

67:6,24 69:17
  70:12 71:16
  72:12,19 75:5,10
  75:14 76:1 77:6
  77:14,19 78:6,15
  79:2,5,10,16
  81:23 82:19
  83:10,15,19 84:1
  84:6,12
objection 8:16,21
  9:6,10,14,20
  10:1,4 11:24
  12:5 13:14,23
  14:3,20,25 15:5
  15:13,18,23 16:2
  16:5,8,12 19:13
  21:13 23:3,8
  28:21 29:1,24
  30:5,10 31:16,22
  31:24 32:3 33:2
  33:6 34:25 38:17
  39:9,18 41:5
  42:16,23 43:21
  44:3,15 46:10
  52:9 54:12,25
  55:5 57:14,25
  58:11,16,19
  59:22 60:2 62:12
  66:9,14,22 67:3
  67:7,11,20,25
  68:4,11,14,18,22
  68:25 69:5 70:13
  71:7,11 72:16,20
  72:23 73:1,19
  74:6 75:6 76:2,4
  76:11 77:20
  78:12,20 79:1,6
  79:17 81:19 82:4
  82:20 83:5,11,22
  84:7,21
objects 50:24
occur 39:13 55:21
occurred 47:19
  74:23
occurrence 7:19
occurrences 9:5
office 5:11 8:13
  88:10,13
officer 4:22 5:11
  8:3,6 12:1,2,13
  13:5,19,24 14:1
  14:4,6 18:25
  19:6,9,25 22:1,2
  22:14,15,24
  23:12,13 24:3
  26:20,20,21
  27:24,25,25 28:1

28:3,7,9,10,12
28:14,23,24 29:2
29:3,14,18,18,18
29:22 30:1,3,8
30:12,23 31:9,10
33:8,24 34:8,11
35:22 36:10,13
37:25 38:6,24
39:4 41:24 46:8
48:9,16 49:20,20
58:23 59:13,14
62:6,10,21,22
63:8,23 64:22
66:17 67:9,17
70:10 71:5 76:23
77:13,18 84:20
**officers** 7:1 21:6
21:14 22:20 23:1
26:19 27:7,17
31:4 37:7 38:21
39:2 41:14 42:9
43:19 47:24 48:2
48:13,25 49:5
51:14 52:4,6
65:11 69:9 70:1
71:20 76:7 81:6
**Oh** 45:5 61:15 64:6
**okay** 5:13 8:25
9:22,24 10:21
11:13 12:12,15
14:17 15:3 17:3
17:8,13 18:3
24:20 25:7,10
26:22 27:4 33:24
36:13 42:2 44:25
55:23 56:19 61:6
61:12 63:5 69:3
69:14 74:10,19
84:23
**old** 57:4
**once** 37:23 64:4
71:24
**ones** 51:5
**oneself** 57:19
**oo0oo** 2:25
**open** 35:18
**operating** 17:8
**operation** 62:19
**opinion** 6:5 23:11
37:6 57:22 60:3
**opportunity** 61:3
61:16
**options** 17:12
**order** 25:14 51:25
**ordered** 25:10,18
25:20,22
**orders** 30:17,20,23

**outside** 22:16
**overhead** 80:17
**owes** 81:11 82:10
82:15
**oxygenation** 39:21

**P**

**P.A** 2:12 88:5
**p.m** 1:15,15 4:7
85:6,7
**Page** 3:1,11 89:2,7
**pages** 87:9
**pain** 62:14,24 65:1
**Palm** 2:8,17
**panic** 40:5
**paragraph** 24:10,15
24:22,23 25:8
62:6
**paragraphs** 26:1,4
**paramedics** 44:7
50:11,16 58:13
58:21
**pardon** 17:18
**part** 5:25 6:8
20:13
**parties** 87:13,14
**passage** 51:2
**passing** 80:17
**patrol** 48:15
**Paul** 2:5 73:6
88:24
**PBA** 24:16,24
**penalties** 89:22
**people** 27:21 37:7
37:8 45:21 57:12
59:3 68:19
**peoples** 20:6
**perform** 31:5
**period** 32:15
**perjury** 89:22
**person** 9:25 20:2,5
31:1 32:7,20
34:3 39:15,19
55:13,19,23 60:7
66:11 70:24
76:12
**person's** 64:20
**personal** 1:5 5:25
10:6 27:15
**personally** 38:21
38:23 51:13
55:20 86:8
**perspective** 10:9
29:11,25 31:9,17
31:17 37:6 38:10
38:11 57:22
**phone** 19:15

**photo** 74:19
**photographs** 74:24
**photos** 58:7,10
**physical** 51:14
55:14
**physically** 24:21
46:15 49:18
52:19 53:4
**physiologic** 66:2
**physiological**
32:12 33:10
**physiology** 31:20
**piece** 65:22
**pin** 28:19,20,23
30:4
**Piper** 2:12 88:5
**place** 33:21 64:11
72:5 74:25
**placed** 47:16 49:15
69:9 70:1,5
**Plaintiff** 1:6 2:2
**Plaintiff's** 3:10
23:16 60:21
**Plaintiffs** 4:18
**plane** 80:14,17
**play** 40:1
**played** 56:17
**Playing** 55:22
**please** 4:15 5:10
**PLLC** 2:16
**point** 18:8 38:25
39:5 42:17,20
43:22 44:5 45:3
48:24 49:19
60:18 63:12,15
**pointed** 41:2,6,9
**pole** 20:25 21:21
77:25
**police** 5:11,14,18
6:9 12:2,21
19:25 21:24 22:2
22:9,15,15,16,24
22:25 23:1,6,12
26:19 45:11
56:20 58:13
59:25 75:21,22
75:23 76:7,23
77:2 82:8,9
84:20
**policies** 22:22
23:5,9
**policy** 13:19 14:15
**portion** 15:25 16:3
62:5
**position** 32:4,16
39:20 46:1,3,17
47:4,8 55:24

63:6,16
**positioned** 28:18
**possibility** 37:15
37:18,20,21 38:2
**possibly** 37:10
53:23 54:3
**power** 30:16
**practically** 53:7
**practice** 56:6
**prank** 56:20
**Pratt** 2:21 4:14
**preparation** 20:13
**prepared** 24:1
88:10
**presence** 51:14
52:12
**present** 2:20 6:25
9:18 27:14
**preserve** 12:8 14:2
22:11,13,17
57:19
**preserved** 12:3
21:24 23:2,10
**press** 6:19
**pressing** 17:22,22
**pressure** 39:21
**pretend** 52:14
**prior** 5:18 6:11
7:12,12,18 8:4
17:16 21:10 28:9
29:3 32:11 39:6
42:8
**privileged** 24:16
24:24 25:1,5
**probably** 40:25
57:11
**probes** 14:8,9
**problem** 19:1
**problems** 10:18
48:14
**procedures** 22:22
23:5,9 59:24
**proceeding** 88:10
**PROCEEDINGS** 3:1
**process** 65:5,10
**processes** 7:3
**produced** 78:19,22
**Professional** 1:25
4:2 86:7 87:7,22
**prone** 32:12,16
33:10 39:8,13,20
46:1,3 47:12
57:16 60:11,13
**property** 70:24
**protocol** 12:7 22:9
22:17 78:4
**provided** 19:22

88:10
PT 53:18,19
Public 4:2 86:7,15
pull 36:10 64:9
 65:23 66:3,11
pulled 34:3 64:7
 64:22
pulling 27:10
 56:20 65:20 66:4
 66:6
pulse 50:9
purple 46:24
purpose 4:8
pushed 66:3
pushing 65:20
put 24:14 32:4
 35:5 36:6 37:8
 39:8 42:21 43:3
 43:12 45:6 46:17
 47:1 65:17
putting 72:9

                Q
question 9:3 25:4
 28:6 38:3 45:17
 48:11 59:21 68:2
 71:16 72:12 73:3
 73:13 76:17,21
 84:18
questioning 11:13
 80:3 82:2,24
questions 6:1 7:22
 84:23 85:1,2
quote 47:23,23
 48:13
quoting 66:17

                R
radio 51:25
raise 4:24
ran 48:15
rate 83:14
re-record 18:7
read 3:7 69:22,24
 85:3 89:22
reading 23:23
 69:11
real 56:6
reality 36:9
really 6:6 36:17
 72:11
reason 18:16 70:15
 89:7
recall 7:17 18:18
 32:24 33:7,18
 49:14,24 51:24
 55:25 61:20

receive 32:17
received 31:19
 32:6 39:17
recitation 29:3
recognize 57:11
 61:8
recollection 10:6
 33:17 39:3 46:14
record 4:6,16
 14:10 85:5 87:10
recorded 12:2
 13:18 16:3
recording 11:21
 14:12 15:7,10,20
 18:4,7,16,16,22
 18:23 19:7 67:18
 69:4 78:25
recordings 12:8
reduced 32:5
redundant 54:11
regarding 10:7
relates 80:4
relationship 81:25
 84:9
relative 87:12,14
released 64:4
relief 62:25
relieved 62:21
remained 47:24
remaining 26:4
remember 19:15
 21:1 22:3 31:12
 32:23 33:4 41:20
 49:21 58:23
 59:10
remove 50:6
removed 49:12
 64:18
repair 19:6
repaired 16:18
rephrase 30:11
report 3:12,13
 7:18,23 8:1,4
 10:11,21 11:1
 19:18 20:4 23:20
 24:1 25:11,20,22
 31:7 35:20 36:1
 36:7,21 38:6
 42:8,13 43:2,12
 44:14 47:23
 55:15 61:2 63:25
 65:15 79:14 87:8
reporter 1:24,25
 3:6 4:2,2,5,12
 4:24 80:14 86:6
 86:7 87:1,6,7,22
Reporter-Master

87:22
reports 55:12
 72:18 78:24
represent 21:5
Representative 1:5
request 88:12
requested 87:10
required 5:21
 32:14
requirement 14:2
 39:7
requires 13:19,21
rescue 50:18
resignation 81:1
 82:17
resistance 36:17
 37:9,24 42:9
 57:23
resisting 27:7,11
 27:13 31:13,23
 37:1 38:13 42:14
 42:17 54:21,24
 55:2 72:1 73:2
respectfully 88:12
responding 25:25
response 15:11
 57:18 66:2
responsive 48:10
responsiveness
 52:13
rest 26:1
restrained 32:20
restraint 32:12,21
 33:10 39:8,13
 43:25 57:16
resulted 13:6
return 88:13
review 21:7 26:10
 61:3,14,16,22
 87:9 88:10,13
Reynolds 2:16,19
 4:22,22 8:16,21
 9:6,10,14,20
 10:1,4 11:24
 12:5 13:14,23
 14:3,20,25 15:5
 15:13,18,23 16:2
 16:5,8,12 19:13
 21:13 22:19 23:3
 23:8 27:19 28:21
 29:1,24 30:5,10
 31:16,22,24 32:3
 32:9 33:2,6
 34:25 38:17 39:9
 39:18 40:12,19
 41:5 42:6,16,23
 43:18,21 44:3,15

46:10 48:19
 51:19,22 52:9
 53:22 54:12,25
 55:5 56:14 57:14
 57:21,25 58:11
 58:16,19 59:22
 60:2 62:12 66:9
 66:14,22 67:3,7
 67:11,20,25 68:4
 68:11,14,18,22
 68:25 69:5,18
 70:13 71:7,11,17
 72:13,16,20,23
 73:1,19 74:6
 75:6,11,17,19
 76:2,4,11 77:7
 77:15,20 78:7,12
 78:20 79:1,6,17
 82:4,20 83:5,11
 83:17,22 84:2,7
 84:13,21 85:1
 88:25
rifle 41:23
right 4:24 8:23
 10:18 15:3,7,7
 15:10,21 17:2,4
 17:17 22:17 24:5
 26:21,22 28:10
 34:3,9,13 35:7,9
 35:10 36:11,21
 37:5,13,17,19,25
 40:10,14,21 42:4
 43:16 44:1,5,8
 44:21 45:9 47:2
 49:9 52:19 53:7
 53:25 54:2 56:3
 57:13 59:4 62:16
 63:8,9,11,12,18
 63:20 64:3 65:6
 65:8,18,23 66:7
 66:12,18,20
 67:23 68:10,13
 68:17 69:4,10,16
 70:6 71:1 72:18
 73:11 74:13
 75:13 78:17
 83:21,25
right-handed 62:15
ripped 42:21 66:20
rmckee@themcke...
 2:9
Robert 2:10 4:17
 88:23
ROBERTS 2:16
Roderick 2:21 4:13
Roosevelt 5:14
Roughly 6:4

Royal 2:8
run 27:2 44:17

**S**

safekeeping 78:14
sand 50:6 53:3
  55:18,22 57:16
  58:3,10 65:23
  66:3
save 42:15
saw 7:10,22 10:24
  11:6 19:14 20:24
  21:2 22:16 23:2
  26:19,20 27:24
  28:14 29:23
  36:23 37:1 41:23
  47:22 51:4,7
  54:8 58:14,24,25
  59:4,7 60:8
  72:22,25 73:2,10
  75:2 77:25
saying 59:14 64:17
  64:21 81:17
says 23:22 24:2
  46:13,13 48:9,13
  69:9,16 70:10
scared 40:16
scene 26:17 27:4,8
  27:22 30:8,12,18
  30:21,24 38:20
  41:14 51:24
  58:20 59:13 63:3
  70:16 71:3
search 70:22
second 62:5
secure 47:25 48:2
  48:25 49:5 64:5
  64:12
secured 48:7 71:20
securing 33:19
  35:21 48:6 71:14
  71:23 72:2
see 20:25 27:6,12
  28:1,4,12 29:2
  29:17 36:13,25
  37:16,19 38:3,24
  41:14,22 43:6,7
  43:14 44:10,13
  44:16,17 45:11
  45:14 46:23
  47:25 48:4 49:5
  49:25 50:2,4,6,9
  51:12 59:6,8
  71:1 73:17,18
  74:4,7,8,10,12
  74:13 84:10
seeing 41:20 58:23

59:11
seen 7:3,8,13,16
  7:18,21 10:21
  11:1,9 16:3 19:9
  19:17 20:4,7
  21:20,23 23:12
  58:7 60:24 67:4
  74:16,19,22,24
  74:25 75:3,24
  76:3,6
sense 7:21 39:24
  39:25 75:13
sent 19:6
sentence 24:15
sentences 24:14
separate 19:23
Sergeant 24:2 47:7
  47:23 48:3,7
  71:3
settlement 77:1
shape 36:7
sheet 3:7 88:13
  89:1
shoulder 28:24,25
  71:10
show 72:10
showed 58:10
showing 74:25
shows 74:19
shut 37:12
side 45:21 63:7
Signed 86:11
Similar 17:9
Simonton 1:16 4:8
simply 56:2
sincerely 33:4
  88:15
sinus 10:18
sir 5:10 8:24 15:1
  16:22 23:17
  60:24 84:24
siren 17:10
sit 33:8,17
six-two 6:2
size 49:4 57:8
skills 6:8
skin 46:21
Smith 79:19 80:20
  83:7
SOB 59:15
somebody 13:2
Somewhat 61:7
soon 85:4
sorry 17:18 18:12
  23:25 45:18
  61:25 80:16
sort 13:20 43:12

46:24
sound 75:4 80:18
source 33:10
sources 20:14,22
Southeast 88:18
Southern 1:1 4:11
Southernmost 26:17
space 64:10
speak 8:13 22:7
  42:9 70:15
specifically 46:13
speed 37:11
spoke 23:1
stand 47:19 71:21
standing 46:17
  47:4,11 53:2
  77:25
started 27:13
  42:10
state 4:3,15 86:3
  86:7,15 87:3
stated 28:19 42:7
  59:3 89:23
statement 36:20
  60:5,6 61:10
  71:14 84:15
statements 8:22
  9:9
states 1:1,16
  62:21 66:16
station 6:16,17
status 23:25 27:5
  38:22,24
stay 58:20
stays 18:11
step 12:12
steps 51:1
STEVENS 2:22
stop 18:7 31:13,23
  73:21
stopped 18:17
  61:25
stories 8:15,19,20
  9:5,12,18,19
  10:3 68:10,16
story 9:15 47:18
  72:9,18 75:3
Street 1:16 2:3
  4:8 26:16
strike 75:19 79:6
strong 57:6
struggle 64:1
struggling 57:23
stuck 36:14,16,18
  36:23,25 37:23
  38:4
stuff 20:6,9

subdue 55:23
subject 48:3,10
  62:23
subject's 64:10
subsequently 16:18
suffocate 40:10
  56:7
suffocating 31:20
suggest 19:5
Suite 2:8,12 88:5
  88:18
summary 10:22
  61:10 62:1,5
  69:11,22 71:14
Sunrise 2:12 88:5
superior 76:23
supervisor 12:11
  26:11
supervisory 76:12
support 4:13,14
  81:11 82:16 88:8
  88:18
supposed 12:13
  30:17
sure 74:2 76:17
survival 57:12
survive 54:24
suspect 48:14 62:7
  66:17 69:9 70:1
  71:14,20,23 72:2
suspect's 48:3
  71:9
Suzanne 1:23 4:1
  4:12 86:6,14
  87:6,21 88:17
swallowed 50:24
swear 4:16,25
sworn 5:6 10:11
  86:10
systems 52:7

**T**

T 2:14 88:4
table 53:6
take 22:10 61:14
  62:5 63:5 74:11
taken 1:20 4:1
  60:5,6 88:8
takes 13:17
talk 16:10,20 75:8
talking 8:23 17:15
  23:13 41:8
tall 6:1
tampered 76:6
tape-over 15:20
taped 13:22 14:19
taping 15:25

**Taser** 8:22,24
11:16,20 12:2,8
12:11,13 13:8,21
16:15,17 67:13
77:13,16
**Tasers** 13:7
**tasked** 44:24 70:17
**tasks** 31:5
**techniques** 47:17
50:18
**telephone** 20:25
21:21 77:25
**tell** 5:10 8:15 9:5
9:19 10:3 17:13
68:9,16 71:19
73:20 76:15
80:20,25 81:6,11
81:13
**telling** 21:10
**tells** 8:20
**ten** 51:21 53:20
54:2
**tendered** 80:25
82:17
**terminology** 27:10
**testified** 5:6 28:9
62:9 82:1
**testify** 14:23 21:8
22:20 31:14
**testifying** 22:2
**testimony** 4:25 7:6
11:11
**THADDEUS** 2:21
**Thank** 60:23 82:12
84:24
**thing** 43:24 83:9
**things** 68:19
**think** 9:21 18:24
22:1 23:15,15
24:14 25:8 26:1
26:6 42:12 43:24
66:1 70:25 82:14
**thinking** 40:5
**third** 17:25 88:18
**thought** 9:13 40:25
64:6
**thousands** 37:23
**three** 5:17 17:12
17:14,19,24 41:2
41:9,10,20
**three-point** 28:19
28:20,23 30:4
**tighter** 64:17,21
**time** 6:12,12 7:22
7:25 10:10 11:6
11:8,21 15:10,20
18:6,15 19:17

24:5 26:24 27:16
27:21 28:4 29:15
29:21 38:13,20
44:21 45:5,8
46:19 54:7 59:2
61:14 62:18
67:15 68:3,6
72:1 74:14 80:6
81:1 85:2
**times** 37:23 52:18
53:24 73:12,20
73:23,25
**Tip** 64:15
**today** 4:6 7:1,12
10:6 16:25 21:10
33:8 62:9
**TODD** 2:22
**told** 9:18 10:22
24:17 25:5 27:24
54:15 68:9 73:18
82:3
**tongue** 50:2
**top** 14:23
**topics** 11:13
**torso** 39:22
**total** 51:14
**touching** 52:23
53:4
**tourist** 19:15
**trained** 32:1 33:9
37:22 39:24
50:18,20,23 55:9
**training** 5:21 6:8
12:7,10 31:19
32:7,11,17,19,25
33:5,13,14,15
39:6,17 55:9
56:6 59:24
**trainings** 32:14
**trait** 57:12
**transcript** 46:12
87:9,10 88:10,21
89:2
**transpired** 7:14
**trauma** 67:5
**Treavor** 1:5 4:10
88:7 89:4
**tried** 71:20
**true** 34:24 61:19
61:20 69:2 72:9
83:6 87:10 89:23
**truth** 5:1,2
**try** 20:14 30:15
65:2
**trying** 27:22 33:20
45:25 54:20,24
55:2,13 75:16

**turn** 13:21 14:4,6
14:11,14 16:23
17:19 18:1 51:25
**turned** 14:18,23
15:9 19:2 54:4,6
54:9 60:11
**turning** 14:10,11
15:24 46:24
**turns** 17:10,21
**TUZZIO** 2:16
**Twenty-five** 73:12
**two** 5:17 8:7 9:1,4
17:9,14,24,24
19:23 21:6 26:4
26:4 36:1 42:2
64:19
**two-year** 32:15
**type** 32:7,20
**typed** 24:21
**typical** 57:11
**typically** 6:15
9:24 10:3 12:23
56:1

**U**

**U.S** 4:11,13,14
88:8,18
**Uh-huh** 8:14 18:14
23:18 53:13
61:24 64:2 69:25
79:24
**Uh-uh** 43:8
**un** 47:16
**un-cuff** 48:14
**unconscious** 38:16
38:19 39:1 47:7
47:14 48:4
**uncuffed** 49:12
69:10 70:2,4,5
**under-stomach**
45:20
**understand** 5:23
45:25
**understanding**
12:23 58:9 62:10
**United** 1:1,16
**unknown** 55:17
**unlock** 35:15 64:6
**unresponsive** 38:7
38:12 45:2 47:20
54:10,17 60:10
70:4 74:10
**untruthful** 9:9
**upper** 47:24
**upward** 46:3
**upwards** 45:24 47:2
**use** 14:16 65:23

74:22
**Usually** 30:25

**V**

**Valle** 2:22 28:1,3
28:10,12,24 29:2
49:20
**value** 14:14
**vantage** 39:5 42:17
42:20 43:22
63:15
**vehicle** 16:20,21
17:6,7,12,20
18:10,12 26:23
48:15
**vehicles** 17:17
**verbal** 31:8
**Verbatim** 1:24 4:1
86:6 87:6,22
**verified** 24:6
**verify** 50:4
**verifying** 24:3
**vicinity** 21:16
**video** 1:13 3:2 4:6
4:9 8:22 19:14
19:22 20:22,24
21:20 28:5 41:19
59:4,6,7,8,11
85:3,5
**videographer** 2:21
4:13 85:5
**videos** 20:15 75:2
**videotape** 7:10,13
78:1
**violent** 72:11 75:4
**visiting** 22:2
**visually** 36:23
**vs** 1:7 4:10 88:7
89:4

**W**

**W** 88:22
**wait** 80:14,18
**waiting** 48:2 61:23
**walk** 27:2
**walked** 21:7 63:4
**WALLACE** 2:3
**Wanciak** 22:1,14
23:13 58:23
59:14
**want** 25:5 74:2
**wanted** 66:2
**wasn't** 14:13 27:14
29:20 30:1 32:25
35:11,13 40:8,22
41:2 45:7 51:5
57:22 70:4 72:8

73:9 74:15 75:8
78:22 81:15
**watch** 67:13
**watching** 67:9,23
68:3,6
**way** 27:13 36:7
54:21 58:17
76:16
**ways** 19:23
**We'll** 25:4 80:18
**We're** 4:7
**we've** 43:24 80:17
**weapons** 41:15,18
41:20 42:4 70:19
70:21,23
**Wednesday** 1:15 4:6
**weight** 6:3 47:2
66:7
**weights** 6:17
**went** 27:1 38:16,19
50:13
**weren't** 40:23 57:6
57:24 67:23 68:3
83:8
**West** 1:2,8,17 2:4
2:17,23 4:8,11
4:20 5:14 12:20
22:9 23:1,5
75:21 76:9 88:7
89:4
**Weston** 2:8
**Whitehead** 2:3
**wife** 82:2,9
**wind** 40:3
**witness** 1:20 4:16
5:3 17:17,19
23:25 29:7,11
41:10 59:18,25
73:23 80:16 85:3
88:1,11,12
**witnessed** 22:25
**witnesses** 21:6
22:11 70:16
**woman** 57:17
**wondering** 22:23
**words** 24:14 25:8
26:2,6,12,12
71:13
**work** 6:8,11 8:19
9:5,9 68:10,17
81:3
**working** 82:16
**works** 66:7
**wouldn't** 14:14
20:8 37:8 57:1
73:9 83:18
**wrist** 64:20

**WRITE** 89:2
**writing** 7:18 8:4
24:12 42:8,14
55:12
**written** 7:23 62:1
**wrong** 29:23 64:7
**wrote** 8:1 10:11
11:1,4,8 19:18
24:8,11,17,18,18
25:1,2

_____

X

_____

Y

**Yeah** 10:25 24:18
25:2 35:3,7
36:25 43:22
45:25 46:4 61:11
61:17 78:10
80:15 82:5
**years** 5:17 8:7 9:1
9:4
**yesterday** 7:13
10:25 11:7,8
12:1 13:6,13
19:1,10,14 20:24
23:13 59:4,14
61:5
**yesterday's** 6:25
**York** 22:24

_____

Z

**Zamora** 24:2 29:14
29:20 30:13
45:20 47:7,23
48:3,7 54:17
60:16 71:3

_____

0

_____

1

**1** 2:8 87:9
**1:21** 1:15 4:7
**1000** 2:12 88:5
**11:16** 24:6
**1186143** 88:8
**11th** 86:11 87:18
**12** 88:2
**1250** 88:18
**14-10028-CIV** 4:10
**14-10028-CIV-M...**
1:3
**1604** 5:14
**17150** 2:8

_____

2

**2:45** 1:15 85:5,7

**2013** 5:20 6:3,11
7:14 10:8 11:2
11:18 17:6 24:6
32:11 38:7
**2014** 1:15 4:7 86:9
86:11 87:18 88:2
88:8 89:5
**2017** 86:16
**217-0150** 2:9
**220** 6:4
**23** 3:12
**2455** 2:12
**2488** 88:5
**25** 73:25
**27** 86:16
**28** 7:14 10:7
**28th** 5:20
**294-4585** 2:4
**294-7822** 2:4
**2nd** 23:25

_____

3

**30** 88:13
**301** 1:16
**305** 2:4,4 88:19
**33040** 1:17 2:4
**33131** 88:19
**33304** 2:13 88:6
**33327** 2:8
**33409** 2:17
**373-8404** 88:19
**3rd** 23:22 24:6

_____

4

**463-0100** 2:13
**463-2444** 2:13
**470** 2:17

_____

5

**5** 1:15 3:3 88:8
89:5
**561** 2:18,18
**5th** 4:6 86:9

_____

6

**60** 3:13
**608** 2:3
**688-2343** 2:18
**688-6560** 2:18

_____

7

_____

8

**8** 3:12 23:15,16,17
**85** 87:9
**86** 3:6
**87** 3:6

**88** 3:7
**888-9877** 2:9
**89** 3:7

_____

9

**9** 3:13 60:19,21
**954** 2:9,9,13,13