**TREAVOR EIMERS**, as Personal Representative of the Estate of **CHARLES EIMERS**, Deceased versus **CITY OF KEY WEST**, *et al.*, Case No.: **14-10028-CIV-MARTINEZ-GOODMAN**, United States District Court, Southern District of Florida

### EXCERPT - DEPOSITION TESTIMONY OF DEFENDANT, THADDEUS CALVERT
### Taken November 5, 2014

**Page 73, line 23 to Page 74 line 2:**
Q: Is it your testimony that the only device used for restraint was handcuffs?
A: Yes.
Q: There was nothing used for his legs?
A: I never saw a hobble.

VIDEO: (1:20) The video plainly refutes this: Office Calvert can be heard requesting the hobble at the 1:20 mark. "We need a hobble." Officer Wanciak then leaves the scene to go to her car to get one.

VIDEO: (2:32) Officer Calvert can be seen standing by Eimers head, looking at Eimers, as Officer Johnson and Officer Lovette are placing the hobble around Eimers legs.

**TREAVOR EIMERS**, as Personal Representative of the Estate of **CHARLES EIMERS**, Deceased versus **CITY OF KEY WEST**, *et al.*, Case No.: **14-10028-CIV-MARTINEZ-GOODMAN**, United States District Court, Southern District of Florida

### EXCERPT - DEPOSITION TESTIMONY OF DEFENDANT, HENRY JOSE DEL VALLE
### Taken November 6, 2014

**Page 50, line 20 to Page 51, line 6:**
Q: And when your arms are pulled backwards in a prone position, where is your face going?
A: Forward
Q: Yeah
A: It could be.
Q: Down into the sand, right?
A: I didn't see, at any time, did I see Mr. Eimers' face planted in the sand.

**Page 53, line 21 to Page 54, line 4:**
Q: After he lost consciousness, did you see his face?
A: I did. I saw it as he lost consciousness.
Q: Was there sand up his nose?
A: No, I didn't see – it's only residual sand on the outside.
Q: Why was there sand in his nose when Officer Stevens took his picture at the hospital?
A: Residual sand. I mean, that's all I saw.

**Page 57, line 4 to line 8:**
Q: Was he being hobbled at any time?
A: I don't know if he, if he was or not. I can't recall seeing that hobble on Mr. Eimers.

**Page 59, line 11 to Page 60, line 2:**
Q: I've had some officer say he was unresponsive while prone face down on the sand, and some say he was partially raised when he went unconscious, and I've had some say he was standing when he went unconscious. Which was it from your perspective?
A: From my perspective?
Q: Yes.
A: From my perspective, sir, two officers, and I can't recall who the officers (sic) were, two officers assisted Mr. Eimers in standing. When he came up to his feet, it looked like he was having – he was struggling to get up to his feet, and he never stood completely upright from my perspective. Never stood completely upright. He leaned forward, you know, and that's what I saw.

**Page 60, line 19-20:**
A: . . . he was assisting himself in standing. Didn't fully come upright.

**Page 63, line 6 to 18:**
Q: Well, what was happening in that one or two minutes when the right cuff was already on – and Garrido was extricated? What was happening in that minute or two?
A: From who, form whose perspective?
Q: Yours. You now had him cuffed.
A: Yeah.
Q: Prone on the sand.

A:      Mr. Eimers is still, you know, thrashing about and resisting.

**Page 65, line 14-15:**
Q:      You saw his color leave him?
A:      Absolutely.

**Page 65, line 24 to Page 66, line 5:**
Q:      He might not have had a pulse even when he was being stood up, correct?
A:      You saw his legs moving to try to stand up.  I saw him moving.  So he may have had a pulse up to the point he stood, because he was moving.

**TREAVOR EIMERS**, as Personal Representative of the Estate of **CHARLES EIMERS**, Deceased versus **CITY OF KEY WEST**, *et al.*, Case No.: **14-10028-CIV-MARTINEZ-GOODMAN**, United States District Court, Southern District of Florida

### EXCERPT - DEPOSITION TESTIMONY OF DEFENDANT, NICHOLAS GALBO
### Taken November 7, 2014

**Page 29, line 6 to Page 30 line 8:**
Q:    Did you ever touch his arms?
A:    When I took him out of handcuffs.
Q:    When you took him out of handcuffs. You're the one who took him out?
A:    Myself and I believe it was Sergeant Zamora took him out of the handcuffs. So I touched his hands and his, probably his arm area, to get the handcuff and actually get the key in and then unlock it.
Q:    What was Mr. Eimers' position relative to the sand when you did that?
A:    At that point he was sitting up.
Q:    Sitting up?
A:    Or was leaned up. Yes, siting up.
Q:    Okay. On his butt?
A:    Yes.
Q:    Okay. And was he struggling?
A:    No.
Q:    Were his legs hobbled?
A:    No.
Q:    Did his legs ever get hobbled?
A:    No. We had started to and were unable to or had stopped.
Q:    Why were you unable to?
A:    We weren't unable, we stopped.
Q:    Why?
A:    We decided to stand Mr. Eimers up and try to walk him over to the patrol vehicle and secure him inside a vehicle off the beach.

VIDEO: (2:48) The video shows that Galbo never assisted in removing the handcuffs. Sgt. Zamora and Officer Wallis removed the handcuffs. Galbo removed the hobble.

VIDEO: (2:43) The video plainly refutes this: Mr. Eimers was never placed in a seated position. No effort was made to lift Eimers up; He was rolled from prone position onto his back; then rolled onto his side to remove the restraints, then rolled onto his back again. KWPD officers never attempted to lift him to a standing position to walk him to a patrol vehicle.

VIDEO (2:39) The video clearly shows the hobble placed around the back of the knees of Mr. Eimers.

**Page 31, lines 1 to 14:**
Q:    Did you see any sand on his face?
A:    No.
Q:    Ever?
A:    No.
Q:    Did you ever see his face?

A:  Yes.
Q:  Did you see any sand in his eyes?
A:  No.
Q:  Nose?
A:  No.
Q:  Mouth?
A:  No.
Q:  Any blood?
A:  No. Not that I recall.

VIDEO: (3:25) The video plainly refutes this: Eimers is shown lying face up with sand covering his entire face. Galbo is shown standing next to him through the entire CPR process and when EMS arrives.

**Page 32, lines 10 to 22:**
Q:  How about reviewing your statement?
A:  Okay.
Q:  Does it say anything about when he became unresponsive?
A:  According to this it says, "As the subject was being lifted, he became unresponsive."
Q:  Is that your memory today, that it was only when he was being lifted that he became unresponsive?
A:  That's when I'm aware of it.

VIDEO: (2:43) The video plainly refutes this: No effort was made to lift Eimers up; He was rolled from prone position onto his back; then rolled onto his side to remove the restraints, then rolled onto his back again. At no time did KWPD officers attempt to lift him to a standing position.

# Mary Luz Rodriguez

| | |
|---|---|
| **From:** | Robert McKee |
| **Sent:** | Wednesday, November 19, 2014 12:05 PM |
| **To:** | jlewis@lewislegalgroup.com; Darren M. Horan; David Brill; David Horan; Mary Luz Rodriguez |
| **Cc:** | Nicole S. Rodrigues |
| **Subject:** | Eimers: False testimony of Officer Gabriel H. Garrido |

TREAVOR EIMERS, as Personal Representative of the Estate of Charles Eimers, deceased, versus CITY OF KEY WEST, ET AL., Case No. 14-10028-CIV-MARTINEZ-GOODMAN, United States District Court, Southern District of Florida

EXCERPTS – DEPOSITION TESTIMONY OF DEFENDANT GABRIEL H. GARRIDO SHOWING FALSE TESTIMONY AS COMPARED TO AUDIO-VIDEO TAPING OF THE SUBJECT EVENT


P. 40  Lines 17-19
Q. And was he (Eimers) walking towards the restaurant?
A.  I recall him walking towards myself and Officer Del Valle

P. 55 Lines 17-23
Q. Was any order given while Mr. Eimers was being compliant, to allow his hands to be cuffed, please:
A. I don not recall what Officer Del Valle was saying.
Q. And does that meanyou don't have any recollection of such an order being given?
A. After we attempted to cuff him, we — and he began resisting, we were giving commands to stop resisting.

P. 62 Lines 24-25, P. 63 Lines1-10
Q. Oh, no, no. There's a difference here. You're face down and now you have man who's not talking to you with another man pointing a rifle at you ahd he's hurting you. Do you think you'd fight yourself?
A. Sir --
Q. It doesn't matter who it is. Would you fight?
A. Sir, I was attempting to detain him. I was not hurting him.

P. 65  Lines 9-15
Q. And you did it so aggressively that you actually caught your own finger in the cuff, between the cuff and his arm, right?
A.  My finger was caught in the cuff because he was resisting.

P. 69  Lines 15-19
Q. Were you — by the way, weren't more than one officer ordering things to happen at the same time?
A. I only recall Officer Henry Del Valle.
Q. You didn't hear Officer Wanciak, too?
A. I did not.

P. 83 Lines 8-10, 18-24
Q. What happened next?
A.We attempted to remove him from the sand and lift him up?
Q. Well, he's face down, right?
A. I never saw his face down into the sand.
Q. Never bothered to check?
A.  I recall his face moving from right to left, never straight down in the sand.

1

P. 84 L. 7-13
Q. To go from left to right, his face, in a prone position, has to go through the sand, right?
A. He could move it above the sand from right to left, is what I saw. I never saw his face, face down into the sand.

P. 86 Lines 8-7 and 17-18
A. His face was going right to left. I never saw it face down in the sand.
A. I saw his face going right to left. I never saw it straight down in the sand.

P. 87 Lines 11-12
A. I was — saw his head, it was going right to left. I never saw it directly in the sand.

P. 88 Lines 16-17
A. I saw his face going right to left. I did not see it going in the sand.

P. 90 Lines 8-15
Q. What happened next?
A. We attempted to remove him from the sand.
Q. How?
A. By lifting him.
Q. Wasn't he already unconscious?
A. Not at that time, we did not--

P. 97 Lines 12-16
Q. When was the hobble put on?
A. At some point after he was fully in handcuffs and I was at his right shoulder.
Q. Why was it put on?
A. Because he was kicking.

P. 101 Lines 11-21
Q. Well you already described you were hlding his shoulder.
A. Correct.
Q. So that he couldn't roll.
A. Correct.
Q. Face down?
A. He was in the prone position.
Q. His face was not face down. His face was to the side.

P106 Lines 2-14

Q. If Zamora, as you stated in your report, announce that he, that Mr. Eimers, was unconscious after you finished cuffing him, there's no need to put restraint on his feet, is there?
A. He announced that after I had already been to his right shoulder and we began to lift him. And, as I believe the report states that, and as I believe I stated on the testimony, the leg restraints, as you're referring to, were place between, from what I remember, between the time the cuff went on and I went to his shoulder. So it would have been after that we notice he was unconscious.

P. 107 Lines 12-14
Q. Well, was he unconscious or not unconscious when the restraint when on his feet?
A. As far as I know, he was conscious.

P. 109 Lines 5-10
Q. An then they put the hobble on him right?
A. I don't recall putting the hobble on after. I recall him still being conscious when the hobble was place on.

2

P. 110 Lines 16-17, 25 and P. 111 Lines 1 and 6-8
A. The second we noticed he was unconscious, we attempted to render medical aid.
A. The moment we notice hew as unconscious, we immediately attempted to render aid.
Q. When did his skin color change?
A. I don't know. I never noticed his skin color change.


P. 112 Lines 14-23
Q. Had you noticed he had stopped breathing before he lost consciousness, had you been monitoring it, you might have been able to save his life, right?
A. The second we noticed he was unconscious, we started to render aid.


P. 151 Lines 13-17
Q. Did you observe him when he was on the ground facing upwards?
A. Yes.
Q. Did he have sand in his nose?
A. I don't recall he had sand in his nose.

3

## LOVETTE'S LIES

| DEPOSITION TESTIMONY | PAGE:LINE | VIDEO | MINUTE:SECOND |
|---|---|---|---|
| Instructed at the scene by Sergeant Zamora to wash hands of blood. ... Would have gone to his car or someone's car that would have had the proper wipes and wiped it off. | 133:22 ... 134:6 | While Lovette is, admittedly, not in view from 1:44 to 2:32 because the video pans away, it is nonetheless apparent that Lovette does not leave the scene to go to any car for a proper wipe. He merely is shown as having moved from the head of Eimers to the right foot of Eimers. He would have only had time, perhaps, to wipe his hands in the ocean.<br><br>{Comment: No wonder Lovette does not recall where the blood on his hands purportedly was; how much there was; whose it was; etc. *See* 135:3 – 136:25}. | 1:44 to 1:32 |
| Lovette was asked, "If Eimers could turn his head [when Lovette was positioned at Eimers' head], he [Eimers] would turn down into the sand?" Lovette responded that he does not "recall that ever happening." | 232:10 – 232:14 | The video of Eimers' sand-caked face says it all. | 3:26 |
| "We had already applied the hobble restraint to his legs and were trying to lift him up. He had already been handcuffed, and he was | 235:19 – 235:21 | The video plainly refutes this: No effort was made to lift Eimers up; he was never stood up, and he assuredly was not breathing when stood up, let alone fighting and | 2:43 |

| | | | |
|---|---|---|---|
| breathing when we stood him up."<br>. . .<br>"He was still fighting and talking. We didn't get very far before we were told that he was out." | 232:23 – 232:24<br><br>*See also* 297:28 – 298:4 | talking. He was rolled over onto his back like a lifeless log. | |
| When asked, "Was Mr. Eimers saying anything during the course of efforts to place him under arrest?" Lovette responded, "When we were telling him to stop resisting, he was telling us no." | 296:9 – 296:10 | Lovette makes no mention of the repeated "Ow!" exclamations by Eimers. Nor does Lovette mention Eimers' "You're hurting me!" scream. | *See, e.g.,* 0:48 |
| When asked, "Did you fire that Taser?" Lovette responded, "No." | 296:22 – 296:23 | We know from the video that a witness off screen asks the videographer, "You got it all, huh?" Then the witness asks the videographer: "You videotaped it?" Then the witness asks twice, "Did you see it when they were Tasing him?" Finally, the witness asks, "When they had him on the ground?" And the witness mimicked the sound of the Taser, "Ch-ch-ch-ch-ch!" | 5:50 |
| Lovette denies punching, striking or kicking Mr. Eimers, or seeing anyone else do so | 296:24 – 297:14 | We know from the video that there is a significant amount of blood in the area of Mr. Eimers' right ear and down his neck. | 3:26 |

**TREAVOR EIMERS**, as Personal Representative of the Estate of **CHARLES EIMERS**, Deceased versus **CITY OF KEY WEST**, *et al.*, Case No.: **14-10028-CIV-MARTINEZ-GOODMAN**, United States District Court, Southern District of Florida

### EXCERPT - DEPOSITION TESTIMONY OF DEFENDANT, GUSTAVO MEDINA
### Taken November 5, 2014

**Page 38, lines 11 to 19:**
Q: What was your perspective as to when he became unresponsive?
A: He was resisting the entire time until we lifted him up.
Q: And so its' not until you exerted more force, lifting him, that he went unconscious?
A: When we brought him up is when he went unconscious.

VIDEO: (2:43) The video plainly refutes this: No effort was made to lift Eimers up; He was rolled from prone position onto his back; then rolled onto his side to remove the restraints, then rolled onto his back again.

**Page 45, line 16 to Page 46, line 17:**
Q: How was Mr. Eimers lifted?
A: I had his under-stomach. I believe Zamora was to my left, and several other were on the side and by his feet.
Q: So you lifted him facedown?
A: No. We were lifting him upwards off the ground.
Q: Yeah, but I'm trying to understand. Was he in the prone position when he was being lifted?
A: Yes.
Q: And you lifted him in a prone position upward?
A: Yeah. And then, eventually, hopefully, to his feet.
Q: But that he was face down that you were doing it?
A: Yes.
Q: So when Officer Garrido said he was face up before that happened, was that accurate?
A: No, I don't believe he said that.
Q: Well, we have his transcript. I asked him specifically that, but it says what it says. But your recollection is that he was face down when you lifted him physically –
A: Yes.
Q: -- to put him in a standing position?
A: Yes.

VIDEO: (2:43) The video plainly refutes this: No effort was made to lift Eimers up; He was rolled from prone position onto his back; then rolled onto his side to remove the restraints, then rolled onto his back again. At no time did KWPD officers attempt to lift him to a standing position.

**Page 71, line 13 to 72 to line 8:**
Q: What do these words mean to you in this, in this summary of your statement: "After securing the suspect." What does that mean to you?
A: What do you mean?
Q: What did—did you tell the investigator that you, after, after you secured the suspect, the officers tried to stand him up?

A: That is correct.
Q: What did you mean by "after securing the suspect"?
A: Once everything—when we knew he was under control and detained, that's when we lifted him up, because he was resisting us the entire time.
A: And does "after securing the suspect" mean after he was handcuffed and had the device around his legs?
A: Again, I don't know if the device around his legs was in place or not.
Q: According to you, you're not even aware of one even being used?
A: I wasn't by his legs, so.

VIDEO: (2:43) The video plainly refutes this: No effort was made to lift Eimers up; He was rolled from prone position onto his back; then rolled onto his side to remove the restraints, then rolled onto his back again. At no time did KWPD officers attempt to lift him to a standing position.

VIDEO (3:00) The video shows that Officer Medina walks over to Eimers legs and is bent over next to Officer Galbo while he (Galbo) is removing the hobble.

### Page 73, lines 8 and 9:
Q: Was the hobble used?
A: Again, I wasn't by his feet, so I wouldn't know.

VIDEO: (3:00) Officer Medina walks over by Eimers feet and is bent over right next to Officer Galbo while he (Galbo) is removing the hobble.

### Page 74, lines 8 to 15:
Q: Did you ever see a hobble used?
A: No.
Q: Did you ever see—
A: I did not see anything by the feet because I was not by the feet.
Q: Okay. Se when he became unresponsive, did you see them take the hobble off of him?
A: No, I did not see that.
Q: Did you ever see a hobble right there by his body at any time?
A: I don't know. I wasn't by his feet.

VIDEO: (3:00) Officer Medina walks over to Eimers legs and is bent over next to Officer Galbo while he (Galbo) is removing the hobble.

**TREAVOR EIMERS**, as Personal Representative of the Estate of **CHARLES EIMERS**, Deceased versus **CITY OF KEY WEST**, *et al.*, Case No.: **14-10028-CIV-MARTINEZ-GOODMAN**, United States District Court, Southern District of Florida

### EXCERPT - DEPOSITION TESTIMONY OF DEFENDANT, KA WANCIAK
### Taken November 4, 2014

#### Page 27, line 21 to Page 28, line 19:
Q:  Do you deny that you made the following statement: "Someone better get that son of a bitch away from me before I arrest him myself.". . . Did you make that statement?
A:  I did not make that statement.
Q:  Do you affirmatively deny, under oath, that you made that statement?
A:  I deny it.
Q:  Do you affirmatively, do you also affirmatively deny, under oath, that you made the following statement on November 28, 2013, in uniform, following the Eimers' incident at the southernmost Café Beachside: "that son of a bitch just murdered that man."
A:  I totally deny it.

#### Page 54, line 25 to Page 55, line 8:
Q:  And that's when you were looking to make sure Mr. Eimers was still breathing; is that right?
A:  I checked his breathing the whole time with his face, because his face was to the side and I could see that he was still breathing.
Q:  And what about his face that tells you he's still breathing?
A:  He was still making motions and noises and he was making noises the whole time.

**TREAVOR EIMERS**, as Personal Representative of the Estate of **CHARLES EIMERS**, Deceased versus **CITY OF KEY WEST**, *et al.*, Case No.: **14-10028-CIV-MARTINEZ-GOODMAN**, United States District Court, Southern District of Florida

### EXCERPT - DEPOSITION TESTIMONY OF DEFENDANT, KA WANCIAK
### Taken November 4, 2014

### Page 54, line 25 to Page 55, line 8:
Q: And that's when you were looking to make sure Mr. Eimers was still breathing; is that right?
A: I checked his breathing the whole time with his face, because his face was to the side and I could see that he was still breathing.
Q: And what about his face that tells you he's still breathing?
A: He was still making motions and noises and he was making noises the whole time.