### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### KEY WEST DIVISION

### Case Number:  14-10028-CIV-MARTINEZ-GOODMAN

**TREAVOR EIMERS**, as Personal Representative of
the Estate of Charles Eimers, Deceased,

                    Plaintiff,

vs.

**CITY OF KEY WEST**, a Florida municipality;
**HENRY DEL VALLE,** an Officer with the City of
Key West's Police Department; **GABRIEL
HUMBERTO GARRIDO**, an Officer with the
City of Key West's Police Department; **GUSTAVO
ADOLFO MEDINA**, an Officer with the City of
Key West's Police Department; **KATHYANN
WANCIAK**, an Officer with the City of Key
West's Police Department; **GARY LEE
LOVETTE**, an Officer with the City of Key West's
Police Department; **MATTHEW JOHNSON**, an
Officer with the City of Key West's Police
Department; **FRANCISCO ZAMORA**, an Officer
with the City of Key West's Police Department;
**THADDEUS CALVERT**, an Officer with the City
of Key West's Police Department; **DEREK
WALLIS**, an Officer with the City of Key West's
Police Department; and **NICHOLAS GALBO**, an
Officer with the City of Key West's Police
Department,

                    Defendants.

_____/

### SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, **TREAVOR EIMERS**, as Personal Representative of the Estate of Charles

Eimers, Deceased sues Defendants, **CITY OF KEY WEST**, a Florida municipality; **HENRY**

**DEL VALLE,** an Officer with the City of Key West's Police Department; **GABRIEL**

**HUMBERTO GARRIDO**, an Officer with the City of Key West's Police Department;

**GUSTAVO ADOLFO MEDINA**, an Officer with the City of Key West's Police Department;
**KATHYANN WANCIAK**, an Officer with the City of Key West's Police Department; **GARY LEE LOVETTE**, an Officer with the City of Key West's Police Department; **MATTHEW JOHNSON**, an Officer with the City of Key West's Police Department; **FRANCISCO ZAMORA**, an Officer with the City of Key West's Police Department; **THADDEUS CALVERT**, an Officer with the City of Key West's Police Department; **DEREK WALLIS**, an Officer with the City of Key West's Police Department; and **NICHOLAS GALBO**, an Officer with the City of Key West's Police Department.

## JURISDICTION AND VENUE

1.      This action is a wrongful death action brought under 42 U.S.C. §1983 and Florida's Wrongful Death Act, Fla. Stat. §768.16 *et seq*. against Defendants to redress the deprivation, under color of law, statute, custom or usage, of rights, privileges and immunities secured to CHARLES EIMERS by the Fourth and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983, and under Florida's Wrongful Death Act, when the Defendant Officers used excessive force during their arrest of CHARLES EIMERS, killing him.

2.      This Court has jurisdiction pursuant to 42 U.S.C. §1983, 28 U.S.C. §1331, 28 U.S.C. §1343(a).  Venue is proper in the Southern District of Florida under 28 U.S.C. §1391(b) because all of the actions described herein were committed in Key West, Monroe County, Florida.

## THE PARTIES

3.      The Decedent CHARLES EIMERS was a Michigan resident who is survived by four (4) adult children.  The potential beneficiaries of a recovery in the instant wrongful death

action are the Decedent's Estate and his children, to wit:  TYSON EIMERS, born December 12, 1973, Plaintiff TREAVOR EIMERS, born December 11, 1975, ERICA EIMERS, born December 26, 1977, and JOSHUA EIMERS, born May 27, 1980.

4.      Plaintiff TREAVOR EIMERS has been authorized by his siblings to serve as the Personal Representative of the Estate of their father and as of this filing TREAVOR EIMERS has been or will be the duly appointed Personal Representative of CHARLES EIMERS' Estate.

5.      Defendant CITY OF KEY WEST is a Florida municipality in Monroe County.

6.      At all material times, Defendants HENRY DEL VALLE, GABRIEL HUMBERTO GARRIDO, GUSTAVO ADOLFO MEDINA, KATHYANN WANCIAK, GARY LEE LOVETTE, MATTHEW JOHNSON, FRANCISCO ZAMORA THADDEUS CALVERT, DEREK WALLIS, and NICHOLAS GALBO were and are police officers employed by the City of Key West Police Department, and were acting within the course and scope of their employment and under the color of state law.

7.      Plaintiff sues Defendants, HENRY DEL VALLE, GABRIEL HUMBERTO GARRIDO, GUSTAVO ADOLFO MEDINA, KATHYANN WANCIAK, GARY LEE LOVETTE, MATTHEW JOHNSON, FRANCISCO ZAMORA THADDEUS CALVERT, DEREK WALLIS and NICHOLAS GALBO in their individual capacity and in their capacity as employees of the City of Key West Police Department.

## ALLEGATIONS AS TO ALL COUNTS

8.      On November 27, 2013 CHARLES EIMERS was fulfilling his dream of spending a winter in beautiful Key West, Florida.  At 61 years of age, CHARLES EIMERS had lived his entire life in Michigan, and after raising four children and nurturing grandchildren,

working his entire adult life at General Motors, saving his money, and receiving a full pension and health benefits, had more than earned a few months' of relaxation in the comforting warmth and beauty of The Keys.

9. On November 28, 2013 – Thanksgiving Day morning – Defendants attempted to lawfully arrest 61 year-old CHARLES EIMERS on the sand on South Beach in Key West, purportedly for a number of traffic violations.

10. After stopping his car at South Beach, CHARLES EIMERS complied with Defendants' instructions in every way, including Defendant HENRY DEL VALLE'S command, made with his service weapon drawn, for EIMERS to drop to his stomach on the sand and put his hands to his side.  No officer asked or informed CHARLES EIMERS that they would handcuff him.

11. Defendant GABRIEL HUMBERTO GARRIDO moved in and on CHARLES EIMERS to place handcuffs on MR. EIMERS' wrists from behind, out of CHARLES EIMERS' view.  After cuffing the left arm, Officer GARRIDO pulled CHARLES EIMERS' right arm straight back without bending MR. EIMERS' elbow, an obviously painful and excessive force maneuver, causing MR. EIMERS to cry out and his body to move in response to the pain the maneuver elicited.

12. Defendants GUSTAVO ADOLFO MEDINA and KATHYANN WANCIAK moved in and on CHARLES EIMERS to unnecessarily assist Defendant GARRIDO in securing MR. EIMERS' hands behind his back while forcing MR. EIMERS' torso and face into the sand.

13. CHARLES EIMERS' wrists were chewed up, totally lacerated and bloodied from the ordeal.

14.     While Officers GARRIDO, MEDINA and WANCIAK exerted their force on CHARLES EIMERS' back and head, Defendant GARY LEE LOVETTE kneeled on MR. EIMERS' back, stuck a Taser or stun gun on MR. EIMERS' back or neck, and screamed at MR. EIMERS.  Then, DEFENDANT LOVETTE slammed his elbow into the back of MR. EIMERS' head dazing him and keeping his face in the sand.  The blow likely rendered MR. EIMERS unconscious or immobile, and helped force MR. EIMERS' face to remain in the sand.

15.     Defendant WANCIAK heard one of her Defendant OFFICERS yell for a "hobble."  (A hobble is a strap device that ties a suspect's legs together and links to the handcuffs, bending the suspect's legs backwards at the knees.  *See, e.g.,* www.policehobble.com.).

16.     Officer WANCIAK quickly got up and ran to get her hobble.  While returning, she saw Defendant MATTHEW JOHNSON and told JOHNSON that the officers holding MR. EIMERS in the sand wanted the hobble and she asked Officer JOHNSON to run her hobble over to the other officers.

17.     Officer JOHNSON ran the hobble over to the other officers and placed it around MR. EIMERS' legs while other officers continued to pin MR. EIMERS' chest and face in the sand.  The hobble was placed onto MR. EIMERS' legs placing more force onto his torso, all occurring when MR. EIMERS had already lost consciousness.

18.     During this time, Defendant SGT. FRANCISCO ZAMORA also had his knees pressed into MR. EIMERS' back.

19.     Defendant THADDEUS CALVERT grabbed MR. EIMERS' left foot and twisted it to prevent MR. EIMERS from turning his body, further pinning MR. EIMERS' chest and face in the sand.

20.     Defendants' actions forced sand into CHARLES EIMERS' nostrils and mouth; in fact, sand caked CHARLES EIMERS' face.  The joint action of the Defendants' forces compressed MR. EIMERS' facial structures causing him to lose his ability to breath and to believe he could not breath.

21.     According to certain witnesses on the scene, Defendant LOVETTE actually used the Taser or stun gun on CHARLES EIMERS.

22.     Upon information and belief, the following Defendant officers were on the scene and may have participated in the use of excessive force on CHARLES EIMERS and failed to take reasonable steps to protect MR. EIMERS from the Defendant officers' use of excessive force and thus must be held liable for their respective nonfeasance:  DEREK WALLIS; NICHOLAS GALBO; and the aforementioned Defendant DEL VALLE.

23.     A short time after the Defendant officers smothered MR. EIMERS by forcing his face into the sand, CHARLES EIMERS stopped breathing, his heart stopped beating, he turned blue and went limp.  Only after they realized this did the Defendant officers remove the cuffs and hobble and request that a defibrillator be brought to the scene. Precious time was lost due to the officers' failure to monitor MR. EIMERS' condition, and almost two minutes passed between his loss of consciousness and CPR efforts.  It was to no avail as CHARLES EIMERS was never brought back to consciousness.

24.     CHARLES EIMERS was transported to Lower Keys Memorial Hospital and put on life support.

25.     CHARLES EIMERS was pronounced dead six days later when he was disconnected from a ventilator at the hospital.

26.     Notwithstanding the horrible police actions and inactions giving rise to CHARLES

EIMERS' "in custody" death, and notwithstanding the mandates set forth in *Fla. Stat.* §406.11 that the district medical examiner shall perform an investigation and autopsy when a person dies "in police custody," and *Fla. Stat.* §406.12 establishing a duty on persons who become aware of the death of any person occurring "in police custody" to report such to the district medical examiner, none of the Defendants reported MR. EIMERS' death to the medical examiner.

27.     On account of Defendants' singular or collective failure to comply with *Fla. Stat.* §406.12 by notifying the Monroe County Medical Examiner of the "in custody" death and hence the requirement to do an autopsy, CHARLES EIMERS' body was taken directly from the hospital to a local funeral home for cremation.

28.     Defendants' failure to comply with *Fla. Stat.* §406.12 was part of Defendants' calculated plan to allow the destruction by cremation of key evidence of Defendants' excessive force, reckless conduct and bad faith, to wit:  CHARLES EIMERS' body.

29.     By sheer good fortune, the local funeral home had not yet cremated MR. EIMERS' body when, several days after receiving it, a public inquiry spurred action and attention into precisely who sent CHARLES EIMERS' deceased remains to the funeral home instead of the Monroe County Medical Examiner and why.

30.     The constricting pressure of the combined body weight and applied forces exerted by the Defendant officers on CHARLES EIMERS' back, head and lower body while he was in the prone position in the sand resulted in a reduction of his actual or perceived ability to breathe. The more weight applied by the Defendant officers, the more severe the degree of compression and the greater the actual or perceived difficulty in breathing CHARLES EIMERS experienced.  The stress of the struggle combined with restraint asphyxia, and

CHARLES EIMERS' underlying cardiac condition, precipitated a cardiac event, which caused anoxic encephalopathy and death.

31.     As further indication of Defendants' plan and artifice, the first reports made by one or more of the officers at the scene falsely stated that CHARLES EIMERS exited his vehicle combative, resisting arrest and after running on the beach.

32.     Within days of the attempted arrest, a video was located showing that MR. EIMERS obeyed all instructions, did not resist and never ran on the beach.

33.     The video of Defendants' attempt to arrest CHARLES EIMERS evidences that Defendants, individually and together, used and/or permitted to be used excessive force which resulted in the death of CHARLES EIMERS.

34.     The Fourth Amendment's prohibition against unreasonable seizures provides protection against the use of excessive force by law-enforcement officers during the course of a lawful arrest, investigatory stop, or "other 'seizure' of a free citizen." *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Zivojinovich v. Barner*, 525 F.3d 1059, 1071-73 (11th Cir. 2008). "When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest." *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006).

35.     The inquiry into whether any given use of force is "reasonable" under the Fourth Amendment is an objective one that requires a careful balancing of "the nature and quality of the intrusion" and the "countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-97 (citations and internal quotation marks omitted).  Evaluating an excessive-force claim requires "careful attention to the facts and circumstances of each

particular case," including, among other things, the relationship between the need for force and the amount used and the extent of the injury inflicted. *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008)).

36. Furthermore, the Eleventh Circuit Court held in *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) *overruled on other grounds by Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), in pertinent part as follows:

> Whether a [defendant's] use of force is excessive, and thus violates the [arrestee's] Fourteenth Amendment right to be free from cruel and unusual punishment, depends on whether the [defendant's] act "shocks the conscience," *Cockrell v. Sparks,* 510 F.3d 1307, 1311 (11th Cir.2007), and it necessarily will if the force " 'was applied ... maliciously and sadistically for the very purpose of causing harm.' " *Id.* (quoting *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986).
> . . .
> When [officers] continue to use substantial force against [an arrestee] who has clearly stopped resisting-whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated-that use of force is excessive. *See Bozeman,* 422 F.3d at 1272 (giving special weight to the fact that the jailers "continued [to] use ... force in a manner that was severe enough to render [the plaintiff], at the very least, unconscious after [he] had surrendered"); *Skrtich,* 280 F.3d at 1303 ("[G]overnment officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated."); *see also Harris v. Chapman,* 97 F.3d 499, 505–06 (11th Cir.1996); *Davis v. Locke,* 936 F.2d 1208, 1212–13 (11th Cir.1991); *Williams v. Cash–C.O.I.,* 836 F.2d 1318, 1320 (11th Cir.1988); *Perry v. Thompson,* 786 F.2d 1093, 1093–95 (11th Cir.1986); *cf. Vinyard,* 311 F.3d at 1348. Once a[n arrestee] has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need.

37. The Eleventh Circuit held in *Skrtich v. Thomas,* 280 F.3d 1295, 1300–1301 (11th Cir. 2002):

> Under the Eighth Amendment [and under the Fourteenth Amendment for non-prisoner arrestees like MR. EIMERS], force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251

(1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.1973)); *see also Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson,* at 7–8, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156; *see also Whitley,* 475 U.S. at 321, 106 S.Ct. 1078, 89 L.Ed.2d 251; *Harris v. Chapman,* 97 F.3d 499, 505 (11th Cir.1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley* 475 U.S. at 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (quoting *Johnson,* 481 F.2d at 1033).

38.     The type of handcuffing procedure to which the Defendant Officers subjected MR. EIMERS, whereby the subject is lying on his belly while being handcuffed, is known as the "prone restraint."   The prone restraint method is well known to be a dangerous method of restraint even when implemented on a hard surface.  The manner and location where the Defendant Officers implemented the "prone restraint" of MR. EIMERS was extraordinarily and unreasonably dangerous.  The Defendant officers and the CITY OF KEY WEST were aware of this danger but had no training regarding this method or its dangers in a beach sand environment.

39.     As recently reported in  a local publication:

> this method has become increasingly controversial since studies have found it has been responsible for numerous deaths from "positional asphyxiation."  A survey released in February 2010 by the Federal Department of Education found that several states have already banned state employees from using the prone restraint method in educational and mental health institutions while others have severely restricted its use.  In England after a series of highly controversial deaths, prone restraint was banned nationwide, even for police departments unless the suspect presents an immediate danger to himself or others. When prone restraint is necessary, the suspect's condition must be monitored constantly. The police procedure in Kent, England was amended in June of this year adding a requirement that a safety officer  "[monitor] the person's position

continually whilst being restrained, as death can occur suddenly and develop beyond the point of viable resuscitation within seconds rather than minutes." In the U.S. certain states, like Colorado, have issued state-wide bans on the use of "prone restraint" for any non-emergency situation not involving an immediate threat of injury.  There is an abundance of information as well as visual demonstrations on YouTube explaining the risk of asphyxiation associated with the method of restraint used on Eimers.  One factor is particularly striking:  Even the best demonstrations of the 'prone restraint' method, videos created by police officers for police officers, show the suspect on his belly on a mat or on a hard floor.  But, what happens when the "suspect" has his head in the sand; when every movement brings more sand into the nose and mouth?

40.   In killing CHARLES EIMERS, the Defendant Officers forced his face into the sand and every movement resulted in a greater reduction of his actual or perceived ability in breathing by CHARLES EIMERS. The combined weight applied by the Defendant officers likewise resulted in more compression and still greater reduction actual or perceived difficulty in breathing by CHARLES EIMERS.  Theses stresses combined with restraint asphyxia, and CHARLES EIMERS' underlying cardiac condition, precipitated a cardiac event, which caused anoxic encephalopathy and death.

41.   To the extent that one or more of the Defendant Officers did not discharge a Taser or stun gun on EIMERS, careful attention to the facts and circumstances of this particular case, including, among other things, the relationship between the need for force and the amount used and the extent of the injury inflicted, leaves no doubt that the force used by the Defendant officers was excessive.

42.   Specifically, the Defendant officers utilized the "prone restraint" to effectuate an arrest of an unarmed man for traffic violations, in deep sand, with multiple officers pressing down on EIMERS' body to facilitate securing the handcuffs and the hobble, and Defendant LOVETTE elbowing with extreme force MR. EIMERS in the back of his head, thereby greatly exacerbating the compression and actual or perceived asphyxia dynamics.  The

Defendant Officers killed CHARLES EIMERS in a horrifying way.

43.    To the extent Defendant LOVETTE indeed discharged a Taser or stun gun, the asphyxiation of CHARLES EIMERS takes on greater significance from an excessive force standpoint and, again, leaves no doubt that the Defendants' force was excessive. Significantly, the amount of time needed for fatal asphyxiation to occur is remarkably shorter when a Taser or stun gun is used than when a Taser or stun gun is not used.

44.    Studies have shown that the body requires rapid and deep breathing after being Tased or stunned.

45.    The Defendant Officers' unconstitutional excessive force implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the Defendant CITY OF KEY WEST, or was visited pursuant to governmental "custom" even though such custom has not received formal approval through the City of Key West's official decision-making channels.

46.    To the extent that the Defendant Officers' unconstitutional force was visited pursuant to such a "custom," this "custom" was a persistent and wide-spread practice, a permanent and well settled practice, and a deeply embedded traditional way of carrying out policy; it was created by those affiliated with the CITY OF KEY WEST whose edicts or acts may fairly be said to represent official policy; and it thus has become so settled and permanent as to have the force of law.

47.    Regardless of whether the use of such excessive force was an officially promulgated policy or an unofficially adopted custom, it was the moving force behind the Defendant Officers' constitutional deprivation of MR. EIMERS' constitutional rights.  Thus, the CITY OF KEY WEST not only established or tolerated the custom or policy, but there

existed a causal link between the custom or policy and the Officers' deprivation of MR. EIMERS' constitutional rights.

48.     This policy or custom of the Defendant CITY OF KEY WEST included adoption or approval or tolerance of the "prone restraint" to which the Defendant Officer subjected MR. EIMERS while providing no training for this method in a beach sand environment. Such arrests on beach sand had previously occurred on multiple occasions, all without training to guide officers about its peculiar dangers and requirements.

49.     As a proximate result of the Defendant Officers' conduct, CHARLES EIMERS died, as indicated, and his Estate and each of his four surviving children have suffered and will continue to suffer damages as follows:

A.      The Estate:

     a.    Loss of earnings of the deceased from the date of injury to the date of death, less lost support of survivors excluding contributions in kind, with interest. Loss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death, reduced to present money value; and

     b.    Medical and funeral expenses due to the decedent's injury or death that have become a charge against her or his estate or that were paid by or on behalf of the decedent.

B.      Each Survivor:

     a.    The loss of support and services from the date of the decedent's injury to his death, with interest, and future loss of support and services from the date of death and reduced to present value; and

      b.   Lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury.

## COUNT I
## CLAIM UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT CITY OF KEY WEST

50.    Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

51.    At all material times the Decedent CHARLES EIMERS was denied his clearly established constitutional rights in violation of 42.U.S.C. 1983.   In particular, MR. EIMERS' was, as indicated above, subjected to excessive use of force during his arrest on South Beach in Key West of the Defendant Police Officers acting in the course and scope of their employment and under color of state law, which excessive force was implemented or executed a policy statement, ordinance, regulation, or decision officially adopted, ratified and promulgated by the Defendant CITY OF KEY WEST, or was visited pursuant to governmental "custom" even though such custom has not received formal approval through the City of Key West's official decision-making channels.

52.    The Defendant Officers' use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

      a.   61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

      b.   MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

    c.  MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp; and

    d.  MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it.

53.  Defendant, CITY OF KEY WEST, at all times material hereto, has acted with deliberate indifference in failing to adequately train its police officers in the use of prone restraint on sand.

54.  The island of Key West has numerous beach locations which attract hundreds of thousands of people on a yearly basis.

55.  The need for a particular type of police training may be obvious where the police face clear constitutional duties in recurrent situations, that a City's failure to implement such training is alone sufficient to establish a City's deliberate indifference to the risks the situations pose, making the City liable under § 1983.  *See Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Admittedly, the Supreme Court has characterized this "as simply hypothesizing in a narrow range of circumstances that a plaintiff might succeed without showing a pattern of constitutional violations."  *Gold v.*

*City of Miami,* 151 F.3d 1346, 1352 (11th Cir. 1998) *citing Board of County Commissioners v. Brown,* 520 U.S. 391, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).  The Court did, however, give an "example of a need to train being 'so obvious' without prior constitutional violations:  The use of deadly force where firearms are provided to police officers." *Gold* at 352*, citing Canton.*  This situation here is sufficiently similar to that example:  Given the inherent potential risks and dangers associated with, and constitutional duties engendered by, the use of prone restraint in sand, the CITY OF KEY WEST did/does not require such training even though arrests in the sand have happened and will continue to happen, and thus the need for such training is obvious.

56.   Officer Richard Thomas, the training officer for KWPD, testified that prone restraint in the sand had occurred prior to this incident and, in fact, that such restraint frequently occurs in the City.

57.   Officer Thomas further testified that none of the Defendant officers were trained in the use of prone restraint on the sand, nor were they trained in the physiological aspects of what happens to a person who is prone in the sand.

58.   Sergeant Joseph Tripp testified that the City has known for years that prone restraint has previously occurred on sand and it is something that an officer may be confronted with.

59.   Sergeant Tripp confessed that even though the officers do not receive such training (prone restraint in sand) it is something that should be discussed.

60.   Further, Sergeant Tripp testified that he could not think of a single scenario where a blow to the head, of a suspect who is handcuffed and in prone-restraint in the sand, would not be excessive force.

61.   Given the certainty that arrests in Key West would take place on the sand, there was an obvious need for training, not if, but when those situations arose.

62.   Had the CITY OF KEY WEST required proper training on the use of prone restraint in sand, the defendant officers would have known that when MR. EIMERS was face-down he would have to ingest sand as he attempted to breathe.

63.   With the knowledge and understanding that officers would assuredly face situations where an arrest and use of prone restraint would take place on sand, the CITY OF KEY WEST showed deliberate indifference when it did not require its officers to train for such an event.

64.   Additionally, the Key West Police Department (hereinafter "KWPD") and the Florida Department of Law Enforcement (hereinafter "FDLE") entered into a "Memorandum of Understanding" (hereinafter "MOU") in 2003.

65.   The MOU states that pending the arrival of FDLE personnel, "the ranking member of the host agency (KPWD) will insure that the scene remains secured, physical evidence is preserved and that all law enforcement and citizen witnesses are identified and separated pending initial review." (MOU pg. 2; para. 2)

66.   Sergeant FRANCISCO ZAMORA was the ranking officer at the scene on November 28, 2013.  It was his responsibility to ensure that evidence was secure and statements of all witnesses were taken.

67.   Moreover, the inaction by the supervisor, Defendant ZAMORA, to not only stop the excessive force but to likewise participate evidences the ratification of egregious police field practices known within the law enforcement industry to result in unreasonable uses of force and deadly force resulting in fatal injuries to citizens.

68. Video evidence and testimony of the Defendant officers proves that KPWD failed in almost every respect to preserve evidence and get statements of ALL witnesses.

69. No photographs of MR. EIMERS face were taken at the scene.  The only photographs taken by the KWPD were those taken at the hospital, after the sand and blood were cleaned from MR. EIMERS face and ear.

70. Defendant LOVETTE was allowed to leave the scene with vital evidence:  His Taser audio/video.

71. According to LOVETTE, his Taser was "activated" during and after the arrest of MR. EIMERS.  The audio/video recording the "during" portion of the arrest is now missing.

72. In the portion of the Taser audio that remains, LOVETTE can clearly be heard commenting that he "dropped a fucking bomb" on MR. EIMERS and that MR. EIMERS suffered "blunt force trauma to the head from [LOVETTE]."

73. According to the Taser audio, LOVETTE acknowledged that KPWD "killed a man" and stated that "it might just be easier to bury [EIMERS]"

74. Neither ZAMORA nor LOVETTE have been punished by the CITY OF KEY WEST in relation to their respective failures to secure this critical evidence, thus the CITY OF KEY WEST has ratified their conduct in that regard, and, by necessary extension, ratified their conduct in regard to inflicting excessive force on CHARLES EIMERS.

75. Upon ZAMORA leaving the scene, Sergeant Pablo Rodriguez and Detective Todd Stevens arrived to get statements and secure evidence.  The CITY OF KEY WEST knows that Rodriguez has a history of tampering with evidence.

76.  Moreover, Rodriguez secured two videos from a female witness at the scene. Rodriguez did not turn over the second video to FDLE until six (6) months later. Rodriguez was never reprimanded by the CITY OF KEY WEST.

77.  Thomas Barnes, a witness at the scene during the time Rodriguez was present, testified that he heard an unidentified male tell a KWPD officer that he (the unidentified male) had a video of the entire event. That video has never surfaced and the identity of the man is still unknown.

78.  This was not the first time Rodriguez attempted to hide/conceal evidence. Earlier this year the CITY OF KEY WEST settled a claim with a former KPWD officer for $287,000 based on allegations that RODRIGUEZ wanted video evidence destroyed.

79.  Instead of taking his statement, Defendant WANCIAK threatened an unknown male NYPD officer with arrest because the NYPD officer made a claim that KWPD "excessively Tased" MR. EIMERS.

80.  Defendant DEL VALLE testified that instead of taking witness statements he told witnesses to leave.

81.  Plaintiff's counsel secured additional video footage taken by an eye witness depicting MR. EIMERS horrific death. This video should have been secured by the KWPD.

82.  An unknown officer can be heard on the latest video telling witness to "move out of the area and clear the pier."

83.  The only statements taken by officers at the scene were statements by two Alabama residents. These statements were only procured because they placed KWPD in a good light.

84.     Witnesses who had negative comments were either told to leave or were allowed to walk away without giving statements.

85.     Further, none of the officers captured the detention and death of MR. EIMERS on their body microphones affixed to their uniforms, as ostensibly mandated by department policy.

86.     Defendant, CITY OF KEY WEST, at all times material hereto, has and implemented a policy of inadequate investigation that allows an environment for the use of unreasonable force because officers may believe they will not be held accountable for the consequences of using excessive force.

87.     The MOU states that FDLE, as an "impartial" agency, would "conduct such investigations for the City of Key West Police Department….in investigating instances in which a law enforcement officer, acting in the line of duty, shoots a person, or when an arrestee expires while in the custody of a law enforcement or corrections officer."

88.     In Key West, FDLE agents are not "impartial" when it comes to investigating KWPD officers.

89.     The lead investigator for FDLE into the in-custody death of MR. EIMERS was Special Agent Kathy Smith, who is the ex-wife of former KWPD Captain Scott Smith.

90.     Captain Scott Smith was the Operations Commander for KWPD during the Eimers incident and investigation by FDLE.

91.     All of the Defendant Officers were under his command.

92.     On December 4, 2013, the day MR. EIMERS was taken off of life support, Captain Smith applied for the position of Special Agent with the FDLE.

93.   Moreover, Kathy Smith was placed on administrative leave pending an investigation of alleged mortgage fraud committed by her and Scott Smith.

94.   A clear conflict existed with the FDLE agent in charge and the department she was investigating.  The CITY OF KEY WEST has known of this conflict for years and has done nothing about it.

95.   According to the MOU, an internal affairs or administrative investigation by KWPD can only begin after a final criminal investigation and determination by the State Attorney's Office.

96.   KWPD's "inquest" process after in-custody deaths is inadequate because its reliance on the prosecutor's investigation and filing decision is unreasonable and inconsistent with generally accepted police supervisory practices.

97.   This is particularly true inasmuch as the prosecutor's investigation and filing decision were rigged to fail to result in a true bill passing out of any grand jury proceedings.  The prosecutor purposely presented only certain of the evidence available, and did so in a way, to guarantee a failed result, including retaining a so-called use-of-force expert who has apparently never found any officer's use-of-force excessive in his lifetime.  The prosecutor plainly felt the need to do so, insofar as the successful prosecution of all criminal cases pending and in the future depended on KWPD cooperation.  An indictment of any KWPD officer would result in KWPD denial of that cooperation and cause the criminal system to grind to a halt.  The prosecutor's office and KWPD needed and depended on each other.  And the CITY OF KEY WEST knew all of this.

98.   The failure by KWPD to conduct a timely internal administrative investigation into excessive force incidences constitutes deliberate indifference against citizens by the

ratification of egregious police field practices known within the law enforcement industry to result in unreasonable uses of force and deadly force resulting in fatal injuries to citizens.

99.     Despite Sergeant Tripp's testimony that he could not think of a single scenario where a blow to the head of a suspect who is handcuffed and in prone-restraint in the sand would not be excessive force, Sergeant Tripp refused to do an internal affairs investigation into whether excessive force was used, relying solely on the criminal findings of FDLE and the Grand Jury.

100.    The failure of the CITY OF KEY WEST to perform an internal affairs investigation with respect to excessive force, despite contrary video evidence and numerous admissions made by LOVETTE, constitutes deliberate indifference against citizens by the ratification of egregious police field practices known within the law enforcement industry to result in unreasonable uses of force and deadly force resulting in fatal injuries to citizens.

101.    This inadequate inquest process allowed an environment for the use of excessive force, because officers knew they will not be held accountable for the consequences of using excessive force.

102.    The recent results of the internal affairs investigation which found the Defendant officers did not use unreasonable force, over a year after MR. EIMERS' death, despite the existence of video evidence to the contrary, constitutes deliberate indifference against citizens by the ratification of egregious police field practices known within the law enforcement industry to result in unreasonable uses of force and deadly force resulting in fatal injuries to citizens.

103.   The recent results of the internal affairs investigation which recognized the loss of crucial evidence at the scene but nonetheless neglected to so much as reprimand the culpable officers constitutes deliberate indifference against citizens by the ratification of egregious police field practices known within the law enforcement industry to result in unreasonable uses of force and deadly force resulting in fatal injuries to citizens.

104.   These acts, omissions, and acquiesces creates an environment which would allow an officer to engage in improper use of excessive and deadly force and were factors that were significant and causal in the death of CHARLES EIMERS.

105.   These shortcomings amount to "deliberate indifference" and an actionable § 1983 municipality claim. *See Canton v. Harris*, 489 U.S. 378, 388–89[, 109 S.Ct. 1197, 103 L.Ed.2d 412] (1989).

106.   As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

   **WHEREFORE**, Plaintiff, demands judgment against Defendant CITY OF KEY WEST under 42 U.S.C. § 1983 for compensatory damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT II**
**CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT**
**GABRIEL HUMBERTO GARRIDO**

107.   Plaintiff reavers paragraphs 1-4 as if fully alleged herein.

108.   The Defendant's use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

    a.   61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

    b.   MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

    c.   MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

    d.   MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it; and

    e.   Other facts as may become known during discovery.

109.   As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against Defendant GABRIEL HUMBERTO GARRIDO individually under 42 U.S.C. § 1983 for violating CHARLES

EIMERS' civil rights and causing CHARLES EIMERS' death for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

## COUNT III
## CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT AGAINST DEFENDANT GABRIEL HUMBERTO GARRIDO

110. Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

111. At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

112. At all material times Defendant breached this duty of care in one, more or all of the following respects:

    a. Engaging in the prone restraint of MR. EIMERS on sand;

    b. Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in air or sufficient air into his lungs and could not inhale air without ingesting or inhaling sand; causing MR. EIMERS' airways to become blocked and become blocked for such a length of time that he stopped breathing, turned blue, lost consciousness and ultimately died; and/or

    c. Failing to act to stop other officers from using excessive force upon MR. EIMERS while he was prone and restrained on the sand.

113. The acts, events, or omissions of action which the Defendant GABRIEL HUMBERTO GARRIDO committed in the course and scope of his employment with the Key West Police Department, as described above, were in bad faith or with malicious purpose or in

a manner exhibiting wanton and willful disregard of human rights, safety, or property, proximately causing the death of Decedent.

114.    As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

WHEREFORE, Plaintiff, demands judgment against the Defendant under Florida's Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT IV**
**CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT**
**KATHYANN WANCIAK**

115.    Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

116.    The Defendant's use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

    a.   61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

    b.   MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

    c.   MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at

some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

d. MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it; and

e. Other facts as may become known during discovery.

117. As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant KATHYANN WANCIAK individually under 42 U.S.C. § 1983 for violating CHARLES EIMERS' civil rights and causing CHARLES EIMERS' death, for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT V**
**CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT AGAINST DEFENDANT KATHYANN WANCIAK**

118. Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

119. At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

120.    At all material times Defendant breached this duty of care in one, more or all of the following respects:

      a.   Engaging in the prone restraint of MR. EIMERS on sand;

      b.   Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in air or sufficient air into his lungs and could not inhale air without ingesting or inhaling sand; causing MR. EIMERS' airways to become blocked and become blocked for such a length of time that he stopped breathing, turned blue, lost consciousness and ultimately died; and/or

      c.   Failing to act to stop other officers from using excessive force upon MR. EIMERS while he was prone and restrained on the sand.

121.    The acts, events, or omissions of action which the Defendant KATHYANN WANCIAK committed in the course and scope of his employment with the Key West Police Department, as described above, were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, proximately causing the death of Decedent.

122.    As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant under Florida's Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

## COUNT VI
## CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT GARY LEE LOVETTE

123.   Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

124.   The Defendant's use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

    a.   61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

    b.   MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

    c.   MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

    d.   MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it;

    e.   Defendant LOVETTE laughed, joked and bragged about the excessive force he committed on MR. EIMERS, which further evinces the gratuitous, malicious or depraved state of LOVETTE'S actions:  LOVETTE laughingly remarked that elbow to MR. EIMER'S head "sure quieted [EIMERS] down;" LOVETTE, after returning from out of town and learning of EIMERS' death, laughed and remarked, "There's no way he's dead, otherwise I'd still be away;" when told after EIMERS' death not to tase anybody, LOVETTE chuckled and commented, "I've already killed someone doing that, I won't be doing it again;" and when teasingly asked to tase someone else after EIMERS' death, LOVETTE responded, "I already got away with that once, don't think I can get away with it again;" and

    f.   Other facts as may become known during discovery.

125.    As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

    **WHEREFORE**, Plaintiff, demands judgment against the Defendant GARY LEE LOVETTE individually under 42 U.S.C. § 1983 for violating CHALRES EIMERS' civil rights and causing CHARLES EIMERS' death for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT VII**
**CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT AGAINST DEFENDANT GARY LEE LOVETTE**

126.    Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

127.    At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

128.    At all material times Defendant breached this duty of care in one, more or all of the following respects:

    a.    Engaging in the prone restraint of MR. EIMERS on sand;

    b.    Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in air or sufficient air into his lungs and could not inhale air without ingesting or inhaling sand; causing MR. EIMERS' airways to become blocked and become blocked for such a length of time that he stopped breathing, turned blue, lost consciousness and ultimately died; and/or

    c.    Failing to act to stop other officers from using excessive force upon MR. EIMERS while he was prone and restrained on the sand.

129.    The acts, events, or omissions of action which the Defendant GARY LEE LOVETTE committed in the course and scope of his employment with the Key West Police Department, as described above, were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, proximately causing the death of Decedent.   Indeed, Defendant LOVETTE laughed, joked and bragged about the excessive force he committed on MR. EIMERS, which further evinces that LOVETTE'S acts, events or omissions of action were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property:  LOVETTE laughingly remarked that elbow to MR. EIMER'S head "sure quieted [EIMERS] down;" LOVETTE, after returning from out of town and

learning of EIMERS' death, laughed and remarked, "There's no way he's dead, otherwise I'd still be away;" when told after EIMERS' death not to tase anybody, LOVETTE chuckled and commented, "I've already killed someone doing that, I won't be doing it again;" and when teasingly asked to tase someone else after EIMERS' death, LOVETTE responded, "I already got away with that once, don't think I can get away with it again."

130.   As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant under Florida's Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

### COUNT VIII
### CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT MATTHEW JOHNSON

131.   Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

132.   The Defendant's use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

    a.   61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

    b.   MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a

Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

c.  MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

d.  MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it; and

e.  Other facts as may become known during discovery.

133.  As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant MATTHEW JOHNSON individually under 42 U.S.C. § 1983 for violating CHARLES EIMERS' civil rights and causing CHARLES EIMERS' death for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT IX**
**CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT**
**AGAINST DEFENDANT MATTHEW JOHNSON**

134.    Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

135.    At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

136.    At all material times Defendant breached this duty of care in one, more or all of the following respects:

      d.   Engaging in the prone restraint of MR. EIMERS on sand;

      a.   Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in air or sufficient air into his lungs and could not inhale air without ingesting or inhaling sand; causing MR. EIMERS' airways to become blocked and become blocked for such a length of time that he stopped breathing, turned blue, lost consciousness and ultimately died; and/or

      b.   Failing to act to stop other officers from using excessive force upon MR. EIMERS while he was prone and restrained on the sand.

137.    The acts, events, or omissions of action which the Defendant MATTHEW JOHNSON committed in the course and scope of his employment with the Key West Police Department, as described above, were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, proximately causing the death of Decedent.

138.    As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant under Florida's Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT X**
**CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT**
**FRANCISCO ZAMORA**

139. Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

140. The Defendant's use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

    a.  61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

    b.  MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

    c.  MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

    d.  MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to

turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it; and

    e.   Other facts as may become known during discovery.

141.   As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant FRANCISCO ZAMORA individually under 42 U.S.C. § 1983 for violating CHARLES EIMERS' civil rights and causing CHARLES EIMERS' death, for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

## COUNT XI
## CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT AGAINST DEFENDANT FRANCISCO ZAMORA

142.   Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

143.   At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

144.   At all material times Defendant breached this duty of care in one, more or all of the following respects:

    c.   Engaging in the prone restraint of MR. EIMERS on sand;

    a.   Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in air or sufficient air into his lungs and could not inhale air without ingesting or

inhaling sand; causing MR. EIMERS' airways to become blocked and become

blocked for such a length of time that he stopped breathing, turned blue, lost

consciousness and ultimately died; and/or

    b.   Failing to act to stop other officers from using excessive force upon MR.

       EIMERS while he was prone and restrained on the sand.

145.    The acts, events, or omissions of action which the Defendant FRANCISCO ZAMORA

committed in the course and scope of his employment with the Key West Police

Department, as described above, were in bad faith or with malicious purpose or in a

manner exhibiting wanton and willful disregard of human rights, safety, or property,

proximately causing the death of Decedent.

146.    As a direct and proximate result of the foregoing actions and inactions MR. EIMERS'

died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant under Florida's

Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and

costs, and further demands trial by jury for all issues so triable.

## COUNT XII
## CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT
## THADDEUS CALVERT

147.    Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

148.    The Defendant's use of force was objectively unreasonable, extreme, disproportionate,

gratuitous and/or applied maliciously and sadistically for the purpose of causing harm

because, as previously alleged:

    a.  61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

    b.  MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

    c.  MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

    d.  MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it; and

    e.  Other facts as may become known during discovery.

149.  As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant THADDEUS CALVERT individually under 42 U.S.C. § 1983 for violating CHARLES EIMERS' civil

rights and causing CHARLES EIMERS' death for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

## COUNT XIII
## CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT AGAINST DEFENDANT THADDEUS CALVERT

150.  Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

151.  At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

152.  At all material times Defendant breached this duty of care in one, more or all of the following respects:

    c.  Engaging in the prone restraint of MR. EIMERS on sand;

    a.  Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in air or sufficient air into his lungs and could not inhale air without ingesting or inhaling sand; causing MR. EIMERS' airways to become blocked and become blocked for such a length of time that he stopped breathing, turned blue, lost consciousness and ultimately died; and/or

    b.  Failing to act to stop other officers from using excessive force upon MR. EIMERS while he was prone and restrained on the sand.

153.  The acts, events, or omissions of action which the Defendant THADEUS CALVERT committed in the course and scope of his employment with the Key West Police Department, as described above, were in bad faith or with malicious purpose or in a

manner exhibiting wanton and willful disregard of human rights, safety, or property, proximately causing the death of Decedent.

154.    As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant under Florida's Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT XIV**
**CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT DEREK WALLIS**

155.    Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

156.    To the extent the Defendant participated in the use of force, the Defendant's use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

   a.   61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

   b.   MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

   c.   MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at

some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

d. MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it; and

e. Other facts as may become known during discovery.

157. Minimally, Defendant was present at the scene of the arrest and failed to take reasonable steps to protect CHARLES EIMERS from the other Officers' use of excessive force and as such Defendant is subject to liability for his non-feasance.

158. Defendant was in a position to intervene yet failed to so do or do anything to stop the excessive forces being exerted upon MR. EIMERS.

159. Defendant could have stopped the excessive forces being exerted upon MR. EIMERS and prevented MR. EIMERS' death.

160. As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant DEREK WALLIS individually under 42 U.S.C. § 1983 for violating CHARLES EIMERS' civil rights and causing CHARLES EIMERS' death for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT XV**
**CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT**
**AGAINST DEFENDANT DEREK WALLIS**

161.    Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

162.    At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

163.    At all material times Defendant breached this duty of care in one, more or all of the following respects:

    c.    Engaging in the prone restraint of MR. EIMERS on sand;

    a.    Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in air or sufficient air into his lungs and could not inhale air without ingesting or inhaling sand; causing MR. EIMERS' airways to become blocked and become blocked for such a length of time that he stopped breathing, turned blue, lost consciousness and ultimately died; and/or

    b.    Failing to act to stop other officers from using excessive force upon MR. EIMERS while he was prone and restrained on the sand.

164.    The acts, events, or omissions of action which the Defendant DEREK WALLIS committed in the course and scope of his employment with the Key West Police Department, as described above, were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, proximately causing the death of Decedent.

165.    As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant under Florida's Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

## COUNT XVI
## CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT NICHOLAS GALBO

166.   Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

167.   To the extent the Defendant participated in the use of force, the Defendant's use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

    a.   61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

    b.   MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

    c.   MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

    d.   MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's

Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it; and

e.   Other facts as may become known during discovery.

168.   Minimally, Defendant was present at the scene of the arrest and failed to take reasonable steps to protect CHARLES EIMERS from the other Officers' use of excessive force and as such Defendant is subject to liability for his non-feasance.

169.   Defendant was in a position to intervene yet failed to so do or do anything to stop the excessive forces being exerted upon MR. EIMERS.

170.   Defendant could have stopped the excessive forces being exerted upon MR. EIMERS and prevented MR. EIMERS' death.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant NICHOLAS GALBO individually under 42 U.S.C. § 1983 for violating CHARLES EIMERS' civil rights and causing CHARLES EIMERS' death for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT XVII**
**CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT**
**AGAINST DEFENDANT NICHOLAS GALBO**

171.   Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

172.   At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

173.   At all material times Defendant breached this duty of care in one, more or all of the following respects:

    c.   Engaging in the prone restraint of MR. EIMERS on sand;

    a.   Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in air or sufficient air into his lungs and could not inhale air without ingesting or inhaling sand; causing MR. EIMERS' airways to become blocked and become blocked for such a length of time that he stopped breathing, turned blue, lost consciousness and ultimately died; and/or

    b.   Failing to act to stop other officers from using excessive force upon MR. EIMERS while he was prone and restrained on the sand.

174.   The acts, events, or omissions of action which the Defendant NICHOLAS GALBO committed in the course and scope of his employment with the Key West Police Department, as described above, were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, proximately causing the death of Decedent.

175.   As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant under Florida's Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

**COUNT XVIII**
**CLAIM OF EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT HENRY DEL VALLE**

176.   Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

177.   To the extent the Defendant participated in the use of force, the Defendant's use of force was objectively unreasonable, extreme, disproportionate, gratuitous and/or applied maliciously and sadistically for the purpose of causing harm because, as previously alleged:

      a.   61 year old MR. EIMERS was unarmed and complied with the all instructions given to him by the police officers on the scene, including laying down on his stomach on the beach with his hands out to the side;

      b.   MR. EIMERS was handcuffed, hobbled, physically pinned by multiple officers, screamed at and intimidated, threatened with drawn fire arms and a Taser, elbowed in the head and rendered unconscious or immobile, and possibly Tased despite all of the above;

      c.   MR. EIMERS' was on the ground, bloodied and bleeding from his head and wrists, had his airway passages obstructed by sand and inhaled sand, had at some point from the sand or forces forcibly exerted upon his chest and head, stopped breathing, turned blue and then went limp;

      d.   MR. EIMERS' inability to expand his lungs and inhale oxygen normally due to several officers' body weight pressure on his back and chest, his body's Taser response and increased need for respiration and oxygen, his attempts to turn and free his blocked airways from the unforgiving sand which he was being forced to ingest, and the blow to the back of his head, and each would, as a matter of common sense, cause the human body to move and push against the limiting forces exerted upon it; and

     e.   Other facts as may become known during discovery.

178.   Minimally, Defendant was present at the scene of the arrest and failed to take reasonable steps to protect CHARLES EIMERS from the other Officers' use of excessive force and as such Defendant is subject to liability for his non-feasance.

179.   Defendant was in a position to intervene yet failed to so do or do anything to stop the excessive forces being exerted upon MR. EIMERS.

180.   Defendant could have stopped the excessive forces being exerted upon MR. EIMERS and prevented MR. EIMERS' death.

**WHEREFORE**, Plaintiff, demands judgment against the Defendant HENRY DEL VALLE individually under 42 U.S.C. § 1983 for violating CHARLES EIMERS' civil rights and causing CHARLES EIMERS' death for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

## COUNT XIX
## CLAIM OF WRONGFUL DEATH UNDER FLORIDA'S WRONGFUL DEATH ACT AGAINST DEFENDANT HENRY DEL VALLE

181.   Plaintiff reavers paragraphs 1-49 as if fully alleged herein.

182.   At all material times Defendant had a duty to CHARLES EIMERS to exercise reasonable care in the manner, method and means of effecting his arrest.

183.   At all material times Defendant breached this duty of care in one, more or all of the following respects:

     a.   Engaging in the prone restraint of MR. EIMERS on sand;

     a.   Participating in the pinning, cuffing, hobbling, striking and immobilizing of MR. EIMERS such that he could not fully expand his lungs, could not take in

air or sufficient air into his lungs and could not inhale air without ingesting or inhaling sand; causing MR. EIMERS' airways to become blocked and become blocked for such a length of time that he stopped breathing, turned blue, lost consciousness and ultimately died; and/or

  b.  Failing to act to stop other officers from using excessive force upon MR. EIMERS while he was prone and restrained on the sand.

184.  The acts, events, or omissions of action which the Defendant HENRY DEL VALLE committed in the course and scope of his employment with the Key West Police Department, as described above, were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, proximately causing the death of Decedent.

185.  As a direct and proximate result of the foregoing actions and inactions MR. EIMERS' died and his Estate and Survivors suffered the damages set forth in Paragraph 49, above.

  **WHEREFORE**, Plaintiff, demands judgment against the Defendant under Florida's Wrongful Death Act for compensatory damages, punitive damages, attorney's fees and costs, and further demands trial by jury for all issues so triable.

Submitted this 6th day of January, 2015,

*CO-COUNSEL FOR THE PLAINTIFF:*

**HORAN, WALLACE & HIGGINS, LLP**
608 Whitehead Street
Key West, Florida 33040
Telephone No.: (305) 294-4585
Facsimile No.: (305) 294-7822
**David Paul Horan, Esq.**
Florida Bar No.: 142474
E-mail: dph@horan-wallace.com

**THE MCKEE LAW GROUP, LLC**
17150 Royal Palm Blvd., Suite 1
Weston, FL 33327
Telephone No.: (954) 888-9877
Facsimile No.: (954) 217-0150
**Robert J. McKee, Esq.**
Florida Bar No.: 972614
E-mail:  rmckee@themckeelawgroup.com

**LEWIS LEGAL GROUP, P.A.**
17150 Royal Palm Blvd., Suite 1
Weston, FL 33326
Telephone No.: (954) 888-9877
Facsimile No.: (954) 217-0150
**Jeannete C. Lewis, Esq.**
Florida Bar No.: 987565
E-mail:jlewis@lewislegalgroup.com

**BRILL & RINALDI, THE LAW FIRM**
17150 Royal Palm Blvd., Suite 2
Weston, FL 33326
Telephone No.: (954) 876-4344
Facsimile No.: (954) 384-6226
**David W. Brill, Esq.**
Florida Bar No.: 0959560
E-mail:david@brillrinaldi.com
**Joseph J. Rinaldi, Jr., Esq.**
Florida Bar No.: 0581941
E-mail:joe@brillrinaldi.com

By:_/s/ _David W. Brill_____
    David W. Brill