UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 14-cv-10028-MARTINEZ-GOODMAN

TREAVOR EIMERS, as Personal Representative
of the Estate of Charles Eimers, Deceased,

      Plaintiff,

vs.

CITY OF KEY WEST, et al.,

      Defendants.

_____/

## DEFENDANTS, CITY OF KEY WEST'S, ET AL., MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendants, CITY OF KEY WEST ("City"), HENRY DEL VALLE, GABRIEL HUMBERTO GARRIDO, GUSTAVO ADOLFO MEDINA, KATHYANN WANCIAK, MATTHEW JOHNSON, FRANCISCO ZAMORA, THADDEUS CALVERT, DEREK WALLIS, and NICHOLAS GALBO (individual Defendants collectively referred to "Defendant Officers"), by and through their undersigned attorneys, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby move for final summary judgment and request entry of a final judgment in their favor on all claims asserted against them.[1]

### I. INTRODUCTION

On Thanksgiving morning 2013, Charles Eimers ("Eimers") choose to flee from a valid traffic stop after he had been pulled over by a Key West Police Department ("KWPD") officer driving a marked KWPD vehicle. Eimers' decision to flee from the traffic stop converted a likely misdemeanor into a third degree felony. Eimers then choose to continue to flee after being followed

_____

[1] The Defendants have filed a Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment concurrently with this Motion. The "undisputed facts" upon which this motion is based are cited in this memorandum as (Facts at ¶ __.).

by multiple units from the KWPD.  During his continued flight, Eimers' reckless and dangerous driving constituted a substantial danger to the public from raising his crime to the level of a second degree felony.

The vehicle portion of Eimers' efforts to allude the KWPD police came to end when he drove onto the beach in front of the Southernmost Beach Café and ran out of places to drive.  Eimers exited his vehicle as KWPD officers arrived on the scene and walked further onto the beach.  Eimers complied with the officers' initial commands to lay down in the sand.  As more officers arrived on the scene, Officer Garrido moved in to handcuff Eimers.

Unbeknownst to Officer Garrido of any other member of the KWPD, Eimers was suffering from chronic congestive heart failure so significant that he was at an increased risk of sudden death due to either a chaotic cardiac rhythm or a worsening of his congestive heart failure.  In fact, he been hospitalized twice in the last two months because of his chronic congestive heart failure.

As Officer Garrido went to cuff Eimers' right wrist, Eimers began to physically resist his efforts.  The Defendant Officers all participated to varying degrees in the effort to detain him.  None of the Defendant Officers punched, kicked, or struck any part of Eimers' body including his head and none of the Defendant Officers used their tasers on Eimers.  During the approximately two-minutes and thirty seconds it took detain Eimers, he became unresponsive.  Medical rescue personnel were called and KWPD officers performed cardiopulmonary resuscitation ("CPR").  Eimers was transported to Lower Keys Medical Center where he was placed on life support, which was removed on December 4, 2014.  An autopsy was performed and the medical experts all opined that Eimers died from total deprivation of oxygen to the brain (anoxic encephalopathy) following cardiac arrest (cardiac dysrhythmia) due to his congestive heart failure (dilated cardiomyopathy) and that the

struggle with the police was a contributing factor in the dysrhythmia which caused Eimers' heart to stop functioning.  The Plaintiff, TREAVOR EIMERS, as Personal Representative of the Estate of Charles Eimers has now filed suit against the Defendant Officers and the City for excessive force under the Fourth Amendment and for wrongful death under Florida law.

Much of the encounter between the KWPD and Eimers was video recorded by tourists and those videos are now in possession of the parties.  These videos along with other video evidence, medical evidence, and undisputed testimony establish, as a matter law, that any force used by the Defendant Officers was reasonable and that all of the Defendant Officers are entitled to qualified immunity.

## II. MOTION

1.      The 19-count Second Amended Complaint asserts claims based on Eimers' death against the City and each of the Defendant Officers under 42 U.S.C. §1983 for alleged excessive force and state law for wrongful death.[2]  DE 141.

2.      The pleadings, depositions, answers to interrogatories, affidavits, and other documents on file demonstrate that there is no genuine issue as to any material fact and that the Defendants are entitled to judgment as a matter of law with respect to all claims asserted in the Second Amended Complaint.

3.      The Defendant Officers are entitled to judgment as a matter of law with respect to the §1983 excessive force claims because (1) any force used by the Defendant Officers was objectively

---

[2] While the Plaintiff previously asserted a claim under Florida's Wrongful Death Act, he has abandoned that claim in the Second Amended Complaint.  Similarly, while Officer Medina is named in the caption of the Second Amended Complaint, the Plaintiff has not raised any specific claims against him.  Since the Plaintiff has abandoned his claims against Medina, judgment should be entered in Medina's favor.

reasonably and (2) the Defendant Officers are entitled to qualified immunity.

4.      The Defendant Officers are entitled to judgment as a matter of law with respect to the Florida wrongful death claim because (1) any force used by the Defendant Officers was objectively reasonably, (2) the Plaintiff cannot show that any individual Defendant Officer's actions "more than likely" caused Eimers' death, and (3) they have immunity pursuant to section 768.28(9), Florida Statutes.  In the alternative, in the absence of a viable federal claim, the Court should decline to exercise its supplemental jurisdiction over the state law claims.

5.      The City is entitled to judgment as a matter of law with respect to the § 1983 claims because there is no basis for municipal liability.

**WHEREFORE**, Defendants request entry of an Order granting them final summary judgment on all claims asserted against them in the Second Amended Complaint.

### III.  MEMORANDUM OF LAW

### A.  The Defendant Officers are Entitled to Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities unless the official violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

"In order to receive qualified immunity, the public official must first prove that he was acting

within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee, 284 F.3d at 1194 (internal quotation marks omitted).  "[A] government official proves that he acted within his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991) (internal quotation marks omitted).

Once the defendant has established that he was acting in his discretionary capacity, the burden shifts to the plaintiff.  See Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009). "One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation.  If the facts, construed . . . in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was 'clearly established.'" Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010) (internal citations omitted).  For an official to lose qualified immunity, the plaintiff must show both that a constitutional violation occurred, and that the violation was of a clearly established right.  See id. "[T]his two-pronged analysis may be done in whatever order is deemed most appropriate for the case." Id.  (citing Pearson v. Callahan, 555 U.S. 223 (2009)).

### 1.  The Defendant Officers were Acting within their Discretionary Authority

The undisputed record evidence establishes that the Defendant Officers were acting within the scope of their discretionary authority during the effort to detain Eimers.  They were all on duty at the time and responded to Officer Celcer's call for backup after Eimers fled the traffic stop. Responding to calls for backup is unquestionably within the scope of their discretionary authority. See Apps. 8-16; Stephens v. Broward Sheriff's Office, 2014 U.S. Dist. LEXIS 170817, 19 (S.D. Fla.

5

Dec. 10, 2014) (finding that there was no real question that the defendant officer was acting within his discretionary authority, where was patrolling in his assigned area, on the night in question when he noticed the plaintiff's car in the parking lot). Since the Defendant Officers have established that they were acting in their discretionary capacity, the burden now shifts to the Plaintiff to establish (1) that a constitutional violation occurred and (2) that the right violated was "clearly established."

### 2. Any Force Used was Reasonable

The Supreme Court recognizes that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386 (1989); Rodriguez v. Farrell, 280 F.3d 1341, 1352 (11th Cir. 2002). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (internal quotation marks and citation omitted).

Force is evaluated from a purely objective standpoint and, if objectively reasonable, comports with the Fourth Amendment. Zivojinovich v. Barner, 525 F.3d 1059, 1072 (11th Cir. 2008). The "calculus of reasonableness must embody allowance for the fact that police officers are often required to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation. Graham, 490 U.S. at 396-97. Hence, it is important that a "reviewing court judge the use of force 'from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight,' and refrain from slipping into the role of a Monday-morning quarterback." Fernandez v. City of Cooper City, 207 F.3d 1371, 1377 (S.D. Fla. 2002).

In examining the officer's conduct, the court should look to the "totality of circumstances" to determine if the manner of arrest was reasonable. Draper v. Reynolds, 369 F.3d 1270, 1277 (11th

Cir. 2004). To assess whether the force used was reasonable, "courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Id. at 1277-78 (citations and footnote modified); see also Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008). The nature and degree of force needed may be measured by such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is activity resisting arrest or attempting to evade arrest by flight." Graham, 109 S.Ct. at 1872. Ultimately, the appropriate inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying motivation.'" Id.

All of the factors weigh in favor of finding that any force used by the Defendant Officers was reasonable. First, the crime at issue was relatively severe. While Eimers was initially stopped for a traffic violation, his decision to flee the traffic stop converted his crime from a likely misdemeanor in to a third degree felony. See Facts at ¶¶ 8, 10; § 316.1935(1), Fla. Stat. Eimers' conduct during his effort to flee the police including driving recklessly and placing the public in danger resulted in his crime rising to the level of second degree felony. Facts at ¶¶ 13-15; § 316.1935(3)(b), Fla. Stat.; App. 20 at 20-21. Contrary to the Plaintiff's assertion, Eimers was not be arrested "for a number of traffic violations," DE 141 at ¶ 9, Eimers was being arrested because he committed a second degree felony while attempting to flee from the lawful activities of the police.

Second, throughout the effort to arrest him, Eimers posed an immediate threat to the safety of the officers and others. The Plaintiff's own expert conceded that Eimers' driving constituted a "significant danger" to the public where Eimers was driving recklessly, exceeding the speed limit, and running through traffic lights and stops. App. 20 at 20-21. The danger continued when Eimers

drove onto a public beach not meant for driving and adjacent to an open restaurant full of patrons. Facts at ¶ 16.  Whether Eimers was unarmed was a complete unknown to the Defendants Officers as he could have been hiding a weapon.  App. 26 at 41.  It was therefore reasonable to have Eimers get into a prone position to minimize his ability to flee again or to use violence on those trying to detain him.

Moreover, Eimers' initial compliance does not guarantee continued compliance.[3]  All the Defendants Officers  knew was that Eimers had recently fled a traffic stop, had driven recklessly to avoid capture, and was in an open area near a number of patrons.  Finally, Eimers' conduct in resisting Officer Garrido's efforts to handcuff his right wrist constituted an immediate threat to the officers at the scene.

Third, Eimers resisted the Defendant Officers' efforts to detain him.  The First and Second Tourist Videos establish that Eimers resisted Officer Garrido's effort to place his right wrist in a handcuff.  App. 23 00:29-00:35; App. 24 at 00:16-00:22.  The undisputed testimony establishes that Eimers' resistance caused Officer Garrido's finger to become caught in the handcuff.  App. 9 at ¶¶ 25-26; App. 10 at ¶ 12; App. 8 at ¶ 26; App. 27 at 39, 48, 50; App. 28 at 76-77.  Eimers' continued to resist Officer Garrido's effort to remove his finger and the other Defendant Officers' efforts to restrain him by moving his legs and rolling his upper body from side to side.  App. 9 at ¶¶ 26-28; App. 10 at ¶ 12; App. 8 at ¶ 26; see App. 23 at 00:32-00:47, 00:58-01:20; App. 24.  Finally, the Defendant Officers' undisputed evidence confirms that Eimers continued to physically resist when

---

[3] In fact, the video evidence confirms that Eimers never fully complied with the Defendant Officers' commands.  He never put his hands behind his back as ordered and instead laid on the ground perched on his elbows.  App. 23; App. 24; App. 22 at 62.  Such conduct created additional concern for the Defendant Officers.  App. 22 at 63.

they began making contact with him.  See Apps. 8-16.  As a result, the undisputed evidence establishes that Eimers was resisting and that it was reasonable for the Defendant Officers to have believed so.  See  Post v. City of Fort Lauderdale, 7 F.3d 1552, 1556, 1559  (11th Cir. 1993) (concluding that the defendant was entitled to qualified immunity because, inter alia, the plaintiff "raised his hands without having been told to do so (according to the plaintiff, he did so in order to be handcuffed), and 'a reasonable officer in [the defendant]'s place could have concluded that the [chokehold the defendant] used was needed to stop [the plaintiff] from becoming violent.'");  Stephens, 2014 U.S. Dist. LEXIS 170817 at 26-27 (concluding that standing after the defendant pushed him down into his seat could be interpreted as a prelude to resistance.).

Fourth, the amount of "force" used by the Defendant Officers, whether considered individually or as a whole, was minimal under the circumstances.  Each of the Defendant Officers' conduct can be broken down as follows:

(1)   Officer del Valle: One of the first officers on scene, Officer del Valle only bent down to assist in handcuffing Eimers for approximately ten seconds before he was relieved by another officer and, after stepping back from Eimers, did not have physical contact with Eimers again until he became unresponsive and he began providing CPR.  Facts at ¶¶ 19, 26, 27; App. 8.

(2)   Officer Garrido:  Officer Garrido was the first officer to have physical contact with Eimers and his contact was limited to handcuffing Eimers' wrists, removing his own finger from between the handcuff and right wrist, and then holding Eimers' right shoulder with enough force so that he could no longer role from side to side while other officers attempted to restrain Eimers. Officer Garrido never placed his knees or on any part of his body on Eimers' body.  Facts at ¶¶ 22, 24, 25, 29, 31, 32, 39, 40, 41; App. 9.

9

(3)    <u>Officer Wanciak</u>:  While Officer Wanciak was also one of the first officers on scene, she rarely touched Eimers and stepped in toward Eimers only as needed to assist in handcuffing him. After remaining near Eimers for approximately one minute and twenty seconds (during which she never held Eimers down), an officer requested a hobble and Officer Wanciak went from the beach area to her vehicle to obtain a hobble.  Facts at ¶¶ 20, 30, 42, 47; App. 11.

(4)    <u>Officer Calvert</u>: When Officer Calvert arrived on the scene, he cleared the P.T. Cruiser and then, after seeing Eimers trying use his feet, knees, and chest to leverage part of his body off the ground, held one of Eimers' feet so that the other officers could get the restraint devices on him.  He was eventually relieved by Officer Galbo.  Facts at ¶¶ 37, 38, 43; App. 14.

(5)    <u>Officer Galbo</u>: Officer Galbo, after noticing that Eimers appeared to be dirty and that the officers engaged with him were not wearing protective gloves, put on his latex gloves and relieved Officer Calvert at Eimers' feet.  Facts at ¶¶ 43, 45; App. 16.

(6)    <u>Officer Zamora</u>:  Sergeant Zamora noticed some blood on Officer Lovette's hand, instructed Officer Lovette to go clean himself, and relieved Officer Lovette by placing his knee on Eimers' left shoulder.  Facts at ¶ 44; App. 13.

(7)    <u>Officer Medina</u>:  Officer Medina took hold of Eimers' left wrist, which had already been handcuffed, to assist in detaining and controlling Eimers and to allow Officer Garrido to remove his finger from the handcuff.  Facts at ¶¶ 34, 35, 36; App. 10.

(8)    <u>Officer Johnson</u>: When Officer Johnson exited his vehicle on Duval Street, he met with Officer Wanciak, who asked him to deliver a hobble over to the officers already on scene.  He then assisted in placing the hobble around Eimers' legs.  Facts at ¶¶ 46, 49; App. 12.

(9)    <u>Officer Wallis</u>: Officer Wallis initially searched the PT Cruiser and then, just as he

10

finished, heard someone advise that Eimers was unresponsive.  As Officer Wallis handed Sergeant Zamora the key, Officer Wallis made his first physical contact with Eimers when he may have briefly touched him as efforts began to administer CPR.  Facts at ¶¶ 59-60; App. 15

In addition, it is undisputed that the Defendant Officers did not punch, kick, or strike any part of Eimers' body including his head and did not use a taser on Eimers.[4]  Facts at ¶¶ 50-52  The force employed by the Defendant Officers consisted solely of restraining Eimers' resistance movements by handcuffing Eimers (Officer Garrido), holding of Eimers' left wrist after it was handcuffed to allow the handcuffing to be completed (Officer Medina), placing a knee on Eimers' left shoulder (Sergeant Zamora after relieving Officer Lovette somewhere between 01:31 and 01:39 mark in the App. 24), holding Eimers' right shoulder (Officer Garrido), restraining Eimers' legs from moving (Officer Calvert before being relieved by Officer Galbo), and placing a hobble around Eimers' legs (Officer Johnson).  Officers del Valle and Wanciak only briefly assisted in handcuffing Eimers, while Officer Wallis made no physical contact with Eimers until after he was unresponsive.   The entire encounter lasted only approximately two minutes and thirty seconds.  App. 24 at 00:13-02:41.

When reviewed objectively, the Defendant Officers's conduct, both individually and when taken as a whole, was reasonable.  The Defendant Officers' efforts to detain Eimers consisted of ordering Eimers to a prone position, attempting to handcuff Eimers, holding him to stop him from resisting, and placing a hobble on his legs to stop him from kicking.

Finally, the actual physical injury resulting from the Defendant Officers' conduct was minimal.  The only physical wounds present on Eimers after the incident included bruising and small abrasions on his right and left wrists and blood near his right ear.  See App. 5; App. 29; App. 24 at

---

[4] In fact, none of the Defendant Officers even displayed a taser at the scene.  Facts at ¶ 51.

03:31.  The Autopsy Report, which remains undisputed, found **no** evidence of injuries to the head or neck area such as contusions or fractures that would indicate trauma to the head or neck.  App. 5 at 3; see App. 6 at 3.

Eimers became unresponsive during the incident and then eventually died.  All of the medical evidence including the Plaintiff's own expert agree that Eimers died from total deprivation of oxygen to the brain (anoxic encephalopathy) following cardiac arrest (cardiac dysrhythmia) due to his congestive heart failure (dilated cardiomyopathy).  App. 6 at 1-2; App. 4 at 2; App. 7 at 3.  Further, all of the medical experts have opined that Eimers' struggle with the KWPD on the beach was merely a contributing factor in his death.  App. 6 at 1-2; App. 4 at 2; App. 7 at 3.  Both the Medical Examiner and the Plaintiff's expert concluded that the struggle with the police resulted in an increase in circulating catecholamines (chemicals from the adrenal glands) which would have had a deleterious effect on Eimers' compromised heart function.  App. 6 at 3; App. 4 at 2.

Under the Fourth Amendment, aggravation of an unknown, pre-existing injury is not significant.  See Rodriguez, 280 F.3d at 1351.  In Rodriguez, the officer's conduct during an arrest aggravated the plaintiff's pre-existing injury, resulting in more than twenty-five subsequent surgeries and the eventual amputation of the plaintiff's arm.  The Eleventh Circuit held that, despite the gravity of this injury, the force used by the officer did not rise to the level of a constitutional violation because he had used an otherwise "common non-excessive handcuffing technique," and had no knowledge of the plaintiff's pre-existing condition.  Rodriguez, 280 F.3d at 1351; see Wordley v. San Miguel, 567 Fed. Appx. 719, 722 (11th Cir. 2014) ("Although unfortunate, [the plaintiff's] injury occurred while Officer San Miguel attempted to secure handcuffs during the normal course of an arrest, and therefore, Officer San Miguel was not put on notice...that his actions were

potentially unlawful.").

Here, Eimers suffered cardiac arrest while being detained by the Defendant Officers.  The video confirms that Eimers choose to flee from the City's lawful traffic stop and then to resist (after initially giving some compliance) the Defendant Officers' efforts to detain him.  During the effort to restrain him, Eimers suffered a cardiac arrest.  While unfortunate, the Plaintiff's own expert conceded that Eimers "was at an increased risk of sudden death due to either a chaotic cardiac rhythm or a worsening of his congestive heart failure." App. 4 at 4; App. 6 at 2.  Aggravation of such an unknown, pre-existing condition during the lawful effort to detain Eimers does not convert the Defendant Officers' otherwise constitutional conduct into excessive force.  See Rodriguez, 280 F.3d at 1351; Wordley, 567 Fed. Appx. at 722.  As a result, all of the factors weigh heavily in finding that the amount of force used was reasonable under the totality of circumstances.[5]

Moreover, the type of restraint technique used by the Defendant Officers including the use of prone restraint is routinely found to be reasonable by the Eleventh Circuit.   In Garrett v. Athens-Clarke County, Ga., 378 F.3d 1274 (11th Cir. 2004), the court found no excessive force where an arrestee died of positional asphyxia due to being fettered.  Id. at 1280.   The court noted that police initially restrained the arrestee solely with handcuffs, then resorted to greater restraint when the arrestee kicked, resisted, and attempted to escape.  Id.  Officers sprayed the arrestee with

---

[5] In fact, the Defendant Officers submit that their conduct constitutes de minimis force under the Fourth Amendment.  Given that there is no question that the Defendant Officers had the right to arrest Eimers for a second degree felony, the lawful arrest, which involved only handcuffing, restraining, and pinning to the ground with no punches or tasing, would be considered de minimis under the Fourth Amendment.  See Woodruff, 434 F. App'x at 853; Croom, 645 F.3d at 1251-53 (11th Cir. 2011); Durruthy v. Pastor, 351 F.3d 1080, 1085 (11th Cir. 2003); Nolin, 207 F.3d at 1255; Jones v. City of Dothan, 121 F.3d 1456, 1458 (11th Cir. 1997) (per curiam); Post, 7 F.3d at 1556.

pepper spray, then immediately fettered him.  Id. at 1281 ("[Officers] restrained [arrestee] in such a way that he could not harm another officer or himself should he decide to stop being compliant, a realistic possibility given his recent words and deeds").  The Eleventh Circuit rejected plaintiff's argument that death or serious injury was a likely consequence of fettering, and noted that even reasonable uses of force pose some risk of death.  Id. at 1280 n.12; see also Cottrell v. Caldwell, 85 F.3d 1480, 1488, 1492 (11th Cir. 1996) (no excessive force, even though arrestee died of positional asphyxia due to being transported in restraints, upside-down, in a police car).

Similarly, in Fernandez, the Court found that the police officers had not used excessive force in arresting a large, obese, mentally-ill and combative man who died of positional asphyxia due to prone restraint.  207 F. Supp. 2d at 1378-80.  It noted that none of the officers ever punched, kicked or struck the arrestee with any objects, and never drew a weapon during the incident.  Id. at 1375. In addition to wrestling the arrestee to the ground, and pinning him on his stomach with an officer's knee pressed into his back, officers also sprayed pepper spray into his face.  Id. at 1378.  The Court determined that the arrestee's death was caused not by excessive force but by his "illegal, physical and prolonged resistance."  Id. at 1379-80.  Based on Garrett, Cottrell, and Fernandez, the Defendant Officers are entitled to judgment as a matter of law because their conduct was reasonable under the Fourth Amendment.[6]

_____

[6] The Defendants Officers are also entitled to judgment as a matter of law for the wrongful death claims.  First, if the Court finds that the Defendant Officers' actions were objectively reasonable as a matter of law with regard to the section 1983 claims (which they were), the Defendants are entitled to the section 776.05(1) defense to a state law wrongful death claim as a matter of law as well. Penley v. Eslinger, 605 F.3d 843, 855-56 (11th Cir. 2010); Fontanez v. Lamberti, 2011 U.S. Dist. LEXIS 109851 (S.D. Fla. Sept. 27, 2011).  Second, under Florida's Wrongful Death Act, the Plaintiff must show that each individual Defendant Officer "more than likely" caused Eimers' death.  See Gooding v. Univ. Hosp. Building, Inc., 445 So.2d 1015 (Fla. 1984); Chaskes v. Gutierrez, 116 So.3d 479 (Fla. 3d DCA 2013). Given the evidence

Throughout this proceeding, the Plaintiff has asserted that Eimers suffocated either as a result of sand in his airways or positional asphyxiation.  While the Plaintiff has continued to make the assertion, he has failed to present any evidence to support it.  The Medical Examiner found no evidence of asphyxiation from sand, App. 6 at 3, and the Plaintiff's expert conceded that suffocation from sand did not cause Eimers' death.  App. 21 at 64-65, 65 ("Q.  Are you telling me -- well, just cut to the chase.  Are you saying that the sand caused his death? ... THE WITNESS:  No. ... Q. There is no evidence you can point to of an airway obstruction caused by sand, correct?  A.  Right.").

Similarly, there is no evidence of positional asphyxiation.  The video evidence confirms that Eimers was on his side during much of the incident.  App. 23; App. 24.  Moreover, the Plaintiff's expert conceded that he could not say, within a reasonable degree of medical probability, that restraint asphyxia was a contributing cause to Eimers' death.  See App. 21 at 30-31 ("Q.  Right.  I'm going to ask my question because I think it calls for a yes or no answer.  You can't say within a reasonable degree of medical probability that the alleged restraint asphyxia caused Mr. Eimers death, correct? ... THE WITNESS:  **Correct**.") (emphasis added); App. 21 at 98 ("Q.  Now, it's your opinion, Doctor, is it not, that Mr. Eimers was not asphyxiated?  A.  Right.  **I don't think he was asphyxiated.**  I think that there may be have been a component of having difficulty breathing or feeling like he had difficulty breathing, but I think the most important thing was the cardiac arrhythmia.") (emphasis added).

Finally, there is no evidence that Eimers had any difficulty breathing before his heart stopped functioning.  On the audio and video recordings, Eimers can be heard speaking and seen moving his

---

described above, he cannot meet this burden for any of the Defendant Officers.  Third, the Defendant Officers would be entitled to judgment as a matter of law on the wrongful death claim because they have immunity pursuant to section 768.28(9), Florida Statutes.

body and kicking his legs.  While the Plaintiff speculates that Eimers may have had difficulty breathing because of his prone position or the presence of sand, no video, audio, or testimonial evidence exists in the record to support the claim.

### 3.  No Violation of Any Clearly Established Right

Even if this Court were to find that a constitutional violation occurred, it still would fail to qualify as a violation of a clearly established right.  To determine whether a right was clearly established at the time of the alleged violation, the Court must consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation  he confronted." Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (internal quotation marks omitted).  Therefore, "unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000).

As explained above, the "controlling and materially similar" case law supports the lawfulness of the Defendant Officers' conduct.   Since there is no controlling and materially similar case law which "declares" the Defendant Officers' conduct unconstitutional, they remain entitled to qualified immunity and judgment should be entered in their favor.

### 4.  No Basis for a Failure to Intervene Claim

The Plaintiff alleges that certain of the Defendant Officers failed to intervene to prevent excessive force.  It is established in the Eleventh Circuit "that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." Velazquez v. City of Hialeah, 484 F.3d 1340, 1341-42 (11th Cir. 2007) (quotation marks omitted).  "But it must also be true that the non-intervening officer

was in a position to intervene yet failed to do so." Hadley, 526 F.3d at 1331.

The Defendant Officers would remain entitled to qualified immunity even under the failure to intervene theory.  First, there has been no constitutional violation by of the Defendants including Officer Lovette.  Simultaneously with the filing of this Motion for Summary Judgment, Officer Lovette has also moved for summary judgment.  If the Court finds that Officer Lovette's Motion should be granted and that no officer committed a constitutional violation, than a failure to intervene claim also fails.

Second, it is undisputed that the Defendant Officers were unaware that Eimers may have had difficulty breathing or some kind of medical issue until Sergeant Zamora noticed that Eimers was unresponsive and called it out to the other officers.  Facts at ¶¶ 33.  If the Defendant Officers were not aware that Eimers was having difficulty breathing or some medical issue, they cannot be expected to intervene.

Third, any allegedly excessive conduct by Officer Lovette would have been too brief in nature for any of the Defendant Officers to have intervened.  To sustain a failure to intervene claim, Eimers must establish that the Defendant Officer were actually able to intervene.  Hadley, 526 F.3d at 1331.  Acts such as a single excessive blow or a single taser are the type of sudden events for which a failure to intervene claim will not lie.  In Hadley, the defendant police officers Ortivero and Gutierrez responded to a report that a man high on cocaine, Hadley, was ransacking a Publix grocery store.  Id. at 1327.  "Hadley neither resisted arrest nor posed a danger to Officer Ortivero;" nevertheless, Officer Ortivero delivered a punch to Hadley's stomach, which the Court found excessive.  Id. at 1330.  Because Officer Ortivero delivered a single unprovoked blow to Hadley, the Eleventh Circuit indicated that "Hadley presented no evidence from which a reasonable jury could

find that Gutierrez could have anticipated and then stopped Ortivero from punching Hadley once in the stomach." Id. at 1331; see Brown, 608 F.3d at n25 (officer could not be liable under theory of failure to intervene where fellow officer pushed non-resisting cooperative plaintiff back into car and spayed her with pepper spray); Harper v. Perkins, 2013 U.S. Dist. LEXIS 84613, 21, 2013 WL 3048322 (S.D. Ga. June 17, 2013) reversed on other issues 571 Fed. Appx. 906 (11th Cir. 2014) (holding that the defendant officers could not be held liable for failing to intervene where the plaintiff was only tased twice the first of which did not work).

The Plaintiff alleges in the First Amended Complaint that certain witnesses testified that Officer Lovette tased Eimers, DE 6 at ¶¶ 21, 41, and that Officer Lovette struck Eimers in the head, DE 6 at ¶ 43.  As a threshold matter, the Defendant Officers dispute that there is any objectively sufficient evidence demonstrating either of these events occurred.  The Taser Reports establish, as a matter of law, that none of the Defendant Officers including Officer Lovette fired their tasers during the time that Eimers was being detained.[7]  DE 112-7; App. 30, Ex B.  Similarly, there is no physical evidence that Eimers was struck in the head.  The Autopsy Report found no evidence of blows to the head, App. 5 at 3; see App. 6 at 3, and no eye-witness testified that it occurred notwithstanding Officer Lovette's after-the-fact exaggerations.

More importantly, even if the Court were to find some issue of material fact as to the whether Officer Lovette used a taser or whether Officer Lovette struck Eimers in the head, the Defendant Officers would remain entitled to judgment for failure to interfere claims.  In the Eleventh Circuit,

---

[7] Moreover, the Plaintiff's expert testified that, if Eimers was resisting, it would have been appropriate to use a "pain compliance" technique.  App. 20 at 52.  Under the City's Response to Resistance policy, the drive stun mode of a taser is considered a pain compliance. See App. 30., Ex. A at 2.  The Defendant Officers cannot be found to have failed to intervene to prevent a tactic that the Plaintiff's own expert opined would be appropriate.

a single strike or a single tase are the kind of fleeting acts that are too quick so as to allow any of the Defendant Officers to intervene.   See Hadley, 526 F.3d at 1331; see Brown, 608 F.3d at n25; Harper, 2013 U.S. Dist. LEXIS 84613 at 21.

## B.  No Basis for Municipal Liability

A municipality may liable under § 1983 if the execution of one of its customs or policies deprives a plaintiff of his federal constitutional rights.   Monell v. Dep't. of Social Servs., 436 U.S. 658, 691 (1978).  It may not, however, be liable under § 1983 on the basis of respondeat superior. Griffin v. City of Opa-Locka, 261 F.3d 1295, 1307 (2001).  To sue a municipality under § 1983, "the plaintiff has the burden to show that a deprivation of constitutional rights occurred as a result of an official government policy or custom."   Cooper v. Dillion, 403 F.3d 1208, 1221 (11th Cir. 2005). A local government body is liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ."  Monell, 436 U.S. at 694; Mercado v. City of Orlando, 407 F.3d 1152 (11th Cir. 2005); Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997).

A plaintiff can also demonstrate official policy by showing a government policy of inadequate training or supervision.  Am. Fed'n of Labor and Congress of Indus. Orgs. v. City of Miami, 637 F.3d 1178 (11th Cir. 2011); City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).  "A plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Bd. of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 407, 117

S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (citing City of Canton, 489 U.S. at 388); AFL-CIO, 637 F.3d at 1187 (citations omitted).

To establish that a city was "deliberately indifferent," a plaintiff must demonstrate that the municipality knew of the need to train in a particular area and that it made a deliberate choice not to take any action.  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  Deliberate indifference can be established in two ways: by showing a widespread pattern of similar constitutional violations by untrained employees or by showing that the need for training was so obvious that a municipality's failure to train its employees would result in a constitutional violation. Connick, 131 S. Ct. at 1360; Gold, 151 F.3d at 1350-52.

The Plaintiff's claim for municipal liability rests entirely on the second theory.  He alleges that the City "has acted with deliberate indifference in failing to adequately train its police officers in the use of prone restraint on sand," DE 141 at ¶ 53, and that "[t]he need for a particular type of police training may be obvious where the police face clear constitutional duties in recurrent situations, that a City's failure to implement such training is alone sufficient to establish a City's deliberate indifference to the risks the situations pose, making the City liable under § 1983." DE 141 at ¶ 55.

As a threshold matter, a "failure to train" claim can not exist independent of an underlying constitutional violation. Rooney v. Watson, 101 F.3d 1378, 1381 n.2 (11th Cir. 1996) ("The Rooneys also allege that Volusia County's failure to train officers for high speed vehicle operation leads to a cognizable cause of action under section 1983.  The Rooneys cannot maintain this cause of action, however, because the automobile accident did not rise to a level of violating their constitutional rights."); Vineyard v. County of Murray, 990 F.2d 1207, 1211 (11th Cir. 1993) (per curiam) ("Only

when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise."); see also Collins v. City of Harker Heights, 503 U.S. 115, 119 (1992); City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  Because the Plaintiff cannot establish an underlying constitutional violation by any of the Defendants, the claim against the City must fail.

Moreover, the Plaintiff's allegations as to deliberate indifference fail as a matter of law.  The Supreme Court has cautioned that the exception creating municipal liability under § 1983 for failure to train applies in only a very narrow range of circumstances, Brown, 520 U.S. at 398, and a municipality's culpability "is at its most tenuous where a claim turns on failure to train." Connick, 131 S. Ct. at 1359.  Indeed, the Supreme Court has provided only a **single hypothetical example** in dicta, recognizing an obvious need for training in the use of deadly force where firearms are provided to police officers.  See City of Canton, 489 U.S. at 390 n.10 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.").

The Plaintiff seeks to extend this hypothetical theory municipal liability to the use of prone of restraints in sand.  DE 141 at ¶ 55.  The Plaintiff's argument fails for several reasons.  First, the undisputed record evidence establishes the Defendant Officers received adequate training on the use of prone restraints.  All of the Defendant Officers were certified by the Florida Department of Law Enforcement as being fully trained.  Apps. 8-16; App. 30.  This means that each officer completed the required Basic Recruit Training (Police Academy) and passed the State Officer Certification

Examination.  App. 30.  As part of the Basic Recruit Training, the officers received instruction on the use of prone restraints in detaining or handcuffing a suspect.  App. 30.  Further, the Defendant Officers received supplemental training at the City, which included instruction on the use of prone restraints in detaining or handcuffing a suspect.  App. 30.

Second, the City has adopted an official policy regarding use of force.  App. 30., Ex. A.  The City's Response to Resistance policy provides the guidelines regarding responding to resistance and explains, among other things, the circumstances under which certain physical control tactics may be employed including restraint devices and take downs.  Id.  The Defendant Officers all received training in the City's Response to Resistance policy and received supplemental training in it periodically.  App. 30, Apps. 8-16, Exs A.

Third, there is no evidence of any prior incidents in the City were a detainee experienced a medical problem during prone restraint in the sand.  To the contrary, all of the evidence indicates that such an incident has never arisen in the past in the City.  App. 30 at ¶¶ 7-8; Apps. 8-16.  If the need for training in prone restraints in the sand was so obvious then certainly one other medical issue would have arisen in the past.  This is especially so where the Plaintiff alleges that "prone restraint in the sand had occurred prior to this incident and, in fact, that such restraint frequently occurs in the City."  DE 114 at ¶ 56.  If it happens frequently, there should be some other example of a medical issue arising if the City's training was somehow deficient.

Rejecting the Plaintiff's attempt to extend failure-to-train liability to prone restraint in the sand would be in accordance with Eleventh Circuit precedent.  Lewis, 561 F.3d at 1293 (rejecting failure-to-train liability for the use of "hobble" restraints);  Gold, 151 F.3d at 1352 (for responding to complaints about the use of handcuffs); Young v. City of Augusta, Ga., 59 F.3d 1160, 1171-72

(11th Cir. 1995) (for the identification and treatment of mentally ill inmates by jail staff); see also Gilliam, 667 F. Supp. 2d at 1293 ("The City's failure to re-train its officers on the use of their tasers every year is not a 'particularly glaring omission' because the use of a taser is distinguishable from the use of a firearm in the Supreme Court's sole hypothetical example.").

Finally, the Plaintiff's failure-to-train claims fail for an additional reason. The alleged lack of training on prone restraint in the sand was not the "moving force" behind any alleged constitutional violation. The Plaintiff's own expert conceded that suffocation from sand or positional asphyxiation did not cause Eimers' death. App. 21 at 64-65, 30-31, 98. If Eimers did not die from positional asphyxiation in the sand, than the City's alleged failure to train on prone restraint in sand could not have caused his death.

The Plaintiff's other alleged basis for municipal liability also fail. The Plaintiff argues that the City's allegedly poor investigation after the incident forms the basis for municipal liability. DE 114 at ¶¶ 64-104. However, this Court has held, "[a]n inadequate investigation following the subject incident will not sustain a claim of municipal liability, because the after-the-fact inadequate investigation could not have been the legal cause of the plaintiff's injury." Feliciano v. City of Miami Beach, 847 F. Supp. 2d 1359, 1367 (S.D. Fla. 2012); Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999) ("[A]n inadequate investigation into the January 22 shooting could not have caused Deputies Haltiner and Whitledge to use excessive force. Rather, Ms. Mettler would need to show that Ramsey County had failed to investigate previous incidents before a court could conclude the deputies at the time of the shooting believed a municipal custom allowed them to violate Shawn's rights with impunity."); Bolander v. Taser Int'l, Inc., No. 07-cv-80789, 2009 U.S. Dist. LEXIS 58394 (S.D.Fla. July 9, 2009) ("Even if the City conducted no investigation after the incident, Plaintiffs

could not show that the failure to investigate caused the use of excessive force. A different result would simply result in respondeat superior liability.").

In paragraphs 86 through 97 of the Second Amended Complaint, the Plaintiff argues the City's reliance of the FDLE and the State Attorney's Office to conduct investigations of in-custody deaths creates a basis for municipal liability.  He alleges that while the FDLE and the State Attorney's Office were theoretically independent and impartial, they are not in this case because an FDLE investigator was previously married to KWPD captain and the State Attorney's Office needed the KWPD's future cooperation or "the criminal system would grind to a halt." DE 141 at ¶¶ 88-90, 97.  These allegations fail as a matter of law.

In showing deliberate indifference in a facially valid municipal policy, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold, 151 F.3d at 1351. Deliberate indifference can also be shown by the municipality's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees . . . ." Brown, 520 U.S. at 407, 117 S. Ct. at 1390.  Either way, "[t]his high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983." Gold, 151 F.3d at 1351 n.10. As the Supreme Court has explained, "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983.  In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." City of Canton, 489 U.S. at 391-92,

24

109 S. Ct. at 1206, 103 L. Ed. 2d 412.

Here, the undisputed record evidence establishes that the City has policies both for conducting investigations of alleged officer misconduct, App. 30, Ex. D, and that it has policies in place for the investigations of in-custody deaths. DE 141 at ¶¶ 87, 95. The Plaintiff has not alleged and cannot demonstrate that these policies are unconstitutional on their face. Rather, he alleges that these policies are applied in an unconstitutional manner. See DE 141 at ¶ 88, 97. However, such allegations are insufficient given the absence of any prior incidents where these policies have failed so as to put the City on notice of the need to change policies. Without some evidence of prior notice, these allegations are insufficient, as a matter of law, to establish municipal liability.[8] See Dowell v. City of Atlanta, Case No. 1:04-CV-1837-CAP, 2006 U.S. Dist. LEXIS 85215 (N.D. Ga. July 20, 2006) (holding that the plaintiff's deliberate indifference claim failed because "[a]side from his own experiences, Dowell presented no evidence of a single prior incident in which a City police officer caused an injury by excessive force because of the policy used by the APD for investigating excessive use of force incidents in December 2002.").

Finally, the Plaintiff alleges that the City's failure to conduct an internal affairs investigation into Officer Lovette and instead to rely solely on the findings of the FDLE and the Grand Jury "constitute[d] deliberate indifference against citizens by the ratification of egregious police field practices known within the law enforcement industry to result in unreasonable uses of force and deadly force resulting in fatal injuries to citizens." DE 141 at ¶¶ 100, 98-106. Again, this allegation

---

[8] Not only is there no evidence of prior issues with this arrangement, but the City was ahead of the curve in adopting such an arrangement. Miami-Dade County recently adopted an almost identical Memorandum of Understanding with the Office State Attorney for the Eleventh Judicial District and the FDLE. See App. 35.

is insufficient to establish municipal liability.

First, the City's decision not institute an internal affairs investigation against Officer Lovette after the fact was not the moving force behind the Plaintiff's alleged constitutional violation.[9] See Feliciano, 847 F. Supp. 2d at 1367; Mettler, 165 F.3d at 1205; Bolander, No. 07-cv-80789, 2009 U.S. Dist. LEXIS 58394.

Second, the undisputed evidence establishes the absence of any prior incidents of un-investigated allegations of excessive so as to the put the City on notice of some deficiency in the City's internal affairs investigation process. Brown, 520 U.S. at 407, 117 S. Ct. at 1390; Gold, 151 F.3d at 1351; Dowell v. City of Atlanta, 2006 U.S. Dist. LEXIS 85215. Here, the undisputed evidence establishes the City has a policy for investigating allegations of police misconduct, App. 30, Ex. D, and that the policy is implemented. App. 30. The Plaintiff's failure to identify some other deficient investigation other than (allegedly) the one involving Eimers is fatal to his ability to establish a basis for municipal liability. For these reasons, judgment should be entered in favor of the City.

---

[9] Moreover, the City's alleged decision not to conduct a further investigation into whether excessive force was used is all the more reasonable given that, as explained above, none of the Defendant Officers engaged in excessive force.

Dated: January 8, 2015.

Respectfully submitted,

 /s/Michael T. Burke
Michael T. Burke, Esquire (338771)
burke@jambg.com
cardona@jambg.com
Hudson C. Gill, Esquire (15274)
Johnson, Anselmo, Murdoch,
Burke, Piper & Hochman, P.A.
2455 East Sunrise Blvd., Suite 1000
Fort Lauderdale, Florida 33304
Telephone:     (954) 463-0100
Attorneys for Defendant City of Key West

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 8th day of January, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of records or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

JOHNSON, ANSELMO, MURDOCH, BURKE,
PIPER & HOCHMAN, P.A.
*Counsel for Defendant City of Key West*
2455 East Sunrise Boulevard, Ste. 1000
Fort Lauderdale, FL 33304
Telephone: 954/463-0100

BY: */s/Michael T. Burke*
MICHAEL T. BURKE
Florida Bar No. 338771
HUDSON C. GILL
Florida Bar No. 15274

**SERVICE LIST**

David W. Brill, Esq.
Joseph J. Rinaldi, Esq.
Brill & Rinaldi, The Law Firm
17150  Royal Palm Blvd., Ste. 2
Weston, FL 33326
Phone: 954-876-4344
david@brillrinaldi.com
joe@brillrinaldi.com
Jessica@brillrinaldi.com
yamile@brillrinaldi.com

David Paul Horan, Esq.
Darren M. Horan, Esq.
Horan, Wallance & Higgins LLP
608 Whitehead St.
Key West, FL 33040
305-294-4585
dph@horan-wallace.com
darren@horan-wallace.com

Robert J. McKee, Esq.
The McKee Law Group, LLC
17150 Royal Palm Blvd., Ste. 1
Weston, FL 33327
954-888-9877
rmckee@themckeelawgroup.com
mrodriguez@themckeelawgroup.com
bserrano@themckeelawgroup.com
nrodrigues@themckeelawgroup.com

Jeannete C. Lewis, Esq.
Lewis Legal Group, P.A.
17150 Royal Palm Blvd., Ste. 1
Weston, FL 33327
954-888-9877
JLewis@lewislegalgroup.com
BCesare@lewislegalgroup.com

Rhea Pincus Grossman, Esq.
2650 W State Road 84, Ste. 103
Ft. Lauderdale, FL 33312-4882
954-791-2010
rheagrossman@comcast.net

Lyman H. Reynolds, Jr., Esq.
Roberts, Reynolds, Bedard & Tuzzio, PLLC
470 Columbia Drive, Ste. C101
West Palm Beach, FL 33409-1983
(561) 688-6560
service_LHR@rrbpa.com
lreynolds@rrbpa.com

Michael T. Burke, Esquire
JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, P.A.
2455 East Sunrise Boulevard, Suite 1000
Ft. Lauderdale, FL 33304
954-463-0100
burke@jambg.com
cardona@jambg.com